**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| TERRESTAR NETWORKS INC., *et al.*,[1] | ) | Case No. 10-[_____] ( ) |
| | ) | |
| Debtors. | ) | Joint Administration Requested |
| | ) | |

### DECLARATION OF JEFFREY W. EPSTEIN PURSUANT TO LOCAL BANKRUPTCY RULE 1007-2 IN SUPPORT OF FIRST DAY PLEADINGS

Under 28 U.S.C. § 1746, I, Jeffrey W. Epstein, declare as follows under penalty of perjury:

1.      I am Chief Executive Officer of TerreStar Networks Inc. ("***TSN***" and, together with its affiliated debtors and debtors in possession, "***TerreStar***" or the "***Debtors***").[2]  I have been employed in this and other capacities by TSN since 2006.[3]   Accordingly, I am familiar with TerreStar's day-to-day operations, business and financial affairs.

2.      On the date hereof (the "***Petition Date***"), each of the Debtors filed a petition with this Court under chapter 11 of title 11 of the United States Code (the "***Bankruptcy Code***").  The Debtors are operating their business and managing their properties as debtors in possession

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal taxpayer-identification number, are:  Motient Communications Inc. [3833]; Motient Holdings Inc. [6634]; Motient License Inc. [2431]; Motient Services Inc. [5106]; Motient Ventures Holding Inc. [6191]; MVH Holdings Inc. [9756]; TerreStar License Inc. [6537]; TerreStar National Services Inc. [6319]; TerreStar Networks Inc. [3931]; TerreStar New York Inc. [6394] (the foregoing entities are collectively referred to as the "***Domestic Debtors***"); 0887729 B.C. Ltd. [1345]; TerreStar Networks (Canada) Inc. [8766]; and TerreStar Networks Holdings (Canada) Inc. [1337] (0887729 B.C. Ltd., TerreStar Networks (Canada) Inc. and TerreStar Networks Holdings (Canada) Inc. are collectively referred to as the "***Canadian Debtors***").

[2] A chart detailing the corporate structure of the Debtors and their non-debtor affiliates (both domestic and foreign) is annexed hereto as Exhibit A.

[3] In addition to serving as an officer of TSN, I also serve as an officer of the following Debtor entities: MVH Holdings Inc., Motient Ventures Holdings Inc., TerreStar Global Ltd., TerreStar National Services Inc., TerreStar License Inc., TerreStar New York Inc. and 0887729 B.C. Ltd.  Furthermore, I serve as an officer of the following non-Debtor entities: TerreStar Corporation, TerreStar Holdings Inc. and TerreStar 1.4 Holdings LLC.

pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  Concurrently with the filing of this declaration (the "***Declaration***"), the Debtors have sought procedural consolidation and joint administration of these chapter 11 cases.

3.      To enable the Debtors to operate effectively and minimize any disruption caused by the commencement of these chapter 11 cases, the Debtors have requested certain relief in motions and applications filed with the Court on the Petition Date (collectively, the "***First Day Pleadings***").  As described herein, the First Day Pleadings seek, among other things, to provide for a debtor-in-possession financing facility, and to ensure the continuation of the Debtors' cash management system and other business operations without interruption, as well as, in general, to maintain employee confidence and morale, and establish certain other administrative procedures to promote a seamless transition into chapter 11.  I am familiar with the contents of each of the First Day Pleadings and I believe that the relief sought in each of these pleadings is necessary to permit an effective transition into chapter 11.  Indeed, I believe that the Debtors' estates would suffer immediate and irreparable harm absent the ability to immediately obtain financing and make certain essential payments and otherwise continue their business operations as sought in the First Day Pleadings.  In my opinion, approval of the relief requested in the First Day Pleadings will minimize disruptions to the Debtors' business operations, thereby preserving and maximizing the value of the Debtors' estates and assisting the Debtors in achieving a successful reorganization.

4.      I submit this Declaration pursuant to Rule 1007-2 of the Local Bankruptcy Rules for the Southern District of New York (the "***Local Rules***") to assist the Court and other parties in interest in understanding the circumstances that compelled the commencement of these chapter 11 cases and in support of the Debtors' petitions for relief under chapter 11 of the Bankruptcy

Code and the First Day Pleadings. I have reviewed the factual support set forth in each of the First Day Pleadings and attest to the accuracy thereof. Except as otherwise indicated, all facts set forth herein are based on my personal knowledge, my discussions with other members of the Debtors' senior management, my review of relevant documents, or my opinion based upon experience, knowledge, and information concerning the Debtors' operations and financial affairs. If called upon to testify, I would testify competently to the facts set forth in this Declaration. I am authorized to submit this Declaration on behalf of the Debtors.

5.    This Declaration is intended to provide a summary overview of the Debtors' business and these chapter 11 cases. Sections I through V of this Declaration provide an overview of the Debtors' business, organizational structure, capital structure, events giving rise to these chapter 11 cases, and information regarding the chapter 11 cases. Section VI summarizes the relief requested with respect to, and the support for, the Debtors' motion for entry of interim and final orders authorizing postpetition financing. Section VII summarizes the relief requested in certain of the First Day Pleadings. Finally, Section VIII lists the schedules of information required by Local Rule 1007-2.

## I.

### TerreStar's Businesses

#### A.    General Background

6.    TerreStar is a next-generation mobile satellite service operator that recently launched a wireless communications system which provides mobile satellite coverage throughout the United States (including Alaska, Hawaii, Puerto Rico and the United States Virgin Islands, as well as in U.S. territorial waters) and Canada using integrated satellite-terrestrial smartphones and other devices. A map depicting the coverage area is annexed hereto as Exhibit B. The Debtors offer this next-generation service as a wholesale mobile satellite services provider,

allowing existing terrestrial service providers to augment their existing terrestrial networks with mobile satellite coverage. Through such relationships, the Debtors' next generation mobile wireless network consists of a telecommunications network that handles multiple types of traffic over both terrestrial and satellite infrastructure. Various communications applications, including voice, data and video services, are available for use over the satellite network.

7.    TerreStar began conducting business in 1988 when TerreStar Corporation ("*TSC*") (formerly Motient Corporation) was incorporated under the laws of the State of Delaware. TerreStar Networks Inc. ("*TSN*"), a majority-owned, indirect subsidiary of TSC,[4] is the Debtors' principal operating entity.[5]

8.    The Debtors are headquartered in Reston, Virginia, with additional facilities in Richardson, Texas; New York, New York; Las Vegas, Nevada; North Salt Lake, Utah; and Lincolnshire, Illinois. The Canadian Debtors maintain offices in Ottawa, Ontario Vancouver, British Columbia, and Montreal, Quebec and have additional facilities in Toronto, Ontario and Allan Park, Ontario.

9.    Within the United States, the Debtors conduct ground operations in the states of Arizona, Florida, Indiana, Louisiana, Nevada, New Mexico, North Carolina, North Dakota, Oregon, Texas, Utah, Virginia and Washington. Within Canada, the Debtors conduct ground

---

[4] TSN is 89.3% owned by TSC (through its wholly owned subsidiaries MVH Holdings Inc. and Motient Ventures Holding Inc.) and 10.7% owned by LightSquared LP ("*LightSquared*") (f/k/a SkyTerra Communications, Inc. ("*SkyTerra*")), an affiliate of Harbinger Capital Partners and Harbinger Capital Management (together, "*Harbinger*").

[5] Two of the Debtors' non-debtor affiliates, TerreStar Global Ltd. (a Bermuda Company) and TerreStar Europe Limited (a United Kingdom Company) were also established to conduct foreign operations. TerreStar Global Ltd. holds a license to utilize an orbital slot allocated to the government of Bermuda by Ofcom, the Office of Communications, which functions as the independent regulator and competition authority for the United Kingdom communications industries. TerreStar Global Ltd. currently conducts no business or operations. TerreStar Europe Limited was established to provide coverage in certain areas of Europe; however, after an unsuccessful bid for the right to use the 2 GHz spectrum in Europe, TerreStar Europe Limited conducts no business or operations and recently has been stricken from the United Kingdom's company register.

operations in the provinces of Ontario, Alberta, British Columbia and Saskatchewan.[6]   A
diagram depicting the location of the Debtors' ground operations is annexed hereto as Exhibit C.
As of the date hereof, the Debtors employ 107 employees, 20 of which are employed by the
Debtors on an hourly basis and the remainder of which are employed by the Debtors on a full-
time, salaried basis (the "***Employees***").[7]  In addition to their Employees, the Debtors supplement
their workforce with independent contractors depending on the Debtors' business needs.

### B.    The Mobile Network

10.    The Debtors' business model is based on integrating ground-based technology
and satellite technology into a single, North American mobile communications system intended
to provide communication service in areas where traditional mobile networks currently do not
reach or are unavailable.  This next-generation network utilizes mobile satellite service ("***MSS***")[8]
using frequencies in the 2GHz band.[9]  The Debtors' next generation wireless communications

---

[6] Ground operations include the maintenance and operation of two Gateway Earth Stations, which include various network equipment, routers, satellite control links and equipment, antenna and ground based beam forming equipment ("***Ground Stations***") located in Las Vegas, Nevada and Allan Park, Ontario, as well as 15 calibration earth stations ("***CES***") located throughout the United States and five CES located throughout Canada.

[7] 101 of the Employees are solely employees of the Domestic Debtors.  Six of the Employees are employees of TerreStar Networks (Canada) Inc. ("***TSN Canada***") (collectively, the "***Canada Employees***").  The Canada Employees are also providing services to a non-Debtor affiliate, TerreStar Solutions Inc., and are directly compensated in full by that entity, which subsequently invoices TSN Canada for its apportioned amount of the compensation for the Canada Employees.

[8] Mobile satellite services (MSS) refers to satellite communication terminating or originating on non-fixed satellite receivers.  A satellite handset connection using MSS is similar to a cellular telephone except rather than using a cell phone tower to attach to the carrier's network, the satellite handset connects to a satellite, which transmits that signal.

[9] The 2 GHz band is in a range of spectrum commonly referred to as the "***S-Band***." The S-Band incorporates frequencies ranging from 2 – 3 GHz.  TerreStar License Inc. holds a license from the Federal Communications Commission (the "***FCC***") to use 20 MHz of the S-Band in the United States for integrated MSS and terrestrial use. TerreStar Networks (Canada) Inc. holds a license from ***Industry Canada***, the Canadian communications regulatory authority, to utilize the MSS portion of the same S-Band spectrum in Canada.  TerreStar Solutions Inc., a non-Debtor affiliate of the Debtors, holds a license from Industry Canada to utilize the ancillary terrestrial component ("***ATC***") portion of the same spectrum in Canada.   In addition, the Debtors have access to 8 MHz of 1.4 GHz spectrum through their non-debtor affiliate, TerreStar 1.4 Holdings LLC, which is wholly owned by TSC through its interests in TerreStar Holdings Inc.  As set forth below in paragraph 18, TerreStar 1.4 Holdings LLC has entered into the Spectrum Lease (as defined below) with respect to the 1.4 GHz spectrum, pursuant to which One Dot Four

system provides coverage in rural areas of North America where either terrestrial coverage is unobtainable because terrestrial build out is not economical for traditional wireless service providers due to the sparse user base in such areas or terrestrial build out is physically unattainable due to geographic conditions (e.g., rough terrain or waterways), or where because of extraordinary events (e.g. natural or man-made disaster) terrestrial wireless service is temporarily unavailable. Such coverage is critical for many first responders and governmental and rescue agencies, and is attractive to the media, technology, communications, logistics and distribution sectors and other sectors requiring uninterrupted wireless service, as well as to certain consumers (e.g., rural residents, outdoorsmen, adventurers and recreational maritime users).[10]

11. In connection with developing their next generation network, in 2009 the Debtors developed the world's first smartphone with integrated all-IP satellite-terrestrial voice and data capabilities (the "*GENUS*").[11] The TerreStar network, combined with the innovation of the GENUS, allows a user to have both terrestrial and satellite coverage through one device –users will be able to place calls over traditional terrestrial cellular networks (for example, through AT&T) but will be able to "roam-in" to satellite coverage on TerreStar's network when terrestrial coverage is unavailable.

---

(as defined below) manages the 1.4 GHz spectrum. The 1.4 GHz spectrum is licensed for terrestrial wireless services.

[10] This focus of enhancing today's terrestrial mobile communications networks and providing more coverage in rural and geographically isolated areas is in line with the primary objectives of the National Broadband Plan, promulgated by the United States government through the FCC on March 15, 2010, which, among other things, seeks to augment mobile broadband capacity, promote the build out of communications infrastructure in high cost areas, and fortify communication channels for emergency first responders. A copy of the National Broadband Plan can be found, and downloaded for free, at http://www.broadband.gov.

[11] The GENUS is a smartphone similar in size to today's terrestrial only wireless smartphones. Unlike other satellite phones available on the market today, the GENUS approximates other smartphones in size, appearance and utility. It offers a touch screen, full QWERTY keyboard, and is Windows Mobile OS compatible. It offers a comprehensive range of features, such as text messaging, email, web browser, WiFi and Bluetooth.

12.     The Debtors' business model is premised on acting as a wholesaler of satellite services and air time, as well as of the GENUS smartphone.  The GENUS is marketed through TerreStar's terrestrial provider partners.   Ordinarily, the GENUS will communicate over a traditional terrestrial cellular 3G network; however, users of the GENUS subscribe, through their traditional terrestrial cellular coverage provider, to have the additional service feature to "roam-in" to the satellite network when a terrestrial network is unavailable for a monthly subscription fee plus per minute or per megabit usage rates (i.e., roaming charges) that will appear on the customers' bills from the terrestrial provider.  In turn, the terrestrial provider will pay TerreStar a monthly fee for each subscribing customer in addition to a per-minute or per megabit charge for usage by customers.  Accordingly, with such a subscription the GENUS can be converted to a satellite phone with the push of a button.  Once the satellite option is selected, the phone will communicate using TerreStar's satellite based network.  This will allow customers to always be in coverage through a single, integrated device with one phone number, one email address and one bill.

13.     In addition to the existing capabilities of the network and related technology, as discussed further below, TerreStar has entered into contracts for the development of a next generation chipset that will be incorporated into a wide range of mobile devices, including small, lightweight and inexpensive handsets.  Once this chipset is available, such devices will be able to utilize all applications (including voice and data service) over the TerreStar network.  This is anticipated to considerably expand the user base of the network in the near future.

14.     TerreStar's network utilizes the "***TerreStar-1***"[12] satellite, as well as two Ground Stations and 20 calibration earth stations (the "***CES***").  The Ground Stations (one located in

---

[12] TerreStar Networks (Canada) Inc. holds title to TerreStar-1.  It has a useful life expectancy of over 15 years.

North Las Vegas, Nevada and the other in Allan Park, Ontario) serve as intercept points between the space and ground based parts of the TerreStar network. The Ground Stations perform both operational and service functions. Transmission to or from end users of the satellite service use the Ground Stations as a link between the satellite-portion of the TerreStar network and the terrestrial link to the public switched telephone network. Equipment at the Ground Stations also performs operational tasks including beam forming, satellite monitoring and satellite control. Additionally, as depicted on <u>Exhibit C</u>, the Debtors have 20 CES (15 throughout the United States and five throughout Canada). These carefully placed sites aid in the TerreStar network's ground based beam forming and satellite health monitoring. Each site collects real time data from the satellite and transmits it to the Ground Stations for processing.

15. The design of TerreStar's MSS network infrastructure has at least two major advantages over other traditional satellite networks. First, the network incorporates advanced ground based beam forming and dynamic spot beam technology. [13] These features allow the location, power and concentration of the satellite beams to be manipulated and reallocated within a few hours notice. The TerreStar network, therefore, can handle a surge in user demand in a particular geographic location with unprecedented speed. This makes TerreStar's network unparalleled in its ability to provide continuous coverage in areas where devastation by a natural or man-made disaster, damaged infrastructure, or unusual demand have compromised terrestrial communication. Second, calibration of the satellite and beam forming are conducted through earth based facilities. The design of the TerreStar network allows software and equipment

---

[13] A satellite's coverage area is comprised of various satellite beams. Satellite beams are equivalent to a cell phone tower in that they receive and transmit signals to or from capable devices within a certain area. Different satellites have different beam capabilities and characteristics. TerreStar-1 can support up to 550 "spot beams," each of which can be manipulated in size, shape, location and power within the coverage area. TerreStar's advanced beam forming capabilities allows efficient frequency re-use: high numbers of users can be active within a single beam without significantly degrading service quality. Spectral efficiency is important to a satellite's performance as satellites are frequency- and power-constrained.

updates as well as physical repairs to be performed on a wider range of satellite components than is typical for traditional space based calibration and beam forming systems.

