AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
(212) 872-1000 (Telephone)
(212) 872-1002 (Facsimile)
Ira S. Dizengoff
Arik Preis
Ashleigh L. Blaylock

*Proposed Counsel to the Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| TERRESTAR NETWORKS INC., *et al.*,[1] | ) Case No. 10-[_____] (  ) |
| | ) |
| Debtors. | ) Joint Administration Requested |
| | ) |

**MOTION OF THE DEBTORS FOR INTERIM AND FINAL
ORDERS UNDER SECTIONS 105, 361, 362, 363(C),
364(C)(1), 364(C)(2), 364(C)(3), AND 364(E) AND 507 OF THE
BANKRUPTCY CODE AND BANKRUPTCY RULES 2002, 4001
AND 9014: (I) AUTHORIZING DEBTORS TO OBTAIN POSTPETITION
FINANCING; (II) AUTHORIZING DEBTORS TO USE CASH
COLLATERAL; (III) GRANTING ADEQUATE PROTECTION
TO PREPETITION SECURED PARTIES; AND (IV) SCHEDULING A
FINAL HEARING PURSUANT TO BANKRUPTCY RULES 4001(B) AND (C)**

The above captioned debtors and debtors in possession in these chapter 11 cases

(collectively, the "***Debtors***"), respectfully represent:

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal taxpayer identification number, are: TerreStar New York Inc. (6394); TerreStar Networks Inc. (3931); Motient Communications Inc. (3833); Motient Holdings Inc. (6634); Motient License Inc. (2431); Motient Services Inc. (5106); Motient Ventures Holding Inc. (6191); MVH Holdings Inc. (9756); TerreStar License Inc. (6537); TerreStar National Services Inc. (6319); TerreStar Networks Holdings (Canada) Inc. (1337); TerreStar Networks (Canada) Inc. (8766) and 0887729 B.C. Ltd. (1345).

## Relief Requested

1.      By this motion (the "***DIP Motion***"), the Debtors request entry of an interim order, substantially in the form attached hereto as Exhibit A (the "***Interim Order***"), and a final order (the "***Final Order***" and together with the Interim Order, the "***DIP Orders***"), pursuant to sections 105, 361, 362, 363(c), 364(c)(1), 364(c)(2), 364(c)(3), 364(e), and 507 of the Bankruptcy Code, Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the "***Bankruptcy Rules***" or the "***Rules***") and Rule 4001-2 of the Local Rules for the United States Bankruptcy Court for the Southern District of New York (the "***Local Rules***" or "***LBR***"):

(i)      authorizing the Debtors to obtain secured, superpriority postpetition financing (the "***DIP Financing***" and the loans thereunder, the "***DIP Loans***") pursuant to the terms and conditions of that certain Debtor in Possession Credit, Security & Guaranty Agreement (as may be amended, supplemented, restated, or otherwise modified from time to time, the "***DIP Agreement***") by and among TerreStar Networks Inc. ("***TSN***") as borrower, the other Debtors as guarantors (the "***Guarantors***"), The Bank of New York Mellon, as administrative and collateral agent (in such capacity, together with its successors in such capacity, the "***DIP Agent***"), EchoStar Corporation, as the initial DIP lender ("***EchoStar***") and the other lenders that may become party thereto (together with EchoStar, the "***DIP Lenders***"), substantially in the form attached hereto as Exhibit B;

(ii)      authorizing the Debtors to execute and deliver the DIP Agreement and other related loan documents (collectively with all documents comprising the DIP Financing, the "***DIP Documents***" and the obligations thereunder, the "***DIP Obligations***") and to perform such other acts as the DIP Agent or EchoStar determine may reasonably be necessary or desirable in connection with the DIP Documents;

(iii)      authorizing the Debtors' use of the proceeds of the DIP Loan and Cash Collateral (defined below) to pay (i) postpetition operating expenses of the Debtors and their subsidiaries incurred in the ordinary course of business in accordance with the Agreed Budget (defined below) and the satisfaction of certain Milestone Requirements (defined below); (ii) certain other costs and expenses of administration of the chapter 11 cases as specified in the DIP Documents; (iii) the payment of a CDN $125,000 retainer to the Foreign Information Officer (defined below); (iv) the payment of certain fees and expenses of EchoStar and certain other DIP Lenders; and (v) any other costs and expenses approved by the DIP Lenders;

(iv)            pursuant to section 364(c)(1) of the Bankruptcy Code, granting to the DIP Agent, for the benefit of the DIP Lenders, allowed senior administrative expense claims (the *"**Superpriority Claims**"*) for the DIP Obligations which shall, except to the extent expressly set forth in the Interim Order and Final Order in respect of the Carve-Out, have priority over any and all administrative expenses, adequate protection claims and all other claims against the Debtors, now existing or hereafter arising, of any kind whatsoever, including without limitation, all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, and over any and all administrative expenses or other claims arising under sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546, 726, 1113 or 1114 of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment, which allowed claims shall for purposes of section 1129(a)(9)(A) of the Bankruptcy Code be considered administrative expenses allowed under section 503(b) of the Bankruptcy Code, and which Superpriority Claims shall be payable from and have recourse to all prepetition and postpetition property of the Debtors and all proceeds thereof, including, without limitation, (subject to entry of the Final Order) the Avoidance Actions (defined below) and any proceeds or other amounts received in respect thereof and property received thereby, whether by judgment, settlement or otherwise;

(v)            granting to the DIP Agent, for the benefit of the DIP Lenders, the following security interests and liens (all property identified in clauses (a) through (c) below being collectively referred to as the "***DIP Collateral***"), subject only to the Carve-Out (all such liens and security interests granted to the DIP Agent, for its benefit and for the benefit of the DIP Lenders, pursuant to the Interim Order, the Final Order and the DIP Documents, the "***DIP Liens***"):

> (a)            pursuant to section 364(c)(2) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected first priority lien on, and security interest in, all tangible and intangible prepetition and postpetition property in which the Debtors have an interest, whether existing on or as of the Petition Date (defined below) or thereafter acquired, that is not subject to valid, perfected, non-avoidable and enforceable liens in existence on or as of the Petition Date (collectively, and excluding any property that is excluded from the definition of "Collateral" in section 10.01 of the DIP Agreement, the "***Unencumbered Property***"), including without limitation, any and all unencumbered cash, accounts receivable, other rights to payment, inventory, general intangibles, contracts, securities, chattel paper, owned real estate, real property leaseholds, fixtures, machinery, equipment, deposit accounts, patents, copyrights, trademarks, tradenames, rights under license agreements and other intellectual property, instruments, investment property, goods, satellites, spare satellites, ground stations, commercial tort claims, proceeds from the disposition of Federal Communications Commission and/or Industry

Canada licenses (and the Federal Communications Commission and/or Industry Canada licenses themselves, to the fullest extent permitted by applicable law), books and records, in each case, wherever located, and the proceeds, products, rents and profits of all of the foregoing, including, without limitation, all property constituting "cash collateral" (as defined in section 363(a) of the Bankruptcy Code, **"Cash Collateral"**) and (subject to entry of the Final Order) the Avoidance Actions and any proceeds or other amounts received in respect thereof and property received thereby, whether by judgment, settlement or otherwise.;

(b)     pursuant to section 364(c)(3) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected lien on, and security interest in, all tangible and intangible prepetition and postpetition property in which the Debtors have an interest, whether now existing or hereafter acquired and all proceeds thereof, that is subject to the Prepetition Secured Party Liens or the Permitted Prepetition Liens, which security interest and lien shall be junior to (i) the Prepetition Secured Party Liens and the Permitted Prepetition Liens (but only to the extent such liens secure valid and enforceable Prepetition Secured Obligations), and (ii) the Carve-Out, but senior to all other liens;

(c)     pursuant to section 364(d)(1) of the Bankruptcy Code, and based upon the consent of the TSN Secured Party (as defined below), a valid, binding, continuing, enforceable, fully-perfected, priming lien on, and security interest in, all now existing or hereafter acquired property of TerreStar Networks (Canada) Inc. that constitutes "Collateral" (as defined in the TSN Security Agreement (defined below)) (the "**TSN Collateral**") under that certain Second Amended and Restated Security Agreement, dated August 11, 2009, as amended, by and between TerreStar Networks Inc., as Secured Party (the "**TSN Secured Party**"), and TerreStar Canada Inc., as Obligor (the "**TSN Security Agreement**").  The DIP Liens on the TSN Collateral shall be senior in all respects to the security interests in, and liens on, the TSN Collateral of the TSN Secured Party (the "TSN Security Agreement Liens"), but shall be junior to (i) the Permitted Prepetition Liens under the 15% Notes (defined below); (ii) the liens of the holders of 15% Notes; and (iii) the Carve-Out (the "**TSN Priming Lien**").

(vi)          authorizing the Debtors to pay the principal, interest, fees, expenses and other amounts payable under each of the DIP Documents as they become due, including, without limitation, commitment fees, and the fees and expenses of the DIP Agent, all to the extent provided by and in accordance with the terms of the respective DIP Documents;

(vii)          authorizing the Debtors to use the Prepetition Collateral (defined below) in which the PMCA Agent, the PMCA Lenders, the 15% Notes

Trustee/Agent, and the 15% Noteholders (each as defined below and collectively, the "**_Prepetition Secured Parties_**") have an interest and the granting of adequate protection to the Prepetition Secured Parties to protect against any diminution in the value of their respective interests in the Prepetition Collateral, including without limitation, any such diminution resulting from the sale, lease or use by the Debtors (or other decline in value), in the form of the Adequate Protection Liens (defined below), 507(b) Claims (defined below) and payment of the reasonable fees and expenses of the PMCA Agent and the 15% Notes Trustee/Agent;

(viii)　　upon entry of the Final Order, waiver by the Debtors of any right to surcharge against the Prepetition Collateral pursuant to section 506(c) of the Bankruptcy Code or any other applicable law or principle of equity, which constitutes a Material Provision (as defined below);

(ix)　　vacating and modifying the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to (a) implement and effectuate the terms and provisions of the DIP Documents and the DIP Orders; and (b) subject to paragraph 8 of the Interim Order, permit the DIP Agent to, upon the occurrence and continuance of an Event of Default (i) reduce the amount of or terminate any outstanding commitments under the DIP Agreement, (ii) terminate the DIP Agreement, (iii) charge the default rate of interest on the Loans, (iv) declare the entirety of the Loans to be due and payable, and/or (v) subject to the Carve-Out (as defined below), exercise any and all remedies under applicable law (including the UCC and PPSA); and

(x)　　scheduling a final hearing (the "**_Final Hearing_**") to consider the relief requested in the DIP Motion and approving the form of notice with respect to the Final Hearing.

## Concise Statement Pursuant to Bankruptcy Rule 4001-2[2]

2.　　Pursuant to Bankruptcy Rules 4001(b), (c), and (d) and Local Bankruptcy

Rule 4001-2, the following is a concise statement and summary of the proposed material terms of

the DIP Documents and the DIP Orders:

| DIP Financing Parties<br>*Rule 4001(c)(1)(B)* | **Borrower:** TerreStar Networks Inc.; **Guarantors:** All other Debtors; **DIP Agent:** The Bank of New York Mellon; **Initial Lender**: EchoStar Corporation; **DIP Lenders:** The lenders party to the DIP Agreement |
|---|---|
| **Interim and Final** | $75 million (less the OID, plus fees, interest and other amounts to be capitalized in accordance |

---

[2] This statement is qualified in its entirety by reference to the provisions of the DIP Agreement, the Interim Order and the Final Order. To the extent of any inconsistency between this concise statement and the DIP Agreement, the DIP Agreement shall govern.

| | |
|---|---|
| **Term Commitments**<br>*Rule 4001(c)(1)(B)*<br>*LBR 4001-2(a)(1)* | with the terms of the DIP Agreement and related documents) non-amortizing multiple draw term loan facility. $18 million (less the OID, plus fees, interest and other amounts to be capitalized in accordance with the terms of the DIP Agreement and related documents) in interim financing. (Interim Order at ¶ 5(a); DIP Agreement definition of "Commitment," and "Facility"; DIP Agreement at § 2.01) |
| **Maturity**<br>*Rule 4001(c)(1)(B)* | The earlier of: (i) nine months after the Petition Date; (ii) the date of the acceleration of the DIP Loan; (iii) 35 calendar days after the entry of the Interim Order, unless the Final Order shall have been entered; (iv) the closing date of a sale pursuant to section 363 of the Bankruptcy Code of all or substantially all of the Debtors' assets; and (v) the effective date of a plan of reorganization in the Borrower's chapter 11 case. (DIP Agreement definition of "Termination Date") |
| **Limits on Use of the Term Facility**<br>*Rule 4001(c)(1)(B)*<br>*LBR 4001-2(a)(9)* | Proceeds of the DIP Financing shall be used to, among other things, fund working capital and general corporate needs in accordance with the Agreed Budget.  In addition, the Committee cannot use the Cash Collateral or DIP Loan to (i) object, contest or raise any defense to the validity, perfection, priority, extent or enforceability of any amount due under the DIP Documents, the Prepetition Loan Documents or the liens or claims granted under the Interim Order, the DIP Documents or the Prepetition Loan Documents or to (ii) assert any Claims and Defenses or any other causes of action against the DIP Agent, the DIP Lenders, the Prepetition Agent, the other Prepetition Secured Parties or their respective agents, affiliates, subsidiaries, directors, officers, representatives, attorneys or advisors, in each case, solely in their capacity as Prepetition Secured Parties; provided, however, up to $200,000 of the Prepetition Collateral (including the Cash Collateral), DIP Loans, the DIP Collateral or the Carve-Out may be used by the Committee to investigate the validity, enforceability or priority of the Prepetition Obligations or the liens on the Prepetition Collateral securing the Prepetition Obligations, or investigate any Claims and Defenses or other causes action against the Prepetition Agent or the Prepetition Secured Parties. (Interim Order at ¶ 17; DIP Agreement at §3.12) |
| **Use of Cash Collateral**<br>*Rules 4001(c)(1)(B),*<br>*4001(2)(a)(9)* | To provide working capital and for other general corporate purposes of the Debtors, including for payment of any adequate protection obligations.  (Interim Order at ¶ 12). |
| **Original Issuance Discount**<br>*Rule 4001(c)(1)(B)* | Each DIP loan shall be made available to the Borrower at an original issue discount of 2%.  (DIP Agreement at § 2.07(b)) |
| **Interest Rate**<br>*Rule 4001(c)(1)(B),*<br>*LBR 4001-2(a)(3)* | **Interest Rate:** 15% paid in kind and added to the principal amount of the DIP Loan.<br>**Default Interest Rate:** The rate that would otherwise be applicable plus 2.00% per annum. (DIP Agreement at § 2.08) |
| **Fees**<br>*Rule 4001(c)(1)(B)*<br>*LBR 4001-2(a)(3)* | **Upfront Fees:** Upon the occurrence of the Closing Date, the Borrower shall pay to the DIP Lenders an upfront fee of 3.0% on the amount of such DIP Lender's commitment under the DIP Financing, such fee to be payable in kind by adding the amount thereof to the principal amount of such DIP Lender's loans under the DIP Loan.  (DIP Agreement at § 2.07(a))<br>**Unused Commitment Fee:** 1.0% per annum on the daily undrawn portion of the commitment in respect of the DIP Loan, payable monthly in arrears after the Closing Date, such fee to be payable in kind.  (DIP Agreement at § 2.07(c)) |
| **Agreed Budget**<br>*Rule 4001(c)(1)(B)* | So long as the Debtors are operating using cash collateral and any commitments remain outstanding under the DIP Financing, the Debtors must operate within the Agreed Budget.  (DIP Agreement at § 4.01) |
| **Milestone Requirements** | The Debtors shall meet the following deadlines for the plan confirmation process (the "***Milestone Requirements***"):  (i) filing a plan and disclosure statement by November 5, 2010; (ii) filing, |

| | |
|---|---|
| *Rule 4001(c)(1)(B)(v)-(vii)* | jointly with any person required by the FCC or Industry Canada; (a) all necessary applications for approval of the transfers of control over all the FCC Licenses, or the transfer of assignment of all the Industry Canada Licenses, and related authorizations held by any Loan Party that are contemplated by any Acceptable Plan and (b) all required notifications to the FCC and Industry Canada, in each case by December 14, 2010; (iii) receiving Court approval of a disclosure statement by December 14, 2010; (iv) commencement of a hearing on confirmation of a plan of reorganization by January 31, 2011; (v) entry of a final, non-appealable order confirming such plan of reorganization by February 14, 2011; (vi) within 7 days after the request of the Required Lenders with respect to any order issued by the Court, a corresponding recognition order reasonably acceptable to the Required Lenders shall have been entered in the Canadian Court, which order shall have become final and non-appealable within 21 days after entry of such order by the Canadian Court; and (vii) the Final Order and Final Recognition Order shall have become final and non-appealable within 60 days and 63 days of the entry of the Interim Order and Initial Recognition Order, respectively.  Failure to meet any Milestone Requirements solely due to the action or inaction of the initial DIP Lender shall not result in a default of any such milestone. (DIP Agreement definition of "Milestone Date" and "Milestone Requirements") |
| **Covenants** *Rule 4001(c)(1)(B) LBR 4001-2(a)(8)* | The loan documentation contains affirmative, negative, and reporting covenants customary for financings of this type and other covenants appropriate to this specific transaction as agreed to by the Debtors and the DIP Lenders (which will be applicable to the Debtors and their subsidiaries), including, without limitation, the following:<br><br>*Affirmative Covenants:* Affirmative covenants regarding (i) the Debtors' existence, business and properties; (ii) insurance; (iii) taxes; (iv) financial statements, reports, etc; (v) litigation and other notices; (vi) compliance with laws, licenses, and material contracts; (vii) maintaining records, access to properties and inspections; (viii) compliance with environmental laws; (ix) reorganization matters; (x) further assurances; (xi) Canadian anti-money laundering & anti-terrorism legislation compliance; and (xii) mortgages.  (DIP Credit Agreement at Article V)<br><br>*Financial Reporting:*  Among other things, the documents evidencing the DIP Loan will require that the Borrower provides bi-weekly cash receipts and disbursement report and monthly financial reports.  The Borrower will provide on an as-requested basis other information reasonably requested by any DIP Lender, including reports and information respecting the Borrower's business, financial condition or prospects.  All financial statements shall be prepared on a consolidated and consolidating basis.  (DIP Credit Agreement at §5.04)<br><br>*Negative Covenants:*  Negative covenants regarding (i) indebtedness; (ii) liens; (iii) investments, loans and advances; (iv) mergers, amalgamations, consolidations, sales of assets and acquisitions; (v) dividends and distributions; (vi) sale/leasebacks; (vii) transactions with affiliates; (viii) business of the Debtors; (ix) limitation on prepayments of indebtedness; (x) modifications of certificate of incorporation, by-laws and certain other agreements; (xi) maximum cumulative disbursements; (xii) minimum revenues; (xiii) minimum subscribers; (xiv) maximum capital expenditures; (xv) phone sales; (xvi) cash management; (xvii) use of proceeds; (xviii) change of control; (xix) payment of pre-existing claims; (xx) Material Adverse Change; (xxi) claims against PMCA Lenders or 15% Holders; (xxii) entry into contractual obligations or settlements; (xxiii) restrictive agreements; (xxiv) super-priority claims; and (xxv) the DIP Order.  (DIP Credit Agreement at Article VI) |
| **Liens and Priorities** *Rule 4001(c)(1)(B) LBR 4001-2(a)(4)* | **Liens:**  The Debtors grant the following as collateral securing all DIP Financing obligations, subject to the Carve-Out:<br><br>**Liens on DIP Collateral.**  (i) Pursuant to section 364(c)(2), a fully perfected first priority security interest in and lien on  the Unencumbered Property, (ii) pursuant to section 364(c)(3) of the Bankruptcy Code, Junior Liens on property secured by the Prepetition Secured Party Liens and Permitted Prepetition Liens (in each case, subject to the Carve-Out and not including any property upon which a lien may not be granted pursuant to applicable law) and (iii) pursuant to |

| | |
|---|---|
| | section 364(d)(1) of the Bankruptcy Code, valid, binding, continuing, enforceable, fully-perfected, priming liens on property secured by the TSN Secured Party Liens (in each case, subject to (a) the applicable Permitted Prepetition Liens, (b) the applicable Prepetition Secured Party Liens, and (c) the Carve-Out).  (Interim Order at ¶ 7)

**Future Property.**  The DIP Collateral includes all property and assets of the Debtors and their estates, real and personal, tangible and intangible, including all causes of action (subject to the limitation noted below and the exclusion of assets on which the grant of such lien would be prohibited by law), whether owned as of the Petition Date or after acquired or arising, and regardless of where located or by whomsoever held, and whether now owned or in which the Debtors have any interest or hereafter acquired or in which the Debtors obtain an interest. (Interim Order at ¶ 7)

**Avoidance Actions.  The DIP Collateral shall include the Debtors' claims and causes of action arising under sections 542-553 of the Bankruptcy Code (collectively, the "*Avoidance Actions*") and the proceeds thereof, subject to entry of the Final Order.  This constitutes an "extraordinary provision" (a "*Material Provision*") under General Order M-274 of the United States Bankruptcy Court for the Southern District of New York.**  (Interim Order at ¶ 7; DIP Agreement at § 10.01)

Priorities:  Obligations under the DIP Financing constitute superpriority administrative expenses in the Debtors' chapter 11 cases and shall be senior to the Prepetition Debt obligations.  (Interim Order at ¶¶ 6,7). |
| **Carve-Out**<br>*LBR 4001-2(a)(5), 4001-2(d)* | The Carve-Out applies to:  (i) all fees required to be paid to the Clerk of the Bankruptcy Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code; (ii) fees and expenses up to $50,000 incurred by a trustee under section 726(b) of the Bankruptcy Code; (iii) with respect to the information officer (the "*Information Officer*") to be appointed by the Canadian Court in connection with the proceedings commenced pursuant to the Companies' Creditors Arrangement Act (Canada) R.S.C. 1985, c. C-36 as amended in the Ontario Superior Court of Justice (Commercial List) in Toronto, Ontario, Canada (the "Canadian Proceedings"), all fees and expenses required to be paid to the Information Officer in connection with the Canadian Proceedings, including to the extent secured by the charge to be granted by the Canadian Court over the Debtors' assets in Canada, in the maximum amount of CDN $125,000, to secure payment of any such fees and expenses of the Information Officer; and (iv) after the occurrence and during the continuance of an Event of Default under the DIP Documents, the payment of allowed professional fees and disbursements incurred by the Debtors or the Committee after the occurrence of the Event of Default not in excess of $800,000 (plus all unpaid professional fees and expenses allowed by this Court that were incurred prior to the occurrence of such Event of Default); *provided* that (X) the Carve-Out shall not be available to pay any such professional fees and expenses incurred in connection with the initiation or prosecution of any claims, causes of action, adversary proceedings or other litigation against the DIP Agent, the DIP Lenders, or the Prepetition Secured Parties or liens and claims held by DIP Agent, the DIP Lenders, the Prepetition Secured Parties, (Y) so long as no Event of Default shall have occurred and be continuing, the Carve-Out shall not be reduced by the payment of fees and expenses allowed by this Court under sections 328, 330 and 331 of the Bankruptcy Code, and (Z) nothing in the Interim Order or Final Order shall impair the right of any party to object to the reasonableness of any such fees or expenses to be paid by the Debtors' estates.  (Interim Order at ¶ 6(b), DIP Agreement at definition of "Carve-Out") |
| **Waiver of Rights/Limitations**<br>*Rule 4001(c)(1)(B)(x)*<br>*LBR 4001-2(a)(8)* | The Debtors waive certain rights and causes of action related to the amount, validity, perfection, priority, enforceability and nonavoidability (under the Bankruptcy Code or otherwise) of the Prepetition Secured Obligations and the security interests in and liens on the collateral securing such debt.  (Interim Order at ¶ 16).  There is a 60 day period from the date of entry of an order approving the appointment of counsel for the Committee, or, if no Committee is appointed, 75 days period after the date of entry of the Final Order, subject to extension by the Court, during |

| | |
|---|---|
| | which any third party and/or the Committee may bring an adversary proceeding or contested matter asserting a claim against the Prepetition Secured Lenders (or such later date as has been agreed to in writing by the applicable prepetition trustees or agents, each in its sole discretion). (Interim Order at ¶ 16). Additionally, the Interim Order contains an acknowledgement by the Debtors of the amount and validity of the Prepetition Secured Obligations and the validity of the Prepetition Secured Party Liens. (Interim Order at ¶ 3). The DIP Agreement limits the use of DIP Financing proceeds or Cash Collateral to pursue claims against the Prepetition Secured Lenders; such amounts are available for the investigation of claims with respect to the Prepetition Secured Obligations by the Committee up to a cap of $200,000, but such amounts may not be used (i) to object, contest or raise any defense to the validity or enforceability of any amount due under the DIP Documents, the 15% Notes or the PMCA, or liens or claims granted under the Interim Order; (ii) to assert any claims and defenses against the DIP Agent, the DIP Lenders, the Prepetition Agents, or other Prepetition Secured Parties, solely as they relate to the incurrence of such indebtedness or validity of any liens granted; (iii) to prevent, hinder, or delay the DIP Agent's or Prepetition Agent's assertion on the Prepetition Collateral of DIP Collateral in accordance with the DIP Documents; (iv) to seek to modify any of the rights granted to the DIP Agent, DIP Lenders, the Prepetition Agents or other Prepetition Secured Parties under the DIP Documents. (Interim Order at ¶ 16; DIP Agreement at § 7.01(l)) |
| **Adequate Protection for Prepetition Lenders** <br> *Rules 4001(b)(1)(B)(iv), 4001(c)(1)(B)(ii) LBR 4001-2(a)(4)* | As described in more detail in ¶ 51, the Adequate Protection Liens, the 507(b) Claims, and fees and expenses. (Interim Order at ¶ 13) |
| **Events of Default** <br> *Rule 4001(c)(1)(B) LBR 4001-2(a)(10)* | The DIP Agreement sets forth a number of events of default, including, among other things: (i) entry of an order dismissing any of the Debtors' chapter 11 cases or converting the chapter 11 cases to a chapter 7 case; (ii) the entry of an order appointing a chapter 11 trustee in any of the Debtors' chapter 11 cases that is not stayed ten days following entry; (iii) the entry of an order granting other superpriority claim on the Collateral superior to that of the DIP Lenders; (iv) entry of an order staying, reversing, or vacating, in a manner adverse to the DIP Lenders and without prior consent of the Lenders, the DIP Loan, Interim Order, or Final Order approving the DIP Loan; (v) the entry of an order appointing an examiner having enlarged powers; (vi) following entry of the Final Order, entry of an order against the Lenders regarding the DIP Loan that has a materially adverse effect on the Lenders' rights and remedies; (vii) failure of any Debtor to pay principal, interest or fees in connection with the DIP Loan; (viii) failure of any Debtor to comply with the negative covenants and certain affirmative covenants in DIP Loan; (ix) the Debtors challenging the enforceability of liens or security interests of the DIP Lenders, Collateral Agent, Noteholders, and Trustee; (x) the entry of the Interim Order shall not have occurred within 3 days after the Petition date, the entry of the Final Order shall not have occurred within 35 days of entry of Interim Order, and the entry of an order modifying or vacating the automatic stay as to allow third party to proceed against asset of the Debtors; (xi) the sale of all or substantially all of the Debtors' assets absent consent; (xii) change in control; (m) failure to meet the Milestone Requirements; (xiii) filing by any of the Debtors of a motion that will impact the Lenders' rights; (xiv) payment of prepetition claims, subject to exceptions; or (xv) entry of an Order by Canadian Court that will materially impair Lenders' rights under DIP Loan. Any default or event of default which results solely from a failure of the initial DIP Lender to perform its obligations contemplated by the plan support agreement (including with respect to its commitment to fund its participation in, as well as backstop, the rights offering) shall be deemed not to have occurred so long as such failure continues. (DIP Agreement at § 7.01) |
| **Waiver or Modification of the** | The automatic stay is vacated to permit the exercise of remedies by the DIP Lenders and/or the DIP Agent; provided, that the DIP Lenders and/or DIP Agent may only exercise rights and |

| | |
|---|---|
| **Automatic Stay**<br>*Rule 4001(c)(1)(B)*<br>*LBR 4001-2(a)(10)* | remedies against DIP Collateral upon the provision of ten business days' prior notice to the Debtors and certain other parties. (Interim Order at ¶ 8, DIP Agreement at § 7.02) |
| **Waivers/Modification Regarding Perfection or Enforcement of a Lien**<br>*Rule 4001(c)(1)(B)(viii)* | The Interim Order is (and the Final Order when entered will be) effective to create in favor of the DIP Lenders legal, valid, enforceable, and fully perfected security interests in and liens on the DIP Collateral.  (Interim Order at ¶ 15) |
| **Change of Control**<br>*LBR 4001-2(a)(11)* | The occurrence of a "Change of Control," as defined in the DIP Agreement, constitutes an Event of Default under the DIP Financing.  (DIP Agreement at § 7.01(r)) |
| **Joint Liability**<br>*LBR 4001-2(a)(14);*<br>*4001-2(e)* | TSN is the Borrower and each of the other Debtors are Guarantors under the DIP Financing. Additionally, the liens and superpriority claims granted under the DIP Financing apply to the estate of each of the Debtors in these chapter 11 cases.  (Interim Order at ¶ [5(a)]; DIP Agreement definitions of "Borrower" and "Guarantor" in preamble; DIP Agreement at § 10.16). |
| **Funding of Non-Debtor Affiliates**<br>*LR 4001-2(a)(15)* | The DIP Agreement provides for a $70,000 per month payment made by TerreStar Networks (Canada) Inc. to compensate TerreStar Solutions Inc. for expenses paid on behalf of TerreStar Networks (Canada) Inc., including pro rata salaries of employees, payments to consultants, office space rentals, utilities and offices spaces from and after the Petition Date permitted to be paid in accordance with the Agreed Budget.  (DIP Agreement at § 6.07)  In addition, there will be a one-time payment of no more than $7,000 to TerreStar Global Ltd., the proceeds of which are used to pay its taxes.  (DIP Agreement at § 6.03(h)) |
| **Indemnification**<br>*Rule 4001(c)(1)(B)(ix)* | The Debtors shall indemnify the DIP Agent, each DIP Lender and each of their respective officers, directors, employees, agents, advisors, attorneys and representatives of each pursuant to customary indemnification provisions.  (Interim Order at ¶ 4(d); DIP Agreement at §8.07) |
| **Section 506(c) Waiver**<br>*Rule 4001(c)(1)(B)(x)* | **Upon entry of the Final Order, the Debtors waive their right to surcharge against the Prepetition Collateral pursuant to section 506(c) of the Bankruptcy Code.  This grant constitutes a Material Provision.**  (Interim Order at ¶ 9; DIP Agreement at § 7.01(f)) |
| **Conditions to Closing and Initial Borrowing**<br>*Rule 4001(c)(1)(B,)*<br>*LBR 4001-2(a)(2),*<br>*4001-2(h)* | The DIP Agreement contains conditions precedent to the Initial Funding Date and conditions precedent to each DIP Loan after the Initial Funding Date.<br>(DIP Agreement at Article IV) |

3. As set forth herein, these provisions were thoroughly negotiated and are necessary for the Debtors to effectuate the DIP Financing and procure the financing made available under the DIP Financing in a sufficient amount and on a timely basis.

## Preliminary Statement

4. By this motion, the Debtors are seeking authority to enter into a "junior" debtor in possession financing facility in the amount of $75 million, under which TSN, the

Debtors' main operating company, will be the borrower and which will be guaranteed by each of the other Debtor entities. The DIP Financing will provide the necessary financing required for the continued viability of the Debtors' businesses and the success of the Debtors' reorganization efforts.

5. As of the Petition Date, the Debtors are operating on less than $500,000 in cash. Absent access to the proposed DIP Financing, the Debtors will not be able to operate their businesses for more than a brief period during these chapter 11 cases and will be forced to shut down their businesses to the detriment of all parties in interest in these chapter 11 cases. Approval of the DIP Financing will allow the Debtors to, among other things, remain operational, make critical capital expenditures, maintain business relationship with vendors, suppliers and customers, and pay their employees.

6. As discussed in more detail below (as well as in the various declarations filed in connection herewith), the Debtors' decision to enter into the proposed DIP Financing is the culmination of an intense, several month process targeted at procuring the best available financing under the circumstances. Ultimately, the Debtors' decision to enter into the DIP Financing was simple because not only were there no better available alternatives but because the DIP Financing has provided the Debtors with a concomitant exit strategy in a situation where the Debtors needed one. In sum, the DIP Lenders are the only lenders willing to lend on the terms necessitated by the Debtors' current liquidity position and capital structure.

**Background**

7. On October 19, 2010 (the ***"Petition Date"***), each of the Debtors commenced with this Court a voluntary case under the Bankruptcy Code. The Debtors are authorized to operate their businesses and manage their properties as debtors in possession

pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  Contemporaneously herewith, the Debtors have filed a motion seeking joint administration of their chapter 11 cases pursuant to Rule 1015(b) of the Bankruptcy Rules.

8.     Additional information regarding the Debtors' businesses, capital structure, and the circumstances leading to these chapter 11 filings is contained in the Declaration of Jeffrey W. Epstein, Chief Executive Officer of TerreStar Networks Inc., in Support of First Day Pleadings (the "***First Day Declaration***") filed contemporaneously herewith.

### Jurisdiction and Venue

9.     This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

### Outstanding Prepetition Indebtedness

10.     As of the Petition Date, the instruments evidencing the Debtors' significant indebtedness are as described below:[3]

| Name of Facility | Borrower; Issuer; Guarantor | Secured or Unsecured | Date Issued / Name of Trustee or Agent | Amount Outstanding as of the Petition Date |
|---|---|---|---|---|
| 15% Notes (the "***15% Notes***" and the liens granted thereunder, the "***15% Notes Liens***") | **Issuer:** TSN **Guarantors:** TerreStar Newtorks Holdings (Canada) Inc., TerreStar Networks (Canada) Inc., TerreStar National Services Inc. and TerreStar License Inc. (the "***15% Notes Guarantors***") | Senior Secured PIK Notes | February 14, 2007/ U.S. Bank National Association-Trustee (the "***15% Notes Indenture Trustee***") | Approximately $943.9 million of principal and accrued interest |
| Senior Exchangeable Notes | **Issuers:** TSN, TSC and certain subsidiaries | Unsecured Senior | February 7, 2008/ U.S. Bank National | Approximately $178.7 million |

---

[3] For a more detailed description of the Debtors' capital structure, please refer to the First Day Declaration, Article III.

12

| Name of Facility | Borrower; Issuer; Guarantor | Secured or Unsecured | Date Issued / Name of Trustee or Agent | Amount Outstanding as of the Petition Date |
|---|---|---|---|---|
| | **Guarantors:** TerreStar National Services Inc. and TerreStar License Inc. (the *"Senior Exchangeable Note Guarantors"*) | Exchangeable PIK Notes | Association – Trustee (the *"Senior Exchangeable Note Indenture Trustee"*) | of principal and accrued interest |
| Purchase Money Credit Facility (the *"PMCA"* and the liens granted thereunder, the "*PMCA Liens*", and together with the 15% Notes Liens, the "*Prepetition Secured Party Liens*" ) | TSN-Borrower; U.S. Bank National Association-collateral agent (the *"PMCA Agent"*); Harbinger and EchoStar as Lenders (the *"PMCA Lenders"*)' | Secured | February 5, 2008 | Approximately $85.9 million of principal and accrued interest |

### Debtors' Proposed DIP Financing

**A.     Need for Postpetition Financing**

11.     As described more fully in the Declaration of Jeffrey W. Epstein in Support of the DIP Motion (the ***Epstein DIP Declaration"***) and the Declaration of Steven W. Zelin in Support of the DIP Motion (the ***"Zelin Declaration"***), attached hereto as Exhibits C and D, respectively, the Debtors are at a critical development stage with very little operating revenue. The Debtors do not generate sufficient cash from operations to cover their operating expenses, and require additional funds to meet capital expenditures and other non-operating cash expenses, including but not limited to capital expenditures required to complete and launch a satellite currently under construction.  *See* Epstein DIP Declaration at ¶¶7, 10; Zelin Declaration at ¶¶ 6-7.

12.     The Debtors have, with the assistance of their financial advisors, Blackstone Advisory Partners L.P. (***"Blackstone"***), analyzed their cash needs in an effort to determine what is necessary to maintain their operations in chapter 11 and work towards a successful reorganization.  In undertaking this analysis, the Debtors and their advisors have

considered the impact of the current economic outlook on the Debtors' near term projected financial performance, including demand for the Debtors' products and the cost to manufacture such products. The Debtors also conferred with individuals in the Debtors' operational and management teams to understand key business metrics in both the near and long term. *See* Zelin Declaration at ¶¶ 9, 10.

13. As part of the Debtors' recent financial analysis and projections, the Debtors developed a 13-week cash flow forecast, which takes into account anticipated cash receipts and disbursements during that time. This forecast considers a number of factors, including, among others, the impact of a bankruptcy filing, material cash disbursements, required vendor payments, cash flows and the cost materials. *See* Zelin Declaration at ¶ 10.

14. Absent approval of the DIP Financing and the Debtors' use of Cash Collateral, the Debtors' financial analysis and projections make clear that the Debtors' current cash on hand and minimal cash generated from their operations will be insufficient to, among other things, continue operating their businesses, maintain relationships with vendors, suppliers and customers, pay employee wages in the ordinary course, make necessary capital expenditures and satisfy other working capital and operational needs during the pendency of these chapter 11 cases, all of which are necessary to preserve the Debtors' going concern values. Without access to the DIP Financing and the immediate use of Cash Collateral, the Debtors will soon have *no* cash available to continue their operations and make the necessary capital expenditures that are critical to their success. As such, the Debtors would be forced to curtail or even terminate their business operations to the material detriment of all parties in interest in these chapter 11 cases. Thus, the Debtors need to ensure that working capital is available now. *See* Epstein DIP Declaration at ¶¶ 8, 10; Zelin Declaration at ¶ 7-9; First Day Declaration at ¶ 80.

**B.**      **The Debtors' Efforts to Obtain Postpetition Financing**

15.      Prior to the Petition Date and as set forth in more detail in both the Zelin Declaration and the First Day Declaration being filed contemporaneously herewith, the Debtors explored all practicable avenues to obtain DIP financing on the best possible terms. Among other things, in June 2010, the Debtors and their advisors reached out to members of the existing capital structure regarding postpetition financing and in early August 2010 the Debtors and their advisors began a process in which they reached out to additional parties (approximately 53 parties collectively) regarding postpetition financing to fund the Debtors' operations (including both from within and without the Debtors' current capital structure). In addition, the Debtors and their advisors analyzed and marketed various DIP financing structures, evaluated the Debtors' need for financing (i.e., amount, type, etc.), and carefully weighed the effect that the Debtors' pre-petition capital structure would have on both its ability to attain DIP financing as well as ultimately exit from chapter 11. Specifically, in exploring all of its options, the Debtors recognized that more than $1 billion of their pre-petition obligations are owed to creditors who are secured, in some manner, by substantially all of the Debtors' assets, such that either (i) the liens of the Prepetition Secured Lenders would have to be "primed" to obtain postpetition financing, or (ii) the Debtors would have to find a postpetition lender willing to extend credit on a junior basis. *See* Zelin Declaration at ¶¶ 13-17; First Day Declaration at ¶¶ 70, 71.

16.      In light of the above, and after a few months of carefully canvassing the market (all as more fully set forth in the Zelin Declaration), the Debtors narrowed their alternatives to two "paths"—a $250 million "priming" DIP with certain financial institutions

who were not current stakeholders in the Debtors' capital structure,[4] and a $75 million "junior" DIP provided by the Debtors' largest secured stakeholder (EchoStar). *See* Zelin Declaration at ¶¶ 17, 18; First Day Declaration at ¶ 72.

17. Over the course of a number of weeks, the Debtors conducted several diligence meetings and held various calls and negotiating sessions with both potential DIP lenders, with an understanding that a decision needed to be made in the near term in light of the Debtors' liquidity crunch. Ultimately, the Debtors decided that the DIP proposal provided by EchoStar was the proposal that was in the best interests of the Debtors and all of their stakeholders. *See* Zelin Declaration at ¶ 18; First Day Declaration at ¶¶ 72, 73.

18. Specifically, the Debtors concluded that the DIP Financing proposal that is the subject of this DIP Motion was superior for a number of reasons. *See* First Day Declaration at ¶ 7. First, the EchoStar proposal eliminated the risk of a "priming" fight in connection with this Court's approval of the third party financing proposal. *See* Zelin Declaration at ¶ 20. Given the standards set forth in section 364(d)(1) of the Bankruptcy Code, the Debtors had significant doubts as to whether they could satisfy the factual or legal predicates necessary to prevail in a "priming" fight.

19. Second, the current DIP proposal is superior to every other financing proposal the Debtors received. Specifically, EchoStar has agreed not to take any pre-petition commitment fees, thereby allowing the Debtors to conduct an orderly chapter 11 filing with their

---

[4] Although the third party DIP Financing proposal offered $250 million in DIP financing, the amount is a little misleading when compared to the $75 million DIP Financing proposed by EchoStar. First, the DIP Financing proposal offered by the third party lenders would have repaid, in full, the PMCA, meaning that, in effect it was actually only $163 million. In addition, the third party DIP Financing proposal included a 10% cash interest component, for one year, thereby further reducing the amount of the DIP from $163 million to $136 million. Further, the third party DIP financing assumed a longer bankruptcy, therefore funding more operating costs, leaving $114 million versus the $75 million proposed by EchoStar.

available remaining cash.  Moreover, all fees in connection with the DIP Financing are payable in-kind rather than in cash, meaning that the Debtors would be able to conserve cash during the chapter 11 cases and not need to, in effect, full-circuit their DIP financing from their lenders back to their lenders.  *See* Zelin Declaration at ¶ 20.

20.      Concomitantly with the DIP Financing, EchoStar also agreed to enter into a plan support agreement (complete with a plan term sheet), whereby EchoStar agreed to (a) backstop a rights offering to other stakeholders of the Debtors that, if fully subscribed, will provide the funding necessary for the Debtors to repay their DIP obligations at the end of the chapter 11 cases, ensure sufficient liquidity for the Debtors to emerge from chapter 11 and fund their post-emergence operations, and (b) support a feasible plan of reorganization, which will maximize the value of these estates and enable a recovery for unsecured creditors.  The Debtors believe that their decision to pursue this comprehensive, and consensual, restructuring plan—will beneficial to their estates, and will ensure a swift exit from these bankruptcy proceedings.  *See* Zelin Declaration at ¶ 21; First Day Declaration at ¶¶ 72, 73.

21.      Based on these factors, and in light of the fair and thorough negotiation process undertaken by the Debtors, the DIP Financing is the only feasible postpetition financing option for the Debtors and is in the best interests of the Debtors' estates.  *See* Zelin Declaration at ¶¶ 22, 23.

## C.    Implementation of the DIP Agreement

22.      The DIP Agreement allows the Debtors to draw on a $75 million commitment (less the OID), including $18 million (less the OID) on an interim basis, from the DIP Lenders, pending this Court's entry of the Final Order.  This commitment should allow the Debtors to meet all of their administrative obligations during these chapter 11 cases while at the

same time making the necessary capital expenditures that are critical to the Debtors' future success as a business.

23.　　The Debtors and EchoStar have agreed upon a budget (the **"Agreed Budget"**) for the nine-month period beginning on the Closing Date (as defined in the DIP Agreement). The Debtors believe that the Agreed Budget is achievable and will allow the Debtors to operate without the accrual of unpaid administrative expenses. *See* Zelin Declaration at ¶ 11.

### Supporting Authority

24.　　The continued viability of the Debtors' businesses and the success of the Debtors' reorganization efforts hinge upon obtaining access to financing. Absent access to financing, the Debtors will not be able to operate their businesses for the duration of these chapter 11 cases. At this time, the Debtors request authorization to borrow up to $18 million (less the OID, plus all fees, interest and other amounts to be capitalized pursuant to the DIP Agreement and related documents) under the proposed DIP Agreement on an interim basis and to use such proceeds to fund their operations. Approval of the DIP Agreement will allow the Debtors to remain operational, including paying their current and ongoing working capital and operating expenses (*e.g.* postpetition wages, salaries, and utility and vendor costs).

25.　　As set forth in detail above, the DIP Financing is the best financing available to the Debtors at this time. The Debtors have been unable to procure sufficient financing: (a) in the form of unsecured credit allowable under section 503(b)(l) of the Bankruptcy Code; (b) solely as an administrative expense under section 364(a)-(b) of the Bankruptcy Code; or (c) in exchange solely for the grant of a superpriority administrative expense claim pursuant to section 364(c) of the Bankruptcy Code. In fact, the proposed financing under the DIP Agreement was the only viable financing option presented to the

Debtors and their advisors. Thus, based on the foregoing and for the reasons set forth below, the Debtors submit that they have satisfied the requirements to access postpetition financing on a superpriority, secured basis pursuant to section 364 of the Bankruptcy Code.

**I.     The Debtors Should be Authorized to Obtain Postpetition Financing Under Section 364 of the Bankruptcy Code**

26.     Pursuant to section 364(c) of the Bankruptcy Code, a court may authorize a debtor to incur debt that is (a) entitled to a superpriority administrative expense status; (b) secured by a lien on otherwise unencumbered property; or (c) secured by a junior lien on encumbered property if the debtor cannot obtain postpetition credit on an unsecured basis, on an administrative expense priority or secured solely by junior liens on the debtor's assets. *See* 11 U.S.C. § 364(c);[5] *In re Barbara K. Enters., Inc.*, No. 08-11474 (MG) 2008 WL 2439649, at *8 (Bankr. S.D.N.Y. June 16, 2008) (In order for a debtor to obtain postpetition secured credit under section 364, the debtor must prove that it was unable to reasonably obtain secure credit elsewhere…); *Pearl-Phil GMT (Far East) Ltd. v. Caldor Corp.*, 266 B.R. 575, 584 (S.D.N.Y. 2001) (superpriority administrative expenses authorized where debtor could not obtain credit as an administrative expense).

27.     Courts in this jurisdiction and others have fashioned guidelines in applying these statutory requirements. Generally, courts advocate using a "holistic approach" to evaluate

---

[5]          Specifically, section 364(c) of the Bankruptcy Code provides, in pertinent part, that:

If the trustee [or debtor-in-possession] is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt – (1) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of this title; (2) secured by a junior lien on property of the estate that is not otherwise subject to a lien; or (3) secured by a junior lien on property of the estate that is subject to a lien.

11 U.S.C. § 364(c).

superpriority postpetition financing agreements, which focuses on the transaction as a whole. As one court has noted:

> Obtaining credit should be permitted not only because it is not available elsewhere, which could suggest the unsoundness of the basis for use of the funds generated by credit, but also because the credit acquired is of significant benefit to the debtor's estate and . . . the terms of the proposed loan are within the bounds of reason, irrespective of the inability of the debtor to obtain comparable credit elsewhere.

*In re Aqua Assocs.*, 123 B.R. 192, 196 (Bankr. E.D. Pa. 1991); *see also In re YL West 87th Holdings I LLC*, 423 B.R. 421, 442 (Bankr. S.D.N.Y. 2010).

28.     More specifically, in evaluating a debtor's proposed postpetition financing, courts consider whether the postpetition financing:  (a) is necessary to preserve the assets of the estate and is necessary, essential and appropriate for continued operation of the Debtors' business; (b) is in the best interests of the Debtors' creditors and estates; (c) is an exercise of a debtor's sound and reasonable business judgment; (d) was negotiated in good faith and at arm's length between the debtor, on the one hand, and the agents and the lenders on the other; and (e) contains terms that are fair, reasonable and adequate given the circumstances of the debtor and the proposed postpetition lender.  *See In re Farmland Indus., Inc.*, 294 B.R. 855, 881 (Bankr. W.D. Mo. 2003) *cited in Transcript of Record at* 733:3-7, *In re Lyondell Chem. Co.*, No. 09-10023 (Bankr. S.D.N.Y. Mar. 5, 2009); *see also; In re Barbara K. Enters., Inc.*, 2008 WL 2439649 at *10; *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990).

29.     The Debtors propose to obtain the financing set forth in the DIP Agreement by providing, among other things, superpriority claims, security interests, and liens pursuant to sections 364(c)(1) – (3) and section 364(d) of the Bankruptcy Code.  For the reasons set forth below, the Debtors submit that entry into the DIP Financing satisfies each of these factors.

**A.** **The DIP Financing was Negotiated in Good Faith and Entry Into the DIP Financing is in the Best Interests of the Debtors' Creditors and Estates, is Necessary to Preserve Estate Assets and is an Exercise of the Debtors' Sound and Reasonable Business Judgment**

30.     A debtor's decision to enter into a postpetition lending facility under section 364 of the Bankruptcy Code is governed by the business judgment standard. *See Barbara K. Enters.*, 2008 WL 2439649, at *14 (explaining that courts defer to a debtor's business judgment); *Ames Dep't Stores*, 115 B.R. at 38 (noting that financing decisions under section 364 of the Bankruptcy Code must reflect a debtor's business judgment). Courts grant a debtor considerable deference in acting in accordance with its sound business judgment. *See, e.g.*, *Barbara K. Enters.*, 2008 WL 2439649, at *14 (explaining that courts defer to a debtor's business judgment "so long as a request for financing does not 'leverage the bankruptcy process' and unfairly cede control of the reorganization to one party in interest."); *Trans World Airlines, Inc. v. Travellers Int'l AG (In re Trans World Airlines, Inc.)*, 163 B.R. 964, 974 (Bankr. D. Del. 1994) (approving postpetition loan and receivables facility because such facility "reflect[ed] sound and prudent business judgment"); *In re Simasko Prod. Co.*, 47 B.R. 444, 449  (Bankr. D. Colo. 1985) ("[D]iscretion to act with regard to business planning activities is at the heart of the debtor's power.") (citations omitted).

31.     Specifically, to determine whether the business judgment standard is met, a court is "'required to examine whether a reasonable business person would make a similar decision under similar circumstances.'" *In re Dura Auto. Sys., Inc.*, No. 06-11202 (KJC), 2007 Bankr. LEXIS 2764, at *272 (Bankr. D. Del, Aug. 15, 2007) (quoting *In re Exide Techs.*, 340 B.R. 222, 239 (Bankr. D. Del. 2006)); *In re Brooklyn Hosp. Ctr. and Caledonian Health Ctr., Inc.*, 341 B.R. 405, 410 (Bankr. E.D.N.Y. 2006) (the business judgment rule "'is a presumption that in making a business decision, the directors of a corporation acted on an informed basis, in

good faith, and in the honest belief that the action taken was in the best interests of the Company'") *quoting Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650, 656 (S.D.N.Y. 1992); *see also In re Curlew Valley Assocs.*, 14 B.R. 506, 513-14 (Bankr. D. Utah 1981) (noting that courts should not second guess a debtor's business decision when that decision involves "a business judgment made in good faith, upon a reasonable basis, and within the scope of [the debtor's] authority under the [Bankruptcy] Code.") (citation omitted).

32.     Furthermore, in determining whether the Debtors have exercised sound business judgment in deciding to enter into the DIP Documents, the Court should consider the economic terms of the DIP Financing in light of current market conditions.  *See, e.g.,* Transcript of Record, 734 35:24, *In re Lyondell Chem. Co.*, Case No. 09-10023 (Bankr. S.D.N.Y. Mar. 5, 2009) [6] (recognizing "the terms that are now available for DIP facilities in the current economic environment aren't as desirable" as in the past).  Moreover, it is appropriate for the Court to consider non-economic benefits to the Debtors offered by a proposed postpetition financing facility.  For example, in *In re ION Media Networks, Inc.*, the Bankruptcy Court for the Southern District of New York held that:

> Although all parties . . . are naturally motivated to obtain financing on the best possible terms, the business decision to obtain credit from a particular lender is almost never based purely on economic terms.  Relevant features of the financing must be evaluated, including non-economic factors. . . . This is particularly true in a bankruptcy setting where cooperation and established alliances with creditor groups can be a vital part of building support for a restructuring that ultimately may lead to a confirmable plan of reorganization. That which helps foster consensus may be preferable to a notionally better transaction that carries the risk of promoting unwanted conflict.

---

[6] Because of the voluminous nature of the orders and transcripts cited herein, they are not attached to the DIP Motion.  Copies of all orders and transcripts cited herein are available on request of Debtors' counsel.

Case No. 09-13125 (Bankr. S.D.N.Y. July 6, 2009).

33.     The Debtors' decision to enter into the proposed DIP Agreement is an exercise of their sound business judgment that warrants approval by the Court.  As described in more detail above, the Debtors' decision to enter into the DIP Agreement is the culmination of an intense, several month process targeted at procuring the best available financing under the circumstances.  The Debtors negotiated the DIP Documents with EchoStar in good faith, at arm's length and with the assistance of outside advisors to obtain the required postpetition financing on the most favorable terms possible to the Debtors.  Moreover, entry into the DIP Agreement with EchoStar is part of a comprehensive global restructuring plan that will facilitate the Debtors' exit from bankruptcy.

34.     Based on the advice of counsel and the Debtors' other advisors, and the Debtors' own analysis, the Debtors have determined in their sound business judgment that the DIP Financing provides financing on more favorable terms than any other reasonably available alternative.

35.     Moreover, entry into the DIP Agreement and securing financing thereunder is absolutely necessary to the preservation of estate assets and is in the best interest of the Debtors' creditors and all parties in interest; therefore, entry into the DIP Agreement is an exercise of the Debtors' sound business judgment.  Given the Debtors' significantly constrained liquidity, the DIP Financing is of critical importance to operating the Debtors' businesses and preserving going concern value.

36.     As with most large businesses with millions in revenue, the Debtors have significant cash needs.  As of the Petition Date, however, the Debtors are operating on less than $500,000 in cash.  The Debtors have an urgent need to obtain access to the DIP Financing to,

among other things, make critical capital expenditures and continue the operation of their businesses in an orderly manner, maintain business relationships with vendors, suppliers, and customers, pay their employees and satisfy other working capital and operational needs – each of which is vital to preserving and maintaining the Debtors' going concern value. The inability to make these capital expenditures, meet payments to vendors, pay employees and satisfy customers would impair, if not destroy, the Debtors' prospects for reorganization. In short, without access to the liquidity provided by the DIP Financing, the Debtors would be forced to shut down their businesses to the detriment of all parties in interest in these chapter 11 cases.

37. Additionally, the Debtors' access to the DIP Financing will ensure that the going concern value of their assets are preserved, thereby providing a greater recovery to the Debtors' creditors than would be realized if the Debtors were forced to cease operations immediately and engage in a piecemeal liquidation of their assets. Accordingly, the Debtors submit that the availability of credit under the DIP Financing is necessary to preserve and enhance the value of their estates for the benefit of all stakeholders in these chapter 11 cases.

38. For these reasons, the Debtors submit that the DIP Agreement was negotiated in good faith and that entry into the DIP Agreement is in the best interests of the Debtors' creditors, is necessary to preserve the value of estate assets and is an exercise of the Debtors' sound and reasonable business judgment.

**B.  The DIP Financing is the Best Source of Funding Available to the Debtors**

39. It is well-recognized in this jurisdiction and others that the appropriateness of a proposed postpetition financing facility must be considered in light of current market conditions. *See, e.g.,* Transcript of record at 734 35:24, *In re Lyondell Chem. Co.*, Case No. 09-10023 (Bankr. S.D.N.Y. Mar. 5, 2009) (recognizing "the terms that are now available for DIP facilities in the current economic environment aren't as desirable" as in the past); *Bray v.*

*Shenandoah Fed. Savs. & Loan Assoc. (In re Snowshoe Co. Inc.)*, 789 F.2d 1085, 1088 (4th Cir.

1986) (noting that a debtor is not required to seek credit from every possible lender before

determining such credit is unavailable).  Indeed, courts often recognize that where there are few

lenders likely able and willing to extend the necessary credit to a debtor, "it would be unrealistic

and unnecessary to require [a debtor] to conduct such an exhaustive search for financing."  *In re*

*Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd*, 99 B.R. 117 (N.D. Ga. 1989);

*see also*, *In re 495 Central Park Ave. Corp.*, 136 B.R. 626, 630 (Bankr. S.D.N.Y. 1992) (the

Bankruptcy Code "does not require the debtor to seek alternate financing from every possible

lender").  This is especially true when time is of the essence.  *See In re Reading Tube Indus.*, 72

B.R. 329, 332 (Bankr. E.D. Pa. 1987).  Rather, a debtor must demonstrate that it made a

reasonable effort to seek credit from other sources available under section 364(a) and (b).  *See*

*Snowshoe*, 789 F.2d at 1088; *see also In re Utah 7000, L.L.C.*, No. 08-21869, 2008 WL

2654919, at *2 (Bankr. D. Utah July 3, 2008); *Shaw Indus.*, *Inc v. First Nat'l Bank of PA (In re*

*Shaw Indus., Inc.)*, 300 B.R. 861, 865 (Bankr. W.D. Pa. 2003) (where debtor made efforts by

contacting "numerous" lenders and was unable to obtain credit without a priming lien, it had met

its burden under Bankruptcy Code section 364(d)); *In re Plabell Rubber Prods., Inc.*, 137 B.R.

897, 899-900 (Bankr. N.D. Ohio 1992).

       40.      Though the current market for financing may be improving, it is still

strained as the global economy recovers from the recent credit crisis.  Simply put, because of

current economic conditions, there is no ready market for any financing, including debtor in

possession financing or otherwise and provisions once considered "extraordinary" in debtor in

possession financing arrangements have, for the time being, become standard.  *See, e.g.*,

*Lyondell*, Tr. at 740:4-6 ("[B]y reason of present market conditions, as disappointing as the

[DIP] pricing terms are, I find the provisions [of a DIP that included a roll-up of prepetition secured debt] reasonable here and now."); Transcript of Record 123:17-25, 123:1, *Chemtura*, No. 09-1123 (S.D.N.Y. Mar. 20, 2009) (J. Gonzalez noting support for finding that DIP with roll-up provision was the only funding available to meet the Debtors' needs at that time).

41.     Nevertheless, the Debtors believe that the terms that they have negotiated in the DIP Financing are favorable, fair and appropriate, and indeed favorable.   First and foremost, the DIP Financing is a "junior" DIP—i.e. it comes behind close to $1 billion in secured claims, and here, every term must be viewed in that light.   Second, although the interest rate is 15%, it is not paid in cash (meaning the Debtors are able to conserve liquidity during the cases).  Third, and as an overall matter, the DIP Financing is part of a comprehensive transaction, which includes a commitment for an exit strategy that, at a minimum, will have the support of more than one-half of the Debtors' secured creditors.   The Debtors believe that the best liquidity available at this time is that afforded by the DIP Financing.   Accordingly, the Debtors submit that terms of the DIP Agreement provide financing on more favorable terms than any other reasonably available alternative.

   C.     **The Terms of the DIP Financing are Fair, Reasonable and Appropriate in Light of the Debtors' Needs and the Current Market Environment**

42.     In considering whether the terms of postpetition financing are fair and reasonable, courts consider the terms in light of the relative circumstances of both the debtor and the potential lender.  *See In re Farmland*, 294 B.R. at 886; *see also Unsecured Creditors' Comm. Mobil Oil Corp. v. First Nat'l Bank & Trust Co.* (*In re Elingsen MacLean Oil Co., Inc.*), 65 B.R. 358, 365 (W.D. Mich. 1986) (recognizing a debtor may have to enter into hard bargains to acquire funds for its reorganization).

### (i)    *The Scope of the Carve-Out is Appropriate*

43.    The proposed DIP Financing subjects the security interests and administrative expense claims of the DIP Lenders to the Carve-Out.  Such carve outs for professional fees have been found to be reasonable and necessary to ensure that a debtor's estate and any statutory committee can retain assistance from counsel.  *See In re Barbara K. Enters., Inc.*, WL 2439649, at *8 *citing Ames*, 115 B.R. at 37.  The DIP Financing does not directly or indirectly deprive the Debtors' estates or other parties in interest of possible rights and powers by restricting the services for which professionals may be paid in these cases.  *See Ames*, 115 B.R. at 38 (observing that courts insist on carve-outs for professionals representing parties-in-interest because "[a]bsent such protection, the collective rights and expectations of all parties-in-interest are sorely prejudiced").  Additionally, the Carve-Out protects against administrative insolvency during the course of the case by ensuring that adequate assets remain for the payment of U.S. Trustee fees, fees and expenses of the Foreign Information Officer in the Canadian Cases, Chapter 7 Trustee Fees, and professional fees notwithstanding the grant of superpriority and administrative liens and claims under the DIP Financing.

### (ii)    *The Payment of Fees to the DIP Lenders is Appropriate*

44.    The various fees and charges to be paid to the DIP Lenders, as described in the overview of the proposed DIP Financing and provided for in section 2.07 of the DIP Agreement, are reasonable and appropriate under the circumstances.  Courts routinely authorize similar lender incentives beyond the explicit liens and rights specified in section 364 of the Bankruptcy Code.  *See Resolution Trust Corp. v. Official Unsecured Creditors Comm. (In re Defender Drug Stores, Inc.*), 145 B.R. 312, 316 (B.A.P. 9th Cir. 1992) (approving financing facility pursuant to section 364 of the Bankruptcy Code that included a lender "enhancement fee").  More specifically, the Debtors believe that a 15% interest rate paid-in-kind, a 3%

commitment fee paid-in-kind, a 1% unused commitment fee paid-in-kind, and a 2% OID discount are all fair, reasonable, and appropriate in light of the fact that the DIP Financing is a junior facility and almost all of the fees are paid-in-kind, therefore allowing the Debtors to conserve cash during the chapter 11 cases.

**(iii)**     ***The TSN Priming Lien on the TSN Secured Party Collateral is Appropriate***

45.     A priming lien can be granted in one of two ways – one, with the consent of the secured creditor who is being primed or two, if the Debtors are able to show that the requirements of section 364(d) of the Bankruptcy Code have been satisfied. Under the DIP Agreement, the DIP Agent, on behalf of the DIP Lenders, is being granted a priming lien on, and security interest in, the TSN Collateral of the TSN Secured Party. To be clear, while the DIP Liens on the TSN Collateral will prime, and be senior in all respects to, the security interests in, and liens on, the TSN Collateral of the TSN Secured Party, they will be junior to (a) the Permitted Prepetition Liens under the 15% Notes, (b) the liens of the holders of the 15% Notes; and (c) the Carve-Out. The only party affected by the TSN Priming Lien – TSN, who is one of the Debtors in these cases and is also substantially benefitting from the $75 million in DIP Financing as a borrower thereunder – has obviously consented to the TSN Collateral being primed by the DIP Liens, as such consent is necessary for the TSN Debtors to receive the financing being requested herein. Accordingly, the Debtors submit that no showing under section 364(d) of the Bankruptcy Code is required and request that the Court approve the grant of the TSN Priming Lien.

**II.**     **The DIP Financing was Negotiated in Good Faith and Should be Afforded the Protection of Section 364(e) of the Bankruptcy Code**

46.     Section 364(e) of the Bankruptcy Code protects a good faith lender's right to collect on loans extended to a debtor and its right in any lien securing those loans, even if the

authority of the debtor to obtain such loans or grant such liens is later reversed or modified on appeal.  Specifically, section 364(e) of the Bankruptcy Code, provides that any "reversal or modification on appeal of an authorization to obtain credit or incur debt or a grant of priority or a lien under section 364 of the Bankruptcy Code shall not affect the validity of that debt incurred or priority or lien granted as long as the entity that extended credit "extended such credit in good faith."  11 U.S.C. § 364(e).

47.     Courts generally hold that "good faith" in the context of postpetition financing means, consistent with the Uniform Commercial Code, honesty in fact in the conduct or transaction concerned.  *See Unsecured Creditors' Comm. v. First Nat'l Bank & Trust Co.  (In re Ellingsen MacLean Oil Co.)*, 834 F.2d 599, 605 (6th Cir. 1987) (citing U.C.C. § 1-201(19)). Additionally, good faith is measured with respect to the good faith of the lender as contrasted to that of the borrower.  Transcript of Record at 736:24-25, *In re Lyondell Chem. Co.*, No. 09-10023 (Bankr. S.D.N.Y. Mar. 5, 2009).  Moreover, a lender's desire to ensure that it is repaid, to make money on interest and fees and to protect prepetition positions are understandable and acceptable motivations for a postpetition lender in negotiating a deal.  *Id*. at 737:10-14.

48.     As explained in detail herein, the terms of the DIP Financing were negotiated in good faith and at arm's length between the Debtors, the DIP Agent and the Initial DIP Lender, and all of the DIP Financing obligations will be extended by the DIP Lenders in good faith (as such term is used in section 364(e) of the Bankruptcy Code).  No consideration is being provided to any party to, or guarantor of, obligations arising under the DIP Financing, other than as set forth herein.  Moreover, the DIP Financing has been extended in express reliance upon the protections offered by section 364(e) of the Bankruptcy Code, and the DIP

Lenders should be entitled to the full protection of section 364(e) of the Bankruptcy Code in the event that the Interim DIP Order or any provision thereof is vacated, reversed, or modified on appeal or otherwise.

### III.     The Interests of the Prepetition Secured Lenders are Adequately Protected

49.     Because not all of the Prepetition Secured Lenders are participating in the DIP Financing they cannot be deemed to have consented to the use of Cash Collateral contemplated by the DIP Financing.  Pursuant to section 363(c) of the Bankruptcy Code, the Debtors may only use cash collateral of the Prepetition Secured Lenders subject to the consent of those parties or the grant of adequate protection.  11 U.S.C. § 363(c)(2).

50.     What constitutes adequate protection is decided on a case-by-case basis and adequate protection can come in various forms, including payment of adequate protection fees, payment of interest, granting of replacement liens and administrative claims.  *See In re Mosello*, 195 B.R. 277, 289 (Bankr. S.D.N.Y. 1996) ("the determination of adequate protection is a fact-specific inquiry . . . 'left to the vagaries of each case'") (citation omitted); *In re Realty Southwest Assocs.*, 140 B.R. 360, 366 (Bankr. S.D.N.Y. 1992); *In re Beker Indus. Corp.*, 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986) (the application of adequate protection "is left to the vagaries of each case, but its focus is protection of the secured creditor from diminution in the value of its collateral during the reorganization process") (citation omitted); *Suntrust Bank v. Den-Mark Constr., Inc.*, 406 B.R. 683, 694 (E.D.N.C. 2009) (the concept of adequate protection is "susceptible to differing applications over a wide range of factual situations").

51.     As adequate protection, and to compensate their pre-petition secured parties for any diminution in value of their prepetition collateral, the Debtors propose to provide the Prepetition Secured Lenders with the following (collectively, the *"Adequate Protection Obligations"*):

(a)    *Adequate Protection Liens*.

(i)    As security for the payment of the Adequate Protection Obligations with respect to the PMCA, the PMCA Agent (for itself and for the benefit of the PMCA Lenders) is hereby granted (effective and perfected upon the date of the Interim Order and without the necessity of the execution by the Debtors of security agreements, pledge agreements, mortgages, financing statements or other agreements) a valid, perfected replacement security interest in and lien on the PMCA Collateral (the ***"PMCA Adequate Protection Lien"***), subject and subordinate only to (a) the Permitted Prepetition Liens; (b) Prepetition Secured Party Liens; (c) the DIP Liens; and (d) the Carve-Out.

(ii)    As security for the payment of the Adequate Protection Obligations with respect to the 15% Notes, the 15% Notes Trustee/Agent (for itself and for the benefit of the 15% Noteholders) is hereby granted (effective and perfected upon the date of the Interim Order and without the necessity of the execution by the Debtors of security agreements, pledge agreements, mortgages, financing statements or other agreements):  (a) a valid, perfected replacement security interest in and lien on the 15% Notes Collateral; and (b) a non-avoidable, valid, enforceable and perfected security interest in and lien on all of the DIP Collateral not included in (a) above (collectively, (a) and (b), the ***"15% Notes Adequate Protection Liens"*** and together with the PMCA Adequate Protection Lien, the ***"Adequate Protection Liens"***), each of which shall be subject and subordinate only to, to the extent applicable, (w) the Permitted Prepetition Liens; (x) Prepetition Secured Party Liens; (y) the DIP Liens; and (z) the Carve-Out.

(b)    *Section 507(b) Claims*.  The Adequate Protection Obligations shall constitute superpriority claims as provided in section 507(b) of the Bankruptcy Code (the ***"507(b) Claims"***), with priority in payment over any and all administrative expenses of the kinds

specified or ordered pursuant to any provision of the Bankruptcy Code, including without limitation, sections 326, 328, 330, 331, 503(b), 506(c), 507(a), 726, 1113 and 1114 of the Bankruptcy Code, subject and subordinate only to (i) the Carve-Out and (ii) the Superpriority Claims granted in respect of the DIP Obligations. Except to the extent expressly set forth in the Interim Order or the Final Order, the Prepetition Secured Parties shall not receive or retain any payments, property or other amounts in respect of the 507(b) Claims unless and until all DIP Obligations shall have indefeasibly been paid in full in cash and the commitments under the DIP Documents have been terminated.

(c)     *Fees and Expenses*.  The Prepetition Agents shall receive from the Debtors reimbursement of all reasonable fees and expenses incurred or accrued by the Prepetition Agents under and pursuant to the applicable prepetition loan documents, including, without limitation, the reasonable fees and disbursements of counsel to the Prepetition Agents, whether incurred or accrued before or after the Petition Date.  None of the fees and expenses payable pursuant to this section shall be subject to separate approval by this Court (but this Court shall resolve any dispute as to the reasonableness of any such fees and expenses), and no recipient of any such payment shall be required to file any interim or final fee application with respect thereto. Subject to any *bona fide* dispute as to the reasonableness of such fees and expenses, the Debtors shall pay the fees and expenses provided for in this section promptly (but no later than ten (10) business days) after invoices for such fees and expenses shall have been submitted to the Debtors, and the Debtors shall promptly provide copies of such invoices to the Committee (if any) and the U.S. Trustee.

(d)     *Access to Information.*  The Debtors shall promptly provide to the Prepetition Agent any written financial information or periodic reporting that is provided to, or

required to be provided to, the DIP Agent or the DIP Lenders (or their advisors) and shall continue to provide to the Prepetition Agent and the Prepetition Secured Parties all financial and other reporting as provided prepetition in accordance with the applicable prepetition loan documents.

52.    The Debtors believe that the proposed adequate protection is necessary and appropriate to ensure that the Debtors can continue to use the cash collateral and access liquidity under the DIP Financing.  Accordingly, the adequate protection proposed herein and in the DIP Orders is fair and reasonable and is sufficient to satisfy the requirements of sections 363(c) and 364(d) of the Bankruptcy Code.

## IV.    Approval of the DIP Financing on an Interim Basis is Necessary to Prevent Immediate and Irreparable Harm

53.    Bankruptcy Rule 4001(c)(2) governs the procedures for obtaining authorization to obtain postpetition financing and provides, in relevant part:

> The court may commence a final hearing on a motion for authority to obtain credit no earlier than 14 days after service of the motion. If the motion so requests, the court may conduct a hearing before such 14 day period expires, but the court may authorize the obtaining of credit only to the extent necessary to avoid immediate and irreparable harm to the estate pending a final hearing.

FED. R. BANKR. P. 4001(c)(2).

54.    Similarly, to the extent the Debtors are seeking authority to sell, use or otherwise incur an obligation regarding property of their estates, Bankruptcy Rule 6003 provides that the Court may only grant such relief to the extent it is necessary to avoid immediate and irreparable harm.  FED. R. BANKR. P. 6003(b).

55.    In examining requests for interim relief under the immediate and irreparable harm standard, courts apply the same business judgment standard applicable to other business decisions.  *See, e.g.*, *Ames Dep't Stores*, 115 B.R. at 36; *Simasko*, 47 B.R. at 449.  After

the 15-day period, the request for financing is not limited to those amounts necessary to prevent the destruction of the debtor's business, and the debtor is entitled to borrow those amounts that it believes are prudent to the operation of its business.  *See Ames Dep't* Stores, 115 B.R. at 36.

56.     Immediate and irreparable harm would result if the relief requested herein is not granted on an interim basis.  As described in detail above and in the Epstein DIP Declaration, the Debtors have very little cash on hand.  Thus, they need to obtain access to liquidity under the DIP Financing in order to, among other things, continue the operation of their businesses, maintain business relationships with vendors, suppliers and customers, make payroll, make capital expenditures, and satisfy other working capital and operational needs.  Funding each of these expenditures is necessary to the Debtors' ability to preserve and maintain their going-concern values for the benefit of all parties in interest.

57.     Absent access to liquidity under the DIP Financing and authorization to use Cash Collateral, the Debtors' trade creditors almost certainly will cease to provide goods and services to the Debtors on credit, the Debtors will be unable to pay their payroll and other direct operating expenses or to obtain goods and services needed to run their business in the ordinary course.  The availability to the Debtors of sufficient working capital and liquidity is vital to the confidence of the Debtors' employees, major suppliers, and to the preservation and maintenance of the value of the Debtors' estates.

58.     The crucial importance of a debtor's ability to secure postpetition financing to prevent immediate and irreparable harm to its estate has been repeatedly recognized in this district in similar circumstances.  *See, e.g.*, *In re Chemtura Corporation*, No. 09-11233 (REG), Docket No. 059, (Bankr. S.D.N.Y. March 20, 2009) (order approving postpetition financing on an interim basis); *In re Tronox Inc.*, No. 09-10156 (ALG), Docket NO. 46, (Bankr.

S.D.N.Y. Jan. 13, 2009) (same); *In re Lyondell Chemical Co.*, No. 09-10023 (REG), Docket No. 79, (Bankr. S.D.N.Y. Jan. 8, 2009) (same); *In re Lenox Sales, Inc.*, No. 08-14679 (ALG), Docket NO. 34, (S.D.N.Y. Nov. 25, 2008) (same); *In re Wellman, Inc.*, No. 08-10595 (SMB), Docket No. 60, (S.D.N.Y. Feb. 27, 2008) (same).

59.     Accordingly, the Debtors believe that, under the circumstances, entry of the Interim Order is necessary to prevent immediate and irreparable harm to the estates and therefore is warranted under the requirements of Bankruptcy Rule 4001(c)(2).

## V.     Modification of the Automatic Stay Provided Under Section 362 of the Bankruptcy Code is Appropriate Under the Circumstances

60.     Paragraph 8 of the proposed Interim Order provides that the automatic stay imposed under section 362(a) of the Bankruptcy Code is hereby lifted to, among other things, (i) permit the Debtors to grant various superpriority liens and claims as well as adequate protection liens, perform various obligations, incur various liabilities; (ii) permit the exercise of remedies by the DIP Agent and DIP Lenders following a default under the DIP Financing; and (iii) to allow the DIP Agent and the DIP Lenders to file and record financing statements, mortgages or other instruments to provide notice and evidence the grant and perfection of the Liens.

61.     Stay modification provisions of this sort are ordinary and usual features of debtor in possession financing facilities and, in the Debtors' business judgment, are reasonable under the present circumstances. *See, e.g., In re Inkkeepers USA Trust, et al.*, Case No. 10-13800 (Bankr. S.D.N.Y.  Sept. 2, 2010); *Tronox Inc.,* Case No. 09-10156 (Bankr. S.D.N.Y. Jan. 15, 2010); *In re Gen. Growth Props. Inc.*, Case No. 09-1197 (Bankr. S.D.N.Y. May 14, 2009); *In re Chemtura Corp.*, Case No. 09-11233 (Bankr. S.D.N.Y. Apr. 29, 2009).  Accordingly, the

Court should modify the automatic stay to the extent contemplated under the DIP Agreement and the proposed DIP Order.

### Request for Final Hearing

62.     Pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), the Debtors request that the Court set a date that is no longer than 14 days from the entry of the Interim Order as a final hearing for consideration of entry of the Final Order.

63.     The Debtors request that they be authorized to serve a copy of the signed Interim Order, which fixes the time and date for the filing of objections, if any, by first class mail upon the Notice Parties listed below.  The Debtors further request that the Court consider such notice of the Final Hearing to be sufficient notice under Bankruptcy Rule 4001(c)(2).

### Request for Waiver of Stay

64.     The Debtors further seek a waiver of any stay of the effectiveness of the order approving this motion.  Pursuant to Bankruptcy Rule 6004(h), "a[n] order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of fourteen (14) days after entry of the order, unless the court orders otherwise."  As set forth above, the DIP Financing is essential to prevent irreparable damage to the Debtors' operations, value and ability to reorganize.  Accordingly, the Debtors submit that ample cause exists to justify a waiver of the 14-day stay imposed by Bankruptcy Rule 6004(h), to the extent it applies.[7]

### Jurisdiction

65.     Pursuant to 28 U.S.C. §§ 157 and 1334 and Standing Order M-61 of the United States District Court for the Southern District of New York, dated July 10, 1984 (Ward, Acting C.J.), the Court has jurisdiction to consider and grant the relief requested herein.  A

---

[7] The DIP Lenders are not required to fund any amounts under the DIP Agreement unless the stay of the Interim Order has been waived or the stay period has run.  *See* DIP Agreement at § 4.01(f)(iii).

proceeding to consider and grant such relief is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## Motion Practice

66. The DIP Motion includes citations to the applicable rules and statutory authorities upon which the relief requested herein is predicated, and a discussion of their application to this motion. Moreover, in addition to all entities otherwise entitled to receive notice, the Debtors have given notice of this motion to all entities believed to have or be claiming an interest in the subject matter of the proposed order or who, it is believed, otherwise would be affected by the proposed order. Accordingly, the Debtors submit that this motion satisfies Local Rule 9013-1.

## Notice

67. The Debtors have provided notice of this DIP Motion to: (a) the Office of the United States Trustee for the Southern District of New York; (b) the entities listed on the Consolidated List of Creditors Holding the 30 Largest Unsecured Claims filed pursuant to Bankruptcy Rule 1007(d); (c) The Bank of New York Mellon as agent for the Debtors' proposed postpetition debtor-in-possession financing; (d) Emmet, Marvin & Martin LLP as counsel to the agent for the Debtors' proposed postpetition debtor-in-possession financing; (e) U.S. Bank National Association as Collateral Agent for the Debtors' purchase money credit facility and Harbinger Capital Partners Master Fund I, Ltd., Harbinger Capital Partners Special Situations Fund, L.P. and EchoStar Corporation as Lenders thereunder; (f) Weil, Gotshal & Manges LLP as counsel to Harbinger Capital Partners Master Fund I, Ltd. and Harbinger Capital Partners Special Situations Fund, L.P. in their capacity as Lenders under the Debtors' purchase money credit facility; (g) Willkie Farr & Gallagher LLP as counsel to EchoStar Corporation in its capacity as Lender under the Debtors' purchase money credit facility and Initial Lender under the Debtors'

proposed postpetition debtor-in-possession financing; (h) U.S. Bank National Association as Indenture Trustee for the Debtors' 15% Senior Secured Notes; (i) U.S. Bank National Association as Indenture Trustee for the Debtors' 6.5% Senior Exchangeable Notes; (j) Quinn Emanuel Urquhart & Sullivan, LLP as counsel to an *Ad Hoc* group of the Debtors' 6.5% Senior Exchangeable Notes; (k) the Internal Revenue Service; (l) the Securities and Exchange Commission; (m) the United States Attorney for the Southern District of New York; and (n) the Federal Communications Commission.  In light of the nature of the relief requested, the Debtors respectfully submit that no further notice is necessary.

**No Prior Request**

68.     No prior motion for the relief requested herein has been made to this or any other court.


WHEREFORE the Debtors respectfully request entry of an order, substantially similar to the proposed form of order attached hereto as Exhibit A, granting the relief requested herein and such other and further relief as the Court may deem just and appropriate.


New York, New York
Dated:  October 19, 2010

*/s/ Ira S. Dizengoff*
AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
(212) 872-1000 (Telephone)
(212) 872-1002 (Facsimile)

Ira S. Dizengoff
Arik Preis
Ashleigh L. Blaylock


*Proposed Counsel to the Debtors and Debtors in Possession*

**EXHIBIT A**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| TERRESTAR NETWORKS INC., *et al.*,[1] | ) | Case No. 10-[ ] ( ) |
| | ) | |
| Debtors. | ) | Joint Administration Requested |
| | ) | |

INTERIM ORDER UNDER SECTIONS 105, 361, 362, 363(c),
364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) AND 364(e) AND 507 OF THE
BANKRUPTCY CODE AND BANKRUPTCY RULES 2002, 4001
AND 9014: (I) AUTHORIZING DEBTORS TO OBTAIN POSTPETITION
FINANCING; (II) AUTHORIZING DEBTORS TO USE CASH
COLLATERAL; (III) GRANTING ADEQUATE PROTECTION
TO PREPETITION SECURED PARTIES; AND (IV) SCHEDULING A
<u>FINAL HEARING PURSUANT TO BANKRUPTCY RULES 4001(b) AND (c)</u>

Upon the motion, dated October 19, 2010 (the "***Motion***"), of TerreStar Networks

Inc. ("***TSN***") and each of its affiliated debtors and debtors in possession (collectively, the

"***Debtors***") in the above-captioned cases (the "***Cases***") commenced on October 19, 2010 (the

"***Petition Date***"), for interim and final orders under sections 105, 361, 362, 363(c), 364(c)(1),

364(c)(2), 364(c)(3), 364(d)(1) and 364(e) of title 11 of the United States Code, 11 U.S.C.

§§ 101, <u>et</u> <u>seq</u>. (as amended, the "***Bankruptcy Code***"), and Rules 2002, 4001 and 9014 of the

Federal Rules of Bankruptcy Procedure (as amended, the "***Bankruptcy Rules***"), and the Local

Bankruptcy Rules for the United States Bankruptcy Court for the Southern District of New York

(the "***Local Rules***"), seeking:

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal taxpayer-identification number, are: TerreStar New York Inc. (6394); TerreStar Networks Inc. (3931); Motient Communications Inc. (3833); Motient Holdings Inc. (6634); Motient License Inc. (2431); Motient Services Inc. (5106); Motient Ventures Holding Inc. (6191); MVH Holdings Inc. (9756); TerreStar License Inc. (6537); TerreStar National Services Inc. (6319); TerreStar Networks Holdings (Canada) Inc. (1337); TerreStar Networks (Canada) Inc. (8766) and 0887729 B.C. Ltd. (1345).

(I)     authorization (a) for TSN (the "***Borrower***") to obtain up to $75 million (plus fees, interest and other amounts to be capitalized in accordance with the terms of the DIP Documents (defined below)) in aggregate principal amount of postpetition financing (the "***DIP Financing***") on the terms and conditions set forth in this interim order (this ***"Order"***) and that certain Debtor-In-Possession Credit, Security & Guaranty Agreement (substantially in the form annexed to the Motion as <u>Exhibit A</u>, and as hereafter amended, supplemented or otherwise modified from time to time, the "***DIP Agreement***";[2] and, collectively with all agreements, guaranties, collateral agreements, documents and instruments delivered or executed from time to time in connection therewith, as hereafter amended, supplemented or otherwise modified from time to time, the "***DIP Documents***"), among the Borrower, the Guarantors (as defined below), EchoStar Corporation ("***EchoStar***" or the "***Initial Lender***"), and the other lenders that may become party thereto from time to time (collectively, the "***DIP Lenders***"), and The Bank of New York Mellon, as Administrative Agent and Collateral Agent (in such capacity, the "***DIP Agent***"), and (b) for each of the Debtors other than the Borrower (the "***Guarantors***"), to jointly and severally (except as provided in section 10.17 of the DIP Agreement) guaranty on a secured basis the Borrower's obligations in respect of the DIP Financing;

(II)     authorization for the Debtors to execute and deliver the DIP Agreement and the other DIP Documents and to perform such other and further acts as may be necessary or appropriate in connection therewith;

---

[2] Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to them in the DIP Agreement.

(III)     authorization for the Debtors to use the Cash Collateral (as defined in paragraph 3(g) below) pursuant to sections 361, 362 and 363 of the Bankruptcy Code, and all other Prepetition Collateral (as defined in paragraph 3(d) below);

(IV)     granting adequate protection to the PMCA Agent, PMCA Lenders, the 15% Notes Trustee/Agent, and the 15% Noteholders (each as defined below, and together, the "***Prepetition Secured Parties***") with respect to such use of Cash Collateral and any diminution in the value of the Prepetition Collateral securing the Debtors' obligations (the "***Prepetition Secured Obligations***") under or in connection with:  (i) that certain Terrestar-2 Purchase Money Credit Agreement, dated as of February 5, 2008 (as amended, restated, supplemented or otherwise modified from time to time, and including any mortgage, security, pledge, control or guaranty agreements or other documentation executed in connection with the foregoing, the "***PMCA***"), among TSN, as borrower, U.S. Bank National Association, as collateral agent (in such capacity, the "***PMCA Agent***"), the guarantors party thereto from time to time, and Harbinger Capital Partners Master Fund 1, Ltd., Harbinger Capital Partners Special Situations Fund, L.P. and EchoStar, as lenders (the "***PMCA Lenders***"); and (ii) the 15.0% senior secured payment-in-kind notes due 2014 (the "***15% Notes***") issued pursuant to that certain Indenture, dated as of February 14, 2007, among TSN, as issuer, U.S. Bank National Association, as indenture trustee and collateral agent (in such capacity, the "***15% Notes Trustee/Agent***" and together with the PMCA Agent, the "***Prepetition Agent***"), and the guarantors from time to time party thereto (as amended, restated, supplemented or otherwise modified from time to time, including by that certain First Supplemental Indenture, dated as of February 7, 2008, and that certain Second Supplemental Indenture, dated as of February 7, 2008, and including any mortgage, security, pledge, control or guaranty agreements or other documentation executed in

connection with the foregoing, the "***15% Notes Indenture***" and, together with the PMCA, the

"***Prepetition Loan Documents***");

(V)     authorization for the DIP Agent to, subject to paragraph 8 below, upon the occurrence and continuance of an Event of Default:  (a) reduce the amount of or terminate any outstanding Commitments under the DIP Agreement, (b) terminate the DIP Agreement, (c) charge the default rate of interest on the Loans, (d) declare the entirety of the Loans to be due and payable, and/or (e) subject to the Carve-Out (as defined in paragraph 6(b) below), exercise any and all remedies under applicable law (including the UCC and PPSA);

(VI)    **subject to entry of the Final Order (as defined below), granting liens to the DIP Lenders on the Debtors' claims and causes of action arising under sections 542-553 of the Bankruptcy Code (collectively, the "*Avoidance Actions*") and the proceeds thereof, which constitutes an "extraordinary provision" (a "*Material Provision*") under General Order M-274 of the United States Bankruptcy Court for the Southern District of New York;**

(VII)   **subject to entry of the Final Order, the waiver by the Debtors of any right to seek to surcharge the DIP Collateral (as defined in paragraph 7 below) pursuant to section 506(c) of the Bankruptcy Code or any other applicable law or principle of equity, which grant constitutes a Material Provision;**

(VIII)  at an interim hearing (the "***Interim Hearing***") on the Motion before this Court, pursuant to Bankruptcy Rule 4001, entry of this Order:  (a) authorizing the Borrower, on an interim basis, to borrow under the DIP Agreement an aggregate principal amount, not to exceed $18 million (plus fees, interest and other amounts to be capitalized in accordance with the terms of the DIP Documents) at any time outstanding prior to the entry of the Final Order,

(b) authorizing the Debtors, on an interim basis, to use the Cash Collateral and the other

Prepetition Collateral, and (c) granting, on an interim basis, adequate protection to the

Prepetition Secured Parties; and

(IX)    scheduling, pursuant to Bankruptcy Rule 4001, a final hearing (the "***Final***

***Hearing***") for this Court to consider entry of a final order, substantially in the form attached to

the DIP Agreement as Exhibit D (the "***Final Order***"), authorizing and approving on a final basis

the relief requested in the Motion, including without limitation, for the Borrower on a final basis

to utilize the DIP Financing and for the Debtors to continue to use the Cash Collateral and the

other Prepetition Collateral subject to the terms of the DIP Documents and the Final Order.

The Interim Hearing having been held by this Court on October [   ], 2010, and

upon the record made by the Debtors at the Interim Hearing, including, without limitation, the

admission into evidence of (i) the First Day Declaration, (ii) the Epstein DIP Declaration, and

(iii) Zelin Declaration (each as defined in the Motion), each of which was filed on the Petition

Date, and the other evidence submitted or adduced and the arguments of counsel made at the

Interim Hearing and after due deliberation and consideration and sufficient cause appearing

therefor;

IT IS FOUND, DETERMINED, ORDERED AND ADJUDGED, that:

1.      *Jurisdiction/Venue*.  This Court has core jurisdiction over the Cases, this

Motion, and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157(b) and 1334.

Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

2.      *Notice*.  Notice of the Motion and the relief requested therein, and the

relief requested at the Interim Hearing was served by the Debtors by electronic mail, facsimile,

or overnight mail to:  (a) the Office of the United States Trustee for the Southern District of New

York (the "***U.S. Trustee***"); (b) the entities listed on the Consolidated List of Creditors Holding the 30 Largest Unsecured Claims filed pursuant to Bankruptcy Rule 1007(d); (c) The Bank of New York Mellon as agent for the Debtors' proposed postpetition debtor-in-possession financing; (d) Emmet, Marvin & Martin LLP as counsel to the agent for the Debtors' proposed postpetition debtor-in-possession financing; (e) U.S. Bank National Association as Collateral Agent for the Debtors' purchase money credit facility and Harbinger Capital Partners Master Fund I, Ltd., Harbinger Capital Partners Special Situations Fund, L.P. and EchoStar Corporation as Lenders thereunder; (f) Weil, Gotshal & Manges LLP as counsel to Harbinger Capital Partners Master Fund I, Ltd. and Harbinger Capital Partners Special Situations Fund, L.P. in their capacity as Lenders under the Debtors' purchase money credit facility; (g) Willkie Farr & Gallagher LLP as counsel to EchoStar Corporation in its capacity as Lender under the Debtors' purchase money credit facility and Initial Lender under the Debtors' proposed postpetition debtor-in-possession financing; (h) U.S. Bank National Association as Indenture Trustee for the Debtors' 15% Senior Secured Notes; (i) U.S. Bank National Association as Indenture Trustee for the Debtors' 6.5% Senior Exchangeable Notes; (j) Quinn Emanuel Urquhart & Sullivan, LLP as counsel to an Ad Hoc group of the Debtors' 6.5% Senior Exchangeable Notes; (k) the Internal Revenue Service; (l) the Securities and Exchange Commission; (m) the United States Attorney for the Southern District of New York; and (n) the Federal Communications Commission. Under the circumstances, the notice provided of the Motion, the relief requested therein and the Interim Hearing constitutes due and sufficient notice thereof, complies with Bankruptcy Rules 4001(c) and (d) and the Local Rules, and no further notice of the relief sought at the Interim Hearing and the relief granted herein is necessary or required.

3. *Debtors' Stipulations*. Subject to the limitations contained in paragraph 16 below, the Debtors admit, stipulate, and agree that:

(a) as of the Petition Date, certain of the Debtors were justly and lawfully indebted and liable, without defense, counterclaim or offset of any kind, to the PMCA Lenders, in the amount of not less than $85.9 million of principal and accrued interest (such obligations, in addition to the obligations described below, the "***Prepetition PMCA Obligations***"), in respect of loans or other financial accommodations made by the PMCA Lenders pursuant to, and in accordance with the terms of, the PMCA, plus, in each case, accrued and unpaid interest thereon and costs and expenses and other obligations owing under the PMCA;

(b) as of the Petition Date, certain of the Debtors were justly and lawfully indebted and liable, without defense, counterclaim or offset of any kind, to the holders of 15% Notes (the "***15% Noteholders***"), in the amount of not less than $943.9 million of principal and accrued interest (such obligations, in addition other obligations described below in this paragraph, the "***Prepetition 15% Notes Obligations***" and, together with the Prepetition PMCA Obligations the "***Prepetition Obligations***"), in respect of loans or other financial accommodations made by the 15% Noteholders pursuant to, and in accordance with the terms of, the 15% Notes Indenture, plus, in each case, accrued and unpaid interest thereon and costs and expenses and other obligations owing under the 15% Notes Indenture;

(c) the liens and security interests granted to the PMCA Agent to secure the Prepetition PMCA Obligations (the "***PMCA Liens***") are (i) valid, binding, perfected, enforceable, first priority (subject to permitted exceptions under the PMCA) liens on and security interests in the personal and real property constituting "Collateral" under, and as defined in, the PMCA (including Cash Collateral, the "***PMCA Collateral***"), (ii) not subject to objection,

defense, counterclaim, offset, contest, attachment, avoidance, recharacterization or subordination pursuant to the Bankruptcy Code or applicable nonbankruptcy law, and (iii) subject and subordinate only to valid, perfected and unavoidable liens permitted under the PMCA to the extent such permitted liens are senior to the liens securing the PMCA (the "***PMCA Permitted Prepetition Liens***") and the Carve-Out (as defined in paragraph 6(b) below);

(d)       the liens and security interests granted to the 15% Notes Trustee/Agent to secure the Prepetition 15% Notes Obligations (the "***15% Notes Liens***" and, together with the PMCA Liens, the "***Prepetition Secured Party Liens***") are (i) valid, binding, perfected, enforceable, first priority (subject to permitted exceptions under the 15% Notes Indenture) liens on and security interests in the personal and real property constituting "Collateral" under, and as defined in, the 15% Notes Indenture (including Cash Collateral, the "***15% Notes Collateral***" and, together with the PMCA Collateral, the "***Prepetition Collateral***"), (ii) not subject to objection, defense, counterclaim, offset, contest, attachment, avoidance, recharacterization or subordination pursuant to the Bankruptcy Code or applicable nonbankruptcy law, and (iii) subject and subordinate only to valid, perfected and unavoidable liens permitted under the 15% Notes Indenture to the extent such permitted liens are senior to the liens securing the Prepetition 15% Notes Obligations (the "***15% Notes Permitted Prepetition Liens***" and, together with the PMCA Permitted Prepetition Liens, the "***Permitted Prepetition Liens***") and the Carve-Out;

(e)       the Prepetition Obligations constitute the legal, valid and binding obligations of the Debtors, enforceable in accordance with their terms (other than in respect of the stay of enforcement arising under section 362 of the Bankruptcy Code);

(f)       (i) no portion of the Prepetition Obligations shall be subject to objection, defense, counterclaim, offset, avoidance, recharacterization, recovery or subordination pursuant

to the Bankruptcy Code or applicable nonbankruptcy law, and (ii) the Debtors do not have, and hereby forever release, any claims (as defined in section 101(5) of the Bankruptcy Code), counterclaims, causes of action, defenses, setoff or recoupment rights, whether arising under the Bankruptcy Code or applicable nonbankruptcy law, against the Prepetition Secured Parties and their respective affiliates, subsidiaries, agents, officers, directors, employees, attorneys and advisors, in each case, solely in their capacity as Prepetition Secured Parties; and

(g)     a portion of the Debtors' cash constitutes Prepetition Collateral and, therefore, is cash collateral of the Prepetition Secured Parties within the meaning of section 363(a) of the Bankruptcy Code (the "***Cash Collateral***").

4.     *Findings Regarding the DIP Financing.*

(a)     Based upon the record presented to the Court by the Debtors, it appears that the Debtors have an immediate need to obtain the DIP Financing and to use the Prepetition Collateral, including any Cash Collateral, in order to, among other things, permit the orderly continuation of their businesses, preserve the going concern value of the Debtors, pay the costs of administration of their estates and for the other purposes set forth in the DIP Documents.   The Debtors' use of the Prepetition Collateral (including the Cash Collateral) and the DIP Financing is necessary to ensure that the Debtors have sufficient working capital and liquidity to preserve and maintain the going concern value of the Debtors' estates.  Good cause has, therefore, been shown for entry of this Order.

(b)     The Debtors are unable to obtain financing on more favorable terms from sources other than the DIP Lenders pursuant to, and for the purposes set forth in, the DIP Documents and are unable to obtain adequate unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense.  The Debtors are also unable to obtain

secured credit allowable under sections 364(c)(1), 364(c)(2) and 364(c)(3) of the Bankruptcy Code without the Debtors granting to the DIP Agent for the benefit of itself and the DIP Lenders, subject to the Carve-Out, (i) the DIP Liens (as defined in paragraph 7 below), including the priming DIP Liens described in paragraph 7(b) below, and (ii) the Superpriority Claims (as defined in paragraph 6(a) below), in each case on the terms and conditions set forth in this Order and the DIP Documents.  Specifically, no party or parties other than the DIP Lenders would provide postpetition financing to the Debtors absent the Debtors granting such parties priming liens on the Debtors' assets pursuant to section 364(d)(1) of the Bankruptcy Code, and the Debtors were unable to satisfy the requirements of section 364(d)(1) of the Bankruptcy Code.

(c)     The terms of the DIP Documents and the use of the Prepetition Collateral (including the Cash Collateral) pursuant to this Order and the DIP Agreement are fair and reasonable, and reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties.  The Debtors will receive and have received fair and reasonable consideration in exchange for access to the DIP Financing and all other financial accommodations provided under the DIP Documents and this Order.

(d)     The DIP Documents and the terms and conditions of the Debtors' use of the Prepetition Collateral (including the Cash Collateral) have been the subject of extensive negotiations conducted in good faith and at arm's length among the Debtors, the DIP Agent, the DIP Lenders, the Prepetition Agent and the PMCA Lenders, and all of the Debtors' obligations and indebtedness arising under or in connection with the DIP Financing, including without limitation, (i) all Loans made to, and guaranties issued by, the Debtors pursuant to the DIP Agreement, (ii) the Debtors' obligation to pay all reasonable costs and expenses of (a) the Initial Lender (including all reasonable, actual and documented fees, expenses and disbursements of the

10

Initial Lender's counsel and financial advisors, i.e., Willkie Farr & Gallagher LLP, Sullivan & Cromwell LLP, Goodmans LLP, Steptoe & Johnson LLP, and Lazard Ltd., and (b) the DIP Agent (including all reasonable, actual and documented fees, expenses and disbursements of the DIP Agent's counsel, i.e., Emmet, Marvin & Martin, LLP) in connection with the preparation, execution and delivery of the DIP Agreement and the funding of the DIP Financing, and (iii) all other obligations (including, without limitation, indemnification and fee obligations) of the Debtors under the DIP Documents and this Order now or hereafter owing to the DIP Agent or any DIP Lender (collectively, (i), (ii) and (iii), the "***DIP Obligations***") shall be deemed to have been extended by the DIP Agent and the DIP Lenders in "good faith" as such term is used in section 364(e) of the Bankruptcy Code, and in express reliance upon the protections set forth therein, and shall be entitled to the full protection of section 364(e) of the Bankruptcy Code, in the event that this Order or any provision hereof is vacated, reversed or modified on appeal or otherwise.

(e)     The Debtors have requested immediate entry of this Order pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2) and Local Rule 4001-2.  Absent the interim relief set forth in this Order, the Debtors' estates will be immediately and irreparably harmed. Consummation of the DIP Financing and authorization of the use of the Prepetition Collateral (including the Cash Collateral) in accordance with this Order and the DIP Documents are, therefore, in the best interest of the Debtors' estates and are consistent with the Debtors' fiduciary duties.

5.     *Authorization Of The DIP Financing And The DIP Documents.*

(a)     The Debtors are hereby authorized, without stockholder, member or board of directors (or similar body) approval, to enter into and perform their obligations under the DIP

Documents and, in the case of (i) the Borrower, to borrow thereunder up to an aggregate principal amount of $18 million (plus fees, interest and other amounts to be capitalized in accordance with the terms of the DIP Documents) for working capital and other general corporate purposes of the Debtors and to pay interest, fees and all other expenses provided for in the DIP Documents, pending entry of the Final Order, all in accordance with the terms of this Order, the DIP Agreement and the other DIP Documents, and (ii) the Guarantors, to jointly and severally (except as provided in section 10.17 of the DIP Agreement) guaranty such borrowing and all other DIP Obligations.

(b)     The Debtors are authorized to use the proceeds of borrowings under the DIP Agreement and Cash Collateral in accordance with and to the extent permitted by the DIP Documents.

(c)     On an interim basis, in furtherance of the foregoing and without further approval of this Court, each Debtor is authorized, and the automatic stay imposed by section 362 of the Bankruptcy Code is hereby lifted to the extent necessary, to perform all acts and to execute and deliver all instruments and documents that the DIP Agent or the Initial Lender determines to be reasonably required or necessary for the Debtors' performance of their obligations under the DIP Documents, including without limitation:

(i)     the execution, delivery and performance of the DIP Documents;

(ii)    the execution, delivery and performance of one or more amendments, waivers, consents or other modifications to and under the DIP Documents, in each case in such form as the Debtors, the DIP Agent and the requisite DIP Lenders may agree, and no further approval of this Court shall be required for immaterial amendments, waivers, consents or other modifications to and under the DIP Documents (and any fees paid in connection

therewith) that do not (A) shorten the maturity of the Loans or (B) increase the Commitments or the rate of interest payable on the Loans under the DIP Agreement; provided, that a copy of any amendment, waiver, consent or other modification to the DIP Documents shall be provided by the Debtors to (X) the U.S. Trustee and (Y) counsel to any statutory committee of unsecured creditors appointed in the Cases (the "***Committee***"), if any;

(iii)     the non-refundable payment to the DIP Agent, its affiliates and the DIP Lenders, as the case may be, of (A) the fees set forth in the DIP Documents (including, without limitation, the fees provided for in the Fee Schedule, dated October 7, 2010, between the Borrower and the DIP Agent) and (B) such reasonable, actual, and documented costs and expenses as may be due from time to time under the DIP Documents, all as provided in the DIP Documents and all of which constitute DIP Obligations; and

(iv)     the performance of all other acts required under or in connection with the DIP Documents.

(d)     Upon execution and delivery of the DIP Documents, the DIP Documents shall constitute valid and binding obligations of the Debtors, enforceable against the Debtors in accordance with the terms of this Order and the DIP Documents, without the need for approval by any equity holder, member, or board of directors (or similar body) of any Debtor.  No obligation, payment, transfer or grant of security under the DIP Documents or this Order shall be stayed, voidable, avoidable or recoverable under the Bankruptcy Code or under any applicable nonbankruptcy law (including without limitation, under sections 502(d), 548 or 549 of the Bankruptcy Code or under any applicable state Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act or similar statute or common law), or subject to any defense, reduction, setoff, recoupment or counterclaim.

13

(e)     The Debtors have provided the DIP Lenders with the 13-week cash flow projection annexed hereto as Exhibit A (the "***Initial 13-Week Projection***").  On a bi-weekly basis, the Debtors will provide the DIP Agent and DIP Lenders with an updated cash flow projection for the following 13 weeks.

6.     *Superpriority Claims.*

(a)     Pursuant to section 364(c)(1) of the Bankruptcy Code, all of the DIP Obligations shall constitute allowed senior administrative expense claims (the "Superpriority Claims") against the Debtors and, except to the extent expressly set forth in this Order in respect of the Carve-Out, such Superpriority Claims shall have priority over any and all administrative expenses, adequate protection claims and all other claims against the Debtors, now existing or hereafter arising, of any kind whatsoever, including without limitation, all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, and over any and all administrative expenses or other claims arising under sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546, 726, 1113 or 1114 of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment, which allowed claims shall for purposes of section 1129(a)(9)(A) of the Bankruptcy Code be considered administrative expenses allowed under section 503(b) of the Bankruptcy Code, and which Superpriority Claims shall be payable from and have recourse to all prepetition and postpetition property of the Debtors and all proceeds thereof, including without limitation (subject to entry of the Final Order) the Avoidance Actions and any proceeds or other amounts received in respect thereof and property received thereby, whether by judgment, settlement or otherwise.

(b)     For purposes hereof, the "***Carve-Out***" shall mean:  (i) all fees required to be paid to the Clerk of the Bankruptcy Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code; ( ii) fees and expenses up to $50,000 incurred by a trustee under section 726(b) of the Bankruptcy Code; (iii) with respect to the information officer (the "***Information Officer***") to be appointed by the Canadian Court in connection with the proceedings commenced pursuant to the Companies' Creditors Arrangement Act (Canada) R.S.C. 1985, c. C-36 as amended in the Ontario Superior Court of Justice (Commercial List) in Toronto, Ontario, Canada (the "***Canadian Proceedings***"), all fees and expenses required to be paid to the Information Officer in connection with the Canadian Proceedings, including to the extent secured by the charge to be granted by the Canadian Court over the Debtors' assets in Canada, in the maximum amount of CDN $125,000, to secure payment of any such fees and expenses of the Information Officer; and (iv) after the occurrence and during the continuance of an Event of Default under the DIP Documents, the payment of allowed professional fees and disbursements incurred by the Debtors or the Committee after the occurrence of the Event of Default not in excess of $800,000 (plus all unpaid professional fees and expenses allowed by this Court that were incurred prior to the occurrence of such Event of Default); <u>provided</u> <u>that</u> (X) the Carve-Out shall not be available to pay any such professional fees and expenses incurred in connection with the initiation or prosecution of any claims, causes of action, adversary proceedings or other litigation against the DIP Agent, the DIP Lenders, or the Prepetition Secured Parties or liens and claims held by DIP Agent, the DIP Lenders, the Prepetition Secured Parties, (Y) so long as no Event of Default shall have occurred and be continuing, the Carve-Out shall not be reduced by the payment of fees and expenses allowed by this Court under sections 328, 330 and 331 of the Bankruptcy Code, and (Z) nothing in this

Order shall impair the right of any party to object to the reasonableness of any such fees or expenses to be paid by the Debtors' estates.

7.    *DIP Liens*.  As security for the DIP Obligations, effective and perfected upon the date of this Order and without the necessity of the execution by the Debtors (or recordation or other filing) of security agreements, control agreements, pledge agreements, financing statements, mortgages or other similar documents, or the possession or control by the DIP Agent of any property, the following security interests and liens are hereby granted to the DIP Agent, for its own benefit and the benefit of the DIP Lenders (all property identified in clauses (a), (b) and (c) below being collectively referred to as the "***DIP Collateral***"), subject only to the Carve-Out (all such liens and security interests granted to the DIP Agent, for its benefit and for the benefit of the DIP Lenders, pursuant to this Order and the DIP Documents, the ***"DIP Liens"***):

(a)    *First Lien on Unencumbered Property*.  Pursuant to section 364(c)(2) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected first priority lien on, and security interest in, all tangible and intangible prepetition and postpetition property in which the Debtors have an interest, whether existing on or as of the Petition Date or thereafter acquired, that is not subject to valid, perfected, non-avoidable and enforceable liens in existence on or as of the Petition Date (collectively, and excluding any property that is excluded from the definition of "Collateral" in section 10.01 of the DIP Agreement, the "***Unencumbered Property***"), including without limitation, any and all unencumbered cash, accounts receivable, other rights to payment, inventory, general intangibles, contracts, securities, chattel paper, owned real estate, real property leaseholds, fixtures, machinery, equipment, deposit accounts, patents, copyrights, trademarks, tradenames, rights under license agreements and other intellectual

property, instruments, investment property, goods, satellites, spare satellites, ground stations, commercial tort claims, proceeds from the disposition of Federal Communications Commission and/or Industry Canada licenses (and the Federal Communications Commission and/or Industry Canada licenses themselves, to the fullest extent permitted by applicable law), books and records, in each case, wherever located, and the proceeds, products, rents and profits of all of the foregoing, including without limitation (subject to entry of the Final Order) the Avoidance Actions and any proceeds or other amounts received in respect thereof and property received thereby, whether by judgment, settlement or otherwise.

(b) *Liens Junior to Certain Existing Liens*.  Pursuant to section 364(c)(3) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected lien on, and security interest in, all tangible and intangible prepetition and postpetition property in which the Debtors have an interest, whether now existing or hereafter acquired and all proceeds thereof, that is subject to the Prepetition Secured Party Liens or the Permitted Prepetition Liens, which security interest and lien shall be junior to (i) the Prepetition Secured Party Liens and the Permitted Prepetition Liens (but only to the extent such liens secure valid and enforceable Prepetition Secured Obligations), and (ii) the Carve-Out, but senior to all other liens.

(c) *Liens Priming TSN Secured Party Liens.*  Pursuant to section 364(d)(1) of the Bankruptcy Code, and based upon the consent of the TSN Secured Party (as defined below), a valid, binding, continuing, enforceable, fully-perfected, priming lien on, and security interest in, all now existing or hereafter acquired property of TerreStar Networks (Canada) Inc. that constitutes "Collateral" (as defined in the TSN Security Agreement (defined below)) (the "***TSN Collateral***") under that certain Second Amended and Restated Security Agreement, dated August 11, 2009, as amended, by and between TerreStar Networks Inc., as Secured Party (the "***TSN***

17

*Secured Party*"), and TerreStar Canada Inc., as Obligor (the "**TSN Security Agreement**").  The

DIP Liens on the TSN Collateral shall be senior in all respects to the security interests in, and

liens on, the TSN Collateral of the TSN Secured Party (the "**TSN Security Agreement Liens**"),

but shall be junior to:  (a) the 15% Notes Permitted Prepetition Liens; (b) the 15% Notes Liens;

and (c) the Carve-Out.

        (d)    *Liens Senior to Certain Other Liens*.  The DIP Liens and the Adequate

Protection Liens (as defined in paragraph 12(a) below) shall not be (i) subject or subordinate to

(A) any lien or security interest that is avoided and preserved for the benefit of the Debtors and

their estates under section 551 of the Bankruptcy Code or (B) any liens arising after the Petition

Date, including without limitation, any liens or security interests granted in favor of any federal,

state, municipal or other governmental unit, commission, board or court for any liability of the

Debtors or (ii) subordinated to or made *pari passu* with any other lien or security interest (other

than the Permitted Prepetition Liens, the Prepetition Secured Party Liens, and the Carve-Out)

under sections 363 or 364 of the Bankruptcy Code or otherwise.

        8.    *Remedies After Event of Default.*  The automatic stay under section 362 of

the Bankruptcy Code is vacated and modified to the extent necessary to permit the DIP Agent

and the DIP Lenders to exercise, (i) immediately upon the occurrence and during the continuance

of an Event of Default, all rights and remedies under the DIP Documents, other than those rights

and remedies against the DIP Collateral as provided in clause (ii) below, and (ii) upon the

occurrence and during the continuance of an Event of Default, and the giving of ten (10) days'

prior written notice to the Debtors, with a copy to counsel for the Debtors, counsel to the

Committee (and, if no Committee is formed, the Debtors' largest thirty (30) unsecured creditors

on a consolidated basis) and to the U.S. Trustee, all rights and remedies against the DIP

Collateral provided for in the DIP Documents and this Order.  In any hearing regarding any exercise of rights or remedies, the only issue that may be raised by any party in opposition thereto shall be whether, in fact, an Event of Default has occurred and is continuing.  In no event shall the DIP Agent, the DIP Lenders, or the Prepetition Secured Parties be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the DIP Collateral.  The DIP Agent's or any DIP Lender's delay or failure to exercise rights and remedies under the DIP Documents or this Order shall not constitute a waiver of the DIP Agent's or the DIP Lenders' rights hereunder, thereunder or otherwise, unless any such waiver is pursuant to a written instrument executed in accordance with the terms of the applicable DIP Documents.

9.     *Limitation on Charging Expenses Against Collateral*.  Subject to and effective upon entry of the Final Order, except to the extent of the Carve-Out with respect to the DIP Collateral and the Prepetition Collateral, no expenses of administration of the Cases or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, shall be charged against or recovered from the DIP Collateral or the Prepetition Collateral pursuant to section 506(c) of the Bankruptcy Code or any similar principle of law or in equity, without the prior written consent of the DIP Agent and the Prepetition Agent, and no such consent shall be implied from any other action or inaction by the DIP Agent, the DIP Lenders, or the Prepetition Secured Parties.

10.    *Payments Free and Clear*.  Any and all payments or proceeds remitted to the DIP Agent on behalf of the DIP Lenders or the Prepetition Agent on behalf of the Prepetition Secured Parties pursuant to the provisions of this Order or any subsequent order of this Court shall be received free and clear of any claim, charge, assessment or other liability.

11.     *Use of Prepetition Collateral (including Cash Collateral).*  The Debtors are hereby authorized to use the Prepetition Collateral, including the Cash Collateral, during the period from the Petition Date through and including the Termination Date under the DIP Agreement for, among other things, working capital and general corporate purposes in accordance with the terms and conditions of this Order and the DIP Documents; <u>provided</u> that the Prepetition Secured Parties are granted adequate protection as hereinafter set forth.

12.     *Adequate Protection.*  The Prepetition Secured Parties are entitled, pursuant to sections 105, 361, 363 and 364 of the Bankruptcy Code, to adequate protection of their interests in the Prepetition Collateral, including Cash Collateral, in an amount equal to the aggregate diminution in value of the Prepetition Secured Parties' security interests in the Prepetition Collateral, including without limitation, any such diminution resulting from the sale, lease or use by the Debtors (or other decline in value) of any Prepetition Collateral, including the Cash Collateral, and the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code (such diminution in value, the "***Adequate Protection Obligations***").  As adequate protection, the Prepetition Secured Parties are hereby granted the following (the "***Adequate Protection***"):

(a)     *Adequate Protection Liens.*

(i)     As security for the payment of the Adequate Protection Obligations with respect to the PMCA, the PMCA Agent (for itself and for the benefit of the PMCA Lenders) is hereby granted (effective and perfected upon the date of this Order and without the necessity of the execution by the Debtors of security agreements, pledge agreements, mortgages, financing statements or other agreements) a valid, perfected replacement security interest in and lien on the PMCA Collateral (the "***PMCA Adequate Protection Lien***"), subject

and subordinate only to (A) the Permitted Prepetition Liens, (B) Prepetition Secured Party Liens, (C) the DIP Liens, and (D) the Carve-Out, and senior to all other liens (including, without limitation, the TSN Liens).

(ii)    As security for the payment of the Adequate Protection Obligations with respect to the 15% Notes, the 15% Notes Trustee/Agent (for itself and for the benefit of the 15% Noteholders) is hereby granted (effective and perfected upon the date of this Order and without the necessity of the execution by the Debtors of security agreements, pledge agreements, mortgages, financing statements or other agreements):  (A) a valid, perfected replacement security interest in and lien on the 15% Notes Collateral, and (B) a non-avoidable, valid, enforceable and perfected security interest in and lien on all of the DIP Collateral not included in (A) above (collectively, (A) and (B), the "*15% Notes Adequate Protection Liens*" and together with the PMCA Adequate Protection Lien, the "*Adequate Protection Liens*"), each of which shall be subject and subordinate only to (W) the Permitted Prepetition Liens, (X) Prepetition Secured Party Liens, (Y) the DIP Liens, and (Z) the Carve-Out, and senior to all other liens (including, without limitation, the TSN Liens).

(b)    *Section 507(b) Claims*.  The Adequate Protection Obligations shall constitute superpriority claims as provided in section 507(b) of the Bankruptcy Code (the "*507(b) Claims*"), with priority in payment over any and all administrative expenses of the kinds specified or ordered pursuant to any provision of the Bankruptcy Code, including without limitation, sections 326, 328, 330, 331, 503(b), 506(c), 507(a), 726, 1113 and 1114 of the Bankruptcy Code, subject and subordinate only to (i) the Carve-Out and (ii) the Superpriority Claims granted in respect of the DIP Obligations.  Except to the extent expressly set forth in this Order or the Final Order, the Prepetition Secured Parties shall not receive or retain any

payments, property or other amounts in respect of the 507(b) Claims unless and until all DIP Obligations shall have indefeasibly been paid in full in cash and the Commitments have been terminated.

(c)     *Fees and Expenses*.  The Prepetition Agent shall receive from the Debtors reimbursement of all reasonable, actual and documented fees and expenses incurred or accrued by the Prepetition Agent under and pursuant to the Prepetition Loan Documents, including, without limitation, the reasonable, actual and documented fees and disbursements of counsel to the Prepetition Agent, whether incurred or accrued prior to or after the Petition Date.  None of the fees and expenses payable pursuant to this paragraph 12(c) shall be subject to separate approval by this Court (but this Court shall resolve any dispute as to the reasonableness of any such fees and expenses), and no recipient of any such payment shall be required to file any interim or final fee application with respect thereto.  Subject to any *bona fide* dispute as to the reasonableness of such fees and expenses, the Debtors shall pay the reasonable, actual and documented fees and expenses provided for in this paragraph 12(c) promptly (but no later than ten (10) business days) after invoices for such fees and expenses shall have been submitted to the Debtors, and the Debtors shall promptly provide copies of such invoices to the Committee (if any) and the U.S. Trustee.

(d)     *Information*.  The Debtors shall promptly provide to the Prepetition Agent any written financial information or periodic reporting that is provided to, or required to be provided to, the DIP Agent or the DIP Lenders (or their advisors) and shall continue to provide to the Prepetition Agent and the Prepetition Secured Parties all financial and other reporting as provided prepetition in accordance with the Prepetition Loan Documents.

13.    *Reservation of Rights of Prepetition Secured Parties*.  Under the circumstances and given that the Adequate Protection is consistent with the Bankruptcy Code, this Court finds that the adequate protection provided herein is reasonable and sufficient to protect the interests of the Prepetition Secured Parties.  Notwithstanding any other provision hereof, the grant of adequate protection to the Prepetition Agent and the Prepetition Secured Parties pursuant hereto is without prejudice to the right of the Prepetition Agent to seek modification of the grant of adequate protection provided hereby so as to provide different or additional adequate protection; provided, however, that any such additional or modified adequate protection shall at all times be subordinate and junior to the claims and liens of the DIP Agent and the DIP Lenders granted under this Order and the DIP Documents.  Except as expressly provided herein, nothing contained in this Order (including without limitation, the authorization to use any Cash Collateral) shall impair or modify any rights, claims or defenses available in law or equity to the Prepetition Agent or any other Prepetition Secured Party.

14.    *Perfection of DIP Liens and Adequate Protection Liens.*

(a)    The DIP Agent and the Prepetition Agent are hereby authorized, but not required, to file or record financing statements, intellectual property filings, mortgages, notices of lien or similar instruments in any jurisdiction, take possession of or control over, or take any other action in order to validate and perfect the liens and security interests granted to them hereunder.  Whether or not the DIP Agent on behalf of the DIP Lenders, or the Prepetition Agent on behalf of the respective Prepetition Secured Parties shall, in their respective sole discretion, choose to file such financing statements, intellectual property filings, mortgages, notices of lien or similar instruments, take possession of or control over, or otherwise confirm perfection of the liens and security interests granted to them hereunder, such liens and security interests shall be

23

deemed valid, perfected, allowed, enforceable, non-avoidable and not subject to challenge, dispute or subordination as of the date of entry of this Order.

(b)     A certified copy of this Order may, in the discretion of the DIP Agent or the Prepetition Agent, as the case may be, be filed with or recorded in filing or recording offices in addition to or in lieu of such financing statements, mortgages, notices of lien or similar instruments, and all filing offices are hereby authorized to accept such certified copy of this Order for filing and recording.

(c)     The Debtors shall execute and deliver to the DIP Agent and the Prepetition Agent, as the case may be, all such agreements, financing statements, instruments and other documents as the DIP Agent and the Prepetition Agent may reasonably request to evidence, confirm, validate or perfect the DIP Liens and the Adequate Protection Liens.  All such documents will be deemed to have been recorded and filed as of the Petition Date.

(d)     In furtherance of the foregoing and without further approval of this Court, each Debtor is authorized to do and perform all acts to make, execute and deliver all instruments and documents and to pay all fees that may be reasonably required or necessary for the Debtors' performance hereunder.

15.     *Preservation of Rights Granted Under the Order.*

(a)     No claim or lien having a priority senior to or *pari passu* with those granted by this Order to the DIP Agent, the DIP Lenders, the Prepetition Agent and other the Prepetition Secured Parties shall be granted or allowed while any portion of the DIP Obligations, the Commitments, the Adequate Protection Obligations or the 507(b) Claims remain outstanding, and the DIP Liens and the Adequate Protection Liens shall not be subject or junior to any lien or security interest that is avoided and preserved for the benefit of the Debtors' estates under

section 551 of the Bankruptcy Code or subordinated to or made *pari passu* with any other lien or security interest (other than the Permitted Prepetition Liens, the Prepetition Secured Party Liens, and the Carve-Out).

(b)     The Debtors shall not seek, and it shall constitute an Event of Default under the DIP Agreement and a termination of the right to use Cash Collateral if any of the Debtors seeks, or if there is entered, (i) any modification of this Order without the prior written consent of the DIP Agent and the Prepetition Agent, and no such consent shall be implied by any other action, inaction or acquiescence by the DIP Agent or the Prepetition Agent, or (ii) an order converting or dismissing any of the Cases.

(c)     The DIP Agent, the DIP Lenders, the Prepetition Agent and the other Prepetition Secured Parties shall be entitled to all of the rights, remedies, privileges and benefits granted in section 364(e) of the Bankruptcy Code.

(d)     Except as expressly provided in this Order or in the DIP Documents, the DIP Liens, the Superpriority Claims, the Adequate Protection Obligations, the Adequate Protection Liens, the 507(b) Claims and all other rights and remedies of the DIP Agent, the DIP Lenders, the Prepetition Agent and the Prepetition Secured Parties granted by this Order and the DIP Documents shall survive, and shall not be modified, impaired or discharged by (i) the entry of an order converting any of the Cases to a case under chapter 7 of the Bankruptcy Code, dismissing any of the Cases or by any other act or omission, or (ii) the entry of an order confirming a plan of reorganization in any of the Cases.  The terms and provisions of this Order and the DIP Documents shall continue in the Cases, in any successor cases if the Cases cease to be jointly administered, or in any superseding chapter 7 cases under the Bankruptcy Code, and the DIP Liens, the Adequate Protection Liens, the Adequate Protection Obligations, the DIP

Obligations, the Superpriority Claims, the Section 507(b) Claims, any other administrative expense claims granted pursuant to this Order, and all other rights and remedies of the DIP Agent, the DIP Lenders, the Prepetition Agent and the Prepetition Secured Parties granted by this Order and the DIP Documents shall continue in full force and effect until all DIP Obligations and all Adequate Protection Obligations are indefeasibly paid in full in cash.

16.     *Effect of Stipulations on Third Parties*.  The stipulations and admissions contained in this Order, including without limitation, in paragraph 3 of this Order:  (a) shall be binding upon the Debtors for all purposes; and (b) shall be binding upon all other parties in interest, including without limitation, the Committee (if any), unless (i) any such Committee, which shall be deemed to have requisite standing, or any other party-in-interest with requisite standing, has duly filed an adversary proceeding (subject to the limitations contained herein, including, without limitation, in paragraph 17) by no later than the date that is the later of (A) 60 days from the date of an order approving counsel for the Committee, or, if no Committee is appointed, 75 days after the date of entry of the Final Order, subject to extension by the Court, after notice and a hearing, for cause shown, and (B) any such later date agreed to in writing by the Prepetition Agent in its sole and absolute discretion (X) challenging the validity, enforceability, priority or extent of the Prepetition Obligations or the liens on the Prepetition Collateral securing such Prepetition Obligations or (Y) otherwise asserting or prosecuting any Avoidance Actions or any other claims, counterclaims or causes of action, objections, contests or defenses (collectively, the "***Claims and Defenses***") against the Prepetition Agent or any of the other Prepetition Secured Parties or their respective agents, affiliates, subsidiaries, directors, officers, representatives, attorneys or advisors in connection with any matter related to the Prepetition Obligations or the Prepetition Collateral, and (ii) an order is entered by a court of

competent jurisdiction and becomes final and non-appealable in favor of the plaintiff sustaining any such challenge or claim in any such duly filed adversary proceeding; provided that, as to the Debtors, all such Claims and Defenses are hereby irrevocably waived and relinquished as of the Petition Date.  If no such adversary proceeding is duly and timely filed in respect of the Prepetition Obligations, (x) the Prepetition Obligations shall constitute allowed claims, not subject to counterclaim, setoff, subordination, recharacterization, defense or avoidance, for all purposes in the Cases and any subsequent chapter 7 case, (y) the liens on the Prepetition Collateral securing the Prepetition Obligations, as the case may be, shall be deemed to have been, as of the Petition Date, and to be, legal, valid, binding, perfected and of the priority specified in paragraph 3, not subject to defense, counterclaim, recharacterization, subordination or avoidance and (z) the Prepetition Obligations, the Prepetition Agent and the Prepetition Secured Parties, as the case may be, and the liens on the Prepetition Collateral granted to secure the Prepetition Obligations shall not be subject to any other or further challenge by the Committee (if any) or any other party-in-interest, and such Committee or party-in-interest shall be enjoined from seeking to exercise the rights of the Debtors' estates, including without limitation, any successor thereto (including, without limitation, any estate representative or a chapter 7 or 11 trustee appointed or elected for any of the Debtors).  If any such adversary proceeding is duly filed, the stipulations and admissions contained in paragraph 3 of this Order shall nonetheless remain binding and preclusive (as provided in the second sentence of this paragraph) on the Committee (if any) and any other party-in-interest, except as to any such stipulations and admissions that were expressly and successfully challenged in such adversary proceeding as set forth in a final, non-appealable order of a court of competent jurisdiction. Nothing in this Order vests or confers on any Person (as defined in the Bankruptcy Code) (other

than the Committee (if any) as provided above), standing or authority to pursue any cause of action belonging to the Debtors or their estates, including without limitation, Claims and Defenses with respect to the Prepetition Loan Documents or the Prepetition Obligations or any liens granted by any Debtor to secure any of the foregoing.

17. *Limitation on Use of DIP Financing and DIP Collateral*.  The Debtors shall use the DIP Financing and the Prepetition Collateral (including the Cash Collateral) solely as provided in this Order and the DIP Documents.  Notwithstanding anything herein or in any other order of this Court to the contrary, no Loans under the DIP Agreement, DIP Collateral, Prepetition Collateral (including the Cash Collateral) or the Carve-Out may be used to (a) object, contest or raise any defense to the validity, perfection, priority, extent or enforceability of any amount due under the DIP Documents, the Prepetition Loan Documents or the liens or claims granted under this Order, the DIP Documents or the Prepetition Loan Documents, (b) assert any Claims and Defenses or any other causes of action against the DIP Agent, the DIP Lenders, the Prepetition Agent, the other Prepetition Secured Parties or their respective agents, affiliates, subsidiaries, directors, officers, representatives, attorneys or advisors, in each case, solely in their capacity as Prepetition Secured Parties, (c) prevent, hinder or otherwise delay the DIP Agent's or the Prepetition Agent's assertion, enforcement or realization on the Prepetition Collateral or the DIP Collateral in accordance with the DIP Documents, the Prepetition Loan Documents or this Order, (d) seek to modify any of the rights granted to the DIP Agent, the DIP Lenders, the Prepetition Agent or the other Prepetition Secured Parties hereunder or under the DIP Documents or the Prepetition Loan Documents, in the case of each of the foregoing clauses (a) through (d), without such applicable party's prior written consent or (e) pay any amount on account of any claims arising prior to the Petition Date unless such payments are (i) approved by

an order of this Court and (ii) permitted under the DIP Documents; provided that, notwithstanding anything to the contrary herein, no more than an aggregate of $200,000 of the Prepetition Collateral (including the Cash Collateral), Loans under the DIP Agreement, the DIP Collateral or the Carve-Out may be used by the Committee to investigate the validity, enforceability or priority of the Prepetition Obligations or the liens on the Prepetition Collateral securing the Prepetition Obligations, or investigate any Claims and Defenses or other causes action against the Prepetition Agent or the Prepetition Secured Parties.

18.    *Exculpation*   Nothing in this Order, the DIP Documents, or any other documents related to these transactions shall in any way be construed or interpreted to impose or allow the imposition upon the DIP Agent, any DIP Lender, or any Prepetition Secured Party any liability for any claims arising from the prepetition or postpetition activities of the Debtors in the operation of their business, or in connection with their restructuring efforts.  So long as the DIP Agent, the DIP Lenders and the Prepetition Secured Parties comply with their obligations under the DIP Documents and the Prepetition Loan Documents (as applicable) and their obligations, if any, under applicable law (including the Bankruptcy Code), (a) the DIP Agent, DIP Lenders and the Prepetition Secured Parties shall not, in any way or manner, be liable or responsible for (i) the safekeeping of the Collateral, (ii) any loss or damage thereto occurring or arising in any manner or fashion from any cause, (iii) any diminution in the value thereof, or (iv) any act or default of any carrier, servicer, bailee, custodian, forwarding agency or other person, and (b) all risk of loss, damage or destruction of the Collateral shall be borne by the Debtors.

19.    *Order Governs*.   In the event of any inconsistency between the provisions of this Order and the DIP Documents, the provisions of this Order shall govern.

20.     *Master Proofs of Claim.*

(a)     To facilitate the processing of claims, to ease the burden upon this Court and to reduce any unnecessary expense to the Debtors' estates, subject to entry of the Final Order, (i) the PMCA Agent is authorized (but not required) to file a single master proof of claim (a "***Master Proof of Claim***") on behalf of itself and the PMCA Lenders on account of their claims arising under the PMCA and hereunder against all Debtors in the Borrower's case only; and (ii) the 15% Notes Agent/Trustee is authorized (but not required) to file a Master Proof of Claim on behalf of itself and the 15% Noteholders on account of their claims arising under the 15% Notes Indenture and hereunder against all Debtors in the Borrower's case only.  Neither the PMCA Agent nor the 15% Notes Agent/Trustee shall be required to file a verified statement pursuant to Rule 2019 of the Bankruptcy Rules in any of the Cases.

(b)     Upon filing of a Master Proof of Claim by the PMCA Agent and/or the 15% Notes Agent/Trustee (as applicable), the PMCA Agent and/or the 15% Notes Agent/Trustee (as applicable) and each PMCA Lender and/or 15% Noteholder (as applicable) and each of their respective successors and assigns, shall be deemed to have filed a proof of claim in the amount set forth opposite its name therein in respect of its claims against each of the Debtors arising under the applicable Prepetition Loan Documents and the claims (as defined in section 101 of the Bankruptcy Code) of the PMCA Agent and/or the 15% Notes Agent/Trustee (as applicable) and each PMCA Lender and/or 15% Noteholder, as applicable (and each of their respective successors and assigns) named in the Master Proof of Claim shall be allowed as if each such entity had filed a separate proof of claim in each of the Cases in the amount set forth in the Master Proof of Claim; <u>provided</u> that the the PMCA Agent and/or the 15% Notes Agent/Trustee (as applicable) may, but shall not be required to, amend the Master Proof of Claim from time to

time to, among other things, reflect a change in the holders of the claims set forth therein or a reallocation among such holders of the claims asserted therein resulting from any transfer of any such claims.

(c)       The provisions set forth in paragraphs (a) and (b) above are intended solely for the purpose of administrative convenience and, except to the extent set forth herein or therein, neither the provisions of this paragraph nor the Master Proof of Claim shall affect the substantive rights of the Debtors, the Committee, the Prepetition Agent, the other Prepetition Secured Parties or any other party in interest or their respective successors in interest, including without limitation, the right of each Prepetition Secured Party (or its successor in interest) to vote separately on any plan of reorganization proposed in the Cases.

21.       *Binding Effect; Successors and Assigns*.  The DIP Documents and the provisions of this Order, including all findings herein, shall be binding upon all parties-in-interest in the Cases, including without limitation, the DIP Agent, the DIP Lenders, the Prepetition Agent, the Prepetition Secured Parties, the Committee (if any), and the Debtors and their respective successors and assigns (including any chapter 7 or chapter 11 trustee hereinafter appointed or elected for any of the Debtors, an examiner appointed pursuant to section 1104 of the Bankruptcy Code, or any other fiduciary appointed as a legal representative of any of the Debtors or with respect to the property of the estate of any of the Debtors) and shall inure to the benefit of the DIP Agent, the DIP Lenders, the Prepetition Secured Parties and the Debtors and their respective successors and assigns; provided that, except to the extent expressly set forth in this Order, the DIP Agent, the Prepetition Agent, the DIP Lenders and the Prepetition Secured Parties shall have no obligation to permit the use of Cash Collateral or extend any financing to any chapter 7 trustee or similar responsible person appointed for the estates of the Debtors.

31

22.     *Limitation of Liability*.  Subject to entry of the Final Order, in determining

to make any Loan under the DIP Agreement, permitting the use of Cash Collateral or in

exercising any rights or remedies as and when permitted pursuant to this Order or the DIP

Documents, the DIP Agent, the Prepetition Agent, the DIP Lenders and the Prepetition Secured

Parties shall not be deemed to be in "control" of the operations of the Debtors or to be acting as a

"responsible person" or "owner or operator" with respect to the operation or management of the

Debtors (as such terms, or any similar terms, are used in the United States Comprehensive

Environmental Response, Compensation and Liability Act, 29 U.S.C. §§ 9601 et seq. as

amended, or any similar federal or state statute).  Furthermore, nothing in this Order or in the

DIP Documents shall in any way be construed or interpreted to impose or allow the imposition

upon the DIP Agent, the DIP Lenders, the Prepetition Agent or the Prepetition Secured Parties

any liability for any claims arising from the prepetition or post-petition activities of any of the

Debtors and their affiliates (as defined in section 101(2) of the Bankruptcy Code).

23.     *Effectiveness*.  This Order shall constitute findings of fact and conclusions

of law and shall take effect immediately upon execution hereof as of the Petition Date, and there

shall be no stay of execution of effectiveness of this Order.

24.     *Final Hearing*.  The Final Hearing is scheduled for [November __], 2010

at ____ _.m. (prevailing Eastern time) before this Court.

25.    *Final Hearing Notice*.  The Debtors shall promptly mail copies of this

Order (which shall constitute adequate notice of the Final Hearing) to the parties having been

given notice of the Interim Hearing, and to any other party that has filed a request for notices

with this Court and to the Committee (if any) after the same has been appointed, or Committee

counsel, if the same shall have been appointed.  Any party-in-interest objecting to the relief

sought at the Final Hearing shall serve and file written objections; which objections shall filed

with the Clerk of the United States Bankruptcy Court for the Southern District of New York and

be served upon (a) Akin Gump Strauss Hauer & Feld LLP, One Bryant Park, New York, NY

10036, Attn: Ira S. Dizengoff, Esq. and Arik Preis, Esq., attorneys for the Debtors; (b) Emmet,

Marvin & Martin, LLP, 120 Broadway, New York, NY 10271, Attn: Elizabeth Clark, Esq.,

counsel to the DIP Agent, (c) the Prepetition Agent, (d) Willkie Farr & Gallagher, 787 Seventh

Avenue, New York, NY 10019, counsel to the Initial Lender; and (e) the Office of the U.S.

Trustee for the Southern District of New York, Attention:  [_____], Esq., and shall be

filed with the Clerk of the United States Bankruptcy Court, Southern District of New York, in

each case to allow actual receipt by the foregoing no later than [November __], 2010 at 4:00 p.m.

(prevailing Eastern time).


Dated:   October __, 2010
         New York, New York

                              _____
                              UNITED STATES BANKRUPTCY JUDGE

# EXHIBIT A

**Initial 13-Week Projection**

**13-Week Cash Flow Forecast**
*($ in thousands)*

| Week Ended | 1 10/01/10 E | 2 10/08/10 E | Ch. 11 Filing → 1 10/15/10 E | 2 10/22/10 E | 3 10/29/10 E | 4 11/05/10 E | 5 11/12/10 E | 6 11/19/10 E | 7 11/26/10 E | 8 12/03/10 E | 9 12/10/10 E | 10 12/17/10 E | 11 12/24/10 E | 12 12/31/10 E | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Cash Receipts** | | | | | | | | | | | | | | | |
| 1.4GHz Spectrum Lease | $ — | $ — | $ — | $ — | $ — | $ — | $ — | $ — | $ — | $ — | $ — | $ — | $ — | $ 89 | $ 138 |
| Roam-In | — | — | — | — | — | — | — | — | — | — | — | — | — | 321 | 321 |
| Handset Sales | — | — | — | 10 | — | — | — | — | — | — | — | — | — | — | |
| **Subtotal** | — | — | — | 10 | — | — | — | — | — | — | — | — | — | 410 | 459 |
| **Payroll** | | | | | | | | | | | | | | | |
| Payroll | 550 | — | 550 | — | 676 | — | 602 | — | 676 | — | 602 | — | 602 | 74 | 4,334 |
| Health Care Benefits | 133 | 17 | 17 | 17 | 133 | 17 | 17 | 17 | 133 | 17 | 17 | 17 | 133 | 17 | 651 |
| **Total Payroll & Benefits** | 683 | 17 | 567 | 17 | 809 | 17 | 619 | 17 | 809 | 17 | 619 | 17 | 735 | 91 | 4,985 |
| **Other Operating Costs** | | | | | | | | | | | | | | | |
| Operational and Technical Facility Leases | 206 | — | — | 206 | — | — | — | — | — | 93 | 113 | — | — | — | 619 |
| CES Sites | 83 | — | — | 83 | — | — | — | — | — | — | 83 | — | — | — | 249 |
| North Las Vegas and Allan Park Operations | 153 | 55 | — | — | 153 | 55 | — | — | — | — | 55 | — | — | — | 472 |
| Satellite Ops Consultants | — | — | — | 221 | — | — | 221 | — | 221 | — | — | — | 221 | — | 662 |
| Network Operations & Circuits | 204 | — | 204 | — | 204 | 204 | — | — | — | 200 | — | 204 | — | — | 813 |
| Information Technology / OBS / BSS | 172 | 283 | 142 | 283 | 166 | 486 | — | 104 | — | — | 92 | 40 | 243 | 81 | 1,842 |
| Business Operations | 18 | 15 | 45 | 45 | 15 | 45 | — | — | 15 | 18 | — | 45 | — | — | 180 |
| Sales & Marketing | 26 | 20 | 20 | 20 | 18 | 20 | — | — | 18 | 18 | 18 | 20 | — | 20 | 114 |
| Canada | 200 | 200 | 600 | 30 | 26 | 200 | 200 | 20 | 20 | 26 | 200 | 616 | 200 | 20 | 1,554 |
| Accounting | 25 | 25 | — | — | 100 | 25 | — | 25 | 30 | — | 25 | — | 80 | — | 915 |
| Legal / Regulatory | 150 | — | — | — | 150 | — | — | — | — | 150 | — | — | — | — | 450 |
| Taxes / Fees | — | — | — | — | — | — | — | — | — | — | — | — | — | — | |
| Miscellaneous Costs | 63 | 63 | 63 | 63 | 63 | 63 | 63 | 63 | 63 | 63 | 63 | 63 | 63 | 63 | 882 |
| **Total Other Operating Costs** | 872 | 390 | 867 | 662 | 981 | 547 | 835 | 217 | 565 | 632 | 988 | 807 | 164 | — | 7,869 |
| **Vendor Payments – Subtotal** | 195 | 3 | 1,373 | 662 | 127 | 3 | 319 | 2,486 | 114 | 3 | 68 | 100 | 1,288 | 561 | 6,638 |
| **Development** | | | | | | | | | | | | | | | |
| Next Generation Chipset (AlumQCom) | — | 550 | — | 550 | 48 | — | 745 | — | — | 15 | 745 | — | — | — | 2,118 |
| Handset Development Work (EB) | — | — | — | — | 15 | 15 | 78 | — | 200 | — | 78 | — | — | — | 357 |
| Hughes | — | 400 | — | 400 | 140 | 140 | — | — | 140 | — | — | — | — | 140 | 820 |
| Common | — | — | — | — | — | — | — | — | — | — | — | — | — | — | |
| DVSI | — | — | — | — | — | — | — | — | — | — | — | — | — | — | |
| **Subtotal** | — | 950 | — | 950 | 188 | 15 | 823 | — | 340 | 15 | 823 | — | — | 140 | 3,295 |
| **Total Operating Disbursements** | 1,750 | 410 | 1,417 | 3,002 | 1,350 | 1,015 | 2,292 | 3,337 | 1,480 | 600 | 2,125 | 1,105 | 2,830 | 956 | 23,668 |
| *Memo: Cumulative DIP Draws before Prof. Fees* | | | *5,083* | *6,523* | *7,406* | *9,745* | *13,150* | *14,629* | *15,232* | *17,401* | *17,401* | *18,528* | *21,416* | *21,973* | *21,973* |
| **Professional Fees** | | | | | | | | | | | | | | | |
| Debtor Professionals | 500 | — | — | — | 1,000 | — | 1,000 | — | — | — | 1,000 | — | — | — | 3,000 |
| UCC / Other Unsecured Creditors | — | — | — | — | 750 | — | 750 | — | — | — | 750 | — | 750 | — | 1,500 |
| Case Fees | — | — | — | — | 750 | — | 750 | — | — | — | 750 | — | 750 | — | 1,500 |
| Senior Notes (Adequate Protection) | — | — | 150 | 750 | — | — | — | 750 | — | — | 750 | — | — | 750 | 2,250 |
| DIP Lenders | — | — | 150 | 750 | — | — | — | 750 | — | — | — | — | — | 750 | 2,400 |
| **Subtotal** | 500 | — | 150 | 1,500 | 2,500 | — | 2,500 | 1,500 | — | — | 2,500 | — | 1,500 | 1,500 | 10,650 |
| **Bankruptcy Expenses** | | | | | | | | | | | | | | | |
| Professional Fee Retainers | — | — | — | — | — | — | — | — | — | — | — | — | — | — | |
| Utility Deposit | — | 500 | — | 500 | — | — | — | — | — | — | — | — | — | — | 500 |
| **Subtotal** | — | 500 | — | 500 | — | — | — | — | — | — | — | — | — | — | 500 |
| **Cash Interest** | | | | | | | | | | | | | | | |
| **Total Disbursements** | 2,250 | 910 | 1,567 | 3,502 | 2,850 | 1,015 | 3,502 | 2,980 | 600 | 4,625 | 1,105 | 2,830 | 2,830 | 2,456 | 34,818 |
| **Net Cash Flow** | (2,250) | (910) | (1,567) | (3,502) | (2,840) | (1,015) | (4,792) | (2,941) | (600) | (4,625) | (1,105) | (2,830) | (2,830) | (2,046) | (34,359) |

**EXHIBIT B**

$75,000,000

DEBTOR-IN-POSSESSION CREDIT, SECURITY & GUARANTY AGREEMENT

Dated as of October [___], 2010

_____

Among

MOTIENT HOLDINGS INC.
MOTIENT COMMUNICATIONS INC.
MOTIENT LICENSE INC.
MOTIENT SERVICES INC.
TERRESTAR NEW YORK INC.
MVH HOLDINGS INC.
MOTIENT VENTURES HOLDING INC.
TERRESTAR NATIONAL SERVICES, INC.
TERRESTAR LICENSE INC.,
each a debtor and debtor-in-possession, as a Guarantor,

TERRESTAR NETWORKS HOLDINGS (CANADA) INC.,
TERRESTAR NETWORKS (CANADA) INC.,
0887729 B.C. LTD.,
each a debtor and debtor-in-possession, as a Canadian Guarantor,

TERRESTAR NETWORKS INC.,
debtor and debtor-in-possession, as the Borrower,

THE LENDERS PARTY HERETO,

and

THE BANK OF NEW YORK MELLON,
as Administrative Agent and Collateral Agent

# TABLE OF CONTENTS

## ARTICLE I
## DEFINITIONS

Section 1.01.  Defined Terms ................................................................................2
Section 1.02.  Terms Generally ..............................................................................22

## ARTICLE II
## THE CREDITS

Section 2.01.  Commitments...................................................................................22
Section 2.02.  Loans and Borrowings.....................................................................22
Section 2.03.  Funding of Borrowings....................................................................23
Section 2.04.  Repayment of Loans; Evidence of Debt..........................................23
Section 2.05.  Prepayment of Loans. ......................................................................24
Section 2.06.  Voluntary Termination or Reduction of Commitments. ..................24
Section 2.07.  Fees...................................................................................................25
Section 2.08.  Interest. .............................................................................................25
Section 2.09.  Increased Costs. ...............................................................................26
Section 2.10.  Taxes.................................................................................................27
Section 2.11.  Payments Generally; Pro Rata Treatment; Sharing of Set-offs. .........30
Section 2.12.  Mitigation Obligations......................................................................31
Section 2.13.  Illegality............................................................................................31
Section 2.14.  Waiver of Any Priming Rights ........................................................32

## ARTICLE III
## REPRESENTATIONS AND WARRANTIES

Section 3.01.  Organization; Powers .......................................................................32
Section 3.02.  Authorization ....................................................................................32
Section 3.03.  Enforceability ...................................................................................33
Section 3.04.  Governmental Approvals..................................................................33
Section 3.05.  Financial Statements; Undisclosed Liabilities..................................33
Section 3.06.  No Material Adverse Change or Material Adverse Effect .................33
Section 3.07.  Title to Properties; Possession Under Leases; Location of Real Property
                      and Leased Premises. ....................................................................34
Section 3.08.  Subsidiaries.......................................................................................35
Section 3.09.  Litigation; Compliance with Laws. ..................................................35
Section 3.10.  Federal Reserve Regulations. ...........................................................35
Section 3.11.  Investment Company Act ..................................................................36
Section 3.12.  Use of Proceeds ................................................................................36
Section 3.13.  Tax Returns .......................................................................................36
Section 3.14.  No Material Misstatements................................................................37
Section 3.15.  Employee Benefit Plans.....................................................................37
Section 3.16.  Environmental Matters ......................................................................38
Section 3.17.  Labor Matters ....................................................................................38

Section 3.18. Insurance ................................................................................................39
Section 3.19. Anti-Terrorism Laws. ..............................................................................39
Section 3.20. Licensing and Accreditation ...................................................................40
Section 3.21. Agreed Budget .........................................................................................40
Section 3.22. Accounts and Cash Management Accounts ............................................40
Section 3.23. Brokers ....................................................................................................40
Section 3.24. Reorganization Matters ...........................................................................40
Section 3.25. Material Contracts ...................................................................................41
Section 3.26. Transactions with Affiliates ....................................................................41
Section 3.27. Collateral .................................................................................................41

ARTICLE IV
CONDITIONS PRECEDENT

Section 4.01. Conditions Precedent to Initial Funding Date .......................................42
Section 4.02. Conditions Precedent to Each Loan after the Initial Funding Date ........44

ARTICLE V
AFFIRMATIVE COVENANTS

Section 5.01. Existence; Businesses and Properties. ....................................................45
Section 5.02. Insurance ..................................................................................................45
Section 5.03. Taxes ........................................................................................................46
Section 5.04. Financial Statements, Reports, etc ..........................................................46
Section 5.05. Litigation and Other Notices ..................................................................48
Section 5.06. Compliance with Laws; Licenses; Material Contracts ...........................49
Section 5.07. Maintaining Records; Access to Properties and Inspections ..................50
Section 5.08. Compliance with Environmental Laws ...................................................50
Section 5.09. [Intentionally Omitted]. ..........................................................................51
Section 5.10. Reorganization Matters ...........................................................................51
Section 5.11. Further Assurances. .................................................................................51
Section 5.12. Canadian Anti-Money Laundering & Anti-Terrorism Legislation
Compliance ..............................................................................................51
Section 5.13. Mortgages ................................................................................................52

ARTICLE VI
NEGATIVE COVENANTS

Section 6.01. Indebtedness ............................................................................................52
Section 6.02. Liens ........................................................................................................53
Section 6.03. Investments, Loans and Advances ..........................................................54
Section 6.04. Mergers, Amalgamations, Consolidations, Sales of Assets and
Acquisitions .............................................................................................55
Section 6.05. Dividends and Distributions ...................................................................56
Section 6.06. Sale/Leasebacks ......................................................................................57
Section 6.07. Transactions with Affiliates ....................................................................57
Section 6.08. Business of the Loan Parties ...................................................................57

Section 6.09.     Limitation on Prepayments of Indebtedness; Modifications of Certificate
          of Incorporation, By-Laws and Certain Other Agreements; etc. ...................57
Section 6.10.     Maximum Cumulative Disbursements ...............................................................58
Section 6.11.     Minimum Revenues...........................................................................................58
Section 6.12.     Minimum Subscribers........................................................................................58
Section 6.13.     [Intentionally Omitted]......................................................................................58
Section 6.14.     Maximum Capital Expenditures ........................................................................58
Section 6.15.     Phone Sales .......................................................................................................58
Section 6.16.     Cash Management .............................................................................................58
Section 6.17.     Use of Proceeds ................................................................................................59
Section 6.18.     Change of Control.............................................................................................59
Section 6.19.     Payment of Pre-Existing Claims........................................................................59
Section 6.20.     Material Adverse Change ..................................................................................59
Section 6.21.     Claims Against PMCA Lenders or 15% Holders...............................................59
Section 6.22.     Entry Into Contractual Obligations or Settlements............................................59
Section 6.23.     Restrictive Agreements, etc ..............................................................................59
Section 6.24.     Super-Priority Claims .......................................................................................60
Section 6.25.     DIP Order ..........................................................................................................60

## ARTICLE VII
## EVENTS OF DEFAULT

Section 7.01.     Events of Default...............................................................................................60
Section 7.02.     Remedies ...........................................................................................................63

## ARTICLE VIII
## THE ADMINISTRATIVE AGENT

Section 8.01.     Appointment ......................................................................................................64
Section 8.02.     Delegation of Duties..........................................................................................65
Section 8.03.     Exculpatory Provisions......................................................................................65
Section 8.04.     Reliance by Administrative Agent .....................................................................67
Section 8.05.     Notice of Default ...............................................................................................68
Section 8.06.     Non-Reliance on Administrative Agent and Other Lenders ...............................68
Section 8.07.     Indemnification..................................................................................................68
Section 8.08.     Agent in Its Individual Capacity........................................................................69
Section 8.09.     Successor Administrative Agent. .......................................................................69
Section 8.10.     Authority of Agent.............................................................................................70

## ARTICLE IX
## MISCELLANEOUS

Section 9.01.     Notices...............................................................................................................70
Section 9.02.     Survival of Agreement.......................................................................................71
Section 9.03.     Binding Effect....................................................................................................71
Section 9.04.     Successors and Assigns. .....................................................................................71
Section 9.05.     Expenses; Indemnity.........................................................................................74

Section 9.06. Right of Set-off..............................................................................................76
Section 9.07. Applicable Law..............................................................................................76
Section 9.08. Waivers; Amendment.....................................................................................76
Section 9.09. Interest Rate Limitation..................................................................................78
Section 9.10. Entire Agreement...........................................................................................78
Section 9.11. Waiver of Jury Trial.......................................................................................78
Section 9.12. Severability....................................................................................................78
Section 9.13. Counterparts...................................................................................................79
Section 9.14. Headings........................................................................................................79
Section 9.15. Confidentiality...............................................................................................79
Section 9.16. Direct Website Communications....................................................................79
Section 9.17. Release of Liens.............................................................................................81
Section 9.18. USA Patriot Act.............................................................................................81
Section 9.19. Conflicts.........................................................................................................81

ARTICLE X
SECURITY AND GUARANTEE

Section 10.01. Security Interest............................................................................................81
Section 10.02. Perfection and Protection of Security Interest...............................................83
Section 10.03. Title to, Liens on, and Use of Collateral.......................................................84
Section 10.04. Proceeds of Accounts ....................................................................................84
Section 10.05. Delivery and Other Perfection.......................................................................84
Section 10.06. Other Financing Statements and Liens...........................................................85
Section 10.07. Preservation of Rights ...................................................................................85
Section 10.08. Special Provisions Relating to Certain Collateral. .........................................85
Section 10.09. Additional Remedies During an Event of Default, Etc ..................................86
Section 10.10. Private Sale ...................................................................................................88
Section 10.11. Application of Proceeds..................................................................................88
Section 10.12. Attorney-in-Fact ...........................................................................................88
Section 10.13. Further Assurances ........................................................................................89
Section 10.14. Certain Regulatory Requirements. .................................................................89
Section 10.15. Agents and Attorneys-in-Fact........................................................................91
Section 10.16. No Senior Liens .............................................................................................91
Section 10.17. Guarantee.......................................................................................................91

Exhibits and Schedules

Exhibit A        Form of Assignment and Acceptance
Exhibit B        Form of Administrative Questionnaire
Exhibit C        Form of Interim DIP Order
Exhibit D        Form of Final DIP Order
Exhibit E        Form of Initial Recognition Order
Exhibit F        Form of Final Recognition Order
Exhibit G        Notice of Borrowing
Exhibit H-1      Form of Legal Opinion of Akin Gump Strauss Hauer & Feld LLP

Exhibit H-2       Form of Legal Opinion of Fraser Milner Casgrain LLP
Exhibit I         Form of Promissory Note

Schedule 2.01     Commitments
Schedule 3.01     Organization and Good Standing
Schedule 3.04     Governmental Approvals
Schedule 3.05     Disclosed Liabilities
Schedule 3.06     Material Adverse Effect Exceptions
Schedule 3.07(b)  Possession under Leases
Schedule 3.07(c)  Real Property
Schedule 3.07(d)  Leased Premises
Schedule 3.08     Subsidiaries
Schedule 3.09     Litigation
Schedule 3.13     Taxes
Schedule 3.16     Environmental Matters
Schedule 3.17     Labor Matters
Schedule 3.18     Insurance
Schedule 3.20     Licenses
Schedule 3.22     Accounts
Schedule 3.23     Brokers
Schedule 3.26     Transactions with Affiliates
Schedule 3.27     Collateral
Schedule 5.06     Material Contracts
Schedule 5.13     Mortgages
Schedule 6.01     Indebtedness
Schedule 6.02     Liens
Schedule 6.03     Investments

DEBTOR-IN-POSSESSION CREDIT, SECURITY & GUARANTY AGREEMENT dated as of October [___], 2010 (as amended, supplemented or otherwise modified from time to time, this "<u>Agreement</u>"), among:

(i) TERRESTAR NETWORKS INC., a Delaware corporation (the "<u>Borrower</u>"),

(ii) MOTIENT HOLDINGS INC., a Delaware corporation, MOTIENT COMMUNICATIONS INC., a Delaware corporation, MOTIENT LICENSE INC., a Delaware corporation, MOTIENT SERVICES INC., a Delaware corporation, TERRESTAR NEW YORK INC., a New York corporation, MVH HOLDINGS INC., a Delaware corporation, and MOTIENT VENTURES HOLDING INC., a Delaware corporation (collectively the "<u>Non-Subsidiary Guarantors</u>"); TERRESTAR NATIONAL SERVICES, INC., a Delaware corporation, and TERRESTAR LICENSE INC., a Delaware corporation (together the "<u>Domestic Subsidiary Guarantors</u>");

(iii) TERRESTAR NETWORKS HOLDINGS (CANADA) INC., an Ontario corporation, TERRESTAR NETWORKS (CANADA) INC., an Ontario corporation ("<u>TerreStar Canada</u>"), and 0887729 B.C. LTD., a British Columbia corporation (collectively the "<u>Canadian Guarantors</u>" and together with the Non-Subsidiary Guarantors, the Domestic Subsidiary Guarantors and such other guarantors from time to time party hereto, the "<u>Guarantors</u>"),

(iv) the Lenders from time to time party hereto; and

(v) THE BANK OF NEW YORK MELLON, as administrative agent and collateral agent (in such capacities, the "<u>Administrative Agent</u>").

The Borrower and the Guarantors are sometimes referred to herein collectively as the "<u>Loan Parties</u>."

W I T N E S S E T H :

WHEREAS, on October 19, 2010 (the "<u>Petition Date</u>") the Borrower and each of the other Loan Parties filed, with the Bankruptcy Court, a voluntary petition for relief (the "<u>US Cases</u>") under Chapter 11 of the Bankruptcy Code;

WHEREAS, on October [___], 2010 the Borrower, as foreign representative for the Loan Parties, commenced a recognition proceeding before the Ontario Superior Court of Justice (Commercial List) (the "<u>Canadian Court</u>") pursuant to Part IV of the Companies' Creditors Arrangement Act, R.S.C. 1985, c. C-36, as amended (the "<u>Canadian Cases</u>" and together with the US Cases, the "<u>Cases</u>") to recognize the US Cases as "foreign main proceedings";

WHEREAS, the Borrower and each of the other Loan Parties are continuing to operate their respective businesses and manage their respective properties as debtors-in-possession under Sections 1107(a) and 1108 of the Bankruptcy Code;

WHEREAS, the Borrower has requested that the Lenders provide a secured debtor-in-possession multiple draw term loan facility to the Borrower in an aggregate principal amount of $75,000,000;

WHEREAS, the Guarantors have agreed to guarantee the obligations of the Borrower hereunder and each of the Loan Parties has agreed to secure its obligations to the Lenders hereunder with, *inter alia*, security interests in, and liens on, all of its property and assets, whether real or personal, tangible or intangible, now existing or hereafter acquired or arising, and subject to certain exceptions, all as more fully provided herein; and

WHEREAS, the Lenders are willing, on the terms and conditions hereinafter set forth, to make available to the Borrower such debtor-in-possession loans.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound hereby, the parties hereto hereby agree as follows:

ARTICLE I

DEFINITIONS

Section 1.01.  Defined Terms.  As used in this Agreement, the following terms shall have the meanings specified below:

"Acceptable Plan" shall mean a Plan in form and substance reasonably acceptable to the Required Lenders (it being understood that a Plan the terms of which are consistent in all respects with (and include all the terms of) the Restructuring Term Sheet and is otherwise reasonably acceptable to the Required Lenders shall be deemed acceptable to the Required Lenders).

"Account" shall have the meaning assigned to such term in the UCC.

"Act" shall have the meaning assigned to such term in Section 9.18.

"Administrative Agent" shall have the meaning assigned to such term in the introductory paragraph of this Agreement.

"Administrative Agent-Related Persons" shall have the meaning assigned to such term in Section 8.03.

"Administrative Agent Fees" shall have the meaning assigned to such term in Section 2.07(d).

"Administrative Questionnaire" shall mean an Administrative Questionnaire in the form of Exhibit B.

"Affiliate" shall mean, when used with respect to a specified person, another person that directly, or indirectly through one or more intermediaries, Controls or is Controlled

by or is under common Control with the person specified; provided, however, no Agent Party or Lender shall be deemed to be an Affiliate of any Loan Party by virtue of its execution of this Agreement, provided further that (a) the Initial Lender shall not be deemed to be an Affiliate of the Borrower or of any Loan Party and (b) DISH Network Corporation and its direct and indirect subsidiaries shall not be deemed to be an Affiliate of the Borrower or of any Loan Party.

"Agent Parties" shall have the meaning assigned to such term in Section 9.16(c).

"Agreed Budget" shall mean the budget provided to the Lenders by the Borrower, pursuant to Section 4.01(d), which budget has been approved by the Required Lenders, subject to modification pursuant to Section 5.11(a).

"Agreement" shall have the meaning assigned to such term in the introductory paragraph of this Agreement.

"Anti-Terrorism Laws" shall have the meaning assigned to such term in Section 3.19(a).

"Assignee" shall have the meaning assigned to such term in Section 9.04(b).

"Assignment and Acceptance" shall mean an assignment and acceptance entered into by a Lender and an assignee, and accepted by the Administrative Agent and the Borrower (if required by such assignment and acceptance), in the form of Exhibit A.

"Availability Period" shall mean the period from and including the Initial Funding Date to but excluding the Termination Date.

"Available Cash" shall mean, for any month, the aggregate amount of unrestricted cash and cash equivalents of the Loan Parties as of the end of the last day of the immediately preceding month.

"Bankruptcy Code" shall mean Title 11 of the United States Code, as amended, or any similar federal or state law for the relief of debtors.

"Bankruptcy Court" shall mean the United States Bankruptcy Court for the Southern District of New York.

"Board" shall mean the Board of Governors of the Federal Reserve System of the United States of America.

"Borrower" shall have the meaning assigned to such term in the introductory paragraph of this Agreement.

"Borrowing" shall mean a group of Loans made on a single date.

"Business Day" shall mean any day that is not a Saturday, Sunday or other day on which commercial banks in New York City are authorized or required by law to remain closed.

"Canadian Anti-Money Laundering & Anti-Terrorism Legislation" shall mean the Criminal Code, R.S.C. 1985, c. C-46, The Proceeds of Crime (Money Laundering) and Terrorist Financing Act, S.C. 2000, c. 17 and the United Nations Act, R.S.C. 1985, c. U-2 or any similar Canadian legislation, together with all rules, regulations and interpretations thereunder or related thereto including, without limitation, the Regulations Implementing the United Nations Resolutions on the Suppression of Terrorism and the United Nations Al-Qaida and Taliban Regulations promulgated under the United Nations Act.

"Canadian Cases" shall have the meaning assigned to such term in the introductory paragraphs of this Agreement.

"Canadian Court" shall have the meaning assigned to such term in the introductory paragraphs of this Agreement.

"Canadian Guarantors" shall have the meaning assigned to such term in the introductory paragraphs of this Agreement.

"Canadian Pension Event" shall mean (a) the termination in whole or in part of any Canadian Pension Plan or Canadian Union Plan, (b) the merger of a Canadian Pension Plan with another pension plan, (c) a material change in the funded status of a Canadian Pension Plan, (d) the occurrence of an event under the Income Tax Act (Canada) that could reasonably be expected to affect the registered status of any Canadian Pension Plan or Canadian Union Plan, (e) the receipt by any Loan Party of any order or notice of intention to issue an order from the applicable pension standards regulator that could reasonably be expected to affect the registered status or cause the termination (in whole or in part) of any Canadian Pension Plan, (f) the receipt of notice by the administrator or the funding agent of any failure to remit contributions to a Canadian Pension Plan or a similar notice from a governmental authority relating to a failure to pay any fees or other amounts (including payments in respect of the pension benefits guarantee fund of Ontario), (g) the receipt by a Loan Party of any notice concerning liability arising from the withdrawal or partial withdrawal of a Loan Party or any other party from a Canadian Union Plan, (h) the adoption of any amendment to a Canadian Pension Plan that requires the provision of security pursuant to applicable law, (i) the failure to satisfy any statutory funding requirement in respect of any Canadian Pension Plan, or (j) any other extraordinary event or condition with respect to a Canadian Pension Plan or Canadian Union Plan that could reasonably be expected to result in a Lien or any acceleration of any statutory requirements to fund all or a substantial portion of the unfunded accrued benefit liabilities of such plan.

"Canadian Pension Plans" shall mean a pension plan that is a "registered pension plan" as defined in the Income Tax Act (Canada) or is subject to the funding requirements of applicable pension benefits standards legislation in any Canadian jurisdiction (in each case, whether or not registered) and is applicable to employees resident in Canada of a Loan Party, other than any Canadian Union Plans.

"Canadian Union Plans" shall mean all pension and other benefit plans for the benefit of Canadian employees or former Canadian employees of a Loan Party which are not maintained, sponsored or administered by a Loan Party, but to which a Loan Party is or was required to contribute pursuant to a collective agreement or participation agreement.

"Capital Lease Obligations" of any person shall mean the obligations of such person to pay rent or other amounts under any lease of (or other arrangement conveying the right to use) real or personal property, or a combination thereof, which obligations are required to be classified and accounted for as capital leases on a balance sheet of such person under GAAP and, for purposes hereof, the amount of such obligations at any time shall be the capitalized amount thereof at such time determined in accordance with GAAP (without giving effect to any change to GAAP after the date hereof regarding the accounting treatment of capitalized versus operating leases).

"Carve-Out" shall have the meaning assigned to such term in the DIP Order.

"Cases" shall have the meaning assigned to such term in the recitals to this Agreement.

"Cash Collateral Order" shall have the meaning assigned to such term in Section 4.01(h).

"Cash Management Order" shall mean the Bankruptcy Court order, in form and substance acceptable to the Required Lenders, relating to the cash management system, bank accounts, and business forms of the Loan Parties.

"Change in Control" shall mean the acquisition by any person or group (within the meaning of Sections 13(d) and 14(d) under the Exchange Act) of beneficial ownership (as defined in Rules 13d-3 and 13d-5 of the Exchange Act), directly or indirectly, of any Equity Interests in (a) the Borrower, other than by MVH or (b) any of the Motient Loan Parties. Notwithstanding the foregoing, (a) the acquisition by any person or group (within the meaning of Sections 13(d) and 14(d) under the Exchange Act) of beneficial ownership (as defined in Rules 13d-3 and 13d-5 of the Exchange Act) of less than 35% (or 35% or more to the extent acquired by the Initial Lender and its Affiliates) of the Equity Interests of TerreStar Corporation shall not constitute a Change of Control, (b) the Equity Interests owned by SkyTerra in the Borrower on the Petition Date shall not constitute a Change in Control, provided, however, that any acquisition of additional Equity Interests by SkyTerra after the Petition Date shall constitute a Change in Control and (c) subject to any orders that may be entered by the Bankruptcy Court restricting transfers of Equity Interests, SkyTerra may transfer all or any portion of its Equity Interests held as of the Petition Date in the Borrower to any person, which such transfer shall not constitute a Change in Control.

"Change in Law" shall mean (a) the adoption of any law, rule or regulation after the Closing Date, (b) any change in law, rule or regulation or in the interpretation or application thereof by any Governmental Authority after the Closing Date, or (c) compliance by any Lender (or, for purposes of Section 2.09(b), by any Lending Office of such Lender or by such Lender's holding company, if any) with any written request, guideline or directive (whether or not having the force of law) of any Governmental Authority made or issued after the Closing Date.

"Charges" shall have the meaning assigned to such term in Section 9.09.

"Closing Date" shall mean the later of: (i) the date upon which the Bankruptcy Court enters the Interim DIP Order and (ii) the date on which the Interim DIP Order is recognized by the Canadian Court.

"Code" shall mean the Internal Revenue Code of 1986, as amended from time to time.

"Collateral" shall have the meaning assigned to such term in Section 10.01(a).

"Commitment" shall mean, with respect to each Lender, the commitment of such Lender to make Loans as set forth in Section 2.01. The initial amount of each Lender's Commitment is set forth on Schedule 2.01, or in the Assignment and Acceptance pursuant to which such Lender shall have assumed its Commitment, as applicable. The aggregate amount of the Commitments on the Closing Date is $75,000,000.

"Commitment Fee" shall have the meaning assigned to such term in Section 2.07(c).

"Commitment Fee PIK Date" shall have the meaning assigned to such term in Section 2.07(c).

"Communications" shall have the meaning assigned to such term in Section 9.16(a).

"Communications Laws" shall mean the Telecommunications Act of 1996, as amended and the rules and regulations promulgated thereunder.

"Control" shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a person, whether through the ownership of voting securities, by contract or otherwise, and "Controlling" and "Controlled" shall have meanings correlative thereto.

"Copyright Collateral" means all Copyrights, including all Copyright Licenses.

"Copyrights" means all domestic and foreign copyrights and works of authorship, whether registered or not, anywhere in the world, whether now or hereafter owned, developed, acquired or used by the Obligors, including, without limitation, all applications, registrations and recordings thereof (including, without limitation, applications, registrations and recordings in the United States Copyright Office or in any similar office of any other country or any political subdivision thereof), software, programs and databases (including, without limitation, source code, object code and all related applications and data files, firmware and documentation and materials relating thereto, and any substitutions, replacements, improvements, error corrections, updates and new versions of any of the foregoing, but excluding, "shrink-wrap" computer software, programs and databases), writings and internet site content.

"Copyright Licenses" means any agreement providing for the grant to or from any Obligor of any right under any Copyright, including, without limitation, the grant of rights to manufacture, distribute, sell or otherwise exploit materials derived from any Copyright.

"Crown" means the power and authority of the British monarch, as exercised by the federal or provincial governments in Canada and their representatives.

"Currency Due" shall have the meaning assigned to such term in Section 9.05(d).

"Default" shall mean any event or condition that upon notice, lapse of time or both would constitute an Event of Default.

"DIP Order" shall mean (a) prior to the entry of the Final DIP Order, the Interim DIP Order and (b) at all times after the entry of the Final DIP Order, the Final DIP Order.

"DIP Orders" shall mean collectively, the Interim DIP Order and Final DIP Order.

"Dollars" or "$" shall mean lawful money of the United States of America.

"Domestic Subsidiary Guarantors" shall have the meaning assigned to such term in the introductory paragraph of this Agreement.

"Environment" shall mean ambient and indoor air, surface water and groundwater (including potable water, navigable water and wetlands), the land surface or subsurface strata, natural resources such as flora and fauna, the workplace or as otherwise defined in any Environmental Law.

"Environmental Laws" shall mean all applicable laws (including common law), rules, regulations, codes, ordinances, orders, decrees or judgments, promulgated or entered into by any Governmental Authority, relating in any way to the Environment, preservation or reclamation of natural resources, the generation, management, Release or threatened Release of, or exposure to, any Hazardous Material or to occupational health and safety matters (to the extent relating to the Environment or Hazardous Materials).

"Equity Interests" of any person shall mean any and all shares, interests, rights to purchase, warrants, options, participation or other equivalents of or interests in (however designated) equity of such person, including any preferred stock, any limited or general partnership interest and any limited liability company membership interest.

"ERISA" shall mean the Employee Retirement Income Security Act of 1974, as the same may be amended from time to time, and the regulations promulgated and rulings issued thereunder.

"ERISA Affiliate" shall mean any trade or business (whether or not incorporated) that, together with any Loan Party or any subsidiary thereof, is treated as a single employer under Section 414(b) or (c) of the Code, or, solely for purposes of Section 302 of ERISA and Section 412 of the Code, is treated as a single employer under Section 414 of the Code.

"ERISA Event" shall mean (a) any Reportable Event, (b) the existence with respect to any ERISA Plan of an "accumulated funding deficiency" (as defined in Section 412 of the Code or Section 302 of ERISA), whether or not waived, (c) the filing pursuant to Section 412(d) of the Code or Section 303(d) of ERISA of an application for a waiver of the minimum

funding standard with respect to any ERISA Plan, the failure to make by its due date a required installment under Section 412(m) of the Code with respect to any ERISA Plan or the failure to make any required contribution to a Multiemployer Plan, (d) the incurrence by any Loan Party, any subsidiary of any Loan Party or any ERISA Affiliate of any liability under Title IV of ERISA with respect to the termination of any ERISA Plan, (e) the receipt by any Loan Party, any subsidiary of any Loan Party or any ERISA Affiliate from the PBGC or a plan administrator of any notice relating to an intention to terminate any ERISA Plan or to appoint a trustee to administer any ERISA Plan under Section 4042 of ERISA, (f) the incurrence by any Loan Party, any subsidiary of any Loan Party or any ERISA Affiliate of any liability with respect to the withdrawal or partial withdrawal from any ERISA Plan or Multiemployer Plan, or (g) the receipt by any Loan Party, any subsidiary of any Loan Party or any ERISA Affiliate of any notice, or the receipt by any Multiemployer Plan from any Loan Party, any subsidiary of any Loan Party or any ERISA Affiliate of any notice, concerning the imposition of Withdrawal Liability or a determination that a Multiemployer Plan is, or is expected to be, insolvent or in reorganization, within the meaning of Title IV of ERISA.

"ERISA Plan" shall mean any employee pension benefit plan (other than a Multiemployer Plan) subject to the provisions of Title IV of ERISA or Section 412 of the Code and in respect of which any Loan Party, any subsidiary of any Loan Party or any ERISA Affiliate is (or, if such plan were terminated, would under Section 4069 of ERISA be deemed to be) an "employer" as defined in Section 3(5) of ERISA.

"Event of Default" shall have the meaning assigned to such term in Section 7.01.

"Exchange Act" means the Securities Exchange Act of 1934, as amended and the rules and regulations promulgated thereunder.

"Exchange Rate" shall mean the prevailing spot rate of exchange of Reference Bank (or if such rate is not available from Reference Bank, such other bank as Administrative Agent may reasonably select) for the purpose of conversion of one currency to another, at or around 11:00 a.m., Local Time, on the date on which any such conversion of currency is to be made under this Agreement.

"Excluded Indebtedness" shall mean all Indebtedness permitted to be incurred under Section 6.01.

"Excluded Taxes" shall mean, with respect to the Administrative Agent, any Lender or any other recipient of any payment to be made by or on account of any obligation of the Borrower hereunder, (a) income taxes imposed on (or measured by) its net income (or franchise taxes imposed in lieu of net income taxes) by the United States of America (or any state thereof) or the jurisdiction under the laws of which such recipient is organized or in which its principal office is located or, in the case of any Lender, in which its applicable Lending Office is located or any other jurisdiction as a result of such recipient engaging in a trade or business in such jurisdiction for tax purposes, (b) any branch profits tax or any similar tax that is imposed by any jurisdiction described in clause (a) above, and (c) in the case of a Lender making a Loan to the Borrower, any withholding tax imposed by the United States that (x) is in effect and would apply to amounts payable hereunder to such Lender at the time such Lender becomes a party to

such Loan to the Borrower (or designates a new Lending Office) except to the extent that such Lender (or its assignor, if any) was entitled, immediately prior to the time of designation of a new Lending Office (or assignment), to receive additional amounts from a Loan Party with respect to any withholding tax pursuant to Section 2.10(a) or (c), or (y) is attributable to such Lender's failure to comply with Section 2.10(f) or (g) with respect to such Loan.

"Executive Order" shall have the meaning assigned to such term in Section 3.19(a).

"Facility" shall mean the Loans made hereunder by the Lenders.

"FCC" shall mean the Federal Communications Commission, or any successor entity.

"FCC License" means any license, authorization, approval, or permit granted by the FCC pursuant to the Communications Act of 1934, as amended, modified or supplemented from time to time, to the Borrower or any other Obligor or assigned or transferred to the Borrower or any other Obligor pursuant to any FCC consent, in each case for or in connection with the construction and/or operation of any satellite system.

"FCC License Rights" means any right, title or interest in, to or under any FCC License, whether directly or indirectly held, including, without limitation, any rights owned, granted, approved or issued directly or indirectly by the FCC or held, leased, licensed or otherwise acquired from or through any party.

"Fee Letter" shall mean that certain Fee Schedule Agreement dated as of October 7, 2010 by and between Borrower and the Administrative Agent.

"Fees" shall mean the Upfront Fee, the Commitment Fee, the Funding Fee and the Administrative Agent Fees.

"444 Entity" shall mean each of 4491165 Canada Inc., a Canada corporation, TerreStar Solutions Holdings Inc. (formerly known as 4491181 Canada Inc.), a Canada corporation, and TerreStar Solutions Inc. (formerly known as 4491190 Canada Inc.), a Canada corporation.

"444 Permitted Payments" shall mean the $70,000 per month payment made by TerreStar Networks (Canada) Inc. to compensate TerreStar Solutions Inc. for expenses paid on behalf of TerreStar Canada, including pro rata salaries of employees, payments to consultants, office space rentals, utilities and office spaces from and after the Petition Date permitted to be paid in accordance with the Agreed Budget.

"15% Notes" shall mean the 15% Senior Secured PIK Notes issued pursuant to the Indenture, dated as of February 14, 2007, among TerreStar Networks Inc, as Issuer (the "Issuer") and U.S. Bank National Association, as Trustee (the "Trustee"), together with the notes issued pursuant to the First Supplemental Indenture, dated as of February 7, 2008, by and among the Issuer, the Trustee and the guarantors party thereto; and the notes issued pursuant to the

Second Supplemental Indenture, dated as of February 7, 2008, by and among the Issuer, the Trustee, and the guarantors party thereto.

"15% Notes Adequate Protection" shall have the meaning assigned to such term in Section 4.01(h).

"Final DIP Order" shall mean a final order of the Bankruptcy Court containing substantially the same provisions as the Interim DIP Order and substantially in the form attached hereto as Exhibit D and otherwise in form and substance reasonably acceptable to the Required Lenders and as to which no stay has been entered and which has not been reversed, modified, vacated or overturned.

"Final Recognition Order" shall mean an order of the Canadian Court in the form attached hereto as Exhibit F and otherwise in form and substance reasonably acceptable to the Required Lenders.

"Financial Officer" of any person shall mean the Chief Financial Officer, principal accounting officer, Treasurer, Assistant Treasurer or Controller of such person.

"Financial Performance Covenants" shall mean the covenants of the Borrower set forth in Sections 6.10, 6.11, 6.12 and 6.13.

"Foreign Information Officer" means that certain Information Officer appointed by the Canadian Court in respect of the Canadian Cases.

"Foreign Lender" shall mean any Lender that is organized under the laws of a jurisdiction other than the United States of America. For purposes of this definition, the United States of America, each State thereof and the District of Columbia shall be deemed to constitute a single jurisdiction.

"Funding Fee" shall have the meaning assigned to such term in Section 2.07(b).

"GAAP" shall mean generally accepted accounting principles in effect from time to time in the United States, applied on a consistent basis, subject to the provisions of Section 1.02.

"Governmental Authority" shall mean any federal, state, provincial, local or foreign court or governmental agency, authority, instrumentality or regulatory or legislative body.

"Guarantee" of or by any person (the "guarantor") shall mean (a) any obligation, contingent or otherwise, of the guarantor guaranteeing or having the economic effect of guaranteeing any Indebtedness or other obligation of any other person (the "primary obligor") in any manner, whether directly or indirectly, and including any obligation of the guarantor, direct or indirect, (i) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or other obligation (whether arising by virtue of partnership arrangements, by agreement to keep well, to purchase assets, goods, securities or services, to take-or-pay or otherwise) or to purchase (or to advance or supply funds for the purchase of) any security for the

payment of such Indebtedness or other obligation, (ii) to purchase or lease property, securities or services for the purpose of assuring the owner of such Indebtedness or other obligation of the payment thereof, (iii) to maintain working capital, equity capital or any other financial statement condition or liquidity of the primary obligor so as to enable the primary obligor to pay such Indebtedness or other obligation, (iv) entered into for the purpose of assuring in any other manner the holders of such Indebtedness or other obligation of the payment thereof or to protect such holders against loss in respect thereof (in whole or in part) or (v) as an account party in respect of any letter of credit or letter of guaranty issued to support such Indebtedness or other obligation, or (b) any Lien on any assets of the guarantor securing any Indebtedness (or any existing right, contingent or otherwise, of the holder of Indebtedness to be secured by such a Lien) of any other person, whether or not such Indebtedness or other obligation is assumed by the guarantor; provided, however, that the term "Guarantee" shall not include endorsements for collection or deposit, in either case in the ordinary course of business, or customary.

"guarantor" shall have the meaning assigned to such term in the definition of the term "Guarantee."

"Guarantors" shall have the meaning assigned to such term in the introductory paragraph of this Agreement.

"Hazardous Materials" shall mean all pollutants, contaminants, wastes, chemicals, materials, substances and constituents of any nature which are subject to regulation or which would reasonably be likely to give rise to liability under any Environmental Law, including, without limitation, explosive or radioactive substances or petroleum or petroleum distillates, asbestos or asbestos-containing materials, polychlorinated biphenyls or radon gas.

"Income Tax Act (Canada)" shall mean shall mean the Income Tax Act (Canada), as amended.

"Indebtedness" of any person shall mean, without duplication, (a) all obligations of such person for borrowed money, (b) all obligations of such person evidenced by bonds, debentures, notes or similar instruments to the extent the same would appear as a liability on a balance sheet prepared in accordance with GAAP, (c) all obligations of such person under conditional sale or other title retention agreements relating to property or assets purchased by such person, (d) all obligations of such person issued or assumed as the deferred purchase price of property or services (other than current trade liabilities and current intercompany liabilities (but not any refinancings, extensions, renewals or replacements thereof) incurred in the ordinary course of business and maturing within 90 days after the incurrence thereof and that are not overdue by over 90 days (except prepetition trade liabilities and intercompany liabilities the enforcement thereof which is stayed by the virtue of the filing of the Cases)), to the extent that the same would be required to be shown as a long-term liability on a balance sheet prepared in accordance with GAAP, (e) all Guarantees by such person of Indebtedness of others, (f) all Capital Lease Obligations of such person, (g) the principal component of all obligations, contingent or otherwise, of such person as an account party in respect of letters of credit and (h) the principal component of all obligations of such person in respect of bankers' acceptances. The Indebtedness of any person shall include the Indebtedness of any partnership in which such

person is a general partner, other than to the extent that the instrument or agreement evidencing such Indebtedness expressly limits the liability of such person in respect thereof.

"Indemnified Taxes" shall mean all Taxes other than Excluded Taxes.

"Indemnitee" shall have the meaning assigned to such term in Section 9.05(b).

"Industry Canada" shall mean the Canadian federal Department of Industry or any successor or any department or agency administering the *Radiocommunication Act (Canada)*, among other statutes, including its staff acting under delegated authority and including the Minister of Industry.

"Industry Canada License Rights" means any right, title or interest in, to or under any Industry Canada License, whether directly or indirectly held, including, without limitation, any rights owned, granted, approved or issued directly or indirectly by Industry Canada or held, leased, licensed or otherwise acquired from or through any party.

"Industry Canada License" means any license, authorization, approval, or permit granted by Industry Canada pursuant to the Radiocommunication Act (Canada), as amended, modified or supplemented from time to time, to TerreStar Canada or assigned or transferred to TerreStar Canada pursuant to any Industry Canada consent, in each case for or in connection with the operation of the TerreStar-1 satellite or TerreStar-2 satellite in a Canadian orbital position and to use associated service, feeder link and telemetry, telecommand and control radio spectrum.

"Information" shall have the meaning assigned to such term in Section 3.14(a).

"Initial Funding Date" shall mean the first Business Day upon which the conditions set forth in Section 4.01 are satisfied or waived by the Initial Lender, which shall in no event be more than four (4) Business Days following the Closing Date.

"Initial Lender" shall mean EchoStar Corporation, a Nevada corporation.

"Initial Lender's Canadian Counsel" shall mean Goodmans LLP.

"Initial Lender's Counsel" shall mean, collectively, Willkie Farr & Gallagher LLP and Sullivan & Cromwell LLP.

"Initial Recognition Order" shall mean an order of the Canadian Court in the form attached hereto as Exhibit E and otherwise in form and substance reasonably acceptable to the Required Lenders.

"Interest Payment Date" shall mean the last day of each calendar month, commencing on October 31, 2010, the Termination Date, and, thereafter, on demand.

"Interim DIP Order" shall mean an interim order of the Bankruptcy Court entered in the Cases pursuant to Section 364 of the Bankruptcy Code, approving this Agreement and the other Loan Documents and authorizing the incurrence by the Loan Parties of post-petition

secured and super-priority debtor-in-possession Indebtedness in accordance with this Agreement, and as to which no stay has been entered and which has not been reversed, modified, vacated or overturned, and which is substantially in the form attached hereto as <u>Exhibit C</u> and otherwise in form and substance reasonably acceptable to the Required Lenders.

"<u>Investment</u>" shall have the meaning assigned to such term in Section 6.03.

"<u>Investment Property</u>" shall have the meaning assigned to such term: (i) in the UCC or (ii) in the PPSA, as applicable at the time of determination.

"<u>IP Collateral</u>" means, collectively, (a) all Copyright Collateral, (b) all Patent Collateral, (c) all Trademark Collateral, (d) all confidential and proprietary information, including, without limitation, know-how, trade secrets, manufacturing and production processes and techniques, inventions, research and development information, databases and data, (e) all other intellectual property or similar proprietary rights, (f) all tangible embodiments of any of the foregoing and all rights corresponding thereto throughout the world, and (g) any and all claims for damages and injunctive relief for past, present and future infringement, dilution, misappropriation, violation, misuse or breach with respect to any of the foregoing, with the right, but not the obligation, to sue for and collect, or otherwise recover, such damages.

"<u>Judgment Currency</u>" shall have the meaning assigned to such term in Section 9.05(d).

"<u>Lender</u>" shall mean the financial institution listed on <u>Schedule 2.01</u>, as well as any person that becomes a "Lender" hereunder pursuant to Section 9.04, in such capacity.

"<u>Lender Group Expenses</u>" shall have the meaning assigned to such term in Section 9.05(a).

"<u>Lending Office</u>" shall mean, as to any Lender, the applicable branch, office or Affiliate of such Lender designated by such Lender to make Loans.

"<u>Lien</u>" shall mean, with respect to any asset, (a) any mortgage, deed of trust, lien, hypothecation, pledge, encumbrance, charge or security interest in or on such asset, (b) the interest of a vendor or a lessor under any conditional sale agreement, capital lease or title retention agreement (or any financing lease having substantially the same economic effect as any of the foregoing) relating to such asset and (c) in the case of securities (other than securities representing an interest in a joint venture that is not a Subsidiary), any purchase option, call or similar right of a third party with respect to such securities to the extent that any such right is intended to have an effect equivalent to that of a security interest in such securities.

"<u>Loan Documents</u>" shall mean this Agreement, the DIP Orders, any Note issued under Section 2.04(e), any security agreements, mortgages and other instruments and documents executed and delivered pursuant to any of the foregoing, and the Fee Letter.

"<u>Loan Parties</u>" shall mean the Borrower and the Guarantors.

"Loans" shall mean the term loans made by each Lender to the Borrower pursuant to Section 2.01.

"Local Time" shall mean New York City time.

"Margin Stock" shall have the meaning assigned to such term in Regulation U.

"Material Adverse Change" shall mean any event, circumstance or condition which has or would reasonably be expected to have a Material Adverse Effect.

"Material Adverse Effect" shall mean a material adverse effect on (a) the business, assets, operations, financial condition or operating results of the Loan Parties, taken as a whole, other than those customarily caused by the filing of a chapter 11 case under the Bankruptcy Code, (b) the Collateral, taken as a whole, other than those customarily caused by the filing of a chapter 11 case under the Bankruptcy Code, (c) the validity and enforceability of any of the Loan Documents or (d) the rights and remedies of the Administrative Agent or the Lenders under the Loan Documents.

"Material Contract" shall mean all contracts which are material to the conduct and operations of the business of the Loan Parties, taken as a whole, including, but not limited to, all those contracts set forth on Schedule 5.06.

"Maximum Rate" shall have the meaning assigned to such term in Section 9.09.

"Milestone Date" shall mean the dates so provided in the meaning of the term "Milestone Requirement".

"Milestone Requirement" shall mean the requirement that the Loan Parties shall meet the following deadlines: (a) filing an Acceptable Plan by November 5, 2010, (b) filing, jointly with any person required by the FCC or Industry Canada, (i) all necessary applications for approval of the transfers of control over all the FCC Licenses, and the transfer of control over, transfer or assignment of all the Industry Canada Licenses within the terms and conditions thereof, and related authorizations held by any Loan Party that are contemplated by any Acceptable Plan and (ii) all required notifications to the FCC and Industry Canada, in each case by December 14, 2010, (c) receiving Bankruptcy Court approval of a disclosure statement by December 14, 2010, (d) commencement of a hearing by the Bankruptcy Court on confirmation of an Acceptable Plan by January 31, 2011, (e) entry of a final, non-appealable order by the Bankruptcy Court confirming such Acceptable Plan by February 14, 2011, (f) within 7 days after request of the Administrative Agent (acting at the written request of the Required Lenders), with respect to any order of the Bankruptcy Court, a corresponding recognition order, in form and substance reasonably acceptable to the Required Lenders shall have been entered in the Canadian Court, which order shall have become final and non-appealable within twenty-one (21) days after entry of such order by the Canadian Court, and (g) the Final DIP Order and Final Recognition Order shall have become final and non-appealable within 60 and 63 days of the date of the entry of the Interim DIP Order and Initial Recognition Order, respectively.

"Monthly Performance Report" shall mean a report in the same form as the Agreed Budget and accompanying projections which shall contain entries detailing the actual performance during the period for which such report is being delivered, the variance from the Agreed Budget and accompanying projections for such period, if any, and an explanation of the reason for any such variance.

"Moody's" shall mean Moody's Investors Service, Inc. and any successor thereto.

"Motient Loan Parties" shall mean, collectively, Motient Holdings Inc., Motient Communications Inc., Motient Services Inc. and Motient License Inc.

"MSS Spectrum" shall have the meaning assigned to such term in Section 5.05.

"Multiemployer Plan" shall mean a multiemployer plan as defined in Section 4001(a)(3) of ERISA to which any Loan Party, any subsidiary of any Loan Party or any ERISA Affiliate (other than one considered an ERISA Affiliate only pursuant to subsection (m) or (o) of Code Section 414) is making or accruing an obligation to make contributions, or has within any of the preceding six plan years made or accrued an obligation to make contributions.

"MVH" shall mean Motient Ventures Holding Inc., a Delaware corporation and a Non-Subsidiary Guarantor.

"Net Proceeds" shall mean:

(a)    100% of the cash proceeds actually received by any Loan Party or any subsidiary of any Loan Party (including any cash payments received by way of deferred payment of principal pursuant to a note or installment receivable or purchase price adjustment receivable or otherwise and including casualty insurance settlements and condemnation awards, but only as and when received) from any loss, damage, destruction or condemnation of, or any sale, transfer or other disposition (including any sale and leaseback of assets and any mortgage or lease of real property) to any person of, any asset or assets of a Loan Party or any subsidiary of a Loan Party (other than those pursuant to Section 6.04(a), (b), (c), (d), (e) or (f)), net of (i) attorneys' fees, accountants' fees, investment banking fees, survey costs, title insurance premiums, and related search and recording charges, transfer taxes, deed or mortgage recording taxes, any amount required by the Bankruptcy Court to be paid or prepaid on Indebtedness (other than the Obligations) secured by a perfected and unavoidable Lien on the applicable assets, other customary expenses and brokerage, consultant and other customary fees actually incurred in connection therewith, and (ii) Taxes paid or payable as a result thereof, provided, however, that evidence of (i) and (ii) are provided to the Administrative Agent in form and substance satisfactory to the Required Lenders; and

(b)    100% of the cash proceeds from the incurrence, issuance or sale by the Borrower or any Subsidiary of any Indebtedness (other than Excluded Indebtedness), net of all taxes and fees (including investment banking fees), commissions, costs and other expenses, in each case incurred in connection with such incurrence, issuance or sale.

For purposes of calculating the amount of Net Proceeds, fees, commissions and other costs and expenses payable to any Loan Party or any Affiliate of a Loan Party shall be disregarded.

"Non-Subsidiary Guarantors" shall have the meaning assigned to such term in the introductory paragraph of this Agreement.

"Note" shall have the meaning assigned to such term in Section 2.04(e).

"Notice of Borrowing" shall have the meaning assigned to such term in Section 2.03(a).

"Obligations" shall mean (a) the due and punctual payment by the Borrower of (i) the unpaid principal of and interest (including paid in kind interest and all interest accruing during the pendency of any bankruptcy, insolvency, receivership or other similar proceeding) on the Loans made to the Borrower, when and as due, whether at maturity, by acceleration, upon one or more dates set for prepayment or otherwise and (ii) all other monetary obligations of the Borrower to any of the Secured Parties under this Agreement and each of the other Loan Documents, including obligations to pay fees, expense and reimbursement obligations and indemnification obligations, whether primary, secondary, direct, contingent, fixed or otherwise (including monetary obligations incurred during the pendency of any bankruptcy, insolvency, receivership or other similar proceeding, regardless of whether allowed or allowable in such proceeding), (b) the due and punctual performance of all other obligations of the Borrower under or pursuant to this Agreement and each of the other Loan Documents, and (c) the due and punctual payment and performance of all the obligations of each other Loan Party under or pursuant to this Agreement and each of the other Loan Documents.

"Obligor" shall mean either the Borrower or any Guarantor, and "Obligors" means the Borrower and the Guarantors.

"OFAC" shall have the meaning assigned to such term in Section 3.19(b).

"Other Taxes" shall mean any and all present or future stamp, registration, recording, filing, transfer or documentary taxes or any other excise or property taxes, charges or similar levies arising from any payment made hereunder or from the execution, delivery or enforcement of, or otherwise with respect to, the Loan Documents, and any and all interest and penalties related thereto.

"Participant" shall have the meaning assigned to such term in Section 9.04(c).

"Patent Collateral" means all Patents, whether now owned or hereafter acquired by any Obligor, including all Patent Licenses.

"Patent License" means any agreement providing for the grant to or from any Obligor of any right to manufacture, use, sell or otherwise exploit any invention covered in whole or in part by a Patent.

"Patents" means all patents, patent applications, and inventions claimed or disclosed therein and all improvements thereto, all registrations and applications for registration for any of the foregoing, together with all reissues, divisions, continuations, continuations-in-part, extensions and reexaminations thereof.

"PBGC" shall mean the Pension Benefit Guaranty Corporation referred to and defined in ERISA.

"Permitted Investments" shall mean:

(a)     direct obligations of the United States of America, Canada or any agency thereof or obligations guaranteed by the United States of America or any agency thereof, in each case with maturities not exceeding one year from the date of acquisition thereof;

(b)     time deposit accounts, certificates of deposit and money market deposits maturing within 180 days of the date of acquisition thereof issued by a bank or trust company that is organized under the laws of the United States of America, any state thereof or any foreign country recognized by the United States of America having capital, surplus and undivided profits in excess of $250,000,000 and whose long-term debt, or whose parent holding company's long-term debt, is rated A (or such similar equivalent rating or higher by at least one nationally recognized statistical rating organization (as defined in Rule 436 under the Securities Act);

(c)     repurchase obligations with a term of not more than 180 days for underlying securities of the types described in clause (a) above entered into with a bank meeting the qualifications described in clause (b) above;

(d)     commercial paper, maturing not more than one year after the date of acquisition, issued by a corporation (other than an Affiliate of the Borrower) organized and in existence under the laws of the United States of America or any foreign country recognized by the United States of America with a rating at the time as of which any investment therein is made of P-1 (or higher) according to Moody's, or A-1 (or higher) according to S&P;

(e)     securities with maturities of one year or less from the date of acquisition issued or fully guaranteed by any State, commonwealth or territory of the United States of America, or by any political subdivision or taxing authority thereof, and rated at least A by S&P or A by Moody's;

(f)     shares of mutual funds whose investment guidelines restrict 95% of such funds' investments to those satisfying the provisions of clauses (a) through (d) above;

(g)     money market funds that (i) comply with the criteria set forth in Rule 2a-7 under the Investment Company Act of 1940, (ii) are rated AAA by S&P and Aaa by Moody's and (iii) have portfolio assets of at least $5,000,000,000; and

(h)     time deposit accounts, certificates of deposit and money market deposits in an aggregate face amount not in excess of 1/2 of 1% of the total assets of the Borrower and its Subsidiaries, on a consolidated basis, as of the end of the Borrower's most recently completed fiscal year.

"Person" or "person" shall mean any natural person, corporation, business trust, joint venture, association, company, partnership, limited liability company or government, individual or family trusts, or any agency or political subdivision thereof.

"Petition Date" shall have the meaning assigned to such term in the recitals to this Agreement.

"Plan" shall mean a plan of reorganization of the Borrower and the Guarantors.

"Plan Support Agreement" shall mean that certain Plan Support Agreement, dated as of October 19, 2010, among the Borrower, the Non-Subsidiary Guarantors, the Domestic Subsidiary Guarantors, TerreStar Corporation and the holders of claims against the Borrower signatory thereto.

"Platform" shall have the meaning assigned to such term in Section 9.16(b).

"Pledged Equity" means any Investment Property constituting Collateral.

"PMCA" shall mean the Purchase Money Credit Agreement, dated as of February 5, 2008, among the Borrower, the guarantors party thereto, U.S. Bank National Association, as Collateral Agent, Harbinger Capital Partners Master Fund 1, Ltd., Harbinger Capital Partners Special Situations Fund, L.P. and EchoStar Corporation, each as a lender, and the other lenders party thereto, as amended, restated, supplemented or otherwise modified prior to the commencement of the Cases.

"PMCA Adequate Protection" shall have the meaning assigned to such term in Section 4.01(h).

"PPSA" shall mean the *Personal Property Security Act* (Ontario) and any other applicable Canadian or provincial personal property security or similar legislation, together with all rules, regulations and interpretations thereunder or related thereto.

"Prepetition Obligations" shall mean, collectively, the obligations of the applicable Loan Parties or their Affiliates under the 15% Notes or the PMCA.

"primary obligor" shall have the meaning given such term in the definition of the term "Guarantee."

"Prior Liens" shall mean (a) the non-avoidable, valid, enforceable and perfected liens securing the valid and enforceable obligations in respect of the 15% Notes and (b) the non-avoidable, valid, enforceable and perfected liens securing the valid and enforceable obligations under the PMCA.

"Projections" shall mean any projections and any forward-looking statements of the Loan Parties and their subsidiaries furnished to the Lenders or the Administrative Agent by or on behalf of the Borrower or any Subsidiary prior to the Closing Date.

"Reference Bank" shall mean The Bank of New York Mellon, or such other bank as Administrative Agent (acting at the direction of the Required Lenders) may from time to time designate.

"Register" shall have the meaning assigned to such term in Section 9.04(b).

"Regulation U" shall mean Regulation U of the Board as from time to time in effect and all official rulings and interpretations thereunder or thereof.

"Regulation X" shall mean Regulation X of the Board as from time to time in effect and all official rulings and interpretations thereunder or thereof.

"Related Parties" shall mean, with respect to any specified person, such person's Affiliates and the respective directors, trustees, officers, employees, agents and advisors of such person and such person's Affiliates.

"Release" shall mean any spilling, leaking, seepage, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, disposing, depositing, emanating or migrating in, into, onto or through the Environment.

"Reportable Event" shall mean any reportable event as defined in Section 4043(c) of ERISA or the regulations issued thereunder, other than those events as to which the 30-day notice period referred to in Section 4043(c) of ERISA has been waived, with respect to an ERISA Plan (other than an ERISA Plan maintained by an ERISA Affiliate that is considered an ERISA Affiliate only pursuant to subsection (m) or (o) of Section 414 of the Code).

"Required Lenders" shall mean, at any time, Lenders having Loans and Commitments outstanding, that, taken together, represent more than 50% of the sum of all Loans outstanding.

"Requirement of Law" shall mean, for any Person, the organizational documents of such Person and any law or determination of an arbitrator or a court or other Governmental Authority, in each case applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject.

"Responsible Officer" of any person shall mean any executive officer or Financial Officer of such person and any other officer or similar official thereof responsible for the administration of the obligations of such person in respect of this Agreement.

"Restructuring Term Sheet" shall mean that certain term sheet attached to the Plan Support Agreement as Exhibit A thereto.

"S&P" shall mean Standard & Poor's Ratings Group, Inc. or any successor thereto.

"Sale/Leaseback Transaction" shall mean any lease, whether an operating lease or a capital lease, whereby any Loan Party or any of its subsidiaries, directly or indirectly, becomes or remains liable as lessee or as guarantor or other surety, of any property whether now owned or hereafter acquired, (a) that any Loan Party or any of its subsidiaries, as the case may be, has sold or transferred or is to sell or transfer to any other Person (other than another Loan Party), or (b) that is acquired by any other Person, as part of a financing transaction to which any Loan Party or any of its subsidiaries is a party, in contemplation of leasing such property to any Loan Party or any of its subsidiaries, as the case may be.

"SEC" shall mean the Securities and Exchange Commission or any successor thereto.

"Secured Parties" shall mean (a) the Lenders (and any Affiliate of a Lender), (b) the Administrative Agent, (c) the beneficiaries of each indemnification obligation undertaken by any Loan Party under any Loan Document, and (d) the successors and permitted assigns of each of the foregoing.

"Securities Act" shall mean the Securities Act of 1933, as amended and the rules and regulations promulgated thereunder.

"SkyTerra" shall mean SkyTerra Communications, Inc.

"Stated Maturity Date" shall mean the 270th day after the Petition Date; provided that if the Stated Maturity Date shall not be a Business Day, the Stated Maturity Date shall be the Business Day immediately preceding.

"Statutory Committee of Unsecured Creditors" shall mean the official statutory committee of unsecured creditors appointed in the Cases pursuant to Section 1102 of the Bankruptcy Code.

"Subsequent Funding Date" shall mean first, on the later of (a) December 5, 2010 and (b) the earliest date that is (i) at least fifteen (15) days after the date of entry of the Final DIP Order and (ii) the date on which no stay pending appeal has been granted with respect to the Final DIP Order; second, on the later of (a) January 7, 2010 and (b) the earliest date that is (i) at least twenty-one (21) days after entry of the Final Recognition Order and (ii) the date on which no stay pending appeal has been granted with respect to the Final Recognition Order (the "Third Advance"); and (c) on the fifth Business Day of each month beginning on the month immediately following the month in which the Third Advance is made.

"subsidiary" shall mean, with respect to any person (herein referred to as the "parent"), any corporation, partnership, association or other business entity (a) of which securities or other ownership interests representing more than 50% of the equity or more than 50% of the ordinary voting power or more than 50% of the general partnership interests are, at the time any determination is being made, directly or indirectly, owned, Controlled or held, or (b) that is, at the time any determination is made, otherwise Controlled, by the parent or one or more subsidiaries of the parent or by the parent and one or more subsidiaries of the parent.

"Subsidiary" shall mean any direct or indirect subsidiary of the Borrower.

"Taxes" shall mean any and all present or future taxes, levies, imposts, duties (including stamp duties), deductions, charges (including ad valorem charges) or withholdings imposed by any Governmental Authority and any and all interest and penalties related thereto.

"Tax Related Person" shall mean a Person (including a beneficial owner of an interest in a pass through entity) whose income is realized through or determined by reference to Administrative Agent, a Participant, or any Tax Related Person of any of the foregoing.

"Termination Date" shall mean the earliest to occur of (a) the Stated Maturity Date, (b) the effective date of a Plan, (c) the closing date of a sale pursuant to Section 363 of the Bankruptcy Code of all or substantially all of the Loan Parties' assets, (d) the date that is thirty-five (35) days after the date of entry of the Interim DIP Order if the Bankruptcy Court shall not have entered the Final DIP Order on or before such date and (e) the acceleration of the Loans upon the occurrence of an Event of Default.

"TerreStar Canada" shall have the meaning assigned to such term in the introductory paragraphs of this Agreement.

"Third Advance" shall have the meaning assigned to such term in the definition of Subsequent Funding Date.

"Trademark Collateral" means all Trademarks, whether now owned or hereafter acquired by any Obligor, including, in each case, with the goodwill of the business connected with the use of, and symbolized by, each such trade name, trademark and service mark and all Trademark Licenses, excluding any United States "intent to use" applications unless and until a "Statement of Use" or "Amendment to Allege Use" has been filed with and accepted by the United States Patent and Trademark Office.

"Trademark License" means any agreement providing for the grant to or from any Obligor of any right to use any Trademark.

"Trademarks" means all domestic and foreign trade names, trademarks and service marks, logos, domain names, trade dress, designs, slogans, business names, corporate names and other source identifiers, whether registered or unregistered, all registrations and applications for registration for any of the foregoing, together with all modifications, extensions and renewals thereof.

"UCC" shall mean the Uniform Commercial Code (or any successor statute) of the State of New York or of any other state the laws of which are required by Section 9-301 thereof to be applied in connection with the issue of perfection of security interests.

"Upfront Fee" shall have the meaning assigned to such term in Section 2.07(a).

"US Cases" shall have the meaning assigned to such term in the introductory paragraphs of this Agreement.

"Wholly Owned Subsidiary" of any person shall mean a subsidiary of such person, all of the Equity Interests of which (other than directors' qualifying shares or nominee or other similar shares required pursuant to applicable law) are owned by such person or another Wholly Owned Subsidiary of such person.

"Withdrawal Liability" shall mean liability to a Multiemployer Plan as a result of a complete or partial withdrawal from such Multiemployer Plan, as such term is defined in Part I of Subtitle E of Title IV of ERISA.

Section 1.02.  Terms Generally.  The definitions set forth or referred to in Section 1.01 shall apply equally to both the singular and plural forms of the terms defined.  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.  The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation."  All references herein to Articles, Sections, Exhibits and Schedules shall be deemed references to Articles and Sections of, and Exhibits and Schedules to, this Agreement unless the context shall otherwise require.  Except as otherwise expressly provided herein, any reference in this Agreement to any Loan Document shall mean such document as amended, restated, supplemented or otherwise modified from time to time.  Except as otherwise expressly provided herein, all terms of an accounting or financial nature shall be construed in accordance with GAAP, as in effect from time to time; provided that, if the Borrower notifies the Administrative Agent that the Borrower requests an amendment to any provision hereof to eliminate the effect of any change occurring after the Closing Date in GAAP or in the application thereof on the operation of such provision (or if the Administrative Agent notifies the Borrower that the Required Lenders request an amendment to any provision hereof for such purpose), regardless of whether any such notice is given before or after such change in GAAP or in the application thereof, then such provision shall be interpreted on the basis of GAAP as in effect and applied immediately before such change shall have become effective until such notice shall have been withdrawn or such provision amended in accordance herewith.  Notwithstanding any provision to the contrary contained in this Agreement, including without limitation the use of the term "per annum", all interest hereunder shall be computed on the basis of a year of 360 days, and in each case shall be payable for the actual number of days elapsed (including the first day but excluding the last day).  Dollars or $ means United States Dollars.

## ARTICLE II

## THE CREDITS

Section 2.01.  Commitments.  Subject to the terms and conditions set forth herein, each Lender severally agrees to make Loans to the Borrower as follows: (i) an initial Borrowing on the Initial Funding Date, in the aggregate principal amount of $18,000,000 and (ii) if the Termination Date shall not have previously occurred, additional Borrowings on each Subsequent Funding Date in respect of which a Notice of Borrowing has been delivered up to an amount equal to (a) the sum of, without duplication: (x) the projected aggregate cash expenses and disbursements for the current month as set forth in the Agreed Budget, (y) any such expenses and disbursements that were projected in the Agreed Budget, but not expended, in the immediate preceding month and (z) $2,000,000, minus (b) the sum of, without duplication: (x) the projected aggregate cash revenue and receipts for the current month and (y) the Available Cash; and, provided, further, that the Loans shall not exceed, for any Lender, in aggregate principal amount, the amount which equals the Commitment of such Lender.  Proceeds of the Loans shall be used solely for the purposes set forth in Section 3.12.  Once repaid, in whole or in part, at maturity or by prepayment, Loans made hereunder may not be reborrowed in whole or in part.

Section 2.02.  Loans and Borrowings.

(a) Each Loan shall be made as part of a single Borrowing consisting of Loans made by the Lenders ratably in accordance with their respective Commitments.  The failure of

any Lender to make any Loan required to be made by it shall not relieve any other Lender of its obligations hereunder; provided that the Commitments of the Lenders are several and no Lender shall be responsible for any other Lender's failure to make Loans as required.

(b) Each Lender at its option may make any Loan by causing any domestic or foreign branch or Affiliate of such Lender to make such Loan; provided that any exercise of such option shall not affect the obligation of the Borrower to repay such Loan in accordance with the terms of this Agreement and such Lender shall not be entitled to any amounts payable under Section 2.09 solely in respect of increased costs resulting from such exercise and existing at the time of such exercise.

Section 2.03.  Funding of Borrowings.

(a) Each Borrowing shall be made on notice given by the Borrower not later than 11:00 a.m. (Local Time) one (1) Business Day prior to the Initial Funding Date, in the case of the initial Borrowing, and five (5) Business Days prior to the date of the proposed Borrowing, in the case of any Borrowings after the Initial Funding Date.  Each such notice shall be substantially in the form of Exhibit G (a "Notice of Borrowing"), specifying (A) the date of such proposed Borrowing (which must be a Subsequent Funding Date during the Availability Period), (B) the amount of the Borrowing and (C) the remaining aggregate Commitments (after giving effect to the proposed Borrowing).

(b) The Administrative Agent shall give each Lender prompt notice of the Administrative Agent's receipt of a Notice of Borrowing.  Each Lender shall make the Loans to be made by it hereunder on the date of any proposed Borrowing by wire transfer of immediately available funds by 1:00 p.m. (Local Time), to the account of the Administrative Agent most recently designated by it for such purpose by notice to the Lenders.  The Administrative Agent will make such Loans available to the Borrower by promptly wiring the amounts received, in like funds, to an account of the Borrower previously provided to the Administrative Agent.

Section 2.04.  Repayment of Loans; Evidence of Debt.

(a) The Borrower hereby unconditionally promises to pay to the Administrative Agent for the ratable account of the Lenders in cash the aggregate outstanding principal amount of the Loans and all accrued but unpaid interest and Fees thereon on the Termination Date.

(b) Each Lender shall maintain in accordance with its usual practice an account or accounts evidencing the indebtedness of the Borrower to such Lender resulting from the Loans made by such Lender, including the amounts of principal and interest payable, Fees and interest paid in-kind and capitalized pursuant to this Agreement or paid in cash to such Lender from time to time hereunder.

(c) The Administrative Agent shall maintain accounts in which it shall record (i) the amount of each Loan made hereunder, (ii) the amount of any principal or interest due and payable or to become due and payable from the Borrower to each Lender hereunder and (iii) any amount received by the Administrative Agent hereunder for the account of the Lenders and each Lender's share thereof.

(d) The entries made in the accounts maintained pursuant to paragraph (b) or (c) of this Section shall be prima facie evidence of the existence and amounts of the obligations recorded therein; provided that the failure of any Lender or the Administrative Agent to maintain such accounts or any error therein shall not in any manner affect the obligation of the Borrower to repay the Loans in accordance with the terms of this Agreement.

(e) Any Lender may request that Loans made by it be evidenced by a promissory note (a "Note").  In such event, the Borrower shall prepare, execute and deliver to such Lender a promissory note payable to the order of such Lender (or, if requested by such Lender, to such Lender and its registered assigns) and in the form attached hereto as Exhibit I.  Thereafter, the Loans evidenced by such promissory note and interest thereon shall at all times (including after assignment pursuant to Section 9.04) be represented by one or more promissory notes in such form payable to the order of the payee named therein (or, if such promissory note is a registered note, to such payee and its registered assigns).

Section 2.05.   Prepayment of Loans.

(a) The Borrower shall have the right at any time and from time to time to prepay any Borrowing in whole or in part, without premium or penalty, in an aggregate principal amount of $5,000,000 or any whole multiple of $1,000,000 in excess thereof or if less, the aggregate amount of Loans then outstanding, subject to prior notice in accordance with paragraph (c) of this Section.

(b) The Borrower shall apply all Net Proceeds promptly upon receipt thereof to prepay Borrowings in accordance with paragraph (c) of this Section; provided that no prior notice shall be required for prepayments made pursuant to this paragraph (b).  Prepayments in accordance with this Section 2.05(b) shall result in a permanent reduction of the Loans and no corresponding increase in the unused Commitments.

(c) Prior to any prepayment of any Borrowing hereunder, the Borrower shall notify the Administrative Agent by telephone (confirmed by telecopy) of such prepayment not later than 2:00 p.m. (Local Time), three (3) Business Days before the scheduled date of such prepayment.  Each prepayment shall be applied ratably to the Loans and shall be accompanied by accrued interest and Fees on the amount repaid.

Section 2.06.   Voluntary Termination or Reduction of Commitments.

(a) The Borrower may, upon written notice to the Administrative Agent, terminate the unused Commitments, or from time to time permanently reduce the unused Commitments; provided, that (i) any such notice shall be received by the Administrative Agent five (5) Business Days prior to the date of termination or reduction, and (ii) any such partial reduction shall be in an aggregate amount (A) of $5,000,000 or any whole multiple of $1,000,000 in excess thereof or (B) equal to the entire remaining amount of the Commitment.

(b) The Administrative Agent will promptly notify the Lenders of any termination or reduction of the unused Commitments under this Section 2.06.  Upon any reduction of unused Commitments, the Commitment of each Lender shall be reduced pro rata.  All Commitment Fees accrued from the last Commitment Fee PIK Date on that portion of the Commitment that is being

reduced until the effective date of any termination shall be paid to the Lenders in cash on the effective date of such termination.

Section 2.07.   Fees.

(a)  The Borrower shall pay to each Lender an upfront fee (an "Upfront Fee") in an amount equal to 3.00% of the aggregate amount of such Lender's Commitments, which Upfront Fee shall be fully earned and payable on the Closing Date and shall be paid in kind and on the Closing Date shall be capitalized and added to the principal amount of the Loan outstanding.

(b)  The Borrower shall pay to each Lender a funding fee (the "Funding Fee") in an amount equal to 2.00% of the principal amount of each Loan made by such Lender hereunder, which fee shall be fully earned and payable on the date such Loan is made to the Borrower and shall be offset by each such Lender against its funding of such Loan.

(c)  The Borrower shall pay to each Lender a commitment fee (the "Commitment Fee") equal to 1.00% per annum times the daily amount of the unused Commitment of such Lender.  The Commitment Fee shall accrue at all times from the Closing Date until the Termination Date, including all times during which one or more of the applicable conditions to borrowing hereunder is not met, and shall be due and payable on each Interest Payment Date (the "Commitment Fee PIK Date"), commencing with the first such date to occur after the Closing Date, and on the Termination Date.  The Commitment Fee shall be paid in-kind on each Commitment Fee PIK Date and on each such date, the accrued Commitment Fee shall be capitalized and added to the principal amount of the Loans outstanding.  The Commitment Fee shall be computed on the basis of a year of 360 days and shall be payable for the actual number of days elapsed (including the first day but excluding the last day).

(d)  The Borrower shall pay to the Administrative Agent, for the account of the Administrative Agent, the agency fee and expenses set forth in the Fee Letter, as amended, restated, supplemented or otherwise modified from time to time, at the times specified therein (the "Administrative Agent Fees").

(e)  No Fees, whether payable in-kind or in cash, shall be refundable under any circumstances.

Section 2.08.   Interest.

(a)  The Loans shall bear interest at a rate per annum equal to 15.00%.

(b)  Notwithstanding the foregoing, if a Default occurs and is continuing, all outstanding Obligations then due and owing (including, if applicable, any overdue amount) shall bear interest during the continuance of such Default, after as well as before judgment, at a rate per annum equal to 2.00% plus the rate otherwise applicable to such Obligation; provided that this paragraph (b) shall not apply to any Default that has been waived by the Lenders pursuant to Section 9.08.

(c)  Accrued interest on each Loan shall be payable in arrears on each Interest Payment Date for such Loan and on the Termination Date.  On each Interest Payment Date, all accrued interest shall be capitalized and added to the principal amount of the Loans then outstanding, except all interest payable under Section 9.08(b) and all interest payable on or after the Termination Date shall be paid in cash.

(d)  All interest hereunder shall be computed on the basis of a year of 360 days and shall be payable for the actual number of days elapsed (including the first day but excluding the last day).

(e)  For the purposes of this Agreement, whenever interest is calculated on the basis of a period which is less than the actual number of days in a calendar year, each rate of interest determined pursuant to such calculation is, for the purposes of the Interest Act (Canada), equivalent to such rate multiplied by the actual number of days in the calendar year in which such rate is to be ascertained and divided by the number of days used as the basis of such calculation.

(f)  The Loan Parties acknowledge and agree that all calculations of interest under this Agreement are to be made on the basis of the nominal interest rate described herein and not on the basis of effective yearly rates or on any other basis which gives effect to the principle of deemed reinvestment of interest.  The Loan Parties acknowledge that there is a material difference between the stated nominal interest rates and the effective yearly rates of interest and that they are capable of making the calculations required to determine such effective yearly rates of interest.

(g)  In no event shall "interest" (as such term is defined in Section 347 of the Criminal Code of Canada) on the "credit advanced" (as defined therein) hereunder be payable by any Loan Party in excess of sixty percent (60%) per annum and if any Loan Party does pay an amount of interest in excess of sixty percent (60%) in any particular year, the amount of such excess shall be repaid by the Lenders (through the Administrative Agent) to such party.

Section 2.09.  Increased Costs.

(a)  If any Change in Law shall:

(i)  impose, modify or deem applicable any reserve, special deposit or similar requirement against assets of, deposits with or for the account of, or credit extended by, any Lender; or

(ii) impose on any Lender or the London interbank market any other condition affecting this Agreement or the Loan made by such Lender;

and the result of any of the foregoing shall be to increase the cost to such Lender of making or maintaining any Loan (or of maintaining its obligation to make any such Loan) or to reduce the amount of any sum received or receivable by such Lender hereunder (whether of principal, interest or otherwise), then the Borrower will pay to such Lender such additional amount or amounts as will compensate such Lender for such additional costs incurred or reduction suffered.

(b) If any Lender determines that any Change in Law regarding capital requirements has or would have the effect of reducing the rate of return on such Lender's capital or on the capital of such Lender's holding company, if any, as a consequence of this Agreement or the Loans made by such Lender to a level below that which such Lender or such Lender's holding company could have achieved but for such Change in Law (taking into consideration such Lender's policies and the policies of such Lender's holding company with respect to capital adequacy), then from time to time the Borrower shall pay to such Lender such additional amount or amounts as will compensate such Lender or such Lender's holding company for any such reduction suffered.

(c) A certificate of a Lender setting forth the amount or amounts necessary to compensate such Lender or its holding company, as applicable, as specified in paragraph (a) or (b) of this Section shall be delivered to the Borrower and shall be conclusive absent manifest error. The Borrower shall pay such Lender the amount shown as due on any such certificate within 10 days after receipt thereof.

(d) Promptly after any Lender has determined that it will make a request for increased compensation pursuant to this Section 2.09, such Lender shall notify the Borrower thereof. Failure or delay on the part of any Lender to demand compensation pursuant to this Section shall not constitute a waiver of such Lender's right to demand such compensation; provided, that the Borrower shall not be required to compensate a Lender pursuant to this Section 2.09 for any increased costs or reductions incurred more than 180 days prior to the date that such Lender notifies the Borrower of the Change in Law giving rise to such increased costs or reductions and of such Lender's intention to claim compensation thereof; provided, further, that if the Change in Law giving rise to such increased costs or reductions is retroactive, then the 180-day period referred to above shall be extended to include the period of retroactive effect thereof.

Section 2.10.  Taxes.

(a) Unless otherwise required by applicable laws, any and all payments by or on account of any obligation of any Loan Party hereunder shall be made free and clear of and without deduction for any Indemnified Taxes or Other Taxes; provided that if a Loan Party shall be required to deduct any Indemnified Taxes or Other Taxes from such payments, then (i) the sum payable shall be increased as necessary so that after making all required deductions (including deductions applicable to additional sums payable under this Section) the Administrative Agent or any Lender, as applicable, receives an amount equal to the sum it would have received had no such deductions been made, (ii) such Loan Party shall make such deductions and (iii) such Loan Party shall timely pay the full amount deducted to the relevant Governmental Authority in accordance with applicable law.

(b) In addition, the Loan Parties shall pay any Other Taxes to the relevant Governmental Authority in accordance with applicable law.

(c) Each Loan Party shall indemnify the Administrative Agent and each Lender, within 10 days after written demand therefor, for the full amount of any Indemnified Taxes or Other Taxes paid by the Administrative Agent or such Lender, as applicable, on or with respect

to any payment by or on account of any obligation of such Loan Party hereunder (including Indemnified Taxes or Other Taxes imposed or asserted on or attributable to amounts payable under this Section) and any reasonable expenses arising therefrom or with respect thereto. A certificate as to the amount of such payment or liability, prepared in good faith and delivered to such Loan Party by a Lender, or by the Administrative Agent on its own behalf or on behalf of a Lender, shall be conclusive absent manifest error.

(d) As soon as practicable after any payment of Indemnified Taxes or Other Taxes by a Loan Party to a Governmental Authority, such Loan Party shall deliver to the Administrative Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment or other evidence of such payment reasonably satisfactory to the Administrative Agent.

(e) If any Loan Party or any other Person is required by applicable law or Governmental Authority to make any deduction or withholding on account of any Indemnified Taxes from any sum paid or payable under any of the Loan Documents: (i) the Loan Parties shall notify the Administrative Agent of any such requirement or any change in any such requirement as soon as any of the applicable Loan Parties become aware of it; (ii) the Loan Parties shall pay any such Indemnified Taxes before the date on which penalties attach thereto, such payment to be made (if the liability to pay is imposed on any Loan Party) for its own account or (if that liability is imposed on Administrative Agent or such Lender, as the case may be) on behalf of and in the name of Administrative Agent or such Lender; (iii) the sum payable by such Loan Party in respect of which the relevant deduction, withholding, or payment is required shall be increased to the extent necessary to ensure that, after the making of that deduction, withholding, or payment of all Indemnified Taxes, Administrative Agent or such Lender, as the case may be, and each of their Tax-Related Persons receives on the due date and retains a net sum equal to what it would have received and retained had no such deduction, withholding, or payment been required or made; and (iv) within 30 days after making any such deduction or withholding, and within 30 days after the due date of payment of any Indemnified Tax or Other Tax which it is required by clause (ii) above to pay, the applicable Loan Party shall deliver to Administrative Agent evidence satisfactory to the other affected parties of such deduction, withholding, and payment and of the remittance thereof to the relevant taxing or other authority.

(f) Any Lender that is entitled to an exemption from or reduction of withholding Tax under the law of the jurisdiction in which the Borrower is located, or any treaty to which such jurisdiction is a party, with respect to payments under this Agreement shall deliver to the Borrower (with a copy to the Administrative Agent), to the extent such Lender is legally entitled to do so, at the time or times prescribed by applicable law, such properly completed and executed documentation prescribed by applicable law as may reasonably be requested by the Borrower or the Administrative Agent to permit such payments to be made without such withholding Tax or at a reduced rate; provided that no Lender shall have any obligation under this paragraph (f) with respect to any withholding Tax imposed by any jurisdiction other than the United States if in the reasonable judgment of such Lender such compliance would subject such Lender to any material unreimbursed cost or expense or would otherwise be prejudicial to such Lender in any material respect.

(g) Each Foreign Lender shall deliver to the Borrower and the Administrative Agent (in such number of copies as shall be reasonably requested by the recipient) on the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), whichever of the following is applicable:  (i) duly completed copies of Internal Revenue Service Form W-8BEN (or any subsequent versions thereof or successors thereto), claiming eligibility for benefits of an income tax treaty to which the United States of America is a party, (ii) duly completed copies of Internal Revenue Service Form W-8ECI (or any subsequent versions thereof or successors thereto), (iii) in the case of a Foreign Lender claiming the benefits of the exemption for portfolio interest under Section 871(h) or 881(c) of the Code, (x) a certificate to the effect that such Foreign Lender is not (A) a "bank" within the meaning of Section 881(c)(3)(A) of the Code, (B) a "10 percent shareholder" of the Borrower within the meaning of Section 871(h)(3) or 881(c)(3)(B) of the Code, or (C) a "controlled foreign corporation" described in Section 881(c)(3)(C) of the Code and (y) duly completed copies of  Internal Revenue Service Form W-8BEN (or any subsequent versions thereof or successors thereto) or (iv) any other form prescribed by applicable law as a basis for claiming exemption from or a reduction in United States federal withholding tax duly completed, together with such supplementary documentation as may be prescribed by applicable law to permit the Borrower to determine the withholding or deduction required to be made.  In addition, in each of the foregoing circumstances, each Foreign Lender shall deliver such forms promptly upon the obsolescence, expiration, or invalidity of any form previously delivered by such Foreign Lender.  Each Foreign Lender shall promptly notify the Borrower at any time it determines that it is no longer in a position to provide any previously delivered certificate to the Borrower (or any other form of certification adopted by the United States of America or other taxing authorities for such purpose).  In addition, each Lender that is not a Foreign Lender shall deliver to the Borrower and the Administrative Agent two copies of Internal Revenue Service Form W-9 (or any subsequent versions thereof or successors thereto) on or before the date such Lender becomes a party and upon the expiration of any form previously delivered by such Lender.  Notwithstanding any other provision of this paragraph, a Lender shall not be required to deliver any form pursuant to this paragraph that such Lender is not legally able to deliver.

(h) If the Administrative Agent or a Lender determines that it has received a refund of any Indemnified Taxes or Other Taxes as to which it has been indemnified by a Loan Party or with respect to which such Loan Party has paid additional amounts pursuant to this Section 2.10, it shall pay over such refund to such Loan Party (but only to the extent of indemnity payments made, or additional amounts paid, by such Loan Party under this Section 2.10 with respect to the Indemnified Taxes or Other Taxes giving rise to such refund), net of all out-of-pocket expenses of the Administrative Agent or such Lender (including any Taxes imposed with respect to such refund) as is determined by the Administrative Agent or Lender in good faith, and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund); provided that such Loan Party, upon the request of the Administrative Agent or such Lender, agrees to repay as soon as reasonably practicable the amount paid over to such Loan Party (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) to the Administrative Agent or such Lender in the event the Administrative Agent or such Lender is required to repay such refund to such Governmental Authority.  This Section 2.10(h) shall not be construed to require the Administrative Agent or any Lender to make available its Tax returns (or any other information relating to its Taxes

which it deems confidential) to the Loan Parties or any other person.  Notwithstanding anything to the contrary, in no event will the Administrative Agent or any Lender be required to pay any amount to any Loan Party the payment of which would place such Lender in a less favorable net after-tax position than such Lender would have been in if the additional amounts giving rise to such refund of any Indemnified Taxes or Other Taxes had never been paid.

Section 2.11.   Payments Generally; Pro Rata Treatment; Sharing of Set-offs.

(a)  Unless otherwise specified, each Loan Party shall make each payment required to be made by it hereunder (whether of principal, interest or fees, or of amounts payable under Section 2.09 or 2.10, or otherwise) prior to 2:00 p.m. (Local Time), on the date when due, in immediately available funds, without condition or deduction for any defense, recoupment, set-off or counterclaim.  Any amounts received after such time on any date shall be deemed to have been received on the next succeeding Business Day for purposes of calculating interest thereon.  All such payments shall be made to the Administrative Agent to the applicable account designated to each Loan Party by the Administrative Agent, except that payments pursuant to Sections 2.09 or 2.10 and 9.05 shall be made directly to the persons entitled thereto.  The Administrative Agent shall distribute any such payments received by it for the account of any other person to the appropriate recipient promptly following receipt thereof.  If any payment hereunder shall be due on a day that is not a Business Day, the date for payment shall be extended to the next succeeding Business Day, and, in the case of any payment accruing interest, interest thereon shall be payable for the period of such extension.  All cash payments hereunder shall be made in Dollars.  Any payment required to be made by the Administrative Agent hereunder shall be deemed to have been made by the time required if the Administrative Agent shall, at or before such time, have taken the necessary steps to make such payment in accordance with the regulations or operating procedures of the clearing or settlement system used by the Administrative Agent to make such payment.

(b)  If at any time insufficient funds are received by and available to the Administrative Agent from each Loan Party to pay fully all amounts of principal, interest and fees then due from the Borrower hereunder, such funds shall be applied (i) first, towards payment of interest and fees then due from each Loan Party hereunder, ratably among the parties entitled thereto in accordance with the amounts of interest and fees then due to such parties, and (ii) second, towards payment of principal (including paid in kind interest previously added to the principal) then due from the Borrower hereunder, ratably among the parties entitled thereto in accordance with the amounts of principal then due to such parties.

(c)  If any Lender shall, by exercising any right of set-off or counterclaim or otherwise, obtain payment in respect of any principal of or interest on its Loans resulting in such Lender receiving payment of a greater proportion of the aggregate amount of its Loans and accrued interest thereon than the proportion received by any other Lender, then the Lender receiving such greater proportion shall purchase (for cash at face value) participations in the Loans of other Lenders to the extent necessary so that the benefit of all such payments shall be shared by the Lenders ratably in accordance with the aggregate amount of principal of and accrued interest on their respective Loans; provided that (i) if any such participations are purchased and all or any portion of the payment giving rise thereto is recovered, such participations shall be rescinded and the purchase price restored to the extent of such recovery,

without interest, and (ii) the provisions of this paragraph (c) shall not be construed to apply to any payment made by each Loan Party pursuant to and in accordance with the express terms of this Agreement or any payment obtained by a Lender as consideration for the assignment of or sale of a participation in its Loan to any assignee or participant, other than to each Loan Party or any Subsidiary or any Affiliate of the Borrower (as to which the provisions of this paragraph (c) shall apply). Each Loan Party consents to the foregoing and agrees, to the extent it may effectively do so under applicable law, that any Lender acquiring a participation pursuant to the foregoing arrangements may exercise against such Loan Party rights of set-off and counterclaim with respect to such participation as fully as if such Lender were a direct creditor of the Loan Party in the amount of such participation.

(d) Unless the Administrative Agent shall have received notice from the Loan Party prior to the date on which any payment is due to the Administrative Agent for the account of the Lenders hereunder that the Loan Party will not make such payment, the Administrative Agent may assume that the Loan Party has made such payment on such date in accordance herewith and may, in reliance upon such assumption, distribute to the Lenders the amount due. In such event, if the Loan Party has not in fact made such payment, then each of the Lenders severally agrees to repay to the Administrative Agent forthwith on demand the amount so distributed to such Lender with interest thereon, for each day from and including the date such amount is distributed to it to but excluding the date of payment to the Administrative Agent, at a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation.

(e) If any Lender shall fail to make any payment required to be made by it pursuant to Section 2.03(b) or 2.11(d), then the Administrative Agent may, in its discretion (notwithstanding any contrary provision hereof), apply any amounts thereafter received by the Administrative Agent for the account of such Lender to satisfy such Lender's obligations under such Sections until all such unsatisfied obligations are fully paid.

Section 2.12. <u>Mitigation Obligations</u>. If any Lender requests compensation under Section 2.09, or if the Borrower is required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 2.10, then such Lender shall use reasonable efforts to designate a different Lending Office for funding or booking its Loans hereunder or to assign its rights and obligations hereunder to another of its offices, branches or Affiliates, if, in the reasonable judgment of such Lender, such designation or assignment (i) would eliminate or reduce amounts payable pursuant to Section 2.09 or 2.10, as applicable, in the future and (ii) would not subject such Lender to any material unreimbursed cost or expense and would not otherwise be disadvantageous to such Lender in any material respect. The Borrower hereby agrees to pay all reasonable costs and expenses incurred by any Lender in connection with any such designation or assignment.

Section 2.13. <u>Illegality</u>. If any Lender reasonably determines that any change in law has made it unlawful, or that any Governmental Authority has asserted after the Closing Date that it is unlawful, for any Lender or its applicable Lending Office to make or maintain any Loans, then, on notice thereof by such Lender to any Loan Party through the Administrative Agent, any obligations of such Lender to maintain its Loan shall be terminated. Upon receipt of such notice, the Loan Party shall, upon demand from such Lender (with a copy to the Administrative Agent),

immediately prepay such Lender's Loan. Upon any such prepayment, the Loan Party shall also pay accrued interest on the amount so prepaid.

Section 2.14. <u>Waiver of Any Priming Rights</u>. Upon the Closing Date, and on behalf of themselves and their estates, and for so long as any Obligations shall be outstanding, the Loan Parties hereby irrevocably waive any right, pursuant to Section 364(c) or (d) of the Bankruptcy Code or otherwise, to grant any Lien on any of the Collateral having priority senior to or *pari passu* with the Liens securing the Obligations, without the prior written consent of the Lenders.

ARTICLE III

REPRESENTATIONS AND WARRANTIES

Each of the Loan Parties represents and warrants to the Administrative Agent and each of the Lenders that:

Section 3.01. <u>Organization; Powers</u>. Except as set forth on <u>Schedule 3.01</u>, each of the Loan Parties and each of their subsidiaries (a) is a limited partnership, limited liability company or corporation duly organized, validly existing and in good standing (or, if applicable in a foreign jurisdiction, enjoys the equivalent status under the laws of any jurisdiction of organization outside the United States) under the laws of the jurisdiction of its organization, (b) subject to the approval of the Bankruptcy Court and recognition thereof by the Canadian Court has all requisite power and authority to own its property and assets and to carry on its business as now conducted, (c) is qualified to do business in each jurisdiction where such qualification is required, except where the failure so to qualify could not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, and (d) subject to entry of the DIP Order, has the power and authority to execute, deliver and perform its obligations under each of the Loan Documents and each other agreement or instrument contemplated thereby to which it is or will be a party and, in the case of the Borrower, to borrow hereunder.

Section 3.02. <u>Authorization</u>. Subject to the entry and terms of the DIP Order, the execution, delivery and performance by the Loan Parties of each of the Loan Documents to which it is a party, and the borrowings hereunder (a) have been duly authorized by all corporate, stockholder, limited partnership or limited liability company action required to be obtained by the Loan Parties and (b) will not (i) violate (A) any provision of law, statute, rule or regulation, or the certificate or articles of incorporation or other constitutive documents or by-laws of any Loan Party, (B) any applicable order of any court or any rule, regulation or order of any Governmental Authority or (C) any provision of any post-petition indenture, certificate of designation for preferred stock, agreement or other instrument to which such Loan Party or any of its subsidiaries is a party or by which any of them or any of their property is or may be bound, (ii) be in conflict with, result in a breach of or constitute (alone or with notice or lapse of time or both) a default under, give rise to a right of or result in any cancellation or acceleration of any right or obligation (including any payment) or a loss of a material benefit under any such post-petition indenture, certificate of designation for preferred stock, agreement or other instrument, where any such post-petition conflict, violation, breach or default referred to in clause (i) or (ii) of this Section 3.02 could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, or (iii) result in the creation or imposition of any Lien upon or with

respect to any property or assets now owned or hereafter acquired by such Loan Party or any of its subsidiaries, other than the Liens created by the Loan Documents and Liens permitted by Section 6.02.

Section 3.03.  <u>Enforceability</u>.  This Agreement has been duly executed and delivered by each of the Loan Parties and constitutes, and each other Loan Document when executed and delivered by each Loan Party that is party thereto will constitute, subject to entry of the DIP Order, a legal, valid and binding obligation of such Loan Party enforceable against each such Loan Party in accordance with its terms and the DIP Order.

Section 3.04.  <u>Governmental Approvals</u>.  Subject to entry and terms of the DIP Order, no action, consent or approval of, registration or filing with or any other action by any Governmental Authority is or will be required in connection with the transactions contemplated hereby, except for (a) the entry of the DIP Orders, (b) such as have been made or obtained and are in full force and effect, (c) such actions, consents and approvals the failure of which to be obtained or made would not reasonably be expected to have a Material Adverse Effect, and (d) filings or other actions listed on <u>Schedule 3.04</u>.

Section 3.05.  <u>Financial Statements; Undisclosed Liabilities</u>.

(a)  The audited consolidated balance sheet as of December 31, 2009 and related statements of income and cash flow of the Borrower, together with its consolidated subsidiaries (including the notes thereto) for the four-quarter period ending December 31, 2009, reported on and accompanied by a report from Ernst & Young, copies of which have heretofore been furnished to the Lenders, present fairly in all material respects the consolidated financial position of the Borrower and its consolidated Subsidiaries as at such date and the consolidated results of operations and cash flows of the Borrower and its consolidated Subsidiaries for the period then ended.

(b)  The unaudited consolidated balance sheet as of June 30, 2010 and related statements of income and cash flow of the Borrower, together with its consolidated subsidiaries (including the notes thereto) for the fiscal quarter ending June 30, 2010, copies of which have heretofore been furnished to the Lenders, present fairly in all material respects the consolidated financial position of the Borrower and its consolidated Subsidiaries as at such date and the consolidated results of operations and cash flows of the Borrower and its consolidated Subsidiaries for such fiscal quarter.

(c)  Except as (i) disclosed on <u>Schedule 3.05</u>, (ii) disclosed or reflected in the financial statements referred to in clauses (a) or (b) of this Section 3.05 or (iii) incurred in the ordinary course of business consistent with past practice, and except for obligations incurred in connection with the Cases and the Loan Documents, none of the Loan Parties has any liabilities or obligations of any nature (whether accrued, absolute, contingent or otherwise) which, individually or in the aggregate, has had or are likely to have a Material Adverse Effect on the Loan Parties.

Section 3.06.  <u>No Material Adverse Change or Material Adverse Effect</u>.  Except as set forth on <u>Schedule 3.06</u>,  since June 30, 2010,  there has been no event, circumstance or condition

that has or would reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

Section 3.07.   Title to Properties; Possession Under Leases; Location of Real Property and Leased Premises.

(a) Each Loan Party and each of its subsidiaries has good and insurable fee simple title to, or valid leasehold interests in, or easements or other limited property interests in, all its real properties and has good and marketable title to its personal property and assets, in each case, except for defects in title that do not interfere with its ability to conduct its business as currently conducted or to utilize such properties and assets for their intended purposes and except where the failure to have such title could not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.  All such properties and assets are free and clear of Liens, other than Liens expressly permitted by Section 6.02.

(b) Each Loan Party and each of its subsidiaries has complied with all obligations under all leases to which it is a party, except where the failure to comply would not have a Material Adverse Effect, and all such leases are in full force and effect, except leases in respect of which the failure to be in full force and effect could not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.  Except as set forth on Schedule 3.07(b), each Loan Party and each of its subsidiaries enjoys peaceful and undisturbed possession under all such leases, other than leases in respect of which the failure to enjoy peaceful and undisturbed possession could not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(c) Schedule 3.07(c) lists completely and correctly, as of the Closing Date, all real property owned by any Loan Party or any of its subsidiaries and the addresses thereof.  As of the Closing Date, the Loan Parties and their subsidiaries own in fee all of the real property set forth as being owned by them on such Schedule.

(d) Schedule 3.07(d) lists completely and correctly, as of the Closing Date, all real property leased by any Loan Party or any of its subsidiaries and the addresses thereof.  The Loan Parties and their subsidiaries have valid leases in all of the material real property set forth as being leased by them on such Schedule.

(e) Each Loan Party and each of its subsidiaries owns or possesses, or is licensed to use, all patents, trademarks, service marks, trade names and copyrights (and all other IP Collateral) and all licenses and rights with respect to the foregoing, necessary for the present conduct of its business, without any conflict (of which any Loan Party or any of its subsidiaries has been notified in writing) with the rights of others, and free from any burdensome restrictions on the present conduct of the Loan Party, except where such conflicts and restrictions could not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(f) As of the Closing Date, none of the Loan Parties and none of their subsidiaries has received any notice of any pending or contemplated condemnation proceeding affecting any of its owned real property or any sale or disposition thereof in lieu of condemnation that remains unresolved.

(g) None of the Loan Parties and none of their subsidiaries are obligated on the Closing Date under any right of first refusal, option or other contractual right to sell, assign or otherwise dispose of any of its owned real property or any interest therein, except as permitted under Sections 6.02 or 6.04.

(h) The First Amended and Restated Wholesale Satellite Capacity Agreement dated as of October 6, 2010 between TerreStar Solutions Inc. and TerreStar Networks (Canada) Inc. does not convey to TerreStar Solutions Inc. any property interest in the Satellite (as defined therein), 100% of which is owned by TerreStar Networks (Canada) Inc.

Section 3.08.   <u>Subsidiaries</u>.

(a) <u>Schedule 3.08</u> sets forth as of the Closing Date the name and jurisdiction of incorporation, formation or organization of each Loan Party and each of its subsidiaries, as to each such Loan Party or subsidiary, the percentage of each class of Equity Interests owned by the parties holding such Equity Interests.

(b) As of the Closing Date, except for the call option and put option set forth in the Amended and Restated Shareholders Agreement dated August 11, 2009 among 4491165 Canada Inc., the Borrower, TerreStar Networks Holdings (Canada) Inc., TerreStar Canada and Trio 2 General Partnership, there are no outstanding subscriptions, options, warrants, calls, rights or other agreements or commitments (other than stock options granted to employees or directors and directors' qualifying shares) of any nature relating to any Equity Interests of any Loan Party or any of its subsidiaries.

Section 3.09.   <u>Litigation; Compliance with Laws</u>.

(a) Except as set forth on <u>Schedule 3.09</u> and other than the Cases, there are no actions, suits, investigations or proceedings at law or in equity or by or on behalf of any Governmental Authority or in arbitration now pending, or, to the knowledge of any Loan Party, threatened in writing against or affecting any Loan Party or any of its subsidiaries or any business, property or rights (including FCC License Rights and Industry Canada License Rights) of any such person, that (i) involve any Loan Document or (ii) could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(b) No Loan Party or any of its subsidiaries or any of their respective properties or assets is in violation of (nor will the continued operation of their material properties and assets as currently conducted violate) any law, rule or regulation (including any zoning, building, ordinance, code or approval or any building permit, but excluding any Environmental Laws, which are subject to Section 3.16) or any restriction of record or agreement affecting any of its owned real property, or is in default with respect to any judgment, writ, injunction or decree of any Governmental Authority, where such violation or default could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

Section 3.10.   <u>Federal Reserve Regulations</u>.

(a) No Loan Party and none of its subsidiaries is engaged principally, or as one of its important activities, in the business of extending credit for the purpose of purchasing or carrying Margin Stock.

(b) No part of the proceeds of any Loan will be used, whether directly or indirectly, and whether immediately, incidentally or ultimately, (i) to purchase or carry Margin Stock or to extend credit to others for the purpose of purchasing or carrying Margin Stock or to refund indebtedness originally incurred for such purpose, or (ii) for any purpose that entails a violation of, or that is inconsistent with, the provisions of the Regulations of the Board, including Regulation U or Regulation X.

Section 3.11.  <u>Investment Company Act</u>.  No Loan Party and none of its subsidiaries is an "investment company" as defined in, or subject to regulation under, the Investment Company Act of 1940, as amended.

Section 3.12.  <u>Use of Proceeds</u>.  The Borrower will use the proceeds of the Loans solely for (i) post petition operating expenses of the Borrower and the other Loan Parties and their subsidiaries incurred in the ordinary course of business in accordance with the Agreed Budget and the satisfaction of certain Milestone Requirements (except to the extent the failure to satisfy any of the Milestone Requirements is solely caused by the action or inaction of the Initial Lender), in each case, and the fees and expenses of the Foreign Information Officer and its counsel, (ii) the payment of costs and expenses of the administration of the Cases, including, without limitation, the payment of fees and expenses of attorneys, accountants and other professionals retained in the Cases pursuant to Sections 327 and 1103 of the Bankruptcy Code and the fees and expenses of the office of the United States Trustee, in accordance with the terms of this Agreement and the DIP Orders, (iii) the payment of a CDN $125,000 retainer in the aggregate (less any amounts already remitted as a retainer) to the Foreign Information Officer, (iv) the payment of the fees and expenses of the Administrative Agent, the Initial Lender and any other Lender having a Commitment equal to or greater than $15,000,000 (and their respective counsel and other advisors of the Initial Lender) in connection with the negotiation, preparation, administration, execution and delivery of this Agreement and the other Loan Documents, and (v) any other costs and expenses approved by the Required Lenders.

Section 3.13.  <u>Tax Returns</u>.  Except as set forth on <u>Schedule 3.13</u>:

(a) each of the Loan Parties and their subsidiaries has filed or caused to be filed all federal, state, provincial, local and non-U.S. Tax returns required to have been filed by it that are material to such companies, taken as a whole, and each such Tax return is true and correct in all material respects;

(b) each of the Loan Parties and their subsidiaries has timely paid or caused to be timely paid all Taxes shown to be due and payable by it on the returns referred to in clause (a) and all other Taxes or assessments (or made adequate provision (in accordance with GAAP) for the payment of all Taxes due) with respect to all periods or portions thereof ending on or before the Closing Date (except Taxes or assessments that are being contested in good faith by appropriate proceedings in accordance with Section 5.03 and for which such Loan Party or its subsidiary (as the case may be) has set aside on its books adequate reserves in accordance with

GAAP), which Taxes, if not paid or adequately provided for, could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect; and

(c) other than as could not be reasonably expected to have, individually or in the aggregate, a Material Adverse Effect as of the Closing Date, with respect to the Loan Parties and their subsidiaries, there are no claims being asserted in writing with respect to any Taxes.

Section 3.14.   No Material Misstatements.

(a)  All written information (other than Projections) (the "Information") concerning the Loan Parties and their subsidiaries and any transactions contemplated hereby prepared by or on behalf of the foregoing or their representatives and made available to any Lenders or the Administrative Agent in connection with the transactions contemplated hereby, when taken as a whole, was true and correct in all material respects as of the date such Information was furnished to the Lenders and as of the Closing Date and did not contain any untrue statement of a material fact as of any such date or omit to state a material fact necessary in order to make the statements contained therein not materially misleading in light of the circumstances under which such statements were made.

(b) The Projections prepared by or on behalf of the Loan Parties or any of their representatives and that have been made available to any Lenders or the Administrative Agent in connection with the transactions contemplated hereby or prepared by or on behalf of the foregoing or their representatives (i) have been prepared in good faith based upon assumptions believed by the Loan Parties to be reasonable as of the date thereof (it being understood that actual results may vary materially from the Projections), as of the date such Projections and estimates were furnished to the Lenders and as of the Closing Date, and (ii) as of the Closing Date, have not been modified in any material respect by the Borrower or any of its Affiliates.

Section 3.15.   Employee Benefit Plans.

(a)  Except as could not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect:  (i) the Loan Parties, their subsidiaries and the ERISA Affiliates are in compliance with the applicable provisions of ERISA and the provisions of the Code relating to ERISA Plans and the regulations and published interpretations thereunder; (ii) other than as a result of the filing of the Cases, no Reportable Event has occurred during the past five (5) years as to which any Loan Party or any subsidiary thereof or any ERISA Affiliate was required to file a report with the PBGC, other than reports that have been filed; (iii) other than as a result of the filing of the Cases, no ERISA Event has occurred or is reasonably expected to occur; and (iv) none of the Loan Parties, any of their subsidiaries or any ERISA Affiliate has received any written notification that any Multiemployer Plan is in reorganization or has been terminated within the meaning of Title IV of ERISA, or has knowledge that any Multiemployer Plan is reasonably expected to be in reorganization or to be terminated.

(b) Each Loan Party and each of its subsidiaries is in compliance (i) with all applicable provisions of law and all applicable regulations and published interpretations thereunder with respect to any employee pension benefit plan or other employee benefit plan governed by the laws of a jurisdiction other than the United States and (ii) with the terms of any

such plan, except, in each case, for such noncompliance that could not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(c)     Except as could not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect: (i) each Canadian Pension Plan and any participation requirements of a Loan Party in each Canadian Union Plan are in compliance with the applicable plan terms and the requirements of any funding agreements and all applicable laws, (ii) each Canadian Pension Plan that requires registration is duly registered under the Income Tax Act (Canada) and all other applicable laws, (iii) all employer and employee payments, contributions or premiums to be remitted or paid to or in respect of each Canadian Pension Plan or Canadian Union Plan have been paid in a timely fashion in accordance with the terms thereof, any funding agreement and all applicable laws, (iv) there have been no improper withdrawals or applications of the assets of the Canadian Pension Plans, (v) no Canadian Pension Event has occurred or is reasonably expected to occur, and (vi) each of the Canadian Pension Plans and Canadian Union Plans is fully funded on a going concern and solvency basis (using actuarial methods and assumptions that are consistent with the valuations last filed with the applicable governmental authorities and that are consistent with generally accepted actuarial principles).

Section 3.16.   Environmental Matters.  Except as disclosed on Schedule 3.16 and except as to matters that could not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect:  (i) no written notice, request for information, claim, demand, order, complaint or penalty has been received by the Loan Parties or any of their subsidiaries, and there are no judicial, administrative or other actions, suits or proceedings pending or, to the Borrower's knowledge, threatened, which allege a violation of or liability under any Environmental Laws, in each case relating to the Loan Parties or any of their subsidiaries, (ii) the Loan Parties and their subsidiaries have all authorizations and permits necessary for their operations to comply with all applicable Environmental Laws and are, and during the term of all applicable statutes of limitation, have been, in compliance with the terms of such permits and with all other applicable Environmental Laws, and (iii) no Hazardous Material is located at, in, or under any property currently or formerly owned, operated or leased by any Loan Party or any of its subsidiaries that could reasonably be expected to give rise to any liability or obligation of any Loan Party or any of its subsidiaries under any Environmental Laws, and no Hazardous Material has been generated, owned or controlled by any Loan Party or any of its subsidiaries and has been transported to or released at any location in a manner that would reasonably be expected to give rise to any liability or obligation of any Loan Party or any of its subsidiaries under any Environmental Laws.

Section 3.17.   Labor Matters.  Except as, individually or in the aggregate, would not reasonably be expected to have a Material Adverse Effect:  (a) there are no strikes or other labor disputes pending or threatened against any Loan Party or any of its subsidiaries; (b) the hours worked and payments made to employees of the Loan Parties and their subsidiaries have not been in violation of the Fair Labor Standards Act or any other applicable law dealing with such matters; and (c) all payments due from any Loan Party or any of its subsidiaries or for which any claim may be made against any Loan Party or any of its subsidiaries, on account of wages and employee health and welfare insurance and other benefits have been paid or accrued as a liability on the books of any Loan Party or any of its subsidiaries to the extent required by GAAP. Except (i) as, individually or in the aggregate, would not reasonably be expected to have a

Material Adverse Effect or (ii) as set forth on <u>Schedule 3.17</u>, the consummation of the transactions contemplated hereby will not give rise to a right of termination or right of renegotiation on the part of any union under any material collective bargaining agreement to which any Loan Party or any of its subsidiaries (or any predecessor of any Loan Party or any of its subsidiaries) is a party or by which any Loan Party or any of its subsidiaries (or any predecessor of any Loan Party or any of its subsidiaries) is bound.

Section 3.18.  <u>Insurance</u>.  <u>Schedule 3.18</u> sets forth a true, complete and correct description of all material insurance maintained by or on behalf of each Loan Party and its subsidiaries as of the Closing Date.  As of such date, such insurance is in full force and effect. The Loan Parties believe that the insurance maintained by or on behalf of the Loan Parties and their subsidiaries is adequate.

Section 3.19.  <u>Anti-Terrorism Laws</u>.

(a)  No Loan Party and, to the knowledge of the Loan Parties, none of its Affiliates is in violation of any Requirement of Law relating to terrorism or money laundering ("<u>Anti-Terrorism Laws</u>"), including, without limitation, Executive Order No. 13224 on Terrorist Financing, effective September 24, 2001 (the "<u>Executive Order</u>"), the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, Public Law 107-56 and Canadian Anti-Money Laundering & Anti-Terrorism Legislation.

(b)  To the knowledge of the Loan Parties, no Loan Party and no Affiliate or broker or other agent of any Loan Party acting or benefiting in any capacity in connection with the Loans is any of the following:

(i)  a person that is listed in the annex to, or is otherwise subject to the provisions of, the Executive Order;

(ii) a person owned or controlled by, or acting for or on behalf of, any person that is listed in the annex to, or is otherwise subject to the provisions of, the Executive Order;

(iii) a person with which any Lender is prohibited from dealing or otherwise engaging in any transaction by any Anti-Terrorism Law;

(iv) a person that commits, threatens or conspires to commit acts of, or supports, "terrorism" as defined in the Executive Order; or

(v)  a person that is named as a "specially designated national and blocked person" on the most current list published by the U.S. Treasury Department Office of Foreign Assets Control ("<u>OFAC</u>") at its official website or any replacement website or other replacement official publication of such list.

(c)  To the knowledge of the Loan Parties, no Loan Party and none of its Affiliates and no broker or other agent of any Loan Party or any of its Affiliates acting in any capacity in connection with the Loans (i) conducts any business or engages in making or receiving any contribution of funds, goods or services to or for the benefit of any person described in paragraph

(b) above, (ii) deals in, or otherwise engages in any transaction relating to, any property or interests in property blocked pursuant to the Executive Order, or (iii) engages in or conspires to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions set forth in any Anti-Terrorism Law.

Section 3.20.   Licensing and Accreditation.   Schedule 3.20 set forth all material FCC Licenses and Industry Canada Licenses.  The Loan Parties and their respective Affiliates to the extent applicable have (a) obtained and maintained in good standing all required material licenses, permits, certificates, registrations, authorizations and approvals necessary for the operation of their businesses as currently conducted, and (b) to the extent necessary for the operation of its businesses as currently conducted, obtained and maintains accreditation from all generally recognized accrediting agencies.  To the knowledge of the Loan Parties, all such required material licenses (including FCC Licenses and Industry Canada Licenses) are in full force and effect on the Closing Date and have not been revoked or suspended or otherwise limited and there no appeals directly relating thereto.

Section 3.21.   Agreed Budget.  The Agreed Budget includes and contains all fees, costs and/or expenses that are projected in the Loan Parties' commercially reasonable judgment to be payable, incurred and/or accrued by the Loan Parties during the period covered by such Agreed Budget.

Section 3.22.   Accounts and Cash Management Accounts.  Schedule 3.22 sets forth a complete and accurate list, as of the Closing Date, of all deposit account and securities accounts (as such terms are defined in Section 9-102 of the UCC) of each Loan Party.

Section 3.23.   Brokers.  Except as set forth on Schedule 3.23, no broker's, finder's or placement fee or commission is or will be payable to any broker, investment banker or agent engaged by any Loan Party or it officers, directors or agents with respect to the transactions contemplated by this Agreement, except for fees payable to the Administrative Agent and Lenders.

Section 3.24.   Reorganization Matters.

(a)  The Cases were commenced on the Petition Date in accordance with applicable law and proper notice thereof and for (i) the motion seeking approval of the Loan Documents and the DIP Order, (ii) the hearing for the approval of the DIP Order and (iii) the motion seeking recognition of the Loan Documents and the DIP Order by the Canadian Court.

(b)  The Loan Parties have given (and shall give), on a timely basis as specified in the DIP Order, all notices required to be given to all parties specified in the DIP Order.

(c)  After the entry of the DIP Order and to the extent provided therein, the Obligations will constitute allowed super-priority administrative expense claims in the Cases having priority under Section 364(c)(i) of the Bankruptcy Code over all administrative expense claims and unsecured claims against the Loan Parties now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expense claims of the kind specified in Sections 105, 326, 328, 330, 331, 363, 364, 503, 506, 507, 546, 726, 1113 and 1114 or any other provision of the Bankruptcy Code or otherwise, as provided under Section 364(c)(1)

of the Bankruptcy Code, subject, as to priority only, to the Carve-Out to the extent set forth in the DIP Order.

(d) After the entry of the DIP Order and pursuant to and to the extent provided therein, the Obligations will be secured by a valid, legal and perfected Lien on and security interest in all of the Collateral of the Loan Parties having the priority afforded by Sections 364(c)(1), (2) and (3) and 364(d)(1) of the Bankruptcy Code, as set forth in the DIP Order.

(e) The DIP Order, with respect to the period on and after entry of the DIP Order, is in full force and effect and has not been modified or amended without the consent of the Required Lenders, or reversed or stayed.

(f) The Borrower consents to the lien priming provisions herein and in the DIP Orders regarding the priming of any Liens held by the Borrower.

Section 3.25.  <u>Material Contracts</u>.  Except as may occur as a result of the commencement of the Cases, (a) each of the Material Contracts is in full force and effect and, to the knowledge of the Loan Parties, there are no material defaults thereunder on the part of any other party thereto which are not subject to an automatic stay or which would reasonably be expected to have a Material Adverse Effect, and (b) no Loan Party is in default in any material respect in the performance, observance or fulfillment of any of its obligations, covenants or conditions contained in any agreement evidencing or creating any Lien permitted under Section 6.02 which is not subject to an automatic stay or any other Material Contract to which it is a party or by which it or its property is bound which are not subject to an automatic stay or which would reasonably be expected to have a Material Adverse Effect.

Section 3.26.  <u>Transactions with Affiliates</u>.  Except as disclosed on <u>Schedule 3.26</u>, no Affiliate of any Loan Party which is not a Loan Party, including but not limited to TerreStar Corporation and any of its subsidiaries that are not Loan Parties, has on the date hereof (i) any interest in any property (whether real, personal or mixed and whether tangible or intangible) used in or pertaining to any of the businesses of the Loan Parties or (ii) any transaction with the Loan Parties (other than, in the ordinary course of business, (x) fees and compensation paid to and indemnity provided on behalf of, officers, employees, consultants or agents of the Loan Parties, and benefits received by such Persons in connection with participation in any Plans, (y) ordinary course reimbursement of expenses incurred on behalf of a Loan Party, and (z) transactions on terms no less favorable to a Loan Party than those which could have been obtained in an arm's-length transaction with an unrelated third party and which provide for payments in any full year period of less than $100,000).

Section 3.27.  <u>Collateral</u>.  The information contained in <u>Schedule 3.27</u> relating to certain Collateral is correct.

## ARTICLE IV

## CONDITIONS PRECEDENT

Section 4.01. <u>Conditions Precedent to Initial Funding Date</u>. The obligation of each Lender to make the Loan required to be made by it on the Initial Funding Date is subject to the satisfaction of all of the following conditions precedent:

(a) The Administrative Agent shall have received a duly executed Notice of Borrowing from Borrower as required under Section 2.03(a).

(b) (i) The representations and warranties set forth herein and in the other Loan Documents shall be true and correct in all material respects on and as of the Initial Funding Date except to the extent such representations and warranties expressly relate solely to an earlier date, in which case such representations and warranties shall be true and correct in all material respects as of such earlier date (<u>provided</u>, <u>however</u>, in each case if any such representation or warranty shall be subject of a qualification as to "materiality," such qualified representation and warranty shall be true and correct in all respects as of such date) and (ii) no Default or Event of Default shall have occurred and be continuing or would result from the making of such Loan or the application of the proceeds therefrom. Each Loan Party shall have delivered a certificate of a Responsible Officer, in form and substance satisfactory to the Required Lenders, certifying the foregoing.

(c) The Administrative Agent (or its counsel) shall have received from each party hereto either (i) a counterpart of this Agreement signed on behalf of such party or (ii) written evidence satisfactory to the Administrative Agent (which may include telecopy transmission of a signed signature page of this Agreement) that such party has signed a counterpart of this Agreement.

(d) The Lenders shall have received the Agreed Budget.

(e) All Fees required to be paid on or prior to the Initial Funding Date shall have been paid and, to the extent invoiced, all other amounts due and payable pursuant to the Loan Documents on or prior to the Initial Funding Date, including reimbursement or payment of all out-of-pocket expenses (including fees, charges and disbursements of Willkie Farr & Gallagher LLP, Sullivan & Cromwell LLP, Goodmans LLP, Emmet, Marvin & Martin, LLP, Steptoe & Johnson LLP and any local counsel) required to be reimbursed or paid by the Loan Parties hereunder or under any Loan Document shall have been paid in full in cash (except as otherwise provided in this Agreement).

(f) The Lenders shall have received a copy of the Interim DIP Order, which Interim DIP Order shall have been entered by the Bankruptcy Court and recognized by the Canadian Court, after notice given and a hearing conducted in accordance with Bankruptcy Rule 4001(c), authorizing and approving the transactions contemplated by the Loan Documents and finding that the Lenders are extending credit to the Loan Parties in good faith within the meaning of Bankruptcy Code Section 364(e), which Interim DIP Order and Initial Recognition Order shall (i) approve the payment by the Loan Parties of all Fees, (ii) otherwise be satisfactory to the

Required Lenders and (iii) be in full force and effect and shall not have been stayed, reversed, vacated, or otherwise modified in a manner adverse to any Lender.

(g) Each Loan Party shall have executed and delivered all documentation required in respect of this Agreement (including all guarantees and related Collateral security and the filing of all perfection filings, including PPSA filings, required by the Lenders), in each case reasonably satisfactory to the Lenders.

(h) All material operational "first day orders" sought to be entered at the time of the commencement of the Loan Parties' Cases shall be in form and substance satisfactory to the Lenders and shall be consistent with the Agreed Budget. The Interim DIP Order shall be in form and substance satisfactory to the Lenders and shall permit the Loan Parties to use all cash that is subject to non-avoidable, valid, enforceable and perfected Liens on the date of the commencement of the Cases, including, without limitation, and to the extent such Liens are non-avoidable, valid, enforceable and perfected, the Liens securing obligations in respect of the 15% Notes and the PMCA. The Interim DIP Order and Final DIP Order will include the provision of adequate protection for the lenders and collateral agent under the 15% Notes (the "15% Notes Adequate Protection"), which shall be in the form of (a) replacement Liens on any and all non-avoidable, valid, enforceable and perfected collateral held by such lenders and collateral agent, (b) a non-avoidable, valid, enforceable and perfected Lien, subject only to those Liens securing the Loan and those Liens securing the PMCA on all of the Loan Parties' assets which are collateral under the Loan but not included in (a) above, (c) a priority adequate protection claim ranking junior to the claims of the Lenders and (d) payment of professional fees and expenses of the Trustee (as defined in the 15% Notes) and collateral agent under the 15% Notes. The cash collateral order (the "Cash Collateral Order") and the Orders will also include the provision of adequate protection for the lenders and the collateral agent under the PMCA (the "PMCA Adequate Protection"), which shall be in the form of (x) replacement Liens on any and all non-avoidable, valid, enforceable and perfected collateral held by the PMCA lenders and collateral agent, (y) a priority adequate protection claim ranking junior to the claims of the Lenders (and pari passu with the adequate protection claims of the lenders and the collateral agent under the 15% Notes) and (z) payment of professional fees and expenses of the collateral agent under the PMCA.

(i) The Lenders shall have received confirmation satisfactory to them of sufficient insurance coverage for all property of the Loan Parties and their subsidiaries, general liability insurance and other forms of insurance in amounts with deductibles satisfactory to the Required Lenders, and that the Administrative Agent, on behalf of and for the benefit of the Lenders, is named an additional insured.

(j) Except for the commencement of the Cases and as caused by such commencement and as may otherwise be disclosed in writing to the Lenders prior to the Closing Date, no Material Adverse Change shall have occurred since June 30, 2010.

(k) All necessary governmental and third-party licenses, consents and approvals in connection with the Loans and the transactions contemplated thereby shall have been obtained (without the imposition of any conditions that are not reasonably acceptable to the Lenders) and

shall remain in effect; and no law or regulation shall be applicable in the reasonable judgment of the Lenders that restrains, prevents or imposes materially adverse conditions upon the Loans.

(l)  The Lenders shall have received (i) a favorable written opinion of Akin Gump Strauss Hauer & Feld LLP, special New York counsel to the Loan Parties, in the form attached hereto as <u>Exhibit H-1</u> and (ii) a favorable written opinion of Fraser Milner Casgrain LLP, Canadian counsel to the Loan Parties, in the form attached hereto as <u>Exhibit H-2</u>.

(m)  The Canadian Court shall have entered the Initial Recognition Order and the Lenders shall have received evidence thereof.

Section 4.02.   <u>Conditions Precedent to Each Loan after the Initial Funding Date</u>.  The obligation of each Lender on any date to make any Loan after the Initial Funding Date is subject to the satisfaction of all the following conditions precedent:

(a)  The Administrative Agent shall have received a duly executed Notice of Borrowing from Borrower as required under Section 2.03(a).

(b)  (i) The representations and warranties set forth herein and in the other Loan Documents shall be true and correct in all material respects on and as of the date of such Loan, except to the extent such representations and warranties expressly relate solely to an earlier date, in which case such representations and warranties shall be true and correct in all material respects as of such earlier date (<u>provided</u>, <u>however</u>, in each case if any such representation or warranty shall be subject of a qualification as to "materiality," such qualified representation and warranty shall be true and correct in all respects as of such date) and (ii) no Default or Event of Default shall have occurred and be continuing or would result from the making of such Loan or the application of the proceeds therefrom.

(c)  The Administrative Agent shall have received a copy of the Final DIP Order and the Final Recognition Order, which Final DIP Order and Final Recognition Order (i) shall be in form and substance satisfactory to the Required Lenders and (ii) shall be in full force and effect and shall not have been vacated, stayed, reversed, modified or amended in any respect; and, if either of the Final DIP Order or the Final Recognition Order is the subject of a pending appeal in any respect, neither the making of the Loans, nor the ability of the Loan Parties to perform any of their respective obligations hereunder, under the other Loan Documents or under any other instrument or agreement referred to herein shall be the subject of a presently effective stay pending appeal.

(d)  The making of the Loans on such date (i) does not violate any Requirement of Law applicable to any Loan Party on the date of or immediately following the making of such Loan and (ii) is not enjoined temporarily, preliminarily or permanently.

(e)  There shall not exist any law, regulation, ruling, judgment, order, injunction or other restraint that prohibits, restricts or imposes materially adverse conditions on the Loan Parties or the exercise by the Administrative Agent or the Lenders of their rights as secured parties with respect to the Collateral.

(f)  The Loan Parties shall have delivered mortgages on the properties set forth on Schedule 5.13 in form and substance satisfactory to the Required Lenders.

(g)  The making of the Loan shall comply with the Agreed Budget.

Each submission by the Borrower to the Administrative Agent of a Notice of Borrowing and the acceptance by the Borrower of the proceeds of each Loan requested therein shall be deemed to constitute a making of the representations and warranties by the Loan Parties (and Borrower is authorized to make and certify such representations and warranties on behalf of the Loan Parties) as to the matters specified in Section 4.02(b) on the date of the making of such Loan.

ARTICLE V

AFFIRMATIVE COVENANTS

Each of the Loan Parties covenants and agrees with the Administrative Agent and each Lender that so long as this Agreement shall remain in effect and until the Commitments have been terminated and the principal of and interest on each Loan, all Fees and all other expenses or amounts payable under any Loan Document shall have been paid in full, unless the Required Lenders shall otherwise consent in writing, the Loan Parties will and will cause their Subsidiaries to:

Section 5.01.  Existence; Businesses and Properties.

(a)  Do or cause to be done all things necessary to preserve, renew and keep in full force and effect their legal existence, except, in the case of any Guarantor, (i) as otherwise expressly permitted under Section 6.04, or (ii) the liquidation or dissolution of any Guarantor if the assets of such Guarantor to the extent they exceed its estimated liabilities are acquired by another Loan Party in such liquidation or dissolution.

(b)  Do or cause to be done all things necessary to (i) lawfully obtain, preserve, renew, extend and keep in full force and effect the permits, franchises, authorizations, patents, trademarks, service marks, trade names, copyrights, licenses and rights with respect thereto necessary to the normal conduct of their business, and (ii) at all times maintain and preserve all property necessary to the normal conduct of their business and keep such property in good repair, working order and condition and from time to time make, or cause to be made, all needful and proper repairs, renewals, additions, improvements and replacements thereto necessary in order that the business carried on in connection therewith, if any, may be properly conducted at all times (in each case except as expressly permitted by the Loan Documents).

Section 5.02.  Insurance.

(a)  Maintain, with financially sound and reputable insurance companies, insurance in such amounts and against such risks as is customarily maintained by similarly situated companies engaged in the same or similar businesses operating in the same or similar locations and cause the Administrative Agent to be listed as a co-loss payee on property (with respect to property unencumbered as of the Petition Date) and casualty policies and as an additional insured on liability policies.

(b) If at any time the area in which any of the real property owned by any of the Loan Parties is located is designated a "flood hazard area" in any Flood Insurance Rate Map published by the Federal Emergency Management Agency (or any successor agency), obtain flood insurance in such total amount as the Required Lenders may from time to time reasonably require, and otherwise comply with the National Flood Insurance Program as set forth in the Flood Disaster Protection Act of 1973, as it may be amended from time to time.

Section 5.03.  Taxes.  In accordance with the Bankruptcy Code and subject to any required approval by an applicable order of the Bankruptcy Court and without any further application to the Bankruptcy Court, timely pay, discharge or otherwise satisfy as the same shall become due and payable:  (a) all its material post-petition Taxes and other material obligations of whatever nature that constitute administrative expenses under Section 503(b) of the Bankruptcy Code in the Cases; provided, however, that such payment and discharge shall not be required (i) with respect to any such post-petition Tax or claim, so long as the validity or amount thereof shall be contested in good faith by appropriate proceedings, the affected Loan Party, as the case may be, shall have set aside on its books reserves in accordance with GAAP with respect thereto or (ii) to the extent prohibited by Section 6.09(b) hereunder; and (b) all material obligations arising from Obligations entered into after the Petition Date or from Obligations entered into prior to the Petition Date and assumed and which are permitted to be paid post-petition.

Section 5.04.  Financial Statements, Reports, etc.  Furnish to the Administrative Agent and the Lenders the following:

(a) within three (3) Business Days after the end of each bi-weekly period of the Loan Parties (commencing with the bi-weekly period ending October 30, 2010), a report, in form reasonably acceptable to the Required Lenders, setting forth the actual cash receipts and disbursements for such immediately preceding bi-weekly period;

(b) within (3) Business Days after the end of each calendar month, beginning with the month ended November 30, 2010, the Monthly Performance Report for the preceding month;

(c) within (3) Business Days after the end of each fiscal month, beginning with the month ended November 30, 2010, a line by line comparison of the actual results of the company against the projections set forth on the DIP Covenants page of the Agreed Budget;

(d) within five (5) Business Days after the end of each fiscal month of the Loan Parties, consolidated and consolidating balance sheets and related statements of operations and cash flows showing the financial position of the Loan Parties as of the close of such fiscal month and the consolidated results of their operations during such fiscal month and setting forth (i) in comparative form the corresponding figures for the corresponding period in the prior fiscal year and figures contained in the projections in the Agreed Budget and (ii) the sum of each line item since the Petition Date, all of which shall be in reasonable detail and which consolidated balance sheet and related statements of operations and cash flows shall be certified by a Financial Officer of the Borrower on behalf of the Borrower as fairly presenting, in all material respects, the financial position and results of operations of the Loan Parties on a consolidated basis in accordance with GAAP (subject to normal year-end audit adjustments and the absence of footnotes);

(e) within forty-five (45) days after the end of each fiscal quarter of each fiscal year of the Loan Parties (commencing with the fiscal quarter ending September 30, 2010), consolidated and consolidating balance sheets and related statements of operations and cash flows showing the financial position of the Loan Parties as of the close of such fiscal quarter and the consolidated results of their operations during such fiscal quarter and the then-elapsed portion of the fiscal year and setting forth in comparative form the corresponding figures for the corresponding periods of the prior fiscal year and figures contained in the projections in the Agreed Budget, all of which shall be in reasonable detail and which consolidated balance sheet and related statements of operations and cash flows shall be certified by a Financial Officer of the Borrower on behalf of the Borrower as fairly presenting, in all material respects, the financial position and results of operations of the Loan Parties on a consolidated basis in accordance with GAAP (subject to normal year-end audit adjustments and the absence of footnotes);

(f) within ninety (90) days after the end of each fiscal year of the Loan Parties, consolidated and consolidating balance sheets of the Loan Parties as of the end of such year and related statements of operations and cash flows showing the financial position of the Loan Parties as of the close of such fiscal year and the consolidated results of their operations for such fiscal year and setting forth in comparative form the corresponding figures for the prior fiscal year, all prepared in conformity with GAAP and certified by the Borrower's independent certified accountants, which shall not be qualified in any material respect as to scope but may contain a qualification with respect to the Cases or "going concern," together with the report of such accountants stating that (i) such financial statements fairly present the consolidated financial position of the Loan Parties as at the dates indicated and the results of their operations and cash flow for the periods indicated in conformity with GAAP applied on a basis consistent with prior years (except for changes with which such accountants shall concur and which shall have been disclosed in the notes to the financial statements), and (ii) if the accounting firm is not restricted from providing such a certificate or statement by its policies, the examination by such accountants in connection with such consolidated financial statements has been made in accordance with generally accepted auditing standards, and accompanied by a certificate stating that in the course of the regular audit of the business of the Loan Parties and such accountants have obtained no knowledge that a Default or Event of Default has occurred, or, if in the opinion of such accountants, a Default or Event of Default has occurred, a statement as to the nature thereof;

(g) concurrently with any delivery of financial statements under paragraph (a), (b), (c), (d), (e) or (f) above, (i) a certificate of a Financial Officer of the Borrower certifying that no Event of Default or Default has occurred or, if such an Event of Default or Default has occurred, specifying the nature and extent thereof and any corrective action taken or proposed to be taken with respect thereto, and (ii) in the case of clauses (a), (d) and (e), a management's discussion and analysis, in detail satisfactory to the Required Lenders, of variances from the Agreed Budget;

(h) as soon as available and in any event not later than the third Business Day of each calendar week after the date hereof, a copy of each Loan Party's sales reports provided to management during the preceding week with respect to handheld phones;

(i)  as soon as available and in any event not later than the third Business Day of every other calendar week after the date hereof, an updated 13-week rolling cash flow forecast in form and substance satisfactory to the Required Lenders setting forth all receipts and disbursements on a weekly basis for the next succeeding 13-week period, including a line item specifying the projected amount of cash and outstanding Loans as of the end of each week covered thereby, and the related variance report;

(j)  promptly after the same become publicly available, copies of all periodic and other publicly available reports, proxy statements and, to the extent requested by the Administrative Agent or any Lender, other materials filed by any Loan Party with the SEC;

(k) promptly after the submission thereof, a copy of all reports submitted to the board of directors (or any committee thereof) of any Loan Party in connection with any material interim or special audit made by independent accountants of the books of any Loan Party (excluding any reports which have been identified as confidential);

(l)  as soon as available and in any event not later than the third Business Day of each calendar month, a summary, in detail reasonably satisfactory to the Required Lenders, of payments made by any Loan Party or any of its subsidiaries to and receipts by any Loan Party or any of its subsidiaries from Related Parties that are not Loan Parties, made during the preceding month;

(m) promptly, from time to time, such other information regarding the operations, business affairs and financial condition of the Loan Parties, or compliance with the terms of any Loan Document, or such consolidated financial statements, as in each case the Administrative Agent or any Lender may reasonably request; and

(n) promptly following a request therefor, all documentation and other information that the Administrative Agent reasonably requests on its own behalf or on behalf of any Lender in order to comply with ongoing obligations under applicable "know your customer" and anti-money laundering rules and regulations, including the Act.

Section 5.05.  Litigation and Other Notices.  Furnish to the Administrative Agent written notice of the following promptly after any Responsible Officer of any Loan Party obtains actual knowledge thereof (unless a specific time frame for providing such written notice is stated, in which case such written notice must be provided within the time frame specified):

(a) any Event of Default or Default, specifying the nature and extent thereof and the corrective action (if any) proposed to be taken with respect thereto;

(b) the filing or commencement of, or any written threat or notice of intention of any person to file or commence, any action, suit or proceeding, whether at law or in equity or by or before any Governmental Authority or in arbitration, against any Loan Party or any of its subsidiaries which, if adversely determined, could reasonably be expected to have a Material Adverse Effect;

(c) any other development specific to any Loan Party or any of its subsidiaries that is not a matter of general public knowledge and that has had, or could reasonably be expected to have, a Material Adverse Effect;

(d) the occurrence of any ERISA Event that, together with all other ERISA Events that have occurred, could reasonably be expected to have a Material Adverse Effect;

(e) the occurrence of any Canadian Pension Event that, together with all other Canadian Pension Events that have occurred, could reasonably be expected to have a Material Adverse Effect;

(f) notices of material changes affecting the business, operations, result of operation or financial condition of any Loan Party or any of its subsidiaries, since the date of entry of the Interim DIP Order, to Material Contracts with customers, including new Material Contracts and contract renewals,

(g) notices of material changes to employment and labor agreements of any Loan Party or any of its subsidiaries;

(h) notices of any changes in management of any Loan Party or any of its subsidiaries; and

(i) other than as a result of the commencement of the Cases or as customarily caused by the filing thereof, notices of any material change in financial condition as well as of the occurrence of any Default or Event of Default.

The Borrower shall be responsible for ensuring that the 2000-2010 MHz and 2190-2200 MHz bands ("MSS Spectrum") are used in full compliance with the Borrower's FCC Licenses and the Communications Laws.

Section 5.06.   Compliance with Laws; Licenses; Material Contracts.  Except required by Section 6.09(b) and Section 6.19, comply in all material respects with all Material Contracts (including, but not limited to, those Material contracts disclosed on Schedule 5.06), licenses (including FCC Licenses and Industry Canada Licenses) and laws (including, without limitation, the Bankruptcy Code and Communications Laws), rules, regulations and orders of any Governmental Authority applicable to it or its property, including, without limitation, all orders and rulings of the Bankruptcy Court; provided that this Section 5.06 shall not apply to Environmental Laws, which are the subject of Section 5.08, or to laws related to Taxes, which are the subject of Section 5.03.  The Borrower shall be solely responsible at its sole cost and expense for promptly (i) filing any ongoing compliance reports required by the FCC or any other governmental authority as a result of its FCC Licenses, and (ii) making all other filings required in connection with its FCC Licenses or otherwise required to be provided to the FCC in connection with the transactions contemplated in this Agreement.  Should the Loan Parties believe that a filing is required by reason of any action, the Loan Parties shall notify the Borrower and if in the Borrower's discretion such filing is required, then the Borrower shall thereafter take all actions reasonably required to make such filing on a timely basis.  The Borrower shall take all actions as are commercially reasonably necessary to maintain the Borrower's FCC Licenses in full force and effect, including without limitation timely and

properly filing and diligently prosecuting any applications with or notifications to the FCC. The Borrower shall provide the Lenders with reasonable advance notice of any investigation or proceeding requested from, or instituted by, the FCC, and the opportunity to provide input on the scope and nature of the proposed actions needed to maintain compliance (such input to be considered in good faith by the Borrower, it being understood that the Borrower shall have the sole discretion to take such actions as it reasonably deems necessary to assure compliance with the Borrower's FCC Licenses and the Communications Laws). If the Borrower becomes aware of (i) any material violation by any Loan Party of the Communications Laws to the extent relating to the Borrower's FCC Licenses, (ii) any event or the initiation of any litigation, investigation, proceeding or inquiry by or before the FCC or any other Governmental Authority with regard to the MSS Spectrum or the Borrower's FCC Licenses, or which could reasonably be expected to limit, affect or impact the Loan Parties' rights or obligations under this Agreement, then the Borrower shall promptly provide the Lenders with notice thereof, together with copies of all material communications relating thereto. In the event that the FCC or any other Governmental Authority initiates an investigation or inquiry concerning the FCC Licenses or any actions or operations of the Borrower thereunder, or is requested to initiate such an investigation or inquiry by a third party and the Borrower receives notice of such request, then the Borrower agrees to notify the Lenders promptly upon becoming aware of such investigation or inquiry and to cooperate with the Lenders, the FCC, and/or any other applicable Governmental Authority. The Borrower shall provide the Lenders with copies of all draft responses related to any such FCC or other governmental authority investigation or inquiry as soon as reasonably practicable prior to its submission thereof, and shall consider in good faith any comments provided by the Lenders in connection therewith.

Section 5.07. <u>Maintaining Records; Access to Properties and Inspections</u>. Maintain all financial records in accordance with GAAP and permit any persons designated by the Administrative Agent or, upon the occurrence and during the continuance of an Event of Default, any Lender to visit and inspect the financial records and the properties of any Loan Party at reasonable times, upon reasonable prior notice to such Loan Party, and as often as reasonably requested and to make extracts from and copies of such financial records, and permit any persons designated by the Administrative Agent or, upon the occurrence and during the continuance of an Event of Default, any Lender upon reasonable prior notice to any Loan Party to discuss the affairs, finances and condition of such Loan Party with the officers thereof and independent accountants therefor (subject to reasonable requirements of confidentiality, including requirements imposed by law or by contract). The Borrower shall make itself available to discuss the foregoing financial issues and issues regarding the restructuring with the Lender on a bi-weekly basis. In addition, the Borrower's management shall make itself available for telephonic and in person meetings, on reasonable notice under the circumstances, to provide additional financial and restructuring information to the Lender.

Section 5.08. <u>Compliance with Environmental Laws</u>. Comply, and make reasonable efforts to cause all lessees and other persons occupying its properties to comply, with all Environmental Laws applicable to its operations and properties; and obtain and renew all material authorizations and permits required pursuant to Environmental Laws for its operations and properties, in each case in accordance with Environmental Laws, except, in each case with respect to this Section 5.08, to the extent the failure to do so could not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

Section 5.09.   [Intentionally Omitted].

Section 5.10.   Reorganization Matters.  Deliver to the Administrative Agent, the Lenders and their respective counsel, for review and comment, all material pleadings, motions and other documents to be filed by or on behalf of any Loan Party in the Cases (i) prior to the filing thereof, in the case of such documents substantially and directly related to the Facility, and (ii) as soon as practicable (and, if possible, prior to the filing thereof), in the case of all other documents not relating to the Facility; provided that any pleadings, motions and other documents substantially and directly related to the Facility shall be deemed to be material.

Section 5.11.   Further Assurances.

(a) Execute any and all further documents, mortgages, financing or financing change statements, agreements and instruments, and take all such further actions (including the filing and recording of financing statements, fixture filings, mortgages and other documents and recordings of Liens in stock registries), that may be required under any applicable law, or that the Administrative Agent (acting at the written request of the Required Lenders) may reasonably request, to effect the transactions contemplated by the Loan Documents or to grant, preserve, protect or perfect the Liens created or intended to be created by the Loan Documents, all at the expense of the Loan Parties, and provide to the Administrative Agent (acting at the written request of the Required Lenders), from time to time upon reasonable request, evidence as to the perfection and priority of the Liens created or intended to be created by the Loan Documents; provided, however, that to the extent any such expenses are not included in the Agreed Budget, the Lenders shall agree to modify the Agreed Budget to account for such expenses.

(b) Without limiting the restrictions of Section 6.04, if any additional direct or indirect subsidiary of any Loan Party is formed or acquired after the Closing Date, within one (1) Business Day after the date such Subsidiary is formed or acquired, notify the Administrative Agent thereof and, within ten (10) Business Days after the date such Subsidiary is formed or acquired, cause such Subsidiary to promptly (i) become a party to this Agreement and (ii) take such actions as may be required by law or reasonably requested by the Administrative Agent (acting at the written request of the Required Lenders) to grant and perfect the Liens intended to be created by the Loan Documents and Guarantee the Obligations of the Loan Parties incurred under the Loan Documents.

Section 5.12.   Canadian Anti-Money Laundering & Anti-Terrorism Legislation Compliance.  The Lenders and the Administrative Agent and their successors and assigns may be subject to Canadian Anti-Money Laundering & Anti-Terrorism Legislation and "know your customer" rules and regulations, and they hereby notify the Loan Parties that in order to comply with such legislation, rules and regulations, they may be required, among other things, to obtain, verify and record information pertaining to the Loan Parties, which information may relate to, among other things, the names, addresses, corporate directors, corporate registration numbers, corporate tax numbers, corporate shareholders and banking transactions of the Loan Parties.  The Loan Parties hereby agree to take such actions and to provide, upon request, such information and access to information regarding the Loan Parties that is required to enable the Lenders and the Administrative Agent and their successors and assigns to comply with such Canadian Anti-

Money Laundering & Anti-Terrorism Legislation and "know your customer" rules and regulations.

Section 5.13.  Mortgages.  Deliver mortgages on the properties set forth on Schedule 5.13 in form and substance satisfactory to the Required Lenders no later than the date of entry of the Final DIP Order.

ARTICLE VI

NEGATIVE COVENANTS

Each of the Loan Parties covenants and agrees with the Administrative Agent and each Lender that, so long as this Agreement shall remain in effect and until the Commitments have been terminated and the principal of and interest on each Loan, all Fees and all other expenses or amounts payable under any Loan Document have been paid in full in cash, unless the Required Lenders shall otherwise consent in writing, such Loan Party will not and will not permit its Subsidiaries to:

Section 6.01.  Indebtedness.  Directly or indirectly incur, create, assume, become liable for or permit to exist any Indebtedness, except:

(a)  Indebtedness existing on the date of this Agreement and disclosed on Schedule 6.01;

(b)  Indebtedness created hereunder and under the other Loan Documents;

(c)  Indebtedness owed to (including obligations in respect of letters of credit or bank guarantees or similar instruments for the benefit of) any person providing workers' compensation, health, disability or other employee benefits or property, casualty or liability insurance to any Loan Party, pursuant to reimbursement or indemnification obligations to such person; provided that upon the incurrence of Indebtedness with respect to reimbursement obligations regarding workers' compensation claims, such obligations are reimbursed not later than 30 days following such incurrence;

(d)  Indebtedness between and among the Borrower, the Domestic Subsidiary Guarantors and the Canadian Guarantors;

(e)  Indebtedness in respect of performance bonds, bid bonds, appeal bonds, surety bonds, financial assurances and completion guarantees and similar obligations, in each case provided in the ordinary course of business, including those incurred to secure health, safety and environmental obligations in the ordinary course of business not to exceed $1,000,000 in the aggregate;

(f)  Indebtedness arising from the honoring by a bank or other financial institution of a check, draft or similar instrument drawn against insufficient funds in the ordinary course of business or other cash management services in the ordinary course of business; provided that such Indebtedness is extinguished within five (5) Business Days of its incurrence;

(g) Guarantees by any Loan Party of any Indebtedness of any Loan Party expressly permitted to be incurred under this Agreement; provided that Guarantees by any Loan Party under this Section 6.01(g) of any other Indebtedness of a person that is subordinated to other Indebtedness of such person shall be expressly subordinated to such other Indebtedness to the same extent;

(h) Indebtedness in respect of netting services, overdraft protection and similar arrangements, in each case, in connection with cash management and deposit accounts incurred in the ordinary course of business;

(i) other Indebtedness of any Loan Party or any of its Subsidiaries in an aggregate principal amount that at the time of, and after giving effect to, the incurrence thereof, would not exceed $500,000;

(j) all premium (if any), interest, fees, expenses, charges and additional or contingent interest on obligations described in paragraphs (a) through (i) above; and

(k) without duplication with any distributions made as permitted under clause (ii) of the proviso in Section 6.05, Indebtedness of TerreStar New York Inc. owed to any other Loan Party in an amount not to exceed $200 per month the proceeds of which are used to pay its operating expenses.

Notwithstanding anything to the contrary contained in this Section 6.01 and except as permitted under Section 6.01(k), no Non-Subsidiary Guarantor may incur Indebtedness from the Borrower, any Domestic Subsidiary Guarantor or any Canadian Guarantor.

Section 6.02.   Liens.  Directly or indirectly create, incur, assume or permit to exist any Lien on any property or assets (including stock or other securities of any person, including the Loan Parties or their subsidiaries) whether now owned or hereafter acquired or on any income or revenues or rights in respect of any thereof, except:

(a) Liens on property or assets of the Borrower or any Subsidiary existing on the Closing Date and described on Schedule 6.02; provided that, other than replacement Liens in connection with the 15% Notes Adequate Protection and PMCA Adequate Protection, such Liens shall secure only those obligations that they secure on the Closing Date and shall not subsequently apply to any other property or assets of any Loan Party;

(b) any Lien created under the Loan Documents, including the DIP Orders;

(c) Liens for Taxes, assessments or other governmental charges or levies not yet delinquent or that are being contested in compliance with Section 5.03;

(d) landlords', carriers', warehousemen's, mechanics', materialmen's, repairmen's, construction or other like Liens arising in the ordinary course of business and securing obligations that are not overdue by more than 30 days or that are being contested in good faith by appropriate proceedings and in respect of which, if applicable, the Borrower and the Subsidiaries shall have set aside on their books reserves in accordance with GAAP;

(e) (i) pledges and deposits made in the ordinary course of business in compliance with the Federal Employers Liability Act or any other workers' compensation, unemployment insurance or other social security laws or regulations and deposits securing liability to insurance carriers under insurance or self-insurance arrangements in respect of such obligations and (ii) pledges and deposits securing liability for reimbursement or indemnification obligations to (including obligations in respect of letters of credit or bank guarantees for the benefit of) insurance carriers providing property, casualty or liability insurance to any Loan Party;

(f) deposits to secure the performance of bids, trade contracts (other than for Indebtedness), leases (other than Capital Lease Obligations), statutory obligations, surety and appeal bonds, performance and return of money bonds, bids, leases, government contracts, trade contracts, and other obligations of a like nature (including letters of credit in lieu of any such bonds or to support the issuance thereof) incurred in the ordinary course of business, not to exceed $500,000 in the aggregate;

(g) zoning restrictions, easements, leases (other than Capital Lease Obligations), licenses, special assessments, rights-of-way, standard reservations, minor defects and irregularities in title and restrictions on use of real property (including reservation of right of Crown, if any) and other similar encumbrances incurred in the ordinary course of business that, in the aggregate, do not interfere in any material respect with the ordinary conduct of the business of any Loan Party;

(h) Liens pursuant to Sections 546(b) and 362(b)(18) of the Bankruptcy Code;

(i) any interest or title of a lessor under any leases or subleases entered into by any Loan Party in the ordinary course of business;

(j) Liens that are contractual rights of set-off (i) relating to the establishment in the ordinary course of business of depository relations with banks not given in connection with the issuance or incurrence of Indebtedness, or (ii) relating to pooled deposit or sweep accounts of the Loan Parties to permit satisfaction of overdraft or similar obligations incurred in the ordinary course of business of the Loan Parties;

(k) Liens arising solely by virtue of any statutory or common law provision relating to banker's liens, rights of set-off or similar rights;

(l) Liens in favor of customs and revenue authorities arising as a matter of law to secure payment of customs duties in connection with the importation of goods; and

(m) Liens created pursuant to Indebtedness permitted by Section 6.01(i) and subject to the Lien priorities set forth in the DIP Order.

Section 6.03.  <u>Investments, Loans and Advances</u>.  Directly or indirectly purchase, hold or acquire any Equity Interests, evidences of Indebtedness or other securities of, make or permit to exist any loans or advances to or Guarantees of the obligations of, or make or permit to exist any investment or any other interest in (each, an "<u>Investment</u>"), any other person, except:

(a) (i) Investments by any Loan Party in the Equity Interests of any other Loan Party, (ii) intercompany loans between and among the Borrower, the Domestic Subsidiary Guarantors and the Canadian Guarantors, and (iii) Guarantees by the Borrower or any Loan Party of Indebtedness otherwise expressly permitted hereunder of the Borrower or any Loan Party.

(b) Permitted Investments;

(c) accounts receivable, security deposits and prepayments arising and trade credit granted in the ordinary course of business and any assets or securities received in satisfaction or partial satisfaction thereof from financially troubled account debtors to the extent reasonably necessary in order to prevent or limit loss and any prepayments and other credits to suppliers made in the ordinary course of business;

(d) Investments existing on the Closing Date and described on Schedule 6.03;

(e) Investments resulting from pledges and deposits referred to in Sections 6.02(e) and (f);

(f) Investments received in connection with the bankruptcy or reorganization of, or settlement of delinquent accounts and disputes with or judgments against, customers and suppliers, in each case in the ordinary course of business;

(g) Capital Expenditures (as defined by GAAP) permitted in Section 6.14;

(h) A one-time payment of no more than $7,000 to TerreStar Global Ltd. the proceeds of which are used to pay its taxes; and

(i) Loans to TerreStar New York Inc. only to the extent TerreStar New York Inc. is permitted to incur such Indebtedness under Section 6.01(k).

Notwithstanding anything to the contrary contained in this Section 6.03, no Loan Party shall create or acquire any Subsidiary after the date hereof and no Investments may be made after the Petition Date by any Loan Party in any Non-Subsidiary Guarantor (other than by a Non-Subsidiary Guarantor in another Non-Subsidiary Guarantor) or any 444 Entity (other than the payment permitted under Section 6.03(h) and Section 6.03(i)).

Section 6.04. Mergers, Amalgamations, Consolidations, Sales of Assets and Acquisitions. Merge into, amalgamate or consolidate with any other person, or permit any other person to merge into, amalgamate or consolidate with it, or sell, transfer, lease or otherwise dispose of (in one transaction or in a series of transactions) all or any part of its assets (whether now owned or hereafter acquired), or any interest therein (including the sale or factoring at maturity or collection of any accounts or in connection with a Sale/Leaseback Transaction), or issue, sell, transfer or otherwise dispose of any Equity Interests of any Loan Party or any subsidiary thereof, or any interest therein, or purchase, lease or otherwise acquire (in one transaction or a series of transactions) all or any substantial part of the assets of any other person (all of the foregoing transactions, a "Covered Transaction"), except that this Section 6.04 shall not prohibit:

(a) (i) the purchase and sale of inventory in the ordinary course of business by any Loan Party or any subsidiaries, (ii) the acquisition or lease (pursuant to an operating lease) of any other asset in the ordinary course of business by any Loan Party or any subsidiary thereof, (iii) the sale of surplus, obsolete or worn-out equipment or other property in the ordinary course of business by any Loan Party or any subsidiary thereof or (iv) the sale of Permitted Investments in the ordinary course of business;

(b) sales, transfers, leases or other dispositions among the Borrower and the Domestic Subsidiary Guarantors;

(c) Investments permitted by Section 6.03, Liens permitted by Section 6.02 and Dividends permitted by Section 6.05;

(d) the sale of defaulted receivables in the ordinary course of business and not as part of an accounts receivables financing transaction not in excess of $500,000 in the aggregate;

(e) licensing and cross-licensing arrangements involving any technology or other intellectual property of any Loan Party in the ordinary course of business;

(f) sales, leases or other dispositions of inventory of any Loan Party or any subsidiary thereof determined by the management of such Loan Party to be no longer useful or necessary in the operation of the business of the Loan Parties and their subsidiaries; and

(g) sales of assets in an amount not to exceed $500,000 in the aggregate.

Notwithstanding anything to the contrary contained in this Section 6.04, (i) no sale, transfer or other disposition of assets shall be permitted by this Section 6.04 (other than sales, transfers, leases or other dispositions to Loan Parties pursuant to paragraph (c) hereof) unless such disposition is for fair market value, (ii) no sale, transfer or other disposition of assets shall be permitted by paragraph (a) of this Section 6.04 unless such disposition is for 100% cash consideration, (iii) no sale, lease, transfer or other disposition (including right of use agreements) of satellites, spare satellites, ground stations, FCC Licenses, Industry Canada Licenses, other licenses, capacity, or spectrum shall be permitted (other than as contemplated by the Agreed Budget (i.e., the AT&T Genus Plan)), (iv) the Borrower, each Domestic Subsidiary Guarantor and each Canadian Guarantor shall not engage in any Covered Transaction with any Non-Subsidiary Guarantor or any 444 Entity other than the 444 Permitted Payments.

Section 6.05. <u>Dividends and Distributions</u>. Declare or pay, directly or indirectly, any dividend or make any other distribution (by reduction of capital or otherwise), whether in cash, property, securities or a combination thereof, with respect to any of its Equity Interests or directly or indirectly redeem, purchase, retire or otherwise acquire for value (or permit any Subsidiary to purchase or acquire) any of its Equity Interests or set aside any amount for any such purpose; <u>provided</u>, <u>however</u>, that (i) any Loan Party may declare and pay dividends to or make other distributions to the Borrower or to any other Loan Party (other than a Non-Subsidiary Guarantor) and (ii) without duplication with any Indebtedness incurred by TerreStar New York Inc. under Section 6.01(k), the Loan Parties may make distributions of no more than $200 per month to TerreStar New York Inc. the proceeds of which are used to pay the operating expenses of TerreStar New York Inc.

Section 6.06.  <u>Sale/Leasebacks</u>.  Enter into any Sale/Leaseback Transaction.

Section 6.07.  <u>Transactions with Affiliates</u>.  Except as otherwise expressly permitted herein, do any of the following:  (a) except as permitted under Section 6.03(h), make any Investment in an Affiliate of any Loan Party which is not a Loan Party; (b) transfer, sell, lease, assign or otherwise dispose of any asset to (or, other than pursuant to an Acceptable Plan, assume or reject any contract, lease or other agreement with) any Affiliate of any Loan Party which is not a Loan Party; (c) except to the extent permitted by Section 6.04, merge into, amalgamate or consolidate with or purchase or acquire assets from any Affiliate of any Loan Party which is not a Loan Party; (d) repay any Indebtedness to any Affiliate of any Loan Party which is not a Loan Party; (e) pay any management fees to any Affiliate of any Loan Party that is not a Loan Party; (f) enter into any other transaction directly or indirectly with or for the benefit of any Affiliate of any Loan Party which is not a Loan Party (including guaranties and assumptions of obligations of any such Affiliate), except for in the case of this clause (f), (i) salaries and other employee compensation to officers or directors of any Loan Party commensurate with current compensation levels, in each case, to the extent contemplated by the Agreed Budget, (ii) expense requirements to directors of any Loan Party in the ordinary course of business, not to exceed $100,000 in the aggregate during the term of this Agreement, (iii) 444 Permitted Payments, (iv) the payment permitted under Section 6.03(h) and (v) the payments permitted under clause (ii) of the proviso in Section 6.05; (g) except for 444 Permitted Payments and the payment permitted under Section 6.03(h), engage in any transaction with or make any payments to TerreStar Corporation or any of its subsidiaries which are not Loan Parties, without the consent of the Required Lenders, or (h) except for the payments permitted under Section 6.03(i), engage in any transaction or make any payments to any Non-Subsidiary Guarantor or, except for 444 Permitted Payments and the payments permitted under Section 6.03(h), any 444 Entity.  As used in this Section 6.07 the term "Affiliate" includes any Person who is an Affiliate on the Petition Date.

Section 6.08.  <u>Business of the Loan Parties</u>.  Notwithstanding any other provisions hereof, engage at any time in any business or business activity other than any business or business activity conducted by any of them on the Closing Date and any business or business activities incidental or reasonably related thereto.

Section 6.09.  <u>Limitation on Prepayments of Indebtedness; Modifications of Certificate of Incorporation, By-Laws and Certain Other Agreements; etc</u>.

(a)  Amend or modify in any manner adverse to the Lenders, or grant any waiver or release under or terminate in any manner (if such granting or termination shall be adverse to the Lenders), the articles or certificate of incorporation or by-laws or limited liability company operating agreement or similar constitutive document of any Loan Party or any Subsidiary thereof.

(b)  Make, or agree or offer to pay or make, directly or indirectly, any payment or other distribution (whether in cash, securities or other property) of or in respect of any Indebtedness or any other liability of any kind or nature, in each case relating to the period prior to the Petition Date (including by way of payment of administrative expense claims arising under Section 503(b)(9) of the Bankruptcy Code), other than (i) liabilities, the payment of which are

permitted under the Agreed Budget, and which may be paid pursuant to an order entered in connection with the motions filed on the Petition Date authorizing the Loan Parties to pay certain prepetition claims or (ii) with the prior written consent of the Required Lenders.

Section 6.10. <u>Maximum Cumulative Disbursements</u>. Permit the aggregate amount of disbursements of the type set forth in the line item "Total Cumulative Budgeted Disbursements" in the Agreed Budget (calculated on a cumulative basis) from the Petition Date through: (a) the end of each of the first, second and third full months following the Petition Date to exceed 115% of the amount set forth in the line item "Total Cumulative Budgeted Disbursements" in the Agreed Budget and accompanying projections for each such month, (b) the end of the fourth full month following the Petition Date to exceed 110% of the amount set forth in the line item "Total Cumulative Budgeted Disbursements" in the Agreed Budget and accompanying projections for such month, and (c) any month end thereafter to exceed 105% of the amount set forth in the line item "Total Cumulative Budgeted Disbursements" in the Agreed Budget and projections for each such month.

Section 6.11. <u>Minimum Revenues</u>. Permit the aggregate revenues of the Loan Parties of the type set forth in the line item "Roam-in Revenue" in the Agreed Budget on (a) November 30, 2010, December 31, 2010 or January 31, 2010, to be less than 85% of the amount set forth in the line item "Roam-in Revenue" for such month in the Agreed Budget and accompanying projections or (b) the last day of each month thereafter, to be less than 90% of the amount set forth in the line item "Roam-in Revenue" for such month in the Agreed Budget and accompanying projections.

Section 6.12. <u>Minimum Subscribers</u>. Permit the number of subscribers on (a) November 30, 2010, December 31, 2010 or January 31, 2010, to be less than 85% of the number of subscribers on such date set forth in the line item "Subscribers" in the Agreed Budget and accompanying projections, or (b) the last day of each month thereafter, to be less than 90% of the number of subscribers on such date set forth in the line item "Subscribers" in the Agreed Budget and accompanying projections.

Section 6.13. [<u>Intentionally Omitted</u>].

Section 6.14. <u>Maximum Capital Expenditures</u>. Permit, on the last day of each calendar month, commencing on November 30, 2010, cumulative total capital expenditures (as defined in GAAP) from the Petition Date through such month end to exceed the cumulative total capital expenditures (as defined in GAAP) set forth in the line item "Budgeted Cumulative Capital Expenditures" in the Agreed Budget and accompanying projections for such time period.

Section 6.15. <u>Phone Sales</u>. Permit any Genus telephone handset to be sold by any Loan Party or its Affiliates for less than $769.

Section 6.16. <u>Cash Management</u>. Fail to maintain its cash management systems as contemplated in the Cash Management Order; <u>provided</u>, that the Loan Parties may make changes to the cash management systems so long as such changes individually and in the aggregate (i) are not material, (ii) are not adverse to the interests of the Lenders, (iii) do not permit transfers of funds to entities that are not Loan Parties, (iv) do not permit transfers otherwise in violation of

this Agreement. and (v) do not permit transfers to Non-Subsidiary Guarantors or, except for the 444 Permitted Payments, 444 Entities.

Section 6.17.   Use of Proceeds.  Use the proceeds of the Loans for any purpose other than those set forth in Section 3.12.

Section 6.18.   Change of Control.  Permit the occurrence of a Change in Control.

Section 6.19.   Payment of Pre-Existing Claims.  Pay any claims existing prior to the Petition Date (other than as both (i) provided in the Agreed Budget and (ii) as approved by the Bankruptcy Court).

Section 6.20.   Material Adverse Change.  Permit the occurrence of a Material Adverse Change.

Section 6.21.   Claims Against PMCA Lenders or 15% Holders.  Consent to or assert any claims against any Lender or the Lenders (as defined in the PMCA) or the Noteholder, Holders or Trustee (each as defined in the 15% Notes) or any agents, issuers or similar parties thereto regarding the Loans or the Prepetition Obligations which arise under sections 506(c) or 552(b) of the Bankruptcy Code, or the commencement against such entities of any actions adverse to their respective rights and remedies under the Loans, the Prepetition Obligations or any Bankruptcy Court order relating to the Loans, the Prepetition Obligations or the documents (including the Loan Documents) related thereto (it being understood and agreed that any derivative action brought by any Statutory Committee of Unsecured Creditors appointed in the Cases shall not be a breach of such covenant).

Section 6.22.   Entry Into Contractual Obligations or Settlements.  Enter into any contractual obligations (or series of related contractual obligations) to the extent that such contractual obligations, individually or in the aggregate, could reasonably be expected to cause the Borrower to fail to comply with the covenants set forth in Sections 6.10 through 6.13 based on the amounts set forth in the Agreed Budget in effect at the time any Loan Party enters into such contractual obligation, without the prior written consent of the Required Lenders.

Section 6.23.   Restrictive Agreements, etc.  Enter into, or permit any of its Subsidiaries to enter into any agreement prohibiting:

(a) the creation or assumption of any Lien upon its properties, revenues or assets, whether now owned or hereafter acquired;

(b) the ability of any Guarantor to amend or otherwise modify any Loan Document; or

(c) the ability of any subsidiary of any Loan Party to make any payments, directly or indirectly, to any other Loan Party, including by way of dividends, advances, repayments of loans, reimbursements of management and other intercompany charges, expenses and accruals or other returns on investments.

The foregoing prohibitions shall not apply to (x) restrictions in any Loan Document or (y) restrictions arising under applicable law.

Section 6.24.  <u>Super-Priority Claims</u>.  Create, incur, assume or permit to exist any administrative expense, unsecured claim, or other super-priority claim or Lien which is senior to or *pari passu* with the super-priority claims or Liens of the Secured Parties against the Loan Parties hereunder, except for the Carve-Out and as otherwise provided herein and in the DIP Order, or apply to the Bankruptcy Court for authority to do so.

Section 6.25.  <u>DIP Order</u>.  Make, permit to be made or seek any change, amendment or modification, or any application or motion for any change, amendment or modification, to the DIP Order or any other order of the Bankruptcy Court or Canadian Court (including the Initial Recognition Order or the Final Recognition Order) with respect to the Facility without the prior written consent of the Required Lenders.

ARTICLE VII

EVENTS OF DEFAULT

Section 7.01.  <u>Events of Default</u>.  In case of the happening of any of the following events (each, an "<u>Event of Default</u>"):

(a)  the entry of an order dismissing any of the Loan Parties' chapter 11 cases or converting any of the Loan Parties' chapter 11 cases to a chapter 7 case that, in each case, is not stayed within ten (10) days following entry;

(b)  the entry of an order appointing a chapter 11 trustee in any of the Loan Parties' chapter 11 cases that, in each case, is not stayed within ten (10) days following entry;

(c)  the entry of an order by the Bankruptcy Court granting any other super-priority claim or lien on the Collateral equal or superior to that granted to the Lenders;

(d)  the entry of an order staying, reversing, vacating or otherwise modifying, in each case in a manner adverse to the Lenders (in the judgment of the Required Lenders) and without the prior written consent of the Required Lenders, the Loans, the Interim DIP Order, Initial Recognition Order, the Final DIP Order or the Final Recognition Order approving the Loans;

(e)  the entry of an order in any of the Loan Parties' chapter 11 cases appointing an examiner having enlarged powers to operate or manage the financial affairs of the Borrower or any of the Loan Parties;

(f)  following entry of the Final DIP Order or Final Recognition Order, the entry of an order in any of the Loan Parties' Cases under sections 506(c) or 552(b) of the Bankruptcy Code or under any bankruptcy or insolvency laws of Canada against any Lender regarding the Loans or the Prepetition Obligations that has a Material Adverse Effect on their respective rights and remedies under the Loans, the Prepetition Obligations or any Bankruptcy Court order;

(g) the filing of any pleading by any Loan Party seeking, or otherwise consenting to or supporting, any of the matters set forth in clauses (a) through (f) above;

(h) the failure of any Loan Party to pay principal, interest, fees or other amounts owing in connection with this Agreement and the other Loan Documents when due and payable, whether at the due date thereof or at a date fixed for prepayment thereof or by acceleration thereof or otherwise;

(i) the failure of any Loan Party to comply with any covenants contained in Article VI or the covenants in Section 5.01, Section 5.05(a) or Section 5.13;

(j) the failure of any Loan Party to perform or comply with any other term or covenant and such default shall continue unremedied for a period of ten (10) days following the earlier of (i) the date on which such Loan Party became aware of such default and (ii) the date on which notice of such failure is given by the Administrative Agent (acting at the written direction of the Required Lenders);

(k) any representation or warranty by any Loan Party shall be materially incorrect or misleading when made (provided, however, in each case if any such representation or warranty shall be subject to a qualification as to "materiality"; such qualified representation or warranty shall be true and correct in all respects as of such date);

(l) (a) the Loan Parties engaging in or supporting, or using any portion of the Loans, the Collateral, including cash collateral, to support any challenge to the validity, perfection, priority, extent or enforceability of the Loans or the Prepetition Obligations or the liens on or security interests in the assets of the Loan Parties securing the Loans or the Prepetition Obligations, including without limitation seeking to equitably subordinate or avoid the liens securing the Prepetition Obligations, or (b) the Loan Parties engaging in or supporting any investigation or their assertion of any claims or causes of action (or supporting the assertion of the same) against (x) any Lender, (y) the Lenders (as defined in the PMCA) and the Collateral Agent (as defined in the PMCA) or (z) the Noteholders or Holders (as defined in the 15% Notes) and the Trustee (as defined in the 15% Notes); provided that, making information available or otherwise responding to a Statutory Committee of Unsecured Creditors shall not be a violation of this provision; provided that the Loan Parties shall seek Bankruptcy Court approval to limit to $200,000 the amount that any Statutory Committee of Unsecured Creditors may expend in fees and expenses in investigating the foregoing solely with respect to Prepetition Obligations (as opposed to filing a claim or challenge under subparts (a) or (b) above) (it being understood and agreed that any derivative action brought by any Statutory Committee of Unsecured Creditors appointed in the Cases shall not be a breach of such covenant);

(m) (i) the entry of the Interim DIP Order shall not have occurred within three (3) days after the Petition Date or (ii) the entry of the Initial Recognition Order by the Canadian Court shall not have occurred within 13 days after entry of the Interim DIP Order;

(n) (i) the entry of the Final DIP Order shall not have occurred within 35 days after the entry of the Interim DIP Order or (ii) the entry of the Final Recognition Order by the Canadian Court shall have not occurred within 45 days after entry of the Interim DIP Order;

(o) the entry of an order by the Bankruptcy Court granting relief from or modifying the automatic stay applicable under Section 362 of the Bankruptcy Code to any holder or holders of any security interest to permit foreclosure or enforcement on any assets of any Loan Party with a value greater than $500,000;

(p) the sale of all or substantially all of the Loan Parties' assets unless consented to by the Lenders;

(q) the entry of an order terminating, or the lapsing or termination of, the exclusive periods during which only the Loan Parties' may file a plan and solicit acceptances thereto;

(r) a Change in Control;

(s) the failure to meet the Milestone Requirements by the applicable Milestone Dates (except to the extent the failure to satisfy any of the Milestone Requirements is solely caused by the action or inaction of the Initial Lender);

(t) the filing by any of the Loan Parties of any motion or proceeding which could reasonably be expected to result in material impairment of the Lenders' rights under the Loan Documents;

(u) from and after the date of entry thereof, the Interim DIP Order, the Initial Recognition Order, the Final DIP Order or the Final Recognition Order, as the case may be, shall cease to be in full force and effect (or shall have been vacated, stayed for a period in excess of three days, reversed, modified or amended);

(v) payment of or granting adequate protection with respect to prepetition claims (other than (A) as approved by the Bankruptcy Court; (B) the 15% Notes Adequate Protection, and (C) the PMCA Adequate Protection);

(w) [intentionally omitted];

(x) the issuance of any order by the Canadian Court which could reasonably be expected to result in material impairment of the Lenders' rights under the Loan Documents;

(y) the failure by any Loan Party to pay one or more final judgments or decrees involving a post-Petition Date liability aggregating in excess of $1,000,000 (to the extent not covered by insurance), which judgments are not vacated, discharged or effectively waived or stayed or bonded pending appeal within the time required by the terms of such judgment;

(z) (i) a Reportable Event or Reportable Events, other than as a result of the filing of the Cases, shall have occurred with respect to any ERISA Plan or a trustee shall be appointed by a United States district court to administer any ERISA Plan, (ii) the PBGC shall institute proceedings (including giving notice of intent thereof) to terminate any ERISA Plan or ERISA Plans, (iii) the Loan Parties or any ERISA Affiliate shall have been notified by the sponsor of a Multiemployer Plan that it has incurred or will be assessed Withdrawal Liability to such Multiemployer Plan and such person does not have reasonable grounds for contesting such

Withdrawal Liability or is not contesting such Withdrawal Liability in a timely and appropriate manner, (iv) any Loan Party or any ERISA Affiliate shall have been notified by the sponsor of a Multiemployer Plan that such Multiemployer Plan is in reorganization or is being terminated, within the meaning of Title IV of ERISA or (v) the Borrower or any Subsidiary shall engage in any "prohibited transaction" (as defined in Section 406 of ERISA, or Section 4975 of the Code) involving any ERISA Plan; and in each case in clauses (i) through (v) above, such event or condition, together with all other such events or conditions, if any, could reasonably be expected to have a Material Adverse Effect;

(aa)    a Canadian Pension Event shall have occurred with respect to any Canadian Pension Plan or Canadian Union Plan, which, together with all such other Canadian Pension Events, could reasonably be expected to have a Material Adverse Effect;

(bb)    (i) any Loan Document shall for any reason be asserted in writing by any Loan Party not to be a legal, valid and binding obligation of any party thereto, (ii) any Lien, security interest or super-priority claim purported to be created by the Loan Documents and the Final DIP Order in favor of the Secured Parties shall for any reason cease to be, or shall be asserted in writing by the Borrower or any other Loan Party not to be, a legal, valid and perfected security interest (perfected as having the priority required by this Agreement and the Final DIP Order and subject to such limitations and restrictions as are set forth herein and therein) in such assets in all respects, or (iii) the Obligations of the Borrower or the Guarantees by the Guarantors of the Obligations shall be invalidated or otherwise cease, or shall be asserted in writing by any Loan Party to be invalid or to cease to be legal, valid and binding obligations of the parties thereto, enforceable in accordance with their terms;

(cc)    (i) the failure of the Loan Parties to file a motion to assume the Plan Support Agreement within one (1) day after the Petition Date; (ii) the failure of the Bankruptcy Court to enter an order authorizing the assumption of and/or entry into the Plan Support Agreement by the Loan Parties on or before the date that is thirty-five (35) days after the Petition Date, or (iii) the Plan Support Agreement shall have been terminated (other than solely as a result of the Initial Lender's failure to comply with its obligations thereunder) or rejected by any of the Loan Parties; or

(dd)    the making of, or the entry of an order by the Bankruptcy Court approving the making of, any cash adequate protection payments with respect to any prepetition Indebtedness (other than as provided in the DIP Order or as approved by the Required Lenders).

Notwithstanding the foregoing, any Default or Event of Default which results solely from a failure of the Initial Lender to perform its obligations contemplated by the Plan Support Agreement (including with respect to its commitment to fund its participation in, as well as backstop, the rights offering) shall be deemed not to have occurred so long as such failure continues.

Section 7.02.  Remedies.  Upon the occurrence and continuation of an Event of Default, the Administrative Agent and the Lenders shall have all remedies available to them at law and equity, including, but not limited to the following and those set forth in Article X:

(a) upon ten (10) Business Days' written notice to the Borrower, the Statutory Committee of Unsecured Creditors, the United States Trustee and the Foreign Information Officer, the automatic stay under section 362 of the Bankruptcy Code, and any similar or corresponding stay imposed by the Canadian Court, shall be deemed lifted without further order of or application to the Bankruptcy Court or the Canadian Court, to permit the Lenders to (i) reduce or terminate outstanding Commitments, (ii) terminate the Loans, (iii) charge the default interest on the Loans, (iv) declare the Loans then outstanding to be forthwith due and payable in whole or in part, whereupon the principal of the Loans so declared to be due and payable, together with accrued interest thereon and any unpaid accrued Fees and all other liabilities of the Borrower accrued hereunder and under any other Loan Document, shall become forthwith due and payable, without presentment, demand, protest or any other notice of any kind, all of which are hereby expressly waived by the Borrower, anything contained herein or in any other Loan Document to the contrary notwithstanding, and (v) subject to the Carve-Out and applicable laws relating to regulatory approvals, exercise any and all remedies under this Agreement, including without limitation to permit the Lenders to realize on all Collateral and exercise remedies under applicable law (including the UCC and the PPSA); and

(b) In any hearing before the Bankruptcy Court the only issue that may be raised by the Loan Parties and any party in interest, or considered by the Bankruptcy Court, shall be whether an Event of Default has occurred, and in every such event, and at any time thereafter during the continuance of such event, the Administrative Agent may and, at the written request of the Required Lenders, shall, upon notice to the Borrower and as otherwise required by the Final DIP Order and Final Recognition Order, declare the Loans then outstanding to be forthwith due and payable in whole or in part, whereupon the principal of the Loans so declared to be due and payable, together with accrued interest thereon and any unpaid accrued Fees and all other liabilities of the Borrower accrued hereunder and under any other Loan Document, shall become forthwith due and payable, without presentment, demand, protest or any other notice of any kind, all of which are hereby expressly waived by the Borrower, anything contained herein or in any other Loan Document to the contrary notwithstanding.

All remedies stated above or in any Loan Document are cumulative. The Administrative Agent and the Lenders shall have no obligation to marshall assets.

ARTICLE VIII

THE ADMINISTRATIVE AGENT

Section 8.01. <u>Appointment</u>. Each Lender hereby irrevocably designates and appoints the Administrative Agent as the agent of such Lender under this Agreement and the other Loan Documents, and each such Lender irrevocably authorizes the Administrative Agent, in such capacity, to take such action on its behalf under the provisions of this Agreement and the other Loan Documents and to exercise such powers and perform such duties as are expressly delegated to the Administrative Agent by the terms of this Agreement and the other Loan Documents, together with such other powers as are reasonably incidental thereto. Notwithstanding any provision to the contrary elsewhere in this Agreement, the Administrative Agent shall not have any duties or responsibilities, except those expressly set forth herein, or any fiduciary relationship with any Lender, and no implied covenants, functions, responsibilities, duties,

obligations or liabilities shall be read into this Agreement or any other Loan Document or otherwise exist against the Administrative Agent; it being expressly understood and agreed that the use of the word "Administrative Agent" is for convenience only and that the Administrative Agent is merely the representative of the Lenders and only has the contractual duties set forth herein.  The Administrative Agent will not be required to take any action that it reasonably determines (or in the opinion of its legal counsel) is contrary to applicable law or any provision of this Agreement or any other Loan Document or that would subject the Administrative Agent to any liability and the Administrative Agent may consult with counsel of its selection and seek the advice of such counsel in respect of its obligations hereunder and under the other Loan Documents.

Section 8.02.  <u>Delegation of Duties</u>.  The Administrative Agent may execute any of its duties under this Agreement and the other Loan Documents by or through agents, employees or attorneys-in-fact and shall be entitled to advice of counsel concerning all matters pertaining to such duties.  The Administrative Agent shall not be responsible for the negligence or misconduct of any agents or attorneys-in-fact selected by it, so long as such selection was made without gross negligence or willful misconduct.

Section 8.03.  <u>Exculpatory Provisions</u>.  Neither the Administrative Agent nor any of its officers, directors, employees, agents, attorneys-in-fact or affiliates (collectively, the "<u>Administrative Agent-Related Persons</u>") shall be (i) liable for any lawful action taken or omitted to be taken by it or such person under or in connection with this Agreement or any other Loan Document (except to the extent that any of the foregoing are found by a final and non-appealable decision of a court of competent jurisdiction to have resulted from its or such person's own gross negligence or willful misconduct) or (ii) responsible in any manner to any of the Lenders for any recitals, statements, representations or warranties made by any Loan Party or any officer thereof contained in this Agreement or any other Loan Document or in any certificate, report, statement or other document referred to or provided for in, or received by the Administrative Agent under or in connection with, this Agreement or any other Loan Document or for the value, validity, effectiveness, genuineness, enforceability or sufficiency of this Agreement or any other Loan Document or for any failure of any Loan Party as a party thereto to perform its obligations hereunder or thereunder.  The Administrative Agent-Related Persons shall not be under any obligation to any Lender to ascertain or to inquire as to the observance or performance of any of the agreements contained in, or conditions of, this Agreement or any other Loan Document, or to inspect the properties, books or records of any Loan Party.

To the fullest extent permitted by applicable law, no Loan Party or Lender shall assert, and each Loan Party and Lender hereby waives, any claim against the Administrative Agent, its sub-agents and their respective Affiliates in respect of any actions taken or omitted to be taken by any of them, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement, any other Loan Document or any agreement or instrument contemplated herby or thereby, the transactions contemplated hereby or thereby, any Loan or the use of the proceeds thereof.

No provision of this Agreement or any other Loan Document or any agreement or instrument contemplated hereby or thereby, the transactions contemplated hereby or thereby

shall require the Administrative Agent to: (i) expend or risk its own funds or provide indemnities in the performance of any of its duties hereunder or the exercise of any of its rights or power or (ii) otherwise incur any financial liability in the performance of its duties or the exercise of any of its rights or powers.

The Administrative Agent shall not be responsible for (i) perfecting, maintaining, monitoring, preserving or protecting the security interest or lien granted under this Agreement, any other Loan Document or any agreement or instrument contemplated hereby or thereby, (ii) the filing, re-filing, recording, re-recording or continuing or any document, financing statement, mortgage, assignment, notice, instrument of further assurance or other instrument in any public office at any time or times or (iii) providing, maintaining, monitoring or preserving insurance on or the payment of taxes with respect to any of the Collateral. The actions described in items (i) through (iii) shall be the sole responsibility of the Loan Parties.

The Administrative Agent shall not be required to qualify in any jurisdiction in which it is not presently qualified to perform its obligations as Administrative Agent.

The Administrative Agent has accepted and is bound by the Loan Documents executed by the Administrative Agent as of the date of this Agreement and, as directed in writing by the Required Lenders, the Administrative Agent shall execute additional Loan Documents delivered to it after the date of this Agreement; *provided, however*, that such additional Loan Documents do not adversely affect the rights, privileges, benefits and immunities of the Administrative Agent. The Administrative Agent will not otherwise be bound by, or be held obligated by, the provisions of any credit agreement, indenture or other agreement governing the Obligations (other than this Agreement and the other Loan Documents to which the Administrative Agent is a party).

No written direction given to the Administrative Agent by the Required Lenders or the Borrower that in the sole judgment of the Administrative Agent imposes, purports to impose or might reasonably be expected to impose upon the Administrative Agent any obligation or liability not set forth in or arising under this Agreement and the other Loan Documents will be binding upon the Administrative Agent unless the Administrative Agent elects, at its sole option, to accept such direction.

The Administrative Agent shall not be responsible or liable for any failure or delay in the performance of its obligations under this Agreement or the other Loan Documents arising out of or caused, directly or indirectly, by circumstances beyond its reasonable control, including, without limitation, acts of God; earthquakes; fire; flood; terrorism; wars and other military disturbances; sabotage; epidemics; riots; business interruptions; loss or malfunctions of utilities, computer (hardware or software) or communication services; accidents; labor disputes; acts of civil or military authority and governmental action.

Beyond the exercise of reasonable care in the custody of the Collateral in its possession, the Administrative Agent will have no duty as to any Collateral in its possession or control or in the possession or control of any agent or bailee or any income thereon or as to preservation of rights against prior parties or any other rights pertaining thereto. The Administrative Agent will be deemed to have exercised reasonable care in the custody of the Collateral in its possession if

the Collateral is accorded treatment substantially equal to that which it accords its own property, and the Administrative Agent will not be liable or responsible for any loss or diminution in the value of any of the Collateral by reason of the act or omission of any carrier, forwarding agency or other agent or bailee selected by the Administrative Agent in good faith.

The Administrative Agent will not be responsible for the existence, genuineness or value of any of the Collateral or for the validity, perfection, priority or enforceability of the Liens in any of the Collateral, whether impaired by operation of law or by reason of any action or omission to act on its part hereunder, except to the extent such action or omission constitutes gross negligence or willful misconduct on the part of the Administrative Agent, as determined by a court of competent jurisdiction in a final, nonappealable order, for the validity or sufficiency of the Collateral or any agreement or assignment contained therein, for the validity of the title of any grantor to the Collateral, for insuring the Collateral or for the payment of taxes, charges, assessments or Liens upon the Collateral or otherwise as to the maintenance of the Collateral. The Administrative Agent hereby disclaims any representation or warranty to the present and future holders of the Obligations concerning the perfection of the Liens granted hereunder or in the value of any of the Collateral.

In the event that the Administrative Agent is required to acquire title to an asset for any reason, or take any managerial action of any kind in regard thereto, in order to carry out any fiduciary or trust obligation for the benefit of another, which in the Administrative Agent's sole discretion may cause the Administrative Agent to be considered an "owner or operator" under any environmental laws or otherwise cause the Administrative Agent to incur, or be exposed to, any environmental liability or any liability under any other federal, state or local law, the Administrative Agent reserves the right, instead of taking such action, either to resign as Administrative Agent or to arrange for the transfer of the title or control of the asset to a court appointed receiver. The Administrative Agent will not be liable to any person for any environmental liability or any environmental claims or contribution actions under any federal, state or local law, rule or regulation by reason of the Administrative Agent's actions and conduct as authorized, empowered and directed hereunder or relating to any kind of discharge or Release or threatened discharge or Release of any Hazardous Materials into the Environment.

Section 8.04.  <u>Reliance by Administrative Agent</u>.  The Administrative Agent shall be entitled to rely, and shall be fully protected in relying, upon any instrument, writing, resolution, notice, consent, certificate, affidavit, letter, telecopy, telex or teletype message, statement, order or other document or conversation believed by it to be genuine and correct and to have been signed, sent or made by the proper person or persons and upon advice and statements of legal counsel (including counsel to the Borrower or counsel to any Lender), independent accountants and other experts selected by the Administrative Agent. The Administrative Agent may deem and treat the payee of any Note as the owner thereof for all purposes unless a written notice of assignment, negotiation or transfer thereof shall have been filed with the Administrative Agent. The Administrative Agent shall be fully justified in failing or refusing to take any action under this Agreement or any other Loan Document unless it shall first receive such advice or concurrence of the Required Lenders (or, if so specified by this Agreement, all Lenders) as it deems appropriate and it shall receive such security or indemnity from the Lenders as it shall require against any and all liability and expense that may be incurred by it by reason of taking or continuing to take any such action. The Administrative Agent shall in all cases be fully

protected in acting, or in refraining from acting, under this Agreement and the other Loan Documents in accordance with a request of the Required Lenders (or, if so specified by this Agreement, all Lenders), and such request and any action taken or failure to act pursuant thereto shall be binding upon all of the Lenders and all future holders of the Loans.

Section 8.05.   Notice of Default.  The Administrative Agent shall not be deemed to have knowledge or notice of the occurrence of any Default or Event of Default unless the Administrative Agent has received notice from a Lender or the Borrower referring to this Agreement, describing such Default or Event of Default and stating that such notice is a "notice of default."  In the event that the Administrative Agent receives such a notice, the Administrative Agent shall give notice thereof to the Lenders.  The Administrative Agent shall take such action with respect to such Default or Event of Default as shall be reasonably directed by the Required Lenders in accordance with the terms of this Agreement (or, if so specified by this Agreement, all Lenders); provided that unless and until the Administrative Agent shall have received such directions, the Administrative Agent may (but shall not be obligated to) take such action, or refrain from taking such action, with respect to such Default or Event of Default as it shall deem advisable in the best interests of the Lenders.  The Administrative Agent shall promptly provide all notices received from the Borrower or any Loan Party to the Lenders.

Section 8.06.   Non-Reliance on Administrative Agent and Other Lenders.  Each Lender expressly acknowledges that neither the Administrative Agent nor any of its respective officers, directors, employees, agents, attorneys-in-fact or affiliates have made any representations or warranties to it and that no act by the Administrative Agent hereafter taken, including any review of the affairs of a Loan Party or any affiliate of a Loan Party, shall be deemed to constitute any representation or warranty by the Administrative Agent to any Lender.  Each Lender represents to the Administrative Agent that it has, independently and without reliance upon the Administrative Agent or any other Lender, and based on such documents and information as it has deemed appropriate, made its own appraisal of and investigation into the business, operations, property, financial and other condition and creditworthiness of the Loan Parties and their affiliates and made its own decision to make its Loans hereunder and enter into this Agreement.  Each Lender also represents that it will, independently and without reliance upon the Administrative Agent or any other Lender, and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit analysis, appraisals and decisions in taking or not taking action under this Agreement and the other Loan Documents, and to make such investigation as it deems necessary to inform itself as to the business, operations, property, financial and other condition and creditworthiness of the Loan Parties and their Affiliates.  Except for notices, reports and other documents expressly required to be furnished to the Lenders by the Administrative Agent hereunder, the Administrative Agent shall not have any duty or responsibility to provide any Lender with any credit or other information concerning the business, operations, property, condition (financial or otherwise), prospects or creditworthiness of any Loan Party or any Affiliate of a Loan Party that may come into the possession of the Administrative Agent-Related Persons.

Section 8.07.   Indemnification.  The Lenders agree to (a) reimburse the Administrative Agent upon demand for all Lender Group Expenses (provided, however, in no event shall the Administrative Agent be required to front or go out of pocket for such expenses) incurred by the Administrative Agent (to the extent not reimbursed by any Loan Party and without limiting the

obligation of the Borrower to do so), and (b) indemnify the Administrative Agent-Related Persons (to the extent not reimbursed by any Loan Party and without limiting the obligation of the Borrower to do so), in each case in an amount equal to its pro rata share (based on the respective principal amount of its applicable outstanding Loan) thereof, from and against any and all claims, liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind whatsoever that may at any time (whether before or after the payment of the Loans) be imposed on, incurred by or asserted against such Administrative Agent-Related Person in any way relating to, or arising out of, the Commitments, this Agreement, any of the other Loan Documents or any documents contemplated by or referred to herein or therein or the transactions contemplated hereby or thereby or any action taken or omitted by such Administrative Agent-Related Person under or in connection with any of the foregoing; provided that no Lender shall be liable for the payment of any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements that are found by a final and non-appealable decision of a court of competent jurisdiction to have resulted from the Administrative Agent's gross negligence or willful misconduct. The agreements in this Section shall survive the payment of the Loans and all other amounts payable hereunder and the resignation or removal of the Administrative Agent.

Section 8.08. <u>Agent in Its Individual Capacity</u>. The Administrative Agent and its Affiliates may make loans to, accept deposits from and generally engage in any kind of business with any Loan Party as though the Administrative Agent were not an Administrative Agent. With respect to its Loans made by it, the Administrative Agent shall have the same rights and powers under this Agreement and the other Loan Documents as any Lender and may exercise the same as though it were not an Administrative Agent, and the terms "Lender" and "Lenders" shall include the Administrative Agent in its individual capacity. The Lenders acknowledge that, pursuant to such activities, the Administrative Agent and its Affiliates may receive information regarding the Loan Parties and their respective Affiliates or any other Person party to any Loan Document that is subject to confidentiality obligations in favor of such Loan Party or such other Person and that prohibit the disclosure of such information to the Lenders, and the Lenders acknowledge that, in such circumstances, the Administrative Agent shall not be under any obligation to provide such information to them.

Section 8.09. <u>Successor Administrative Agent</u>.

(a) The Administrative Agent may be removed upon vote of the Required Lenders and such removal shall be effective when a successor is appointed and accepts the appointment. The Required Lenders shall appoint a successor agent for the Lenders, whereupon such successor agent shall succeed to the rights, powers and duties of the Administrative Agent, and the term "Administrative Agent" shall mean such successor agent effective upon such appointment and approval (and the payment of all outstanding fees and expenses (including, but not limited to, attorneys' fees and expenses) of the removed Administrative Agent), and the former Administrative Agent's rights, powers and duties as Administrative Agent shall be terminated, without any other or further act or deed on the part of such former Administrative Agent or any of the parties to this Agreement or any holders of the Loans.

(b) The Administrative Agent may resign as Administrative Agent upon 45 days' notice to the Lenders and the Borrower (unless the right to receive such notice is waived by the

Lenders and the Borrower), such resignation effective upon the later of the 45th day after delivery of such notice and the date of the appointment of a successor agent.  If the Administrative Agent shall resign as Administrative Agent under this Agreement and the other Loan Documents, then the Required Lenders shall appoint a successor agent for the Lenders, whereupon such successor agent shall succeed to the rights, powers and duties of the Administrative Agent, and the term "Administrative Agent" shall mean such successor agent effective upon such appointment and approval (and the payment of all outstanding fees and expenses (including, but not limited to, attorneys' fees and expenses) of the resigning Administrative Agent), and the former Administrative Agent's rights, powers and duties as Administrative Agent shall be terminated, without any other or further act or deed on the part of such former Administrative Agent or any of the parties to this Agreement or any holders of the Loans.  If no successor agent has accepted appointment as Administrative Agent by the date that is 45 days following a retiring Administrative Agent's notice of resignation, the retiring Administrative Agent shall be entitled to appoint an Administrative Agent at its choosing or shall be entitled to petition a court of competent jurisdiction to appoint an Administrative Agent, which Administrative Agent must be an entity that regularly performs agency duties in credit facilities.  After any retiring Administrative Agent's resignation as Administrative Agent, the provisions of this Article VIII shall inure to its benefit as to any actions taken or omitted to be taken by it while it was Administrative Agent under this Agreement and the other Loan Documents.

Section 8.10.   <u>Authority of Agent</u>.  Notwithstanding any provision in the Loan Documents to the contrary, the Administrative Agent shall obtain the approval of, and shall act solely at the direction of, the Required Lenders for all purposes herein other than those which are purely ministerial.

ARTICLE IX

MISCELLANEOUS

Section 9.01.   <u>Notices</u>.

(a) Notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by telecopy, as follows:

(i)  if to any Loan Party, to TerreStar Networks Inc., 12010 Sunset Hills Road, 6th Floor, Reston, VA 20190, with a copy to Akin, Gump, Strauss Hauer & Feld LLP, One Bryant Park, New York, NY 10036, Attention of Ira Dizengoff and Arik Preis (Facsimile (212) 872-1002); and

(ii) if to the Administrative Agent, to The Bank of New York Mellon, 600 E. Las Colinas Blvd., Suite 1300, Irving, Texas 75039, Attention: Melinda K. Valentine, with a copy to Emmet, Marvin & Martin, LLP, 120 Broadway, New York, New York 10271, Attention of Elizabeth M. Clark, Esq.

(b) Notices and other communications to the Lenders hereunder may be delivered or furnished by electronic communications pursuant to procedures approved by the Administrative Agent; provided that the foregoing shall not apply to notices pursuant to Article II unless otherwise agreed by the Administrative Agent and the applicable Lender. Each of the Administrative Agent and the Borrower may, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it; provided, further, that approval of such procedures may be limited to particular notices or communications. A copy of all notices provided to the Initial Lender shall be provided to Willkie Farr & Gallagher LLP, 787 Seventh Avenue, New York, NY 10019, Attention of William E. Hiller, Esq. (Facsimile (212) 728-8111).

(c) All notices and other communications given to any party hereto in accordance with the provisions of this Agreement shall be deemed to have been given on the date of receipt if delivered by hand or overnight courier service, sent by telecopy or (to the extent permitted by paragraph (b) above) electronic means or on the date five (5) Business Days after dispatch by certified or registered mail if mailed, in each case delivered, sent or mailed (properly addressed) to such party as provided in this Section 9.01 or in accordance with the latest unrevoked direction from such party given in accordance with this Section 9.01.

(d) Any party hereto may change its address or telecopy number for notices and other communications hereunder by notice to the other parties hereto.

Section 9.02.  Survival of Agreement.  All covenants, agreements, representations and warranties made by the Loan Parties herein, in the other Loan Documents and in the certificates or other instruments prepared or delivered in connection with or pursuant to this Agreement or any other Loan Document shall be considered to have been relied upon by the Lenders and shall survive the making by the Lenders of the Loans and the execution and delivery of the Loan Documents, regardless of any investigation made by such persons or on their behalf, and shall continue in full force and effect as long as the principal of or any accrued interest on any Loan or any Fee or any other amount payable under this Agreement or any other Loan Document is outstanding and unpaid. Without prejudice to the survival of any other agreements contained herein, indemnification and reimbursement obligations contained herein (including pursuant to Sections 2.07, 2.10, 8.07 and 9.05) shall survive the payment in full of the principal and interest hereunder and the termination of this Agreement and the resignation or removal of the Administrative Agent.

Section 9.03.  Binding Effect.  This Agreement shall become effective when it shall have been executed by the Loan Parties hereunder, the Lenders and the Administrative Agent and when the Administrative Agent shall have received copies hereof which, when taken together, bear the signatures of each of the other parties hereto, and thereafter shall be binding upon and inure to the benefit of the Loan Parties, the Administrative Agent and each Lender and their respective permitted successors and assigns.

Section 9.04.  Successors and Assigns.

(a) The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except

that (i) the Borrower may not assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of each Lender (and any attempted assignment or transfer by the Borrower without such consent shall be null and void) and (ii) no Lender may assign or otherwise transfer its rights or obligations hereunder except in accordance with this Section 9.04.  Nothing in this Agreement, expressed or implied, shall be construed to confer upon any person (other than the parties hereto, their respective successors and assigns permitted hereby, Participants (to the extent provided in paragraph (c) of this Section 9.04), and, to the extent expressly contemplated hereby, the Related Parties of each of the Administrative Agent and the Lenders) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)  (i)  Subject to the conditions set forth in paragraph (b)(ii) below, any Lender may assign to one or more other entities (each, an "Assignee") all or a portion of its rights, Loans and obligations under this Agreement (including all or a portion of its Loans at the time owing to it and its Commitments then outstanding) without prior consent (except for any assignment to Globalstar USA, Iridium Satellite Communications or ICO Global Communications, where the consent of the Borrower must be obtained).

(ii) Assignments shall be subject to the following additional conditions:

(A)  the parties to each assignment shall execute and deliver to the Administrative Agent an Assignment and Acceptance; and

(B)  the Assignee, if it shall not be a Lender, shall deliver to the Administrative Agent an Administrative Questionnaire.

(iii) Subject to acceptance and recording thereof pursuant to paragraph (b)(iv) below, from and after the effective date specified in each Assignment and Acceptance, the Assignee thereunder shall be a party hereto and, to the extent of the interest assigned by such Assignment and Acceptance, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Acceptance, be released from its obligations under this Agreement (and, in the case of an Assignment and Acceptance covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto but shall continue to be entitled to the benefits of Sections 2.08, 2.09, 2.10 and 9.05).  Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this Section 9.04 shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with paragraph (c) of this Section 9.04.

(iv) The Administrative Agent, acting for this purpose as an agent of the Borrower, shall maintain at one of its offices a copy of each Assignment and Acceptance delivered to it and a register for the recordation of the names and addresses of the Lenders, and the Commitments of, and principal amount of the Loans owing to, each Lender pursuant to the terms hereof from time to time (the "Register").  The entries in the Register shall be conclusive absent manifest error, and the Borrower, the Administrative Agent and the Lenders shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary; provided,

however, in the case of an assignment to an Affiliate of the assigning Lender, such assignment shall be effective between such Lender and its Affiliate immediately without compliance with the conditions for assignment under this Section 9.04, but shall not be effective with respect to any other party hereto (including, but not limited to, the Administrative Agent), and each other party hereto shall be entitled to deal solely with such assigning Lender under any such assignment, in each case until the conditions for assignment under this Section 9.04 have been satisfied.  The Register shall be available for inspection by the Borrower and any Lender, at any reasonable time and from time to time upon reasonable prior notice.

(v) Upon its receipt of a duly completed Assignment and Acceptance executed by an assigning Lender and an Assignee, the Assignee's completed Administrative Questionnaire (unless the Assignee shall already be a Lender hereunder), the processing and recordation fee (consisting of the payment of a fee of $3,500 to the Administrative Agent) (which fee shall be paid by the Borrower in the event of any initial transfer by the Initial Lender to any Person of a Commitment of at least $15,000,000) referred to in paragraph (b) of this Section to such assignment required by paragraph (b) of this Section, the Administrative Agent shall accept such Assignment and Acceptance and record the information contained therein in the Register.  No assignment, whether or not evidenced by a promissory note, shall be effective for purposes of this Agreement unless it has been recorded in the Register as provided in this paragraph (b)(v).

(c)  (i)  Any Lender may, without the consent of the Borrower or the Administrative Agent, sell participations to one or more banks or other entities (a "Participant") in all or a portion of such Lender's rights and obligations under this Agreement (including all or a portion of its Commitments and the Loans owing to it); provided that (A) such Lender's obligations under this Agreement shall remain unchanged, (B) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (C) the Borrower, the Administrative Agent and the other Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement.  Any agreement pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and the other Loan Documents and to approve any amendment, modification or waiver of any provision of this Agreement and the other Loan Documents; provided that (x) such agreement may provide that such Lender will not, without the consent of the Participant, agree to any amendment, modification or waiver that (1) requires the consent of each Lender directly affected thereby pursuant to this Section 9.04 or clause (i), (ii), (iii), (iv), (v) or (vi) of the first proviso to Section 9.08(b) and (2) directly affects such Participant and (y) no other agreement with respect to such Participant may exist between such Lender and such Participant.  Subject to the foregoing provisions of this paragraph (c)(i) and to paragraph (c)(ii) of this Section 9.04, the Borrower agrees that each Participant shall be entitled to the benefits of Sections 2.08, 2.09 and 2.10 (subject to the requirements of those Sections as if it were a Lender) to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to paragraph (b) of this Section 9.04.  Subject to the foregoing provisions of this paragraph (c)(i), to the extent permitted by law, each Participant also shall be entitled to the benefits of Section 9.06 as though it were a Lender.

(ii) A Participant shall not be entitled to receive any greater payment under Section 2.08, 2.09 or 2.10 than the applicable Lender would have been entitled to receive with respect to the participation sold to such Participant, unless the sale of the participation to such Participant is made with the Borrower's prior written consent.

(d) Any Lender may at any time, without the consent of or notice to the Administrative Agent or the Borrower, pledge or assign a security interest in all or any portion of its rights under this Agreement to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank, and this Section 9.04 shall not apply to any such pledge or assignment of a security interest; provided that no such pledge or assignment of a security interest shall release a Lender from any of its obligations hereunder or substitute any such pledgee or Assignee for such Lender as a party hereto.

(e) The Borrower, upon receipt of written notice from the relevant Lender, agrees to issue Notes to any Lender requiring Notes to facilitate transactions of the type described in paragraph (d) above.

Section 9.05.   Expenses; Indemnity.

(a) The Borrower and each other Loan Party shall jointly and severally pay all (i) reasonable, actual and documented costs and expenses of the Initial Lender and the Administrative Agent (including all reasonable, actual and documented fees, expenses and disbursements of Initial Lender's Counsel and Initial Lender's Canadian Counsel as well as counsel to the Administrative Agent) in connection with the negotiation, preparation, execution and delivery of the loan documentation and the funding of the loans under this Agreement, including, without limitation, all due diligence, transportation, computer, duplication, messenger, audit, insurance, appraisal and consultant costs and expenses, and all search, filing and recording fees, incurred or sustained by the Initial Lender and the Administrative Agent in connection with this Agreement, the other Loan Documents or the transactions contemplated thereby, the administration of the Loans and any amendment or waiver of any provision of the loan documentation and (ii) costs and expenses (including Other Taxes) of the Lenders and the Administrative Agent (including the costs of settlement and the reasonable, actual and documented fees, expenses and disbursements of one outside counsel, one Canadian counsel and one regulatory counsel for the Lenders and one outside counsel, one Canadian counsel and one regulatory counsel for the Administrative Agent) in connection with the enforcement or protection of the Lenders' rights and remedies under the Loan Documents, provided, however, that should the Required Lenders engage counsel and Canadian counsel to the Initial Lender in connection with such enforcement or protection, the Borrower and each Guarantor shall jointly and severally pay such costs with respect to Initial Lender's Counsel and Initial Lender's Canadian Counsel as well as one regulatory counsel. (collectively, the "Lender Group Expenses").

(b) Each Loan Party shall indemnify and hold harmless the Administrative Agent, each Lender and each of their respective officers, directors, employees, agents, advisors, attorneys and representatives of each (each, an "Indemnitee") from and against any and all claims, damages, losses, penalties, actions, judgments, suits, liabilities, costs, expenses and disbursements of any funds whatsoever (including, without limitation, reasonable fees and

disbursements of counsel), joint or several, that may be incurred by or asserted or awarded against any Indemnitee (including, without limitation, in connection with or relating to any investigation, litigation or proceeding or the preparation of any defense in connection therewith), in each case arising out of or in connection with or by reason of the Loans, the Loan Documents or any of the transactions contemplated thereby, or any actual or proposed use of the proceeds of the Loans, except to the extent such claim, damage, loss, penalty, action, judgment, suit, liability, cost, expense or disbursement of any funds whatsoever is found in a final non-appealable judgment by a court of competent jurisdiction to have resulted primarily from such Indemnitee's gross negligence or willful misconduct.  In the case of an investigation, litigation or other proceeding to which the indemnity in this paragraph applies, such indemnity shall be effective whether or not such investigation, litigation or proceeding is brought by any Loan Party, any director, securityholder or creditor of any Loan Party, an Indemnitee or any other person, or an Indemnitee is otherwise a party thereto and whether or not the transactions contemplated hereby are consummated. Each Loan Party further agrees that no Indemnitee shall have any liability (whether direct or indirect, in contract, tort or otherwise) to such Loan Party or any of its securityholders or creditors for or in connection with the transactions contemplated hereby, except for direct damages (as opposed to special, indirect, consequential or punitive damages (including, without limitation, any loss of profits, business or anticipated savings)) determined in a final non-appealable judgment by a court of competent jurisdiction to have resulted primarily from such Indemnitee's gross negligence or willful misconduct.

(c) Except as expressly provided in Section 9.05(a) with respect to Other Taxes, which shall not be duplicative with any amounts paid pursuant to Section 2.10, this Section 9.05 shall not apply to Taxes.

(d) If, for the purposes of obtaining judgment in any court in any jurisdiction with respect to this Agreement, any of the Loan Documents or any of the other related documents, it becomes necessary to convert into the currency of such jurisdiction (the "Judgment Currency") any amount due under this Agreement, any of the Loan Documents or any of the other related documents in any currency other than the Judgment Currency (the "Currency Due"), then conversion shall be made at the Exchange Rate prevailing on the Business Day before the day on which judgment is given.  In the event that there is a change in the Exchange Rate prevailing between the Business Day before the day on which the judgment is given and the date of receipt by Administrative Agent of the amount due, the applicable Loan Party will, on the date of receipt by Administrative Agent, pay such additional amounts, if any, or be entitled to receive reimbursement of such amount, if any, as may be necessary to ensure that the amount received by Administrative Agent on such date is the amount in the Judgment Currency which when converted at the Exchange Rate prevailing on the date of receipt by Administrative Agent is the amount then due under this Agreement, any of the Loan Documents or any of the other related documents in the Currency Due.  If the amount of the Currency Due which Administrative Agent is able to purchase is less than the amount of the Currency Due originally due to it, such Loan Party shall indemnify and save Administrative Agent harmless from and against loss or damage arising as a result of such deficiency.  The indemnity contained herein shall constitute an obligation separate and independent from the other obligations contained in this Agreement, the Loan Documents or any of the other related documents, shall give rise to a separate and independent cause of action, shall apply irrespective of any indulgence granted by Administrative Agent from time to time and shall continue in full force and effect

notwithstanding any judgment or order for a liquidated sum in respect of an amount due under this Agreement, any of the Loan Documents, any of the other related documents or under any judgment or order.

Section 9.06.  <u>Right of Set-off</u>.  If an Event of Default shall have occurred and be continuing, each Lender is hereby authorized at any time and from time to time, to the fullest extent permitted by law, to set off and apply any and all deposits (general or special, time or demand, provisional or final) at any time held and other Indebtedness at any time owing by such Lender to or for the credit or the account of the Borrower or any Subsidiary against any of and all of the Obligations of the Borrower or the Subsidiary Loan Parties now or hereafter existing under this Agreement or any other Loan Document held by such Lender, irrespective of whether or not such Lender shall have made any demand under this Agreement or such other Loan Document and although the obligations may be unmatured.  The rights of each Lender under this Section 9.06 are in addition to other rights and remedies (including other rights of set-off) that such Lender may have.

Section 9.07.  <u>Applicable Law</u>.  THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS (OTHER THAN AS EXPRESSLY SET FORTH IN OTHER LOAN DOCUMENTS) SHALL BE CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK AND GOVERNED BY THE LAWS OF THE STATE OF NEW YORK AND, AS APPLICABLE, THE BANKRUPTCY CODE, OR, WITH RESPECT TO SECURITY DOCUMENTS FROM THE CANADIAN GUARANTORS, OTHER APPLICABLE LAW TO THE EXTENT SET FORTH IN SUCH SECURITY DOCUMENT.

Section 9.08.  <u>Waivers; Amendment</u>.

(a)  No failure or delay of the Administrative Agent or any Lender in exercising any right or power hereunder or under any Loan Document shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such a right or power, preclude any other or further exercise thereof or the exercise of any other right or power.  The rights and remedies of the Administrative Agent and the Lenders hereunder and under the other Loan Documents are cumulative and are not exclusive of any rights or remedies that they would otherwise have.  No waiver of any provision of this Agreement or any other Loan Document or consent to any departure by any Loan Party therefrom shall in any event be effective unless the same shall be permitted by paragraph (b) below, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given.  No notice or demand on any Loan Party in any case shall entitle such person to any other or further notice or demand in similar or other circumstances.

(b)  Neither this Agreement nor any other Loan Document nor any provision hereof or thereof may be waived, amended or modified except (x) in the case of this Agreement, pursuant to an agreement or agreements in writing entered into by the Borrower and the Required Lenders and (y) in the case of any other Loan Document, pursuant to an agreement or agreements in writing entered into by each party thereto and the Administrative Agent and consented to by the Required Lenders; <u>provided</u>, <u>however,</u> that no such agreement shall

(i) decrease or forgive the principal amount of, extend the final maturity of, decrease the rate of interest on, extend any Interest Payment Date for, reduce the amount of any Fees payable in connection with or extend the date of the payment of any Fee relating to any Loan, without the prior written consent of the Administrative Agent or each Lender directly affected thereby,

(ii) increase or extend the Commitment of any Lender without the prior written consent of such Lender (it being understood that waivers or modifications of conditions precedent, covenants, Defaults or Events of Default shall not constitute an increase in the Commitment of any Lender),

(iii) amend or modify the provisions of Section 2.11 in a manner that would by its terms alter the pro rata sharing of payments required thereby or revise the order of the allocation of prepayments, without the prior written consent of each Lender adversely affected thereby,

(iv) amend or modify the provisions of this Section 9.08 or the definition of the term "Required Lenders" or any other provision hereof specifying the number or percentage of Lenders required to waive, amend or modify any rights hereunder or make any determination or grant any consent hereunder, without the prior written consent of each Lender adversely affected thereby,

(v) release all or substantially all of the Collateral or release the Borrower or all or substantially all of the Loan Parties from their respective Guarantees hereunder, unless, in the case of a Loan Party, all or substantially all of the Equity Interests of such Loan Party are sold or otherwise disposed of in a transaction permitted by this Agreement, without the prior written consent of each Lender,

(vi) effect any waiver, amendment or modification of any Loan Document that would alter the relative priorities of the rights of the Secured Parties as against any other Person without the consent of each Lender, or

(vii)   amend or modify the provisions of Section 9.08(d) without the prior written consent of each Lender.

provided, further, that no such agreement shall amend, modify or otherwise affect the rights or duties of the Administrative Agent hereunder without the prior written consent of the Administrative Agent acting as such at the effective date of such agreement, as applicable. Each Lender shall be bound by any waiver, amendment or modification authorized by this Section 9.08 and any consent by any Lender pursuant to this Section 9.08 shall bind any successor or assignee of such Lender.

(c) Without the consent of any Lender, the Loan Parties and the Administrative Agent may (in their respective sole discretion, or shall, to the extent required by any Loan Document) enter into any amendment, modification or waiver of any Loan Document, or enter into any new agreement or instrument, to effect the granting, perfection, protection, expansion or enhancement of any security interest in any Collateral or additional property to become Collateral for the benefit of the Secured Parties, or as required by local law to give effect to, or

protect any security interest for the benefit of the Secured Parties, in any property or so that the security interests therein comply with applicable law.

(d) No fee shall be payable to any Lender in consideration of the consent to any waiver or amendment unless each Lender shall have the opportunity to so consent and earn such fee.

Any consent, waiver or approval of Lenders or Required Lenders under any Loan Document may be given or withheld by such Lenders in their sole discretion.

Section 9.09.   Interest Rate Limitation.  Notwithstanding anything herein to the contrary, if at any time the applicable interest rate, together with all fees and charges that are treated as interest under applicable law (collectively, the "Charges"), as provided for herein or in any other document executed in connection herewith, or otherwise contracted for, charged, received, taken or reserved by any Lender, shall exceed the maximum lawful rate (the "Maximum Rate") that may be contracted for, charged, taken, received or reserved by such Lender in accordance with applicable law, the rate of interest payable hereunder, together with all Charges payable to such Lender, shall be limited to the Maximum Rate; provided that such excess amount shall be paid to such Lender on subsequent payment dates to the extent not exceeding the legal limitation.

Section 9.10.   Entire Agreement.  This Agreement, the other Loan Documents and the agreements regarding certain Fees referred to herein constitute the entire contract between the parties relative to the subject matter hereof.  Any previous agreement among or representations from the parties or their Affiliates with respect to the subject matter hereof is superseded by this Agreement and the other Loan Documents.  Notwithstanding the foregoing, the Fee Letter shall survive the execution and delivery of this Agreement and remain in full force and effect.  Except as expressly set forth herein, nothing in this Agreement or in the other Loan Documents, expressed or implied, is intended to confer upon any party other than the parties hereto and thereto any rights, remedies, obligations or liabilities under or by reason of this Agreement or the other Loan Documents.

Section 9.11.   Waiver of Jury Trial.  **EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT OR ANY OF THE OTHER LOAN DOCUMENTS.  EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS, AS APPLICABLE, BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 9.11.**

Section 9.12.   Severability.  In the event any one or more of the provisions contained in this Agreement or in any other Loan Document should be held invalid, illegal or unenforceable

in any respect, the validity, legality and enforceability of the remaining provisions contained herein and therein shall not in any way be affected or impaired thereby.  The parties shall endeavor in good-faith negotiations to replace the invalid, illegal or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the invalid, illegal or unenforceable provisions.

Section 9.13.  <u>Counterparts</u>.  This Agreement may be executed in two or more counterparts, each of which shall constitute an original but all of which, when taken together, shall constitute but one contract, and shall become effective as provided in Section 9.03.  Delivery of an executed counterpart to this Agreement by facsimile transmission (or other electronic transmission pursuant to procedures approved by the Administrative Agent) shall be as effective as delivery of a manually signed original.

Section 9.14.  <u>Headings</u>.  Article and Section headings and the Table of Contents used herein are for convenience of reference only, are not part of this Agreement and are not to affect the construction of, or to be taken into consideration in interpreting, this Agreement.

Section 9.15.  <u>Confidentiality</u>.  Each of the Lenders and the Administrative Agent agrees that it shall maintain in confidence any information relating to the Loan Parties furnished to it by or on behalf of the Loan Parties (other than information that (a) has become generally available to the public other than as a result of a disclosure by such party, (b) has been independently developed by such Lender or the Administrative Agent, as applicable, without violating this Section 9.15 or (c) was available to such Lender or the Administrative Agent, as applicable, from a third party having, to such person's knowledge, no obligations of confidentiality to any Loan Party) and shall not reveal the same other than to its directors, trustees, officers, employees and advisors with a need to know or to any person that approves or administers the Loans on behalf of such Lender (so long as each such person shall have been instructed to keep the same confidential in accordance with this Section 9.15 and shall have agreed to be bound by this confidentiality clause), except:  (A) to the extent necessary to comply with law or any legal process or the requirements of any Governmental Authority, the National Association of Insurance Commissioners or of any securities exchange on which securities of the disclosing party or any Affiliate of the disclosing party are listed or traded, (B) as part of the reporting or review procedures to, or examinations by, Governmental Authorities or self-regulatory authorities, including the National Association of Insurance Commissioners or the National Association of Securities Dealers, Inc., (C) to its parent companies, Affiliates or auditors (so long as each such person shall have been instructed to keep the same confidential in accordance with this Section 9.15 and shall have agreed to be bound by this confidentiality clause), (D) in order to enforce its rights under any Loan Document in a legal proceeding, and (E) to any pledgee under Section 9.04(d) or any other prospective assignee of, or prospective Participant in, any of its rights under this Agreement (so long as such person shall have been instructed to keep the same confidential in accordance with this Section 9.15 and shall have agreed to be bound by this confidentiality clause).

Section 9.16.  <u>Direct Website Communications</u>.

(a) <u>Delivery</u>.  (i)  Each Loan Party hereby agrees that it will provide to the Administrative Agent all information, documents and other materials that it is obligated to

furnish to the Administrative Agent pursuant to this Agreement and any other Loan Document, including, without limitation, all notices, requests, financial statements, financial and other reports, certificates and other information materials, but excluding any such communication that (A) relates to the payment of any principal or other amount due under this Agreement prior to the scheduled date therefor, (B) provides notice of any Default or Event of Default under this Agreement or (C) is required to be delivered to satisfy any condition precedent to the effectiveness of this Agreement and/or any borrowing hereunder (all such non-excluded communications collectively, the "Communications"), by transmitting the Communications in an electronic/soft medium in a format acceptable to the Administrative Agent. In addition, each Loan Party agrees to continue to provide the Communications to the Administrative Agent in the manner specified in this Agreement or any other Loan Document. Nothing in this Section 9.16 shall prejudice the right of the Administrative Agent or any Lender or any Loan Party to give any notice or other communication pursuant to this Agreement or any other Loan Document in any other manner specified in this Agreement or any other Loan Document.

(ii) The Administrative Agent agrees that receipt of the Communications by the Administrative Agent at its email address set forth above shall constitute effective delivery of the Communications to the Administrative Agent for purposes of the Loan Documents. Each Lender agrees that notice to it (as provided in the next sentence) specifying that the Communications have been posted to the Platform (as defined below) shall constitute effective delivery of the Communications to such Lender for purposes of the Loan Documents. Each Lender agrees (A) to notify the Administrative Agent in writing (including by electronic communication) from time to time of such Lender's email address to which the foregoing notice may be sent by electronic transmission and (B) that the foregoing notice may be sent to such email address.

(b) Posting. Each Loan Party further agrees that the Administrative Agent may make the Communications available to the Lenders by posting the Communications on Intralinks or a substantially similar electronic transmission system (the "Platform").

(c) Platform. The Platform is provided "as is" and "as available." The Agent Parties (as defined below) do not warrant the accuracy or completeness of the Communications, or the adequacy of the Platform and expressly disclaim liability for errors or omissions in the Communications. No warranty of any kind, express, implied or statutory, including, without limitation, any warranty of merchantability, fitness for a particular purpose, non-infringement of third party rights or freedom from viruses or other code defects, is made by any Agent Party in connection with the Communications or the Platform. In no event shall the Administrative Agent or any of its Affiliates or any of their respective officers, directors, employees, agents, advisors or representatives (collectively, "Agent Parties") have any liability to the Loan Parties, any Lender or any other person or entity for damages of any kind, including, without limitation, direct or indirect, special, incidental or consequential damages, losses or expenses (whether in tort, contract or otherwise) arising out of any Loan Party's or the Administrative Agent's transmission of communications through the internet, except to the extent the liability of any Agent Party is found in a final non-appealable judgment by a court of competent jurisdiction to have resulted primarily from such Agent Party's gross negligence or willful misconduct.

Section 9.17.  Release of Liens.  The Administrative Agent agrees to take such actions as are reasonably requested by the Borrower and at the Borrower's expense to terminate the Liens and security interests created by the Loan Documents when all Commitments are terminated and the Obligations are indefeasibly paid in full.

Section 9.18.  USA Patriot Act.  Each Lender hereby notifies the Borrower that pursuant to the requirements of the USA Patriot Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)) (the "Act"), it is required to obtain, verify and record information that identifies the Borrower, which information includes the name and address of the Borrower and other information that will allow such Lender to identify the Borrower in accordance with the Act.

Section 9.19.  Conflicts.  In the event of any conflict between the terms of this Agreement and the DIP Order, the DIP Order shall govern.

ARTICLE X

SECURITY AND GUARANTEE

Section 10.01. Security Interest.

(a) As security for all Obligations, each Obligor hereby collaterally assigns and grants to the Administrative Agent, for the benefit of the Administrative Agent and the Lenders, a continuing security interest in, Lien on and assignment of, all of the following property and assets of such Obligor, whether now owned or existing or hereafter acquired or arising, regardless of where located:

(i)  all Accounts, including all credit enhancements therefor;

(ii) all contract rights, including, without limitation, all rights of such Obligor as either lessor or lessee under any lease or rental agreement of real or personal property, including, without limitation, each lease;

(iii) all chattel paper;

(iv) all documents;

(v) all instruments;

(vi) all supporting obligations and letter-of-credit rights;

(vii) all General Intangibles (including, without limitation, payment intangibles, intercompany accounts, and software) (as defined in the UCC) and all IP Collateral;

(viii)  all inventory and other goods (including satellites and spare satellites and equipment used in ground stations);

(ix) all equipment and fixtures;

(x) all Investment Property (except as provided in the last sentence of this Section 10.01(a) below);

(xi) all money, cash, cash equivalents, securities, and other property of any kind;

(xii) all deposit accounts and all other credits and balances with and other claims against any financial institution;

(xiii) all notes, and all documents of title;

(xiv) all books, records, and other property related to or referring to any of the foregoing, including, without limitation, books, records, account ledgers, data processing records, computer software and other property, and General Intangibles at any time evidencing or relating to any of the foregoing;

(xv) all commercial tort claims disclosed from time to time to the Administrative Agent pursuant to the terms of this Agreement;

(xvi) all real estate owned or leased by such Obligor;

(xvii) all other personal property of such Obligor, including any avoidance actions under Chapter 5 of the Bankruptcy Code and recoveries therefrom;

(xviii) all FCC License Rights and Industry Canada License Rights, whether now owned or held or hereafter acquired or held by an Obligor, including all FCC Licenses and Industry Canada Licenses, to the fullest extent permitted by applicable law; and the right to receive monies, proceeds, or other consideration in connection with the sale, assignment, transfer, or other disposition of any FCC Licenses or Industry Canada Licenses, the proceeds from the sale of any FCC Licenses or any Industry Canada Licenses or any goodwill or other intangible rights or benefits associated therewith, including without limitation all rights of each Obligor to: (A) transfer, assign or otherwise dispose of its rights, title and interests, if any, under or in respect of such FCC Licenses or such Industry Canada Licenses, subject to any and all required FCC and/or Industry Canada approvals, (B) exercise any rights, demands and remedies against the lessor, licensor or other parties thereto, and (C) all rights of such Obligor to receive proceeds of any insurance, indemnities, warranties, guaranties or claims for damages in connection therewith; provided, that such security interest does not include at any time any FCC License or any Industry Canada License to the extent (but only to the extent) that at such time the Administrative Agent may not validly possess a security interest directly in the FCC License or Industry Canada License pursuant to applicable law, including the United States Communications Act of 1934, as amended, and the rules, regulations and policies promulgated thereunder, as in effect at such time, but such security interest does include at all times all proceeds of the FCC Licenses and Industry Canada Licenses, and the right to receive all monies, consideration and proceeds derived from or in connection with the sale, assignment, transfer, or other disposition of the FCC Licenses and Industry Canada Licenses consistent with the conditions thereof; and

(xix)   all accessions to, substitutions for, and replacements, products, and proceeds of any of the foregoing, including, but not limited to, proceeds of any insurance policies, claims against third parties, and condemnation or requisition payments with respect to all or any of the foregoing.

All of the foregoing and all other property of such Obligor in which the Administrative Agent or any Lender may at any time be granted a Lien, is herein collectively referred to as the "Collateral."

(b) All of the Obligations shall be secured by all of the Collateral.

Section 10.02. Perfection and Protection of Security Interest.

(a) Each Obligor shall, as applicable, at such Obligor's expense, perform all steps reasonably requested by the Administrative Agent (acting at the written request of the Required Lenders) or the Required Lenders at any time to perfect, maintain, protect, and enforce the Administrative Agent's Liens, including:  upon an Event of Default, delivering to the Administrative Agent (1) the originals of all instruments, documents, and chattel paper, and all other Collateral of which the Administrative Agent reasonably determines it should have physical possession in order to perfect and protect the Administrative Agent's security interest therein, duly pledged, endorsed, or assigned to the Administrative Agent without restriction, (2) warehouse receipts covering any portion of the Collateral located in warehouses and for which warehouse receipts are issued, (3) certificates of title (excluding deeds for real estate) covering any portion of the Collateral for which certificates of title have been issued and (4) all letters of credit on which such Obligor is named beneficiary.

(b) To the extent permitted by any legal requirement, the Administrative Agent may file, without any Obligor's signature, one or more financing statements or similar statements disclosing the Administrative Agent's Liens on the Collateral.

(c) To the extent any Obligor is or becomes the issuer of any investment property that is Collateral (in such capacity, an "Issuer"), upon the request of the Administrative Agent (acting at the written direction of the Required Lenders) each Obligor agrees as follows with respect to such investment property, but subject to the terms of any documents or agreements entered into prior to the Closing Date creating or evidencing any pre-petition Lien with respect to such Investment Property:

(i)  All such Investment Property issued by such Issuer, all warrants, and all non-cash dividends and other non-cash distributions in respect thereof at any time registered in the name of, or otherwise deliverable to, any Obligor, shall be delivered directly to the Administrative Agent, for the account of such Obligor, at the Administrative Agent's address for notices set forth in herein.

(ii) Such Issuer will not acknowledge any transfer or encumbrance in respect of such investment property to or in favor of any Person other than the Administrative Agent or a Person designated by the Administrative Agent in writing.

(d) <u>Title to, Liens on, and Use of Collateral</u>.  Each Obligor represents and warrants to the Administrative Agent and the Lenders and agrees with the Administrative Agent and the Lenders that:  (a) all of the Collateral owned by such Obligor is and will (subject to dispositions permitted hereunder) continue to be owned by such Obligor free and clear of all Liens whatsoever, except for Permitted Liens, (b) the Administrative Agent's Liens in the Collateral will not be junior in priority to any prior Lien other than the Carve-Out and the Prior Liens and (c) such Obligor will use, store, and maintain the Collateral owned by such Obligor with all reasonable care.  The inclusion of proceeds in the Collateral shall not be deemed to constitute the Administrative Agent's or any Lender's consent to any sale or other disposition of the Collateral except as expressly permitted herein.  The security interests and Liens in favor of the Secured Parties in the Collateral shall not be subject to challenge and shall attach and become valid, legal and perfected immediately upon the entry of the DIP Order, subject to the terms and conditions set forth in the DIP Order.

Section 10.03.  <u>Proceeds of Accounts</u>**.**  If so requested by the Administrative Agent (acting at the written request of the Required Lenders) at any time after the occurrence and during the continuance of an Event of Default, the Obligors shall instruct all account debtors in respect of accounts, chattel paper and General Intangibles and all obligors on instruments to make all payments in respect thereof either: (i) directly to the Administrative Agent (by instructing that such payments be remitted to a post office box which shall be in the name and under the control of the Administrative Agent), or (ii) to one or more other banks in the United States of America (by instructing that such payments be remitted to a post office box which shall be in the name and under the control of the Administrative Agent) under arrangements, in form and substance satisfactory to the Required Lenders, pursuant to which the Obligors shall have irrevocably instructed such other bank (and such other bank shall have agreed) to remit all proceeds of such payments directly to the Administrative Agent.

Section 10.04.  <u>Delivery and Other Perfection</u>.  Each Obligor shall:

(a)       give, execute, deliver, file, record, authorize or obtain all such financing statements, notices, instruments, documents, agreements or consents or other papers and take all such other actions as may be necessary or desirable and reasonably requested by the Administrative Agent (acting at the written request of the Required Lenders) to create, preserve, perfect or validate the security interest in the Collateral granted pursuant hereto under the law of Canada, the United States or a jurisdiction thereof or to enable the Administrative Agent to exercise and enforce its rights hereunder with respect to such pledge and security interest, including, without limitation, (i) (A) making filings, registrations and recordations with the U.S. Patent and Trademark Office and the U.S. Copyright Office, (B) delivery of all original certificates representing Investment Property, together with endorsements, stock powers or other appropriate instruments of transfer, duly executed or endorsed in blank, and (C) taking all such action as may be required by the PPSA or Uniform Commercial Code then in effect in any applicable jurisdiction in order to effect the same, and (ii) following the occurrence and during the continuance of an Event of Default, (A) causing any or all of the Pledged Equity to be transferred of record into the name of the Administrative Agent or its nominee (and the Administrative Agent agrees that if any Pledged Equity is transferred into its name or the name of its nominee, the Administrative Agent will thereafter promptly give to the

Obligors copies of any notices and communications received by it with respect to the Pledged Equity pledged by the Obligors hereunder) and (B) if requested by the Administrative Agent (acting at the written request of the Required Lenders), using commercially reasonable efforts to obtain any consents, authorization and approvals of the FCC and Industry Canada in connection with any transfer or disposition of any FCC License or any Industry Canada License or the equity or any issuer that owns or holds any rights with respect to any FCC License or any Industry Canada License;

      (b)     keep full and accurate books and records relating to the Collateral;

      (c)     if any Event of Default shall have occurred and be continuing, permit representatives of the Administrative Agent, upon reasonable notice, at any time during normal business hours to inspect and make abstracts from its books and records pertaining to the Collateral, and permit representatives of the Administrative Agent to be present at the Obligors' respective places of business to receive copies of all communications and remittances relating to the Collateral, and forward copies of any notices or communications received by the Obligors with respect to the Collateral, all in such manner as the Administrative Agent (acting at the written direction of the Required Lenders) may require; and

      (d)     execute and deliver and, subject to the execution thereof by the Administrative Agent, cause to be filed, such continuation statements, and do such other acts and things as necessary to maintain the perfection of the security interest granted pursuant hereto under the law of Canada, the United States or a jurisdiction therein.

Section 10.05.  <u>Other Financing Statements and Liens</u>.  Except as otherwise permitted under this Agreement, no Obligor shall file or suffer to be on file, or authorize or permit to be filed or to be on file, in any jurisdiction, any financing statement or like instrument with respect to the Collateral in which the Administrative Agent is not named as the sole secured party for the benefit of the Secured Parties.

Section 10.06.  <u>Preservation of Rights</u>.  The Administrative Agent shall not be required to take steps necessary to preserve any rights against prior parties to any of the Collateral.

Section 10.07.  <u>Special Provisions Relating to Certain Collateral</u>.

      (a)     So long as no Event of Default shall have occurred and be continuing, the Obligors shall have the right to exercise all voting, consensual and other powers of ownership pertaining to the Pledged Equity for all purposes not inconsistent with the terms of this Agreement and the other Loan Documents.  If any Event of Default shall have occurred and be continuing, the Administrative Agent (acting at the written direction of the Required Lenders) may exercise all voting, consensual and other powers of ownership pertaining to the Pledged Equity.

      (b)     If any Event of Default shall have occurred and be continuing, and whether or not the Lenders or the Administrative Agent exercise any available right to declare any Obligations due and payable or seek or pursue any other relief or remedy available to them under applicable law or under this Agreement or the other Loan

Documents, upon request by the Administrative Agent (acting at the written request of the Required Lenders), all dividends and other distributions on the Pledged Equity shall be paid directly to the Administrative Agent, and, if the Administrative Agent shall so request in writing (acting at the written request of the Required Lenders), the Obligors jointly and severally agree to execute and deliver to the Administrative Agent appropriate additional dividend, distribution and other orders and documents to that end, provided that if such Event of Default is cured, any such dividend or distribution theretofore paid to the Lenders shall, upon request of any Obligor (except to the extent theretofore applied to the Obligations), be returned by the Lenders (through the Administrative Agent) to the Obligors.

(d)     For the purpose of enabling the Administrative Agent to exercise rights and remedies under Section 7.02 at such time as the Administrative Agent shall be lawfully entitled to exercise such rights and remedies, and for no other purpose, the Obligors hereby grant to the Administrative Agent or its nominee, to the extent assignable, an irrevocable, non-exclusive license (exercisable without payment of royalty or other compensation to the Obligors) to use, assign, license or sublicense any of the intellectual property Collateral now owned or hereafter acquired by the Obligors, wherever the same may be located, including in all cases with reasonable access to all media in which any of the licensed items may be recorded or stored and to all computer programs used for the compilation or printout thereof.

Section 10.08. <u>Additional Remedies During an Event of Default, Etc</u>.  During the period during which an Event of Default shall have occurred and be continuing, without limiting the rights otherwise provided in this Agreement, the other Loan Documents and applicable law:

(a)     the Obligors shall, at the request of the Administrative Agent, assemble the Collateral owned by them at such place or places, reasonably convenient to the Administrative Agent and the Obligors, designated in the Administrative Agent's request;

(b)     the Administrative Agent may make any reasonable compromise or settlement deemed desirable with respect to any of the Collateral and may extend the time of payment, arrange for payment in installments, or otherwise modify the terms of, any of the Collateral;

(c)     the Administrative Agent shall have all of the rights and remedies with respect to the Collateral of a secured party under the New York Uniform Commercial Code and the PPSA (whether or not in effect in the jurisdiction where the rights and remedies are asserted) and such additional rights and remedies to which a secured party is entitled under the laws in effect in any jurisdiction where any rights and remedies hereunder may be asserted, including, without limitation, the right, to the maximum extent permitted by law, to exercise all voting, consensual and other powers of ownership pertaining to the Collateral as if the Administrative Agent were the sole and absolute owner thereof (and the Obligors agree to take all such action as may be appropriate to give effect to such right);

(d)     the Administrative Agent (acting at the written direction of the Required Lenders) may, in its name or in the name of the Obligors or otherwise, demand, sue for, collect or receive any money or property at any time payable or receivable on account of or in exchange for any of the Collateral, but shall be under no obligation to do so; and

(e)     the Administrative Agent may, upon 10 Business Days' prior written notice to the Obligors of the time and place (which the Obligors agree constitutes reasonable prior notice), with respect to the Collateral or any part thereof which shall then be or shall thereafter come into the possession, custody or control of the Administrative Agent, the holders of the Obligations or any of their respective agents, sell, lease, assign or otherwise dispose of all or any part of such Collateral, at such place or places as the Administrative Agent (acting at the written direction of the Required Lenders) deems best, and for cash or for credit or for future delivery (without thereby assuming any credit risk), at public or private sale, without demand of performance or notice of intention to effect any such disposition or of the time or place thereof (except such notice as is required above or by applicable statute and cannot be waived), and the Administrative Agent or its nominee or any holder of any Obligation or anyone else may be the purchaser, lessee, assignee or recipient of any or all of the Collateral so disposed of at any public sale (or, to the extent permitted by law, at any private sale) and thereafter hold the same absolutely, free from any claim or right of whatsoever kind, including any right or equity of redemption (statutory or otherwise), of the Obligors, any such demand, notice and right or equity being hereby expressly waived and released. In the event of any sale, assignment, or other disposition of any of the IP Collateral, the goodwill connected with and symbolized by the IP Collateral subject to such disposition shall be included. The Administrative Agent may, without notice or publication, adjourn any public or private sale or cause the same to be adjourned from time to time by announcement at the time and place fixed for the sale, and such sale may be made at any time or place to which the sale may be so adjourned. The proceeds of each collection, sale or other disposition under this Section 10.09, including by virtue of the exercise of the license granted to the Administrative Agent in Section 10.08(d), shall be applied in accordance with Section 10.11. The Obligors recognize that, by reason of certain prohibitions contained in the Securities Act of 1933, as amended, and applicable state securities laws, the Administrative Agent may be compelled, with respect to any sale of all or any part of the Collateral, to limit purchasers to those who will agree, among other things, to acquire the Collateral for their own account, for investment and not with a view to the distribution or resale thereof. The Obligors acknowledge that any such private sales may be at prices and on terms less favorable to the Administrative Agent than those obtainable through a public sale without such restrictions, and, notwithstanding such circumstances, agree that any such private sale shall be deemed to have been made in a commercially reasonable manner and that the Administrative Agent shall have no obligation to engage in public sales and no obligation to delay the sale of any Collateral for the period of time necessary to permit the respective issuer thereof to register it for public sale. The Administrative Agent shall not be required to marshal any present or future collateral security (including, but not limited to, this Agreement and the Collateral) for, or other assurances of payment of, the Obligations or any of them or to resort to such collateral security or other assurances of payment in any particular order, and all of the Administrative Agent's rights hereunder and in respect of such collateral security and

other assurances of payment shall be cumulative and in addition to all other rights, however existing or arising. To the extent that each Obligor lawfully may, the Obligor hereby agrees that it will not invoke any law relating to the marshalling of collateral which might cause delay in or impede the enforcement of the Administrative Agent's rights under this Agreement or under any other instrument creating or evidencing any of the Obligations or under which any of the Obligations is outstanding or by which any of the Obligations is secured or payment thereof is otherwise assured, and, to the extent that it lawfully may, the Obligor hereby irrevocably waives the benefits of all such laws. Each Obligor hereby acknowledges that if the Administrative Agent complies with any applicable state, provincial, or federal law requirements in connection with a disposition of the Collateral, such compliance will not adversely affect the commercial reasonableness of any sale or other disposition of the Collateral.

Section 10.09. <u>Private Sale</u>. The Administrative Agent and the Lenders shall incur no liability as a result of the sale of the Collateral, or any part thereof, at any private sale conducted in a commercially reasonable manner.

Section 10.10. <u>Application of Proceeds</u>. Except as otherwise herein expressly provided and except as provided below in this Section 10.11, the Proceeds of any collection, sale or other realization of all or any part of the Collateral pursuant hereto, and any other cash at the time held by the Administrative Agent under Section 7.02 or this Article X, shall be applied by the Administrative Agent:

<u>First</u>, to the payment of the (a) reasonable costs and expenses of such collection, sale or other realization, including reasonable out-of-pocket costs and expenses of the Administrative Agent and the reasonable fees and expenses of its agents and counsel, and all out-of-pocket expenses incurred and advances made by the Administrative Agent in connection therewith and (b) any and all outstanding fees and expenses of the Administrative Agent (including, but not limited to, attorneys' fees and expenses);

<u>Next</u>, to the payment in full of the Obligations, in each case equally and ratably in accordance with the respective amounts thereof then due and owing or as the Lenders holding the same may otherwise agree; and

<u>Finally</u>, to the payment to the respective Obligors, or their respective successors or assigns, or as a court of competent jurisdiction may direct, of any surplus then remaining.

Section 10.11. <u>Attorney-in-Fact</u>. Without limiting any rights or powers granted by this Agreement to the Administrative Agent while no Event of Default has occurred and is continuing, the Administrative Agent is hereby appointed the attorney-in-fact of the Obligors to, upon the occurrence and during the continuance of any Event of Default, carry out the provisions of this Article X and take any action and execute any instruments that the Administrative Agent (acting at the written direction of the Required Lenders) may deem necessary or advisable to accomplish the purposes hereof, which appointment as attorney-in-fact is irrevocable and coupled with an interest; provided that, Administrative Agent shall not execute on behalf of Obligors any application or other instrument to be submitted to the FCC or Industry Canada except to the extent permitted by applicable law. Without limiting the generality of the

foregoing, so long as the Administrative Agent shall be entitled under this Article X to make collections in respect of the Collateral, the Administrative Agent shall have the right and power to receive, endorse and collect all checks made payable to the order of the Obligors representing any dividend, payment or other distribution in respect of the Collateral or any part thereof and to give full discharge for the same.

Without limiting the foregoing, the Obligors consent that UCC or PPSA financing statements may be filed describing the Collateral as "all assets" or "all personal property" of the Obligors (provided that no such description shall be deemed to modify the description of Collateral set forth in Section 10.01).

Section 10.12. <u>Further Assurances</u>.  Each Obligor agrees that, from time to time upon the written request of the Administrative Agent (acting at the written request of the Required Lenders), at the expense of such Obligor and, subject to the terms hereof, such Obligor will promptly execute and use commercially reasonable efforts to deliver, or otherwise authenticate, all further instruments and documents, and take all further commercially reasonable action that the Required Lenders may reasonably request in order to perfect and protect any pledge or security interest granted or purported to be granted by such Obligor hereunder or to enable the Administrative Agent to exercise and enforce its rights and remedies hereunder with respect to any Collateral of such Obligor and do such other acts and things as the Administrative Agent may reasonably request in order fully to effect the purposes of this Agreement, including, without limitation, taking any other action contemplated by this Article X.  In addition, each Obligor will furnish to the Administrative Agent from time to time statements and schedules (or update any schedules and annexes hereto) further identifying and describing the Collateral of such Obligor and such other reports in connection with such Collateral as the Administrative Agent may reasonably request (acting at the written request of the Required Lenders), all in reasonable detail.

Section 10.13. <u>Certain Regulatory Requirements</u>.

(a)     At any time after the occurrence and during the continuance of an Event of Default, each Obligor shall take all lawful action that the Administrative Agent (acting at the written direction of the Required Lenders) may reasonably request in the exercise of its rights and remedies hereunder, which include the right to require such Obligor to transfer or assign any FCC License Rights or Industry Canada License Rights held by it or any of its Subsidiaries to any party or parties to facilitate an arms'-length public or private sale for the benefit of the Lenders.  In furtherance of this right, the Obligors shall (i) cooperate fully with the Administrative Agent in obtaining all approvals and consents from the FCC and Industry Canada and each other Governmental Authority and from any third parties that the Administrative Agent (acting at the written direction of the Required Lenders) may deem necessary or advisable to accomplish any such transfer or assignment, and (ii) prepare, execute and file with the FCC, Industry Canada and any other Governmental Authority any application, request for consent, certificate or instrument that the Administrative Agent (acting at the written direction of the Required Lenders) may deem necessary or advisable to accomplish any such transfer or assignment.  If the Obligors fail to execute such applications, requests for consent, certificates or instruments, the clerk of any court that has jurisdiction over the Loan

Documents may, upon an ex parte request by the Administrative Agent (acting at the written direction of the Required Lenders), execute and file the same on behalf of the Obligors for purposes of placing such request before the FCC or Industry Canada, except to the extent as would not be permissible under applicable law.

(b)     To enforce the provisions of Article X, the Administrative Agent is authorized to request the consent or approval of the FCC, Industry Canada or any other Governmental Authority to a voluntary or an involuntary transfer of control of the Obligors or the voluntary or involuntary assignment of any FCC License Rights and any Industry Canada Rights held by the Obligors. In connection with the exercise of its remedies under this Agreement, the Administrative Agent may obtain the appointment of a trustee or receiver to assume control of the Obligors, subject to any required prior approval of the FCC, Industry Canada or any other Governmental Authority. Such trustee or receiver shall have all rights and powers provided to it by law or by court order or provided to the Administrative Agent under this Agreement.

(c)     Notwithstanding anything to the contrary contained in this Agreement, to the extent required by applicable law:

(i)     the Administrative Agent will not take any action hereunder that would constitute or result in any transfer of control or assignment of the FCC Licenses or Industry Canada Licenses without obtaining all necessary FCC, Industry Canada and other Governmental Authority approvals, and all voting rights in any Collateral representing control rights in the holders of any FCC License or any Industry Canada License shall remain with the Obligors notwithstanding the occurrence of any Event of Default until such required consents of the FCC or Industry Canada, as applicable, shall have been obtained (and, in that connection, the Administrative Agent and the Lenders shall be entitled to rely on the advice of FCC counsel  or Industry Canada counsel selected by the Administrative Agent (acting at the written direction of the Required Lenders) to determine whether FCC approval, Industry Canada approval or other Governmental Authority approvals are required), and

(ii)     the Administrative Agent shall not foreclose on, sell, assign, transfer or otherwise dispose of, or exercise any right to control the FCC Licenses or Industry Canada Licenses as provided herein or take any other action that would affect the operational, voting, or other control of the Obligors, unless such action is taken in accordance with the provisions of the Communications Act of 1934, as from time to time amended, and the rules, regulations and policies of the FCC, Industry Canada and any other Governmental Authority.

(c)     Each Obligor acknowledges that the approval of the FCC, Industry Canada and each other appropriate Governmental Authority to the assignment of the FCC License Rights and the Industry Canada License Rights is integral to the Administrative Agent's realization of the value of the Collateral, including, without limitation, the FCC Licenses and the Industry Canada Licenses, that there is no adequate remedy at law for failure by the Obligor to comply with the provisions of this Section 10.14 and that such

failure could not be adequately compensable in damages. Therefore, the Obligors agree that the provisions of this Section 10.14 may be specifically enforced, without any requirement to post bond (such rights being fully waived by Obligors) and without regard to the adequacy of any remedies available at law (the defense of the adequacy of remedies at law being fully waived by the Obligors).

Section 10.14. <u>Agents and Attorneys-in-Fact</u>. The Administrative Agent may employ agents and attorneys-in-fact in connection herewith and shall not be responsible for the negligence or misconduct of any such agents or attorneys-in-fact selected by it in good faith.

Section 10.15. <u>No Senior Liens</u>. To the extent that, by reason of changes in law or regulations or for any other reason Obligors may grant to Administrative Agent additional rights with respect to the FCC Licenses or Industry Canada Licenses or rights facilitating Administrative Agent's ability to foreclose upon, acquire and/or dispose of such interests upon the occurrence of an Event of Default, Obligors agree, upon notice from Administrative Agent (acting at the written direction of the Required Lenders), to amend this agreement to provide such rights or such assurance to Administrative Agent.

Section 10.16. <u>Guarantee</u>.

(a) In order to induce the Lenders to enter into this Agreement and to provide Loans hereunder and in recognition of the direct benefits to be received by the Guarantors from the proceeds of the Loans, each Guarantor hereby unconditionally and irrevocably, jointly and severally, guarantees as primary obligor and not merely as surety the due and punctual payment in full of the principal of and interest on the Loans and of all of the Obligations to each of the Lenders and the Administrative Agent, when and as due, whether at maturity, by acceleration or otherwise. If any or all of the Obligations of the Borrower to the Lenders or the Administrative Agent becomes due and payable hereunder, each Guarantor unconditionally promises on a joint and several basis to pay such Obligations to the Lenders or the Administrative Agent, as the case may be, or order, on demand, together with any and all expenses which may be incurred by the Administrative Agent or the Lenders in collecting any of the Obligations. Notwithstanding the foregoing, the maximum liability of any Non-Subsidiary Guarantor shall not exceed the sum of (x)(i) the aggregate amount of funds transferred (including as dividends or loans to such Non-Subsidiary Guarantor) to any Non-Subsidiary Guarantor or any subsidiary of any Non-Subsidiary Guarantor (excluding the Borrower, the Domestic Subsidiary Guarantors and the Canadian Guarantors) after the Petition Date by the Borrower or any other Guarantor or to any subsidiary of such Non-Subsidiary Guarantor (including funds transferred pursuant to Section 6.03(h) and payments to TerreStar New York Inc. specified in Section 6.05) minus (ii) the aggregate amount of any funds contributed, loaned, repaid by such Non-Subsidiary Guarantor to the Borrower or any other Guarantor plus (y) the fees and expenses incurred by the Administrative Agent or any Lender incurred in connection with the enforcement of the obligations of such Non-Subsidiary Guarantor under the Loan Documents under Section 10.16.

(b) Each Guarantor authorizes the Administrative Agent and the Lenders without notice or demand (except as shall be required by applicable statute and which cannot be waived), and without affecting or impairing its liability hereunder, from time to time to (a) renew, compromise, extend, increase, accelerate or otherwise change the time for payment of, or

otherwise change the terms of, the Obligations or any part thereof in accordance with this Agreement, including any increase or decrease of the rate of interest thereon, (b) take and hold security from any Guarantor or any other party for the payment of this Guarantee or the Obligations and exchange, enforce, waive and release any such security and (c) apply such security and direct the order or manner of sale thereof as the Administrative Agent and the Lenders in their discretion may determine.

(c) The Obligations of each Guarantor hereunder are independent of the Obligations of any other Guarantor or the Borrower, and a separate action or actions may be brought and prosecuted against each Guarantor whether or not action is brought against any other Guarantor or the Borrower and whether or not any other Guarantor or the Borrower be joined in any such action or actions. Each Guarantor waives, to the fullest extent permitted by law, the benefit of any statute of limitations affecting its liability hereunder or the enforcement thereof. Any payment by the Borrower or other circumstances which operate to toll any statute of limitations as to the Borrower shall operate to toll the statute of limitations as to each Guarantor.

(d) Each Guarantor waives presentation to, demand for payment from and protest to the Borrower or any other Guarantor, and also waives notice of protest for nonpayment. The Obligations of the Guarantors hereunder shall not be affected by (i) the failure of the Administrative Agent or any Lender to assert any claim or demand or to enforce any right or remedy against the Borrower or any other Guarantor under the provisions of this Agreement or any other Loan Document or otherwise, (ii) any extension or renewal of any provision hereof or thereof, (iii) any rescission, waiver, compromise, acceleration, amendment or modification of any of the terms or provisions of any of the Loan Documents, (iv) the release, exchange, waiver or foreclosure of any security held by the Administrative Agent for the Obligations or any of them, (v) the failure of the Administrative Agent or any Lender to exercise any right or remedy against any other Guarantor, or (vi) the release or substitution of the Borrower or any other Guarantor.

(e) Each Guarantor further agrees that this Guarantee constitutes a Guarantee of payment when due and not just of collection, and waives any right to require that any resort be had by the Administrative Agent or any Lender to any security held for payment of the Obligations, to any other Guarantee of the Obligations or to any balance of any deposit, account or credit on the books of the Administrative Agent or any Lender in favor of the Borrower or any other Guarantor, or to any other Person.

(f) Each Guarantor hereby waives any defense that it might have based on a failure to remain informed of the financial condition of the Borrower and of any other Guarantor and any circumstances affecting the ability of the Borrower to perform under this Agreement.

(g) Each Guarantor's guarantee shall not be affected by the genuineness, validity, regularity or enforceability of the Obligations or any other instrument evidencing any Obligations, or by the existence, validity, enforceability, perfection, or extent of any collateral therefor or by any other circumstance relating to the Obligations which might otherwise constitute a defense to this Guarantee. Neither the Administrative Agent nor any of the Lenders makes any representation or warranty in respect to any such circumstances or shall have any duty

or responsibility whatsoever to any Guarantor in respect of the management and maintenance of the Obligations.

(h) Subject to the provisions of Article VII, upon the Obligations becoming due and payable (by acceleration or otherwise), the Lenders shall be entitled to immediate payment of such Obligations by the Guarantors upon written demand by the Administrative Agent, without further application to or order of the Bankruptcy Court.

(i) The obligations of the Guarantors hereunder shall not be subject to any reduction, limitation, impairment or termination for any reason, including any claim of waiver, release, surrender, alteration or compromise, and shall not be subject to any defense or set-off, counterclaim, recoupment or termination whatsoever by reason of the invalidity, illegality or unenforceability of the Obligations. Without limiting the generality of the foregoing, the obligations of the Guarantors hereunder shall not be discharged or impaired or otherwise affected by the failure of the Administrative Agent or any Lender to assert any claim or demand or to enforce any remedy under this Agreement or any other agreement, by any waiver or modification of any provision thereof, by any default, failure or delay, willful or otherwise, in the performance of the Obligations, or by any other act or thing or omission or delay to do any other act or thing which may or might in any manner or to any extent vary the risk of the Guarantors or would otherwise operate as a discharge of the Guarantors as a matter of law, unless and until the Obligations are paid in full.

(j) Upon payment by any Guarantor of any sums to the Administrative Agent or any Lender hereunder, all rights of such Guarantor against the Borrower arising as a result thereof by way of right of subrogation or otherwise, shall in all respects be subordinate and junior in right of payment to the prior final and indefeasible payment in full of all of the Obligations. If any amount shall be paid to such Guarantor for the account of the Borrower, such amount shall be held in trust for the benefit of the Administrative Agent and the Lenders and shall forthwith be paid to the Administrative Agent and the Lenders to be credited and applied to the Obligations, whether matured or unmatured.

[Signature Pages Follow]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

TERRESTAR NETWORKS INC.,
debtor and debtor-in-possession, as the Borrower

By:_____
Name:
Title:

MOTIENT HOLDINGS INC.
MOTIENT COMMUNICATIONS INC.
MOTIENT LICENSE INC.
MOTIENT SERVICES INC.
TERRESTAR NEW YORK INC.
MVH HOLDING INC.
MOTIENT VENTURES HOLDING INC.
TERRESTAR NATIONAL SERVICES, INC.
TERRESTAR LICENSE INC.,
each a debtor and debtor-in-possession, as
Guarantors


By:_____
Name:
Title:




TERRESTAR NETWORKS HOLDINGS
(CANADA) INC.
TERRESTAR NETWORKS HOLDINGS
(CANADA) INC.
TERRESTAR NETWORKS (CANADA) INC.
0887729 B.C. LTD.,
each a debtor and debtor-in-possession, as Canadian
Guarantors


By:_____
Name:
Title:

THE BANK OF NEW YORK MELLON,
as Administrative Agent and Collateral Agent


By:_____
    Name:
    Title:

ECHOSTAR CORPORATION,
as Lender

By:_____
    Name:
    Title:

**EXHIBIT C**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| TERRESTAR NETWORKS INC., *et al.*,[1] | ) Case No. 10-[_____] (   ) |
| | ) |
| Debtors. | ) Joint Administration Requested |
| | ) |

**DECLARATION OF JEFFREY W. EPSTEIN IN SUPPORT OF
MOTION OF THE DEBTORS FOR INTERIM AND FINAL
ORDERS UNDER SECTIONS 105, 361, 362, 363(C),
364(C)(1), 364(C)(2), 364(C)(3), AND 364(E) AND 507 OF THE
BANKRUPTCY CODE AND BANKRUPTCY RULES 2002, 4001
AND 9014: (I) AUTHORIZING DEBTORS TO OBTAIN POSTPETITION
FINANCING; (II) AUTHORIZING DEBTORS TO USE CASH
COLLATERAL; (III) GRANTING ADEQUATE PROTECTION
TO PREPETITION SECURED PARTIES; AND (IV) SCHEDULING A
<u>FINAL HEARING PURSUANT TO BANKRUPTCY RULES 4001(B) AND (C)</u>**

I, Jeffrey W. Epstein, hereby declare, pursuant to 28 U.S.C. § 1746, under penalty of perjury:

<u>**Background**</u>

1.      I am the Chief Executive Officer of TerreStar Networks Inc., ("***TSN***" and, together with its affiliated debtors and debtors in possession, "***TerreStar***" or the "***Debtors***" or "***we***").   I have been employed in this and other capacities by TSN since July 2006. Accordingly, I am familiar with TerreStar's day-to-day operations, business, and financial affairs.

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal taxpayer-identification number, are: TerreStar New York Inc. (6394); TerreStar Networks Inc. (3931); Motient Communications Inc. (3833); Motient Holdings Inc. (6634); Motient License Inc. (2431); Motient Services Inc. (5106); Motient Ventures Holding Inc. (6191); MVH Holdings Inc. (9756); TerreStar License Inc. (6537); TerreStar National Services Inc. (6319); TerreStar Networks Holdings (Canada) Inc. (1337); TerreStar Networks (Canada) Inc. (8766) and 0887729 B.C. Ltd. (1345).

2.      I submit this supplemental declaration in support of the *Motion of the Debtors for Interim and Final Orders Pursuant to Sections 105, 361, 362, 363(c), 364(c)(1), 364(c)(2), 364(c)(3), 364(e) and 507 of the Bankruptcy Code and Bankruptcy Rules 2002, 4001 and 9014: (I) Authorizing Debtors to Obtain Postpetition Financing; (II) Authorizing the Debtors to Use Cash Collateral; (III) Granting Adequate Protection to Prepetition Secured Parties; and (IV) Scheduling a Final Hearing Pursuant to Bankruptcy Rules 4001(b) and (c)* (the "***DIP Motion***").[2]

3.      The statements in this declaration are, except where specifically noted, based on my personal knowledge, my discussions with other members of the Debtors' senior management, my review of relevant documents, or my opinion based upon experience, knowledge and information concerning the Debtors' operations and financial affairs.  If called upon to testify, I could and would testify competently to the facts set forth herein.  I am authorized to submit this declaration on behalf of the Debtors.

### The Debtors' Business and Current Financing Obligations

4.      As discussed in detail in my declaration in support of first day pleadings submitted contemporaneously herewith (the "***First Day Declaration***"), TerreStar is a next-generation mobile satellite service operator that recently launched a wireless communications system which provides mobile satellite coverage throughout the United States and Canada using integrated satellite-terrestrial smartphones and other devices.  We offer this next-generation service as a wholesale mobile satellite services provider, allowing existing terrestrial service providers to augment their existing terrestrial networks with mobile satellite coverage.

---

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed in the DIP Motion.

5.     Our business enterprise is dependent in large part on a number of key agreements and other arrangements, which, among other things, provide the necessary intellectual property to us as well as allow us to reach the broadest range of potential customers who are targeted as likely users of our planned communications systems.  As more fully described in my First Day Declaration, these key contract counterparties are critical not only to the continuation of our business plan, but also to keep the T-1 Satellite on course in its orbit and maintain space and ground equipment necessary to our operations.

6.     As of the date hereof (the *"Petition Date"*), the various Debtors are parties to certain instruments evidencing our long-term indebtedness including the Senior Secured Notes Indenture, the Senior Exchangeable Notes Indenture, and the Purchase Money Credit Facility, all of which I discuss in length in the First Day Declaration.  Pursuant to these various instruments, as of the Petition Date, our outstanding pre-petition long-term indebtedness obligations total approximately $1.2 billion.

### The Debtors' Need for Liquidity

7.     As discussed above, and as further described in the First Day Declaration, to date, our business model has been premised upon a substantial amount of capital expenditures needed to develop the technological components necessary to run our network.  Specifically, regular infusions of financing have been and continue to be necessary to, among other things, construct and maintain satellites and ground stations, develop a chipset that would allow smartphones and cellular devices to communicate over the TerreStar network and obtain regulatory and other approvals.  Each of these components is vital to our business plan, and some of these components (such as the maintenance of satellites and ground stations) are critical to maintaining asset values.

8.      Despite recently achieving the significant milestone of turning our product into a revenue stream, we still require a significant amount of capital before we become profitable enough to service our current debt load and also meet our on-going capital requirements for continued technological development and expansion of our product. Accordingly, over the past six months, we attempted a number of measures to increase liquidity restructure our balance sheet.  Although we were successful in obtaining a small amount of capital, the capital was not sufficient to allow the Company to generate revenue to solve the Company's near-term and long-term liquidity needs nor service its debt obligations.

9.      As such, we determined that the best path forward was to file for chapter 11 in order to both raise capital and restructure our balance sheet.  As part of that path, we needed to obtain debtor in possession financing.  Specifically, and among other things, we require financing because we (1) must be able to make payments to significant contract counterparties on a current basis postpetition, (2) need to continue to pay employees and consultants whose employment is vital to our business operations and (3) must pay ordinary operating expenses such as rent, utilities, insurance, taxes, and fees.

10.     Our need for DIP Financing cannot be understated.  As of the Petition Date, we had less than $500,000 of cash on hand with very little in the way of any revenue stream.  Without access to the funds proposed to be advanced under the DIP Facility, our overall business would come to a halt, causing immediate and irreparable harm to us, our estates, and our creditors.  Indeed, our payroll obligations alone average approximately $550,000 on a bi-weekly basis.  Our employees include people with significant industry experience and are vital to the continued functionality of the TerreStar network and the continued development of our

business under our business plan.  Without the ability to compensate our employees their regular wages on a consistent basis, we risk losing key employees, thus jeopardizing our operations.

11.     The failure to pay any one of the aforementioned contract counterparties and employees could have a significant negative impact on our enterprise value and our ability to market our next generation network, thereby causing harm to creditors and parties in interest in these cases.  Any cessation in performance, even for a day, would have significant negative consequences.

12.     In light of the above, I believe that our decision to enter into the DIP Financing was a sound exercise of our business judgment and consistent in all respects with our fiduciary duties to our creditors and other stakeholders.   Indeed, we believe entry into the DIP Financing Facility presents us with our best opportunity to maximize the value of our estates.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: New York, New York

Jeffrey W. Epstein

**EXHIBIT D**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| TERRESTAR NETWORKS INC., *et al.*,[1] | ) Case No. 10-[_____] (   ) |
| | ) |
| Debtors. | ) Joint Administration Requested |
| | ) |

**DECLARATION OF STEVEN ZELIN IN SUPPORT OF MOTION OF THE DEBTORS
FOR INTERIM AND FINAL ORDERS PURSUANT TO SECTIONS 105, 361, 362, 363(C),
364(C)(1), 364(C)(2), 364(C)(3), 364(E) AND 507 OF THE BANKRUPTCY CODE AND
BANKRUPTCY RULES 2002, 4001 AND 9014: (I) AUTHORIZING DEBTORS TO
OBTAIN POSTPETITION FINANCING; (II) AUTHORIZING THE DEBTORS TO USE
CASH COLLATERAL; (III) GRANTING ADEQUATE PROTECTION TO
PREPETITION SECURED PARTIES; AND (IV) SCHEDULING A FINAL HEARING
PURSUANT TO BANKRUPTCY RULES 4001(B) AND (C)**

I, Steven Zelin, hereby declare, pursuant to 28 U.S.C. § 1746, under penalty of perjury:

**Background**

1.       I am a Senior Managing Director of Blackstone Advisory Partners L.P.

(the ***"Advisor"***), an affiliate of The Blackstone Group L.P. ("***Blackstone***") a global alternative

asset manager and provider of financial advisory services listed on the New York Stock

Exchange that maintains offices at 345 Park Avenue, New York, New York 10154.  The Advisor

was retained by the Debtors in April 2010 to assist with a broad range of responsibilities

including, among other things, to structure and secure debtor in possession financing to the

extent necessary.  Over the course of the last several months, the Advisor has become familiar

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal taxpayer-identification number, are: TerreStar New York Inc. (6394); TerreStar Networks Inc. (3931); Motient Communications Inc. (3833); Motient Holdings Inc. (6634); Motient License Inc. (2431); Motient Services Inc. (5106); Motient Ventures Holding Inc. (6191); MVH Holdings Inc. (9756); TerreStar License Inc. (6537); TerreStar National Services Inc. (6319); TerreStar Networks Holdings (Canada) Inc. (1337); TerreStar Networks (Canada) Inc. (8766) and 0887729 B.C. Ltd. (1345).

with the Debtors' business, finances, capital structure and operations, as well as their financial restructuring initiatives.

2.     I joined the Advisor in 1998 and was made partner in 2001.  Prior to joining the Advisor, I was a partner in the Restructuring & Reorganization Group of Ernst & Young LLP.

3.      I have in excess of 20 years of experience in financial advisory services, including financial transactions, valuation and restructuring transactions.  I have led complex bankruptcies and reorganizations across a broad spectrum of industries in a variety of capacities. Among other things, I have advised companies, equity sponsors and creditors in both domestic and cross-border restructurings, capital raises, and merger and acquisition advisory transactions. In particular, I have provided services to debtors and other constituencies in numerous restructurings, including, among others, *Abitibi Bowater Holdings, Inc., Aeromexico/Mexicana Airlines, American Axle & Manufacturing, Inc., Aquila, Inc., Big V Supermarkets (Shop Rite), Centaur Gaming, Delphi Corporation, Enron Corporation, Entergy New Orleans, General Motors Corporation, The Goodyear Tire & Rubber Company, Integrated Resources, Inc., Intrawest Resorts, Kindred Healthcare (formerly Vencor), Marvel Entertainment Group, Mrs. Fields Cookies, Inc., Motorola Inc. (in the restructuring of Iridium), Pacific Lumber/Scotia Pacific Corp., SEM Group Energy Partners, R. H. Macy & Co., Sumitomo Corp (in the restructuring of Apex Silver Mines), and Xerox Corporation.*  I have provided expert witness testimony regarding valuation and restructuring matters on numerous occasions.

4.     I submit this declaration in support of the *Motion of the Debtors for Interim and Final Orders Pursuant to Sections 105, 361, 362, 363(c), 364(c)(1), 364(c)(2), 364(c)(3), 364(e) and 507 of the Bankruptcy Code and Bankruptcy Rules 2002, 4001 and 9014:*

*(I) Authorizing Debtors to Obtain Postpetition Financing; (II) Authorizing the Debtors to Use*

*Cash Collateral; (III) Granting Adequate Protection to Prepetition Secured Parties; and (IV)*

*Scheduling a Final Hearing Pursuant to Bankruptcy Rules 4001(b) and (c)* (the "**DIP Motion**").[2]

5.     The statements in this declaration are, except where specifically noted,

based on my personal knowledge or opinion, on information that I have received from the

Debtors' employees or advisors and/or employees of the Advisor working directly with me or

under my supervision, direction or control, or from the Debtors' records maintained in the

ordinary course of their business.  I am not being compensated specifically for this testimony

other than through payments received by the Advisor as a professional proposed to be retained

by the Debtors.[3]  If I were called upon to testify, I could and would testify competently to the

facts set forth herein.  I am authorized to submit this declaration on behalf of the Debtors.

### The Debtors' Need for Postpetition Financing

6.     The Debtors' business focuses on developing a next generation wireless

communications network.  However, because the Company is still in its development stage, it

has not yet generated significant revenue.  Accordingly, regular infusions of financing have been

and continue to be necessary to, among other things, construct and maintain satellites and ground

stations, develop a chipset that would allow smartphones and cellular devices to communicate

over the TerreStar network and obtain regulatory and other approvals.  Each of these components

is vital to the Debtors' business plan, and some of these components (such as the maintenance of

satellites and ground stations) are critical to maintaining asset values.

---

[2] Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the DIP Motion.

[3] By separate motion, I understand the Debtors will be filing a motion to approve the retention of Blackstone Advisory Partners L.P. as financial advisor for the Debtors and Debtors in possession *nunc pro tunc* to the Petition Date.

7.      Despite recently achieving the significant milestone of turning their product into a revenue stream, the Debtors still require a significant amount of capital before they become profitable enough to both service their current debt load and also meet their on-going capital requirements for continued technological development and expansion of their product.  Accordingly, over the past six months, the Debtors attempted a number of measures to increase liquidity and restructure their balance sheet.  Although the Company was successful in obtaining some capital, the amount raised was not sufficient to fund operations to the point where it was able to generate revenue that would allow the Company to finance near-term and long-term liquidity needs and service its debt obligations.

8.      As such, the Debtors determined that the best path forward was to file for chapter 11 in order to both raise capital, including a debtor in possession financing, and restructure their balance sheet.  Specifically, and among other things, the Debtors required financing because they must be able to (1) make payments to significant contract counterparties on a current basis postpetition, including, but not limited to, certain key vendors that are determined to be critical; (2) continue to pay employees and consultants whose employment is vital to the Debtors' business operations, and (3) pay ordinary operating expenses such as rent, utilities, insurance, taxes, and fees.

9.      The Debtors' need for DIP Financing cannot be understated.  As of the Petition Date, they had less than $0.5 million of cash on hand, and, as stated above, very little in the way of any revenue stream.  Without access to the funds proposed to be advanced under the DIP Agreement, the Debtors' overall business would come to a halt, causing immediate and irreparable harm to the Debtors, their estates, and their creditors.  The failure to pay any one of the Debtors' contract counterparties could have a significant negative impact on the enterprise

value of the Debtors and their ability to market their next generation network, thereby causing harm to creditors and parties in interest in these cases. Any cessation in performance, even for a day, would have significant negative consequences.

10. As part of the Debtors' debtor in possession financing process, the Debtors, with the Advisor's assistance, have developed a 13-week cash flow forecast. This forecast considers a number of items, including, among others, the impact of a bankruptcy filing, material cash disbursements, required vendor payments and cash flows. Without approval of the DIP Financing, the Debtors will have insufficient cash on hand to meet these needs.

11. Lastly, the DIP Financing received by the Debtors will be subject to a budget. The Debtors, with the assistance of the Advisor, have agreed upon a budget (the "***Agreed Budget***") for the DIP Financing for the nine-month period beginning on the Closing Date (as defined in the DIP Agreement). Following the Closing Date, the Debtors will report their results as compared to the Agreed Budget on a bi-weekly basis, pursuant to the terms set forth in the DIP Agreement. After discussing and working to put together the Agreed Budget with the Debtors, I believe that the Agreed Budget is achievable, will allow the Debtors to operate without the accrual of unpaid administrative expenses and will allow the Debtors to continue to make necessary expenditures critical to their business.

## DIP Financing Negotiations

12. Despite the Debtors' obvious needs for DIP financing (as explained above), the Debtors were still able to run a full, robust, careful and well-documented process to both obtain the best possible financing available, as well as, at the same time, attempt to explore restructuring alternatives with their stakeholders. As a result of their efforts, the Debtors have been able to file, on the first day of these cases, both a motion seeking approval of $75 million in

DIP financing, as well as a motion seeking to assume a plan support agreement that provides the Debtors with a fully funded path out of chapter 11. Set forth below is an explanation of this process.

13. In April 2010, the Debtors and their advisors discussed and contemplated a chapter 11 filing.[4] To provide the Debtors with appropriate and necessary funding, the negotiation of adequate liquidity in the form of debtor-in-possession financing was critical to ensure that the Debtors could operate in accordance with their business plan during chapter 11. In June 2010, the Advisor approached members of the existing capital structure for a $250 million junior DIP financing where lenders would receive a junior "non-priming" lien on all assets that secure the Senior Secured Notes and a first lien on all assets that do not secure the Senior Secured Notes.[5] Specifically, the Debtors engaged in discussions with an informal group comprised of certain holders of the 6.5% Senior Exchangeable PIK Notes of TerreStar Networks Inc., due 2014 (the *"Ad Hoc Noteholder Group"*) as well as Harbinger Capital Partners (*"Harbinger"*) a significant holder of many of the Debtors' obligations. During this time, the Debtors also reached out to EchoStar Corporation (*"EchoStar"*), another significant stakeholder of many of the Debtors' obligations, attempting to engage them in restructuring/DIP financing negotiations.

---

[4] At that time, and up until recently, the Debtors contemplated that Terrestar Corporation (the ultimate parent) and Terrestar Holdings, Inc. (its direct subsidiary) would file for chapter 11 as well. In light of recent events, including, without limitation, the agreement by certain parties to toll the litigation they were bringing against Terrestar Corporation, the Debtors decided that filing these entities for chapter 11 at this time would not be necessary.

[5] Terrestar Corporation has access to 8 MHz of 1.4 GHz spectrum through a license held by their non-debtor affiliate, TerreStar 1.4 Holdings LLC (*"1.4 Holdings"*) 1.4 Holdings currently is a party to the Spectrum Lease Agreement, pursuant to which One Dot Four manages the 1.4 Spectrum in exchange for payments to 1.4 Holdings of $2 million per month. TerreStar 1.4 Holdings LLC is a wholly owned subsidiary of TerreStar Holdings Inc. (*"TerreStar Holdings"*), which is the direct subsidiary of Terrestar Corporation.

14.     The Debtors and their professionals received some preliminary indications that certain of the 6.5% Noteholders, as well as Harbinger, would be willing to be DIP lenders in the "junior" DIP structure, and entered into extensive and arms'-length negotiations with these parties; however, such commitments ultimately were not obtainable.

15.     In early August 2010, the Debtors and their advisors began to shop the "junior" DIP to additional parties, including other stakeholders not previously contacted, as well as non-stakeholder parties, while at the same time continuing discussions with the Ad Hoc Noteholder Group and Harbinger.  The Advisor utilized its standard DIP marketing procedures for these circumstances (i.e., companies of this nature in this particular distressed situation).  Of the total of fifty-three parties contacted, the Debtors executed non-disclosure agreements with twenty-five of those parties.  Upon execution of a non-disclosure agreement, the Advisor facilitated and participated in numerous diligence discussions with, and responded to information requests made by, the potential lenders.

16.     The Debtors were unable to obtain sufficient interest to fill the contemplated "junior" DIP financing facility.  However, the feedback from the marketing process suggested that the potential lenders had significant interest in a priming DIP.  As such, in late August, the Debtors began to solicit interest in a priming DIP financing.[6]

17.     In late September, after having reached an agreement in principle with respect to the priming DIP Financing, the Debtors received a $75 million "junior" DIP proposal provided by EchoStar, which financing was to be provided as part of a complete restructuring of the Debtors' capital structure the terms of which were at that time yet to be defined.  The

_____

[6] Soon thereafter, the Debtors were approached by Harbinger and EchoStar who offered the Debtors $10 million of financing under the PMCA.  This gave the Debtors more breathing room.  Accordingly, after the Debtors received this short term financing, although the Debtors continued to explore alternative sources of financing, at that time, the Debtors began having joint discussions with EchoStar and Harbinger regarding a potential restructuring.

"junior" DIP proposal would have a second lien on all of the Debtors' assets that were encumbered by the PMCA and the 15% Secured Notes, and a senior lien on all of the Debtors' unencumbered assets.

18.     For a short period of time, the Debtors negotiated parallel DIP financing arrangements – a "priming" DIP with certain financial institutions who were not current stakeholders (the "**Third Parties**") and a "junior" DIP with EchoStar – in order to secure the most favorable financing arrangement possible.  During this time, the Debtors continued to conduct diligence meetings and hold various calls and negotiation sessions with both potential DIP lenders, with an understanding that a decision needed to be made.

19.     In early October, EchoStar sent the Debtors a DIP commitment letter and draft DIP credit agreement for the proposed Junior DIP Facility (the "***DIP Agreement***") as well as the terms of proposed restructuring of the Debtors and the Third Parties sent the Debtors a DIP commitment letter and a draft credit agreement for the proposed priming facility.

20.     Following extensive diligence and negotiations with the two potential DIP lender groups, the Debtors determined that it would be in the best interests of the Debtors and their stakeholders to enter into the DIP Agreement with EchoStar.  Specifically, the Debtors concluded that the EchoStar DIP financing was superior for, among other things, the following reasons: (1) it eliminated the risks of any "priming" fight necessary for this Court to approve the third party financing proposal, thereby making the Debtors' ability to receive the necessary financing more certain; (2) it did not require the payment of pre-petition commitment fees; and (3) it did not require a full draw of all amounts available under the financing thus reducing the

interest costs.[7] Further, and importantly, counsel to the Debtors has advised me that given the standards set forth in section 364(d)(1) of the Bankruptcy Code, the Debtors had significant doubts as to whether they could meet the factual and legal predicates necessary to prevail in a "priming" fight.

21. Moreover, and concomitantly with offering the DIP Financing, EchoStar also agreed to enter into a plan support agreement (complete with a plan term sheet), whereby EchoStar agreed to, among other things, (a) convert substantially all of its secured indebtedness (other than amounts owed to EchoStar under the PMCA) into equity of the reorganized Debtors; (2) convert all of its unsecured indebtedness into equity of the reorganized Debtors; (3) backstop one-hundred million dollars of a one-hundred and twenty-five million dollar rights offering to be offered to substantially all other stakeholders of the Debtors that will provide the funding necessary for the Debtors to repay their DIP obligations and other emergence costs and, assuming the rights offering is fully subscribed, provide financing that enables the Debtors to fund its operations post emergence from Chapter 11; and (4) provide, at EchoStar's option, an additional $25 million of financing, in its sole discretion. I believe that, based upon all of the above, the Debtors' decision to pursue this comprehensive and consensual restructuring plan will maximize recoveries to their creditors, be beneficial to their estates, and will ensure a swift exit from these bankruptcy proceedings pursuant to a feasible plan of reorganization.

---

[7] Although the third party DIP Financing proposal offered $250 million in DIP financing, the amount is not comparable to the $75 million DIP Financing proposed by the EchoStar. First, the DIP Financing proposal offered by the third party lenders would have repaid, in full, the PMCA, meaning that, in effect it was actually only $163 million in cash proceeds to the Company. In addition, the third party DIP Financing proposal included a 10% cash interest component, for one year, incremental original issue discount, and commitment fees thereby further reducing the amount of the DIP from $163 million to $136 million. Further, the third party DIP financing assumed a longer bankruptcy, therefore funding more operating costs, leaving $113 million versus the $75 million proposed by EchoStar.

22.     For numerous reasons, no party, other than the proposed DIP Lenders, was willing to provide a better financing package to the Debtors.  Without the relief requested in the DIP Motion and access to the DIP Financing, the Debtors would likely have to curtail or even terminate their business operations, which would have a material negative impact on the Debtors' estates, their creditors, employees, stakeholders and other parties in interest.  Thus, the Debtors need to ensure that working capital is available immediately upon the commencement of these cases.

23.     I believe that the terms of the DIP Financing, the Debtors' use of the cash collateral as provided by the proposed order for the DIP Motion and all other financial accommodations provided under the DIP Documents are fair and reasonable and supported by reasonably equivalent value and fair consideration.  Moreover, the DIP Financing addresses the Debtors' working capital and liquidity needs and will enable the Debtors to preserve their value as a going-concern.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated:       New York, New York
              October 17, 2010

                                  Steven Zelin
                                  Senior Managing Director