AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
(212) 872-1000 (Telephone)
(212) 872-1002 (Facsimile)
Ira S. Dizengoff
Arik Preis
Ashleigh L. Blaylock

*Proposed Counsel to the Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| TERRESTAR NETWORKS INC., *et al.*,[1] | ) Case No. 10-[_____] ( ) |
| | ) |
| Debtors. | ) Joint Administration Requested |
| | ) |

## DEBTORS' MOTION FOR AN ORDER (A) AUTHORIZING THE DEBTORS TO ASSUME A RESTRUCTURING SUPPORT AGREEMENT AND (B) GRANTING RELATED RELIEF

TerreStar Networks Inc. and certain of its affiliates, as debtors and debtors in possession

(collectively, the "***Debtors***"), seek entry of an order, substantially in the form attached hereto as

Exhibit A, (a) authorizing the Debtors to assume that certain Restructuring Support Agreement

(the "***RSA***") between the Debtors and EchoStar Corporation ("***EchoStar***"), attached hereto as

Exhibit B and (b) granting such other relief as is just and proper.  In support of this motion, the

Debtors submit the Declaration of Jeffrey W. Epstein, Chief Executive Officer of TerreStar

---

[1]  The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal taxpayer-identification number, are: TerreStar New York Inc. (6394); TerreStar Networks Inc. (3931); Motient Communications Inc. (3833); Motient Holdings Inc. (6634); Motient License Inc. (2431); Motient Services Inc. (5106); Motient Ventures Holding Inc. (6191); MVH Holdings Inc. (9756); TerreStar License Inc. (6537); TerreStar National Services Inc. (6319); TerreStar Networks Holdings (Canada) Inc. (1337); TerreStar Networks (Canada) Inc. (8766) and 0887729 B.C. Ltd. (1345).

Corporation, in Support of First Day Pleadings (the "***First Day Declaration***").  In further support of this motion, the Debtors respectfully state as follows:

## Preliminary Statement

By this motion, the Debtors are seeking this Court's approval to assume a restructuring support agreement with their largest secured creditor (and indeed, their largest stakeholder), which will help pave the way for the Debtors to exit chapter 11 with a deleveraged balance sheet and give the Debtors the best available opportunity for them to maximize value for their estates, including their stakeholders.

Before the commencement of these chapter 11 cases, and as set forth in more detail in the First Day Declaration and various of the declarations[3] that the Debtors have filed in support of their Motion of the Debtors for Interim and Final Orders Pursuant to Sections 105, 361, 362, 363(c), 364(c)(1), 364(c)(2), 364(c)(3), 364(e) and 507 of the Bankruptcy Code and Bankruptcy Rules 2002, 4001 and 9014: (I) Authorizing Debtors to Obtain Postpetition Financing; (II) Authorizing the Debtors to Use Cash Collateral; (III) Granting Adequate Protection to Prepetition Secured Parties; and (IV) Scheduling a Final Hearing Pursuant to Bankruptcy Rules 4001(b) and (c) (the "***DIP Motion***"), the Debtors explored and pursued every available option for debtor-in-possession financing ("***DIP Financing***").[4]  As part of this process, the Debtors also

---

[3]    The Debtors filed two declarations in support of the DIP Motion: (1) Declaration of Steven Zelin in Support of Motion of the Debtors for Interim and Final Orders Pursuant to Sections 105, 361, 362, 363(c), 364(c)(1), 364(c)(2), 364(c)(3), 364(e) and 507 of the Bankruptcy Code and Bankruptcy Rules 2002, 4001 and 9014: (I) Authorizing Debtors to Obtain Postpetition Financing; (II) Authorizing the Debtors to Use Cash Collateral; (III) Granting Adequate Protection to Prepetition Secured Parties; and (IV) Scheduling a Final Hearing Pursuant to Bankruptcy Rules 4001(b) and (c) (the "***Zelin Declaration***"); and (2) Declaration of Jeffrey W. Epstein in Support of Motion of the Debtors for Interim and Final Orders Pursuant to Sections 105, 361, 362, 363(c), 364(c)(1), 364(c)(2), 364(c)(3), 364(e) and 507 of the Bankruptcy Code and Bankruptcy Rules 2002, 4001 and 9014: (I) Authorizing Debtors to Obtain Postpetition Financing; (II) Authorizing the Debtors to Use Cash Collateral; (III) Granting Adequate Protection to Prepetition Secured Parties; and (IV) Scheduling a Final Hearing Pursuant to Bankruptcy Rules 4001(b) and (c) (the "***Epstein Declaration***").

[4]    A copy of the Zelin Declaration and Epstein Declaration are attached hereto.

had numerous discussions with their stakeholders regarding a consensual restructuring and the terms of a chapter 11 plan. This was necessary because in light of the Debtors' minimal current operating revenue (and no significant revenue projected for the next 12 months), the Debtors could not pursue a DIP Financing package in a vacuum, without some sort of back-end exit strategy. Moreover, and as set forth in the DIP Motion, Zelin Declaration and Epstein Declaration, given the standards set forth in section 364(d)(1) of the Bankruptcy Code, the Debtors had significant doubts as to whether they could meet the factual and legal predicates necessary to prevail in a "priming fight."

Ultimately, and after running a full and robust process seeking DIP Financing and a potential comprehensive restructuring, the Debtors were able to "kill two birds with one EchoStar". The Debtors were able to procure $75 million of "junior" DIP Financing from EchoStar, which will allow the Debtors to operate their businesses in chapter 11 in a value-maximizing fashion for all creditors. In addition, the Debtors were able to negotiate and agree with EchoStar on the terms of an exit strategy (embodied in the instant RSA), pursuant to which (i) EchoStar has committed to backstop $100 million of a $125 million preferred stock rights offering, which will allow the Debtors to repay their DIP Financing facility in full and, if the rights offering is fully subscribed, finance their operations upon their emergence from chapter 11, and (ii) EchoStar has committed to support the equitization of the totality of its secured notes – which represents more than 50% of the Debtors' close to $1 billion secured notes obligations. This support is crucial to the Debtors' reorganization efforts, and will allow the Debtors to pursue the equitization of their secured claims.

The Debtors believe, in the exercise of their business judgment, that the plan contemplated by the RSA presents the Debtors with the best available alternative for exiting

chapter 11 in an expeditious manner and in a structure that will allow the Debtors to maximize the value of their estates. As more thoroughly discussed in the First Day Declaration, the instant agreement with EchoStar to provide the Debtors with DIP Financing and to enter into the RSA was, without a doubt, the most attractive restructuring alternative available. The Debtors believe that the agreements they have reached with EchoStar, including the RSA, will maximize the value of the Debtors' enterprise for the benefit of the Debtors' estates, creditors, and other parties in interest.[5]

In sum, the Debtors' entry into the RSA is a sound exercise of their business judgment, and assumption of the RSA is in the best interests of the Debtors, their estates, and all of their stakeholders.

## Jurisdiction

1. The United States Bankruptcy Court for the Southern District of New York has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

2. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

3. The bases for the relief requested herein are sections 105 and 365 of title 11 of the United States Code (the "***Bankruptcy Code***"), Rule 6006 of the Federal Rules of Bankruptcy Procedure (the "***Bankruptcy Rules***"), and Rule 6006-1 of the Local Bankruptcy Rules for the Southern District of New York (the "***Local Rules***").

---

[5] The RSA contains a "fiduciary out" that expressly reserves the Debtors' ability to comply with their fiduciary duties.

**Background**

4.    On October 19, 2010 (the "**Petition Date**"), each of the Debtors filed a petition with this Court under chapter 11 of the Bankruptcy Code.   The Debtors are operating their business and managing their property as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.   No request for the appointment of a trustee or examiner has been made in these chapter 11 cases and no statutory committees have been appointed or designated.

5.    Contemporaneously with the filing of this motion, the Debtors have sought procedural consolidation and joint administration of these chapter 11 cases under the case of TerreStar Networks Inc. ("**TSN**").   A description of the Debtors' business, the reasons for filing these chapter 11 cases and the relief sought from this Court to allow for a smooth transition into operations under chapter 11 is set forth in the First Day Declaration, which is being filed contemporaneously with this motion.

**Basis for Relief**

**I.    Overview of the RSA**

6.    As discussed in the First Day Declaration, as part of the Debtors' chapter 11 preparation process, the Debtors negotiated with certain of their key constituents to secure support for a consensual restructuring.   Among this key group was EchoStar, in its capacity as (a) holder of a majority of the 15.0% senior secured payment-in-kind notes issued by TSN (the "**Senior Secured Notes**"); (b) holder of approximately one-third of the 6.5% senior exchangeable payment-in-kind notes issued by TSN (the "**Senior Exchangeable Notes**"); and (c) lender of approximately one-half of the amount outstanding under the $100 million TerreStar-2 Purchase Money Credit Agreement (the "**PMCA**") among TSN, as the borrower, U.S. Bank National Association, as collateral agent, and EchoStar and Harbinger Capital Partners Master Fund I,

Ltd., Harbinger Capital Partners Special Situations Fund, L.P. (together, "***Harbinger***"), as lenders.

7.      As thoroughly discussed in the First Day Declaration, the Debtors conducted a competitive, substantial and well-documented process to both obtain the best possible DIP Financing available, as well as, at the same time, attempt to explore restructuring alternatives with their stakeholders.   In fact, the Debtors' marketing efforts reached approximately 53 financial institutions (including current stakeholders) and resulted in the execution of confidentiality agreements with more than 25 parties.  As a result, over the weeks leading to the commencement of these cases, the Debtors engaged in substantial discussions and negotiations on parallel tracks with a group of third party financial institutions and with EchoStar.

8.      Following extensive diligence and negotiations with the third party group and EchoStar, the Debtors determined that it would be in their best interests to obtain DIP Financing from EchoStar.  Moreover, concomitantly with offering the DIP Financing, EchoStar also agreed to support a restructuring and fund the Debtors' exit from chapter 11.  Accordingly, in the weeks before the Petition Date, and on a parallel track with finalizing the terms of the proposed DIP Financing facility currently before the Court, the Debtors and EchoStar engaged in numerous strategic discussions to outline a potential restructuring of the Debtors' business that would maximize the value of their estates for the benefit of all constituents.    After extensive negotiations conducted at arm's-length and in good faith, on October 19, 2010, the Debtors and EchoStar entered into the RSA to memorialize the agreements reached in those discussions.  The Debtors believe that their decision to pursue this comprehensive, and consensual, restructuring plan will maximize recoveries to their creditors, be beneficial to their estates, and will ensure a swift exit from these bankruptcy proceedings.

9.     Through the RSA, among other commitments, EchoStar has committed to support the Debtors' restructuring efforts, including an agreement, at the appropriate time and consistent with applicable law, to support a plan of reorganization (a "***Plan***") consistent with the Restructuring Term Sheet attached to the RSA (the "***Term Sheet***") and to backstop $100 million of a $125 million rights offering that will be used to repay the Debtors' DIP Financing facility in full and to fund the Debtors' operations upon emergence.  The restructuring contemplated by the Term Sheet provides the Debtors with a clear exit strategy for these chapter 11 cases. Importantly, as part of the proposed Plan, EchoStar, which holds over 50% of the Senior Secured Notes, has agreed to support the conversion of its Senior Secured Notes to equity of the reorganized Debtors.  Equitization of the Senior Secured Notes through a Plan would allow the Debtors to emerge from chapter 11 with a substantially deleveraged capital structure.

10.     The RSA[6] provides for a comprehensive restructuring of the Debtors, including a significant deleveraging of the Debtors' balance sheet, which will enable the Debtors to maximize enterprise value on a going-forward basis.

11.     The Term Sheet contemplates, among other things, the following:

(a)     entry into a proposed postpetition debtor-in-possession financing facility (the "***DIP Facility***"), consisting of the $75 million DIP Facility provided by EchoStar, which proceeds will be used primarily to fund postpetition operating expenses of the Debtors incurred in the ordinary course of business and certain other costs and expenses incurred in connection with the administration of these chapter 11 cases;[7] and

(b)     the Debtors filing the Plan, and seeking confirmation thereof within certain milestones, which Plan will consist of the following:

---

[6]   The descriptions and discussions of the RSA and the Term Sheet contained herein are summary in nature.  In the event of any inconsistency between the terms of any of those documents and their descriptions contained herein, the terms of the actual documents will control.

[7]   Contemporaneously herewith, the Debtors have filed the a motion to approve the DIP Facility.

i.  holders of allowed Senior Secured Notes receiving (x) their pro rata share of 97% of the New Common Stock to be issued by TSN and (y) rights to purchase a number of shares of New Preferred Stock (the "***Rights***") corresponding to their proportionate ownership of the Senior Secured Notes through a $125 million rights offering, $100 million of which will be backstopped by EchoStar;

ii.  holders of allowed claims under the PMCA being repaid in cash, or at the holders' discretion, reinstated;

iii.  holders of allowed Senior Exchangeable Notes receiving (x) their pro rata share of [TBD]% of the New Common Stock[8]; and (y) Rights[9] to purchase New Preferred Stock;

iv.  holders of allowed unsecured claims at the Debtors' receiving (x) their pro rata share of [TBD]% of the New Common Stock[10]; and (y) Rights[11] to purchase New Preferred Stock; and

v.  holders of interests in the Debtors, including preferred stock, receiving no distributions on account of such interests, with such interests being cancelled.

12.  Overall, the proposed Plan would (a) reduce the Debtors' indebtedness, (b) improve cash flows by significantly reducing debt service, (c) provide additional capital to the enterprise and (d) enable a settlement under Bankruptcy Rule 9019 that will provide a recovery to the Debtors' general unsecured creditors and holders of Senior Exchangeable Notes. Absent the settlement provided for in the proposed Plan, it is unclear that such creditors would ever have received any recovery. Further, although certain other secured creditors have not

---

[8]  The remaining 3% of New Common Stock shall be allocated to holders of Senior Exchangeable Notes Claims and holders of other unsecured claims on terms to be agreed upon at a later date.

