AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
(212) 872-1000 (Telephone)
(212) 872-1002 (Facsimile)
Ira S. Dizengoff
Arik Preis

1333 New Hampshire Avenue, NW
Washington, DC 20036
(202) 887-4000 (Telephone)
(202) 887-4288 (Facsimile)
Joanna F. Newdeck
Ashleigh L. Blaylock

*Proposed Counsel to the Debtors and Debtors in Possession*

# UNITED STATES BANKRUPTCY COURT
# SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| TERRESTAR NETWORKS INC., *et al.*,[1] | ) | Case No. 10-15446 (SHL) |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |

### DISCLOSURE STATEMENT FOR THE JOINT CHAPTER 11 PLAN OF
### TERRESTAR NETWORKS INC., TERRESTAR NATIONAL SERVICES, INC., 0887729 B.C. LTD.,
### TERRESTAR LICENSE INC., TERRESTAR NETWORKS HOLDINGS (CANADA) INC., AND
### TERRESTAR NETWORKS (CANADA) INC.

**THIS IS NOT A SOLICITATION OF AN ACCEPTANCE, OR REJECTION OF THE PLAN WITHIN THE MEANING OF SECTION 1125 OF THE BANKRUPTCY CODE. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT. THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL, BUT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT.**

Dated: November 5, 2010

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal taxpayer-identification number, are: Motient Communications Inc. [3833]; Motient Holdings Inc. [6634]; Motient License Inc. [2431]; Motient Services Inc. [5106]; Motient Ventures Holding Inc. [6191]; MVH Holdings Inc. [9756]; TerreStar New York Inc. [6394] (the foregoing entities are collectively referred to as the "***Non-TSN Debtors***"); TerreStar License Inc. [6537]; TerreStar National Services Inc. [6319]; TerreStar Networks Inc. [3931]; (TerreStar License Inc., TerreStar National Services Inc. and TerreStar Networks Inc. are collectively referred to as the "***Domestic TSN Debtors***" and, together with the Non-TSN Debtors, the "***Domestic Debtors***"); 0887729 B.C. Ltd. [1345]; TerreStar Networks (Canada) Inc. [8766]; and TerreStar Networks Holdings (Canada) Inc. [1337] (0887729 B.C. Ltd., TerreStar Networks (Canada) Inc. and TerreStar Networks Holdings (Canada) Inc. are collectively referred to as the "***Canadian Debtors***" and, together with the Domestic TSN Debtors, the "***TSN Debtors***").

```
┌─────────────────────────────────────────────────────────────────┐
│                IMPORTANT INFORMATION FOR YOU TO READ              │
└─────────────────────────────────────────────────────────────────┘
```

**THE DEADLINE TO VOTE ON THE JOINT CHAPTER 11 PLAN OF TERRESTAR NETWORKS INC., TERRESTAR NATIONAL SERVICES, INC., 0887729 B.C. LTD., TERRESTAR LICENSE INC., TERRESTAR NETWORKS HOLDINGS (CANADA) INC., AND TERRESTAR NETWORKS (CANADA) INC. IS [DATE] AT [###] P.M. PREVAILING EASTERN TIME.**

**FOR YOUR VOTE TO BE COUNTED, YOUR BALLOT MUST BE _ACTUALLY_ _RECEIVED_ BY THE VOTING AND CLAIMS AGENT BEFORE THE VOTING DEADLINE AS DESCRIBED HEREIN.**

**The TSN Debtors are providing the information in this Disclosure Statement for the _Joint Chapter 11 Plan of TerreStar Networks, Inc., TerreStar National Services, Inc., 0887729 B.C. Ltd., TerreStar License Inc., TerreStar Networks Holdings (Canada) Inc. and TerreStar Networks (Canada) Inc._ [Docket No. ###] (as may be amended, modified or supplemented from time to time, the "_Plan_")[2] to holders of Claims and Interests entitled to vote on the Plan for the purpose of soliciting votes to accept the Plan. Capitalized terms used but not otherwise defined in this Disclosure Statement shall have the meaning given to those terms in the Plan; the terms of which are adopted and incorporated here by reference. _Nothing in this Disclosure Statement may be relied upon or used by any entity for any other purpose._**

**This Disclosure Statement may not be deemed as providing any legal, financial, securities, tax or business advice. The TSN Debtors urge any holder of a Claim or Interest to consult with its own advisors for any legal, financial, securities, tax or business advice in reviewing this Disclosure Statement, the Plan and each of the proposed transactions contemplated thereby. The Bankruptcy Court's approval of the adequacy of the disclosure contained in this Disclosure Statement does not constitute the Bankruptcy Court's approval of the merits of the Plan. The TSN Debtors have not authorized any entity to give any information about or concerning the Plan other than the information contained in this Disclosure Statement. The TSN Debtors have not authorized any representations concerning the TSN Debtors or the value of their property other than as set forth in this Disclosure Statement.**

**The TSN Debtors urge every holder of a Claim entitled to vote on the Plan to (1) read the entire Disclosure Statement and Plan carefully, (2) consider all of the information in this Disclosure Statement, including, importantly, the risk factors described in section XI of this Disclosure Statement and (3) consult with your own advisors with respect to reviewing this Disclosure Statement, the Plan and all documents that are attached or were filed in connection with the Plan and Disclosure Statement _before_ deciding whether to vote to accept or reject the Plan.**

**This Disclosure Statement contains summaries of the Plan, certain statutory provisions, events in the TSN Debtors' chapter 11 cases and certain documents related to the Plan. Although the Debtors believe that these summaries are fair and accurate, the same are all qualified in their entirety. In the event of any inconsistency or discrepancy between a description in this Disclosure Statement and the terms and provisions of the Plan or other referenced documents, the Plan or other referenced documents will govern for all purposes. Except where otherwise specifically noted, factual information contained in this Disclosure Statement has been provided by the Debtors' management. The TSN Debtors do not represent or warrant that the information contained in or attached to this Disclosure Statement is without any material inaccuracy or omission.**

**Although the TSN Debtors have used their reasonable business judgment to ensure the accuracy of the financial information contained in, or incorporated by reference into, this Disclosure Statement, much of that financial information has not been audited. The TSN Debtors are generally making the statements and**

---

[2]     The Plan solely applies to TerreStar Networks, Inc., TerreStar National Services, Inc., 0887729 B.C. Ltd., TerreStar License Inc., TerreStar Networks Holdings (Canada) Inc. and TerreStar Networks (Canada) Inc. The Debtors intend to file a chapter 11 plan for the remaining seven Debtors in the chapter 11 cases jointly administered under Case No. 10-15446 (SHL) at a later date.

providing the financial information contained in this Disclosure Statement as of the date hereof where feasible, unless otherwise specifically noted. Although the TSN Debtors may subsequently update the information in this Disclosure Statement, the TSN Debtors have no affirmative duty to do so, and parties reviewing this Disclosure Statement should be aware that, at the time of their review, the facts may have changed since this Disclosure Statement was filed.

Neither this Disclosure Statement nor the Plan is or should be construed as an admission of fact, liability, stipulation or waiver, and nothing stated herein shall be admissible in any proceeding involving the TSN Debtors or any other person, or be deemed conclusive evidence of the tax or other legal effects of the Plan on the TSN Debtors or holders of Claims or Interests. Rather, holders of Claims and Interests and other parties in interest should construe this Disclosure Statement as a statement made in settlement negotiations related to contested matters, adversary proceedings and other pending or threatened litigation or actions. The TSN Debtors or the Reorganized Debtors may seek to investigate, file and prosecute Causes of Action and may object to Claims after the Confirmation or Effective Date irrespective of whether this Disclosure Statement identifies any such Causes of Action or objections to Claims.

## SPECIAL NOTICE REGARDING FEDERAL AND STATE SECURITIES LAWS

Neither this Disclosure Statement nor the Plan has been filed with the United States Securities and Exchange Commission (the "**SEC**") or any state authority. The Plan has not been approved or disapproved by the SEC or any state securities commission and neither the SEC nor any state securities commission has passed upon the accuracy or adequacy of this Disclosure Statement or the merits of the Plan. Any representation to the contrary is a criminal offense.

This Disclosure Statement has been prepared pursuant to section 1125 of the Bankruptcy Code and Bankruptcy Rule 3016(b) and is not necessarily in accordance with federal or state securities laws or other similar laws. The securities to be issued on or after the Effective Date will not have been the subject of a registration statement filed with the SEC under the Securities Act of 1933, as amended (the "**Securities Act**") or any securities regulatory authority of any state under any state securities law ("**Blue Sky Law**"). The TSN Debtors are relying on section 4(2) of the Securities Act and similar Blue Sky Law provisions, as well as, to the extent applicable, the exemption from the Securities Act and equivalent state law registration requirements provided by section 1145(a) of the Bankruptcy Code, to exempt the issuance of new securities in connection with the solicitation and the Plan from registration under the Securities Act and Blue Sky Law.

This Disclosure Statement contains "forward looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. Such statements consist of any statement other than a recitation of historical fact and can be identified by the use of forward looking terminology such as "may," "expect," "anticipate," "estimate" or "continue" or the negative thereof, as well as any similar or comparable language. You are cautioned that all forward looking statements are necessarily speculative and there are certain risks and uncertainties that could cause actual events or results to differ materially from those referred to in such forward looking statements. The Liquidation Analysis, distribution projections and other information contained herein and attached hereto are estimates only, and the timing and amount of actual distributions to Holders of Allowed Claims and Interests may be affected by many factors that cannot be predicted. Any analyses, estimates or recovery projections may or may not turn out to be accurate.

Making investment decisions based on the information contained in this Disclosure Statement and/or the Plan is therefore highly speculative. The TSN Debtors recommend that potential recipients of any securities issued pursuant to the Plan consult their own legal counsel concerning the securities laws governing the transferability of any such securities.

## QUESTIONS AND ADDITIONAL INFORMATION

If you would like to obtain copies of this Disclosure Statement, the Plan or any of the documents attached hereto or referenced herein, or if you have questions about the solicitation and voting process or these chapter 11 cases generally, please contact Garden City Group by (i) calling 1-866-682-1770, (ii) emailing TerreStarInfo@gcginc.com or (iii) visiting www.TerreStarInfo.com.

# TABLE OF CONTENTS

Page

I.  EXECUTIVE SUMMARY ........................................................................................................1

    A.  Overview of this Disclosure Statement and the Executive Summary ...............................1

    B.  Purpose and Effect of the Plan ..........................................................................................1

    C.  Summary of Treatment of Claims and Interests and Description of Recoveries Under the Plan ....................................................................................................................................3

    D.  Voting Deadline .................................................................................................................5

    F.  Additional Plan-Related Documents ..................................................................................7

II.  IMPORTANT INFORMATION ABOUT THIS DISCLOSURE STATEMENT ....................................8

III.  QUESTIONS AND ANSWERS REGARDING  THIS DISCLOSURE STATEMENT AND THE JOINT PLAN .......................................................................................................................9

    A.  What is Chapter 11? ..........................................................................................................9

    B.  Why are the TSN Debtors sending me this Disclosure Statement? ...................................9

    C.  Am I entitled to vote on the Plan?  What will I receive from the TSN Debtors if the Plan is consummated? ................................................................................................................9

    D.  If the Plan provides that I get a distribution, do I get it upon Confirmation or when the Plan goes effective, and what do you mean when you refer to "Confirmation," "Effective Date" and "consummation?" ................................................................................................9

    E.  If the Plan solely applies to the TSN Debtors, what happens to a claim I may have against a Debtor not included in this Plan? ...................................................................................10

    F.  What is included in the solicitation packages to be sent to creditors who are eligible to vote on the Plan? ..............................................................................................................10

    G.  What is the deadline to vote on the Plan? ........................................................................10

    H.  How do I vote for or against the Plan? .............................................................................10

    I.  When is the Confirmation Hearing set to occur? ............................................................11

    J.  What is the deadline to object to Confirmation? .............................................................12

    K.  What is the effect of Confirmation on the Debtors' ongoing business? ...........................12

    L.  Do the Debtors recommend voting in favor of the Plan? .................................................12

IV.  THE DEBTORS' HISTORY ...............................................................................................13

    A.  Company Overview .........................................................................................................13

    B.  The Company's Business Operations ...............................................................................14

    C.  The Company's Organizational Structure.........................................................................20

    D.  Prepetition Litigation ......................................................................................................23

    E.  The Debtors' Prepetition Capital Structure ......................................................................23

**V.**      **EVENTS LEADING TO COMMENCEMENT OF THE CHAPTER 11 CASES** ..................................27

**VI.**      **INITIAL MOTIONS OF THE CHAPTER 11 CASES AND CERTAIN RELATED RELIEF** ..........30

     A.      "First-Day" Motions and Related Relief ..................................................................30

     B.      Initial DIP Financing Order ....................................................................................31

     C.      The Motion to Assume the Restructuring Support Agreement .................................31

     D.      Canadian Proceedings ............................................................................................32

**VII.**      **DEVELOPMENTS DURING THE CHAPTER 11 CASES** ...................................................33

     A.      Appointment of the Statutory Committee ................................................................33

     B.      The Claims Process .................................................................................................33

     C.      Exclusivity ..............................................................................................................33

     D.      The Motion to Dismiss Certain Chapter 11 Cases .................................................34

     E.      The Debtors' Licenses and Related Applications ...................................................34

**VIII.**      **DESCRIPTION OF THE JOINT PLAN OF REORGANIZATION** ......................................36

     A.      TREATMENT OF ADMINISTRATIVE CLAIMS, DIP CLAIMS, U.S. TRUSTEE FEES AND PRIORITY TAX CLAIMS ...................................................................36

     B.      CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS ...............38

     C.      ACCEPTANCE REQUIREMENTS .........................................................................42

     D.      MEANS FOR IMPLEMENTATION OF THE PLAN .............................................42

     E.      TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES .....48

     F.      PROVISIONS GOVERNING DISTRIBUTIONS .................................................50

     G.      PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED AND DISPUTED CLAIMS ..............................................................................................54

     H.      SETTLEMENT, RELEASE, INJUNCTION AND RELATED PROVISIONS............55

     I.      CONDITIONS PRECEDENT TO CONFIRMATION OF THE PLAN AND THE EFFECTIVE DATE ................................................................................................59

     J.      MODIFICATION, REVOCATION OR WITHDRAWAL OF THE PLAN ..............60

     K.      RETENTION OF JURISDICTION .........................................................................61

     L.      MISCELLANEOUS PROVISIONS .......................................................................63

**IX.**      **SOLICITATION AND VOTING PROCEDURES** ...............................................................65

     A.      Holders of Claims Entitled to Vote on the Plan .....................................................65

     B.      Voting Record Date .................................................................................................66

     C.      Voting on the Plan ..................................................................................................66

     D.      Ballots, Note Ballots or Master Ballots Not Counted ...........................................66

**X.**      **CONFIRMATION OF THE PLAN** ....................................................................................68

     A.      The Confirmation Hearing ......................................................................................68

     B.      Deadline to Object to Confirmation of the Plan ....................................................68

| | C. | Confirmation Hearing | 68 |
| | D. | Requirements for Confirmation of the Plan | 68 |
| | E. | Best Interests of Creditors/Liquidation Analysis | 69 |
| | F. | Feasibility/Financial Projections | 70 |
| | G. | Acceptance by Impaired Classes | 70 |
| | H. | Confirmation Without Acceptance by All Impaired Classes/Fair and Equitable Test | 70 |
| | I. | Valuation of the TSN Debtors | 72 |
| | J. | Effect of Confirmation and Consummation of the Plan | 72 |
| **XI.** | **RISK FACTORS** | | **73** |
| | A. | Risks Related to Confirmation of the Plan | 73 |
| | B. | Risks That May Affect the Value of the Securities to Be Issued Under the Plan | 75 |
| | C. | Risks Related to the Debtors' Businesses | 76 |
| | D. | Risks Relating to Government Regulations | 84 |
| | E. | Risks Relating to Forward Looking Statements | 87 |
| | F. | Risks Relating to Recoveries Under the Plan | 87 |
| | G. | Disclosure Statement Disclaimer | 88 |
| **XII.** | **APPLICATION OF SECURITIES LAWS** | | **91** |
| | A. | Issuance and Resale of Securities Under the Plan | 91 |
| | B. | New Common Stock and New Preferred Stock | 92 |
| | C. | Rights Offering: Rights Offering Preferred Stock | 92 |
| **XIII.** | **CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN** | | **93** |
| | B. | Certain U.S. Federal Income Tax Consequences to the U.S. Holders under the Plan | 96 |
| | C. | General U.S. Federal Income Tax Consequences to Non-U.S. Holders | 100 |
| | D. | Importance of Obtaining Professional Tax Assistance | 102 |
| **XIV.** | **RECOMMENDATION** | | **103** |

**EXHIBITS**

EXHIBIT A        Plan

EXHIBIT B        Disclosure Statement Order and Canadian Disclosure Statement Order

EXHIBIT C        Organizational Chart of the Debtors and their Non-Debtor Affiliates

EXHIBIT D        Liquidation Analysis

EXHIBIT E        Financial Projections

EXHIBIT F        Valuation Analysis

EXHIBIT G        Restructuring Support Agreement

EXHIBIT H        Solicitation, Voting and Tabulation Procedures

EXHIBIT I        Rights Offering Procedures

---

THE DEBTORS HEREBY ADOPT AND INCORPORATE EACH EXHIBIT ATTACHED TO THIS
DISCLOSURE STATEMENT BY REFERENCE AS THOUGH FULLY SET FORTH HEREIN.

---

# I.
# EXECUTIVE SUMMARY

### A.    Overview of this Disclosure Statement and the Executive Summary

TerreStar Networks Inc. ("***TSN***"), a Delaware corporation with its corporate offices in Reston, Virginia, and its affiliated debtors and debtors in possession (collectively, the "***Debtors***") each filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York (the "***Bankruptcy Court***") on October 19, 2010 (the "***Petition Date***"). The Debtors' chapter 11 cases are jointly administered under lead case number 10-15446 (SHL). TSN, TerreStar National Services, Inc., 0887729 B.C. Ltd., TerreStar License Inc., TerreStar Networks Holdings (Canada) Inc. and TerreStar Networks (Canada) Inc. (collectively, the "***TSN Debtors***" and, as reorganized pursuant to the Plan, the "***Reorganized Debtors***") submit this Disclosure Statement pursuant to section 1125 of the Bankruptcy Code to holders of Claims against and Interests in the TSN Debtors because the Debtors are asking holders of Claims to accept the *Joint Chapter 11 Plan of TerreStar Networks, Inc., TerreStar National Services, Inc., 0887729 B.C. Ltd., TerreStar License Inc., TerreStar Networks Holdings (Canada) Inc. and TerreStar Networks (Canada) Inc.* (the "***Plan***"), dated November 5, 2010.[3]  A copy of the Plan is attached hereto as **Exhibit A**.

The Plan solely applies to the TSN Debtors, but is supported by each of the Debtors as well as TerreStar Corporation, the Debtors' ultimate parent. The Debtors anticipate that they will file a chapter 11 plan to address the Non-TSN Debtors at a future date.

Before soliciting acceptances of a proposed chapter 11 plan of reorganization, section 1125 of the Bankruptcy Code requires a debtor to prepare a disclosure statement that contains information of a kind, and in sufficient detail, to permit a hypothetical reasonable investor to make an informed judgment regarding acceptance of the plan of reorganization. The Bankruptcy Court approved this Disclosure Statement at a hearing held on [DATE]. A copy of the order approving the Disclosure Statement is attached hereto as **Exhibit B** (the "***Disclosure Statement Order***").

A hearing to consider Confirmation of the Plan is scheduled to be held before the Honorable Sean H. Lane at [TIME] Prevailing Eastern Time on [DATE], at the Bankruptcy Court, located at One Bowling Green, New York, New York 10004-1408. Additional details with respect to Confirmation are provided in section X of this Disclosure Statement, entitled "Confirmation of the Plan."

This Disclosure Statement contains, among other things, descriptions and summaries of certain provisions of, and financial transactions contemplated by, the Plan being proposed by the Debtors as filed with the Bankruptcy Court on November 5, 2010. Certain provisions of the Plan (and the descriptions and summaries contained herein) remain the subject of continuing negotiations among the Debtors and various parties, have not been finally agreed upon and may be modified.

***This Executive Summary is only a general overview of this Disclosure Statement and the material terms of, and transactions proposed by, the Plan, and is qualified in its entirety by reference to, and should be read in conjunction with, the more detailed discussions appearing elsewhere in this Disclosure Statement and the exhibits attached to this Disclosure Statement, including the Plan.***

### B.    Purpose and Effect of the Plan

The TSN Debtors are reorganizing under chapter 11 of the Bankruptcy Code, which is the principal business reorganization chapter of the Bankruptcy Code. Under chapter 11 of the Bankruptcy Code, a debtor may

---

[3]    Capitalized terms used but not otherwise defined in this Disclosure Statement will have the meaning ascribed to those terms in the Plan. **Please note that the description of the Plan provided throughout this Disclosure Statement is only a summary provided for convenience. In the case of any inconsistency between the summary of the Plan in this Disclosure Statement and the Plan, the Plan will govern.**

reorganize its business for the benefit of its stakeholders. The consummation of a plan of reorganization is the principal objective of a chapter 11 case. A plan of reorganization sets forth how a debtor will treat its claims and interests.

A bankruptcy court's confirmation of a plan binds the debtor, any entity or person acquiring property under the plan, any creditor of or equity security holder in a debtor and any other entities and persons as may be ordered by the bankruptcy court to the terms of the confirmed plan, whether or not such creditor or equity security holder is impaired under or has voted to accept the plan or receives or retains any property under the plan.

Among other things (subject to certain limited exceptions and except as otherwise provided in the Plan or the Confirmation Order), the Confirmation Order will discharge the Debtors from any debt arising before the Effective Date, substitute the obligations set forth in the Plan for those pre-bankruptcy claims and terminate all of the rights and interests of pre-bankruptcy equity security holders. Under the Plan, Claims and Interests are divided into Classes according to their relative priority and other criteria.

Each of the TSN Debtors is a proponent of the Plan within the meaning of section 1129 of the Bankruptcy Code. As described throughout this Disclosure Statement, the Plan provides for a comprehensive restructuring of the TSN Debtors' pre-bankruptcy obligations, preserves the going-concern value of the TSN Debtors' businesses, maximizes recoveries available to all constituents and provides for an equitable distribution to the TSN Debtors' stakeholders. The Plan is premised on the consummation of restructuring transactions supported by the Debtors' largest secured creditor, EchoStar Corporation ("*EchoStar*"), which includes, among other things, (i) the equitization of the Debtors' $1 billion of secured debt obligations and (ii) a $125 million new money rights offering, $100 million of which is backstopped by EchoStar.

Following the Plan, the TSN Debtors will emerge from chapter 11 with an improved, highly deleveraged balance sheet. As of the Petition Date, the Debtors had funded debt facilities with an aggregate accreted amount of approximately $1.2 billion, including: (a) $943.9 million in aggregate principal and accrued interest of 15% Senior Secured PIK Notes due 2014; (b) $178.7 million in aggregate principal and accrued interest of 6.5% Senior Exchangeable PIK Notes due 2014; and (c) $85.9 million in principal and accrued interest in the TerreStar-2 Purchase Money Credit Agreement. In contrast, under the Plan, the Reorganized Debtors' sole funded debt will be the amounts owing under the TerreStar-2 Purchase Money Credit Agreement.

In developing the Plan, the TSN Debtors, with the assistance of their professional advisors, conducted a careful review of their current operations, their prospects as an ongoing business, financial projections included in the business plan developed by management and estimated recoveries in a liquidation scenario. Following this review, the TSN Debtors concluded that recoveries to their stakeholders would be maximized by the TSN Debtors' continued operations as a going concern and by the TSN Debtors' emergence from chapter 11 with the structure proposed in the Plan.

The TSN Debtors believe that their businesses and assets have significant value that would not be realized in a liquidation, either in whole or in substantial part. Consistent with the valuation, liquidation and other analyses prepared by the TSN Debtors with the assistance of their advisors (*see* **Exhibits D**, **E** and **F** attached hereto), the value of the TSN Debtors is substantially greater as a going concern than in a liquidation. The TSN Debtors also believe that any alternative to Confirmation, such as an attempt by another party to file a competing plan, would result in significant delays, litigation and additional costs, and could negatively affect value by causing unnecessary uncertainty with the TSN Debtors' key customer and supplier constituencies, which could ultimately lower the recoveries for all holders of Allowed Claims and Interests.

---

**ACCORDINGLY, FOR ALL OF THESE REASONS AND THE OTHER REASONS
DESCRIBED IN THIS DISCLOSURE STATEMENT, THE DEBTORS URGE YOU
TO RETURN YOUR BALLOT ACCEPTING THE PLAN BY THE VOTING DEADLINE.**

---

**C. Summary of Treatment of Claims and Interests and Description of Recoveries Under the Plan**

*(i) Summary of Classification of Claims and Interests Under the Plan*

The Plan organizes the TSN Debtors' various creditor and equity constituencies into groups called "Classes." For each Class, the Plan describes (a) the underlying "Claim" or "Interest," (b) the recovery available to the holders of Claims or Interests in that Class under the Plan, (c) whether the Class is "impaired" under the Plan, meaning that each holder will receive less than the full value on account of its Claim or Interest or that the rights of holders under law will be altered in some way (such as receiving stock instead of holding a Claim) and (d) the form of consideration (*e.g.*, cash, stock or a combination thereof), if any, that such holders will receive on account of their respective Claims or Interests.

The table below provides a summary of the classification and description of Claims and Interests under the Plan. This information is provided in summary form below for illustrative purposes only and is qualified in its entirety by reference to the provisions of the Plan. For a more detailed description of the treatment of Claims and Interests under the Plan, see section VIII of this Disclosure Statement, entitled "Description of the Joint Plan of Reorganization."

| Class Number | Name of Class | Status | Description of Class |
|:---:|:---|:---:|:---|
| 1 | Other Priority Claims | Unimpaired | Class 1 consists of Other Priority Claims against each of the TSN Debtors. |
| 2 | Other Secured Claims | Unimpaired | Class 2 consists of Other Secured Claims against each of the TSN Debtors. |
| 3 | Senior Secured Notes Claims | Impaired | Class 3 consists of the Senior Secured Notes Claims against TSN, TerreStar License Inc., TerreStar National Services Inc., TerreStar Networks Holdings (Canada) Inc. and TerreStar Networks (Canada) Inc. |
| 4 | PMCA Claims | Unimpaired | Class 4 consists of the PMCA Claims against TSN. |
| 5 | Senior Exchangeable Notes Claims | Impaired | Class 5 consists of the Senior Exchangeable Notes Claims against TSN, TerreStar License Inc. and TerreStar National Services Inc. |
| 6 | Other Unsecured Claims | Impaired | Class 6 consists of the unsecured claims other than a Senior Exchangeable Notes Claim and Unsecured Convenience Claim against each of the TSN Debtors. |
| 7 | Unsecured Convenience Claims | Impaired | Class 7 consists of Unsecured Convenience Claims against each of the TSN Debtors. |
| 8 | Equity Interests | Impaired | Class 8 consists of all Equity Interests against each of the TSN Debtors. |

In addition to the Classes identified above, the Plan provides for recoveries to certain types of Claims that are not separately classified under the Plan, as follows:

- **Allowed Administrative and Priority Tax Claims**. Administrative Claims include Claims for costs and expenses of administration of these chapter 11 cases pursuant to sections 503(b), 507(a)(2), 507(b) or 1114(e)(2) of the Bankruptcy Code. Priority Tax Claims include any Claim of a governmental unit, as defined in section 101(27) of the Bankruptcy Code, of the kind specified in section 507(a)(8) of the Bankruptcy Code.

- **Allowed DIP Claims**. DIP Claims include Claims derived from or based upon the DIP Loan Agreement, including without limitation Claims for principal, interest, fees, or expenses.

- **Payment of Statutory Fees**. Statutory fees include all U.S. Trustee quarterly fees payable under 28 U.S.C. § 1930(a)(6), plus interest due and payable under 31 U.S.C. § 3717, on all

disbursements, including Plan payments and disbursements in and outside the ordinary course of the Debtors' businesses, until the entry of a Final Order, dismissal of the chapter 11 cases or conversion of the chapter 11 cases to cases under chapter 7 of the Bankruptcy Code.

Under the proposed Plan, holders of Allowed Administrative Claims, DIP Claims and Priority Tax Claims and all Statutory Fees will be paid in full, in cash, will otherwise be left unimpaired or granted such other treatment as agreed between the Debtors and the applicable creditor, all as further provided in Article III of the Plan and Article VIII of this Disclosure Statement.

*(ii)*    ***Summary of Treatment, Estimated Range of Recoveries and Voting Rights of Claims and Interests Under the Plan***

The table below summarizes the classification, status, voting rights, treatment and estimated range of recoveries of classified Claims and Interests under the Plan accounting for these various factors.  These summaries are described in the form below for illustrative purposes only and are qualified in their entirety by reference to the provisions of the Plan.  For a more detailed description of the treatment of Claims and Interests under the Plan, see section VIII of this Disclosure Statement, entitled "Description of the Joint Plan of Reorganization."

**THE ESTIMATED PROJECTED RECOVERIES SET FORTH IN THE TABLE
BELOW ARE ESTIMATES ONLY AND ARE THEREFORE SUBJECT TO CHANGE.**

**SUMMARY OF STATUS, TREATMENT AND RECOVERY**

| Class | Status | Voting Rights | Plan Treatment of Class | Estimated Recovery |
|---|---|---|---|---|
| 1- | Unimpaired | No (deemed to accept) | Except to the extent that a holder of an Allowed Other Priority Claim (i) has been paid by the TSN Debtors, in whole or in part, prior to the Effective Date or (ii) agrees to a less favorable treatment, each holder of an Allowed Other Priority Claim shall receive, on the Initial Distribution Date and in full satisfaction, settlement, release, and discharge of, and in exchange for such Other Priority Claim, Cash in the full amount of such Allowed Other Priority Claim. | 100% |

| Class | Status | Voting Rights | Plan Treatment of Class | Estimated Recovery |
|---|---|---|---|---|
| 2- | Unimpaired | No (deemed to accept) | Except to the extent that a holder of an Allowed Other Secured Claim agrees to a less favorable treatment, at the option of the TSN Debtors or the Reorganized TSN Debtors (which option shall be reasonably satisfactory to the Plan Sponsor), (i) each Allowed Other Secured Claim shall be reinstated and Unimpaired in accordance with section 1124(2) of the Bankruptcy Code, or (ii) each holder of an Allowed Other Secured Claim shall receive, in full satisfaction, settlement, release, and discharge of, and in exchange for, such Other Secured Claim, either (w) Cash in the full amount of such Allowed Other Secured Claim, including any postpetition interest accrued pursuant to section 506(b) of the Bankruptcy Code, (x) the proceeds of the sale or disposition of the collateral securing such Allowed Other Secured Claim to the extent of the value of the holder's secured interest in such collateral, (y) the collateral securing such Allowed Other Secured Claim and any interest on such Allowed Other Secured Claim required to be paid pursuant to section 506(b) of the Bankruptcy Code, or (z) such other distribution as necessary to satisfy the requirements of section 1129 of the Bankruptcy Code. | 100% |
| 3- | Impaired | Yes | Each holder of an allowed Senior Secured Notes Claim shall receive its Pro Rata share of the Class 3 Distribution. | [###]% |
| 4- | Unimpaired | No (deemed to accept) | The PMCA Claims will be reinstated pursuant to section 1124 of the Bankruptcy Code. | 100% |
| 5- | Impaired | Yes | Each holder of a Senior Exchangeable Notes Claim shall receive, on the Initial Distribution Date, its Pro Rata share of the Class 5 Distribution. | [###]% |
| 6- | Impaired | Yes | Unless such holder has made a Convenience Claim Election, except as set forth in section (c) below, each holder of an Allowed Other Unsecured Claim shall receive its Pro Rata share of the Class 6 Distribution. | [###]% |
| 7- | Impaired | Yes | Each holder of an Allowed Unsecured Convenience Claim shall receive Cash in an amount equal to the lesser of: (i) 10% of such holders' Unsecured Convenience Claim; and (ii) such holder's Pro Rata share of $500,000. | [###]% |
| 8- | Impaired | No (deemed to reject) | On the Effective Date, all Equity Interests shall be deemed cancelled and shall be of no further force and effect, whether surrendered for cancellation or otherwise, and there shall be no distribution to the holders of Equity Interests. | 0% |

D. **Voting Deadline**

The deadline to vote on the Plan is [___] p.m. (prevailing Eastern time) on [_____], 2011 (the "***Voting Deadline***").

### E. Procedures for Voting on the Plan

This Disclosure Statement, accompanied by a Ballot, Note Ballot or Master Ballot (as applicable) to be used for voting on the Plan, is being distributed to the holders of Claims entitled to vote on the Plan. If you are a holder of Claims in Classes 3, 5, 6 or 7, you may vote for or against the Plan by completing the Ballot, Note Ballot, or Master Ballot (as applicable) and returning it in the envelope provided in accordance with the instructions provided on the Ballot and in the Voting and Tabulation Procedures.

The Debtors, with the approval of the Bankruptcy Court, have engaged Garden City Group ("*GCG*") to serve as the voting agent for claims and generally oversee the voting process (the "***Voting and Claims Agent***"). The Voting and Claims Agent will also process and tabulate Ballots for each Class entitled to vote to accept or reject the Plan and will process and tabulate and Note Ballots and Master Ballots for Classes 3, 5, 6 and 7.

| DELIVERY OF BALLOTS |
|---|
| Ballots, Note Ballots and Note Master Ballots must be **<u>actually received</u>** by the Voting and Claims Agent by the Voting Deadline of [**###**] p.m. (Prevailing Eastern Time) on [**DATE**], 2011 at the following addresses: |
| ***Voting and Claims Agent:*** |
| If by mail: |
| TerreStar Networks Inc.<br>c/o The Garden City Group, Inc.<br>P.O. Box 9649<br>Dublin, OH 43017-4949 |
| If by hand or overnight courier: |
| TerreStar Networks Inc.<br>c/o The Garden City Group, Inc.<br>5151 Blazer Parkway, Suite A<br>Dublin, OH 43017 |
| * * * * * * * |
| If you received an envelope addressed to your nominee, you must return your ballot to your nominee prior to [___] p.m. on the date that is three (3) days prior to the Voting Deadline, to provide sufficient time for your nominee to compile and submit a Master Ballot. |
| If you have any questions on the procedure for voting on the Plan, please call the Voting and Claims Agent at the following telephone number: |
| 1-866-682-1770 |

More detailed instructions regarding how to vote on the Plan are contained on the Ballots, Note Ballots and Master Note Ballots (as applicable) distributed to holders of Claims that are entitled to vote on the Plan as well as the Voting and Tabulation Procedures. For your vote to be counted, your Ballot or Note Ballot (as applicable) must be completed, signed and **<u>actually received</u>** by [**###**] p.m. (Prevailing Eastern Time), on the Voting Deadline, [**DATE**], 2011.

Any Ballot or Note Ballot that is properly executed by the holder of a Claim, but which does not clearly indicate either an acceptance or rejection of the Plan or which indicates both an acceptance and a rejection of the Plan, will not be counted.

Each holder of a Claim may cast only one Ballot or Note Ballot per each Claim held. It is important to follow the specific instructions provided on each Ballot or Note Ballot. For information regarding voting, see the

section herein entitled "Solicitation and Voting Procedures," which begins on page 65 as well as the Solicitation, Voting and Tabulation Procedures, which are attached here to as **Exhibit H**.

### F.   Additional Plan-Related Documents

The TSN Debtors will file the Plan Supplement with the Bankruptcy Court before the Confirmation Hearing (or such later date as may be approved by the Bankruptcy Court). The Noticing and Claims Agent will serve the 2002 List and Master Service List with a notice that will inform parties that the Plan Supplement was filed, list the information included therein and explain how copies of the Plan Supplement may be obtained. The Plan Supplement will include a compilation of documents and forms of documents, schedules and exhibits to the Plan to be filed by the TSN Debtors, including, (a) the New Corporate Governance Documents, (b) the identity of the members of the New Boards of each of the Reorganized Debtors as well as the nature and amount of compensation for any member of a New Board who is an "insider" under section 101(31) of the Bankruptcy Code, to the extent known; (c) the Rejected Executory Contract and Unexpired Lease List; (d) the Registration Rights Agreement; (e) the Schedule of Retained Causes of Action; (f) the New Preferred Stock Certificate of Designation; (g) the New Employment Agreements; (h) a schedule of the Insurance Policies; (i) a schedule of Intercompany Claims; and all exhibits, attachments, supplements, annexes, schedules, and ancillary documents related to each of the foregoing.

> **THE PLAN WILL BIND ALL HOLDERS OF CLAIMS AGAINST, AND INTERESTS IN, THE TSN DEBTORS TO THE FULLEST EXTENT AUTHORIZED OR PROVIDED UNDER THE BANKRUPTCY CODE, INCLUDING SECTIONS 524 AND 1141 THEREOF, AND BY ALL OTHER APPLICABLE LAW.**

# II.
## IMPORTANT INFORMATION ABOUT THIS DISCLOSURE STATEMENT

This Disclosure Statement provides important information regarding the TSN Debtors' joint chapter 11 plan of reorganization, which the TSN Debtors are seeking to have confirmed by the Bankruptcy Court.

**THE DEBTORS BELIEVE THAT THE PLAN IS IN THE BEST INTERESTS OF ALL STAKEHOLDERS. THE DEBTORS URGE ALL HOLDERS OF CLAIMS WHO ARE ENTITLED TO VOTE ON THE PLAN TO VOTE IN FAVOR OF THE PLAN.**

**All capitalized terms used but not defined herein will have the meanings provided to them in the Plan.**

**The summary of the Plan provided herein is qualified in its entirety by reference to the Plan. In the case of any inconsistency between the summary provided in this Disclosure Statement and the Plan, the Plan will govern**.

The TSN Debtors submit this Disclosure Statement pursuant to section 1125 of the Bankruptcy Code for the purposes of soliciting acceptances with respect to, and confirmation of, the Plan. The Disclosure Statement and the information it contains may not be relied on for any other purpose. The TSN Debtors believe that the summary of certain provisions of the Plan and certain other documents and financial information contained or referenced in this Disclosure Statement is fair and accurate. The summaries of the financial information and the documents annexed to this Disclosure Statement, including the Plan, are qualified in their entirety by reference to those documents.

No representations concerning the TSN Debtors or the value of the TSN Debtors' property have been authorized by the TSN Debtors other than as set forth in this Disclosure Statement. Any other information, representations or inducements made to obtain acceptance of the Plan should not be relied on by any holder of a Claim or Interest entitled to vote on the Plan.

The TSN Debtors have sought to ensure the accuracy of the financial information provided in this Disclosure Statement, but the financial information contained in, or incorporated by reference into, this Disclosure Statement has not been and will not be audited or reviewed by the Debtors' independent auditors unless explicitly stated otherwise herein.

For additional information about the Debtors' business operations, please refer to TerreStar Corporation's Annual Report on Form 10-K/A for the fiscal year ended December 31, 2009, filed with the SEC on May 6, 2010, Quarterly Report on Form 10-Q for the quarterly period ended March 31, 2010, filed with the SEC on May 11, 2010, Quarterly Report on Form 10-Q for the quarterly period ended June 30, 2010 filed with the SEC on August 6, 2010, and any other recent report filed with the SEC. These filings are available by visiting the SEC's website at http://www.sec.gov.

**III.**
**QUESTIONS AND ANSWERS REGARDING**
**THIS DISCLOSURE STATEMENT AND THE JOINT PLAN**

**A.      What is Chapter 11?**

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code.  In addition to permitting debtor rehabilitation, chapter 11 of the Bankruptcy Code promotes equality of treatment for similarly-situated creditors and similarly-situated interest holders, subject to the priority of distributions prescribed by the Bankruptcy Code.

The commencement of a chapter 11 case creates an estate that includes all of the legal and equitable interests of the debtor in property as of the bankruptcy commencement date.  The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

Consummating a plan of reorganization is the principal objective of a chapter 11 case.  A plan that is confirmed by the bankruptcy court is binding on the debtor, any person acquiring property under the plan, any creditor or interest holder of the debtor and any other entity as may be ordered by the bankruptcy court, in accordance with the applicable provisions of the Bankruptcy Code.  Subject to certain limited exceptions, the order issued by a bankruptcy court confirming a plan provides for the treatment of the debtor's claims and interests in accordance with the terms of the confirmed plan.

**B.      Why are the TSN Debtors sending me this Disclosure Statement?**

The TSN Debtors are seeking to obtain Bankruptcy Court approval of the Plan.  Before soliciting acceptances of the Plan, section 1125 of the Bankruptcy Code requires the TSN Debtors to prepare a Disclosure Statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance of the Plan.  [The Bankruptcy Court approved this Disclosure Statement under section 1125 of the Bankruptcy Code on [DATE].  The Ontario Superior Court of Justice (Commercial List) (the "*Canadian Court*") recognized the Bankruptcy Court's approval of the Disclosure Statement by order dated [DATE], 2010 (the "*Canadian Disclosure Statement Order*").  A copy of the Disclosure Statement Order and Canadian Disclosure Statement Order are attached hereto as **Exhibit B**.  This Disclosure Statement is being submitted to the Debtors' stakeholders in accordance with these Bankruptcy Code requirements, the Disclosure Statement Order and the Canadian Disclosure Statement Order.]

**C.      Am I entitled to vote on the Plan?  What will I receive from the TSN Debtors if the Plan is consummated?**

Your ability to vote and the distribution and consideration that you will receive under the Plan, if any, depend on what kind of claim or interest you hold.  As described in section VIII of this Disclosure Statement, Article III of the Plan creates categories of holders of claims and interests, each of which is referred to as a "*Class*." A summary of the Classes of Claims and Interests and a description each Class's voting status are set forth in the Executive Summary of this Disclosure Statement.

You should refer to this entire Disclosure Statement and the Plan for a complete description of the classification and treatment of each Class of Claims, and Interests.

For more information about the treatment of Claims and Interests, see "Description of the Joint Plan of Reorganization," which begins on page 36.

**D.      If the Plan provides that I get a distribution, do I get it upon Confirmation or when the Plan goes effective, and what do you mean when you refer to "Confirmation," "Effective Date" and "consummation?"**

"Confirmation" refers to approval of the Plan by the Bankruptcy Court.  Confirmation does not guarantee that you will receive the distribution indicated under the Plan.  After Confirmation, there are certain conditions that need to be satisfied or waived so that the Plan can be consummated or become effective.  References to the

9

"Effective Date" mean the date that all conditions to the Plan have been satisfied or waived and the Plan has been fully consummated. Distributions will only be made on the Effective Date or as soon as practicable thereafter, in accordance with Article III of the Plan (and for claims that are not yet Allowed, distributions will be further delayed). *See* "Confirmation of the Plan," which begins on page 68, for a discussion of the conditions to consummation.

**E.  If the Plan solely applies to the TSN Debtors, what happens to a claim I may have against a Debtor not included in this Plan?**

The Plan applies to TerreStar Networks, Inc., TerreStar National Services, Inc., 0887729 B.C. Ltd., TerreStar License Inc., TerreStar Networks Holdings (Canada) Inc. and TerreStar Networks (Canada) Inc. (collectively, the "***TSN Debtors***"). The Non-TSN Debtors intend to file a chapter 11 plan at a later date. Accordingly, creditors with claims against any Debtor other than the TSN Debtors, will receive notice of the proposed plan for the Non-TSN Debtors at that time. The Plan will only affect creditors of the TSN Debtors.

**F.  What is included in the solicitation packages to be sent to creditors who are eligible to vote on the Plan?**

All parties in interest will receive notice of the Confirmation Hearing, which is the hearing at which the TSN Debtors will seek Confirmation. Additionally, creditors who are eligible to vote on the Plan will receive appropriate solicitation materials including ballots. Specifically, accompanying this Disclosure Statement are, among other things, copies of: (1) the Plan (attached as Exhibit A hereto); (2) documentation relating to the Rights Offering; (3) the notice of, among other things, the time for submitting Ballots to accept or reject the Plan, the date, time and place of the hearing to consider the confirmation of the Plan and related matters, and the time for filing objections to the confirmation of the Plan (the "***Confirmation Hearing Notice***"); (4) if you are entitled to vote, one or more Ballots (and return envelopes) to be used by you in voting to accept or to reject the Plan; and (5) if you are eligible to participate in the Rights Offering, one or more rights offering subscription forms (and return envelopes) to be used by you in participating in the Rights Offering (collectively, the "***Solicitation Package***").

The notices to be sent to parties in interest will state that this Disclosure Statement, the Plan and all of the exhibits thereto are available for viewing by any party free of charge at: (i) calling 1-866-682-1770, (ii) emailing TerreStarInfo@gcginc.com or (iii) visiting www.TerreStarInfo.com.

**G.  What is the deadline to vote on the Plan?**

[###] p.m. (Eastern Daylight Time) on [DATE], 2011.

**H.  How do I vote for or against the Plan?**

This Disclosure Statement, accompanied by a Ballot, Note Ballot or Master Ballot to be used for voting on the Plan, is being distributed to the holders of Claims entitled to vote on the Plan. If you are a holder of Claims in Classes 3, 5, 6 or 7, you may vote for or against the Plan by completing the Ballot, Note Ballot, or Note Master Ballot and returning it in the envelope provided in accordance with the instructions provided on the Ballot and in the Voting and Tabulation Procedures.

The Debtors, with the approval of the Bankruptcy Court, have engaged Garden City Group ("***GCG***") to serve as the voting agent for claims and generally oversee the voting process (the "***Voting and Claims Agent***"). The Voting and Claims Agent will also process and tabulate Ballots for each Class entitled to vote to accept or reject the Plan and will process and tabulate any Ballots, Note Ballots and Master Ballots for Classes 3, 5, 6 and 7.

<table>
<tr><td align="center">**DELIVERY OF BALLOTS**</td></tr>
</table>

Ballots, Note Ballots and Note Master Ballots must be **_actually_ _received_** by the Voting and Claims Agent by the Voting Deadline of **[###]** p.m. (Eastern Daylight Time) on **[DATE]**, 2011 at the following addresses:

*Voting and Claims Agent:*

If by mail:

TerreStar Networks Inc.
c/o The Garden City Group, Inc.
P.O. Box 9649
Dublin, OH 43017-4949

If by hand or overnight courier:

TerreStar Networks Inc.
c/o The Garden City Group, Inc.
5151 Blazer Parkway, Suite A
Dublin, OH 43017

\* \* \* \* \* \* \*

If you received an envelope addressed to your nominee, you must return your ballot to your nominee prior to [___] p.m. on the date that is three (3) days prior to the Voting Deadline, to provide sufficient time for your nominee to compile and submit a Master Ballot.

If you have any questions on the procedure for voting on the Plan, please call the Voting and Claims Agent at the following telephone number:

1-866-682-1770

More detailed instructions regarding how to vote on the Plan are contained on the Ballots, Note Ballots and Master Note Ballots distributed to holders of Claims that are entitled to vote on the Plan as well as the Voting and Tabulation Procedures. For your vote to be counted, your Ballot or Note Ballot must be completed, signed and **_actually_ _received_** by **[###]** p.m. (Eastern Daylight Time), on the Voting Deadline, **[DATE]**, 2011.

Any Ballot or Note Ballot that is properly executed by the holder of a Claim, but which does not clearly indicate either an acceptance or rejection of the Plan or which indicates both an acceptance and a rejection of the Plan, will not be counted.

Each holder of a Claim may cast only one Ballot or Note Ballot per each Claim held. It is important to follow the specific instructions provided on each Ballot or Note Ballot. For information regarding voting, see the section herein entitled "Solicitation and Voting Procedures," which begins on page 65 as well as the Solicitation, Voting and Tabulation Procedures, which are attached here to as **Exhibit H**.

I. **When is the Confirmation Hearing set to occur?**

The Bankruptcy Court has scheduled the Confirmation Hearing for **[DATE]**, 2011 to take place at **[###]** a.m. (Eastern Daylight Time) before the Honorable Sean H. Lane, United States Bankruptcy Judge, in the United States Bankruptcy Court for the Southern District of New York, located at One Bowling Green, New York, New York 10004-1408. T**he Confirmation Hearing may be adjourned from time to time without further notice except for an announcement of the adjourned date made at the Confirmation Hearing or any adjournment thereof.**

**J.      What is the deadline to object to Confirmation?**

Objections to Confirmation must be filed and served on the Debtors, and certain other parties in interest, so that they are **actually** **received** no later than [DATE], 2011 at [###] p.m. (Eastern Daylight Time) in accordance with the requirements set forth in the Disclosure Statement Order, which is attached to this Disclosure Statement as **Exhibit B**.      Unless objections to Confirmation are timely served and filed in compliance with the Disclosure Statement Order they may not be considered by the Bankruptcy Court.      For further information on Confirmation see the section of this Disclosure Statement titled "Confirmation of the Plan," which begins on page 68.

**K.      What is the effect of Confirmation on the Debtors' ongoing business?**

The TSN Debtors are reorganizing under chapter 11 of the Bankruptcy Code.      As a result, unless otherwise set forth in the Plan reorganizing specific TSN Debtors, Confirmation means that the TSN Debtors will not be liquidated or forced to go out of business.      Following Confirmation, the Plan will be consummated on the Effective Date, which is a date selected by the TSN Debtors (with the consent of the Plan Sponsor) that is the first business day after which all conditions to consummation have been satisfied or waived.      *See* Article X of the Plan.      On or after the Effective Date, and unless otherwise provided in the Plan, each Reorganized Debtor may operate its business and may use, acquire or dispose of property and compromise or settle any Claims, Interests or causes of action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

In the event that the Plan is not consummated, the Plan will be null and void in all respects.      Accordingly, any settlement or compromise, distribution on account of any Claim or Interest, assumption or rejection of Executory Contracts or Unexpired Leases affected by the Plan and any document or agreement executed pursuant to the Plan shall be deemed null and void.

**L.      Do the Debtors recommend voting in favor of the Plan?**

Yes.      It is the Debtors' opinion and belief that the Plan provides for a larger distribution to the TSN Debtors' creditors than would result from any other available alternative.      The Debtors believe the Plan, which contemplates a significant deleveraging of the TSN Debtors' more than $1 billion in debt obligations, is in the best interests of all holders of Claims and Interests.      Any other alternative, including a liquidation under chapter 7 of the Bankruptcy Code, would realize lesser value than the value to be afforded under the Plan.      Thus, the Debtors recommend that holders of Claims who are entitled to vote on the Plan vote to accept it.

# IV.
## THE DEBTORS' HISTORY

### A.    Company Overview

TerreStar Networks Inc. ("***TSN***" and, together with its affiliated debtors and debtors in possession, the "***Debtors***" and, the Debtors together with their non-Debtor affiliates, "***TerreStar***" or the "***Company***") is a next-generation mobile satellite service operator that recently launched a wireless communications system which provides mobile satellite coverage throughout the United States (including Alaska, Hawaii, Puerto Rico and the United States Virgin Islands, as well as in U.S. territorial waters) and Canada using integrated satellite-terrestrial smartphones and other devices. The TSN Debtors offer this next-generation service as a wholesale mobile satellite services provider, allowing existing terrestrial service providers to augment their existing terrestrial networks with mobile satellite coverage. Through such relationships, the TSN Debtors' next generation mobile wireless network consists of a telecommunications network that handles multiple types of traffic over both terrestrial and satellite infrastructure. Various communications applications, including voice, data and video services, are available for use over the satellite network.

TerreStar began conducting business in 1988 when TerreStar Corporation ("***TSC***") (formerly Motient Corporation) was incorporated under the laws of the State of Delaware. TSN was formed in 2002 as a wholly-owned subsidiary of Mobile Satellite Ventures LP to develop a mobile satellite communications system in the 2 GHz S-band and subsequently spun off under Motient Corporation (which became TSC). TSN is a majority-owned, indirect subsidiary of TSC,[4] and is TSC's principal operating entity.[5] TSC is not a Debtor in these chapter 11 cases.[6]

The Debtors are headquartered in Reston, Virginia, with additional facilities in Richardson, Texas; New York, New York; Las Vegas, Nevada; North Salt Lake, Utah; and Lincolnshire, Illinois. The Canadian Debtors maintain offices in Ottawa, Ontario Vancouver, British Columbia, and Montreal, Quebec and have additional facilities in Toronto, Ontario and Allan Park, Ontario.

Within the United States, the TSN Debtors conduct ground operations in the states of Arizona, Florida, Indiana, Louisiana, Nevada, New Mexico, North Carolina, North Dakota, Oregon, Texas, Utah, Virginia and Washington. Within Canada, the TSN Debtors conduct ground operations in the provinces of Ontario, Alberta, British Columbia and Saskatchewan.[7] As of the date hereof, the TSN Debtors employ 107 employees, 20 of which

---

[4]   TSN is 89.3% owned by TSC (through its wholly owned subsidiaries MVH Holdings Inc. and Motient Ventures Holding Inc.) and 10.7% owned by LightSquared LP ("***LightSquared***") (f/k/a SkyTerra Communications, Inc. ("***SkyTerra***")), an affiliate of Harbinger.

[5]   Two of the Debtors' non-debtor affiliates, TerreStar Global Ltd. (a Bermuda Company) and TerreStar Europe Limited (a United Kingdom Company) were also established to conduct foreign operations. TerreStar Global Ltd. holds a license to utilize an orbital slot allocated to the government of Bermuda by Ofcom, the Office of Communications, which functions as the independent regulator and competition authority for the United Kingdom communications industries. TerreStar Global Ltd. currently conducts no business or operations. TerreStar Europe Limited was established to provide coverage in certain areas of Europe; however, after an unsuccessful bid for the right to use the TSN Debtors' 2 GHz spectrum in Europe, TerreStar Europe Limited conducts no business or operations and recently has been stricken from the United Kingdom's company register.

[6]   TSC is currently in discussions with holders of its Series A and B Preferred Stock with regard to a potential chapter 11 filing of TSC and its wholly owned subsidiary, TerreStar Holdings Inc.

[7]   The TSN Debtors' ground operations include the maintenance and operation of two Gateway Earth Stations, which include various network equipment, routers, satellite control links and equipment, antenna and ground based beam forming equipment ("***Ground Stations***") located in Las Vegas, Nevada and Allan Park, Ontario, as

(Continued…)

are employed by the TSN Debtors on an hourly basis and the remainder of which are employed by the TSN Debtors on a full-time, salaried basis (the "**Employees**").[8]  In addition to their Employees, the TSN Debtors supplement their workforce with independent contractors depending on the TSN Debtors' business needs.

### B. The Company's Business Operations

#### *(i)    The Mobile Network*

The TSN Debtors' business model is based on integrating ground-based technology and satellite technology into a single, North American mobile communications system intended to provide communication service in areas where traditional mobile networks currently do not reach or are unavailable.  This next-generation network utilizes mobile satellite service ("**MSS**")[9] using frequencies in the 2 GHz band.[10]  The TSN Debtors' next generation wireless communications system provides coverage throughout North America, including in rural areas where either terrestrial coverage is unobtainable because terrestrial build out is not economical for traditional wireless service providers due to the sparse user base in such areas or terrestrial build out is physically unattainable due to geographic conditions (e.g., rough terrain or waterways), or where because of extraordinary events (e.g. natural or man-made disaster) terrestrial wireless service is temporarily unavailable.  Such coverage is critical for many first responders and governmental and rescue agencies, and is attractive to the media, technology, communications,

---

well as 15 calibration earth stations ("**CES**") located throughout the United States and five CES located throughout Canada.

[8]  101 of the Employees are solely employees of the Domestic Debtors.  Six of the Employees are employees of TerreStar Networks (Canada) Inc. ("**TSN Canada**") (collectively, the "**Canada Employees**").  The Canada Employees also provide services to a non-Debtor affiliate, TerreStar Solutions Inc., and are directly compensated in full by that entity, which subsequently invoices TSN Canada for its apportioned amount of the compensation for the Canada Employees.  As set forth further herein, this arrangement is continuing in chapter 11, and is supported by the Debtors' DIP Financing.

[9]  Mobile satellite services (**MSS**) refers to satellite communication terminating or originating on non-fixed satellite receivers.  A satellite handset connection using MSS is similar to a cellular telephone except rather than using a cell phone tower to attach to the carrier's network, the satellite handset connects to a satellite, which transmits that signal.

[10]  The 2 GHz band is in a range of spectrum commonly referred to as the "**S-Band**." The S-Band incorporates frequencies ranging from 2 – 3 GHz.  TerreStar License Inc., a Debtor in these chapter 11 cases, holds a license from the Federal Communications Commission (the "**FCC**") to use 20 MHz of the S-Band in the United States for integrated MSS and terrestrial use.  This license was obtained in connection with the Debtors' build-out of their MSS Network.  Specifically, TerreStar Networks (Canada) Inc. ("**TerreStar Canada**"), a TSN Debtor, was formed to hold a previously awarded approval in principle from Industry Canada to operate a satellite in an orbital slot at 111° WL.  When TerreStar Canada acquired title to the "**TerreStar-1**" satellite, this permitted TSN to acquire a previously issued FCC authorization for one of the two remaining S-Band licenses in the United States, which since late 2005, had included 20 MHz of nationwide ATC spectrum.  TerreStar Networks (Canada) Inc. holds a license from Industry Canada, the Canadian communications regulatory authority, to utilize the MSS portion of the same S-Band spectrum in Canada.  TerreStar Solutions Inc., a non-Debtor affiliate of the Debtors, holds a license from Industry Canada to utilize the ancillary terrestrial component ("**ATC**") portion of the same spectrum in Canada.  With every passing day, usage of 10.5 GHz spectrum continues to be filled, and entities who require use of the spectrum for their businesses seek out the next best untapped spectrum frequency.  In addition, the Debtors' non-Debtor affiliate, TerreStar 1.4 Holdings LLC (which is wholly owned by TSC through TerreStar Holdings Inc., a non-Debtor affiliate) has access to 8 MHz of 1.4 GHz spectrum.  TerreStar 1.4 Holdings LLC has entered into the Spectrum Lease (as defined below) with respect to the 1.4 GHz spectrum, pursuant to which One Dot Four (as defined below) manages the 1.4 GHz spectrum.  The 1.4 GHz spectrum is licensed for terrestrial wireless services.

logistics and distribution sectors and other sectors requiring uninterrupted wireless service, as well as to certain consumers (e.g., rural residents, outdoorsmen, adventurers and recreational maritime users).[11]

In connection with developing their next generation network, in 2009 the TSN Debtors developed the world's first smartphone with integrated all-IP satellite-terrestrial voice and data capabilities (the "***GENUS***").[12] The TerreStar network, combined with the innovation of the GENUS, allows a user to have both terrestrial and satellite coverage through one device - - i.e. users will be able to place calls over traditional terrestrial cellular networks (for example, through AT&T) but will be able to "roam-in" to satellite coverage on the TSN Debtors' network when terrestrial coverage is unavailable.

Further, the TSN Debtors' business model is premised on acting as a wholesaler of satellite services and air time, as well as of the GENUS smartphone. The GENUS is marketed through the TSN Debtors' terrestrial provider partners. Ordinarily, the GENUS will communicate over a traditional terrestrial cellular 3G network; however, users of the GENUS subscribe, through their traditional terrestrial cellular coverage provider, to have the additional service feature to "roam-in" to the satellite network provided by the TSN Debtors when a terrestrial network is unavailable for a monthly subscription fee plus per minute or per megabit usage rates (i.e., roaming charges) that will appear on the customers' bills from the terrestrial provider. In turn, the terrestrial provider will pay the TSN Debtors a monthly fee for each subscribing customer in addition to a per-minute or per megabit charge for usage by customers. Accordingly, with such a subscription the GENUS can be converted to a satellite phone with the push of a button. Once the satellite option is selected, the phone will communicate using the TSN Debtors' satellite based network. This will allow customers to always be in coverage through a single, integrated device with one phone number, one email address and one bill.

In addition to the existing capabilities of the network and related technology, as discussed further below, the TSN Debtors have entered into contracts for the development of a next generation chipset that will be incorporated into a wide range of mobile devices, including small, lightweight and inexpensive handsets. Once this chipset is available, such devices will be able to utilize all applications (including voice and data service) over the TSN Debtors' network. This is anticipated to considerably expand the user base of the network in the near future.

The TSN Debtors' network utilizes the "***TerreStar-1***"[13] satellite, as well as two Ground Stations and 20 calibration earth stations (the "***CES***"). The Ground Stations (one located in North Las Vegas, Nevada and the other in Allan Park, Ontario) serve as intercept points between the space and ground based parts of the TerreStar network. The Ground Stations perform both operational and service functions. Transmission to or from end users of the satellite service use the Ground Stations as a link between the satellite-portion of the TSN Debtors' network and the terrestrial link to the public switched telephone network. Equipment at the Ground Stations also performs operational tasks including beam forming, satellite monitoring and satellite control. Additionally, the TSN Debtors have 20 CES (15 throughout the United States and five throughout Canada). These carefully placed sites aid in the TSN Debtors' network's ground based beam forming and satellite health monitoring. Each site collects real time data from the satellite and transmits it to the Ground Stations for processing.

---

[11] This focus of enhancing today's terrestrial mobile communications networks and providing more coverage in rural and geographically isolated areas is in line with the primary objectives of the National Broadband Plan, promulgated by the United States government through the FCC on March 15, 2010, which, among other things, seeks to augment mobile broadband capacity, promote the build out of communications infrastructure in high cost areas, and fortify communication channels for emergency first responders.

[12] The GENUS is a smartphone similar in size to today's terrestrial only wireless smartphones. Unlike other satellite phones available on the market, the GENUS approximates other smartphones in size, appearance and utility. It offers a touch screen, full QWERTY keyboard, and is Windows Mobile OS compatible. It offers a comprehensive range of features, such as text messaging, email, web browser, WiFi and Bluetooth.

[13] As noted above, in light of various regulatory requirements in place when TerreStar-1 was constructed, TerreStar Networks (Canada) Inc., a Debtor in these chapter 11 cases, holds title to TerreStar-1. It has a useful life expectancy of over 15 years.

The design of the TSN Debtors' MSS network infrastructure has at least two major advantages over other traditional satellite networks. First, the network incorporates advanced ground based beam forming and dynamic spot beam technology. [14] These features allow the location, power and concentration of the satellite beams to be manipulated and reallocated within a few hours notice. The TSN Debtors' network, therefore, can handle a surge in user demand in a particular geographic location with unprecedented speed. This makes the TSN Debtors' network unparalleled in its ability to provide continuous coverage in areas where devastation by a natural or man-made disaster, damaged infrastructure, or unusual demand have compromised terrestrial communication. Second, calibration of the satellite and beam forming are conducted through earth based facilities. The design of the Debtors' network allows software and equipment updates as well as physical repairs to be performed on a wider range of satellite components than is typical for traditional space based calibration and beam forming systems.

In connection with the build out of the TSN Debtors' network, the TSN Debtors have recently achieved several significant milestones. They successfully launched TerreStar-1, on July 1, 2009 and placed it into its assigned[15] orbital slot.[16] On July 20, 2009, the TSN Debtors placed the first successful phone call over TerreStar-1 and accordingly TerreStar-1 was certified as operational on that date. On August 27, 2009, the TSN Debtors announced the successful completion of in-orbit testing. In December 2009 both the FCC and the PTCRB[17] certified the GENUS handset. On January 13, 2010, the FCC granted the TSN Debtors authority to integrate terrestrial use of their S-Band spectrum into their next generation mobile wireless network or, in other words, approved the ancillary terrestrial component ("*ATC*")[18] of the TSN Debtors' services. On July 19, 2010, Industry Canada issued a similar ATC authorization to TerreStar Solutions Inc., a non-Debtor affiliate of TerreStar Canada. ATC approval was a critical step in the TSN Debtors' ability to operate a combined satellite and terrestrial network. On September 21, 2010, AT&T announced the availability of satellite augmented mobile service through the GENUS handset to its government and enterprise customers.

---

[14] A satellite's coverage area is comprised of various satellite beams. Satellite beams are equivalent to a cell phone tower in that they receive and transmit signals to or from capable devices within a certain area. Different satellites have different beam capabilities and characteristics. TerreStar-1 can support up to 550 "spot beams," each of which can be manipulated in size, shape, location and power within the coverage area. The Debtors' advanced beam forming capabilities allows efficient frequency re-use: high numbers of users can be active within a single beam without significantly degrading service quality. Spectral efficiency is important to a satellite's performance as satellites are frequency- and power-constrained.

[15] The geosynchronous slot that TerreStar-1 occupies is assigned to TerreStar Networks (Canada) Inc., a Debtor in these chapter 11 cases, by Industry Canada. A geosynchronous orbit is one with an orbital period that matches the earth's rotation period. The synchronization of rotation and orbital period means that for an observer at a fixed location on the surface of the Earth, a satellite in geosynchronous orbit appears at a constant fixed point above the earth.

[16] The TSN Debtors are also in the process of building a ground spare satellite, "*TerreStar-2*," which is nearly identical to TerreStar-1 and is also designed for MSS using frequencies in the S-Band. Currently, access to a completed and operational ground spare satellite is a requirement for the TSN Debtors' ATC authorization; however, the National Broadband Plan has proposed relaxing this criterion. It remains to be seen whether the FCC will in fact remove the requirement for a ground spare satellite. Nonetheless, TerreStar-2 is currently under construction at SpaceSystems/Loral ("*Loral*") and is more than 90% complete, with approximately 95% of the construction costs having been paid. Completion is currently scheduled for October 2011.

[17] The PTCRB is a global organization created by Mobile Network Operators to provide an independent evaluation process.

[18] Ancillary Terrestrial Component, or ATC, is ground based infrastructure in a mobile satellite system to enhance the availability, efficiency and economic viability of the coverage of the satellite network. ATC allows MSS providers to deploy terrestrial networks to enhance coverage in areas where the satellite signal is attenuated or unavailable.

*(ii)*      ***Significant Contracts***

The Debtors' business enterprise is dependent in large part on a number of key agreements and other arrangements, which, among other things, provide the necessary intellectual property to the Debtors as well as allows them to reach the broadest range of potential customers who are targeted as likely users of the Debtors' planned communications systems.  Set forth below is a short summary of some of these significant agreements, arrangements and relationships.

*Relationship with Harbinger/LightSquared (f/k/a SkyTerra)*

The Debtors and their non-Debtor affiliates have a number of separate contractual relationships with Harbinger (one of the Debtors' most significant stakeholders) and certain of its affiliates.  Among other things, as described in detail below, Harbinger and/or its affiliates lease rights to use TerreStar 1.4 Holdings LLC's 1.4 GHz spectrum and have purchased prepaid satellite minutes from the Debtors.

In September 2009, TerreStar 1.4 Holdings LLC ("*1.4 Holdings*"), a Delaware limited liability company and a non-Debtor entity wholly owned by non-Debtor, TerreStar Holdings Inc., entered into a Spectrum Manager Lease Agreement (the "*Spectrum Lease*") with One Dot Four Corp. ("*One Dot Four*"), an affiliate of Harbinger, under which One Dot Four acts as a manager in order to lease the rights to use certain 1.4 GHz terrestrial spectrum for which 1.4 Holdings holds FCC licenses.  The Spectrum Lease has an initial term through April 2017, renewable at One Dot Four's option for two additional terms of ten years each, in both instances subject to FCC renewal of the licenses.  Pursuant to the Spectrum Lease, One Dot Four pays 1.4 Holdings $2 million[19] per month.  Under certain conditions One Dot Four has an option, but not the obligation, to purchase the spectrum licenses.  One Dot Four also has a right of first refusal to match the price (less credit for certain amounts paid under the Spectrum Lease) in any potential transfer of such licenses to a third party.

In addition to the agreement with One Dot Four, the Debtors and their non-Debtor affiliates have entered into a series of exclusivity agreements with Harbinger and certain of its affiliates regarding Harbinger's desire to enter into a pooling arrangement of the parties' various spectrum and satellite capacity.  Specifically, in January 2010, the Debtors entered into the first of these agreements - an exclusivity agreement  (the "*Original Exclusivity Agreement*") - pursuant to which they agreed that for a period of 90 days, they would negotiate in good faith an agreement with Harbinger under which the S-Band spectrum licensed to TerreStar License Inc. would be combined with other services (such as satellite usage rights) to provide mobile communications services (a "*Pooling Arrangement*").  In exchange, Harbinger, on behalf of its affiliate, One Dot Four, agreed to prepay $30 million of the amounts due under the Spectrum Lease.[20]  As part of the Original Exclusivity Agreement, TSC and TSN agreed, among other things, that during the exclusivity period they would not enter into any agreement relating to the S-Band spectrum license other than with Harbinger and certain of its affiliates, nor grant any third party rights with respect to the S-Band spectrum license that would interfere with use of the S-Band spectrum license by Harbinger and certain of its affiliates.  The Original Exclusivity Agreement expired on April 26, 2010, without the parties entering into a Pooling Arrangement, but on May 6, 2010, the Debtors entered into a new exclusivity agreement (the "*New Exclusivity Agreement*") with SkyTerra (n/k/a LightSquared), an affiliate of Harbinger (together, "*LightSquared/Harbinger*"), whereby they agreed that, for a period of 90 days, they would negotiate in good faith on a Pooling Arrangement and that during the period of exclusivity TerreStar would not (i) solicit or encourage the submissions of proposals or offers relating to the S-Band spectrum license from any person or entity other than LightSquared/Harbinger, (ii) enter into any written or oral agreement relating to the S-Band spectrum license with any person or entity other than LightSquared/Harbinger, or (iii) participate in discussions or negotiations with, or

---

[19]   Unless otherwise noted, all dollar amounts stated herein refer to USD.

[20]   Upon receipt of the funds from Harbinger, TerreStar 1.4 Holdings LLC paid a dividend to its 100% shareholder TerreStar Holdings Inc., in the amount of the funds received.  TerreStar Holdings Inc. then made an intercompany loan to Motient Ventures Holding Inc in the amount of approximately $32 million.  Motient Ventures Holding Inc. then made a capital contribution to TSN, its 89.3% owned subsidiary of approximately $32 million.

furnish any non-public information to, any person or entity in connection with a possible transaction regarding the S-Band where doing so would interfere with or obstruct the use of the S-Band by LightSquared/Harbinger or otherwise make it unavailable for use by LightSquared/Harbinger or limit the ability of any of TerreStar or LightSquared/Harbinger to enter into a transaction regarding the S-Band. The New Exclusivity Agreement expired on August 4, 2010, without the parties reaching a definitive agreement on a Pooling Arrangement; thus, since August 4, 2010, the Debtors have not been encumbered by any exclusivity arrangement with regard to marketing the S-Band. Since that time, and due in large part to the Debtors' need to focus on their liquidity concerns and preparations for its chapter 11 filing, the parties have not entered into any further exclusivity agreements regarding a Pooling Arrangement.

Contemporaneously with entry into the New Exclusivity Agreement, on or about May 6, 2010, TSN entered into a Satellite Minutes Agreement (the "**Satellite Minutes Agreement**") with SkyTerra (n/k/a LightSquared) whereby LightSquared agreed to purchase minutes ("**Satellite Minutes**") of voice or data transmission and satellite capacity to use on TerreStar-1. Subject to certain terms and conditions set forth in the Satellite Minutes Agreement, LightSquared has prepaid for Satellite Minutes in equal amounts on May 6, 2010, May 20, 2010, June 3, 2010 and June 17, 2010 for an aggregate purchase price of $40 million (the "**Purchase Price**"). Subject to the terms and conditions of the Satellite Minutes Agreement, LightSquared may begin using the Satellite Minutes (the "**Usage Start Date**") at any time within one year after TSN launches commercial service on TerreStar-1.[21] LightSquared will have five years after the Usage Start Date to use the Satellite Minutes (the "**Usage Term**"). The Usage Term shall be automatically extended for an additional five years if there are any unused Satellite Minutes remaining at the end of the initial five year period. LightSquared may, in its discretion, credit all or part of the portion of the Purchase Price attributable to any unused Satellite Minutes to outstanding payments, if any, then due from LightSquared to TSN under any Pooling Arrangement (to the extent one is entered into, as discussed above). If there are no such payments due or if LightSquared chooses not to so credit all or a portion of the Purchase Price thereto, the unused Satellite Minutes will expire at the end of the Usage Term (including any extensions thereof).

*Satellite Construction and Ground Maintenance*

The Debtors have various contractual relationships and agreements that are necessary to ensure that their satellite network remains operational. Set forth below are some of the more important arrangements.

On December 13, 2006, TSN entered into the Site Preparation and Site Hosting Agreement (the "**Hughes O&M Agreement**") with Hughes Network Systems LLC ("**Hughes**"), under which Hughes provides site hosting services for the TerreStar Ground Station at the North Las Vegas site and CES equipment (the "**TerreStar Equipment**"). The parties entered into Amendment 2 to the Hughes O&M Agreement on April 21, 2009 for the purpose of adding the statement of work for Hughes to provide operations and maintenance services for the TerreStar Equipment. Under the Hughes O&M Agreement, Hughes provides (a) monitoring services 24 hours a day, seven days a week, every day of the year; (b) certain preventive and corrective maintenance; and (c) certain additional services (e.g., inventory management, warranty management, daily operations reporting, and operations security). The Hughes O&M Agreement automatically renews for successive one year renewal terms unless either party provides 90 days notice of intent not to enter into the next renewal term.

On March 30, 2007, in connection with the Hughes O&M Agreement, TSN entered into a contract with Hughes for the design, development and supply of satellite base station subsystems ("**S-BSS**")[22] at the Las Vegas, NV and Allan Park, Ontario Ground Stations (the "**S-BSS Contract**").

TSN is party to two contracts with Loral relating to the purchase and construction of TerreStar-1 (the "**TerreStar-1 Agreement**") and TerreStar-2 (the "**TerreStar-2 Agreement**"). The TerreStar-1 Agreement includes

---

[21] TSN launched its commercial service on TerreStar-1 on September 21, 2010, triggering LightSquared's Usage Term.

[22] S-BSS is the section of the network that is responsible for transmitting and receiving radio signals to and from a mobile phone. S-BSS carries out transcoding of speech channels, allocation of radio channels to mobile phones, paging and many other tasks related to the network.

launch support services, mission operations support services, risk management insurance procurement support, training services and other items relating to the TerreStar-1 satellite. The TerreStar-1 Agreement also contains in-orbit performance incentive payments by TSN to Loral over the life of the TerreStar-1 satellite. The TerreStar-2 Agreement contains services and terms substantially similar to those of the TerreStar-1 Agreement. The TerreStar-2 agreement also includes orbital performance incentive payments by TSN to be paid over the life of the TerreStar-2 satellite.

TSN is also party to a space based network ("**SBN**") contract with Loral pursuant to which Loral will (a) provide services to integrate the TerreStar-1 satellite with the ground segment Satellite Beam Access Subsystem ("**SBAS**")[23] to be provided by Hughes and (b) deliver an integrated SBN network consisting of the TerreStar-1 satellite and the SBAS.

On May 11, 2007, TerreStar Canada contracted with Telesat Canada ("**Telesat**") to provide in-orbit satellite operational services for TerreStar-1 ("**Telesat TT&C Agreement**"). Under the Telesat TT&C Agreement, Telesat uses its facilities and equipment located in Allan Park, Ontario to provide tracking, telemetry and control ("**TT&C**") for TerreStar-1. These services include maintenance of the satellite's proper orbital location, monitoring the health and operational status of the satellite, monitoring and notifying of any terrestrial or space-based threats to satellite operation, and issuing planned and emergency command and ranging. Telesat also provides assistance with satellite anomaly analysis and regulatory services including coordination and proper registration of the satellite.

On April 1, 2009, TSN entered into a Site Hosting and Operation and Maintenance of Satellite Gateway Systems agreement ("**Telesat O&M Agreement**") with Telesat. On June 30, 2009, TSN assigned the Telesat O&M Agreement to 4506901 Canada Inc. (n/k/a 0887729 B.C. Ltd.). The Telesat O&M Agreement provides for the lease of real property at Telesat's Allan Park teleport facility and equipment operation and maintenance for satellite gateway equipment and antennas housed in a structure known as the TSN Debtors' Canadian gateway earth station. The equipment in the Ground Stations in Canada (like that in the U.S.), combines elements of the satellite and ground based networks and, in coordination with the CES, is critical to beam forming and linking voice and data traffic to the Network Operations Control Center in Richardson, TX.

*Chipset Development and Related Technology*

The TSN Debtors are party to a number of agreements with various parties relating to chipset development and the development of the GENUS device. In addition to the development of the fully integrated GENUS device, the Debtors have contracted with Qualcomm Incorporated ("**Qualcomm**") and Infineon Technologies AG ("**Infineon**"), two of the premiere chipset developers for mobile and smartphone devices to ensure that, in the next generation of such devices, the ability to connect to the Debtors' network is built in and would need simply to be activated by a provider. These chipsets will substantially increase the availability of the TSN Debtors' network to mobile device customers. The TSN Debtors have also contracted with certain parties to develop chipsets for the Ground Stations that are necessary to enable the chipsets in the smartphone and mobile devices to communicate with the TSN Debtors' network.

TerreStar has entered into a number of agreements with Elektrobit, Inc. ("**Elektrobit**") with respect to the development of the GENUS handset. First, on September 19, 2007, TSN signed a Statement of Work (the "**Statement of Work**") under the Master Development & Licensing Agreement entered into by TSN and Elektrobit on August 10, 2007. Under the Statement of Work, Elektrobit has assigned a multi-disciplined engineering team to perform reference design and development programs, software development for satellite and terrestrial chipset integration, and provide a reference design and production of the GENUS handset. Second, on December 1, 2009, the Debtors and TSC entered into a Master Supply Agreement (the "**Supply Agreement**") with Elektrobit, which sets the terms for the individual purchase orders for the GENUS. Additionally, under the Supply Agreement, Elektrobit

---

[23] SBAS is a system that supports wide-area or regional augmentation through the use of additional satellite-broadcast messages. Such systems are commonly composed of multiple ground stations located at accurately-surveyed points. The ground stations take measurements of one or more of the satellites, the satellite signals, or other environmental factors that may impact the signal received by the users. Using these measurements, information messages are created and sent to one or more satellites for broadcast to the end users.

provides manufacturing services, forward and reverse logistics, and after market services support for certain satellite-terrestrial smartphones, starting with the GENUS smartphone. While there is no volume commitment from TerreStar in the Supply Agreement, pricing and other terms are adjusted based on volume.

As noted above, one of the TSN Debtors' chipset providers is Qualcomm. On December 11, 2008, TSN (as operator) entered into a 15 year agreement with Qualcomm for the provision by Qualcomm of satellite enabled mobile chipsets and satellite base station components to facilitate the development of S-Band mobile devices and networks systems (the "***Qualcomm Agreement***"). Under the Qualcomm Agreement, certain Qualcomm chipsets that have satellite and S-Band capabilities will be available on a mass market basis. Separately on March 30, 2009, TSN (as operator), in connection with the Qualcomm Agreement, entered into an agreement with Alcatel-Lucent USA Inc. ("***Alcatel***") to develop, test and provide an S-BSS and to supply such S-BSS commercial products (the "***Alcatel-Lucent Agreement***"). This S-BSS ground infrastructure will be designed to work with the chipsets produced under the Qualcomm Agreement.

Finally, on March 30, 2009, TSN, as operator, entered into an agreement with Infineon pursuant to which Infineon will design and develop chipset technology that will enable satellite-terrestrial handsets to operate with multiple cellular and satellite-based communications technologies (including GSM, GPRS and GMR-2G/3G) (the "***Infineon Chipset Contract***"). In conjunction with the Infineon Chipset Contract, on March 30, 2009, TSN entered into an agreement with Hughes to develop and design a satellite chipset for use in mobile terminals that operate on the TerreStar network. The chipset interfaces with the S-BSS and SBAS also developed by Hughes. More specifically, this additional software will, with the existing Hughes S-BSS Contract, allow Hughes to deliver the full S-BSS development required to integrate with the Infineon chipset.

### AT&T Distribution Agreement

On September 25, 2009, the Debtors entered into a Mobile Satellite Services and Support Agreement with AT&T Mobility II, LLC ("***AT&T***") under which AT&T markets, resells and provides support for certain of the Debtors' satellite communications services to government, commercial and other customers on a non-exclusive basis (the "***AT&T MSS Agreement***"). AT&T sells the GENUS (and various accessories) and AT&T's Satellite Augmented Mobility Service ("***SAM***") to end users. SAM includes access to AT&T's terrestrial mobile network and the TSN Debtors' satellite network. Pursuant to the rate plan under the AT&T MSS Agreement, AT&T pays the TSN Debtors a recurring monthly charge for each subscribing customer plus a fixed amount per minute for satellite voice calls (plus certain termination charges) and a fixed amount for each megabyte of satellite data used and satellite text message, sent or received.

### C.  The Company's Organizational Structure

### (i)  Overview of Debtors' Organizational Structure

Attached as **Exhibit C** to this Disclosure Statement is an organizational chart summarizing the Company's corporate structure, including the Debtors and their Non-Debtor Affiliates, as of October 19, 2010. As demonstrated by the organizational chart, TSN is a Delaware corporation and is an affiliate of each of the other Debtors. As set forth below, certain of TSN's subsidiaries and affiliates are entities organized under the laws of the provinces of Ontario and British Columbia, some of which are also Debtors in these chapter 11 cases. As further set forth below, contemporaneously with the filing of these chapter 11 cases, TSN, in its capacity as proposed foreign representative, commenced a recognition proceeding in Canada, which, among other things, seeks the Canadian Court's recognition of the chapter 11 cases as a "foreign main proceeding".

As of the date hereof, TSC[24], the ultimate parent of each of the Debtors, but not a Debtor in these cases, has four wholly-owned direct subsidiaries, three of which are Debtors in these proceedings: TerreStar New York

---

[24]  As of October 11, 2010, TSC had authorized 240 million shares of common stock (the "***Common Stock***"). As of October 11, 2010, TSC had 139,441,616 shares of Common Stock outstanding. As of the Petition Date, EchoStar held approximately 28.9% of the Common Stock and Harbinger held approximately 47.78% of the Common Stock, subject to dilution by certain equity linked securities of TSC and its Affiliates, as more fully set forth in TSC's filings with the SEC.

Inc. ("***TerreStar NY***"), Motient Holdings Inc. ("***Motient***") and MVH Holdings Inc. ("***MVH***").[25]  TerreStar Holdings Inc. ("***TerreStar Holdings***"), a Delaware corporation, is the fourth wholly-owned direct subsidiary of TSC but is not a Debtor in these cases.[26]

TerreStar NY is a New York corporation that has no subsidiaries.  TerreStar NY is not a TSN Debtor.

Motient holds 100% of the interests in both Motient Services Inc. and Motient Communications Inc., each a Delaware corporation, and each a Debtor in these proceedings.  Motient Communications Inc. in turn holds 100% of the interests in Motient License Inc., another Delaware corporation, and a Debtor in these proceedings.  These entities have minimal operations, minimal assets and various liabilities they will seek to reject in the chapter 11 cases.  None of these entities are TSN Debtors.

MVH directly holds 100% of the interests in Motient Ventures Holdings Inc., a Delaware corporation.  Neither of these Debtors are TSN Debtors.

Motient Ventures Holdings Inc. holds approximately 89.3% of the equity of TSN,[27] and 86.5% of the equity of TerreStar Global Ltd.,[28] a Bermuda company and a non-Debtor affiliate in these cases.  TerreStar Global Ltd. holds a license to utilize an orbital slot allocated to the government of Bermuda by Ofcom.[29]  The orbital slot is available for use in the S-Band spectrum and use of the slot would require a satellite that can operate on the S-Band.[30]  The license to use the slot is set to expire in December 2013 unless the Debtors renew the license, which will require a showing that the Debtors intend to use the slot.

TerreStar Global Ltd. holds 100% of the equity of TerreStar Europe Limited, a United Kingdom company and a non-Debtor in these cases.  TerreStar Europe Limited was established to provide coverage in certain areas of Europe.  After an unsuccessful bid for the right to use the S-Band in Europe, TerreStar Europe Limited conducts no operations and was recently stricken from the United Kingdom's company register.

TSN wholly owns both TerreStar National Services Inc. and TerreStar License Inc., each of which are co-Debtors with TSN in these cases.  TerreStar National Services Inc. is a Delaware corporation established to conduct certain confidential work on behalf of the United States government.  TerreStar License Inc., also a Delaware corporation, is an entity established solely to hold certain FCC licenses and regulatory approvals related to the Debtors' operations, including licenses necessary to operate the S-Band and the U.S. CES and Ground Stations.

In developing the Debtors' satellite network, the Domestic Debtors and their domestic non-Debtor affiliates have worked closely and cooperatively with their Canadian partner, Trio 2 General Partnership ("***Trio***"), through

---

[25]  TSC does not directly hold any Canadian assets; as discussed below, the interests held in the Debtors' Canadian affiliates are directly or indirectly held by TSN.

[26]  TerreStar Holdings directly holds 100% of the interests in 1.4 Holdings.  As noted earlier, 1.4 Holdings is a Delaware limited liability company, which holds the FCC licenses for certain 1.4 GHz spectrum.

[27]  The remaining 10.7% of the interests in TSN are held by LightSquared.

[28]  Of the remaining 13.5%, MSV Investors Holdings Inc. owns 13.1%, 0.3% is held by Continental Casualty and the remainder is held by a former director of TerreStar Global Ltd. and a private investor.

[29]  Ofcom is the Office of Communications, which functions as the independent regulator and competition authority for the United Kingdom communications industries.

[30]  The Debtors are unaware of any entity, other than the Debtors, that has a satellite it is not currently using that would be able to take advantage of this slot.

Trio's subsidiary, 4491165 Canada Inc. ("*4491165*").[31]  Neither Trio nor 4491165 are Debtors in these cases, nor part of the Canadian recognition proceedings.  Nevertheless, both of these entities have worked closely and cooperatively with the Debtors during the chapter 11 preparation process and thus far during the chapter 11 cases and the recognition proceedings.

As discussed above, the necessity for the creation of TerreStar Networks Holdings (Canada) Inc., TerreStar Networks (Canada) Inc. and 0887729 B.C. Ltd. (each a Canadian company and each a Debtor in these cases) arises from certain licensee and ownership restrictions existing in Canada.  Industry Canada (the Canadian federal government department responsible for spectrum management and licensing in Canada) has stringent requirements for, among other things, qualifying an entity as a licensee of spectrum, as a licensee of Ground Stations and CES sites, and as a licensee of orbital slots.  Specifically, certain licenses may be granted only to Canadian entities and, until very recently, some of these entities were required to be Canadian controlled – that is, a certain threshold of voting interests must be held by a Canadian national.[32]  Accordingly, the Domestic Debtors, along with a predecessor in interest to Trio, created TerreStar Networks Holdings (Canada) Inc. ("*Holdings Canada*"), an entity in which 33⅓% of the voting interests are held by TSN with the remaining 66⅔% held by 4491165.  Holdings Canada functions as a holding company for TerreStar Networks (Canada) Inc. ("*TerreStar Canada*").  TSN holds 20% of the voting interests in TerreStar Canada, with the remaining 80% held by Holdings Canada.[33]

TerreStar Canada holds title to the TerreStar-1 satellite as well as rights to the orbital slot in which TerreStar-1 resides, spectrum licenses to use the S-Band in Canada, and related authorizations to conduct operations in Canada.  Under the terms of an amended and restated Indefeasible Right of Use Agreement dated August 11, 2009 between TSN and TerreStar Canada, TSN has been granted the right to use 90% of the capacity of TerreStar-1.

TSN, Trio, TerreStar Solutions Holdings Inc. ("*Solutions Holdings*")[34] and TerreStar Solutions Inc. ("*TerreStar Solutions*") entered into a Shareholders' Agreement on August 11, 2009, which establishes certain rights and obligations of the shareholders of TerreStar Solutions, a corporation incorporated under the laws of Canada and established for the purpose of providing commercial MSS/ATC services in Canada using the TerreStar-1 satellite and 2 GHz terrestrial spectrum (i.e. the S-Band).  TSN holds 20% of Class A common shares in TerreStar Solutions and 100% of Class B common shares.  The remaining 80% of the Class A common shares in TerreStar Solutions is held by Solutions Holdings.  Neither Solutions Holdings nor TerreStar Solutions are Debtors in these cases.

In furtherance of its objective to be the provider of commercial MSS/ATC services in Canada, TerreStar Solutions (1) has entered into a Wholesale Satellite Capacity Agreement with TerreStar Canada whereby TerreStar Solutions has the right to use up to 10% of the capacity of TerreStar-1 on a per minute/per megabyte basis and (2) intends to enter into various agreements to allow for the use of TSN handsets in Canada and for the sale of end user devices in Canada.  Additionally, TerreStar Solutions has entered into a Rights and Services agreement under which it is expected to procure certain network and technical services from TSN to facilitate the development and integration of the network with TerreStar Canada.

---

[31]  Trio owns a 75.6% interest in 4491165, with the remaining 24.4% held by Healthcare of Ontario Pension Plan, which has also been acting cooperatively with the Debtors in these cases.

[32]  On July 12, 2010, certain amendments to Canada's Telecommunications Act were given royal assent, the effect of which was to remove the restrictions on non-Canadian ownership of Canadian satellites.  Nonetheless, as of the Petition Date, no changes to the corporate structure have been made as a result of these amendments.

[33]  This means that TSN effectively holds 46.67% of the controlling interests in TerreStar Canada.

[34]  Trio owns a 75.6% interest in Solutions Holding, with the remaining 24.4% held by Healthcare of Ontario Pension Plan.

TerreStar Solutions has also entered into certain cost-sharing arrangements (the "***Cost-Sharing Arrangement***") with TerreStar Canada whereby TerreStar Canada and TerreStar Solutions share several operational costs and expenses, including but not limited to employees, utilities, and rent. To apportion the costs between TerreStar Canada and TerreStar Solutions, the companies use a charge back procedure, which is part of the separate budget approved by each of the boards of directors of TerreStar Canada and TerreStar Solutions. Specifically, operational costs are primarily paid in full by TerreStar Solutions on behalf of both it and TerreStar Canada. Subsequently, TerreStar Solutions invoices TerreStar Canada for its apportioned share. The aggregate amount paid monthly by TerreStar Canada to TerreStar Solutions is approximately between CDN $50,000 and CDN $70,000, with roughly 70% of that amount allocated to employee related costs and the remaining 30% allocated to rent, utilities and other operational costs. As of September 30, 2010, TerreStar Canada owes TerreStar Solutions approximately CDN $695,071 arising from the Cost-Sharing Arrangement. The Debtors' DIP Financing provides for the continuation of the Cost-Sharing Arrangement during the chapter 11 cases.

Additionally, 0887729 B.C. Ltd., a Canadian entity 100% owned by TSN, holds licenses and assets in Canada relating to the Ground Station and CES sites located in Canada.

As noted above, three of the Debtors' Canadian affiliates, TerreStar Canada, Holdings Canada and 0887729 B.C. Ltd., are TSN Debtors in these chapter 11 cases. Accordingly, (and as further set forth herein) to protect against the risk of creditors seeking to enforce their rights in Canadian courts separate and apart from the bankruptcy proceedings, contemporaneously with the filing of these chapter 11 petitions, TSN, as proposed foreign representative, filed recognition proceeding under the Companies' Creditors Arrangement Act (Canada) with the Ontario Superior Court of Justice (Commercial List) seeking recognition in Canada of these U.S. chapter 11 cases as foreign main proceedings, and certain orders entered therein, in Canada (the "***Recognition Proceedings***").

### D. Prepetition Litigation

On June 25, 2008, Sprint Nextel Corporation ("***Sprint***") filed a lawsuit (the "***Sprint Litigation***")in the United States District Court for the Eastern District of Virginia naming TSN as a defendant. New ICO Satellite Services, G.P. was also named as a defendant (together with TSN, the "***Defendants***"). Sprint seeks, among other things, enforcement of certain FCC orders and reimbursement of not less than $100 million from each Defendant. Sprint argues that Defendants owed Sprint reimbursement for certain spectrum relocation costs Sprint incurred or will incur in connection with relocating incumbent licensees from certain frequencies in the 2 GHz spectrum band. Specifically, in the United States, Sprint is obligated to relocate existing BAS and other terrestrial users in the TSN Debtors' uplink spectrum and 2 GHz MSS S-band licensees must relocate microwave users in the 2 GHz MSS S-band downlink band. Sprint completed such band clearing in July 2010 and currently is seeking reimbursement pursuant to applicable FCC rules from the Defendants for a portion of the expenses incurred by Sprint to accomplish such band clearing, which are now the subject of the Sprint Litigation.

On TSN's motion, the United States District Court for the Eastern District of Virginia stayed Sprint's suit on the ground that primary jurisdiction of the dispute resides in the FCC; the case has been administratively closed. In September 2010, the FCC issued an order resolving certain regulatory issues related to the obligations of 2 GHz MSS licensees to Sprint for such BAS relocation expenses. In October 2010, the other 2 GHz MSS licensee appealed the FCC's September 2010 order and this appeal remains pending. The case remains stayed pending a final decision by the FCC and has also been stayed by the automatic stay upon the commencement of the Debtors' chapter 11 cases.

### E. The Debtors' Prepetition Capital Structure

*(i) Overview*

As of the Petition Date, the TSN Debtors had debt facilities in place with an aggregate accreted amount of approximately $1.2 billion. The chart below summarizes the Debtors' prepetition indebtedness, including approximate outstanding amounts as of October 19, 2010. Further detail with respect to each category of debt obligation is provided below.

| Debt Obligation | Original Amount | Approximate Amount Outstanding as of October 19, 2010 | Maturity Date | Security Status |
|---|---|---|---|---|
| Senior Secured PIK Notes | $550 million | $943.9 million | February 2014 | Secured |
| Purchase Money Credit Agreement | $100 million | $85.9 million | February 2013 | Secured |
| Senior Exchangeable PIK Notes | $150 million | $178.7 million | June 2014 | Unsecured |

*(ii)*      ***Senior Secured Notes***

On February 14, 2007, TSN issued $500 million aggregate principal amount of Senior Secured PIK Notes due 2014 (the "***Initial Senior Secured Notes***") and on February 7, 2008, TSN issued an additional $50 million aggregate principal amount of Senior Secured PIK Notes due 2014 (the "***Additional Senior Secured Notes***" and, together with the Initial Senior Secured Notes, the "***Senior Secured Notes***") pursuant to an Indenture (together with any amendments, supplements or modifications thereto, the "***Senior Secured Notes Indenture***"), among TSN, as issuer, the guarantors from time to time party thereto (the "***Senior Secured Notes Guarantors***")[35] and U.S. Bank National Association, as trustee (the "***Senior Secured Notes Indenture Trustee***").

The Senior Secured Notes bear interest from the date of issuance at a rate of 15% per annum.  Beginning August 15, 2007, and until and including February 15, 2011, interest on the Senior Secured Notes has been and will be payable in additional Senior Secured Notes on each February 15 and August 15 semi-annually.  Thereafter, interest on the Senior Secured Notes will be payable in cash on February 15 and August 15 semi-annually, starting August 15, 2011.  Per the provisions of the Senior Secured Notes, additional interest of up to 1.5% per annum may accrue if certain milestones are not met by the Debtors.  Due to the failure to meet a milestone under the Senior Secured Notes Indenture, interest is currently accruing at a rate of 15.5%.[36]

The Senior Secured Notes are secured by a first priority security interest in the assets of TSN, TerreStar National Services Inc. and TerreStar License Inc., subject to certain exceptions, pursuant to a security agreement (the "***U.S. Senior Secured Notes Security Agreement***") dated as of February 14, 2007 among TSN, as issuer, and TerreStar National Services Inc. and TerreStar License Inc. as guarantors, in favor of U.S. Bank National Association, as collateral agent.  Additionally, the Senior Secured Notes are secured by a first priority security interest in the assets of TerreStar Canada and Holdings Canada, subject to certain exceptions, pursuant to a security agreement (the "***Canadian Senior Secured Notes Security Agreement***"), dated as of February 14, 2007, among TSN as issuer and TerreStar Canada and Holdings Canada as guarantors, and U.S. Bank National Association, as collateral agent.

As of the Petition Date, approximately $943.9 million of principal and accrued interest is outstanding on account of the Senior Secured Notes.

*(iii)*      ***The Senior Exchangeable Notes***

On February 7, 2008, TSN issued $150 million aggregate principal amount of 6.5% Senior Exchangeable PIK Notes due 2014 (which are exchangeable for TerreStar Corporation common stock at a conversion price of

---

[35]   As of the date hereof, the Senior Secured Notes Guarantors are Holdings Canada, TerreStar Canada, TerreStar National Services Inc. and TerreStar License Inc.

[36]   This failure relates to the milestone requiring TerreStar to enter into a multi-year service contract with the United States Government.

$5.57 per share) (the "*Senior Exchangeable Notes*"), pursuant to an Indenture (the "*Senior Exchangeable Note Indenture*") among TSN, as issuer, the guarantors from time to time party thereto (the "*Senior Exchangeable Note Guarantors*")[37] and U.S. Bank National Association, as trustee (the "*Senior Exchangeable Note Indenture Trustee*"). On October 28, 2010, pursuant to a tripartite agreement, Deutsche Bank National Trust Company replaced U.S. Bank National Association as the Senior Exchangeable Notes Indenture Trustee. The Senior Exchangeable Notes bear interest at a rate of 6.5% per annum, payable on a quarterly basis (on each of March 15, June 15, September 15 and December 15). Until and including June 15, 2011, interest on the Senior Exchangeable Notes has been and will continue to be payable in additional Senior Exchangeable Notes quarterly. Thereafter, interest on the Senior Exchangeable Notes will be payable in cash quarterly. The Senior Exchangeable Notes are scheduled to mature on June 15, 2014.

The Senior Exchangeable Notes rank senior in right of payment to all existing and future subordinated indebtedness, and *pari passu* with all other unsubordinated indebtedness. The Senior Exchangeable Notes are unsecured obligations of TSN and the Senior Exchangeable Note Guarantors.

As of the Petition Date, approximately $178.7 million of principal and accrued interest is outstanding on account of the Senior Exchangeable Notes.

*(iv)*     ***Purchase Money Credit Facility***

On February 5, 2008, TSN entered into a $100 million TerreStar-2 Purchase Money Credit Agreement (the "***PMCA***") among TSN, as the borrower, U.S. Bank National Association, as collateral agent (the "***PMCA Agent***"), and Harbinger and EchoStar Corporation ("***EchoStar***"), as original lenders. There are no guarantors of the PMCA. The financing under the PMCA is advanced as required and used to fund the completion of the construction of TerreStar-2 satellite. The PMCA is secured by a first lien on all of TSN's rights in the TerreStar-2 satellite, along with the raw materials, work-in-process, construction agreement, insurance, books and records and all proceeds related thereto.

Amounts outstanding under the PMCA bear interest at a rate of 14% per annum and are due on February 5, 2013. Pursuant to the PMCA, and in light of the Debtors' failure to reach certain milestones, additional interest of 3% accrued between December 31, 2009 and January 13, 2010. On January 13, 2010, the Debtors met the required milestones, thereby reducing the interest rate back to 14% per annum from such date.

On August 25, 2010, Harbinger and EchoStar each advanced an additional $5 million under the PMCA, for an aggregate advance of $10 million, (the "***August 2010 Advance***") to reimburse TSN for a portion of the aggregate amount of payments made by TSN within the previous 180 days in connection with the construction of TerreStar-2. Contemporaneously with the August 2010 Advance, on August 25, 2010, Harbinger and EchoStar each executed a Waiver and Forbearance Agreement (the "***Waiver and Forbearance***"), wherein each agreed to waive certain provisions of the PMCA in connection with the August 2010 Advance and further agreed to forbear from exercising rights and remedies with respect to certain defaults or events of default that may arise under the PMCA, Senior Secured Notes Indenture or Senior Exchangeable Notes Indenture in connection with the August 2010 Advance or the use of such proceeds.

As of the Petition Date, approximately $85.9 million of principal and accrued interest is outstanding under the PMCA.

---

[37]   As of the Petition Date, the Senior Exchangeable Note Guarantors are TerreStar National Services Inc. and TerreStar License Inc.

*(v)*     ***Stockholders' Equity***

### a.     TSN Preferred Stock

TSN has one outstanding share of non-voting Series A preferred stock ("***TSN Series A Preferred***") issued to EchoStar and one outstanding share of non-voting Series B preferred stock ("***TSN Series B Preferred***") issued to Harbinger.  The TSN Series A and B Preferred have no voting rights and are not convertible into any other class of capital stock of the Debtors.  The TSN Series A and B Preferred rank on parity with one another and rank superior to all other classes of TSN capital stock.

# V.
## EVENTS LEADING TO COMMENCEMENT OF THE CHAPTER 11 CASES

The following is a general description of factors that ultimately led to the commencement of the Debtors' chapter 11 cases.

As discussed above, the TSN Debtors' business model is premised upon innovation in the wireless telecommunications sector. Innovation does not happen overnight, nor does it come with a low price tag. The TSN Debtors and their non-Debtor affiliates have spent years developing their satellite and next generation network. Build-out required not only procuring the various technological components necessary to run the network – including technological build-out, such as the development of the GENUS handset, chipsets, the build-out of the CES and Ground Stations, the construction of the TerreStar-1 satellite and the TerreStar-2 ground spare, and the launch of TerreStar-1 – but also the procurement of various licenses and regulatory approvals required in order to operate the TerreStar network (such as licenses to use the S-Band spectrum both in the United States and Canada, ATC authorization in both the United States and Canada, licenses to operate CES and Ground Stations in both the United States and Canada, and licenses to use orbital slots in Canada). On top of actually developing the hard technology and procuring the necessary authority to operate it, the TSN Debtors had to carefully coordinate software development to facilitate communications between the CES sites, Ground Stations, TerreStar-1, the GENUS and the chipsets for traditional mobile devices. However, this alone is not enough to market the TSN Debtors' MSS. In addition to all of the foregoing, the TSN Debtors had to obtain ATC authorization in order to market their next generation network to traditional terrestrial coverage providers.

Accordingly, throughout the preceding years, the TSN Debtors' business model has largely been premised upon a substantial amount of capital expenditures with very little in the way of revenue. The TSN Debtors, now at the end stages of the development process, have begun to market their network, recently entering into the AT&T Agreement and attaining a position where they can begin to build a customer base, which will further increase their revenue in the upcoming years. Nonetheless, despite achieving the significant milestone of turning their product into a revenue stream, the TSN Debtors require continued financing for further development and marketing before they become profitable enough to service their prepetition debt load and meet their capital requirements for continued technological development and expansion of their product.

The willingness of the TSN Debtors' investors to contribute more than $1 billion to fund the development of the TSN Debtors' network over the course of the years preceding the chapter 11 filings is a testament to such investors' belief in its business and its future. Nevertheless, the TSN Debtors eventually came to realize that they would not be able to meet their liquidity needs to satisfy working capital requirements, operating expenses, debt and other obligations absent either an infusion of new capital or a restructuring of their balance sheet.

Amidst one of the most challenging credit markets in recent history, in the last 12 months, the Debtors attempted a number of measures to increase liquidity. Specifically, and as described above in Article IV.B.ii. entitled "Significant Contracts", the Debtors and their non-Debtor affiliates entered into a series of transactions with Harbinger and certain of its affiliates under which the Debtors and their non-Debtor affiliates provided services or entered into transactions beneficial to each party's business efforts in exchange for additional capital for the Debtors in the form of one-time cash infusions or, in some cases, a revenue stream. For instance, as detailed above, the Debtors entered into an agreement with LightSquared whereby LightSquared purchased use capacity on the TerreStar-1 satellite, and entered into various agreements providing LightSquared/Harbinger with the exclusive right to negotiate a Pooling Arrangement regarding the parties' satellites and S-Band rights. While these agreements were successful in bringing additional funding and revenue into the Debtors' capital structure, standing alone they did not provide TerreStar with sufficient revenue to service its outstanding debt obligations while maintaining the capital expenditures necessary to finalize development of its technology.

In recognition of the fact that, despite the Debtors' best efforts, their available cash and borrowing capacity were likely to decrease to the point where there would be insufficient capital to cover funding needs for the third and

fourth quarters of 2010, the Company began restructuring negotiations with its key stakeholders in April 2010.[38] These negotiations focused on both financing and balance sheet restructuring. Key stakeholders participating in such discussions included Harbinger (a substantial holder of the Senior Secured Notes and Senior Exchangeable Notes and, at that time, a 50% lender under the PMCA,) as well as an informal group comprised of holders holding a significant amount of TSN's Senior Exchangeable Notes – many of which have cross holdings in the Senior Secured Notes.

Despite the good faith efforts of these various parties, because of their divergent interests and the Debtors' impending liquidity crunch (which was set to occur in short order), TerreStar determined that it was in its best interest to temporarily set aside the restructuring negotiations and primarily focus upon procuring additional financing in the form of a debtor-in-possession financing facility, which would allow TerreStar to continue negotiations with its stakeholders while receiving adequate financing and residing under the protections of the Bankruptcy Code. TerreStar determined that this path was the most viable restructuring alternative and would increase the likelihood of emerging from the restructuring process with a healthy balance sheet and adequate financing to continue the marketing of its network and the further development of necessary technological innovations.

Initially, the Company and its financial advisor, Blackstone Advisory Partners L.P. ("**Blackstone**") discussed and contemplated a chapter 11 filing with postpetition operations sustaining only on the use of cash collateral, without any additional financing, to fund operations during the chapter 11 cases. Even assuming the Debtors would be able to obtain the necessary consent to use cash collateral, it was determined that cash collateral alone would be insufficient to fund operations and necessary expenditures under the Debtors' go-forward business plan while continuing to service existing debt. Thus, to provide the Debtors with appropriate and necessary financing, the negotiation of adequate liquidity in the form of debtor-in-possession financing was critical to ensure that the business could operate in accordance with their business plan.

The Debtors explored all practicable avenues to obtain DIP financing on the best possible terms, including exploring financing options from participants in their prepetition capital structure and from unrelated third parties. Initially, the Debtors contemplated a junior, "non-priming" DIP financing structure whereby certain participants in the Debtors' prepetition capital structure would provide financing in exchange for a junior "non-priming" lien on all assets that secure the Senior Secured Notes and a first lien on all assets that do not secure the Senior Secured Notes. At the Debtors' suggestion, Blackstone marketed this DIP structure to existing stakeholders. The Debtors received preliminary indications that certain holders within the capital structure would be willing to participate in this sort of "junior" DIP financing structure but despite extensive arms' length negotiations with those parties, commitments to provide the required DIP financing ultimately were not obtainable.

---

[38] At that time, and up until a few days before the Petition Date, the Debtors contemplated that TSC and TerreStar Holdings Inc. (the "**TSC Entities**") would file for chapter 11 and be part of these chapter 11 proceedings. However, certain of the largest preferred shareholders of TSC's Series A and B Preferred Stock (including Solus Alternative Asset Management LP ("**Solus**"), Harbinger, and Highland Capital Management LP ("**Highland**")) requested that the Debtors refrain from filing the TSC Entities for chapter 11 while they worked with the TSC Entities on the terms of a consensual restructuring. (100% of TSC's Series A preferred stock is owned by Highland, and approximately 55% of TSC's Series B preferred stock is owned by Solus and Harbinger.) As part of these consensual negotiations these parties, including Harbinger, Solus, and Highland, agreed to provide the TSC Entities with $1.25 million of short term financing until a consensual restructuring could be achieved, and Highland agreed to toll certain litigation they currently have outstanding against TSC (for a description of such litigation, please see TSC's form 10-K/A for the fiscal year ended December 31, 2009, filed with the SEC on May 6, 2010). As such, since the days before the Petition Date and as of the date hereof, and as an accommodation to the above mentioned holders of TSC's Preferred Stock, the TSC Entities have decided to delay a chapter 11 filing until a consensual restructuring could be achieved; however, if the TSC Entities do not actually receive the financing necessary to continue these negotiations and fund their operations, they may need to file for chapter 11 without a prearranged plan.

As a result, in August 2010, the Debtors marketed the "junior" DIP financing structure to additional non-stakeholder parties. The Debtors executed numerous non-disclosure agreements with various parties; however, the Debtors were unable to attain sufficient interest to fill a sufficient "junior" DIP financing facility at that time. Because the Debtors did not obtain a sufficient junior DIP financing facility in August, and in light of their mounting liquidity concerns, the Debtors decided to explore whether they could obtain financing through a senior "priming" DIP. The Debtors' marketing efforts reached approximately 53 financial institutions (including current stakeholders) and resulted in the execution of confidentiality agreements with more than 25 parties. As a result of those efforts, the Debtors identified a group of third party lenders as a potential source of "priming" DIP financing and began negotiations with that group for a priming DIP (the **"Third Party Lenders"**). At the same time, the Debtors continued discussions with their largest stakeholders with respect to the junior DIP financing structure.

Over the weeks leading to the commencement of these cases, the Debtors engaged in substantial discussions and negotiations on parallel tracks: a potential "priming" DIP facility from the Third Party Lenders and a "junior" DIP facility from one of the Debtors' largest stakeholders, EchoStar. The "priming" DIP had numerous problems, including risk of execution (i.e. a "non-consensual priming fight"), an uncertain chapter 11 exit strategy, and expensive "break-up" fees demanded by such lenders. Moreover, the Debtors had significant doubts as to whether they could meet the factual and legal predicates necessary to prevail in a "priming" fight, because of, among other things, the availability of junior debtor-in-possession financing proposed by EchoStar. The EchoStar DIP proposal, on the other hand, carried very little risk of execution as it is a "junior" DIP and thus would not require any "priming" fight. Moreover, the EchoStar transaction included an exit strategy. Specifically, the Debtors were able to negotiate and agree with EchoStar on terms (embodied in the Restructuring Support Agreement, described below), pursuant to which (i) EchoStar has committed, subject to certain terms and conditions, to backstop $100 million of a $125 million preferred stock rights offering, which will allow the Debtors to repay their DIP Financing facility in full and, if the rights offering is fully subscribed, finance their operations upon their emergence from chapter 11, and (ii) EchoStar has committed to support the equitization of the totality of its secured notes – which represents more than 50% of the Debtors' close to $1 billion secured notes obligations. This support is crucial to the Debtors' reorganization efforts, and will allow the Debtors to pursue the equitization of their secured noteholders. Ultimately, the Debtors determined that the best available financing option was to obtain the debtor-in-possession financing facility (the "**DIP Facility**") which (as noted below in Article VI.B) was approved on an interim basis on October 20, 2010, by the Bankruptcy Court. In light of the fair and thorough negotiation process undertaken by the Debtors to identify potential lenders and to obtain the best available postpetition financing terms, the Debtors believe that DIP Facility represents the best and most favorable financing for the Debtors.

Additionally, and on a parallel track with finalizing the terms of the DIP Facility, the Debtors and EchoStar engaged in extensive, good faith, arm's-length negotiations with respect to the terms of a plan term sheet, which efforts culminated in the execution of a Restructuring Support Agreement (a further explanation of which is included in Article VI.C, and, as noted above in footnote 38, and as an accommodation to TSC's largest preferred shareholder, did not include a chapter 11 filing of the TSC Entities). The Debtors believe that their decision to pursue that comprehensive, consensual restructuring plan – which includes entry into the DIP Facility –represents the best option to maximize recoveries to their creditors and will ensure a swift exit from these bankruptcy proceedings.

# VI.
## INITIAL MOTIONS OF THE CHAPTER 11 CASES AND CERTAIN RELATED RELIEF

On the Petition Date, each of the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York. The Debtors' chapter 11 cases are being jointly administered for procedural purposes only under the caption *In re TerreStar Networks Inc., et al.*, Case No. 10-15446 (SHL), before the Honorable Sean H. Lane. The Debtors continue to operate their businesses and manage their properties as debtors in possession under the jurisdiction of the Bankruptcy Court and in accordance with the applicable provisions of the Bankruptcy Code and orders of the Bankruptcy Court.

### A. "First-Day" Motions and Related Relief

To ensure a smooth transition to operations in chapter 11, the Debtors filed a number of motions with the Bankruptcy Court seeking relief designed to, among other things, prevent interruptions to the Debtors' business, ease the strain on the Debtors' relationship with certain essential constituents, including employees and provide access to immediate financing. At a hearing held on October 20, 2010, the Bankruptcy Court entered several orders granting various of the Debtors' initial requests for relief, as discussed below.

### (i) Procedural Orders

To facilitate a smooth and efficient administration of the Debtors' chapter 11 cases and minimize the impact to daily business operations, the Bankruptcy Court entered certain "procedural" orders by which the Bankruptcy Court (a) approved the joint administration of each of the Debtors' 13 chapter 11 cases [Docket No. 32]; and (b) authorized the Debtors to prepare a list of creditors and file a consolidated list of their 30 largest unsecured creditors [Docket No. 31].

### (ii) Operational Orders

Recognizing that any interruption of the Debtors' business, even for a brief period of time, would negatively impact their operations and to facilitate the stabilization of their businesses and effectuate a smooth transition into operating as debtors in possession, the Debtors sought [and obtained] orders authorizing them to:

• pay prepetition wages, salaries and other compensation, reimbursable employee expenses and employee medical and similar benefits [Docket Nos. 34, __];

• maintain their existing cash management systems and grant postpetition intercompany claims administrative expense priority and continue intercompany arrangements [Docket Nos. 33, __];

In addition, on the Petition Date, the Debtors filed motions seeking to:

(1) continue to administer their prepetition insurance coverage policies and practices [Docket No. __]; and

(2) establish procedures for providing adequate assurance of future payment to utility providers [Docket No. __].

A hearing with regard to approval of these motions is scheduled for November 8, 2010.

### (iii) Retention of Professionals

On the Petition Date, the Debtors filed various applications seeking Bankruptcy Court approval to retain various professionals to assist in carrying out their duties as debtors in possession and to represent their interests in the chapter 11 cases. Specifically, the Debtors filed applications to retain the following professionals:

- Akin Gump Strauss Hauer & Feld LLP, as restructuring attorneys [Docket No. 17];

- Blackstone Advisory Partners L.P., as financial advisor and investment banker [Docket No. 18];

- Garden City Group, Inc., as notice and claims agent [Docket No. 5];

- Fraser Milner Casgrain LLP, as Canadian Counsel for the Debtors [Docket No. 19]; and

- Stikeman Elliot LLP, as Canadian Counsel for TerreStar Networks Holdings (Canada) Inc. and TerreStar Networks (Canada) Inc. [Docket No. 20].

In addition to these professionals, the Debtors also sought authority to retain various law firms and professionals to advise them with respect to certain of the Debtors' daily business operations, including corporate, securities and regulatory matters and pending litigation matters [Docket No. 15].

### B. Initial DIP Financing Order

In addition to the Debtors' initial procedural and operational relief, the Debtors filed a motion on the Petition Date seeking authority to ensure adequate access to liquidity during their chapter 11 cases, as discussed below.

On the Petition Date the Debtors sought approval of ongoing access to cash collateral as well as approval to enter into an aggregate $75 million junior secured debtor-in-possession financing facility (the "***DIP Facility***"). The DIP Facility is secured by a first lien on all of the Debtors' assets, subject to the liens held by the Debtors' Senior Secured Noteholders and the lenders under the PMCA. In addition, the DIP Facility is guaranteed by all of the Debtors; however, the guarantee provided by certain of the Debtors is limited to the aggregate amount of DIP Facility funds these entities actually receive from the DIP Financing Facility, as fully set forth in the DIP Facility and the Interim DIP Order (defined below). The DIP Facility carries a 15% interest rate, (which is paid-in-kind), and was issued with a 2% original issue discount. The DIP Lenders received a 3% commitment fee for providing the DIP Facility, which was also paid-in-kind. The DIP Facility contains negative and affirmative covenants standard for debtor-in-possession financing facilities, as well as various operational performance covenants. The Debtors do not believe they will be unable to comply with these covenants. Further, the DIP Facility contains various events of default, including, without limitation, complying with certain milestones as more fully described below in the section describing the Restructuring Support Agreement.

On October 20, 2010, the Bankruptcy Court entered an order approving the Debtors' entry into the DIP Facility on an interim basis (the "***Interim DIP Order***") [Docket No. 35]. The Debtors have used the funds generated by the DIP Facility to, among other things, gain access to working capital.

### C. The Motion to Assume the Restructuring Support Agreement

On the Petition Date, the Debtors filed a motion seeking authority to assume the Restructuring Support Agreement between the Debtors and EchoStar (the "***RSA***").[39] As discussed above, in the weeks leading to the commencement of these cases, the Debtors and EchoStar actively negotiated the terms for a restructuring of the TSN Debtors' business that would maximize the value of their estates for the benefit of all constituents. (In addition, before and since the Petition Date the TSN Debtors fielded a number of requests regarding potential transactions regarding the TSN Debtors' assets and continue to pursue any transaction that maximizes the value of their estates for the benefit of all constituents.) After extensive negotiations conducted at arm's-length and in good faith the Debtors and EchoStar entered into the RSA to memorialize the agreements reached in those discussions. Through the RSA, among other commitments, EchoStar has committed to support the Debtors' restructuring efforts,

---

[39] The descriptions and discussions of the RSA and the Term Sheet contained herein are summary in nature. In the event of any inconsistency between the terms of any of those documents and their descriptions contained herein, the terms of the actual documents will control. Further, as the terms of the proposed Plan have been amended since the RSA was executed, in the event of an inconsistency between the RSA and the Plan, the terms of the Plan control.

including an agreement to support a plan of reorganization consistent with the Restructuring Term Sheet attached to the RSA (the "***Term Sheet***") and to backstop a rights offering that will repay the DIP Facility in full and in cash and which provides the Debtors with a clear exit strategy for these chapter 11 cases. As part of the proposed plan, EchoStar has agreed to support the conversion of its Senior Secured Notes to equity of the reorganized entity, giving the Debtors the support of one-half of their secured creditors for such equitization.

The RSA contains many of the same milestones that are contained in the DIP Facility with regard to the filing of a plan and disclosure statement, approval of the disclosure statement, confirmation of the plan and consummation thereof. Specifically, the RSA and DIP Facility require that the Debtors file a plan and disclosure statement on or before November 5, 2010, receive Bankruptcy Court approval of the disclosure statement on or before December 14, 2010, commence a hearing to confirm the plan before January 31, 2011, obtain Bankruptcy Court approval of the plan by February 14, 2011 and consummate the plan before May 31, 2011.

The Bankruptcy Court has scheduled a hearing on the RSA Motion for November 16, 2010 at 10:00 a.m.

### D.     Canadian Proceedings

To protect certain of the Debtors' Industry Canada licenses and approvals, as well as other assets located in Canada, the Debtors determined that it would be necessary to commence foreign recognition proceedings in Canada under Part IV of the *Companies' Creditors Arrangement Act*, R.S.C. 1985, c.C-36. In this regard, on the Petition Date, the Debtors sought and, on October 20, 2010 received, Bankruptcy Court authorization for TSN to act as the Foreign Representative on behalf of the Debtors in the Canadian Recognition Proceedings [Docket No. 30] (the "***Foreign Representative Order***"). Subsequent to entry of that Order, TSN filed the Foreign Representative Order with the Canadian Court and sought recognition of, among other things, the Interim DIP Order. On October 21, 2010, the Canadian Court, among other things, granted the Debtors a stay of proceedings, recognized the chapter 11 cases as foreign main proceedings and also recognized and gave full force and effect to the Interim DIP Order, in Canada.

The Debtors' Canadian counsel will continue to seek additional recognition orders from the Canadian Court for substantive relief granted by the Bankruptcy Court in these chapter 11 cases.

# VII. DEVELOPMENTS DURING THE CHAPTER 11 CASES

## A. Appointment of the Statutory Committee

Section 1102 of the Bankruptcy Code requires that, absent an order of the Bankruptcy Court to the contrary, the U.S. Trustee must appoint a committee of unsecured creditors as soon as practicable. On October 29, 2010, the U.S. Trustee appointed the Official Committee of Unsecured Creditors in these chapter 11 cases (the "**Creditors' Committee**"). The Creditors' Committee is comprised of the following members:

- Deutsche Bank National Trust Company, Indenture Trustee;

- Hughes Network Systems, Inc.;

- Nokia Siemens Networks US LLC;

- Qualcomm Incorporated;

- Shaffer Wilson Sarver & Gray, P.C.;

- Space Systems/Loral. Inc.; and

- Van Vlissingen and Company.

The Creditors' Committee subsequently sought to retain Otterbourg, Steindler, Houston & Rosen LLP, as legal counsel and FTI Consulting, as financial advisor.

## B. The Claims Process

### (i) Filing of the Debtors' Statements of Financial Affairs and Schedules of Assets and Liabilities

On November [8], 2010, the Debtors filed their schedules of assets and liabilities and statements of financial affairs (collectively, the "**SOFAs and Schedules**") pursuant to section 521 of the Bankruptcy Code and Bankruptcy Rule 1007. The SOFAs and Schedules provide information concerning each of the Debtors' assets, liabilities (including accounts payable), executory contracts and other financial information as of the Petition Date. Copies of the Debtors' SOFAs and Schedules are available free of charge by accessing www.TerreStarInfo.com. The SOFAs and Schedules include, among other things, a list of all intercompany transfers among the Debtors and between the Debtors and their non-Debtor affiliates.

### (ii) Establishment of the Claims Bar Date

On November [8], 2010, the Bankruptcy Court entered an order [Docket No. ____] (the "**Bar Date Order**") establishing December 11, 2010 (the "**Bar Date**") as the deadline by which each person or entity asserting a claim against any of the Debtors was required to file written proof of such claim. The Bar Date Order was recognized by the Canadian Court on November [9], 2010. In accordance with the Bar Date Order, the Debtors provided written notice of the Bar Date to each of the parties and entities identified as creditors on the SOFAs and Schedules and to all known actual or potential creditors of the Debtors according to the Debtors' books and records at the time of mailing of the notice. Where possible, this notice was accompanied by a "personalized" proof of claim form approved by the Bankruptcy Court. Additionally, in an effort to reach unknown creditors, the Debtors published notice of the Bar Date in the *Washington Post, USA Today* and *The Globe and Mail (national edition).*

## C. Exclusivity

Under the Bankruptcy Code, a debtor has the exclusive right to file and solicit acceptance of a plan or plans of reorganization for an initial period of 120 days from the date on which the debtor filed for voluntary relief (the "**Exclusive Filing Period**"). If a debtor files a plan during the Exclusive Filing Period, then the debtor has the exclusive right for 180 days from the commencement date to solicit acceptance of the Plan (the "**Exclusive Solicitation Period**" and, together with the Exclusive Filing Period, the "**Exclusive Periods**"). During the Exclusive

Periods, no other party in interest may file a competing plan of reorganization. However, a court may extend these periods upon the request of a party in interest.

The Debtors' initial Exclusive Filing Period and Exclusive Solicitation Period are set to expire on February 16, 2011 and April 18, 2011, respectively.

### D. The Motion to Dismiss Certain Chapter 11 Cases

On November 1, 2010, certain holders of TSC's Series B Preferred Stock (specifically, the affiliated managed funds of Solus Alternative Asset Management LP and Millennium International Management LP) (the "*Movants*") filed a motion to dismiss the Chapter 11 Cases of the Non-TSN Debtors pursuant to sections 105(a) and 1112(b) of the Bankruptcy Code and Bankruptcy Rule 1017(a) (the "*Motion to Dismiss*"). On November 5, 2010, Marathon Asset Management, L.P., a holder of TSC Common Stock, filed a joinder to the Motion to Dismiss. The Movants argued (i) the Non-TSN Debtors' bankruptcy petitions were not filed in good faith or in furtherance of a rehabilitative purpose and (ii) in filing the Non-TSN Debtors' bankruptcy petitions, the directors of TSC and the Non-TSN Debtors did not exercise independent fiduciary duties owed to their respective estates and stakeholders. The Debtors vigorously disputed both assertions. On November 2, 2010, the Movants served discovery requests pertaining to issues raised in the Motion to Dismiss. [On November _, 2010, the parties reached an agreement and the Movants agreed to withdraw the Motion to Dismiss and the related discovery requests.]

### E. The Debtors' Licenses and Related Applications

As further described above (see generally, Article IV), the TSN Debtors' principal business, the provision of mobile satellite services ("*MSS*") in North America, is subject to extensive regulation by the FCC in the United States and by Industry Canada in Canada. The TSN Debtors provide MSS using the TerreStar-1 2 GHz MSS satellite, which is licensed to TerreStar Canada by Industry Canada and resides in an orbital slot that is authorized by Industry Canada. In the United States, the TSN Debtors provide MSS using TerreStar-1 pursuant to a 2 GHz spectrum reservation issued by the FCC to TSN. TSN, TerreStar Canada, 0887729 B.C. Ltd. and TerreStar Solutions also hold various additional FCC and Industry Canada licenses and equipment authorizations relating to their Ground Stations, CES, handsets, and terrestrial base stations and MSS, feeder link and telemetry, trajectory and control spectrum. TSN further holds an FCC authorization to provide ATC services in the United States, which authorization is subject to a variety of gating criteria intended to ensure that such ATC services remain ancillary to TSN's MSS offering as well as other conditions, including a condition requiring compliance with FCC decisions related to payment for rebranding of the 2 GHz band. TerreStar Solutions, a non-Debtor in these chapter 11 cases, holds a similar ATC authorization issued by Industry Canada governing the provision of ATC in Canada.

The restructurings required for both the FCC and Industry Canada hold regulatory authority in the United States and Canada, respectively, to regulate the operation and ownership of the MSS, ATC and related authorizations held by the TSN Debtors and affiliates of their Canadian partner, Trio. This includes authority to issue, renew and modify such authorizations; require prior approval with respect to certain changes in ownership or control of the authorizations, including approval rights over foreign ownership; adopt and implement regulations and policies governing the ownership and operations of the licensees; and impose penalties, including forfeitures and license revocations, for violations of their respective rules and policies.

Both the entry of the Debtors into chapter 11 bankruptcy protection and the emergence of the Reorganized Debtors from chapter 11 require the consent of the FCC under Section 310(d) of the Communications Act. The Debtors filed *pro forma* assignment applications seeking FCC consent for the prior assignment of the Debtors' FCC licenses to the Debtors as "debtors in possession" under chapter 11. The Debtors expect the FCC to grant these applications in the normal course. The Debtors also will be required to file FCC applications seeking prior FCC consent to transfer control of TSN's FCC licenses to the Reorganized Debtors upon TSN's emergence from chapter 11 ("*Long-Form Applications*"). The Debtors will be required to disclose in the Long-Form Application certain information about entities that will hold a 10% or greater direct or indirect interests in TSN post-emergence. The Debtors also will be required to certify the legal, character, and other qualifications of the proposed transferee of control in FCC licensees. Grant of the Long-From Applications by the FCC is a prerequisite to the TSN Debtors' emergence from chapter 11 protection.

Further, Section 310(b)(4) of the Communications Act prohibits foreign ownership of US. common carrier wireless licenses, including TSN's ATC authorization, in excess of 25 percent unless the FCC determines that such foreign ownership is not contrary to the public interest. TSN may be required to file a petition for a declaratory ruling seeking such an FCC determination with respect to certain of its authorizations ("***Foreign Ownership PDR***"). The TSN Debtors will be required to disclose in the Foreign Ownership PDR certain information regarding entities that will hold direct and indirect interests in TSN that are foreign owned, controlled, organized, and/or headquartered.

To facilitate collection of the information that will be required to be disclosed in the Long-Form Application and Foreign Ownership PDR, if any, as well as to stabilize the identity of the entities that will be disclosed in such filings during the FCC's review of the filings, the Debtors will be filing a motion with the Bankruptcy Court requesting the court to require the disclosure to the Debtors of certain information by Claims holders and restricting certain trading of certain Claims. Specifically, the Debtors will seek for the holders of certain Claims to be required to disclose information required to be submitted to the FCC in the Long-Form Application and the Foreign Ownership PDR, if any. In addition, the Debtors will be requesting that the Bankruptcy Court restrict certain trading of certain Claims during the pendency of the FCC's review of the Long Form Applications and Foreign Ownership PDR to the extent necessary to prevent such trading from causing the anticipated post-emergence ownership of TSN disclosed in such filings from substantially shifting while the FCC is reviewing the filings. This is intended to prevent delay in the FCC's review and approval of the filings and to avoid the need to file multiple amendments to the filings during such FCC review. Such amendments potentially could extend the FCC's review of the Long-Form Application and/or Foreign Ownership PDR to the detriment of the TSN Debtors.

Any transfer of control of TerreStar Canada or any transfer of the Industry Canada licenses held by the TSN Debtors to another party is subject to the prior approval of Industry Canada. To the extent that the reorganization of the TSN Debtors' reorganization involves any such transfers, the prior approval of Industry Canada will be required and such approval is a condition precedent to the occurrence of the Effective Date pursuant to Article X of the Plan, as described in Article VIII.H hereof.

# VIII.
## DESCRIPTION OF THE JOINT PLAN OF REORGANIZATION[40]

This section provides a summary of the structure and means for implementation of the Plan and the classification and treatment of Claims and Interests under the Plan and is qualified in its entirety by reference to the Plan (as well as the exhibits thereto and definitions therein).

The Plan is premised on the consummation of the restructuring transactions generally contemplated in the RSA as set forth herein and as further set forth and amended in the Plan. The Debtors believe that the reorganization contemplated by the Plan is in the best interests of the estates and creditors of the TSN Debtors. If the Plan is not confirmed, the TSN Debtors believe that they will be forced to either file an alternate plan of reorganization or liquidate under chapter 7 of the Bankruptcy Code. In either event, the TSN Debtors believe that the holders of Allowed Claims would realize a less favorable distribution of value, or, in certain cases, none at all, for their Claims. *See* Section X.E. and the Liquidation Analysis attached as Exhibit D hereto.

### A. TREATMENT OF ADMINISTRATIVE CLAIMS, DIP CLAIMS, U.S. TRUSTEE FEES AND PRIORITY TAX CLAIMS

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, DIP Claims, U.S. Trustee Fees and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Article III of the Plan and shall have the following treatment:

*(i)* *Administrative Claims*

#### a. Administrative Claims

Except with respect to Administrative Claims that are Claims for Accrued Professional Compensation and except to the extent that a holder of an Allowed Administrative Claim agrees to less favorable treatment, each holder of an Allowed Administrative Claim shall, in complete satisfaction of such Allowed Administrative Claim, be paid Cash in the full amount of such Allowed Administrative Claim on the later of: (a) the Initial Distribution Date; (b) the first date such Administrative Claim is Allowed or as soon as reasonably practicable thereafter; and (c) the date such Allowed Administrative Claim becomes due and payable by its terms, or as soon thereafter as is reasonably practicable.

#### b. Professional Compensation

##### i. Claims for Accrued Professional Compensation

Professionals or other Entities asserting a Claim for Accrued Professional Compensation for services rendered before the Effective Date must file and serve on the TSN Debtors and such other Entities who are designated by the Bankruptcy Rules, the Confirmation Order, the Interim Compensation Order or other order of the Bankruptcy Court an application for final allowance of such Claim for Accrued Professional Compensation no later

---

[40] The statements contained in this Disclosure Statement include summaries of the provisions contained in the Plan and in the documents referred to therein. The statements contained in this Disclosure Statement do not purport to be precise or complete statements of all the terms and provisions of the Plan or documents referred to therein, and reference is made to the Plan and to such documents for the full and complete statement of such terms and provisions of the Plan or documents referred to therein. The Plan itself controls the actual treatment of Claims against and Interests in the TSN Debtors and will, upon the occurrence of the Effective Date, be binding upon all Holders of Claims and Interests and other parties in interest. In the event of any conflict between this Disclosure Statement and the Plan or any other operative document, the terms of the Plan and/or such other operative document will control. Capitalized terms used but not defined in this section of this Disclosure Statement have the meaning ascribed to such terms in the Plan.

than 30 days after the Effective Date. Objections to any Claim for Accrued Professional Compensation must be filed and served on the Reorganized TSN Debtors, the Creditors' Committee, the Office of the U.S. Trustee and the requesting party no later than the earlier of (a) 45 days after such application is filed or (b) 75 days after the Effective Date.

ii.      Treatment of Claims for Accrued Professional Compensation

A Claim for Accrued Professional Compensation in respect of which a final fee application has been properly filed and served pursuant to Article II(A)(2)(a) of the Plan shall be payable to the extent approved by order of the Bankruptcy Court. Subject to the Holdback Amount, on the Effective Date, or as soon thereafter as reasonably practicable, to the extent not otherwise paid, all Allowed Claims for Accrued Professional Compensation (including estimated Accrued Professional Compensation through the Effective Date) shall be paid in full in Cash. To receive payment on the Effective Date for unbilled fees and expenses incurred through the Effective Date, each Professional shall reasonably estimate fees and expenses due for unbilled fees and expenses for periods that will not have been billed as of the Effective Date and shall deliver such estimates to the TSN Debtors, the Plan Sponsor and the U.S. Trustee prior to the Effective Date. If the estimated payment received by such Professional exceeds the actual allowed Accrued Professional Compensation for the estimated period, such excess amount shall be deducted from the Holdback Amount for such Professional and if the Holdback Amount is insufficient, such Professional shall disgorge the difference. If the estimated payment received by the Professional is lower than the Accrued Professional Compensation of such Professional, the difference shall be promptly paid to the Professional.

On the Effective Date, the Reorganized TSN Debtors shall fund the Holdback Amount Reserve for payment of the Holdback Amount. Upon final allowance by the Bankruptcy Court of the Accrued Professional Compensation, or entry of an earlier order of the Bankruptcy Court granting the release of the Holdback Amount, such amount, less any excess paid in connection with estimated fees and expenses through the Effective Date, shall be paid promptly and directly to the Professionals.

iii.      Post- Effective Date Fees and Expenses

Upon the Effective Date, any requirement that Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Reorganized TSN Debtors may employ and pay any Professional for services rendered or expenses incurred after the Effective Date in the ordinary course of business without any further notice to any party or action (including, without limitation, without the need to file a fee application), order or approval of the Bankruptcy Court.

c.      **Administrative Claim Bar Date**

Except as otherwise provided in this Article II.A of the Plan, requests for payment of Administrative Claims must be filed and served on the Reorganized TSN Debtors pursuant to the procedures specified in the Confirmation Order and the notice of entry of the Confirmation Order no later than 45 days after the Effective Date. Holders of Administrative Claims that are required to, but do not, file and serve a request for payment of such Administrative Claims by such date shall be forever barred, estopped and enjoined from asserting such Administrative Claims against the TSN Debtors or Reorganized TSN Debtors or their property and such Administrative Claims shall be deemed discharged as of the Effective Date. Objections to such requests, if any, must be filed and served on the Reorganized TSN Debtors and the requesting party no later than 90 days after the Effective Date. Notwithstanding the foregoing, no request for payment of an Administrative Claim need be filed with respect to an Administrative Claim previously Allowed by Final Order, including all Administrative Claims expressly Allowed under the Plan.

*(ii)*      ***DIP Claims***

On the Effective Date, unless otherwise agreed to by the DIP Lenders, the DIP Claims shall be paid in full in Cash as provided under the DIP Loan Agreement. Upon payment and satisfaction in full of all Allowed DIP Claims, all liens and security interests granted to secure such obligations shall be terminated and immediately released and the DIP Lenders shall execute and deliver to the Reorganized TSN Debtors such instruments of release,

satisfaction and/or assignments (in recordable form) as may be reasonably requested by the Reorganized TSN Debtors.

### (iii) *U.S. Trustee Fees*

On the Effective Date, the TSN Debtors shall pay all U.S. Trustee Fees that are due and owing on the Effective Date.

### (iv) *Priority Tax Claims*

Each holder of an Allowed Priority Tax Claim due and payable on or before the Effective Date shall receive, on the Distribution Date, at the option of the TSN Debtors (which option shall be reasonably satisfactory to the Plan Sponsor), one of the following treatments, in complete satisfaction of such Allowed Priority Tax Claim: (1) Cash in an amount equal to the amount of such Allowed Priority Tax Claim; (2) Cash in an aggregate amount of such Allowed Priority Tax Claim payable in installment payments over a period of time not to exceed five years after the Petition Date, pursuant to section 1129(a)(9)(C) of the Bankruptcy Code; or (3) such other treatment as may be agreed upon by such holder and the TSN Debtors or otherwise determined upon an order of the Bankruptcy Court.

## B.  CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

### (i) *General Rule of Classification*

(a) Pursuant to section 1122 of the Bankruptcy Code, set forth below is a designation of Classes of Claims against and Interests in the TSN Debtors.  A Claim or Interest is placed in a particular Class only to the extent that the Claim or Interest falls within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest falls within the description of such other Classes.  A Claim or Interest is also placed in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim or Interest is an Allowed Claim in that Class and such Claim or Interest has not been paid, released, or otherwise settled prior to the Effective Date.

(b) The TSN Debtors shall be treated as if they were consolidated solely for Plan voting, confirmation and distribution purposes as described in Article VII of the Plan; provided, however, that if any Class of Impaired Claims votes to reject the Plan, the TSN Debtors' ability to confirm the Plan with respect to such rejecting Class pursuant to the cramdown standards of section 1129(b) of the Bankruptcy Code will be determined by reference to the treatment to which the holders of Claims in such Class would be entitled were (i) their Claims limited to the specific TSN Debtor(s) that are liable for such Claims, and (ii) the TSN Debtors not treated as consolidated for distribution and confirmation purposes.  This limited consolidation treatment is designed to consensually pool the assets and liabilities of the TSN Debtors solely to implement the settlements and compromises reached by the primary constituencies in the TSN Debtors' Chapter 11 Cases.

### (ii) *Summary of Classification*

The following chart represents the general classification of Claims and Interests against the TSN Debtors pursuant to the Plan:

| Class | Claim | Status | Voting Rights |
|---|---|---|---|
| 1 | Other Priority Claims | Unimpaired | No (deemed to accept) |
| 2 | Other Secured Claims | Unimpaired | No (deemed to accept) |
| 3 | Senior Secured Notes Claims | Impaired | Yes |
| 4 | PMCA Claims | Unimpaired | No (deemed to accept) |
| 5 | Senior Exchangeable Notes Claims | Impaired | Yes |
| 6 | Other Unsecured Claims | Impaired | Yes |

| Class | Claim | Status | Voting Rights |
|-------|-------|--------|---------------|
| 7 | Unsecured Convenience Claims | Impaired | Yes |
| 8 | Equity Interests | Impaired | No (deemed to reject) |

*(iii)*     ***Treatment of Claims and Interests***

      **a.**     **Class 1 – Other Priority Claims**

         *i.*     *Classification*:  Class 1 consists of Other Priority Claims.

         *ii.*     *Treatment*:  Except to the extent that a holder of an Allowed Other Priority Claim (i) has been paid by the TSN Debtors, in whole or in part, prior to the Effective Date or (ii) agrees to a less favorable treatment, each holder of an Allowed Other Priority Claim shall receive, on the Initial Distribution Date and in full satisfaction, settlement, release, and discharge of, and in exchange for such Other Priority Claim, Cash in the full amount of such Allowed Other Priority Claim.

         *iii.*     *Voting*:  Class 1 is Unimpaired, and the holders of Other Priority Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, holders of Other Priority Claims are not entitled to vote to accept or reject the Plan.

      **b.**     **Class 2 – Other Secured Claims**

         *i.*     *Classification:*  Class 2 consists of Other Secured Claims.  Although all Other Secured Claims have been placed in one Class for the purposes of nomenclature, each Other Secured Claim, to the extent secured by a Lien on any property or interest in property of the TSN Debtors different than that securing any other Other Secured Claims, shall be treated as being in a separate sub-Class for the purpose of receiving distributions under the Plan.

         *ii.*     *Treatment:*  On the Initial Distribution Date, except to the extent that a holder of an Allowed Other Secured Claim agrees to a less favorable treatment, at the option of the TSN Debtors or the Reorganized TSN Debtors (which option shall be reasonably satisfactory to the Plan Sponsor), (i) each Allowed Other Secured Claim shall be reinstated and Unimpaired in accordance with section 1124(2) of the Bankruptcy Code, or (ii) each holder of an Allowed Other Secured Claim shall receive, in full satisfaction, settlement, release, and discharge of, and in exchange for, such Other Secured Claim, either (w) Cash in the full amount of such Allowed Other Secured Claim, including any postpetition interest accrued pursuant to section 506(b) of the Bankruptcy Code, (x) the proceeds of the sale or disposition of the collateral securing such Allowed Other Secured Claim to the extent of the value of the holder's secured interest in such collateral, (y) the collateral securing such Allowed Other Secured Claim and any interest on such Allowed Other Secured Claim required to be paid pursuant to section 506(b) of the Bankruptcy Code, or (z) such other distribution as necessary to satisfy the requirements of section 1129 of the Bankruptcy Code.

          *iii.*    *Voting:* Class 2 is Unimpaired, and the holders of Other Secured Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, holders of Other Secured Claims are not entitled to vote to accept or reject the Plan.

**c.**    **Class 3 – Senior Secured Notes Claims**

    *i.*    *Classification:* Class 3 consists of the Senior Secured Notes Claims.

    *ii.*    *Treatment:* Each holder of an allowed Senior Secured Notes Claim shall receive its Pro Rata share of the Class 3 Distribution. *"Class 3 Distribution"* means (i) 97% of the New Common Stock, and (ii) with respect to holders of Class 3 Claims that become Allowed Claims on or before the Subscription Record Date only, Rights to purchase 97% of the Rights Offering Preferred Stock.

    *iii.*    *Voting:* Holders of Senior Secured Notes Claims are Impaired. Therefore, each holder of a Senior Secured Notes Claim is entitled to vote to accept or reject the Plan.

**d.**    **Class 4 – PMCA Claims**

    *i.*    *Classification:* Class 4 consists of the PMCA Claims.

    *ii.*    *Treatment:* The PMCA Claims will be reinstated pursuant to section 1124 of the Bankruptcy Code.

    *iii.*    *Voting:* Class 4 is Unimpaired, and the holders of PMCA Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, holders of PMCA Claims are not entitled to vote to accept or reject the Plan.

**e.**    **Class 5 – Senior Exchangeable Notes Claims**

    *i.*    *Classification:* Class 5 consists of the Senior Exchangeable Notes Claims.

    *ii.*    *Treatment:* Each holder of a Senior Exchangeable Notes Claim shall receive, on the Initial Distribution Date, its Pro Rata share of the Class 5 Distribution. *"Class 5 Distribution"* means (i) at least 1% but no more than 3% of the New Common Stock, and (ii) with respect to holders of Class 5 Claims that become Allowed Claims on or before the Subscription Record Date only, Rights to purchase at least 1% but no more than 3% of the Rights Offering Preferred Stock.[41]

    *iii.*    *Voting:* Holders of Senior Exchangeable Notes Claims are Impaired. Therefore, each holder of a Senior Exchangeable Notes Claim is entitled to vote to accept or reject the Plan.

---

[41] Exact percentages to be determined and disclosed prior to the Disclosure Statement hearing.

**f.** **Class 6 – Other Unsecured Claims**

    *i.*      *Classification:* Class 6 consists of the Other Unsecured Claims.

    *ii.*      *Treatment:* Unless such holder has made a Convenience Class Election, each holder of an Allowed Other Unsecured Claim shall receive its Pro Rata share of the Class 6 Distribution. *"Class 6 Distribution"* means (i) 3% of the New Common Stock <u>minus</u> any amount of New Common Stock distributed pursuant to the Class 5 Distribution, and (ii) with respect to holders of Class 6 Claims that become Allowed Claims on or before the Subscription Record Date only, Rights to purchase 3% of the Rights Offering Preferred Stock <u>minus</u> any Rights to purchase Rights Offering Preferred Stock distributed pursuant to the Class 5 Distribution.[42]

    *iii.*      *"Convenience Class Election"* means each holder of an Allowed Class 6 Claim in an amount in excess of $25,000 may elect to be treated as a holder of an Unsecured Convenience Claim in Class 7 by electing to reduce its Class 6 Claim to the amount of $25,000 in full and final satisfaction, release, and discharge of such Allowed Class 6 Claim (such election, a "Convenience Class Election"). Except as may be agreed to by the TSN Debtors, any Convenience Class Election must be made on the Ballot and no Holder of a Class 6 Claim can make a Convenience Class Election after the Voting Deadline. Upon any Convenience Class Election, the Class 6 Claim of the applicable holder shall be automatically reduced to $25,000 and shall no longer be entitled to any other distribution as contemplated by the Plan.

    *iv.*      *Voting:* Holders of Other Unsecured Claims are Impaired. Therefore, each holder of an Other Unsecured Claim is entitled to vote to accept or reject the Plan.

**g.** **Class 7 – Unsecured Convenience Claims**

    *i.*      *Classification:* Class 7 consists of Unsecured Convenience Claims.

    *ii.*      *Treatment:* Each holder of an Allowed Unsecured Convenience Claim shall receive Cash in an amount equal to the lesser of: (i) 10% of such holders' Unsecured Convenience Claim; and (ii) such holder's Pro Rata share of $500,000.

    *iii.*      *Voting:* Class 7 is Impaired by the Plan. Therefore, each holder of an Unsecured Convenience Claim is entitled to vote to accept or reject the Plan.

**h.** **Class 8 – Equity Interests in TSN**

    *i.*      *Classification:* Class 8 consists of all Equity Interests.

---

[42] Exact percentages to be determined and disclosed prior to the Disclosure Statement hearing.

ii. *Treatment:* On the Effective Date, all Equity Interests shall be deemed cancelled and shall be of no further force and effect, whether surrendered for cancellation or otherwise, and there shall be no distribution to the holders of Equity Interests.

iii. *Voting:* Class 8 is Impaired, and the holders of Equity Interests are conclusively presumed to have rejected the Plan. Therefore, holders of Equity Interests are not entitled to vote to accept or reject the Plan.

## C. ACCEPTANCE REQUIREMENTS

*(i)* *Acceptance or Rejection of the Plan*

### a. Voting Class

Classes 3, 5, 6 and 7 are Impaired under the Plan and are receiving property under the Plan. Therefore, such Classes are entitled to vote to accept or reject the Plan.

### b. Presumed Acceptance of the Plan

Classes 1, 2, and 4 are Unimpaired under the Plan and are, therefore, conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.

*(ii)* *Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code*

Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation by acceptance of the Plan by an Impaired Class of Claims. The TSN Debtors shall seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Interests. The TSN Debtors reserve the right to modify the Plan in accordance with Article XI of the Plan to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification.

## D. MEANS FOR IMPLEMENTATION OF THE PLAN

*(i)* *Limited Consolidation for Voting, Confirmation and Distribution Purposes*

The Plan provides for substantive consolidation of the TSN Debtors' Estates, but solely for purposes of voting, confirmation, and making distributions to the holders of Allowed Claims under the Plan. On the Effective Date, and solely for purposes of voting, confirmation, and making distributions to the holders of Allowed Claims under the Plan: (a) all guarantees of any TSN Debtor of the payment, performance or collection of another TSN Debtor with respect to Claims against such TSN Debtor will be eliminated and cancelled; (b) any single obligation of multiple TSN Debtors will be treated as a single obligation in the consolidated Chapter 11 Cases; and (c) all guarantees by a TSN Debtor with respect to Claims against one or more of the other TSN Debtors will be treated as a single obligation in the consolidated Chapter 11 Cases. On the Effective Date, and in accordance with the terms of the Plan and the consolidation of the assets and liabilities of the TSN Debtors, all Claims based upon guarantees of collection, payment, or performance made by a TSN Debtor as to the obligation of another TSN Debtor shall be released and of no further force and effect. Except as set forth in this Article V.A.1, such substantive consolidation shall not affect (a) the legal and corporate structure of the Reorganized TSN Debtors, or (b) any obligations under any leases or contracts assumed in the Plan or otherwise after the Petition Date.

Such election to treat the Estates as if they were consolidated solely for the purpose of implementing the Plan shall not affect: (1) the legal and corporate structures of the TSN Debtors, subject to the right of the TSN Debtors to effect the Restructuring Transactions contemplated pursuant to the Plan; (2) any obligations under any contracts or leases that were entered into during the Chapter 11 Cases or Executory Contracts and unexpired leases that have been or will be assumed pursuant to the Plan; (3) Intercompany Interests; (4) distributions from any insurance policies or proceeds of such policies; (5) the revesting of assets in the separate Reorganized TSN Debtors pursuant to Article V.N of the Plan. In addition, such election to treat the Estates as consolidated for the purpose of

implementing the Plan will not constitute a waiver of the mutuality requirement for setoff under section 553 of the Bankruptcy Code, except to the extent otherwise expressly waived by the TSN Debtors.

*(ii)* ***Intercompany Claims***

Each Allowed Intercompany Claim shall be reinstated on the Effective Date, except as otherwise determined to by the TSN Debtors with the reasonable consent of the Plan Sponsor. After the Effective Date, the Reorganized TSN Debtors shall have the right to resolve or compromise Disputed Intercompany Claims without approval of the Bankruptcy Court.

*(iii)* ***Sources of Consideration for Plan Distributions***

All Cash consideration necessary for the TSN Debtors or the Reorganized TSN Debtors, as applicable, to make payments or distributions pursuant hereto shall be obtained from the Rights Offering (and the Backstop Party's purchase of the Overallotment, if applicable) or other Cash on hand, including Cash derived from business operations.

*(iv)* ***Issuance of New Securities and Debt Instruments***

**a.        Issuance of New Common Stock**

On the Effective Date, TSN shall issue the New Common Stock to the Holders of Claims entitled thereto.

**b.        Issuance of New Preferred Stock**

On the Effective Date, the Reorganized TSN Debtor shall issue the New Preferred Stock, on such terms and conditions as set forth in the New Preferred Stock Certificate of Designation. The New Preferred Stock will have the same economic and voting rights as the Common Stock on an "as converted" basis; provided that the New Preferred Stock shall be entitled to a liquidation preference set forth in the New Preferred Stock Certificate of Designation.

**c.        New Shareholders Agreement**

The holders of the New Common Stock and New Preferred Stock shall be parties to the New Shareholders Agreement. As of the Effective Date, and as a condition to receiving any distribution of New Common Stock or New Preferred Stock, holders of Claims or Interests that receive the New Common Stock or New Preferred Stock shall be deemed bound by the New Shareholders Agreement.

*(v)* ***The Rights Offering***

**a.        General Description**

Pursuant to the Rights Offering, TSN will offer and sell the Rights Offering Preferred Stock. The Rights Offering Preferred Stock shall be subject to the New Preferred Stock Certificate of Designation.

**b.        Rights Offering Procedures**

Each holder of Rights will be entitled to exercise such Rights in order to subscribe for and acquire their Pro Rata share of the Rights Offering Preferred Stock, calculated before issuing Additional Shares of New Preferred Stock in connection with payment of the Backstop Commitment Fee and, if exercised, the Overallotment. The Rights Offering will be consummated pursuant to the Rights Offering Procedures.

**c.        The Backstop Commitment and Overallotment**

Pursuant to the terms of the EPCA, and subject to the terms thereof, in order to facilitate the Rights Offering and implementation of the Plan, the Backstop Party has agreed to purchase, and TSN has agreed to sell and

issue to the Backstop Party, at the Discount Purchase Price: (a) [_____] shares of Rights Offering Preferred Stock, and (b) any Unsubscribed Shares, up to the Backstop Amount in accordance with and subject to the terms and conditions of the EPCA. To the extent that there are Non-Backstopped Shares, participants in the Rights Offering may, subject to a right of first refusal of the Backstop Party with respect to the Non-Backstopped Shares, elect to purchase the Non-Backstopped Shares on a Pro Rata basis. In addition, the Backstop Party shall have the option to purchase the Overallotment at the Discount Purchase Price pursuant to the EPCA. On the Effective Date, in accordance with the Backstop Approval Order, (i) the TSN Debtors will pay to the Backstop Party the Transaction Expenses and (ii) the Backstop Party will receive the Backstop Commitment Fee and be entitled to the Backstop Indemnification Obligations. The Backstop Commitment Fee will be payable in Additional Shares of New Preferred Stock equal to 3% of the Backstop Amount; _provided_, _however_, that pursuant to the EPCA to the extent that the Plan is not consummated, the Backstop Commitment Fee will be payable in Cash.

*(vi)* **Cancellation of Securities and Agreements**

On the Effective Date, except as otherwise specifically provided for in the Plan: (1) the obligations of the TSN Debtors under the Senior Secured Notes Security Agreement and the Indentures, and any other certificate, share, note, bond, indenture, purchase right, option, warrant or other instrument or document directly or indirectly evidencing or creating any indebtedness or obligation of or ownership interest in the TSN Debtors giving rise to any Claim or Interest (except such certificates, notes or other instruments or documents evidencing indebtedness or obligations of the TSN Debtors that are specifically reinstated pursuant to the Plan), shall be cancelled as to the TSN Debtors, and the Reorganized TSN Debtors shall not have any continuing obligations thereunder and (2) the obligations of the TSN Debtors pursuant, relating or pertaining to any agreements, indentures, certificates of designation, bylaws or certificate or articles of incorporation or similar documents governing the shares, certificates, notes, bonds, purchase rights, options, warrants or other instruments or documents evidencing or creating any indebtedness or obligation of the TSN Debtors (except such agreements, certificates, notes or other instruments evidencing indebtedness or obligations of the TSN Debtors that are specifically reinstated or assumed pursuant to the Plan) shall be released and discharged; _provided_, _however_, notwithstanding Confirmation or the occurrence of the Effective Date, any such indenture or agreement that governs the rights of the holder of a Claim shall continue in effect solely for purposes of (a) allowing holders of Senior Secured Notes Claims and Senior Exchangeable Notes Claims (as applicable) to receive distributions under the Plan, (b) allowing the Indenture Trustees, if applicable, to make distributions under the Plan, and deduct therefrom such compensation, reasonable fees and expenses due thereunder or incurred in making such distributions and (c) allowing the Indenture Trustees to seek compensation and/or reimbursement of reasonable fees and expenses in accordance with the terms of the Indentures and the Plan; _provided further_, _however_, that the preceding proviso shall not affect the discharge of Claims or Interests pursuant to the Bankruptcy Code, the Confirmation Order or the Plan, or result in any expense or liability to the Reorganized TSN Debtors, except to the extent set forth in or provided for under the Plan. On and after the Effective Date, all duties and responsibilities of the Indenture Trustees under the Indentures, as applicable, shall be discharged except to the extent required in order to effectuate the Plan.

*(vii)* **Exemptions for Issuance of New Equity**

The issuance of the New Common Stock, the New Preferred Stock, including the Rights Offering Preferred Stock and the Additional Shares (and the issuance of any common stock of Reorganized TSN upon conversion of the New Preferred Stock) shall be authorized and exempt from registration under the securities laws pursuant to, as applicable, section 1145 of the Bankruptcy Code, section 4(2) of the Securities Act of 1933, as amended, and/or other applicable laws, as of the Effective Date without further act or action by any person, unless required by provision of the relevant corporate documents or applicable law, regulation, order or rule; and all documents evidencing the same shall be executed and delivered as provided for in the Plan or the Plan Supplement.

*(viii)* **Corporate Existence**

Subject to any Restructuring Transaction and except as otherwise provided in the Plan, in the New Corporate Governance Documents or elsewhere in the Plan Supplement, each Debtor, as Reorganized, shall continue to exist after the Effective Date as a separate corporate entity, limited liability company, partnership or other form, as the case may be, with all the powers of a corporation, limited liability company, partnership or other form, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is

incorporated or formed. The Corporate Governance Documents shall be substantially in the form filed with the Plan Supplement.

### (ix) New Certificate of Incorporation and New By-Laws

On or as soon as reasonably practicable after the Effective Date, each of the Reorganized TSN Debtors will file their respective New Certificates of Incorporation with the applicable Secretaries of State and/or other applicable authorities in their respective states of incorporation in accordance with the corporate laws of the respective states of incorporation. After the Effective Date, each of the Reorganized TSN Debtors may amend and restate their respective New Certificates of Incorporation and New By-Laws and other constituent documents as permitted by the laws of their respective states of incorporation and their respective New Certificates of Incorporation and New By-Laws.

### (x) Reorganized TSN Debtors' Boards of Directors

To the extent known, the identity of the members of the New Boards of each of the Reorganized TSN Debtors will be identified in the Plan Supplement.

### (xi) Officers of Reorganized TSN Debtors

To the extent known, officers of each of the other Reorganized TSN Debtors shall be identified in the Plan Supplement. Such officers shall serve in accordance with applicable non-bankruptcy law and, to the extent applicable, the New Employment Agreements.

### (xii) Employee Benefits

Except as otherwise provided in the Plan, on and after the Effective Date, the Reorganized TSN Debtors may: (1) honor, in the ordinary course of business, any contracts, agreements, policies, programs and plans for, among other things, compensation (other than equity based compensation related to Interests), health care benefits, disability benefits, deferred compensation benefits, travel benefits, savings, severance benefits, retirement benefits, welfare benefits, workers' compensation insurance and accidental death and dismemberment insurance for the directors, officers and employees of any of the TSN Debtors who served in such capacity at any time and (2) honor, in the ordinary course of business, Claims of employees employed as of the Effective Date for accrued vacation time arising before the Petition Date; provided, however, that the TSN Debtors' or Reorganized TSN Debtors' performance under any employment agreement will not entitle any person to any benefit or alleged entitlement under any policy, program or plan that has expired or been terminated before the Effective Date, or restore, reinstate or revive any such benefit or alleged entitlement under any such policy, program or plan. Nothing in the Plan shall limit, diminish or otherwise alter the Reorganized TSN Debtors' defenses, claims, Causes of Action or other rights with respect to any such contracts, agreements, policies, programs and plans.

### (xiii) Vesting of Assets in the Reorganized TSN Debtors

Except as otherwise provided in the Plan or any agreement, instrument or other document incorporated therein, on the Effective Date any and all property in each Estate and all Causes of Action (except those released pursuant to the Releases by the TSN Debtors) shall vest in each respective Reorganized TSN Debtor, free and clear of all Liens, Claims, charges or other encumbrances. On and after the Effective Date, except as otherwise provided in the Plan, each Reorganized TSN Debtor may operate its business and may use, acquire or dispose of property and compromise or settle any Claims, Interests or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

### (xiv) Restructuring Transactions

On the Effective Date or as soon as reasonably practicable thereafter, the Reorganized TSN Debtors may enter into the Restructuring Transactions and may take all actions as may be necessary or appropriate to effect a restructuring of their respective businesses or the overall organizational structure of the Reorganized TSN Debtors. The Restructuring Transactions may include one or more mergers, consolidations, restructurings, conversions,

dissolutions, transfers or liquidations as may be reasonably determined by (i) the TSN Debtors, with the reasonable consent of the Plan Sponsor or (ii) the Reorganized TSN Debtors to be necessary or appropriate. The actions to effect the Restructuring Transactions may include: (1) the execution and delivery of appropriate agreements or other documents of merger, consolidation, restructuring, conversion, disposition, transfer, dissolution or liquidation containing terms that are consistent with the terms of the Plan and that satisfy the applicable requirements of applicable law and any other terms to which the applicable Entities may agree; (2) the execution and delivery of appropriate instruments of transfer, assignment, assumption or delegation of any asset, property, right, liability, debt or obligation on terms consistent with the terms of the Plan and having other terms for which the applicable parties agree; (3) the filing of appropriate certificates or articles of incorporation or amendments thereof, reincorporation, merger, consolidation, conversion or dissolution pursuant to applicable state law; and (4) all other actions that the applicable Entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law in connection with the Restructuring Transactions. In the event a Restructuring Transaction is a merger transaction, upon the consummation of such Restructuring Transaction, each party to such merger shall cease to exist as a separate corporate entity and thereafter the surviving Reorganized TSN Debtor shall assume and perform the obligations of each Reorganized TSN Debtor under the Plan. In the event a Reorganized TSN Debtor is liquidated, the Reorganized TSN Debtors (or the Reorganized TSN Debtor which owned the stock in such liquidating Debtor prior to such liquidation) shall assume and perform such obligations. Implementation of the Restructuring Transactions shall not affect the distributions under the Plan.

*(xv)* **Intercompany Interests**

Subject to any Restructuring Transaction, in order to implement the Plan, at the option of the Reorganized TSN Debtors (with the reasonable consent of the Plan Sponsor), Intercompany Interests shall either (i) be retained, in which case the Debtor holding such Intercompany Interest shall continue to hold such Interest and the legal, equitable and contractual rights to which the holders of such Intercompany Interests are entitled shall remain unaltered or (ii) be cancelled and new Intercompany Interests in the applicable Other Debtor shall be issued pursuant to the Plan to the Reorganized TSN Debtor that holds such Intercompany Interests.

*(xvi)* **Corporate Action**

Upon the Effective Date, all actions contemplated by the Plan shall be deemed authorized and approved in all respects, including (1) entry into the New Employment Agreements; (2) selection of the directors and officers of the Reorganized TSN Debtors; (3) the distribution of the New Common Stock as provided in the Plan; and (4) all other actions contemplated by the Plan (whether to occur before, on or after the Effective Date). All matters provided for in the Plan involving the corporate structure of the TSN Debtors or the Reorganized TSN Debtors, and any corporate action required by the TSN Debtors or the Reorganized TSN Debtors in connection with the Plan shall be deemed to have occurred and shall be in effect, without any requirement of further action by the directors or officers of the TSN Debtors or the Reorganized TSN Debtors.

On or (as applicable) before the Effective Date, the appropriate officers of the TSN Debtors or the Reorganized TSN Debtors, as applicable, shall be authorized and directed to issue, execute and deliver the agreements, documents, securities, certificates of incorporation, operating agreements and instruments contemplated by the Plan (or necessary or desirable to effect the transactions contemplated by the Plan) in the name of and on behalf of the Reorganized TSN Debtors, including any and all agreements, documents, securities and instruments relating to the foregoing. The authorizations and approvals contemplated by this Article V.O of the Plan shall be effective notwithstanding any requirements under non-bankruptcy law.

*(xvii)* **Effectuating Documents; Further Transactions**

On and after the Effective Date, the Reorganized TSN Debtors and the managers, officers and members of the boards of directors thereof are authorized to issue, execute, deliver, file or record such contracts, securities, instruments, releases and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement and further evidence the terms and conditions of the Plan and the securities issued pursuant to the Plan in the name of and on behalf of the Reorganized TSN Debtors, without the need for any approvals, authorization or consents except for those expressly required pursuant to the Plan.

*(xviii)    General Settlement of Claims and Interests*

### a.    Settlement Generally

As discussed in detail in the Disclosure Statement and as otherwise provided in the Plan, as one element of, and in consideration for, an overall negotiated settlement of disputed Claims and issues embodied in the Plan, pursuant to Bankruptcy Rule 9019 and section 1123 of the Bankruptcy Code and in consideration for the classification, distributions, releases and other benefits provided under the Plan, the provisions of the Plan constitute a good faith compromise and settlement of all Claims, Interests and controversies resolved pursuant to the Plan, including, without limitation, the settlement of issues arising from or related to [____].  Pursuant to Rule 408 of the Federal Rules of Evidence, the Plan, the Disclosure Statement, the Plan Support Agreement (and any exhibits or supplements relating to the foregoing) and all negotiations relating thereto shall not be admissible into evidence in any proceeding unless and until the Plan in consummated, and then only in accordance with the Plan.  In the event the Plan is not consummated, provisions of the Plan, the Disclosure Statement, the Plan Support Agreement (and any exhibits or supplements relating to the foregoing) and all negotiations relating thereto shall not be binding or probative.  Subject to Article VII of the Plan, all distributions made to Holders of Allowed Claims and Interests in any Class are intended to be and shall be final and indefeasible.

### b.    Allocation of Distribution to holders of Senior Exchangeable Notes Claims

The allocation of the distribution proposed to be provided under the Plan to holders of Senior Exchangeable Notes Claims reflects an overall negotiated compromise and settlement with respect to such Claims.  Specifically, the allocation reflects the fact that the Senior Exchangeable Notes are structurally senior to Other Unsecured Claims due to the ability of the holders of Senior Exchangeable Notes to assert Claims at TerreStar License Inc. and TerreStar National Services Inc. based on their respective guarantees of the Senior Exchangeable Notes.

*(xix)    Section 1146 Exemption from Certain Taxes and Fees*

Pursuant to section 1146(a) of the Bankruptcy Code, any transfers of property in contemplation of, in connection with, or pursuant to the Plan shall not be subject to any stamp tax or other similar tax or governmental assessment in the United States or Canada, and the Confirmation Order shall direct and be deemed to direct the appropriate state or local governmental officials or agents to forgo the collection of any such tax or governmental assessment and to accept for filing and recordation instruments or other documents pursuant to such transfers of property without the payment of any such tax or governmental assessment.  Such exemption specifically applies, without limitation, to (1) the creation of any mortgage, deed of trust, lien or other security interest; (2) the making or assignment of any lease or sublease; (3) any restructuring transaction authorized by Article V.O of the Plan; or (4) the making or delivery of any deed or other instrument of transfer under, in furtherance of or in connection with the Plan, including: (a) any merger agreements; (b) agreements of consolidation, restructuring, disposition, liquidation or dissolution; (c) deeds; or (d) assignments executed in connection with any transaction occurring under the Plan.

*(xx)    D&O Liability Insurance Policies and Indemnification Provisions*

Notwithstanding anything in the Plan to the contrary, as of the Effective Date, the D&O Liability Insurance Policies shall be deemed to be, and shall be treated as though they are, executory contracts and the TSN Debtors shall assume (and assign to the Reorganized TSN Debtors if necessary to continue the D&O Liability Insurance Policies in full force) all of the D&O Liability Insurance Policies pursuant to section 365(a) of the Bankruptcy Code. Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the TSN Debtors' foregoing assumption of each of the D&O Liability Insurance Policies.  On or before the Effective Date, the Reorganized TSN Debtors shall obtain tail coverage under a directors' and officers' liability insurance policy for the current and former directors, officers and managers of the TSN Debtors for a period of five years, and placed with such insurers, the terms of which shall be set forth in the Plan Supplement.

As of the Effective Date, the directors, officers, members, attorneys, employees and other agents of the TSN Debtors who served the TSN Debtors prior to (but not on or after) the Effective Date shall be entitled to the full benefit of any applicable Indemnification Provisions; *provided*, that any claims by such directors, officers, members,

attorneys, employees or other agents relating to or arising out of the Indemnification Provisions shall be deemed to be, and treated as though they are, Other Unsecured Claims against the TSN Debtors. For the avoidance of doubt, the Reorganized TSN Debtors shall have no liability to such directors, officers, members, attorneys, employees or other agents in respect of the Indemnification Provisions.

In addition, on the Effective Date, the New Corporate Governance Documents of the Reorganized TSN Debtors shall contain provisions which (i) eliminate the personal liability of the TSN Debtors' and the Reorganized TSN Debtors' then-present and future directors and officers for post-emergence monetary damages resulting from breaches of their fiduciary duties to the fullest extent permitted by applicable law in the jurisdiction in which the subject Reorganized TSN Debtor is organized; and (ii) require such Reorganized TSN Debtor, subject to appropriate procedures, to indemnify the TSN Debtors' and the Reorganized TSN Debtors' directors, officers, and other key employees (as such key employees are identified by the New Board) serving on or after the Effective Date for all claims and actions to the fullest extent permitted by applicable law in the jurisdiction in which the subject Reorganized TSN Debtor is incorporated or organized.

### (xxi) *Preservation of Rights and Causes of Action*

In accordance with section 1123(b) of the Bankruptcy Code, and except where such Causes of Action have been expressly released (including, for the avoidance of doubt, pursuant to the Releases by the TSN Debtors provided by Article IX.B of the Plan), the Reorganized TSN Debtors shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action, including Causes of Action under chapter 5 of the Bankruptcy Code, whether arising before or after the Petition Date, and the Reorganized TSN Debtors' rights to commence, prosecute or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date. No Entity may rely on the absence of a specific reference in the Plan, the Disclosure Statement, or the Schedule of Retained Causes of Action, to any Cause of Action against them as any indication that the TSN Debtors or Reorganized TSN Debtors, as applicable, will not pursue any and all available Causes of Action against them. No preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise) or laches, shall apply to such retained Causes of Action upon, after or as a consequence of the Confirmation or consummation of the Plan.

### E.     TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

### (i)     *Assumption and Rejection of Executory Contracts and Unexpired Leases*

Except as otherwise provided in the Plan, or in any contract, instrument, release, indenture or other agreement or document entered into in connection with the Plan, each of the TSN Debtors' Executory Contracts and Unexpired Leases shall be deemed assumed as of the Effective Date, unless such Executory Contract or Unexpired Lease: (1) was assumed or rejected previously by the TSN Debtors; (2) expired or terminated pursuant to its own terms before the Effective Date; (3) is the subject of a motion to assume filed on or before the Effective Date; or (4) is identified on the Rejected Executory Contract and Unexpired Lease List.

Entry of the Confirmation Order shall constitute a Bankruptcy Court order approving the assumptions or rejections of such Executory Contracts or Unexpired Leases as set forth in the Plan, all pursuant to sections 365(a) and 1123 of the Bankruptcy Code. The Confirmation Order shall constitute an order of the Bankruptcy Court, approving (i) the assumption and assignment, or rejection, as the case may be, of Executory Contracts and Unexpired Leases, as described above, pursuant to sections 365(a) and 1123(b)(2) of the Bankruptcy Code, (ii) that the Reorganized TSN Debtors had properly provided for the cure of any defaults that might have existed, (iii) that each assumption and assignment was in the best interest of the Reorganized TSN Debtors, their estates, and all parties in interest in the Chapter 11 Cases, and (iv) the requirements for assumption and assignment of any Executory Contract or Unexpired Lease to be assumed had been satisfied. Unless otherwise indicated, all assumptions or rejections of Executory Contracts and Unexpired Leases pursuant to the Plan are effective as of the Effective Date. Each Executory Contract or Unexpired Lease assumed pursuant to the Plan or by Bankruptcy Court order but not assigned to a third party before the Effective Date shall revest in and be fully enforceable by the applicable contracting Reorganized TSN Debtor in accordance with its terms, except as such terms may have been modified by such order. Notwithstanding anything to the contrary in the Plan, the TSN Debtors (with the reasonable consent of the Plan Sponsor) or the Reorganized TSN Debtors, as applicable, reserve the right to alter, amend,

modify or supplement the list of Executory Contracts and Unexpired Leases identified in the Plan Supplement at any time before the Effective Date; provided, that to the extent that, as of the Effective Date, there is any pending dispute between one or more of the TSN Debtors and a counterparty to an Executory Contract or Unexpired Lease regarding such counterparty's Cure Claim, the TSN Debtors and Reorganized TSN Debtors shall reserve the right to add the applicable Executory Contract or Unexpired Lease to the Rejected Executory Contract and Unexpired Lease List following the resolution of such dispute, in which event such Executory Contract or Unexpired Lease shall be deemed rejected and such counterparty shall have any and all rights with respect thereto. After the Effective Date, the Reorganized TSN Debtors shall have the right to terminate, amend or modify any intercompany contracts, leases or other agreements without approval of the Bankruptcy Court.

*(ii)*        ***Cure of Defaults for Executory Contracts and Unexpired Leases Assumed***

Any monetary defaults under each Executory Contract and Unexpired Lease to be assumed pursuant to the Plan shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the default amount in Cash on the Effective Date, subject to the limitations described below, or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree. In the event of a dispute regarding (1) the amount of any payments to cure such a default, (2) the ability of the Reorganized TSN Debtors or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed or (3) any other matter pertaining to assumption, the payment of Cure Claims required by section 365(b)(1) of the Bankruptcy Code shall be made no later than ten (10) business days following the entry of a Final Order or orders resolving the dispute and approving the assumption. At least ten days before the Confirmation Hearing, the TSN Debtors shall distribute, or cause to be distributed, notices of proposed assumption and proposed amounts of Cure Claims to the applicable third parties, which notices shall include procedures for objecting to proposed assumptions of Executory Contracts and Unexpired Leases and any amounts of Cure Claims to be paid in connection therewith and resolution of disputes by the Bankruptcy Court. Any objection by a counterparty to an Executory Contract or Unexpired Lease to a proposed assumption or related Cure Claim amount must be filed, served and actually received by the TSN Debtors at least three days before the Confirmation Hearing. Any counterparty to an Executory Contract or Unexpired Lease that fails to object timely to the proposed assumption or Cure Claim amount will be deemed to have assented to such assumption or cure amount.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time before the effective date of the assumption.

*(iii)*       ***Claims Based on Rejection of Executory Contracts or Unexpired Leases***

All proofs of Claim with respect to Claims arising from the rejection of Executory Contracts and Unexpired Leases, if any, must be filed with the Bankruptcy Court within 30 days after the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection. Any Claims arising from the rejection of Executory Contracts and Unexpired Leases not filed with the Bankruptcy Court within such time will be automatically disallowed, forever barred from assertion and shall not be enforceable against the TSN Debtors or the Reorganized TSN Debtors, the Estates or their property without the need for any objection by the Reorganized TSN Debtors or further notice to, or action, order or approval of the Bankruptcy Court. All Allowed Claims arising from the rejection of the TSN Debtors' Executory Contracts and Unexpired Leases shall be classified as Class 6 Other Unsecured Claims against the applicable Debtor and shall be treated in accordance with Article III of the Plan. The deadline to object to Claims arising from the rejection of Executory Contracts and Unexpired Leases, if any, shall be the later of (a) 180 days following the date on which such Claim was filed and (b) such other period of limitation as may be specifically fixed by an order of the Bankruptcy Court for objecting to such Claims.

*(iv)*       ***Insurance Policies***

Notwithstanding anything in the Plan to the contrary, as of the Effective Date, the TSN Debtors (with the reasonable consent of the Plan Sponsor) shall assume (and assign to the Reorganized TSN Debtors if necessary to continue the Insurance Policies in full force) all of the Insurance Policies pursuant to section 365(a) of the

Bankruptcy Code. Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the TSN Debtors' foregoing assumption of each of the Insurance Policies.

*(v)* ***Modifications, Amendments, Supplements, Restatements or Other Agreements.***

Unless otherwise provided, each Executory Contract or Unexpired Lease that is assumed shall include all modifications, amendments, supplements, restatements or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and all Executory Contracts and Unexpired Leases related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under the Plan.

Modifications, amendments, supplements and restatements to Executory Contracts and Unexpired Leases that have been executed by the TSN Debtors during the Chapter 11 Cases shall not be deemed (unless otherwise agreed by the contract counterparty) to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority or amount of any Claims that may arise in connection therewith.

*(vi)* ***Reservation of Rights.***

Neither the exclusion nor inclusion of any Executory Contract or Unexpired Lease on the Rejected Executory Contract and Unexpired Lease List, nor anything contained in the Plan, shall constitute an admission by the TSN Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that any Reorganized TSN Debtor has any liability thereunder. If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the TSN Debtors or Reorganized TSN Debtors, as applicable, shall have 45 days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.

*(vii)* ***Contracts and Leases Entered Into After the Petition Date.***

Contracts and leases entered into after the Petition Date by any TSN Debtor, including any Executory Contracts and Unexpired Leases assumed by such Debtor, will be performed by the Debtor or Reorganized TSN Debtor liable thereunder in the ordinary course of its business. Accordingly, such contracts and leases (including any assumed Executory Contracts and Unexpired Leases) will survive and remain unaffected by entry of the Confirmation Order, unless the parties thereto agree to any modifications, amendments, supplements or restatements.

### F. PROVISIONS GOVERNING DISTRIBUTIONS

*(i)* ***Record Date for Distributions***

As of the entry of the Confirmation Order, the various transfer registers for each of the Classes of Claims or Interests as maintained by the TSN Debtors or their respective agents shall be deemed closed, and there shall be no further changes made to reflect any new record holders of any Claims or Interests. The TSN Debtors shall have no obligation to recognize any transfer of Claims or Interests occurring on or after the Distribution Record Date.

*(ii)* ***Timing and Calculation of Amounts to Be Distributed***

Except as otherwise provided in the Plan, on the applicable Distribution Date, each holder of an Allowed Claim or Interest against the TSN Debtors shall receive the full amount of the distributions that the Plan provides for Allowed Claims or Interests in the applicable Class and in the manner provided in the Plan. In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date. If and to the extent that there are Disputed Claims, distributions on account of any such Disputed Claims shall be made pursuant to the provisions set forth in Article VIII of the Plan. Except as otherwise provided in the Plan, holders of Claims shall not be entitled to interest,

dividends or accruals on the distributions provided for in the Plan, regardless of whether such distributions are delivered on or at any time after the Effective Date.

*(iii)*    *Fractional Distributions*

No fractions of New Common Stock, New Preferred Stock or Rights shall be distributed. Cash shall not be distributed under the Plan in denominations of less than one cent ($0.01). For purposes of distribution, fractions of New Common Stock, New Preferred Stock or Rights shall be rounded down to the nearest whole number. The Disbursing Agent shall have no obligation to make any distribution of Cash that is less than $10.00.

*(iv)*    *Disbursing Agent*

Except as otherwise provided in the Plan, all distributions under the Plan shall be made by the Reorganized TSN Debtors as Disbursing Agent or such other Entity designated by the Reorganized TSN Debtors as a Disbursing Agent on the Effective Date. If the Disbursing Agent is not one of the Reorganized TSN Debtors, such entity shall obtain a bond or surety for the performance of its duties, and all costs and expenses of procuring any such bond or surety shall be borne by the TSN Debtors or Reorganized TSN Debtors.

*(v)*    *Rights and Powers of Disbursing Agent*

**a.    Powers of the Disbursing Agent**

The Disbursing Agent shall be empowered to: (a) affect all actions and execute all agreements, instruments and other documents necessary to perform its duties under the Plan; (b) make all distributions contemplated hereby; (c) employ professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions of the Plan.

**b.    Expenses Incurred On or After the Effective Date**

Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable fees and expenses incurred by the Disbursing Agent in carrying out its obligations under Article VII of the Plan on or after the Effective Date (including taxes) and any reasonable compensation and expense reimbursement claims (including reasonable attorney fees and expenses) made by the Disbursing Agent related thereto shall be paid in Cash by the Reorganized TSN Debtors in their reasonable discretion.

*(vi)*    *Distributions to Holders of Disputed Claims*

Notwithstanding any provision otherwise in the Plan and except as may be agreed to by the TSN Debtors (with the reasonable consent of the Plan Sponsor) or the Reorganized TSN Debtors, in each case in their sole discretion, and the holder of a Disputed Claim, no partial payments and no partial distributions shall be made with respect to any Disputed Claim until all Disputed Claims held by the holder of such Disputed Claim or Interest have become Allowed Claims or have otherwise been resolved by settlement or Final Order.

*(vii)*    *Delivery of Distributions and Undeliverable or Unclaimed Distributions*

**a.    Delivery of Distributions in General**

Except as otherwise provided in the Plan and subject to Bankruptcy Rule 9010, distributions to holders of Allowed Claims shall be made to holders of record as of the Distribution Record Date by the Disbursing Agent: (a) to the signatory set forth on any of the Proofs of Claim filed by such holder or other representative identified therein (or at the last known addresses of such holder if no Proof of Claim is filed or if the TSN Debtors have been notified in writing of a change of address); (b) at the addresses set forth in any written notices of address changes delivered to the Disbursing Agent after the date of any related Proof of Claim; (c) at the addresses reflected in the Schedules if no Proof of Claim has been filed and the Disbursing Agent has not received a written notice of a change of address; or (d) on any counsel that has appeared in the Chapter 11 Cases on the holder's behalf. Distributions under the Plan

on account of Allowed Claims shall not be subject to levy, garnishment, attachment or like legal process, so that each holder of an Allowed Claim shall have and receive the benefit of the distributions in the manner set forth in the Plan. None of the TSN Debtors, the Reorganized TSN Debtors and the applicable Disbursing Agent shall incur any liability whatsoever on account of any distributions under the Plan except for gross negligence, willful misconduct or fraud.

Except as otherwise provided in the Plan, all distributions to holders of Notes Claims shall be governed by the Notes and the Indentures, and shall be deemed completed when made to the respective Indenture Trustees, who shall in turn make distributions in accordance with the Notes and Indentures.

### b.    Undeliverable Distributions and Unclaimed Property

In the event that any distribution to any holder is returned as undeliverable, no distribution to such holder shall be made unless and until the Disbursing Agent has determined the then current address of such holder, at which time such distribution shall be made as soon as practicable after such distribution has become deliverable or has been claimed to such holder without interest; *provided, however,* that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code and forfeited at the expiration of six months from the applicable Distribution Date. After such date, all "unclaimed property" or interests in property shall revert to the Reorganized TSN Debtors (notwithstanding any applicable federal or state escheat, abandoned or unclaimed property laws to the contrary), and the Claim of any holder to such property or Interest in property shall be discharged and forever barred.

### (viii)    *Hart-Scott-Rodino Compliance*

Any shares of New Common Stock or New Preferred Stock to be distributed under the Plan to any entity required to file a Premerger Notification and Report Form under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, or to meet any similar requirements under applicable non-U.S. law, shall not be distributed until the notification and waiting periods applicable under such law to such entity shall have expired or been terminated.

### (ix)    *Withholding and Reporting Requirements*

In connection with the Plan and all instruments issued in connection therewith, the Disbursing Agent shall comply with all applicable withholding and reporting requirements imposed by any federal, state or local taxing authority, and all distributions under the Plan shall be subject to any such withholding or reporting requirements.

### (x)    *Setoffs*

The TSN Debtors and the Reorganized TSN Debtors may withhold (but not set off except as set forth below) from the distributions called for under the Plan on account of any Allowed Claim an amount equal to any claims, equity interests, rights and Causes of Action of any nature that the TSN Debtors or the Reorganized TSN Debtors may hold against the holder of any such Allowed Claim. In the event that any such claims, equity interests, rights and Causes of Action of any nature that the TSN Debtors or the Reorganized TSN Debtors may hold against the holder of any such Allowed Claim are adjudicated by Final Order or otherwise resolved, the TSN Debtors may, pursuant to section 553 of the Bankruptcy Code or applicable non-bankruptcy law, set off against any Allowed Claim and the distributions to be made pursuant hereto on account of such Allowed Claim (before any distribution is made on account of such Allowed Claim) the amount of any adjudicated or resolved claims, equity interests, rights and Causes of Action of any nature that the TSN Debtors or the Reorganized TSN Debtors may hold against the holder of any such Allowed Claim, but only to the extent of such adjudicated or resolved amount. Neither the failure to effect such a setoff nor the allowance of any Claim under the Plan shall constitute a waiver or release by the TSN Debtors or the Reorganized TSN Debtors of any such claims, equity interests, rights and Causes of Action that the TSN Debtors or the Reorganized TSN Debtors may possess against any such holder, except as specifically provided in the Plan.

*(xi)* *Claims Paid or Payable by Third Parties*

### a. Claims or Interests Paid by Third Parties

The TSN Debtors or the Reorganized TSN Debtors, as applicable, shall reduce in part or in full a Claim or Interest to the extent that the holder of such Claim or Interest receives payment in part or in full on account of such Claim or Interest from a party that is not a TSN Debtor or Reorganized TSN Debtor. To the extent a holder of a Claim or Interest receives a distribution on account of such Claim or Interest and receives payment from a party that is not a TSN Debtor or a Reorganized TSN Debtor on account of such Claim or Interest, such holder shall, within two weeks of receipt thereof, repay or return the distribution to the applicable Reorganized TSN Debtor, to the extent the holder's total recovery on account of such Claim or Interest from the third party and under the Plan exceeds the amount of such Claim or Interest as of the date of any such distribution under the Plan.

### b. Claims Payable by Third Parties

No distributions under the Plan shall be made on account of Allowed insured Claims until the holder of such Allowed insured Claim has exhausted all remedies with respect to the TSN Debtors' Insurance Policies. To the extent that one or more of the TSN Debtors' insurers agrees to satisfy in full a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, such Claim may be expunged without a Claims objection having to be filed and without any further notice to or action, order or approval of the Bankruptcy Court.

### c. Applicability of Insurance Policies

Except as otherwise provided in the Plan, distributions to holders of Allowed Claims shall be in accordance with the provisions of any applicable Insurance Policy. Nothing contained in the Plan shall constitute or be deemed a waiver of any cause of action that the TSN Debtors or any Entity may hold against any other Entity, including insurers under any policies of insurance, nor shall anything contained in the Plan constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

*(xii)* *Postpetition Interest*

Unless expressly provided in the Plan, the Confirmation Order, the DIP Financing Order, or any contract, instrument, release, settlement or other agreement entered into in connection with the Plan, or required by the Bankruptcy Code (including without limitation sections 506(b) and 1129(b) of the Bankruptcy Code), postpetition interest shall not accrue on or after the Petition Date on account of any Claim.

*(xiii)* *Section 506(c) Reservation*

The TSN Debtors and the Reorganized TSN Debtors reserve all rights under section 506(c) of the Bankruptcy Code with respect to any and all Secured Claims, except to the extent waived pursuant to the DIP Financing Order.

*(xiv)* *Single Satisfaction of Claims*

Holders of Allowed Claims may assert such Claims against each Debtor obligated with respect to such Claim, and such Claims shall be entitled to share in the recovery provided for the applicable Class of Claims against each obligated Debtor based upon the full Allowed amount of the Claim. Notwithstanding the foregoing, in no case shall the aggregate value of all property received or retained under the Plan on account of Allowed Claims exceed 100% of the underlying Allowed Claim.

### G. PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED AND DISPUTED CLAIMS

*(i) Prosecution of Objections to Claims*

The TSN Debtors (with the reasonable consent of the Plan Sponsor) or the Reorganized TSN Debtors, as applicable, shall have the exclusive authority to file, settle, compromise, withdraw or litigate to judgment any objections to Claims as permitted under the Plan. From and after the Effective Date, the Reorganized TSN Debtors may settle or compromise any Disputed Claim without approval of the Bankruptcy Court. The TSN Debtors reserve all rights to resolve any Disputed Claim outside the Bankruptcy Court under applicable governing law.

*(ii) Allowance of Claims*

Except as expressly provided in the Plan or in any order entered in the Chapter 11 Cases before the Effective Date (including the Confirmation Order), the Reorganized TSN Debtors after the Effective Date will have and retain any and all rights and defenses held by the TSN Debtors with respect to any Claim as of the Petition Date. All claims of any Entity against any TSN Debtor shall be disallowed unless and until such Entity pays, in full, the amount it owes each such Debtor.

*(iii) Disputed Claims Reserve*

On the Effective Date (or as soon thereafter as is reasonably practicable), the Reorganized TSN Debtors shall deposit in the Disputed Claims Reserve New Common Stock and/or Cash having an aggregate value equal to the aggregate value of the consideration that would have been distributed to the holders of all Disputed Claims as if such Disputed Claims had been Allowed Claims on the Effective Date, with the amount of such Allowed Claims to be determined, solely for the purposes of establishing reserves, to be the lesser of (a) the asserted amount of the Disputed Claims filed with the Bankruptcy Court, or (if no proof of such Claim was filed) scheduled by the TSN Debtors, (b) the amount, if any, estimated by the Bankruptcy Court pursuant to section 502(c) of the Bankruptcy Code pursuant to Article VIII.G of the Plan or (c) the amount otherwise agreed to by the TSN Debtors and the holder of such Disputed Claims for reserve purposes. In any vote by holders of New Common Stock, the New Common Stock held in the Disputed Claims Reserve shall be deemed to have been voted in the same proportions as the New Common Stock that was actually voted.

*(iv) Distributions After Allowance*

On the Distribution Date following the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim becomes a Final Order, the Disbursing Agent shall provide to the holder of such Claim the distribution (if any) to which such holder is entitled under the Plan as of the Effective Date, without any interest to be paid on account of such Claim.

*(v) Distribution of Excess Amounts in the Disputed Claims Reserve*

Any Cash held in the Disputed Claims Reserve after all Disputed Claims have been Allowed or Disallowed shall be transferred by the Disbursing Agent or Reorganized TSN Debtors (as applicable), in a supplemental distribution to the holders of Allowed Claims in accordance with the Plan on a Pro Rata basis. Any New Common Stock held in the Disputed Claims Reserve after all Disputed Claims have been Allowed or Disallowed shall be cancelled.

*(vi) Property Held in the Reserve for Disputed Claims*

Each holder of a Disputed Claim that ultimately becomes an Allowed Claim will have recourse only to the undistributed New Common Stock and/or Cash (if applicable) held in the Disputed Claims Reserve for satisfaction of the distributions to which holders of Allowed Claims are entitled under the Plan, and not to any Reorganized TSN Debtor, their property or any assets previously distributed on account of any Allowed Claim.

*(vii)*     ***Estimation of Claims***

The TSN Debtors (before the Effective Date) or Reorganized TSN Debtors (on or after the Effective Date) may, at any time, and from time to time, request that the Bankruptcy Court estimate any Disputed Claim pursuant to section 502(c) of the Bankruptcy Code regardless of whether an objection was previously filed with the Bankruptcy Court with respect to such Claim, or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including during the pendency of any appeal relating to any such objection. In the event that the Bankruptcy Court estimates any Disputed Claim, that estimated amount will constitute either the Allowed amount of such Claim or a maximum limitation on such Claim against any party or Entity, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on such Claim, the TSN Debtors (before the Effective Date) or the Reorganized TSN Debtors (after the Effective Date), may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim. All of the objection, estimation, settlement and resolution procedures set forth in the Plan are cumulative and not necessarily exclusive of one another. Claims may be estimated and subsequently compromised, objected to, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court.

*(viii)*     ***Deadline to File Objections to Claims***

Any objections to Claims shall be filed on or before the date that is the later of (a) one hundred and eighty (180) days after the Effective Date and (b) the last day of such other period of limitation as may be specifically fixed by an order of the Bankruptcy Court for objecting to certain Claims.

## H.     SETTLEMENT, RELEASE, INJUNCTION AND RELATED PROVISIONS

*(i)*     ***Compromise and Settlement of Claims, Interests and Controversies***

As discussed in detail herein and as otherwise provided in the Plan, pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good faith compromise of all Claims, Interests and controversies relating to the contractual, legal and subordination rights that a holder of a Claim may have with respect to any Allowed Claim or Interest, or any distribution to be made on account of such Allowed Claim or Interest. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the TSN Debtors, their Estates and holders of Claims and Interests and is fair, equitable and reasonable. In accordance with the provisions of the Plan, pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019(a), without any further notice to or action, order or approval of the Bankruptcy Court, after the Effective Date, the Reorganized TSN Debtors may compromise and settle Claims against them and Causes of Action against other Entities.

*(ii)*     ***Releases by the TSN Debtors***

**Pursuant to section 1123(b) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan or the Plan Supplement, for good and valuable consideration, including the contributions of the Released Parties to facilitate the expeditious reorganization of the TSN Debtors and the implementation of the restructuring contemplated by the Plan and the other contracts, instruments, releases, agreements or documents executed and delivered in connection with the Plan, the Released Parties are deemed released and discharged by the TSN Debtors, the Reorganized TSN Debtors and the Estates from any and all claims, obligations, rights, suits, damages, Causes of Action, remedies and liabilities whatsoever, including any derivative claims, asserted or assertable on behalf of the TSN Debtors, whether known or unknown, foreseen or unforeseen, liquidated or unliquidated, fixed or contingent, matured or unmatured, existing or hereinafter arising, in law, equity or otherwise, that the TSN Debtors, the Reorganized TSN Debtors, the Estates or their Affiliates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other Entity, based in whole or in part on any act, omission, transaction, event or other occurrence taking place on or prior to the Effective Date in any way relating to the TSN Debtors, the Released Parties, the Reorganization Cases, the Plan or the Disclosure**

Statement, the EPCA, or related agreements, instruments or other documents, other than Claims or liabilities arising out of or relating to any act or omission of a Released Party that constitutes gross negligence, fraud or willful misconduct, as determined by a Final Order.

*(iii)*     *Releases by Holders of Claims and Interests*

As of the Effective Date, to the fullest extent permissible under applicable law, as such law may be extended or interpreted subsequent to the Effective Date, for good and valuable consideration, including the contributions of the Released Parties to facilitate the expeditious reorganization of the TSN Debtors and the implementation of the restructuring contemplated by the Plan and the other contracts, instruments, releases, agreements or documents executed and delivered in connection with the Plan, each holder of a Claim or an Interest shall be deemed to have conclusively, absolutely, unconditionally, irrevocably and forever, released and discharged the Debtors, TSC, the Reorganized Debtors and the Released Parties from any and all Claims, Interests, obligations, rights, suits, damages, causes of action, remedies and liabilities whatsoever, including any derivative Claims, asserted on behalf of a Debtor, whether known or unknown, foreseen or unforeseen, liquidated or unliquidated, fixed or contingent, matured or unmatured, existing or hereafter arising, in law, equity or otherwise, that such Entity would have been legally entitled to assert (whether individually or collectively), based in whole or in part on any act, omission, transaction, event or other occurrence taking place on or prior to the Effective Date in any way relating to the Debtors, TSC, the Released Parties, the Reorganization Cases, the Plan or the Disclosure Statement, or related agreements, instruments or other documents, other than Claims or liabilities arising out of or relating to any act or omission of a Released Party that constitutes gross negligence, fraud or willful misconduct, as determined by a Final Order; **provided**, that nothing in the Plan shall be deemed a waiver or release of a Releasing Party's right to receive a distribution pursuant to the terms of the Plan.

*(iv)*     *Exculpation*

Except as otherwise specifically provided in the Plan or Plan Supplement, no Exculpated Party shall have or incur, and each Exculpated Party is hereby released and exculpated from, any Exculpated Claim, obligation, cause of action or liability for any Exculpated Claim, except for gross negligence or willful misconduct, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan. The TSN Debtors and the Reorganized TSN Debtors (and each of their respective Affiliates, agents, directors, officers, employees, advisors and attorneys) have, and upon Confirmation of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code with regard to the solicitation and distribution of the Plan securities pursuant to the Plan, and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

*(v)*     *Discharge of Claims and Termination of Interests*

Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan, the distributions, rights and treatment that are provided in the Plan shall be in full and final satisfaction, settlement, release and discharge, effective as of the Effective Date, of all Claims, Interests and causes of action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against and Interests in, the TSN Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities and causes of action that arose before the Effective Date, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h) or 502(i) of the Bankruptcy Code, in each case whether or not: (1) a Proof of Claim or Interest based upon such Claim, debt, right or Interest is filed or deemed filed pursuant to section 501 of the Bankruptcy Code; (2) a Claim or Interest based upon such Claim, debt, right or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (3) the holder of such a Claim or Interest has accepted the Plan. Except as otherwise provided in the Plan, any default by the TSN Debtors or their Affiliates with respect to any Claim or Interest that existed before or on account of the

filing of the Chapter 11 Cases shall be deemed cured on the Effective Date. The Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the Effective Date occurring, except as otherwise expressly provided in the Plan.

*(vi)* *Injunction*

FROM AND AFTER THE EFFECTIVE DATE, ALL ENTITIES ARE PERMANENTLY ENJOINED FROM COMMENCING OR CONTINUING IN ANY MANNER, ANY CAUSE OF ACTION RELEASED OR TO BE RELEASED PURSUANT TO THE PLAN OR THE CONFIRMATION ORDER.

FROM AND AFTER THE EFFECTIVE DATE, TO THE EXTENT OF THE RELEASES AND EXCULPATION GRANTED IN ARTICLE IX OF THE PLAN, THE RELEASING PARTIES SHALL BE PERMANENTLY ENJOINED FROM COMMENCING OR CONTINUING IN ANY MANNER AGAINST THE RELEASED PARTIES AND THE EXCULPATED PARTIES AND THEIR ASSETS AND PROPERTIES, AS THE CASE MAY BE, ANY SUIT, ACTION OR OTHER PROCEEDING, ON ACCOUNT OF OR RESPECTING ANY CLAIM, DEMAND, LIABILITY, OBLIGATION, DEBT, RIGHT, CAUSE OF ACTION, INTEREST OR REMEDY RELEASED OR TO BE RELEASED PURSUANT TO ARTICLE IX OF THE PLAN.

EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THE PLAN, THE PLAN SUPPLEMENT OR RELATED DOCUMENTS, OR FOR OBLIGATIONS ISSUED PURSUANT TO THE PLAN, ALL ENTITIES WHO HAVE HELD, HOLD OR MAY HOLD CLAIMS OR INTERESTS THAT HAVE BEEN RELEASED PURSUANT TO ARTICLE IX.B OR ARTICLE IX.C OF THE PLAN, DISCHARGED PURSUANT TO ARTICLE IX.E OF THE PLAN, OR ARE SUBJECT TO EXCULPATION PURSUANT TO ARTICLE IX.D OF THE PLAN, ARE PERMANENTLY ENJOINED, FROM AND AFTER THE EFFECTIVE DATE, FROM TAKING ANY OF THE FOLLOWING ACTIONS: (1) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (2) ENFORCING, ATTACHING, COLLECTING OR RECOVERING BY ANY MANNER OR MEANS ANY JUDGMENT, AWARD, DECREE OR ORDER AGAINST SUCH ENTITIES ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (3) CREATING, PERFECTING OR ENFORCING ANY ENCUMBRANCE OF ANY KIND AGAINST SUCH ENTITIES OR THE PROPERTY OR ESTATE OF SUCH ENTITIES ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (4) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS RELEASED, SETTLED OR DISCHARGED PURSUANT TO THE PLAN; AND (5) ACTING OR PROCEEDING IN ANY MANNER, IN ANY PLACE WHATSOEVER, THAT DOES NOT CONFORM WITH THE PROVISIONS OF THE PLAN TO THE FULL EXTENT PERMITTED BY APPLICABLE LAW.

THE RIGHTS AFFORDED IN THE PLAN AND THE TREATMENT OF ALL CLAIMS AND INTERESTS IN THE PLAN SHALL BE IN EXCHANGE FOR AND IN COMPLETE SATISFACTION OF ALL CLAIMS AND INTERESTS OF ANY NATURE WHATSOEVER, INCLUDING ANY INTEREST ACCRUED ON CLAIMS FROM AND AFTER THE PETITION DATE, AGAINST THE TSN DEBTORS OR ANY OF THEIR ASSETS, PROPERTY OR ESTATES. ON THE EFFECTIVE DATE, ALL SUCH CLAIMS AGAINST THE TSN DEBTORS SHALL BE FULLY RELEASED AND DISCHARGED, AND THE INTERESTS SHALL BE CANCELLED.

EXCEPT AS OTHERWISE EXPRESSLY PROVIDED FOR IN THE PLAN OR IN OBLIGATIONS ISSUED PURSUANT HERETO FROM AND AFTER THE EFFECTIVE DATE, ALL CLAIMS AGAINST THE TSN DEBTORS SHALL BE FULLY RELEASED AND DISCHARGED, AND ALL INTERESTS SHALL BE CANCELLED, AND THE TSN DEBTORS' LIABILITY WITH RESPECT THERETO SHALL BE EXTINGUISHED COMPLETELY, INCLUDING ANY LIABILITY OF THE KIND SPECIFIED UNDER SECTION 502(G) OF THE BANKRUPTCY CODE.

ALL ENTITIES SHALL BE PRECLUDED FROM ASSERTING AGAINST THE TSN DEBTORS, THE TSN DEBTORS' ESTATES, THE REORGANIZED TSN DEBTORS, EACH OF THEIR RESPECTIVE

SUCCESSORS AND ASSIGNS, AND EACH OF THEIR ASSETS AND PROPERTIES, ANY OTHER CLAIMS OR INTERESTS BASED UPON ANY DOCUMENTS, INSTRUMENTS OR ANY ACT OR OMISSION, TRANSACTION OR OTHER ACTIVITY OF ANY KIND OR NATURE THAT OCCURRED BEFORE THE EFFECTIVE DATE.

*(vii)* **Term of Injunctions or Stays**

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court or any order of the Canadian Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date. All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

*(viii)* **Injunction Against Interference With Plan**

To the fullest extent permitted by applicable law, upon the entry of the Confirmation Order, all of the Releasing Parties shall be enjoined from taking any actions to interfere with the implementation or consummation of the Plan.

*(ix)* **Injunction Related to Releases and Exculpation**

The Confirmation Order shall permanently enjoin the commencement or prosecution by any person or entity, whether directly, derivatively or otherwise, of any Claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action or liabilities released pursuant to the Plan, including but not limited to the claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action or liabilities released in Articles IX.C and IX.D of the Plan.

*(x)* **Protection Against Discriminatory Treatment**

Consistent with section 525 of the Bankruptcy Code and the Supremacy Clause of the U.S. Constitution, all Entities, including Governmental Units, shall not discriminate against the Reorganized TSN Debtors or deny, revoke, suspend or refuse to renew a license, permit, charter, franchise or other similar grant to, condition such a grant to, discriminate with respect to such a grant against, the Reorganized TSN Debtors or another Entity with whom such Reorganized TSN Debtors have been associated, solely because one of the TSN Debtors has been a debtor under chapter 11, has been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases but before the Debtor is granted or denied a discharge) or has not paid a debt that is dischargeable in the Chapter 11 Cases.

*(xi)* **No Consent to Change of Control Required**

To the fullest extent permitted by applicable law, except as otherwise expressly provided by order of the Bankruptcy Court, none of (a) the facts or circumstances giving rise to the commencement of, or occurring in connection with, the Chapter 11 Cases, (b) the issuance of the New Common Stock or New Preferred Stock pursuant to the Plan, or (c) consummation of any other transaction pursuant to the Plan (including, without limitation, the Restructuring Transactions) shall constitute a "change in ownership" or "change of control" (or a change in working control) of, or in connection with, any TSN Debtor requiring the consent of any person other than the TSN Debtors or the Bankruptcy Court.

*(xii)* **Release of Liens**

Except as otherwise provided in the Plan or in any contract, instrument, release or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, all mortgages, deeds of trust, Liens, pledges or other security interests against any property of the Estates shall be fully released and discharged, and all of the right, title and

interest of any holder of such mortgages, deeds of trust, Liens, pledges or other security interests shall revert to the Reorganized TSN Debtor and its successors and assigns. For the avoidance of doubt, all mortgages, deeds of trust, Liens, pledges or other security interests against any property of the Estates shall be fully released and discharged on the Effective Date without any further action of any party, including, but not limited to, further order of the Bankruptcy Court, the Canadian Court or filing updated schedules or statements typically filed pursuant to the Uniform Commercial Code, the Personal Property Security Act (Ontario) or in accordance with any other real or personal property registry system in any of the applicable provinces in Canada; provided, that nothing in the Plan shall be deemed to release the Liens securing the PMCA Claims, which PMCA Claims and Liens are being reinstated hereby.

## I. CONDITIONS PRECEDENT TO CONFIRMATION OF THE PLAN AND THE EFFECTIVE DATE

### (i) Conditions Precedent to Confirmation

It shall be a condition to Confirmation of the Plan that the following provisions, terms and conditions shall have been satisfied or waived pursuant to the provisions of Article X.C of the Plan.

- The Bankruptcy Court shall have entered a Final Order, in form and substance acceptable to the TSN Debtors, approving the Disclosure Statement with respect to the Plan as containing adequate information within the meaning of section 1125 of the Bankruptcy Code.

### (ii) Conditions Precedent to the Effective Date

It shall be a condition to the Effective Date that the following provisions, terms and conditions shall have been satisfied or waived pursuant to the provisions of Article X.C of the Plan.

- The Confirmation Order, in a form reasonably satisfactory to the TSN Debtors and Plan Sponsor, shall be a Final Order.

- The Canadian Court shall have entered an order, in form and substance reasonably acceptable to the TSN Debtors and the Plan Sponsor, recognizing the Bankruptcy Court's entry of the Confirmation Order, and such order shall have become a Final Order.

- The Bankruptcy Court shall have entered one or more orders (which may include the Confirmation Order), in form and substance reasonably acceptable to the TSN Debtors and the Plan Sponsor, authorizing the assumption and rejection of Executory Contracts and Unexpired Leases by the TSN Debtors as contemplated in the Plan, which shall have become Final Orders.

- The Canadian Court shall have entered orders, in form and substance reasonably acceptable to the TSN Debtors and the Plan Sponsor, recognizing the Bankruptcy Court's entry of the orders described in Article X.B.3 of the Plan, and such orders shall have become Final Order.

- The Rights Offering shall have been consummated pursuant to the terms of this Plan, the Rights Offering Procedures, and the EPCA.

- All of the schedules, documents, supplements and exhibits to the Plan shall have been filed in form and substance reasonably acceptable to the TSN Debtors and the Plan Sponsor.

- All actions, documents, certificates, and agreements necessary to implement the Plan, including, without limitation, the New By-Laws, the New Certificate of Incorporation, and the Registration Rights Agreement, shall have been effected or executed and delivered to the required parties and, to the extent required, filed with the applicable governmental units in accordance with applicable laws.

- A decision released by the FCC or a bureau or subdivision thereof (an "***FCC Order***") approving the transfer of control to the Plan Sponsor over the licenses and authorizations held by Debtors, and all other governmental, regulatory and third party licenses, approvals, waivers and/or consents required under applicable law to consummate the transactions contemplated by the Plan, including without limitation the Industry Canada Approval (defined below), shall have been obtained and shall be final and in full force and effect without any condition or requirement that would reasonably be expected to have, individually or in the aggregate, a material impact on the current business operations of the Plan Sponsor. In addition, the FCC shall not have reconsidered the FCC Order on its own motion within 30 days (or, if released by a bureau or other subdivision of the FCC, within 40 days) of its release, and the FCC and the courts will have denied all petitions for reconsideration, applications for review and appeals (collectively, "***Appeals***") of the FCC Order (or of an FCC or court order affirming the FCC Order), or the periods for filing such Appeals have passed and no Appeal has been filed. Moreover, there shall exist no claim, action, suit, investigation, litigation or proceeding, pending or threatened in any court or before any arbitrator or governmental instrumentality, which would prohibit the transactions contemplated by the Plan.

- The prior approval of the Minister of Industry (the "***Industry Canada Approval***") approving the transfer of control of the Canadian Debtors to the Plan Sponsor or, at the option of the Plan Sponsor, the transfer or assignment of the licenses and authorizations held by the TSN Debtors to a party designated by the Plan Sponsor that is eligible to hold such licenses, to the extent required by applicable law, including the licenses and authorizations to consummate the transactions contemplated by the Plan, shall have been obtained and shall be final and in full force and effect without any condition or requirement that would reasonably be expected to have, individually or in the aggregate, a material impact on the current or future business operations of the Plan Sponsor. In addition, the courts will have denied all applications for judicial review or other court challenges to the Industry Canada Approval or appeals of any court order upholding the Industry Canada Approval or the periods for filing such appeals have passed and no appeal has been filed.

- The TSN Debtors shall have cash on hand as of the Effective Date of at least $5 million.

*(iii)*     ***Waiver of Conditions***

The conditions to Confirmation of the Plan and to the occurrence of the Effective Date set forth in this Article X of the Plan may be waived at any time by the TSN Debtors, with the written consent of the Plan Sponsor; *provided, however,* that the TSN Debtors may not waive entry of the Confirmation Order.

*(iv)*     ***Effect of Failure of Conditions***

If the Effective Date does not occur, the Plan shall be null and void in all respects and nothing contained in the Plan or the Disclosure Statement shall: (1) constitute a waiver or release of any claims by or Claims against the TSN Debtors; (2) prejudice in any manner the rights of the TSN Debtors, any holders of Claims or any other Entity; or (3) constitute an admission, acknowledgment, offer or undertaking by the TSN Debtors, any holders or any other Entity in any respect.

## J.     MODIFICATION, REVOCATION OR WITHDRAWAL OF THE PLAN

*(i)*     ***Modification and Amendments***

Except as otherwise specifically provided in the Plan, the TSN Debtors reserve the right, subject to the reasonable consent of the Plan Sponsor, to modify the Plan as to material terms and seek Confirmation consistent with the Bankruptcy Code and, as appropriate, not re-solicit votes on such modified Plan. Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019 and those restrictions on modifications set forth in the Plan, the TSN Debtors expressly reserve their rights, subject to the reasonable consent of the Plan Sponsor, to alter, amend or modify materially the Plan with respect to any or all Debtors, one or more times, after Confirmation, and, to the extent necessary, may initiate proceedings in the

Bankruptcy Court to so alter, amend or modify the Plan or remedy any defect or omission, or reconcile any inconsistencies in the Plan, the Disclosure Statement or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of the Plan. Any such modification or supplement shall be considered a modification of the Plan and shall be made in accordance with this Article XI of the Plan.

In addition, prior to the Effective Date, the TSN Debtors (with the reasonable consent of the Plan Sponsor) may make appropriate technical adjustments and modifications to the Plan, without further order or approval of the Bankruptcy Court; provided, however, that such technical adjustments and modifications do not adversely affect in a material way the treatment of holders of Claims or Interests.

*(ii)* **Effect of Confirmation on Modifications**

Entry of a Confirmation Order shall mean that all modifications or amendments to the Plan occurring after the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or re-solicitation under Bankruptcy Rule 3019.

*(iii)* **Revocation or Withdrawal of the Plan**

The TSN Debtors (with the reasonable consent of the Plan Sponsor) reserve the right to revoke or withdraw the Plan before the Effective Date. If the TSN Debtors revoke or withdraw the Plan, or if Confirmation or the Effective Date does not occur, then: (1) the Plan shall be null and void in all respects; (2) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of any Claim or Interest or Class of Claims or Interests), assumption or rejection of Executory Contracts or Unexpired Leases effected by the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void; and (3) nothing contained in the Plan shall: (a) constitute a waiver or release of any Claims or Interests or Claims by any TSN Debtor against any other Entity; (b) prejudice in any manner the rights of such Debtor or any other Entity; or (c) constitute an admission, acknowledgement, offer or undertaking of any sort by such Debtor or any other Entity.

## K.    RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court shall retain such jurisdiction over the Chapter 11 Cases and all matters, arising out of or related to, the Chapter 11 Cases and the Plan including jurisdiction to:

- allow, disallow, determine, liquidate, classify, estimate or establish the priority, Secured or Unsecured status or amount of any Claim or Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the Secured or Unsecured status, priority, amount or allowance of Claims;

- decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan;

- resolve any matters related to: (a) the assumption, assumption and assignment or rejection of any Executory Contract or Unexpired Lease to which a TSN Debtor is party or with respect to which a TSN Debtor may be liable in any manner and to hear, determine and, if necessary, liquidate, any Claims arising therefrom, including Rejection Claims, Cure Claims pursuant to section 365 of the Bankruptcy Code or any other matter related to such Executory Contract or Unexpired Lease; (b) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed; (c) the Reorganized TSN Debtors amending, modifying or supplementing, after the Effective Date, pursuant to Article VI of the Plan, any Executory Contracts or Unexpired Leases to the list of Executory Contracts and Unexpired Leases to be assumed or rejected or otherwise; and (d) any dispute regarding whether a contract or lease is or was executory or expired.

- ensure that distributions to holders of Allowed Claims are accomplished pursuant to the provisions of the Plan;

- adjudicate, decide or resolve any motions, adversary proceedings, contested or litigated matters and any other matters, and grant or deny any applications involving a TSN Debtor that may be pending on the Effective Date;

- adjudicate, decide or resolve any and all matters related to any Cause of Action;

- adjudicate, decide or resolve any and all matters related to section 1141 of the Bankruptcy Code;

- enter and enforce any order for the sale of property pursuant to sections 363, 1123 or 1146(a) of the Bankruptcy Code;

- resolve any avoidance or recovery actions under sections 105, 502(d), 542 through 551 and 553 of the Bankruptcy Code;

- resolve any cases, claims, controversies, suits, disputes or causes of action that may arise in connection with the consummation, interpretation or enforcement of the Plan or any entity's obligations incurred in connection with the Plan;

- resolve any cases, controversies, suits, disputes or causes of action that may arise in connection with or under the DIP Loan Agreement;

- resolve any cases, controversies, suits, disputes or causes of action that may arise in connection with or under the Notes;

- issue injunctions, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any entity with consummation or enforcement of the Plan;

- resolve any cases, controversies, suits, disputes or causes of action with respect to the discharge, releases, injunctions, exculpations, indemnifications and other provisions contained in Article IX of the Plan and enter such orders as may be necessary or appropriate to implement such releases, injunctions and other provisions;

- enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked or vacated;

- determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release, indenture or other agreement or document created in connection with the Plan or the Disclosure Statement;

- adjudicate any and all disputes arising from or relating to distributions under the Plan;

- consider any modifications of the Plan, cure any defect or omission or reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

- determine requests for the payment of Claims and Interests entitled to priority pursuant to section 507 of the Bankruptcy Code, including requests by Professionals for payment of Accrued Professional Fees;

- hear and determine disputes arising in connection with the interpretation, implementation or enforcement of the Plan or the Confirmation Order, including disputes arising under agreements, documents or instruments executed in connection with the Plan;

- hear and determine matters concerning state, local and federal taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code;

- hear and determine all disputes involving the existence, nature or scope of the TSN Debtors' discharge, including any dispute relating to any liability arising out of the termination of employment or the termination of any employee or retiree benefit program, regardless of whether such termination occurred before or after the Effective Date;

- enforce all orders previously entered by the Bankruptcy Court;

- hear any other matter not inconsistent with the Bankruptcy Code; and

- enter an order concluding or closing the Chapter 11 Cases.

## L. MISCELLANEOUS PROVISIONS

### (i) Immediate Binding Effect

Subject to Article X.B of the Plan, and notwithstanding Bankruptcy Rules 3020(e), 6004(h) or 7062 or any other Bankruptcy Rule, upon the occurrence of the Effective Date, the terms of the Plan and the Plan Supplement shall be immediately effective and enforceable and deemed binding upon the TSN Debtors, the Reorganized TSN Debtors and any and all holders of Claims or Interests (irrespective of whether such Claims or Interests are deemed to have accepted the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, discharges and injunctions described in the Plan, each Entity acquiring property under the Plan, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the TSN Debtors.

### (ii) Dissolution of Creditors' Committee

On the Effective Date, the Creditors' Committee shall dissolve and members thereof shall be released and discharged from all rights, duties, responsibilities and obligations from or related to the Chapter 11 Cases. In addition, the retention and employment of the Creditors' Committee's attorneys, accountants and other agents shall terminate on the Effective Date.

### (iii) Severability of Plan Provisions

If, before Confirmation of the Plan, any term or provision of the Plan is held by the Bankruptcy Court or any other court exercising jurisdiction to be invalid, void or unenforceable, the Bankruptcy Court or other court exercising jurisdiction shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired or invalidated by such holding, alteration or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is: (1) valid and enforceable pursuant to its terms; (2) integral to the Plan and may not be deleted or modified without the TSN Debtors' consent; and (3) nonseverable and mutually dependent.

### (iv) Votes Solicited in Good Faith

Upon entry of the Confirmation Order, the TSN Debtors will be deemed to have solicited votes on the Plan in good faith and in compliance with the Bankruptcy Code and any applicable non-bankruptcy law, and pursuant to section 1125(e) of the Bankruptcy Code, the TSN Debtors and their respective Affiliates, agents, representatives, members, principals, shareholders, officers, directors, employees, advisors and attorneys will be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale and purchase of Plan securities offered and sold under the Plan, and, therefore, will have no liability for the violation of any

applicable law, rule or regulation governing the solicitation of votes on the Plan or the offer, issuance, sale or purchase of the New Common Stock or New Preferred Stock offered and sold under the Plan.

*(v)* ***Closing of Chapter 11 Cases***

The Reorganized TSN Debtors shall, promptly after the full administration of the Chapter 11 Cases, file with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Bankruptcy Court to close the Chapter 11 Cases.

*(vi)* ***Conflicts***

Except as set forth in the Plan, to the extent that any provision of the Disclosure Statement or any other order (other than the Confirmation Order) referenced in the Plan (or any exhibits, schedules, appendices, supplements or amendments to any of the foregoing), conflict with or are in any way inconsistent with any provision of the Plan, the Plan shall govern and control; *provided, however*, that if there is a conflict between the Plan and a Plan Supplement document, the Plan Supplement document shall govern and control; and *provided further, however*, that to the extent that any provision of the Plan conflicts with or is in any way inconsistent with any provision of the Confirmation Order, the Confirmation Order shall govern and control.

# IX.
## SOLICITATION AND VOTING PROCEDURES

This Disclosure Statement, accompanied by a ballot or ballots to be used for voting on the Plan, is being distributed to the holders of Claims in Classes 3, 5, 6 and 7. Only the holders of Claims in these Classes are entitled to vote to accept or reject the Plan and may do so by completing the ballot and returning it in the envelope provided. Additionally, a discussion of the procedures used to tabulate the votes cast for or against the Plan can be found in **Exhibit B**, attached hereto and are incorporated herein by reference and should be read in conjunction with this Disclosure Statement and in formulating a decision to vote to accept or reject the Plan.

The Debtors, with the approval of the Bankruptcy Court, have engaged GCG as their Voting Agent to assist in the solicitation process. The Voting Agent will, among other things, answer questions, provide additional copies of all solicitation materials, and generally oversee the solicitation process for their assigned Claims. The Voting Agent will also process and tabulate ballots for each of their respective Classes that are entitled to vote to accept or reject the Plan and will file a voting report as soon as practicable before the Confirmation Hearing.

### A.      Holders of Claims Entitled to Vote on the Plan

Under the provisions of the Bankruptcy Code, not all holders of claims against and interests in a debtor are entitled to vote on a chapter 11 plan. As shown in the table below, the TSN Debtors are soliciting votes to accept the Plan only from holders of Claims and Interests in Classes 3, 5, 6 and 7 (collectively, the "***Voting Classes***"). The holders of Claims in the Voting Classes are Impaired under the Plan and are receiving property under the Plan. Therefore, holders of Claims in the Voting Classes have the right to vote to accept or reject the Plan.

The TSN Debtors are **not** soliciting votes from (a) holders of Unimpaired Claims in Classes 1, 2, and 4 because those parties are conclusively presumed to have accepted the Plan or (b) holders of Interests in Class 8 because those parties are conclusively presumed to have rejected the Plan. Additionally, the Voting and Tabulation Procedures that certain holders of Claims in the Voting Classes, such as those holders whose Claims have been disallowed or subject to a pending objection, are not entitled to vote to accept or reject the Plan. The following table provides a summary of the status and voting rights of each Class (and, therefore, of each holder within such Class) under the Plan:

### SUMMARY OF STATUS AND VOTING RIGHTS

| Class | Status | Voting Rights |
|---|---|---|
| 1- Other Priority Claims | Unimpaired | No (deemed to accept) |
| 2- Other Secured Claims | Unimpaired | No (deemed to accept) |
| 3- Senior Secured Notes Claims | Impaired | Yes |
| 4- PMCA Claims | Unimpaired | No (deemed to accept) |
| 5- Senior Exchangeable Notes Claims | Impaired | Yes |
| 6- Other Unsecured Claims | Impaired | Yes |
| 7- Unsecured Convenience Claims | Impaired | Yes |
| 8- Equity Interests | Impaired | No (deemed to reject) |

### B. Voting Record Date

**The Voting Record Date is [###] p.m. Prevailing Eastern Time on [DATE], 2010**. The Voting Record Date is the date on which it will be determined which holders of Claims and Interests in the Voting Classes are entitled to vote to accept or reject the Plan and whether Claims and Interests have been properly assigned or transferred under Bankruptcy Rule 3001(e) such that an assignee can vote as the holder of a Claim or Interest.

### C. Voting on the Plan

**The Voting Deadline is [###] p.m. Prevailing Eastern Time on [DATE], 2011**. In order to be counted as votes to accept or reject the Plan, all Ballots, Note Ballots and Note Master Ballots must be properly executed, completed and delivered (either by using the return envelope provided, by first class mail, overnight courier or personal delivery) so that it is **actually received** on or before the Voting Deadline by either the Voting and Claims Agent at the following address:

<table>
<tr><td align="center"><strong>DELIVERY OF BALLOTS</strong></td></tr>
<tr><td>

Ballots, Note Ballots and Note Master Ballots must be **actually received** by the Voting and Claims Agent by the Voting Deadline of **[###]** p.m. (Prevailing Eastern Time) on **[DATE]**, 2011 at the following addresses:

*Voting and Claims Agent:*
If by mail:

TerreStar Networks Inc.
c/o The Garden City Group, Inc.
P.O. Box 9649
Dublin, OH 43017-4949

If by hand or overnight courier:

TerreStar Networks Inc.
c/o The Garden City Group, Inc.
5151 Blazer Parkway, Suite A
Dublin, OH 43017
* * * * * * *

If you received an envelope addressed to your nominee, you must return your ballot to your nominee prior to [____] p.m. on the date that is three (3) days prior to the Voting Deadline, to provide sufficient time for your nominee to compile and submit a Master Ballot.

If you have any questions on the procedure for voting on the Plan, please call the Voting and Claims Agent at the following telephone number:

1-866-682-1770

</td></tr>
</table>

### D. Ballots, Note Ballots or Master Ballots Not Counted

**No Ballot, Note Ballot or Master Ballot will be counted toward Confirmation if, among other things**: (a) it is illegible or contains insufficient information to permit the identification of the holder of the Claim or Interest; (b) it was transmitted by facsimile or other electronic means; (c) it was cast by an entity that is not entitled to vote on the Plan; (d) it was cast for a Claim listed in the Schedules as contingent, unliquidated or disputed for which the applicable bar date has passed and no proof of claim was timely filed; (e) it was cast for a Claim that is subject to an objection pending as of the Record Date (unless temporarily allowed in accordance with the Solicitation and Voting Procedures); (f) it was sent to the Debtors, the Debtors' agents/representatives (other than the Voting and Claims Agent), an indenture trustee or the Debtors' financial or legal advisors instead of to the Claims and Voting Agent; (g) it is unsigned; or (h) it is not marked to either accept or reject the Plan or it is marked

both to accept and reject the Plan.  **Please refer to the Voting and Tabulation Procedures set forth in Exhibit H hereto for additional requirements with respect to voting to accept or reject the Plan.**

> **IF YOU HAVE ANY QUESTIONS ABOUT THE SOLICITATION OR VOTING PROCESS, PLEASE CONTACT THE VOTING AND CLAIMS AGENT.  ANY BALLOT, NOTE BALLOT OR MASTER BALLOT RECEIVED AFTER THE VOTING DEADLINE OR OTHERWISE NOT IN COMPLIANCE WITH THE VOTING AND TABULATION PROCEDURES WILL <u>NOT</u> BE COUNTED.**

# X.
## CONFIRMATION OF THE PLAN

### A.     The Confirmation Hearing

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a hearing to consider Confirmation.  Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to Confirmation.

The Bankruptcy Court has scheduled the Confirmation Hearing for **[DATE]** at **[###]** a.m. (Prevailing Eastern Time) before the Honorable Judge Sean H. Lane, United States Bankruptcy Judge, in the Bankruptcy Court, located at Alexander Hamilton Custom House, One Bowling Green, New York, New York 10004.   The Confirmation Hearing may be adjourned from time to time without further notice except for an announcement of the adjourned date made at the Confirmation Hearing or any adjournment thereof.

### B.     Deadline to Object to Confirmation of the Plan

Objections to Confirmation must be filed and served at or before **[###]** p.m. (Prevailing Eastern Time) on **[DATE]** in accordance with the notice of the Confirmation Hearing that accompanies this Disclosure Statement. This means that written objections to Confirmation, if any, that conform to the applicable provisions of the Disclosure Statement Order, the Bankruptcy Code, the Bankruptcy Rules and the Local Bankruptcy Rules, must be filed, together with a proof of service, with the Bankruptcy Court and served so as to be **actually received** on or before the Plan Objection Deadline by the following parties:

- <u>Counsel to the Debtors</u>: Akin Gump Strauss Hauer & Feld LLP, Attn: Ira Dizengoff and Arik Preis, One Bryant Park, New York, New York, 10036;

- <u>Counsel to the Plan Sponsor</u>: Willkie Farr & Gallagher LLP, Attn: Matthew A. Feldman and Rachel Strickland, 787 Seventh Avenue, New York, New York 10019-6099

- <u>U.S. Trustee</u>: Office of the United States Trustee for the Southern District of New York, Attn: Susan Golden, Whitehall Street, 21st Floor, New York, New York 10004.

**Unless objections to Confirmation are timely served and Filed, they may not be considered by the Bankruptcy Court.**

### C.     Confirmation Hearing

The Confirmation Hearing will commence at **[###]** a.m. Prevailing Eastern Time on **[DATE]**, 2011.  The Confirmation Hearing will be held before the Honorable Sean H. Lane in the Bankruptcy Court, One Bowling Green, New York, New York 10004-1408.  At least 28 days before the Voting Deadline, the TSN Debtors will (a) serve the Confirmation Hearing Notice upon all known creditors of the TSN Debtors and (b) publish the Confirmation Hearing Notice in the national editions of *The New Washington Post, USA Today* and *The Globe and Mail (national edition)*, which will contain, among other things, details regarding voting on and objecting to Confirmation, including the Voting Deadline and the Plan Objection Deadline, and the date, time and location of the Confirmation Hearing.  The Confirmation Hearing Notice will also be posted on the TSN Debtors' restructuring website www.TerreStarInfo.com.  **The Confirmation Hearing may be adjourned from time to time without further notice except for an announcement of the adjourned date made at the Confirmation Hearing or any adjournment thereof.**

### D.     Requirements for Confirmation of the Plan

Among the requirements for Confirmation are the following: (i) the Plan is accepted by all impaired Classes of Claims or, if the Plan is rejected by an impaired Class, that it "does not discriminate unfairly" and is "fair and equitable" as to such Class; (ii) the Plan is feasible; and (iii) the Plan is in the "best interests" of holders of Claims and Interests that are impaired under its provisions.

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies the requirements of section 1129 of the Bankruptcy Code. The TSN Debtors believe that the Plan satisfies or will satisfy all of the necessary requirements of chapter 11 of the Bankruptcy Code. Specifically, in addition to other applicable requirements, the TSN Debtors believe that the Plan satisfies or will satisfy the applicable Confirmation requirements of section 1129 of the Bankruptcy Code set forth below:

- The Plan complies with the applicable provisions of the Bankruptcy Code.

- The TSN Debtors, as the Plan proponents, have complied with the applicable provisions of the Bankruptcy Code.

- The Plan has been proposed in good faith and not by any means forbidden by law.

- Any payment made or promised under the Plan for services or for costs and expenses in, or in connection with, the chapter 11 cases, or in connection with the Plan and incident to the case, has been disclosed to the Bankruptcy Court, and any such payment: (i) made before Confirmation is reasonable or (ii) subject to the approval of the Bankruptcy Court is reasonable, if it is to be fixed after Confirmation.

- Either each holder of an impaired Claim or Interest in the TSN Debtors has accepted (or is deemed to have accepted) the Plan, or each non-accepting creditor will receive or retain under the Plan on account of such Claim or Interest, property of a value, as of the Effective Date of the Plan, that is not less than the amount that the holder would receive or retain if the TSN Debtors were liquidated on that date under chapter 7 of the Bankruptcy Code.

- Each Class of Claims or Interests that is entitled to vote on the Plan will have accepted the Plan, or the Plan can be confirmed without the approval of the Class pursuant to section 1129(b) of the Bankruptcy Code.

- Except to the extent that the holder of a particular Claim will agree to a different treatment of its Claim, the Plan provides that Administrative Claims and Priority Non-Tax Claims will be paid in full on the Effective Date, or as soon thereafter as is reasonably practicable.

- At least one Class of impaired Claims will have accepted the Plan, determined without including any acceptance of the Plan by any insider holding a Claim in that Class.

- Confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtors or any successors thereto under the Plan.

- All fees of the type described in 28 U.S.C. § 1930, including the fees of the U.S. Trustee, will be paid as of the Effective Date.

**E. Best Interests of Creditors/Liquidation Analysis**

Often called the "best interests" test, section 1129(a)(7) of the Bankruptcy Code requires that a bankruptcy court find, as a condition to confirmation, that a chapter 11 plan provides, with respect to each class, that each holder of a claim or an interest in such class either (i) has accepted the plan or (ii) will receive or retain under the plan property of a value, as of the effective date of the plan, that is not less than the amount that such holder would receive or retain if the debtors liquidated under chapter 7 of the Bankruptcy Code. To make these findings, a bankruptcy court must: (i) estimate the cash liquidation proceeds that a chapter 7 trustee would generate if each of the debtor's chapter 11 cases were converted to a chapter 7 case and the assets of such debtor's estate were liquidated; (ii) determine the liquidation distribution that each non-accepting holder of a claim or an interest would receive from such liquidation proceeds under the priority scheme dictated in chapter 7; and (iii) compare the holder's liquidation distribution to the distribution under the plan that the holder would receive if the plan were confirmed and consummated.

To satisfy the requirements of section 1129(a)(7) of the Bankruptcy Code, the TSN Debtors, together with their retained advisors, prepared the liquidation analysis attached hereto as **Exhibit D** to this Disclosure Statement (the "*Liquidation Analysis*").  Based on the Liquidation Analysis, the Debtors believe that holders of Claims will receive equal or greater value as of the Effective Date under the Plan than such holders would receive in a chapter 7 liquidation and that the Plan will therefore meet the "best interests" test provided in section 1129(a)(7) of the Bankruptcy Code.

## F.      Feasibility/Financial Projections

Section 1129(a)(11) of the Bankruptcy Code requires that confirmation of the plan of reorganization is not likely to be followed by the liquidation or the need for further financial reorganization of the debtor, or any successor to the debtor (unless such liquidation or reorganization is proposed in the plan of reorganization).

To determine whether the Plan meets this feasibility requirement, the TSN Debtors have analyzed their ability to meet their respective obligations under the Plan.  As part of this analysis, the TSN Debtors have prepared the projections, attached to this Disclosure Statement as **Exhibit E**.  Based upon the projections, the TSN Debtors believe that they will be a viable entity following the chapter 11 cases and that the Plan will meet the feasibility requirements of the Bankruptcy Code.

THE PROJECTIONS ATTACHED AS EXHIBIT E, INCLUDING THE UNDERLYING ASSUMPTIONS, SHOULD BE CAREFULLY REVIEWED IN EVALUATING THE PLAN.  THE PROJECTIONS WERE PREPARED IN [_____] 2010.  WHILE MANAGEMENT BELIEVES THE ASSUMPTIONS UNDERLYING THE PROJECTIONS, WHEN CONSIDERED ON AN OVERALL BASIS, WERE REASONABLE WHEN PREPARED IN LIGHT OF CURRENT CIRCUMSTANCES AND EXPECTATIONS, NO ASSURANCE CAN BE GIVEN THAT THE PROJECTIONS WILL BE REALIZED.  THE TSN DEBTORS MAKE NO REPRESENTATION OR WARRANTY AS TO THE ACCURACY OF THE PROJECTIONS.

## G.      Acceptance by Impaired Classes

The Bankruptcy Code requires that, except as described in the following section, each impaired class of claims or interests must accept a plan in order for it to be confirmed.  A class that is not "impaired" under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to the class is not required.  A class is "impaired" unless the plan:  (i) leaves unaltered the legal, equitable and contractual rights to which the claim or the interest entitles the holder of the claim or interest; or (ii) cures any default, reinstates the original terms of such obligation, compensates the holder for certain damages or losses, as applicable, and does not otherwise alter the legal, equitable or contractual rights to which such claim or interest entitles the holder of such claim or interest.

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds in dollar amount and more than one-half in number of allowed claims in that class, counting only those claims that actually voted to accept or to reject the plan.  Thus, a class of claims will have voted to accept the plan only if two-thirds in amount and a majority in number actually voting cast their ballots in favor of acceptance.  For a class of impaired interests to accept a plan, section 1126(d) of the Bankruptcy Code requires acceptance by interest holders that hold at least two-thirds in amount of the allowed interests of such class, counting only those interests that actually voted to accept or reject the plan.  Thus, a class of interests will have voted to accept the plan only if two-thirds in amount actually voting cast their ballots in favor of acceptance.

## H.      Confirmation Without Acceptance by All Impaired Classes/Fair and Equitable Test

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a plan even if all impaired classes have not accepted the plan, *provided* that the plan has been accepted by at least one impaired class.  Pursuant to section 1129(b) of the Bankruptcy Code, notwithstanding an impaired class rejection or deemed rejection of the plan, the plan will be confirmed, at the plan proponent's request, in a procedure commonly known as "cramdown," so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.

*(i)*     *No Unfair Discrimination*

Often referred to as the "vertical test," this test applies to classes of claims or interests that are of equal priority and are receiving different treatment under a proposed plan. The test does not require that the treatment be the same or equivalent, but that such treatment be "fair." In general, bankruptcy courts consider whether a plan discriminates unfairly in its treatment of classes of claims of equal rank (*e.g.*, classes of the same legal character). Bankruptcy courts will take into account a number of factors in determining whether a plan discriminates unfairly. A proposed plan could treat two classes of unsecured creditors differently without unfairly discriminating against either class.

*(ii)*    *Fair and Equitable Test*

Often referred to as the "horizontal test," this test applies to classes of different priority and status (*e.g.*, secured versus unsecured) and includes the general requirement that no class of claims receive more than 100% of the amount of the allowed claims in such class. As to the dissenting class, this test sets different standards depending upon the type of claims or interests in such class:

#### a.     Secured Claims

The condition that a plan be "fair and equitable" to a non-accepting class of secured claims includes the requirements that: (i) the holders of such secured claims retain the liens securing such claims to the extent of the allowed amount of the claims, whether the property subject to the liens is retained by the debtor or transferred to another entity under the Plan; and (ii) each holder of a secured claim in the class receives deferred cash payments totaling at least the allowed amount of such claim with a value, as of the effective date of the plan, at least equivalent to the value of the secured claimant's interest in the debtor's property subject to the liens.

#### b.     Unsecured Claims

The condition that a plan be "fair and equitable" to a non-accepting class of unsecured claims includes the requirement that either: (i) the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or (ii) the holder of any claim or any interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or junior interest any property, subject to certain exceptions.

#### c.     Interests

The condition that a plan be "fair and equitable" to a non-accepting class of interests includes the requirements that either: (i) the plan provides that each holder of an interest in that class receives or retains under the plan on account of that Interest property of a value, as of the effective date of the plan, equal to the greater of: (A) the allowed amount of any fixed liquidation preference to which such holder is entitled; (B) any fixed redemption price to which such holder is entitled; or (C) the value of such interest; or (ii) if the class does not receive the amount as required under (i) hereof, no class of interests junior to the non-accepting class may receive a distribution under the plan.

If any impaired Class rejects the Plan, the TSN Debtors reserve the right to seek Confirmation of the Plan utilizing the "cramdown" provision of section 1129(b) of the Bankruptcy Code. Specifically, to the extent that any Impaired Class rejects the Plan or is deemed to have rejected the Plan, the TSN Debtors will request Confirmation of the Plan, as it may be modified from time to time, under section 1129(b) of the Bankruptcy Code. The TSN Debtors reserve the right to alter, amend, modify, revoke or withdraw the Plan prior to Confirmation, including to amend or modify the Plan to satisfy the requirements of section 1129(b) of the Bankruptcy Code.

The TSN Debtors submit that if the TSN Debtors "cramdown" the Plan pursuant to section 1129(b) of the Bankruptcy Code, the Plan is structured such that it does not "discriminate unfairly" and satisfies the "fair and equitable" requirement. The TSN Debtors believe that the Plan and the treatment of all Classes of Claims and Interests under the Plan satisfy the foregoing requirements for nonconsensual Confirmation of the Plan.

**I.        Valuation of the TSN Debtors**

In conjunction with formulating the Plan, the TSN Debtors determined that it was necessary to estimate the post-Confirmation going-concern of the Reorganized Debtors (the "***Valuation Analysis***").  The Valuation Analysis is set forth on the exhibit attached hereto as **Exhibit F**.

THE VALUATION INFORMATION SET FORTH ON EXHIBIT F REPRESENTS A HYPOTHETICAL VALUATION OF THE REORGANIZED DEBTORS, WHICH ASSUMES THAT SUCH REORGANIZED DEBTORS CONTINUE AS AN OPERATING BUSINESS.  THE ESTIMATED VALUE SET FORTH ON <u>EXHIBIT F</u> DOES NOT PURPORT TO CONSTITUTE AN APPRAISAL OR NECESSARILY REFLECT THE ACTUAL MARKET VALUE THAT MIGHT BE REALIZED THROUGH A SALE OR LIQUIDATION OF THE REORGANIZED DEBTORS, THEIR SECURITIES OR THEIR ASSETS, WHICH VALUE MAY BE SIGNIFICANTLY HIGHER OR LOWER THAN THE ESTIMATE SET FORTH IN THIS SECTION.  ACCORDINGLY, SUCH ESTIMATED VALUE IS NOT NECESSARILY INDICATIVE OF THE PRICES AT WHICH THE NEW COMMON STOCK OR OTHER SECURITIES OF REORGANIZED TSN MAY TRADE AFTER GIVING EFFECT TO THE REORGANIZATION AND TRANSACTIONS SET FORTH IN THE PLAN, WHICH PRICES MAY BE SIGNIFICANTLY HIGHER OR LOWER THAN INDICATED BY THIS VALUATION.

**J.        Effect of Confirmation and Consummation of the Plan**

Following Confirmation, subject to Article X of the Plan, the Plan will be consummated on the Effective Date.  Among other things, on the Effective Date, certain release, injunction, exculpation and discharge provisions set forth in Article IX of the Plan will become effective.  As such, it is important to read the provisions contained in Article IX of the Plan very carefully so that you understand how Confirmation and Consummation of the Plan – which effectuates such provisions – will affect you and any Claim you may hold against the TSN Debtors and other claim holders so that you cast your vote accordingly.  Further discussion of the releases contemplated in the Plan is provided in section VIII of this Disclosure Statement.

# XI.
# RISK FACTORS

*Holders of Claims and Interests should read and consider carefully the risk factors set forth below, as well as the other information set forth in this Disclosure Statement and the documents delivered together herewith, referred to or incorporated by reference herein, before voting to accept or reject the Plan. Although these risk factors are many, these factors should not be regarded as constituting the only risks present in connection with the TSN Debtors' business or the Plan and its implementation.*

## A. Risks Related to Confirmation of the Plan

### (i) The TSN Debtors may not be able to obtain Confirmation of the Plan.

To emerge successfully from chapter 11 as a viable business, the TSN Debtors, like any debtor, must obtain approval of a plan of reorganization, and thereafter confirm and successfully implement the Plan. This process requires the TSN Debtors to (a) meet certain statutory requirements concerning the adequacy of disclosure with respect to any proposed plan; (b) solicit and obtain creditor acceptances of the proposed plan; and (c) fulfill other statutory conditions with respect to plan confirmation.

With regard to any proposed plan of reorganization, the TSN Debtors may not receive the requisite acceptances to confirm the Plan. If the requisite acceptances of the Plan are received, the TSN Debtors intend to seek Confirmation by the Bankruptcy Court. If the requisite acceptances are not received, the TSN Debtors may nevertheless seek Confirmation notwithstanding the dissent of certain Classes of Claims. The Bankruptcy Court may confirm the Plan pursuant to the "cramdown" provisions of the Bankruptcy Code, which allows the Bankruptcy Court to confirm a plan that has been rejected by an "impaired" class of claims if it determines that the plan satisfies section 1129(b) of the Bankruptcy Code. To confirm a plan over the objection of a dissenting class, a bankruptcy court also must find that at least one impaired class has accepted the plan, with such acceptance being determined without including the acceptance of any "insider" in such class.

Even if the requisite acceptances of the Plan are received, the Bankruptcy Court might not confirm the Plan as proposed. A dissenting holder of a Claim against or Interest in the TSN Debtors could challenge the balloting procedures and results as not being in compliance with the Bankruptcy Code. Further, even if the Bankruptcy Court determined that the balloting procedures and results were appropriate, the Bankruptcy Court could still decline to confirm the Plan if it found that any of the statutory requirements for confirmation had not been met. Specifically, section 1129 of the Bankruptcy Code sets forth the requirements for confirmation and requires, among other things, a finding by the Bankruptcy Court that (a) a debtor's plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes; (b) confirmation of the debtor's plan is not likely to be followed by a liquidation or a need for further financial reorganization; and (c) the value of distributions to non-accepting holders of claims within a particular class under the debtor's plan will not be less than the value of distributions such holders would receive if the debtor were liquidated under chapter 7 of the Bankruptcy Code. A bankruptcy court may determine that a proposed plan does not satisfy one or more of these requirements, in which case the proposed plan would not be confirmed by a bankruptcy court.

If the Plan is not confirmed by the Bankruptcy Court, it is unclear whether and when the TSN Debtors would be able to reorganize their businesses and what, if any, distributions holders of Claims or Interests ultimately would receive on account of their Claims or Interests. There also can be no assurance that the TSN Debtors will be able to successfully develop, prosecute, confirm and consummate an alternative plan of reorganization that is acceptable to the Bankruptcy Court and the TSN Debtors' creditors and other parties in interest. Additionally, it is possible that third parties may seek and obtain approval to terminate or shorten the exclusive period under section 1121 of the Bankruptcy Code during which only the Debtors may propose and solicit votes on a plan of reorganization. Finally, the TSN Debtors' emergence from bankruptcy is not assured. Although the TSN Debtors expect to emerge from bankruptcy, there can be no assurance that the TSN Debtors will successfully reorganize or of when this reorganization will occur.

*(ii)* ***Parties in Interest may object to the TSN Debtors' Classification of Claims and Equity Interests.***

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an interest in a particular class only if the claim or interest is substantially similar to the other claims or interests in that class. The Debtors believe that the classification of holders of claims against and holders of interests in the Debtors under the Plan complies with the requirements set forth in the Bankruptcy Code because the classes established under the Plan each encompass claims or interests that are substantially similar to similarly classified claims or interests. Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

*(iii)* ***The conditions precedent to the Effective Date of the Plan may not occur.***

As more fully set forth in the Plan, which is attached hereto as **Exhibit A**, the Effective Date is subject to a number of conditions precedent. If these conditions precedent are not met or waived pursuant to the provisions of the Plan, the Effective Date will not occur.

*(iv)* ***Historical financial information of the TSN Debtors may not be comparable to the financial information of the Reorganized Debtors.***

As a result of the consummation of the Plan and the transactions contemplated thereby, the financial condition and results of operations of the Reorganized Debtors from and after the Effective Date may not be comparable to the financial condition or results of operations reflected in the TSN Debtors' historical financial statements.

*(v)* ***The TSN Debtors may object to the amount or classification of a Claim.***

Except as otherwise provided in the Plan, the TSN Debtors reserve the right to object (prior to or after the occurrence of the Effective Date) to the amount or classification of any Claim under the Plan. The estimates set forth in this Disclosure Statement cannot be relied on by any holder of a Claim where such Claim is subject to an objection. Any holder of a Claim that is subject to an objection thus may not receive its expected share of the estimated distributions described in this Disclosure Statement.

*(vi)* ***Holders of Claims that are not Allowed as of the Subscription Record Date will not receive their Pro Rata share of the Rights allocated to their respective Classes.***

Pursuant to the Plan, distributions to the holders of Claims in Classes 3, 5, and 6 include Rights to purchase New Preferred Stock, but only with respect to holders of Claims that are Allowed as of the Subscription Record Date (i.e., [_____], 2010). Therefore, to the extent that a holder's Claim is the subject of an objection or is otherwise not Allowed as of the Subscription Record Date, such holder will not receive any of the Rights allocated to such holder's Class under the Plan, even if such holder's Claim becomes Allowed at a later date.

*(vii)* ***There may be litigation regarding the collateral securing the Senior Secured Notes, which could delay confirmation of the Plan and erode the value of the Debtors' Estates.***

There is a litigable issue as to whether the TSN Debtors' obligations under the Senior Secured PIK Notes are secured by TerreStar-2. Certain holders of unsecured Claims against the TSN Debtors have asserted that such obligations are not secured by TerreStar-2, an assertion that is disputed by certain holders of Senior Secured PIK Notes. The TSN Debtors do not believe the outcome of this dispute would have any material impact on creditor recoveries under the Plan. However, litigation arising from this dispute could delay Confirmation and/or erode the value of the TSN Debtors' Estates by increasing the expenses of administration of the Debtors' Estates.

*(viii)* ***There may be litigation regarding the ability of the TSN Debtors to reinstate the PMCA.***

Section 1124 of the Bankruptcy Code provides that a claim can be reinstated if a plan cures certain prepetition and postpetition defaults, including compensation for actual pecuniary loss, and reinstates the maturity

and interest of the debt without otherwise altering the claimant's legal, equitable, or contractual rights. The Plan provides for the reinstatement of the PMCA. The TSN Debtors believe that the Plan meets the requirements necessary to reinstate the PMCA, including without limitation, the ability of the TSN Debtors to cure any defaults required to be cured under the PMCA. Nevertheless, parties in interest may seek to litigate this issue and there can be no assurance that the Bankruptcy Court will agree with the TSN Debtors that the Plan satisfies the requirements of section 1124 with respect to the PMCA.

B.       **Risks That May Affect the Value of the Securities to Be Issued Under the Plan**

*(i)       A Liquid Trading Market For The New Common Stock Or New Preferred Stock May Not Develop.*

There can be no assurances that a liquid trading market for the New Common Stock or New Preferred Stock will develop. The liquidity of any market for the New Common Stock or New Preferred Stock will depend, among other things, upon the number of respective holders of New Common Stock and New Preferred Stock, the Reorganized Debtors' financial performance and the market for similar securities, none of which can be determined or predicted. Therefore, the TSN Debtors cannot provide assurances that an active trading market will develop, or if a market develops, what the liquidity or pricing characteristics of that market will be. If an active trading market does not develop, holders of New Common Stock and New Preferred Stock may have difficulty selling their shares.

*(ii)       The resale of the New Common Stock or New Preferred Stock may be restricted by law.*

As described in Article XI, titled "Application of Securities Laws," the Debtors intend to rely on the exemption from registration, pursuant to the exemptions contained in section 1145 of the Bankruptcy Code, the Securities Act of 1933, and/or equivalent exemptions in state securities laws, as applicable. However, if a holder of New Common Stock or New Preferred Stock is deemed to be an "underwriter" with respect to such securities (with certain exceptions for "ordinary trading transactions" by certain persons) or an "affiliate" of the issuer of such securities, resales of such securities by such holder would not be exempt from the registration requirements under the Securities Act and applicable state securities laws under section 4(1) of the Securities Act. Accordingly, such sales could be effected only pursuant to an effective registration statement or in reliance on another applicable exemption from these registration requirements, which may not be available to such holder.

*(iii)       The Valuation of New Common Stock and New Preferred Stock is Not Intended to Represent the Trading Value of the Securities to be Issued.*

The valuation of the Reorganized Debtors, set forth on Exhibit F hereto, is based on the assumption that the holders of Claims will receive substantially all of the issued New Common Stock or New Preferred on behalf of their Claims and is not intended to represent the trading values of New Common Stock or New Preferred Stock in public or private markets.

*(iv)       The Reorganized Debtors May Not Achieve Projected Financial Results Or Meet Post-Reorganization Debt Obligations And Finance All Operating Expenses, Working Capital Needs, and Capital Expenditures.*

The projected financial results of the Reorganized Debtors are based on numerous assumptions, including the timing, confirmation and consummation of the Plan in accordance with its terms, the anticipated future performance of the Reorganized Debtors, general business and economic conditions and other matters, many of which are beyond the control of the Reorganized Debtors and which may not materialize.

Accordingly, the Reorganized Debtors may not be able to achieve the revenue or cash flow relied upon to make the projections or to otherwise meet their projected financial results. To the extent the Reorganized Debtors do not meet their projected financial results or achieve projected revenues and cash flows, the Reorganized Debtors may lack sufficient liquidity to continue operating as planned after the Effective Date, may be unable to service their debt obligations as they come due or may not be able to meet their operational needs. Any one of these failures may preclude the Reorganized Debtors from, among other things: (a) enhancing the current customer offerings; (b) taking advantage of future opportunities; or (c) responding to competitive pressures. Further, a failure of the

Reorganized Debtors to meet their projected financial results or achieve their projected revenues and cash flows could lead to cash flow and working capital constraints, which constraints may require the Reorganized Debtors to seek additional working capital. The Reorganized Debtors may not be able to obtain such working capital when it is required. Further, even if the Reorganized Debtors were able to obtain additional working capital, it may only be available on unreasonable terms. If any such required capital is obtained in the form of equity, the interests of the holders of the then-outstanding New Common Stock (and options or other rights to acquire New Common Stock), New Preferred Stock or Rights to purchase Rights Offering Preferred Stock could be diluted. While the Debtors' Financial Projections represent management's view based on current known facts and assumptions about the future operations of the Reorganized Debtors, there is no guarantee that the Financial Projections will be realized.

*(v)* **The Reorganized Debtors May Be Controlled By A Small Number Of Holders.**

Consummation of the Plan may result in a small number of holders owning a significant percentage of the outstanding shares of New Common Stock and New Preferred Stock. These holders may, among other things, exercise a controlling influence over the business and affairs of the Reorganized Debtors and have the power to elect directors and approve significant mergers, acquisitions, divestures, and other material corporate transactions, including the sale of the Reorganized Debtors, or delaying, preventing or deterring such transactions. The interests of such holders may differ from the interests of the other holders of New Common Stock and New Preferred Stock. The Debtors can make no assurances regarding the future actions of the holders of New Common Stock and New Preferred Stock and the impact such actions may have on the value of the New Common Stock and New Preferred Stock.

### C.    Risks Related to the Debtors' Businesses

*(i)*    *Risks And Uncertainties Associated With The Chapter 11 Cases.*

Although the TSN Debtors believe that the Chapter 11 Cases, commenced in order to implement an agreed-upon restructuring, will be of short duration and will not be materially disruptive to their businesses, the TSN Debtors cannot be certain that this will be the case. Although the Plan is designed to minimize the length of the bankruptcy proceeding, it is impossible to predict with certainty the amount of time that the Debtors may spend in bankruptcy or to assure parties-in-interest that the Plan will be confirmed.

Even if the Plan is confirmed on a timely basis, for the duration of the Chapter 11 Cases, the TSN Debtors' operations and the TSN Debtors' ability to execute their business strategy will be subject to the risks and uncertainties associated with bankruptcy. These risks include:

•  the TSN Debtors' ability to obtain approval of the Bankruptcy Court with respect to motions filed in the Chapter 11 Cases from time to time;

•  the TSN Debtors' ability to obtain and maintain normal trade terms with suppliers and service providers and maintain contracts that are critical to their operations;

•  the TSN Debtors' ability to attract, motivate and retain key employees;

•  the TSN Debtors' ability to attract and retain customers; and

•  the TSN Debtors' ability to obtain creditor and Bankruptcy Court approval for, and then to consummate, a Plan to emerge from bankruptcy.

The TSN Debtors will also be subject to risks and uncertainties with respect to the actions and decisions of the creditors and other third parties who have interests in the Chapter 11 Cases that may be inconsistent with the TSN Debtors' restructuring and business goals.

These risks and uncertainties could affect the TSN Debtors' business and operations in various ways. For example, negative events or publicity associated with the Chapter 11 Cases could adversely affect the TSN Debtors' sales and relationships with their customers, as well as with their suppliers and employers, which in turn could

adversely affect the TSN Debtors' operations and financial condition. In addition, pursuant to the Bankruptcy Code, the TSN Debtors need approval of the Bankruptcy Court for transactions outside the ordinary course of business, which may limit their ability to respond timely to certain events or take advantage of certain opportunities. Because of the risks and uncertainties associated with the Chapter 11 Cases, the TSN Debtors cannot predict or quantify the ultimate impact that events occurring during the reorganization process will have on their business, financial condition and results of operations.

As a result of the Chapter 11 Cases, the realization of assets and the satisfaction of liabilities are subject to uncertainty. While operating as debtors in possession, and subject to approval of the Bankruptcy Court, or otherwise as permitted in the normal course of business or Bankruptcy Court order, the TSN Debtors may sell or otherwise dispose of assets and liquidate or settle liabilities for amounts other than those reflected in the condensed consolidated financial statements included in TSC's Form 10-Q for the quarterly period ended June 30, 2010. Further, the Plan could materially change the amounts and classifications of assets and liabilities reported in the historical consolidated financial statements. The historical consolidated financial statements do not include any adjustments to the reported amounts of assets or liabilities that might be necessary as a result of Confirmation of a Plan.

*(ii)*      ***Each Of The Debtors Is A Development Stage Company With No Operating Revenues.***

Each of the TSN Debtors is a development stage company and only recently, with the announcement of and entry into the AT&T Agreement, has TSN generated minimal revenues from operations. The TSN Debtors' ability to transition into operating companies will depend on, among other things: successful development and execution of business plans; market acceptance of the services they intend to offer; and attracting, training and motivating highly skilled satellite and network operations personnel, a sales force and customer service personnel. The TSN Debtors may not be able to successfully complete the transition into operating companies or generate sufficient cash from operations to cover their expenses. Further, if the TSN Debtors do not become profitable, they will have difficulty obtaining funds to continue their operations.

*(iii)*     ***The TSN Debtors Are Not Cash Flow Positive, And Will Need Additional Liquidity To Fund Their Operations And Fully Fund All Of Their Necessary Capital Expenditures.***

The TSN Debtors do not generate sufficient cash from operations to cover their operating expenses, and it is unclear when, or if, they will be able to do so. Even if the TSN Debtors begin to generate cash in excess of operating expenses, they may require additional funds to meet capital expenditures and other non-operating cash expenses.

*(iv)*      ***The Reorganized Debtors will have indebtedness upon emergence.***

The Reorganized Debtors will have substantially less indebtedness than the TSN Debtors. On the Effective Date, after giving effect to the transactions contemplated by the Plan, the Reorganized Debtors will, on a consolidated basis, have approximately $95 million in secured indebtedness under the Purchase Money Credit Agreement, as reinstated.

The Reorganized Debtors' indebtedness could have important consequences because:

•  a portion of the Reorganized Debtors' cash flow from operations will be dedicated to debt service and unavailable to support operations, working capital, capital expenditures, expansion, acquisitions or general corporate or other purposes;

•  the Reorganized Debtors' ability to obtain additional financing in the future may be limited;

•  the Reorganized Debtors' flexibility in planning for, or reacting to, changes in their business may be limited; and

• it may make the Reorganized Debtors more vulnerable in the event of a downturn in their business or the economy in general.

The Reorganized Debtors' ability to make payments on and to refinance their debt, will depend on their ability to generate cash in the future. This, to a certain extent, is subject to general economic, business, financial, competitive, legislative, regulatory and other factors that are beyond the control of the Reorganized Debtors.

There can be no assurance that the Reorganized Debtors will be able to generate sufficient cash flow from operations or that sufficient future borrowings will be available to pay off the Reorganized Debtors' debt obligations. The Reorganized Debtors may need to refinance all or a portion of their debt on or before maturity; however, there can be no assurance that the Reorganized Debtors will be able to refinance any of their debt on commercially reasonable terms or at all.

*(v)*       *The TSN Debtors May Require Funding After Emergence.*

The TSN Debtors may require funds for sales, general and administrative expenses, working capital, interest on borrowings, financing costs, potential capital expenditures and operating expenses until sometime after the commencement of commercial operations. Such capital expenditures could exceed current estimates, in which case, the TSN Debtors may need to modify certain portions of their business plan. If the TSN Debtors require more funding than they currently anticipate, or cannot meet their financing needs, their ability to operate their business, financial condition and results of operation could be adversely affected.

*(vi)*      *The Success of Certain Portions of the TSN Debtors' Business Plan Will Depend On Market Acceptance Of New And Unproven Technology, Which May Never Occur.*

Other than satellite radio, the Debtors are not aware of any integrated satellite and terrestrial wireless network in commercial operation. As a result, the TSN Debtors' proposed market is new and untested and the TSN Debtors cannot predict with certainty the potential demand for the services the TSN Debtors plan to offer or the extent to which they will meet that demand. There may not be sufficient demand in general for the services the TSN Debtors plan to offer, or in particular geographic markets, for particular types of services or during particular time periods, to enable the TSN Debtors to generate positive cash flow, and the TSN Debtors' cost structure may not permit the TSN Debtors to meet their obligations.

The TSN Debtors cannot successfully implement certain portions of their business plan if they cannot gain market acceptance for certain planned products and services. A lack of demand could adversely affect the TSN Debtors' ability to sell their services, enter into strategic relationships or develop and successfully market new services. In addition, demand patterns shift over time, and user preferences may not favor the services the TSN Debtors plan to offer. Any material miscalculation with respect to the TSN Debtors' service offerings or operating strategy will adversely affect the Debtors' ability to operate their business, financial condition and results of operations.

*(vii)*     *The TSN Debtors May Be Unable to Achieve Their Business and Financial Objectives Because The Communications Industry Is Highly Competitive.*

The global communications industry is highly competitive and characterized by rapid change. The TSN Debtors will encounter competition in many forms, including:

• satellite services from other operators;

• conventional and emerging terrestrial wireless services;

• traditional wireline voice and high-speed data offerings;

• terrestrial land-mobile and fixed services; and

- next-generation integrated services that may be offered in the future by other networks operating in the S-band or the L-band.

Participants in the communications industry include major domestic and international companies, many of which have financial, technical, marketing, sales, distribution and other resources substantially greater than that of the TSN Debtors and which provide a wider range of services than the TSN Debtors will provide. There currently are several other satellite companies that provide or are planning to provide services similar to the TSN Debtors. In addition to facing competition from the TSN Debtors' satellite-based competitors, the TSN Debtors are subject to competition from terrestrial voice and data service providers in several markets and with respect to certain services, particularly from those that are expanding into rural and remote areas and providing the same general types of services and products that the TSN Debtors intend to provide. Land-based telecommunications service capabilities have been expanded into underserved areas more quickly than the TSN Debtors anticipated, which could result in less demand for the TSN Debtors services than anticipated when formulating the TSN Debtors' current business plan. These ground-based communications companies may have certain advantages over the TSN Debtors because of the general perception among consumers that wireless voice communication products and services are cheaper and more convenient than satellite-based ones. Furthermore, the TSN Debtors may also face competition from new competitors or emerging technologies with which the TSN Debtors may be unable to compete effectively.

With many companies targeting many of the same clients, if any of the TSN Debtors' competitors succeeds in offering services to clients before the TSN Debtors do, or develops a network that is, or that is perceived to be, superior to the TSN Debtors' network, then the Debtors may not be able to execute their business plan, which would materially adversely affect their business, financial condition and results of operations.

The TSN Debtors' system may not function as intended, and they will not know whether it will function as intended until they have deployed a substantial portion of their network. Hardware or software errors in space or on the ground may limit or delay the TSN Debtors' service, and therefore reduce anticipated revenues and the viability of the TSN Debtors' services. There could also be delays in the planned development, integration and operation of the components of the TSN Debtors' network. The strength of the signal from the TSN Debtors' satellite could cause ground-based interference or other unintended effects. If the technological integration of the TSN Debtors' network is not completed in a timely and effective manner, the TSN business will be harmed.

(viii)    *Satellites Have A Limited Useful Life and Premature Failure Of The Debtors' Satellite Could Damage Their Business.*

During and after their launch, all satellites are subject to equipment failures, malfunctions (which are commonly referred to as anomalies) and other problems. A number of factors could decrease the expected useful lives or the utility of the TSN Debtors' satellites, including:

- defects in construction;

- radiation induced failure of satellite parts;

- faster than expected degradation of solar panels;

- malfunction of component parts;

- loss of fuel on board;

- higher than anticipated use of fuel to maintain the satellite's orbital location;

- higher than anticipated use of fuel during orbit raising following launch;

- random failure of satellite components not protected by back-up units;

- inability to control the positioning of the satellite;

- electromagnetic storms, solar and other astronomical events, including solar radiation and flares; and

- collisions with other objects in space, including meteors and decommissioned spacecrafts in uncontrolled orbits that pass through the geostationary belt at various points.

The TSN Debtors' may experience failures, anomalies and other problems, whether of the types described above or arising from the failure of other systems or components, despite extensive precautionary measures taken to determine and eliminate the cause of anomalies in the TSN Debtors' satellites and provide redundancy for many critical components in their satellites. The interruption of the TSN Debtors' business caused by the loss or premature degradation of a satellite would continue until the TSN Debtors either extended service to end users on another satellite or built and launched additional satellites. If any of the TSN Debtors' satellites were to malfunction or to fail prematurely, it could affect the quality of service, substantially delay the commencement or interrupt the continuation of service, harm the TSN Debtors' reputation, cause the Debtors' insurance costs to increase and adversely affect certain portions of the TSN Debtors' business and financial condition.

### (ix) *Damage To, Or Caused By, The TSN Debtors' Satellites May Not Be Fully Covered By Insurance.*

The TSN Debtors have purchased launch and in-orbit insurance policies for their satellite. If the TSN Debtors' satellite is damaged in orbit, the TSN Debtors' insurance may not fully cover their losses and these failures may also cause insurers to include additional exclusions in the TSN Debtors' insurance policies when they come up for renewal. The TSN Debtors' may not be able to obtain additional financing to construct, launch and insure a replacement satellite or such financing may not be available on terms favorable to the TSN Debtors. Also, any insurance the TSN Debtors obtain will likely contain certain customary exclusions and material change conditions that would limit their coverage. These exclusions typically relate to losses resulting from acts of war, insurrection or military action and government confiscation, as well as lasers, directed energy beams, nuclear and anti-satellite devices and radioactive contamination. Any uninsured losses could have a material adverse effect on the TSN Debtors.

The TSN Debtors do not expect to buy insurance to cover, and would not have protection against, business interruption, loss of business or similar losses. Furthermore, the TSN Debtors expect to maintain third-party liability insurance. Such insurance may not be adequate or available to cover all third-party damages that may be caused by the TSN Debtors' satellites, the TSN Debtors may not be able to obtain or renew their third-party liability insurance on reasonable terms and conditions, or at all.

### (x) *The TSN Debtors Depend On A Limited Number Of Suppliers And Service Providers To Design, Construct And Maintain the Debtors' Network.*

The TSN Debtors rely on contracts with third parties to design and build their satellites, as well as the terrestrial components of their network. The TSN Debtors also intend to enter into relationships with third-party contractors in the future for equipment and maintenance and other services relating to their network. There are only a few companies capable of supplying the products and services necessary to implement and maintain their network. As a result, if any third-party contractor relationship with the TSN Debtors is terminated, the TSN Debtors may not be able to find a replacement in a timely manner or on satisfactory terms. In addition, if any of these third-party contractors are unable to perform on the terms of the contract due to financial reasons, other reasons specifically related to the business of these suppliers or other matters outside the TSN Debtors' control, the TSN Debtors' business would be significantly impacted. This could lead to delays in the implementation of the TSN Debtors' network and interruptions in providing service to the TSN Debtors' customers, which would adversely affect the TSN Debtors' financial condition.

### (xi) *The TSN Debtors May Rely On Third Parties To Identify, Develop And Market Products.*

The TSN Debtors have entered into an agreement with a third party to market products. The TSN Debtors intend to enter into additional such agreements with other third parties. The TSN Debtors may be unable to identify,

or to enter into agreements with, suitable third parties to perform these activities. If the TSN Debtors do not form satisfactory relationships with third parties, or if any such third parties do not successfully carry out their contractual duties or meet expected deadlines, the TSN Debtors may not be able to successfully identify, develop and sell products, which could adversely affect the TSN Debtors' financial condition and results of operations.

(xii)    *The Debtors May Not Be Able To Identify, Develop And Market Innovative Products And May Not Be Able To Compete Effectively.*

The TSN Debtors' ability to implement their business plan depends in part on their ability to gauge the direction of commercial and technological progress in key markets and to fund and successfully develop and market products in their targeted markets. The TSN Debtors' competitors may have access to technologies not available to the TSN Debtors, which may enable them to provide communications services of greater interest to end users, or at a more competitive price. The TSN Debtors may not be able to develop new products or technology, either alone or with third parties, or license any additional necessary intellectual property rights from third parties on a commercially competitive basis. The satellite and wireless industries are both characterized by rapid technological change, frequent new product innovations, changes in customer requirements and expectations and evolving industry standards. If the TSN Debtors are unable to keep pace with these changes, the TSN Debtors' business may be unsuccessful. Products using new technologies, or emerging industry standards, could make the Debtors' technologies obsolete. If the TSN Debtors fail to keep pace with the evolving technological innovations in their markets on a competitive basis, the TSN Debtors' financial condition and results of operation could be adversely affected. In particular, if existing wireless providers improve their coverage of terrestrial-based systems to make them more ubiquitous, demand for products and services utilizing the TSN Debtors' network could be adversely affected or fail to materialize.

(xiii)   *The Current Weakening of U.S. and Canadian Economic Conditions As Well As Any Future Downturns Or Changes In Consumer Spending Could Adversely Affect The TSN Debtors' Financial Condition.*

The United States and Canada have experienced an economic downturn and spending by consumers has dropped. If this downturn and decrease in spending continues the TSN Debtors' business may be adversely affected. Demand for the services the TSN Debtors plan to offer may not grow or be accepted generally, or in particular geographic markets, for particular types of services, or during particular time periods. A lack of demand could adversely affect the TSN Debtors' ability to sell their services, enter into strategic relationships or develop and successfully market new services.

(xiv)    *Certain portions of the TSN Debtors' Business Require Use of Licenses Of Critical Intellectual Property From ATC Technologies, LLC, A Wholly-Owned Subsidiary Of SkyTerra.*

The Debtors' license the majority of the technology they plan to use to operate their network from ATC Technologies, LLC ("**ATC Technologies**") a wholly-owned subsidiary of SkyTerra. SkyTerra has rights to approximately 30 MHz of spectrum in the L-band, is positioned to achieve device transparency and plans to offer services that compete with the services that the Debtors' plan to offer.

SkyTerra has assigned to ATC Technologies a significant intellectual property portfolio, including a significant number of patents. Pursuant to the agreement by and between ATC Technologies and the Debtors, ATC Technologies granted the Debtors a perpetual, world-wide, non-exclusive, royalty-free, fully paid up, nontransferable (except for certain rights to sublicense), non-assignable, limited purpose right and license to certain existing patents owned by ATC Technologies for the sole purpose of developing, operating, implementing, providing and maintaining S-band or MSS services with an ATC component. ATC Technologies granted back to SkyTerra similar rights to the same intellectual property for L-band services in any geographic territory in the entire world where SkyTerra, one of its affiliates or a joint venture or strategic alliance into which SkyTerra has entered, is authorized to provide L-band services. In addition, ATC Technologies granted rights to MSV International, LLC, or MSVI, a subsidiary of SkyTerra, in and to the same intellectual property for the purpose of providing communications services anywhere in the entire world, excluding services relating to the S-band. The Debtors granted to ATC Technologies a perpetual, world-wide, non-exclusive, royalty-free, fully paid up, nontransferable

(except for certain rights to sublicense), non-assignable, limited purpose right and license to certain existing patents owned or licensed by the Debtors and certain technologies licensed by the Debtors for the sole purpose of developing, operating, implementing, providing and maintaining L-band services or L-band services with an ATC component. ATC Technologies has also contractually committed to license to the Debtors, pursuant to the same terms as set forth above, certain additional patents that may be developed, acquired or otherwise owned by ATC Technologies or its affiliates (including SkyTerra and MSVI), and the Debtors have contractually committed to license to ATC Technologies, pursuant to the same terms as set forth above, certain additional patents and technologies that may be developed, licensed, acquired or otherwise owned by the Debtors until October 1, 2016.

The license agreement between the Debtors and ATC Technologies may be terminated: (1) by mutual written consent of both parties; (2) by either party in the event that the other party fails to perform or otherwise breaches any material obligations under the license agreement and fails to cure such breach within 90 days of receiving notice thereof; or (3) in the event that the other party files a petition for bankruptcy or insolvency or upon certain other insolvency events.

Upon the filings of the Debtors' petition for bankruptcy the license agreement between the Debtors and ATC Technologies was terminated. However, notwithstanding the termination of the license agreement with ATC Technologies, the Debtors will retain their perpetual license to all ATC Technologies intellectual property licensed to the Debtors on a license-by-license basis, until the date of the expiration of the applicable patent under which the license was granted. If ATC Technologies terminates or breaches its agreements with the Debtors or if the Debtors and ATC Technologies have a significant dispute regarding the licensed intellectual property, such termination, breach or significant dispute could have a material adverse effect on the Debtors' business.

The intellectual property the Debtors license from ATC Technologies includes issued patents and technology included in patent applications. The patents for which the Debtors or ATC Technologies have applied may not be issued or, if they are issued, such patents may be insufficient to protect fully the technology the Debtors own or license. Moreover, if such patents prove to be inadequate to protect fully the technology the Debtors own or license, the Debtors ability to implement their business plan and, consequently, their financial condition, may be adversely affected. In addition, any patents that may be issued to the Debtors and any patents licensed to the Debtors from ATC Technologies may be challenged, invalidated or circumvented.

The Debtors also rely upon unpatented proprietary technology and other trade secrets. The Debtors failure to protect such proprietary technology and trade secrets or the lack of enforceability or breach by third parties of agreements into which the Debtors have entered could also adversely affect the Debtors ability to implement their business plan and financial condition.

*(xv)* **The TSN Debtors May Incur Costs, And May Not Be Successful, In Defending Their Rights To Intellectual Property Upon Which the TSN Debtors Depend.**

In developing and implementing the TSN Debtors' network, the TSN Debtors will need to develop or obtain rights to additional technology that is not currently owned by or licensed to them. The TSN Debtors may be unsuccessful in developing additional technologies required to develop and implement their network, and may not be able to protect intellectual property associated with technologies the TSN Debtors develop from infringement by third parties. In addition, if the TSN Debtors are able to develop or license such technologies, there can be no assurance that any patents issued or licensed to the TSN Debtors will not be challenged, invalidated or circumvented. Litigation to defend and enforce these intellectual property rights could result in substantial costs and diversion of resources and could have a material adverse effect on the TSN Debtors' financial condition and results of operations, regardless of the final outcome of such litigation. Despite the TSN Debtors' efforts to safeguard and maintain their proprietary rights, the TSN Debtors may not be successful in doing so, and their competitors may independently develop or patent technologies equivalent or superior to their technologies. It is possible that third parties may infringe upon the TSN Debtors' intellectual property now and in the future.

The TSN Debtors may be unable to determine when third parties are using the TSN Debtors' intellectual property rights without the TSN Debtors' authorization. The undetected or unremedied use of the TSN Debtors' intellectual property rights or the legitimate development or acquisition of intellectual property similar to the TSN Debtors by third parties could reduce or eliminate any competitive advantage the TSN Debtors have as a result of

their intellectual property, adversely affecting their financial condition and results of operations. If the TSN Debtors must take legal action to protect, defend or enforce their intellectual property rights, any suits or proceedings could result in significant costs and diversion of the TSN Debtors' resources and the TSN Debtors' management's attention. Furthermore, the TSN Debtors may not prevail in any such suits or proceedings. A failure to protect, defend or enforce the TSN Debtors' intellectual property rights could have an adverse effect on the TSN Debtors' business, financial condition and results of operations.

*(xvi)*   ***Third Parties May Claim That The Debtors' Products Or Services Infringe Their Intellectual Property Rights.***

Other parties may have patents or pending patent applications relating to integrated wireless technology that may later mature into patents. Such parties may bring suit against the TSN Debtors for patent infringement or other violations of intellectual property rights. The development and operation of the TSN Debtors' system may also infringe or otherwise violate as-yet unidentified intellectual property rights of others. If the TSN Debtors' products or services are found to infringe or otherwise violate the intellectual property rights of others, the Debtors' may need to obtain licenses from those parties or substantially re-engineer their products or processes in order to avoid infringement. The TSN Debtors may not be able to obtain the necessary licenses on commercially reasonable terms, if at all, or be able to re-engineer their products successfully. Moreover, if the TSN Debtors are found by a court of law to infringe or otherwise violate the intellectual property rights of others, the TSN Debtors could be required to pay substantial damages or be enjoined from making, using or selling the infringing products or technology. The TSN Debtors also could be enjoined from making, using or selling the allegedly infringing products or technology, pending the final outcome of the suit. The TSN Debtors' financial condition could be adversely affected if the TSN Debtors are required to pay damages or are enjoined from using critical technology.

*(xvii)*   ***Wireless Devices May, May Be Perceived To, Pose Health and Safety Risks And, As A Result, The TSN Debtors May Be Subject To New Regulations, Demand For The TSN Debtors' Services May Decrease And The Debtors Could Face Liability Or Reputational Harm Based On Alleged Health Risks.***

There has been adverse publicity concerning alleged health risks associated with radio frequency transmissions from portable hand-held telephones that have transmitting antennae, similar to devices that may incorporate the TSN Debtors' universal chipset architecture. Lawsuits have been filed against participants in the wireless industry alleging various adverse health consequences, including cancer, as a result of wireless phone usage. If courts or governmental agencies find that there is valid scientific evidence that the use of portable hand-held devices poses a health risk, or if consumers' health concerns over radio frequency emissions increase for any reason, use of wireless handsets may decline. Further, government authorities might increase regulation of wireless handsets as a result of these health concerns. The actual or perceived risk of radio frequency emissions could have an adverse effect on the Debtors' business, financial condition and results of operations.

*(xviii)*   ***The TSN Debtors May Be Negatively Affected By Industry Consolidation.***

Consolidation in the communications industry could adversely affect the TSN Debtors by increasing the scale or scope of the Debtors' competitors, or creating a competitor that is capable of providing services similar to those the Debtors intend to offer, thereby making it more difficult for the Debtors to compete. Industry consolidation also may impede the Debtors' ability to identify acquisition, joint venture or other strategic opportunities.

*(xix)*   ***Certain Tax Implications of the TSN Debtors' Bankruptcy and Reorganization May Increase the Tax Liability of the Reorganized Debtors.***

Holders of Claims should carefully review Article XIII herein, titled "Certain U.S. Federal Income Tax Consequences of the Plan," to determine how the tax implications of the Plan and the TSN Debtors' chapter 11 cases may adversely affect the Reorganized Debtors. Certain tax implications of the TSN Debtors' bankruptcy and reorganization may increase the tax liability of the Reorganized Debtors.

D.      **Risks Relating to Government Regulations**

*(i)      The TSN Debtors' Business Is Subject To A High Degree Of Government Regulation.*

The communications industry is highly regulated by governmental entities and regulatory authorities, including the FCC and Industry Canada. The Debtors' business is completely dependent upon obtaining and maintaining regulatory authorizations to operate the TSN Debtors' existing MSS network and planned integrated satellite and terrestrial network. The needed authorizations include FCC and Industry Canada authorizations relating to (i) the TSN Debtors' satellite, TerreStar-1, and their ground spare currently under construction, TerreStar-2; (ii) the orbital slot in which TerreStar-1 resides and any additional orbital slot required for TerreStar-2, if any; (iii) the Ground Stations and CES; (iv) the integrated MSS/ATC handsets that will be used by customers to communicate over the TSN Debtors' planned integrated satellite and terrestrial network, including both spectrum authorizations and equipment certifications with respect to such handsets; (v) equipment authorizations with respect to planned terrestrial transmission facilities associated with the ATC component of the TSN Debtors' integrated satellite and terrestrial network; (vi) equipment authorizations related to the GENUS handset; and (vii) certain Section 214 authorizations issued by the FCC with respect to international communications originating or terminating in the United States, as well as other FCC and Industry Canada regulatory authorizations. Failure to obtain or maintain necessary governmental authorizations would impair the TSN Debtors' ability to continue to offer MSS services using their existing MSS network and/or implement their planned network and would have a material adverse effect on their financial condition.

*(ii)      The TSN Debtors Could Lose Their FCC Authorization and Industry Canada Approval In Principal And Be Subject To Fines Or Other Penalties.*

The TSN Debtors must comply with complex and changing FCC and Industry Canada rules and regulations to maintain their authorizations to use their assigned spectrum and orbital slot. The TSN Debtors are required to maintain satellite coverage of all 50 states, the District of Columbia, Puerto Rico, the U.S. Virgin Islands and all regions of Canada that are within the coverage contour of the TerreStar-1 Satellite and to provide an integrated MSS service offering in all locations where the Debtors' ATC is made available. Non-compliance with these or other conditions, including other FCC or Industry Canada gating or ongoing service criteria, could result in fines, additional conditions, revocation of the authorizations, or other adverse FCC or Industry Canada actions. The FCC issued in July 2010 a notice of proposed rulemaking and notice of inquiry in which the FCC sought public comment regarding certain proposed changes to the rules governing the use of 2 GHz MSS spectrum, including for purposes of operating an ATC network. It is not possible to predict what, if any, revisions to the rules applicable to 2 GHz MSS providers will be adopted by the FCC in this pending proceeding or when any such rule changes would be adopted. Such rule changes, if any, could impair the Debtors' ability to execute their business plan and could materially impact the value of the Debtors' FCC authorizations. The loss of the Debtors' spectrum authorizations would prevent them from implementing their business plan.

*(iii)      FCC and Industry Canada Decisions Affecting The Amount of 2 GHz MSS S-band Spectrum Assigned To Us Are Subject To Reconsideration And Review.*

In December 2005, the FCC provided TMI Communications, Inc. ("**TMI Communications**") with a reservation of 10 MHz of uplink MSS spectrum and 10 MHz of downlink MSS spectrum in the 2 GHz MSS S-band. TMI Communications subsequently assigned that authorization to the Debtors and on May 10, 2007 the FCC modified the reservation to reflect that change. Two parties have challenged the FCC's December 2005 ruling, and one party has also challenged a separate decision by the FCC to cancel its own 2 GHz MSS S-band authorization. If these challenges succeed, the amount of 2 GHz MSS S-band spectrum that is available to the TSN Debtors may be reduced to a level that is insufficient for the Debtors to implement their business plan. Furthermore, in Canada, the TSN Debtors' spectrum could be reduced from 20 MHz to 14 MHz if Industry Canada determines that it is necessary to reapportion spectrum in order to license other MSS operators in Canada. Any reduction in the spectrum the TSN Debtors are authorized to use could impair their business plan and materially adversely affect their financial condition.

*(iv)*     *The Debtors Service May Cause Or Be Subject To Interference.*

The Debtors will be required to provide ATC service without causing harmful interference. In addition, the Debtors must accept some interference from certain other spectrum users. For example, the FCC may adopt rules for an adjacent band that do not adequately protect the Debtors against interference. In September 2004, the FCC issued an order allowing PCS operation in the 1995-2000 MHz and in June 2008 sought comment on proposed rules. In September 2007 and June 2008, the FCC sought comment on proposed rules for the 2155-2180 MHz bands. Both bands are adjacent to the 2 GHz MSS S-band. If the rules that the FCC adopts for the 1995-2000 MHz and 2155-2180 MHz bands do not adequately protect the Debtors against adjacent band interference, the Debtors' reputation and ability to compete effectively could be adversely affected. The FCC has stated that it anticipates issuing an order with respect to this matter in the fourth quarter of 2010. Requirements that the Debtors limit the interference they cause, or requiring the Debtors to accept certain levels of interference, may hinder satellite and/or planned ATC operations within the Debtors' system and may, in certain cases, subject the Debtors' users to a degradation in service quality, which may adversely affect the Debtors' reputation and financial condition.

*(v)*     *Technical Challenges Or Regulatory Requirements May Limit The Attractiveness Of Our Spectrum For Providing Mobile Services.*

The TSN Debtors believe their 2 GHz MSS S-band spectrum with ATC capability must be at least functionally equivalent to the PCS/cellular spectrum in order to be attractive to parties with which they may enter into strategic relationships. The FCC and Industry Canada require the TSN Debtors and their non-Debtor affiliates to satisfy certain gating criteria as a precondition to the provision of ATC service using their S-band spectrum, including a requirement that the TSN Debtors and their non-Debtor affiliates provide commercial satellite service throughout the United States and Canada and an "integrated service" requirement. Under the "safe harbor" method for satisfying this latter requirement, that all handsets with ATC functionality must also contain the ability to communicate with the Debtors satellite network. The former requirement may limit the availability of some of the TSN Debtors' spectrum for terrestrial service and the latter requirement may impact whether handsets used to communicate with the TSN Debtor's planned integrated mobile satellite and terrestrial network are perceived by customers to be functionally equivalent to PCS/cellular handsets. In addition, the TSN Debtors may not commence the commercial provision of ATC services more than one year prior to completion of their ground spare satellite, which the TSN Debtors currently intend to be TerreStar-2. The TSN Debtors informed the FCC that they do not expect that TerreStar-2 will be completed until the fourth quarter of 2011. Any delays in such anticipated completion date could delay the date on which the TSN Debtors may begin deploying ATC services. Risks related to the satisfaction of these ATC gating criteria by the TSN Debtors may impact the interest of third parties in entering into strategic relationships with Debtor related to the TSN Debtors' deployment of a planned integrated mobile satellite and terrestrial network. If the TSN Debtors are not able to develop technology that allows the entities with which the Debtors enter into strategic relationships to use the TSN Debtors' spectrum in a manner comparable to PCS/cellular operators, the TSN Debtors' may not be successful in entering into strategic arrangements with these parties.

*(vi)*     *The Debtors May Face Unforeseen Regulations With Which They Find It Difficult, Costly Or Impossible To Comply.*

The provision of communications services is highly regulated. As a provider of communications services in the United States and Canada, the Debtors will be subject to the laws and regulations of both the United States and Canada. Violations of laws or regulations of these countries may result in various sanctions including fines, loss of authorizations and the denial of applications for new authorizations or for the renewal of existing authorizations.

From time to time, governmental entities may impose new or modified conditions on the Debtors authorizations, which could adversely affect their ability to generate revenues and implement their business plan. For example, from time to time, the U.S. federal government has considered imposing substantial new fees on the use of frequencies, such as the ones the Debtors plan to use to provide their service. In the U.S. and Canada, the FCC and Industry Canada, respectively, already collect fees from space and terrestrial spectrum licensees. The Debtors are currently required to pay certain fees, and it is possible that the Debtors may be subject to increased fees in the future.

*(vii)*    ***Export Control and Embargo Laws May Preclude The Debtors From Obtaining Necessary Satellites, Parts Or Data Or Providing Certain Services In The Future.***

The TSN Debtors must comply with U.S. export control laws in connection with any information, products, or materials that they provide to non-U.S. persons relating to satellites, associated equipment and data and with the provision of related services. These requirements may make it necessary for the TSN Debtors to obtain export or re-export authorizations from the U.S. government in connection with any dealings they have with 4491165 Canada Inc., 0887729 B.C. Ltd., TerreStar Canada, TerreStar Canada Holdings, non-U.S. satellite manufacturing firms, launch services providers, insurers, customers and employees. The TSN Debtors may not be able to obtain and maintain the necessary authorizations, which could adversely affect the TSN Debtors' ability to:

- effect the transfer agreements;

- procure new U.S.-manufactured satellites;

-  control any existing satellites;

- acquire launch services;

- obtain insurance and pursue our rights under insurance policies; or

- conduct our satellite-related operations.

In addition, if the TSN Debtors do not properly manage their internal compliance processes and, as a result, violate U.S. export laws, the terms of an export authorization or embargo laws, the violation could make it more difficult, or even impossible, to maintain or obtain licenses and could result in civil or criminal penalties.

*(viii)*   ***FCC And Industry Canada Regulations And Approval Processes Could Delay Or Impede A Transfer Of Control Of The Debtors.***

Any investment that could result in a transfer of control of the TSN Debtors or a transfer of the TSN Debtors' licenses to another party is subject to prior FCC and Industry Canada approval and in some cases could involve a lengthy review period prior to its consummation.  In addition, new and/or substantially increased foreign ownership in TSN Debtors may require the prior approval of the FCC.  The TSN Debtors anticipate that they will need regulatory approvals before the emergence of the TSN Debtors from bankruptcy reorganization.  The TSN Debtors may not be able to obtain any such FCC or Industry Canada approvals on a timely basis, if at all, and the FCC or Industry Canada may impose new or additional license conditions as part of any review of such a request. As a result, these approval requirements could impede or prevent a transfer of control of the TSN Debtors as part of their intended reorganization.

*(ix)*    ***Rules Relating To Canadian Ownership And Control Of TerreStar Canada Are Subject To Interpretation and Change.***

TerreStar Canada is subject to foreign ownership restrictions imposed by the Telecommunications Act (Canada) and the Radiocommunication Act (Canada) and regulations made pursuant to the these acts.  Future determinations by Industry Canada or the Canadian Radio-Television and Telecommunications Commission, or CRTC, or events beyond the TSN Debtors' control, may result in TerreStar Canada ceasing to comply with the relevant legislation.  If such a development were to occur, the ability of TerreStar Canada to operate as a Canadian carrier under the Telecommunications Act (Canada) or to maintain, renew or secure its Industry Canada approval in principle could be jeopardized and the TSN Debtors' business could be materially adversely affected.

### E. Risks Relating to Forward Looking Statements

*(i)*     *Financial Information Is Based On The TSN Debtors' Books And Records And, Unless Otherwise Stated, No Audit Was Performed.*

The financial information contained in this Disclosure Statement has not been audited. In preparing this Disclosure Statement, the TSN Debtors relied on financial data derived from their books and records that was available at the time of such preparation. Although the TSN Debtors have used their reasonable business judgment to ensure the accuracy of the financial information provided in this Disclosure Statement, and while the TSN Debtors believe that such financial information fairly reflects, in all material respects, the financial results of the TSN Debtors, the TSN Debtors are unable to warrant or represent that the financial information contained herein and attached hereto is without inaccuracies.

This Disclosure Statement contains various projections concerning the financial results of the Reorganized Debtors' operations, including the Financial Projections that are, by their nature, forward looking, and which projections are necessarily based on certain assumptions or estimates ultimately prove to be incorrect, the actual future financial results of the Reorganized Debtors may turn out to be different from the Financial Projections. The Financial Projections do not reflect emergence adjustments, including the impact of "fresh start" accounting.

Specifically, the projected financial results contained in this Disclosure Statement reflect numerous assumptions concerning the anticipated future performance of the Reorganized Debtors, some of which may not materialize, including, without limitation, assumptions concerning: (a) the magnitude of the potential adverse impacts of the filing of the Chapter 11 Cases on the Debtors' business, financial condition, or results of operations, including the Debtors' ability to maintain customer and vendor relationships that are critical to their business and the actions and decisions of their creditors and other third parties with interests in the Chapter 11 Cases; (b) the Debtors' ability to obtain approval of Bankruptcy Court with respect to motions in the Chapter 11 Cases prosecuted from time to time and to develop, prosecute, confirm, and consummate one or more plans of reorganization with respect to the Chapter 11 Cases and to consummate all of the transactions contemplated by one or more such plans or upon which consummation of such plans may be conditioned; (c) the timing of Confirmation and Consummation of one or more plans of reorganization in accordance with its terms; (d) the anticipated future performance of the Reorganized Debtors; (e) general economic conditions in the markets in which the Debtors operate, including changes in interest rates or currency exchange rates; (f) the financial condition of the Debtors' customers or suppliers; and (g) other risks described herein and from time to time in TSC's SEC filings.

Due to inherent uncertainties associated with projecting financial results generally, the projections contained in this Disclosure Statement will not be considered assurances or guarantees of the amount of funds or the amount of Claims that may be Allowed in the various Classes. While the TSN Debtors believe that the Financial Projections contained in this Disclosure Statement are reasonable, there can be no assurance that they will be realized.

### F. Risks Relating to Recoveries Under the Plan

*(i)*     *The Recovery to holders of Allowed Claims Cannot Be Stated With Absolute Certainty.*

This Disclosure Statement contains various projections concerning the financial results of the Reorganized Debtors' operations, including the financial projections, that are, by their nature, forward looking, and which projections are necessarily based on certain assumptions and estimates regarding the anticipated future performance of the Reorganized Debtors, including, without limitation, their ability to maintain or increase revenue and gross margins, control future operating expenses or make necessary capital, as well as assumptions concerning general business and economic conditions and overall industry performance and trends, which the TSN Debtors are unable to control. Should any or all of these assumptions or estimates ultimately prove to be incorrect or not materialize, the actual future experiences of the Reorganized Debtors may turn out to be different from the financial projections.

Due to the inherent uncertainties associated with projecting financial results generally, the projections contained in this Disclosure Statement will <u>not</u> be considered assurances or guarantees of the amount of funds or the amount of Claims that may be Allowed in the various Classes. While the TSN Debtors believe that the financial

projections contained in this Disclosure Statement are reasonable, there can be no assurance that they will be realized. Also, because the liquidation analysis, distribution projections and other information contained herein and attached hereto are estimates only, the timing and amount of actual distributions to holders of Allowed Claims may be affected by many factors that cannot be predicted.

The Claims estimates set forth herein are based on various assumptions. The actual amounts of Allowed Claims may differ significantly from those estimates should one or more underlying assumption prove to be incorrect. Such differences may adversely affect the percentage recovery to holders of such Allowed Claims under the Plan. Moreover, the estimated recoveries set forth herein are necessarily based on numerous assumptions, the realization of many of which are beyond the TSN Debtors' control, including, without limitation, (a) the successful reorganization of the TSN Debtors, (b) an assumed date for the occurrence of the Effective Date, (c) the TSN Debtors' ability to achieve the operating and financial results included in the financial projections, (d) the TSN Debtors' ability to maintain adequate liquidity to fund operations and (e) the assumption that capital and equity markets remain consistent with current conditions. The actual amounts of Allowed Claims may differ significantly from those estimates should one or more underlying assumption prove to be incorrect, which could affect the percentage recovery to holders of such Allowed Claims under the Plan, in some instances adversely. Also, the estimated recoveries to holders of Allowed Claims are not intended to represent the private sale values of the Reorganized Debtors' securities.

The distributions available to holders of Allowed Claims under the Plan can be affected by a variety of contingencies, including, without limitation, whether the Bankruptcy Court orders the subordination of any Allowed Claims to other Allowed Claims, whether the TSN Debtors object to the amount or classification of any Claim, or whether, subject to the terms and conditions of the Plan, the TSN Debtors are required to modify certain terms or conditions of the Plan in order to Confirm the Plan. The occurrence of contingencies that could affect distributions available to holders of Allowed Claims under the Plan, however, will not affect the validity of the vote taken by the Impaired Classes to accept or reject the Plan or require any sort of revote by the Impaired Classes.

## G. Disclosure Statement Disclaimer

### (i) No Representations Made Outside this Disclosure Statement Are Authorized.

The information contained in this Disclosure Statement is for purposes of soliciting acceptances of the Plan and may not be relied upon for any other purposes. Except as otherwise provided herein or in the Plan, no representations relating to the TSN Debtors, the chapter 11 cases or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code. Any representations or inducements made to secure your acceptance or rejection of the Plan that are other than as contained in, or included with, this Disclosure Statement, should not be relied upon by you in arriving at your decision. You should promptly report unauthorized representations or inducements to the counsel to the Debtors, the counsel to the Creditors' Committee and the U.S. Trustee.

### (ii) The Debtors Relied on Certain Exemptions from Registration Under the Securities Act.

This Disclosure Statement has not been filed with the SEC or any state regulatory authority. Neither the SEC nor any state regulatory authority has passed upon the accuracy or adequacy of this Disclosure Statement, or the exhibits or the statements contained herein, and any representation to the contrary is unlawful. This Disclosure Statement has been prepared pursuant to section 1125 of the Bankruptcy Code and Rule 3016(b) of the Federal Rules of Bankruptcy Procedure and is not necessarily in accordance with the requirements of federal or state securities laws or other similar laws.

To the maximum extent permitted by section 1145 of the Bankruptcy Code, the Securities Act and other applicable non-bankruptcy law, the issuance of the New Common Stock and the New Preferred Stock will be exempt from registration under the Securities Act by virtue of section 1145 of the Bankruptcy Code or a "no sale" under the Securities Act as described herein.

*(iii)*     ***The Information Herein Was Provided by the Debtors and Relied Upon by Their Advisors.***

Counsel to and other advisors retained by the Debtors have relied upon information provided by the Debtors in connection with the preparation of this Disclosure Statement. Although counsel to and other advisors retained by the Debtors have performed certain limited due diligence in connection with the preparation of this Disclosure Statement, they have not verified independently the information contained herein.

The statements contained in this Disclosure Statement are made by the TSN Debtors as of the date hereof, unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has not been a change in the information set forth herein since that date. While the TSN Debtors have used their reasonable business judgment to ensure the accuracy of all of the information provided in this Disclosure Statement and in the Plan, the TSN Debtors nonetheless cannot, and do not, confirm the current accuracy of all statements appearing in this Disclosure Statement. Further, although the TSN Debtors may subsequently update the information in this Disclosure Statement, the TSN Debtors have no affirmative duty to do so unless ordered to do so by the Bankruptcy Court.

The financial information contained in this Disclosure Statement has not been audited. In preparing this Disclosure Statement, the TSN Debtors relied on financial data derived from their books and records that was available at the time of such preparation. Although the TSN Debtors have used their reasonable business judgment to ensure the accuracy of the financial information provided in this Disclosure Statement, and while the TSN Debtors believe that such financial information fairly reflects the financial condition of the TSN Debtors, the TSN Debtors are unable to warrant or represent that the financial information contained herein and attached hereto is without inaccuracies.

*(iv)*     ***No Legal or Tax Advice Is Provided to You by this Disclosure Statement.***

This Disclosure Statement is not legal advice to you. The contents of this Disclosure Statement should not be construed as legal, business or tax advice. Each holder of a Claim or an Interest should consult his or her own legal counsel and accountant with regard to any legal, tax and other matters concerning his or her Claim or Equity Interest. This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Plan or object to Confirmation of the Plan.

*(v)*     ***No Admissions Are Made by This Disclosure Statement.***

The information and statements contained in this Disclosure Statement will neither constitute an admission of any fact or liability by any Entity (including, without limitation, the Debtors) nor be deemed evidence of the tax or other legal effects of the Plan on the Debtors, the Reorganized Debtors, holders of Allowed Claims or Equity Interest or any other parties in interest. The vote by a holder of an Allowed Claim for or against the Plan does not constitute a waiver or release of any Claims or rights of the TSN Debtors or the Reorganized Debtors (or any party in interest, as the case may be) to object to that holder's Allowed Claim, or recover any preferential, fraudulent or other voidable transfer or assets, regardless of whether any Claims or Causes of Action of the Debtors or their respective Estates are specifically or generally identified herein.

In addition, no reliance should be placed on the fact that a particular litigation claim or projected objection to a particular Claim or Interest is, or is not, identified in this Disclosure Statement. The TSN Debtors or the Reorganized Debtors may seek to investigate, file and prosecute Claims and Interests and may object to Claims after the Confirmation or Effective Date of the Plan irrespective of whether this Disclosure Statement identifies such Claims or Objections to Claims.

*(vi)*     ***Forward Looking Statements In This Disclosure Statement.***

The Debtors make statements in this Disclosure Statement that are considered forward-looking statements under the federal securities laws. The Debtors consider all statements regarding anticipated or future matters, including the following, to be forward-looking statements:

- any future effects as a result of the pendency of the chapter 11 cases;

- the Debtors' expected future financial position, liquidity, results of operations, profitability and cash flows;

- financing plans;

- competitive position;

- business strategy;

- budgets;

- projected cost reductions;

- projected and estimated environmental liabilities;

- other projected and estimated liability costs;

- results of litigation;

- disruption of operations;

- regulatory changes;

- plans and objectives of management for future operations;

- contractual obligations;

- off-balance sheet arrangements;

- growth opportunities for existing services;

- projected price increases;

- projected general market conditions; and

- benefits from new technologies.


Statements concerning these and other matters are not guarantees of the Debtors' future performance. Such statements represent the Debtors' estimates and assumptions only as of the date such statements were made. There are risks, uncertainties and other important factors that could cause the Debtors' actual performance or achievements to be materially different from those they may project and the Debtors undertake no obligation to update any such statement. These risks, uncertainties and factors include:

- the Debtors' ability to develop, confirm and consummate the Plan;

- the Debtors' ability to reduce their overall financial leverage;

- the potential adverse impact of the chapter 11 cases on the Debtors' operations, management and employees, and the risks associated with operating the businesses during the chapter 11 cases;

- customer/partner response to the chapter 11 cases;

- inability to have claims discharged/settled during the chapter 11 cases;

- general economic, business and market conditions, including the recent volatility and disruption in the capital and credit markets and the significant downturn in the overall economy;

- interest rate fluctuations;

- exposure to litigation;

- dependence upon key personnel;

- ability to implement cost reduction and market share initiatives in a timely manner;

- efficacy of new technologies and facilities;

- the financial condition of the Debtors' customers;

- adverse tax changes;

- limited access to capital resources;

- changes in laws and regulations;

- natural disasters; and

- inability to implement the Debtors' business plan.

## XII.
## APPLICATION OF SECURITIES LAWS

### A.       Issuance and Resale of Securities Under the Plan

Section 1145 of the Bankruptcy Code generally exempts the issuance of a security from registration under the Securities Act (and any equivalent state securities or "blue sky" laws) if the following conditions are satisfied: (i) the security is issued by a debtor (or its successor) under a chapter 11 plan, (ii) the recipient of the security holds a claim against, an interest in, or a claim for an administrative expense against, the debtor and (iii) the security is issued entirely in exchange for such claim or interest, or is issued "principally" in exchange for such claim or interest and "partly" for cash or property.

Section 1145 is not available to any entity that is defined as an underwriter as defined in section 1145(b) of the Bankruptcy Code  Section 1145(b) of the Bankruptcy Code defines "underwriter" as an entity who: (A) purchases a claim against, interest in, or claim for an administrative expense in the case concerning, the debtor, if such purchase is with a view to the distribution of any security received or to be received in exchange for such a claim or interest; (B) offers to sell securities offered or sold under a plan for the holder of such securities; (C) offers to buy securities offered or sold under a plan from the holder of such securities, if such offer to buy is (i) with a view to the distribution of such securities, and (ii) under an agreement made in connection with the plan, with the consummation of the plan, or with the offer or sale of securities under the plan; or (D) is an issuer, as used in section 2(a)(11) of the Securities Act, with respect to such securities.  Issuer for these purposes is defined as any person who, directly or indirectly, controls, is controlled by, or is under direct or indirect common control with, the issuer. "Control" (as such term is defined in Rule 405 of Regulation C under the Securities Act) means the possession, direct or indirect, of the power to direct or cause the direction of the policies of a person, whether through the ownership of voting securities, by contract or otherwise.

Securities exempt from registration under section 1145 of the Bankruptcy Code may be resold without registration under the Securities Act or other federal securities laws pursuant to the exemption provided in section 4(1) of the Securities Act, which provides that the registration provisions of the Securities Act do not apply to transactions by persons other than issuers, underwriters or dealers.  In addition, such securities generally may be resold without registration under the state securities laws pursuant to various exemptions provided by the respective laws of several states.  **However, recipients of securities issued under the Plan are advised to consult their own counsel as to the availability of any such exemption from registration in any given instance and as to any applicable requirements or conditions to such availability.**

Securities distributed under the Plan to affiliates of the Company, meaning persons in a "control" relationship with the Company as defined above, would not be eligible for the exemption provided in section 4(1) of the Securities Act.  However, affiliates who receive securities under the Plan that would otherwise qualify for the exemption of section 1145 might still be able to sell those securities without registration pursuant to Rule 144 of the Securities Act.  Rule 144 allows a holder of securities that is an affiliate of an issuer to sell, without registration, the number of such securities that does not exceed, together with all sales of securities of the same class sold for the account of such holder within the preceding three (3) months, the greater of one percent (1%) of the number of outstanding securities in question or the average weekly trading volume in the securities in question during the four (4) calendar weeks preceding the date on which notice of such sale was filed pursuant to Rule 144, subject to the satisfaction of certain other requirements of Rule 144 regarding the manner of sale, notice requirements and the availability of specified current public information regarding the issuer.

There can be no assurance that an active market for any of the securities to be distributed under the Plan will develop and no assurance can be given as to the prices at which they might be traded.

**BECAUSE OF THE COMPLEX, SUBJECTIVE NATURE OF THE QUESTION OF WHETHER A PARTICULAR HOLDER MAY BE AN UNDERWRITER, AFFILIATE OR DEALER, THE TSN DEBTORS MAKE NO REPRESENTATION CONCERNING THE ABILITY OF ANY PERSON TO DISPOSE OF THE SECURITIES TO BE DISTRIBUTED UNDER THE PLAN.**

**MOREOVER, SUCH SECURITIES, OR THE DOCUMENTS THAT ESTABLISH THE TERMS AND PROVISIONS THEREOF, MAY CONTAIN TERMS AND LEGENDS THAT RESTRICT OR**

**INDICATE THE EXISTENCE OF RESTRICTIONS ON THE TRANSFERABILITY OF SUCH SECURITIES.**

**THE TSN DEBTORS RECOMMEND THAT RECIPIENTS OF SECURITIES UNDER THE PLAN CONSULT WITH LEGAL COUNSEL CONCERNING THE LIMITATIONS ON THEIR ABILITY TO DISPOSE OF SUCH SECURITIES.**

B.    **New Common Stock and New Preferred Stock**

The Plan provides that:

(a) each holder of an Allowed Senior Secured Notes Claim shall receive, on the Initial Distribution Date, its Pro Rata share of: (i) 97% of the New Common Stock; and (ii) if such holder's Allowed Senior Secured Notes Claim became an Allowed Claim on or before the Subscription Record Date, Rights to purchase 97% of the Rights Offering Preferred Stock;

(b) each holder of an Allowed Senior Exchangeable Notes Claim shall receive, on the Initial Distribution Date, its Pro Rata share of: (i) at least 1% but no more than 3% of the New Common Stock, and (ii) with respect to holders of Allowed Senior Exchangeable Notes Claims that become Allowed Claims on or before the Subscription Record Date only, Rights to purchase at least 1% but no more than 3% of the Rights Offering Preferred Stock; and

(c) each holder of an Allowed Other Unsecured Claim shall receive its Pro Rata share of: (i) 3% of the New Common Stock minus any amount of New Common Stock distributed to the holders of Allowed Senior Exchangeable Notes Claims pursuant to the Class 5 Distribution, and (ii) with respect to holders of Other Unsecured Claims that become Allowed Claims on or before the Subscription Record Date only, Rights to purchase 3% of the Rights Offering Preferred Stock minus any Rights to purchase Rights Offering Preferred Stock distributed pursuant to the holders of Allowed Senior Exchangeable Notes Claims pursuant to the Class 5 Distribution.

The Debtors believe that the issuance of the New Common Stock, the Rights and, upon exercise of the Rights, the Rights Offering Preferred Stock, are exempt from the registration requirements of the Securities Act and equivalent state securities or "blue sky" laws pursuant to the exemptions contained, as applicable, in section 1145 of the Bankruptcy Code, the Securities Act of 1933, and/or equivalent exemptions in state securities laws.

C.    **Rights Offering: Rights Offering Preferred Stock**

The Rights Offering is described in Article V.D. of the Plan.  Pursuant to the Rights Offering, the Debtors will issue, if applicable, Rights to purchase the Rights Offering Preferred Stock to each holder of an Allowed Senior Secured Notes Claim, Allowed Senior Exchangeable Notes Claim and Allowed Other Unsecured Claim whose Claim became an Allowed Claim on or before the Subscription Record Date.  The Backstop Party, in accordance with and subject to the terms of the Commitment Letter, has agreed to purchase up to $100 million of the Rights Offering Preferred Stock.

# XIII.
## CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

The following is a summary of certain U.S. federal income tax consequences of the Plan to the Debtors and certain holders of Claims. This summary is based on the Internal Revenue Code of 1986, as amended (the "Tax Code"), Treasury Regulations thereunder, and administrative and judicial interpretations and practice, all as in effect on the date of this Disclosure Statement and all of which are subject to change, with possible retroactive effect. Due to the lack of definitive judicial and administrative authority in a number of areas, substantial uncertainty may exist with respect to some of the tax consequences described below. No opinion of counsel has been obtained, and the Debtors do not intend to seek a ruling from the Internal Revenue Service (the "IRS") as to any of the tax consequences of the Plan discussed below. Events occurring after the date of the Disclosure Statement, including changes in law and changes in administrative positions, could affect the U.S. federal income tax consequences of the Restructuring. No representations are being made regarding the particular tax consequences of the confirmation and consummation of an Offer or the Plan to the Company or any Holder. There can be no assurance that the IRS will not challenge one or more of the tax consequences of the Plan described below.

This summary does not apply to holders of Claims that are not United States persons (as such term is defined in the Tax Code) or that are otherwise subject to special treatment under U.S. federal income tax law (including, for example, banks, governmental authorities or agencies, financial institutions, insurance companies, pass-through entities, tax-exempt organizations, brokers and dealers in securities, mutual funds, small business investment companies, employees, persons who receive their Claims or Interests pursuant to the exercise of an employee stock option or otherwise as compensation, persons holding Claims or Interests that are a hedge against, or that are hedged against, currency risk or that are part of a straddle, constructive sale, or conversion transaction and regulated investment companies). The following discussion assumes that holders of Allowed Claims hold such Claims as "capital assets" within the meaning of section 1221 of the Tax Code. Moreover, this summary does not purport to cover all aspects of U.S. federal income taxation that may apply to the Debtors and holders of Allowed Claims based upon their particular circumstances. Additionally, this summary does not discuss any tax consequences that may arise under any laws other than U.S. federal income tax law, including under state, local, or foreign tax law.

For purposes of this summary, a "U.S. Holder" means a holder of Claims that, in any case, is, for U.S. federal income tax purposes: (i) an individual that is a citizen or resident of the United States; (ii) a corporation, or other entity treated as a corporation for U.S. federal income tax purposes, created or organized in or under the laws of the United States, any state thereof or the District of Columbia; (iii) an estate, the income of which is subject to U.S. federal income taxation regardless of its source; or (iv) a trust (x) if a court within the United States is able to exercise primary supervision over its administration and one or more United States persons have the authority to control all of the substantial decisions of such trust or (y) that has a valid election in effect under applicable Treasury Regulations to be treated as a U.S. person. A "Non-U.S. Holder" means a holder of Claims that is not a U.S. Holder and is, for U.S. federal income tax purposes, an individual, corporation (or other entity treated as a corporation for U.S. federal income tax purposes), estate or trust.

If an entity taxable as a partnership for U.S. federal income tax purposes holds Claims, the U.S. federal income tax treatment of a partner (or other owner) of the entity generally will depend on the status of the partner (or other owner) and the activities of the entity. Such partner (or other owner) should consult its tax advisor as to the tax consequences of the entity's ownership or disposition of Claims, New Common Stock, and Rights Offering Preferred Stock, if any.

The U.S. federal income tax consequences of the Plan are complex. The following summary is for information purposes only and is not a substitute for careful tax planning and advice based on the particular circumstances of each holder of a Claim or Interest. Each holder of a Claim or Interest is urged to consult his, her, or its own tax advisors as to the U.S. federal income tax consequences, as well as other tax consequences, including under any applicable state, local, and foreign law, of the restructuring described in the Plan.

**IRS CIRCULAR 230 DISCLOSURE: TO ENSURE COMPLIANCE WITH REQUIREMENTS IMPOSED BY THE IRS, ANY TAX ADVICE CONTAINED IN THIS DISCLOSURE STATEMENT (INCLUDING ATTACHMENTS) IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE**

**USED, BY ANY TAXPAYER FOR THE PURPOSE OF AVOIDING TAX-RELATED PENALTIES UNDER THE IRC. THE TAX ADVICE CONTAINED IN THIS DISCLOSURE STATEMENT (INCLUDING ATTACHMENTS) WAS WRITTEN TO SUPPORT THE PROMOTION OR MARKETING OF THE TRANSACTIONS DESCRIBED IN THIS DISCLOSURE STATEMENT. EACH TAXPAYER SHOULD SEEK ADVICE BASED ON THE TAXPAYER'S PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.**

A.     **Certain U.S. Federal Income Tax Consequences to the Reorganized Debtors**

*(i)*     Cancellation of Debt and Reduction of Tax Attributes

As a result of the Plan, the TSN Debtors' aggregate outstanding indebtedness will be substantially reduced. In general, absent an exception, a debtor will recognize cancellation of debt ("***COD***") income upon discharge of its outstanding indebtedness for an amount less than its adjusted issue price. The amount of COD income, in general, is the excess of (a) the adjusted issue price of the indebtedness discharged, over (b) the sum of the issue price of any new indebtedness of the taxpayer issued, the amount of cash paid and the fair market value of any other consideration, including stock of the TSN Debtors, given in exchange for such indebtedness at the time of the exchange.

A debtor is not, however, required to include any amount of COD income in gross income if such debtor is under the jurisdiction of a court in a chapter 11 bankruptcy proceeding and the discharge of debt occurs pursuant to that proceeding. Instead, as a price for the exclusion of COD income under the foregoing rule, Section 108 of the Tax Code requires the debtor to reduce (as of the first day of the taxable year following the year of the debt discharge) its tax attributes by the amount of COD income which it excluded from gross income. As a general rule, tax attributes will be reduced in the following order: (i) net operating losses ("***NOLs***"), (ii) most tax credits, (iii) capital loss carryovers, (iv) tax basis in assets (but not below the amount of liabilities to which the debtor remains subject), and (v) foreign tax credits. A debtor with COD income may elect first to reduce the basis of its depreciable assets under IRC Section 108(b)(5).

The amount of COD income (and, accordingly, the amount of tax attributes required to be reduced) cannot be known with certainty until after the Effective Date. Thus, although it is expected that a reduction of tax attributes will be required, the exact amount of such reduction cannot be predicted with certainty.

Any required reduction in tax attributes of a member of a consolidated group applies first to any tax attributes attributable to the debtor realizing the COD income at issue. To the extent the debtor reduces its tax basis in the stock of another member of the consolidated group (which basis may not be reduced below zero) such other member is required to reduce its tax attributes by an equivalent amount.

With respect to transactions giving rise to COD income occurring in 2009 and 2010, a debtor may elect to defer the recognition of the COD income, and thus the requirement to pay tax currently, until 2014. If the debtor defers such COD income until 2014, the COD income is then included in income ratably over the 5 taxable year period beginning in 2014. In certain cases, debtors may make the deferral election on a protective basis.

*(ii)*     Impact of Senior Secured Notes Treatment as Applicable High Yield Discount Obligations ("***AHYDO***")

The Senior Secured Notes are subject to the provisions of the Tax Code dealing with applicable high yield discount obligations. In general, an AHYDO is any debt instrument with "significant original issue discount," a maturity date that is more than five years from the issue date and a yield to maturity that is at least five percentage points higher than the applicable federal rate on the issue date. When the Senior Secured Notes were issued with a yield of 15% in February 2007, the applicable federal rate was 4.61%. As such, any interest deductions with respect to any original issue discount ("***OID***") related to the Senior Secured Notes have been deferred until paid in cash or in other property (other than stock or debt issued by the TSN Debtors or by a person deemed to be related to the TSN Debtors under section 453(f)(1) of the Tax Code), and have been disallowed to the extent the yield to maturity on the Senior Secured Notes exceeds six percentage points over the applicable federal rate. Pursuant to the Plan, the deduction for the amount of interest on the Senior Secured Notes that has been previously deferred will be permanently disallowed because holders of Senior Secured Notes Claims will receive New Common Stock of the

Reorganized Debtors in exchange for these Claims. As a result, this interest will not be a part of the consolidated outstanding indebtedness in the calculation of COD income of the TSN Debtors because of the disallowance.

*(iii)*     ***Limitation of Net Operating Loss Carry Forwards and Other Tax Attributes***

The TSN Debtors collectively will have NOL carryovers at the time of the exchange of approximately $[__] million, a portion of which is subject to limitations, as discussed below, from prior ownership changes. Additionally, the Debtors collectively will have approximately $110 million capital losses from 2008 available for five (5) year carryforward at the time of the exchange. The precise amount of NOL carryovers and other tax attributes, including capital losses, that will be available to the TSN Debtors collectively and individually after emergence is based on a number of factors and is impossible to calculate at this time. Some of the factors that will impact the amount of available NOLs include: the amount of tax losses incurred by the TSN Debtors in 2010; the value of the New Common Stock and the Rights Offering Preferred Stock; the amount of COD Income, if any, realized by the TSN Debtors under the Plan; and the extent to which different Debtors are affiliated or combined pursuant to the Plan.

Under sections 382 and 383 of the Tax Code, if a corporation undergoes an "ownership change," the amount of its pre-change losses that may be utilized to offset future taxable income generally is subject to an annual limitation. At this time, the TSN Debtors anticipate that the issuance of the New Common Stock and New Preferred Stock, under the Plan are likely to result in an "ownership change" of the TSN Debtors for these purposes, and that the TSN Debtors' use of their pre-change losses is likely to be subject to limitation unless an exception to the general rules of sections 382 and 383 of the Tax Code applies.

a.     General Section 382 Annual Limitation

In general, the amount of the annual limitation to which a corporation that undergoes an "ownership change" would be subject is equal to the product of (i) the fair market value of the stock of the corporation immediately before the "ownership change" (with certain adjustments) multiplied by (ii) the "long-term tax-exempt rate" (which is the highest of the adjusted Federal long-term rates in effect for any month in the 3-calendar-month period ending with the calendar month in which the "ownership change" occurs; 3.86% for November 2010). Any unused limitation may be carried forward, thereby increasing the annual limitation in the subsequent taxable year.

b.     Special Bankruptcy Exceptions

An exception to the foregoing annual limitation rules generally applies when so-called "qualified creditors" of a debtor company in chapter 11 receive, in respect of their claims, at least 50% of the vote and value of the stock of the reorganized debtor (or a controlling corporation if also in chapter 11) pursuant to a confirmed chapter 11 plan (the "***382(l)(5) Exception***"). Under the 382(l)(5) Exception, a debtor's pre-change losses are not limited on an annual basis but, instead, are required to be reduced by the amount of any interest deductions claimed during the three taxable years preceding the effective date of the plan of reorganization, and during the part of the taxable year prior to and including the effective date of the plan of reorganization, in respect of all debt converted into stock in the reorganization. If the 382(l)(5) Exception applies and the Debtors undergo another "ownership change" within two (2) years after consummation of the Plan, then the Debtors' annual limitation to use their pre-change losses against their future income would be reduced to zero.

Where the 382(l)(5) Exception is not applicable (either because the debtor does not qualify for it or the debtor elects not to utilize the 382(l)(5) Exception), a second special rule will generally apply (the "***382(l)(6) Exception***"). Under the 382(l)(6) Exception, the limitation will be calculated by reference to the lesser of the value of the debtor corporation's new stock (with certain adjustments) immediately after the ownership change or the value of such debtor corporation's assets (determined without regard to liabilities) immediately before the ownership change. This differs from the ordinary rule that requires the fair market value of a debtor corporation that undergoes an "ownership change" to be determined before the events giving rise to the change. The 382(l)(6) Exception also differs from the 382(l)(5) Exception in that under the 382(l)(6) Exception the debtor corporation is not required to reduce its NOLs by the amount of interest deductions claimed during the current year and three preceding years with respect to the debt converted to equity, and the debtor may undergo a change of ownership within two (2) years without reducing the annual limitation on its NOLs to zero.

The issuance under the Plan of New Common Stock and the Rights Offering Preferred Stock, along with the cancellation of existing stock of the TSN Debtors, is expected to cause an ownership change with respect to the TSN Debtors. Upon an ownership change, the TSN Debtors' pre-change losses would be subject to the Section 382 limitation (as described above). The TSN Debtors anticipate that any limitation arising under the Plan will be calculated according to the 382(l)(6) Exception. If an ownership change occurs contrary to expectation, the TSN Debtors are uncertain, at this time, whether they would qualify for the 382(l)(5) Exception, and whether the consequences of that rule would be favorable relative to those under the 382(l)(6) Exception.

*(iv)* ***Special Considerations in the Application of COD Rules and Reduction of Tax Attributes to Debtors***

As described above, the TSN Debtors will have substantial NOLs and capital losses available at the time of the exchange. These tax attributes may be available for reduction as part of the COD income exclusion under section 108. A critical issue is the entity that incurred the particular NOLs or capital losses. The entity that realizes but does not recognize COD income is required to reduce its tax attributes. However, NOLs in a sister company generally cannot be utilized to the extent the company with COD income has tax attributes that can be reduced – whether NOLs, capital losses, tax credits, or basis in its assets or a subsidiary.

*(v)* ***Alternative Minimum Tax***

In general, an alternative minimum tax ("***AMT***") is imposed on a corporation's alternative minimum taxable income at a 20% rate to the extent that such tax exceeds the corporation's regular federal income tax. For purposes of computing taxable income for AMT purposes, certain tax deductions and other beneficial allowances are modified or eliminated. In particular, even though a corporation otherwise might be able to offset all of its taxable income for regular tax purposes by available NOL carry-forwards, only 90% of a corporation's taxable income from AMT purposes may be offset by available NOL carry-forwards (as computed for AMT purposes).

In addition, if a corporation undergoes an ownership change, within the meaning of section 382 of the Tax Code and is in a net unrealized built-in loss position (as determined for AMT purposes) on the date of the ownership change, the corporation's aggregate tax basis in its assets would be adjusted for certain AMT purposes to reflect the fair market value of such assets as of the change date.

## B.    Certain U.S. Federal Income Tax Consequences to the U.S. Holders under the Plan

The U.S. federal income tax consequences of the Plan to U.S. Holders and the character, amount and timing of income, gain or loss recognized as a consequence of the Plan and the distributions provided for or by the Plan generally will depend upon, among other things, (i) the manner in which a holder acquired a Claim; (ii) the length of time a Claim has been held; (iii) whether the Claim was acquired at a discount; (iv) whether the holder has taken a bad debt deduction in the current or prior years; (v) whether the holder has previously included accrued but unpaid interest with respect to a Claim; (vi) the holder's method of tax accounting; (vii) whether the holder will realize foreign currency exchange gain or loss with respect to a Claim; and (viii) whether a Claim is an installment obligation for federal income tax purposes. Therefore, holders of Claims are urged to consult their tax advisors for information that may be relevant to their particular situation and circumstances and the particular tax consequences to such holders as a result thereof.

*(i)* ***Consequences to U.S. Holders of Allowed Senior Secured Notes Claims (Class 3)***

Each U.S. Holder of an Allowed Senior Secured Notes Claim shall receive, on the Initial Distribution Date, its pro rata share of 97% of: (i) the New Common Stock and (ii) Rights to purchase the Rights Offering Preferred Stock. U.S. Holders receiving Rights to purchase the Rights Offering Preferred Stock should see the "Rights Offering" discussion below.

The U.S. federal income tax consequences of the Plan to such U.S. Holders of Claims will depend, in part, on whether the Claims surrendered constitute "securities" for U.S. federal income tax purposes.

Whether a debt instrument constitutes a "security" is determined based on all the facts and circumstances, but most authorities have held that the length of the term of a debt instrument at initial issuance is an important

factor in determining whether such instrument is a security for federal income tax purposes. These authorities have indicated that a term of less than five years is evidence that the instrument is not a security, whereas a term of ten (10) years or more is evidence that it is a security. There are numerous other factors that could be taken into account in determining whether a debt instrument is a security, including the security for payment, the creditworthiness of the obligor, the subordination or lack thereof with respect to other creditors, the right to vote or otherwise participate in the management of the obligor, convertibility of the instrument into an equity interest of the obligor, whether payments of interest are fixed, variable or contingent and whether such payments are made on a current basis or accrued. The Senior Secured Notes Claims may or may not constitute securities as the Senior Secured Notes have a term of approximately six (6) years.

If a U.S. Holder's Claims are treated as "securities" for federal income tax purposes, then the receipt of New Common Stock and the Rights in exchange for Allowed Senior Secured Notes Claims should constitute a "recapitalization" under section 368(a)(1)(E) of the Tax Code. As a result, except as discussed below with respect to accrued interest and in regards to "market discount", a U.S. Holder of such an Allowed Claim should not recognize gain or loss on the exchange of its Claim for New Common Stock and Rights. The U.S. Holder's basis in the New Common Stock and the Rights will be the same as the basis of the surrendered Claims immediately before the exchange, allocated between the New Common Stock and the Rights based on the relative fair market value of each. The U.S. Holder's holding period in the New Common Stock and the Rights will be the same as the holding period of the surrendered Claims immediately before the exchange.

If the Senior Secured Notes Claims are not be treated as "securities" for federal income tax purposes, a U.S. Holder should be treated as exchanging its Claims for New Common Stock and Rights in a fully taxable exchange. In that case, the Holder should recognize gain or loss equal to the difference between (1) the fair market value as of the Effective Date of the New Common Stock and of the Rights Offering that is not allocable to accrued interest (not previously included in income) and (2) the U.S. Holder's tax basis in the Claims surrendered by the U.S. Holder (other than any tax basis attributable to accrued interest not previously included in income). See "Impact of Treatment of Senior Secured Notes as Applicable High Yield Discount Obligations" for a discussion on the AHYDO rules impact on a U.S. Holder's basis in its Allowed Senior Secured Notes Claims. Such gain or loss should be capital in nature if the Claims were held as capital assets by the U.S. Holder (subject to the "market discount" rules described below) and should be long-term capital gain or loss if the Claims were held for more than one year by the U.S. Holder. If the Holder is a non-corporate taxpayer, any such long-term capital gain will be taxed at preferential rates. The deductibility of capital losses is subject to limitations, see discussion below. To the extent that a portion of the New Common Stock received in the exchange is allocable to accrued interest, the Holder may recognize ordinary income. See the discussion of "Accrued Interest but Unpaid Interest" below.

In a taxable exchange, a U.S. Holder's tax basis in the New Common Stock and the Rights should equal the fair market value as of the Effective Date. A U.S. Holder's holding period for the New Common Stock should begin on the day following the Effective Date. For consequences of exercising the Rights, see "Rights Offering" discussion below.

*(ii)* *Consequences to Holders of Allowed Senior Exchangeable Notes Claims (Class 5) and Allowed Other Unsecured Claims (Class 6)*

Each U.S. Holder of a Senior Exchangeable Notes Claim shall receive, on the Initial Distribution Date, its pro rata share of the Class 5 Distribution. Each U.S. Holder of a Other Unsecured Claim shall receive its pro rata share the Class 6 Distribution. U.S. Holders receiving Rights to purchase the Rights Offering Preferred Stock should see the "Rights Offering" discussion below.

The U.S. federal income tax consequences of the Plan to such U.S. Holders of Claims will depend, in part, on whether the Claims surrendered constitute "securities" for U.S. federal income tax purposes, see discussion above. The Senior Exchangeable Notes Claims may or may not constitute securities as the Senior Secured Notes have a term of approximately six (6) years. The debt instruments underlying the Other Unsecured Claims may or may not constitute securities.

If a U.S. Holder's Claims are treated as "securities" for federal income tax purposes, then the receipt of New Common Stock and the Rights in exchange for Allowed Claims should constitute a "recapitalization" under section 368(a)(1)(E) of the Tax Code. As a result, except as discussed below with respect to accrued interest and in

regards to "market discount", a U.S. Holder of such an Allowed Claim should not recognize gain or loss on the exchange of its Claim for New Common Stock and Rights. The Holder's basis and holding period in the New Common Stock and the Rights will be the same as the basis and holding period in the surrendered Claims immediately before the exchange.

If the Claims are not treated as "securities" for federal income tax purposes, a U.S. Holder should be treated as exchanging its Claims for New Common Stock and Rights in a fully taxable exchange. In that case, the Holder should recognize gain or loss equal to the difference between (1) the fair market value as of the Effective Date of the New Common Stock and the Rights that is not allocable to accrued interest (not previously included in income) and (2) the U.S. Holder's tax basis in the Claims surrendered by the U.S. Holder (other than any tax basis attributable to accrued interest not previously included in income). Such gain or loss should be capital in nature if the Claims were held as capital assets by the U.S. Holder (subject to the "market discount" rules described below) and should be long-term capital gain or loss if the Claims were held for more than one year by the U.S. Holder. If the Holder is a non-corporate taxpayer, any such long-term capital gain will be taxed at preferential rates. The deductibility of capital losses is subject to limitations, see discussion below. To the extent that a portion of the New Common Stock received in the exchange is allocable to accrued interest, the Holder may recognize ordinary income. See the discussion of accrued interest below.

In a taxable exchange, a U.S. Holder's tax basis in the New Common Stock and Rights should equal the fair market value as of the Effective Date. A U.S. Holder's holding period for the New Common Stock should begin on the day following the Effective Date. If the Rights have any value as of the Effective Date, their basis should equal such amount. For consequences of exercising the Rights, see "Rights Offering" discussion below.

### (iii)     Consequences to U.S. Holders of Allowed Unsecured Convenience Claims

Each U.S. Holder of an Allowed Unsecured Convenience Claim shall receive Cash in an amount equal to such holders' Unsecured Convenience Claim.

U.S. Holders should recognize capital gain or loss (which capital gain or loss would be long-term capital gain or loss to the extent that the U.S. Holder has held the debt instrument underlying its Claim for more than one year) in an amount equal to the amount of Cash received over the U.S. Holder's adjusted basis its Allowed Unsecured Convenience Claims. To the extent that a portion of the Cash received represents accrued but unpaid interest that the Holder has not already taken into income, the Holder should recognize ordinary interest income. See "Accrued but Unpaid Interest" below.

### (iv)     Rights Offering

A recipient of Rights to purchase Rights Offering Preferred Stock generally should not recognize taxable gain or loss upon the exercise of its Rights. If a U.S. Holder allows the Rights received under the Plan to expire, it should recognize capital loss equal to its basis (if any) in such expiring Rights. The tax basis in the New Preferred Stock received upon participation in the Rights Offering should equal the amount paid for such New Preferred Stock, including the basis, allocable to the Rights. The holding period in such New Preferred Stock received should commence the day following its acquisition.

### (v)     Ownership and Disposition of New Common Stock and New Preferred Stock

Dividends on New Common Stock and New Preferred Stock. Distributions made with respect to New Common Stock received under the Plan or New Common Stock received upon the exercise of the Rights generally will be treated as dividends to a U.S. Holder to the extent of current and accumulated earnings and profits of the Reorganized Debtors as determined under U.S. federal income tax principles, at the end of the tax year of the distribution. To the extent the distributions exceed the current and accumulated earnings and profits of the Reorganized Debtors, the excess will be treated first as a tax-free return of capital to the extent of the U.S. Holder's adjusted tax basis in the New Common Stock or New Preferred Stock and thereafter as capital gain. Corporate U.S. Holders generally will be entitled to claim the dividends received deduction with respect to dividends paid on New Common Stock or New Preferred Stock, subject to applicable restrictions, including satisfaction of applicable holding period requirements.

Sale or Other Disposition of New Common Stock or New Preferred Stock. Upon the sale or other disposition of New Common Stock received under the Plan or New Preferred Stock received upon the exercise of the Rights, a U.S. Holder generally will recognize capital gain or loss equal to the difference between (i) the amount of cash and the fair market value of any property received upon the sale or other disposition and (ii) the U.S. Holder's adjusted tax basis in the New Common Stock or New Preferred Stock. Such capital gain or loss will be long-term if the U.S. Holder's holding period in respect of such New Common Stock or New Preferred Stock is more than one year. The deductibility of capital losses is subject to limitations, see discussion below.

### (vi) *Accrued but Unpaid Interest*

A portion of the consideration received by participating U.S. Holders may be attributable to accrued but unpaid interest with respect to their Claims. Such amount should be taxable to the U.S. Holders as ordinary interest income to the extent that the accrued interest has not been previously included in the U.S. Holder's gross income for U.S. federal income tax purposes. Conversely, a U.S. Holder generally recognizes a deductible loss to the extent that any accrued interest was previously included in income and is not paid in full. If the Plan is consummated, the Debtors will allocate for U.S. federal income tax purposes all distributions in respect of any Claim first to the principal amount of such Claim, and thereafter to accrued but unpaid interest, pursuant to the Plan. Certain legislative history indicates that an allocation of consideration between principal and interest provided for in a bankruptcy plan of reorganization is binding for U.S. federal income tax purposes. However, no assurance can be given that the IRS will not challenge such allocation. If a distribution with respect to a Claim is allocated entirely to the principal amount of such Claim, a U.S. Holder may be entitled to claim a loss to the extent of any accrued but unpaid interest on the Claim that was previously included in the U.S. Holder's gross income. U.S. Holders of Claims should consult their tax advisors regarding the proper allocation of the consideration received by them under the Plan, as well as the character of any loss claimed with respect to accrued but unpaid interest previously included in gross income.

### (vii) *Market Discount*

Under the "market discount" provisions of sections 1276 through 1278 of the Tax Code, some or all of any gain realized by a U.S. Holder exchanging the debt instruments constituting its Allowed Claim may be treated as ordinary income (instead of capital gain), to the extent of the amount of "market discount" on the debt constituting the surrendered Allowed Claim.

In general, a debt instrument is considered to have been acquired with "market discount" if its holder's adjusted tax basis in the debt instrument is less than (i) the sum of all remaining payments to be made on the debt instrument, excluding "qualified stated interest" or, (ii) in the case of a debt instrument issued with original issue discount ("***OID***"), its adjusted issue price, by at least a de minimis amount (equal to 0.25% of the sum of all remaining payments to be made on the debt instrument, excluding qualified stated interest, multiplied by the number of remaining whole years to maturity).

Any gain recognized by a U.S. Holder on the taxable disposition (determined as described above) of debts that it acquired with market discount would be treated as ordinary income to the extent of the market discount that accrued thereon while such debts were considered to be held by the U.S. Holder (unless the U.S. Holder elected to include market discount in income as it accrued). To the extent that the surrendered debts that had been acquired with market discount are exchanged in a tax-free or other reorganization transaction for other property (as may occur here), any market discount that accrued on such debts but was not recognized by the U.S. Holder may be required to be carried over to the property received therefor and any gain recognized on the subsequent sale, exchange, redemption or other disposition of such property may be treated as ordinary income to the extent of the accrued but unrecognized market discount with respect to the exchanged debt instrument.

### (viii) *Limitations on Use Capital Losses*

U.S. Holders of Claims who recognize capital losses as a result of the distributions under the Plan will be subject to limits on their use of capital losses. For noncorporate holders, capital losses may be used to offset any capital gains (without regard to holding periods) plus ordinary income to the extent of the lesser of (1) $3,000 ($1,500 for married individuals filing separate returns) or (2) the excess of the capital losses over the capital gains.

Holders, other than corporations, may carry over unused capital losses and apply them to capital gains and a portion of their ordinary income for an unlimited number of years. For corporate holders, losses from the sale or exchange of capital assets may only be used to offset capital gains. Holders who have more capital losses than can be used in a tax year may be allowed to carry over the excess capital losses for use in succeeding tax years. Corporate holders may only carry over unused capital losses for the five years following the capital loss year, but are allowed to carry back unused capital losses to the three years preceding the capital loss year.

*(ix)* *Information Reporting and Backup Withholding*

In general, U.S. Holders (other than corporations and other exempt holders) will be subject to information reporting requirements with respect to interest, dividends and other taxable distributions paid in respect of, and the proceeds from a sale, redemption or other disposition of, the New Common Stock or New Preferred Stock, if applicable. In addition, such U.S. Holders may be subject to backup withholding on such payments if such U.S. Holder (i) fails to provide an accurate taxpayer identification number to the payor; (ii) has been notified by the IRS of a failure to report all interest or dividends required to be shown on its U.S. federal income tax returns; or (iii) in certain circumstances, fails to comply with applicable certification requirements.

Any amounts withheld under the backup withholding rules will be allowed as a refund or a credit against a U.S. Holder's U.S. federal income tax liability, provided that the required information is furnished to the IRS on a timely basis. A U.S. Holder should consult its tax advisors regarding the application of information reporting and backup withholding rules in their particular situations, the availability of an exemption therefrom, and the procedure for obtaining such an exemption, if applicable.

### C. General U.S. Federal Income Tax Consequences to Non-U.S. Holders

The rules governing U.S. federal income taxation of a Non-U.S. Holder are complex. Each Non-U.S. Holder should consult with its own tax advisor to determine the effect of U.S. federal, state, local and foreign income tax laws, as well as treaties, with regard to its participation in the transactions contemplated by the Plan, and its ownership of Claims, New Common Stock, and New Preferred Stock.

*(i)* *Tax Consequences to Non-U.S. Holders of Plan*

a. Tax Consequences of Non-U.S. Holders Under the Plan

A Non-U.S. Holder generally will not be subject to U.S. federal income tax with respect to any New Common Stock, Rights, and Cash received in the Plan, unless (i) such Non-U.S. Holder is engaged in a trade or business in the United States to which income, gain or loss from the exchange is "effectively connected" for U.S. federal income tax purposes, or (ii) such Non-U.S. Holder is an individual and is present in the United States for 183 days or more during the taxable year of the exchange and certain other requirements are met.

b. Non-U.S. Holders of New Common Stock or New Preferred Stock

If a Non-U.S. Holder receives New Common Stock or New Preferred Stock under the Plan, distributions of cash and property that Reorganized Debtors make in respect of New Common Stock or New Preferred Stock will constitute dividends for U.S. federal income tax purposes to the extent of its current or accumulated earnings and profits (as determined under U.S. federal income tax principles). Distributions of cash and property that constitute dividends for U.S. federal income tax purposes generally will be subject to U.S. federal withholding at a 30% rate unless a reduced rate is prescribed by an applicable income tax treaty. If the amount of a distribution exceeds Reorganized Debtors' current and accumulated earnings and profits, such excess first will be treated as a return of capital to the extent of a Non-U.S. Holder's tax basis in the New Common Stock or New Preferred Stock and thereafter will be treated as gain from the disposition of such New Common Stock or New Preferred Stock, subject to tax as described below in "Sale, Exchange or Disposition of New Common Stock or New Preferred Stock."

In order to obtain a reduced rate of U.S. withholding tax under an applicable income tax treaty, a Non-U.S. Holder will be required to provide a properly executed IRS Form W-8BEN certifying its entitlement to benefits under the treaty. If a Non-U.S. Holder is eligible for a reduced rate of U.S. withholding tax under a treaty, the Non-U.S. Holder may obtain a refund or credit of any excess amounts withheld by filing an appropriate claim for a

refund with the IRS. Each Non-U.S. Holder should consult its own tax advisor regarding its possible entitlement to benefits under a treaty.

The U.S. federal withholding tax described above will not apply to dividends paid to a Non-U.S. Holder if such dividends represent U.S. trade or business income for the Non-U.S. Holder and the Non-U.S. Holder provides a properly executed IRS Form W-8ECI certifying that the dividends are effectively connected with the Non-U.S. Holder's conduct of a trade or business within the U.S. because the dividends are otherwise subject to tax in the U.S. as part of their trade or business income.

c.      Effectively Connected Income and Loss

If a Non-U.S. Holder is engaged in a trade or business in the U.S. and if dividends received in respect of New Common Stock or New Preferred Stock, or gain or loss realized on the disposition of New Common Stock or New Preferred Stock are "effectively connected" with the conduct of such U.S. trade or business, any such dividends, gain or loss realized by the Non-U.S. Holder will be subject to full net-basis U.S. federal income tax in the same manner as if the Non-U.S. Holder were a U.S. Holder, unless an applicable income tax treaty provides otherwise. In addition, if the Non-U.S. Holder is a foreign corporation, the Non-U.S. Holder may also be subject to a "branch profits tax" on earnings and profits effectively connected with such U.S. trade or business (subject to certain adjustments) at a rate of 30%, unless the branch profits tax is reduced or eliminated by an applicable income tax treaty. Even though any such effectively connected income would be subject to income tax, and might also be subject to branch profits tax, it would not be subject to withholding tax if the Non-U.S. Holder satisfied the applicable certification requirements described above. Non-U.S. Holders should discuss the applicability of the "effectively connected" rules with their tax advisors.

d.      Sale, Exchange or Disposition of New Common Stock and New Preferred Stock

Subject to the discussion below concerning backup withholding, if a Non-U.S. Holder owns New Common Stock or New Preferred Stock, the Non-U.S. Holder generally will not be subject to U.S. federal income tax with respect to any gain or loss realized on the sale, exchange or other taxable disposition of such New Common Stock or New Preferred Stock, unless:

a.      the Non-U.S. Holder is an individual who is present in the U.S. for 183 days or more in the taxable year of disposition, and certain other conditions are met;

b.      such gain is effectively connected with the Non-U.S. Holder's conduct of a trade or business in the U.S.

*(ii)*      *Information Reporting and Backup Withholding for Non-U.S. Holders*

Unless certain exceptions apply, the Debtors must report annually to the IRS and to each Non-U.S. Holder any interest paid during the taxable year, as well as the amount of any dividends paid to the Non-U.S. Holder (whether such dividend income is subject to U.S. withholding tax or is exempt from such tax pursuant to an income tax treaty). Copies of these information returns may also be made available under the provisions of a specific treaty or other agreement to the tax authorities of the country in which a Non-U.S. Holder resides.

Under current U.S. federal income tax law, backup withholding tax will not apply to payments of dividends by the Debtors or its paying agent if the Non-U.S. Holder provides a properly executed IRS Form W-8BEN (or successor form), or otherwise establishes its eligibility for an exemption, provided that the Debtors or their paying agent, as the case may be, does not have actual knowledge or reason to know that the payee Non-U.S. Holder is a U.S. person.

Withholding and backup withholding are not additional taxes. Any amounts withheld from a payment to a Non-U.S. Holder under the withholding or backup withholding rules will be allowed as a credit against such Holder's U.S. federal income tax liability and may entitle the holder to a refund, provided that the holder furnishes the required information to the IRS. A Non-U.S. Holder should consult its tax advisor regarding the application of information reporting, withholding and backup withholding in such holder's particular situation, the availability of an exemption from backup withholding and the procedure for obtaining such an exemption, if available.

Under legislation recently enacted into law, certain payments made after December 31, 2012 to certain foreign entities (including foreign accounts or foreign intermediaries) would be subject to a 30% withholding tax unless various U.S. information reporting and due diligence requirements have been satisfied. Payments subject to such requirements include dividends on (as applicable) and the gross proceeds from the sale or other disposition of New Common Stock and New Preferred Stock. These requirements are different from, and in addition to, the withholding tax requirements described above. Non-U.S. Holders should consult their tax advisors concerning the application of this legislation to their particular circumstances.

**D.      Importance of Obtaining Professional Tax Assistance**

**THE FOREGOING DISCUSSION IS INTENDED ONLY AS A SUMMARY OF CERTAIN INCOME TAX CONSEQUENCES OF THE PLAN AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL. THE ABOVE DISCUSSION IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT TAX ADVICE. THE TAX CONSEQUENCES ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING ON A HOLDER'S PARTICULAR CIRCUMSTANCES. ACCORDINGLY, HOLDERS OF CLAIMS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS ABOUT THE UNITED STATES FEDERAL, STATE, AND LOCAL, AND APPLICABLE FOREIGN INCOME AND OTHER TAX CONSEQUENCES OF THE PLAN.**

# XIV.
## RECOMMENDATION

TerreStar Networks Inc. and its Debtor affiliates submit that the Plan is preferable to the alternatives described in this Disclosure Statement because it provides for a larger distribution to the Debtors' creditors than would otherwise result in liquidation under chapter 7 of the Bankruptcy Code.  In addition, any alternative other than Confirmation could result in extensive delays and increased administrative expenses, resulting in smaller distributions to holders of Allowed Claims (and, potentially, Interests, in the Debtors) than those proposed under the Plan.  The Debtors thus believe that approval of the Plan is in the best interests of all stakeholders in the TSN Debtors' chapter 11 cases, and accordingly, the Debtors recommend that holders of Claims and Interests entitled to vote on the Plan vote to accept the Plan.

Dated:  November 5, 2010

Respectfully submitted,

TerreStar Networks Inc.
(for itself and on behalf of each of the TSN Debtors)

By: _s/Jeffrey Epstein_____
     Name: Jeffrey Epstein
     Title: Chief Executive Officer

Prepared by:

Ira S. Dizengoff
Arik Preis
AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036

(212) 872-1000 (Telephone)
(212) 872-1002 (Facsimile)

1333 New Hampshire Avenue, NW
Washington, DC 20036
(202) 887-4000 (Telephone)
(202) 887-4288 (Facsimile)
Joanna F. Newdeck

Ashleigh L. Blaylock

*Proposed Counsel to the Debtors and Debtors in Possession*

<u>**Exhibit A**</u>

**Plan**

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
(212) 872-1000 (Telephone)
(212) 872-1002 (Facsimile)
Ira S. Dizengoff
Arik Preis

1333 New Hampshire Avenue, NW
Washington, DC 20036
(202) 887-4000 (Telephone)
(202) 887-4288 (Facsimile)
Joanna F. Newdeck
Ashleigh L. Blaylock

*Proposed Counsel to the Debtors and Debtors in Possession*

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| TERRESTAR NETWORKS INC., *et al.*,[1] | ) | Case No. 10-15446 (SHL) |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |

### JOINT CHAPTER 11 PLAN OF TERRESTAR NETWORKS INC., TERRESTAR NATIONAL SERVICES, INC., 0887729 B.C. LTD., TERRESTAR LICENSE INC., TERRESTAR NETWORKS HOLDINGS (CANADA) INC., AND TERRESTAR NETWORKS (CANADA) INC.

THIS CHAPTER 11 PLAN IS BEING SUBMITTED FOR
APPROVAL BY THE BANKRUPTCY COURT.  THIS CHAPTER 11
PLAN HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT.
ACCORDINGLY, THIS IS NOT A SOLICITATION OF ACCEPTANCE
OR REJECTION OF THE CHAPTER 11 PLAN.  ACCEPTANCES OR
REJECTIONS MAY NOT BE SOLICITED UNTIL A DISCLOSURE
STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT.

Dated:  November 5, 2010

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal taxpayer-identification number, are: TerreStar New York Inc. (6394); TerreStar Networks Inc. (3931); Motient Communications Inc. (3833); Motient Holdings Inc. (6634); Motient License Inc. (2431); Motient Services Inc. (5106); Motient Ventures Holding Inc. (6191); MVH Holdings Inc. (9756); TerreStar License Inc. (6537); TerreStar National Services Inc. (6319); TerreStar Networks Holdings (Canada) Inc. (1337); TerreStar Networks (Canada) Inc. (8766) and 0887729 B.C. Ltd. (1345).

**TABLE OF CONTENTS**

ARTICLE I. ................................................................................................................................. 1
    A.     Defined Terms ......................................................................................................... 1
    B.     Rules of Interpretation ........................................................................................ 12
    C.     Computation of Time ........................................................................................... 12
    D.     Governing Law ..................................................................................................... 12
    E.     Reference to Monetary Figures ........................................................................... 13
    F.     Settlement of Certain Inter-Creditor Issues ...................................................... 13

ARTICLE II. ADMINISTRATIVE CLAIMS, DIP CLAIMS, U.S. TRUSTEE FEES AND
    PRIORITY TAX CLAIMS ................................................................................................ 13
    A.     Administrative Claims .......................................................................................... 13
    B.     DIP Claims ............................................................................................................ 14
    C.     U.S. Trustee Fees ................................................................................................. 15
    D.     Priority Tax Claims .............................................................................................. 15

ARTICLE III. CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS ............ 15
    A.     General Rules of Classification ............................................................................ 15
    B.     Summary of Classification ................................................................................... 15
    C.     Treatment of Claims and Interests ..................................................................... 16

ARTICLE IV. ............................................................................................................................. 18

ACCEPTANCE REQUIREMENTS ............................................................................................ 18
    A.     Acceptance or Rejection of the Plan .................................................................... 18
    B.     Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code .......... 18

ARTICLE V. MEANS FOR IMPLEMENTATION OF THE PLAN ............................................. 18
    A.     Limited Consolidation for Voting, Confirmation and Distribution Purposes ......... 18
    B.     Intercompany Claims ........................................................................................... 19
    C.     Sources of Consideration for Plan Distributions ................................................. 19
    D.     Issuance of New Securities and Debt Instruments ............................................. 19
    E.     The Rights Offering ............................................................................................. 19
    F.     Cancellation of Securities and Agreements ........................................................ 20
    G.     Exemptions for Issuance of New Equity ............................................................. 20
    H.     Corporate Existence ............................................................................................. 21
    I.     New Certificate of Incorporation and New By-Laws ........................................... 21
    J.     Reorganized TSN Debtors' Boards of Directors ................................................. 21
    K.     Officers of Reorganized TSN Debtors ................................................................. 21
    L.     Employee Benefits ............................................................................................... 21
    M.     Vesting of Assets in the Reorganized TSN Debtors ........................................... 21
    N.     Restructuring Transactions ................................................................................. 22
    O.     Intercompany Interests ........................................................................................ 22
    P.     Corporate Action .................................................................................................. 22
    Q.     Effectuating Documents; Further Transactions ................................................. 23
    R.     General Settlement of Claims and Interests ....................................................... 23
    S.     Section 1146 Exemption from Certain Taxes and Fees ...................................... 23
    T.     D&O Liability Insurance Policies and Indemnification Provisions ....................... 23
    U.     Preservation of Rights and Causes of Action ..................................................... 24

ARTICLE VI. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES ...... 24
    A.     Assumption and Rejection of Executory Contracts and Unexpired Leases ......... 24
    B.     Cure of Defaults for Executory Contracts and Unexpired Leases Assumed ....... 25

C.      Claims Based on Rejection of Executory Contracts or Unexpired Leases...............................25
D.      Insurance Policies.................................................................................................................26
E.      Modifications, Amendments, Supplements, Restatements or Other Agreements...................26
F.      Reservation of Rights............................................................................................................26
G.      Contracts and Leases Entered Into After the Petition Date....................................................26

**ARTICLE VII. PROVISIONS GOVERNING DISTRIBUTIONS**...............................................................26
A.      Record Date for Distributions...............................................................................................26
B.      Timing and Calculation of Amounts to Be Distributed .........................................................27
C.      Fractional Distributions........................................................................................................27
D.      Disbursing Agent...................................................................................................................27
E.      Rights and Powers of Disbursing Agent.................................................................................27
F.      Distributions to Holders of Disputed Claims.........................................................................27
G.      Delivery of Distributions and Undeliverable or Unclaimed Distributions..............................28
H.      Hart-Scott-Rodino Compliance.............................................................................................28
I.      Withholding and Reporting Requirements.............................................................................28
J.      Setoffs...................................................................................................................................28
K.      Claims Paid or Payable by Third Parties................................................................................29
L.      Postpetition Interest..............................................................................................................29
M.      Section 506(c) Reservation ...................................................................................................29
N.      Single Satisfaction of Claims.................................................................................................30

**ARTICLE VIII.**.............................................................................................................................................30

**PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED AND DISPUTED CLAIMS**..........30
A.      Prosecution of Objections to Claims.....................................................................................30
B.      Allowance of Claims.............................................................................................................30
C.      Disputed Claims Reserve......................................................................................................30
D.      Distributions After Allowance...............................................................................................30
E.      Distribution of Excess Amounts in the Disputed Claims Reserve...........................................30
F.      Property Held in the Reserve for Disputed Claims.................................................................31
G.      Estimation of Claims.............................................................................................................31
H.      Deadline to File Objections to Claims ...................................................................................31

**ARTICLE IX. SETTLEMENT, RELEASE, INJUNCTION AND RELATED PROVISIONS** .......................31
A.      Compromise and Settlement of Claims, Interests and Controversies .....................................31
B.      Releases by the TSN Debtors................................................................................................32
C.      Releases by Holders of Claims and Interests .........................................................................32
D.      Exculpation...........................................................................................................................32
E.      Discharge of Claims and Termination of Interests ................................................................33
F.      Injunction.............................................................................................................................33
G.      Term of Injunctions or Stays.................................................................................................34
H.      Injunction Against Interference With Plan.............................................................................34
I.      Injunction Related to Releases and Exculpation....................................................................34
J.      Protection Against Discriminatory Treatment .......................................................................34
K.      No Consent to Change of Control Required ...........................................................................35
L.      Release of Liens....................................................................................................................35

**ARTICLE X. CONDITIONS PRECEDENT TO CONFIRMATION OF THE PLAN AND THE EFFECTIVE DATE**...................................................................................................................35
A.      Conditions Precedent to Confirmation ..................................................................................35
B.      Conditions Precedent to the Effective Date ...........................................................................35
C.      Waiver of Conditions............................................................................................................36
D.      Effect of Failure of Conditions..............................................................................................36

**ARTICLE XI. MODIFICATION, REVOCATION OR WITHDRAWAL OF THE PLAN** .............................37

     **A.**      **Modification and Amendments**..............................................................................37

     **B.**      **Effect of Confirmation on Modifications** .............................................................37

     **C.**      **Revocation or Withdrawal of the Plan** ..................................................................37

**ARTICLE XII. RETENTION OF JURISDICTION**.................................................................37

**ARTICLE XIII. MISCELLANEOUS PROVISIONS** .................................................................39

     **A.**      **Immediate Binding Effect**.......................................................................................39

     **B.**      **Additional Documents** .............................................................................................39

     **C.**      **Dissolution of Creditors' Committee**......................................................................39

     **D.**      **Successors and Assigns** ...........................................................................................40

     **E.**      **Service of Documents**..............................................................................................40

     **F.**      **Entire Agreement**....................................................................................................40

     **G.**      **Severability of Plan Provisions** .............................................................................40

     **H.**      **Exhibits** ....................................................................................................................40

     **I.**      **Votes Solicited in Good Faith** ................................................................................41

     **J.**      **Closing of Chapter 11 Cases**..................................................................................41

     **K.**      **Conflicts** ...................................................................................................................41

# INTRODUCTION

TerreStar Networks, Inc., TerreStar National Services, Inc., 0887729 B.C. Ltd., TerreStar License Inc., TerreStar Networks Holdings (Canada) Inc., and TerreStar Networks (Canada) Inc. respectfully propose the following joint chapter 11 plan of reorganization. Capitalized terms used in the Plan and not otherwise defined shall have the meanings ascribed to such terms in Article I.A hereof.

# ARTICLE I.

## DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME AND GOVERNING LAW

A.      *Defined Terms*

Unless the context otherwise requires, the following terms shall have the following meanings when used in capitalized form:

1.        *"Accrued Professional Compensation"* means, at any given moment, all accrued, contingent and/or unpaid fees (including success fees) for legal, financial advisory, accounting and other services and obligations for reimbursement of expenses rendered or incurred before the Effective Date that are awardable and allowable under sections 328, 330(a) or 331 of the Bankruptcy Code by any retained Professional in the Chapter 11 Cases, or that are awardable and allowable under section 503 of the Bankruptcy Code, that the Bankruptcy Court has not denied by a Final Order, all to the extent that any such fees and expenses have not been previously paid.  To the extent that the Bankruptcy Court or any higher court denies or reduces by a Final Order any amount of a Professional's fees or expenses, then those reduced or denied amounts shall no longer constitute Accrued Professional Compensation.  For the avoidance of doubt, Accrued Professional Compensation shall not include any accrued, contingent and/or unpaid fees for services and obligations for reimbursement of expenses rendered or incurred before the Effective Date by any Entity retained pursuant to the Ordinary Course Professional Order and authorized to be compensated thereunder without filing a fee application.

2.        *"Additional Shares"* means shares of New Preferred Stock, other than the Rights Offering Preferred Stock.

3.        *"Administrative Claim"* means any right to payment constituting a cost or expense of administration of the Chapter 11 Cases of the TSN Debtors of the kind specified in section 503(b) of the Bankruptcy Code and entitled to priority pursuant to sections 507(a)(2) or 507(b) of the Bankruptcy Code, including, but not limited to:  (a) the actual and necessary costs and expenses incurred after the Petition Date and through the Effective Date of preserving the Estates and operating the businesses of the TSN Debtors; (b) compensation for legal, financial advisory, accounting and other services and reimbursement of expenses Allowed pursuant to sections 328, 330(a), 331 or 363 of the Bankruptcy Code or otherwise for the period commencing on the Petition Date and through the Effective Date; and (c) all fees and charges assessed against the Estates pursuant to chapter 123 of title 28 of the United States Code, 28 U.S.C. §§ 1–4001.

4.        *"Administrative Claims Bar Date"* means the bar date for Administrative Claims as such term is defined in Article II.A.3 hereof.

5.        *"Affiliate"* has the meaning set forth in section 101(2) of the Bankruptcy Code.

6.        *"Allowed Claim" or "Allowed [___] Claim"* (with respect to a specific type of Claim, if specified) means: (a) any Claim (or a portion thereof) as to which no action to dispute, deny, equitably subordinate or otherwise limit recovery with respect thereto, or alter priority thereof, has been filed within the applicable period of time fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules or applicable law; or (b) any Claim or portion thereof that is allowed (i) in any contract, instrument, indenture or other agreement entered into in connection with the Plan, (ii) pursuant to the terms of the Plan, (iii) by Final Order of the Bankruptcy Court, or (iv) with respect to an Administrative Expense Claim only (x) that was incurred by a TSN Debtor in the ordinary course of business during

the Chapter 11 Cases of the TSN Debtors to the extent due and owing without defense, offset, recoupment or counterclaim of any kind, and (y) that is not otherwise disputed.

7. *"Backstop Amount"* means the Backstop Party's commitment to purchase up to $100 million of the Rights Offering Preferred Stock, or such other greater amount as may be agreed upon by the Backstop Party and the TSN Debtors.

8. *"Backstop Approval Order"* means that order entered by the Bankruptcy Court on [_____], 2010, authorizing and approving (a) the TSN Debtors' entry into the EPCA and (b) the Backstop Commitment Fee, Transaction Expenses, and Indemnification Obligations.

9. *"Backstop Commitment Fee"* means a commitment fee equal to 3% of the Backstop Amount, which shall be paid in Additional Shares.

10. *"Backstop Indemnification Obligations"* means the indemnification obligations described in Section 10 of the EPCA.

11. *"Backstop Party"* means, collectively, EchoStar and, if applicable, any Related Purchasers (as defined in the EPCA).

12. *"Bankruptcy Code"* means title 11 of the United States Code, as amended from time to time.

13. *"Bankruptcy Court"* means the United States Bankruptcy Court for the Southern District of New York having jurisdiction over the Chapter 11 Cases or any other court having jurisdiction over the Chapter 11 Cases, including, to the extent of the withdrawal of any reference under 28 U.S.C. § 157, the United States District Court for the Southern District of New York.

14. *"Bankruptcy Rules"* means the Federal Rules of Bankruptcy Procedure, as applicable to the Chapter 11 Cases, promulgated under section 2075 of title 28 of the United States Code, 28 U.S.C. §§ 1–4001, as well as the general and local rules of the Bankruptcy Court and the Order Pursuant to Sections 105(a) and (d) of the Bankruptcy Code and Bankruptcy Rules 1015(c), 2002(m) annd 9007 Implementing Certain Notice and Case Management Procedures (Docket No. 60), as it may be amended from time to time.

15. *"Canadian Court"* means the Ontario Superior Court of Justice (Commercial List).

16. *"Canadian Debtors*" means, collectively, TerreStar Networks (Canada) Inc., TerreStar Networks Holdings (Canada) Inc. and 0887729 B.C. Ltd.

17. *"Canadian Proceedings*" means the recognition proceeding (Court File No.: CV-10-8944-00CL) commenced on October 20, 2010 before the Canadian Court by TSN, as foreign representative on behalf of the Debtors, pursuant to Part IV of the CCAA, to, among other things, recognize the jointly administered Chapter 11 Cases as a "foreign main proceeding".

18. *"Cash"* means the legal tender of the United States of America or the equivalent thereof.

19. *"Causes of Action"* means any action, claim, cause of action, controversy, demand, right, action, Lien, indemnity, guaranty, suit, obligation, liability, damage, judgment, account, defense, offset, power, privilege, license and franchise of any kind or character whatsoever of the TSN Debtors, known, unknown, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively, whether arising before, on, or after the Petition Date, in contract or in tort, in law or in equity or pursuant to any other theory of law. Causes of Action also include: (a) any right of setoff, counterclaim or recoupment and any claim on contracts or for breaches of duties imposed by law or in equity; (b) the right to object to Claims or Interests; (c) any claim pursuant to section 362 or chapter 5 of the Bankruptcy Code; (d) any claim or defense including fraud, mistake, duress and usury and any other defenses set

forth in section 558 of the Bankruptcy Code; (e) any state law fraudulent transfer claim; and (f) any claim set forth on the Schedule of Retained Causes of Action.

20.     *"CCAA"* means the Companies' Creditors Arrangement Act (Canada), R.S. C. 1985, c. C-36, as amended.

21.     *"Chapter 11 Cases"* means (a) when used with reference to a particular Debtor, the chapter 11 case pending for that Debtor under chapter 11 of the Bankruptcy Code in the Bankruptcy Court and (b) when used with reference to all Debtors, the procedurally consolidated chapter 11 cases pending for the Debtors in the Bankruptcy Court under Case No. 10-15446 (SHL).

22.     *"Claim"* means any claim against a TSN Debtor as defined in section 101(5) of the Bankruptcy Code.

*23.*     *"Class"* means a category of holders of Claims or Interests as set forth in Article III.

24.     *"Class 3 Distribution"* means (i) 97% of the New Common Stock, and (ii) with respect to holders of Class 3 Claims that become Allowed Claims on or before the Subscription Record Date only, Rights to purchase 97% of the Rights Offering Preferred Stock.

25.     *"Class 5 Distribution"* means (i) at least 1% but no more than 3% of the New Common Stock, and (ii) with respect to holders of Class 5 Claims that become Allowed Claims on or before the Subscription Record Date only, Rights to purchase at least 1% but no more than 3% of the Rights Offering Preferred Stock.[2]

26.     *"Class 6 Distribution"* means (i) 3% of the New Common Stock <u>minus</u> any amount of New Common Stock distributed pursuant to the Class 5 Distribution, and (ii) with respect to holders of Class 6 Claims that become Allowed Claims on or before the Subscription Record Date only, Rights to purchase 3% of the Rights Offering Preferred Stock <u>minus</u> any Rights to purchase Rights Offering Preferred Stock distributed pursuant to the Class 5 Distribution.[3]

27.     *"Collateral"* means any property or interest in property of the TSN Debtors subject to a Lien to secure the payment or performance of a Claim.

28.     *"Confirmation"* means the entry of the Confirmation Order on the docket of the Chapter 11 Cases.

29.     *"Confirmation Date"* means the date upon which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases of the TSN Debtors within the meaning of Bankruptcy Rules 5003 and 9021.

30.     *"Confirmation Hearing"* means the hearing held by the Bankruptcy Court concerning Confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code, as such hearing may be continued from time to time.

31.     *"Confirmation Order"* means the order entered by the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

32.     *"Convenience Class"* means the Class of Unsecured Convenience Claims.

---

[2] Exact percentages to be determined and disclosed prior to the Disclosure Statement hearing.

[3] Exact percentages to be determined and disclosed prior to the Disclosure Statement hearing.

33.     *"Convenience Class Election"* means an election by a holder of an Allowed Class 6 Claim in an amount in excess of $25,000 to be treated as a Holder of an Unsecured Convenience Claim in Class 7 by electing to reduce its Class 6 Claim to the amount of $25,000 in full and final satisfaction, release, and discharge of such Allowed Class 6 Claim.  Except as may be agreed to by the TSN Debtors, any Convenience Class Election must be made on the Ballot and no Holder of a Class 6 Claim can make a Convenience Class Election after the Voting Deadline.  Upon any Convenience Class Election, the Class 6 Claim of the applicable holder shall be automatically reduced to $25,000 and shall no longer be entitled to any other distribution on account of its Other Unsecured Credit Claim as contemplated by this Plan.

34.     *"Creditors' Committee"* means the statutory committee of unsecured creditors of the TSN Debtors appointed in the Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code by the U.S. Trustee, as such committee membership may be reconstituted from time to time.

35.     *"Cure Claim"* means a Claim based upon a monetary default, if any, by any TSN Debtor on an Executory Contract or Unexpired Lease at the time such contract or lease is assumed by such Debtor pursuant to sections 365 or 1123 of the Bankruptcy Code.

36.     *"D&O Liability Insurance Policies"* means all insurance policies of any of the TSN Debtors for directors', managers' and officers' liability, as set forth on the schedule of Insurance Policies to be included in the Plan Supplement.

37.     *"Debtor"* means one of the TSN Debtors, in its individual capacity as a debtor and debtor in possession in these Chapter 11 Cases.

38.     *"Debtors"* means, collectively, the TSN Debtors and the Non-TSN Debtors.

39.     *"DIP Agent"* means The Bank of New York Mellon, or its duly appointed successor, in its capacity as administrative agent and collateral agent under the DIP Loan Agreement.

40.     *"DIP Claims"* means any Claim derived from or based upon the DIP Loan Agreement, including without limitation Claims for principal, interest, fees, or expenses (including without limitation all reasonable, actual and documented fees, expenses and disbursements of (i) EchoStar and its counsel and financial advisors, which consists of Willkie Farr & Gallagher LLP, Sullivan & Cromwell LLP, Goodmans LLP, Steptoe & Johnson LLP, and Lazard Ltd. and (ii) the DIP Agent and its counsel, Emmet, Marvin & Martin, LLP).

41.     *"DIP Lenders"* means EchoStar and the other lenders that may become party to the DIP Loan Agreement from time to time, each in their capacity as such.

42.     *"DIP Loan Agreement"* means that certain Debtor-In-Possession Credit, Security & Guaranty Agreement, dated as of October 19, 2010, by and among TSN, as borrower, each of the other Debtors, as guarantors, the DIP Agent and the DIP Lenders, as may be amended, modified, ratified, extended, renewed, or restated, as well as any other documents entered into in connection therewith.

43.     *"Disbursing Agent"* means the Reorganized TSN Debtors or the Entity or Entities chosen by the Reorganized TSN Debtors to make or facilitate distributions pursuant to the Plan.

44.     *"Disclosure Statement"* means the disclosure statement that relates to this Plan, as such disclosure statement may be amended, modified, or supplemented (including all exhibits and schedules annexed thereto or referred to therein).

45.     *"Disallowed"* means a finding of the Bankruptcy Court in a Final Order, or provision in the Plan providing that a Disputed Claim or Interest shall not be Allowed.

46.     *"Discount Purchase Price"* means $[____], the price at which the New Preferred Stock will be issued, as set forth in the EPCA.

47.    *"Disputed Claim"* or *"Disputed [___] Claim"* (with respect to a specific type of Claim, if specified) means a Claim that is not an Allowed Claim or Disallowed Claim as of the relevant date.

48.    *"Disputed Claims Reserve"* means the reserve to be created by the TSN Debtors to hold a contribution of New Common Stock, which reserve shall be held for the benefit of holders of Disputed Claims as of the Effective Date that subsequently become Allowed Claims, for distribution according to the procedures set forth in Article VIII.

49.    *"Distribution Date"* means any of the Initial Distribution Date or the Periodic Distribution Dates.

50.    *"Distribution Record Date"* means the date that the Confirmation Order is entered by the Bankruptcy Court.

51.    *"EchoStar"* means EchoStar Corporation and, where applicable, its Affiliates.

52.    *"Effective Date"* means the first business day after which all provisions, terms and conditions specified in Article X.B have been satisfied or waived pursuant to Article X.C.

53.    *"Entity"* has the meaning set forth in section 101(15) of the Bankruptcy Code.

54.    *"EPCA"* means that certain Equity Purchase and Commitment Agreement, dated as of November __, 2010, by and among Echostar Corporation and TSN (as the same may be amended, modified or supplemented from time to time).

55.    *"Equity Interests"* mean the Interests in TSN.  For the avoidance of doubt, Equity Interests include the TSN Preferred Shares.

56.    *"Estate"* means, as to each Debtor, the estate created for the Debtor in its Chapter 11 Case pursuant to section 541 of the Bankruptcy Code.

57.    *"Exculpated Claim"* means any claim related to any act or omission in connection with, relating to or arising out of the TSN Debtors' restructuring efforts, the TSN Debtors' Chapter 11 Cases, formulation, preparation, dissemination, negotiation or filing of the Disclosure Statement, Plan, DIP Loan Agreement or any contract, instrument, release or other agreement or document created or entered into in connection with the Disclosure Statement or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of consummation of the Plan, the administration and implementation of the Plan, including the issuance of Plan securities, or the distribution of property under the Plan or any other related agreement; *provided, however, that* Exculpated Claims shall not include any act or omission that is determined in a Final Order to have constituted gross negligence, willful misconduct or fraud.  For the avoidance of doubt, no Cause of Action, obligation or liability expressly set forth in or preserved by the Plan or the Schedule of Retained Causes of Action constitutes an Exculpated Claim.

58.    *"Exculpated Party"* means each of:  (a) the TSN Debtors, the Reorganized TSN Debtors and their Affiliates, (b) the Creditors' Committee and the current and former members thereof, in their capacity as such; (c) EchoStar in connection with the Chapter 11 Cases, including but not limited to the DIP Loan Agreement, the EPCA, the Plan, the Disclosure Statement, and related documents, agreements, and releases, and (d) with respect to each of the foregoing Entities in clauses (a) through (c), such Entities' subsidiaries, affiliates, members, officers, directors, agents, financial advisors, accountants, investment bankers, consultants, attorneys, employees, partners, and representatives, in each case solely in their capacity as such.

59.    *"Executory Contracts and Unexpired Leases"* means contracts and leases to which one or more of the TSN Debtors is a party that are subject to assumption or rejection under section 365 of the Bankruptcy Code.

60.    *"Final Order"* means, as applicable, an order or judgment of the Bankruptcy Court or other court of competent jurisdiction with respect to the relevant subject matter, which has not been reversed, stayed, modified

or amended, and as to which the time to appeal or seek certiorari has expired and no appeal or petition for certiorari has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been or may be filed has been resolved by the highest court to which the order or judgment could be appealed or from which certiorari could be sought or the new trial, reargument or rehearing shall have been denied, resulted in no modification of such order or has otherwise been dismissed with prejudice.

61.　　"*Harbinger*" means collectively, Harbinger Capital Partners and Harbinger Capital Management.

62.　　"*Holdback Amount*" means, with respect to Accrued Professional Compensation, amounts held back pursuant to an order or orders of the Bankruptcy Court in the Chapter 11 Cases, including the Interim Compensation Order.

63.　　"*Holdback Amount Reserve*" means, with respect to Accrued Professional Compensation, a reserve established by the Reorganized TSN Debtors on the Effective Date for the benefit of the Professionals, and to be held in trust for the Professionals, for the payment of the Holdback Amount.

64.　　"*Impaired*" has the meaning set forth in section 1124 of the Bankruptcy Code.

65.　　"*Impaired Class*" means a Class of Claims or Interests that are Impaired. For the avoidance of doubt, Impaired Classes are Classes 3, 5, 6, 7, and 8 for each Debtor.

66.　　"*Indemnification Provisions*" means each of the indemnification provisions, agreements or obligations in place as of the Petition Date, whether in the bylaws, certificates of incorporation or other formation documents in the case of a limited liability company, board resolutions or employment contracts, for the TSN Debtors and the current directors, officers, members (including *ex officio* members), employees, attorneys, other professionals and agents of the TSN Debtors.

67.　　"*Indenture Trustees*" means, collectively, the Senior Secured Notes Indenture Trustee and the Senior Exchangeable Notes Indenture Trustee.

68.　　"*Indentures*" means, collectively, the Senior Secured Notes Indenture and the Senior Exchangeable Notes Indenture.

69.　　"*Initial Distribution Date*" means the date occurring on or as soon as reasonably practicable after the Effective Date when distributions under the Plan shall commence.

70.　　"*Insurance Policies*" means, collectively, all of the TSN Debtors' insurance policies listed on the schedule of Insurance Policies to be included in the Plan Supplement.

71.　　"*Intercompany Claim*" means any Claim held by a TSN Debtor against another TSN Debtor. The TSN Debtors shall include a schedule listing all Intercompany Claims in the Plan Supplement.

72.　　"*Intercompany Interests*" mean the Interests in a TSN Debtor held by another TSN Debtor.

73.　　"*Interest*" means any equity security in a TSN Debtor as defined in section 101(16) of the Bankruptcy Code, including all issued, unissued, authorized or outstanding shares of capital stock of the TSN Debtors together with any warrants, options or contractual rights to purchase or acquire such equity securities at any time and all rights arising with respect thereto. For the avoidance of doubt, with respect to TSN, the Interests include the TSN Preferred Shares.

74.　　"*Interim Compensation Order*" means the *Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses for Professionals* (Docket No. ___).

75.　　"*Lien*" has the meaning set forth in section 101(37) of the Bankruptcy Code.

76.     "*Material Contracts or Leases*" means any agreement, lease, user agreement or other type of contract of one or more of the TSN Debtors (a) where consideration has been or will be paid or received by the TSN Debtors or any of its Affiliates in excess of $100,000 in any twelve month period or in excess of $1,000,000 over the remaining term, (b) with an Affiliate, or (c) that relates to the sale, lease or use of spectrum, capacity or satellites (other than as contemplated by the Agreed Budget, as defined in the DIP Loan Agreement).

77.     "*New Board*" means, with respect to each Reorganized TSN Debtor, the initial board of directors of such Entity appointed as of the Effective Date, the members of which shall be determined in accordance with Article V.J.

78.     "*New By-Laws*" means, with respect to each Reorganized TSN Debtor, the new by-laws of such Entity, the form of which shall be included in the Plan Supplement and shall be reasonably satisfactory to the Plan Sponsor.

79.     "*New Certificate of Incorporation*" means, with respect to each Reorganized TSN Debtor, the form of the initial certificate of incorporation (or other applicable formation document) of each such Entity, the form of which shall be included in the Plan Supplement and shall be reasonably satisfactory to the Plan Sponsor.

80.     "*New Common Stock*" means a certain number of shares of common stock of Reorganized TSN authorized pursuant to the Plan, of which up to [##] shares shall be initially issued and outstanding as of the Effective Date, which shares shall be subject to dilution by the conversion of the New Preferred Stock into common stock of Reorganized TSN.

81.     "*New Corporate Governance Documents*" means the New Certificates of Incorporation, the New Shareholders Agreement and the New By-Laws, substantially final forms of each of which shall be filed with the Bankruptcy Court in the Plan Supplement.

82.     "*New Employment Agreements*" means employment agreements that the TSN Debtors shall enter into with certain individuals in the TSN Debtors' senior management, the form of which shall be included in the Plan Supplement and shall be reasonably satisfactory to the Plan Sponsor.

83.     "*New Equity*" means the New Common Stock and the New Preferred Stock.

84.     "*New Preferred Stock*" means newly issued Series A Preferred Convertible Stock to be issued on the Effective Date in connection with the Rights Offering, the Backstop Commitment Fee and, if purchased, the Overallotment, the terms and conditions of which shall be set forth in the New Preferred Stock Certificate of Designation.

85.     "*New Preferred Stock Certificate of Designation*" means the certificate of designation dated as of the Effective Date governing the terms and conditions of the New Preferred Stock, the form of which shall be included in the Plan Supplement and shall be reasonably satisfactory to the Plan Sponsor.

86.     "*New Shareholders Agreement*" means that certain agreement to be executed on or before the Effective Date providing for, among other things, the rights and obligations of the holders of the New Common Stock, the form of which will be filed as part of the Plan supplement and shall be reasonably acceptable to the Plan Sponsor.

87.     "*Non-Backstopped Shares*" means shares of New Preferred Stock issuable in connection with the Rights Offering that are not subject to the Backstop Party's backstop obligations described herein and in the EPCA, if any.

88.     "*Non-Debtor Affiliate*" means any Affiliate of the TSN Debtors that is not a TSN Debtor.

89.     "*Non-TSN Debtors*" means TerreStar New York Inc.; Motient Communications Inc.; Motient Holdings Inc.; Motient License Inc.; Motient Services Inc.; Motient Ventures Holding Inc.; and MVH Holdings Inc.

90.     *"Notes"* means, collectively, the Senior Secured Notes and the Senior Exchangeable Notes.

91.     *"Notes Claims"* means, collectively, the Senior Secured Notes Claims and the Senior Exchangeable Notes Claims.

92.     *"Notice and Claims Agent"* means Garden City Group, Inc., located at P.O. Box 9576, Dublin, Ohio 43017-4876, (866) 405-2137, retained as the TSN Debtors' notice, claims and solicitation agent.

*93.     "Ordinary Course Professional Order"* means the *Order Authorizing the Debtors' Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business* (Docket No. <u>___</u>).

94.     "*Other Debtors*" means all of the Debtors other than TSN.

95.     *"Other Priority Claim"* means any Claim accorded priority in right of payment under section 507(a) of the Bankruptcy Code, other than:  (a) an Administrative Claim; (b) a DIP Claim; or (c) a Priority Tax Claim.

96.     *"Other Secured Claims"* means a Secured Claim against the TSN Debtors, other than the PMCA Claims and the Senior Secured Notes Claims.

97.     *"Other Unsecured Claims"* means any Allowed unsecured claim against any TSN Debtor, other than a Senior Exchangeable Notes Claim and an Unsecured Convenience Claim, including without limitation, a trade claim, an unsecured Claim held by a Non-Debtor Affiliate of the TSN Debtors against the TSN Debtors, or a claim arising out of the rejection of executory contracts or unexpired leases by any TSN Debtor.

98.     *"Overallotment"* means up to $25 million of Additional Shares purchased by the Backstop Party, at its option, in its sole discretion, purchased at the Discount Purchase Price pursuant to the EPCA.

99.     *"Periodic Distribution Date"* means, unless otherwise ordered by the Bankruptcy Court, the first Business Day that is 120 days after the Initial Distribution Date, and for the first year thereafter, the first Business Day that is 120 days after the immediately preceding Periodic Distribution Date.  After one year following the Distribution Date, the Periodic Distribution Date will occur on the first Business Day that is 180 days after the immediately preceding Periodic Distribution Date.  Notwithstanding the foregoing, if the Disbursing Agent determines, in his sole discretion, that there are not sufficient distributions to be made on a date that would otherwise be a Periodic Distribution Date, then the Periodic Distribution Date shall be the on last business day of the subsequent calendar quarter.

100.    *"Person"* has the meaning set forth in section 101(41) of the Bankruptcy Code.

101.    *"Petition Date"* means October 19, 2010.

102.    *"Plan"* means this *Joint Chapter 11 Plan of TerreStar Networks, Inc., TerreStar National Services, Inc., 0887729 B.C. Ltd., TerreStar License Inc., TerreStar Networks Holdings (Canada) Inc., and TerreStar Networks (Canada) Inc.* and all exhibits hereto, including the Plan Supplement, which is incorporated herein by reference.

103.    *"Plan Securities"* means, collectively, the New Common Stock and the New Preferred Stock.

104.    *"Plan Sponsor"* means Echostar, in its capacity as plan sponsor.

105.    *"Plan Supplement"* means the compilation of documents and forms of documents, schedules and exhibits to the Plan to be filed by the TSN Debtors by the Plan Supplement Filing Date compromised of, without limitation, the following:  (a) the New Corporate Governance Documents, (b) the identity of the known members of the New Boards and the nature and compensation for any director who is an "insider" under the Bankruptcy Code; (c) the Rejected Executory Contract and Unexpired Lease List; (d) the Registration Rights Agreement; (e) the

Schedule of Retained Causes of Action; (f) the New Preferred Stock Certificate of Designation; (g) the New Employment Agreements; (h) a schedule of the Insurance Policies; (i) a schedule of Intercompany Claims; and all exhibits, attachments, supplements, annexes, schedules, and ancillary documents related to each of the foregoing.

106. "*Plan Supplement Filing Date*" means the date on which the Plan Supplement shall be filed with the Bankruptcy Court, which date shall be at least ten days prior to the Voting Deadline or such later date as may be approved by the Bankruptcy Court without further notice; provided, however, that the identity of the initial members of the New Boards and the nature and compensation for any director who is an "insider" under the Bankruptcy Code known at the time shall not be required to be disclosed and filed with the Bankruptcy Court until 10 days prior to the Confirmation Hearing or such later date as may be approved by the Bankruptcy Court without further notice.

107. "*Plan Support Agreement*" means that certain agreement, dated as of October 19, 2010, by and between the Debtors, certain Non-Debtor Affiliates, and EchoStar, as amended, supplemented or modified from time to time.

108. "*PMCA Claims*" means the Allowed Claims derived from or based upon the Purchase Money Credit Agreement, in an aggregate amount of $[_____].

109. "*Priority Tax Claim*" means any Claim of a governmental unit, as defined in section 101(27) of the Bankruptcy Code, of the kind specified in section 507(a)(8) of the Bankruptcy Code.

110. "*Pro Rata*" means, as applicable: (a) the proportion that an Allowed Claim or Interest in a particular Class bears to the aggregate amount of Allowed Claims or Interests in that Class; (b) the proportion that all Allowed Claims or Interests in a particular Class bear to the aggregate amount of Allowed Claims or Interests in such Class and other Classes entitled to share in the same recovery under the Plan; or (c) with respect to a participant in the Rights Offering who, in accordance with the Rights Offering Procedures, elects to exercise their right to purchase Non-Backstopped Shares or any Rights Offering Preferred Stock not purchased by other participants thereof or by the Backstop Party (in its capacity as holder of the Senior Secured Notes Claims), the proportion that (i) the amount of shares of Rights Offering Preferred Stock requested to be purchased by such participant (prior to issuance of the Backstopped Shares) bears to (ii) the aggregate amount of shares of Rights Offering Preferred Stock requested to be purchased by all other Rights Offering participants (excluding the Backstop Party) who elect to purchase Non-Backstopped Shares (prior to issuance of the Non-Backstopped Shares) or any Rights Offering Preferred Stock not purchased by other participants thereof or by the Backstop Party (in its capacity as holder of the Senior Secured Notes Claims).

111. "*Professional*" means an Entity: (a) retained pursuant to a Final Order in accordance with sections 327, 363 or 1103 of the Bankruptcy Code and to be compensated for services rendered before or on the Effective Date, pursuant to sections 327, 328, 329, 330, 363 and 331 of the Bankruptcy Code or (b) awarded compensation and reimbursement by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code.

112. "*Proof of Claim*" means a proof of Claim filed against any of the TSN Debtors in the Chapter 11 Cases.

113. "*Purchase Money Agent*" means the U.S. Bank National Association as Collateral Agent.

114. "*Purchase Money Credit Agreement*" means the Purchase Money Credit Agreement, dated as of February 5, 2008, among TSN, as borrower, each of the guarantors named therein, the lenders party thereto and the Purchase Money Agent.

115. "*Purchase Money Lenders*" means those lenders party to the Purchase Money Credit Agreement from time to time.

116. "*Registration Rights Agreement*" means the Registration Rights Agreement, dated as of the Effective Date, among the holders of the Senior Notes Claims and Reorganized TSN, the form of which will be included in the Plan Supplement and shall be reasonably satisfactory to the Plan Sponsor.

117.    "*Rejected Executory Contract and Unexpired Lease List*" means the list (as may be amended) of Executory Contracts and Unexpired Leases that will be rejected by the TSN Debtors pursuant to the provisions of Article VI determined by the TSN Debtors; provided, however, that the disposition of any Material Contracts or Lease shall be determined by the TSN Debtors, with the reasonable consent of the Plan Sponsor.

118.    "*Rejection Claim*" means a Claim arising from the rejection of an Executory Contract or Unexpired Lease pursuant to section 365 of the Bankruptcy Code.

119.    "*Releasing Parties*" means all Entities who have held, hold or may hold Claims or Interests that have been released pursuant to Article IX.B or Article IX.C, discharged pursuant to Article IX.E or are subject to exculpation pursuant to Article IX.D.

120.    "*Released Party*" means each of (in each case solely in their respective capacities): (a) the current and former directors and officers of the TSN Debtors who were directors or officers of the TSN Debtors as of or after the Petition Date; (b) the Indenture Trustees; (c) the Purchase Money Agent; (d) the DIP Lenders; (e) the Backstop Party; (f) the Plan Sponsor; (g) the Purchase Money Lenders; (h) the holders of the Notes, to the extent such parties vote to accept the Plan; (i) the DIP Agent; (j) the Creditors' Committee and the current and former members thereof; (k) Deloitte & Touche Inc., in its capacity as information officer in the Canadian Proceedings; and (l) with respect to each of the foregoing Entities in clauses (a) through (k), such Entities' subsidiaries, affiliates, members, officers, directors, agents, financial advisors, accountants, investment bankers, consultants, attorneys, employees, partners, and representatives, in each case, only in their capacity as such.

121.    "*Reorganized*" means, with respect to the TSN Debtors, any TSN Debtor or any successor thereto, by merger, consolidation or otherwise, on or after the Effective Date.

122.    "*Restructuring Transactions*" means a dissolution or winding up of the corporate existence of a debtor or the consolidation, merger, restructuring, conversion, dissolution, transfer, liquidation, contribution of assets, or other transaction pursuant to which a Reorganized TSN Debtor merges with or transfers substantially all of its assets and liabilities to a Reorganized TSN Debtor or newly formed Entity, prior to, on or after the Effective Date, as provided for in Article V.N of the Plan.

123.    "*Rights*" means the non-certified subscription rights to purchase the Rights Offering Preferred Stock issued in connection with the Rights Offering on the terms and subject to the conditions set forth in the Plan, the Rights Offering Procedures, and the EPCA.

124.    "*Rights Offering*" means the offering of the Rights by TSN to the Holders of the Senior Secured Notes Claims, Senior Exchangeable Notes Claims and Other Unsecured Claims to purchase the Rights Offering Preferred Stock, in accordance with the Rights Offering Procedures, the Plan and the EPCA.

125.    "*Rights Offering Preferred Stock*" means $125 million in face amount of New Preferred Stock to be issued on the Effective Date in connection with the Rights Offering, $100 million of which will be backstopped by the Backstop Party.

126.    "*Rights Offering Procedures*" means the procedures governing the Rights Offering, as agreed upon by the Backstop Party and the TSN Debtors and approved by the Bankruptcy Court, and described in the Disclosure Statement, the EPCA and offering documents relating to the Rights Offering.

127.    "*Schedule of Retained Causes of Action*" means the schedule, to be included as part of the Plan Supplement, listing the Causes of Action to be retained by the Reorganized TSN Debtors after the Effective Date.

128.    "*Schedules*" means, collectively, the schedules of assets and liabilities, schedules of Executory Contracts and Unexpired Leases and statements of financial affairs filed by the TSN Debtors pursuant to section 521 of the Bankruptcy Code and in substantial accordance with the Official Bankruptcy Forms, as may be amended from time to time before entry of a final decree.

129.     *"SEC"* means the Securities and Exchange Commission.

130.     *"Secured"* means, when referring to a Claim:  (a) secured by a Lien on property in which the Estate of the TSN Debtor against which the Claim is asserted has an interest, which Lien is valid, perfected and enforceable pursuant to applicable law or by reason of a Bankruptcy Court order, to the extent of the value of the creditor's interest in the Estate's interest in such property as determined pursuant to section 506(a) of the Bankruptcy Code; (b) subject to setoff pursuant to section 553 of the Bankruptcy Code, to the extent of the value of the property subject to setoff; or (c) otherwise Allowed by Final Order of the Court (which may be the Confirmation Order) as a Secured Claim.

131.     *"Securities Act"* means the U.S. Securities Action of 1933, as amended.

132.     *"Senior Exchangeable Notes"* means the 6.5% senior exchangeable payment-in-kind notes, issued by TSN pursuant to the Senior Exchangeable Notes Indenture.

133.     *"Senior Exchangeable Notes Claims"* means the Allowed Claims arising under the Senior Exchangeable Notes, in an aggregate amount of $[_____].

134.     *"Senior Exchangeable Notes Indenture"* means the Indenture, dated as of February 7, 2008 between TSN, as issuer, each of the guarantors named therein and the Senior Exchangeable Notes Indenture Trustee, as well as any guarantees and other documents entered into in connection therewith.

135.     *"Senior Exchangeable Notes Indenture Trustee"* means U.S. Bank National Association and/or its duly appointed successor, in its capacity as indenture trustee under the Senior Exchangeable Notes Indenture.

136.     *"Senior Secured Notes"* means the 15% senior secured payment-in-kind notes, issued by TSN pursuant to the Senior Secured Notes Indenture.

137.     *"Senior Secured Notes Claims"* means the Allowed Claims arising under the Senior Secured Notes, in an aggregate amount of $[_____].

138.     *"Senior Secured Notes Indenture"* means the Indenture, dated as of February 14, 2007 between TSN, as issuer, each of the guarantors named therein and the Senior Secured Notes Indenture Trustee, as well as any guarantees and other documents entered into in connection therewith, and as amended by those certain First and Second Supplemental Indentures, each dated as of February 7, 2008.

139.     *"Senior Secured Notes Indenture Trustee"* means U.S. Bank National Association and/or its duly appointed successor, in its capacity as indenture trustee under the Senior Secured Notes Indenture.

140.     *"Senior Secured Notes Security Agreements"* means, collectively:  (i) the Security Agreement, dated as of February 14, 2007, among TSN and the domestic guarantors to the Senior Secured Notes Indenture, as grantors, and U.S. Bank National Association, as agent; and (ii) the Security Agreement, dated as of February 14, 2007, among TSN and the Canadian guarantors to the Senior Secured Notes Indenture, as grantors, and U.S. Bank National Association, as agent.

141.     *"Subscription Expiration Date"* means 5:00 p.m. (prevailing Eastern Time) on [____], 2011.

142.     *"Subscription Record Date"* means the record date established by TSN and approved by the Bankruptcy Court in connection with the Rights Offering, as provided in the EPCA.

143.     *"Transaction Expenses"* has the meaning ascribed to it in the EPCA.

144.     *"TSC"* means TerreStar Corporation.

145.     *"TSN"* means TerreStar Networks Inc.

146.    "*TSN Debtors*" means TerreStar Networks, Inc., TerreStar National Services, Inc., 0887729 B.C. Ltd., TerreStar License Inc., TerreStar Networks Holdings (Canada) Inc., and TerreStar Networks (Canada) Inc.

147.    "*TSN Preferred Shares*" means collectively, the TSN Series A Preferred Shares and the TSN Series B Preferred Shares.

148.    "*TSN Series A Preferred Shares*" means the one share of non-voting Series A preferred stock of TSN, which was issued to EchoStar.

149.    "*TSN Series B Preferred Shares*" means the one share of non-voting Series B preferred stock of TSN, which was issued to Harbinger.

150.    "*Unimpaired*" means any Claim or Interest that is not designated as Impaired.

151.    "*Unsecured Convenience Claims*" means any prepetition unsecured claim against any of the TSN Debtors that, but for being defined as a Unsecured Convenience Claim, would be an Other Unsecured Claim, and either (a) is Allowed in an amount of $25,000 or less or (b) is Allowed in an amount greater than $25,000, but is subject to an irrevocable election by the holder thereof to reduce the Allowed amount of the Other Unsecured Claim to $25,000 for the purpose of rendering such Claim an Unsecured Convenience Claim.

152.    "*Unsubscribed Shares*" means those shares of New Preferred Stock issued in connection with the Rights Offering that are not subscribed for pursuant to the Rights Offering as of the Subscription Expiration Date.

153.    "*U.S. Trustee*" means the United States Trustee for the Southern District of New York.

154.    "*U.S. Trustee Fees*" means fees arising under 28 U.S.C. § 1930(a)(6) or accrued interest thereon arising under 31 U.S.C. § 3717.

155.    "*Voting Deadline*" means 5:00 p.m. (prevailing Eastern Time) on [____], 2011.

*B.    Rules of Interpretation*

For purposes of this Plan: (a) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine or neuter gender shall include the masculine, feminine and the neuter gender; (b) any reference herein to a contract, lease, instrument, release, indenture or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; (c) any reference herein to an existing document or exhibit having been filed or to be filed shall mean that document or exhibit, as it may thereafter be amended, modified or supplemented; (d) unless otherwise specified, all references herein to "Articles" are references to Articles hereof or hereto; (e) unless otherwise stated, the words "herein," "hereof" and ''hereto'' refer to the Plan in its entirety rather than to a particular portion of the Plan; (f) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation hereof; (g) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; and (h) any immaterial effectuating provisions may be interpreted by the Reorganized TSN Debtors in a manner that is consistent with the overall purpose and intent of the Plan all without further Bankruptcy Court order.

*C.    Computation of Time*

The provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein.

*D.    Governing Law*

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of New York, without giving effect

to the principles of conflict of laws, shall govern the rights, obligations, construction and implementation of the Plan, any agreements, documents, instruments or contracts executed or entered into in connection with the Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreement shall control); *provided, however,* that corporate governance matters relating to the TSN Debtors or the Reorganized TSN Debtors, as applicable, not incorporated in New York shall be governed by the laws of the jurisdiction of incorporation of the applicable TSN Debtor or Reorganized TSN Debtor, as applicable.

E.    *Reference to Monetary Figures*

All references in the Plan to monetary figures shall refer to currency of the United States of America, unless otherwise expressly provided.

F.    *Settlement of Certain Inter-Creditor Issues*

As discussed in detail in the Disclosure Statement and as otherwise provided herein, pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good faith compromise of all Claims, Interests and controversies relating to the contractual, legal and subordination rights that a holder of a Claim may have with respect to any Allowed Claim or Interest, or any distribution to be made on account of such Allowed Claim or Interest. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the TSN Debtors, their Estates and holders of Claims and Interests and is fair, equitable and reasonable.

# ARTICLE II.

# ADMINISTRATIVE CLAIMS, DIP CLAIMS, U.S. TRUSTEE FEES AND PRIORITY TAX CLAIMS

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, DIP Claims, U.S. Trustee Fees and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Article III and shall have the following treatment:

A.    *Administrative Claims*

1.    Administrative Claims

Except with respect to Administrative Claims that are Claims for Accrued Professional Compensation and except to the extent that a holder of an Allowed Administrative Claim agrees to less favorable treatment, each holder of an Allowed Administrative Claim shall, in complete satisfaction of such Allowed Administrative Claim, be paid Cash in the full amount of such Allowed Administrative Claim on the later of: (a) the Initial Distribution Date; (b) the first date such Administrative Claim is Allowed or as soon as reasonably practicable thereafter; and (c) the date such Allowed Administrative Claim becomes due and payable by its terms, or as soon thereafter as is reasonably practicable.

2.    Professional Compensation

(a)    Claims for Accrued Professional Compensation

Professionals or other Entities asserting a Claim for Accrued Professional Compensation for services rendered before the Effective Date must file and serve on the TSN Debtors and such other Entities who are designated by the Bankruptcy Rules, the Confirmation Order, the Interim Compensation Order or other order of the Bankruptcy Court an application for final allowance of such Claim for Accrued Professional Compensation no later than 30 days after the Effective Date. Objections to any Claim for Accrued Professional Compensation must be filed and served on the Reorganized TSN Debtors, the Creditors' Committee, the Office of the U.S. Trustee and the

requesting party no later than the earlier of (a) 45 days after such application is filed or (b) 75 days after the Effective Date.

(b)      Treatment of Claims for Accrued Professional Compensation

A Claim for Accrued Professional Compensation in respect of which a final fee application has been properly filed and served pursuant to Article II(A)(2)(a) shall be payable to the extent approved by order of the Bankruptcy Court. Subject to the Holdback Amount, on the Effective Date, or as soon thereafter as reasonably practicable, to the extent not otherwise paid, all Allowed Claims for Accrued Professional Compensation (including estimated Accrued Professional Compensation through the Effective Date) shall be paid in full in Cash. To receive payment on the Effective Date for unbilled fees and expenses incurred through the Effective Date, each Professional shall reasonably estimate fees and expenses due for unbilled fees and expenses for periods that will not have been billed as of the Effective Date and shall deliver such estimates to the TSN Debtors, the Plan Sponsor and the U.S. Trustee prior to the Effective Date. If the estimated payment received by such Professional exceeds the actual allowed Accrued Professional Compensation for the estimated period, such excess amount shall be deducted from the Holdback Amount for such Professional and if the Holdback Amount is insufficient, such Professional shall disgorge the difference. If the estimated payment received by the Professional is lower than the Accrued Professional Compensation of such Professional, the difference shall be promptly paid to the Professional.

On the Effective Date, the Reorganized TSN Debtors shall fund the Holdback Amount Reserve for payment of the Holdback Amount. Upon final allowance by the Bankruptcy Court of the Accrued Professional Compensation, or entry of an earlier order of the Bankruptcy Court granting the release of the Holdback Amount, such amount, less any excess paid in connection with estimated fees and expenses through the Effective Date, shall be paid promptly and directly to the Professionals.

(c)      Post- Effective Date Fees and Expenses

Upon the Effective Date, any requirement that Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Reorganized TSN Debtors may employ and pay any Professional for services rendered or expenses incurred after the Effective Date in the ordinary course of business without any further notice to any party or action (including, without limitation, without the need to file a fee application), order or approval of the Bankruptcy Court.

### 3. Administrative Claim Bar Date

Except as otherwise provided in this Article II.A, requests for payment of Administrative Claims must be filed and served on the Reorganized TSN Debtors pursuant to the procedures specified in the Confirmation Order and the notice of entry of the Confirmation Order no later than 45 days after the Effective Date. Holders of Administrative Claims that are required to, but do not, file and serve a request for payment of such Administrative Claims by such date shall be forever barred, estopped and enjoined from asserting such Administrative Claims against the TSN Debtors or Reorganized TSN Debtors or their property and such Administrative Claims shall be deemed discharged as of the Effective Date. Objections to such requests, if any, must be filed and served on the Reorganized TSN Debtors and the requesting party no later than 90 days after the Effective Date. Notwithstanding the foregoing, no request for payment of an Administrative Claim need be filed with respect to an Administrative Claim previously Allowed by Final Order, including all Administrative Claims expressly Allowed under this Plan.

**B.**    *DIP Claims*

On the Effective Date, unless otherwise agreed to by the DIP Lenders, the DIP Claims shall be paid in full in Cash as provided under the DIP Loan Agreement. Upon payment and satisfaction in full of all Allowed DIP Claims, all liens and security interests granted to secure such obligations shall be terminated and immediately released and the DIP Lenders shall execute and deliver to the Reorganized TSN Debtors such instruments of release, satisfaction and/or assignments (in recordable form) as may be reasonably requested by the Reorganized TSN Debtors.

*C.      U.S. Trustee Fees*

On the Effective Date, the TSN Debtors shall pay all U.S. Trustee Fees that are due and owing on the Effective Date.

*D.      Priority Tax Claims*

Each holder of an Allowed Priority Tax Claim due and payable on or before the Effective Date shall receive, on the Distribution Date, at the option of the TSN Debtors (which option shall be reasonably satisfactory to the Plan Sponsor), one of the following treatments, in complete satisfaction of such Allowed Priority Tax Claim:  (1) Cash in an amount equal to the amount of such Allowed Priority Tax Claim; (2) Cash in an aggregate amount of such Allowed Priority Tax Claim payable in installment payments over a period of time not to exceed five years after the Petition Date, pursuant to section 1129(a)(9)(C) of the Bankruptcy Code; or (3) such other treatment as may be agreed upon by such holder and the TSN Debtors or otherwise determined upon an order of the Bankruptcy Court.

## ARTICLE III.

## CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

*A.      General Rules of Classification*

(i)  Pursuant to section 1122 of the Bankruptcy Code, set forth below is a designation of Classes of Claims against and Interests in the TSN Debtors.  A Claim or Interest is placed in a particular Class only to the extent that the Claim or Interest falls within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest falls within the description of such other Classes.  A Claim or Interest is also placed in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim or Interest is an Allowed Claim in that Class and such Claim or Interest has not been paid, released, or otherwise settled prior to the Effective Date.

(ii)  The TSN Debtors shall be treated as if they were consolidated solely for Plan voting, confirmation and distribution purposes as described in Article VII; provided, however, that if any Class of Impaired Claims votes to reject the Plan, the TSN Debtors' ability to confirm the Plan with respect to such rejecting Class pursuant to the cramdown standards of section 1129(b) of the Bankruptcy Code will be determined by reference to the treatment to which the holders of Claims in such Class would be entitled were (i) their Claims limited to the specific TSN Debtor(s) that are liable for such Claims, and (ii) the TSN Debtors not treated as consolidated for distribution and confirmation purposes.  This limited consolidation treatment is designed to consensually pool the assets and liabilities of the TSN Debtors solely to implement the settlements and compromises reached by the primary constituencies in the TSN Debtors' Chapter 11 Cases.

*B.      Summary of Classification*

The following chart represents the general classification of Claims and Interests against the TSN Debtors pursuant to the Plan:

| Class | Claim | Status | Voting Rights |
|:---:|---|:---:|:---:|
| 1 | Other Priority Claims | Unimpaired | No (deemed to accept) |
| 2 | Other Secured Claims | Unimpaired | No (deemed to accept) |
| 3 | Senior Secured Notes Claims | Impaired | Yes |
| 4 | PMCA Claims | Unimpaired | No (deemed to accept) |
| 5 | Senior Exchangeable Notes Claims | Impaired | Yes |
| 6 | Other Unsecured Claims | Impaired | Yes |

| Class | Claim | Status | Voting Rights |
|-------|-------|--------|---------------|
| 7 | Unsecured Convenience Claims | Impaired | Yes |
| 8 | Equity Interests | Impaired | No (deemed to reject) |

*C.*      *Treatment of Claims and Interests*

    1.   Class 1 – Other Priority Claims

        (a)    *Classification:* Class 1 consists of Other Priority Claims.

        (b)    *Treatment:* Except to the extent that a holder of an Allowed Other Priority Claim (i) has been paid by the TSN Debtors, in whole or in part, prior to the Effective Date or (ii) agrees to a less favorable treatment, each holder of an Allowed Other Priority Claim shall receive, on the Initial Distribution Date and in full satisfaction, settlement, release, and discharge of, and in exchange for such Other Priority Claim, Cash in the full amount of such Allowed Other Priority Claim.

        (c)    *Voting:* Class 1 is Unimpaired, and the holders of Other Priority Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, holders of Other Priority Claims are not entitled to vote to accept or reject the Plan.

    2.   Class 2 – Other Secured Claims

        (a)    *Classification:* Class 2 consists of Other Secured Claims. Although all Other Secured Claims have been placed in one Class for the purposes of nomenclature, each Other Secured Claim, to the extent secured by a Lien on any property or interest in property of the TSN Debtors different than that securing any other Other Secured Claims, shall be treated as being in a separate sub-Class for the purpose of receiving distributions under the Plan.

        (b)    *Treatment:* On the Initial Distribution Date, except to the extent that a holder of an Allowed Other Secured Claim agrees to a less favorable treatment, at the option of the TSN Debtors or the Reorganized TSN Debtors (which option shall be reasonably satisfactory to the Plan Sponsor), (i) each Allowed Other Secured Claim shall be reinstated and Unimpaired in accordance with section 1124(2) of the Bankruptcy Code, or (ii) each holder of an Allowed Other Secured Claim shall receive, in full satisfaction, settlement, release, and discharge of, and in exchange for, such Other Secured Claim, either (w) Cash in the full amount of such Allowed Other Secured Claim, including any postpetition interest accrued pursuant to section 506(b) of the Bankruptcy Code, (x) the proceeds of the sale or disposition of the collateral securing such Allowed Other Secured Claim to the extent of the value of the holder's secured interest in such collateral, (y) the collateral securing such Allowed Other Secured Claim and any interest on such Allowed Other Secured Claim required to be paid pursuant to section 506(b) of the Bankruptcy Code, or (z) such other distribution as necessary to satisfy the requirements of section 1129 of the Bankruptcy Code.

        (c)    *Voting:* Class 2 is Unimpaired, and the holders of Other Secured Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, holders of Other Secured Claims are not entitled to vote to accept or reject the Plan.

3. Class 3 – Senior Secured Notes Claims

    (a)    *Classification:*  Class 3 consists of the Senior Secured Notes Claims.

    (b)    *Treatment:*  Each holder of an Allowed Senior Secured Notes Claim shall receive its Pro Rata share of the Class 3 Distribution.

    (c)    *Voting:*  Holders of Senior Secured Notes Claims are Impaired.  Therefore, each holder of a Senior Secured Notes Claim is entitled to vote to accept or reject the Plan.

4. Class 4 – PMCA Claims

    (a)    *Classification:*  Class 4 consists of the PMCA Claims.

    (b)    *Treatment:*  The PMCA Claims will be reinstated pursuant to section 1124 of the Bankruptcy Code.

    (c)    *Voting:*  Class 4 is Unimpaired, and the holders of PMCA Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, holders of PMCA Claims are not entitled to vote to accept or reject the Plan.

5. Class 5 – Senior Exchangeable Notes Claims

    (a)    *Classification:*  Class 5 consists of the Senior Exchangeable Notes Claims.

    (b)    *Treatment:*  Each holder of a Senior Exchangeable Notes Claim shall receive, on the Initial Distribution Date, its Pro Rata share of the Class 5 Distribution.

    (c)    *Voting:*  Holders of Senior Exchangeable Notes Claims are Impaired.  Therefore, each holder of a Senior Exchangeable Notes Claim is entitled to vote to accept or reject the Plan.

6. Class 6 – Other Unsecured Claims

    (a)    *Classification:*  Class 6 consists of the Other Unsecured Claims.

    (b)    *Treatment:*  Unless such holder has made a Convenience Class Election, each holder of an Allowed Other Unsecured Claim shall receive its Pro Rata share of the Class 6 Distribution.

    (c)    *Voting:*  Holders of Other Unsecured Claims are Impaired.  Therefore, each holder of an Other Unsecured Claim is entitled to vote to accept or reject the Plan.

7. Class 7 – Unsecured Convenience Claims

    (a)    *Classification:*  Class 7 consists of Unsecured Convenience Claims.

    (b)    *Treatment:*  Each holder of an Allowed Unsecured Convenience Claim shall receive Cash in an amount equal to the lesser of:  (i) 10% of such holders' Unsecured Convenience Claim; and (ii) such holder's Pro Rata share of $500,000.

    (c)    *Voting:*  Class 7 is Impaired by the Plan.  Therefore, each holder of an Unsecured Convenience Claim is entitled to vote to accept or reject the Plan.

8. Class 8 – Equity Interests in TSN

    (a)    *Classification:* Class 8 consists of all Equity Interests.

    (b)    *Treatment:* On the Effective Date, all Equity Interests shall be deemed cancelled and shall be of no further force and effect, whether surrendered for cancellation or otherwise, and there shall be no distribution to the holders of Equity Interests.

    (c)    *Voting:* Class 8 is Impaired, and the holders of Equity Interests are conclusively presumed to have rejected the Plan. Therefore, holders of Equity Interests are not entitled to vote to accept or reject the Plan.

# ARTICLE IV.

## ACCEPTANCE REQUIREMENTS

A.    *Acceptance or Rejection of the Plan*

1. Voting Class

Classes 3, 5, 6 and 7 are Impaired under the Plan and are receiving property under the Plan. Therefore, such Classes are entitled to vote to accept or reject the Plan.

2. Presumed Acceptance of the Plan

Classes 1, 2, and 4 are Unimpaired under the Plan and are, therefore, conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.

B.    *Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code*

Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation by acceptance of the Plan by an Impaired Class of Claims. The TSN Debtors shall seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Interests. The TSN Debtors reserve the right to modify the Plan in accordance with Article XI hereof to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification.

# ARTICLE V.

## MEANS FOR IMPLEMENTATION OF THE PLAN

A.    *Limited Consolidation for Voting, Confirmation and Distribution Purposes*

1. This Plan provides for substantive consolidation of the TSN Debtors' Estates, but solely for purposes of voting, confirmation, and making distributions to the holders of Allowed Claims under this Plan. On the Effective Date, and solely for purposes of voting, confirmation, and making distributions to the holders of Allowed Claims under this Plan: (a) all guarantees of any TSN Debtor of the payment, performance or collection of another TSN Debtor with respect to Claims against such TSN Debtor shall be eliminated and cancelled; (b) any single obligation of multiple Debtors shall be treated as a single obligation in the consolidated Chapter 11 Cases; and (c) all guarantees by a TSN Debtor with respect to Claims against one or more of the other TSN Debtors shall be treated as a single obligation in the consolidated Chapter 11 Cases. On the Effective Date, and in accordance with the terms of this Plan and the consolidation of the assets and liabilities of the TSN Debtors, all Claims based upon guarantees of collection, payment, or performance made by a TSN Debtor as to the obligation of another TSN Debtor shall be released and of no further force and effect. Except as set forth in this Article V.A.1, such substantive consolidation shall not affect (a) the legal and corporate structure of the Reorganized TSN Debtors, or (b) any obligations under any leases or contracts assumed in this Plan or otherwise after the Petition Date.

2.     Such election to treat the Estates as if they were consolidated solely for the purpose of implementing the Plan shall not affect: (1) the legal and corporate structures of the TSN Debtors, subject to the right of the TSN Debtors to effect the Restructuring Transactions contemplated pursuant to the Plan; (2) any obligations under any contracts or leases that were entered into during the Chapter 11 Cases or Executory Contracts and unexpired leases that have been or will be assumed pursuant to the Plan; (3) Intercompany Interests; (4) distributions from any insurance policies or proceeds of such policies; (5) the revesting of assets in the separate Reorganized TSN Debtors pursuant to Article V.N of the Plan.  In addition, such election to treat the Estates as consolidated for the purpose of implementing the Plan will not constitute a waiver of the mutuality requirement for setoff under section 553 of the Bankruptcy Code, except to the extent otherwise expressly waived by the TSN Debtors.

B.      *Intercompany Claims*

Each Allowed Intercompany Claim shall be reinstated on the Effective Date, except as otherwise determined to by the TSN Debtors with the reasonable consent of the Plan Sponsor.  After the Effective Date, the Reorganized TSN Debtors shall have the right to resolve or compromise Disputed Intercompany Claims without approval of the Bankruptcy Court.

C.      *Sources of Consideration for Plan Distributions*

1.      Cash Consideration

All Cash consideration necessary for the TSN Debtors or the Reorganized TSN Debtors, as applicable, to make payments or distributions pursuant hereto shall be obtained from the Rights Offering (and the Backstop Party's purchase of the Overallotment, if applicable) or other Cash on hand, including Cash derived from business operations.

D.      *Issuance of New Securities and Debt Instruments*

1.      Issuance of New Common Stock

On the Effective Date, TSN shall issue the New Common Stock to the Holders of Claims entitled thereto.

2.      Issuance of New Preferred Stock

On the Effective Date, the Reorganized TSN Debtor shall issue the New Preferred Stock, on such terms and conditions as set forth in the New Preferred Stock Certificate of Designation.

3.      New Shareholders Agreement

The holders of the New Common Stock and New Preferred Stock shall be parties to the New Shareholders Agreement.  As of the Effective Date, and as a condition to receiving any distribution of New Common Stock or New Preferred Stock, holders of Claims or Interests that receive the New Common Stock or New Preferred Stock shall be deemed bound by the New Shareholders Agreement.

E.      *The Rights Offering*

1.      General Description

Pursuant to the Rights Offering, TSN will offer and sell the Rights Offering Preferred Stock.  The Rights Offering Preferred Stock shall be subject to the New Preferred Stock Certificate of Designation.

2.      Rights Offering Procedures

Each holder of Rights will be entitled to exercise such Rights in order to subscribe for and acquire their Pro Rata share of the Rights Offering Preferred Stock, calculated prior to giving effect to dilution resulting from the

Backstop Commitment Fee and, if exercised, the Overallotment. The Rights Offering will be consummated pursuant to the Rights Offering Procedures.

3. <u>The Backstop Commitment and Overallotment</u>

Pursuant to the terms of the EPCA, in order to facilitate the Rights Offering and implementation of the Plan, the Backstop Party has agreed to purchase, and TSN has agreed to sell and issue to the Backstop Party, at the Discount Purchase Price: (a) [___] shares of Rights Offering Preferred Stock, and (b) any Unsubscribed Shares, up to the Backstop Amount in accordance with and subject to the terms and conditions of the EPCA. To the extent that there are Non-Backstopped Shares, participants in the Rights Offering may, subject to a right of first refusal of the Backstop Party with respect to the Non-Backstopped Shares, elect to purchase the Non-Backstopped Shares on a Pro Rata basis. In addition, the Backstop Party shall have the option to purchase the Overallotment at the Discount Purchase Price pursuant to the EPCA. On the Effective Date, in accordance with the Backstop Approval Order, (i) the TSN Debtors will pay to the Backstop Party the Transaction Expenses and (ii) the Backstop Party will receive the Backstop Commitment Fee and be entitled to the Backstop Indemnification Obligations.

F. *Cancellation of Securities and Agreements*

On the Effective Date, except as otherwise specifically provided for in the Plan: (1) the obligations of the TSN Debtors under the Senior Secured Notes Security Agreement and the Indentures, and any other certificate, share, note, bond, indenture, purchase right, option, warrant or other instrument or document directly or indirectly evidencing or creating any indebtedness or obligation of or ownership interest in the TSN Debtors giving rise to any Claim or Interest (except such certificates, notes or other instruments or documents evidencing indebtedness or obligations of the TSN Debtors that are specifically reinstated pursuant to the Plan), shall be cancelled as to the TSN Debtors, and the Reorganized TSN Debtors shall not have any continuing obligations thereunder and (2) the obligations of the TSN Debtors pursuant, relating or pertaining to any agreements, indentures, certificates of designation, bylaws or certificate or articles of incorporation or similar documents governing the shares, certificates, notes, bonds, purchase rights, options, warrants or other instruments or documents evidencing or creating any indebtedness or obligation of the TSN Debtors (except such agreements, certificates, notes or other instruments evidencing indebtedness or obligations of the TSN Debtors that are specifically reinstated or assumed pursuant to the Plan) shall be released and discharged; *provided*, *however*, notwithstanding Confirmation or the occurrence of the Effective Date, any such indenture or agreement that governs the rights of the holder of a Claim shall continue in effect solely for purposes of (a) allowing holders of Senior Secured Notes Claims and Senior Exchangeable Notes Claims (as applicable) to receive distributions under the Plan as provided herein, (b) allowing the Indenture Trustees, if applicable, to make distributions under the Plan as provided herein, and deduct therefrom such compensation, reasonable fees and expenses due thereunder or incurred in making such distributions and (c) allowing the Indenture Trustees to seek compensation and/or reimbursement of reasonable fees and expenses in accordance with the terms of the Indentures and this Plan; *provided further*, *however*, that the preceding proviso shall not affect the discharge of Claims or Interests pursuant to the Bankruptcy Code, the Confirmation Order or the Plan, or result in any expense or liability to the Reorganized TSN Debtors, except to the extent set forth in or provided for under this Plan. On and after the Effective Date, all duties and responsibilities of the Indenture Trustees under the Indentures, as applicable, shall be discharged except to the extent required in order to effectuate the Plan.

G. *Exemptions for Issuance of New Equity*

The issuance of the New Common Stock, the New Preferred Stock, including the Rights Offering Preferred Stock and the Additional Shares (and the issuance of any common stock of Reorganized TSN upon conversion of the New Preferred Stock) shall be authorized and exempt from registration under the securities laws pursuant to, as applicable, section 1145 of the Bankruptcy Code, section 4(2) of the Securities Act of 1933, as amended, and/or other applicable laws, as of the Effective Date without further act or action by any person, unless required by provision of the relevant corporate documents or applicable law, regulation, order or rule; and all documents evidencing the same shall be executed and delivered as provided for in the Plan or the Plan Supplement.

### H. Corporate Existence

Subject to any Restructuring Transaction and except as otherwise provided herein, in the New Corporate Governance Documents or elsewhere in the Plan Supplement, each Debtor, as Reorganized, shall continue to exist after the Effective Date as a separate corporate entity, limited liability company, partnership or other form, as the case may be, with all the powers of a corporation, limited liability company, partnership or other form, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed. The Corporate Governance Documents shall be substantially in the form filed with the Plan Supplement.

### I. New Certificate of Incorporation and New By-Laws

On or as soon as reasonably practicable after the Effective Date, each of the Reorganized TSN Debtors will file their respective New Certificates of Incorporation with the applicable Secretaries of State and/or other applicable authorities in their respective states of incorporation in accordance with the corporate laws of the respective states of incorporation. After the Effective Date, each of the Reorganized TSN Debtors may amend and restate their respective New Certificates of Incorporation and New By-Laws and other constituent documents as permitted by the laws of their respective states of incorporation and their respective New Certificates of Incorporation and New By-Laws.

### J. Reorganized TSN Debtors' Boards of Directors

To the extent known, the identity of the members of the New Boards of each of the Reorganized TSN Debtors will be identified in the Plan Supplement.

### K. Officers of Reorganized TSN Debtors

To the extent known, officers of each of the other Reorganized TSN Debtors shall be identified in the Plan Supplement. Such officers shall serve in accordance with applicable non-bankruptcy law and, to the extent applicable, the New Employment Agreements.

### L. Employee Benefits

Except as otherwise provided herein, on and after the Effective Date, the Reorganized TSN Debtors may: (1) honor, in the ordinary course of business, any contracts, agreements, policies, programs and plans for, among other things, compensation (other than equity based compensation related to Interests), health care benefits, disability benefits, deferred compensation benefits, travel benefits, savings, severance benefits, retirement benefits, welfare benefits, workers' compensation insurance and accidental death and dismemberment insurance for the directors, officers and employees of any of the TSN Debtors who served in such capacity at any time and (2) honor, in the ordinary course of business, Claims of employees employed as of the Effective Date for accrued vacation time arising before the Petition Date; *provided, however,* that the TSN Debtors' or Reorganized TSN Debtors' performance under any employment agreement will not entitle any person to any benefit or alleged entitlement under any policy, program or plan that has expired or been terminated before the Effective Date, or restore, reinstate or revive any such benefit or alleged entitlement under any such policy, program or plan. Nothing herein shall limit, diminish or otherwise alter the Reorganized TSN Debtors' defenses, claims, Causes of Action or other rights with respect to any such contracts, agreements, policies, programs and plans.

### M. Vesting of Assets in the Reorganized TSN Debtors

Except as otherwise provided in the Plan or any agreement, instrument or other document incorporated therein, on the Effective Date any and all property in each Estate and all Causes of Action (except those released pursuant to the Releases by the TSN Debtors) shall vest in each respective Reorganized TSN Debtor, free and clear of all Liens, Claims, charges or other encumbrances. On and after the Effective Date, except as otherwise provided in the Plan, each Reorganized TSN Debtor may operate its business and may use, acquire or dispose of property and compromise or settle any Claims, Interests or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

*N.* *Restructuring Transactions*

On the Effective Date or as soon as reasonably practicable thereafter, the Reorganized TSN Debtors may enter into the Restructuring Transactions and may take all actions as may be necessary or appropriate to effect a restructuring of their respective businesses or the overall organizational structure of the Reorganized TSN Debtors. The Restructuring Transactions may include one or more mergers, consolidations, restructurings, conversions, dissolutions, transfers or liquidations as may be reasonably determined by (i) the TSN Debtors, with the reasonable consent of the Plan Sponsor or (ii) the Reorganized TSN Debtors to be necessary or appropriate. The actions to effect the Restructuring Transactions may include: (1) the execution and delivery of appropriate agreements or other documents of merger, consolidation, restructuring, conversion, disposition, transfer, dissolution or liquidation containing terms that are consistent with the terms of the Plan and that satisfy the applicable requirements of applicable law and any other terms to which the applicable Entities may agree; (2) the execution and delivery of appropriate instruments of transfer, assignment, assumption or delegation of any asset, property, right, liability, debt or obligation on terms consistent with the terms of the Plan and having other terms for which the applicable parties agree; (3) the filing of appropriate certificates or articles of incorporation or amendments thereof, reincorporation, merger, consolidation, conversion or dissolution pursuant to applicable state law; and (4) all other actions that the applicable Entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law in connection with the Restructuring Transactions. In the event a Restructuring Transaction is a merger transaction, upon the consummation of such Restructuring Transaction, each party to such merger shall cease to exist as a separate corporate entity and thereafter the surviving Reorganized TSN Debtor shall assume and perform the obligations of each Reorganized TSN Debtor under the Plan. In the event a Reorganized TSN Debtor is liquidated, the Reorganized TSN Debtors (or the Reorganized TSN Debtor which owned the stock in such liquidating Debtor prior to such liquidation) shall assume and perform such obligations. Implementation of the Restructuring Transactions shall not affect the distributions under the Plan.

*O.* *Intercompany Interests*

Subject to any Restructuring Transaction, in order to implement the Plan, at the option of the Reorganized TSN Debtors (with the reasonable consent of the Plan Sponsor), Intercompany Interests shall either (i) be retained, in which case the Debtor holding such Intercompany Interest shall continue to hold such Interest and the legal, equitable and contractual rights to which the holders of such Intercompany Interests are entitled shall remain unaltered or (ii) be cancelled and new Intercompany Interests in the applicable Other Debtor shall be issued pursuant to the Plan to the Reorganized TSN Debtor that holds such Intercompany Interests.

*P.* *Corporate Action*

Upon the Effective Date, all actions contemplated by the Plan shall be deemed authorized and approved in all respects, including (1) entry into the New Employment Agreements; (2) selection of the directors and officers of the Reorganized TSN Debtors; (3) the distribution of the New Common Stock as provided herein; and (4) all other actions contemplated by the Plan (whether to occur before, on or after the Effective Date). All matters provided for in the Plan involving the corporate structure of the TSN Debtors or the Reorganized TSN Debtors, and any corporate action required by the TSN Debtors or the Reorganized TSN Debtors in connection with the Plan shall be deemed to have occurred and shall be in effect, without any requirement of further action by the directors or officers of the TSN Debtors or the Reorganized TSN Debtors.

On or (as applicable) before the Effective Date, the appropriate officers of the TSN Debtors or the Reorganized TSN Debtors, as applicable, shall be authorized and directed to issue, execute and deliver the agreements, documents, securities, certificates of incorporation, operating agreements and instruments contemplated by the Plan (or necessary or desirable to effect the transactions contemplated by the Plan) in the name of and on behalf of the Reorganized TSN Debtors, including any and all agreements, documents, securities and instruments relating to the foregoing. The authorizations and approvals contemplated by this Article V.O shall be effective notwithstanding any requirements under non-bankruptcy law.

*Q.*     *Effectuating Documents; Further Transactions*

On and after the Effective Date, the Reorganized TSN Debtors and the managers, officers and members of the boards of directors thereof are authorized to issue, execute, deliver, file or record such contracts, securities, instruments, releases and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement and further evidence the terms and conditions of the Plan and the securities issued pursuant to the Plan in the name of and on behalf of the Reorganized TSN Debtors, without the need for any approvals, authorization or consents except for those expressly required pursuant to the Plan.

*R.*     *General Settlement of Claims and Interests*

As discussed in detail in the Disclosure Statement and as otherwise provided herein, as one element of, and in consideration for, an overall negotiated settlement of disputed Claims and issues embodied in the Plan, pursuant to Bankruptcy Rule 9019 and section 1123 of the Bankruptcy Code and in consideration for the classification, distributions, releases and other benefits provided under the Plan, the provisions of the Plan constitute a good faith compromise and settlement of all Claims, Interests and controversies resolved pursuant to the Plan, including, without limitation, the settlement of issues arising from or related to [____].  Pursuant to Rule 408 of the Federal Rules of Evidence, this Plan, the Disclosure Statement, the Plan Support Agreement (and any exhibits or supplements relating to the foregoing) and all negotiations relating thereto shall not be admissible into evidence in any proceeding unless and until this Plan in consummated, and then only in accordance with this Plan.  In the event this Plan is not consummated, provisions of this Plan, the Disclosure Statement, the Plan Support Agreement (and any exhibits or supplements relating to the foregoing) and all negotiations relating thereto shall not be binding or probative.

Subject to Article VII, all distributions made to Holders of Allowed Claims and Interests in any Class are intended to be and shall be final and indefeasible.

*S.*     *Section 1146 Exemption from Certain Taxes and Fees*

Pursuant to section 1146(a) of the Bankruptcy Code, any transfers of property in contemplation of, in connection with, or pursuant to the Plan shall not be subject to any stamp tax or other similar tax or governmental assessment in the United States or Canada, and the Confirmation Order shall direct and be deemed to direct the appropriate state or local governmental officials or agents to forgo the collection of any such tax or governmental assessment and to accept for filing and recordation instruments or other documents pursuant to such transfers of property without the payment of any such tax or governmental assessment.  Such exemption specifically applies, without limitation, to (1) the creation of any mortgage, deed of trust, lien or other security interest; (2) the making or assignment of any lease or sublease; (3) any restructuring transaction authorized by Article V.O hereof; or (4) the making or delivery of any deed or other instrument of transfer under, in furtherance of or in connection with the Plan, including: (a) any merger agreements; (b) agreements of consolidation, restructuring, disposition, liquidation or dissolution; (c) deeds; or (d) assignments executed in connection with any transaction occurring under the Plan.

*T.*     *D&O Liability Insurance Policies and Indemnification Provisions*

Notwithstanding anything herein to the contrary, as of the Effective Date, the D&O Liability Insurance Policies shall be deemed to be, and shall be treated as though they are, executory contracts and the TSN Debtors shall assume (and assign to the Reorganized TSN Debtors if necessary to continue the D&O Liability Insurance Policies in full force) all of the D&O Liability Insurance Policies pursuant to section 365(a) of the Bankruptcy Code. Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the TSN Debtors' foregoing assumption of each of the D&O Liability Insurance Policies.  On or before the Effective Date, the Reorganized TSN Debtors shall obtain tail coverage under a directors' and officers' liability insurance policy for the current and former directors, officers and managers of the TSN Debtors for a period of five years, and placed with such insurers, the terms of which shall be set forth in the Plan Supplement.

As of the Effective Date, the directors, officers, members, attorneys, employees and other agents of the TSN Debtors who served the TSN Debtors prior to (but not on or after) the Effective Date shall be entitled to the full

benefit of any applicable Indemnification Provisions; provided, that any claims by such directors, officers, members, attorneys, employees or other agents relating to or arising out of the Indemnification Provisions shall be deemed to be, and treated as though they are, Other Unsecured Claims against the TSN Debtors. For the avoidance of doubt, the Reorganized TSN Debtors shall have no liability to such directors, officers, members, attorneys, employees or other agents in respect of the Indemnification Provisions.

In addition, on the Effective Date, the New Corporate Governance Documents of the Reorganized TSN Debtors shall contain provisions which (i) eliminate the personal liability of the TSN Debtors' and the Reorganized TSN Debtors' then-present and future directors and officers for post-emergence monetary damages resulting from breaches of their fiduciary duties to the fullest extent permitted by applicable law in the jurisdiction in which the subject Reorganized TSN Debtor is organized; and (ii) require such Reorganized TSN Debtor, subject to appropriate procedures, to indemnify the TSN Debtors' and the Reorganized TSN Debtors' directors, officers, and other key employees (as such key employees are identified by the New Board) serving on or after the Effective Date for all claims and actions to the fullest extent permitted by applicable law in the jurisdiction in which the subject Reorganized TSN Debtor is incorporated or organized.

U.      *Preservation of Rights and Causes of Action*

In accordance with section 1123(b) of the Bankruptcy Code, and except where such Causes of Action have been expressly released (including, for the avoidance of doubt, pursuant to the Releases by the TSN Debtors provided by Article IX.B hereof), the Reorganized TSN Debtors shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action, including Causes of Action under chapter 5 of the Bankruptcy Code, whether arising before or after the Petition Date, and the Reorganized TSN Debtors' rights to commence, prosecute or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date. No Entity may rely on the absence of a specific reference in the Plan, the Disclosure Statement, or the Schedule of Retained Causes of Action, to any Cause of Action against them as any indication that the TSN Debtors or Reorganized TSN Debtors, as applicable, will not pursue any and all available Causes of Action against them. No preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise) or laches, shall apply to such retained Causes of Action upon, after or as a consequence of the Confirmation or consummation of the Plan.

## ARTICLE VI.

## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

A.      *Assumption and Rejection of Executory Contracts and Unexpired Leases*

Except as otherwise provided herein, or in any contract, instrument, release, indenture or other agreement or document entered into in connection with the Plan, each of the TSN Debtors' Executory Contracts and Unexpired Leases shall be deemed assumed as of the Effective Date, unless such Executory Contract or Unexpired Lease: (1) was assumed or rejected previously by the TSN Debtors; (2) expired or terminated pursuant to its own terms before the Effective Date; (3) is the subject of a motion to assume filed on or before the Effective Date; or (4) is identified on the Rejected Executory Contract and Unexpired Lease List.

Entry of the Confirmation Order shall constitute a Bankruptcy Court order approving the assumptions or rejections of such Executory Contracts or Unexpired Leases as set forth in the Plan, all pursuant to sections 365(a) and 1123 of the Bankruptcy Code. The Confirmation Order shall constitute an order of the Bankruptcy Court, approving (i) the assumption and assignment, or rejection, as the case may be, of Executory Contracts and Unexpired Leases, as described above, pursuant to sections 365(a) and 1123(b)(2) of the Bankruptcy Code, (ii) that the Reorganized TSN Debtors had properly provided for the cure of any defaults that might have existed, (iii) that each assumption and assignment was in the best interest of the Reorganized TSN Debtors, their estates, and all parties in interest in the Chapter 11 Cases, and (iv) the requirements for assumption and assignment of any Executory Contract or Unexpired Lease to be assumed had been satisfied. Unless otherwise indicated, all assumptions or rejections of Executory Contracts and Unexpired Leases pursuant to the Plan are effective as of the Effective Date. Each Executory Contract or Unexpired Lease assumed pursuant to the Plan or by Bankruptcy Court order but not assigned to a third party before the Effective Date shall revest in and be fully enforceable by the

applicable contracting Reorganized TSN Debtor in accordance with its terms, except as such terms may have been modified by such order. Notwithstanding anything to the contrary in the Plan, the TSN Debtors (with the reasonable consent of the Plan Sponsor) or the Reorganized TSN Debtors, as applicable, reserve the right to alter, amend, modify or supplement the list of Executory Contracts and Unexpired Leases identified in the Plan Supplement at any time before the Effective Date; provided, that to the extent that, as of the Effective Date, there is any pending dispute between one or more of the TSN Debtors and a counterparty to an Executory Contract or Unexpired Lease regarding such counterparty's Cure Claim, the TSN Debtors and Reorganized TSN Debtors shall reserve the right to add the applicable Executory Contract or Unexpired Lease to the Rejected Executory Contract and Unexpired Lease List following the resolution of such dispute, in which event such Executory Contract or Unexpired Lease shall be deemed rejected and such counterparty shall have any and all rights with respect thereto. After the Effective Date, the Reorganized TSN Debtors shall have the right to terminate, amend or modify any intercompany contracts, leases or other agreements without approval of the Bankruptcy Court.

B.      *Cure of Defaults for Executory Contracts and Unexpired Leases Assumed*

Any monetary defaults under each Executory Contract and Unexpired Lease to be assumed pursuant to the Plan shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the default amount in Cash on the Effective Date, subject to the limitations described below, or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree. In the event of a dispute regarding (1) the amount of any payments to cure such a default, (2) the ability of the Reorganized TSN Debtors or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed or (3) any other matter pertaining to assumption, the payment of Cure Claims required by section 365(b)(1) of the Bankruptcy Code shall be made no later than ten (10) business days following the entry of a Final Order or orders resolving the dispute and approving the assumption. At least ten days before the Confirmation Hearing, the TSN Debtors shall distribute, or cause to be distributed, notices of proposed assumption and proposed amounts of Cure Claims to the applicable third parties, which notices shall include procedures for objecting to proposed assumptions of Executory Contracts and Unexpired Leases and any amounts of Cure Claims to be paid in connection therewith and resolution of disputes by the Bankruptcy Court. Any objection by a counterparty to an Executory Contract or Unexpired Lease to a proposed assumption or related Cure Claim amount must be filed, served and actually received by the TSN Debtors at least three days before the Confirmation Hearing. Any counterparty to an Executory Contract or Unexpired Lease that fails to object timely to the proposed assumption or Cure Claim amount will be deemed to have assented to such assumption or cure amount.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time before the effective date of the assumption.

C.      *Claims Based on Rejection of Executory Contracts or Unexpired Leases*

All proofs of Claim with respect to Claims arising from the rejection of Executory Contracts and Unexpired Leases, if any, must be filed with the Bankruptcy Court within 30 days after the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection. Any Claims arising from the rejection of Executory Contracts and Unexpired Leases not filed with the Bankruptcy Court within such time will be automatically disallowed, forever barred from assertion and shall not be enforceable against the TSN Debtors or the Reorganized TSN Debtors, the Estates or their property without the need for any objection by the Reorganized TSN Debtors or further notice to, or action, order or approval of the Bankruptcy Court. All Allowed Claims arising from the rejection of the TSN Debtors' Executory Contracts and Unexpired Leases shall be classified as Class 6 Other Unsecured Claims against the applicable Debtor and shall be treated in accordance with Article III of the Plan. The deadline to object to Claims arising from the rejection of Executory Contracts and Unexpired Leases, if any, shall be the later of (a) 180 days following the date on which such Claim was filed and (b) such other period of limitation as may be specifically fixed by an order of the Bankruptcy Court for objecting to such Claims.

D.    *Insurance Policies*

Notwithstanding anything herein to the contrary, as of the Effective Date, the TSN Debtors (with the reasonable consent of the Plan Sponsor) shall assume (and assign to the Reorganized TSN Debtors if necessary to continue the Insurance Policies in full force) all of the Insurance Policies pursuant to section 365(a) of the Bankruptcy Code.  Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the TSN Debtors' foregoing assumption of each of the Insurance Policies.

E.    *Modifications, Amendments, Supplements, Restatements or Other Agreements.*

Unless otherwise provided, each Executory Contract or Unexpired Lease that is assumed shall include all modifications, amendments, supplements, restatements or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and all Executory Contracts and Unexpired Leases related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under the Plan.

Modifications, amendments, supplements and restatements to Executory Contracts and Unexpired Leases that have been executed by the TSN Debtors during the Chapter 11 Cases shall not be deemed (unless otherwise agreed by the contract counterparty) to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority or amount of any Claims that may arise in connection therewith.

F.    *Reservation of Rights.*

Neither the exclusion nor inclusion of any Executory Contract or Unexpired Lease on the Rejected Executory Contract and Unexpired Lease List, nor anything contained in the Plan, shall constitute an admission by the TSN Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that any Reorganized TSN Debtor has any liability thereunder.  If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the TSN Debtors or Reorganized TSN Debtors, as applicable, shall have 45 days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.

G.    *Contracts and Leases Entered Into After the Petition Date.*

Contracts and leases entered into after the Petition Date by any TSN Debtor, including any Executory Contracts and Unexpired Leases assumed by such Debtor, will be performed by the Debtor or Reorganized TSN Debtor liable thereunder in the ordinary course of its business.  Accordingly, such contracts and leases (including any assumed Executory Contracts and Unexpired Leases) will survive and remain unaffected by entry of the Confirmation Order, unless the parties thereto agree to any modifications, amendments, supplements or restatements.

## ARTICLE VII.

## PROVISIONS GOVERNING DISTRIBUTIONS

A.    *Record Date for Distributions*

As of the entry of the Confirmation Order, the various transfer registers for each of the Classes of Claims or Interests as maintained by the TSN Debtors or their respective agents shall be deemed closed, and there shall be no further changes made to reflect any new record holders of any Claims or Interests.  The TSN Debtors shall have no obligation to recognize any transfer of Claims or Interests occurring on or after the Distribution Record Date.

B.       *Timing and Calculation of Amounts to Be Distributed*

Except as otherwise provided in the Plan, on the applicable Distribution Date, each holder of an Allowed Claim or Interest against the TSN Debtors shall receive the full amount of the distributions that the Plan provides for Allowed Claims or Interests in the applicable Class and in the manner provided herein.  In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.  If and to the extent that there are Disputed Claims, distributions on account of any such Disputed Claims shall be made pursuant to the provisions set forth in Article VIII hereof.  Except as otherwise provided herein, holders of Claims shall not be entitled to interest, dividends or accruals on the distributions provided for herein, regardless of whether such distributions are delivered on or at any time after the Effective Date.

C.       *Fractional Distributions*

No fractions of New Common Stock, New Preferred Stock or Rights shall be distributed.  Cash shall not be distributed under the Plan in denominations of less than one cent ($0.01).  For purposes of distribution, fractions of New Common Stock, New Preferred Stock or Rights shall be rounded down to the nearest whole number.  The Disbursing Agent shall have no obligation to make any distribution of Cash that is less than $10.00.

D.       *Disbursing Agent*

Except as otherwise provided herein, all distributions under the Plan shall be made by the Reorganized TSN Debtors as Disbursing Agent or such other Entity designated by the Reorganized TSN Debtors as a Disbursing Agent on the Effective Date.  If the Disbursing Agent is not one of the Reorganized TSN Debtors, such entity shall obtain a bond or surety for the performance of its duties, and all costs and expenses of procuring any such bond or surety shall be borne by the TSN Debtors or Reorganized TSN Debtors.

E.       *Rights and Powers of Disbursing Agent*

1.       Powers of the Disbursing Agent

The Disbursing Agent shall be empowered to: (a) affect all actions and execute all agreements, instruments and other documents necessary to perform its duties under the Plan; (b) make all distributions contemplated hereby; (c) employ professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions hereof.

2.       Expenses Incurred On or After the Effective Date

Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable fees and expenses incurred by the Disbursing Agent in carrying out its obligations under this Article VII of the Plan on or after the Effective Date (including taxes) and any reasonable compensation and expense reimbursement claims (including reasonable attorney fees and expenses) made by the Disbursing Agent related thereto shall be paid in Cash by the Reorganized TSN Debtors in their reasonable discretion.

F.       *Distributions to Holders of Disputed Claims*

Notwithstanding any provision otherwise in the Plan and except as may be agreed to by the TSN Debtors (with the reasonable consent of the Plan Sponsor) or the Reorganized TSN Debtors, in each case in their sole discretion, and the holder of a Disputed Claim, no partial payments and no partial distributions shall be made with respect to any Disputed Claim until all Disputed Claims held by the holder of such Disputed Claim or Interest have become Allowed Claims or have otherwise been resolved by settlement or Final Order.

*G.      Delivery of Distributions and Undeliverable or Unclaimed Distributions*

1.    Delivery of Distributions in General

Except as otherwise provided in the Plan and subject to Bankruptcy Rule 9010, distributions to holders of Allowed Claims shall be made to holders of record as of the Distribution Record Date by the Disbursing Agent: (a) to the signatory set forth on any of the Proofs of Claim filed by such holder or other representative identified therein (or at the last known addresses of such holder if no Proof of Claim is filed or if the TSN Debtors have been notified in writing of a change of address); (b) at the addresses set forth in any written notices of address changes delivered to the Disbursing Agent after the date of any related Proof of Claim; (c) at the addresses reflected in the Schedules if no Proof of Claim has been filed and the Disbursing Agent has not received a written notice of a change of address; or (d) on any counsel that has appeared in the Chapter 11 Cases on the holder's behalf.  Distributions under the Plan on account of Allowed Claims shall not be subject to levy, garnishment, attachment or like legal process, so that each holder of an Allowed Claim shall have and receive the benefit of the distributions in the manner set forth in the Plan.  None of the TSN Debtors, the Reorganized TSN Debtors and the applicable Disbursing Agent shall incur any liability whatsoever on account of any distributions under the Plan except for gross negligence, willful misconduct or fraud.

Except as otherwise provided in the Plan, all distributions to holders of Notes Claims shall be governed by the Notes and the Indentures, and shall be deemed completed when made to the respective Indenture Trustees, who shall in turn make distributions in accordance with the Notes and Indentures.

2.    Undeliverable Distributions and Unclaimed Property

In the event that any distribution to any holder is returned as undeliverable, no distribution to such holder shall be made unless and until the Disbursing Agent has determined the then current address of such holder, at which time such distribution shall be made as soon as practicable after such distribution has become deliverable or has been claimed to such holder without interest; *provided, however,* that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code and forfeited at the expiration of six months from the applicable Distribution Date.  After such date, all "unclaimed property" or interests in property shall revert to the Reorganized TSN Debtors (notwithstanding any applicable federal or state escheat, abandoned or unclaimed property laws to the contrary), and the Claim of any holder to such property or Interest in property shall be discharged and forever barred.

*H.      Hart-Scott-Rodino Compliance*

Any shares of New Common Stock or New Preferred Stock to be distributed under the Plan to any entity required to file a Premerger Notification and Report Form under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, or to meet any similar requirements under applicable non-U.S. law, shall not be distributed until the notification and waiting periods applicable under such law to such entity shall have expired or been terminated.

*I.      Withholding and Reporting Requirements*

In connection with the Plan and all instruments issued in connection therewith, the Disbursing Agent shall comply with all applicable withholding and reporting requirements imposed by any federal, state or local taxing authority, and all distributions under the Plan shall be subject to any such withholding or reporting requirements.

*J.      Setoffs*

The TSN Debtors and the Reorganized TSN Debtors may withhold (but not set off except as set forth below) from the distributions called for under the Plan on account of any Allowed Claim an amount equal to any claims, equity interests, rights and Causes of Action of any nature that the TSN Debtors or the Reorganized TSN Debtors may hold against the holder of any such Allowed Claim.  In the event that any such claims, equity interests, rights and Causes of Action of any nature that the TSN Debtors or the Reorganized TSN Debtors may hold against

the holder of any such Allowed Claim are adjudicated by Final Order or otherwise resolved, the TSN Debtors may, pursuant to section 553 of the Bankruptcy Code or applicable non-bankruptcy law, set off against any Allowed Claim and the distributions to be made pursuant hereto on account of such Allowed Claim (before any distribution is made on account of such Allowed Claim) the amount of any adjudicated or resolved claims, equity interests, rights and Causes of Action of any nature that the TSN Debtors or the Reorganized TSN Debtors may hold against the holder of any such Allowed Claim, but only to the extent of such adjudicated or resolved amount. Neither the failure to effect such a setoff nor the allowance of any Claim under the Plan shall constitute a waiver or release by the TSN Debtors or the Reorganized TSN Debtors of any such claims, equity interests, rights and Causes of Action that the TSN Debtors or the Reorganized TSN Debtors may possess against any such holder, except as specifically provided herein.

K.      *Claims Paid or Payable by Third Parties*

    1.  Claims or Interests Paid by Third Parties

    The TSN Debtors or the Reorganized TSN Debtors, as applicable, shall reduce in part or in full a Claim or Interest to the extent that the holder of such Claim or Interest receives payment in part or in full on account of such Claim or Interest from a party that is not a TSN Debtor or Reorganized TSN Debtor. To the extent a holder of a Claim or Interest receives a distribution on account of such Claim or Interest and receives payment from a party that is not a TSN Debtor or a Reorganized TSN Debtor on account of such Claim or Interest, such holder shall, within two weeks of receipt thereof, repay or return the distribution to the applicable Reorganized TSN Debtor, to the extent the holder's total recovery on account of such Claim or Interest from the third party and under the Plan exceeds the amount of such Claim or Interest as of the date of any such distribution under the Plan.

    2.  Claims Payable by Third Parties

    No distributions under the Plan shall be made on account of Allowed insured Claims until the holder of such Allowed insured Claim has exhausted all remedies with respect to the TSN Debtors' Insurance Policies. To the extent that one or more of the TSN Debtors' insurers agrees to satisfy in full a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, such Claim may be expunged without a Claims objection having to be filed and without any further notice to or action, order or approval of the Bankruptcy Court.

    3.  Applicability of Insurance Policies

    Except as otherwise provided in the Plan, distributions to holders of Allowed Claims shall be in accordance with the provisions of any applicable Insurance Policy. Nothing contained in the Plan shall constitute or be deemed a waiver of any cause of action that the TSN Debtors or any Entity may hold against any other Entity, including insurers under any policies of insurance, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

L.      *Postpetition Interest*

    Unless expressly provided herein, the Confirmation Order, the DIP Financing Order, or any contract, instrument, release, settlement or other agreement entered into in connection with the Plan, or required by the Bankruptcy Code (including without limitation sections 506(b) and 1129(b) of the Bankruptcy Code), postpetition interest shall not accrue on or after the Petition Date on account of any Claim.

M.      *Section 506(c) Reservation*

    The TSN Debtors and the Reorganized TSN Debtors reserve all rights under section 506(c) of the Bankruptcy Code with respect to any and all Secured Claims, except to the extent waived pursuant to the DIP Financing Order.

N.      *Single Satisfaction of Claims*

Holders of Allowed Claims may assert such Claims against each Debtor obligated with respect to such Claim, and such Claims shall be entitled to share in the recovery provided for the applicable Class of Claims against each obligated Debtor based upon the full Allowed amount of the Claim. Notwithstanding the foregoing, in no case shall the aggregate value of all property received or retained under the Plan on account of Allowed Claims exceed 100% of the underlying Allowed Claim.

## ARTICLE VIII.

## PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED AND DISPUTED CLAIMS

A.      *Prosecution of Objections to Claims*

The TSN Debtors (with the reasonable consent of the Plan Sponsor) or the Reorganized TSN Debtors, as applicable, shall have the exclusive authority to file, settle, compromise, withdraw or litigate to judgment any objections to Claims as permitted under the Plan. From and after the Effective Date, the Reorganized TSN Debtors may settle or compromise any Disputed Claim without approval of the Bankruptcy Court. The TSN Debtors reserve all rights to resolve any Disputed Claim outside the Bankruptcy Court under applicable governing law.

B.      *Allowance of Claims*

Except as expressly provided herein or in any order entered in the Chapter 11 Cases before the Effective Date (including the Confirmation Order), the Reorganized TSN Debtors after the Effective Date will have and retain any and all rights and defenses held by the TSN Debtors with respect to any Claim as of the Petition Date. All claims of any Entity against any TSN Debtor shall be disallowed unless and until such Entity pays, in full, the amount it owes such Debtor.

C.      *Disputed Claims Reserve*

On the Effective Date (or as soon thereafter as is reasonably practicable), the Reorganized TSN Debtors shall deposit in the Disputed Claims Reserve New Common Stock having an aggregate value equal to the aggregate value of the consideration that would have been distributed to the holders of all Disputed Claims as if such Disputed Claims had been Allowed Claims on the Effective Date, with the amount of such Allowed Claims to be determined, solely for the purposes of establishing reserves, to be the lesser of (a) the asserted amount of the Disputed Claims filed with the Bankruptcy Court, or (if no proof of such Claim was filed) scheduled by the TSN Debtors, (b) the amount, if any, estimated by the Bankruptcy Court pursuant to section 502(c) of the Bankruptcy Code pursuant to Article VIII.G or (c) the amount otherwise agreed to by the TSN Debtors and the holder of such Disputed Claims for reserve purposes. In any vote by holders of New Common Stock, the New Common Stock held in the Disputed Claims Reserve shall be deemed to have been voted in the same proportions as the New Common Stock that was actually voted.

D.      *Distributions After Allowance*

On the Distribution Date following the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim becomes a Final Order, the Disbursing Agent shall provide to the holder of such Claim the distribution (if any) to which such holder is entitled under the Plan as of the Effective Date, without any interest to be paid on account of such Claim.

E.      *Distribution of Excess Amounts in the Disputed Claims Reserve*

Any Cash held in the Disputed Claims Reserve after all Disputed Claims have been Allowed or Disallowed shall be transferred by the Disbursing Agent or Reorganized TSN Debtors (as applicable), in a supplemental distribution to the holders of Allowed Claims in accordance with this Plan on a Pro Rata basis. Any New Common

Stock held in the Disputed Claims Reserve after all Disputed Claims have been Allowed or Disallowed shall be cancelled.

F.      *Property Held in the Reserve for Disputed Claims*

Each holder of a Disputed Claim that ultimately becomes an Allowed Claim will have recourse only to the undistributed New Common Stock and/or Cash (if applicable) held in the Disputed Claims Reserve for satisfaction of the distributions to which holders of Allowed Claims are entitled under the Plan, and not to any Reorganized TSN Debtor, their property or any assets previously distributed on account of any Allowed Claim.

G.      *Estimation of Claims*

The TSN Debtors (before the Effective Date) or Reorganized TSN Debtors (on or after the Effective Date) may, at any time, and from time to time, request that the Bankruptcy Court estimate any Disputed Claim pursuant to section 502(c) of the Bankruptcy Code regardless of whether an objection was previously filed with the Bankruptcy Court with respect to such Claim, or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including during the pendency of any appeal relating to any such objection. In the event that the Bankruptcy Court estimates any Disputed Claim, that estimated amount will constitute either the Allowed amount of such Claim or a maximum limitation on such Claim against any party or Entity, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on such Claim, the TSN Debtors (before the Effective Date) or the Reorganized TSN Debtors (after the Effective Date), may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim. All of the objection, estimation, settlement and resolution procedures set forth in the Plan are cumulative and not necessarily exclusive of one another. Claims may be estimated and subsequently compromised, objected to, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court.

H.      *Deadline to File Objections to Claims*

Any objections to Claims shall be filed on or before the date that is the later of (a) one hundred and eighty (180) days after the Effective Date and (b) the last day of such other period of limitation as may be specifically fixed by an order of the Bankruptcy Court for objecting to certain Claims.

## ARTICLE IX.

## SETTLEMENT, RELEASE, INJUNCTION AND RELATED PROVISIONS

A.      *Compromise and Settlement of Claims, Interests and Controversies*

As discussed in detail in the Disclosure Statement and as otherwise provided herein, pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good faith compromise of all Claims, Interests and controversies relating to the contractual, legal and subordination rights that a holder of a Claim may have with respect to any Allowed Claim or Interest, or any distribution to be made on account of such Allowed Claim or Interest. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the TSN Debtors, their Estates and holders of Claims and Interests and is fair, equitable and reasonable. In accordance with the provisions of the Plan, pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019(a), without any further notice to or action, order or approval of the Bankruptcy Court, after the Effective Date, the Reorganized TSN Debtors may compromise and settle Claims against them and Causes of Action against other Entities.

B.    *Releases by the TSN Debtors*

Pursuant to section 1123(b) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan or the Plan Supplement, for good and valuable consideration, including the contributions of the Released Parties to facilitate the expeditious reorganization of the TSN Debtors and the implementation of the restructuring contemplated by the Plan and the other contracts, instruments, releases, agreements or documents executed and delivered in connection with the Plan, the Released Parties are deemed released and discharged by the TSN Debtors, the Reorganized TSN Debtors and the Estates from any and all claims, obligations, rights, suits, damages, Causes of Action, remedies and liabilities whatsoever, including any derivative claims, asserted or assertable on behalf of the TSN Debtors, whether known or unknown, foreseen or unforeseen, liquidated or unliquidated, fixed or contingent, matured or unmatured, existing or hereinafter arising, in law, equity or otherwise, that the TSN Debtors, the Reorganized TSN Debtors, the Estates or their Affiliates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other Entity, based in whole or in part on any act, omission, transaction, event or other occurrence taking place on or prior to the Effective Date in any way relating to the TSN Debtors, the Released Parties, the Reorganization Cases, this Plan or the Disclosure Statement, the EPCA, or related agreements, instruments or other documents, other than Claims or liabilities arising out of or relating to any act or omission of a Released Party that constitutes gross negligence, fraud or willful misconduct, as determined by a Final Order.

C.    *Releases by Holders of Claims and Interests*

As of the Effective Date, to the fullest extent permissible under applicable law, as such law may be extended or interpreted subsequent to the Effective Date, for good and valuable consideration, including the contributions of the Released Parties to facilitate the expeditious reorganization of the TSN Debtors and the implementation of the restructuring contemplated by the Plan and the other contracts, instruments, releases, agreements or documents executed and delivered in connection with the Plan, each holder of a Claim or an Interest shall be deemed to have conclusively, absolutely, unconditionally, irrevocably and forever, released and discharged the Debtors, TSC, the Reorganized Debtors and the Released Parties from any and all Claims, Interests, obligations, rights, suits, damages, causes of action, remedies and liabilities whatsoever, including any derivative Claims, asserted on behalf of a Debtor, whether known or unknown, foreseen or unforeseen, liquidated or unliquidated, fixed or contingent, matured or unmatured, existing or hereafter arising, in law, equity or otherwise, that such Entity would have been legally entitled to assert (whether individually or collectively), based in whole or in part on any act, omission, transaction, event or other occurrence taking place on or prior to the Effective Date in any way relating to the Debtors, TSC, the Released Parties, the Reorganization Cases, this Plan or the Disclosure Statement, or related agreements, instruments or other documents, other than Claims or liabilities arising out of or relating to any act or omission of a Released Party that constitutes gross negligence, fraud or willful misconduct, as determined by a Final Order; **provided**, that nothing herein shall be deemed a waiver or release of a Releasing Party's right to receive a distribution pursuant to the terms of this Plan.

D.    *Exculpation*

Except as otherwise specifically provided in the Plan or Plan Supplement, no Exculpated Party shall have or incur, and each Exculpated Party is hereby released and exculpated from, any Exculpated Claim, obligation, cause of action or liability for any Exculpated Claim, except for gross negligence or willful misconduct, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.  The TSN Debtors and the Reorganized TSN Debtors (and each of their respective Affiliates, agents, directors, officers, employees, advisors and attorneys) have, and upon Confirmation of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code with regard to the solicitation and distribution of the Plan securities pursuant to the Plan, and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

E. *Discharge of Claims and Termination of Interests*

Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan, the distributions, rights and treatment that are provided in the Plan shall be in full and final satisfaction, settlement, release and discharge, effective as of the Effective Date, of all Claims, Interests and causes of action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against and Interests in, the TSN Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities and causes of action that arose before the Effective Date, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h) or 502(i) of the Bankruptcy Code, in each case whether or not: (1) a Proof of Claim or Interest based upon such Claim, debt, right or Interest is filed or deemed filed pursuant to section 501 of the Bankruptcy Code; (2) a Claim or Interest based upon such Claim, debt, right or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (3) the holder of such a Claim or Interest has accepted the Plan. Except as otherwise provided herein, any default by the TSN Debtors or their Affiliates with respect to any Claim or Interest that existed before or on account of the filing of the Chapter 11 Cases shall be deemed cured on the Effective Date. The Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the Effective Date occurring, except as otherwise expressly provided in the Plan.

F. *Injunction*

FROM AND AFTER THE EFFECTIVE DATE, ALL ENTITIES ARE PERMANENTLY ENJOINED FROM COMMENCING OR CONTINUING IN ANY MANNER, ANY CAUSE OF ACTION RELEASED OR TO BE RELEASED PURSUANT TO THE PLAN OR THE CONFIRMATION ORDER.

FROM AND AFTER THE EFFECTIVE DATE, TO THE EXTENT OF THE RELEASES AND EXCULPATION GRANTED IN ARTICLE IX HEREOF, THE RELEASING PARTIES SHALL BE PERMANENTLY ENJOINED FROM COMMENCING OR CONTINUING IN ANY MANNER AGAINST THE RELEASED PARTIES AND THE EXCULPATED PARTIES AND THEIR ASSETS AND PROPERTIES, AS THE CASE MAY BE, ANY SUIT, ACTION OR OTHER PROCEEDING, ON ACCOUNT OF OR RESPECTING ANY CLAIM, DEMAND, LIABILITY, OBLIGATION, DEBT, RIGHT, CAUSE OF ACTION, INTEREST OR REMEDY RELEASED OR TO BE RELEASED PURSUANT TO ARTICLE IX HEREOF.

EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THE PLAN, THE PLAN SUPPLEMENT OR RELATED DOCUMENTS, OR FOR OBLIGATIONS ISSUED PURSUANT TO THE PLAN, ALL ENTITIES WHO HAVE HELD, HOLD OR MAY HOLD CLAIMS OR INTERESTS THAT HAVE BEEN RELEASED PURSUANT TO ARTICLE IX.B OR ARTICLE IX.C, DISCHARGED PURSUANT TO ARTICLE IX.E, OR ARE SUBJECT TO EXCULPATION PURSUANT TO ARTICLE IX.D, ARE PERMANENTLY ENJOINED, FROM AND AFTER THE EFFECTIVE DATE, FROM TAKING ANY OF THE FOLLOWING ACTIONS: (1) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (2) ENFORCING, ATTACHING, COLLECTING OR RECOVERING BY ANY MANNER OR MEANS ANY JUDGMENT, AWARD, DECREE OR ORDER AGAINST SUCH ENTITIES ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (3) CREATING, PERFECTING OR ENFORCING ANY ENCUMBRANCE OF ANY KIND AGAINST SUCH ENTITIES OR THE PROPERTY OR ESTATE OF SUCH ENTITIES ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (4) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS RELEASED, SETTLED OR DISCHARGED PURSUANT TO THE PLAN; AND (5) ACTING OR PROCEEDING IN ANY MANNER, IN ANY PLACE WHATSOEVER, THAT DOES NOT CONFORM WITH THE PROVISIONS OF THIS PLAN TO THE FULL EXTENT PERMITTED BY APPLICABLE LAW.

THE RIGHTS AFFORDED IN THE PLAN AND THE TREATMENT OF ALL CLAIMS AND INTERESTS HEREIN SHALL BE IN EXCHANGE FOR AND IN COMPLETE SATISFACTION OF ALL

CLAIMS AND INTERESTS OF ANY NATURE WHATSOEVER, INCLUDING ANY INTEREST ACCRUED ON CLAIMS FROM AND AFTER THE PETITION DATE, AGAINST THE TSN DEBTORS OR ANY OF THEIR ASSETS, PROPERTY OR ESTATES. ON THE EFFECTIVE DATE, ALL SUCH CLAIMS AGAINST THE TSN DEBTORS SHALL BE FULLY RELEASED AND DISCHARGED, AND THE EQUITY INTERESTS SHALL BE CANCELLED.

EXCEPT AS OTHERWISE EXPRESSLY PROVIDED FOR HEREIN OR IN OBLIGATIONS ISSUED PURSUANT HERETO FROM AND AFTER THE EFFECTIVE DATE, ALL CLAIMS AGAINST THE TSN DEBTORS SHALL BE FULLY RELEASED AND DISCHARGED, AND ALL EQUITY INTERESTS SHALL BE CANCELLED, AND THE TSN DEBTORS' LIABILITY WITH RESPECT THERETO SHALL BE EXTINGUISHED COMPLETELY, INCLUDING ANY LIABILITY OF THE KIND SPECIFIED UNDER SECTION 502(G) OF THE BANKRUPTCY CODE.

ALL ENTITIES SHALL BE PRECLUDED FROM ASSERTING AGAINST THE TSN DEBTORS, THE TSN DEBTORS' ESTATES, THE REORGANIZED TSN DEBTORS, EACH OF THEIR RESPECTIVE SUCCESSORS AND ASSIGNS, AND EACH OF THEIR ASSETS AND PROPERTIES, ANY OTHER CLAIMS OR INTERESTS BASED UPON ANY DOCUMENTS, INSTRUMENTS OR ANY ACT OR OMISSION, TRANSACTION OR OTHER ACTIVITY OF ANY KIND OR NATURE THAT OCCURRED BEFORE THE EFFECTIVE DATE.

G.      *Term of Injunctions or Stays*

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court or any order of the Canadian Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date. All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

H.      *Injunction Against Interference With Plan*

To the fullest extent permitted by applicable law, upon the entry of the Confirmation Order, all of the Releasing Parties shall be enjoined from taking any actions to interfere with the implementation or consummation of this Plan.

I.      *Injunction Related to Releases and Exculpation*

The Confirmation Order shall permanently enjoin the commencement or prosecution by any person or entity, whether directly, derivatively or otherwise, of any Claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action or liabilities released pursuant to this Plan, including but not limited to the claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action or liabilities released in Articles IX.C and IX.D of this Plan.

J.      *Protection Against Discriminatory Treatment*

Consistent with section 525 of the Bankruptcy Code and the Supremacy Clause of the U.S. Constitution, all Entities, including Governmental Units, shall not discriminate against the Reorganized TSN Debtors or deny, revoke, suspend or refuse to renew a license, permit, charter, franchise or other similar grant to, condition such a grant to, discriminate with respect to such a grant against, the Reorganized TSN Debtors or another Entity with whom such Reorganized TSN Debtors have been associated, solely because one of the TSN Debtors has been a debtor under chapter 11, has been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases but before the Debtor is granted or denied a discharge) or has not paid a debt that is dischargeable in the Chapter 11 Cases.

*K.*     *No Consent to Change of Control Required*

To the fullest extent permitted by applicable law, except as otherwise expressly provided by order of the Bankruptcy Court, none of (a) the facts or circumstances giving rise to the commencement of, or occurring in connection with, the Chapter 11 Cases, (b) the issuance of the New Common Stock or New Preferred Stock pursuant to the Plan, or (c) consummation of any other transaction pursuant to the Plan (including, without limitation, the Restructuring Transactions) shall constitute a "change in ownership" or "change of control" (or a change in working control) of, or in connection with, any TSN Debtor requiring the consent of any person other than the TSN Debtors or the Bankruptcy Court.

*L.*     *Release of Liens*

Except as otherwise provided herein or in any contract, instrument, release or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, all mortgages, deeds of trust, Liens, pledges or other security interests against any property of the Estates shall be fully released and discharged, and all of the right, title and interest of any holder of such mortgages, deeds of trust, Liens, pledges or other security interests shall revert to the Reorganized TSN Debtor and its successors and assigns.  For the avoidance of doubt, all mortgages, deeds of trust, Liens, pledges or other security interests against any property of the Estates shall be fully released and discharged on the Effective Date without any further action of any party, including, but not limited to, further order of the Bankruptcy Court, the Canadian Court or filing updated schedules or statements typically filed pursuant to the Uniform Commercial Code, the Personal Property Security Act (Ontario) or in accordance with any other real or personal property registry system in any of the applicable provinces in Canada; provided, that nothing in the Plan shall be deemed to release the Liens securing the PMCA Claims, which PMCA Claims and Liens are being reinstated hereby.

# ARTICLE X.

# CONDITIONS PRECEDENT TO CONFIRMATION OF THE PLAN AND THE EFFECTIVE DATE

*A.*     *Conditions Precedent to Confirmation*

It shall be a condition to Confirmation hereof that the following provisions, terms and conditions shall have been satisfied or waived pursuant to the provisions of Article X.C.

1.     The Bankruptcy Court shall have entered a Final Order, in form and substance acceptable to the TSN Debtors, approving the Disclosure Statement with respect to the Plan as containing adequate information within the meaning of section 1125 of the Bankruptcy Code.

*B.*     *Conditions Precedent to the Effective Date*

It shall be a condition to the Effective Date that the following provisions, terms and conditions shall have been satisfied or waived pursuant to the provisions of Article X.C.

1.     The Confirmation Order, in a form reasonably satisfactory to the TSN Debtors and Plan Sponsor, shall be a Final Order.

2.     The Canadian Court shall have entered an order, in form and substance reasonably acceptable to the TSN Debtors and the Plan Sponsor, recognizing the Bankruptcy Court's entry of the Confirmation Order, and such order shall have become a Final Order.

3.     The Bankruptcy Court shall have entered one or more orders (which may include the Confirmation Order), in form and substance reasonably acceptable to the TSN Debtors and the Plan Sponsor, authorizing the assumption and rejection of Executory Contracts and Unexpired Leases by the TSN Debtors as contemplated herein, which shall have become Final Orders.

4. The Canadian Court shall have entered orders, in form and substance reasonably acceptable to the TSN Debtors and the Plan Sponsor, recognizing the Bankruptcy Court's entry of the orders described in Article X.B.3 above, and such orders shall have become Final Order.

5. The Rights Offering shall have been consummated pursuant to the terms of this Plan, the Rights Offering Procedures, and the EPCA.

6. All of the schedules, documents, supplements and exhibits to the Plan shall have been filed in form and substance reasonably acceptable to the TSN Debtors and the Plan Sponsor.

7. All actions, documents, certificates, and agreements necessary to implement this Plan, including, without limitation, the New By-Laws, the New Certificate of Incorporation, and the Registration Rights Agreement, shall have been effected or executed and delivered to the required parties and, to the extent required, filed with the applicable governmental units in accordance with applicable laws.

8. A decision released by the FCC or a bureau or subdivision thereof (an "*FCC Order*") approving the transfer of control to the Plan Sponsor over the licenses and authorizations held by Debtors, and all other governmental, regulatory and third party licenses, approvals, waivers and/or consents required under applicable law to consummate the transactions contemplated by the Plan, including without limitation the Industry Canada Approval (defined below), shall have been obtained and shall be final and in full force and effect without any condition or requirement that would reasonably be expected to have, individually or in the aggregate, a material impact on the current business operations of the Plan Sponsor. In addition, the FCC shall not have reconsidered the FCC Order on its own motion within 30 days (or, if released by a bureau or other subdivision of the FCC, within 40 days) of its release, and the FCC and the courts will have denied all petitions for reconsideration, applications for review and appeals (collectively, "*Appeals*") of the FCC Order (or of an FCC or court order affirming the FCC Order), or the periods for filing such Appeals have passed and no Appeal has been filed. Moreover, there shall exist no claim, action, suit, investigation, litigation or proceeding, pending or threatened in any court or before any arbitrator or governmental instrumentality, which would prohibit the transactions contemplated by the Plan.

9. The prior approval of the Minister of Industry (the "*Industry Canada Approval*") approving the transfer of control of the Canadian Debtors to the Plan Sponsor or, at the option of the Plan Sponsor, the transfer or assignment of the licenses and authorizations held by the TSN Debtors to a party designated by the Plan Sponsor that is eligible to hold such licenses, to the extent required by applicable law, including the licenses and authorizations to consummate the transactions contemplated by the Plan, shall have been obtained and shall be final and in full force and effect without any condition or requirement that would reasonably be expected to have, individually or in the aggregate, a material impact on the current or future business operations of the Plan Sponsor. In addition, the courts will have denied all applications for judicial review or other court challenges to the Industry Canada Approval or appeals of any court order upholding the Industry Canada Approval or the periods for filing such appeals have passed and no appeal has been filed.

10. The TSN Debtors shall have cash on hand as of the Effective Date of at least $5 million.

*C.       Waiver of Conditions*

The conditions to Confirmation of the Plan and to the occurrence of the Effective Date set forth in this Article X may be waived at any time by the TSN Debtors, with the written consent of the Plan Sponsor; *provided, however,* that the TSN Debtors may not waive entry of the Confirmation Order.

*D.       Effect of Failure of Conditions*

If the Effective Date does not occur, the Plan shall be null and void in all respects and nothing contained in the Plan or the Disclosure Statement shall: (1) constitute a waiver or release of any claims by or Claims against the TSN Debtors; (2) prejudice in any manner the rights of the TSN Debtors, any holders of Claims or any other Entity; or (3) constitute an admission, acknowledgment, offer or undertaking by the TSN Debtors, any holders or any other Entity in any respect.

# ARTICLE XI.

## MODIFICATION, REVOCATION OR WITHDRAWAL OF THE PLAN

*A.      Modification and Amendments*

Except as otherwise specifically provided herein, the TSN Debtors reserve the right, subject to the reasonable consent of the Plan Sponsor, to modify the Plan as to material terms and seek Confirmation consistent with the Bankruptcy Code and, as appropriate, not re-solicit votes on such modified Plan. Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019 and those restrictions on modifications set forth in the Plan, the TSN Debtors expressly reserve their rights, subject to the reasonable consent of the Plan Sponsor, to alter, amend or modify materially the Plan with respect to any or all Debtors, one or more times, after Confirmation, and, to the extent necessary, may initiate proceedings in the Bankruptcy Court to so alter, amend or modify the Plan or remedy any defect or omission, or reconcile any inconsistencies in the Plan, the Disclosure Statement or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of the Plan. Any such modification or supplement shall be considered a modification of the Plan and shall be made in accordance with this Article XI.

In addition, prior to the Effective Date, the TSN Debtors (with the reasonable consent of the Plan Sponsor) may make appropriate technical adjustments and modifications to the Plan, without further order or approval of the Bankruptcy Court; provided, however, that such technical adjustments and modifications do not adversely affect in a material way the treatment of holders of Claims or Interests.

*B.      Effect of Confirmation on Modifications*

Entry of a Confirmation Order shall mean that all modifications or amendments to the Plan occurring after the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or re-solicitation under Bankruptcy Rule 3019.

*C.      Revocation or Withdrawal of the Plan*

The TSN Debtors (with the reasonable consent of the Plan Sponsor) reserve the right to revoke or withdraw the Plan before the Effective Date. If the TSN Debtors revoke or withdraw the Plan, or if Confirmation or the Effective Date does not occur, then: (1) the Plan shall be null and void in all respects; (2) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of any Claim or Interest or Class of Claims or Interests), assumption or rejection of Executory Contracts or Unexpired Leases effected by the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void; and (3) nothing contained in the Plan shall: (a) constitute a waiver or release of any Claims or Interests or Claims by any TSN Debtor against any other Entity; (b) prejudice in any manner the rights of such Debtor or any other Entity; or (c) constitute an admission, acknowledgement, offer or undertaking of any sort by such Debtor or any other Entity.

# ARTICLE XII.

## RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court shall retain such jurisdiction over the Chapter 11 Cases and all matters, arising out of or related to, the Chapter 11 Cases and the Plan including jurisdiction to:

1.      allow, disallow, determine, liquidate, classify, estimate or establish the priority, Secured or Unsecured status or amount of any Claim or Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the Secured or Unsecured status, priority, amount or allowance of Claims;

2.　　　decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan;

3.　　　resolve any matters related to:　(a) the assumption, assumption and assignment or rejection of any Executory Contract or Unexpired Lease to which a TSN Debtor is party or with respect to which a TSN Debtor may be liable in any manner and to hear, determine and, if necessary, liquidate, any Claims arising therefrom, including Rejection Claims, Cure Claims pursuant to section 365 of the Bankruptcy Code or any other matter related to such Executory Contract or Unexpired Lease; (b) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed; (c) the Reorganized TSN Debtors amending, modifying or supplementing, after the Effective Date, pursuant to Article VI, any Executory Contracts or Unexpired Leases to the list of Executory Contracts and Unexpired Leases to be assumed or rejected or otherwise; and (d) any dispute regarding whether a contract or lease is or was executory or expired.

4.　　　ensure that distributions to holders of Allowed Claims are accomplished pursuant to the provisions of the Plan;

5.　　　adjudicate, decide or resolve any motions, adversary proceedings, contested or litigated matters and any other matters, and grant or deny any applications involving a TSN Debtor that may be pending on the Effective Date;

6.　　　adjudicate, decide or resolve any and all matters related to any Cause of Action;

7.　　　adjudicate, decide or resolve any and all matters related to section 1141 of the Bankruptcy Code;

8.　　　enter and enforce any order for the sale of property pursuant to sections 363, 1123 or 1146(a) of the Bankruptcy Code;

9.　　　resolve any avoidance or recovery actions under sections 105, 502(d), 542 through 551 and 553 of the Bankruptcy Code;

10.　　　resolve any cases, claims, controversies, suits, disputes or causes of action that may arise in connection with the consummation, interpretation or enforcement of the Plan or any entity's obligations incurred in connection with the Plan;

11.　　　resolve any cases, controversies, suits, disputes or causes of action that may arise in connection with or under the DIP Loan Agreement;

12.　　　resolve any cases, controversies, suits, disputes or causes of action that may arise in connection with or under the Notes;

13.　　　issue injunctions, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any entity with consummation or enforcement of the Plan;

14.　　　resolve any cases, controversies, suits, disputes or causes of action with respect to the discharge, releases, injunctions, exculpations, indemnifications and other provisions contained in Article IX and enter such orders as may be necessary or appropriate to implement such releases, injunctions and other provisions;

15.　　　enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked or vacated;

16.　　　determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release, indenture or other agreement or document created in connection with the Plan or the Disclosure Statement;

17.  adjudicate any and all disputes arising from or relating to distributions under the Plan;

18.  consider any modifications of the Plan, cure any defect or omission or reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

19.  determine requests for the payment of Claims and Interests entitled to priority pursuant to section 507 of the Bankruptcy Code, including requests by Professionals for payment of Accrued Professional Fees;

20.  hear and determine disputes arising in connection with the interpretation, implementation or enforcement of the Plan or the Confirmation Order, including disputes arising under agreements, documents or instruments executed in connection with the Plan;

21.  hear and determine matters concerning state, local and federal taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code;

22.  hear and determine all disputes involving the existence, nature or scope of the TSN Debtors' discharge, including any dispute relating to any liability arising out of the termination of employment or the termination of any employee or retiree benefit program, regardless of whether such termination occurred before or after the Effective Date;

23.  enforce all orders previously entered by the Bankruptcy Court;

24.  hear any other matter not inconsistent with the Bankruptcy Code; and

25.  enter an order concluding or closing the Chapter 11 Cases.

# ARTICLE XIII.

# MISCELLANEOUS PROVISIONS

## A.  *Immediate Binding Effect*

Subject to Article X.B, and notwithstanding Bankruptcy Rules 3020(e), 6004(h) or 7062 or any other Bankruptcy Rule, upon the occurrence of the Effective Date, the terms of the Plan and the Plan Supplement shall be immediately effective and enforceable and deemed binding upon the TSN Debtors, the Reorganized TSN Debtors and any and all holders of Claims or Interests (irrespective of whether such Claims or Interests are deemed to have accepted the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, discharges and injunctions described in the Plan, each Entity acquiring property under the Plan, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the TSN Debtors.

## B.  *Additional Documents*

On or before the Effective Date, the TSN Debtors may file with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan. The TSN Debtors or Reorganized TSN Debtors, as applicable, and all holders of Claims receiving distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

## C.  *Dissolution of Creditors' Committee*

On the Effective Date, the Creditors' Committee shall dissolve and members thereof shall be released and discharged from all rights, duties, responsibilities and obligations from or related to the Chapter 11 Cases. In addition, the retention and employment of the Creditors' Committee's attorneys, accountants and other agents shall terminate on the Effective Date.

D.      *Successors and Assigns*

The rights, benefits and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or assign, affiliate, officer, director, manager, agent, representative, attorney, beneficiaries or guardian, if any, of each Entity.

E.      *Service of Documents*

After the Effective Date, any pleading, notice or other document required by the Plan to be served on or delivered to the TSN Debtors or the Reorganized TSN Debtors shall be served on:

TerreStar Networks, Inc.
12010 Sunset Hills Road, 6th Flr.
Reston, Virginia 20190
Attn:  Doug Brandon, General Counsel

with copies to:

Akin Gump Strauss Hauer & Feld LLP
One Bryant Park
New York, New York 10036
Attn: Ira Dizengoff
        Arik Preis

After the Effective Date, the TSN Debtors may, in their sole discretion, notify Entities that, in order to continue receiving documents pursuant to Bankruptcy Rule 2002, such Entities must file a renewed request to receive documents pursuant to Bankruptcy Rule 2002.  After the Effective Date, the TSN Debtors are authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities who have filed such renewed requests.

F.      *Entire Agreement*

Except as otherwise indicated, the Plan and the Plan Supplement supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings and representations on such subjects, all of which have become merged and integrated into the Plan.

G.      *Severability of Plan Provisions*

If, before Confirmation of the Plan, any term or provision of the Plan is held by the Bankruptcy Court or any other court exercising jurisdiction to be invalid, void or unenforceable, the Bankruptcy Court or other court exercising jurisdiction shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired or invalidated by such holding, alteration or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is: (1) valid and enforceable pursuant to its terms; (2) integral to the Plan and may not be deleted or modified without the TSN Debtors' consent; and (3) nonseverable and mutually dependent.

H.      *Exhibits*

All exhibits and documents included in the Plan Supplement are incorporated into and are a part of the Plan as if set forth in full in the Plan.  After the exhibits and documents are filed, copies of such exhibits and documents shall be available upon request to the TSN Debtors' counsel, by contacting Ashleigh L. Blaylock, Akin Gump

Strauss Hauer & Feld LLP, 1333 New Hampshire Avenue, N.W., Washington, D.C. 20036, Telephone: (202) 887-4064, email: blaylocka@akingump.com, at the Bankruptcy Court's web site at *www.ecf.nysb.uscourts.gov* or at the website of the Notice and Claims Agent, at http://www.terrestarinfo.com.  To the extent any exhibit or document is inconsistent with the terms of the Plan, unless otherwise ordered by the Bankruptcy Court, the non-exhibit or non-document portion of the Plan shall control.

I.      *Votes Solicited in Good Faith*

        Upon entry of the Confirmation Order, the TSN Debtors will be deemed to have solicited votes on the Plan in good faith and in compliance with the Bankruptcy Code and any applicable non-bankruptcy law, and pursuant to section 1125(e) of the Bankruptcy Code, the TSN Debtors and their respective Affiliates, agents, representatives, members, principals, shareholders, officers, directors, employees, advisors and attorneys will be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale and purchase of Plan securities offered and sold under the Plan, and, therefore, will have no liability for the violation of any applicable law, rule or regulation governing the solicitation of votes on the Plan or the offer, issuance, sale or purchase of the New Common Stock or New Preferred Stock offered and sold under the Plan.

J.      *Closing of Chapter 11 Cases*

        The Reorganized TSN Debtors shall, promptly after the full administration of the Chapter 11 Cases, file with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Bankruptcy Court to close the Chapter 11 Cases.

K.      *Conflicts*

        Except as set forth in the Plan, to the extent that any provision of the Disclosure Statement or any other order (other than the Confirmation Order) referenced in the Plan (or any exhibits, schedules, appendices, supplements or amendments to any of the foregoing), conflict with or are in any way inconsistent with any provision of the Plan, the Plan shall govern and control; *provided, however*, that if there is a conflict between this Plan and a Plan Supplement document, the Plan Supplement document shall govern and control; and *provided further, however*, that to the extent that any provision of the Plan conflicts with or is in any way inconsistent with any provision of the Confirmation Order, the Confirmation Order shall govern and control.

Dated:  November 5, 2010

Respectfully submitted,

TerreStar Networks Inc. (for itself and on behalf of each of the TSN Debtors)


By: _/s/  Jeffrey Epstein_____
    Name:  Jeffrey Epstein
    Title:  Chief Executive Officer

<u>**Exhibit B**</u>

**Disclosure Statement Order and Canadian Disclosure Statement Order**

**<u>Exhibit C</u>**

**Organizational Chart Of The Debtors And Their Non-Debtor Affiliates**

# Organizational Chart of TerreStar Corporation



**Exhibit D**

**Liquidation Analysis**

**Exhibit E**

**Financial Projections**

# Exhibit F

## Valuation Analysis

## Exhibit G

## Restructuring Support Agreement

# PLAN SUPPORT AGREEMENT

This Plan Support Agreement (the "Agreement"), dated as of October 19, 2010, is made by and among (i) TerreStar Networks Inc., TerreStar New York Inc., Motient Communications Inc., Motient Holdings Inc., Motient License Inc., Motient Services Inc., Motient Ventures Holding Inc., MVH Holding Inc., TerreStar License Inc., TerreStar National Services Inc., 0887729 B.C. Ltd., TerreStar Networks Holdings (Canada) Inc., TerreStar Networks (Canada) Inc. (collectively, the "TSN Debtors"), TerreStar Corporation and TerreStar Holdings Inc. (together, the "TSC Entities" and collectively with the TSN Debtors, the "Company"), and (ii) the undersigned holders in each and every capacity in which each such holder holds a Claim against or Interest in, the TSN Debtors (each, a "Plan Sponsor," and, collectively, the "Plan Sponsors"), each of which is a signatory hereto and a holder of equity interests in ("Interests") and/or claims (as defined in section 101(5) of Title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as amended, the "Bankruptcy Code")) against the TSN Debtors (the "Claims") arising under or in connection with, among other things (a) that certain TerreStar-2 Purchase Money Credit Agreement, dated February 5, 2008, among TerreStar Networks Inc., as borrower, U.S. Bank National Association, as collateral agent (in such capacity, the "PMCA Agent"), the guarantors party thereto from time to time, and Harbinger Capital Partners Master Fund 1, Ltd., Harbinger Capital Partners Special Situations Fund, L.P. and EchoStar Corporation, as lenders (the "PMCA"), and (b) the 15.0% senior secured payment-in-kind notes due 2014 issued pursuant to the Indenture, dated as of February 14, 2007, among TerreStar Networks Inc., as issuer, U.S. Bank National Association, as indenture trustee (in such capacity, the "Senior Secured PIK Notes Indenture Trustee"), and the guarantors party thereto (as amended, restated, supplemented or otherwise modified from time to time, the "Senior Secured PIK Notes Indenture"); and/or (c) the 6.5% senior exchangeable payment-in-kind notes due 2014 pursuant to the Indenture, dated as of February 7, 2008, among TerreStar Networks Inc., as issuer, U.S. Bank National Association, as indenture trustee (in such capacity, the "Exchangeable PIK Notes Indenture Trustee" and, together with the PMCA Agent and Senior Secured PIK Notes Indenture Trustee, the "Agents/Trustees"), and TerreStar Corporation and the guarantors party thereto (as amended, restated, supplemented or otherwise modified from time to time, the "Exchangeable PIK Notes Indenture" and, collectively with the PMCA and Senior Secured PIK Notes Indenture, the "Credit Documents"). For the avoidance of doubt, the Plan Sponsors hereunder, in the aggregate, hold more than 50% in amount of Claims arising under the Senior Secured PIK Notes Indenture (the "Senior Secured PIK Notes Claims"). The Company and the Plan Sponsors are each referred to herein as a "Party", and collectively, as the "Parties".

# RECITALS

**WHEREAS**, the Company has determined that it would be in its best interests to engage in a restructuring or recapitalization concerning or impacting, *inter alia*, the balance sheet of the TSN Debtors (the "Transaction"); and

**WHEREAS**, the Plan Sponsors and the Company have negotiated and agreed on the material terms of the Transaction; and

**WHEREAS**, the material general terms of the Transaction are memorialized in the term sheet attached hereto as Exhibit A (as it may be amended pursuant to terms thereof, the

"Restructuring Term Sheet"),[1] and the Debtor-In-Possession Credit, Security & Guaranty Agreement among the TSN Debtors, the Plan Sponsor and the other lenders that may become party thereto from time to time, and The Bank of New York Mellon, as Administrative Agent and Collateral Agent, attached hereto as Exhibit B (as it may be amended pursuant to the terms thereof, the "DIP Agreement," and together with the Restructuring Term Sheet, the "Restructuring Documents"), which are incorporated herein and are made part of this Agreement, including, without limitation, all provisions thereof relating to the Sponsor Termination Events and the Company Termination Events; and

WHEREAS, the Parties intend to implement the Transaction through a plan of reorganization for the TSN Debtors to be confirmed in bankruptcy cases (the "Bankruptcy Cases") to be commenced by the TSN Debtors by filing voluntary petitions under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") substantially on the terms set forth in the Restructuring Term Sheet (the "Plan"); and

WHEREAS, in connection with the Bankruptcy Cases, TerreStar Networks Inc., as foreign representative to the TSN Debtors, intends to commence recognition proceedings (the "Canadian Recognition Proceedings") on behalf of all of the TSN Debtors before the Ontario Superior Court of Justice (Commercial List) (the "Canadian Court") pursuant to Part IV of the Companies' Creditors Arrangement Act, R.S.C. 1985, c. C-36, as amended; and

WHEREAS, subject to execution of definitive documentation and, as required, appropriate approvals of the Bankruptcy Court and/or the Canadian Court, the following sets forth the agreement between the Parties concerning their respective obligations.

NOW, THEREFORE, in consideration of the foregoing, the Parties agree as follows:

## AGREEMENT

**Section 1.        Plan Sponsors' Commitments Regarding Transaction.**

### 1.01.        Voting on the Plan

Each Plan Sponsor agrees that, for as long as it is a holder of a Claim or Interest, it shall (a) when properly solicited pursuant to the requirements of the Bankruptcy Code, subject to the acknowledgements contained in Section 6 hereof, timely vote all of its Claims and if applicable Interests to support the Plan and not revoke, change or withdraw such vote (or cause such vote to be revoked, changed or withdrawn); (b) not consent to, vote for or otherwise seek, support, solicit, encourage or consent to, either directly or indirectly, any other plan of reorganization or liquidation for the TSN Debtors, or dissolution, winding up, or restructuring of the TSN Debtors; (c) not object to, oppose or otherwise interfere with, and cause its controlled affiliates (as defined in the Bankruptcy Code) to not object to, oppose or otherwise interfere with, the confirmation of the Plan or other provisions of the Restructuring Documents; or (d) not take any other action that

---

[1]        Capitalized terms used herein without definition shall have the meanings ascribed to such terms in the Restructuring Term Sheet.

is inconsistent with, or that would delay, hinder or prevent, the Transaction on the terms and conditions set forth herein and in the Restructuring Documents; provided, however, (x) the material terms of any agreement implementing the Transaction, including, without limitation, the Plan, embody and are consistent with the terms and conditions set forth in the Restructuring Documents, unless otherwise agreed to by the Parties (y) the Plan, the related disclosure statement (the "Disclosure Statement"), any and all pleadings seeking relief in connection with the contemplated DIP Financing, and any and all other documents contemplated in the Restructuring Documents are reasonably satisfactory to the Plan Sponsors, and (z) no Sponsor Termination Event shall have resulted in the termination of the Restructuring Term Sheet in accordance with its terms (a "Sponsor Termination").

### 1.02. Forbearance from Exercising Remedies

Each Plan Sponsor (including the Agents/Lenders in their capacity as such) hereby agrees, as long as the Company is in compliance with this Agreement and the Restructuring Documents, including, without limitation, the various target dates for certain actions and events set forth in the Restructuring Documents, to forbear: (a) through the filing of the Bankruptcy Cases (the "Petition Date"), from exercising any rights or remedies under the Credit Documents, except with respect to any defaults arising under: (i) any of the following clauses of section 7.01 of the PMCA: (a), (b), (c) (other than based upon a failure to comply with Section 6.07 of the PMCA), (d) (based upon a failure to comply with any of the following sections of the PMCA: 5.01, 5.03, 5.09, 5.11, 5.12, 5.14, 5.15, and 5.16), (f), (g), (h), (i), (l) (m), (n), (o), (p) (q) and (r); or (ii) any of the following clauses of section 6.01(a) of the Senior Secured PIK Notes Indenture: (1), (2), (3), (4) (other than as it relates to Section 5.07 of the Senior Secured Notes PIK Indenture), (6), (8), (9), (10), (11) and (12); and (b) after the Petition Date through the Effective Date, from seeking the lifting of the automatic stay to exercise any rights or remedies under the Credit Documents, provided, however, that the Plan Sponsors shall retain all rights and remedies set forth in the Restructuring Documents and/or available to them under any document governing the DIP Facility.

### 1.03. Transfer of Claims/Further Acquisitions

For a period commencing as of the date hereof until the occurrence of a Sponsor Termination, each of the Plan Sponsors hereby agrees not to (i) sell, assign, transfer, hypothecate or otherwise dispose of, directly or indirectly, any Claim or Interest, unless the transferee (such transferees, if any, to also be "Plan Sponsors" hereunder with regard to each and every Claim or Interest they may have) agrees in writing, by delivering a joinder in the form annexed as Exhibit C hereto to this Agreement to the Existing Agent and the Company, to be bound by this Agreement and the Restructuring Documents; or (ii) grant any proxies, deposit its Claim into a voting trust, or enter into a voting agreement or any similar agreement with respect thereto, unless any such arrangement provides, in writing, in a form reasonably acceptable to and enforceable by the Company, for compliance with this Agreement and the Restructuring Documents or this Agreement (each action referred to in the foregoing clauses (i) and (ii), a "Transfer"). Any Transfer that does not comply with the preceding sentence shall be deemed void *ab initio*.

This Agreement shall in no way be construed to preclude any Plan Sponsor or any of its affiliates (as defined in section 101(2) of the Bankruptcy Code) from acquiring additional Claims or Interests following its execution of this Agreement; provided however, that any such additional Claim or Interest acquired by a Plan Sponsor shall automatically be deemed to be subject to the terms of this Agreement.

### 1.04. <u>Representation of Holdings</u>

Each of the Plan Sponsors represents that, as of the date hereof, such Plan Sponsor (i) either (A) is the sole legal and beneficial owner of the Senior Plan Secured PIK Notes Claims and other Claims and Interests, if applicable, set forth below such Plan Sponsor's name on Schedule 1 hereto, or (B) has investment or voting discretion with respect to such Claims and/or Interests in respect to matters relating to the Transactions contemplated by this Agreement and has the power and authority to bind the beneficial owner(s) of such Notes to the terms of this Agreement and (ii) has full power and authority to act on behalf of, vote and consent to matters concerning such Claims and/or Interests in respect to matters relating to the Transactions contemplated by this Agreement and the Restructuring Documents and to dispose of, exchange, assign and transfer such Claims and/or Interests. Furthermore, such Plan Sponsor has made no prior assignment, sale, grant, conveyance, or other transfer of, and has not entered into any other agreement to assign, sell, grant, convey or otherwise transfer, in whole or in part, any portion of its right, title, or interest in any Claims or Interests that are subject to this Agreement, the terms of which agreement are, as of the date hereof, inconsistent with the representations and warranties of such Plan Sponsor herein or would render such Plan Sponsor otherwise unable to comply with this Agreement and perform its obligations hereunder.

**Section 2.** **<u>The Company's Undertakings</u>.** The Company shall, subject to Section 3 hereof, and so long as no Debtor Termination Event has resulted in the termination of the Restructuring Documents in accordance with its terms, (i) take all actions reasonably necessary to effectuate and consummate the transactions contemplated by the Restructuring Documents and the Plan; (ii) implement all steps reasonably necessary and desirable to obtain an order of the Bankruptcy Court confirming the Plan; and (iii) take no actions inconsistent with the transactions contemplated by this Agreement, the Restructuring Documents and the Plan or the timely confirmation and consummation of the Plan. For the avoidance of doubt, subject to Section 3 below, by this Section 2, the TSC Entities undertake and agree not to negotiate, file or otherwise prosecute any restructuring agreement, in or out of court, that is inconsistent with the terms of the Restructuring Documents or in any way contradicts the Plan.

**Section 3.** **<u>The Company's Fiduciary Obligations</u>.** Notwithstanding anything to the contrary herein, nothing in this Agreement or in the Restructuring Documents shall require any TSN Debtor, any subsidiary or affiliate of any TSN Debtor, or any of their respective directors or officers (in such person's capacity as a director or officer) or agents or advisors to take any action, or to refrain from taking any action, to the extent that taking such action or refraining from taking such action would result in a breach of such person's fiduciary obligations under applicable law.

For the avoidance of doubt, the Company may terminate its obligations under this Agreement by written notice to the Plan Sponsors only if: (a) on or after the Petition Date but prior to entry of a

Bankruptcy Court Order authorizing the TSN Debtors' assumption of this Agreement pursuant to section 365(a) of the Bankruptcy Code (the "Assumption"), the Company determines in good faith (after consultation with their outside legal counsel and their independent financial advisors) that pursuit of a plan of reorganization or liquidation for the Company, or dissolution, winding up, or restructuring of the Company, other than the Plan (an "Alternative Restructuring Transaction") would be superior to consummation of the Plan, taking into account all legal, financial, regulatory, and other aspects of such alternative course of action including, without limitation, (i) all financial considerations, (ii) litigation risks, (iii) potential delays, (iv) the prospects for completion of such Alternative Restructuring Transaction, and (v) the identity of any other parties to such Alternative Restructuring Transaction; or (b) at any time after the Assumption, the TSN Debtors determine in good faith (after consultation with their outside legal counsel and their independent financial advisors) that pursuit of an Alternative Restructuring Transaction would be more favorable to their bankruptcy estates than consummation of the Plan.

Nothing herein shall prohibit the TSC Entities from continuing any discussions relating to an Alternative Restructuring Transaction involving the TSC Entities that is not inconsistent with or contrary to the Restructuring Documents or the Plan.

**Section 4.**   **Mutual Representations, Warranties, and Covenants.**  Each of the Parties represents, warrants, and covenants to the others the following, each of which is a continuing representation, warranty, and covenant:

**4.01.**   **Enforceability.**

This Agreement is a legal, valid, and binding obligation of the Party, enforceable against it in accordance with its terms, except as enforcement may be limited by applicable laws relating to or limiting creditor's rights generally or by equitable principles relating to enforceability.

**4.02.**   **No Consent or Approval.**

Except as expressly provided in this Agreement, no consent or approval by any other person or entity is required in order for it to carry out the provisions of this Agreement.

**4.03**   **Power and Authority.**  It has all requisite power and authority to enter into this Agreement and to carry out the transactions contemplated by, and perform its respective obligations under, this Agreement, the Restructuring Documents and the Plan.

**4.04**   **Authorization.**  The execution and delivery of this Agreement and the performance of its obligations hereunder have been duly authorized by all necessary action on its part.

**4.05**   **Governmental Consents.**  The execution, delivery and performance by it of this Agreement do not and shall not require any registration or filing with, consent or approval of, or notice to, or other action by, any federal, state or other governmental authority or regulatory body, except such filings as may be necessary and/or required under the federal securities laws and, in connection with the commencement of the Bankruptcy Cases, the

approval of the Disclosure Statement and confirmation of Plan.

**Section 5.** **No Waiver of Participation and Reservation of Rights.** This Agreement and the Plan are part of a proposed settlement of disputes among the Parties. Except as expressly provided in this Agreement, nothing herein is intended to, or does, in any manner waive, limit, impair, or restrict the ability of each of the Plan Sponsors to protect and preserve its rights, remedies and interests, including without limitation, its Claims against the Company or its full participation in the Bankruptcy Cases. If the Transaction is not consummated, or if this Agreement is terminated for any reason, the Parties fully reserve any and all of their rights.

**Section 6.** **Acknowledgment.** This Agreement and the Restructuring Documents and the transactions contemplated herein and therein are the product of negotiations between the Parties and their respective representatives. This Agreement is not and shall not be deemed to be a solicitation of votes for the acceptance of the Plan. Each of the Plan Sponsors' acceptance of the Plan will not be solicited until it has received a copy of the Disclosure Statement approved by the Bankruptcy Court as complying in all respects with all relevant provisions of the Bankruptcy Code.

**Section 7.** **Effectiveness; Amendments.** This Agreement shall not become effective and binding upon any of the Parties until all Parties have delivered counterpart signatures hereto. This Agreement cannot be amended, except by a writing executed by all Parties.

**Section 8.** **Miscellaneous.**

**8.01.** **Further Assurances.**

The Parties agree to execute and deliver such other instruments and perform such acts, in addition to the matters herein specified, as may be reasonably appropriate or necessary, from time to time, to effectuate the agreements and understandings of the Parties, whether the same occurs before or after the date of this Agreement.

**8.02.** **Complete Agreement.**

This Agreement (together with the Restructuring Documents) constitutes the entire agreement between the Parties with respect to the subject matter hereof and supersedes all prior agreements, oral or written, between the Parties with respect thereto.

**8.03.** **Parties.**

This Agreement shall be binding upon, and inure to the benefit of, the Parties. No rights or obligations of any Party under this Agreement may be assigned or transferred to any other person or entity except as provided in Section 1.03 hereof. Nothing in this Agreement, express or implied, shall give to any person or entity, other than the Parties, any benefit or any legal or equitable right, remedy or claim under this Agreement.

**8.04.** **Governing Law.**

THIS AGREEMENT IS TO BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND TO BE PERFORMED IN SUCH STATE, WITHOUT GIVING EFFECT TO THE CHOICE OF LAWS PRINCIPLES THEREOF THAT WOULD REQUIRE THE APPLICATION OF THE LAWS OF ANY OTHER JURISDICTION.

### 8.05. **Execution of Agreement; Headings.**

This Agreement may be executed and delivered (by facsimile or otherwise) in any number of counterparts, each of which, when executed and delivered, shall be deemed an original, and all of which together shall constitute the same agreement. Except as expressly provided in this Agreement, each individual executing this Agreement on behalf of a Party has been duly authorized and empowered to execute and deliver this Agreement on behalf of said Party. The headings of all sections of this Agreement are inserted solely for the convenience of reference and are not a part of and are not intended to govern, limit or aid in the construction or interpretation of any term or provision hereof.

### 8.06. **Interpretation.**

This Agreement is the product of negotiations of the Parties, and in the enforcement or interpretation hereof, is to be interpreted in a neutral manner, and any presumption with regard to interpretation for or against any party by reason of that Party having drafted or caused to be drafted this Agreement, or any portion hereof, shall not be effective in regard to the interpretation hereof.

### 8.07 **Confidentiality.**

All information obtained in the course of the negotiations leading up to this Agreement, including but not limited to the identities of the Plan Sponsors and their respective individual holdings of Claims, shall be treated by all Parties hereto as confidential information and not disclosed without the written consent of the Company, or the applicable Plan Sponsor, as applicable, based upon a given Party's rights in the information at issue, except as may be required by law; provided, however that the Plan Sponsors may, in their sole discretion, confer with other holders of Claims in order to obtain further support for the Plan, so long as the Plan Sponsors do not furnish any confidential information of the Company to such other holders of Claims, except to the extent that such persons or entities are (or that the Company has advised the Plan Sponsors are) subject to confidentiality obligations owing to the Company pursuant to a confidentiality agreement in form and substance satisfactory to the Company. In no event shall the respective individual holdings of the Plan Sponsors be referenced in public filings or press releases without the express written consent of the Party at issue; provided however, that the TSN Debtors are authorized to file, under seal with the Bankruptcy Court, a list of the individual Claim and Interest holdings of the Plan Sponsors. Notwithstanding anything to the contrary herein, upon the prior written consent of the Plan Sponsors, the TSN Debtors shall be permitted to disclose (i) the terms of this Agreement and (ii) the fact that this Agreement has been executed, to the extent required by applicable law or regulation, or in connection with required filings in the Bankruptcy Cases or the Canadian Recognition Proceedings, or with the Securities and Exchange Commission, the Federal Communications Commission or Industry Canada.

**8.08.** **Successors and Assigns.**

This Agreement is intended to bind and inure to the benefit of the Parties and their respective successors, assigns, heirs, executors, administrators and representatives, other than a trustee or similar representative appointed in the Bankruptcy Cases. The agreements, representations and obligations of the Plan Sponsors under this Agreement are, in all respects, several and not joint.

**8.09.** **Fees and Expenses**

If any Party brings any action against any other Party for breach of such other Party of its obligations hereunder, the prevailing Party shall be entitled to all reasonable expenses, including, without limitation, reasonable attorneys' fees incurred in connection with such action.

**8.10.** **Specific Performance**

The Parties acknowledge and agree that money damages would not be an adequate or sufficient remedy for any breach of this Agreement, and each non-breaching Party shall be entitled to specific performance and/or injunctive or other equitable relief as a remedy for any such breach.

IN WITNESS WHEREOF, the parties have executed this Agreement on the day and year first above written.

Dated:  October 18, 2010

TERRESTAR CORPORATION

By: _____
Name:  Douglas Brandon
Its:  GC + Secretary

Dated: October __, 2010

TERRESTAR HOLDINGS INC.

By: _____
Name: Douglas Brandon
Its:    General Counsel & Secretary

Dated: October __, 2010

MOTIENT HOLDINGS INC.
MOTIENT COMMUNICATIONS INC.
MOTIENT LICENSE INC.
MOTIENT SERVICES INC.
TERRESTAR NEW YORK INC.
MVH HOLDING INC.
MOTIENT VENTURES HOLDING INC.
TERRESTAR NATIONAL SERVICES, INC.
TERRESTAR LICENSE INC.

By:
Name: Jeffrey W. Epstein
Title: President

Dated: October __, 2010

0887729 B.C. LTD.,

By:
Name: Jeffrey W. Epstein
Its: Director

IN WITNESS WHEREOF, the parties have executed this Agreement on the day and year first above written.

Dated: October __, 2010

TERRESTAR NETWORKS INC.

By: _____

Name: Jeffrey W. Epstein

Its: President and Chief Executive Officer

TERRESTAR NETWORKS HOLDINGS
(CANADA) INC.
TERRESTAR NETWORKS (CANADA) INC.

By: _____

Name: Jacques Leduc
Title: Chief Financial Officer

Dated: October __, 2010

ECHOSTAR CORPORATION

David J. Rayner
Chief Financial Officer

Telephone: _____
Facsimile: _____

<u>**Exhibit A**</u>

**Restructuring Term Sheet**

# TERRESTAR NETWORKS INC.

## Summary of Principal Terms and Conditions of Restructuring

## October 19, 2010

The terms and conditions set forth in this term sheet (the "Restructuring Term Sheet") are meant to be part of a comprehensive compromise, each element of which is consideration for the other elements and an integral aspect of the proposed restructuring. The Restructuring Term Sheet is in the nature of a settlement proposal in furtherance of settlement discussions and is entitled to protection from any use or disclosure to any party or person pursuant to Federal Rule of Evidence 408 and any other rule of similar import.

This Restructuring Term Sheet does not constitute an offer of securities or a solicitation of the acceptance or rejection of a chapter 11 plan for the Company. The transactions contemplated by this Restructuring Term Sheet will be subject to the terms and conditions to be set forth in definitive documents acceptable to the Company and the Plan Sponsor. This Restructuring Term Sheet is part of, and will be attached to, the Plan Support Agreement (the "Plan Support Agreement") among the Company and the Plan Sponsor, and is subject to the terms thereof. This Restructuring Term Sheet can only be amended with each of the parties' prior written consent.

| I. | GENERAL/DIP FINANCING |
|---|---|
| **Company:** | TerreStar Networks Inc. ("TSN" and, as reorganized pursuant to the Plan (as defined below), "Reorganized TSN") and its affiliates, Motient Holdings Inc., Motient Communications Inc., Motient License Inc., Motient Services Inc., TerreStar New York Inc., MVH Holdings Inc., Motient Ventures Holdings Inc., TerreStar National Services Inc. and TerreStar License Inc., TerreStar Networks Holdings (Canada) Inc., TerreStar Networks (Canada) Inc., and 0887729 B.C. Ltd. (together with TSN, the "TSN Debtors" and, as reorganized pursuant to the Plan, the "Reorganized TSN Debtors"), TerreStar Corporation and TerreStar Holdings, Inc. (the "TSC Entities" and together with the TSN Debtors, the "Company"). |
| **Plan Sponsor:** | EchoStar Corporation ("EchoStar" or the "Plan Sponsor") |

| | |
|---|---|
| **Restructuring Transaction:** | Subject to the terms hereof, the TSN Debtors shall restructure their capital structure (the "<u>Restructuring</u>") through a prenegotiated plan of reorganization (the "<u>Plan</u>") to be confirmed in bankruptcy cases (the "<u>Chapter 11 Cases</u>") to be commenced by the TSN Debtors by filing voluntary petitions under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York (the "<u>Bankruptcy Court</u>"). <br><br> In addition, TSN, as foreign representative to the TSN Debtors, shall commence recognition proceedings on behalf of the TSN Debtors before the Ontario Superior Court of Justice (Commercial List) (the "<u>Canadian Court</u>") pursuant to Part IV of the Companies' Creditors Arrangement Act, R.S.C. 1985, c. C-36, as amended. |
| **DIP Financing:** | EchoStar shall provide debtor-in-possession financing to the TSN Debtors through a $75 million non-amortizing multiple draw term loan facility (the "<u>DIP Facility</u>"), on the terms and conditions set forth in the Debtor-In-Possession Credit, Security & Guaranty Agreement annexed to the Plan Support Agreement as <u>Exhibit B</u> (the "<u>DIP Agreement</u>"). As set forth in further detail in the DIP Agreement, the claims of the DIP Lenders (inclusive of accrued and unpaid principal and interest, fees, expenses and other obligations and charges under the DIP Facility, the "<u>DIP Claims</u>") shall be secured by: (i) a first priority lien on any of the TSN Debtors' assets that are not currently encumbered by liens securing the TSN Debtors' obligations under the 15% Senior Secured PIK Notes or the Purchase Money Credit Agreement (the "<u>PMCA</u>"); and (ii) a second priority lien on all other assets of the TSN Debtors. |

## II.    TREATMENT OF CLAIMS
## AND INTERESTS UNDER THE PLAN

| | |
|---|---|
| **DIP Claims** | The DIP Facility will be repaid in cash. |
| **Administrative Expense Claims:** | Administrative Expense Claims will be repaid in cash. |
| **15% Senior Secured PIK Notes Claims:** | Each holder of an allowed 15% Senior Secured PIK Notes Claim shall receive its pro rata share of 97% of: (i) the New Common Stock (as defined below); and (ii) Rights to purchase New Preferred Stock (as defined below). |

| | |
|---|---|
| **PMCA Claims:** | The PMCA Claims will be repaid in cash or, if the holders of PMCA Claims consent in their sole discretion, reinstated. |
| **Other Secured Claims and Priority Claims:** | Each allowed priority claim or secured claim (other than a 15% Senior Secured PIK Noteholder Claim or PMCA Claim) shall, at the option of the TSN Debtors, with the consent of the Plan Sponsor, be paid: (i) in cash in full on the later of (x) the Effective Date and (y) the date such claim becomes due and payable in the ordinary course of business; (ii) in cash on such other terms and conditions as may be agreed between the holder of such claim, the TSN Debtors and the Plan Sponsor; or (iii) in deferred cash payments, to the extent permissible under the Bankruptcy Code. |
| **Unsecured Claims:** | Each holder of any allowed unsecured claim against any TSN Debtor, including without limitation, an Exchangeable PIK Notes Claim, a trade claim or claim arising out of the rejection of executory contracts or unexpired leases by any Debtor (the "<u>Unsecured Claims</u>"), shall receive, in the aggregate, 3% of: (i) the New Common Stock (as defined below); and (ii) either (a) to the extent such Unsecured Claim holder is eligible pursuant to the securities laws to participate in the Rights Offering, Rights to purchase New Preferred Stock (as defined below) or (b) to the extent such Unsecured Claim holder is not eligible to participate in the Rights Offering pursuant to the securities laws, cash or New Common Stock (at the Debtors' sole option) equal to the amount of the value of the Rights; <u>provided</u>, that, in all events, holders of Other Unsecured Claims (as defined below) may elect to reduce their respective Other Unsecured Claims to the amount of $[____] and have such claims treated as Convenience Claims (defined below) (collectively, the "<u>Unsecured Distribution</u>"). |
| **Exchangeable PIK Notes Claims:** | Each holder of an Exchangeable PIK Notes Claim shall receive its pro rata share of that portion of the Unsecured Distribution that is allocated to holders of Exchangeable PIK Note Claims, which allocation shall be equal to or more than 1% of: (i) the New Common Stock (as defined below); and (ii) Rights to purchase New Preferred Stock (as defined below). |
| **Other Unsecured Claims:** | Each holder of any allowed unsecured claim against any TSN Debtor, other than an Exchangeable PIK Notes Claim, including without limitation, a trade claim or claim |

| | |
|---|---|
| | arising out of the rejection of executory contracts or unexpired leases by any Debtor (the "Other Unsecured Claims"), shall receive its pro rata share of that portion of the Unsecured Distribution that is allocated to Other Unsecured Claims. Such allocation shall be determined after a reconciliation of material Other Unsecured Claims and will give effect to the "structural seniority" of certain of the Exchangeable PIK Notes Claims. |
| **Convenience Claims:** | Each holder of: (a) an allowed Other Unsecured Claim against any TSN Debtor in an amount of $[_____] or less; or (b) an allowed Other Unsecured Claim against any TSN Debtor in an amount in excess of $[_____], which the holder thereof elects to have reduced to $[_____] and treated in accordance with this paragraph (a "Convenience Claim"), shall receive cash in an amount equal to such holder's Convenience Claim. |
| **Existing Equity:** | Existing Equity of the TSN Debtors shall receive no distributions on account of their interests. |
| **Releases and Exculpations:** | The Plan will include derivative releases, mutual third-party releases and exculpation provisions. |

## III.    RIGHTS OFFERING

| | |
|---|---|
| **Rights Offering:** | As part of the Restructuring, there shall be a rights offering (the "Rights Offering") for shares of New Preferred Stock (as defined below) in the amount of (a) $125 million (the "Rights Offering Amount"). In connection with the Rights Offering: (a) each holder of an allowed 15% Senior Secured PIK Notes Claim shall receive its pro rata share (based on such holder's proportionate ownership of the 15% Senior Secured PIK Notes) of rights ("Rights") to purchase 97% of the New Preferred Stock issued in connection with the Rights Offering; (b) each holder of an allowed Exchangeable PIK Notes Claim shall receive its pro rata share (based on such holder's proportionate ownership of the Exchangeable PIK Notes) of Rights to purchase [__]% of the New Preferred Stock issued in connection with the Rights Offering; and (c) each holder of an allowed Other Unsecured Claim shall receive its pro rata share of Rights to purchase [__]% of the New |

| | |
|---|---|
| | Preferred Stock issued in connection with the Rights Offering.[1]<br><br>The New Preferred Stock shall be issued at a price (the "Discount Purchase Price") reflecting a 35% discount to the net distributable value under the Plan of approximately $1.050 billion (the "Plan Value"). The Discount Purchase Price assumes that the PMCA Credit Facility will be the only indebtedness outstanding at emergence. The proceeds of the Rights Offering shall be used to fund certain payment obligations of the Company under the Plan and/or to provide working capital for the Reorganized TSN Debtors.<br><br>The Rights shall only be transferrable with the underlying claim (i.e., they shall not be separately detachable). Any such transfer shall be subject to a right of first refusal (in each case, a "ROFR") of the Plan Sponsor. The Rights shall not be listed or quoted on any public or over-the-counter exchange or quotation system. |
| **Rights Offering Backstop:** | The Plan Sponsor hereby commits and, subject to the terms hereof, shall enter into definitive documentation to (a) participate in the Rights Offering by purchasing that number of shares of New Preferred Stock corresponding to its current proportionate ownership of the 15% Senior Secured PIK Notes and the 6.5% Exchangeable Notes Claims, and (b) purchase all shares of New Preferred Stock to which the holders of Rights do not subscribe in connection with the Rights Offering (such shares, the "Rights Offering Residual Shares"); provided, that notwithstanding the foregoing, the Plan Sponsor shall not be required to purchase in excess of $100 million of New Preferred Stock, or such other greater amount as may be agreed upon by the Parties (the "Backstop Amount"); provided, further, that if, and to the extent that, at the time the Rights Offering is commenced, the Rights Offering Amount exceeds the Backstop Amount (i.e., there are shares of New Preferred Stock to be issued in connection with the Rights Offering that are not subject to the Plan Sponsor's backstop obligations described herein (such shares, the "Non-Backstopped Shares")), participants in the Rights Offering may, subject to a right of first refusal of the Plan Sponsor with respect to the Non-Backstopped |

---

[1] The percentage of Rights to purchase New Preferred Stock issued in connection with the Rights Offering to holders of Unsecured Claims will be determined in the same manner as the percentage of New Common Stock issued to such holders.

| | Shares, elect to purchase the Non-Backstopped Shares on a pro rata basis. |
| --- | --- |
| | The Plan Sponsor shall be: |
| | (a) entitled to receive a commitment fee equal to 3% of the Backstop Amount (the "<u>Backstop Commitment Fee</u>") in Additional Shares of New Preferred Stock at the Discount Purchase Price. "Additional Shares" means shares of New Preferred Stock issued by TSN other than in connection with the Rights Offering; |
| | (b) offered the option, in its sole discretion, to purchase up to $25 million of Additional Shares of New Preferred Stock at the Discount Purchase Price (the "<u>Overallotment</u>") within 10 days of the conclusion of the subscription period; and |
| | (c) granted a ROFR on any Rights transferred by a holder of 15% Senior Secured PIK Notes Claims, 6.5% Exchangeable PIK Notes Claims, or Other Unsecured Claims. |

## IV.    CORPORATE GOVERNANCE AND MANAGEMENT

| | |
| --- | --- |
| **Board of Directors:** | The initial Board of Directors of Reorganized TSN (the "<u>Initial TSN Board</u>") shall consist of seven members selected by Plan Sponsor. The members of the Initial TSN Board shall be designated at least ten (10) days prior to the hearing on confirmation of the Plan. The members of the Initial TSN Board shall also serve as the members of the initial Boards of Directors of the other Reorganized TSN Debtors. Successor directors of each Reorganized TSN Debtor will be appointed and/or elected in accordance with the applicable Reorganized TSN Debtor's charter and by-laws. |
| **Chief Executive Officer:** | The initial Chief Executive Officer ("<u>CEO</u>") of Reorganized TSN shall be one of the members of the Initial TSN Board, and shall be selected by the Initial TSN Board. The CEO of Reorganized TSN shall also serve as the initial CEO of each other Reorganized TSN Debtor. |
| **Employee Incentives/Senior Management** | As part of the overall restructuring, the Plan Sponsor recognizes and understands the importance of ensuring that the Debtors' chapter 11 operations continue to be managed in a manner that maximizes value for the estates. In that regard, the Plan Sponsor will support a motion seeking |

| | |
|---|---|
| | authority for the Debtors to provide an employee incentive plan (materially consistent in form and substance with the compensation arrangements currently being negotiated by the parties hereto), which will include terms and conditions regarding compensation and/or severance for senior management after the Effective Date. |
| **New Common Stock:** | Reorganized TSN shall issue one class of common stock, par value $0.01 per share (the "New Common Stock"). The New Common Stock shall be exempt from registration pursuant to section 1145 of the Bankruptcy Code.<br><br>97% of the New Common Stock shall be issued to the holders of allowed 15% Senior Secured PIK Notes Claims, on a pro rata basis (based on such holders' respective ownership of the 15% Senior Secured PIK Notes).<br><br>[ ]% of the New Common Stock shall be issued to holders of allowed Other Unsecured Claims, on a pro rata basis.<br><br>[ ]% of the New Common Stock shall be issued to holders of allowed Exchangeable PIK Notes Claims, on a pro rata basis (based on such holders' respective ownership of the Exchangeable PIK Notes).[2]<br><br>The New Common Stock shall be subject to dilution by the issuance of the New Preferred Stock. |
| **Company Status:** | The Reorganized TSN Debtors shall be private (non-reporting) companies. The New Common Stock will: (i) not be registered; (ii) not be listed on any national exchange; and (iii) be transferable by the recipients thereof under the Plan pursuant to the exemption from registration granted by section 1145(c) of the Bankruptcy Code (except with respect to any such recipient deemed to be an "underwriter"). |
| **New Preferred Stock:** | Reorganized TSN shall issue one class of preferred stock (the "New Preferred Stock"). The New Preferred Stock, which (other than its liquidation preference) shall have the same economic and voting rights as the Common Stock on an "as converted" basis, shall be issued to participants in the Rights Offering and, if exercised in the Plan Sponsor's sole discretion, the Overallotment. All shares of New Preferred Stock shall be: (i) issued at the Discount Purchase Price; (ii) exempt from registration pursuant to |

---

[2] The 3% of New Common Stock to be issued to holders Unsecured Claims shall be allocated to holders of Exchangeable PIK Notes Claims and holders of Other Unsecured Claims on terms to be agreed upon at a later date.

| | section 1145 of the Bankruptcy Code; and (iii) freely convertible into New Common Stock at the option of the holder. |
| | |
| | Holders of New Preferred Stock shall be entitled to participate in dividends paid to holders of New Common Stock on an "as converted" basis. |
| | |
| | The voting rights of the New Preferred Stock and New Common Stock shall be identical. Holders of New Preferred Stock shall be entitled to vote on an "as converted" basis (together with holders of New Common Stock) on any matter or transaction on which the New Common Stock is entitled to vote. |
| | |
| | Upon any merger, consolidation, change in control, liquidation, dissolution or winding up of Reorganized TSN, the holders of the New Preferred Stock shall be entitled to receive, in preference to the holders of the Common Stock, a per share amount equal to the greater of (a) 155% of the Discount Purchase Price plus any accrued but unpaid dividends, and (b) the "as converted" value of the New Preferred Stock. After the payment of such amount to the holders of the New Preferred Stock, the remaining assets of Reorganized TSN shall be distributed ratably to the holders of the New Common Stock and the New Preferred Stock. |
| **Registration Rights Agreement:** | On the Effective Date, Reorganized TSN and the 15% Senior Secured PIK Noteholders shall enter into a Registration Rights Agreement, which, without limitation, shall provide for (i) "piggy-back" registration rights for the New Common Stock (with customary exceptions, including Reorganized TSN's initial public offering); (ii) following the initial public offering of Reorganized TSN, for those holders of New Common Stock that cannot sell freely under Rule 144 of the Securities Act of 1933, as amended, S-3 or "short-form" demand registration rights for the New Common Stock (with customary limitations); (iii) information rights, including the right of prospective purchasers of the New Common Stock to obtain non-public information upon execution of a confidentiality agreement; and (iv) preemptive rights (with customary exceptions). |

## V.      OTHER TERMS

| **Conditions Precedent To Effective Date:** | Conditions precedent to the occurrence of the Effective Date of the Plan, each of which may be waived in writing by the Plan Sponsor, shall include, but not be limited to, |

the following:

(a)     an order confirming the Plan (the "<u>Confirmation Order</u>"), in a form that is satisfactory to the Plan Sponsor, shall have been entered by the Bankruptcy Court and shall have become a final order, not subject to a stay;

(b)     the TSN Debtors shall have executed and delivered appropriate definitive documentation regarding the Restructuring, including, without limitation, (i) the amended and restated certificates of incorporation and by-laws of the Reorganized TSN Debtors (which documents shall contain provisions: (a) limiting the transfer of the New Common Stock to ensure that Reorganized TSN remains a private company; and (b) requiring no more than majority approval to amend such documents); and (ii) the Registration Rights Agreement, each in a form that is satisfactory to the TSN Debtors and the Plan Sponsor;

(c)     A decision released by the FCC or a bureau or subdivision thereof (an "<u>FCC Order</u>") approving the transfer of control to the Plan Sponsor over the licenses and authorizations held by the TSN Debtors, and all other governmental, regulatory and third party licenses, approvals, waivers and/or consents required under applicable law to consummate the transactions contemplated by the Plan, including without limitation the Industry Canada Approval (defined below), shall have been obtained and shall be final and in full force and effect without any condition or requirement that would reasonably be expected to have, individually or in the aggregate, a material impact on the current or future business operations of the Plan Sponsor. In addition, the FCC shall not have reconsidered the FCC Order on its own motion within 30 days (or, if released by a bureau or other subdivision of the FCC, within 40 days) of its release, and the FCC and the courts will have denied all petitions for reconsideration, applications for review and appeals (collectively, "<u>Appeals</u>") of the FCC Order (or of an FCC or court order affirming the FCC Order), or the periods for filing such Appeals have passed and no Appeal has been filed. Moreover, there shall exist no claim, action, suit, investigation, litigation or proceeding, pending or threatened in any court or before any arbitrator or governmental

| | |
|---|---|
| | instrumentality, which would prohibit the transactions contemplated by the Plan; |
| | (d) The prior approval of the Minister of Industry (the "<u>Industry Canada Approval</u>") approving the transfer of control of TerreStar Canada to the Plan Sponsor or, at the option of the Plan Sponsor, the transfer or assignment of the licenses and authorizations held by the TSN Debtors to a party designated by the Plan Sponsor that is eligible to hold such licenses, to the extent required by applicable law, including the licenses and authorizations, to consummate the transactions contemplated by the Plan, shall have been obtained and shall be final and in full force and effect without any condition or requirement that would reasonably be expected to have, individually or in the aggregate, a material impact on the current or future business operations of the Plan Sponsor.  In addition, the courts will have denied all applications for judicial review or other court challenges to the Industry Canada Approval or appeals of any court order upholding the Industry Canada Approval or the periods for filing such appeals have passed and no appeal has been filed. |
| | (e) the TSN Debtors shall have cash on hand as of the Effective Date of at least $5 million; and |
| | (f) no Sponsor Termination Event or Company Termination Event (each as defined below) shall have occurred that shall not have been waived by the Plan Sponsor or the Company, as applicable. |
| **Sponsor Termination Events:** | This Restructuring Term Sheet shall be terminated and all of the obligations of the parties hereto shall be of no further force or effect, in the event (each, a "<u>Sponsor Termination Event</u>") that any of the following occurs: |
| | (a) the TSN Debtors shall fail to (i) commence the Chapter 11 Cases or (ii) file the Plan and Disclosure Statement on or prior to November 5, 2010; |
| | (b) the Company shall fail to file, jointly with the Plan Sponsor and in form and content acceptable to Plan Sponsor, all necessary applications for approval of the transfers of control over all the FCC licenses and authorizations held by Company that are contemplated by the Plan, and all required notifications to the FCC, or shall fail to collaborate |

|  | with the Plan Sponsor to allow timely preparation of such applications and notifications, on or prior to December 14, 2010; |
|  | (c) the Company shall fail to file, in form and content acceptable to the Plan Sponsor, all applications necessary to obtain Industry Canada approval of the transfers or assignments of all the Industry Canada licenses and authorizations held by Company that are contemplated by the Plan, and any required notifications to Industry Canada, or shall fail to collaborate with the Plan Sponsor to allow timely preparation of such applications and notifications, on or prior to December 14, 2010; |
|  | (d) any of the pleadings filed by the TSN Debtors seeking customary "first day" relief, including, without limitation, terms for retention of professionals in the Chapter 11 Cases and any of the Bankruptcy Court orders entered in connection therewith, or any of the recognition pleadings filed by the TSN Debtors with the Canadian Court, are not, in form and substance, satisfactory to the Plan Sponsor; |
|  | (e) an Event of Default under the DIP Facility; |
|  | (f) (i) the TSN Debtors shall not have filed a motion to assume the Plan Support Agreement within one (1) day after the date of commencement of the Chapter 11 Cases (the "Petition Date"); (ii) the Bankruptcy Court shall not have entered an order authorizing the TSN Debtors' assumption of the Plan Support Agreement on or before the date that is thirty-five (35) days after the Petition Date; or (iii) the Plan Support Agreement shall have been terminated or rejected by the TSN Debtors or the Company; |
|  | (g) the Disclosure Statement shall not have been approved by final order of the Bankruptcy Court on or before December 14, 2010; |
|  | (h) a Bankruptcy Court hearing on confirmation of the Plan shall not have commenced on or before January 31, 2011; |
|  | (i) a final, non-appealable order by the Bankruptcy Court confirming the Plan shall not have been |

entered on or before February 14, 2011;

(j)      the Effective Date shall not have occurred later than two Business Days after all conditions to consummation have been satisfied and, in any event, shall occur no later than May 31, 2011, or such later date as may be mutually agreed by the Parties;

(k)      upon the request of the Plan Sponsor, (a) within seven days of the issuance of any order in the Bankruptcy Court, a corresponding recognition order, in form and substance reasonably acceptable to the Plan Sponsor shall not have been entered in the Canadian Court, or (b) such order shall not have become final and non-appealable within twenty-one (21) days after entry of such order by the Canadian Court;

(l)      the Company shall enter into any material contractual obligations or any material settlements, without the prior written consent of the Plan Sponsor;

(m)      there shall be any material modification to any terms of the Restructuring that is inconsistent with the terms and conditions set forth in this Restructuring Term Sheet, without the prior written consent of the Plan Sponsor;

(n)      the Company shall withdraw, or file a motion to withdraw, the Plan or submit an amended plan of reorganization or liquidation that is adverse to the Plan Sponsor or inconsistent with the terms and provisions of this Restructuring Term Sheet;

(o)      any event, development or circumstance (other than any event, development or circumstance arising from or relating to the Chapter 11 Cases) shall have occurred on or after June 30, 2010 that, either alone or in combination, has had or could reasonably be expected to have a material adverse effect on the business, operations, assets, liabilities, or condition (financial or otherwise) of the TSN Debtors taken as a whole or the Reorganized TSN Debtors taken as a whole;

(p)      a trustee, responsible officer, or an examiner with powers beyond the duty to investigate and report, as set forth in subclauses (3) and (4) of clause (a) of section 1106 of the Bankruptcy Code shall have been

<table>
<tr><td></td><td>appointed under section 1104 of the Bankruptcy Code for service in the Chapter 11 Cases;

(q)    the Chapter 11 Cases shall have been converted to cases under chapter 7 of the Bankruptcy Code; or

(r)    the Company shall have breached any material provision of this Restructuring Term Sheet.

The foregoing Sponsor Termination Events are intended solely for the benefit of the Plan Sponsor.

Upon the occurrence of any of the Sponsor Termination Events, this Restructuring Term Sheet shall terminate automatically upon (x) the seventh (7th) business day after the occurrence of such Sponsor Termination Event set forth in subparagraphs (a), (b), (c), (e), (f), (g), (h), (i), (j), (k), (l), (m), (q) and (r) above, unless waived in writing by the Plan Sponsor, in its sole discretion before the expiration of such waiver period; or (y) in case of the Sponsor Termination Events set forth in subparagraphs (d), (n), (o), and (p) above, (i) written notice of such Termination Event provided to the Company by the Plan Sponsor; provided that the Company hereby agree to waive the requirement that the automatic stay under section 362 of the Bankruptcy Code be lifted in connection with giving such notice (and not to object to the Plan Sponsor seeking to lift the automatic stay in connection with giving such notice, if necessary); and (ii) such Sponsor Termination Event remaining uncured for at least five (5) days following the delivery of notice thereof.</td></tr>
</table>

| **Company Termination Events:** | This Restructuring Term Sheet may be terminated by the Company and all of the obligations of the parties hereto shall be of no further force or effect, in the event that (i) the Plan Sponsor shall have breached any material provision of this Restructuring Term Sheet; or (ii) the Chapter 11 Cases shall have been converted to cases under chapter 7 of the Bankruptcy Code (the "Company Termination Events").

The foregoing Company Termination Events are intended solely for the benefit of the Company.

Upon the occurrence of a Company Termination Event, the termination of this Restructuring Term Sheet shall be effective upon (i) written notice being provided to the Plan Sponsor by the Company; and (ii) such breach (if applicable) remaining uncured for at least five (5) days |

| | |
|---|---|
| | following the Plan Sponsor's receipt of such notice. |
| **Expenses:** | The Company will reimburse the Plan Sponsor, the 15% Senior Secured PIK Notes Indenture Trustee, and the PMCA Agent for all reasonable, actual and documented out-of-pocket expenses incurred by such parties in connection with the Restructuring and the Rights Offering, including, but not limited to, the fees and expenses of such entities' counsel and financial advisors. |
| **Executory Contracts and Unexpired Leases:** | The Company and the Plan Sponsor shall mutually agree on the disposition of Material Contracts and Leases (as defined below), which disposition (e.g., rejection, assumption or termination) shall be set forth in the Plan. Prior to confirmation of the Plan, the Company shall not make any motion to assume or reject a Material Contract or Lease without the consent of the Plan Sponsor. A "Material Contract or Lease" shall mean any agreement, lease, user agreement or other type of contract of one or more of the TSN Debtors (a) where consideration has been or will be paid or received by Company or any of its affiliates in excess of $100,000 in any twelve month period or in excess of $1,000,000 over the remaining term, (b) with an affiliate, or (c) that relates to the sale, lease or use of spectrum, capacity or satellites (other than as contemplated by the Agreed Budget (i.e., the AT&T Genus business)). |
| **No Waiver:** | Nothing in this Restructuring Term Sheet shall affect in any way, or be deemed a waiver of, any of the rights of (i) any of the holders of the 15% Senior Secured PIK Notes Claims or PMCA Claims, or (ii) the Company, under any applicable instrument, document or law. |
| **Governing Law:** | State of New York. |
| **Bankruptcy Rule 9019:** | Pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure, the Company and Plan Sponsor hereby acknowledge that this Restructuring Term Sheet, the Plan Support Agreement, and the Plan contemplated hereby and thereby (the "Proposed Plan") are part of a good faith compromise and settlement of all claims and controversies relating to the rights of the Company and the Plan Sponsor, including without limitation disputed issues relating to lien priority and collateral valuation. Nothing in this Restructuring Term Sheet, the Plan Support Agreement, or the Proposed Plan shall be deemed an admission of any kind. Pursuant to Federal Rule of Evidence 408 and any applicable state rules of evidence, this Restructuring Term Sheet, the Plan Support Agreement, and the Proposed Plan and all negotiations relating thereto shall not be admissible into evidence in any proceeding unless and until the Proposed Plan is consummated, and then only in |

| | accordance with the terms of the Proposed Plan. In the event the Proposed Plan is not consummated, provisions of this Restructuring Term Sheet, the Plan Support Agreement, and the Proposed Plan shall be of no effect. |
| --- | --- |
| | The Company and the Plan Sponsor further agree that the Plan and Disclosure Statement shall contain appropriate provisions to reflect the foregoing acknowledgments and agreements. |

**Exhibit B**

**DIP Agreement**

A copy of the DIP Agreement is attached as Exhibit B to the Motion of the Debtors for Interim and Final Orders Under Sections 105, 361, 362, 363(c), 364(c)(1), 364(c)(2), 364(c)(3), 364(e) and 507 of the Bankruptcy Code and Bankruptcy Rules 2002, 4001 and 9014:  (I) Authorizing Debtors to Obtain Postpetition Financing; (II) Authorizing Debtors to Use Cash Collateral; (III) Granting Adequate Protection to Prepetition Secured Parties; and (IV) Scheduling a Final Hearing Pursuant to Bankruptcy Rules 4001(b) and (c).

<u>**Exhibit C**</u>

**Joinder**

The undersigned ("<u>Transferee</u>") hereby acknowledges that it has read and understands the Plan Support Agreement, dated as of October 19, 2010 (the "<u>Agreement</u>"), by and among TerreStar Networks Inc. (the "<u>Company</u>"), on behalf of itself and its affiliated Debtors, EchoStar Corporation ("<u>Transferor</u>"), and the other holders of claims against, and equity interests in, the Company signatory thereto, and agrees to be bound by the terms and conditions thereof to the extent Transferor was thereby bound, and shall be deemed a "<u>Party</u>" and a "<u>Plan Sponsor</u>" under the terms of the Agreement, as if an original signatory thereto.

Dated: _____ , 2010                    [Transferee's Name]


                                         _____
                                         _____
                                         Title:  _____

## <u>Schedule 1</u>

**Plan Sponsors' Claims and Interests**

**[REDACTED]**

**Exhibit H**

**Solicitation, Voting and Tabulation Procedures**

<u>**Exhibit I**</u>

**Rights Offering Procedures**