QUINN EMANUEL URQUHART
  & SULLIVAN, LLP
Susheel Kirpalani (SK-8926)
James C. Tecce (JT-5910)
Scott C. Shelley (SS-1013)
Daniel S. Holzman (DH-5770)
51 Madison Avenue, 22nd Floor
New York, New York 10010

*Counsel to Solus Alternative Asset
Management LP and Remus Holdings LLC,
as nominee of certain holders of 6.5%
Notes of TerreStar Networks Inc.*


UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------x
|  | : | Chapter 11 |
| In re: | : |  |
|  | : | Case No. 10-15446 (SHL) |
| TERRESTAR NETWORKS INC., *et al.*,[1] | : |  |
|  | : | (Jointly Administered) |
| Debtors. | : |  |
|  | : |  |
---------------------------------------------------------------x


**OBJECTION OF SOLUS ALTERNATIVE ASSET MANAGEMENT LP AND REMUS HOLDINGS LLC, AS NOMINEE OF CERTAIN HOLDERS OF 6.5% NOTES OF TERRESTAR NETWORKS INC., TO: (I) DEBTORS' MOTION FOR AN ORDER (A) AUTHORIZING THE DEBTORS TO ASSUME A RESTRUCTURING SUPPORT AGREEMENT AND (B) GRANTING RELATED RELIEF; AND (II) MOTION OF THE DEBTORS FOR INTERIM AND FINAL ORDERS UNDER SECTIONS 105, 361, 362, 363(c), 364(c)(1), 364(c)(2), 364(c)(3), 364(e) AND 507 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULES 2002, 4001, AND 9014: (I) AUTHORIZING DEBTORS TO OBTAIN POSTPETITION FINANCING; (II) AUTHORIZING DEBTORS TO USE**

---

[1]    The debtors in these chapter 11 cases, along with the last four digits of each debtor's federal taxpayer identification number, are:  TerreStar New York Inc. (6394); TerreStar Networks Inc. (3931); Motient Communications Inc. (3833); Motient Holdings Inc. (6634); Motient License Inc. (2431); Motient Services Inc. (5106); Motient Ventures Holding Inc. (6191); MVH Holdings Inc. (9756); TerreStar License Inc. (6537); TerreStar National Services Inc. (6319); TerreStar Networks Holdings (Canada) Inc. (1337); TerreStar Networks (Canada) Inc. (8766); and 0887729 B.C. Ltd. (1345) (collectively, the "Debtors").

**CASH COLLATERAL; (III) GRANTING ADEQUATE PROTECTION TO PREPETITION SECURED PARTIES; AND (IV) SCHEDULING A FINAL HEARING PURSUANT TO BANKRUPTCY RULES 4001(b) AND (c)**

Solus Alternative Asset Management LP ("Solus") in its capacity as a holder of 6.5% senior exchangeable payment-in-kind notes due 2014 (the "6.5% Notes") of TerreStar Networks Inc. ("TSN" and together with its affiliated debtors and debtors in possession, the "Debtors") and Remus Holdings LLC, as nominee of certain holders of 6.5% Notes ("Remus" and together with Solus, the "Objectors"), hereby file this objection (the "Objection") to (i) the Debtors' Motion for an Order (A) Authorizing the Debtors to Assume a Restructuring Support Agreement and (B) Granting Related Relief (the "PSA Assumption Motion"); and (ii) the Motion of the Debtors for Interim and Final Orders (I) Authorizing the Debtors to Obtain Postpetition Financing; (II) Authorizing Debtors to Use Cash Collateral; (III) Granting Adequate Protection to Prepetition Secured Parties; and (IV) Scheduling a Final Hearing Pursuant to Bankruptcy Rules 4001(b) and (c) (the "DIP Motion"), and in support thereof, respectfully state as follows:

## I.    PRELIMINARY STATEMENT

1.    The relief requested in the PSA Assumption Motion and the DIP Motion will propel these cases down an irreversible, predetermined course charted for the singular purpose of serving EchoStar's interests at the expense – and to the detriment of all other stakeholders. Consummation of the transactions contemplated in these motions is not only tantamount to a breach of the Debtors' fiduciary duties to other stakeholders, but it lacks any sound business justification. EchoStar's efforts to commandeer these cases for parochial purposes must be stopped in order to realize on a primary and egalitarian objective of chapter 11: maximizing value for *all stakeholders*.

2.      Through the PSA, the Debtors cede control of these cases by slavishly committing themselves with no escape to an unduly burdensome timeline as well as the substantive terms of a comprehensive restructuring favorable only to EchoStar.  *First*, the PSA mandates the terms of a restructuring, including, among other things, credit recoveries and the structure and corporate governance of the reorganized debtors.  *Second*, the PSA establishes milestones that make the timing of any alternative restructuring proposals all but impossible and that impose severe consequences on the Debtors for failure to meet them.  *Third*, the PSA prohibits the Debtors from taking any actions inconsistent with the restructuring contemplated by the PSA, and thus prevents the Debtors from entertaining potentially beneficial restructuring alternatives.  *Fourth*, the supposed "fiduciary out" fails to provide any protection against the PSA's onerous provisions because resort to that provision triggers a default under the DIP Agreement.  At bottom, the PSA is the quintessential *sub rosa* plan – establishing all of the key terms of a restructuring to which the Debtors' hands are tied while eliminating their ability to explore or entertain alternatives.