16.     In connection with the build out of TerreStar's network, the Debtors have recently achieved several significant milestones.  They successfully launched TerreStar-1, on July 1, 2009 and placed it into its assigned[14] orbital slot.[15]   On July 20, 2009, the Debtors placed the first successful phone call over TerreStar-1 and accordingly TerreStar-1 was certified as operational on that date.  On August 27, 2009, the Debtors announced the successful completion of in-orbit testing.  In December 2009 both the FCC and the PTCRB[16] certified the GENUS handset.  On January 13, 2010, the FCC granted the Debtors authority to integrate terrestrial use of their S-Band spectrum into their next generation mobile wireless network or, in other words, approved the ancillary terrestrial component ("*ATC*")[17] of the Debtors' services.  ATC approval was a critical step in the Debtors' ability to operate a combined satellite and terrestrial network.  On September 21, 2010, AT&T announced the availability of satellite augmented mobile service through the GENUS handset to its government and enterprise customers.

---

[14] The geosynchronous slot that TerreStar-1 occupies is assigned to TerreStar Networks (Canada) Inc. by Industry Canada.  A geosynchronous orbit is one with an orbital period that matches the earth's rotation period.  The synchronization of rotation and orbital period means that for an observer at a fixed location on the surface of the Earth, a satellite in geosynchronous orbit appears at a constant fixed point above the earth.

[15] The Debtors are also in the process of building a ground spare satellite, "*TerreStar-2*," which is nearly identical to TerreStar-1 and is also designed for MSS using frequencies in the S-Band.  Currently, access to a completed and operational ground spare satellite is a requirement for TererStar's ATC authorization; however, the National Broadband Plan has proposed relaxing this criterion.  It remains to be seen whether the FCC will in fact remove the requirement for a ground spare satellite.  Nonetheless, TerreStar-2 is currently under construction at SpaceSystems/Loral ("*Loral*") and is approximately 90% complete, with approximately 95% of the construction costs having been paid.  Completion is currently scheduled for October 2011.

[16] The PTCRB is a global organization created by Mobile Network Operators to provide an independent evaluation process.

[17] Ancillary Terrestrial Component, or ATC, is ground based infrastructure in a mobile satellite system to enhance the availability, efficiency and economic viability of  the coverage of the satellite network.  ATC allows MSS providers to deploy terrestrial networks to enhance coverage in areas where the satellite signal is attenuated or unavailable.

## C. Significant Agreements and Relationships

17.     The Debtors' business enterprise is dependent in large part on a number of key agreements and other arrangements, which, among other things, provide the necessary intellectual property to the Debtors as well as allow them to reach the broadest range of potential customers who are targeted as likely users of the Debtors' planned communications systems.  Set forth below is a short summary of some of these significant relationships.

*Relationship with Harbinger/LightSquared (f/k/a SkyTerra)*

18.     TerreStar has a number of separate contractual relationships with Harbinger and certain of its affiliates.  As described herein, Harbinger is not only one of the Debtors' significant contract counterparties, but also is one of the Debtors' most significant stakeholders.  Among other things, as described in detail below, Harbinger and/or its affiliates lease rights to use the TerreStar's 1.4 GHz spectrum and have purchased prepaid satellite minutes from the Debtors.

19.     In September 2009, TerreStar 1.4 Holdings LLC ("*1.4 Holdings*"), a Delaware limited liability company and a non-Debtor entity wholly owned by non-Debtor, TerreStar Holdings Inc., entered into a Spectrum Manager Lease Agreement (the "*Spectrum Lease*") with One Dot Four Corp. ("*One Dot Four*"), an affiliate of Harbinger, under which One Dot Four acts as a manager in order to lease the rights to use certain 1.4 GHz terrestrial spectrum for which 1.4 Holdings holds FCC licenses.  The Spectrum Lease has an initial term through April 2017, renewable at One Dot Four's option for two additional terms of ten years each, in both instances subject to FCC renewal of the licenses.  Pursuant to the Spectrum Lease, One Dot Four pays 1.4 Holdings $2 million[18] per month.  Under certain conditions One Dot Four has an option, but not the obligation, to purchase the spectrum licenses.  One Dot Four also has a right of first refusal to

---

[18] Unless otherwise noted, all dollar amounts stated herein refer to USD.

match the price (less credit for certain amounts paid under the Spectrum Lease) in any potential transfer of such licenses to a third party.

20.     In addition to the agreement with One Dot Four, TSC and TSN have entered into a series of exclusivity agreements with Harbinger and certain of its affiliates regarding Harbinger's desire to enter into a pooling arrangement of the parties' various spectrum and satellite capacity.   Specifically, in January 2010, TSC and TSN entered into the first of these agreements - an exclusivity agreement  (the "***Original Exclusivity Agreement***") - pursuant to which they agreed that for a period of 90 days from the date of the Original Exclusivity Agreement, they would negotiate in good faith an agreement with Harbinger under which the S-Band spectrum licensed to TerreStar License Inc. would be combined with other services (such as satellite usage rights) to provide mobile communications services (a "***Pooling Arrangement***"). In exchange, Harbinger, on behalf of its affiliate, One Dot Four, agreed to prepay $30 million of the amounts due under the Spectrum Lease.  As part of the Original Exclusivity Agreement, TSC and TSN agreed, among other things, that during the exclusivity period they would not enter into any agreement relating to the S-Band spectrum license other than with Harbinger and certain of its affiliates, nor grant any third party rights with respect to the S-Band spectrum license that would interfere with use of the S-Band spectrum license by Harbinger and certain of its affiliates. The Original Exclusivity Agreement expired on April 26, 2010, without the parties entering into a Pooling Arrangement, but on May 6, 2010, TSC and TSN entered into a new exclusivity agreement (the "***New Exclusivity Agreement***") with SkyTerra (n/k/a LightSquared), an affiliate of Harbinger (together, "***LightSquared/Harbinger***"), whereby they agreed that, for a period of 90 days from the date of the New Exclusivity Agreement, they would negotiate in good faith on a Pooling Arrangement and that during the period of exclusivity TerreStar would not (i) solicit or

encourage the submissions of proposals or offers relating to the S-Band spectrum license from any person or entity other than LightSquared/Harbinger, (ii) enter into any written or oral agreement relating to the S-Band spectrum license with any person or entity other than LightSquared/Harbinger, or (iii) participate in discussions or negotiations with, or furnish any non-public information to, any person or entity in connection with a possible transaction regarding the S-Band where doing so would interfere with or obstruct the use of the S-Band by LightSquared/Harbinger or otherwise make it unavailable for use by LightSquared/Harbinger or limit the ability of any of TerreStar or LightSquared/Harbinger to enter into a transaction regarding the S-Band.  The New Exclusivity Agreement expired on August 4, 2010, without the parties reaching a definitive agreement on a Pooling Arrangement.  Since that time, and due in large part to TerreStar's need to focus on its liquidity concerns and preparations for its chapter 11 filing, the parties have not entered into any further exclusivity agreements regarding a Pooling Arrangement.

21.    Contemporaneously with entry into the New Exclusivity Agreement, on or about May 6, 2010, TSN entered into a Satellite Minutes Agreement (the "*Satellite Minutes Agreement*") with SkyTerra (n/k/a LightSquared) whereby LightSquared agreed to purchase minutes ("*Satellite Minutes*") of voice or data transmission and satellite capacity to use on TerreStar-1.  Subject to certain terms and conditions set forth in the Satellite Minutes Agreement, LightSquared has prepaid for Satellite Minutes in equal amounts on May 6, 2010, May 20, 2010, June 3, 2010 and June 17, 2010 for an aggregate purchase price of $40 million (the "*Purchase Price*").  Subject to the terms and conditions of the Satellite Minutes Agreement, LightSquared may begin using the Satellite Minutes (the "*Usage Start Date*") at any time within one year after

TSN launches commercial service on TerreStar-1.[19]  LightSquared will have five years after the Usage Start Date to use the Satellite Minutes (the "***Usage Term***").  The Usage Term shall be automatically extended for an additional five years if there are any unused Satellite Minutes remaining at the end of the initial five year period.  LightSquared may, in its discretion, credit all or part of the portion of the Purchase Price attributable to any unused Satellite Minutes to outstanding payments, if any, then due from LightSquared to TSN under any Pooling Arrangement (to the extent one is entered into, as discussed above).  If there are no such payments due or if LightSquared chooses not to so credit all or a portion of the Purchase Price thereto, the unused Satellite Minutes will expire at the end of the Usage Term (including any extensions thereof).

*Satellite Construction and Ground Maintenance*

22.    On December 13, 2006, TSN entered into the Site Preparation and Site Hosting Agreement (the "***Hughes O&M Agreement***") with Hughes Network Systems LLC ("***Hughes***"), under which Hughes provides site hosting services for the TerreStar Ground Station at the North Las Vegas site and CES equipment (the "***TerreStar Equipment***").  The parties entered into Amendment 2 to the Hughes O&M Agreement on April 21, 2009 for the purpose of adding the statement of work for Hughes to provide operations and maintenance services for the TerreStar Equipment.  Under the Hughes O&M Agreement, Hughes provides (a) monitoring services 24 hours a day, seven days a week, every day of the year; (b) certain preventive and corrective maintenance; and (c) certain additional services (e.g., inventory management, warranty management, daily operations reporting, and operations security).  The Hughes O&M Agreement

---

[19] TSN launched its commercial service on TerreStar-1 on September 21, 2010, triggering LightSquared's Usage Term.

automatically renews for successive one year renewal terms unless either party provides 90 days notice of intent not to enter into the next renewal term.

23.     On March 30, 2007, in connection with the Hughes O&M Agreement, TSN entered into a contract with Hughes for the design, development and supply of satellite base station subsystems ("*S-BSS*")[20] at the Las Vegas, NV and Allan Park, Ontario Ground Stations (the "*S-BSS Contract*").

24.     TSN is party to two contracts with Loral relating to the purchase and construction of TerreStar-1 (the "*TerreStar-1 Agreement*") and TerreStar-2 (the "*TerreStar-2 Agreement*"). The TerreStar-1 Agreement includes launch support services, mission operations support services, risk management insurance procurement support, training services and other items relating to the TerreStar-1 satellite.  The TerreStar-1 Agreement also contains in-orbit performance incentive payments by TSN to Loral over the life of the TerreStar-1 satellite.  The TerreStar-2 Agreement contains services and terms substantially similar to those of the TerreStar-1 Agreement.  The TerreStar-2 agreement also includes orbital performance incentive payments by TSN to be paid over the life of the TerreStar-2 satellite.

25.     TSN is also party to a space based network ("*SBN*") contract with Loral pursuant to which Loral will (a) provide services to integrate the TerreStar-1 satellite with the ground segment Satellite Beam Access Subsystem ("*SBAS*")[21] to be provided by Hughes and (b) deliver an integrated SBN network consisting of the TerreStar-1 satellite and the SBAS.

---

[20] S-BSS is the section of the network that is responsible for transmitting and receiving radio signals to and from the mobile phone. S-BSS carries out transcoding of speech channels, allocation of radio channels to mobile phones, paging and many other tasks related to the network.

[21] SBAS  is a system that supports wide-area or regional augmentation through the use of additional satellite-broadcast messages.  Such systems are commonly composed of multiple ground stations located at accurately-surveyed points. The ground stations take measurements of one or more of the satellites, the satellite signals, or other environmental factors that  may impact the signal received by the users. Using these measurements, information messages are created and sent to one or more satellites for broadcast to the end users.

26.     On May 11, 2007, TerreStar Canada contracted with Telesat Canada ("***Telesat***")
to provide in-orbit satellite operational services for TerreStar-1 ("***Telesat TT&C Agreement***").
Under the Telesat TT&C Agreement, Telesat uses its facilities and equipment located in Allan
Park, Ontario to provide tracking, telemetry and control ("***TT&C***") for TerreStar-1.  These
services include maintenance of the satellite's proper orbital location, monitoring the health and
operational status of the satellite, monitoring and notifying of any terrestrial or space-based
threats to satellite operation, and issuing planned and emergency command and ranging.  Telesat
also provides assistance with satellite anomaly analysis and regulatory services including
coordination and proper registration of the satellite.

27.     On April 1, 2009, TSN entered into a Site Hosting and Operation and
Maintenance of Satellite Gateway Systems agreement ("***Telesat O&M Agreement***") with
Telesat.  On June 30, 2009, TSN assigned the Telesat O&M Agreement to 4506901 Canada Inc.
(n/k/a 0887729 B.C. Ltd.).  The Telesat O&M Agreement provides for the lease of real property
at Telesat's Allan Park teleport facility and equipment operation and maintenance for satellite
gateway equipment and antennas housed in a structure known as TerreStar's Canadian gateway
earth station.  The equipment in the Ground Stations in Canada (like that in the U.S.), combines
elements of the satellite and ground based networks and, in coordination with the CES, is critical
to beam forming and linking voice and data traffic to the Network Operations Control Center in
Richardson, TX.

*Chipset Development and Related Technology*

28.     The Debtors are party to a number of agreements with various parties relating to
chipset development and the development of the GENUS device.  In addition to the development
of the fully integrated GENUS device, which permits customers to seamlessly transition between

terrestrial and satellite networks, the Debtors have contracted with Qualcomm Incorporated ("**Qualcomm**") and Infineon Technologies AG ("**Infineon**"), two of the premiere chipset developers for mobile and smartphone devices to ensure that, in the next generation of such devices, the ability to connect to the TerreStar network is built in and would need simply to be activated by a provider. These chipsets will substantially increase the availability of TerreStar's network to mobile device customers. The Debtors have also contracted with certain parties to develop chipsets for the Ground Stations that are necessary to enable the chipsets in the smartphone and mobile devices to communicate with the TerreStar network.

29. TerreStar has entered into a number of agreements with Elektrobit, Inc. ("**Elektrobit**") with respect to the development of the GENUS handset. First, on September 19, 2007, TSN signed a Statement of Work (the "**Statement of Work**") under the Master Development & Licensing Agreement entered into by TSN and Elektrobit on August 10, 2007. Under the Statement of Work, Elektrobit has assigned a multi-disciplined engineering team to perform reference design and development programs, software development for satellite and terrestrial chipset integration, and provide a reference design and production of the GENUS handset. Second, on December 1, 2009, TSC entered into a Master Supply Agreement (the "**Supply Agreement**") with Elektrobit, which sets the terms for the individual purchase orders (often placed by TSN) for the GENUS. Additionally, under the Supply Agreement, Elektrobit provides manufacturing services, forward and reverse logistics, and after market services support for certain satellite-terrestrial smartphones, starting with the GENUS smartphone. While there is no volume commitment from TerreStar in the Supply Agreement, pricing and other terms are adjusted based on volume.

30.     As noted above, one of the Debtors' chipset providers is Qualcomm.    On December 11, 2008, TSN (as operator) entered into a 15 year agreement with Qualcomm for the provision by Qualcomm of satellite enabled mobile chipsets and satellite base station components to facilitate the development of S-Band mobile devices and networks systems (the "**Qualcomm Agreement**").    Under the Qualcomm Agreement, certain Qualcomm chipsets that have satellite and S-Band capabilities will be available on a mass market basis.    Separately on March 30, 2009, TSN (as operator), in connection with the Qualcomm Agreement, entered into an agreement with Alcatel-Lucent USA Inc. ("**Alcatel**") to develop, test and provide an S-BSS and to supply such S-BSS commercial products (the "**Alcatel-Lucent Agreement**").    This S-BSS ground infrastructure will be designed to work with the chipsets produced under the Qualcomm Agreement.