[9]  The percentage of Rights to purchase New Preferred Stock issued in connection with the Rights Offering to holders of Senior Exchangeable Notes will be determined in the same manner as the percentage of New Common Stock issued to such holders.

[10]  The remaining 3% of New Common Stock shall be allocated to holders of Senior Exchangeable Notes Claims and holders of other unsecured claims on terms to be agreed upon at a later date.

[11]  The percentage of Rights to purchase New Preferred Stock issued in connection with the Rights Offering to holders of unsecured claims will be determined in the same manner as the percentage of New Common Stock issued to such holders.

executed the RSA, the Debtors have had positive discussions with many of the holders of the Senior Secured Notes before the commencement of these cases and intend to continue negotiating with them to seek a fully consensual plan consistent with the Term Sheet.

13.     Importantly, while the Debtors believe that the proposed Plan represents the best opportunity to maximize value of the Debtors' estates, the Debtors negotiated for, and the RSA contains, a "fiduciary out" provision, that will enable the Debtors to comply with their fiduciary duties.  Specifically, section 3 of the RSA provides, in pertinent part,

> (a)     Notwithstanding anything to the contrary herein, nothing in this Agreement or in the Term Sheet shall require any Debtor, any non-debtor subsidiary or affiliate of any Debtor, or any of their respective directors or officers (in such person's capacity as a director or officer) or agents or advisors to take any action, or to refrain from taking any action, to the extent that taking such action or refraining from taking such action would result in a breach of such person's fiduciary obligations under applicable law; (*See* section 3(a) of the RSA.)

> (b)     For the avoidance of doubt, the Debtors may terminate their obligations under this Agreement by written notice to the Plan Sponsors only if:  (i) on or after the Petition Date but prior to entry of a Bankruptcy Court Order authorizing the Debtors' assumption of this Agreement pursuant to section 365(a) of the Bankruptcy Code (the "***Assumption***"), the Debtors determine in good faith (after consultation with their outside legal counsel and their independent financial advisors) that pursuit of an alternative course of action would be more favorable to the Debtors' bankruptcy estates than consummation of the Plan, taking into account all legal, financial, regulatory, and other aspects of such alternative course of action including, without limitation, litigation risks and potential delays; or (ii) at any time after the Assumption, the Debtors determine in good faith (after consultation with their outside legal counsel and their independent financial advisors) that pursuit of an alternative course of action would be superior to consummation of the Plan. (*See* section 3(c) of the RSA.)

## II.     Termination Provisions under the RSA

14.     The RSA, like most restructuring support agreements, contains a number of events that will result in termination thereof, including the following:

> (a)     the failure to meet certain milestones in connection with filing and prosecution of these chapter 11 cases, including milestones requiring the

Debtors to pursue a restructuring and plan process diligently and consistent with an agreed upon schedule;

(b)    any material modification to any terms of the Restructuring (as defined in the Term Sheet) that is inconsistent with terms and conditions set forth in the Term Sheet, without the prior written consent of EchoStar;

(c)    withdrawal of, or the filing of a motion to withdraw, the Plan or submit an amended plan of reorganization or liquidation that is adverse to EchoStar or materially inconsistent with the terms and provisions of the Term Sheet;

(d)    the occurrence of any event, development or circumstance (other than any event, development or circumstance arising from or relating to these chapter 11 cases) on or after June 30, 2010 that, either alone or in combination, has had or could reasonably be expected to have a material adverse effect on the business, operations, assets, liabilities or condition (financial or otherwise) of the Debtors taken as a whole;

(e)    the conversion of these chapter 11 cases under chapter 7 of the Bankruptcy Code;

(f)    the Debtors' breach of any material provision of the Term Sheet; or

(g)    the occurrence and continuation of a default (provided that a cure of such default before the expiration of the notice period shall be a cure of such default) under the DIP Facility.

15.    Specifically, with respect to the chapter 11 milestones, the Debtors have agreed to pursue a restructuring in accordance with the following deadlines:

(a)    a disclosure statement and a plan consistent with the terms set forth in the Term Sheet filed no later than November 5, 2010;

(b)    an application with the Federal Communications Commission filed by December 14, 2010;

(c)    a final order approving the disclosure statement consistent with the terms set forth in the Term Sheet entered by the Bankruptcy Court no later than December 14, 2010;

(d)    a hearing to confirm a plan consistent with the terms set forth in the Term Sheet commenced by the Bankruptcy Court no later than January 31, 2011;

(e)    a final order approving the confirmation of a plan consistent with the terms set forth in the Term Sheet entered by the Bankruptcy Court no later than February 14, 2011; and

(f)     occurrence of the effective date of the Plan no later than May 31, 2011, or a later date that is mutually agreed.

16.     The Term Sheet includes provisions for the automatic termination of the RSA on the seventh (7th) business day after the occurrence of certain Sponsor Termination Events unless waived in writing by EchoStar before the expiration of such waiver period. For certain other Sponsor Termination Events the RSA will terminate only after EchoStar provides the Debtors with written notice of the Sponsor Termination Event and such Sponsor Termination Event remains uncured for at least five (5) days following the delivery of notice thereof.

17.     Additionally, the Debtors may also terminate the Term Sheet and all of the obligations of the parties thereto at their sole discretion (the "**_Debtor Termination Events_**") if: (a) EchoStar breaches any material provision in the Term Sheet; or (b) the chapter 11 cases are converted to cases under chapter 7 of the Bankruptcy Code. Should any of the above events occur, the termination of the Term Sheet shall be effective upon (i) written notice being provided to EchoStar by the Debtors; and (ii) if applicable, such breach remaining uncured for at least five (5) days following EchoStar's receipt of such notice.

## Relief Requested

18.     By this motion, the Debtors seek the entry of an order (a) authorizing the Debtors to assume the RSA and (b) granting such other relief as is just and proper.

## Supporting Authority

19.     The Debtors' entry into the RSA is an exercise of sound business judgment and this Court should authorize the Debtors to assume the RSA. Section 365(a) of the Bankruptcy Code provides, in relevant part, that a debtor, "subject to the court's approval, may assume or reject an executory contract or an unexpired lease." *See Univ. Med. Ctr. v. Sullivan (In re Univ. Med. Ctr.)*, 973 F.2d 1065, 1075 (3d Cir. 1992). The assumption of a contract by a debtor is

subject to review under the business judgment standard. *See In re Federated Dep't Stores, Inc.*, 131 B.R. 808, 811 (S.D. Ohio 1991) ("Courts traditionally have applied the business judgment standard in determining whether to authorize the rejection of executory contracts and unexpired leases"). If a debtor's business judgment has been reasonably exercised, a court should approve the assumption or rejection of the executory contract or unexpired lease. *See, e.g.*, *NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 523 (1984); *Grp. of Institutional Investors v. Chicago M. St. P. & P.R.R. Co.*, 318 U.S. 523 (1943); *In re Mkt. Square Inn, Inc.*, 978 F.2d 116, 121 (3d Cir. 1992) (holding that the "resolution of . . . assumption or rejection will be a matter of business judgment").

20.      The business judgment rule shields a debtor's management from judicial second-guessing. *See In re Johns-Manville Corp.*, 60 B.R. 612, 615-16 (Bankr. S.D.N.Y. 1986) ("[T]he Code favors the continued operation of a business by a debtor and a presumption of reasonableness attaches to a debtor's management decisions."). Once a debtor articulates a valid business justification, "[t]he business judgment rule 'is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company.'" *See In re Integrated Res., Inc.*, 147 B.R. 650, 656 (S.D.N.Y. 1992) (*quoting Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985)).

21.      Indeed, in applying the "business judgment" standard, debtors are usually given significant discretion when requesting to assume or reject an executory contract or unexpired lease. *See In re Riodizio, Inc.*, 204 B.R. 417, 424 (Bankr. S.D.N.Y. 1997) ("[A] court will ordinarily defer to the business judgment of the debtor's management"); *In re Chipwich, Inc.*, 54 B.R. 427, 430-31 (Bankr. S.D.N.Y. 1985) (finding that a court should not interfere with a

debtor's decision to assume or reject "absent a showing of bad faith or abuse of business discretion"). Further, the "business judgment" standard merely requires the debtors to establish that the requested assumption will benefit the estate. *See Westbury Real Estate Ventures, Inc. v. Bradlees, Inc. (In re Bradlees Stores, Inc.)*, 194 B.R. 555, 558 n.1 (Bankr. S.D.N.Y. 1996) ("the court must examine the contract and circumstances and apply its best 'business judgment' to determine if the assumption or rejection would be beneficial or burdensome to the estate").

22. The Debtors' determination to assume the RSA plainly satisfies the business judgment test. The agreement set forth in the RSA is an agreement between the Debtors and their largest stakeholder, who holds substantial positions throughout the Debtors' capital structure, to support a restructuring that has the Debtors poised to accomplish a necessary balance sheet deleveraging that will maximize the value of the Debtors' enterprise for the benefit of the Debtors' estates, creditors, and other parties in interest. Additionally, under the RSA, EchoStar has agreed to backstop a rights offering to repay the DIP Facility and provide the Debtors with a clear exit strategy for these chapter 11 cases. Absent the totality of EchoStar's transaction, the Debtors, among other undesirable outcomes, might have been forced to liquidate as the Debtors had little available liquidity when they commenced these chapter 11 cases and, at the time of filing, no viable alternatives for DIP Financing other than that proposed by EchoStar. Finally, the RSA contains the agreement of the Debtors' largest secured creditor – who holds one-half of the Senior Secured Notes – to equitize its secured debt, the importance of which cannot be underestimated in light of the extreme difficulties the Debtors would encounter in trying to "cram up" their Senior Secured Notes with equity of the reorganized Debtors. The Debtors believe that an expeditious prosecution of, and emergence from, these chapter 11 cases is essential to preserving value for their estates and parties in interest by ensuring that the

Debtors' business does not languish in chapter 11 for an extended period of time. By serving as a roadmap for the Debtors' chapter 11 cases, the RSA focuses on the Debtors' ultimate goal—the expedient and efficient emergence from chapter 11.

23.     The RSA is the result of extensive arms-length negotiations between the Debtors and EchoStar, with both parties represented by counsel and financial advisors. The final terms of the RSA are the result of the give-and-take of negotiations and represent the best agreement the Debtors believe they could negotiate. Without such support, if the Debtors were able to stave off liquidation, the Debtors would be facing the potential for complicated and expensive contested confirmation and disclosure statement hearings and a prolonged stay in bankruptcy, which would severely limit recoveries. By securing EchoStar's support, the RSA will allow the Debtors to propose a plan supported by one-half of its secured debt holders that will equitize their secured debt as well as provide a generous recovery to the Debtors' unsecured creditors and to hopefully emerge from chapter 11 successfully and on an expedited basis, thereby maximizing value for the benefit of their estates and their creditors.

24.     Thus, given the significant benefits to be garnered, the Debtors determined, in the exercise of their reasonable business judgment, that the proposed chapter 11 plan structure set forth in the RSA and the Term Sheet is the best opportunity to maximize the value of their estates and, thereby, maximize creditor recoveries. The terms of the Plan will not only reduce the Debtors' funded indebtedness significantly, but will also provide the necessary capital to fund the Debtors' future operations, meet competitive conditions, and preserve asset value for the Debtors and their estates.

25.     The obligations of the Debtors under the RSA are subject to the fulfillment of the Debtors' fiduciary duties. The RSA allows the Debtors to effectively comply with their

fiduciary duties. Thus, compliance with the RSA will enable, not prohibit, the Debtors from fulfilling their fiduciary obligations to maximize value to their estates.

26. Based on the foregoing, the Debtors respectfully submit that they have exercised sound business judgment in deciding to enter into the RSA. Accordingly, the Debtors request that the Court authorize the Debtors to assume the RSA.

### Motion Practice

27. This motion includes citations to the applicable rules and statutory authorities upon which the relief requested herein is predicated, and a discussion of their application to this motion. Accordingly, the Debtors submit that this motion satisfies Local Rule 9013-1(a).

### The Debtors' Reservation of Rights

28. Nothing contained herein is intended or should be construed as an admission of the validity of any claim against the Debtors or a waiver of the Debtors' rights to dispute any claim. The Debtors expressly reserve their right to contest any invoice or claim related to the relief requested herein in accordance with applicable non-bankruptcy law.

### Notice

29. The Debtors have provided notice of this Motion to: (a) the Office of the United States Trustee for the Southern District of New York; (b) the entities listed on the Consolidated List of Creditors Holding the 30 Largest Unsecured Claims filed pursuant to Bankruptcy Rule 1007(d); (c) The Bank of New York Mellon as agent for the Debtors' proposed postpetition debtor-in-possession financing; (d) Emmet, Marvin & Martin LLP as counsel to the agent for the Debtors' proposed postpetition debtor-in-possession financing; (e) U.S. Bank National Association as Collateral Agent for the Debtors' purchase money credit facility and Harbinger Capital Partners Master Fund I, Ltd., Harbinger Capital Partners Special Situations Fund, L.P. and EchoStar Corporation as Lenders thereunder; (f) Weil, Gotshal & Manges LLP as counsel to

Harbinger Capital Partners Master Fund I, Ltd. and Harbinger Capital Partners Special Situations Fund, L.P. in their capacity as Lenders under the Debtors' purchase money credit facility; (g) Willkie Farr & Gallagher LLP as counsel to EchoStar Corporation in its capacity as Lender under the Debtors' purchase money credit facility and Initial Lender under the Debtors' proposed postpetition debtor-in-possession financing; (h) U.S. Bank National Association as Indenture Trustee for the Debtors' 15% Senior Secured Notes; (i) U.S. Bank National Association as Indenture Trustee for the Debtors' 6.5% Senior Exchangeable Notes; (j) Quinn Emanuel Urquhart & Sullivan, LLP as counsel to an Ad Hoc group of the Debtors' 6.5% Senior Exchangeable Notes; (k) the Internal Revenue Service; (l) the Securities and Exchange Commission; (m) the United States Attorney for the Southern District of New York; and (n) the Federal Communications Commission. In light of the nature of the relief requested, the Debtors respectfully submit that no further notice is necessary.