3.      In addition to needlessly constraining the Debtors' options, the PSA improperly misappropriates value to EchoStar and its fellow 15% Noteholders – value which should inure to the benefit of the Debtors' other stakeholders.  The PSA transfers value to the 15% Noteholders based on the erroneous assumption that the 15% Noteholders hold a valid, perfected security interest in certain assets.  They do not hold any such security interest.  Not surprisingly, this misallocation of value inures almost exclusively to EchoStar's benefit.

4.      While the PSA, on its own, is a *sub rosa* plan that should be rejected, in conjunction with the DIP Agreement, the two documents entirely restrict the Debtors' ability to appropriately exercise their fiduciary duties.  The DIP Agreement is improperly tied to the PSA,

such that the two documents contain cross-defaults that give EchoStar, as DIP lender, the unilateral control over the chapter 11 reorganization.  In addition, the DIP Agreement, in conjunction with the PSA, commands the timing and outcome of these cases, rendering any alternative restructuring impossible.  A DIP Agreement should work to assist the Debtor in building a bridge to emergence, not to misappropriate assets and the chapter 11 process to a single stakeholder.  Accordingly, the Objectors submit that the PSA Assumption Motion and the DIP Motion should be denied.

## II.    BACKGROUND

5.      The Debtors filed petitions for relief under chapter 11 of title 11, United States Code, 11 U.S.C. §§ 101-1532 (as amended, the "Bankruptcy Code") on October 19, 2010 (the "Petition Date").  The Debtors are operating their business and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

6.      Prior to the Petition Date, the Debtors entered into a Plan Support Agreement (the "PSA") with non-debtors TerreStar Corporation ("TSC") and TerreStar Holdings Inc. ("TS Holdings"), and EchoStar Corporation ("EchoStar").  EchoStar holds the majority of 15% senior secured payment-in-kind notes (the "15% Notes") and approximately one-third of the 6.5% Notes of TSN, and is the lender of approximately one-half of the amount outstanding under the $100 million TerreStar-2 Purchase Money Credit Agreement (the "PMCA") among TSN, as borrower, U.S. Bank National Association, as collateral agent, EchoStar, Harbinger Capital Partners Master Fund I, and Harbinger Capital Partners Special Situations Fund, L.P.  Through the PSA, EchoStar has committed to support a plan of reorganization (the "EchoStar-TSN Plan") consistent with the Restructuring Term Sheet attached to the PSA (the "Term Sheet").

7.      The Term Sheet contemplates, among other things:  (i) entry into the proposed postpetition debtor in possession financing facility provided by EchoStar (the "DIP

Financing") – default under which constitutes a termination event under the PSA; (ii) holders of allowed 15% Notes (the "15% Noteholders") will receive 97% of New Common Stock to be issued by TSN and rights to purchase new preferred Stock through a $125 million rights offering, $100 million of which will be backstopped by EchoStar; (iii) holders of allowed claims under the PMCA will be repaid in cash or reinstated, at the holders' discretion; (iv) holders of allowed 6.5% Notes (the "6.5% Noteholders") and allowed unsecured claims (the "Unsecured Creditors") will receive the remaining 3% of New Common Stock and rights to purchase New Preferred Stock; and (v) existing equity in the Debtors, including preferred stock, will receive no distributions on account of such interests, with such interests being cancelled.

8.      The Term Sheet also provides that (i) EchoStar will select the members of TSN's board of directors, who will also serve as the members of the initial boards of directors of the other reorganized Debtors, and (ii) the Debtors, TSC, and TS Holdings cannot enter into any material contractual obligations or settlements without EchoStar's prior written consent.

9.      As contemplated by the PSA and Term Sheet, the Debtors are seeking to obtain the DIP Financing pursuant to the terms and conditions of a $75 million secured debtor in possession credit agreement (the "DIP Agreement") among TSN as borrower, the other Debtors, as guarantors, The Bank of New York Mellon, as administrative and collateral agent, and EchoStar, as the initial DIP Lender.  The following constitute events of default (each, an "Event of Default") under the DIP Agreement:  (i) the Debtors' failure to file a motion to assume the PSA within one (1) day of the Petition Date; (ii) failure of the Court to enter an order authorizing the assumption  of and/or entry into the PSA by the Debtors within thirty-five (35) days of the Petition Date; and (iii) the PSA shall have been terminated (other than solely as a result of EchoStar's failure to comply with its obligations thereunder) or rejected by any of the Debtors.

*See* DIP Agreement § 7.01(cc).  The Debtors' failure to meet the "Milestone Requirements," which impose strict deadlines mirroring those contained in the PSA, also constitutes an Event of Default under the DIP Agreement.  *See* DIP Agreement § 7.01(s).

10.　　In accordance with the terms of the DIP Agreement and PSA, the Debtors filed the DIP Motion and PSA Assumption Motions on the Petition Date.