31.     Finally, on March 30, 2009, TSN, as operator, entered into an agreement with Infineon pursuant to which Infineon will design and develop chipset technology that will enable satellite-terrestrial handsets to operate with multiple cellular and satellite-based communications technologies (including GSM, GPRS and GMR-2G/3G) (the "**Infineon Chipset Contract**").    In conjunction with the Infineon Chipset Contract, on March 30, 2009, TSN entered into an agreement with Hughes to develop and design a satellite chipset for use in mobile terminals that operate on the TerreStar network.    The chipset interfaces with the S-BSS and SBAS also developed by Hughes.    More specifically, this additional software will, with the existing Hughes S-BSS Contract, allow Hughes to deliver the full S-BSS development required to integrate with the Infineon chipset.

*AT&T Distribution Agreement*

32.     On September 25, 2009, TerreStar entered into a Mobile Satellite Services and Support Agreement with AT&T Mobility II, LLC ("***AT&T***") under which AT&T markets, resells and provides support for certain of the Debtors' satellite communications services to government, commercial and other customers on a non-exclusive basis (the "***AT&T MSS Agreement***").    AT&T sells the GENUS (and various accessories) and AT&T's Satellite Augmented Mobility Service ("***SAM***") to end users.    SAM includes access to AT&T's terrestrial mobile network and TerreStar's satellite network.    Pursuant to the rate plan under the AT&T MSS Agreement, AT&T pays TerreStar a recurring monthly charge for each subscribing customer plus a fixed amount per minute for satellite voice calls (plus certain termination charges) and a fixed amount for each megabyte of satellite data used and satellite text message sent or received.

**II.**

**Organizational Structure**

33.     As demonstrated on the organizational chart attached hereto as Exhibit A, TSN, a Debtor in these cases, is a Delaware corporation and is an affiliate of each of the other Debtors. As set forth below, certain of TSN's subsidiaries and affiliates are entities organized under the laws of the provinces of Ontario and British Columbia, some of which are also Debtors in these chapter 11 cases.    As further set forth below, contemporaneously with the filing of these chapter 11 cases, TSN, in its capacity as proposed foreign representative, has commenced a recognition proceeding in Canada seeking recognition of the chapter 11 cases by the Canadian courts as a "foreign main proceeding".

34.     As of the date hereof, TSC[22], the ultimate parent of each of the Debtors, but not a Debtor in these cases, has four wholly-owned direct subsidiaries, three of which are Debtors in these proceedings:  TerreStar New York Inc. ("***TerreStar NY***"), Motient Holdings Inc. ("***Motient***") and MVH Holdings Inc. ("***MVH***").[23]  TerreStar Holdings Inc. ("***TerreStar Holdings***"), a Delaware corporation, is the fourth wholly-owned direct subsidiary of TSC but is not a Debtor in these cases.[24]

35.     TerreStar NY is a New York corporation that has no subsidiaries.

36.     Motient holds 100% of the interests in both Motient Services Inc. and Motient Communications Inc., each a Delaware corporation, and each a Debtor in these proceedings. Motient Communications Inc. in turn holds 100% of the interests in Motient License Inc., another Delaware corporation, and a Debtor in these proceedings.

37.     MVH directly holds 100% of the interests in Motient Ventures Holdings Inc., a Delaware corporation.

38.     Motient Ventures Holdings Inc. holds approximately 89.3% of the equity of TSN,[25] the proposed lead Debtor in these cases, and 86.5% of the equity of TerreStar Global Ltd.,[26] a Bermuda company and a non-Debtor affiliate in these cases.  TerreStar Global Ltd. holds a license to utilize an orbital slot allocated to the government of Bermuda by Ofcom.[27]

---

[22] As of October 11, 2010, TSC had authorized 240 million shares of common stock (the "***Common Stock***").  As of October 11, 2010, TSC had 139,441,616 shares of Common Stock outstanding.  As of the Petition Date, EchoStar held approximately 28.9% of the Common Stock and Harbinger held approximately 47.78% of the Common Stock.

[23] TSC does not directly hold any Canadian assets; as discussed below, the interests held in the Debtors' Canadian affiliates are directly or indirectly held by TSN.

[24] TerreStar Holdings directly holds 100% of the interests in 1.4 Holdings.  As noted earlier, 1.4 Holdings is a Delaware limited liability company, which holds the FCC licenses for certain 1.4 GHz spectrum.

[25] The remaining 10.7% of the interests in TSN are held by LightSquared.

[26] Of the remaining 13.5%, MSV Investors Holdings Inc. owns 13.1%, 0.3% is held by Continental Casualty and the

39.     TerreStar Global Ltd. holds 100% of the equity of TerreStar Europe Limited, a United Kingdom company and a non-Debtor in these cases.  TerreStar Europe Limited was established to provide coverage in certain areas of Europe.  After an unsuccessful bid for the right to use the S-Band in Europe, TerreStar Europe Limited conducts no operations and was recently stricken from the United Kingdom's company register.

40.     TSN wholly owns both TerreStar National Services Inc. and TerreStar License Inc., each of which are co-Debtors with TSN in these cases.  TerreStar National Services Inc. is a Delaware corporation established to conduct certain confidential work on behalf of the United States government.  TerreStar License Inc., also a Delaware corporation, is an entity established solely to hold certain FCC licenses and regulatory approvals related to TerreStar's operations, including licenses necessary to operate the S-Band and the U.S. CES and Ground Stations.

41.     In developing the TerreStar network, the Domestic Debtors and their domestic non-Debtor affiliates have worked closely and cooperatively with their Canadian partner, Trio 2 General Partnership ("*Trio*"), through Trio's subsidiary, 4491165 Canada Inc. ("*4491165*").[28] Neither Trio nor 4491165 are Debtors in these cases, nor participants in the Canadian recognition proceedings.

42.     The necessity for the creation of TerreStar Networks Holdings (Canada) Inc., TerreStar Networks (Canada) Inc. and 0887729 B.C. Ltd. (each a Canadian company and each a Debtor in these cases) arises from certain licensee and ownership restrictions existing in Canada. Industry Canada (the Canadian governmental agency regulating the communications sector in

_____

remainder is held by a former director of TerreStar Global Ltd. and a private investor.

[27] Ofcom is the Office of Communications, which functions as the independent regulator and competition authority for the United Kingdom communications industries.

[28] Trio owns a 75.6% interest in 4491165, with the remaining 24.4% held by Healthcare of Ontario Pension Plan, which has also been acting cooperatively with the Debtors in these cases.

Canada – the Canadian counterpart of the FCC) has stringent requirements for, among other things, qualifying as a licensee of spectrum, as a lessee of Ground Stations and CES sites, and as a licensee of orbital slots. Specifically, certain leases and licenses may be granted only to Canadian entities and, furthermore, in some instances such entities must be Canadian controlled – that is, a certain threshold of voting interests must be held by a Canadian national.[29] Accordingly, the Domestic Debtors, along with a predecessor in interest to Trio, created TerreStar Networks Holdings (Canada) Inc. ("***Holdings Canada***"), an entity in which 33⅓% of the voting interests are held by TSN with the remaining 66⅔% held by 4491165 Holdings Canada functions as a holding company for TerreStar Networks (Canada) Inc. ("***TerreStar Canada***"). TSN holds 20% of the voting interests in TerreStar Canada, with the remaining 80% held by Holdings Canada.[30]

43.     TerreStar Canada holds title to the TerreStar-1 satellite as well as rights to the orbital slot in which TerreStar-1 resides, spectrum licenses to use the S-Band in Canada, and related authorizations to conduct operations in Canada. Under the terms of an amended and restated Indefeasible Right of Use Agreement dated August 11, 2009 between TSN and TerreStar Canada, TSN has been granted the right to use 90% of the capacity of TerreStar-1.

44.     TSN, Trio, TerreStar Solutions Holdings Inc. ("***Solutions Holdings***")[31] and TerreStar Solutions Inc. ("***TerreStar Solutions***") entered into a Shareholders' Agreement on August 11, 2009, which establishes certain rights and obligations of the shareholders of Terrestar

---

[29] On July 12, 2010, certain amendments to Canada's Telecommunications Act were given royal assent, the effect of which was to remove the restrictions on non-Canadian ownership of Canadian satellites. Nonetheless, as of the Petition Date, no changes to the corporate structure have been made as a result of these amendments.

[30] This means that TSN effectively holds 46.67% of the controlling interests in TerreStar Canada.

[31] Trio owns a 75.6% interest in Solutions Holding, with the remaining 24.4% held by Healthcare of Ontario Pension Plan.

Solutions, a corporation incorporated under the laws of Canada and established for the purpose of providing commercial MSS/ATC services in Canada using the TerreStar-1 satellite and 2 GHz terrestrial spectrum. TSN holds 20% of Class A common shares in TerreStar Solutions and 100% of Class B common shares. The remaining 80% of the Class A common shares in TerreStar Solutions is held by Solutions Holdings. Neither Solutions Holdings nor TerreStar Solutions are Debtors in these cases.

45. In furtherance of its objective to be the provider of commercial MSS/ATC services in Canada, TerreStar Solutions (1) has entered into a Wholesale Satellite Capacity Agreement with TerreStar Canada whereby TerreStar Solutions has the right to use up to 10% of the capacity of TerreStar-1 on a per minute/per megabyte basis and (2) intends to enter into various agreements to allow for the use of TSN handsets in Canada and for the sale of end user devices in Canada. Additionally, TerreStar Solutions has entered into a Rights and Services agreement under which it is expected to procure certain network and technical services from TSN to facilitate the development and integration of the network with TerreStar Canada.

46. TerreStar Solutions has also entered into certain cost-sharing arrangements (the "*Cost-Sharing Arrangement*") with TerreStar Canada whereby TerreStar Canada and TerreStar Solutions share several operational costs and expenses, including but not limited to employees, utilities, and rent. To apportion the costs between TerreStar Canada and TerreStar Solutions, the companies use a charge back procedure, which is part of the separate budget approved by each of the boards of directors of TerreStar Canada and TerreStar Solutions. Specifically, operational costs are primarily paid in full by TerreStar Solutions on behalf of both it and TerreStar Canada. Subsequently, TerreStar Solutions invoices TerreStar Canada for its apportioned share. The aggregate amount paid monthly by TerreStar Canada to TerreStar Solutions is approximately

between CDN $50,000 and CDN $70,000, with roughly 70% of that amount allocated to employee related costs and the remaining 30% allocated to rent, utilities and other operational costs. As of September 30, 2010, TerreStar Canada owes TerreStar Solutions approximately CDN $695,071 arising from the cost-sharing arrangement.

47.     Additionally, 0887729 B.C. Ltd., a Canadian entity 100% owned by TSN, holds licenses and assets in Canada relating to the Ground Station and CES sites located in Canada.

48.     As noted above, three of the Debtors' Canadian affiliates, TerreStar Canada, Holdings Canada and 0887729 B.C. Ltd., are Debtors in these chapter 11 cases. Accordingly, to protect against the risk of creditors seeking to enforce their rights in Canadian courts separate and apart from the bankruptcy proceedings, contemporaneously with the filing of these chapter 11 petitions, TSN, as proposed foreign representative, filed or will be filing recognition proceeding under the Companies' Creditors Arrangement Act (Canada) with the Ontario Superior Court of Justice (Commercial List) seeking recognition in Canada of these U.S. chapter 11 cases as foreign main proceedings, and certain orders entered therein, in Canada (the "*Recognition Proceedings*").

### III.

### Capital Structure

49.     As of the Filing Date, various of the Debtors were party to certain instruments evidencing the Debtors' long term indebtedness. A summary of these obligations is set forth below.

**A.     Senior Secured Notes**

50.     On February 14, 2007, TSN issued $500 million aggregate principal amount of Senior Secured PIK Notes due 2014 (the "*Initial Senior Secured Notes*") and on February 7, 2008, TSN issued an additional $50 million aggregate principal amount of Senior Secured PIK

Notes due 2014 (the "**Additional Senior Secured Notes**" and, together with the Initial Senior Secured Notes, the "**Senior Secured Notes**") pursuant to an Indenture (together with any amendments, supplements or modifications thereto, the "**Senior Secured Notes Indenture**"), among TSN, as issuer, the guarantors from time to time party thereto (the "**Senior Secured Notes Guarantors**")[32] and U.S. Bank National Association, as trustee (the "**Senior Secured Notes Indenture Trustee**").

51.     The Senior Secured Notes bear interest from the date of issuance at a rate of 15% per annum.  Beginning August 15, 2007, and until and including February 15, 2011, interest on the Senior Secured Notes has been and will be payable in additional Senior Secured Notes on each February 15 and August 15 semi-annually.  Thereafter, interest on the Senior Secured Notes will be payable in cash on February 15 and August 15 semi-annually, starting August 15, 2011. Per the provisions of the Senior Secured Notes, additional interest of up to 1.5% per annum may accrue if certain milestones are not met by the Debtors.  Due to the failure to meet a milestone under the Senior Secured Notes Indenture, interest is currently accruing at a rate of 15.5%.[33]

52.     The Senior Secured Notes are secured by a first priority security interest in the assets of TSN, TerreStar National Services Inc. and TerreStar License Inc., subject to certain exceptions, pursuant to a security agreement (the "**U.S. Senior Secured Notes Security Agreement**") dated as of February 14, 2007 among TSN, as issuer, and TerreStar National Services Inc. and TerreStar License Inc. as guarantors, in favor of U.S. Bank National Association, as collateral agent.  Additionally, the Senior Secured Notes are secured by a first

---

[32] As of the date hereof, the Senior Secured Notes Guarantors are Holdings Canada, TerreStar Canada, TerreStar National Services Inc. and TerreStar License Inc.

[33] This failure relates to the milestone requiring TerreStar to enter into a multi-year service contract with the United States Government.

priority security interest in the assets of TerreStar Canada and Holdings Canada, pursuant to a security agreement (the "***Canadian Senior Secured Notes Security Agreement***"), dated as of February 14, 2007, among TSN as issuer and TerreStar Canada and Holdings Canada as guarantors, and U.S. Bank National Association, as collateral agent.

53.     As of the Petition Date, approximately $943.9 million of principal and accrued interest is outstanding on account of the Senior Secured Notes.

**B.     Senior Exchangeable Notes**

54.     On February 7, 2008, TSN issued $150 million aggregate principal amount of 6.5% Senior Exchangeable PIK Notes due 2014 (which are exchangeable for TerreStar Corporation common stock at a conversion price of $5.57 per share) (the "***Senior Exchangeable Notes***"), pursuant to an Indenture (the "***Senior Exchangeable Note Indenture***") among TSN, as issuer, the guarantors from time to time party thereto (the "***Senior Exchangeable Note Guarantors***")[34] and U.S. Bank National Association, as trustee (the "***Senior Exchangeable Note Indenture Trustee***").  The Senior Exchangeable Notes bear interest at a rate of 6.5% per annum, payable on a quarterly basis (on each of March 15, June 15, September 15 and December 15). Until and including June 15, 2011, interest on the Senior Exchangeable Notes has been and will continue to be payable in additional Senior Exchangeable Notes quarterly.  Thereafter, interest on the Senior Exchangeable Notes will be payable in cash quarterly.  The Senior Exchangeable Notes are scheduled to mature on June 15, 2014.

55.     The Senior Exchangeable Notes rank senior in right of payment to all existing and future subordinated indebtedness, and *pari passu* with all other unsubordinated indebtedness.

---

[34]As of the Petition Date, the Senior Exchangeable Note Guarantors are TerreStar National Services Inc. and TerreStar License Inc.

The Senior Exchangeable Notes are unsecured obligations of TSN and the Senior Exchangeable Note Guarantors.

56.     As of the Petition Date, approximately $178.7 million of principal and accrued interest is outstanding on account of the Senior Exchangeable Notes.

### C.     The Purchase Money Credit Facility

57.     On February 5, 2008, the Debtors entered into a $100 million TerreStar-2 Purchase Money Credit Agreement (the "***PMCA***") among TSN, as the borrower, U.S. Bank National Association, as collateral agent (the "***PMCA Agent***"), and Harbinger and EchoStar Corporation ("***EchoStar***"), as lenders.  There are no guarantors of the PMCA.  The financing under the PMCA is advanced as required and used to fund the completion of the construction of TerreStar-2 satellite.  The PMCA is secured by a first lien on all of TSN's rights in the TerreStar-2 satellite, along with the raw materials, work-in-process, construction agreement, insurance, books and records and all proceeds related thereto.