WHEREFORE, the Debtors respectfully request that the Court (a) enter an order, substantially in the form attached hereto as Exhibit A, granting the relief requested herein and (b) grant such other relief as is just and proper.

New York, New York
Dated: October 19, 2010

s/ Ira S. Dizengoff
AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
(212) 872-1000 (Telephone)
(212) 872-1002 (Facsimile)

Ira S. Dizengoff
Arik Preis
Ashleigh L. Blaylock

*Proposed Counsel to the Debtors and Debtors in Possession*

**EXHIBIT A**

**Proposed Order**

# UNITED STATES BANKRUPTCY COURT
# SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| TERRESTAR NETWORKS INC., *et al.*,[1] | ) Case No. 10-[_____] (    ) |
| | ) |
| Debtors. | ) Joint Administration Requested |
| | ) |

## ORDER (A) AUTHORIZING THE DEBTORS TO ASSUME THE RESTRUCTURING SUPPORT AGREEMENT AND (B) GRANTING RELATED RELIEF

Upon the motion (the "***Motion***")[2] of TerreStar Networks Inc. and its affiliated

debtors and debtors in possession in the above-captioned cases (collectively, the "***Debtors***"), for

entry of an order (a) authorizing the Debtors to assume the RSA and (b) granting related relief,

all as more fully set forth in the Motion; and upon the First Day Declaration; and the Court

having found that the Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and

1334; and the Court having found that this is a core proceeding pursuant to 28 U.S.C.

§ 157(b)(2); and the Court having found that venue of this proceeding and the Motion in this

district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and the Court having found that the

relief requested in the Motion is in the best interests of the Debtors' estates, their creditors, and

other parties in interest; and the Debtors having provided appropriate notice of the Motion and

the opportunity for a hearing on the Motion under the circumstances; and the Court having

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal taxpayer-identification number, are: TerreStar New York Inc. (6394); TerreStar Networks Inc. (3931); Motient Communications Inc. (3833); Motient Holdings Inc. (6634); Motient License Inc. (2431); Motient Services Inc. (5106); Motient Ventures Holding Inc. (6191); MVH Holdings Inc. (9756); TerreStar License Inc. (6537); TerreStar National Services Inc. (6319); TerreStar Networks Holdings (Canada) Inc. (1337); TerreStar Networks (Canada) Inc. (8766) and 0887729 B.C. Ltd. (1345).

[2] All capitalized terms used but otherwise not defined herein shall have the meanings set forth in the Motion or the RSA.

reviewed the Motion and having heard the statements in support of the relief requested therein before the Court (the "***Hearing***"); and the Court having determined that the legal and factual bases set forth in the Motion and at the Hearing establish just cause for the relief granted herein; and upon all of the proceedings had before the Court; and after due deliberation and sufficient cause appearing therefor, it is HEREBY ORDERED THAT:

1.      The Motion is granted in its entirety.

2.      The Debtors are authorized to assume the RSA and the RSA shall be assumed as of the date hereof.

3.      The failure to describe specifically or include any particular provision of the RSA or the Term Sheet in this Order shall not diminish or impair the effectiveness of such provision, it being the intent of this Court that the RSA be assumed by the Debtors in its entirety.

4.      No default exists under the RSA, and, therefore, the Debtors are not required to satisfy the requirements of section 365(b)(1) of the Bankruptcy Code.  Accordingly, the Debtors are not required to:  (a) cure, or provide adequate assurance that the Debtors will promptly cure, any default under the RSA; (b) compensate, or provide adequate assurance that the Debtors will promptly compensate, EchoStar for any actual pecuniary loss resulting from any default; or (c) provide adequate assurance of future performance of the RSA.

5.      Notwithstanding the Debtors' assumption of the RSA, EchoStar's and the Debtors' respective remedy for breach of the RSA shall be limited to specific performance. Nothing in the Motion, the RSA, or this Order, nor as a result of the Debtors' assumption of the RSA pursuant to this Order, shall give rise to, or provide any entity, including, without limitation, EchoStar, a right to assert or recover on account of any claims, including, without limitation, unsecured claims, administrative claims, priority claims, or cure claims in the

Debtors' chapter 11 cases, or otherwise for breach by the Debtors or EchoStar or termination of the RSA by EchoStar or the Debtors.

6.      The RSA shall be solely for the benefit of the parties thereto and no other person or entity shall be a third party beneficiary hereof.  No entity, other than EchoStar and the Debtors, shall have any right to seek or enforce specific performance of the RSA.

7.      Notice of the Motion as provided therein shall be deemed good and sufficient notice and the requirements of the Bankruptcy Rules and the Local Bankruptcy Rules are satisfied by such notice.

8.      The terms and conditions of this Order shall be immediately effective and enforceable upon its entry.

9.      All time periods set forth in this Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

10.     The Debtors are authorized to take all actions necessary to effectuate the relief granted pursuant to this Order in accordance with the Motion.

11.     The Court retains jurisdiction with respect to all matters arising from or related to the implementation of this Order.

New York, New York

Date: _____, 2010     _____
                                        United States Bankruptcy Judge

**EXHIBIT B**

**Restructuring Support Agreement**

# PLAN SUPPORT AGREEMENT

This Plan Support Agreement (the "Agreement"), dated as of October 19, 2010, is made by and among (i) TerreStar Networks Inc., TerreStar New York Inc., Motient Communications Inc., Motient Holdings Inc., Motient License Inc., Motient Services Inc., Motient Ventures Holding Inc., MVH Holding Inc., TerreStar License Inc., TerreStar National Services Inc., 0887729 B.C. Ltd., TerreStar Networks Holdings (Canada) Inc., TerreStar Networks (Canada) Inc. (collectively, the "TSN Debtors"), TerreStar Corporation and TerreStar Holdings Inc. (together, the "TSC Entities" and collectively with the TSN Debtors, the "Company"), and (ii) the undersigned holders in each and every capacity in which each such holder holds a Claim against or Interest in, the TSN Debtors (each, a "Plan Sponsor," and, collectively, the "Plan Sponsors"), each of which is a signatory hereto and a holder of equity interests in ("Interests") and/or claims (as defined in section 101(5) of Title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as amended, the "Bankruptcy Code")) against the TSN Debtors (the "Claims") arising under or in connection with, among other things (a) that certain TerreStar-2 Purchase Money Credit Agreement, dated February 5, 2008, among TerreStar Networks Inc., as borrower, U.S. Bank National Association, as collateral agent (in such capacity, the "PMCA Agent"), the guarantors party thereto from time to time, and Harbinger Capital Partners Master Fund 1, Ltd., Harbinger Capital Partners Special Situations Fund, L.P. and EchoStar Corporation, as lenders (the "PMCA"), and (b) the 15.0% senior secured payment-in-kind notes due 2014 issued pursuant to the Indenture, dated as of February 14, 2007, among TerreStar Networks Inc., as issuer, U.S. Bank National Association, as indenture trustee (in such capacity, the "Senior Secured PIK Notes Indenture Trustee"), and the guarantors party thereto (as amended, restated, supplemented or otherwise modified from time to time, the "Senior Secured PIK Notes Indenture"); and/or (c) the 6.5% senior exchangeable payment-in-kind notes due 2014 pursuant to the Indenture, dated as of February 7, 2008, among TerreStar Networks Inc., as issuer, U.S. Bank National Association, as indenture trustee (in such capacity, the "Exchangeable PIK Notes Indenture Trustee" and, together with the PMCA Agent and Senior Secured PIK Notes Indenture Trustee, the "Agents/Trustees"), and TerreStar Corporation and the guarantors party thereto (as amended, restated, supplemented or otherwise modified from time to time, the "Exchangeable PIK Notes Indenture" and, collectively with the PMCA and Senior Secured PIK Notes Indenture, the "Credit Documents"). For the avoidance of doubt, the Plan Sponsors hereunder, in the aggregate, hold more than 50% in amount of Claims arising under the Senior Secured PIK Notes Indenture (the "Senior Secured PIK Notes Claims"). The Company and the Plan Sponsors are each referred to herein as a "Party", and collectively, as the "Parties".

# RECITALS

**WHEREAS**, the Company has determined that it would be in its best interests to engage in a restructuring or recapitalization concerning or impacting, *inter alia*, the balance sheet of the TSN Debtors (the "Transaction"); and

**WHEREAS**, the Plan Sponsors and the Company have negotiated and agreed on the material terms of the Transaction; and

**WHEREAS**, the material general terms of the Transaction are memorialized in the term sheet attached hereto as Exhibit A (as it may be amended pursuant to terms thereof, the

"Restructuring Term Sheet"),[1] and the Debtor-In-Possession Credit, Security & Guaranty Agreement among the TSN Debtors, the Plan Sponsor and the other lenders that may become party thereto from time to time, and The Bank of New York Mellon, as Administrative Agent and Collateral Agent, attached hereto as <u>Exhibit B</u> (as it may be amended pursuant to the terms thereof, the "<u>DIP Agreement</u>," and together with the Restructuring Term Sheet, the "<u>Restructuring Documents</u>"), which are incorporated herein and are made part of this Agreement, including, without limitation, all provisions thereof relating to the Sponsor Termination Events and the Company Termination Events; and

**WHEREAS**, the Parties intend to implement the Transaction through a plan of reorganization for the TSN Debtors to be confirmed in bankruptcy cases (the "<u>Bankruptcy Cases</u>") to be commenced by the TSN Debtors by filing voluntary petitions under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York (the "<u>Bankruptcy Court</u>") substantially on the terms set forth in the Restructuring Term Sheet (the "<u>Plan</u>"); and

**WHEREAS**, in connection with the Bankruptcy Cases, TerreStar Networks Inc., as foreign representative to the TSN Debtors, intends to commence recognition proceedings (the "<u>Canadian Recognition Proceedings</u>") on behalf of all of the TSN Debtors before the Ontario Superior Court of Justice (Commercial List) (the "<u>Canadian Court</u>") pursuant to Part IV of the Companies' Creditors Arrangement Act, R.S.C. 1985, c. C-36, as amended; and

**WHEREAS**, subject to execution of definitive documentation and, as required, appropriate approvals of the Bankruptcy Court and/or the Canadian Court, the following sets forth the agreement between the Parties concerning their respective obligations.

**NOW, THEREFORE**, in consideration of the foregoing, the Parties agree as follows:

<u>AGREEMENT</u>

**Section 1.**      <u>Plan Sponsors' Commitments Regarding Transaction.</u>

**1.01.**      <u>Voting on the Plan</u>

Each Plan Sponsor agrees that, for as long as it is a holder of a Claim or Interest, it shall (a) when properly solicited pursuant to the requirements of the Bankruptcy Code, subject to the acknowledgements contained in Section 6 hereof, timely vote all of its Claims and if applicable Interests to support the Plan and not revoke, change or withdraw such vote (or cause such vote to be revoked, changed or withdrawn); (b) not consent to, vote for or otherwise seek, support, solicit, encourage or consent to, either directly or indirectly, any other plan of reorganization or liquidation for the TSN Debtors, or dissolution, winding up, or restructuring of the TSN Debtors; (c) not object to, oppose or otherwise interfere with, and cause its controlled affiliates (as defined in the Bankruptcy Code) to not object to, oppose or otherwise interfere with, the confirmation of the Plan or other provisions of the Restructuring Documents; or (d) not take any other action that

---

[1]      Capitalized terms used herein without definition shall have the meanings ascribed to such terms in the Restructuring Term Sheet.

is inconsistent with, or that would delay, hinder or prevent, the Transaction on the terms and conditions set forth herein and in the Restructuring Documents; provided, however, (x) the material terms of any agreement implementing the Transaction, including, without limitation, the Plan, embody and are consistent with the terms and conditions set forth in the Restructuring Documents, unless otherwise agreed to by the Parties (y) the Plan, the related disclosure statement (the "Disclosure Statement"), any and all pleadings seeking relief in connection with the contemplated DIP Financing, and any and all other documents contemplated in the Restructuring Documents are reasonably satisfactory to the Plan Sponsors, and (z) no Sponsor Termination Event shall have resulted in the termination of the Restructuring Term Sheet in accordance with its terms (a "Sponsor Termination").

### 1.02. Forbearance from Exercising Remedies

Each Plan Sponsor (including the Agents/Lenders in their capacity as such) hereby agrees, as long as the Company is in compliance with this Agreement and the Restructuring Documents, including, without limitation, the various target dates for certain actions and events set forth in the Restructuring Documents, to forbear:  (a) through the filing of the Bankruptcy Cases (the "Petition Date"), from exercising any rights or remedies under the Credit Documents, except with respect to any defaults arising under:  (i) any of the following clauses of section 7.01 of the PMCA:  (a), (b), (c) (other than based upon a failure to comply with Section 6.07 of the PMCA), (d) (based upon a failure to comply with any of the following sections of the PMCA: 5.01, 5.03, 5.09, 5.11, 5.12, 5.14, 5.15, and 5.16), (f), (g), (h), (i), (l) (m), (n), (o), (p) (q) and (r); or (ii) any of the following clauses of section 6.01(a) of the Senior Secured PIK Notes Indenture: (1), (2), (3), (4) (other than as it relates to Section 5.07 of the Senior Secured Notes PIK Indenture), (6), (8), (9), (10), (11) and (12); and (b) after the Petition Date through the Effective Date, from seeking the lifting of the automatic stay to exercise any rights or remedies under the Credit Documents, provided, however, that the Plan Sponsors shall retain all rights and remedies set forth in the Restructuring Documents and/or available to them under any document governing the DIP Facility.