## III.　ARGUMENT

### A.　THE BUSINESS JUDGMENT RULE DOES NOT APPLY TO TRANSACTIONS INVOLVING AN INSIDER SUCH AS ECHOSTAR

11.　　EchoStar is an insider of TSN, rendering the business judgment rule inapplicable to transactions between these two parties.  Instead the transactions must be analyzed utilizing the "entire fairness" standard.  As described in greater detail herein, the DIP Motion and the PSA Assumption Motion are unable to satisfy the entire fairness standard, and these motions must be denied.

12.　　In seeking approval of the DIP Financing and assumption of the PSA, the Debtors fail to disclose that EchoStar is an insider of TSN – but filings with the Securities and Exchange Commission reveal the truth.  Specifically, according to TSC's 10-K/A for the year ended December 31, 2009, EchoStar holds 26.9% of TSC's voting stock, including notes exchangeable into common stock.  The 10-K/A provides: "Pursuant to a Schedule 13D dated June 19, 2008, as filed with the Commission, EchoStar Corporation reported it had shared voting and dispositive power over 39,180,172 shares, including 9,180,172 shares of Common Shares issuable upon the conversion of its Exchangeable Notes."

13.　　In addition to its vast holdings of TSC common stock, EchoStar is the sole holder of TSC Series C preferred stock.  Ownership of the Series C preferred stock gives EchoStar significant consent rights relating to certain fundamental corporate actions, including,

among other things, "any merger, consolidation, recapitalization, liquidation, or dissolution of the Corporation or any subsidiary of the Corporation." *See* Section B.2, Certificate of Designations of Series E Junior Participating Preferred Stock, Series C Preferred Stock and Series D Preferred Stock of TerreStar Corporation (the "CDE Designations of Rights," a copy of which is annexed to this Objection as <u>Exhibit A</u>). By virtue of its ownership of the Series C preferred stock, EchoStar also has the power to prevent (i) certain asset sales, (ii) any material change in TSC's line of business, (iii) the amendment of TSC's certificate of incorporation, by-laws, or other of TSC's organizational documents or those of any of its subsidiaries, (iv) certain acquisitions of assets, (v) certain capital expenditures, and (vi) other transactions.

14. Based on the foregoing, it is indisputable that EchoStar is a "person in control" of both TSC and TSN, and thus an "insider" of TSN within the meaning of Bankruptcy Code section 101(31). *See* 11 U.S.C. 101(31) (defining "insider" as including, with respect to a corporation, a "person in control of the debtor"). Moreover, even if the rights granted to EchoStar by the CDE Designations of Rights did not give it control over TSN – which they do – EchoStar would still be an insider of TSN by virtue of its status as an insider of TSN's affiliate, TSC. *See* 11 U.S.C. § 101(31)(E) (stating that an "insider" includes an "affiliate, or insider of an affiliate as if such affiliate were the debtor").

15. As a result of EchoStar's status as an insider of TSN, and the prospect of a breach of TSN's duty of loyalty, TSN's proposed transactions with EchoStar are subject to the exacting scrutiny required under the entire fairness standard. *See Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc.*, 506 A.2d 173, 180 (Del. 1986) (stating that "[w]hile the business judgment rule may be applicable to the actions of corporate directors . . . the principles upon which it is founded – care, loyalty and independence – must first be satisfied"). Here, TSN is

unable to establish that it has satisfied the *Revlon* criteria, thus, the business judgment standard does not apply. *Id.* at 184 (declaring that "when bidders make relatively similar offers, or dissolution of the company becomes inevitable, the directors cannot fulfill their enhanced *Unocal* duties by playing favorites with the contending factions. Market forces must be allowed to operate freely to bring the target's shareholders the best price available for their equity.").

16. By acquiescing to EchoStar's overreaching demands, the Debtors have foreclosed their ability to realize the best price for stakeholders. As a result of the Debtors' failure to fulfill their duty of care, both the PSA and the DIP Financing are tainted. While the Debtors may assert that they had limited options at the time they agreed to these transactions with EchoStar, there simply is no exigency that justifies abandoning their duty of care. The PSA Assumption Motion and the DIP Motion both fail the entire fairness test, and both motions should be denied.

**B.    EVEN UNDER THE BUSINESS JUDGMENT STANDARD, THE DEBTORS DID NOT EXERCISE SOUND AND REASONABLE BUSINESS JUDGMENT BY ENTERING INTO THE PSA AND DIP AGREEMENT.**

17. If the Court concludes that the entire fairness standard should not apply to these insider transactions, nonetheless, in order to justify the assumption of the PSA, the Debtors must show that such assumption is supported by their sound business judgment, which judgment must be exercised fairly, and without prejudice to parties in interest. *See In re Grayhall Resources, Inc.*, 63 B.R. 382, 384 (Bankr. D. Colo. 1986) (debtor may assume contracts under section 365 where "assumption represents a sound business judgment on the part of the Debtor and will not be prejudicial to the interest of the creditors"); *In re Trak Auto Corp.*, 2002 WL 32129975, *2 (Bankr. E.D. Va. Jan. 9, 2002) (court must "evaluate debtor's business judgment

by considering the impact of the debtor's decision on a variety of parties as well as the impact on the debtor's estate").