58.     Amounts outstanding under the PMCA bear interest at a rate of 14% per annum and are due on February 5, 2013.  Pursuant to the PMCA, and in light of the Debtors' failure to reach certain milestones, additional interest of 3% accrued between December 31, 2009 and January 13, 2010.  On January 13, 2010, the Debtors met the required milestones, thereby reducing the interest rate back to 14% per annum from such date.

59.     On August 25, 2010, Harbinger and EchoStar each advanced an additional $5 million under the PMCA, for an aggregate advance of $10 million, (the "***August 2010 Advance***") to reimburse TSN for a portion of the aggregate amount of payments made by TSN within the previous 180 days in connection with the construction of TerreStar-2.  Contemporaneously with the August 2010 Advance, on August 25, 2010, Harbinger and EchoStar each executed a Waiver and Forbearance Agreement (the "***Waiver and Forbearance***"), wherein each agreed to waive

certain provisions of the PMCA in connection with the August 2010 Advance and further agreed to forbear from exercising rights and remedies with respect to certain defaults or events of default that may arise under the PMCA, Senior Secured Notes Indenture or Senior Exchangeable Notes Indenture in connection with the August 2010 Advance or the use of such proceeds.

60.     As of the Petition Date, approximately $85.9 million of principal and accrued interest is outstanding under the PMCA.

**D.     Stockholders' Equity**

61.     *TSN Series A and B Preferred Shares*:  TSN has one outstanding share of non-voting Series A preferred stock ("***TSN Series A Preferred***") issued to EchoStar and one outstanding share of non-voting Series B preferred stock ("***TSN Series B Preferred***") issued to Harbinger.  The TSN Series A and B Preferred have no voting rights and are not convertible into any other class of capital stock of the Debtors.  The TSN Series A and B Preferred rank on parity with one another and rank superior to all other classes of TSN capital stock.

**E.     Recent Financial Information**

62.     As of December 31, 2009, the consolidated financial statements for TSN and its subsidiaries reflected assets of approximately $967.2 million and long-term debt of approximately $1.078 billion.  As of June 30, 2010, the corresponding numbers for TSN and its subsidiaries were assets of approximately $1.0 billion and long-term debt of approximately $1.081 billion.[35]  As of the Petition Date, TSN and its subsidiaries had long-term debt of $1.2 billion, which amount includes the amount outstanding under the PMCA.  As of the Petition Date, the Debtors had cash-on-hand of less than $500,000.

---

[35] On a comparative basis, the long-term debt balance as on June 30, 2010, does not include $72.6 million of debt relating to PMCA, which was treated as current liability in the financial statements for period ending June 30, 2010.

63.     As discussed above, the Debtors' business model is premised upon innovation in the wireless telecommunications sector.  Innovation does not happen overnight, nor does it come with a low price tag.  The Debtors have spent years developing their next generation network. As detailed above, build-out required not only procuring the various technological components necessary to run the network – including technological build-out, such as the development of the GENUS handset, chipsets, the build-out of the CES and Ground Stations, the construction of the TerreStar-1 satellite and the TerreStar-2 ground spare, and the launch of TerreStar-1 – but also the procurement of various licenses and regulatory approvals required in order to operate the TerreStar network (such as licenses to use the S-Band spectrum both in the United States and Canada, licenses to use the 1.4 GHz Spectrum, ATC authorization in both the United States and Canada, licenses to operate CES and Ground Stations in both the United States and Canada, and licenses to use orbital slots in Canada).  On top of actually developing the hard technology and procuring the necessary authority to operate it, the Debtors had to carefully coordinate software development to facilitate communications between the CES sites, Ground Stations, TerreStar-1, the GENUS and the chipsets for traditional mobile devices.  However, this alone is not enough to market the Debtors' MSS.  In addition to all of the foregoing, the Debtors had to obtain ATC authorization in order to market their next generation network to traditional terrestrial coverage providers.

64.     Accordingly, throughout the preceding years, the Debtors' business model has largely been premised upon a substantial amount of capital expenditures.  The Debtors, now at the end stages of the development process, have begun to market their network, recently entering into the AT&T Agreement and attaining a position where they can begin to build a customer

base, which will further increase their revenue in the upcoming years. Nonetheless, despite achieving the significant milestone of turning their product into a revenue stream, the Debtors require continued financing for further development and marketing before they become profitable enough to service their current debt load and meet their capital requirements for continued technological development and expansion of their product.

65.     The willingness of TerreStar's investors to contribute nearly $1 billion to fund the development of TerreStar's network over the course of the years preceding the chapter 11 filings is a testament to TerreStar's investors' belief in its product and its future. Nevertheless, the Debtors eventually came to realize that they would not be able to meet their liquidity needs to satisfy working capital requirements, operating expenses, debt and preferred stock redemption obligations absent either an infusion of new capital or a restructuring of their balance sheet.

66.     Amidst one of the most challenging credit markets in recent history, the Debtors have attempted a number of measures to increase liquidity. Specifically, the Debtors entered into a series of transactions with Harbinger and certain of its affiliates under which the Debtors provided services or entered into transactions beneficial to each party's business efforts in exchange for additional capital for TerreStar in the form of one-time cash infusions or, in some cases, a revenue stream. For instance, as detailed in Section I.C. above, the Debtors leased to LightSquared, a Harbinger affiliate, the right to manage the 1.4 GHz spectrum, entered into an agreement with LightSquared whereby LightSquared purchased use capacity on the TerreStar-1 satellite, and entered into various agreements providing LightSquared/Harbinger with the exclusive right to negotiate a Pooling Arrangement regarding the parties' satellites and S-Band rights. While these agreements were successful in bringing additional funding and revenue into the Debtors' capital structure, standing alone they did not provide TerreStar with sufficient

revenue to service its outstanding debt obligations while maintaining the capital expenditures necessary to finalize development of its technology.

67.     In recognition of the fact that, despite the Debtors' best efforts, their available cash and borrowing capacity were likely to decrease to the point where there would be insufficient capital to cover funding needs for the third and fourth quarters of 2010, TerreStar began restructuring negotiations with its key stakeholders in April 2010.[36] These negotiations focused on both financing and balance sheet restructuring. Key stakeholders participating in such discussions included Harbinger (a 50% lender under the PMCA, a substantial holder of the Senior Secured Notes and Senior Exchangeable Notes) as well as an informal group comprised of holders holding a significant amount of TSN's Senior Exchangeable Notes – many of which have cross holdings in the Senior Secured Notes.

68.     Despite the good faith efforts of these various parties, because of their divergent interests and TerreStar's impending liquidity crunch (which was set to occur in short order), TerreStar determined that it was in its best interest to temporarily set aside the restructuring negotiations and primarily focus upon procuring additional financing in the form of a debtor-in-possession financing facility, which would allow TerreStar to continue negotiations with its stakeholders while receiving adequate financing and residing under the protections of the Bankruptcy Code. TerreStar determined that this path was the most viable restructuring alternative and would increase the likelihood of emerging from the restructuring process with a healthy balance sheet and adequate financing to continue the marketing of its network and the further development of necessary technological innovations.

---

[36] At that time, and up until recently, the Debtors contemplated that TSC and TerreStar Holdings would file for chapter 11 as well. In light of recent events, including, without limitation, the agreement by certain parties to toll the litigation they were bringing against TSC, the Debtors decided that filing these entities for chapter 11 at this time would not be necessary, but note that such a filing may be necessary in the future.

69.     Initially, the Debtors and their proposed financial advisor, Blackstone Advisory Partners L.P. ("**Blackstone**") discussed and contemplated a chapter 11 filing with postpetition operations sustaining only on the use of cash collateral, without any additional financing, to fund operations during the chapter 11 cases.  Even assuming the Debtors would be able to obtain the necessary consent to use cash collateral, it was determined that cash collateral alone would be insufficient to fund operations and necessary expenditures under the Debtors' go-forward business plan while continuing to service existing debt.  Thus, to provide the Debtors with appropriate and necessary financing, the negotiation of adequate liquidity in the form of debtor-in-possession financing was critical to ensure that the business could operate in accordance with their business plan.

70.     The Debtors explored all practicable avenues to obtain DIP financing on the best possible terms, including exploring financing options from participants in their prepetition capital structure and from unrelated third parties.  Initially, the Debtors contemplated a junior, "non-priming" DIP financing structure whereby certain participants in the Debtors' prepetition capital structure would provide financing in exchange for a junior "non-priming" lien on all assets that secure the Senior Secured Notes and a first lien on all assets that do not secure the Senior Secured Notes.  At the Debtors' suggestion, Blackstone marketed this DIP structure to existing stakeholders.  The Debtors received preliminary indications that certain holders within the capital structure would be willing to participate in this sort of "junior" DIP financing structure but despite extensive arms' length negotiations with those parties, commitments to provide the required DIP financing ultimately were not obtainable.

71.     As a result, in August 2010, the Debtors marketed the "junior" DIP financing structure to additional non-stakeholder parties.  The Debtors executed numerous non-disclosure

agreements with various parties; however, the Debtors were unable to attain sufficient interest to fill a sufficient "junior" DIP financing facility at that time. Because the Debtors did not obtain a sufficient junior DIP financing facility in August, and in light of their mounting liquidity concerns, the Debtors decided to explore whether they could obtain financing through a senior "priming" DIP. The Debtors' marketing efforts reached approximately 53 financial institutions (including current stakeholders) and resulted in the execution of confidentiality agreements with more than 25 parties. As a result of those efforts, the Debtors identified a group of third party lenders as a potential source of "priming" DIP financing and began negotiations with that group for a priming DIP (the ***"Third Party Lenders"***). At the same time, the Debtors continued discussions with their largest stakeholders with respect to the junior DIP financing structure.

72.     Over the weeks leading to the commencement of these cases, the Debtors engaged in substantial discussions and negotiations on parallel tracks: a potential "priming" DIP facility from the Third Party Lenders and a "junior" DIP facility from one of the Debtors' largest stakeholders, EchoStar. The "priming" DIP had numerous problems, including risk of execution (i.e. a "non-consensual priming fight"), an uncertain chapter 11 exit strategy, and expensive "break-up" fees demanded by such lenders. Moreover, I have been advised by my counsel that given the standards set forth in section 364(d)(1) of the Bankruptcy Code, there was significant doubts as to whether we could meet the factual and legal predicates necessary to prevail in a "priming" fight. The EchoStar DIP proposal, on the other hand, carried very little risk of execution as it is a "junior" DIP and thus will not require any "priming" fight. Moreover, the EchoStar transaction included an exit strategy. Specifically, the Debtors were able to negotiate and agree with EchoStar on terms (embodied in the RSA), pursuant to which (i) EchoStar has committed to backstop $100 million of a $125 million preferred stock rights offering, which will

allow the Debtors to repay their DIP Financing facility in full and, if the rights offering is fully subscribed, finance their operations upon their emergence from chapter 11, and (ii) EchoStar has committed to support the equitization of the totality of its secured notes – which represents more than 50% of the Debtors' close to $1 billion secured notes obligations. This support is crucial to the Debtors' reorganization efforts, and will allow the Debtors to pursue the equitization of their secured creditors. Ultimately, and as further described below, the Debtors determined that the best available financing option was to obtain the debtor-in-possession financing facility currently before the Court. In light of the fair and thorough negotiation process undertaken by the Debtors to identify potential lenders and to obtain the best available postpetition financing terms, (all as described more thoroughly in the declaration of Steven Zelin in support of the DIP Motions, defined below) I believe that DIP Facility represents the best and most favorable financing for the Debtors.

73.     Additionally, and on a parallel track with finalizing the terms of the proposed DIP Facility, the Debtors and EchoStar engaged in extensive, good faith, arm's-length negotiations with respect to the terms of the plan term sheet that I have described above, which efforts culminated in the execution of a Restructuring Support Agreement (defined below)[37]. The Debtors believe that their decision to pursue this comprehensive, consensual restructuring plan – which includes entry into the proposed DIP Facility –represents the best option to maximize recoveries to their creditors and will ensure a swift exit from these bankruptcy proceedings.

---

[37] Contemporaneously with this Declaration, the Debtors have filed a motion for authority to assume the Restructuring Support Agreement, which is described herein in section VII. For further background on the Restructuring Support Agreement, please refer to the motion to assume the Restructuring Support Agreement.

# V.

## The Chapter 11 Cases

74.     As described below, through the First Day Pleadings, the Debtors seek to ensure the continuation of their business operations without interruption.  The Debtors are also seeking authorization to obtain a postpetition debtor-in-possession financing facility from certain of the Debtors' prepetition stakeholders, in the amount of $75 million, which will provide the Debtors' businesses with ample liquidity.

75.     The Debtors believe it is in the best interest of all stakeholders to commence the chapter 11 cases.  In the short-term, chapter 11 will facilitate the reorganization of the Debtors' capital structure.  In the long-term, the financial restructuring will better position the Debtors to continue operating successfully and enhance their growth potential, especially the opportunity to continue development and marketing of the satellite-terrestrial network.  Furthermore, completion of the financial restructuring will allow management to focus its attention on operations and long-term planning rather than on short-term financial management.

# VI.

## DIP Financing, Use of Cash Collateral, and Adequate Protection

76.     As stated above, the Debtors have negotiated and reached agreements to enter into, subject to approval of the Court, a $75 million Senior Secured Superpriority Debtor-in-Possession Credit Agreement (the "*DIP Agreement*" and the postpetition financing made available thereby, the "*DIP Facility*").

77.     By the motion filed contemporaneously herewith (the "*DIP Motion*"), the Debtors seek authorization, pursuant to section 364(c) of the Bankruptcy Code, for entry of interim and final orders permitting them to obtain debtor in possession financing in the form of

the DIP Facility. The Debtors also seek interim and final orders authorizing the use of cash collateral pursuant to section 363 of the Bankruptcy Code. The cash collateral to be used consists of cash on hand sourced from the proceeds of collateral under the Senior Secured Notes Indenture.

78. The DIP Agreement, dated as of October 19, 2010, is by and among TSN as borrower, the other Debtors (excluding TSC and TerreStar Holdings) as guarantors (and together with TSN, the "*DIP Loan Parties*"), The Bank of New York Mellon, as administrative and collateral agent (in such capacity, together with its successors in such capacity, the "*DIP Agent*"), EchoStar, as the initial lender (the "*Initial DIP Lender*") and the other lenders that may become party thereto (together with the Initial DIP Lender, the "*DIP Lenders*").

79. In accordance with the terms and conditions of the DIP Agreement, the DIP Lenders have agreed to extend the DIP Facility in an aggregate amount of $75 million (less an original issue discount of 2%, plus fees, interest and other amounts to be capitalized in accordance with the terms of the DIP Documents). Specifically, upon entry of the interim order, the DIP Lenders will provide the Debtors with $18 million in interim financing (less an original issue discount of 2%, plus fees, interest and other amounts to be capitalized in accordance with the terms of the DIP Documents). The interest rate on the DIP Facility is 15%, paid in kind, and will be added to the principal amount of the DIP Facility. Subject to Court approval, the proceeds of the DIP Facility will be used by the DIP Loan Parties, among other things, to fund working capital and general corporate needs in accordance with the Approved Budget (as defined in the Junior DIP Agreement). Subject to this Court's approval, the DIP Facility will be secured by a first lien on all of the Loan Parties' assets, other than certain excluded assets, and

subject to the existing liens of the lenders under the PMCA and the Noteholders under the Senior Secured Notes Indenture.