### 1.03. Transfer of Claims/Further Acquisitions

For a period commencing as of the date hereof until the occurrence of a Sponsor Termination, each of the Plan Sponsors hereby agrees not to (i) sell, assign, transfer, hypothecate or otherwise dispose of, directly or indirectly, any Claim or Interest, unless the transferee (such transferees, if any, to also be "Plan Sponsors" hereunder with regard to each and every Claim or Interest they may have) agrees in writing, by delivering a joinder in the form annexed as Exhibit C hereto to this Agreement to the Existing Agent and the Company, to be bound by this Agreement and the Restructuring Documents; or (ii) grant any proxies, deposit its Claim into a voting trust, or enter into a voting agreement or any similar agreement with respect thereto, unless any such arrangement provides, in writing, in a form reasonably acceptable to and enforceable by the Company, for compliance with this Agreement and the Restructuring Documents or this Agreement (each action referred to in the foregoing clauses (i) and (ii), a "Transfer").  Any Transfer that does not comply with the preceding sentence shall be deemed void *ab initio*.

This Agreement shall in no way be construed to preclude any Plan Sponsor or any of its affiliates (as defined in section 101(2) of the Bankruptcy Code) from acquiring additional Claims or Interests following its execution of this Agreement; provided however, that any such additional Claim or Interest acquired by a Plan Sponsor shall automatically be deemed to be subject to the terms of this Agreement.

### 1.04. Representation of Holdings

Each of the Plan Sponsors represents that, as of the date hereof, such Plan Sponsor (i) either (A) is the sole legal and beneficial owner of the Senior Plan Secured PIK Notes Claims and other Claims and Interests, if applicable, set forth below such Plan Sponsor's name on Schedule 1 hereto, or (B) has investment or voting discretion with respect to such Claims and/or Interests in respect to matters relating to the Transactions contemplated by this Agreement and has the power and authority to bind the beneficial owner(s) of such Notes to the terms of this Agreement and (ii) has full power and authority to act on behalf of, vote and consent to matters concerning such Claims and/or Interests in respect to matters relating to the Transactions contemplated by this Agreement and the Restructuring Documents and to dispose of, exchange, assign and transfer such Claims and/or Interests. Furthermore, such Plan Sponsor has made no prior assignment, sale, grant, conveyance, or other transfer of, and has not entered into any other agreement to assign, sell, grant, convey or otherwise transfer, in whole or in part, any portion of its right, title, or interest in any Claims or Interests that are subject to this Agreement, the terms of which agreement are, as of the date hereof, inconsistent with the representations and warranties of such Plan Sponsor herein or would render such Plan Sponsor otherwise unable to comply with this Agreement and perform its obligations hereunder.

**Section 2.      The Company's Undertakings.**  The Company shall, subject to Section 3 hereof, and so long as no Debtor Termination Event has resulted in the termination of the Restructuring Documents in accordance with its terms, (i) take all actions reasonably necessary to effectuate and consummate the transactions contemplated by the Restructuring Documents and the Plan; (ii) implement all steps reasonably necessary and desirable to obtain an order of the Bankruptcy Court confirming the Plan; and (iii) take no actions inconsistent with the transactions contemplated by this Agreement, the Restructuring Documents and the Plan or the timely confirmation and consummation of the Plan.  For the avoidance of doubt, subject to Section 3 below, by this Section 2, the TSC Entities undertake and agree not to negotiate, file or otherwise prosecute any restructuring agreement, in or out of court, that is inconsistent with the terms of the Restructuring Documents or in any way contradicts the Plan.

**Section 3.      The Company's Fiduciary Obligations.**  Notwithstanding anything to the contrary herein, nothing in this Agreement or in the Restructuring Documents shall require any TSN Debtor, any subsidiary or affiliate of any TSN Debtor, or any of their respective directors or officers (in such person's capacity as a director or officer) or agents or advisors to take any action, or to refrain from taking any action, to the extent that taking such action or refraining from taking such action would result in a breach of such person's fiduciary obligations under applicable law.

For the avoidance of doubt, the Company may terminate its obligations under this Agreement by written notice to the Plan Sponsors only if:  (a) on or after the Petition Date but prior to entry of a

Bankruptcy Court Order authorizing the TSN Debtors' assumption of this Agreement pursuant to section 365(a) of the Bankruptcy Code (the "Assumption"), the Company determines in good faith (after consultation with their outside legal counsel and their independent financial advisors) that pursuit of a plan of reorganization or liquidation for the Company, or dissolution, winding up, or restructuring of the Company, other than the Plan (an "Alternative Restructuring Transaction") would be superior to consummation of the Plan, taking into account all legal, financial, regulatory, and other aspects of such alternative course of action including, without limitation, (i) all financial considerations, (ii) litigation risks, (iii) potential delays, (iv) the prospects for completion of such Alternative Restructuring Transaction, and (v) the identity of any other parties to such Alternative Restructuring Transaction; or (b) at any time after the Assumption, the TSN Debtors determine in good faith (after consultation with their outside legal counsel and their independent financial advisors) that pursuit of an Alternative Restructuring Transaction would be more favorable to their bankruptcy estates than consummation of the Plan.

Nothing herein shall prohibit the TSC Entities from continuing any discussions relating to an Alternative Restructuring Transaction involving the TSC Entities that is not inconsistent with or contrary to the Restructuring Documents or the Plan.

**Section 4.** **Mutual Representations, Warranties, and Covenants.** Each of the Parties represents, warrants, and covenants to the others the following, each of which is a continuing representation, warranty, and covenant:

    **4.01.** **Enforceability.**

    This Agreement is a legal, valid, and binding obligation of the Party, enforceable against it in accordance with its terms, except as enforcement may be limited by applicable laws relating to or limiting creditor's rights generally or by equitable principles relating to enforceability.

    **4.02.** **No Consent or Approval.**

    Except as expressly provided in this Agreement, no consent or approval by any other person or entity is required in order for it to carry out the provisions of this Agreement.

    **4.03** **Power and Authority.** It has all requisite power and authority to enter into this Agreement and to carry out the transactions contemplated by, and perform its respective obligations under, this Agreement, the Restructuring Documents and the Plan.

    **4.04** **Authorization.** The execution and delivery of this Agreement and the performance of its obligations hereunder have been duly authorized by all necessary action on its part.

    **4.05** **Governmental Consents.** The execution, delivery and performance by it of this Agreement do not and shall not require any registration or filing with, consent or approval of, or notice to, or other action by, any federal, state or other governmental authority or regulatory body, except such filings as may be necessary and/or required under the federal securities laws and, in connection with the commencement of the Bankruptcy Cases, the

approval of the Disclosure Statement and confirmation of Plan.

**Section 5.** **No Waiver of Participation and Reservation of Rights.** This Agreement and the Plan are part of a proposed settlement of disputes among the Parties. Except as expressly provided in this Agreement, nothing herein is intended to, or does, in any manner waive, limit, impair, or restrict the ability of each of the Plan Sponsors to protect and preserve its rights, remedies and interests, including without limitation, its Claims against the Company or its full participation in the Bankruptcy Cases. If the Transaction is not consummated, or if this Agreement is terminated for any reason, the Parties fully reserve any and all of their rights.

**Section 6.** **Acknowledgment.** This Agreement and the Restructuring Documents and the transactions contemplated herein and therein are the product of negotiations between the Parties and their respective representatives. This Agreement is not and shall not be deemed to be a solicitation of votes for the acceptance of the Plan. Each of the Plan Sponsors' acceptance of the Plan will not be solicited until it has received a copy of the Disclosure Statement approved by the Bankruptcy Court as complying in all respects with all relevant provisions of the Bankruptcy Code.

**Section 7.** **Effectiveness; Amendments.** This Agreement shall not become effective and binding upon any of the Parties until all Parties have delivered counterpart signatures hereto. This Agreement cannot be amended, except by a writing executed by all Parties.

**Section 8.** **Miscellaneous.**

**8.01.** **Further Assurances.**

The Parties agree to execute and deliver such other instruments and perform such acts, in addition to the matters herein specified, as may be reasonably appropriate or necessary, from time to time, to effectuate the agreements and understandings of the Parties, whether the same occurs before or after the date of this Agreement.

**8.02.** **Complete Agreement.**

This Agreement (together with the Restructuring Documents) constitutes the entire agreement between the Parties with respect to the subject matter hereof and supersedes all prior agreements, oral or written, between the Parties with respect thereto.

**8.03.** **Parties.**

This Agreement shall be binding upon, and inure to the benefit of, the Parties. No rights or obligations of any Party under this Agreement may be assigned or transferred to any other person or entity except as provided in Section 1.03 hereof. Nothing in this Agreement, express or implied, shall give to any person or entity, other than the Parties, any benefit or any legal or equitable right, remedy or claim under this Agreement.

**8.04.** **Governing Law.**

THIS AGREEMENT IS TO BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND TO BE PERFORMED IN SUCH STATE, WITHOUT GIVING EFFECT TO THE CHOICE OF LAWS PRINCIPLES THEREOF THAT WOULD REQUIRE THE APPLICATION OF THE LAWS OF ANY OTHER JURISDICTION.

### 8.05. **Execution of Agreement; Headings.**

This Agreement may be executed and delivered (by facsimile or otherwise) in any number of counterparts, each of which, when executed and delivered, shall be deemed an original, and all of which together shall constitute the same agreement. Except as expressly provided in this Agreement, each individual executing this Agreement on behalf of a Party has been duly authorized and empowered to execute and deliver this Agreement on behalf of said Party. The headings of all sections of this Agreement are inserted solely for the convenience of reference and are not a part of and are not intended to govern, limit or aid in the construction or interpretation of any term or provision hereof.

### 8.06. **Interpretation.**

This Agreement is the product of negotiations of the Parties, and in the enforcement or interpretation hereof, is to be interpreted in a neutral manner, and any presumption with regard to interpretation for or against any party by reason of that Party having drafted or caused to be drafted this Agreement, or any portion hereof, shall not be effective in regard to the interpretation hereof.

### 8.07 **Confidentiality.**

All information obtained in the course of the negotiations leading up to this Agreement, including but not limited to the identities of the Plan Sponsors and their respective individual holdings of Claims, shall be treated by all Parties hereto as confidential information and not disclosed without the written consent of the Company, or the applicable Plan Sponsor, as applicable, based upon a given Party's rights in the information at issue, except as may be required by law; provided, however that the Plan Sponsors may, in their sole discretion, confer with other holders of Claims in order to obtain further support for the Plan, so long as the Plan Sponsors do not furnish any confidential information of the Company to such other holders of Claims, except to the extent that such persons or entities are (or that the Company has advised the Plan Sponsors are) subject to confidentiality obligations owing to the Company pursuant to a confidentiality agreement in form and substance satisfactory to the Company. In no event shall the respective individual holdings of the Plan Sponsors be referenced in public filings or press releases without the express written consent of the Party at issue; provided however, that the TSN Debtors are authorized to file, under seal with the Bankruptcy Court, a list of the individual Claim and Interest holdings of the Plan Sponsors. Notwithstanding anything to the contrary herein, upon the prior written consent of the Plan Sponsors, the TSN Debtors shall be permitted to disclose (i) the terms of this Agreement and (ii) the fact that this Agreement has been executed, to the extent required by applicable law or regulation, or in connection with required filings in the Bankruptcy Cases or the Canadian Recognition Proceedings, or with the Securities and Exchange Commission, the Federal Communications Commission or Industry Canada.

**8.08.** **Successors and Assigns.**

This Agreement is intended to bind and inure to the benefit of the Parties and their respective successors, assigns, heirs, executors, administrators and representatives, other than a trustee or similar representative appointed in the Bankruptcy Cases.  The agreements, representations and obligations of the Plan Sponsors under this Agreement are, in all respects, several and not joint.

**8.09.** **Fees and Expenses**

If any Party brings any action against any other Party for breach of such other Party of its obligations hereunder, the prevailing Party shall be entitled to all reasonable expenses, including, without limitation, reasonable attorneys' fees incurred in connection with such action.

**8.10.** **Specific Performance**

The Parties acknowledge and agree that money damages would not be an adequate or sufficient remedy for any breach of this Agreement, and each non-breaching Party shall be entitled to specific performance and/or injunctive or other equitable relief as a remedy for any such breach.

IN WITNESS WHEREOF, the parties have executed this Agreement on the day and year first above written.

Dated: October 18, 2010

TERRESTAR CORPORATION

By: _____
Name: Douglas Brandon
Its: GC + Secretary

Dated: October __, 2010

TERRESTAR HOLDINGS INC.

By: _____
Name: Douglas Brandon
Its:     General Counsel & Secretary

Dated: October __, 2010

MOTIENT HOLDINGS INC.
MOTIENT COMMUNICATIONS INC.
MOTIENT LICENSE INC.
MOTIENT SERVICES INC.
TERRESTAR NEW YORK INC.
MVH HOLDING INC.
MOTIENT VENTURES HOLDING INC.
TERRESTAR NATIONAL SERVICES, INC.
TERRESTAR LICENSE INC.

By: _____
Name: Jeffrey W. Epstein
Title: President

Dated: October __, 2010

0887729 B.C. LTD.,

By: _____
Name: Jeffrey W. Epstein
Its: Director

IN WITNESS WHEREOF, the parties have executed this Agreement on the day and year first above written.

Dated: October __, 2010        TERRESTAR NETWORKS INC.

By: _____

Name: Jeffrey W. Epstein

Its:    President and Chief Executive Officer

TERRESTAR NETWORKS HOLDINGS
(CANADA) INC.
TERRESTAR NETWORKS (CANADA) INC.