18.     Similarly, when considering the propriety of debtor in possession financing, courts will consider whether the proposed financing is in the best interests of the estate and its creditors, as well as whether the proposed financing is an exercise of sound and reasonable business judgment. *See Mid-State Raceway*, 323 B.R. 40, 60 (Bankr. N.D.N.Y. 2005); *see also In re Tenney Village Co. Inc.*, 104 B.R., 562, 569 (Bankr. D. N.H. 1989) (rejecting DIP financing proposal when, among other things, "the execution of the Financing Agreement violates the Debtors' fiduciary obligations to the estate").

19.     For the reasons discussed below, the Debtors' agreement to the terms of the PSA and DIP Agreement was not an exercise of sound and reasonable business judgment, but rather is prejudicial to many of their creditor constituencies and stakeholders.

**C.     THE PSA IS AN ONEROUS AND IMPROPER *SUB ROSA* PLAN THAT ALLOWS ECHOSTAR TO HIJACK THESE CHAPTER 11 CASES AND TO UNFAIRLY CONVERT VALUE FROM OTHER TERRESTAR STAKEHOLDERS.**

**1.     The PSA Is an Improper *Sub Rosa* Plan**

20.     The PSA is not simply an agreement pursuant to which the Debtors will pursue, and EchoStar will support, a common goal of emerging from chapter 11 and a general restructuring plan. Instead, the PSA is a device through which the Debtors have locked themselves into a particular restructuring, with onerous consequences attached to the failure to implement that restructuring – all without the protections and procedures of chapter 11 of the Bankruptcy Code. Thus, the PSA is an impermissible *sub rosa* plan.

21.     The law is clear – "[t]he debtor and the bankruptcy court should not be able to short circuit the requirements of Chapter 11 for confirmation of a reorganization plan by

establishing the terms of the plan *sub rosa*." *In re* Braniff, 700 F 2.d 935, 940 (5th Cir. 1983).

Thus, "[a] settlement which has the effect of dictating the terms of the debtor's plan of

reorganization prior to the confirmation process cannot be approved." *In re Tower Automotive

Inc.*, 241 F.R.D. 162, 168-69 (S.D.N.Y. 2006); *see also In re Crowthers McCall pattern, Inc.*,

114 B.R. 877, 887 (Bankr. S.D.N.Y. 1990) ("A transaction which would effect a lock-up of the

terms of a plan will not be permitted.").

   22.  While the history of the *sub rosa* plan focuses on sales pursuant to section

363(b) of the Bankruptcy Code, the underlying basis for such an objection is equally applicable

in the context of a plan support agreement. In both contexts there exists the "fear that one class

of creditors may strong-arm the debtor-in-possession and bypass the requirements of Chapter 11

to cash out quickly at the expense of other stakeholders, in a proceeding that amounts to a

reorganization in all but name, achieved by stealth and momentum." *In re Chrysler LLC*, 576

F.3d 108, 116 (2d Cir. 2009) *rev'd on other grounds* in *Indian State Police Pension Trust v.

Chrysler LLC*, 130 S.Ct. 1015 (2009). All of the above elements justifying prohibitions against

*sub rosa* plans are present here.

   23.  ***First***, a single creditor – EchoStar – is attempting to dictate and control the

chapter 11 process by strong-arming the Debtors. Pursuant to the PSA, the Debtors have agreed

not only to take all actions necessary to effectuate and consummate the transactions in

accordance with the Term Sheet – *see* PSA at § 2 – but they also have agreed to "take no actions

inconsistent with the transactions contemplated by the [PSA]." *Id.* Thus, the Debtors' hands are

tied, preventing them from exploring options beneficial to all stakeholders, rather than only

EchoStar. This "no-shop" provision is a breach of TSN's fiduciary duty. *See Revlon,* 506 A.2d

at 184 ("The no-shop provision, like the lock-up option, while not *per se* illegal, is impermissible

under the *Unocal* standards when a board's primary duty becomes that of an auctioneer responsible for selling the company to the highest bidder.")

24. ***Second***, EchoStar has demanded – and the Debtors have acquiesced – that each of the major milestones in this case be completed at lightning speed, with confirmation of the EchoStar-TSN Plan set for just over three months after the Petition Date. *See* Term Sheet at 10-12. Thus, instead of using the bankruptcy process to reorganize for the benefit of the Debtors' estates and creditors, EchoStar has compelled the Debtors to use the bankruptcy process to accomplish a strategic asset acquisition in the shortest amount of time possible.

25. EchoStar not only has gained control of the timing of these chapter 11 cases; it has locked the Debtors into a very specific restructuring plan that includes, among other terms, EchoStar and other holders of the 15% Notes, receiving 97% of the common stock of the reorganized debtors ("Reorganized TSN") and the right of EchoStar to select all seven members of the initial Board of Directors of Reorganized TSN. *See* Term Sheet at 5-6. Thus EchoStar, through the PSA (and the DIP Financing), controls both the timing and terms of the Debtors' restructuring.