80.     The continued viability of the Debtors' businesses and the success of the Debtors' reorganization efforts hinge upon obtaining immediate access to financing.  Absent an immediate infusion of capital or access to financing, the Debtors simply cannot operate their businesses.  Without use of cash collateral and the DIP Facility to pay employees, vendors and counterparties to contracts, the Debtors will be unable to operate and the value of their business platform will be impaired.  At this time, I believe that the Debtors' liquidity needs can be satisfied only if the Debtors are authorized to borrow up to a total of $18 million under the proposed DIP Agreement on an interim basis, and use such proceeds to fund their operations.  The Debtors do not have sufficient unencumbered assets which they could liquidate on short notice to fund their operations.  Accordingly, the use of cash collateral and the DIP Facility are absolutely necessary to pay the costs of maintaining critical services to each of the Debtors' business operations.  Without the liquidity provided by the use of cash collateral and the DIP Facility, the Debtors' objective of restructuring their businesses as a going concern, while maintaining the value of their assets for the benefit of creditors, will fail without a fair opportunity to achieve the purposes of the chapter 11 process.  Approval of the DIP Facility will allow the Debtors to remain operational, including paying their current and ongoing operating expenses (e.g., postpetition wages, salaries, and utility and vendor costs).

81.     As stated above, and in the declaration of Steve Zelin in support of the DIP Motion, the DIP Facility is the culmination of an intense, months-long process targeted at procuring the best financing option available to the company under the present circumstances.  For the reasons set forth in the DIP Motion, I believe that entering into the DIP Facility is a

sound exercise of the Debtors' business judgment and is in the best interest of the Debtors' estates because this financing will preserve the value of the Debtors' assets and operations for the benefit of their creditors, employees, and other parties in interest.

## VII.

## Summary of Other First Day Pleadings[9]

82.     As discussed above, concurrently with the filing of their chapter 11 petitions, the Debtors filed various First Day Pleadings, which they believe are necessary to enable them to operate with minimal disruption and loss of productivity.  Through the First Day Pleadings, the Debtors seek to, among other things, pay their employees' wages and continue all employee benefits in the ordinary course of business; continue their cash management system, and make certain other payments that are critical to the Debtors' ongoing operations.  It is my understanding that Rule 6003 of the Federal Rules of Bankruptcy Procedure provides that to the extent "relief is necessary to avoid immediate and irreparable harm," a Bankruptcy Court may approve a motion to "pay all or part of a claim that arose before the filing of the petition" prior to twenty-one days after the Petition Date.  Certain First Day Pleadings request that the Court authorize the Debtors to pay claims that arose prior to the date hereof in the first twenty-one days of these chapter 11 cases (the **"*Interim Period*"**).  As set forth in more detail below, in such instances, I believe the relief sought is necessary to avoid immediate and irreparable harm to the Debtors.  It is also my understanding that the motions reflect the comments of the United States Trustee for the Southern District of New York.

---

[9] Unless otherwise defined, terms defined herein have the meaning ascribed to them in the respective First Day Pleading described.

**Operations Motions**

**Cash Management Motion.** **Debtors' Motion for Entry of an Order (A) Authorizing the Debtors to Continue Their Existing Cash Management System, Bank Accounts and Business Forms, (B) Granting Postpetition Intercompany Claims Administrative Expense Priority and (C) Authorizing Continued Intercompany Transactions**

83.     In the ordinary course of business, the Debtors maintain an integrated cash management system that provides well-established mechanisms for the collection, concentration, management, disbursement and investment of funds used in their operations (the "***Cash Management System***").  Such system provides numerous benefits, including the ability to: (a) quickly create status reports on the location and amount of funds, thereby allowing management to track and control corporate funds; (b) ensure cash availability; and (c) reduce administrative costs by facilitating the efficient movement of funds.

84.     As of the Petition Date, the Cash Management System included various bank accounts (collectively, the "***Bank Accounts***") with SunTrust Bank, HSBC Bank Canada, TD Canada Trust and Royal Bank of Canada, (collectively, the "***Banks***") used in the ordinary course of the Debtors' business.  The Debtors utilize a number of methods for disbursing funds, including (a) automatic clearing house transfer ("***ACH Transfer***"); (b) debit; (c) wire transfer; and (d) written check.

85.     The Debtors' primary operating accounts are as follows:

- **Investment Accounts:**  The Debtors maintain a stand-alone investment account in the name of TSN, and several Certificate of Deposit accounts at SunTrust Bank.

- **Disbursement Accounts:**  The Debtors pay certain accounts payable, payroll, taxes, and other expenses from various accounts held at SunTrust Bank, HSBC Bank Canada, TD Canada Trust and Royal Bank of Canada (the "***Disbursement Accounts***").  TSN replenishes the Disbursement Account with amounts from the Investment Account as needed.

86.     The Debtors have used their Cash Management System for a number of years, and the Cash Management System has evolved over time into a mainstay of the Debtors' ordinary, usual and essential business practices.

87.     Additionally, in the ordinary course of business, the Debtors and certain non-Debtor entities utilize a cost allocation system, through which expenses initially paid by a Debtor or a non-Debtor affiliate for the benefit of other Debtors or non-Debtor affiliates are allocated to the appropriate entities in proportion to the benefits received by such entities (the "***Intercompany Transactions***").  As a result of the Intercompany Transactions, intercompany receivables and payables are created in the ordinary course of business (the "***Intercompany Claims***").  In addition, the Debtors have in the past, created notes to evidence the Intercompany Transactions (the "***Intercompany Notes***").  The Debtors also maintain a credit facility (the "***Intercompany Credit Facility***") between TSN and TerreStar Canada, which is used to fund operating and other expenses of TerreStar Canada.  The Intercompany Transactions are sometimes settled by book entry rather than by an actual transfer of cash and are not always evidenced by Intercompany Notes or through the Intercompany Credit Facility.  The Debtors track all Intercompany Transactions through the methods described above and electronically in their accounting system and can ascertain, trace and account for them as needed.  Continuing these Intercompany Transactions, and other intercompany services will benefit the Debtors' estates and preserve the value of the Debtors' ownership interest in their non-filing affiliates.  If the Intercompany Transactions were to be discontinued, the Cash Management System and related administrative controls would be disrupted to the Debtors' detriment.

88.     The Debtors maintain records of all transfers and can ascertain, trace and account for all Intercompany Transactions and will continue to do so during these chapter 11 cases.

Accordingly, the Debtors seek authority to continue the Intercompany Transactions and request, pursuant to sections 503(b)(1) and 364(b) of the Bankruptcy Code, that postpetition Intercompany Claims resulting from ordinary course Intercompany Transactions be accorded administrative priority. Discontinuing the Intercompany Transactions would disrupt the Debtors' Cash Management System and related administrative controls to the detriment of the Debtors' estates, their creditors, and other parties in interest. Indeed, the Intercompany Transactions provide the only mechanism for payment of expenses incurred by those Debtors that do not have bank accounts. By allowing the Debtors to continue Intercompany Transactions and providing administrative priority to postpetition Intercompany Claims, the Court will ensure that (a) the Debtors without bank accounts can continue operating, (b) no Debtor or non-Debtor affiliate permanently funds the operations of other Debtors or non-Debtor affiliates, and (c) each entity utilizing funds flowing through the Cash Management System continues to bear ultimate repayment responsibility for such ordinary course transactions.

89.     Additionally, to minimize expenses to the Debtors' estates, avoid delays and facilitate the Debtors' smooth transition into chapter 11, the Debtors seek authority to (a) continue using the existing Cash Management System and Bank Accounts, (b) treat the Bank Accounts for all purposes as accounts for the Debtors as debtors in possession; (c) disburse funds from the Bank Accounts by all usual methods, including written check, wire transfer, debit and ACH Transfer; and (d) perform obligations under the documents governing the Cash Management System and the Bank Accounts, including paying ordinary course bank fees incurred in connection with the Bank Accounts. The Debtors will ensure that all postpetition transfers and transactions are documented in their books and records to the same extent as before

the commencement of their chapter 11 cases and are readily ascertainable from their books and records documenting transfers and transactions.

**Wages Motion.** **Debtors' Motion for Entry of Interim and Final Orders (A) Authorizing, but not Directing, Debtors (I) to Pay Certain Prepetition Wages and Reimbursable Employee Expenses, (II) to Pay and Honor Employee Medical and Other Benefits and (III) to Continue Employee Benefits Programs and (B) Authorizing Financial Institutions to Honor All Related Checks and Electronic Payment Requests**

90.     As explained above, the Debtors employ a total of approximately 107 Employees, 20 of which are employed by the Debtors on an hourly basis (the "***Hourly Employees***") and the balance of which are employed by the Debtors on a full-time salaried basis (the "***Full-Time Employees***").    The Debtors also supplement their work force with independent contractors depending on the Debtors' business needs.  The Debtors incur and pay a number of obligations related to their Employees such as payroll, federal and state withholding taxes and other withheld amounts (including wage garnishments, Employees' share of insurance premiums, taxes and 401(k) contributions), health benefits, retirement benefits, workers' compensation benefits, vacation time, life and accidental dismemberment insurance, short and long-term disability coverage, various reimbursable expenses and other benefits that the Debtors have historically provided in the ordinary course of business (collectively, the "***Employee Obligations***").  In an effort to minimize the personal hardship to Employees and to maintain moral and stability in the Debtors' business operations, the Debtors' seek authority to continue these programs and pay and honor amounts arising under or in connection with the Debtors' Employee Obligations.

91.     By the Wages Motion, the Debtors request authority to pay Employee Obligations during the interim period.  As further described in the Wages Motion, the Debtors believe that substantially all prepetition Employee Obligations have been satisfied.   However, certain amounts may remain outstanding due to a number of factors, including (a) discrepancies that exist between amounts paid prepetition and the amounts that should have been paid, (b) the

possibility some prepetition checks or other payments may not have cleared before the Petition Date and (c) the fact that certain accrued obligations may not yet have become due and payable as of the Petition Date. Additionally, certain prepetition amounts related to the Employees may have accrued but remain outstanding because they are pending approval or they have not yet been submitted.

92.     Additionally, the Debtors request authority to continue certain other benefit programs including programs related to employee incentive bonuses, paid-time-off, leaves of absence, transportation assistance and flexible healthcare spending (the "***Employee Benefit Programs***") which the Debtors' provide as a service to their Employees.

93.     I believe that the payment of the Employee Obligations and continuation of the Employee Benefit Programs is essential to the preservation of the Debtors' business. As an initial matter, it is important to ensure the morale of our Employees does not diminish in light of our filing these chapter 11 cases. Additionally, failing to pay our Employee Obligations and continue the Employee Benefit Programs could lead many employees to terminate their employment with the Debtors leaving the Debtors unable to operate their business. I have also been informed that the Debtors must continue certain of the programs mentioned above, especially the workers compensation program, in order to maintain the legal right to operate their business.

## **Procedural Motions**

**Joint Administration Motion. Debtors' Motion for Entry of an Order Directing Joint Administration of Related Chapter 11 Cases**

94.     As discussed herein above, the 13 Debtors in these chapter 11 cases include TSN and 12 of its affiliates, each of which is wholly-owned or controlled by the Company, or of which the Company holds the power to vote twenty percent (20%) or more of the subsidiaries'

outstanding voting securities. The Debtors have common ownership, and they share key financial and operational systems.

95.     The joint administration of these chapter 11 cases, to the best of my knowledge, will not give rise to any conflict of interest among the Debtors' estates. Nor will joint administration adversely affect the Debtors' respective creditors because this motion requests only administrative, not substantive, consolidation of the estates. Thus, I believe individual creditors' rights should not be harmed by the relief requested; by contrast, non-Debtor parties in interest will benefit from the cost reductions associated with the joint administration of these cases.

**Schedules and Statements Extension Motion.  Debtors' Motion for Entry of an Order Granting an Extension of Time to File Schedules and Statements**

96.     As a consequence of the complexity of the Debtors' business operations, and the geographical spread of the Debtors' operations, the Debtors have not yet finished gathering the statements of financial affairs, schedules of assets and liabilities, schedules of current income and expenditures, statements of executory contracts and unexpired leases and lists of equity security holders.

97.     Given the numerous critical operational matters that the Debtors' accounting and legal personnel must address in the early days of these chapter 11 cases, I believe that with an additional 30 day extension, the Debtors will be able to focus the attention of key accounting and legal personnel on vital operational and restructuring issues during the critical first weeks after filing these chapter 11 cases. This will help the Debtors make a smooth transition into chapter 11 and, therefore, ultimately will maximize the value of the Debtors' estates to the benefit of creditors and all parties in interest.

**Case Management Motion.** **Motion of the Debtors for an Order Establishing Noticing Requirement and Omnibus Hearings for All Proceedings**

98.     I expect that there will be numerous parties in interest in these cases, that those parties will file requests for service of filings and that numerous motions and applications will be filed in these chapter 11 cases.  The costs and burdens that might arise absent adoption of case management procedures -- such as, for example, those associated with multiple hearings per month, plus the costs associated with copying, mailing, overnighting or otherwise serving paper copies of all such documents -- could impose significant economic and administrative burdens on the Debtors' estates, the Court and all other parties in interest.  Given the size and scope of these cases, I believe that implementation of case management procedures will facilitate their efficient administration.

**GCG Retention** **Debtors' Motion for Entry of an Order Authorizing and Approving the Employment and Retention of The Garden City Group, Inc. as Notice and Claims Agent**

99.     The Debtors propose to engage The Garden City Group, Inc. ("*GCG*") to act as claims and noticing agent in these chapter 11 cases, and they respectfully submit that this retention will maximize efficiency in administering these cases and will ease administrative burdens such as providing notice to all creditors and parties in interest in these cases, that otherwise would fall upon the Court and the United States Trustee for the Southern District of New York.

**Creditor Matrix Motion.** **Debtors' Motion for Entry of an Order Authorizing the Debtors to (A) Prepare a List of Creditors in Lieu of Submitting a Formatted Mailing Matrix, (B) File a Consolidated List of the Debtors' 30 Largest Unsecured Creditors and (C) Mail Initial Notices**

100.     The Debtors propose to retain GCG as notice and claims agent in connection with the Debtors' chapter 11 cases to assist the Debtors in preparing creditor lists and mailing initial notices. With such assistance, the Debtors will be prepared to file a computer-readable

consolidated list of creditors and a list of equity security holders upon request and will be capable of undertaking all necessary mailings. Indeed, because the Debtors have numerous creditors, converting the Debtors' computerized information to a format compatible with the matrix requirements would be an exceptionally burdensome task and would greatly increase the risk and recurrence of error with respect to information already intact on computer systems maintained by the Debtors or their agents.

101.     I believe that consolidation of the Debtors' computer records into a creditor database and mailing notices to all applicable parties in such database will be sufficient to permit GCG to promptly notice those parties. Accordingly, maintaining electronic-format lists of creditors and equity security holders rather than preparing and filing separate matrices will maximize efficiency and accuracy, and reduce costs.

**Foreign Representative Motion.**   **Motion for Entry of an Order Authorizing TerreStar Networks Inc. to Act as Foreign Representative Pursuant to 11 U.S.C. § 1505**

102.     By the *Debtors' Motion for Entry of an Order Authorizing TerreStar Networks Inc. to Act as Foreign Representative Pursuant to 11 U.S.C. § 1505* (the "***Foreign Representative Motion***"), the Debtors are seeking entry of an order authorizing TSN to act as the Foreign Representative on behalf of the Debtors in the Recognition Proceeding.  TSN will be commencing the Recognition Proceedings in conjunction with the commencement of these chapter 11 cases.

103.     I understand from counsel that, in order for TSN to be recognized as the Foreign Representative in the Recognition Proceeding so that it can apply to have the chapter 11 cases recognized by the Canadian Court as a foreign main proceeding, an order of the Court must be granted authorizing TSN to act as the foreign representative in foreign proceedings.  I understand that, if such an order is granted, TSN will be able to file the order sought on the Foreign

Representative Motion with the Canadian Court as the instrument authorizing TSN to act as the Foreign Representative pursuant to section 46 of the CCAA. Accordingly, I believe that appointing TSN as the Foreign Representative will allow coordination of the Recognition Proceeding and these chapter 11 cases.