By: _Jacques Leduc_
    Name: Jacques Leduc
    Title: Chief Financial Officer

Dated: October __, 2010                    ECHOSTAR CORPORATION


David J. Rayner
Chief Financial Officer


Telephone: _____
Facsimile: _____

## <u>Exhibit A</u>

## Restructuring Term Sheet

## TERRESTAR NETWORKS INC.

### Summary of Principal Terms and Conditions of Restructuring

### October 19, 2010

The terms and conditions set forth in this term sheet (the "<u>Restructuring Term Sheet</u>") are meant to be part of a comprehensive compromise, each element of which is consideration for the other elements and an integral aspect of the proposed restructuring. The Restructuring Term Sheet is in the nature of a settlement proposal in furtherance of settlement discussions and is entitled to protection from any use or disclosure to any party or person pursuant to Federal Rule of Evidence 408 and any other rule of similar import.

This Restructuring Term Sheet does not constitute an offer of securities or a solicitation of the acceptance or rejection of a chapter 11 plan for the Company. The transactions contemplated by this Restructuring Term Sheet will be subject to the terms and conditions to be set forth in definitive documents acceptable to the Company and the Plan Sponsor. This Restructuring Term Sheet is part of, and will be attached to, the Plan Support Agreement (the "<u>Plan Support Agreement</u>") among the Company and the Plan Sponsor, and is subject to the terms thereof. This Restructuring Term Sheet can only be amended with each of the parties' prior written consent.

| I. GENERAL/DIP FINANCING | |
|---|---|
| **Company:** | TerreStar Networks Inc. ("<u>TSN</u>" and, as reorganized pursuant to the Plan (as defined below), "<u>Reorganized TSN</u>") and its affiliates, Motient Holdings Inc., Motient Communications Inc., Motient License Inc., Motient Services Inc., TerreStar New York Inc., MVH Holdings Inc., Motient Ventures Holdings Inc., TerreStar National Services Inc. and TerreStar License Inc., TerreStar Networks Holdings (Canada) Inc., TerreStar Networks (Canada) Inc., and 0887729 B.C. Ltd. (together with TSN, the "<u>TSN Debtors</u>" and, as reorganized pursuant to the Plan, the "<u>Reorganized TSN Debtors</u>"), TerreStar Corporation and TerreStar Holdings, Inc. (the "<u>TSC Entities</u>" and together with the TSN Debtors, the "<u>Company</u>"). |
| **Plan Sponsor:** | EchoStar Corporation ("<u>EchoStar</u>" or the "<u>Plan Sponsor</u>") |

| | |
|---|---|
| **Restructuring Transaction:** | Subject to the terms hereof, the TSN Debtors shall restructure their capital structure (the "<u>Restructuring</u>") through a prenegotiated plan of reorganization (the "<u>Plan</u>") to be confirmed in bankruptcy cases (the "<u>Chapter 11 Cases</u>") to be commenced by the TSN Debtors by filing voluntary petitions under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York (the "<u>Bankruptcy Court</u>").<br><br>In addition, TSN, as foreign representative to the TSN Debtors, shall commence recognition proceedings on behalf of the TSN Debtors before the Ontario Superior Court of Justice (Commercial List) (the "<u>Canadian Court</u>") pursuant to Part IV of the Companies' Creditors Arrangement Act, R.S.C. 1985, c. C-36, as amended. |
| **DIP Financing:** | EchoStar shall provide debtor-in-possession financing to the TSN Debtors through a $75 million non-amortizing multiple draw term loan facility (the "<u>DIP Facility</u>"), on the terms and conditions set forth in the Debtor-In-Possession Credit, Security & Guaranty Agreement annexed to the Plan Support Agreement as <u>Exhibit B</u> (the "<u>DIP Agreement</u>").  As set forth in further detail in the DIP Agreement, the claims of the DIP Lenders (inclusive of accrued and unpaid principal and interest, fees, expenses and other obligations and charges under the DIP Facility, the "<u>DIP Claims</u>") shall be secured by:  (i) a first priority lien on any of the TSN Debtors' assets that are not currently encumbered by liens securing the TSN Debtors' obligations under the 15% Senior Secured PIK Notes or the Purchase Money Credit Agreement (the "<u>PMCA</u>"); and (ii) a second priority lien on all other assets of the TSN Debtors. |

## II.     TREATMENT OF CLAIMS
## AND INTERESTS UNDER THE PLAN

| | |
|---|---|
| **DIP Claims** | The DIP Facility will be repaid in cash. |
| **Administrative Expense Claims:** | Administrative Expense Claims will be repaid in cash. |
| **15% Senior Secured PIK Notes Claims:** | Each holder of an allowed 15% Senior Secured PIK Notes Claim shall receive its pro rata share of 97% of:  (i) the New Common Stock (as defined below); and (ii) Rights to purchase New Preferred Stock (as defined below). |

| | |
|---|---|
| **PMCA Claims:** | The PMCA Claims will be repaid in cash or, if the holders of PMCA Claims consent in their sole discretion, reinstated. |
| **Other Secured Claims and Priority Claims:** | Each allowed priority claim or secured claim (other than a 15% Senior Secured PIK Noteholder Claim or PMCA Claim) shall, at the option of the TSN Debtors, with the consent of the Plan Sponsor, be paid:  (i) in cash in full on the later of (x) the Effective Date and (y) the date such claim becomes due and payable in the ordinary course of business; (ii) in cash on such other terms and conditions as may be agreed between the holder of such claim, the TSN Debtors and the Plan Sponsor; or (iii) in deferred cash payments, to the extent permissible under the Bankruptcy Code. |
| **Unsecured Claims:** | Each holder of any allowed unsecured claim against any TSN Debtor, including without limitation, an Exchangeable PIK Notes Claim, a trade claim or claim arising out of the rejection of executory contracts or unexpired leases by any Debtor (the "<u>Unsecured Claims</u>"), shall receive, in the aggregate, 3% of:  (i) the New Common Stock (as defined below); and (ii) either (a) to the extent such Unsecured Claim holder is eligible pursuant to the securities laws to participate in the Rights Offering, Rights to purchase New Preferred Stock (as defined below) or (b) to the extent such Unsecured Claim holder is not eligible to participate in the Rights Offering pursuant to the securities laws, cash or New Common Stock (at the Debtors' sole option) equal to the amount of the value of the Rights; <u>provided</u>, that, in all events, holders of Other Unsecured Claims (as defined below) may elect to reduce their respective Other Unsecured Claims to the amount of $[____] and have such claims treated as Convenience Claims (defined below) (collectively, the "<u>Unsecured Distribution</u>"). |
| **Exchangeable PIK Notes Claims:** | Each holder of an Exchangeable PIK Notes Claim shall receive its pro rata share of that portion of the Unsecured Distribution that is allocated to holders of Exchangeable PIK Note Claims, which allocation shall be equal to or more than 1% of:  (i) the New Common Stock (as defined below); and (ii) Rights to purchase New Preferred Stock (as defined below). |
| **Other Unsecured Claims:** | Each holder of any allowed unsecured claim against any TSN Debtor, other than an Exchangeable PIK Notes Claim, including without limitation, a trade claim or claim |

| | |
|---|---|
| | arising out of the rejection of executory contracts or unexpired leases by any Debtor (the "<u>Other Unsecured Claims</u>"), shall receive its pro rata share of that portion of the Unsecured Distribution that is allocated to Other Unsecured Claims. Such allocation shall be determined after a reconciliation of material Other Unsecured Claims and will give effect to the "structural seniority" of certain of the Exchangeable PIK Notes Claims. |
| **Convenience Claims:** | Each holder of: (a) an allowed Other Unsecured Claim against any TSN Debtor in an amount of $[_____] or less; or (b) an allowed Other Unsecured Claim against any TSN Debtor in an amount in excess of $[_____], which the holder thereof elects to have reduced to $[_____] and treated in accordance with this paragraph (a "<u>Convenience Claim</u>"), shall receive cash in an amount equal to such holder's Convenience Claim. |
| **Existing Equity:** | Existing Equity of the TSN Debtors shall receive no distributions on account of their interests. |
| **Releases and Exculpations:** | The Plan will include derivative releases, mutual third-party releases and exculpation provisions. |

## III.  RIGHTS OFFERING

| | |
|---|---|
| **Rights Offering:** | As part of the Restructuring, there shall be a rights offering (the "<u>Rights Offering</u>") for shares of New Preferred Stock (as defined below) in the amount of (a) $125 million (the "<u>Rights Offering Amount</u>"). In connection with the Rights Offering: (a) each holder of an allowed 15% Senior Secured PIK Notes Claim shall receive its pro rata share (based on such holder's proportionate ownership of the 15% Senior Secured PIK Notes) of rights ("<u>Rights</u>") to purchase 97% of the New Preferred Stock issued in connection with the Rights Offering; (b) each holder of an allowed Exchangeable PIK Notes Claim shall receive its pro rata share (based on such holder's proportionate ownership of the Exchangeable PIK Notes) of Rights to purchase [__]% of the New Preferred Stock issued in connection with the Rights Offering; and (c) each holder of an allowed Other Unsecured Claim shall receive its pro rata share of Rights to purchase [__]% of the New |

| | |
|---|---|
| | Preferred Stock issued in connection with the Rights Offering.[1] |
| | The New Preferred Stock shall be issued at a price (the "<u>Discount Purchase Price</u>") reflecting a 35% discount to the net distributable value under the Plan of approximately $1.050 billion (the "<u>Plan Value</u>"). The Discount Purchase Price assumes that the PMCA Credit Facility will be the only indebtedness outstanding at emergence. The proceeds of the Rights Offering shall be used to fund certain payment obligations of the Company under the Plan and/or to provide working capital for the Reorganized TSN Debtors. |
| | The Rights shall only be transferrable with the underlying claim (<u>i.e.</u>, they shall not be separately detachable). Any such transfer shall be subject to a right of first refusal (in each case, a "<u>ROFR</u>") of the Plan Sponsor. The Rights shall not be listed or quoted on any public or over-the-counter exchange or quotation system. |
| **Rights Offering Backstop:** | The Plan Sponsor hereby commits and, subject to the terms hereof, shall enter into definitive documentation to (a) participate in the Rights Offering by purchasing that number of shares of New Preferred Stock corresponding to its current proportionate ownership of the 15% Senior Secured PIK Notes and the 6.5% Exchangeable Notes Claims, and (b) purchase all shares of New Preferred Stock to which the holders of Rights do not subscribe in connection with the Rights Offering (such shares, the "<u>Rights Offering Residual Shares</u>"); <u>provided</u>, that notwithstanding the foregoing, the Plan Sponsor shall not be required to purchase in excess of $100 million of New Preferred Stock, or such other greater amount as may be agreed upon by the Parties (the "<u>Backstop Amount</u>"); <u>provided</u>, <u>further</u>, that if, and to the extent that, at the time the Rights Offering is commenced, the Rights Offering Amount exceeds the Backstop Amount (i.e., there are shares of New Preferred Stock to be issued in connection with the Rights Offering that are not subject to the Plan Sponsor's backstop obligations described herein (such shares, the "<u>Non-Backstopped Shares</u>")), participants in the Rights Offering may, subject to a right of first refusal of the Plan Sponsor with respect to the Non-Backstopped |

---

[1] The percentage of Rights to purchase New Preferred Stock issued in connection with the Rights Offering to holders of Unsecured Claims will be determined in the same manner as the percentage of New Common Stock issued to such holders.

| | Shares, elect to purchase the Non-Backstopped Shares on a pro rata basis. |
| --- | --- |
| | The Plan Sponsor shall be: |
| | (a) entitled to receive a commitment fee equal to 3% of the Backstop Amount (the "<u>Backstop Commitment Fee</u>") in Additional Shares of New Preferred Stock at the Discount Purchase Price. "Additional Shares" means shares of New Preferred Stock issued by TSN other than in connection with the Rights Offering; |
| | (b) offered the option, in its sole discretion, to purchase up to $25 million of Additional Shares of New Preferred Stock at the Discount Purchase Price (the "<u>Overallotment</u>") within 10 days of the conclusion of the subscription period; and |
| | (c) granted a ROFR on any Rights transferred by a holder of 15% Senior Secured PIK Notes Claims, 6.5% Exchangeable PIK Notes Claims, or Other Unsecured Claims. |