26. The proposed transactions blatantly runs roughshod over the protections of chapter 11 and should be rejected. *See In re Washington-St. Tammany Elec. Co-op., Inc.*, 87 B.R. 852, 856 (E.D. La. 1989) (reversing Bankruptcy Court's extension of exclusivity that would have "effectively determined[ed] the terms of an acceptable reorganization plan") (citing *Braniff*, 700 F.2d at 940 (5th Cir. 1983)); *see also In re Cloverleaf Enterprises, Inc.*, 2010 WL 1445487 at *3 (Bankr. D. Md. April 2, 2010) ("When a proposed transaction specifies terms or coerces one result for adopting a reorganization plan, the parties and the district court must scale the hurdles erected in Chapter 11." ).

27.     The Debtors attempt to excuse this *fait accompli* by asserting that they explored "restructuring alternatives with their stakeholders," including certain "financial institutions."  *See* PSA Assumption Motion at ¶ 7.  Notably absent is any indication that the Debtors marketed a restructuring or sale to strategic buyers – which is undoubtedly the posture in which EchoStar is pursuing this restructuring.[2]  Furthermore, the Debtors are prohibited under the PSA from exploring any restructuring or sale options through strategic buyers, as such actions would be inconsistent with the transactions contemplated in the PSA.  *See* PSA at § 2.

28.     The Debtors overstate the benefits of their so-called "fiduciary out."  *See* PSA Assumption Motion at ¶ 13 (citing PSA at § 3).  That so-called escape hatch is completely illusory, however, because the termination of the PSA constitutes an event of default under the DIP Agreement.  *See* DIP Agreement § 7.01(cc).  Similarly, an event of default under the DIP Agreement constitutes a termination under the PSA.  *See* Term Sheet at 11.  As such, if the Debtors ultimately determine that the restructuring contemplated by the Term Sheet is not in the best interests of their estates and creditors and therefore terminate the PSA pursuant to the fiduciary out, EchoStar has the right to declare an Event of Default under the DIP Agreement, allowing it to, among other things, declare the loans under the DIP Agreement to be immediately due and payable, with default interest, and foreclose on their collateral.  *See* DIP Agreement at § 7.02.  Because the so-called "fiduciary out" provision does not prevent a cross-default with the DIP Agreement, its benefits are largely illusory.

29.     EchoStar's ability to back out of the PSA is subject to remarkably fewer restraints.  For example, EchoStar may terminate the PSA if the Debtors fail to meet any of the

---

[2]   In fact, Citi Investment Research recently upgraded EchoStar's stock from a "Sell" to a "Buy" on the basis that EchoStar has an opportunity to launch a new mobile video service using satellite spectrum that is among the Debtors' assets.  *See*  Bloomberg Business Week, October 29, 2010, available at *http://www.businessweek.com/ap/financialnews/D9J5GNQ02.htm*.

accelerated milestones.  *See* Term Sheet at 10-13 (listing numerous dates that if the Debtors fail

to meet, give EchoStar the right to terminate the PSA).  In addition, the Material Adverse

Change (MAC) clause allows EchoStar to terminate the PSA without a qualification that the

MAC must be a disproportionate adverse effect to what everyone in the industry suffers.  *See*

Term Sheet at 11.  The MAC clause should, at the very least, except from its grasp a material

adverse change in the industry as a whole.  *See e.g.*, *Pittsburgh Coke & Chemical Co. v. Bollo*,

421 F. Supp. 908, 930 (D.C.N.Y. 1976) (denying breach of warranty claim as to material adverse

change clause and noting that to claim that changes in the aviation industry as a whole

constituted material adverse changes in the company's business or financial condition "is

patently unreasonable").

30.     Finally, notwithstanding the speed at which this process is to occur, the

onerous terms of the PSA and the DIP Agreement and the *fait accompli* nature of the proposed

relief in the PSA Assumption Motion and the DIP Motion, the Debtors assert that (a) they have

met the business judgment standard under section 365 to assume the PSA and (b) the PSA

enables a settlement pursuant to Bankruptcy Rule 9019 that will "provide a recovery to the

Debtors' general unsecured creditors and holders of Senior Exchangeable Notes."  *See* PSA

Assumption Motion at ¶ 12.

31.     As to the first point, circumventing the far more stringent protections of

the chapter 11 plan confirmation standards (e.g., those contained in sections 1125 and 1129 of

the Bankruptcy Code) and seeking shelter in the business judgment rule hardly provides comfort

to the Debtors' stakeholders, nor does it cleanse the PSA as a *sub rosa* plan.  As to the second

point, the fact that the PSA allows for EchoStar to enter into a settlement wearing all of its

various hats in these cases is preposterous – what is the dispute that is being settled?

2.     **The PSA Improperly Converts Value to the 15% Noteholders Under the EchoStar-TSN Plan Relying On Inaccurate Assumptions About Their Allegedly Secured Status**

32.     According to the PSA Assumption Motion and the Term Sheet, the 15% Noteholders will receive 97% of the New Common Stock of Reorganized TSN under the EchoStar-TSN Plan. The remaining 3% will be divided among the 6.5% Noteholders and Unsecured Creditors. *See* PSA Assumption Motion ¶ 11. EchoStar and the Debtors likely will attempt to justify this enormous disparity by citing the 15% Notes' secured status.