## Motions and Applications to Be Deferred for Later Hearing

**Akin Gump Retention. Debtors' Application for Entry of an Order Authorizing the Employment and Retention of Akin Gump Strauss Hauer & Feld LLP as Attorneys for the Debtors Effective Nunc ProTunc to the Petition Date**

104.    The Debtors seek to retain Akin Gump Strauss Hauer & Feld LLP ("***Akin Gump***") as their attorneys because Akin Gump has extensive experience and knowledge in the field of debtors' and creditors' rights and business reorganizations under chapter 11 of the Bankruptcy Code. Akin Gump has been working with the Debtors since 2007 with respect to various corporate, tax, regulatory, securities, restructuring, and other related matters.

**Blackstone Retention. Debtors' Application for Entry of Interim and Finals Orders Authorizing the Employment and Retention of Blackstone Advisory Partners L.P. as Financial Advisor for the Debtors and Debtors in Possession Effective Nunc Pro Tunc to the Petition Date**

105.    The Debtors seek to retain Blackstone Advisory Partners L.P. ("***Blackstone***") as their financial advisor because, among other things, Blackstone has extensive experience and an excellent reputation in providing high quality financial advisory services to debtors and creditors in bankruptcy reorganizations and other restructurings. Blackstone has been working with the Company since April 2010 with respect to various restructuring and other related matters.

**Fraser Milner Retention. Application of the Debtors Pursuant to Bankruptcy Code Sections 327(a), 328(a) and 330 and Federal Rules of Bankruptcy Procedure 2014 and 2016 for an Order Authorizing the Employment and Retention of Fraser Milner Casgrain LLP as Canadian Counsel for the Debtors Nunc Pro Tunc to the Petition Date**

106.    In addition to their principal operations in the United States, the Debtors also have certain assets and limited operations in Canada.  In connection with the filing of these chapter 11 cases, the Debtors will be commencing the Recognition Proceeding.

107.    The Debtors seek to retain Fraser Milner Casgrain LLP ("***Fraser Milner***") as Canadian Counsel to represent TSN as the proposed foreign representative in the Recognition Proceeding and to provide Canadian legal advice to all of the Debtors except Holdings Canada and TerreStar Canada in connection with their ongoing restructuring efforts in these cases and the Recognition Proceeding.  Fraser Milner has extensive experience and knowledge in the field of debtors' and creditors' rights and cross-border reorganizations which implicate both chapter 11 of the Bankruptcy Code and the CCAA.  Moreover, Fraser Milner acted for the Debtors since 2004 with respect to various corporate, tax, regulatory, securities, restructuring, and other related matters.

108.    As described in the First Day Declaration, Holdings Canada and TerreStar Canada are not "controlled" by any of the other Debtors in these cases.  As such, they will, by separate application, be seeking authority to retain and employ Stikeman Elliott LLP ("***Stikeman***") as special Canadian counsel to provide independent legal advice to those two Debtor entities in connection with these cases and the Recognition Proceeding.

**Stikeman Retention.** **Application of the Debtors Pursuant to Bankruptcy Code Sections 327(a), 328(a) and 330 and Federal Rules of Bankruptcy Procedure 2014 and 2016 for an Order Authorizing the Employment and Retention of Stikeman Elliot LLP as Canadian Counsel for TerreStar Networks (Canada) Inc. and TerreStar Networks Holdings (Canada) Inc. Nunc Pro Tunc to the Petition Date**

109. The Debtors are seeking authority to retain and employ Stikeman as special Canadian counsel to provide independent legal advice and, when necessary, act as conflicts counsel for Holdings Canada and TerreStar Canada in connection with these cases and the Recognition Proceeding. I respectfully submit that the representation of the Holdings Canada and TerreStar Canada by distinct Canadian counsel is required and appropriate in the circumstances given, *inter alia*, that Holdings Canada and TerreStar Canada do not have the same majority and controlling shareholders as the Domestic Debtors. The appointment of distinct Canadian counsel is required for the proper exercise of the fiduciary duties of the directors of Holdings Canada and TerreStar Canada.

**OCP Motion.** **Debtors' Motion for Entry of an Order Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business**

110. The Debtors employ various attorneys in the ordinary course of their business (each, an "*OCP*" and, collectively, the "*OCPs*"). The OCPs provide services for the Debtors in a variety of matters unrelated to these chapter 11 cases, including legal services with regard to specialized areas of the law, FCC regulation and litigation.

111. In the ordinary course of business, the Debtors also employ professional service providers (the "*Service Providers*"). Although some of the Service Providers have professional degrees and certifications, they provide services to the Debtors that are integral to the day-to-day operation of the Debtors' businesses and do not directly relate to or materially affect the administration of these chapter 11 cases.

112.     I believe that although the OCPs and Service Providers will wish to continue to represent the Debtors during these chapter 11 cases, many would not be in a position to do so if the Debtors cannot pay them on a regular basis. Without the background knowledge, expertise and familiarity that the OCPs and Service Providers have relative to the Debtors and their operations, the Debtors undoubtedly would incur additional and unnecessary expenses in educating and retaining replacement professionals. Accordingly, I believe that the Debtors' estates and their creditors are best served by avoiding any disruption in the professional services that are required for the day-to-day operation of the Debtors' business. Moreover, in light of the substantial number of OCPs and Service Providers, and the significant costs associated with the preparation of employment applications and fee applications for professionals who will receive relatively modest fees, I believe that it would be impractical, inefficient and extremely costly for the Debtors and their legal advisors to prepare and submit individual applications and proposed retention orders for each OCP and Service Provider.

113.     I am aware that some of the OCPs and Service Providers may hold relatively small unsecured claims against the Debtors in connection with services rendered to the Debtors prepetition; I do not believe that such claims would cause any of the OCPs or Service Providers to have an interest materially adverse to the Debtors, their creditors or other parties in interest.

**Interim Compensation Motion.  Debtors' Motion for Entry of an Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses for Professionals**

114.     I believe that establishing orderly procedures for payment of Akin Gump, Blackstone, Fraser Milner, Stikeman Elliot, GCG and any other professionals retained in these chapter 11 (collectively, the "***Professionals***") will streamline the administration of these chapter 11 cases by facilitating efficient review of the Professionals' fees and expenses while saving the Debtors unnecessary copying and mailing expenses.

**Insurance Motion.  Debtors' Motion for Entry of an Order (A) Authorizing, but not Directing, Debtors to Continue to Administer Insurance Coverage and (B) Authorizing Financial Institutions to Honor All Related Checks and Electronic Payment Requests**

115.     The Debtors maintain a comprehensive insurance program that provides coverage related to, among other things, satellite in-orbit activities, property liability, general liability, directors' and officers' liability, employment practices liability and business automobile liability (collectively, the "***Insurance Programs***").

116.     I believe that the Insurance Programs are essential to the preservation of the value of the Debtors' businesses, property and assets. In many cases, insurance coverage such as that provided by the Insurance Programs is required by the diverse regulations, laws and contracts that govern the Debtors' commercial activities.  Moreover, maintaining these insurance programs is a necessary condition to the DIP Facility and the failure to maintain them could jeopardize TerreStar's postpetition financing and, in turn, the value for our creditors.

**Taxes Motion.  Debtors' Motion for Entry of an Order (A) Authorizing, but not Directing, the Debtors to Pay Taxes and Fees and (B) Authorizing Financial Institutions to Honor All Checks and Electronic Payment Requests**

117.     In the ordinary course of their business, the Debtors:  (a) collect and incur taxes, including certain business, franchise, personal property, sales & use, goods & services, excise and other taxes in operating their business (collectively, the "***Taxes***"); (b) charge fees and other similar charges and assessments (collectively, the "***Fees***") on behalf of various taxing, licensing and other governmental authorities (collectively, the "***Authorities***"); and (c) pay Fees to such Authorities for licenses and permits required to conduct the Debtors' business in the ordinary course.  The Debtors pay the Taxes and Fees monthly, quarterly or annually to the respective Authorities, in each case as required by applicable laws and regulations.

118.     It is my understanding from various members of the Company's tax and legal departments that the Debtors' failure to pay the Taxes and Fees could materially and adversely

impact the Debtors' business operations in several ways. The Authorities may initiate audits of the Debtors, which would unnecessarily divert the Debtors' attention from the tasks required by the reorganization process at a critical time for the Debtors' business. The Authorities may also attempt to suspend the Debtors' operations, file liens, seek to lift the automatic stay and pursue other remedies that will be administratively burdensome to the estates. Furthermore, certain directors and officers could be subject to personal liability, which would likely distract those key personnel from their duties related to the Debtors' restructuring. Moreover, with respect to the Fees, the Debtors' failure to pay such Fees to the Authorities and other relevant third parties would cause the Debtors to incur late fees, penalties and other charges in addition to the Fees.

119.    In the ordinary course of business, the Debtors purchase equipment necessary to the Debtors' business operations. In lieu of the Debtors paying or incurring sales or excise taxes in connection with these purchases, applicable state taxing authorities require the Debtors to pay use taxes on the equipment. The Debtors pay use taxes on a monthly basis, and the Debtors remit approximately $60,000 in the aggregate in use taxes per year to certain of the Authorities. Based on historical monthly payments, I believe that, as of the date hereof, the Debtors may owe approximately $5,000 to the Authorities for prepetition use taxes.

120.    Under applicable law, state and local governments in jurisdictions where the Debtors' operations are located, including Texas, Virginia, Arizona, Florida, Indiana, Louisiana, Maryland, North Carolina, North Dakota, New Mexico, Nevada, Oregon, Utah, and Washington are granted the authority to levy property taxes against real and personal property. The Debtors generally do not own real property but typically pay $300,000 per year in property taxes on their personal property in the ordinary course of business as such taxes are invoiced. I believe that, as

of the Petition Date, the Debtors have approximately $120,000 in accrued, unpaid property taxes that are due in the first quarter of 2011.

121.    Certain states require the Debtors to pay various business taxes. These taxes may be based on gross receipts or other bases determined by the taxing jurisdiction. Further, certain states require the Debtors to pay annual reporting fees to state governments to remain in good standing for purposes of conducting business within the state. The Debtors pay approximately $25,000 per year with respect to these various business taxes and annual reporting fees. I believe that, as of the date hereof, there are no amounts owing with respect to prepetition business taxes and annual reporting fees.

122.    The Debtors pay franchise taxes to the state of Delaware to operate their business in the state. The Delaware franchise taxes are paid on an annual basis, in the approximate amount of $405,000 per year. I believe that, as of the Petition Date, the Debtors have approximately $177,000 in accrued, unpaid Delaware franchise taxes that are due in the first quarter of 2011.

123.    In connection with the operation of their Canadian affiliates, the Debtors are responsible for paying Canadian corporation, retail sales and capital taxes each year (the "***Canadian Taxes***"). The amount of Canadian Taxes the Debtors incur varies from year to year. In 2009, the Debtors paid approximately $119,000 (CDN) in Canadian Taxes and estimate that they will owe approximately $50,000 (CDN) in Canadian Taxes for 2010. The anticipated reduction is based on the phasing out of the Ontario capital tax in July 2010, which tax comprised the vast majority of the Debtors' Canadian tax liability.

124.    Section 9 of the Communications Act of 1934 empowers the FCC to "assess and collect regulatory fees to recover the costs of ...  enforcement activities, policy and rulemaking

activities, user information services, and international activities." 47 U.S.C. § 159(a)(1). As a satellite communications company, the Debtors are subject to regulation and oversight by the FCC and, as such, incur such "regulatory fees" in the ordinary course of business (the "***FCC Fees***"). The Debtors' annual FCC Fees are approximately $1,500 and are due in August 2011. I believe that, as of the Petition Date, the Debtors have approximately $240 in accrued prepetition FCC Fees due in August 2011.

125. In addition to the FCC Fees, the Debtors, in the ordinary course of business, incur approximately $39,000 (CDN) in Canadian regulatory fees (the "***Canadian Regulatory Fees***") in connection with the operation of the TerreStar-1 Satellite and five Canadian calibration earth stations. The Canadian Regulatory Fees are payable to the Canadian Government on an annual basis. Included in the Canadian Regulatory Fees are mobile satellite service license fees, radio license fees and spectrum fees. I believe that, as of the Petition Date, the Debtors have approximately $16,250 (CDN) in accrued prepetition Canadian Regulatory Fees due in March 2011.

**Utilities Motion. Debtors' Motion for Entry of an Order Determining Adequate Assurance of Payment for Future Utility Services**

126. The Debtors incur utility expenses for electric, natural and industrial gas, steam, water, telephone, internet, and other similar utility services. Approximately 60 utility providers (collectively, the "***Utility Providers***") provide these services through approximately 70 accounts. On average, the Debtors spend approximately $180,000 each month on utility costs.

127. The Utility Providers service the Debtors' corporate headquarters, data centers and operation centers. Preserving utility services on an uninterrupted basis is essential to the Debtors' ongoing operations and, therefore, to the success of their reorganization. Indeed, any interruption in utility services, even for a brief period of time, would disrupt the Debtors' ability

to continue operations. I believe such a result could seriously jeopardize the Debtors' reorganization efforts and, ultimately, value and creditor recoveries. It is therefore critical that utility services continue uninterrupted during these chapter 11 cases.

**RSA Assumption Motion. Debtors' Motion for Entry of an Order Authorizing the Debtors to Assume a Restructuring Support Agreement**

128.    As discussed above, in the weeks leading to the commencement of these cases, the Debtors and EchoStar have actively negotiated the terms for a restructuring of the Debtors' business that would maximize the value of their estates for the benefit of all constituents. After extensive negotiations conducted at arm's-length and in good faith the Debtors and EchoStar entered into a Restructuring Support Agreement (the "*RSA*") to memorialize the agreements reached in those discussions. Through the RSA, among other commitments, EchoStar has committed to support the Debtors' restructuring efforts, including an agreement, at the appropriate time and consistent with applicable law, to support a plan of reorganization (a "*Plan*") consistent with the Restructuring Term Sheet attached to the RSA (the "*Term Sheet*") and to backstop a rights offering that will repay the DIP Facility in full and in cash and which provides the Debtors with a clear exit strategy for these chapter 11 cases. Importantly, as part of the proposed Plan, EchoStar has agreed to support the conversion of its Senior Secured Notes to equity of the reorganized entity, giving the Debtors support of one-half of their secured creditors for such equitization.

129.    By the RSA Motion, the Debtors are seeking this Court's approval to assume a restructuring support agreement with their largest secured creditor (and indeed, their largest stakeholder), which will help pave the way for the Debtors to exit chapter 11 with a deleveraged balance sheet and give the Debtors the best available opportunity for them to maximize value for

their estates, including their stakeholders. Specifically, the RSA[38] provides for a comprehensive restructuring of the Debtors, including a significant deleveraging of the Debtors' balance sheet, which will enable the Debtors to maximize enterprise value on a going-forward basis.

130.     Importantly, the RSA contains a "fiduciary out" provision, that will allow the Debtors to take any actions that are necessary to comply with their fiduciary duties.

131.     Given the significant benefits to be garnered, the Debtors determined, in the exercise of their reasonable business judgment, that the proposed chapter 11 plan structure set forth in the RSA and the Term Sheet is the best opportunity to maximize the value of their estates and, thereby, maximize creditor recoveries. The terms of the Plan will not only significantly reduce the Debtors' funded indebtedness, but will also provide the necessary capital to fund the Debtors' future operations, meet competitive conditions, and preserve asset value for the Debtors and their estates.

## VIII.

## Information Required by Local Bankruptcy Rule 1007-2

132.     Local Bankruptcy Rule 1007-2 requires certain information related to the Debtors, which is set forth below. The information requested in Local Bankruptcy Rule 1007-2(a)(1) is set forth in Sections I and IV above.

133.     Pursuant to Local Bankruptcy Rule 1007-2 (a)(3), Schedule 1 hereto lists the names and addresses of the members of, and attorneys for, the ad hoc committee of holders of the Debtors' 6.5% Senior Exchangeable PIK Notes organized prior to the Petition Date (the "*Ad Hoc Bondholders Committee*").

---

[38] The descriptions and discussions of the RSA and the Term Sheet contained herein are summary in nature. In the event of any inconsistency between the terms of any of those documents and their descriptions contained herein, the terms of the actual documents will control.