## IV.    CORPORATE GOVERNANCE AND MANAGEMENT

| | |
| --- | --- |
| **Board of Directors:** | The initial Board of Directors of Reorganized TSN (the "<u>Initial TSN Board</u>") shall consist of seven members selected by Plan Sponsor. The members of the Initial TSN Board shall be designated at least ten (10) days prior to the hearing on confirmation of the Plan. The members of the Initial TSN Board shall also serve as the members of the initial Boards of Directors of the other Reorganized TSN Debtors. Successor directors of each Reorganized TSN Debtor will be appointed and/or elected in accordance with the applicable Reorganized TSN Debtor's charter and by-laws. |
| **Chief Executive Officer:** | The initial Chief Executive Officer ("<u>CEO</u>") of Reorganized TSN shall be one of the members of the Initial TSN Board, and shall be selected by the Initial TSN Board. The CEO of Reorganized TSN shall also serve as the initial CEO of each other Reorganized TSN Debtor. |
| **Employee Incentives/Senior Management** | As part of the overall restructuring, the Plan Sponsor recognizes and understands the importance of ensuring that the Debtors' chapter 11 operations continue to be managed in a manner that maximizes value for the estates. In that regard, the Plan Sponsor will support a motion seeking |

| | |
|---|---|
| | authority for the Debtors to provide an employee incentive plan (materially consistent in form and substance with the compensation arrangements currently being negotiated by the parties hereto), which will include terms and conditions regarding compensation and/or severance for senior management after the Effective Date. |
| **New Common Stock:** | Reorganized TSN shall issue one class of common stock, par value $0.01 per share (the "New Common Stock"). The New Common Stock shall be exempt from registration pursuant to section 1145 of the Bankruptcy Code.<br><br>97% of the New Common Stock shall be issued to the holders of allowed 15% Senior Secured PIK Notes Claims, on a pro rata basis (based on such holders' respective ownership of the 15% Senior Secured PIK Notes).<br><br>[    ]% of the New Common Stock shall be issued to holders of allowed Other Unsecured Claims, on a pro rata basis.<br><br>[    ]% of the New Common Stock shall be issued to holders of allowed Exchangeable PIK Notes Claims, on a pro rata basis (based on such holders' respective ownership of the Exchangeable PIK Notes).[2]<br><br>The New Common Stock shall be subject to dilution by the issuance of the New Preferred Stock. |
| **Company Status:** | The Reorganized TSN Debtors shall be private (non-reporting) companies. The New Common Stock will: (i) not be registered; (ii) not be listed on any national exchange; and (iii) be transferable by the recipients thereof under the Plan pursuant to the exemption from registration granted by section 1145(c) of the Bankruptcy Code (except with respect to any such recipient deemed to be an "underwriter"). |
| **New Preferred Stock:** | Reorganized TSN shall issue one class of preferred stock (the "New Preferred Stock"). The New Preferred Stock, which (other than its liquidation preference) shall have the same economic and voting rights as the Common Stock on an "as converted" basis, shall be issued to participants in the Rights Offering and, if exercised in the Plan Sponsor's sole discretion, the Overallotment. All shares of New Preferred Stock shall be: (i) issued at the Discount Purchase Price; (ii) exempt from registration pursuant to |

---

[2]    The 3% of New Common Stock to be issued to holders Unsecured Claims shall be allocated to holders of Exchangeable PIK Notes Claims and holders of Other Unsecured Claims on terms to be agreed upon at a later date.

| | section 1145 of the Bankruptcy Code; and (iii) freely convertible into New Common Stock at the option of the holder. |
|---|---|
| | Holders of New Preferred Stock shall be entitled to participate in dividends paid to holders of New Common Stock on an "as converted" basis. |
| | The voting rights of the New Preferred Stock and New Common Stock shall be identical. Holders of New Preferred Stock shall be entitled to vote on an "as converted" basis (together with holders of New Common Stock) on any matter or transaction on which the New Common Stock is entitled to vote. |
| | Upon any merger, consolidation, change in control, liquidation, dissolution or winding up of Reorganized TSN, the holders of the New Preferred Stock shall be entitled to receive, in preference to the holders of the Common Stock, a per share amount equal to the greater of (a) 155% of the Discount Purchase Price plus any accrued but unpaid dividends, and (b) the "as converted" value of the New Preferred Stock. After the payment of such amount to the holders of the New Preferred Stock, the remaining assets of Reorganized TSN shall be distributed ratably to the holders of the New Common Stock and the New Preferred Stock. |
| **Registration Rights Agreement:** | On the Effective Date, Reorganized TSN and the 15% Senior Secured PIK Noteholders shall enter into a Registration Rights Agreement, which, without limitation, shall provide for (i) "piggy-back" registration rights for the New Common Stock (with customary exceptions, including Reorganized TSN's initial public offering); (ii) following the initial public offering of Reorganized TSN, for those holders of New Common Stock that cannot sell freely under Rule 144 of the Securities Act of 1933, as amended, S-3 or "short-form" demand registration rights for the New Common Stock (with customary limitations); (iii) information rights, including the right of prospective purchasers of the New Common Stock to obtain non-public information upon execution of a confidentiality agreement; and (iv) preemptive rights (with customary exceptions). |
| **V. OTHER TERMS** | |
| **Conditions Precedent To Effective Date:** | Conditions precedent to the occurrence of the Effective Date of the Plan, each of which may be waived in writing by the Plan Sponsor, shall include, but not be limited to, |

the following:

(a)     an order confirming the Plan (the "<u>Confirmation Order</u>"), in a form that is satisfactory to the Plan Sponsor, shall have been entered by the Bankruptcy Court and shall have become a final order, not subject to a stay;

(b)     the TSN Debtors shall have executed and delivered appropriate definitive documentation regarding the Restructuring, including, without limitation, (i) the amended and restated certificates of incorporation and by-laws of the Reorganized TSN Debtors (which documents shall contain provisions: (a) limiting the transfer of the New Common Stock to ensure that Reorganized TSN remains a private company; and (b) requiring no more than majority approval to amend such documents); and (ii) the Registration Rights Agreement, each in a form that is satisfactory to the TSN Debtors and the Plan Sponsor;

(c)     A decision released by the FCC or a bureau or subdivision thereof (an "<u>FCC Order</u>") approving the transfer of control to the Plan Sponsor over the licenses and authorizations held by the TSN Debtors, and all other governmental, regulatory and third party licenses, approvals, waivers and/or consents required under applicable law to consummate the transactions contemplated by the Plan, including without limitation the Industry Canada Approval (defined below), shall have been obtained and shall be final and in full force and effect without any condition or requirement that would reasonably be expected to have, individually or in the aggregate, a material impact on the current or future business operations of the Plan Sponsor. In addition, the FCC shall not have reconsidered the FCC Order on its own motion within 30 days (or, if released by a bureau or other subdivision of the FCC, within 40 days) of its release, and the FCC and the courts will have denied all petitions for reconsideration, applications for review and appeals (collectively, "<u>Appeals</u>") of the FCC Order (or of an FCC or court order affirming the FCC Order), or the periods for filing such Appeals have passed and no Appeal has been filed. Moreover, there shall exist no claim, action, suit, investigation, litigation or proceeding, pending or threatened in any court or before any arbitrator or governmental

| | |
|---|---|
| | instrumentality, which would prohibit the transactions contemplated by the Plan; |
| | (d) The prior approval of the Minister of Industry (the "<u>Industry Canada Approval</u>") approving the transfer of control of TerreStar Canada to the Plan Sponsor or, at the option of the Plan Sponsor, the transfer or assignment of the licenses and authorizations held by the TSN Debtors to a party designated by the Plan Sponsor that is eligible to hold such licenses, to the extent required by applicable law, including the licenses and authorizations, to consummate the transactions contemplated by the Plan, shall have been obtained and shall be final and in full force and effect without any condition or requirement that would reasonably be expected to have, individually or in the aggregate, a material impact on the current or future business operations of the Plan Sponsor. In addition, the courts will have denied all applications for judicial review or other court challenges to the Industry Canada Approval or appeals of any court order upholding the Industry Canada Approval or the periods for filing such appeals have passed and no appeal has been filed. |
| | (e) the TSN Debtors shall have cash on hand as of the Effective Date of at least $5 million; and |
| | (f) no Sponsor Termination Event or Company Termination Event (each as defined below) shall have occurred that shall not have been waived by the Plan Sponsor or the Company, as applicable. |
| **Sponsor Termination Events:** | This Restructuring Term Sheet shall be terminated and all of the obligations of the parties hereto shall be of no further force or effect, in the event (each, a "<u>Sponsor Termination Event</u>") that any of the following occurs: |
| | (a) the TSN Debtors shall fail to (i) commence the Chapter 11 Cases or (ii) file the Plan and Disclosure Statement on or prior to November 5, 2010; |
| | (b) the Company shall fail to file, jointly with the Plan Sponsor and in form and content acceptable to Plan Sponsor, all necessary applications for approval of the transfers of control over all the FCC licenses and authorizations held by Company that are contemplated by the Plan, and all required notifications to the FCC, or shall fail to collaborate |

| | | with the Plan Sponsor to allow timely preparation of such applications and notifications, on or prior to December 14, 2010; |
| | (c) | the Company shall fail to file, in form and content acceptable to the Plan Sponsor, all applications necessary to obtain Industry Canada approval of the transfers or assignments of all the Industry Canada licenses and authorizations held by Company that are contemplated by the Plan, and any required notifications to Industry Canada, or shall fail to collaborate with the Plan Sponsor to allow timely preparation of such applications and notifications, on or prior to December 14, 2010; |
| | (d) | any of the pleadings filed by the TSN Debtors seeking customary "first day" relief, including, without limitation, terms for retention of professionals in the Chapter 11 Cases and any of the Bankruptcy Court orders entered in connection therewith, or any of the recognition pleadings filed by the TSN Debtors with the Canadian Court, are not, in form and substance, satisfactory to the Plan Sponsor; |
| | (e) | an Event of Default under the DIP Facility; |
| | (f) | (i) the TSN Debtors shall not have filed a motion to assume the Plan Support Agreement within one (1) day after the date of commencement of the Chapter 11 Cases (the "Petition Date"); (ii) the Bankruptcy Court shall not have entered an order authorizing the TSN Debtors' assumption of the Plan Support Agreement on or before the date that is thirty-five (35) days after the Petition Date; or (iii) the Plan Support Agreement shall have been terminated or rejected by the TSN Debtors or the Company; |
| | (g) | the Disclosure Statement shall not have been approved by final order of the Bankruptcy Court on or before December 14, 2010; |
| | (h) | a Bankruptcy Court hearing on confirmation of the Plan shall not have commenced on or before January 31, 2011; |
| | (i) | a final, non-appealable order by the Bankruptcy Court confirming the Plan shall not have been |

entered on or before February 14, 2011;

(j) the Effective Date shall not have occurred later than two Business Days after all conditions to consummation have been satisfied and, in any event, shall occur no later than May 31, 2011, or such later date as may be mutually agreed by the Parties;

(k) upon the request of the Plan Sponsor, (a) within seven days of the issuance of any order in the Bankruptcy Court, a corresponding recognition order, in form and substance reasonably acceptable to the Plan Sponsor shall not have been entered in the Canadian Court, or (b) such order shall not have become final and non-appealable within twenty-one (21) days after entry of such order by the Canadian Court;

(l) the Company shall enter into any material contractual obligations or any material settlements, without the prior written consent of the Plan Sponsor;

(m) there shall be any material modification to any terms of the Restructuring that is inconsistent with the terms and conditions set forth in this Restructuring Term Sheet, without the prior written consent of the Plan Sponsor;

(n) the Company shall withdraw, or file a motion to withdraw, the Plan or submit an amended plan of reorganization or liquidation that is adverse to the Plan Sponsor or inconsistent with the terms and provisions of this Restructuring Term Sheet;

(o) any event, development or circumstance (other than any event, development or circumstance arising from or relating to the Chapter 11 Cases) shall have occurred on or after June 30, 2010 that, either alone or in combination, has had or could reasonably be expected to have a material adverse effect on the business, operations, assets, liabilities, or condition (financial or otherwise) of the TSN Debtors taken as a whole or the Reorganized TSN Debtors taken as a whole;

(p) a trustee, responsible officer, or an examiner with powers beyond the duty to investigate and report, as set forth in subclauses (3) and (4) of clause (a) of section 1106 of the Bankruptcy Code shall have been

appointed under section 1104 of the Bankruptcy Code for service in the Chapter 11 Cases;

(q)     the Chapter 11 Cases shall have been converted to cases under chapter 7 of the Bankruptcy Code; or

(r)     the Company shall have breached any material provision of this Restructuring Term Sheet.

The foregoing Sponsor Termination Events are intended solely for the benefit of the Plan Sponsor.

Upon the occurrence of any of the Sponsor Termination Events, this Restructuring Term Sheet shall terminate automatically upon (x) the seventh (7th) business day after the occurrence of such Sponsor Termination Event set forth in subparagraphs (a), (b), (c), (e), (f), (g), (h), (i), (j), (k), (l), (m), (q) and (r) above, unless waived in writing by the Plan Sponsor, in its sole discretion before the expiration of such waiver period; or (y) in case of the Sponsor Termination Events set forth in subparagraphs (d), (n), (o), and (p) above, (i) written notice of such Termination Event provided to the Company by the Plan Sponsor; provided that the Company hereby agree to waive the requirement that the automatic stay under section 362 of the Bankruptcy Code be lifted in connection with giving such notice (and not to object to the Plan Sponsor seeking to lift the automatic stay in connection with giving such notice, if necessary); and (ii) such Sponsor Termination Event remaining uncured for at least five (5) days following the delivery of notice thereof.

| **Company Termination Events:** | This Restructuring Term Sheet may be terminated by the Company and all of the obligations of the parties hereto shall be of no further force or effect, in the event that (i) the Plan Sponsor shall have breached any material provision of this Restructuring Term Sheet; or (ii) the Chapter 11 Cases shall have been converted to cases under chapter 7 of the Bankruptcy Code (the "Company Termination Events"). |
|---|---|
| | The foregoing Company Termination Events are intended solely for the benefit of the Company. |
| | Upon the occurrence of a Company Termination Event, the termination of this Restructuring Term Sheet shall be effective upon (i) written notice being provided to the Plan Sponsor by the Company; and (ii) such breach (if applicable) remaining uncured for at least five (5) days |

| | |
|---|---|
| | following the Plan Sponsor's receipt of such notice. |
| **Expenses:** | The Company will reimburse the Plan Sponsor, the 15% Senior Secured PIK Notes Indenture Trustee, and the PMCA Agent for all reasonable, actual and documented out-of-pocket expenses incurred by such parties in connection with the Restructuring and the Rights Offering, including, but not limited to, the fees and expenses of such entities' counsel and financial advisors. |
| **Executory Contracts and Unexpired Leases:** | The Company and the Plan Sponsor shall mutually agree on the disposition of Material Contracts and Leases (as defined below), which disposition (e.g., rejection, assumption or termination) shall be set forth in the Plan. Prior to confirmation of the Plan, the Company shall not make any motion to assume or reject a Material Contract or Lease without the consent of the Plan Sponsor. A "Material Contract or Lease" shall mean any agreement, lease, user agreement or other type of contract of one or more of the TSN Debtors (a) where consideration has been or will be paid or received by Company or any of its affiliates in excess of $100,000 in any twelve month period or in excess of $1,000,000 over the remaining term, (b) with an affiliate, or (c) that relates to the sale, lease or use of spectrum, capacity or satellites (other than as contemplated by the Agreed Budget (i.e., the AT&T Genus business)). |
| **No Waiver:** | Nothing in this Restructuring Term Sheet shall affect in any way, or be deemed a waiver of, any of the rights of (i) any of the holders of the 15% Senior Secured PIK Notes Claims or PMCA Claims, or (ii) the Company, under any applicable instrument, document or law. |
| **Governing Law:** | State of New York. |
| **Bankruptcy Rule 9019:** | Pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure, the Company and Plan Sponsor hereby acknowledge that this Restructuring Term Sheet, the Plan Support Agreement, and the Plan contemplated hereby and thereby (the "Proposed Plan") are part of a good faith compromise and settlement of all claims and controversies relating to the rights of the Company and the Plan Sponsor, including without limitation disputed issues relating to lien priority and collateral valuation. Nothing in this Restructuring Term Sheet, the Plan Support Agreement, or the Proposed Plan shall be deemed an admission of any kind. Pursuant to Federal Rule of Evidence 408 and any applicable state rules of evidence, this Restructuring Term Sheet, the Plan Support Agreement, and the Proposed Plan and all negotiations relating thereto shall not be admissible into evidence in any proceeding unless and until the Proposed Plan is consummated, and then only in |

| | accordance with the terms of the Proposed Plan. In the event the Proposed Plan is not consummated, provisions of this Restructuring Term Sheet, the Plan Support Agreement, and the Proposed Plan shall be of no effect.