33.     According to the Declaration of Jeffrey W. Epstein Pursuant to Bankruptcy Rule 1007-2 In Support of First Day Pleadings (the "Epstein Declaration"), the 15% Notes are secured by a first priority security interest in the assets of TSN, TerreStar National Services Inc. ("TerreStar Services"), and TerreStar License Inc. ("TerreStar License"), subject to certain exceptions, pursuant to a security agreement, dated as of February 14, 2007, among TSN as issuer, and TerreStar National and TerreStar License, as guarantors, in favor of U.S. Bank National Association, as collateral agent (the "Senior Secured Notes Security Agreement"). While the Senior Secured Notes Security Agreement does provide the 15% Noteholders with a first priority security interest in the assets of TSN, TerreStar National and TerreStar License, assets subject to a purchase money credit agreement are specifically excepted from such security interest. *See* Senior Secured Notes Security Agreement § 1.03; PMCA § 6.02.

34.     One of TSN's primary assets, the TerreStar-2 satellite, is the subject of the PMCA. Accordingly, under the terms of the Senior Secured Notes Security Agreement, the 15% Noteholders do not have a lien on this valuable asset. In fact, the TerreStar-2 satellite is only encumbered by the PMCA in the amount of principal and interest outstanding thereunder, which, as of the Petition Date, totaled $85.9 million. *See* Epstein Declaration ¶ 60.

35.     Although no valuation has been provided to any of the 6.5% Noteholders, the Unsecured Creditors, or the Court, there is reason to believe that the value of TerreStar-2 far exceeds $85.9 million.  Any such unencumbered value should inure to the benefit of the 6.5% Noteholders and other unsecured creditors of TSN.  Indeed, the proper exercise of the Debtors' fiduciary duties would direct a challenge to the improper allocation of value proposed by EchoStar.  That challenge is woefully lacking, suggesting instead that the Debtors have abandoned the idea of advancing the interests of other creditors in breach of those duties.

36.     The foregoing provides but one example of why approval of the PSA Assumption Motion is improper.  The implicit valuations reflected in the Term Sheet have not been disclosed, let alone subject to review.  The EchoStar-TSN Plan's allocation of value should not go untested.

## D.     THE DIP AGREEMENT IS A *SUB ROSA* PLAN, THE APPROVAL OF WHICH EFFECTIVELY WILL DICTATE THE TERMS OF THE DEBTORS' PLAN OF REORGANIZATION.

37.     Chapter 11 debtors cannot tailor DIP financings to satisfy exclusively the needs, concerns, and desires of a single creditor or creditor constituency.  Courts recognize that "in connection with post-petition financing, lenders often extract favorable terms that may or may not have the effect of causing harm to the estate and creditors."  *In re Tenney Village Co., Inc.*, 104 B.R. 562, 569 (Bankr. D.N.H. 1989).  As such, "bankruptcy courts do not allow terms in financing arrangements that convert the bankruptcy process from one designed to benefit all creditors to one designed for the unwarranted benefit of the post-petition lender."  *In re Mid-State Raceway, Inc.*, 323 B.R. at 59.

38.     More specifically, a lender cannot extend DIP financing to "seize control of the reins of reorganization."  *In re Tenney Village Co., Inc.*, 104 B.R. at 568 (denying approval of DIP financing extended by prepetition lender "under the guise of financing a

reorganization," when in reality the lender would have "the ultimate say over the very goal of [the] Chapter 11 case, a confirmed plan of reorganization").  This is especially true considering a debtor in possession's fiduciary duty runs to **all** creditors.  *See, e.g.*, *In re Penick Pharmaceutical, Inc.*, 227 B.R. 229, 232-33 (Bankr. S.D.N.Y. 1998) ("[I]n the case of an inanimate debtor in possession such as a corporation, the fiduciary duties borne by a trustee for a debtor out of possession fall on the debtor's directors, officers and managing employees … who have a duty to maximize the value of the estate … and who are burdened to ensure that the resources that flow through the debtor in possession's hands are used to benefit the unsecured creditors and other parties in interest.") (citations omitted).

      39.      To that end, courts examining proposed DIP financings must consider whether "the proposed terms would prejudice the powers and rights that the Code confers for the benefit of all creditors and leverage the Chapter 11 process by granting the lender excessive control over the debtor or its assets so as to unduly prejudice the rights of other parties in interest."  *In re Mid-State Raceway, Inc.*, 323 B.R. at 58.

      40.      DIP financings cannot dictate the terms of a chapter 11 plan.  Indeed, "[t]he bankruptcy court cannot, under the guise of section 364, approve financing arrangements that amount to a plan of reorganization but evade confirmation requirements."  *In re Mid-State Raceway, Inc.*, 323 B.R. at 59 (citing *In re Defender Drug Stores, Inc.*, 145 B.R. 312, 317 (9th Cir. BAP 1992)); *see also In re Braniff Airways, Inc.*, 700 F.2d 935, 940 (5th Cir. 1983) (explaining that the danger of *sub rosa* plans is that a debtor in possession may enter into a transaction that will, in effect, "short circuit the requirements of the chapter 11 for confirmation of a reorganization plan").