134.    Pursuant to Local Bankruptcy Rule 1007-2(a)(4), <u>Schedule 2</u> hereto lists the following information with respect to each of the holders of the Debtors' 30 largest unsecured claims on a consolidated basis, excluding claims of insiders: the creditor's name, address (including the number, street, apartment or suite number, and zip code, if not included in the post office address), and telephone number; the name(s) of persons(s) familiar with the Debtors' accounts; the amount of the claim; and an indication of whether the claim is contingent, unliquidated, disputed, or partially secured.

135.    Pursuant to Local Bankruptcy Rule 1007-2(a)(5), <u>Schedule 3</u> hereto provides the following information with respect to each of the holders of the five (5) largest secured claims against the Debtors on a consolidated basis: the creditor's name, address (including the number, street, apartment or suite number, and zip code, if not included in the post office address), and telephone number; the amount of the claim; a brief description of the collateral securing the claim; an estimate of the value of the collateral; and whether the claim or lien is disputed.

136.    Pursuant to Local Bankruptcy Rule 1007-2(a)(6), <u>Schedule 4</u> hereto provides a summary of the Debtors' assets and liabilities on a consolidated basis.

137.    Pursuant to Local Bankruptcy Rule 1007-2(a)(7), <u>Schedule 5</u> provides a summary of the Debtors' stock, debentures, or other securities in the Company that are publicly held.

138.    Pursuant to Local Bankruptcy Rule 1007-2(a)(8), <u>Schedule 6</u> hereto provides a list of the Debtors' property in the possession or custody of any custodian, public officer, mortgagee, pledgee, assignee of rents, secured creditor, or agent for any such entity, giving the name, address, and telephone number of such entity and the location of the court in which any proceeding relating thereto is pending.

139.     Pursuant to Local Bankruptcy Rule 1007-2(a)(9), <u>Schedule 7</u> hereto provides a list of the premises owned, leased, or held under other arrangement from which the Debtors operate their business.

140.     Pursuant to Local Bankruptcy Rule 1007-2(a)(10), <u>Schedule 8</u> hereto provides the location of the Debtors' substantial assets, the location of their books and records, and the nature, location, and value of any assets held by the Debtors outside the territorial limits of the United States.

141.     Pursuant to Local Bankruptcy Rule 1007-2(a)(11), <u>Schedule 9</u> hereto provides a list of the nature and present status of each action or proceeding, pending or threatened, against the Debtors or their property where a judgment against the Debtors or a seizure of their property may be imminent.

142.     Pursuant to Local Bankruptcy Rule 1007-2(a)(12), <u>Schedule 10</u> hereto provides the names of the individuals who comprise the Debtors' existing senior management, their tenure with the Debtors, and a brief summary of their relevant responsibilities and experience.

143.     Pursuant to Local Bankruptcy Rule 1007-2(b)(1)-(2)(A), <u>Schedule 11</u> hereto provides the estimated amount of weekly payroll to the Debtors' employees (not including officers, directors, stockholders, and partners) and the estimated amount to be paid to officers, stockholders, directors and financial partners, and business consultants retained by the Debtors, for the 30-day period following the filing of the Debtors' chapter 11 petitions.

144.     Pursuant to Local Bankruptcy Rule 1007-2(b)(3), <u>Schedule 12</u> hereto provides, for the 30-day period following the filing of the chapter 11 petitions, a list of estimated cash receipts and disbursements, net cash gain or loss, obligations and receivables expected to accrue

but remain unpaid, other than professional fees, and any other information relevant to an understanding of the foregoing.

I declare under penalty of perjury that the foregoing is true and correct. Executed on this

19th day of October, 2010.

By:
Name: Jeffrey W. Epstein
Title: **Chief Executive Officer**
      **TerreStar Networks Inc.**

## <u>EXHIBIT A</u>

## The Company's Corporate Organization Chart

# Organizational Chart of TerreStar Corporation



## EXHIBIT B

## Map of the Debtors' Satellite Coverage Area



# TerreStar Satellite Coverage Area

### To be available on the GENUS™ smartphone*

Alaska

United States

Hawaii

The TerreStar-1 satellite covers North America using hundreds of spot beams. Actual coverage may differ from map depiction. Coverage may be affected by such things as terrain, weather, dense foliage, buildings and other factors. This coverage map is not a guarantee of coverage. Service availability will extend beyond the beam edge and may vary depending on terrain and other factors. Coverage in Alaska subject to technical limitations and will change over time. In all areas, service is offered subject to available capacity. Quality of service may vary from beam to beam. Roaming in Canada expected at a future date. TerreStar reserves the right to optimize coverage, allocated capacity, and quality of service to best meet customer needs from time to time at its own discretion.

Puerto Rico & U.S.V.I.

Primary Service Area

External Antenna Recommended

External Antenna Required

\* Launching soon with AT&T

EXHIBIT C

**Diagram of the Debtors' Ground Operations**

# GBBF and CES Locations



| CES SITE # | LOCATION |
|---|---|
| 1 | Town of Burns Lake, British Columbia, Canada |
| 2 | Barlow, Oregon, USA |
| 3 | Village of Valleyview, Alberta, Canada |
| 4 | Ritzville, Washington, USA |
| 5 | Austin - NW Desert, Nevada, USA |
| 6 | North Las Vegas – SW Desert, Nevada, USA |
| 7 | Paragonah - Central Utah, Utah, USA |
| 8 | Mammoth, Arizona, USA |
| 9 | Wynyard, Saskatchewan, Canada |
| 10 | Ruidoso, New Mexico, USA |
| 11 | Devils Lake, Walsh County, North Dakota |
| 12 | Junction – Kimble County, Texas, USA |
| 13 | Laredo Tex/Mex Border, Texas, USA |
| 14 | Town of Pickle Lake, Ontario, Canada |
| 15 | Austin – Jackson County, Indiana |
| 16 | New Iberia – St. Martinville, Louisiana, USA |
| 17 | Madoc Township, Ontario, Canada |
| 18 | Independence – Greyson County, Virginia, USA |
| 19 | Windsor, North Carolina, USA |
| 20 | Homestead – South Miami, Florida |

G40520 P 06/01/09

HUGHES PROPRIETARY

**<u>EXHIBIT D</u>**

**Additional Information Required Pursuant to Local Rule 1007-2**

## Schedule 1 - Ad Hoc Bondholder Committee

Pursuant to Local Rule 1007-2(a)(3), the following is a list of the members of and attorneys for an *ad hoc* committee of holders of the Debtors' 6.5% Senior Exchangeable PIK Notes organized prior to the Petition Date (the "***Ad Hoc Bondholders' Committee***"), with their respective addresses.

| Committee Member | Address |
|---|---|
| Millennium Partners, L.P. | Millennium Partners, L.P.<br>1995 Broadway<br>New York, NY 10023 |
| OZ Global Special Investments Master Fund, LP | Och Ziff Capital Management Group<br>9 West 57th Street<br>New York, NY 10019 |
| OZ Master Fund, LTD | Och Ziff Capital Management Group<br>9 West 57th Street<br>New York, NY 10019 |
| Singer Children's Management Trust | Romulus Holdings Inc.<br>20 Rock Ridge Circle,<br>New Rochelle, NY 10804 |
| Gary & Karen Singer Children's Trust | Romulus Holdings Inc.<br>20 Rock Ridge Circle,<br>New Rochelle, NY 10804 |
| Sola LTD | Solus Alternative Asset Management<br>430 Park Avenue<br>New York, NY 10022 |
| Solus Core Opportunities Master Fund Ltd. | Solus Alternative Asset Management<br>430 Park Avenue<br>New York, NY 10022 |

| Category | Professional | Address |
|---|---|---|
| Attorneys | Quinn Emanuel Urquhart & Sullivan, LLP – retained on June 8, 2010 | 51 Madison Ave, 22nd Floor<br>New York, NY 10010<br>(212) 849-7000 |
| Financial Advisors | Houlihan Lokey Howard & Zukin Capital, Inc. | 1930 Century Park West<br>Los Angeles, CA 90067<br>(310) 553-8871 |

## Description

The *Ad Hoc* Bondholders' Committee was formed to engage in negotiations regarding restructuring the Debtors' obligations under the Senior Exchangeable Notes Indenture; the *Ad Hoc* Bondholders Committee retained counsel and advisors to represent them solely in their capacity as holders thereunder and not with regard to any other claim or interest they may hold in any of the Debtors.

## Approximate Date Formed

May 2010

**Schedule 2 - Holders of the Debtors' 30 Largest Unsecured Claims on a Consolidated Basis**

Pursuant to Local Rule 1007-2(a)(4), the following provides information with respect to the holders of the 30 largest unsecured claims against the Debtors on a consolidated basis.

The information contained herein shall not constitute an admission of liability by, nor is it binding on, the Debtors. The Debtors reserve all rights to assert that any debt or claim listed herein is a disputed claim or debt, and to challenge the priority, nature, amount or status of any such claim or debt. In the event of any inconsistencies between the summaries set forth below and the respective corporate and legal documents relating to such obligations, the descriptions in the corporate and legal documents shall control. The schedule estimates outstanding claim amounts (including principal and interest) as of October 19, 2010.

| No. | Holder of Claim | Name of Person Familiar with Debtors' Account/Mailing Address/Phone Number/Fax Number | Amount of Claim | Nature of Claim | Contingent/ Unliquidated/ Disputed Claim |
|---|---|---|---|---|---|
| 1. | U.S. Bank National Association, in its capacity as Indenture Trustee for the 6.5% Senior Exchangeable Notes | EP-MN-WS3C 60 Livingston Avenue, St. Paul, MN 55107-1419 Ph: 651-495-3814 Fax: 651-495-8097 | $178,715,631 | Note holder Claim | Disputed |
| 2. | Space Systems/Loral Inc. | 3825 Fabian Way Palo Alto, CA 94303-4604 Ph:: 650 852-8563 Fax: 650-852-4060 | $35,647,804 | Vendor | Disputed |
| 3. | Elektrobit, Inc | 22745 29th Drive SE SUI, Suite 200 Bothell, WA 98201 PH: 425 869-2001 Fax: 425 686 3102 | $25,659,839 | Vendor | Disputed |
| 4. | Hughes Networks System LLC | 11717 Exploration Lane GERMANTOWN, MD 20876 PH: 301 428-5500 | $4,513,861 | Vendor | Disputed |

| No. | Holder of Claim | Name of Person Familiar with Debtors' Account/Mailing Address/Phone Number/Fax Number | Amount of Claim | Nature of Claim | Contingent/ Unliquidated/ Disputed Claim |
|---|---|---|---|---|---|
| | | Fax: 301 548  1155 | | | |
| 5. | Infineon Technologies AG | AM Campeon 1-12 Neubiberg, Germany  85579 PH: 49 89 234 65555 Fax: (+49) 911-37 88 10 00 | $2,937,180 | Vendor | Disputed |
| 6. | Qualcomm | 5775 Morehouse Dr. San Diego, CA 92121 PH:  858-845-1452 Fax:  858-845-5553 | $2,280,850 | Vendor | Disputed |
| 7. | Comneon GMBH | Suedwestpark 2-4 Nuremburg  90449 PH:  49-2-911-37-88-0 Fax: 011 49 911 3788-1000 | $1,686,271 | Vendor | Disputed |
| 8. | ATC Technologies | 10802 Parkridge Blvd c/o SkyTerra LP RESTON, VA 20191 PH :  781-926-4500 Fax :  781-926-4555 | $1,381,197 | Vendor | Disputed |
| 9. | Nokia Siemens Network | 1950 N Stemmons Fwy Suite 5010 Dallas, TX  75207 PH:  214-763-6318 Fax:  972-374-3806 | $1,000,008 | Vendor | Disputed |
| 10. | Alcatel - Lucent | 3400 M/S SS01 West Plano Parkway Plano, TX  75082 PH:  484-242-3321 | $990,000 | Vendor | Disputed |

| No. | Holder of Claim | Name of Person Familiar with Debtors' Account/Mailing Address/Phone Number/Fax Number | Amount of Claim | Nature of Claim | Contingent/ Unliquidated/ Disputed Claim |
|---|---|---|---|---|---|
| | | Fax: 484-242-3160 | | | |
| 11. | Van Vlissingen and Co. | One Overlook Point Suite 100 Lincolnshire, IL 60069 PH: 847-634-2300 Fax: 847-634-9598 | $444,210 | Vendor | Disputed |
| 12. | Jefferies & Company, Inc | 520 Madison Avenue New York, NY 10022 PH: 212-284-2300 Fax: | $350,000 | Professional | Disputed |
| 13. | RKF Engineering, LLC | 1229 19th Street, NW Washington, DC 20036 PH: 202-463-1567 Fax: 202-463-0344 | $277,792 | Vendor | Disputed |
| 14. | Data Sales Co., Inc. | 3450 W Burnsville Parkway, Burnsville, MN 55337 PH: 952-890-8838 Fax: 952-890-8917 | $242,177 | Vendor | Disputed |
| 15. | Telx-Dallas LLC | 2323 Bryant St. Dallas, TX 75201 PH: 347-562-0213 Fax: 212-480-8384 | $106,059 | Vendor | Disputed |
| 16. | Databank Holdings | 400 S Akard Street, Suite 100 Dallas, TX 75202 Ph: 214-720-2266 Fax: 214-720-2275 | $81,159 | Vendor | Disputed |
| 17. | Intrado Inc. | 1601 Dry Creek Drive, | $62,500 | Vendor | Disputed |

| No. | Holder of Claim | Name of Person Familiar with Debtors' Account/Mailing Address/Phone Number/Fax Number | Amount of Claim | Nature of Claim | Contingent/ Unliquidated/ Disputed Claim |
|---|---|---|---|---|---|
| | | Longmont, CO 80503-6493 Ph: 800-269-4165 | | | |
| 18. | Shaffer, Wilson, Sarver, & Gray | 1821 Michael Faraday Dr #302, Reston, VA 20190-5346<br><br>Ph: 703-471-6803 Fax: 703-742-3975 | $34,322 | Vendor | Disputed |
| 19. | Telesat Canada | 1601 Telesat Court Ottawa, ON K1B5P4<br><br>Ph: 613-748-0123 Fax: 613-748-8712 | $28,504 | Vendor | Disputed |
| 20. | Sonoran Systems Inc. | 2983 East Vaughn Ave, Gilbert, AZ 85234<br><br>PH: 702-228-9054 Fax: 702-442-4743 | $19,200 | Vendor | Disputed |
| 21. | John Gilsenan | 206 Pond View Drive Bethany Beach, DE 19930 PH: (302) 539-5873 | $16,139 | Vendor | Disputed |
| 22. | BCI Northwood Flex, LLC | PO Box 540478 North Salt Lake, UT 84054 PH: 801-677-6400 Fax: 801-677-6416 | $15,634 | Vendor | Disputed |
| 23. | Ruder Finn | 301 East 57th New York, NY 10022 PH: 212-593-6400 Fax: 212-715-1658 | $10,000 | Vendor | Disputed |
| 24. | Neustar | 46000 Center Oak Plaza, Sterling, VA 20165<br><br>PH: 571-434-5400 | $9,995 | Vendor | Disputed |

| No. | Holder of Claim | Name of Person Familiar with Debtors' Account/Mailing Address/Phone Number/Fax Number | Amount of Claim | Nature of Claim | Contingent/ Unliquidated/ Disputed Claim |
|---|---|---|---|---|---|
| | | Fax: 703-738-7588 | | | |
| 25. | Forum Financial Service | 275 W. Campbell Road, Suite 320 Richardson, TX 75080 PH: 972 690-9444 Fax: 972-690-9464 | $7,421 | Vendor | Disputed |
| 26. | Thomson Reuters | 195 Broadway, New York, NY 10007 Ph: 617-249-1814 Fax: 617-249-1814 | $5,475 | Vendor | Disputed |
| 27. | Oxford Global Resource | 100 Cummings Center Suite 206L Beverly, MA 01915 PH: 800-724-8844 Fax: 817-490-5039 | $4,200 | Vendor | Disputed |
| 28. | Telus | PO Box 7575 Vancouver, Ontario Canada V6B 8N9 Ph:403-699-0335 Fax: 886-341-6525 | $3,325 | Vendor | Disputed |
| 29. | Bell Canada | PO Box 3650 Station Don Mills, Toronto, Ontario Canada M3C 3X9 Ph: 888-875-1843 Fax: 416-542-6786 | $1,795 | Vendor | Disputed |
| 30. | RE&M Solutions, Inc. | Estate Unite #370, Dallas, TX 75238 Ph: 214-341-7308 Fax: 214-221-9271 | $1,168 | Vendor | Disputed |

## Schedule 3 - Holders of the Debtors' 5 Largest Secured Claims

Pursuant to Local Rule 1007-2(a)(5), the following lists the Debtors' five largest secured claims on a consolidated basis. The five largest secured creditors are certain holders of the Debtors' Senior Secured Notes and lenders under the Purchase Money Credit Agreement. U.S. Bank National Association is the Indenture Trustee for the Senior Secured Notes and the Agent under the Purchase Money Credit Agreement.