The Company and the Plan Sponsor further agree that the Plan and Disclosure Statement shall contain appropriate provisions to reflect the foregoing acknowledgments and agreements. |
| --- | --- |

**Exhibit B**

**DIP Agreement**

A copy of the DIP Agreement is attached as Exhibit B to the Motion of the Debtors for Interim and Final Orders Under Sections 105, 361, 362, 363(c), 364(c)(1), 364(c)(2), 364(c)(3), 364(e) and 507 of the Bankruptcy Code and Bankruptcy Rules 2002, 4001 and 9014:  (I) Authorizing Debtors to Obtain Postpetition Financing; (II) Authorizing Debtors to Use Cash Collateral; (III) Granting Adequate Protection to Prepetition Secured Parties; and (IV) Scheduling a Final Hearing Pursuant to Bankruptcy Rules 4001(b) and (c).

## Exhibit C

### Joinder

The undersigned ("Transferee") hereby acknowledges that it has read and understands the Plan Support Agreement, dated as of October 19, 2010 (the "Agreement"), by and among TerreStar Networks Inc. (the "Company"), on behalf of itself and its affiliated Debtors, EchoStar Corporation ("Transferor"), and the other holders of claims against, and equity interests in, the Company signatory thereto, and agrees to be bound by the terms and conditions thereof to the extent Transferor was thereby bound, and shall be deemed a "Party" and a "Plan Sponsor" under the terms of the Agreement, as if an original signatory thereto.

Dated: _____ , 2010                    [Transferee's Name]


                                               _____
                                               _____
                                               Title: _____

## Schedule 1

### Plan Sponsors' Claims and Interests

### [REDACTED]

**EXHIBIT C**

**DIP Declarations**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| TERRESTAR NETWORKS INC., *et al.*,[1] | ) Case No. 10-[_____] ( ) |
| | ) |
| Debtors. | ) Joint Administration Requested |
| | ) |

**DECLARATION OF STEVEN ZELIN IN SUPPORT OF MOTION OF THE DEBTORS
FOR INTERIM AND FINAL ORDERS PURSUANT TO SECTIONS 105, 361, 362, 363(C),
364(C)(1), 364(C)(2), 364(C)(3), 364(E) AND 507 OF THE BANKRUPTCY CODE AND
BANKRUPTCY RULES 2002, 4001 AND 9014: (I) AUTHORIZING DEBTORS TO
OBTAIN POSTPETITION FINANCING; (II) AUTHORIZING THE DEBTORS TO USE
CASH COLLATERAL; (III) GRANTING ADEQUATE PROTECTION TO
PREPETITION SECURED PARTIES; AND (IV) SCHEDULING A FINAL HEARING
PURSUANT TO BANKRUPTCY RULES 4001(B) AND (C)**

I, Steven Zelin, hereby declare, pursuant to 28 U.S.C. § 1746, under penalty of perjury:

**Background**

1.        I am a Senior Managing Director of Blackstone Advisory Partners L.P.

(the ***"Advisor"***), an affiliate of The Blackstone Group L.P. ("***Blackstone***") a global alternative

asset manager and provider of financial advisory services listed on the New York Stock

Exchange that maintains offices at 345 Park Avenue, New York, New York 10154.  The Advisor

was retained by the Debtors in April 2010 to assist with a broad range of responsibilities

including, among other things, to structure and secure debtor in possession financing to the

extent necessary.  Over the course of the last several months, the Advisor has become familiar

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal taxpayer-identification number, are: TerreStar New York Inc. (6394); TerreStar Networks Inc. (3931); Motient Communications Inc. (3833); Motient Holdings Inc. (6634); Motient License Inc. (2431); Motient Services Inc. (5106); Motient Ventures Holding Inc. (6191); MVH Holdings Inc. (9756); TerreStar License Inc. (6537); TerreStar National Services Inc. (6319); TerreStar Networks Holdings (Canada) Inc. (1337); TerreStar Networks (Canada) Inc. (8766) and 0887729 B.C. Ltd. (1345).

with the Debtors' business, finances, capital structure and operations, as well as their financial restructuring initiatives.

2.      I joined the Advisor in 1998 and was made partner in 2001.  Prior to joining the Advisor, I was a partner in the Restructuring & Reorganization Group of Ernst & Young LLP.

3.      I have in excess of 20 years of experience in financial advisory services, including financial transactions, valuation and restructuring transactions.  I have led complex bankruptcies and reorganizations across a broad spectrum of industries in a variety of capacities. Among other things, I have advised companies, equity sponsors and creditors in both domestic and cross-border restructurings, capital raises, and merger and acquisition advisory transactions. In particular, I have provided services to debtors and other constituencies in numerous restructurings, including, among others, *Abitibi Bowater Holdings, Inc., Aeromexico/Mexicana Airlines, American Axle & Manufacturing, Inc., Aquila, Inc., Big V Supermarkets (Shop Rite), Centaur Gaming, Delphi Corporation, Enron Corporation, Entergy New Orleans, General Motors Corporation, The Goodyear Tire & Rubber Company, Integrated Resources, Inc., Intrawest Resorts, Kindred Healthcare (formerly Vencor), Marvel Entertainment Group, Mrs. Fields Cookies, Inc., Motorola Inc. (in the restructuring of Iridium), Pacific Lumber/Scotia Pacific Corp., SEM Group Energy Partners, R. H. Macy & Co., Sumitomo Corp (in the restructuring of Apex Silver Mines), and Xerox Corporation.*  I have provided expert witness testimony regarding valuation and restructuring matters on numerous occasions.

4.      I submit this declaration in support of the *Motion of the Debtors for Interim and Final Orders Pursuant to Sections 105, 361, 362, 363(c), 364(c)(1), 364(c)(2), 364(c)(3), 364(e) and 507 of the Bankruptcy Code and Bankruptcy Rules 2002, 4001 and 9014:*

*(I) Authorizing Debtors to Obtain Postpetition Financing; (II) Authorizing the Debtors to Use Cash Collateral; (III) Granting Adequate Protection to Prepetition Secured Parties; and (IV) Scheduling a Final Hearing Pursuant to Bankruptcy Rules 4001(b) and (c)* (the "**DIP Motion**").[2]

5.      The statements in this declaration are, except where specifically noted, based on my personal knowledge or opinion, on information that I have received from the Debtors' employees or advisors and/or employees of the Advisor working directly with me or under my supervision, direction or control, or from the Debtors' records maintained in the ordinary course of their business. I am not being compensated specifically for this testimony other than through payments received by the Advisor as a professional proposed to be retained by the Debtors.[3] If I were called upon to testify, I could and would testify competently to the facts set forth herein. I am authorized to submit this declaration on behalf of the Debtors.

## The Debtors' Need for Postpetition Financing

6.      The Debtors' business focuses on developing a next generation wireless communications network. However, because the Company is still in its development stage, it has not yet generated significant revenue. Accordingly, regular infusions of financing have been and continue to be necessary to, among other things, construct and maintain satellites and ground stations, develop a chipset that would allow smartphones and cellular devices to communicate over the TerreStar network and obtain regulatory and other approvals. Each of these components is vital to the Debtors' business plan, and some of these components (such as the maintenance of satellites and ground stations) are critical to maintaining asset values.

---

[2] Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the DIP Motion.

[3] By separate motion, I understand the Debtors will be filing a motion to approve the retention of Blackstone Advisory Partners L.P. as financial advisor for the Debtors and Debtors in possession *nunc pro tunc* to the Petition Date.

7.     Despite recently achieving the significant milestone of turning their product into a revenue stream, the Debtors still require a significant amount of capital before they become profitable enough to both service their current debt load and also meet their on-going capital requirements for continued technological development and expansion of their product.  Accordingly, over the past six months, the Debtors attempted a number of measures to increase liquidity and restructure their balance sheet.  Although the Company was successful in obtaining some capital, the amount raised was not sufficient to fund operations to the point where it was able to generate revenue that would allow the Company to finance near-term and long-term liquidity needs and service its debt obligations.

8.     As such, the Debtors determined that the best path forward was to file for chapter 11 in order to both raise capital, including a debtor in possession financing, and restructure their balance sheet.  Specifically, and among other things, the Debtors required financing because they must be able to (1) make payments to significant contract counterparties on a current basis postpetition, including, but not limited to, certain key vendors that are determined to be critical; (2) continue to pay employees and consultants whose employment is vital to the Debtors' business operations, and (3) pay ordinary operating expenses such as rent, utilities, insurance, taxes, and fees.

9.     The Debtors' need for DIP Financing cannot be understated.  As of the Petition Date, they had less than $0.5 million of cash on hand, and, as stated above, very little in the way of any revenue stream.  Without access to the funds proposed to be advanced under the DIP Agreement, the Debtors' overall business would come to a halt, causing immediate and irreparable harm to the Debtors, their estates, and their creditors.  The failure to pay any one of the Debtors' contract counterparties could have a significant negative impact on the enterprise

value of the Debtors and their ability to market their next generation network, thereby causing harm to creditors and parties in interest in these cases. Any cessation in performance, even for a day, would have significant negative consequences.

10.     As part of the Debtors' debtor in possession financing process, the Debtors, with the Advisor's assistance, have developed a 13-week cash flow forecast. This forecast considers a number of items, including, among others, the impact of a bankruptcy filing, material cash disbursements, required vendor payments and cash flows. Without approval of the DIP Financing, the Debtors will have insufficient cash on hand to meet these needs.

11.     Lastly, the DIP Financing received by the Debtors will be subject to a budget. The Debtors, with the assistance of the Advisor, have agreed upon a budget (the "**Agreed Budget**") for the DIP Financing for the nine-month period beginning on the Closing Date (as defined in the DIP Agreement). Following the Closing Date, the Debtors will report their results as compared to the Agreed Budget on a bi-weekly basis, pursuant to the terms set forth in the DIP Agreement. After discussing and working to put together the Agreed Budget with the Debtors, I believe that the Agreed Budget is achievable, will allow the Debtors to operate without the accrual of unpaid administrative expenses and will allow the Debtors to continue to make necessary expenditures critical to their business.

## DIP Financing Negotiations

12.     Despite the Debtors' obvious needs for DIP financing (as explained above), the Debtors were still able to run a full, robust, careful and well-documented process to both obtain the best possible financing available, as well as, at the same time, attempt to explore restructuring alternatives with their stakeholders. As a result of their efforts, the Debtors have been able to file, on the first day of these cases, both a motion seeking approval of $75 million in

DIP financing, as well as a motion seeking to assume a plan support agreement that provides the Debtors with a fully funded path out of chapter 11. Set forth below is an explanation of this process.

13. In April 2010, the Debtors and their advisors discussed and contemplated a chapter 11 filing.[4] To provide the Debtors with appropriate and necessary funding, the negotiation of adequate liquidity in the form of debtor-in-possession financing was critical to ensure that the Debtors could operate in accordance with their business plan during chapter 11. In June 2010, the Advisor approached members of the existing capital structure for a $250 million junior DIP financing where lenders would receive a junior "non-priming" lien on all assets that secure the Senior Secured Notes and a first lien on all assets that do not secure the Senior Secured Notes.[5] Specifically, the Debtors engaged in discussions with an informal group comprised of certain holders of the 6.5% Senior Exchangeable PIK Notes of TerreStar Networks Inc., due 2014 (the *"Ad Hoc Noteholder Group"*) as well as Harbinger Capital Partners (*"Harbinger"*) a significant holder of many of the Debtors' obligations. During this time, the Debtors also reached out to EchoStar Corporation (*"EchoStar"*), another significant stakeholder of many of the Debtors' obligations, attempting to engage them in restructuring/DIP financing negotiations.

---

[4] At that time, and up until recently, the Debtors contemplated that Terrestar Corporation (the ultimate parent) and Terrestar Holdings, Inc. (its direct subsidiary) would file for chapter 11 as well. In light of recent events, including, without limitation, the agreement by certain parties to toll the litigation they were bringing against Terrestar Corporation, the Debtors decided that filing these entities for chapter 11 at this time would not be necessary.