41.     Here, the DIP Financing is inextricably linked with the PSA, an agreement which, for the reasons discussed above, constitutes a *sub rosa* plan on its own accord.  The failure of the Debtors to file the PSA Assumption Motion, the Court's denial thereof, or the Debtors' termination or rejection of the PSA each constitute an Event of Default under the DIP Agreement.  As such, Debtors have tied themselves to a plan *sub rosa* by agreeing to condition the DIP Financing on their filing and (and confirmation of) the EchoStar-TSN Plan.

42.     Triggering any of the Events of Default contained in Section 7.01(cc) of the DIP Agreement automatically allows EchoStar to, among other things, terminate the DIP Financing.  *See* DIP Agreement § 7.02.  By tying their postpetition financing to the PSA, the Debtors have given their DIP lender, EchoStar, "the ultimate say over the very goal of this Chapter 11 case, a confirmed plan of reorganization."  *In re Tenney Village Co., Inc.*, 104 B.R. at 568.  As in *Tenney Village*, here, a plan can no longer be confirmed over EchoStar's objection under the cram-down provisions of section 1129(b)(2)(A) of the Bankruptcy Code.

43.     The mere proposal, let alone confirmation, of a non-"Acceptable Plan"[3] (which, in reality, means any plan other than the EchoStar-TSN Plan), would constitute an Event of Default under the DIP Agreement.  Therefore, if approved, the DIP Financing would commit the Debtors to the EchoStar-TSN Plan, without the benefit of the disclosure and confirmation process.

E.     **THE PSA AND DIP AGREEMENT ARE PRODUCTS OF, AND WILL NECESSARILY RESULT IN, THE DEBTORS' BREACH OF THEIR FIDUCIARY DUTIES TO THEIR ESTATES AND ALL OF THEIR CREDITORS.**

---

[3]  The DIP Agreement defines "Acceptable Plan" as "a Plan in form and substance reasonably acceptable to the Required Lenders (it being understood that a Plan the terms of which are consistent in all respects with (and include all the terms of) the Term Sheet and is otherwise reasonably acceptable to the Required Lenders shall be deemed acceptable to the Required Lenders)."  *See* DIP Agreement § 1.01.

44.     Debtors in possession owe a fiduciary duty to their estates and creditors. *See Cenargo International, PLC*, 294 B.R. 571, 599 n. 32 (Bankr. S.D.N.Y. 2003); *see also In re Mondie Forge, Inc.*, 148 B.R. 499, 502 (Bankr. N.D. Ohio 1992) ("the [t]rustee has a duty to realize the maximum return for the estate for further distribution to the [d]ebtor's creditors").

45.     The fiduciary duty owed by trustees and debtors in possession is owed to each creditor of the estate. *In re Ngan Gung Rest.*, 254 B.R. 566, 570 (Bankr. S.D.N.Y. 2000) ("A trustee also owes a fiduciary duty to *each creditor* of the estate.  As such, he has a duty to treat all creditors fairly…." (internal quotations omitted) (emphasis added); *In re Centennial Textiles, Inc.*, 227 B.R. 606, 612 (Bankr. S.D.N.Y. 1998) ("As fiduciaries, the debtor in possession and its managers are obligated to treat all parties to the case fairly, maximize the value of the estate, and protect and conserve the debtor's properly.") (internal quotations omitted).

46.     It is well established that an agreement that involves committing a breach of a fiduciary duty is illegal and unenforceable on the grounds of public policy.  *See* RESTATEMENT (SECOND) OF CONTRACTS § 193 (2010) ("A promise by a fiduciary to violate his fiduciary duty or a promise that tends to induce such a violation is unenforceable on grounds of public policy.").  Courts therefore refuse to approve or enforce agreements that would result in the breach of a debtor in possession's fiduciary duty to its estate or creditors.  *See, e.g.*, *In re Tenney Village Co., Inc.*, 104 B.R. at 569 (refusing to approve DIP financing because "the execution of the Financing Agreement violates the Debtor's fiduciary obligations to the estate"); *In re U.S. Lines, Inc.*, 103 B.R. 427, 431 n.1 (Bankr. S.D.N.Y. 1989) (refusing to enforce an agreement by debtor in possession to abstain from objecting to fee applications because "[a]

promise by a fiduciary tending to violate his fiduciary duty is unenforceable on grounds of public policy").

47.     Here, the Debtors have breached their fiduciary duties to all of their creditors by agreeing to consummate these transactions.  This is especially true with respect to the Debtors' agreement to the illusory "fiduciary out" provision of the PSA and the onerous "Milestone Requirements."  Moreover, by agreeing to the terms of the PSA and DIP Agreement, the Debtors effectively are precluded from pursuing any reorganization plan other than the EchoStar-TSN Plan, even if such alternative plan would better serve their estates' and creditors' interests.