The information contained herein shall not constitute an admission of liability by, nor is it binding on, the Debtors. The Debtors reserve all rights to assert that any debt or claim listed herein is a disputed claim or debt, and to challenge the priority, nature, amount or status of any such claim or debt. The descriptions of the collateral securing the underlying obligations are intended only as brief summaries. In the event of any inconsistencies between the summaries set forth below and the respective corporate and legal documents relating to such obligations, the descriptions in the corporate and legal documents shall control. The schedule estimates outstanding claim amounts (including principal and interest) as of October 19, 2010.

|  | Creditor | Contact: Mailing Address & Telephone Number & Fax Number | Amount of Claim | Type of Collateral |
|---|---|---|---|---|
| 1. | U.S Bank National Association in its capacity as Indenture Trustee of the 15% Senior Secured PIK Notes due 2014 | EP-MN-WS3C 60 Livingston Avenue St. Paul MN 55107-1419 Attn: Corporate Trust Services<br><br>TEL:(651) 495-3814 FAX: (651) 495-8097 | $943,959,275 | The claim relates to the Senior Secured Notes, which are secured by a first priority security interest in the assets of TSN, subject to certain exceptions. |
| 2. | U.S Bank National Association in its capacity as Collateral Agent for Purchase Money Credit Agreement | EP-MN-WS3C 60 Livingston Avenue St. Paul MN 55107-1419 Attn: Corporate Trust Services<br><br>TEL:(651) 495-3814 FAX: (651) 495-8097 | $85,961,925 | The claim relates to the Purchase Money Security Agreement, which is secured by a first priority security interest in the Debtors' interests in the TerreStar-2 Satellite along with the raw materials, work-in-process, construction, agreement, insurance, books and records and all proceeds related thereto. |
| 3. | None |  |  |  |
| 4. | None |  |  |  |
| 5. | None |  |  |  |

## Schedule 4 - Summary of Debtors Assets and Liabilities

Pursuant to Local Rule 1007-2(a)(6), the following financial data (unaudited) is the latest available information and reflects the Debtors' financial condition, as consolidated with its domestic affiliated debtors and non-debtors as of June 30, 2010. The following financial data shall not constitute an admission of liability by the Debtors. The Debtors reserve all rights to assert that any debt or claim included herein is a disputed claim or debt or challenge the priority, nature, amount or status of any claim or debt.

Total Assets (Book Value): $1,401,602,000

Total Liabilities: $1,642,947,000

## Schedule 5 - Schedule of Publicly Held Securities

***15% Notes***

TerreStar Networks Inc., an indirect subsidiary of TerreStar Corporation, has issued $550 million aggregate principal amount of 15% Senior Secured Paid-in-Kind (PIK) Notes due 2014.  Approximately $943.9 million is outstanding pursuant to the 15% notes as of October 19, 2010.  There are approximately 24 holders of record of the 15% notes as of October 19, 2010.

***6.5% Notes***

TerreStar Networks Inc., an indirect subsidiary of TerreStar Corporation has issued $150 million aggregate principal amount of 6.5% Exchangeable Notes due 2014.  Approximately $178.7 million is outstanding pursuant to the 6.5% notes as of October 19, 2010.  There are approximately 10 holders of record of the 6.5% notes as of October 19, 2010.

## Schedule 6 - Debtors' Property Not in the Debtors' Possession

None.

# Schedule 7 - Debtors' Property

Pursuant to Local Rule 1007-2(a)(9), the following lists the property or premises owned, leased or held under other arrangement from which the Debtors operate their businesses as of September 30, 2010.

## Owned Real Property

| Address | City | State | Country | Zip Code |
|---------|------|-------|---------|----------|
| Village of Dafoe | Dafoe | SK | Canada | S0K 1C0 |

## Leased Property

| Address | City | State | Country | Zip Code |
|---------|------|-------|---------|----------|
| 4605 36th Avenue | Valleyview | AB | Canada | T0H 3NO |
| 86281 E. Webb Court | San Manuel | AZ | USA | 85631 |
| 42865 Burns Lake | Burns Lake | BC | Canada | VOJ 1 |
| 8801 SW 177 Avenue | Miami | FL | USA | 33196 |
| 300 Knightsbridge Pkwy | Lincolnshire | IL | USA | 60669 |
| 1256 W. Old State Road | Austin | IN | USA | 47102 |
| 4814 W. Admiral Doyle Drive | New Iberia | LA | USA | 70506 |
| 146 Balgra Road | Merry Hill | NC | USA | 27983 |
| 5196-83rd Avenue NE | Devils Lake | ND | USA | 58301 |
| Sec. 24 Township 10 South Range 17 East | Tinnie | NM | USA | 88351 |
| 146 Third Street | Austin | NV | USA | 89310 |
| 1 Aerojet Way, Suite 300 | North Las Vegas | NV | USA | 89310 |
| Pickle Lake Road | Pickle Lake | ON | Canada | |
| W 1065-15590 Highway 62 | Madoc | ON | Canada | |
| 133438 Allan Park Road | West Grey Township Allan Park | ON | Canada | |
| 23488 S. Barlow Road | Canby | OR | USA | 97073 |
| 148 Roselawn Drive | Junction | TX | USA | 76849 |
| 15712 US 83 North | Laredo | TX | USA | 78041 |
| 2703 Telecom Pkwy, Suite 100 | Richardson | TX | USA | 75082 |
| 925 West 100 North, Suite A | North Salt Lake | UT | USA | 84054 |
| 8-15 & Frontage Road | Paragohan | UT | USA | 84760 |
| 12010 Sunset Hills Road, Suite 600 | Reston | VA | USA | 20190 |
| 280 Wolf Hill Lane | Independence | VA | USA | 24348 |
| 497 Road U, NE | Warden | WA | USA | 98857 |

## Schedule 8 - Location of Debtors Assets, Books and Records

Pursuant to Local Rule 1007-2(a)(10), the following lists the locations of the Debtors' substantial assets, the location of their books and records, and the nature, location and value of any assets held by the Debtors outside the territorial limits of the United States.

The books and records for all Domestic Debtors are primarily located at 12010 Sunset Hills Road - 6th Floor, Reston, VA 20190.

The books and records for 0887729 B.C. Ltd. are primarily located at 1040 West Georgia Street, 15th Floor, Vancouver, B.C.  V6E 4H8.

The books and records for TerreStar Networks (Canada) Inc. and TerreStar Networks Holdings (Canada) Inc. are primarily located at 1155 boul, René-Lévesque Ouest,40e étage, Montréal, QC  H3B 3V2.

The Debtors' primary assets consist of (i) the T-1 satellite, which is currently located in its assigned orbital slot over North America, (ii) their rights under a certain agreement for the construction of the T-2 satellite, which is currently under construction (more than 90% completed) in Palo Alto, California and (iii) the licenses to use certain spectrum in the United States and Canada.   In addition to the aforementioned assets, the Debtors own equipment which is currently located at the various leased locations detailed in the above schedule regarding the Debtors' property.

## Schedule 9 - Litigation

Pursuant to Local Rule 1007-2(a)(11), the following is a list of the nature and present status of each action or proceeding, pending or threatened against the Debtors or their properties.  This list reflects all actions or proceedings currently pending against the Debtors however, the Debtors reserve the right, if necessary, to supplement this list in the corresponding Schedules to be filed by the Debtors in these chapter 11 cases.

| No. | Matter Name | Jurisdiction | Type | Status |
|-----|-------------|--------------|------|--------|
| 1. | Sprint Nextel Corporation v. New ICO Satellite Services G.P. et al. | Virginia (Federal) | Contribution | Stayed pending FCC Decisions |

## Schedule 10 - Senior Management

Pursuant to Local Rule 1008-2(a)(12), the following provides the names of the individuals who comprise the Domestic Debtors' existing senior management and a brief summary of their relevant responsibilities and experience.

| Name | Title | Tenure | Prior Experience |
| --- | --- | --- | --- |
| Jeffrey W. Epstein. | President and Chief Executive Officer | Since February 2010 | Mr. Epstein previously served as principal executive officer of the Domestic Debtors from April 2008 through January 2010. Additionally, he served as senior vice president, general counsel and secretary of the board from October 2006 through December 2008 and as general counsel and secretary of the board from July 2006 through December 2006.<br><br>From October 2003 to July 2006, Mr. Epstein served as Director, Assistant General Counsel, Transactions, for Capital One Financial Corporation. From March 2000 to September 2003, he was an associate at the law firm Piper Rudnick LLP.<br><br>Mr. Epstein earned a B.A. in Business Administration from the University of Florida, a J.D. from St. Thomas University School of Law and a L.L.M. in Securities and Financial Regulation from Georgetown University Law Center. |
| Vincent Loiacono | Chief Financial Officer | Since February 2010 | Mr. Loiacono previously served as Chief Accounting Officer of the Domestic Debtors from November 2008 to February 2010.<br><br>Mr. Loiacono served as Senior Vice President and Corporate Controller of WorldSpace, Inc. from May 2005 to October 2008. Mr. Loiacono served in senior financial management roles in AT&T Government Solutions and Nextel Communications from May 1996 to May 2005. Mr. Loiacono also held senior manager and manager roles at public accounting firms KPMG and Deloitte and Touche.<br><br>Mr. Loiacono holds a B.B.A. in accounting from Bernard Baruch College and is a Certified Public Accountant. |

| Name | Title | Tenure | Prior Experience |
|---|---|---|---|
| Douglas Brandon | General Counsel and Secretary | Since December 2008 | Prior to joining TerreStar, Mr. Brandon was Vice President of External Affairs & Law, Chief Counsel for Federal Affairs, and Associate General Counsel at AT&T Wireless Services, Inc. Prior to AT&T Wireless, Mr. Brandon had been a Vice President of McCaw Cellular Communications, Inc. Mr. Brandon is a member of the New York, District of Columbia and Virginia (Corporate Counsel) Bars.<br><br>Mr. Brandon received his bachelor's degree from the University of Virginia and his law degree from Vanderbilt University. |
| Dennis W. Matheson | Chief Technology Officer, Senior Vice President—Satellite Operations | Since January 2006. | Mr. Matheson also has served as a Senior Vice President of TerreStar Global since February 2006.<br><br>From August 1993 to January 2006, Mr. Matheson served as Chief Technical Officer of Motient Corporation. Mr. Matheson holds a B.S. in Electrical Engineering from Clemson University and an M.S. in Electrical Engineering from the University of Tennessee. |

# Senior Management

Pursuant to Local Rule 1008-2(a)(12), the following provides the names of the individuals who comprise the Canadian Debtors' existing senior management and a brief summary of their relevant responsibilities and experience.

| Name | Title | Tenure | Prior Experience |
|---|---|---|---|
| André Tremblay | President and Chief Executive Officer | Since August 2009 | Mr. Tremblay previously served as President and Chief Executive Officer of Microcell Telecommunications from 1995 to 2004 and was Chairman of Microcell Telecommunications from August 1999 to March 2000.<br><br>Mr. Tremblay has also been mandated by the minister of Industry Canada to join a task force on the policy and regulatory framework for telecommunications.<br><br>Mr. Tremblay holds a Bachelor's degree in Administration and a degree in Accounting from University Laval, as well as a Master's degree in Taxation from the University of Sherbrooke. He has also completed the Advanced Management Program at Harvard University. |

| Name | Title | Tenure | Prior Experience |
|---|---|---|---|
| Jacques Leduc | Chief Financial Officer | Since August 2009 | Mr. Leduc previously served as Chief Financial Officer and Treasurer of Microcell Telecommunications from 2001 to 2004. He also served as vice-president, finance and planning manager of Microcell Telecommunications.<br><br>Mr. Leduc also served as financial advisor for overseas satellite telecommunications supplier Teleglobe Canada and a taxation advisor for an international accounting firm.<br><br>Mr. Leduc holds a master's degree in business administration from HEC Montreal (University of Montreal). He also holds a bachelor's degree in business administration from the University of Quebec in Montreal and was admitted by the Canadian Institute of Chartered Accountants in 1986. |
| Carl Dexter | Chief Technology Officer | Since October 2009 | Mr. Dexter previously served as Vice-President, National Network and Services Operation of Microcell Telecommunications Inc. from 2001 to 2004.<br><br>Mr. Dexter also served as Vice-President, Network Operations and Customer Services at MTT, now Aliant Telecom, in Nova Scotia, Canada and as Vice-President, Operations Support, of the international wireless operating companies of Telesystem International Wireless. |

| Name | Title | Tenure | Prior Experience |
|---|---|---|---|
| René Bousquet | Chief Commercialization Officer | Since October 2009 | Mr. Bousquet previously served as Vice-President, Marketing of Solutions at Microcell Telecommunications. He also served as Director with the Financial Planning and Corporate Planning departments before becoming Vice-President, Finance of Solutions at Microcell Telecommunications and president of the Fido Solutions division. Mr. Bousquet also held a number of management positions in marketing, including Director at PricewaterhouseCoopers. Mr. Bousquet holds a Bachelor's degree in Business Administration (Marketing and Finance) from the University of Sherbrooke and a Master's degree in Business Administration from the same institution. He has also completed specialized studies in consumer behavior analysis and in statistical modeling at New York University. |
| Jan Skora | Vice-President, Regulatory | Since October 2009 | Mr. Skora served as Director General of the Radiocommunications and Broadcasting Regulatory Branch at Industry Canada. He served different positions at the federal government for more than 30 years. |
| André Ouellet | Vice-President, Finance | Since August 2010 | Mr. Ouellet previously served as Senior Director, Corporate Finance at Microcell Telecommunications. Mr. Ouellet holds a Bachelor of Business Administration from the University of Quebec at Montreal and has completed Quebec's professional CMA program. |

# Schedule 11 - Payroll

Pursuant to Local Rules 1007-2(b)(1)-(2)(A) and (C), the following provides the estimated amount of weekly payroll to the Debtors' employees (not including officers, directors and stockholders) and the estimated amount to be paid to officers, stockholders, directors and financial and business consultants retained by Debtors, for the 30-day period following the Petition Date.[1]

| | |
|---|---|
| **Payments to Employees (not including Officers, Directors and Stockholders)** | Approximately $891,000.00 for the 30 days. |
| **Payments to Officers, Directors and Stockholders** | <u>Officers</u>:  Approximately $72,000.00 for the 30 days.<br><br><u>Directors</u>: $0.<br><br><u>Stockholders</u>:  $0. |
| **Payments to Financial and Business Consultants** | Approximately $200,000 for the 30 days. |

---

[1] The amounts listed herein are exclusive of the approximately $49,000 monthly employee related costs TSN pays to TerreStar Solutions in connection with the Cost-Sharing Arrangement.

**Schedule 12 - Cash Receipts and Disbursements, Net Cash Gain or Loss,
Unpaid Obligations and Receivables**

Estimated Financial Data for 30-Day Period Postpetition

Pursuant to Local Rule 1007-2(b)(3), the following provides the estimated aggregated cash receipts and disbursements, net cash gain or loss, and obligations and receivables expected to accrue that remain unpaid (other than professional fees) for the 30-day period following the Petition Date.

| | |
|---|---|
| Cash Receipts | $0 |
| Cash Disbursements (excluding professional fees) | $9,500,000 |
| Net Cash Loss | $9,500,000 |
| Unpaid Obligations (excluding professional fees) | $0 |
| Unpaid Receivables (excluding professional fees) | $0 |