[5] Terrestar Corporation has access to 8 MHz of 1.4 GHz spectrum through a license held by their non-debtor affiliate, TerreStar 1.4 Holdings LLC (*"1.4 Holdings"*) 1.4 Holdings currently is a party to the Spectrum Lease Agreement, pursuant to which One Dot Four manages the 1.4 Spectrum in exchange for payments to 1.4 Holdings of $2 million per month. TerreStar 1.4 Holdings LLC is a wholly owned subsidiary of TerreStar Holdings Inc. (*"TerreStar Holdings"*), which is the direct subsidiary of Terrestar Corporation.

14.     The Debtors and their professionals received some preliminary indications that certain of the 6.5% Noteholders, as well as Harbinger, would be willing to be DIP lenders in the "junior" DIP structure, and entered into extensive and arms'-length negotiations with these parties; however, such commitments ultimately were not obtainable.

15.     In early August 2010, the Debtors and their advisors began to shop the "junior" DIP to additional parties, including other stakeholders not previously contacted, as well as non-stakeholder parties, while at the same time continuing discussions with the Ad Hoc Noteholder Group and Harbinger.  The Advisor utilized its standard DIP marketing procedures for these circumstances (i.e., companies of this nature in this particular distressed situation).  Of the total of fifty-three parties contacted, the Debtors executed non-disclosure agreements with twenty-five of those parties.  Upon execution of a non-disclosure agreement, the Advisor facilitated and participated in numerous diligence discussions with, and responded to information requests made by, the potential lenders.

16.     The Debtors were unable to obtain sufficient interest to fill the contemplated "junior" DIP financing facility.  However, the feedback from the marketing process suggested that the potential lenders had significant interest in a priming DIP.  As such, in late August, the Debtors began to solicit interest in a priming DIP financing.[6]

17.     In late September, after having reached an agreement in principle with respect to the priming DIP Financing, the Debtors received a $75 million "junior" DIP proposal provided by EchoStar, which financing was to be provided as part of a complete restructuring of the Debtors' capital structure the terms of which were at that time yet to be defined.  The

---

[6] Soon thereafter, the Debtors were approached by Harbinger and EchoStar who offered the Debtors $10 million of financing under the PMCA.  This gave the Debtors more breathing room.  Accordingly, after the Debtors received this short term financing, although the Debtors continued to explore alternative sources of financing, at that time, the Debtors began having joint discussions with EchoStar and Harbinger regarding a potential restructuring.

"junior" DIP proposal would have a second lien on all of the Debtors' assets that were encumbered by the PMCA and the 15% Secured Notes, and a senior lien on all of the Debtors' unencumbered assets.

18.     For a short period of time, the Debtors negotiated parallel DIP financing arrangements – a "priming" DIP with certain financial institutions who were not current stakeholders (the "***Third Parties***") and a "junior" DIP with EchoStar – in order to secure the most favorable financing arrangement possible.  During this time, the Debtors continued to conduct diligence meetings and hold various calls and negotiation sessions with both potential DIP lenders, with an understanding that a decision needed to be made.

19.     In early October, EchoStar sent the Debtors a DIP commitment letter and draft DIP credit agreement for the proposed Junior DIP Facility (the "***DIP Agreement***") as well as the terms of proposed restructuring of the Debtors and the Third Parties sent the Debtors a DIP commitment letter and a draft credit agreement for the proposed priming facility.

20.     Following extensive diligence and negotiations with the two potential DIP lender groups, the Debtors determined that it would be in the best interests of the Debtors and their stakeholders to enter into the DIP Agreement with EchoStar.  Specifically, the Debtors concluded that the EchoStar DIP financing was superior for, among other things, the following reasons: (1) it eliminated the risks of any "priming" fight necessary for this Court to approve the third party financing proposal, thereby making the Debtors' ability to receive the necessary financing more certain; (2) it did not require the payment of pre-petition commitment fees; and (3) it did not require a full draw of all amounts available under the financing thus reducing the

interest costs.[7]  Further, and importantly, counsel to the Debtors has advised me that given the standards set forth in section 364(d)(1) of the Bankruptcy Code, the Debtors had significant doubts as to whether they could meet the factual and legal predicates necessary to prevail in a "priming" fight.

21.     Moreover, and concomitantly with offering the DIP Financing, EchoStar also agreed to enter into a plan support agreement (complete with a plan term sheet), whereby EchoStar agreed to, among other things, (a) convert substantially all of its secured indebtedness (other than amounts owed to EchoStar under the PMCA) into equity of the reorganized Debtors; (2) convert all of its unsecured indebtedness into equity of the reorganized Debtors; (3) backstop one-hundred million dollars of a one-hundred and twenty-five million dollar rights offering to be offered to substantially all other stakeholders of the Debtors that will provide the funding necessary for the Debtors to repay their DIP obligations and other emergence costs and, assuming the rights offering is fully subscribed,  provide financing that enables the Debtors to fund its operations post emergence from Chapter 11; and (4) provide, at EchoStar's option, an additional $25 million of financing, in its sole discretion.  I believe that, based upon all of the above, the Debtors' decision to pursue this comprehensive and consensual restructuring plan will maximize recoveries to their creditors, be beneficial to their estates, and will ensure a swift exit from these bankruptcy proceedings pursuant to a feasible plan of reorganization.

---

[7] Although the third party DIP Financing proposal offered $250 million in DIP financing, the amount is not comparable to the $75 million DIP Financing proposed by the EchoStar.  First, the DIP Financing proposal offered by the third party lenders would have repaid, in full, the PMCA, meaning that, in effect it was actually only $163 million in cash proceeds to the Company.  In addition, the third party DIP Financing proposal included a 10% cash interest component, for one year, incremental original issue discount, and commitment fees thereby further reducing the amount of the DIP from $163 million to $136 million.  Further, the third party DIP financing assumed a longer bankruptcy, therefore funding more operating costs, leaving $113 million versus the $75 million proposed by EchoStar.

22.     For numerous reasons, no party, other than the proposed DIP Lenders, was willing to provide a better financing package to the Debtors.  Without the relief requested in the DIP Motion and access to the DIP Financing, the Debtors would likely have to curtail or even terminate their business operations, which would have a material negative impact on the Debtors' estates, their creditors, employees, stakeholders and other parties in interest.  Thus, the Debtors need to ensure that working capital is available immediately upon the commencement of these cases.

23.     I believe that the terms of the DIP Financing, the Debtors' use of the cash collateral as provided by the proposed order for the DIP Motion and all other financial accommodations provided under the DIP Documents are fair and reasonable and supported by reasonably equivalent value and fair consideration.  Moreover, the DIP Financing addresses the Debtors' working capital and liquidity needs and will enable the Debtors to preserve their value as a going-concern.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated:      New York, New York
             October 17, 2010

                                            Steven Zelin
                                            Senior Managing Director

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| TERRESTAR NETWORKS INC., *et al.*,[1] | ) Case No. 10-[_____] ( ) |
| | ) |
| Debtors. | ) Joint Administration Requested |
| | ) |

## DECLARATION OF JEFFREY W. EPSTEIN IN SUPPORT OF MOTION OF THE DEBTORS FOR INTERIM AND FINAL ORDERS UNDER SECTIONS 105, 361, 362, 363(C), 364(C)(1), 364(C)(2), 364(C)(3), AND 364(E) AND 507 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULES 2002, 4001 AND 9014: (I) AUTHORIZING DEBTORS TO OBTAIN POSTPETITION FINANCING; (II) AUTHORIZING DEBTORS TO USE CASH COLLATERAL; (III) GRANTING ADEQUATE PROTECTION TO PREPETITION SECURED PARTIES; AND (IV) SCHEDULING A <u>FINAL HEARING PURSUANT TO BANKRUPTCY RULES 4001(B) AND (C)</u>

I, Jeffrey W. Epstein, hereby declare, pursuant to 28 U.S.C. § 1746, under penalty of perjury:

## Background

1.      I am the Chief Executive Officer of TerreStar Networks Inc., ("***TSN***" and, together with its affiliated debtors and debtors in possession, "***TerreStar***" or the "***Debtors***" or "***we***").   I have been employed in this and other capacities by TSN since July 2006. Accordingly, I am familiar with TerreStar's day-to-day operations, business, and financial affairs.

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal taxpayer-identification number, are: TerreStar New York Inc. (6394); TerreStar Networks Inc. (3931); Motient Communications Inc. (3833); Motient Holdings Inc. (6634); Motient License Inc. (2431); Motient Services Inc. (5106); Motient Ventures Holding Inc. (6191); MVH Holdings Inc. (9756); TerreStar License Inc. (6537); TerreStar National Services Inc. (6319); TerreStar Networks Holdings (Canada) Inc. (1337); TerreStar Networks (Canada) Inc. (8766) and 0887729 B.C. Ltd. (1345).

2.      I submit this supplemental declaration in support of the *Motion of the Debtors for Interim and Final Orders Pursuant to Sections 105, 361, 362, 363(c), 364(c)(1), 364(c)(2), 364(c)(3), 364(e) and 507 of the Bankruptcy Code and Bankruptcy Rules 2002, 4001 and 9014: (I) Authorizing Debtors to Obtain Postpetition Financing; (II) Authorizing the Debtors to Use Cash Collateral; (III) Granting Adequate Protection to Prepetition Secured Parties; and (IV) Scheduling a Final Hearing Pursuant to Bankruptcy Rules 4001(b) and (c)* (the "***DIP Motion***").[2]

3.      The statements in this declaration are, except where specifically noted, based on my personal knowledge, my discussions with other members of the Debtors' senior management, my review of relevant documents, or my opinion based upon experience, knowledge and information concerning the Debtors' operations and financial affairs.  If called upon to testify, I could and would testify competently to the facts set forth herein.  I am authorized to submit this declaration on behalf of the Debtors.

## The Debtors' Business and Current Financing Obligations

4.      As discussed in detail in my declaration in support of first day pleadings submitted contemporaneously herewith (the "***First Day Declaration***"), TerreStar is a next-generation mobile satellite service operator that recently launched a wireless communications system which provides mobile satellite coverage throughout the United States and Canada using integrated satellite-terrestrial smartphones and other devices.  We offer this next-generation service as a wholesale mobile satellite services provider, allowing existing terrestrial service providers to augment their existing terrestrial networks with mobile satellite coverage.

---

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed in the DIP Motion.

5.     Our business enterprise is dependent in large part on a number of key agreements and other arrangements, which, among other things, provide the necessary intellectual property to us as well as allow us to reach the broadest range of potential customers who are targeted as likely users of our planned communications systems.  As more fully described in my First Day Declaration, these key contract counterparties are critical not only to the continuation of our business plan, but also to keep the T-1 Satellite on course in its orbit and maintain space and ground equipment necessary to our operations.

6.     As of the date hereof (the ***"Petition Date"***), the various Debtors are parties to certain instruments evidencing our long-term indebtedness including the Senior Secured Notes Indenture, the Senior Exchangeable Notes Indenture, and the Purchase Money Credit Facility, all of which I discuss in length in the First Day Declaration.  Pursuant to these various instruments, as of the Petition Date, our outstanding pre-petition long-term indebtedness obligations total approximately $1.2 billion.

**The Debtors' Need for Liquidity**

7.     As discussed above, and as further described in the First Day Declaration, to date, our business model has been premised upon a substantial amount of capital expenditures needed to develop the technological components necessary to run our network.  Specifically, regular infusions of financing have been and continue to be necessary to, among other things, construct and maintain satellites and ground stations, develop a chipset that would allow smartphones and cellular devices to communicate over the TerreStar network and obtain regulatory and other approvals.  Each of these components is vital to our business plan, and some of these components (such as the maintenance of satellites and ground stations) are critical to maintaining asset values.

8. Despite recently achieving the significant milestone of turning our product into a revenue stream, we still require a significant amount of capital before we become profitable enough to service our current debt load and also meet our on-going capital requirements for continued technological development and expansion of our product. Accordingly, over the past six months, we attempted a number of measures to increase liquidity restructure our balance sheet. Although we were successful in obtaining a small amount of capital, the capital was not sufficient to allow the Company to generate revenue to solve the Company's near-term and long-term liquidity needs nor service its debt obligations.

9. As such, we determined that the best path forward was to file for chapter 11 in order to both raise capital and restructure our balance sheet. As part of that path, we needed to obtain debtor in possession financing. Specifically, and among other things, we require financing because we (1) must be able to make payments to significant contract counterparties on a current basis postpetition, (2) need to continue to pay employees and consultants whose employment is vital to our business operations and (3) must pay ordinary operating expenses such as rent, utilities, insurance, taxes, and fees.

10. Our need for DIP Financing cannot be understated. As of the Petition Date, we had less than $500,000 of cash on hand with very little in the way of any revenue stream. Without access to the funds proposed to be advanced under the DIP Facility, our overall business would come to a halt, causing immediate and irreparable harm to us, our estates, and our creditors. Indeed, our payroll obligations alone average approximately $550,000 on a bi-weekly basis. Our employees include people with significant industry experience and are vital to the continued functionality of the TerreStar network and the continued development of our

business under our business plan.  Without the ability to compensate our employees their regular wages on a consistent basis, we risk losing key employees, thus jeopardizing our operations.

11.     The failure to pay any one of the aforementioned contract counterparties and employees could have a significant negative impact on our enterprise value and our ability to market our next generation network, thereby causing harm to creditors and parties in interest in these cases.  Any cessation in performance, even for a day, would have significant negative consequences.

12.     In light of the above, I believe that our decision to enter into the DIP Financing was a sound exercise of our business judgment and consistent in all respects with our fiduciary duties to our creditors and other stakeholders.   Indeed, we believe entry into the DIP Financing Facility presents us with our best opportunity to maximize the value of our estates.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: New York, New York

Jeffrey W. Epstein