1.     **The DIP Agreement's Event of Default Provisions Render the PSA's "Fiduciary Out" Provision Illusory**

48.     As discussed above, the protections allegedly contained in the PSA's "fiduciary out" provision are illusory only.  Section 3 of the PSA provides the following:

> Notwithstanding anything to the contrary herein, nothing in this Agreement or in the Restructuring Documents shall require any TSN Debtor, any subsidiary or affiliate of any TSN Debtor, or any of their respective directors or officers (in such person's capacity as a director or officer) or agents or advisors to take any action, or to refrain from taking any action, to the extent that taking such action or refraining from taking such action would result in a breach of such person's fiduciary obligations under applicable law.

> For the avoidance of doubt, the Company may terminate its obligations under this Agreement by written notice to the Plan Sponsors only if: (a) on or after the Petition Date but prior to entry of a Bankruptcy Court Order authorizing the TSN Debtors' assumption of this Agreement pursuant to section 365(a) of the Bankruptcy Code (the "Assumption"), the Company determines in good faith (after consultation with their outside legal counsel and their independent financial advisors) that pursuit of a plan of reorganization or liquidation for the Company, or dissolution,

winding up, or restructuring of the Company, other than the Plan (an "Alternative Restructuring Transaction") would be superior to consummation of the Plan, taking into account all legal, financial, regulatory, and other aspects of such alternative course of action including, without limitation, (i) all financial considerations, (ii) litigation risks, (iii) potential delays, (iv) the prospects for completion of such Alternative Restructuring Transaction, and (v) the identity of any other parties to such Alternative Restructuring Transaction; or (b) at any time after the Assumption, the TSN Debtors determine in good faith (after consultation with their outside legal counsel and their independent financial advisors) that pursuit of an Alternative Restructuring Transaction would be more favorable to their bankruptcy estates than consummation of the Plan.

Nothing herein shall prohibit the TSC Entities from continuing any discussions relating to an Alternative Restructuring Transaction involving the TSC Entities that is not inconsistent with or contrary to the Restructuring Documents or the Plan.

PSA § 3. However, section 7.01(cc) of the DIP Agreement provides that it is an Event of Default if the PSA is terminated or rejected by the Debtors. Thus, the Debtors will lose their financing if they agree to pursue a competing plan of reorganization -- even if it provides greater value to the Debtors' estates.

2.     **The Milestones Established in the PSA and DIP Agreements Effectively Preclude the Debtors from Exploring Other Potential Reorganization Plans.**

49.     The Debtors are required under the PSA and DIP Agreement to meet certain accelerated milestones, which include, among others: (i) filing an "Acceptable Plan" by November 5, 2010; (ii) receiving Court approval of a disclosure statement by December 14, 2010; (iii) commencement of hearing on confirmation of an "Acceptable Plan" by January 31, 2010; and (iv) entry of a final, non-appealable Court order confirming such "Acceptable Plan" by February 14, 2010. *See* DIP Agreement § 1.01. Failure to meet these strict deadlines constitutes an Event of Default under the DIP Agreement, and therefore threatens the termination and

acceleration of the Debtors' postpetition financing.  *See* DIP Agreement § 7.01(s); *see also* Term

Sheet at 10-13 (listing virtually identical deadlines).

50. Failure to meet any of these deadlines constitutes an Event of Default

under the DIP Agreement – *see* DIP Agreement § 7.01(s) – and a "Sponsor Termination Event"

under the Term Sheet.  *See* Term Sheet at 10-13.  These milestones force the EchoStar-TSN Plan

through this bankruptcy proceeding at an overly-hastened pace, foreclosing any possibility that

the Debtors will be able to consider or pursue other restructuring options.

51. Instead, the imposition of these strict guidelines as a condition for receipt

of postpetition financing all but ensures that the Debtors will pursue the EchoStar-TSN Plan

exclusively, to the detriment of their estates and creditor constituencies for the sole benefit of

EchoStar.   Moreover, these milestones effectively negate the PSA's so-called "fiduciary out"

provision.  Therefore, by entering into the PSA and DIP Agreement, the Debtors have bargained

away their ability to fulfill their fiduciary duty to their estates and creditors.  By conditioning the

DIP Agreement on the hasty assumption of the PSA, EchoStar has overreached – well beyond

what the Bankruptcy Code permits.

# V.    CONCLUSION

52.    For the foregoing reasons, the Objectors respectfully request that the Court

(i) sustain the Objection; (ii) deny the PSA Assumption Motion in its entirety; (iii) deny the DIP

Motion in its entirety; and (iv) grant such other and further relief as the Court deems just and

proper.

Dated: November 9, 2010
     New York, New York

                    QUINN EMANUEL URQUHART
                      & SULLIVAN, LLP


                    */s/   Susheel Kirpalani*
                    Susheel Kirpalani
                    susheelkirpalani@quinnemanuel.com
                    James C. Tecce
                    jamestecce@quinnemanuel.com
                    Scott C. Shelley
                    scottshelley@quinnemanuel.com
                    Daniel S. Holzman
                    danielholzman@quinnemanuel.com
                    51 Madison Avenue, 22nd Floor
                    New York, New York 10010
                    Telephone: (212) 849-7000
                    Facsimile: (212) 849-7100

                    *Counsel to Solus Alternative Asset*
                    *Management LP and Remus Holdings*
                    *LLC, as nominee of certain holders of 6.5%*
                    *Notes of TerreStar Networks Inc.*