**Exhibit 1**

**December 2, 2010 Version of Disclosure Statement**

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
(212) 872-1000 (Telephone)
(212) 872-1002 (Facsimile)
Ira S. Dizengoff
Arik Preis

1333 New Hampshire Avenue, NW
Washington, DC 20036
(202) 887-4000 (Telephone)
(202) 887-4288 (Facsimile)
Joanna F. Newdeck
Ashleigh L. Blaylock

*Counsel to the Debtors and Debtors in Possession*

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| TERRESTAR NETWORKS INC., *et al.*,[1] | ) | Case No. 10-15446 (SHL) |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |

**FIRST AMENDED DISCLOSURE STATEMENT FOR THE JOINT CHAPTER 11 PLAN OF TERRESTAR NETWORKS INC., TERRESTAR NATIONAL SERVICES, INC., 0887729 B.C. LTD., TERRESTAR LICENSE INC., TERRESTAR NETWORKS HOLDINGS (CANADA) INC., AND TERRESTAR NETWORKS (CANADA) INC.**

**THIS IS NOT A SOLICITATION OF AN ACCEPTANCE, OR REJECTION OF THE PLAN WITHIN THE MEANING OF SECTION 1125 OF THE BANKRUPTCY CODE. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT. THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL, BUT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT.**

Dated: December 2, 2010

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal taxpayer-identification number, are: Motient Communications Inc. [3833]; Motient Holdings Inc. [6634]; Motient License Inc. [2431]; Motient Services Inc. [5106]; Motient Ventures Holding Inc. [6191]; MVH Holdings Inc. [9756]; TerreStar New York Inc. [6394] (the foregoing entities are collectively referred to as the "***Non-TSN Debtors***"); TerreStar License Inc. [6537]; TerreStar National Services Inc. [6319]; TerreStar Networks Inc. [3931]; (TerreStar License Inc., TerreStar National Services Inc. and TerreStar Networks Inc. are collectively referred to as the "***Domestic TSN Debtors***" and, together with the Non-TSN Debtors, the "***Domestic Debtors***"); 0887729 B.C. Ltd. [1345]; TerreStar Networks (Canada) Inc. [8766]; and TerreStar Networks Holdings (Canada) Inc. [1337] (0887729 B.C. Ltd., TerreStar Networks (Canada) Inc. and TerreStar Networks Holdings (Canada) Inc. are collectively referred to as the "***Canadian Debtors***" and, together with the Domestic TSN Debtors, the "***TSN Debtors***").

| IMPORTANT INFORMATION FOR YOU TO READ |
| --- |

**THE DEADLINE TO VOTE ON THE JOINT CHAPTER 11 PLAN OF TERRESTAR NETWORKS INC., TERRESTAR NATIONAL SERVICES, INC., 0887729 B.C. LTD., TERRESTAR LICENSE INC., TERRESTAR NETWORKS HOLDINGS (CANADA) INC., AND TERRESTAR NETWORKS (CANADA) INC. IS JANUARY [    ], 2011 AT 5:00 P.M. PREVAILING EASTERN TIME.**

**FOR YOUR VOTE TO BE COUNTED, YOUR BALLOT MUST BE <u>ACTUALLY</u> <u>RECEIVED</u> BY THE VOTING AND CLAIMS AGENT BEFORE THE VOTING DEADLINE AS DESCRIBED HEREIN.**

The TSN Debtors are providing the information in this Disclosure Statement for the *Joint Chapter 11 Plan of TerreStar Networks, Inc., TerreStar National Services, Inc., 0887729 B.C. Ltd., TerreStar License Inc., TerreStar Networks Holdings (Canada) Inc. and TerreStar Networks (Canada) Inc.* [Docket No. 82] (as may be amended, modified or supplemented from time to time, the "*Plan*")[2] to holders of Claims and Interests entitled to vote on the Plan for the purpose of soliciting votes to accept the Plan. Capitalized terms used but not otherwise defined in this Disclosure Statement shall have the meaning given to those terms in the Plan; the terms of which are adopted and incorporated here by reference. <u>Nothing in this Disclosure Statement may be relied upon or used by any entity for any other purpose.</u>

This Disclosure Statement may not be deemed as providing any legal, financial, securities, tax or business advice. The TSN Debtors urge any holder of a Claim or Interest to consult with its own advisors for any legal, financial, securities, tax or business advice in reviewing this Disclosure Statement, the Plan and each of the proposed transactions contemplated thereby. The Bankruptcy Court's approval of the adequacy of the disclosure contained in this Disclosure Statement does not constitute the Bankruptcy Court's approval of the merits of the Plan. The TSN Debtors have not authorized any entity to give any information about or concerning the Plan other than the information contained in this Disclosure Statement. The TSN Debtors have not authorized any representations concerning the TSN Debtors or the value of their property other than as set forth in this Disclosure Statement.

The TSN Debtors urge every holder of a Claim entitled to vote on the Plan to (1) read the entire Disclosure Statement and Plan carefully, (2) consider all of the information in this Disclosure Statement, including, importantly, the risk factors described in section XI of this Disclosure Statement and (3) consult with your own advisors with respect to reviewing this Disclosure Statement, the Plan and all documents that are attached or were filed in connection with the Plan and Disclosure Statement <u>before</u> deciding whether to vote to accept or reject the Plan.

This Disclosure Statement contains summaries of the Plan, certain statutory provisions, events in the TSN Debtors' chapter 11 cases and certain documents related to the Plan. Although the Debtors believe that these summaries are fair and accurate, the same are all qualified in their entirety. In the event of any inconsistency or discrepancy between a description in this Disclosure Statement and the terms and provisions of the Plan or other referenced documents, the Plan or other referenced documents will govern for all purposes. Except where otherwise specifically noted, factual information contained in this Disclosure Statement has been provided by the Debtors' management. The TSN Debtors do not represent or warrant that the information contained in or attached to this Disclosure Statement is without any material inaccuracy or omission.

Although the TSN Debtors have used their reasonable business judgment to ensure the accuracy of the financial information contained in, or incorporated by reference into, this Disclosure Statement, much of that financial information has not been audited. The TSN Debtors are generally making the statements and providing the financial information contained in this Disclosure Statement as of the date hereof where feasible, unless otherwise specifically noted. Although the TSN Debtors may subsequently update the

---

[2] The Plan solely applies to the TSN Debtors. The Debtors intend to file a chapter 11 plan for the remaining seven Debtors in the chapter 11 cases jointly administered under Case No. 10-15446 (SHL) at a later date.

information in this Disclosure Statement, the TSN Debtors have no affirmative duty to do so, and parties reviewing this Disclosure Statement should be aware that, at the time of their review, the facts may have changed since this Disclosure Statement was filed.

Neither this Disclosure Statement nor the Plan is or should be construed as an admission of fact, liability, stipulation or waiver, and nothing stated herein shall be admissible in any proceeding involving the TSN Debtors or any other person, or be deemed conclusive evidence of the tax or other legal effects of the Plan on the TSN Debtors or holders of Claims or Interests. Rather, holders of Claims and Interests and other parties in interest should construe this Disclosure Statement as a statement made in settlement negotiations related to contested matters, adversary proceedings and other pending or threatened litigation or actions. The TSN Debtors or the Reorganized Debtors may seek to investigate, file and prosecute Causes of Action and may object to Claims after the Confirmation or Effective Date irrespective of whether this Disclosure Statement identifies any such Causes of Action or objections to Claims.

## SPECIAL NOTICE REGARDING FEDERAL AND STATE SECURITIES LAWS

Neither this Disclosure Statement nor the Plan has been filed with the United States Securities and Exchange Commission (the "*SEC*") or any state authority. The Plan has not been approved or disapproved by the SEC or any state securities commission and neither the SEC nor any state securities commission has passed upon the accuracy or adequacy of this Disclosure Statement or the merits of the Plan. Any representation to the contrary is a criminal offense.

This Disclosure Statement has been prepared pursuant to section 1125 of the Bankruptcy Code and Bankruptcy Rule 3016(b) and is not necessarily in accordance with federal or state securities laws or other similar laws. The securities to be issued on or after the Effective Date will not have been the subject of a registration statement filed with the SEC under the Securities Act of 1933, as amended (the "*Securities Act*") or any securities regulatory authority of any state under any state securities law ("*Blue Sky Law*"). The TSN Debtors are relying on section 4(2) of the Securities Act and similar Blue Sky Law provisions, as well as, to the extent applicable, the exemption from the Securities Act and equivalent state law registration requirements provided by section 1145(a) of the Bankruptcy Code, to exempt the issuance of new securities in connection with the solicitation and the Plan from registration under the Securities Act and Blue Sky Law.

This Disclosure Statement contains "forward looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. Such statements consist of any statement other than a recitation of historical fact and can be identified by the use of forward looking terminology such as "may," "expect," "anticipate," "estimate" or "continue" or the negative thereof, as well as any similar or comparable language. You are cautioned that all forward looking statements are necessarily speculative and there are certain risks and uncertainties that could cause actual events or results to differ materially from those referred to in such forward looking statements. The Liquidation Analysis, financial projections and other information contained herein, and attached hereto are estimates only, and the timing and amount of actual distributions to Holders of Allowed Claims and Interests may be affected by many factors that cannot be predicted. Any analyses, estimates or recovery projections may or may not turn out to be accurate.

## NOTICE REGARDING SECURITIES LAWS IN CANADA

Any distribution of securities in Canada pursuant to the Plan is being made under a prospectus exemption for a distribution in connection with a reorganization or arrangement under a statutory procedure. TSN is not a reporting issuer in any province or territory of Canada. Accordingly, any resale of such securities must be made in accordance with an exemption from the prospectus requirements of the securities laws of the applicable Canadian jurisdictions. Recipients of the securities are advised to seek legal advice prior to any resale of the securities.

Making investment decisions based on the information contained in this Disclosure Statement and/or the Plan is therefore highly speculative. The TSN Debtors recommend that potential recipients of any securities issued pursuant to the Plan consult their own legal counsel concerning the securities laws governing the transferability of any such securities.

If you would like to obtain copies of this Disclosure Statement, the Plan or any of the documents attached hereto or referenced herein, or if you have questions about the solicitation and voting process or these chapter 11 cases generally, please contact Garden City Group by (i) calling 1-866-682-1770, (ii) emailing TerreStarInfo@gcginc.com or (iii) visiting www.TerreStarInfo.com.

# TABLE OF CONTENTS

Page

I. EXECUTIVE SUMMARY ...............................................................................................1
    A. Overview of this Disclosure Statement and the Executive Summary ............................1
    B. Purpose and Effect of the Plan .....................................................................................1
    C. Summary of Treatment of Claims and Interests and Description of Recoveries Under the Plan ...........................................................................................................3
    D. Voting Deadline ..............................................................................................................6
    F. Additional Plan-Related Documents ..............................................................................7

II. IMPORTANT INFORMATION ABOUT THIS DISCLOSURE STATEMENT ...................................8

III. QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT AND THE JOINT PLAN ...........................................................................................9
    A. What is Chapter 11? ......................................................................................................9
    B. Why are the TSN Debtors sending me this Disclosure Statement? ...............................9
    C. Am I entitled to vote on the Plan? What will I receive from the TSN Debtors if the Plan is consummated? ...........................................................................................9
    D. If the Plan provides that I get a distribution, do I get it upon Confirmation or when the Plan goes effective, and what do you mean when you refer to "Confirmation," "Effective Date" and "consummation?" ...............................................................10
    E. If the Plan solely applies to the TSN Debtors, what happens to a claim I may have against a Debtor not included in this Plan? ...............................................................10
    F. What is included in the solicitation packages to be sent to creditors who are eligible to vote on the Plan? ...........................................................................................10
    G. What is the deadline to vote on the Plan? ....................................................................10
    H. How do I vote for or against the Plan? .........................................................................10
    I. When is the Confirmation Hearing set to occur? .........................................................11
    J. What is the deadline to object to Confirmation? ..........................................................12
    K. What is the effect of Confirmation on the Debtors' ongoing business? .......................12
    L. Do the Debtors recommend voting in favor of the Plan? .............................................12

IV. THE DEBTORS' HISTORY ...........................................................................................13
    A. Company Overview .......................................................................................................13
    B. The Company's Business Operations ............................................................................14
    C. The Company's Organizational Structure ....................................................................20
    D. Prepetition Litigation ...................................................................................................23
    E. The Debtors' Prepetition Capital Structure .................................................................24

| V. | **EVENTS LEADING TO COMMENCEMENT OF THE CHAPTER 11 CASES** ...................................27 |
|---|---|
| VI. | **INITIAL MOTIONS OF THE CHAPTER 11 CASES AND CERTAIN RELATED RELIEF** ..........30 |
| | A. "First-Day" Motions and Related Relief.........................................................................30 |
| | B. Debtor-In-Possession Financing .....................................................................................31 |
| | C. The Motion to Assume the Restructuring Support Agreement .......................................33 |
| | D. Canadian Proceedings ....................................................................................................33 |
| VII. | **DEVELOPMENTS DURING THE CHAPTER 11 CASES**....................................................35 |
| | A. Appointment of the Statutory Committee .......................................................................35 |
| | B. The Claims Process ........................................................................................................35 |
| | C. Rejection of Executory Contracts and Unexpired Leases ..............................................35 |
| | D. Exclusivity .....................................................................................................................36 |
| | E. The Motion to Dismiss Certain Chapter 11 Cases ..........................................................36 |
| | F. The TSN Debtors' Licenses and Related Applications ...................................................37 |
| | G. The TSN Debtors' Marketing Process ...........................................................................38 |
| | H. Ad Hoc Group of 15% Senior Secured Noteholders.......................................................39 |
| | I. Motions Relating to the Rights Offering .......................................................................39 |
| VIII. | **DESCRIPTION OF THE JOINT PLAN OF REORGANIZATION** ......................................40 |
| | A. TREATMENT OF ADMINISTRATIVE CLAIMS, DIP CLAIMS, U.S. TRUSTEE FEES AND PRIORITY TAX CLAIMS..................................................................................41 |
| | B. CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS ...................43 |
| | C. ACCEPTANCE REQUIREMENTS..................................................................................47 |
| | D. MEANS FOR IMPLEMENTATION OF THE PLAN .......................................................47 |
| | E. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES ..............54 |
| | F. PROVISIONS GOVERNING DISTRIBUTIONS .............................................................56 |
| | G. PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED AND DISPUTED CLAIMS.......................................................................................................60 |
| | H. SETTLEMENT, RELEASE, INJUNCTION AND RELATED PROVISIONS...................61 |
| | I. CONDITIONS PRECEDENT TO CONFIRMATION OF THE PLAN AND THE EFFECTIVE DATE ..........................................................................................................65 |
| | J. MODIFICATION, REVOCATION OR WITHDRAWAL OF THE PLAN ....................66 |
| | K. RETENTION OF JURISDICTION ..................................................................................67 |
| | L. MISCELLANEOUS PROVISIONS .................................................................................69 |
| IX. | **SOLICITATION AND VOTING PROCEDURES** .................................................................71 |
| | A. Holders of Claims Entitled to Vote on the Plan ..............................................................71 |
| | B. Voting Record Date ........................................................................................................72 |
| | C. Voting on the Plan..........................................................................................................72 |
| | D. Ballots, Note Ballots or Master Ballots Not Counted ....................................................72 |

**X.      CONFIRMATION OF THE PLAN**................................................................................**74**

    A.      The Confirmation Hearing .................................................................................... 74

    B.      Deadline to Object to Confirmation of the Plan.................................................. 74

    C.      Confirmation Hearing .......................................................................................... 74

    D.      Requirements for Confirmation of the Plan ........................................................ 74

    E.      Best Interests of Creditors/Liquidation Analysis ............................................... 75

    F.      Feasibility/Financial Projections......................................................................... 76

    G.      Acceptance by Impaired Classes.......................................................................... 76

    H.      Confirmation Without Acceptance by All Impaired Classes/Fair and Equitable Test ................... 76

    I.      Valuation of the TSN Debtors.............................................................................. 78

    J.      Effect of Confirmation and Consummation of the Plan ...................................... 78

**XI.      RISK FACTORS** ................................................................................................................**79**

    A.      Risks Related to Confirmation of the Plan.......................................................... 79

    B.      Risks That May Affect the Value of the Securities to Be Issued Under the Plan ........................ 81

    C.      Risks Related to the TSN Debtors' Businesses.................................................... 82

    D.      Risks Relating to Government Regulations ......................................................... 90

    E.      Risks Relating to Forward Looking Statements .................................................. 93

    F.      Risks Relating to Recoveries Under the Plan ..................................................... 93

    G.      Disclosure Statement Disclaimer ........................................................................ 94

**XII.      APPLICATION OF SECURITIES LAWS** ....................................................................**98**

    A.      Issuance and Resale of Securities Under the Plan............................................... 98

    B.      New Common Stock and New Preferred Stock ................................................... 99

    C.      Rights Offering: Rights Offering Preferred Stock .............................................. 99

**XIII.      CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN**..............................**100**

    B.      Certain U.S. Federal Income Tax Consequences to the U.S. Holders under the Plan.................. 103

    C.      General U.S. Federal Income Tax Consequences to Non-U.S. Holders ...................................... 107

    D.      Importance of Obtaining Professional Tax Assistance ...................................... 109

**XIV.      RECOMMENDATION** ..................................................................................................**110**

## EXHIBITS

EXHIBIT A        Plan

EXHIBIT B        Disclosure Statement Order and Canadian Disclosure Statement Order

EXHIBIT C        Organizational Chart of the Debtors and their Non-Debtor Affiliates

EXHIBIT D        Liquidation Analysis

EXHIBIT E        Financial Projections

EXHIBIT F        Valuation Analysis

EXHIBIT G        Solicitation, Voting and Tabulation Procedures

EXHIBIT H        Rights Offering Procedures

---

THE TSN DEBTORS HEREBY ADOPT AND INCORPORATE EACH EXHIBIT ATTACHED TO THIS DISCLOSURE STATEMENT BY REFERENCE AS THOUGH FULLY SET FORTH HEREIN.

---

# I.
# EXECUTIVE SUMMARY

### A.      Overview of this Disclosure Statement and the Executive Summary

TerreStar Networks Inc. ("***TSN***"), a Delaware corporation with its corporate offices in Reston, Virginia, and its affiliated debtors and debtors in possession (collectively, the "***Debtors***") each filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York (the "***Bankruptcy Court***") on October 19, 2010 (the "***Petition Date***"). The Debtors' chapter 11 cases are jointly administered under lead case number 10-15446 (SHL). TSN, TerreStar National Services, Inc., 0887729 B.C. Ltd., TerreStar License Inc., TerreStar Networks Holdings (Canada) Inc. and TerreStar Networks (Canada) Inc. (collectively, the "***TSN Debtors***" and, as reorganized pursuant to the Plan, the "***Reorganized Debtors***") submit this Disclosure Statement pursuant to section 1125 of the Bankruptcy Code to holders of Claims against and Interests in the TSN Debtors because the Debtors are asking holders of Claims to accept the *Joint Chapter 11 Plan of TerreStar Networks, Inc., TerreStar National Services, Inc., 0887729 B.C. Ltd., TerreStar License Inc., TerreStar Networks Holdings (Canada) Inc. and TerreStar Networks (Canada) Inc.* (as amended from time to time, the "***Plan***"), dated November 5, 2010.[3] A copy of the Plan is attached hereto as **Exhibit A**.

The Plan solely applies to the TSN Debtors, but is supported by each of the Debtors as well as TerreStar Corporation, the Debtors' ultimate parent. The Debtors anticipate that they will file a chapter 11 plan to address the Non-TSN Debtors at a future date. The Debtors also anticipate that TerreStar Corporation and its wholly-owned subsidiary TerreStar Holdings Inc. will file for chapter 11 in the near term.

Before soliciting acceptances of a proposed chapter 11 plan of reorganization, section 1125 of the Bankruptcy Code requires a debtor to prepare a disclosure statement that contains information of a kind, and in sufficient detail, to permit a hypothetical reasonable investor to make an informed judgment regarding acceptance of the plan of reorganization. The Bankruptcy Court approved this Disclosure Statement at a hearing held on [DATE]. A copy of the order approving the Disclosure Statement is attached hereto as **Exhibit B** (the "***Disclosure Statement Order***").

A hearing to consider Confirmation of the Plan is scheduled to be held before the Honorable Sean H. Lane at 10:00 a.m. Prevailing Eastern Time on [DATE], 2011, at the Bankruptcy Court, located at One Bowling Green, New York, New York 10004-1408. Additional details with respect to Confirmation are provided in section X of this Disclosure Statement, entitled "Confirmation of the Plan."

This Disclosure Statement contains, among other things, descriptions and summaries of certain provisions of, and financial transactions contemplated by, the Plan being proposed by the TSN Debtors. Certain provisions of the Plan (and the descriptions and summaries contained herein) remain the subject of continuing negotiations among the TSN Debtors and various parties, have not been finally agreed upon and may be modified.

***This Executive Summary is only a general overview of this Disclosure Statement and the material terms of, and transactions proposed by, the Plan, and is qualified in its entirety by reference to, and should be read in conjunction with, the more detailed discussions appearing elsewhere in this Disclosure Statement and the exhibits attached to this Disclosure Statement, including the Plan.***

### B.      Purpose and Effect of the Plan

The TSN Debtors are reorganizing under chapter 11 of the Bankruptcy Code, which is the principal business reorganization chapter of the Bankruptcy Code. Under chapter 11 of the Bankruptcy Code, a debtor may

---

[3]    Capitalized terms used but not otherwise defined in this Disclosure Statement will have the meaning ascribed to those terms in the Plan. **Please note that the description of the Plan provided throughout this Disclosure Statement is only a summary provided for convenience. In the case of any inconsistency between the summary of the Plan in this Disclosure Statement and the Plan, the Plan will govern.**

reorganize its business for the benefit of its stakeholders. The consummation of a plan of reorganization is the principal objective of a chapter 11 case. A plan of reorganization sets forth how a debtor will treat its claims and interests.

A bankruptcy court's confirmation of a plan binds the debtor, any entity or person acquiring property under the plan, any creditor of or equity security holder in a debtor and any other entities and persons as may be ordered by the bankruptcy court to the terms of the confirmed plan, whether or not such creditor or equity security holder is impaired under or has voted to accept the plan or receives or retains any property under the plan.

Among other things (subject to certain limited exceptions and except as otherwise provided in the Plan or the Confirmation Order), the Confirmation Order will discharge the TSN Debtors from any debt arising before the Effective Date, substitute the obligations set forth in the Plan for those pre-bankruptcy claims and terminate all of the rights and interests of pre-bankruptcy equity security holders. Under the Plan, Claims and Interests are divided into Classes according to their relative priority and other criteria.

Each of the TSN Debtors is a proponent of the Plan within the meaning of section 1129 of the Bankruptcy Code. As described throughout this Disclosure Statement, the Plan provides for a comprehensive restructuring of the TSN Debtors' pre-bankruptcy obligations, preserves the going-concern value of the TSN Debtors' businesses, maximizes recoveries available to all constituents and provides for an equitable distribution to the TSN Debtors' stakeholders. The Plan is premised on the consummation of restructuring transactions supported by the TSN Debtors' largest secured creditor, EchoStar Corporation ("*EchoStar*"), which include, among other things, (i) the equitization of the Debtors' approximately $1 billion of 15% senior secured note obligations and (ii) a $125 million Rights Offering of New Preferred Stock, $100 million of which is backstopped by EchoStar.

Following the Plan, the TSN Debtors will emerge from chapter 11 with an improved, highly deleveraged balance sheet. As of the Petition Date, the TSN Debtors had funded debt facilities with an aggregate accreted amount of approximately $1.2 billion, consisting of: (a) $943.9 million in aggregate principal and accrued interest of 15% Senior Secured PIK Notes due 2014; (b) $178.7 million in aggregate principal and accrued interest of 6.5% Senior Exchangeable PIK Notes due 2014; and (c) $85.9 million in principal and accrued interest in the TerreStar-2 Purchase Money Credit Agreement. In contrast, under the Plan, the Reorganized Debtors' sole funded debt will be the amounts owing under the TerreStar-2 Purchase Money Credit Agreement. Additionally, under the Plan, holders of 15% Senior Secured PIK Notes and 6.5% Senior Exchangeable PIK Notes, as well as holders of Other Unsecured Claims, will receive both common stock of Reorganized TSN and rights to purchase New Preferred Stock in the Rights Offering, all in the percentages and on the terms set forth herein and in the Plan.

In developing the Plan, the TSN Debtors, with the assistance of their professional advisors, conducted a careful review of their current operations, their prospects as an ongoing business, financial projections included in the business plan developed by management and estimated recoveries in a liquidation scenario. Following this review, the TSN Debtors concluded that recoveries to their stakeholders would be maximized by the TSN Debtors' continued operations as a going concern and by the TSN Debtors' emergence from chapter 11 with the structure proposed in the Plan. Although the TSN Debtors continue to market their assets to prospective purchasers in an effort to maximize value for their stakeholders, at this point, no offer has been received.

The TSN Debtors believe that their businesses and assets have significant value that would not be realized in a liquidation, either in whole or in substantial part. Consistent with the valuation, liquidation and other analyses prepared by the TSN Debtors with the assistance of their advisors (*see* **Exhibits D**, **E** and **F** attached hereto), the value of the TSN Debtors is substantially greater as a going concern than in a liquidation. The TSN Debtors also believe that any alternative to Confirmation (other than a sale of the TSN Debtors' assets that will result in increased value for all stakeholders), such as an attempt by another party to file a competing plan, would result in significant delays, litigation and additional costs, and could negatively affect value by causing unnecessary uncertainty with the TSN Debtors' key customer and supplier constituencies, which could ultimately lower the recoveries for all holders of Allowed Claims and Interests.

---

**ACCORDINGLY, FOR ALL OF THESE REASONS AND THE OTHER REASONS DESCRIBED IN THIS DISCLOSURE STATEMENT, THE DEBTORS URGE YOU TO RETURN YOUR BALLOT ACCEPTING THE PLAN BY THE VOTING DEADLINE.**

---

### C. Summary of Treatment of Claims and Interests and Description of Recoveries Under the Plan

*(i)* ***Summary of Classification of Claims and Interests Under the Plan***

The Plan organizes the TSN Debtors' various creditor and equity constituencies into groups called "Classes." For each Class, the Plan describes (a) the underlying "Claim" or "Interest," (b) the recovery available to the holders of Claims or Interests in that Class under the Plan, (c) whether the Class is "impaired" under the Plan, meaning that each holder will receive less than the full value on account of its Claim or Interest or that the rights of holders under law will be altered in some way (such as receiving stock instead of holding a Claim) and (d) the form of consideration (*e.g.*, cash, stock or a combination thereof), if any, that such holders will receive on account of their respective Claims or Interests.

The table below provides a summary of the classification and description of Claims and Interests under the Plan. This information is provided in summary form below for illustrative purposes only and is qualified in its entirety by reference to the provisions of the Plan. For a more detailed description of the treatment of Claims and Interests under the Plan, see section VIII of this Disclosure Statement, entitled "Description of the Joint Plan of Reorganization."

| Class Number | Name of Class | Status | Description of Class |
|:---:|:---|:---:|:---|
| 1 | Other Priority Claims | Unimpaired | Class 1 consists of Other Priority Claims against each of the TSN Debtors. |
| 2 | Other Secured Claims | Unimpaired | Class 2 consists of Other Secured Claims against each of the TSN Debtors. |
| 3 | Senior Secured Notes Claims | Impaired | Class 3 consists of the Senior Secured Notes Claims against TSN, TerreStar License Inc., TerreStar National Services Inc., TerreStar Networks Holdings (Canada) Inc. and TerreStar Networks (Canada) Inc. |
| 4 | PMCA Claims | Unimpaired | Class 4 consists of the PMCA Claims against TSN. |
| 5 | Senior Exchangeable Notes Claims | Impaired | Class 5 consists of the Senior Exchangeable Notes Claims against TSN, TerreStar License Inc. and TerreStar National Services Inc. |
| 6 | Other Unsecured Claims | Impaired | Class 6 consists of the unsecured claims other than a Senior Exchangeable Notes Claim and Unsecured Convenience Claim against each of the TSN Debtors. |
| 7 | Unsecured Convenience Claims | Impaired | Class 7 consists of Unsecured Convenience Claims against each of the TSN Debtors. |
| 8 | Equity Interests | Impaired | Class 8 consists of all Equity Interests against each of the TSN Debtors. |

In addition to the Classes identified above, the Plan provides for recoveries to certain types of Claims that are not separately classified under the Plan, as follows:

- **Allowed Administrative and Priority Tax Claims**. Administrative Claims include Claims for costs and expenses of administration of these chapter 11 cases pursuant to sections 503(b), 507(a)(2), 507(b) or 1114(e)(2) of the Bankruptcy Code. Priority Tax Claims include any Claim of a governmental unit, as defined in section 101(27) of the Bankruptcy Code, of the kind specified in section 507(a)(8) of the Bankruptcy Code.

- **Allowed DIP Claims**. DIP Claims include Claims derived from or based upon the DIP Loan Agreement, including without limitation Claims for principal, interest, fees, or expenses.

- **Payment of Statutory Fees**. Statutory fees include all U.S. Trustee quarterly fees payable under 28 U.S.C. § 1930(a)(6), plus interest due and payable under 31 U.S.C. § 3717, on all

disbursements, including Plan payments and disbursements in and outside the ordinary course of the TSN Debtors' businesses, until the entry of a Final Order, dismissal of the chapter 11 cases or conversion of the chapter 11 cases to cases under chapter 7 of the Bankruptcy Code.

Under the proposed Plan, holders of Allowed Administrative Claims, DIP Claims and Priority Tax Claims and all Statutory Fees will be paid in full, in cash, will otherwise be left unimpaired or granted such other treatment as agreed between the TSN Debtors and the applicable creditor, all as further provided in Article III of the Plan and Article VIII of this Disclosure Statement.

*(ii)* ***Summary of Treatment, Estimated Range of Recoveries and Voting Rights of Claims and Interests Under the Plan***

The table below summarizes the classification, status, voting rights, treatment and estimated range of recoveries of classified Claims and Interests under the Plan accounting for these various factors. These summaries are described in the form below for illustrative purposes only and are qualified in their entirety by reference to the provisions of the Plan. For a more detailed description of the treatment of Claims and Interests under the Plan, see section VIII of this Disclosure Statement, entitled "Description of the Joint Plan of Reorganization."

**THE ESTIMATED PROJECTED RECOVERIES SET FORTH IN THE TABLE BELOW ARE ESTIMATES ONLY AND ARE THEREFORE SUBJECT TO CHANGE.**

**SUMMARY OF STATUS, TREATMENT AND RECOVERY**

| Class | Status | Voting Rights | Plan Treatment of Class | Estimated Recovery[4] |
|---|---|---|---|---|
| **1** | Unimpaired | No (deemed to accept) | Except to the extent that a holder of an Allowed Other Priority Claim (i) has been paid by the TSN Debtors, in whole or in part, prior to the Effective Date or (ii) agrees to a less favorable treatment, each holder of an Allowed Other Priority Claim shall receive, on the Initial Distribution Date and in full satisfaction, settlement, release, and discharge of, and in exchange for such Other Priority Claim, Cash in the full amount of such Allowed Other Priority Claim. | 100% |

---

[4] The estimated recovery assumes the exercise of the Overallotment option, which is at the sole discretion of the Plan Sponsor.

| Class | Status | Voting Rights | Plan Treatment of Class | Estimated Recovery[4] |
|-------|--------|---------------|-------------------------|----------------------|
| 2 | Unimpaired | No (deemed to accept) | Except to the extent that a holder of an Allowed Other Secured Claim agrees to a less favorable treatment, at the option of the TSN Debtors or the Reorganized TSN Debtors (which option shall be reasonably satisfactory to the Plan Sponsor), (i) each Allowed Other Secured Claim shall be reinstated and Unimpaired in accordance with section 1124(2) of the Bankruptcy Code, or (ii) each holder of an Allowed Other Secured Claim shall receive, in full satisfaction, settlement, release, and discharge of, and in exchange for, such Other Secured Claim, either (w) Cash in the full amount of such Allowed Other Secured Claim, including any postpetition interest accrued pursuant to section 506(b) of the Bankruptcy Code, (x) the proceeds of the sale or disposition of the collateral securing such Allowed Other Secured Claim to the extent of the value of the holder's secured interest in such collateral, (y) the collateral securing such Allowed Other Secured Claim and any interest on such Allowed Other Secured Claim required to be paid pursuant to section 506(b) of the Bankruptcy Code, or (z) such other distribution as necessary to satisfy the requirements of section 1129 of the Bankruptcy Code. | 100% |
| 3 | Impaired | Yes | Each holder of an allowed Senior Secured Notes Claim shall receive its Pro Rata share of the Class 3 Distribution. | 98% |
| 4 | Unimpaired | No (deemed to accept) | The PMCA Claims will be reinstated pursuant to section 1124 of the Bankruptcy Code. | 100% |
| 5 | Impaired | Yes | Each holder of a Senior Exchangeable Notes Claim shall receive, on the Initial Distribution Date, its Pro Rata share of the Class 5 Distribution.[5] | 6% |
| 6 | Impaired | Yes | Unless such holder has made a Convenience Claim Election, each holder of an Allowed Other Unsecured Claim shall receive its Pro Rata share of the Class 6 Distribution. | 6% |
| 7 | Impaired | Yes | Each holder of an Allowed Unsecured Convenience Claim shall receive Cash in an amount equal to the lesser of:  (i) 10% of such holders' Unsecured Convenience Claim; and (ii) such holder's Pro Rata share of $500,000. | N/A |

---

[5]  The TSN Debtors have assumed that the total amount of Allowed Other Unsecured Claims at the TSN Debtors will be approximately $365 million.  Any decrease in the total amount of Allowed Other Unsecured Claims at the TSN Debtors will inure to the benefit of the holders of the Senior Exchangeable Notes Claims, but holders of the Senior Exchangeable Notes Claims will not be harmed by any increase in such Allowed Other Unsecured Claims.

| Class | Status | Voting Rights | Plan Treatment of Class | Estimated Recovery[4] |
|-------|--------|---------------|------------------------|-----------------------|
| 8 | Impaired | No (deemed to reject) | On the Effective Date, all Equity Interests shall be deemed cancelled and shall be of no further force and effect, whether surrendered for cancellation or otherwise, and there shall be no distribution to the holders of Equity Interests. | 0% |

### D.    Voting Deadline

The deadline to vote on the Plan is 5:00 p.m. (prevailing Eastern time) on January [__], 2011 (the "**Voting Deadline**").

### E.    Procedures for Voting on the Plan

This Disclosure Statement, accompanied by a Ballot, Note Ballot or Master Ballot (as applicable) to be used for voting on the Plan, is being distributed to the holders of Claims entitled to vote on the Plan.  If you are a holder of Claims in Classes 3, 5, 6 or 7, you may vote for or against the Plan by completing the Ballot, Note Ballot, or Master Ballot (as applicable) and returning it in the envelope provided in accordance with the instructions provided on the Ballot and in the Voting and Tabulation Procedures.

The Debtors, with the approval of the Bankruptcy Court, have engaged Garden City Group ("**GCG**") to serve as the voting agent for claims and generally oversee the voting process (the "**Voting and Claims Agent**").  The Voting and Claims Agent will also process and tabulate Ballots for each Class entitled to vote to accept or reject the Plan and will process and tabulate any Note Ballots and Master Ballots for Classes 3, 5, 6 and 7.

---

**DELIVERY OF BALLOTS**

Ballots, Note Ballots and Master Ballots must be **actually** **received** by the Voting and Claims Agent by the Voting Deadline of 5:00 p.m. (Prevailing Eastern Time) on January [__], 2011 at the following addresses:

***Voting and Claims Agent:***

If by mail:

TerreStar Networks Inc.
c/o The Garden City Group, Inc.
P.O. Box 9649
Dublin, OH 43017-4949

If by hand or overnight courier:

TerreStar Networks Inc.
c/o The Garden City Group, Inc.
5151 Blazer Parkway, Suite A
Dublin, OH 43017

* * * * * * *

If you received an envelope addressed to your nominee, you must return your ballot to your nominee prior to 5:00  p.m. on the date that is five (5) days prior to the Voting Deadline, to provide sufficient time for your nominee to compile and submit a Master Ballot.

If you have any questions on the procedure for voting on the Plan, please call the Voting and Claims Agent at the following telephone number:

1-866-682-1770

---

More detailed instructions regarding how to vote on the Plan are contained on the Ballots, Note Ballots and Master Note Ballots (as applicable) distributed to holders of Claims that are entitled to vote on the Plan as well as the Voting and Tabulation Procedures. For your vote to be counted, your Ballot or Note Ballot (as applicable) must be completed, signed and **actually** **received** by 5:00 p.m. (Prevailing Eastern Time), on the Voting Deadline, January [__], 2011.

Any Ballot or Note Ballot that is properly executed by the holder of a Claim, but which does not clearly indicate either an acceptance or rejection of the Plan or which indicates both an acceptance and a rejection of the Plan, will not be counted.

Each holder of a Claim may cast only one Ballot or Note Ballot per each Claim held. It is important to follow the specific instructions provided on each Ballot or Note Ballot. For information regarding voting, see the section herein entitled "Solicitation and Voting Procedures," which begins on page 71 as well as the Solicitation, Voting and Tabulation Procedures, which are attached here to as **Exhibit G**.

### F. Additional Plan-Related Documents

The TSN Debtors will file the Plan Supplement with the Bankruptcy Court before the Confirmation Hearing (or such later date as may be approved by the Bankruptcy Court). The Noticing and Claims Agent will serve the 2002 List and Master Service List with a notice that will inform parties that the Plan Supplement was filed, list the information included therein and explain how copies of the Plan Supplement may be obtained. The Plan Supplement will include a compilation of documents and forms of documents, schedules and exhibits to the Plan to be filed by the TSN Debtors, including, (a) the New Corporate Governance Documents, (b) the identity of the members of the New Boards of each of the Reorganized Debtors as well as the nature and amount of compensation for any member of a New Board who is an "insider" under section 101(31) of the Bankruptcy Code, to the extent known; (c) the Rejected Executory Contract and Unexpired Lease List; (d) the Registration Rights Agreement; (e) the Schedule of Retained Causes of Action; (f) the New Preferred Stock Certificate of Designation; (g) the New Employment Agreements; (h) a schedule of the Insurance Policies; (i) a schedule of Intercompany Claims; and all exhibits, attachments, supplements, annexes, schedules, and ancillary documents related to each of the foregoing.

> **THE PLAN WILL BIND ALL HOLDERS OF CLAIMS AGAINST, AND INTERESTS IN, THE TSN DEBTORS TO THE FULLEST EXTENT AUTHORIZED OR PROVIDED UNDER THE BANKRUPTCY CODE, INCLUDING SECTIONS 524 AND 1141 THEREOF, AND BY ALL OTHER APPLICABLE LAW.**

## II.
## IMPORTANT INFORMATION ABOUT THIS DISCLOSURE STATEMENT

This Disclosure Statement provides important information regarding the TSN Debtors' joint chapter 11 plan of reorganization, which the TSN Debtors are seeking to have confirmed by the Bankruptcy Court.

**THE DEBTORS BELIEVE THAT THE PLAN IS IN THE BEST INTERESTS OF ALL STAKEHOLDERS. THE DEBTORS URGE ALL HOLDERS OF CLAIMS WHO ARE ENTITLED TO VOTE ON THE PLAN TO VOTE IN FAVOR OF THE PLAN.**

**All capitalized terms used but not defined herein will have the meanings provided to them in the Plan.**

**The summary of the Plan provided herein is qualified in its entirety by reference to the Plan. In the case of any inconsistency between the summary provided in this Disclosure Statement and the Plan, the Plan will govern**.

The TSN Debtors submit this Disclosure Statement pursuant to section 1125 of the Bankruptcy Code for the purposes of soliciting acceptances with respect to, and confirmation of, the Plan. The Disclosure Statement and the information it contains may not be relied on for any other purpose. The TSN Debtors believe that the summary of certain provisions of the Plan and certain other documents and financial information contained or referenced in this Disclosure Statement is fair and accurate. The summaries of the financial information and the documents annexed to this Disclosure Statement, including the Plan, are qualified in their entirety by reference to those documents.

No representations concerning the TSN Debtors or the value of the TSN Debtors' property have been authorized by the TSN Debtors other than as set forth in this Disclosure Statement. Any other information, representations or inducements made to obtain acceptance of the Plan should not be relied on by any holder of a Claim or Interest entitled to vote on the Plan.

The TSN Debtors have sought to ensure the accuracy of the financial information provided in this Disclosure Statement, but the financial information contained in, or incorporated by reference into, this Disclosure Statement has not been and will not be audited or reviewed by the TSN Debtors' independent auditors unless explicitly stated otherwise herein.

For additional information about the TSN Debtors' business operations, please refer to TerreStar Corporation's Annual Report on Form 10-K/A for the fiscal year ended December 31, 2009, filed with the SEC on May 6, 2010, Quarterly Report on Form 10-Q for the quarterly period ended March 31, 2010, filed with the SEC on May 11, 2010, Quarterly Report on Form 10-Q for the quarterly period ended June 30, 2010 filed with the SEC on August 6, 2010, and any other recent report filed with the SEC. These filings are available by visiting the SEC's website at http://www.sec.gov.

**QUESTIONS AND ANSWERS REGARDING**
**THIS DISCLOSURE STATEMENT AND THE JOINT PLAN**

**A.      What is Chapter 11?**

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code.  In addition to permitting debtor rehabilitation, chapter 11 of the Bankruptcy Code promotes equality of treatment for similarly-situated creditors and similarly-situated interest holders, subject to the priority of distributions prescribed by the Bankruptcy Code.

The commencement of a chapter 11 case creates an estate that includes all of the legal and equitable interests of the debtor in property as of the bankruptcy commencement date.  The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

Consummating a plan of reorganization is the principal objective of a chapter 11 case.  A plan that is confirmed by the bankruptcy court is binding on the debtor, any person acquiring property under the plan, any creditor or interest holder of the debtor and any other entity as may be ordered by the bankruptcy court, in accordance with the applicable provisions of the Bankruptcy Code.  Subject to certain limited exceptions, the order issued by a bankruptcy court confirming a plan provides for the treatment of the debtor's claims and interests in accordance with the terms of the confirmed plan.

**B.      Why are the TSN Debtors sending me this Disclosure Statement?**

The TSN Debtors are seeking to obtain Bankruptcy Court approval of the Plan.  Before soliciting acceptances of the Plan, section 1125 of the Bankruptcy Code requires the TSN Debtors to prepare a Disclosure Statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance of the Plan.  **[**The Bankruptcy Court approved this Disclosure Statement under section 1125 of the Bankruptcy Code on [DATE].  The Ontario Superior Court of Justice (Commercial List) (the "*Canadian Court*")[6] recognized the Bankruptcy Court's approval of the Disclosure Statement by order dated [DATE], 2010 (the "*Canadian Disclosure Statement Order*").  A copy of the Disclosure Statement Order and Canadian Disclosure Statement Order are attached hereto as **Exhibit B**.  This Disclosure Statement is being submitted to the Debtors' stakeholders in accordance with these Bankruptcy Code requirements, the Disclosure Statement Order and the Canadian Disclosure Statement Order.**]**

**C.      Am I entitled to vote on the Plan?  What will I receive from the TSN Debtors if the Plan is consummated?**

Your ability to vote and the distribution and consideration that you will receive under the Plan, if any, depend on what kind of claim or interest you hold.  As described in section VIII of this Disclosure Statement, Article III of the Plan creates categories of holders of claims and interests, each of which is referred to as a "*Class*." A summary of the Classes of Claims and Interests and a description each Class's voting status are set forth in the Executive Summary of this Disclosure Statement.

You should refer to this entire Disclosure Statement and the Plan for a complete description of the classification and treatment of each Class of Claims, and Interests.

For more information about the treatment of Claims and Interests, see "Description of the Joint Plan of Reorganization," which begins on page 40.

---

6      A description of the foreign recognition proceedings in Canada in respect of these chapter 11 cases is contained in Article VI.D. herein.

**D.** **If the Plan provides that I get a distribution, do I get it upon Confirmation or when the Plan goes effective, and what do you mean when you refer to "Confirmation," "Effective Date" and "consummation?"**

"Confirmation" refers to approval of the Plan by the Bankruptcy Court. Confirmation does not guarantee that you will receive the distribution indicated under the Plan. After Confirmation, there are certain conditions that need to be satisfied or waived so that the Plan can be consummated or become effective. References to the "Effective Date" mean the date that all conditions to the Plan have been satisfied or waived and the Plan has been fully consummated. Distributions will only be made on the Effective Date or as soon as practicable thereafter, in accordance with Article III of the Plan (and for claims that are not yet Allowed, distributions will be further delayed). *See* "Confirmation of the Plan," which begins on page 74, for a discussion of the conditions to consummation.

**E.** **If the Plan solely applies to the TSN Debtors, what happens to a claim I may have against a Debtor not included in this Plan?**

The Plan applies to TerreStar Networks, Inc., TerreStar National Services, Inc., 0887729 B.C. Ltd., TerreStar License Inc., TerreStar Networks Holdings (Canada) Inc. and TerreStar Networks (Canada) Inc. (collectively, the "***TSN Debtors***"). The Non-TSN Debtors intend to file a chapter 11 plan at a later date. Accordingly, creditors with claims against any Debtor other than the TSN Debtors will receive notice of the proposed plan for the Non-TSN Debtors at that time. The Plan will only affect creditors of the TSN Debtors.

**F.** **What is included in the solicitation packages to be sent to creditors who are eligible to vote on the Plan?**

All parties in interest will receive notice of the Confirmation Hearing, which is the hearing at which the TSN Debtors will seek Confirmation. Additionally, creditors who are eligible to vote on the Plan will receive appropriate solicitation materials including ballots. Specifically, accompanying this Disclosure Statement are, among other things, copies of: (1) the Plan (attached as Exhibit A hereto); (2) documentation relating to the Rights Offering; (3) the notice of, among other things, the time for submitting Ballots to accept or reject the Plan, the date, time and place of the hearing to consider the confirmation of the Plan and related matters, and the time for filing objections to the confirmation of the Plan (the "***Confirmation Hearing Notice***"); and (4) if you are entitled to vote, one or more Ballots (and return envelopes) to be used by you in voting to accept or to reject the Plan (collectively, the "***Solicitation Package***"). If you are eligible to participate in the Rights Offering, you will receive, with the Solicitation Package, one or more Rights Offering subscription forms (and return envelopes) to be used by you in participating in the Rights Offering.

The notices to be sent to parties in interest will state that this Disclosure Statement, the Plan and all of the exhibits thereto are available for viewing by any party free of charge at: (i) calling 1-866-682-1770, (ii) emailing TerreStarInfo@gcginc.com or (iii) visiting www.TerreStarInfo.com.

**G.** **What is the deadline to vote on the Plan?**

5:00 p.m. (Eastern Daylight Time) on January [__], 2011.

**H.** **How do I vote for or against the Plan?**

This Disclosure Statement, accompanied by a Ballot, Note Ballot or Master Ballot to be used for voting on the Plan, is being distributed to the holders of Claims entitled to vote on the Plan. If you are a holder of Claims in Classes 3, 5, 6 or 7, you may vote for or against the Plan by completing the Ballot, Note Ballot, or Master Ballot and returning it in the envelope provided in accordance with the instructions provided on the Ballot and in the Voting and Tabulation Procedures.

The Debtors, with the approval of the Bankruptcy Court, have engaged Garden City Group ("***GCG***") to serve as the voting agent for claims and generally oversee the voting process (the "***Voting and Claims Agent***"). The Voting and Claims Agent will also process and tabulate Ballots for each Class entitled to vote to accept or reject the Plan and will process and tabulate any Ballots, Note Ballots and Master Ballots for Classes 3, 5, 6 and 7.

| DELIVERY OF BALLOTS |
|---|
| Ballots, Note Ballots and Note Master Ballots must be **actually received** by the Voting and Claims Agent by the Voting Deadline of 5:00 p.m. (Eastern Daylight Time) on January [\_\_], 2011 at the following addresses: |
| ***Voting and Claims Agent:*** |
| If by mail: |
| TerreStar Networks Inc. <br> c/o The Garden City Group, Inc. <br> P.O. Box 9649 <br> Dublin, OH 43017-4949 |
| If by hand or overnight courier: |
| TerreStar Networks Inc. <br> c/o The Garden City Group, Inc. <br> 5151 Blazer Parkway, Suite A <br> Dublin, OH 43017 |
| \* \* \* \* \* \* \* |
| If you received an envelope addressed to your nominee, you must return your ballot to your nominee prior to 5:00 p.m. on the date that is five (5) days prior to the Voting Deadline, to provide sufficient time for your nominee to compile and submit a Master Ballot. |
| If you have any questions on the procedure for voting on the Plan, please call the Voting and Claims Agent at the following telephone number: <br> 1-866-682-1770 |

More detailed instructions regarding how to vote on the Plan are contained on the Ballots, Note Ballots and Master Note Ballots distributed to holders of Claims that are entitled to vote on the Plan as well as the Voting and Tabulation Procedures. For your vote to be counted, your Ballot or Note Ballot must be completed, signed and **actually received** by 5:00 p.m. (Eastern Daylight Time), on the Voting Deadline, January [\_\_], 2011.

Any Ballot or Note Ballot that is properly executed by the holder of a Claim, but which does not clearly indicate either an acceptance or rejection of the Plan or which indicates both an acceptance and a rejection of the Plan, will not be counted.

Each holder of a Claim may cast only one Ballot or Note Ballot per each Claim held. It is important to follow the specific instructions provided on each Ballot or Note Ballot. For information regarding voting, see the section herein entitled "Solicitation and Voting Procedures," which begins on page 71 as well as the Solicitation, Voting and Tabulation Procedures, which are attached here to as **Exhibit H**.

I.      **When is the Confirmation Hearing set to occur?**

The Bankruptcy Court has scheduled the Confirmation Hearing for [DATE], 2011 to take place at 10:00 a.m. (Prevailing Eastern Time) before the Honorable Sean H. Lane, United States Bankruptcy Judge, in the United States Bankruptcy Court for the Southern District of New York, located at One Bowling Green, New York, New York 10004-1408. T**he Confirmation Hearing may be adjourned from time to time without further notice except for an announcement of the adjourned date made at the Confirmation Hearing or any adjournment thereof.**

**J.      What is the deadline to object to Confirmation?**

Objections to Confirmation must be filed and served on the Debtors, and certain other parties in interest, so that they are **actually received** no later than January [__], 2011 at 5:00 p.m. (Eastern Daylight Time) in accordance with the requirements set forth in the Disclosure Statement Order, which is attached to this Disclosure Statement as **Exhibit B**.    Unless objections to Confirmation are timely served and filed in compliance with the Disclosure Statement Order they may not be considered by the Bankruptcy Court.  For further information on Confirmation see the section of this Disclosure Statement titled "Confirmation of the Plan," which begins on page 74.

**K.      What is the effect of Confirmation on the Debtors' ongoing business?**

The TSN Debtors are reorganizing under chapter 11 of the Bankruptcy Code.  As a result, unless otherwise set forth in the Plan, Confirmation means that the TSN Debtors will not be liquidated or forced to go out of business.  Following Confirmation, the Plan will be consummated on the Effective Date, which is a date selected by the TSN Debtors (with the consent of the Plan Sponsor) that is the first business day after which all conditions to consummation have been satisfied or waived.  *See* Article X of the Plan.  On or after the Effective Date, and unless otherwise provided in the Plan, each Reorganized Debtor may operate its business and may use, acquire or dispose of property and compromise or settle any Claims, Interests or causes of action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

In the event that the Plan is not consummated, the Plan will be null and void in all respects.  Accordingly, any settlement or compromise, distribution on account of any Claim or Interest, assumption or rejection of Executory Contracts or Unexpired Leases affected by the Plan and any document or agreement executed pursuant to the Plan shall be deemed null and void.

**L.      Do the Debtors recommend voting in favor of the Plan?**

Yes.  It is the Debtors' opinion and belief that the Plan provides for a larger distribution to the TSN Debtors' creditors than would result from any other available alternative.  Although the TSN Debtors continue to market their assets to prospective purchasers in an effort to maximize value for their stakeholders, at this point, no offer has been received.  The Debtors believe that the Plan, which contemplates a significant deleveraging of more than $1 billion of the TSN Debtors' debt obligations, is in the best interests of all holders of Claims and Interests.  Any other alternative, including a liquidation under chapter 7 of the Bankruptcy Code, would realize lesser value than the value to be afforded under the Plan.  Thus, the Debtors recommend that holders of Claims who are entitled to vote on the Plan vote to accept it.

# IV.
## THE DEBTORS' HISTORY

### A.    Company Overview

TerreStar Networks Inc. ("**TSN**" and, together with its affiliated debtors and debtors in possession, the "**Debtors**" and, the Debtors together with their non-Debtor affiliates, "**TerreStar**" or the "**Company**") is a next-generation mobile satellite service operator that recently launched a wireless communications system which provides mobile satellite coverage throughout the United States (including Alaska, Hawaii, Puerto Rico and the United States Virgin Islands, as well as in U.S. territorial waters) and Canada using integrated satellite-terrestrial smartphones and other devices. The TSN Debtors offer this next-generation service as a wholesale mobile satellite services provider, allowing existing terrestrial service providers to augment their existing terrestrial networks with mobile satellite coverage. Through such relationships, the TSN Debtors' next generation mobile wireless network consists of a telecommunications network that handles multiple types of traffic over both terrestrial and satellite infrastructure. Various communications applications, including voice, data and video services, are available for use over the satellite network.

TerreStar began conducting business in 1988 when TerreStar Corporation ("**TSC**") (formerly Motient Corporation) was incorporated under the laws of the State of Delaware. TSN was formed in 2002 as a wholly-owned subsidiary of Mobile Satellite Ventures LP to develop a mobile satellite communications system in the 2 GHz S-band and subsequently spun off under Motient Corporation (which became TSC). TSN is a majority-owned, indirect subsidiary of TSC,[7] and is TSC's principal operating entity.[8] TSC is not a Debtor in these chapter 11 cases.[9]

The Debtors are headquartered in Reston, Virginia, with additional facilities in Richardson, Texas; New York, New York; Las Vegas, Nevada; North Salt Lake, Utah; and Lincolnshire, Illinois. The Canadian Debtors maintain offices in Ottawa, Ontario Vancouver, British Columbia, and Montreal, Quebec and have additional facilities in Toronto, Ontario and Allan Park, Ontario.

Within the United States, the TSN Debtors conduct ground operations in the states of Arizona, Florida, Indiana, Louisiana, Nevada, New Mexico, North Carolina, North Dakota, Oregon, Texas, Utah, Virginia and Washington. Within Canada, the TSN Debtors conduct ground operations in the provinces of Ontario, Alberta, British Columbia and Saskatchewan.[10] As of the date hereof, the TSN Debtors employ 107 employees, 20 of which

---

[7]    TSN is 89.3% owned by TSC (through its wholly owned subsidiaries MVH Holdings Inc. and Motient Ventures Holding Inc.) and 10.7% owned by LightSquared LP ("**LightSquared**") (f/k/a SkyTerra Communications, Inc. ("**SkyTerra**")), an affiliate of Harbinger.

[8]    Two of the Debtors' non-debtor affiliates, TerreStar Global Ltd. (a Bermuda Company) and TerreStar Europe Limited (a United Kingdom Company) were also established to conduct foreign operations. TerreStar Global Ltd. holds a license to utilize an orbital slot allocated to the government of Bermuda by Ofcom, the Office of Communications, which functions as the independent regulator and competition authority for the United Kingdom communications industries. TerreStar Global Ltd. currently conducts no business or operations. TerreStar Europe Limited was established to provide coverage in certain areas of Europe; however, after an unsuccessful bid for the right to use the TSN Debtors' 2 GHz spectrum in Europe, TerreStar Europe Limited conducts no business or operations and recently has been stricken from the United Kingdom's company register.

[9]    TSC is currently in discussions with holders of its Series A and B Preferred Stock with regard to a potential chapter 11 filing of TSC and its wholly owned subsidiary, TerreStar Holdings Inc.

[10]   The TSN Debtors' ground operations include the maintenance and operation of two Gateway Earth Stations, which include various network equipment, routers, satellite control links and equipment, antenna and ground based beam forming equipment ("**Ground Stations**") located in Las Vegas, Nevada and Allan Park, Ontario, as

(Continued…)

are employed by the TSN Debtors on an hourly basis and the remainder of which are employed by the TSN Debtors on a full-time, salaried basis (the "***Employees***").[11]   In addition to their Employees, the TSN Debtors supplement their workforce with independent contractors depending on the TSN Debtors' business needs.

## B.     The Company's Business Operations

### (i)     *The Mobile Network*

The TSN Debtors' business model is based on integrating ground-based technology and satellite technology into a single, North American mobile communications system intended to provide communication service in areas where traditional mobile networks currently do not reach or are unavailable.  This next-generation network utilizes mobile satellite service ("***MSS***")[12] using frequencies in the 2 GHz band.[13]   The TSN Debtors' next generation wireless communications system provides coverage throughout North America, including in rural areas where either terrestrial coverage is unobtainable because terrestrial build out is not economical for traditional wireless service providers due to the sparse user base in such areas or terrestrial build out is physically unattainable due to geographic conditions (e.g., rough terrain or waterways), or where because of extraordinary events (e.g. natural or man-made disaster) terrestrial wireless service is temporarily unavailable.  Such coverage is critical for many first responders and governmental and rescue agencies, and is attractive to the media, technology, communications,

---

well as 15 calibration earth stations ("***CES***") located throughout the United States and five CES located throughout Canada.

[11]   101 of the Employees are solely employees of the Domestic Debtors.  Six of the Employees are employees of TerreStar Networks (Canada) Inc. ("***TSN Canada***") (collectively, the "***Canada Employees***").  The Canada Employees also provide services to a non-Debtor affiliate, TerreStar Solutions Inc., and are directly compensated in full by that entity, which subsequently invoices TSN Canada for its apportioned amount of the compensation for the Canada Employees.  As set forth further herein, this arrangement is continuing in chapter 11, and payment thereof is included in the budget for the TSN Debtors' DIP Financing.

[12]   Mobile satellite services (***MSS***) refers to satellite communication terminating or originating on non-fixed satellite receivers.  A satellite handset connection using MSS is similar to a cellular telephone except rather than using a cell phone tower to attach to the carrier's network, the satellite handset connects to a satellite, which transmits that signal.

[13]   The 2 GHz band is in a range of spectrum commonly referred to as the "***S-Band***."  The S-Band incorporates frequencies ranging from 2 – 3 GHz.  TerreStar License Inc., a Debtor in these chapter 11 cases, holds a license from the Federal Communications Commission (the "***FCC***") to use 20 MHz of the S-Band in the United States for integrated MSS and terrestrial use.  This license was obtained in connection with the Debtors' build-out of their MSS Network.  Specifically, TerreStar Networks (Canada) Inc. ("***TerreStar Canada***"), a TSN Debtor, was formed to hold a previously awarded approval in principle from Industry Canada to operate a satellite in an orbital slot at 111° WL.  When TerreStar Canada acquired title to the "***TerreStar-1***" satellite, this permitted TSN to acquire a previously issued FCC authorization for one of the two remaining S-Band licenses in the United States, which since late 2005, had included 20 MHz of nationwide ATC spectrum.  TerreStar Networks (Canada) Inc. holds a license from Industry Canada, the Canadian communications regulatory authority, to utilize the MSS portion of the same S-Band spectrum in Canada.  TerreStar Solutions Inc., a non-Debtor affiliate of the Debtors, holds a license from Industry Canada to utilize the ancillary terrestrial component ("***ATC***") portion of the same spectrum in Canada.  In addition, the Debtors' non-Debtor affiliate, TerreStar 1.4 Holdings LLC (which is wholly owned by TSC through TerreStar Holdings Inc., a non-Debtor affiliate) has access to 8 MHz of 1.4 GHz spectrum.  TerreStar 1.4 Holdings LLC has entered into the Spectrum Lease (as defined below) with respect to the 1.4 GHz spectrum, pursuant to which One Dot Four (as defined below) manages the 1.4 GHz spectrum.  The 1.4 GHz spectrum is licensed for terrestrial wireless services.

logistics and distribution sectors and other sectors requiring uninterrupted wireless service, as well as to certain consumers (e.g., rural residents, outdoorsmen, adventurers and recreational maritime users).[14]

In connection with developing their next generation network, in 2009 the TSN Debtors developed the world's first smartphone with integrated all-IP satellite-terrestrial voice and data capabilities (the "***GENUS***").[15] The TerreStar network, combined with the innovation of the GENUS, allows a user to have both terrestrial and satellite coverage through one device - - i.e. users will be able to place calls over traditional terrestrial cellular networks (for example, through AT&T) but will be able to "roam-in" to satellite coverage on the TSN Debtors' network when terrestrial coverage is unavailable.

Further, the TSN Debtors' business model is premised on acting as a wholesaler of satellite services and air time, as well as of the GENUS smartphone. The GENUS is marketed through the TSN Debtors' terrestrial provider partners. Ordinarily, the GENUS will communicate over a traditional terrestrial cellular 3G network; however, users of the GENUS subscribe, through their traditional terrestrial cellular coverage provider, to have the additional service feature to "roam-in" to the satellite network provided by the TSN Debtors when a terrestrial network is unavailable for a monthly subscription fee plus per minute or per megabit usage rates (i.e., roaming charges) that will appear on the customers' bills from the terrestrial provider. In turn, the terrestrial provider will pay the TSN Debtors a monthly fee for each subscribing customer in addition to a per-minute or per megabit charge for usage by customers. Accordingly, with such a subscription the GENUS can be converted to a satellite phone with the push of a button. Once the satellite option is selected, the phone will communicate using the TSN Debtors' satellite based network. This will allow customers to always be in coverage through a single, integrated device with one phone number, one email address and one bill.

Before filing for chapter 11, the TSN Debtors also entered into contracts for the development of a next generation chipset that could be incorporated into a wide range of mobile devices, including small, lightweight and inexpensive handsets. At this point, it is unclear whether the Reorganized Debtors will continue the development of the next generation chipset.

The TSN Debtors' network utilizes the "***TerreStar-1***"[16] satellite, as well as two Ground Stations and 20 calibration earth stations (the "***CES***"). The Ground Stations (one located in North Las Vegas, Nevada and the other in Allan Park, Ontario) serve as intercept points between the space and ground based parts of the TerreStar network. The Ground Stations perform both operational and service functions. Transmission to or from end users of the satellite service use the Ground Stations as a link between the satellite-portion of the TSN Debtors' network and the terrestrial link to the public switched telephone network. Equipment at the Ground Stations also performs operational tasks including beam forming, satellite monitoring and satellite control. Additionally, the TSN Debtors have 20 CES (15 throughout the United States and five throughout Canada). These carefully placed sites aid in the TSN Debtors' network's ground based beam forming and satellite health monitoring. Each site collects real time data from the satellite and transmits it to the Ground Stations for processing.

---

[14] This focus of enhancing today's terrestrial mobile communications networks and providing more coverage in rural and geographically isolated areas is in line with the primary objectives of the National Broadband Plan, promulgated by the United States government through the FCC on March 15, 2010, which, among other things, seeks to augment mobile broadband capacity, promote the build out of communications infrastructure in high cost areas, and fortify communication channels for emergency first responders.

[15] The GENUS is a smartphone similar in size to today's terrestrial only wireless smartphones. Unlike other satellite phones available on the market, the GENUS approximates other smartphones in size, appearance and utility. It offers a touch screen, full QWERTY keyboard, and is Windows Mobile OS compatible. It offers a comprehensive range of features, such as text messaging, email, web browser, WiFi and Bluetooth.

[16] As noted above, in light of various regulatory requirements in place when TerreStar-1 was constructed, TerreStar Networks (Canada) Inc., a Debtor in these chapter 11 cases, holds title to TerreStar-1. It has a useful life expectancy of over 15 years.

The design of the TSN Debtors' MSS network infrastructure has at least two major advantages over other traditional satellite networks. First, the network incorporates advanced ground based beam forming and dynamic spot beam technology. [17] These features allow the location, power and concentration of the satellite beams to be manipulated and reallocated within a few hours notice. The TSN Debtors' network, therefore, can handle a surge in user demand in a particular geographic location with unprecedented speed. This makes the TSN Debtors' network unparalleled in its ability to provide continuous coverage in areas where devastation by a natural or man-made disaster, damaged infrastructure, or unusual demand have compromised terrestrial communication. Second, calibration of the satellite and beam forming are conducted through earth based facilities. The design of the Debtors' network allows software and equipment updates as well as physical repairs to be performed on a wider range of satellite components than is typical for traditional space based calibration and beam forming systems.

In connection with the build out of the TSN Debtors' network, the TSN Debtors have recently achieved several significant milestones. They successfully launched TerreStar-1, on July 1, 2009 and placed it into its assigned[18] orbital slot.[19] On July 20, 2009, the TSN Debtors placed the first successful phone call over TerreStar-1 and accordingly TerreStar-1 was certified as operational on that date. On August 27, 2009, the TSN Debtors announced the successful completion of in-orbit testing. In December 2009 both the FCC and the PTCRB[20] certified the GENUS handset. On January 13, 2010, the FCC granted the TSN Debtors authority to integrate terrestrial use of their S-Band spectrum into their next generation mobile wireless network or, in other words, approved the ancillary terrestrial component ("*ATC*")[21] of the TSN Debtors' services. On July 19, 2010, Industry Canada issued a similar ATC authorization to TerreStar Solutions Inc., a non-Debtor affiliate of TerreStar Canada. ATC approval was a critical step in the TSN Debtors' ability to operate a combined satellite and terrestrial network. On September 21, 2010, AT&T announced the availability of satellite augmented mobile service through the GENUS handset to its government and enterprise customers.

---

[17] A satellite's coverage area is comprised of various satellite beams. Satellite beams are equivalent to a cell phone tower in that they receive and transmit signals to or from capable devices within a certain area. Different satellites have different beam capabilities and characteristics. TerreStar-1 can support up to 550 "spot beams," each of which can be manipulated in size, shape, location and power within the coverage area. The Debtors' advanced beam forming capabilities allows efficient frequency re-use: high numbers of users can be active within a single beam without significantly degrading service quality. Spectral efficiency is important to a satellite's performance as satellites are frequency- and power-constrained.

[18] The geosynchronous slot that TerreStar-1 occupies is assigned to TerreStar Networks (Canada) Inc., a Debtor in these chapter 11 cases, by Industry Canada. A geosynchronous orbit is one with an orbital period that matches the earth's rotation period. The synchronization of rotation and orbital period means that for an observer at a fixed location on the surface of the Earth, a satellite in geosynchronous orbit appears at a constant fixed point above the earth.

[19] The TSN Debtors are also in the process of building a ground spare satellite, "*TerreStar-2*," which is nearly identical to TerreStar-1 and is also designed for MSS using frequencies in the S-Band. Currently, access to a completed and operational ground spare satellite is a requirement for the TSN Debtors' ATC authorization; however, the National Broadband Plan has proposed relaxing this criterion. It remains to be seen whether the FCC will in fact remove the requirement for a ground spare satellite. Nonetheless, TerreStar-2 is currently under construction at SpaceSystems/Loral ("*Loral*") and is more than 90% complete, with approximately 95% of the construction costs having been paid. Completion is currently scheduled for October 2011.

[20] The PTCRB is a global organization created by Mobile Network Operators to provide an independent evaluation process.

[21] Ancillary Terrestrial Component, or ATC, is ground based infrastructure in a mobile satellite system to enhance the availability, efficiency and economic viability of the coverage of the satellite network. ATC allows MSS providers to deploy terrestrial networks to enhance coverage in areas where the satellite signal is attenuated or unavailable.

*(ii)*     ***Significant Contracts***

The Debtors' business enterprise is dependent in large part on a number of key agreements and other arrangements, which, among other things, provide the necessary intellectual property to the Debtors as well as allows them to reach the broadest range of potential customers who are targeted as likely users of the Debtors' planned communications systems. Set forth below is a short summary of some of these significant agreements, arrangements and relationships.

*Satellite Construction and Ground Maintenance*

The TSN Debtors have various contractual relationships and agreements that are necessary to ensure that their satellite network remains operational. Set forth below are some of the more important arrangements.

On December 13, 2006, TSN entered into the Site Preparation and Site Hosting Agreement (the "***Hughes O&M Agreement***") with Hughes Network Systems LLC ("***Hughes***"), under which Hughes provides site hosting services for the TerreStar Ground Station at the North Las Vegas site and CES equipment (the "***TerreStar Equipment***"). The parties entered into Amendment 2 to the Hughes O&M Agreement on April 21, 2009 for the purpose of adding the statement of work for Hughes to provide operations and maintenance services for the TerreStar Equipment. Under the Hughes O&M Agreement, Hughes provides (a) monitoring services 24 hours a day, seven days a week, every day of the year; (b) certain preventive and corrective maintenance; and (c) certain additional services (e.g., inventory management, warranty management, daily operations reporting, and operations security). The Hughes O&M Agreement automatically renews for successive one year renewal terms unless either party provides 90 days notice of intent not to enter into the next renewal term.

On March 30, 2007, in connection with the Hughes O&M Agreement, TSN entered into a contract with Hughes for the design, development and supply of satellite base station subsystems ("***S-BSS***")[22] at the Las Vegas, NV and Allan Park, Ontario Ground Stations (the "***S-BSS Contract***").

TSN is party to two contracts with Loral relating to the purchase and construction of TerreStar-1 (the "***TerreStar-1 Agreement***") and TerreStar-2 (the "***TerreStar-2 Agreement***"). The TerreStar-1 Agreement includes launch support services, mission operations support services, risk management insurance procurement support, training services and other items relating to the TerreStar-1 satellite. The TerreStar-1 Agreement also contains in-orbit performance incentive payments by TSN to Loral over the life of the TerreStar-1 satellite. The TerreStar-2 Agreement contains services and terms substantially similar to those of the TerreStar-1 Agreement. The TerreStar-2 agreement also includes orbital performance incentive payments by TSN to be paid over the life of the TerreStar-2 satellite.

TSN is also party to a space based network ("***SBN***") contract with Loral pursuant to which Loral will (a) provide services to integrate the TerreStar-1 satellite with the ground segment Satellite Beam Access Subsystem ("***SBAS***")[23] to be provided by Hughes and (b) deliver an integrated SBN network consisting of the TerreStar-1 satellite and the SBAS.

On May 11, 2007, TerreStar Canada contracted with Telesat Canada ("***Telesat***") to provide in-orbit satellite operational services for TerreStar-1 ("***Telesat TT&C Agreement***"). Under the Telesat TT&C Agreement, Telesat uses its facilities and equipment located in Allan Park, Ontario to provide tracking, telemetry and control ("***TT&C***") for TerreStar-1. These services include maintenance of the satellite's proper orbital location, monitoring the health

---

[22]   S-BSS is the section of the network that is responsible for transmitting and receiving radio signals to and from a mobile phone. S-BSS carries out transcoding of speech channels, allocation of radio channels to mobile phones, paging and many other tasks related to the network.

[23]   SBAS is a system that supports wide-area or regional augmentation through the use of additional satellite-broadcast messages. Such systems are commonly composed of multiple ground stations located at accurately-surveyed points. The ground stations take measurements of one or more of the satellites, the satellite signals, or other environmental factors that may impact the signal received by the users. Using these measurements, information messages are created and sent to one or more satellites for broadcast to the end users.

and operational status of the satellite, monitoring and notifying of any terrestrial or space-based threats to satellite operation, and issuing planned and emergency command and ranging. Telesat also provides assistance with satellite anomaly analysis and regulatory services including coordination and proper registration of the satellite.

On April 1, 2009, TSN entered into a Site Hosting and Operation and Maintenance of Satellite Gateway Systems agreement ("***Telesat O&M Agreement***") with Telesat. On June 30, 2009, TSN assigned the Telesat O&M Agreement to 4506901 Canada Inc. (n/k/a 0887729 B.C. Ltd.). The Telesat O&M Agreement provides for the lease of real property at Telesat's Allan Park teleport facility and equipment operation and maintenance for satellite gateway equipment and antennas housed in a structure known as the TSN Debtors' Canadian gateway earth station. The equipment in the Ground Stations in Canada (like that in the U.S.), combines elements of the satellite and ground based networks and, in coordination with the CES, is critical to beam forming and linking voice and data traffic to the Network Operations Control Center in Richardson, TX.

*GENUS Handset, Chipset Development and Related Technology*

TSN and certain of its affiliates are party to a number of agreements with various parties relating to chipset development and the development of the GENUS device. TerreStar has entered into a number of agreements with Elektrobit, Inc. ("***Elektrobit***") with respect to the development of the GENUS handset. First, on September 19, 2007, TSN signed a Statement of Work (the "***Statement of Work***") under the Master Development & Licensing Agreement entered into by TSN and Elektrobit on August 10, 2007.[24] Under the Statement of Work, Elektrobit has assigned a multi-disciplined engineering team to perform reference design and development programs, software development for satellite and terrestrial chipset integration, and provide a reference design and production of the GENUS handset. Second, on December 1, 2009, TSN and TSC entered into a Master Supply Agreement (the "***Supply Agreement***") with Elektrobit, which sets the terms for the individual purchase orders for the GENUS. Additionally, under the Supply Agreement, Elektrobit provides manufacturing services, forward and reverse logistics, and after market services support for certain satellite-terrestrial smartphones, starting with the GENUS smartphone. While there is no volume commitment from TerreStar in the Supply Agreement, pricing and other terms are adjusted based on volume.

In addition to the development of the fully integrated GENUS device, before filing for chapter 11, the TSN Debtors contracted with Qualcomm Incorporated ("***Qualcomm***") and Infineon Technologies AG ("***Infineon***"), two of the premiere chipset developers for mobile and smartphone devices to ensure that, in the next generation of such devices, the ability to connect to the TSN Debtors' network is built in and would need simply to be activated by a provider. These chipsets could substantially increase the availability of the TSN Debtors' network to mobile device customers. The TSN Debtors have also contracted with certain parties to develop chipsets for the Ground Stations that are necessary to enable the chipsets in the smartphone and mobile devices to communicate with the TSN Debtors' network.[25]

*AT&T Distribution Agreement*

On September 25, 2009, the TSN Debtors entered into a Mobile Satellite Services and Support Agreement with AT&T Mobility II, LLC ("***AT&T***") under which AT&T markets, resells and provides support for certain of the TSN Debtors' satellite communications services to government, commercial and other customers on a non-exclusive basis (the "***AT&T MSS Agreement***"). AT&T sells the GENUS (and various accessories) and AT&T's Satellite Augmented Mobility Service ("***SAM***") to end users. SAM includes access to AT&T's terrestrial mobile network and the TSN Debtors' satellite network. Pursuant to the rate plan under the AT&T MSS Agreement, AT&T pays

---

[24] Pursuant to an amendment dated November 18, 2009, TSC guarantees TSN's obligations to Elektrobit under the Master Development and License Agreement. By summons and complaint dated November 19, 2010, Elektrobit has brought various causes of action against TSC seeking payment under Master Development and License Agreement as well as the Supply Agreement. The complaint was filed in the Supreme Court for the State of New York, County of New York.

[25] At this point, it is unclear whether the Reorganized Debtors will continue the development of the next generation chipset in light of, among other things, the capital required for such development.

the TSN Debtors a recurring monthly charge for each subscribing customer plus a fixed amount per minute for satellite voice calls (plus certain termination charges) and a fixed amount for each megabyte of satellite data used and satellite text message, sent or received.

*Relationship with Harbinger/LightSquared (f/k/a SkyTerra)*

The Debtors and their non-Debtor affiliates have a number of separate contractual relationships with Harbinger (one of the Debtors' most significant stakeholders) and certain of its affiliates. Among other things, as described in detail below, Harbinger and/or its affiliates lease rights to use TerreStar 1.4 Holdings LLC's 1.4 GHz spectrum and have purchased prepaid satellite minutes from TSN.

In September 2009, TerreStar 1.4 Holdings LLC ("*1.4 Holdings*"), a Delaware limited liability company and a non-Debtor entity wholly owned by non-Debtor, TerreStar Holdings Inc., entered into a Spectrum Manager Lease Agreement (the "*Spectrum Lease*") with One Dot Four Corp. ("*One Dot Four*"), an affiliate of Harbinger, under which One Dot Four acts as a manager in order to lease the rights to use certain 1.4 GHz terrestrial spectrum for which 1.4 Holdings holds FCC licenses. The Spectrum Lease has an initial term through April 2017, renewable at One Dot Four's option for two additional terms of ten years each, in both instances subject to FCC renewal of the licenses. Pursuant to the Spectrum Lease, One Dot Four pays 1.4 Holdings $2 million[26] per month. Under certain conditions One Dot Four has an option, but not the obligation, to purchase the spectrum licenses. One Dot Four also has a right of first refusal to match the price (less credit for certain amounts paid under the Spectrum Lease) in any potential transfer of such licenses to a third party.

In addition to the agreement with One Dot Four, before the commencement of the chapter 11 cases, the Debtors and their non-Debtor affiliates entered into a series of exclusivity agreements with Harbinger and certain of its affiliates regarding Harbinger's desire to enter into a pooling arrangement of the parties' various spectrum and satellite capacity. Specifically, in January 2010, the Debtors entered into the first of these agreements - an exclusivity agreement (the "*Original Exclusivity Agreement*") - pursuant to which they agreed that for a period of 90 days, they would negotiate in good faith an agreement with Harbinger under which the S-Band spectrum licensed to TerreStar License Inc. would be combined with other services (such as satellite usage rights) to provide mobile communications services (a "*Pooling Arrangement*"). In exchange, Harbinger, on behalf of its affiliate, One Dot Four, agreed to prepay $30 million of the amounts due under the Spectrum Lease.[27] As part of the Original Exclusivity Agreement, TSC and TSN agreed, among other things, that during the exclusivity period they would not enter into any agreement relating to the S-Band spectrum license other than with Harbinger and certain of its affiliates, nor grant any third party rights with respect to the S-Band spectrum license that would interfere with use of the S-Band spectrum license by Harbinger and certain of its affiliates. The Original Exclusivity Agreement expired on April 26, 2010, without the parties entering into a Pooling Arrangement, but on May 6, 2010, the Debtors entered into a new exclusivity agreement (the "*New Exclusivity Agreement*") with SkyTerra (n/k/a LightSquared), an affiliate of Harbinger (together, "*LightSquared/Harbinger*"), whereby they agreed that, for a period of 90 days, they would negotiate in good faith on a Pooling Arrangement and that during the period of exclusivity TerreStar would not (i) solicit or encourage the submissions of proposals or offers relating to the S-Band spectrum license from any person or entity other than LightSquared/Harbinger, (ii) enter into any written or oral agreement relating to the S-Band spectrum license with any person or entity other than LightSquared/Harbinger, or (iii) participate in discussions or negotiations with, or furnish any non-public information to, any person or entity in connection with a possible transaction regarding the S-Band where doing so would interfere with or obstruct the use of the S-Band by LightSquared/Harbinger or otherwise make it unavailable for use by LightSquared/Harbinger or limit the ability of

---

[26]  Unless otherwise noted, all dollar amounts stated herein refer to USD.

[27]  Upon receipt of the funds from Harbinger, TerreStar 1.4 Holdings LLC paid a dividend to its 100% shareholder TerreStar Holdings Inc., in the amount of the funds received. TerreStar Holdings Inc. then made an intercompany loan to Motient Ventures Holding Inc in the amount of approximately $32 million. Motient Ventures Holding Inc. then made a capital contribution to TSN, its 89.3% owned subsidiary of approximately $32 million. The TSN Debtors understand that certain creditors have raised the issue as to whether some or all of these transfers may be subject to avoidance.

any of TerreStar or LightSquared/Harbinger to enter into a transaction regarding the TSN Debtors' S-Band spectrum license rights. The New Exclusivity Agreement expired on August 4, 2010, without the parties reaching a definitive agreement on a Pooling Arrangement; thus, since August 4, 2010, the Debtors have not been encumbered by any exclusivity arrangement with regard to marketing their S-Band spectrum license rights. Since that time, and due in large part to the Debtors' need to focus on their liquidity concerns and preparations for its chapter 11 filing, the TSN Debtors have not entered into any further exclusivity agreements regarding a Pooling Arrangement. Since early October 2010, however, and as more fully set forth herein, the TSN Debtors have been, together with their advisors, marketing the TSN Debtors' assets in an effort to maximize value for their estates. As of the date hereof, no offer has been received.

Contemporaneously with entry into the New Exclusivity Agreement, on or about May 6, 2010, TSN entered into a Satellite Minutes Agreement (the "***Satellite Minutes Agreement***") with SkyTerra (n/k/a LightSquared) whereby LightSquared agreed to purchase minutes ("***Satellite Minutes***") of voice or data transmission and satellite capacity to use on TerreStar-1. Subject to certain terms and conditions set forth in the Satellite Minutes Agreement, LightSquared has prepaid for Satellite Minutes in equal amounts on May 6, 2010, May 20, 2010, June 3, 2010 and June 17, 2010 for an aggregate purchase price of $40 million (the "***Purchase Price***"). Subject to the terms and conditions of the Satellite Minutes Agreement, LightSquared may begin using the Satellite Minutes (the "***Usage Start Date***") at any time within one year after TSN launches commercial service on TerreStar-1.[28] As of the date hereof, TSN has not determined whether it will assume or reject the Satellite Minutes Agreement.

### C. The Company's Organizational Structure

#### (i) Overview of Debtors' Organizational Structure

Attached as **Exhibit C** to this Disclosure Statement is an organizational chart summarizing the corporate structure of the Debtors and their Non-Debtor Affiliates, as of October 19, 2010. As demonstrated by the organizational chart, TSN is a Delaware corporation and is an affiliate of each of the other Debtors. As set forth below, certain of TSN's subsidiaries and affiliates are entities organized under the laws of the provinces of Ontario and British Columbia, some of which are also Debtors in these chapter 11 cases. As further set forth below, contemporaneously with the filing of these chapter 11 cases, TSN, in its capacity as proposed foreign representative, commenced a recognition proceeding in Canada, which, among other things, sought the Canadian Court's recognition of the chapter 11 cases as a "foreign main proceeding".

As of the date hereof, TSC[29], the ultimate parent of each of the Debtors, but not a Debtor in these cases, has four wholly-owned direct subsidiaries, three of which are Debtors in these proceedings: TerreStar New York Inc. ("***TerreStar NY***"), Motient Holdings Inc. ("***Motient***") and MVH Holdings Inc. ("***MVH***").[30] TerreStar Holdings

---

[28] TSN launched its commercial service on TerreStar-1 on September 21, 2010, triggering LightSquared's Usage Term.

[29] As of October 11, 2010, TSC had authorized 240 million shares of common stock (the "***Common Stock***") and had 139,441,616 shares of Common Stock outstanding. As of the Petition Date, and assuming conversion of any preferred stock held by Harbinger, Harbinger beneficially held approximately 47.78% of the Common Stock, subject to dilution by certain equity linked securities of TSC and its Affiliates (but not, for the avoidance of doubt, subject to dilution on account of any conversion to equity of any of the Senior Exchangeable Notes), as more fully set forth in TSC's filings with the SEC. On a fully diluted basis, including the impact of conversion of equity linked securities of TSC and its Affiliates and conversion of the Senior Exchangeable Notes, as of the Petition Date, EchoStar beneficially held 19.0% of the TSC Common Stock.

[30] TSC does not directly hold any Canadian assets; as discussed below, the interests held in the Debtors' Canadian affiliates are directly or indirectly held by TSN.

Inc. ("**TerreStar Holdings**"), a Delaware corporation, is the fourth wholly-owned direct subsidiary of TSC but is not a Debtor in these cases.[31]

TerreStar NY is a New York corporation that has no subsidiaries. TerreStar NY is not a TSN Debtor.

Motient holds 100% of the interests in both Motient Services Inc. and Motient Communications Inc., each a Delaware corporation, and each a Debtor in these proceedings. Motient Communications Inc. in turn holds 100% of the interests in Motient License Inc., another Delaware corporation, and a Debtor in these proceedings. These entities have minimal operations, minimal assets and various liabilities they will seek (or have sought already) to reject in the chapter 11 cases. None of these entities are TSN Debtors.

MVH directly holds 100% of the interests in Motient Ventures Holdings Inc., a Delaware corporation. Neither of these Debtors are TSN Debtors.

Motient Ventures Holdings Inc. holds approximately 89.3% of the equity of TSN,[32] and 86.5% of the equity of TerreStar Global Ltd.,[33] a Bermuda company and a non-Debtor affiliate in these cases. TerreStar Global Ltd. holds a license to utilize an orbital slot allocated to the government of Bermuda by Ofcom.[34] The orbital slot is available for use in the S-Band spectrum and use of the slot would require a satellite that can operate on the S-Band.[35] The license to use the slot is set to expire in December 2013 unless the Debtors renew the license, which will require a showing that the Debtors intend to use the slot. At this point, the TSN Debtors do not intend to use the slot.

TerreStar Global Ltd. holds 100% of the equity of TerreStar Europe Limited, a United Kingdom company and a non-Debtor in these cases. TerreStar Europe Limited was established to provide coverage in certain areas of Europe. After an unsuccessful bid for the right to use the S-Band in Europe, TerreStar Europe Limited conducts no operations and was recently stricken from the United Kingdom's company register.

TSN wholly owns both TerreStar National Services Inc. and TerreStar License Inc., each of which are co-Debtors with TSN in these cases. TerreStar National Services Inc. is a Delaware corporation established to conduct certain confidential work on behalf of the United States government. TerreStar License Inc., also a Delaware corporation, is an entity established solely to hold certain FCC licenses and regulatory approvals related to the TSN Debtors' operations, including licenses necessary to operate the S-Band and the U.S. CES and Ground Stations.

In developing the TSN Debtors' satellite network, the Domestic Debtors and their domestic non-Debtor affiliates have worked closely and cooperatively with their Canadian partner, Trio 2 General Partnership ("**Trio**"), through Trio's subsidiary, 4491165 Canada Inc. ("**4491165**").[36] Neither Trio nor 4491165 are Debtors in these

---

[31] TerreStar Holdings directly holds 100% of the interests in 1.4 Holdings. As noted earlier, 1.4 Holdings is a Delaware limited liability company, which holds the FCC licenses for certain 1.4 GHz spectrum.

[32] The remaining 10.7% of the interests in TSN are held by LightSquared.

[33] Of the remaining 13.5%, MSV Investors Holdings Inc. owns 13.1%, 0.3% is held by Continental Casualty and the remainder is held by a former director of TerreStar Global Ltd. and a private investor.

[34] Ofcom is the Office of Communications, which functions as the independent regulator and competition authority for the United Kingdom communications industries.

[35] The Debtors are unaware of any entity, other than the Debtors, that has a satellite it is not currently using that would be able to take advantage of this slot.

[36] Trio owns a 75.6% interest in 4491165, with the remaining 24.4% held by Healthcare of Ontario Pension Plan, which has also been acting cooperatively with the Debtors in these cases.

cases, nor are they part of the Canadian recognition proceedings. Nevertheless, both of these entities have worked closely and cooperatively with the Debtors during the chapter 11 preparation process and thus far during the chapter 11 cases and the Recognition Proceedings (as defined below).

As discussed above, the necessity for the creation of TerreStar Networks Holdings (Canada) Inc., TerreStar Networks (Canada) Inc. and 0887729 B.C. Ltd. (each a Canadian company and each a TSN Debtor in these cases) arises from certain licensee and ownership restrictions existing in Canada. Industry Canada (the Canadian federal government department responsible for spectrum management and licensing in Canada) has stringent requirements for, among other things, qualifying an entity as a licensee of spectrum, as a licensee of Ground Stations and CES sites, and as a licensee of orbital slots. Specifically, certain licenses may be granted only to Canadian entities and, until very recently, some of these entities were required to be Canadian controlled – that is, a certain threshold of voting interests must be held by a Canadian national.[37] Accordingly, the Domestic Debtors, along with a predecessor in interest to Trio, created TerreStar Networks Holdings (Canada) Inc. ("**Holdings Canada**"), an entity in which 33⅓% of the voting interests are held by TSN with the remaining 66⅔% held by 4491165. Holdings Canada functions as a holding company for TerreStar Networks (Canada) Inc. ("**TerreStar Canada**"). TSN directly holds 20% of the voting interests in TerreStar Canada, with the remaining 80% held by Holdings Canada.[38]

TerreStar Canada holds title to the TerreStar-1 satellite as well as rights to the orbital slot in which TerreStar-1 resides, spectrum licenses to use the S-Band in Canada, and related authorizations to conduct operations in Canada. Under the terms of an amended and restated Indefeasible Right of Use Agreement dated August 11, 2009 between TSN and TerreStar Canada, TSN has been granted the right to use 90% of the capacity of TerreStar-1.

TSN, Trio, TerreStar Solutions Holdings Inc. ("**Solutions Holdings**")[39] and TerreStar Solutions Inc. ("**TerreStar Solutions**") entered into a Shareholders' Agreement on August 11, 2009, which establishes certain rights and obligations of the shareholders of TerreStar Solutions, a corporation incorporated under the laws of Canada and established for the purpose of providing commercial MSS/ATC services in Canada using the TerreStar-1 satellite and the S-Band. TSN holds 20% of Class A common shares in TerreStar Solutions and 100% of Class B common shares. The remaining 80% of the Class A common shares in TerreStar Solutions is held by Solutions Holdings. Neither Solutions Holdings nor TerreStar Solutions are Debtors in these cases.[40]

In furtherance of its objective to be the provider of commercial MSS/ATC services in Canada, TerreStar Solutions (1) has entered into a Wholesale Satellite Capacity Agreement with TerreStar Canada whereby TerreStar Solutions has the right to use up to 10% of the capacity of TerreStar-1 on a per minute/per megabyte basis and (2) intends to enter into various agreements to allow for the use of TSN handsets in Canada and for the sale of end user devices in Canada. Additionally, TerreStar Solutions has entered into a Rights and Services agreement under which

---

[37] On July 12, 2010, certain amendments to Canada's Telecommunications Act were given royal assent, the effect of which was to remove the restrictions on non-Canadian ownership of Canadian satellites. Nonetheless, as of the Petition Date, no changes to the corporate structure have been made as a result of these amendments.

[38] This means that TSN effectively holds (either directly or indirectly) 46.67% of the controlling interests in TerreStar Canada.

[39] Trio owns a 75.6% interest in Solutions Holding, with the remaining 24.4% held by Healthcare of Ontario Pension Plan.

[40] In addition to the foregoing Shareholders Agreement, there is an additional shareholders' agreement between TSN, TerreStar Networks (Canada) Inc. and TerreStar Networks (Canada) Holdings Inc., and non-Debtors 4491165 and Trio, dated August 11, 2009. Pursuant to that agreement, TSN has certain call rights (subject to certain exceptions set forth therein) that can be exercised to acquire 4491165's equity interests in TerreStar Networks (Canada) Holdings Inc. and 4491165 has certain put rights (subject to certain exceptions set forth therein) that can be exercised to oblige TSN to acquire 4491165's equity interests in TerreStar Networks (Canada) Holdings Inc.

it is expected to procure certain network and technical services from TSN to facilitate the development and integration of the network with TerreStar Canada.

TerreStar Solutions has also entered into certain cost-sharing arrangements (the "***Cost-Sharing Arrangement***") with TerreStar Canada whereby TerreStar Canada and TerreStar Solutions share several operational costs and expenses, including but not limited to employees, utilities, and rent. To apportion the costs between TerreStar Canada and TerreStar Solutions, the companies use a charge back procedure, which is part of the separate budget approved by each of the boards of directors of TerreStar Canada and TerreStar Solutions. Specifically, operational costs are primarily paid in full by TerreStar Solutions on behalf of both it and TerreStar Canada. Subsequently, TerreStar Solutions invoices TerreStar Canada for its apportioned share. The aggregate amount paid monthly by TerreStar Canada to TerreStar Solutions is approximately between CDN $50,000 and CDN $70,000, with roughly 70% of that amount allocated to employee related costs and the remaining 30% allocated to rent, utilities and other operational costs. As of September 30, 2010, TerreStar Canada owes TerreStar Solutions approximately CDN $695,071 arising from the Cost-Sharing Arrangement. The TSN Debtors' DIP Financing provides for the continuation of the Cost-Sharing Arrangement during the chapter 11 cases.

Additionally, 0887729 B.C. Ltd., a Canadian entity 100% owned by TSN, holds licenses and assets in Canada relating to the Ground Station and CES sites located in Canada.

As noted above, three of the Debtors' Canadian affiliates, TerreStar Canada, Holdings Canada and 0887729 B.C. Ltd., are TSN Debtors in these chapter 11 cases. Accordingly, (and as further set forth herein) to protect against the risk of creditors seeking to enforce their rights in Canadian courts separate and apart from the bankruptcy proceedings, contemporaneously with the filing of these chapter 11 petitions, TSN, as proposed foreign representative, filed recognition proceeding under the Companies' Creditors Arrangement Act (Canada) with the Ontario Superior Court of Justice (Commercial List) seeking recognition in Canada of these U.S. chapter 11 cases as foreign main proceedings, and certain orders entered therein, in Canada (the "***Recognition Proceedings***").

### D. Prepetition Litigation

On June 25, 2008, Sprint Nextel Corporation ("***Sprint***") filed a lawsuit (the "***Sprint Litigation***") in the United States District Court for the Eastern District of Virginia naming TSN as a defendant. New ICO Satellite Services, G.P. was also named as a defendant (together with TSN, the "***Defendants***"). Sprint seeks, among other things, enforcement of certain FCC orders and reimbursement of not less than $100 million from each Defendant. Sprint argues that the Defendants owed Sprint reimbursement for certain spectrum relocation costs Sprint incurred or will incur in connection with relocating incumbent licensees from certain frequencies in the 2 GHz spectrum band. Specifically, in the United States, Sprint is obligated to relocate existing BAS and other terrestrial users in the TSN Debtors' uplink spectrum and 2 GHz MSS S-band licensees must relocate microwave users in the 2 GHz MSS S-band downlink band. Sprint completed such band clearing in July 2010 and currently is seeking reimbursement pursuant to applicable FCC rules from the Defendants for a portion of the expenses incurred by Sprint to accomplish such band clearing, which are now the subject of the Sprint Litigation.

On TSN's motion, the United States District Court for the Eastern District of Virginia stayed Sprint's suit on the ground that primary jurisdiction of the dispute resides in the FCC; the case has been administratively closed. In September 2010, the FCC issued an order resolving certain regulatory issues related to the obligations of 2 GHz MSS licensees to Sprint for such BAS relocation expenses. In October 2010, the other 2 GHz MSS licensee appealed the FCC's September 2010 order and this appeal remains pending. The Sprint Litigation remains stayed pending a final decision by the FCC and has also been stayed by the automatic stay upon the commencement of the Debtors' chapter 11 cases.

E.    **The Debtors' Prepetition Capital Structure**

*(i)*    *Overview*

As of the Petition Date, the TSN Debtors had debt facilities in place with an aggregate accreted amount of approximately $1.2 billion.  The chart below summarizes the TSN Debtors' prepetition indebtedness[41], including approximate outstanding amounts as of October 19, 2010.  Further detail with respect to each category of debt obligation is provided below.

| Debt Obligation | Original Amount | Approximate Amount Outstanding as of October 19, 2010 | Maturity Date | Security Status |
|---|---|---|---|---|
| Senior Secured PIK Notes | $550 million | $943.9 million | February 2014 | Secured |
| Purchase Money Credit Agreement | $100 million | $85.9 million | February 2013 | Secured |
| Senior Exchangeable PIK Notes | $150 million | $178.7 million | June 2014 | Unsecured |

*(ii)*    *Senior Secured Notes*

On February 14, 2007, TSN issued $500 million aggregate principal amount of Senior Secured PIK Notes due 2014 (the "***Initial Senior Secured Notes***") and on February 7, 2008, TSN issued an additional $50 million aggregate principal amount of Senior Secured PIK Notes due 2014 (the "***Additional Senior Secured Notes***" and, together with the Initial Senior Secured Notes, the "***Senior Secured Notes***") pursuant to an Indenture (together with any amendments, supplements or modifications thereto, the "***Senior Secured Notes Indenture***"), among TSN, as issuer, the guarantors from time to time party thereto (the "***Senior Secured Notes Guarantors***")[42] and U.S. Bank National Association, as trustee (the "***Senior Secured Notes Indenture Trustee***").

The Senior Secured Notes bear interest from the date of issuance at a rate of 15% per annum.  Beginning August 15, 2007, and until and including February 15, 2011, interest on the Senior Secured Notes has been and will be payable in additional Senior Secured Notes on each February 15 and August 15 semi-annually.  Thereafter, interest on the Senior Secured Notes will be payable in cash on February 15 and August 15 semi-annually, starting August 15, 2011.  Per the provisions of the Senior Secured Notes, additional interest of up to 1.5% per annum may accrue if certain milestones are not met by the Debtors.  Due to the failure to meet a milestone under the Senior Secured Notes Indenture, interest is currently accruing at a rate of 15.5%.[43]

The Senior Secured Notes are secured by a first priority security interest in the assets of TSN, TerreStar National Services Inc. and TerreStar License Inc., subject to certain exceptions[44], pursuant to a security agreement

---

41  This chart does not include any amounts relating to intercompany transfers.

42  As of the date hereof, the Senior Secured Notes Guarantors are Holdings Canada, TerreStar Canada, TerreStar National Services Inc. and TerreStar License Inc.  For the avoidance of doubt, 0887729 B.C. Ltd. is not a Senior Secured Notes Guarantor.

43  This failure relates to the milestone requiring TerreStar to enter into a multi-year service contract with the United States Government.

44  As set forth herein, there is a litigable issue as to whether the holders of the Senior Secured Notes have a lien on the TSN's rights in TerreStar-2.

(the "***U.S. Senior Secured Notes Security Agreement***") dated as of February 14, 2007 among TSN, as issuer, and TerreStar National Services Inc. and TerreStar License Inc. as guarantors, in favor of U.S. Bank National Association, as collateral agent.  Additionally, the Senior Secured Notes are secured by a first priority security interest in the assets of TerreStar Canada and Holdings Canada, subject to certain exceptions, pursuant to a security agreement (the "***Canadian Senior Secured Notes Security Agreement***"), dated as of February 14, 2007, among TSN as issuer and TerreStar Canada and Holdings Canada as guarantors, and U.S. Bank National Association, as collateral agent.

As of the Petition Date, approximately $943.9 million of principal and accrued interest was outstanding on account of the Senior Secured Notes.

### (iii)    *The Senior Exchangeable Notes*

On February 7, 2008, TSN issued $150 million aggregate principal amount of 6.5% Senior Exchangeable PIK Notes due 2014 (which are exchangeable for TerreStar Corporation common stock at a conversion price of $5.57 per share) (the "*Senior Exchangeable Notes*"), pursuant to an Indenture (the "***Senior Exchangeable Note Indenture***") among TSN, as issuer, the guarantors from time to time party thereto (the "***Senior Exchangeable Note Guarantors***")[45] and U.S. Bank National Association, as trustee (the "***Senior Exchangeable Note Indenture Trustee***").  On October 28, 2010, pursuant to a tripartite agreement, Deutsche Bank National Trust Company replaced U.S. Bank National Association as the Senior Exchangeable Notes Indenture Trustee.  The Senior Exchangeable Notes bear interest at a rate of 6.5% per annum, payable on a quarterly basis (on each of March 15, June 15, September 15 and December 15).  Until and including June 15, 2011, interest on the Senior Exchangeable Notes has been and will continue to be payable in additional Senior Exchangeable Notes quarterly.  Thereafter, interest on the Senior Exchangeable Notes will be payable in cash quarterly.  The Senior Exchangeable Notes are scheduled to mature on June 15, 2014.

The Senior Exchangeable Notes rank senior in right of payment to all existing and future subordinated indebtedness, and *pari passu* with all other unsubordinated indebtedness.  The Senior Exchangeable Notes are unsecured obligations of TSN and the Senior Exchangeable Note Guarantors.

As of the Petition Date, approximately $178.7 million of principal and accrued interest was outstanding on account of the Senior Exchangeable Notes.

### (iv)    *Purchase Money Credit Facility*

On February 5, 2008, TSN entered into a $100 million TerreStar-2 Purchase Money Credit Agreement (the "***PMCA***") among TSN, as the borrower, U.S. Bank National Association, as collateral agent (the "***PMCA Agent***"), and Harbinger and EchoStar Corporation ("***EchoStar***"), as original lenders.  There are no guarantors of the PMCA.  The financing under the PMCA is advanced as required and used to fund the completion of the construction of TerreStar-2 satellite.  The PMCA is secured by a first lien on all of TSN's rights in the TerreStar-2 satellite, along with the raw materials, work-in-process, construction agreement, insurance, books and records and all proceeds related thereto.

Amounts outstanding under the PMCA bear interest at a rate of 14% per annum and are due on February 5, 2013.  Pursuant to the PMCA, and in light of the Debtors' failure to reach certain milestones, additional interest of 3% accrued between December 31, 2009 and January 13, 2010.  On January 13, 2010, TSN met the required milestones, thereby reducing the interest rate back to 14% per annum from such date.

On August 25, 2010, Harbinger and EchoStar each advanced an additional $5 million under the PMCA, for an aggregate advance of $10 million, (the "***August 2010 Advance***") to reimburse TSN for a portion of the aggregate amount of payments made by TSN within the previous 180 days in connection with the construction of TerreStar-2.

---

[45]    As of the Petition Date, the Senior Exchangeable Note Guarantors are TerreStar National Services Inc. and TerreStar License Inc.

Contemporaneously with the August 2010 Advance, on August 25, 2010, Harbinger and EchoStar each executed a Waiver and Forbearance Agreement (the "***Waiver and Forbearance***"), wherein each agreed to waive certain provisions of the PMCA in connection with the August 2010 Advance and further agreed to forbear from exercising rights and remedies with respect to certain defaults or events of default that may arise under the PMCA, Senior Secured Notes Indenture or Senior Exchangeable Notes Indenture in connection with the August 2010 Advance or the use of such proceeds.

As of the Petition Date, approximately $85.9 million of principal and accrued interest is outstanding under the PMCA. Since the Petition Date, Harbinger has sold all of its interests in the PMCA. As of December 1, 2010, those interests are held by the following parties in various amounts: Mast Credit Opportunities I Master Fund Limited and its affiliates, Coharzick High Yield International Master Fund, Ltd. and its affiliates, Ulysses Partners L.P. and its affiliates and River Park Short Term High Yield Fund and its affiliates.

*(v)*     ***Stockholders' Equity***

### a.     TSN Preferred Stock

TSN has one outstanding share of non-voting Series A preferred stock ("***TSN Series A Preferred***") issued to EchoStar and one outstanding share of non-voting Series B preferred stock ("***TSN Series B Preferred***") issued to Harbinger. The TSN Series A and B Preferred have no voting rights and are not convertible into any other class of capital stock of the Debtors. The TSN Series A and B Preferred rank on parity with one another and rank superior to all other classes of TSN capital stock.[46]

### b.     TSN Common Stock

TSN's common stock is held by Motient Ventures Holdings Inc. (89.3%) and LightSquared, an affiliate of Harbinger (10.7%).

---

[46]   The TSN Series A and Series B Preferred Stock have certain rights as set forth in TSC's public filings.

<div align="center">

**V.**

**EVENTS LEADING TO COMMENCEMENT OF THE CHAPTER 11 CASES**

</div>

The following is a general description of factors that ultimately led to the commencement of the Debtors' chapter 11 cases.

As discussed above, the TSN Debtors' business model is premised upon innovation in the wireless telecommunications sector. Innovation does not happen overnight, nor does it come with a low price tag. The TSN Debtors and their non-Debtor affiliates have spent years developing their satellite and next generation network. Build-out required not only procuring the various technological components necessary to run the network – including technological build-out, such as the development of the GENUS handset, chipsets, the build-out of the CES and Ground Stations, the construction of the TerreStar-1 satellite and the TerreStar-2 ground spare, and the launch of TerreStar-1 – but also the procurement of various licenses and regulatory approvals required in order to operate the TerreStar network (such as licenses to use the S-Band spectrum both in the United States and Canada, ATC authorization in both the United States and Canada, licenses to operate CES and Ground Stations in both the United States and Canada, and licenses to use orbital slots in Canada). On top of actually developing the hard technology and procuring the necessary authority to operate it, the TSN Debtors had to carefully coordinate software development to facilitate communications between the CES sites, Ground Stations, TerreStar-1, the GENUS and the chipsets for traditional mobile devices. However, this alone is not enough to market the TSN Debtors' MSS. In addition to all of the foregoing, the TSN Debtors had to obtain ATC authorization in order to market their next generation network to traditional terrestrial coverage providers.

Accordingly, throughout the preceding years, the TSN Debtors' business model has largely been premised upon a substantial amount of capital expenditures with very little in the way of revenue. The TSN Debtors, now at the end stages of the development process, have begun to market their network, recently entering into the AT&T MSS Agreement and attaining a position where they can begin to build a customer base, which will further increase their revenue in the upcoming years. Nonetheless, despite achieving the significant milestone of turning their product into a revenue stream, the TSN Debtors require continued financing for further development and marketing before they become profitable enough to service their prepetition debt load and meet their capital requirements for continued technological development and expansion of their product.

The willingness of the TSN Debtors' investors to contribute more than $1 billion to fund the development of the TSN Debtors' network over the course of the years preceding the chapter 11 filings is a testament to such investors' belief in its business and its future. Nevertheless, the TSN Debtors eventually came to realize that they would not be able to meet their liquidity needs to satisfy working capital requirements, operating expenses, debt and other obligations absent either an infusion of new capital or a restructuring of their balance sheet.

Amidst one of the most challenging credit markets in recent history, in the 12 months before the Petition Date, the Debtors attempted a number of measures to increase liquidity. Specifically, and as described above in Article IV.B.ii. entitled "Significant Contracts", the Debtors and their non-Debtor affiliates entered into a series of transactions with Harbinger and certain of its affiliates under which the Debtors and their non-Debtor affiliates provided services or entered into transactions beneficial to each party's business efforts in exchange for additional capital for the Debtors in the form of one-time cash infusions or, in some cases, a revenue stream. For instance, as detailed above, the Debtors entered into an agreement with LightSquared whereby LightSquared purchased use capacity on the TerreStar-1 satellite, and entered into various agreements providing LightSquared/Harbinger with the exclusive right to negotiate a Pooling Arrangement regarding the parties' satellites and S-Band rights. While these agreements were successful in bringing additional funding and revenue into the Debtors' capital structure, standing alone they did not provide the TSN Debtors with sufficient revenue to service their outstanding debt obligations while maintaining the capital expenditures necessary to finalize development of their technology.

In recognition of the fact that, despite the Debtors' best efforts, their available cash and borrowing capacity were likely to decrease to the point where there would be insufficient capital to cover funding needs for the third and

fourth quarters of 2010, the Company began restructuring negotiations with its key stakeholders in April 2010.[47] These negotiations focused on both financing and balance sheet restructuring. Key stakeholders participating in such discussions included Harbinger (a substantial holder of the Senior Exchangeable Notes and, at that time, a substantial holder of the Senior Secured Notes and a 50% lender under the PMCA) as well as an informal group comprised of holders holding a significant amount of TSN's Senior Exchangeable Notes – many of which have cross holdings in the Senior Secured Notes.

Despite the good faith efforts of these various parties, because of their divergent interests and the Debtors' impending liquidity crunch (which was set to occur in short order), TerreStar determined that it was in its best interest to temporarily set aside the restructuring negotiations and primarily focus upon procuring additional financing in the form of a debtor-in-possession financing facility, which would allow TerreStar to continue negotiations with its stakeholders while receiving adequate financing and residing under the protections of the Bankruptcy Code. TerreStar determined that this path was the most viable restructuring alternative and would increase the likelihood of emerging from the restructuring process with a healthy balance sheet and adequate financing to continue the marketing of its network and the further development of necessary technological innovations.

Initially, the Company and its financial advisor, Blackstone Advisory Partners L.P. ("*Blackstone*") discussed and contemplated a chapter 11 filing with postpetition operations sustaining only on the use of cash collateral, without any additional financing, to fund operations during the chapter 11 cases. Even assuming the Debtors would be able to obtain the necessary consent to use cash collateral, it was determined that cash collateral alone would be insufficient to fund operations and necessary expenditures under the Debtors' go-forward business plan while continuing to service existing debt. Thus, to provide the Debtors with appropriate and necessary financing, obtaining adequate liquidity in the form of debtor-in-possession financing was critical to ensure that the business could operate in accordance with their business plan.

The Debtors explored all practicable avenues to obtain DIP financing on the best possible terms, including exploring financing options from participants in their prepetition capital structure and from unrelated third parties. Initially, the Debtors contemplated a junior, "non-priming" DIP financing structure whereby certain participants in the Debtors' prepetition capital structure would provide financing in exchange for a junior "non-priming" lien on all assets that secure the Senior Secured Notes and a first lien on all assets that do not secure the Senior Secured Notes. At the Debtors' suggestion, Blackstone marketed this DIP structure to existing stakeholders. The Debtors received preliminary indications that certain holders within the capital structure would be willing to participate in this sort of "junior" DIP financing structure but despite extensive arms' length negotiations with those parties, commitments to provide the required DIP financing ultimately were not obtainable.

---

[47] At that time, and up until a few days before the Petition Date, the Debtors contemplated that TSC and one of its wholly-owned direct subsidiaries, TerreStar Holdings Inc. (the "*TSC Entities*") would file for chapter 11 and be part of these chapter 11 cases. However, certain of the largest preferred shareholders of TSC's Series A and B Preferred Stock (including Solus Alternative Asset Management LP ("*Solus*"), Harbinger, and Highland Capital Management LP ("*Highland*")) requested that the Debtors refrain from filing the TSC Entities for chapter 11 while they worked with the TSC Entities on the terms of a consensual restructuring. (100% of TSC's Series A preferred stock is owned by Highland, and approximately 55% of TSC's Series B preferred stock is owned by Solus and Harbinger.) As part of these consensual negotiations these parties, including Harbinger, Solus, and Highland, agreed to provide the TSC Entities with $2.65 million of short term financing until a consensual restructuring could be achieved, and Highland agreed to toll certain litigation they currently have outstanding against TSC (for a description of such litigation, please see TSC's form 10-K/A for the fiscal year ended December 31, 2009, filed with the SEC on May 6, 2010). As such, since the days before the Petition Date and as of the date hereof, and as an accommodation to the above mentioned holders of TSC's Preferred Stock, the TSC Entities have decided to delay a chapter 11 filing until a consensual restructuring could be achieved; however, if a consensual restructuring cannot be obtained, the TSC Entities may need to file for chapter 11 without a prearranged plan.

As a result, in August 2010, the Debtors marketed the "junior" DIP financing structure to additional non-stakeholder parties. The Debtors executed numerous non-disclosure agreements with various parties; however, the Debtors were unable to attain sufficient interest to fill a sufficient "junior" DIP financing facility at that time. Because the Debtors did not obtain a sufficient junior DIP financing facility in August, and in light of their mounting liquidity concerns, the Debtors decided to explore whether they could obtain financing through a senior "priming" DIP. The Debtors' marketing efforts reached approximately 53 financial institutions (including current stakeholders) and resulted in the execution of confidentiality agreements with more than 25 parties. As a result of those efforts, the Debtors identified a group of third party lenders as a potential source of "priming" DIP financing and began negotiations with that group for a priming DIP (the ***Third Party Lenders***). At the same time, the Debtors continued discussions with their largest stakeholders with respect to the junior DIP financing structure.

Over the weeks leading to the commencement of these cases, the Debtors engaged in substantial discussions and negotiations on parallel tracks: a potential "priming" DIP facility from the Third Party Lenders and a "junior" DIP facility from one of the Debtors' largest stakeholders, EchoStar. The "priming" DIP had numerous problems, including risk of execution (i.e. a "non-consensual priming fight"), an uncertain chapter 11 exit strategy, and expensive "break-up" fees demanded by such lenders. Moreover, the Debtors had significant doubts as to whether they could meet the factual and legal predicates necessary to prevail in a "priming" fight, because of, among other things, the availability of junior debtor-in-possession financing proposed by EchoStar. The EchoStar DIP proposal, on the other hand, carried very little risk of execution as it is a "junior" DIP and thus would not require any "priming" fight. Moreover, the EchoStar transaction included an exit strategy. Specifically, the Debtors were able to negotiate and agree with EchoStar on terms, pursuant to which (i) EchoStar committed, subject to certain terms and conditions, to backstop $100 million of a $125 million Rights Offering of New Preferred Stock, which will allow the Debtors to repay their DIP Financing facility in full and, if the Rights Offering is fully subscribed, finance their operations upon their emergence from chapter 11, and (ii) EchoStar has committed to support the equitization of the totality of its secured notes – which represents more than 50% of the Debtors' close to $1 billion secured notes obligations. This support is crucial to the Debtors' reorganization efforts, and will allow the Debtors to pursue the equitization of their secured noteholders. Ultimately, the Debtors determined that the best available financing option was to obtain the debtor-in-possession financing facility offered by EchoStar (the "***DIP Facility***") which (as noted below in Article VI.B) was approved on an interim basis on October 20, 2010, and on a final basis on November 18, 2010, by the Bankruptcy Court. In light of the fair and thorough negotiation process undertaken by the Debtors to identify potential lenders and to obtain the best available postpetition financing terms, the Debtors believe that DIP Facility represents the best and most favorable financing for the Debtors.

Additionally, and on a parallel track with finalizing the terms of the DIP Facility, the Debtors and EchoStar engaged in extensive, good faith, arm's-length negotiations with respect to the terms of a plan term sheet, which efforts culminated in the execution of the RSA (defined below and, as noted above in footnote 47, and as an accommodation to TSC's largest preferred shareholder, did not include a chapter 11 filing of the TSC Entities). The Debtors believe that their decision to pursue that comprehensive, consensual restructuring plan – which includes entry into the DIP Facility –represents the best option to maximize recoveries to their creditors and will ensure a swift exit from these bankruptcy proceedings.

<center>**VI.**</center>
<center>**INITIAL MOTIONS OF THE CHAPTER 11 CASES AND CERTAIN RELATED RELIEF**</center>

On the Petition Date, each of the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York. The Debtors' chapter 11 cases are being jointly administered for procedural purposes only under the caption *In re TerreStar Networks Inc., et al.*, Case No. 10-15446 (SHL), before the Honorable Sean H. Lane. The Debtors continue to operate their businesses and manage their properties as debtors in possession under the jurisdiction of the Bankruptcy Court and in accordance with the applicable provisions of the Bankruptcy Code and orders of the Bankruptcy Court.

**A.     "First-Day" Motions and Related Relief**

To ensure a smooth transition to operations in chapter 11, the Debtors filed a number of motions with the Bankruptcy Court seeking relief designed to, among other things, prevent interruptions to the Debtors' business, ease the strain on the Debtors' relationship with certain essential constituents, including employees and provide access to immediate financing. At a hearing held on October 20, 2010, the Bankruptcy Court entered several orders granting various of the Debtors' initial requests for relief, as discussed below.

*(i)     Procedural Orders*

To facilitate a smooth and efficient administration of the Debtors' chapter 11 cases and minimize the impact to daily business operations, the Bankruptcy Court entered certain "procedural" orders by which the Bankruptcy Court (a) approved the joint administration of each of the Debtors' 13 chapter 11 cases [Docket No. 32]; and (b) authorized the Debtors to prepare a list of creditors and file a consolidated list of their 30 largest unsecured creditors [Docket No. 31].

*(ii)     Operational Orders*

Recognizing that any interruption of the Debtors' business, even for a brief period of time, would negatively impact their operations and to facilitate the stabilization of their businesses and effectuate a smooth transition into operating as debtors in possession, the Debtors sought and obtained orders authorizing them to:

•     pay prepetition wages, salaries and other compensation, reimbursable employee expenses and employee medical and similar benefits [Docket Nos. 34 (Interim Order), 176 (Final Order)];

•     maintain their existing cash management systems and grant postpetition intercompany claims administrative expense priority and continue intercompany arrangements [Docket Nos. 33 (Interim Order) and 177 (Final Order)];

In addition, on the Petition Date, the Debtors filed motions seeking to:

(1)     continue to administer their prepetition insurance coverage policies and practices [Docket No. 10]; and

(2)     establish procedures for providing adequate assurance of future payment to utility providers [Docket No. 12].

The Bankruptcy Court approved these motions by orders entered on November 8, 2010 [Docket Nos. 88 and 89, respectively].

*(iii)     Retention of Professionals*

On the Petition Date, the Debtors filed various applications seeking Bankruptcy Court approval to retain various professionals to assist in carrying out their duties as debtors in possession and to represent their interests in

<center>30</center>

the chapter 11 cases. Thereafter, the Debtors received Bankruptcy Court approval to retain the following professionals:

- Akin Gump Strauss Hauer & Feld LLP, as restructuring attorneys [Docket No. 179];

- Blackstone Advisory Partners L.P., as financial advisor and investment banker [Docket No. 195 (Interim Order)];[48]

- Garden City Group, Inc., as notice and claims agent [Docket No. 5];

- Fraser Milner Casgrain LLP, as Canadian Counsel for the Debtors [Docket No. 175]; and

- Stikeman Elliot LLP, as Canadian Counsel for TerreStar Networks Holdings (Canada) Inc. and TerreStar Networks (Canada) Inc. [Docket No. 180].

In addition to these professionals, the Debtors also obtained authority to retain various law firms and professionals to advise them with respect to certain of the Debtors' daily business operations, including corporate, securities and regulatory matters and pending litigation matters [Docket No. 173].

### B. Debtor-In-Possession Financing

In addition to the Debtors' initial procedural and operational relief, the Debtors filed a motion on the Petition Date seeking authority to ensure adequate access to liquidity during their chapter 11 cases, as discussed below.

### (i) The Interim DIP Order

On the Petition Date the Debtors sought approval of ongoing access to cash collateral as well as approval to enter into an aggregate $75 million junior secured debtor-in-possession financing facility (the "**DIP Facility**"). The DIP Facility is secured by a first lien on all of the Debtors' assets, subject to the liens held by the Debtors' Senior Secured Noteholders and the lenders under the PMCA. In addition, the DIP Facility is guaranteed by all of the Debtors; however, the guarantee provided by the Non-TSN Debtors is limited to the aggregate amount of DIP Facility funds these entities actually receive from the DIP Financing Facility, as fully set forth in the DIP Facility and the Interim DIP Order (defined below).

Ultimately, as set forth below, of the First Amendment to the DIP Facility (filed on November 12, 2010), the Non-TSN Debtors will be removed as guarantors upon the repayment of the minimal funds loaned to such entities. The DIP Facility carries a 15% interest rate, (which is paid-in-kind), and was issued with a 2% original issue discount. The DIP Lenders received a 3% commitment fee for providing the DIP Facility, which was also paid-in-kind. The DIP Facility contains negative and affirmative covenants standard for debtor-in-possession financing facilities, as well as various operational performance covenants. The Debtors do not believe they will be unable to comply with these covenants. Further, the DIP Facility contains various events of default, including, without limitation, complying with the following milestones: (1) the TSN Debtors file a plan and disclosure statement on or before November 5, 2010; (2) receive Bankruptcy Court approval of the disclosure statement on or before December 14, 2010; (3) commence a hearing to confirm the plan before January 31, 2011; and (4) obtain Bankruptcy Court approval of the plan by February 14, 2011.

On October 20, 2010, the Bankruptcy Court entered an order approving the Debtors' entry into the DIP Facility on an interim basis (the "**Interim DIP Order**") [Docket No. 35].

---

[48] Between the Petition Date and the date that the interim order approving the motion to retain Blackstone was entered, Blackstone's engagement letter with the Debtors was modified to reflect that (a) only the TSN Debtors would be party thereto and (b) Blackstone would receive an additional fee if either (i) their marketing efforts resulted in a sale of the TSN Debtors' assets in an amount greater than the current Plan value or (ii) as a result of their marketing efforts, the distributable Plan value was modified to result in an implied aggregate value greater than current Plan value.

*(ii)*     *Objections to the DIP Facility*

The TSN Debtors received numerous objections to the DIP Facility including objections from: (i) Marathon; (ii) Harbinger; (iii) Solus Alternative Asset Management LP and Remus Holdings LLC (together "***Solus***"); (iv) Sprint Nextel Corporation ("***Sprint***"); and (v) the statutory committee of unsecured creditors appointed in these chapter 11 cases (the "***Creditors' Committee***") (collectively, the "***Objectors***").

Many of the Objectors argued that the entry into the DIP Facility was not in the best interests of the Debtors' estates because it ceded too much control to EchoStar as the DIP Lender and/or that the DIP Facility constituted a sub rosa plan because the DIP Facility included the milestone requirements noted above ("***Milestones***") and required that any chapter 11 plan proposed and prosecuted by the TSN Debtors be "acceptable" to EchoStar. Certain other Objectors' arguments related to the extent or validity of certain prepetition security interests.

The TSN Debtors filed an omnibus reply in response to the Objections and in further support of the DIP Motion on November 13, 2010 [Docket No. 162] (the "***Omnibus Reply***").

### a.     The Marathon Objection

Marathon, in addition to several of the arguments noted above, asserted that the DIP Facility was not the best financing alternative available because Marathon itself was willing to provide alternative DIP Financing without the aspects of the proposed DIP Facility that it and the other Objectors objected to. At the final hearing on the DIP Motion, Marathon's counsel announced to the Court the terms of the alternative financing proposal (the "***Marathon Facility***"). Importantly, the Marathon Facility was not offered on a **junior** lien basis, but rather would be a senior secured priming facility that would require the Debtors to hold a contested hearing on whether they could successfully provide adequate protection to their prepetition Senior Secured Noteholders and prevail in a priming fight. This aspect of the Marathon Facility was one of the same aspects that caused the Debtors to move forward with the EchoStar DIP Facility rather than the third party priming facility for which they received a commitment before the commencement of the chapter 11 cases. Since the date of the final DIP hearing, the TSN Debtors have not received any commitment (or other documentation) from Marathon regarding the proposed Marathon Facility.

### b.     The Sprint Objection

The Objection filed by Sprint included two primary objections: (a) an argument that TerreStar License Inc. ("***TLI***") should not be authorized to guaranty the DIP Financing because the DIP Financing allegedly does not benefit TLI's estate and (b) the Senior Secured Notes do not have a lien on the Federal Communications Commission ("***FCC***") licenses held by TLI (collectively, the "***Licenses***") and therefore, the lien in the proceeds of such licenses allegedly does not attach to postpetition proceeds of the Licenses.

In their Omnibus Reply, the TSN Debtors responded to Sprint's assertion that TLI was not receiving the benefit of the proposed DIP Financing by pointing out that TLI would indeed receive substantial benefits from the use of the DIP proceeds. In particular, the DIP proceeds would allow TSN to continue to provide the financial and operational support TLI needed and without which the underlying licenses themselves would be idle and subject to cancellation or revocation.

### c.     The Creditors' Committee's Objection

The Creditors' Committee objected to the Milestones, which set the pace of these cases, and provisions linking the DIP Facility to the pursuit of a plan of reorganization reasonably acceptable to EchoStar. In addition, the Creditors' Committee objected to the grant of liens and superpriority claims on the proceeds of avoidance actions and the Debtors' grant of a Bankruptcy Code section 506(c) waiver.

### d.     Solus' Objection and Discovery Requests

As set forth above, Solus objected to the DIP Financing Facility on various grounds. In connection with its objection, Solus filed various document requests on the TSN Debtors, as well as requested a deposition of Mr. Steven Zelin, the Debtors' financial advisor. In response to the various document requests, the TSN Debtors produced approximately 5,000 pages of documents. On Monday November 15, 2010, Solus took the deposition of Mr. Zelin.

*(iii)*     ***The First Amendment to the DIP Facility***

On November 12, 2010, the TSN Debtors filed the First Amendment to the DIP Facility [Docket No. 153]. Pursuant to Amendment #1, the DIP Facility was amended, among other things, as follows: (1) the milestone requirement that the Debtors receive Bankruptcy Court approval of the Debtors' assumption of the RSA (defined below) within 35 days of the Petition Date was eliminated; (2) From and after the date on which all advances made by TSN and its subsidiaries to the Non-TSN Debtors are repaid in full in cash, the Non-TSN Debtors will cease to be Loan Parties or Guarantors (each as defined in the DIP Facility) of the TSN Debtors' obligations under the DIP Facility and any security interests granted in any collateral of the Non-TSN Debtors will be released and terminated; (3) the first measurement date for the operational covenants requiring the TSN Debtors to (a) earn a certain minimum amount of revenue from the Roam-In Business and (b) achieve a certain minimum number of subscribers was moved from November 30, 2010 to December 31, 2010; and (4) the date of the next draw of the DIP Facility was set for December 15, 2010, in the amount of $6 million.

*(iv)*     ***The Final DIP Hearing and Final DIP Order***

The final hearing on the DIP Motion was held on November 16, 2010.

After several hours of argument and testimony, including evidence provided by Mr. Zelin, the Debtors' financial advisor, regarding the TSN Debtors' need for financing and the process by which they determined that the EchoStar DIP Facility was the best debtor-in-possession financing available, the Bankruptcy Court approved the DIP Facility on a final basis and overruled all of the outstanding objections with one exception. Specifically, the Bankruptcy Court held that it would not approve the grant of liens or superpriority claims to the DIP Lenders on the avoidance actions or proceeds thereof.

On November 18, 2010, the Bankruptcy Court entered an order approving the Debtors' entry into the DIP Facility on a final basis (the "***Final DIP Order***") [Docket No. 181].

**C.     The Motion to Assume the Restructuring Support Agreement**

On the Petition Date, the Debtors filed a motion seeking authority to assume the Restructuring Support Agreement between the Debtors and EchoStar (the "***RSA***"). The Bankruptcy Court originally scheduled a hearing on the Motion to Assume the RSA for November 16, 2010. Per the Debtors' agreement with EchoStar, the Debtors are no longer seeking Bankruptcy Court approval of the RSA. In that respect, on November 12, 2010, the TSN Debtors filed a notice of withdrawal of the Motion to Assume the RSA [Docket No. 161].

**D.     Canadian Proceedings**

To protect the TSN Debtors' Industry Canada licenses and approvals, as well as other assets located in Canada, the Debtors determined that it would be necessary to commence foreign recognition proceedings in Canada under Part IV of the *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36 ("***CCAA***"). In this regard, on the Petition Date, the Canadian Court entered an interim order granting certain interim relief including, among other things, a general stay of proceedings against the Debtors in Canada. To facilitate the recognition proceedings, on the Petition Date the Debtors sought and, on October 20, 2010 received, Bankruptcy Court authorization for TSN to act as the Foreign Representative on behalf of the Debtors in the Canadian Recognition Proceedings [Docket No. 30] (the "***Foreign Representative Order***"). Subsequent to entry of that order, TSN filed the Foreign Representative Order with the Canadian Court and sought recognition of these jointly consolidated chapter 11 cases as a foreign main proceeding. On October 21, 2010, the Canadian Court granted certain orders that, among other things, recognized these cases as a foreign main proceeding pursuant to Part IV of the CCAA, recognized TSN as the foreign representative of the Debtors and recognized and gave full force and effect in Canada to certain of the first day orders of the Bankruptcy Court, including the Interim DIP Order. On November 19, 2010, the Canadian Court recognized and gave full force and effect in Canada to, among other orders of the Bankruptcy Court, the Final DIP Order.

Since the Petition Date, the Debtors' Canadian counsel has continued (and will continue) to seek additional recognition orders from the Canadian Court for substantive relief granted by the Bankruptcy Court in these chapter

11 cases.  To date, the Canadian Court has recognized and given full force and effect in Canada to each of the Bankruptcy Court orders that have been brought before the Canadian Court for recognition.

# VII.  DEVELOPMENTS DURING THE CHAPTER 11 CASES

## A.  Appointment of the Statutory Committee

Section 1102 of the Bankruptcy Code requires that, absent an order of the Bankruptcy Court to the contrary, the U.S. Trustee must appoint a committee of unsecured creditors as soon as practicable.  On October 29, 2010, the U.S. Trustee appointed the Creditors' Committee.  The Creditors' Committee is comprised of the following members:

- Deutsche Bank National Trust Company, Indenture Trustee;

- Hughes Network Systems, Inc.;

- Nokia Siemens Networks US LLC;

- Qualcomm Incorporated;

- Shaffer Wilson Sarver & Gray, P.C.;

- Space Systems/Loral. Inc.; and

- Van Vlissingen and Company.

The Creditors' Committee subsequently sought to retain Otterbourg, Steindler, Houston & Rosen LLP, as legal counsel [Docket No. 194] and FTI Consulting, as financial advisor [Docket No. 205].  A hearing on these retentions has been scheduled on December 15, 2010 at 10:00 a.m.

## B.  The Claims Process

### (i)  Filing of the Debtors' Statements of Financial Affairs and Schedules of Assets and Liabilities

On November 8, 2010, the Debtors filed their schedules of assets and liabilities and statements of financial affairs (collectively, the "**SOFAs and Schedules**") pursuant to section 521 of the Bankruptcy Code and Bankruptcy Rule 1007.  The SOFAs and Schedules provide information concerning each of the Debtors' assets, liabilities (including accounts payable), executory contracts and other financial information as of the Petition Date.  Copies of the Debtors' SOFAs and Schedules are available free of charge by accessing www.TerreStarInfo.com.  The SOFAs and Schedules include, among other things, a list of all intercompany transfers among the Debtors and between the Debtors and their non-Debtor affiliates.

### (ii)  Establishment of the Claims Bar Date

On November 8, 2010, the Bankruptcy Court entered an order [Docket No. 92] (the "**Bar Date Order**") establishing December 10, 2010 (the "**Bar Date**") as the deadline by which each person or entity asserting a claim against any of the Debtors was required to file written proof of such claim.  The Bar Date Order was recognized by the Canadian Court on November 9, 2010.  In accordance with the Bar Date Order, the Debtors provided written notice of the Bar Date to each of the parties and entities identified as creditors on the SOFAs and Schedules and to all known actual or potential creditors of the Debtors according to the Debtors' books and records at the time of mailing of the notice.  Where possible, this notice was accompanied by a "personalized" proof of claim form approved by the Bankruptcy Court.  Additionally, in an effort to reach unknown creditors, the Debtors published notice of the Bar Date in the *Washington Post, USA Today* and *The Globe and Mail (national edition)*.

## C.  Rejection of Executory Contracts and Unexpired Leases

The Debtors are party to numerous contracts and lease agreements that are entered into in the ordinary course of their business operations.  After analyzing and reviewing the terms and conditions of many of these agreements, the Debtors determined that some of the agreements were no longer beneficial to the Debtors' ongoing business operations and would constitute an unnecessary drain on the Debtors' resources.  Accordingly, to avoid incurring administrative expense claims during these chapter 11 cases with respect to agreements that were no

longer of utility to the Debtors, the Debtors have sought to reject various executory contracts and unexpired leases, and will continue to do so during the course of the chapter 11 cases. To date, the Debtors have filed a motion to reject unexpired leases, a motion to reject an executory contract with The telx Group and one omnibus motion seeking to reject a number of agreements. The Bankruptcy Court entered orders authorizing the relief requested in the motion to reject unexpired leases and the motion to reject the agreement with The telx Group on November 23, 2010 [Docket Nos. 196 and 197]. The first omnibus motion to reject certain contracts is scheduled to be heard by the Court on December 10, 2010.

### D. Exclusivity

Under the Bankruptcy Code, a debtor has the exclusive right to file and solicit acceptance of a plan or plans of reorganization for an initial period of 120 days from the date on which the debtor filed for voluntary relief (the "**Exclusive Filing Period**"). If a debtor files a plan during the Exclusive Filing Period, then the debtor has the exclusive right for 180 days from the commencement date to solicit acceptance of the Plan (the "**Exclusive Solicitation Period**" and, together with the Exclusive Filing Period, the "**Exclusive Periods**"). During the Exclusive Periods, no other party in interest may file a competing plan of reorganization. However, a court may extend these periods upon the request of a party in interest.

The Debtors' initial Exclusive Filing Period and Exclusive Solicitation Period are set to expire on February 16, 2011 and April 18, 2011, respectively.

### E. The Motion to Dismiss Certain Chapter 11 Cases

On November 1, 2010, certain holders of TSC's Series B Preferred Stock (specifically, the affiliated managed funds of Solus Alternative Asset Management LP and Millennium International Management LP) (the "**Movants**") filed a motion to dismiss the Chapter 11 Cases of the Non-TSN Debtors pursuant to sections 105(a) and 1112(b) of the Bankruptcy Code and Bankruptcy Rule 1017(a) (the "**Motion to Dismiss**"). On November 5, 2010, Marathon Asset Management, L.P. filed a joinder to the Motion to Dismiss. The Movants argued (i) the Non-TSN Debtors' bankruptcy petitions were not filed in good faith or in furtherance of a rehabilitative purpose and (ii) in filing the Non-TSN Debtors' bankruptcy petitions, the directors of TSC and the Non-TSN Debtors did not exercise independent fiduciary duties owed to their respective estates and stakeholders. The Debtors vigorously disputed both assertions. On November 2, 2010, the Movants served discovery requests pertaining to issues raised in the Motion to Dismiss. A hearing on the Motion to Dismiss was originally scheduled for November 16, 2010.

On November 12, 2010, the parties reached an agreement, evidenced by a stipulation [Docket No. 159] (the "**Stipulation**") and the Movants agreed to withdraw the Motion to Dismiss and the related discovery requests. Specifically, the Stipulation provides, among other things, that: (a) the Non-TSN Debtors would be removed from and not reorganized under any chapter 11 plan with the TSN Debtors absent the consent of the Preferred Stockholders holding a majority of each of the aggregate number of shares then outstanding of TSC's Series A Cumulative Convertible Preferred Stock and the aggregate number of shares then outstanding of TSC's Series B Cumulative Convertible Preferred Stock (TSC's Series A Cumulative Convertible Preferred Stock and Series B Cumulative Convertible Preferred Stock collectively, the "**Preferred Stock**"); (b) the DIP Facility would be amended to provide that, upon repayment to EchoStar, in full and in cash of all principal and accrued interest, of any funds owed by the Non-TSN Debtors under the DIP Facility, the Non-TSN Debtors would be removed as Loan Parties (as defined in the DIP Facility) and that any funding needs required by the Non-TSN Debtors would be provided through a loan to be made available to TSC and the Non-TSN Debtors by certain of the Preferred Stockholders (the "**TSC Loan**"); (c) TSC's intercompany loan (the "**TSC IC Loan**") to TSN, evidenced by those certain notes dated June 8, 2009, July 6, 2009, August 4, 2009, August 26, 2009, and September 21, 2009, in the face amount of $50 million (plus interest) would be an allowed, undisputed, and non-contingent claim in the TSN Debtors' chapter 11 cases.

In exchange for the foregoing, the Movants agreed to withdraw the Motion to Dismiss (and related discovery requests) and the Preferred Stockholders (in their capacity as such) agreed not to object to (or cause another holder of Preferred Stock to object to or support another holder of Preferred Stock's objection to) the relief requested in the Debtors' motion to approve the DIP Facility. Additionally, the Preferred Stockholders agreed to forbear from exercising rights and remedies under the certificates of designations governing the Preferred Stock (the "**Certificates of Designations**") from and after the closing date of the TSC Loan (the "**TSC Closing Date**") until the

earliest of (i) 75 days after the TSC Closing Date, (ii) the time either TSC or TerreStar Holdings Inc. enters into an agreement regarding postpetition financing for one or both of TSC and TerreStar Holdings Inc., and (iii) the date TSC and/or TerreStar Holdings Inc. files a petition under the Bankruptcy Code or commences any similar insolvency proceeding, provided no event of default under the TSC Loan shall have occurred. The TSC Loan closed on November 19, 2010. Finally, the Preferred Stockholders agreed not to object to any motion filed by TSC in any chapter 11 case of TSC to assume TSC's obligations under the TSN Debtors' RSA. In addition, both the Creditors' Committee (by signing the Stipulation) and Marathon (by representation in Bankruptcy Court on November 16, 2010) agreed not to object to the Stipulation in return for a clarification that nothing therein prejudiced their rights with regard thereto.

On November 17, 2010 the Movants withdrew the Motion to Dismiss [Docket No. 171].

### F. The TSN Debtors' Licenses and Related Applications

As further described above (see generally, Article IV), the TSN Debtors' principal business, the provision of mobile satellite services ("**MSS**") in North America, is subject to extensive regulation by the FCC in the United States and by Industry Canada in Canada. The TSN Debtors provide MSS using the TerreStar-1 2 GHz MSS satellite, which is licensed to TerreStar Canada by Industry Canada and resides in an orbital slot that is authorized by Industry Canada. In the United States, the TSN Debtors provide MSS using TerreStar-1 pursuant to a 2 GHz spectrum reservation issued by the FCC to TSN. TSN, TerreStar Canada, 0887729 B.C. Ltd. and TerreStar Solutions also hold various additional FCC and Industry Canada licenses and equipment authorizations relating to their Ground Stations, CES, handsets, and terrestrial base stations and MSS, feeder link and telemetry, trajectory and control spectrum. TSN further holds an FCC authorization to provide ATC services in the United States, which authorization is subject to a variety of gating criteria intended to ensure that such ATC services remain ancillary to TSN's MSS offering as well as other conditions, including a condition requiring compliance with FCC decisions related to payment for rebranding of the 2 GHz band. TerreStar Solutions, a non-Debtor in these chapter 11 cases, holds a similar ATC authorization issued by Industry Canada governing the provision of ATC in Canada.

The FCC and Industry Canada hold regulatory authority in the United States and Canada, respectively, to regulate the operation and ownership of the MSS, ATC and related authorizations held by the TSN Debtors and affiliates of their Canadian partner, Trio. This includes authority to issue, renew and modify such authorizations; require prior approval with respect to certain changes in ownership or control of the authorizations, including approval rights over foreign ownership; adopt and implement regulations and policies governing the ownership and operations of the licensees; and impose penalties, including forfeitures and license revocations, for violations of their respective rules and policies.

Both the entry of the TSN Debtors into chapter 11 bankruptcy protection and the emergence of the Reorganized Debtors from chapter 11 require the consent of the FCC under Section 310(d) of the Communications Act. The Debtors filed *pro forma* assignment applications seeking FCC consent for the prior assignment of the Debtors' FCC licenses to the TSN Debtors as "debtors in possession" under chapter 11. The FCC has granted these applications. The TSN Debtors also will be required to file FCC applications seeking prior FCC consent to transfer control of TSN's FCC licenses to the Reorganized Debtors upon TSN's emergence from chapter 11 ("**Long-Form Applications**"). The TSN Debtors will be required to disclose in the Long-Form Application certain information about entities that will hold a 10% or greater direct or indirect interests in TSN post-emergence. The Debtors also will be required to certify the legal, character, and other qualifications of the proposed transferee of control in FCC licensees. Grant of the Long-From Applications by the FCC is a prerequisite to the TSN Debtors' emergence from chapter 11 protection.

Further, Section 310(b)(4) of the Communications Act prohibits foreign ownership of US. common carrier wireless licenses, including TSN's ATC authorization, in excess of 25 percent unless the FCC determines that such foreign ownership is not contrary to the public interest. TSN may be required to file a petition for a declaratory ruling seeking such an FCC determination with respect to certain of its authorizations ("**Foreign Ownership PDR**"). The TSN Debtors will be required to disclose in the Foreign Ownership PDR certain information regarding entities that will hold direct and indirect interests in Reorganized TSN that are foreign owned, controlled, organized, and/or headquartered.

To facilitate collection of the information that will be required to be disclosed in the Long-Form Application and Foreign Ownership PDR, if any, as well as to stabilize the identity of the entities that will be disclosed in such filings during the FCC's review of the filings, the TSN Debtors filed a motion with the Bankruptcy Court requesting the court to require the disclosure to the TSN Debtors of certain information by Claims holders and restricting certain trading of certain Claims [Docket Nos. 119 and 130] (the "***Trading Restrictions Motion***"). Specifically, in the Trading Restrictions Motion, the Debtors sought for the holders of certain Claims to be required to disclose information required to be submitted to the FCC in the Long-Form Application and the Foreign Ownership PDR, if any. In addition, the Debtors requested that the Bankruptcy Court restrict certain trading of certain Claims during the pendency of the FCC's review of the Long Form Applications and Foreign Ownership PDR to the extent necessary to prevent such trading from causing the anticipated post-emergence ownership of Reorganized TSN disclosed in such filings from substantially shifting while the FCC is reviewing the filings. These restrictions are intended to prevent delay in the FCC's review and approval of the filings and to avoid the need to file multiple amendments to the filings during such FCC review. Such amendments potentially could extend the FCC's review of the Long-Form Application and/or Foreign Ownership PDR to the detriment of the TSN Debtors. After filing the Trading Restrictions Motion, the TSN Debtors worked with various of their stakeholders, including counsel to an ad hoc group of holders of the TSN Debtors' Senior Secured Notes, counsel to Harbinger, and the Creditors' Committee, to ensure that the burdens imposed on claimants by the proposed trading restrictions would be minimal. Among other things, the TSN Debtors agreed to limit the applicability of the proposed trading restrictions to (a) those holders of the Senior Secured Notes who would hold 10% or more of reorganized TSN upon emergence (or holders of the TSN Debtors' 6.5% Exchangeable PIK Notes who also hold Senior Secured Notes and qualify for the 10% threshold)(i.e. a "Substantial Equityholder" as defined in the Trading Restrictions Motion) or (b) those holders of Senior Secured Notes who would hold at least half of reorganized TSN upon emergence. The TSN Debtors were able to reach a resolution with regard to all of the various issues raised by these parties concerning the Trading Restrictions Motion, and thereafter presented to the Bankruptcy Court an agreed-upon proposed order. The Bankruptcy Court entered the order approving the Trading Restrictions Motion on November 23, 2010 [Docket No. 198].

Any transfer of control of TerreStar Canada or any transfer of the Industry Canada licenses held by the TSN Debtors to another party is subject to the prior approval of Industry Canada. To the extent that the reorganization of the TSN Debtors' reorganization involves any such transfers, the prior approval of Industry Canada will be required and such approval is a condition precedent to the occurrence of the Effective Date pursuant to Article X of the Plan, as described in Article VIII.H hereof.

### G. The TSN Debtors' Marketing Process

As discussed in detail above, before the commencement of these chapter 11 cases, and between July 2010 and August 2010, the TSN Debtors were subject to various exclusivity agreements with Harbinger/LightSquared that restricted their ability to market their assets to prospective purchasers. When this exclusivity period ended in August 2010, the Debtors (as part of their search for postpetition financing) also had numerous discussions with their stakeholders regarding a consensual restructuring through a chapter 11 plan and/or a sale of the TSN Debtors' assets. Based on those discussions, the TSN Debtors determined that their best available restructuring option was to enter into the RSA and pursue approval of the DIP Facility from EchoStar. Before signing the RSA and beginning in early October, and until the Petition Date, the TSN Debtors, together with their advisors, actively marketed the TSN Debtors' assets in an effort to maximize value for all of their stakeholders. This marketing process included calling various parties that the TSN Debtors and their advisors believed would be potential purchasers and discussing the sale with them as well as explaining to them the TSN Debtors' proposed chapter 11 process with EchoStar.

From the Petition Date through November 12, 2010, the date on which the Debtors withdrew the motion to assume the RSA, the TSN Debtors entertained and actively responded to calls received by the TSN Debtors and their advisors from any prospective purchasers. Once the motion to assume the RSA was withdrawn, the TSN Debtors resumed their comprehensive marketing process. Specifically, the TSN Debtors and their advisors have contacted or are in the process of contacting numerous parties to gauge their potential interest in purchasing the TSN Debtors' assets. Additionally, the TSN Debtors have filed on the docket [Docket No. 210] a notice of marketing of their assets and have published that notice in the *Washington Post*, *USA Today* and *The Globe and Mail (national*

*edition).* At this time, however, the TSN Debtors have not received an offer to purchase all or any portion of their assets.

### H. Ad Hoc Group of 15% Senior Secured Noteholders

The TSN Debtors have been informed that an ad hoc group of noteholders of the TSN Debtors' 15% Senior Secured Notes has formed. The group has retained Kirkland & Ellis LLP as its legal counsel and Peter J. Solomon as its financial advisors. On November 12, 2010, Kirkland & Ellis LLP filed its Verified Statement of Kirkland & Ellis LLP Pursuant to Federal Rule of Bankruptcy Procedure 2019 [Docket No. 152], according to which it stated that the noteholders that it represents hold, in the aggregate, $258 million of the 15% Senior Secured Notes.

### I. Motions Relating to the Rights Offering

On November 19, 2010, the TSN Debtors filed their *Motion for Entry of an Order (I) Approving the TSN Debtors' Entry into the Backstop Commitment Agreement and (II) Authorizing the TSN Debtors' Payment of Related Fees, Expenses and Indemnification to the Backstop Party* [Docket No. 188] (the "***EPCA Approval Motion***"). Pursuant to the EPCA Approval Motion, the TSN Debtors are seeking authorization to enter into the equity purchase and commitment agreement (the "***EPCA***") with EchoStar, in its capacity as Plan Sponsor. The EPCA documents EchoStar's commitment to backstop $100 million of the TSN Debtors' proposed $125 million Rights Offering of New Preferred Stock, subject to the terms and conditions set forth therein. The EPCA also documents the consideration which EchoStar is receiving on account of its commitment to purchase shares of New Preferred Stock: (a) a 3% commitment fee, payable in New Preferred Stock (if the Rights Offering is consummated) or cash (if the transactions embodied in the Plan are not consummated); (b) the right to purchase $25 million in additional New Preferred Stock (the "***Overallotment***"), (c) a right of first refusal to purchase any unsubscribed shares in the Rights Offering that are not subject to EchoStar's backstop commitment (prior to the exercise by any other holder of its oversubscription right), and (d) on the Effective Date, the reimbursement of EchoStar's reasonable, actual and documented expenses incurred in connection with the Rights Offering and other transactions contemplated by the EPCA. A hearing to consider the EPCA Approval Motion is scheduled for December 15, 2010.

On November 23, 2010, as part of the *Motion for Entry of an Order (A) Fixing Dates and Deadlines Related to Confirmation of the Plan; (B) Approving Procedures for Soliciting and Tabulating the Votes on, and for Objecting to, the Plan; (C) Approving the Manner and Form of Notices and Documents Relating to the Plan; (D) Approving Rights Offering Procedures; and (E) Authorizing the Employment and Retention of Epiq Bankruptcy Solutions, LLC as Subscription Agent* [Docket No. 201] (the "***Procedures Motion***"), the TSN Debtors set forth their proposed procedures for the Rights Offering. Pursuant thereto, holders of Allowed Claims as of the Record Date will be permitted to participate in the Rights Offering (subject to certain exceptions set forth therein). Further, and as set forth in the Rights Offering Procedures, the TSN Debtors have proposed that each holder of an unsecured claim be permitted to participate in the Rights Offering based on a claim amount equal to the larger of: (a) the amount of such holder's claim as set forth on the TSN Debtors' schedules of assets and liabilities and statements of financial affairs; and (b) the amount of such holder's claim as set forth on such holder's proof of claim form, unless such amount has been objected to (in which case such holder's claim, for the purposes of the Rights Offering, will be equal to the undisputed portion of such claim). A hearing to consider the Procedures Motion is scheduled for December 10, 2010.

# VIII.
## DESCRIPTION OF THE JOINT PLAN OF REORGANIZATION[49]

This section provides a summary of the structure and means for implementation of the Plan and the classification and treatment of Claims and Interests under the Plan and is qualified in its entirety by reference to the Plan (as well as the exhibits thereto and definitions therein).

The Plan is premised on the consummation of the restructuring transactions as further set forth in the Plan. The Debtors believe that the reorganization contemplated by the Plan is in the best interests of the estates and creditors of the TSN Debtors. If the Plan is not confirmed, and the TSN Debtors are unable to successfully sell the TSN Debtors' assets at a higher value than that upon which the Plan is based, the TSN Debtors believe that they will be forced to either file an alternate plan of reorganization or liquidate under chapter 7 of the Bankruptcy Code. In such event, the TSN Debtors believe that the holders of Allowed Claims would realize a less favorable distribution of value, or, in certain cases, none at all, for their Claims. *See* Section X.E. and the Liquidation Analysis attached as Exhibit D hereto.

The Plan embodies an overall compromise and settlement of claims under Bankruptcy Rule 9019, which was heavily negotiated between EchoStar and the TSN Debtors before the Petition Date. As set forth in Exhibit F to this Disclosure Statement, the TSN Debtors' Financial Advisor valued the overall enterprise valuation between $1.07 billion and $1.37 billion. As part of the overall compromise and settlement upon which the Plan is based, however, the TSN Debtors used an enterprise value of $1.265 billion (i.e. an increase of $50 million from $1.215 billion, the midpoint of the TSN Debtors' valuation range) as the starting point when determining distributable value under the Plan.

In arriving at the distributions contained in the Plan, the TSN Debtors and their advisors considered the following, some of which are the subject of dispute among the various parties in the case:

- Except as noted in the fourth bullet below (and as may otherwise be prohibited by law), the Senior Secured Noteholders have a first priority lien in all of the TSN Debtors' (other than 0887729 B.C. Ltd.) assets.

- The holders of PMCA claims have a first priority lien in the TSN Debtors' rights in the TerreStar-2 satellite.

- The holders of DIP Claims hold a first priority lien in all of the TSN Debtors' assets (other than avoidance actions), subject only to the liens held by holders of the PMCA Claims and holders of the Senior Secured Notes Claims.

- The Senior Secured Noteholders assert that they have a security interest in TSN's rights in the TerreStar-2 satellite. This is a litigable issue. However, the impact of any such litigation is immaterial due to the fact, among other things, that the holders of the Senior Secured Notes Claims are entitled to assert their full deficiency claim at TSN.[50]

---

[49] The statements contained in this Disclosure Statement include summaries of the provisions contained in the Plan and in the documents referred to therein. The statements contained in this Disclosure Statement do not purport to be precise or complete statements of all the terms and provisions of the Plan or documents referred to therein, and reference is made to the Plan and to such documents for the full and complete statement of such terms and provisions of the Plan or documents referred to therein. The Plan itself controls the actual treatment of Claims against and Interests in the TSN Debtors and will, upon the occurrence of the Effective Date, be binding upon all Holders of Claims and Interests and other parties in interest. In the event of any conflict between this Disclosure Statement and the Plan or any other operative document, the terms of the Plan and/or such other operative document will control. Capitalized terms used but not defined in this section of this Disclosure Statement have the meaning ascribed to such terms in the Plan.

[50] Moreover, absent the ability to obtain a meaningfully higher recovery, engaging in litigation will merely erode the value of the TSN Debtors' further, to the detriment of unsecured creditors.

- The holders of the TSN Debtors' Senior Exchangeable Notes Claims have a guarantee from TerreStar License Inc. and TerreStar National Services Inc. The guarantee that the Senior Exchangeable Noteholders have at these entities gives such claimants structural seniority over creditors who are solely claimants at TSN.

- The holders of the Senior Secured Notes have a first priority lien on all of the assets held by TerreStar License Inc. and TerreStar National Services Inc. (except as may be prohibited by law). Due to, among other things, the size of the secured claims held by the holders of the Senior Secured Notes, and as part of the overall compromise and settlement reached between EchoStar and the TSN Debtors as to the value to be ascribed to the guarantee claims held by holders of TSN Debtors' Senior Exchangeable Notes, the holders of the Senior Exchangeable Notes will receive no less than 1% of the New Common Stock.

- The TSN Debtors have assumed that the aggregate amount of Allowed Other Unsecured Claims at the TSN Debtors will be approximately $365 million. Holders of the Senior Exchangeable Notes Claims will not be harmed by any increase in such Allowed Other Unsecured Claims.

## A. TREATMENT OF ADMINISTRATIVE CLAIMS, DIP CLAIMS, U.S. TRUSTEE FEES AND PRIORITY TAX CLAIMS

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, DIP Claims, U.S. Trustee Fees and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Article III of the Plan and shall have the following treatment:

*(i)    Administrative Claims*

### a.    Administrative Claims

Except with respect to Administrative Claims that are Claims for Accrued Professional Compensation and except to the extent that a holder of an Allowed Administrative Claim agrees to less favorable treatment, each holder of an Allowed Administrative Claim shall, in complete satisfaction of such Allowed Administrative Claim, be paid Cash in the full amount of such Allowed Administrative Claim on the later of: (a) the Initial Distribution Date; (b) the first date such Administrative Claim is Allowed or as soon as reasonably practicable thereafter; and (c) the date such Allowed Administrative Claim becomes due and payable by its terms, or as soon thereafter as is reasonably practicable.

### b.    Professional Compensation

#### i.    Claims for Accrued Professional Compensation

Professionals or other Entities asserting a Claim for Accrued Professional Compensation for services rendered before the Effective Date must file and serve on the TSN Debtors and such other Entities who are designated by the Bankruptcy Rules, the Confirmation Order, the Interim Compensation Order or other order of the Bankruptcy Court an application for final allowance of such Claim for Accrued Professional Compensation no later than 30 days after the Effective Date. Objections to any Claim for Accrued Professional Compensation must be filed and served on the Reorganized TSN Debtors, the Creditors' Committee, the Office of the U.S. Trustee and the requesting party no later than the earlier of (a) 45 days after such application is filed or (b) 75 days after the Effective Date.

#### ii.    Treatment of Claims for Accrued Professional Compensation

A Claim for Accrued Professional Compensation in respect of which a final fee application has been properly filed and served pursuant to Article II(A)(2)(a) of the Plan shall be payable to the extent approved by order of the Bankruptcy Court. Subject to the Holdback Amount, on the Effective Date, or as soon thereafter as reasonably practicable, to the extent not otherwise paid, all Allowed Claims for Accrued Professional Compensation (including estimated Accrued Professional Compensation through the Effective Date) shall be paid in full in Cash. To receive payment on the Effective Date for unbilled fees and expenses incurred through the Effective Date, each Professional shall reasonably estimate fees and expenses due for unbilled fees and expenses for periods that will not

have been billed as of the Effective Date and shall deliver such estimates to the TSN Debtors, the Plan Sponsor and the U.S. Trustee prior to the Effective Date. If the estimated payment received by such Professional exceeds the actual allowed Accrued Professional Compensation for the estimated period, such excess amount shall be deducted from the Holdback Amount for such Professional and if the Holdback Amount is insufficient, such Professional shall disgorge the difference. If the estimated payment received by the Professional is lower than the Accrued Professional Compensation of such Professional, the difference shall be promptly paid to the Professional.

On the Effective Date, the Reorganized TSN Debtors shall fund the Holdback Amount Reserve for payment of the Holdback Amount. Upon final allowance by the Bankruptcy Court of the Accrued Professional Compensation, or entry of an earlier order of the Bankruptcy Court granting the release of the Holdback Amount, such amount, less any excess paid in connection with estimated fees and expenses through the Effective Date, shall be paid promptly and directly to the Professionals.

<center>iii.    Post- Effective Date Fees and Expenses</center>

Upon the Effective Date, any requirement that Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Reorganized TSN Debtors may employ and pay any Professional for services rendered or expenses incurred after the Effective Date in the ordinary course of business without any further notice to any party or action (including, without limitation, without the need to file a fee application), order or approval of the Bankruptcy Court.

<center>**c.    Administrative Claim Bar Date**</center>

Except as otherwise provided in this Article II.A of the Plan, requests for payment of Administrative Claims must be filed and served on the Reorganized TSN Debtors pursuant to the procedures specified in the Confirmation Order and the notice of entry of the Confirmation Order no later than 45 days after the Effective Date. Holders of Administrative Claims that are required to, but do not, file and serve a request for payment of such Administrative Claims by such date shall be forever barred, estopped and enjoined from asserting such Administrative Claims against the TSN Debtors or Reorganized TSN Debtors or their property and such Administrative Claims shall be deemed discharged as of the Effective Date. Objections to such requests, if any, must be filed and served on the Reorganized TSN Debtors and the requesting party no later than 90 days after the Effective Date. Notwithstanding the foregoing, no request for payment of an Administrative Claim need be filed with respect to an Administrative Claim previously Allowed by Final Order, including all Administrative Claims expressly Allowed under the Plan.

*(ii)*    ***DIP Claims***

On the Effective Date, unless otherwise agreed to by the DIP Lenders, the DIP Claims shall be paid in full in Cash as provided under the DIP Loan Agreement. Upon payment and satisfaction in full of all Allowed DIP Claims, all liens and security interests granted to secure such obligations shall be terminated and immediately released and the DIP Lenders shall execute and deliver to the Reorganized TSN Debtors such instruments of release, satisfaction and/or assignments (in recordable form) as may be reasonably requested by the Reorganized TSN Debtors.

*(iii)*    ***U.S. Trustee Fees***

On the Effective Date, the TSN Debtors shall pay all U.S. Trustee Fees that are due and owing on the Effective Date.

*(iv)*    ***Priority Tax Claims***

Each holder of an Allowed Priority Tax Claim due and payable on or before the Effective Date shall receive, on the Distribution Date, at the option of the TSN Debtors (which option shall be reasonably satisfactory to the Plan Sponsor), one of the following treatments, in complete satisfaction of such Allowed Priority Tax Claim: (1) Cash in an amount equal to the amount of such Allowed Priority Tax Claim; (2) Cash in an aggregate amount of

such Allowed Priority Tax Claim payable in installment payments over a period of time not to exceed five years after the Petition Date, pursuant to section 1129(a)(9)(C) of the Bankruptcy Code; or (3) such other treatment as may be agreed upon by such holder and the TSN Debtors or otherwise determined upon an order of the Bankruptcy Court.

## B. CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

### (i) General Rule of Classification

(a) Pursuant to section 1122 of the Bankruptcy Code, set forth below is a designation of Classes of Claims against and Interests in the TSN Debtors. A Claim or Interest is placed in a particular Class only to the extent that the Claim or Interest falls within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest falls within the description of such other Classes. A Claim or Interest is also placed in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim or Interest is an Allowed Claim in that Class and such Claim or Interest has not been paid, released, or otherwise settled prior to the Effective Date.

(b) The TSN Debtors shall be treated as if they were consolidated solely for Plan voting, confirmation and distribution purposes as described in Article VII of the Plan; provided, however, that if any Class of Impaired Claims votes to reject the Plan, the TSN Debtors' ability to confirm the Plan with respect to such rejecting Class pursuant to the cramdown standards of section 1129(b) of the Bankruptcy Code will be determined by reference to the treatment to which the holders of Claims in such Class would be entitled were (i) their Claims limited to the specific TSN Debtor(s) that are liable for such Claims, and (ii) the TSN Debtors not treated as consolidated for distribution and confirmation purposes. This limited consolidation treatment is designed to consensually pool the assets and liabilities of the TSN Debtors solely to implement the settlements and compromises reached by the primary constituencies in the TSN Debtors' Chapter 11 Cases.

### (ii) Summary of Classification

The following chart represents the general classification of Claims and Interests against the TSN Debtors pursuant to the Plan:

| Class | Claim | Status | Voting Rights |
|-------|-------|--------|---------------|
| 1 | Other Priority Claims | Unimpaired | No (deemed to accept) |
| 2 | Other Secured Claims | Unimpaired | No (deemed to accept) |
| 3 | Senior Secured Notes Claims | Impaired | Yes |
| 4 | PMCA Claims | Unimpaired | No (deemed to accept) |
| 5 | Senior Exchangeable Notes Claims | Impaired | Yes |
| 6 | Other Unsecured Claims | Impaired | Yes |
| 7 | Unsecured Convenience Claims | Impaired | Yes |
| 8 | Equity Interests | Impaired | No (deemed to reject) |

### (iii) Treatment of Claims and Interests

#### a. Class 1 – Other Priority Claims

i.  Classification: Class 1 consists of Other Priority Claims.

ii.  Treatment: Except to the extent that a holder of an Allowed Other Priority Claim (i) has been paid by the TSN Debtors, in whole or in part, prior to the Effective Date or (ii) agrees to a less favorable

treatment, each holder of an Allowed Other Priority Claim shall receive, on the Initial Distribution Date and in full satisfaction, settlement, release, and discharge of, and in exchange for such Other Priority Claim, Cash in the full amount of such Allowed Other Priority Claim.

iii. *Voting*:  Class 1 is Unimpaired, and the holders of Other Priority Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, holders of Other Priority Claims are not entitled to vote to accept or reject the Plan.

**b.     Class 2 – Other Secured Claims**

i. *Classification:*  Class 2 consists of Other Secured Claims.  Although all Other Secured Claims have been placed in one Class for the purposes of nomenclature, each Other Secured Claim, to the extent secured by a Lien on any property or interest in property of the TSN Debtors different than that securing any other Other Secured Claims, shall be treated as being in a separate sub-Class for the purpose of receiving distributions under the Plan.

ii. *Treatment:*  On the Initial Distribution Date, except to the extent that a holder of an Allowed Other Secured Claim agrees to a less favorable treatment, at the option of the TSN Debtors or the Reorganized TSN Debtors (which option shall be reasonably satisfactory to the Plan Sponsor), (i) each Allowed Other Secured Claim shall be reinstated and Unimpaired in accordance with section 1124(2) of the Bankruptcy Code, or (ii) each holder of an Allowed Other Secured Claim shall receive, in full satisfaction, settlement, release, and discharge of, and in exchange for, such Other Secured Claim, either (w) Cash in the full amount of such Allowed Other Secured Claim, including any postpetition interest accrued pursuant to section 506(b) of the Bankruptcy Code, (x) the proceeds of the sale or disposition of the collateral securing such Allowed Other Secured Claim to the extent of the value of the holder's secured interest in such collateral, (y) the collateral securing such Allowed Other Secured Claim and any interest on such Allowed Other Secured Claim required to be paid pursuant to section 506(b) of the Bankruptcy Code, or (z) such other distribution as necessary to satisfy the requirements of section 1129 of the Bankruptcy Code.

iii. *Voting:* Class 2 is Unimpaired, and the holders of Other Secured Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, holders of Other Secured Claims are not entitled to vote to accept or reject the Plan.

**c.     Class 3 – Senior Secured Notes Claims**

i. *Classification:*  Class 3 consists of the Senior Secured Notes Claims.

ii. *Treatment:*  Each holder of an allowed Senior Secured Notes Claim shall receive its Pro Rata share of the Class 3 Distribution.  *"Class 3 Distribution"* means (i) 97% of the New Common Stock, and (ii) with respect to holders of Class 3 Claims that become Allowed Claims in accordance with the Rights Offering Procedures on or before the

Subscription Record Date only, Rights to purchase 97% of the Rights Offering Preferred Stock.

    *iii.*    *Voting:* Holders of Senior Secured Notes Claims are Impaired. Therefore, each holder of a Senior Secured Notes Claim is entitled to vote to accept or reject the Plan.

**d.**    **Class 4 – PMCA Claims**

    *i.*    *Classification:* Class 4 consists of the PMCA Claims.

    *ii.*    *Treatment:* The PMCA Claims will be reinstated pursuant to section 1124 of the Bankruptcy Code.

    *iii.*    *Voting:* Class 4 is Unimpaired, and the holders of PMCA Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, holders of PMCA Claims are not entitled to vote to accept or reject the Plan.

**e.**    **Class 5 – Senior Exchangeable Notes Claims**

    *i.*    *Classification:* Class 5 consists of the Senior Exchangeable Notes Claims.

    *ii.*    *Treatment:* Each holder of a Senior Exchangeable Notes Claim shall receive, on the Initial Distribution Date, its Pro Rata share of the Class 5 Distribution. *"Class 5 Distribution"* means (i) at least 1% but no more than 3% of the New Common Stock, and (ii) with respect to holders of Class 5 Claims that become Allowed Claims in accordance with the Rights Offering Procedures on or before the Subscription Record Date only, Rights to purchase at least 1% but no more than 3% of the Rights Offering Preferred Stock. The exact percentage will be determined after resolution of the Other Unsecured Claims pool; however, for the avoidance of doubt, (1) the TSN Debtors have assumed that the aggregate amount of Allowed Other Unsecured Claims at the TSN Debtors will be approximately $365 million; (2) any decrease in the aggregate amount of Allowed Other Unsecured Claims at the TSN Debtors will result in fewer shares of New Common Stock being issued by Reorganized TSN; and (3) Holders of the Senior Exchangeable Notes Claims will not be harmed by any increase in Allowed Other Unsecured Claims.

    *iii.*    *Voting:* Holders of Senior Exchangeable Notes Claims are Impaired. Therefore, each holder of a Senior Exchangeable Notes Claim is entitled to vote to accept or reject the Plan.

**f.**    **Class 6 – Other Unsecured Claims**

    *i.*    *Classification:* Class 6 consists of the Other Unsecured Claims.

    ii.    *Treatment:* Unless such holder has made a Convenience Class Election, each holder of an Allowed Other Unsecured Claim shall receive its Pro Rata share of the Class 6 Distribution. *"Class 6 Distribution"* means (i) 3% of the New Common Stock <u>minus</u> any amount of New Common Stock distributed pursuant to the Class 5

Distribution, and (ii) with respect to holders of Class 6 Claims that become Allowed Claims in accordance with the Rights Offering Procedures on or before the Subscription Record Date only, Rights to purchase 3% of the Rights Offering Preferred Stock <u>minus</u> any Rights to purchase Rights Offering Preferred Stock distributed pursuant to the Class 5 Distribution. The exact percentage will be determined based upon the final resolution of Allowed Other Unsecured Claims. For the avoidance of doubt, (1) the TSN Debtors have assumed that the aggregate amount of Allowed Other Unsecured Claims at the TSN Debtors will be approximately $365 million; (2) to the extent Allowed Other Unsecured Claims are ultimately determined to be greater than $365 million, holders of Allowed Other Unsecured Claims will not receive any additional New Common Stock; (3) to the extent Allowed Other Unsecured Claims are ultimately determined to be less than $365 million, Reorganized TSN will issue fewer shares of New Common Stock.

iii.    "*Convenience Class Election*" means each holder of an Allowed Class 6 Claim in an amount in excess of $25,000 may elect to be treated as a holder of an Unsecured Convenience Claim in Class 7 by electing to reduce its Class 6 Claim to the amount of $25,000 in full and final satisfaction, release, and discharge of such Allowed Class 6 Claim (such election, a "Convenience Class Election"). Except as may be agreed to by the TSN Debtors, any Convenience Class Election must be made on the Ballot and no Holder of a Class 6 Claim can make a Convenience Class Election after the Voting Deadline. Upon any Convenience Class Election, the Class 6 Claim of the applicable holder shall be automatically reduced to $25,000 and shall no longer be entitled to any other distribution as contemplated by the Plan.

iv.    *Voting:* Holders of Other Unsecured Claims are Impaired. Therefore, each holder of an Other Unsecured Claim is entitled to vote to accept or reject the Plan.

**g.**    **Class 7 – Unsecured Convenience Claims**

i.    *Classification:* Class 7 consists of Unsecured Convenience Claims.

ii.    *Treatment:* Each holder of an Allowed Unsecured Convenience Claim shall receive Cash in an amount equal to the lesser of: (i) 10% of such holders' Unsecured Convenience Claim; and (ii) such holder's Pro Rata share of $500,000.

iii.    *Voting:* Class 7 is Impaired by the Plan. Therefore, each holder of an Unsecured Convenience Claim is entitled to vote to accept or reject the Plan.

**h.**    **Class 8 – Equity Interests in TSN**

i.    *Classification:* Class 8 consists of all Equity Interests.

ii.    *Treatment:* On the Effective Date, all Equity Interests shall be deemed cancelled and shall be of no further force and effect, whether surrendered for cancellation or otherwise, and there shall be no distribution to the holders of Equity Interests.

iii.    *Voting:*  Class 8 is Impaired, and the holders of Equity Interests are conclusively presumed to have rejected the Plan. Therefore, holders of Equity Interests are not entitled to vote to accept or reject the Plan.

## C.    ACCEPTANCE REQUIREMENTS

### *(i)*    *Acceptance or Rejection of the Plan*

#### a.    Voting Class

Classes 3, 5, 6 and 7 are Impaired under the Plan and are receiving property under the Plan. Therefore, such Classes are entitled to vote to accept or reject the Plan.

#### b.    Presumed Acceptance of the Plan

Classes 1, 2, and 4 are Unimpaired under the Plan and are, therefore, conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.

### *(ii)*    *Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code*

Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation by acceptance of the Plan by an Impaired Class of Claims. The TSN Debtors shall seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Interests. The TSN Debtors reserve the right to modify the Plan in accordance with Article XI of the Plan to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification.

## D.    MEANS FOR IMPLEMENTATION OF THE PLAN

### *(i)*    *Limited Consolidation for Voting, Confirmation and Distribution Purposes*

The Plan provides for substantive consolidation of the TSN Debtors' Estates, but solely for purposes of voting, confirmation, and making distributions to the holders of Allowed Claims under the Plan. On the Effective Date, and solely for purposes of voting, confirmation, and making distributions to the holders of Allowed Claims under the Plan: (a) all guarantees of any TSN Debtor of the payment, performance or collection of another TSN Debtor with respect to Claims against such TSN Debtor will be eliminated and cancelled; (b) any single obligation of multiple TSN Debtors will be treated as a single obligation in the consolidated Chapter 11 Cases; and (c) all guarantees by a TSN Debtor with respect to Claims against one or more of the other TSN Debtors will be treated as a single obligation in the consolidated Chapter 11 Cases. On the Effective Date, and in accordance with the terms of the Plan and the consolidation of the assets and liabilities of the TSN Debtors, all Claims based upon guarantees of collection, payment, or performance made by a TSN Debtor as to the obligation of another TSN Debtor shall be released and of no further force and effect. Except as set forth in this Article V.A.1, such substantive consolidation shall not affect (a) the legal and corporate structure of the Reorganized TSN Debtors, or (b) any obligations under any leases or contracts assumed in the Plan or otherwise after the Petition Date.

Such election to treat the Estates as if they were consolidated solely for the purpose of implementing the Plan shall not affect: (1) the legal and corporate structures of the TSN Debtors, subject to the right of the TSN Debtors to effect the Restructuring Transactions contemplated pursuant to the Plan; (2) any obligations under any contracts or leases that were entered into during the Chapter 11 Cases or Executory Contracts and unexpired leases that have been or will be assumed pursuant to the Plan; (3) Intercompany Interests; (4) distributions from any insurance policies or proceeds of such policies; (5) the revesting of assets in the separate Reorganized TSN Debtors pursuant to Article V.N of the Plan. In addition, such election to treat the Estates as consolidated for the purpose of implementing the Plan will not constitute a waiver of the mutuality requirement for setoff under section 553 of the Bankruptcy Code, except to the extent otherwise expressly waived by the TSN Debtors.

To maximize the recoveries of creditors, the TSN Debtors propose limited consolidation solely to facilitate implementation of the Plan. Each of the TSN Debtors (other than 0887729 B.C. Ltd.)[51] is obligated as an issuer or guarantor of the Senior Secured Notes and accordingly, except as set forth in the introductory paragraphs of this Article VIII, distributions at those entities must first satisfy the claims held by such creditors (and holders of the PMCA and DIP Facility Claims) before any recovery can be provided to unsecured creditors. As a result, the TSN Debtors are not aware of any creditor materially affected by the consolidations contemplated under the Plan. The TSN Debtors believe that treating the TSN Debtors as consolidated for plan distribution purposes and pooling the assets and liabilities of the TSN Debtors is in the best interests of creditors because it will simplify the administration of the chapter 11 cases and implementation of the Plan. Additionally, consolidation for Plan purposes permits the TSN Debtors to implement the settlement transactions contemplated by the Plan (as further described herein), which avoid costly litigation and other expenses related to separating out assets and liabilities and preserves such assets for creditors. In light of the above, limited consolidation for plan distribution purposes does not improperly enhance or impair the recoveries of any creditors, and is appropriate and warranted under the circumstances.

The TSN Debtors understand that Sprint asserts that there is no basis for substantive consolidation for Plan purposes. Sprint may object to confirmation of the Plan on that basis.

*(ii)* **Intercompany Claims**

Each Allowed Intercompany Claim shall be reinstated on the Effective Date, except as otherwise determined to by the TSN Debtors with the reasonable consent of the Plan Sponsor. After the Effective Date, the Reorganized TSN Debtors shall have the right to resolve or compromise Disputed Intercompany Claims without approval of the Bankruptcy Court.

*(iii)* **Sources of Consideration for Plan Distributions**

All Cash consideration necessary for the TSN Debtors or the Reorganized TSN Debtors, as applicable, to make payments or distributions pursuant hereto shall be obtained from the Rights Offering (and the Backstop Party's purchase of the Overallotment, if applicable) or other Cash on hand, including Cash derived from business operations.

*(iv)* **Issuance of New Securities and Debt Instruments**

### a. Issuance of New Common Stock

On the Effective Date, TSN shall issue the New Common Stock to the Holders of Claims entitled thereto.

### b. Issuance of New Preferred Stock

On the Effective Date, the Reorganized TSN Debtor shall issue the New Preferred Stock, on such terms and conditions as set forth in the New Preferred Stock Certificate of Designation. The New Preferred Stock will have the same economic and voting rights as the Common Stock on an "as converted" basis; provided that the New Preferred Stock shall be entitled to a liquidation preference set forth in the New Preferred Stock Certificate of Designation.

### c. New Shareholders Agreement

The holders of the New Common Stock and New Preferred Stock shall be parties to the New Shareholders Agreement. As of the Effective Date, and as a condition to receiving any distribution of New Common Stock or

---

[51] To the best of the TSN Debtors' knowledge, 0887729 B.C. Ltd. has no third-party general unsecured creditors.

New Preferred Stock, holders of Claims or Interests that receive the New Common Stock or New Preferred Stock shall be deemed bound by the New Shareholders Agreement.

*(v)*     ***The Rights Offering***

#### a.     General Description

Pursuant to the Rights Offering, TSN will offer and sell the Rights Offering Preferred Stock. The Rights Offering Preferred Stock shall be subject to the New Preferred Stock Certificate of Designation.

#### b.     Rights Offering Procedures

Each holder of Rights will be entitled to exercise such Rights in order to subscribe for and acquire their Pro Rata share of the Rights Offering Preferred Stock, calculated before issuing Additional Shares of New Preferred Stock in connection with payment of the Backstop Commitment Fee and, if exercised, the Overallotment. The Rights Offering will be consummated pursuant to the Rights Offering Procedures.

#### c.     The Backstop Commitment and Overallotment

Pursuant to the terms of the EPCA, and subject to the terms thereof, in order to facilitate the Rights Offering and implementation of the Plan, the Backstop Party has agreed to purchase, and TSN has agreed to sell and issue to the Backstop Party, at the Discount Purchase Price: (a) [_____] shares of Rights Offering Preferred Stock, and (b) any Unsubscribed Shares, up to the Backstop Amount in accordance with and subject to the terms and conditions of the EPCA. To the extent that there are Non-Backstopped Shares, participants in the Rights Offering may, subject to a right of first refusal of the Backstop Party with respect to the Non-Backstopped Shares, elect to purchase the Non-Backstopped Shares on a Pro Rata basis. In addition, the Backstop Party shall have the option to purchase the Overallotment at the Discount Purchase Price pursuant to the EPCA. On the Effective Date, in accordance with the Backstop Approval Order, (i) the TSN Debtors will pay to the Backstop Party the Transaction Expenses and (ii) the Backstop Party will receive the Backstop Commitment Fee and be entitled to the Backstop Indemnification Obligations. The Backstop Commitment Fee will be payable in Additional Shares of New Preferred Stock equal to 3% of the Backstop Amount; provided, however, that pursuant to the EPCA to the extent that the Plan is not consummated, the Backstop Commitment Fee will be payable in Cash.

*(vi)*     ***Cancellation of Securities and Agreements***

On the Effective Date, except as otherwise specifically provided for in the Plan: (1) the obligations of the TSN Debtors under the Senior Secured Notes Security Agreement and the Indentures, and any other certificate, share, note, bond, indenture, purchase right, option, warrant or other instrument or document directly or indirectly evidencing or creating any indebtedness or obligation of or ownership interest in the TSN Debtors giving rise to any Claim or Interest (except such certificates, notes or other instruments or documents evidencing indebtedness or obligations of the TSN Debtors that are specifically reinstated pursuant to the Plan), shall be cancelled as to the TSN Debtors, and the Reorganized TSN Debtors shall not have any continuing obligations thereunder and (2) the obligations of the TSN Debtors pursuant, relating or pertaining to any agreements, indentures, certificates of designation, bylaws or certificate or articles of incorporation or similar documents governing the shares, certificates, notes, bonds, purchase rights, options, warrants or other instruments or documents evidencing or creating any indebtedness or obligation of the TSN Debtors (except such agreements, certificates, notes or other instruments evidencing indebtedness or obligations of the TSN Debtors that are specifically reinstated or assumed pursuant to the Plan) shall be released and discharged; *provided, however*, notwithstanding Confirmation or the occurrence of the Effective Date, any such indenture or agreement that governs the rights of the holder of a Claim shall continue in effect solely for purposes of (a) allowing holders of Senior Secured Notes Claims and Senior Exchangeable Notes Claims (as applicable) to receive distributions under the Plan, (b) allowing the Indenture Trustees, if applicable, to make distributions under the Plan as provided herein, and in accordance with any payment priorities established under the Indentures and to deduct therefrom such compensation, reasonable fees and expenses due thereunder or incurred in making such distributions and to create a reserve, in an amount no greater than $[____], for future fees and expenses the Indenture Trustees may incur after the Effective Date and (c) allowing the Indenture Trustees to seek compensation and/or reimbursement of reasonable fees and expenses in accordance with the terms of the

Indentures and the Plan; *provided further, however,* that the preceding proviso shall not affect the discharge of Claims or Interests pursuant to the Bankruptcy Code, the Confirmation Order or the Plan, or result in any expense or liability to the Reorganized TSN Debtors, except to the extent set forth in or provided for under the Plan. On and after the Effective Date, all duties and responsibilities of the Indenture Trustees under the Indentures, as applicable, shall be discharged except to the extent required in order to effectuate the Plan.

### (vii) *Exemptions for Issuance of New Equity*

The issuance of the New Common Stock, the New Preferred Stock, including the Rights Offering Preferred Stock and the Additional Shares (and the issuance of any common stock of Reorganized TSN upon conversion of the New Preferred Stock) shall be authorized and exempt from registration under the securities laws pursuant to, as applicable, section 1145 of the Bankruptcy Code, section 4(2) of the Securities Act of 1933, as amended, and/or other applicable laws, as of the Effective Date without further act or action by any person, unless required by provision of the relevant corporate documents or applicable law, regulation, order or rule; and all documents evidencing the same shall be executed and delivered as provided for in the Plan or the Plan Supplement.

Any distribution of securities in Canada pursuant to the Plan is being made under a prospectus exemption for a distribution in connection with a reorganization or arrangement under a statutory procedure. TSN is not a reporting issuer in any province or territory of Canada. Accordingly, any resale of such securities must be made in accordance with an exemption from the prospectus requirements of the securities laws of the applicable Canadian jurisdictions.

### (viii) *Corporate Existence*

Subject to any Restructuring Transaction and except as otherwise provided in the Plan, in the New Corporate Governance Documents or elsewhere in the Plan Supplement, each TSN Debtor, as Reorganized, shall continue to exist after the Effective Date as a separate corporate entity, limited liability company, partnership or other form, as the case may be, with all the powers of a corporation, limited liability company, partnership or other form, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed. The Corporate Governance Documents shall be substantially in the form filed with the Plan Supplement.

### (ix) *New Certificate of Incorporation and New By-Laws*

On or as soon as reasonably practicable after the Effective Date, each of the Reorganized TSN Debtors will file their respective New Certificates of Incorporation with the applicable Secretaries of State and/or other applicable authorities in their respective states of incorporation in accordance with the corporate laws of the respective states of incorporation. After the Effective Date, each of the Reorganized TSN Debtors may amend and restate their respective New Certificates of Incorporation and New By-Laws and other constituent documents as permitted by the laws of their respective states of incorporation and their respective New Certificates of Incorporation and New By-Laws.

### (x) *Reorganized TSN Debtors' Boards of Directors*

To the extent known, the identity of the members of the New Boards of each of the Reorganized TSN Debtors will be identified in the Plan Supplement.

### (xi) *Officers of Reorganized TSN Debtors*

To the extent known, officers of each of the other Reorganized TSN Debtors shall be identified in the Plan Supplement. Such officers shall serve in accordance with applicable non-bankruptcy law and, to the extent applicable, the New Employment Agreements.

*(xii)*      **Employee Benefits**

Except as otherwise provided in the Plan, on and after the Effective Date, the Reorganized TSN Debtors may: (1) honor, in the ordinary course of business, any contracts, agreements, policies, programs and plans for, among other things, compensation (other than equity based compensation related to Interests), health care benefits, disability benefits, deferred compensation benefits, travel benefits, savings, severance benefits, retirement benefits, welfare benefits, workers' compensation insurance and accidental death and dismemberment insurance for the directors, officers and employees of any of the TSN Debtors who served in such capacity at any time and (2) honor, in the ordinary course of business, Claims of employees employed as of the Effective Date for accrued vacation time arising before the Petition Date; *provided, however,* that the TSN Debtors' or Reorganized TSN Debtors' performance under any employment agreement will not entitle any person to any benefit or alleged entitlement under any policy, program or plan that has expired or been terminated before the Effective Date, or restore, reinstate or revive any such benefit or alleged entitlement under any such policy, program or plan. Nothing in the Plan shall limit, diminish or otherwise alter the Reorganized TSN Debtors' defenses, claims, Causes of Action or other rights with respect to any such contracts, agreements, policies, programs and plans.

*(xiii)*      **Vesting of Assets in the Reorganized TSN Debtors**

Except as otherwise provided in the Plan or any agreement, instrument or other document incorporated therein, on the Effective Date any and all property in each Estate and all Causes of Action (except those released pursuant to the Releases by the TSN Debtors) shall vest in each respective Reorganized TSN Debtor, free and clear of all Liens, Claims, charges or other encumbrances. On and after the Effective Date, except as otherwise provided in the Plan, each Reorganized TSN Debtor may operate its business and may use, acquire or dispose of property and compromise or settle any Claims, Interests or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

*(xiv)*      **Restructuring Transactions**

On the Effective Date or as soon as reasonably practicable thereafter, the Reorganized TSN Debtors may enter into the Restructuring Transactions and may take all actions as may be necessary or appropriate to effect a restructuring of their respective businesses or the overall organizational structure of the Reorganized TSN Debtors. The Restructuring Transactions may include one or more mergers, consolidations, restructurings, conversions, dissolutions, transfers or liquidations as may be reasonably determined by (i) the TSN Debtors, with the reasonable consent of the Plan Sponsor or (ii) the Reorganized TSN Debtors to be necessary or appropriate. The actions to effect the Restructuring Transactions may include: (1) the execution and delivery of appropriate agreements or other documents of merger, consolidation, restructuring, conversion, disposition, transfer, dissolution or liquidation containing terms that are consistent with the terms of the Plan and that satisfy the applicable requirements of applicable law and any other terms to which the applicable Entities may agree; (2) the execution and delivery of appropriate instruments of transfer, assignment, assumption or delegation of any asset, property, right, liability, debt or obligation on terms consistent with the terms of the Plan and having other terms for which the applicable parties agree; (3) the filing of appropriate certificates or articles of incorporation or amendments thereof, reincorporation, merger, consolidation, conversion or dissolution pursuant to applicable state law; and (4) all other actions that the applicable Entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law in connection with the Restructuring Transactions. In the event a Restructuring Transaction is a merger transaction, upon the consummation of such Restructuring Transaction, each party to such merger shall cease to exist as a separate corporate entity and thereafter the surviving Reorganized TSN Debtor shall assume and perform the obligations of each Reorganized TSN Debtor under the Plan. In the event a Reorganized TSN Debtor is liquidated, the Reorganized TSN Debtors (or the Reorganized TSN Debtor which owned the stock in such liquidating Debtor prior to such liquidation) shall assume and perform such obligations. Implementation of the Restructuring Transactions shall not affect the distributions under the Plan.

*(xv)*      **Intercompany Interests**

Subject to any Restructuring Transaction, in order to implement the Plan, at the option of the Reorganized TSN Debtors (with the reasonable consent of the Plan Sponsor), Intercompany Interests shall either (i) be retained, in which case the Debtor holding such Intercompany Interest shall continue to hold such Interest and the legal,

equitable and contractual rights to which the holders of such Intercompany Interests are entitled shall remain unaltered or (ii) be cancelled and new Intercompany Interests in the applicable Other Debtor shall be issued pursuant to the Plan to the Reorganized TSN Debtor that holds such Intercompany Interests.

*(xvi)*    ***Corporate Action***

Upon the Effective Date, all actions contemplated by the Plan shall be deemed authorized and approved in all respects, including (1) entry into the New Employment Agreements; (2) selection of the directors and officers of the Reorganized TSN Debtors; (3) the distribution of the New Common Stock as provided in the Plan; and (4) all other actions contemplated by the Plan (whether to occur before, on or after the Effective Date). All matters provided for in the Plan involving the corporate structure of the TSN Debtors or the Reorganized TSN Debtors, and any corporate action required by the TSN Debtors or the Reorganized TSN Debtors in connection with the Plan shall be deemed to have occurred and shall be in effect, without any requirement of further action by the directors or officers of the TSN Debtors or the Reorganized TSN Debtors.

On or (as applicable) before the Effective Date, the appropriate officers of the TSN Debtors or the Reorganized TSN Debtors, as applicable, shall be authorized and directed to issue, execute and deliver the agreements, documents, securities, certificates of incorporation, operating agreements and instruments contemplated by the Plan (or necessary or desirable to effect the transactions contemplated by the Plan) in the name of and on behalf of the Reorganized TSN Debtors, including any and all agreements, documents, securities and instruments relating to the foregoing. The authorizations and approvals contemplated by this Article V.O of the Plan shall be effective notwithstanding any requirements under non-bankruptcy law.

*(xvii)*    ***Effectuating Documents; Further Transactions***

On and after the Effective Date, the Reorganized TSN Debtors and the managers, officers and members of the boards of directors thereof are authorized to issue, execute, deliver, file or record such contracts, securities, instruments, releases and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement and further evidence the terms and conditions of the Plan and the securities issued pursuant to the Plan in the name of and on behalf of the Reorganized TSN Debtors, without the need for any approvals, authorization or consents except for those expressly required pursuant to the Plan.

*(xviii)*    ***General Settlement of Claims and Interests***

a.    **Settlement Generally**

As discussed in detail in the Disclosure Statement and as otherwise provided in the Plan, as one element of, and in consideration for, an overall negotiated settlement of disputed Claims and issues embodied in the Plan, pursuant to Bankruptcy Rule 9019 and section 1123 of the Bankruptcy Code and in consideration for the classification, distributions, releases and other benefits provided under the Plan, the provisions of the Plan constitute a good faith compromise and settlement of all Claims, Interests and controversies resolved pursuant to the Plan, including, without limitation, the settlement of issues set forth above in the introduction to this Article VIII. Pursuant to Rule 408 of the Federal Rules of Evidence, the Plan, the Disclosure Statement, the Plan Support Agreement (and any exhibits or supplements relating to the foregoing) and all negotiations relating thereto shall not be admissible into evidence in any proceeding unless and until the Plan is consummated, and then only in accordance with the Plan. In the event the Plan is not consummated, provisions of the Plan, the Disclosure Statement, the Plan Support Agreement (and any exhibits or supplements relating to the foregoing) and all negotiations relating thereto shall not be binding or probative. Subject to Article VII of the Plan, all distributions made to Holders of Allowed Claims and Interests in any Class are intended to be and shall be final and indefeasible.

b.    **Allocation of Distribution to holders of Senior Exchangeable Notes Claims**

The allocation of the distribution proposed to be provided under the Plan to holders of Senior Exchangeable Notes Claims reflects an overall negotiated compromise and settlement with respect to such Claims. Specifically, the allocation reflects the fact that the Senior Exchangeable Notes are structurally senior to Other Unsecured Claims

due to the ability of the holders of Senior Exchangeable Notes to assert Claims at TerreStar License Inc. and TerreStar National Services Inc. based on their respective guarantees of the Senior Exchangeable Notes.

*(xix)* ***Section 1146 Exemption from Certain Taxes and Fees***

Pursuant to section 1146(a) of the Bankruptcy Code, any transfers of property in contemplation of, in connection with, or pursuant to the Plan shall not be subject to any stamp tax or other similar tax or governmental assessment in the United States or Canada, and the Confirmation Order shall direct and be deemed to direct the appropriate state or local governmental officials or agents to forgo the collection of any such tax or governmental assessment and to accept for filing and recordation instruments or other documents pursuant to such transfers of property without the payment of any such tax or governmental assessment. Such exemption specifically applies, without limitation, to (1) the creation of any mortgage, deed of trust, lien or other security interest; (2) the making or assignment of any lease or sublease; (3) any restructuring transaction authorized by Article V.O of the Plan; or (4) the making or delivery of any deed or other instrument of transfer under, in furtherance of or in connection with the Plan, including: (a) any merger agreements; (b) agreements of consolidation, restructuring, disposition, liquidation or dissolution; (c) deeds; or (d) assignments executed in connection with any transaction occurring under the Plan.

*(xx)* ***D&O Liability Insurance Policies and Indemnification Provisions***

Notwithstanding anything in the Plan to the contrary, as of the Effective Date, the D&O Liability Insurance Policies shall be deemed to be, and shall be treated as though they are, executory contracts and the TSN Debtors shall assume (and assign to the Reorganized TSN Debtors if necessary to continue the D&O Liability Insurance Policies in full force) all of the D&O Liability Insurance Policies pursuant to section 365(a) of the Bankruptcy Code. Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the TSN Debtors' foregoing assumption of each of the D&O Liability Insurance Policies. On or before the Effective Date, the Reorganized TSN Debtors shall obtain tail coverage under a directors' and officers' liability insurance policy for the current and former directors, officers and managers of the TSN Debtors for a period of five years, and placed with such insurers, the terms of which shall be set forth in the Plan Supplement.

As of the Effective Date, the directors, officers, members, attorneys, employees and other agents of the TSN Debtors who served the TSN Debtors prior to (but not on or after) the Effective Date shall be entitled to the full benefit of any applicable Indemnification Provisions; <u>provided</u>, that any claims by such directors, officers, members, attorneys, employees or other agents relating to or arising out of the Indemnification Provisions shall be deemed to be, and treated as though they are, Other Unsecured Claims against the TSN Debtors. For the avoidance of doubt, the Reorganized TSN Debtors shall have no liability to such directors, officers, members, attorneys, employees or other agents in respect of the Indemnification Provisions.

In addition, on the Effective Date, the New Corporate Governance Documents of the Reorganized TSN Debtors shall contain provisions which (i) eliminate the personal liability of the TSN Debtors' and the Reorganized TSN Debtors' then-present and future directors and officers for post-emergence monetary damages resulting from breaches of their fiduciary duties to the fullest extent permitted by applicable law in the jurisdiction in which the subject Reorganized TSN Debtor is organized; and (ii) require such Reorganized TSN Debtor, subject to appropriate procedures, to indemnify the TSN Debtors' and the Reorganized TSN Debtors' directors, officers, and other key employees (as such key employees are identified by the New Board) serving on or after the Effective Date for all claims and actions to the fullest extent permitted by applicable law in the jurisdiction in which the subject Reorganized TSN Debtor is incorporated or organized.

*(xxi)* ***Preservation of Rights and Causes of Action***

In accordance with section 1123(b) of the Bankruptcy Code, and except where such Causes of Action have been expressly released (including, for the avoidance of doubt, pursuant to the Releases by the TSN Debtors provided by Article IX.B of the Plan), the Reorganized TSN Debtors shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action, including Causes of Action under chapter 5 of the Bankruptcy Code, whether arising before or after the Petition Date, and the Reorganized TSN Debtors' rights to commence, prosecute or settle such Causes of Action shall be preserved notwithstanding the occurrence of the

Effective Date. No Entity may rely on the absence of a specific reference in the Plan, the Disclosure Statement, or the Schedule of Retained Causes of Action, to any Cause of Action against them as any indication that the TSN Debtors or Reorganized TSN Debtors, as applicable, will not pursue any and all available Causes of Action against them. No preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise) or laches, shall apply to such retained Causes of Action upon, after or as a consequence of the Confirmation or consummation of the Plan.

*(xxii)*  ***Payment of Fees and Expenses of Senior Secured Notes Indenture Trustee/Agent and Purchase Money Agent***

In accordance with the Final DIP Order, the fees and expenses of the Senior Secured Notes Indenture Trustee/Agent and the Purchase Money Agent shall be finally allowed. On the Effective Date (and thereafter with respect to fees and expenses relating to post-Effective Date service under the Plan) or as soon as reasonably practicable thereafter, the TSN Debtors or Reorganized Debtors shall pay in Cash all reasonable and documented unpaid fees and expenses of the Senior Secured Notes Indenture Trustee/Agent and the Purchase Money Agent and their advisors, including counsel. The TSN Debtors or Reorganized Debtors may dispute any portion of such fees and expenses in which case (a) the TSN Debtors or Reorganized Debtors shall pay the portion of such fees and expenses that is not specifically disputed and (b) in the absence of a consensual resolution, the affected Indenture Trustee/Agent or the Reorganized Debtors shall submit the dispute to the Bankruptcy Court for adjudication. For the avoidance of doubt, nothing herein affects an Indenture Trustee's right to exercise its charging lien against distributions to holders of the Notes.

## E. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

*(i)*  ***Assumption and Rejection of Executory Contracts and Unexpired Leases***

Except as otherwise provided in the Plan, or in any contract, instrument, release, indenture or other agreement or document entered into in connection with the Plan, each of the TSN Debtors' Executory Contracts and Unexpired Leases shall be deemed assumed as of the Effective Date, unless such Executory Contract or Unexpired Lease: (1) was assumed or rejected previously by the TSN Debtors; (2) expired or terminated pursuant to its own terms before the Effective Date; (3) is the subject of a motion to assume filed on or before the Effective Date; or (4) is identified on the Rejected Executory Contract and Unexpired Lease List.

Entry of the Confirmation Order shall constitute a Bankruptcy Court order approving the assumptions or rejections of such Executory Contracts or Unexpired Leases as set forth in the Plan, all pursuant to sections 365(a) and 1123 of the Bankruptcy Code. The Confirmation Order shall constitute an order of the Bankruptcy Court, approving (i) the assumption and assignment, or rejection, as the case may be, of Executory Contracts and Unexpired Leases, as described above, pursuant to sections 365(a) and 1123(b)(2) of the Bankruptcy Code, (ii) that the Reorganized TSN Debtors had properly provided for the cure of any defaults that might have existed, (iii) that each assumption and assignment was in the best interest of the Reorganized TSN Debtors, their estates, and all parties in interest in the Chapter 11 Cases, and (iv) the requirements for assumption and assignment of any Executory Contract or Unexpired Lease to be assumed had been satisfied. Unless otherwise indicated, all assumptions or rejections of Executory Contracts and Unexpired Leases pursuant to the Plan are effective as of the Effective Date. Each Executory Contract or Unexpired Lease assumed pursuant to the Plan or by Bankruptcy Court order but not assigned to a third party before the Effective Date shall revest in and be fully enforceable by the applicable contracting Reorganized TSN Debtor in accordance with its terms, except as such terms may have been modified by such order. Notwithstanding anything to the contrary in the Plan, the TSN Debtors (with the reasonable consent of the Plan Sponsor) or the Reorganized TSN Debtors, as applicable, reserve the right to alter, amend, modify or supplement the list of Executory Contracts and Unexpired Leases identified in the Plan Supplement at any time before the Effective Date; provided, that to the extent that, as of the Effective Date, there is any pending dispute between one or more of the TSN Debtors and a counterparty to an Executory Contract or Unexpired Lease regarding such counterparty's Cure Claim, the TSN Debtors and Reorganized TSN Debtors shall reserve the right to add the applicable Executory Contract or Unexpired Lease to the Rejected Executory Contract and Unexpired Lease List following the resolution of such dispute, in which event such Executory Contract or Unexpired Lease shall be deemed rejected and such counterparty shall have any and all rights with respect thereto. After the Effective Date,

the Reorganized TSN Debtors shall have the right to terminate, amend or modify any intercompany contracts, leases or other agreements without approval of the Bankruptcy Court.

*(ii)*     ***Cure of Defaults for Executory Contracts and Unexpired Leases Assumed***

Any monetary defaults under each Executory Contract and Unexpired Lease to be assumed pursuant to the Plan shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the default amount in Cash on the Effective Date, subject to the limitations described below, or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree. In the event of a dispute regarding (1) the amount of any payments to cure such a default, (2) the ability of the Reorganized TSN Debtors or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed or (3) any other matter pertaining to assumption, the payment of Cure Claims required by section 365(b)(1) of the Bankruptcy Code shall be made no later than ten (10) business days following the entry of a Final Order or orders resolving the dispute and approving the assumption. At least ten days before the Confirmation Hearing, the TSN Debtors shall distribute, or cause to be distributed, notices of proposed assumption and proposed amounts of Cure Claims to the applicable third parties, which notices shall include procedures for objecting to proposed assumptions of Executory Contracts and Unexpired Leases and any amounts of Cure Claims to be paid in connection therewith and resolution of disputes by the Bankruptcy Court. Any objection by a counterparty to an Executory Contract or Unexpired Lease to a proposed assumption or related Cure Claim amount must be filed, served and actually received by the TSN Debtors at least three days before the Confirmation Hearing. Any counterparty to an Executory Contract or Unexpired Lease that fails to object timely to the proposed assumption or Cure Claim amount will be deemed to have assented to such assumption or cure amount.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time before the effective date of the assumption.

*(iii)*     ***Claims Based on Rejection of Executory Contracts or Unexpired Leases***

All proofs of Claim with respect to Claims arising from the rejection of Executory Contracts and Unexpired Leases, if any, must be filed with the Bankruptcy Court within 30 days after the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection. Any Claims arising from the rejection of Executory Contracts and Unexpired Leases not filed with the Bankruptcy Court within such time will be automatically disallowed, forever barred from assertion and shall not be enforceable against the TSN Debtors or the Reorganized TSN Debtors, the Estates or their property without the need for any objection by the Reorganized TSN Debtors or further notice to, or action, order or approval of the Bankruptcy Court. All Allowed Claims arising from the rejection of the TSN Debtors' Executory Contracts and Unexpired Leases shall be classified as Class 6 Other Unsecured Claims against the applicable Debtor and shall be treated in accordance with Article III of the Plan. The deadline to object to Claims arising from the rejection of Executory Contracts and Unexpired Leases, if any, shall be the later of (a) 180 days following the date on which such Claim was filed and (b) such other period of limitation as may be specifically fixed by an order of the Bankruptcy Court for objecting to such Claims.

*(iv)*     ***Insurance Policies***

Notwithstanding anything in the Plan to the contrary, as of the Effective Date, the TSN Debtors (with the reasonable consent of the Plan Sponsor) shall assume (and assign to the Reorganized TSN Debtors if necessary to continue the Insurance Policies in full force) all of the Insurance Policies pursuant to section 365(a) of the Bankruptcy Code. Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the TSN Debtors' foregoing assumption of each of the Insurance Policies.

*(v)*     ***Modifications, Amendments, Supplements, Restatements or Other Agreements.***

Unless otherwise provided, each Executory Contract or Unexpired Lease that is assumed shall include all modifications, amendments, supplements, restatements or other agreements that in any manner affect such

Executory Contract or Unexpired Lease, and all Executory Contracts and Unexpired Leases related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under the Plan.

Modifications, amendments, supplements and restatements to Executory Contracts and Unexpired Leases that have been executed by the TSN Debtors during the Chapter 11 Cases shall not be deemed (unless otherwise agreed by the contract counterparty) to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority or amount of any Claims that may arise in connection therewith.

*(vi)* *Reservation of Rights.*

Neither the exclusion nor inclusion of any Executory Contract or Unexpired Lease on the Rejected Executory Contract and Unexpired Lease List, nor anything contained in the Plan, shall constitute an admission by the TSN Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that any Reorganized TSN Debtor has any liability thereunder. If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the TSN Debtors or Reorganized TSN Debtors, as applicable, shall have 45 days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.

*(vii)* *Contracts and Leases Entered Into After the Petition Date.*

Contracts and leases entered into after the Petition Date by any TSN Debtor, including any Executory Contracts and Unexpired Leases assumed by such Debtor, will be performed by the Debtor or Reorganized TSN Debtor liable thereunder in the ordinary course of its business. Accordingly, such contracts and leases (including any assumed Executory Contracts and Unexpired Leases) will survive and remain unaffected by entry of the Confirmation Order, unless the parties thereto agree to any modifications, amendments, supplements or restatements.

## F. PROVISIONS GOVERNING DISTRIBUTIONS

*(i)* *Record Date for Distributions*

As of the entry of the Confirmation Order, the various transfer registers for each of the Classes of Claims or Interests as maintained by the TSN Debtors or their respective agents shall be deemed closed, and there shall be no further changes made to reflect any new record holders of any Claims or Interests. The TSN Debtors shall have no obligation to recognize any transfer of Claims or Interests occurring on or after the Distribution Record Date.

*(ii)* *Timing and Calculation of Amounts to Be Distributed*

Except as otherwise provided in the Plan, on the applicable Distribution Date, each holder of an Allowed Claim or Interest against the TSN Debtors shall receive the full amount of the distributions that the Plan provides for Allowed Claims or Interests in the applicable Class and in the manner provided in the Plan. In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date. If and to the extent that there are Disputed Claims, distributions on account of any such Disputed Claims shall be made pursuant to the provisions set forth in Article VIII of the Plan. Except as otherwise provided in the Plan, holders of Claims shall not be entitled to interest, dividends or accruals on the distributions provided for in the Plan, regardless of whether such distributions are delivered on or at any time after the Effective Date.

*(iii)* *Fractional Distributions*

No fractions of New Common Stock, New Preferred Stock or Rights shall be distributed. Cash shall not be distributed under the Plan in denominations of less than one cent ($0.01). For purposes of distribution, fractions of

New Common Stock, New Preferred Stock or Rights shall be rounded down to the nearest whole number. The Disbursing Agent shall have no obligation to make any distribution of Cash that is less than $10.00.

*(iv)* **Disbursing Agent**

Except as otherwise provided in the Plan, all distributions under the Plan shall be made by the Reorganized TSN Debtors as Disbursing Agent or such other Entity designated by the Reorganized TSN Debtors as a Disbursing Agent on the Effective Date. If the Disbursing Agent is not one of the Reorganized TSN Debtors, such entity shall obtain a bond or surety for the performance of its duties, and all costs and expenses of procuring any such bond or surety shall be borne by the TSN Debtors or Reorganized TSN Debtors; *provided*, *however*, that the Indenture Trustees shall not be required to obtain such a bond or surety.

*(v)* **Rights and Powers of Disbursing Agent**

        **a.**        **Powers of the Disbursing Agent**

The Disbursing Agent shall be empowered to: (a) affect all actions and execute all agreements, instruments and other documents necessary to perform its duties under the Plan; (b) make all distributions contemplated hereby; (c) employ professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions of the Plan.

        **b.**        **Expenses Incurred On or After the Effective Date**

Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable fees and expenses incurred by the Disbursing Agent in carrying out its obligations under Article VII of the Plan on or after the Effective Date (including taxes) and any reasonable compensation and expense reimbursement claims (including reasonable attorney fees and expenses) made by the Disbursing Agent related thereto shall be paid in Cash by the Reorganized TSN Debtors in their reasonable discretion.

*(vi)* **Distributions to Holders of Disputed Claims**

Notwithstanding any provision otherwise in the Plan and except as may be agreed to by the TSN Debtors (with the reasonable consent of the Plan Sponsor) or the Reorganized TSN Debtors, in each case in their sole discretion, and the holder of a Disputed Claim, no partial payments and no partial distributions shall be made with respect to any Disputed Claim until all Disputed Claims held by the holder of such Disputed Claim or Interest have become Allowed Claims or have otherwise been resolved by settlement or Final Order.

*(vii)* **Delivery of Distributions and Undeliverable or Unclaimed Distributions**

        **a.**        **Delivery of Distributions in General**

Except as otherwise provided in the Plan and subject to Bankruptcy Rule 9010, distributions to holders of Allowed Claims shall be made to holders of record as of the Distribution Record Date by the Disbursing Agent: (a) to the signatory set forth on any of the Proofs of Claim filed by such holder or other representative identified therein (or at the last known addresses of such holder if no Proof of Claim is filed or if the TSN Debtors have been notified in writing of a change of address); (b) at the addresses set forth in any written notices of address changes delivered to the Disbursing Agent after the date of any related Proof of Claim; (c) at the addresses reflected in the Schedules if no Proof of Claim has been filed and the Disbursing Agent has not received a written notice of a change of address; or (d) on any counsel that has appeared in the Chapter 11 Cases on the holder's behalf. Distributions under the Plan on account of Allowed Claims shall not be subject to levy, garnishment, attachment or like legal process, so that each holder of an Allowed Claim shall have and receive the benefit of the distributions in the manner set forth in the Plan. None of the TSN Debtors, the Reorganized TSN Debtors and the applicable Disbursing Agent shall incur any liability whatsoever on account of any distributions under the Plan except for gross negligence, willful misconduct or fraud.

Except as otherwise provided in the Plan, all distributions to holders of Notes Claims shall be governed by the Notes and the Indentures, and shall be deemed completed when made to the respective Indenture Trustees, who shall in turn make distributions in accordance with the Notes and Indentures.

### b. Undeliverable Distributions and Unclaimed Property

In the event that any distribution to any holder is returned as undeliverable, no distribution to such holder shall be made unless and until the Disbursing Agent has determined the then current address of such holder, at which time such distribution shall be made as soon as practicable after such distribution has become deliverable or has been claimed to such holder without interest; *provided, however,* that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code and forfeited at the expiration of six months from the applicable Distribution Date. After such date, all "unclaimed property" or interests in property shall revert to the Reorganized TSN Debtors (notwithstanding any applicable federal or state escheat, abandoned or unclaimed property laws to the contrary), and the Claim of any holder to such property or Interest in property shall be discharged and forever barred.

### (viii) *Hart-Scott-Rodino Compliance*

Any shares of New Common Stock or New Preferred Stock to be distributed under the Plan to any entity required to file a Premerger Notification and Report Form under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, or to meet any similar requirements under applicable non-U.S. law, shall not be distributed until the notification and waiting periods applicable under such law to such entity shall have expired or been terminated.

### (ix) *Withholding and Reporting Requirements*

In connection with the Plan and all instruments issued in connection therewith, the Disbursing Agent shall comply with all applicable withholding and reporting requirements imposed by any federal, state or local taxing authority, and all distributions under the Plan shall be subject to any such withholding or reporting requirements.

### (x) *Setoffs*

The TSN Debtors and the Reorganized TSN Debtors may withhold (but not set off except as set forth below) from the distributions called for under the Plan on account of any Allowed Claim an amount equal to any claims, equity interests, rights and Causes of Action of any nature that the TSN Debtors or the Reorganized TSN Debtors may hold against the holder of any such Allowed Claim. In the event that any such claims, equity interests, rights and Causes of Action of any nature that the TSN Debtors or the Reorganized TSN Debtors may hold against the holder of any such Allowed Claim are adjudicated by Final Order or otherwise resolved, the TSN Debtors may, pursuant to section 553 of the Bankruptcy Code or applicable non-bankruptcy law, set off against any Allowed Claim and the distributions to be made pursuant hereto on account of such Allowed Claim (before any distribution is made on account of such Allowed Claim) the amount of any adjudicated or resolved claims, equity interests, rights and Causes of Action of any nature that the TSN Debtors or the Reorganized TSN Debtors may hold against the holder of any such Allowed Claim, but only to the extent of such adjudicated or resolved amount. Neither the failure to effect such a setoff nor the allowance of any Claim under the Plan shall constitute a waiver or release by the TSN Debtors or the Reorganized TSN Debtors of any such claims, equity interests, rights and Causes of Action that the TSN Debtors or the Reorganized TSN Debtors may possess against any such holder, except as specifically provided in the Plan.

### (xi) *Claims Paid or Payable by Third Parties*

### a. Claims or Interests Paid by Third Parties

The TSN Debtors or the Reorganized TSN Debtors, as applicable, shall reduce in part or in full a Claim or Interest to the extent that the holder of such Claim or Interest receives payment in part or in full on account of such Claim or Interest from a party that is not a TSN Debtor or Reorganized TSN Debtor. To the extent a holder of a Claim or Interest receives a distribution on account of such Claim or Interest and receives payment from a party that

is not a TSN Debtor or a Reorganized TSN Debtor on account of such Claim or Interest, such holder shall, within two weeks of receipt thereof, repay or return the distribution to the applicable Reorganized TSN Debtor, to the extent the holder's total recovery on account of such Claim or Interest from the third party and under the Plan exceeds the amount of such Claim or Interest as of the date of any such distribution under the Plan.

### b. Claims Payable by Third Parties

No distributions under the Plan shall be made on account of Allowed insured Claims until the holder of such Allowed insured Claim has exhausted all remedies with respect to the TSN Debtors' Insurance Policies. To the extent that one or more of the TSN Debtors' insurers agrees to satisfy in full a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, such Claim may be expunged without a Claims objection having to be filed and without any further notice to or action, order or approval of the Bankruptcy Court.

### c. Applicability of Insurance Policies

Except as otherwise provided in the Plan, distributions to holders of Allowed Claims shall be in accordance with the provisions of any applicable Insurance Policy. Nothing contained in the Plan shall constitute or be deemed a waiver of any cause of action that the TSN Debtors or any Entity may hold against any other Entity, including insurers under any policies of insurance, nor shall anything contained in the Plan constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

### (xii) *Postpetition Interest*

Unless expressly provided in the Plan, the Confirmation Order, the Final DIP Order, or any contract, instrument, release, settlement or other agreement entered into in connection with the Plan, or required by the Bankruptcy Code (including without limitation sections 506(b) and 1129(b) of the Bankruptcy Code), postpetition interest shall not accrue on or after the Petition Date on account of any Claim.

### (xiii) *Section 506(c) Reservation*

The TSN Debtors and the Reorganized TSN Debtors reserve all rights under section 506(c) of the Bankruptcy Code with respect to any and all Secured Claims, except to the extent waived pursuant to the Final DIP Order.

### (xiv) *Single Satisfaction of Claims*

Holders of Allowed Claims may assert such Claims against each Debtor obligated with respect to such Claim, and such Claims shall be entitled to share in the recovery provided for the applicable Class of Claims against each obligated Debtor based upon the full Allowed amount of the Claim. Notwithstanding the foregoing, in no case shall the aggregate value of all property received or retained under the Plan on account of Allowed Claims exceed 100% of the underlying Allowed Claim.

### G. PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED AND DISPUTED CLAIMS

*(i)* **Prosecution of Objections to Claims**

The TSN Debtors (with the reasonable consent of the Plan Sponsor) or the Reorganized TSN Debtors, as applicable, shall have the exclusive authority to file, settle, compromise, withdraw or litigate to judgment any objections to Claims as permitted under the Plan. From and after the Effective Date, the Reorganized TSN Debtors may settle or compromise any Disputed Claim without approval of the Bankruptcy Court. The TSN Debtors reserve all rights to resolve any Disputed Claim outside the Bankruptcy Court under applicable governing law.

*(ii)* **Allowance of Claims**

Except as expressly provided in the Plan or in any order entered in the Chapter 11 Cases before the Effective Date (including the Confirmation Order), the Reorganized TSN Debtors after the Effective Date will have and retain any and all rights and defenses held by the TSN Debtors with respect to any Claim as of the Petition Date. All claims of any Entity against any TSN Debtor shall be disallowed unless and until such Entity pays, in full, the amount it owes each such Debtor.

*(iii)* **Disputed Claims Reserve**

On the Effective Date (or as soon thereafter as is reasonably practicable), the Reorganized TSN Debtors shall deposit in the Disputed Claims Reserve New Common Stock having an aggregate value equal to the aggregate value of the consideration that would have been distributed to the holders of all Disputed Claims as if such Disputed Claims had been Allowed Claims on the Effective Date, with the amount of such Allowed Claims to be determined, solely for the purposes of establishing reserves, to be the lesser of (a) the asserted amount of the Disputed Claims filed with the Bankruptcy Court, or (if no proof of such Claim was filed) scheduled by the TSN Debtors, (b) the amount, if any, estimated by the Bankruptcy Court pursuant to section 502(c) of the Bankruptcy Code pursuant to Article VIII.G of the Plan or (c) the amount otherwise agreed to by the TSN Debtors and the holder of such Disputed Claims for reserve purposes. In any vote by holders of New Common Stock, the New Common Stock held in the Disputed Claims Reserve shall be deemed to have been voted in the same proportions as the New Common Stock that was actually voted.

*(iv)* **Distributions After Allowance**

On the Distribution Date following the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim becomes a Final Order, the Disbursing Agent shall provide to the holder of such Claim the distribution (if any) to which such holder is entitled under the Plan as of the Effective Date, without any interest to be paid on account of such Claim.

*(v)* **Distribution of Excess Amounts in the Disputed Claims Reserve**

Any Cash held in the Disputed Claims Reserve after all Disputed Claims have been Allowed or Disallowed shall be transferred by the Disbursing Agent or Reorganized TSN Debtors (as applicable), in a supplemental distribution to the holders of Allowed Claims in accordance with the Plan on a Pro Rata basis. Any New Common Stock held in the Disputed Claims Reserve after all Disputed Claims have been Allowed or Disallowed shall be cancelled.

*(vi)* **Property Held in the Reserve for Disputed Claims**

Each holder of a Disputed Claim that ultimately becomes an Allowed Claim will have recourse only to the undistributed New Common Stock and/or Cash (if applicable) held in the Disputed Claims Reserve for satisfaction of the distributions to which holders of Allowed Claims are entitled under the Plan, and not to any Reorganized TSN Debtor, their property or any assets previously distributed on account of any Allowed Claim.

*(vii)*    ***Estimation of Claims***

The TSN Debtors (before the Effective Date) or Reorganized TSN Debtors (on or after the Effective Date) may, at any time, and from time to time, request that the Bankruptcy Court estimate any Disputed Claim pursuant to section 502(c) of the Bankruptcy Code regardless of whether an objection was previously filed with the Bankruptcy Court with respect to such Claim, or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including during the pendency of any appeal relating to any such objection.  In the event that the Bankruptcy Court estimates any Disputed Claim, that estimated amount will constitute either the Allowed amount of such Claim or a maximum limitation on such Claim against any party or Entity, as determined by the Bankruptcy Court.  If the estimated amount constitutes a maximum limitation on such Claim, the TSN Debtors (before the Effective Date) or the Reorganized TSN Debtors (after the Effective Date), may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim.  All of the objection, estimation, settlement and resolution procedures set forth in the Plan are cumulative and not necessarily exclusive of one another.  Claims may be estimated and subsequently compromised, objected to, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court.

*(viii)*    ***Deadline to File Objections to Claims***

Any objections to Claims shall be filed on or before the date that is the later of (a) one hundred and eighty (180) days after the Effective Date and (b) the last day of such other period of limitation as may be specifically fixed by an order of the Bankruptcy Court for objecting to certain Claims.

## H.    SETTLEMENT, RELEASE, INJUNCTION AND RELATED PROVISIONS

*(i)*    ***Compromise and Settlement of Claims, Interests and Controversies***

As discussed in detail herein (including, without limitation, in the introductory paragraphs to this Article VIII) and as otherwise provided in the Plan, pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good faith compromise of all Claims, Interests and controversies relating to the contractual, legal and subordination rights that a holder of a Claim may have with respect to any Allowed Claim or Interest, or any distribution to be made on account of such Allowed Claim or Interest.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the TSN Debtors, their Estates and holders of Claims and Interests and is fair, equitable and reasonable. In accordance with the provisions of the Plan, pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019(a), without any further notice to or action, order or approval of the Bankruptcy Court, after the Effective Date, the Reorganized TSN Debtors may compromise and settle Claims against them and Causes of Action against other Entities.

*(ii)*    ***Releases by the TSN Debtors***

**Pursuant to section 1123(b) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan or the Plan Supplement, for good and valuable consideration, including the contributions of the Released Parties to facilitate the expeditious reorganization of the TSN Debtors and the implementation of the restructuring contemplated by the Plan and the other contracts, instruments, releases, agreements or documents executed and delivered in connection with the Plan, the Released Parties are deemed released and discharged by the TSN Debtors, the Reorganized TSN Debtors and the Estates from any and all claims, obligations, rights, suits, damages, Causes of Action, remedies and liabilities whatsoever, including any derivative claims, asserted or assertable on behalf of the TSN Debtors, whether known or unknown, foreseen or unforeseen, liquidated or unliquidated, fixed or contingent, matured or unmatured, existing or hereinafter arising, in law, equity or otherwise, that the TSN Debtors, the Reorganized TSN Debtors, the Estates or their Affiliates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other Entity, based in whole or in part on any act, omission, transaction, event or other occurrence taking place on or prior to the Effective Date in any way**

relating to the TSN Debtors, the Released Parties, the Reorganization Cases, the Plan or the Disclosure Statement, the EPCA, or related agreements, instruments or other documents, other than Claims or liabilities arising out of or relating to any act or omission of a Released Party that constitutes gross negligence, fraud or willful misconduct, as determined by a Final Order.

*(iii)* **Releases by Holders of Claims and Interests**

**As of the Effective Date, to the fullest extent permissible under applicable law, as such law may be extended or interpreted subsequent to the Effective Date, for good and valuable consideration, including the contributions of the Released Parties to facilitate the expeditious reorganization of the TSN Debtors and the implementation of the restructuring contemplated by the Plan and the other contracts, instruments, releases, agreements or documents executed and delivered in connection with the Plan, each holder of a Claim or an Interest shall be deemed to have conclusively, absolutely, unconditionally, irrevocably and forever, released and discharged the Debtors, the Reorganized Debtors and the Released Parties from any and all Claims, Interests, obligations, rights, suits, damages, causes of action, remedies and liabilities whatsoever, including any derivative Claims, asserted on behalf of a Debtor, whether known or unknown, foreseen or unforeseen, liquidated or unliquidated, fixed or contingent, matured or unmatured, existing or hereafter arising, in law, equity or otherwise, that such Entity would have been legally entitled to assert (whether individually or collectively), based in whole or in part on any act, omission, transaction, event or other occurrence taking place on or prior to the Effective Date in any way relating to the Debtors, the Released Parties, the Reorganization Cases, the Plan or the Disclosure Statement, or related agreements, instruments or other documents, other than Claims or liabilities arising out of or relating to any act or omission of a Released Party that constitutes gross negligence, fraud or willful misconduct, as determined by a Final Order; provided, that nothing in the Plan shall be deemed a waiver or release of a Releasing Party's right to receive a distribution pursuant to the terms of the Plan.**

*(iv)* **Exculpation**

**Except as otherwise specifically provided in the Plan or Plan Supplement, no Exculpated Party shall have or incur, and each Exculpated Party is hereby released and exculpated from, any Exculpated Claim, obligation, cause of action or liability for any Exculpated Claim, except for gross negligence or willful misconduct, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan. The TSN Debtors and the Reorganized TSN Debtors (and each of their respective Affiliates, agents, directors, officers, employees, advisors and attorneys) have, and upon Confirmation of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code with regard to the solicitation and distribution of the Plan securities pursuant to the Plan, and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.**

*(v)* **Discharge of Claims and Termination of Interests**

Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan, the distributions, rights and treatment that are provided in the Plan shall be in full and final satisfaction, settlement, release and discharge, effective as of the Effective Date, of all Claims, Interests and causes of action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against and Interests in, the TSN Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities and causes of action that arose before the Effective Date, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h) or 502(i) of the Bankruptcy Code, in each case whether or not: (1) a Proof of Claim or Interest based upon such Claim, debt, right or Interest is filed or deemed filed pursuant to section 501 of the Bankruptcy Code; (2) a Claim or Interest based upon such Claim, debt, right or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (3) the holder of such a Claim or Interest has accepted the Plan. Except as otherwise provided in the Plan, any default by

the TSN Debtors or their Affiliates with respect to any Claim or Interest that existed before or on account of the filing of the Chapter 11 Cases shall be deemed cured on the Effective Date. The Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the Effective Date occurring, except as otherwise expressly provided in the Plan.

*(vi)* **Injunction**

FROM AND AFTER THE EFFECTIVE DATE, ALL ENTITIES ARE PERMANENTLY ENJOINED FROM COMMENCING OR CONTINUING IN ANY MANNER, ANY CAUSE OF ACTION RELEASED OR TO BE RELEASED PURSUANT TO THE PLAN OR THE CONFIRMATION ORDER.

FROM AND AFTER THE EFFECTIVE DATE, TO THE EXTENT OF THE RELEASES AND EXCULPATION GRANTED IN ARTICLE IX OF THE PLAN, THE RELEASING PARTIES SHALL BE PERMANENTLY ENJOINED FROM COMMENCING OR CONTINUING IN ANY MANNER AGAINST THE RELEASED PARTIES AND THE EXCULPATED PARTIES AND THEIR ASSETS AND PROPERTIES, AS THE CASE MAY BE, ANY SUIT, ACTION OR OTHER PROCEEDING, ON ACCOUNT OF OR RESPECTING ANY CLAIM, DEMAND, LIABILITY, OBLIGATION, DEBT, RIGHT, CAUSE OF ACTION, INTEREST OR REMEDY RELEASED OR TO BE RELEASED PURSUANT TO ARTICLE IX OF THE PLAN.

EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THE PLAN, THE PLAN SUPPLEMENT OR RELATED DOCUMENTS, OR FOR OBLIGATIONS ISSUED PURSUANT TO THE PLAN, ALL ENTITIES WHO HAVE HELD, HOLD OR MAY HOLD CLAIMS OR INTERESTS THAT HAVE BEEN RELEASED PURSUANT TO ARTICLE IX.B OR ARTICLE IX.C OF THE PLAN, DISCHARGED PURSUANT TO ARTICLE IX.E OF THE PLAN, OR ARE SUBJECT TO EXCULPATION PURSUANT TO ARTICLE IX.D OF THE PLAN, ARE PERMANENTLY ENJOINED, FROM AND AFTER THE EFFECTIVE DATE, FROM TAKING ANY OF THE FOLLOWING ACTIONS: (1) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (2) ENFORCING, ATTACHING, COLLECTING OR RECOVERING BY ANY MANNER OR MEANS ANY JUDGMENT, AWARD, DECREE OR ORDER AGAINST SUCH ENTITIES ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (3) CREATING, PERFECTING OR ENFORCING ANY ENCUMBRANCE OF ANY KIND AGAINST SUCH ENTITIES OR THE PROPERTY OR ESTATE OF SUCH ENTITIES ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (4) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS RELEASED, SETTLED OR DISCHARGED PURSUANT TO THE PLAN; AND (5) ACTING OR PROCEEDING IN ANY MANNER, IN ANY PLACE WHATSOEVER, THAT DOES NOT CONFORM WITH THE PROVISIONS OF THE PLAN TO THE FULL EXTENT PERMITTED BY APPLICABLE LAW.

THE RIGHTS AFFORDED IN THE PLAN AND THE TREATMENT OF ALL CLAIMS AND INTERESTS IN THE PLAN SHALL BE IN EXCHANGE FOR AND IN COMPLETE SATISFACTION OF ALL CLAIMS AND INTERESTS OF ANY NATURE WHATSOEVER, INCLUDING ANY INTEREST ACCRUED ON CLAIMS FROM AND AFTER THE PETITION DATE, AGAINST THE TSN DEBTORS OR ANY OF THEIR ASSETS, PROPERTY OR ESTATES. ON THE EFFECTIVE DATE, ALL SUCH CLAIMS AGAINST THE TSN DEBTORS SHALL BE FULLY RELEASED AND DISCHARGED, AND THE INTERESTS SHALL BE CANCELLED.

EXCEPT AS OTHERWISE EXPRESSLY PROVIDED FOR IN THE PLAN OR IN OBLIGATIONS ISSUED PURSUANT HERETO FROM AND AFTER THE EFFECTIVE DATE, ALL CLAIMS AGAINST THE TSN DEBTORS SHALL BE FULLY RELEASED AND DISCHARGED, AND ALL INTERESTS SHALL BE CANCELLED, AND THE TSN DEBTORS' LIABILITY WITH RESPECT THERETO SHALL BE EXTINGUISHED COMPLETELY, INCLUDING ANY LIABILITY OF THE KIND SPECIFIED UNDER SECTION 502(G) OF THE BANKRUPTCY CODE.

ALL ENTITIES SHALL BE PRECLUDED FROM ASSERTING AGAINST THE TSN DEBTORS, THE TSN DEBTORS' ESTATES, THE REORGANIZED TSN DEBTORS, EACH OF THEIR RESPECTIVE SUCCESSORS AND ASSIGNS, AND EACH OF THEIR ASSETS AND PROPERTIES, ANY OTHER CLAIMS OR INTERESTS BASED UPON ANY DOCUMENTS, INSTRUMENTS OR ANY ACT OR OMISSION, TRANSACTION OR OTHER ACTIVITY OF ANY KIND OR NATURE THAT OCCURRED BEFORE THE EFFECTIVE DATE.

*(vii)* **Term of Injunctions or Stays**

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court or any order of the Canadian Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date. All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

*(viii)* **Injunction Against Interference With Plan**

To the fullest extent permitted by applicable law, upon the entry of the Confirmation Order, all of the Releasing Parties shall be enjoined from taking any actions to interfere with the implementation or consummation of the Plan.

*(ix)* **Injunction Related to Releases and Exculpation**

The Confirmation Order shall permanently enjoin the commencement or prosecution by any person or entity, whether directly, derivatively or otherwise, of any Claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action or liabilities released pursuant to the Plan, including but not limited to the claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action or liabilities released in Articles IX.C and IX.D of the Plan.

*(x)* **Protection Against Discriminatory Treatment**

Consistent with section 525 of the Bankruptcy Code and the Supremacy Clause of the U.S. Constitution, all Entities, including Governmental Units, shall not discriminate against the Reorganized TSN Debtors or deny, revoke, suspend or refuse to renew a license, permit, charter, franchise or other similar grant to, condition such a grant to, discriminate with respect to such a grant against, the Reorganized TSN Debtors or another Entity with whom such Reorganized TSN Debtors have been associated, solely because one of the TSN Debtors has been a debtor under chapter 11, has been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases but before the Debtor is granted or denied a discharge) or has not paid a debt that is dischargeable in the Chapter 11 Cases.

*(xi)* **No Consent to Change of Control Required**

To the fullest extent permitted by applicable law, except as otherwise expressly provided by order of the Bankruptcy Court, none of (a) the facts or circumstances giving rise to the commencement of, or occurring in connection with, the Chapter 11 Cases, (b) the issuance of the New Common Stock or New Preferred Stock pursuant to the Plan, or (c) consummation of any other transaction pursuant to the Plan (including, without limitation, the Restructuring Transactions) shall constitute a "change in ownership" or "change of control" (or a change in working control) of, or in connection with, any TSN Debtor requiring the consent of any person other than the TSN Debtors or the Bankruptcy Court.

*(xii)* **Release of Liens**

Except as otherwise provided in the Plan or in any contract, instrument, release or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured

Claim that is Allowed as of the Effective Date, all mortgages, deeds of trust, Liens, pledges or other security interests against any property of the Estates shall be fully released and discharged, and all of the right, title and interest of any holder of such mortgages, deeds of trust, Liens, pledges or other security interests shall revert to the Reorganized TSN Debtor and its successors and assigns. For the avoidance of doubt, all mortgages, deeds of trust, Liens, pledges or other security interests against any property of the Estates shall be fully released and discharged on the Effective Date without any further action of any party, including, but not limited to, further order of the Bankruptcy Court, the Canadian Court or filing updated schedules or statements typically filed pursuant to the Uniform Commercial Code, the Personal Property Security Act (Ontario) or in accordance with any other real or personal property registry system in any of the applicable provinces in Canada; provided, that nothing in the Plan shall be deemed to release the Liens securing the PMCA Claims, which PMCA Claims and Liens are being reinstated hereby, or the Indenture Trustees' charging liens for unpaid fees, costs, expenses and indemnification under the Indentures or other agreements.

## I. CONDITIONS PRECEDENT TO CONFIRMATION OF THE PLAN AND THE EFFECTIVE DATE

### *(i)* *Conditions Precedent to Confirmation*

It shall be a condition to Confirmation of the Plan that the following provisions, terms and conditions shall have been satisfied or waived pursuant to the provisions of Article X.C of the Plan.

- The Bankruptcy Court shall have entered a Final Order, in form and substance acceptable to the TSN Debtors, approving the Disclosure Statement with respect to the Plan as containing adequate information within the meaning of section 1125 of the Bankruptcy Code.

### *(ii)* *Conditions Precedent to the Effective Date*

It shall be a condition to the Effective Date that the following provisions, terms and conditions shall have been satisfied or waived pursuant to the provisions of Article X.C of the Plan.

- The Confirmation Order, in a form reasonably satisfactory to the TSN Debtors and Plan Sponsor, shall be a Final Order.

- The Canadian Court shall have entered an order, in form and substance reasonably acceptable to the TSN Debtors and the Plan Sponsor, recognizing the Bankruptcy Court's entry of the Confirmation Order, and such order shall have become a Final Order.

- The Bankruptcy Court shall have entered one or more orders (which may include the Confirmation Order), in form and substance reasonably acceptable to the TSN Debtors and the Plan Sponsor, authorizing the assumption and rejection of Executory Contracts and Unexpired Leases by the TSN Debtors as contemplated in the Plan, which shall have become Final Orders.

- The Canadian Court shall have entered orders, in form and substance reasonably acceptable to the TSN Debtors and the Plan Sponsor, recognizing the Bankruptcy Court's entry of the orders described in Article X.B.3 of the Plan, and such orders shall have become Final Orders.

- The Rights Offering shall have been consummated pursuant to the terms of this Plan, the Rights Offering Procedures, and the EPCA.

- All of the schedules, documents, supplements and exhibits to the Plan shall have been filed in form and substance reasonably acceptable to the TSN Debtors and the Plan Sponsor.

- All actions, documents, certificates, and agreements necessary to implement the Plan, including, without limitation, the New By-Laws, the New Certificate of Incorporation, and the Registration Rights Agreement, shall have been effected or executed and delivered to the required parties and,

to the extent required, filed with the applicable governmental units in accordance with applicable laws.

- A decision released by the FCC or a bureau or subdivision thereof (an "*FCC Order*") approving the transfer of control to the Plan Sponsor over the licenses and authorizations held by Debtors, and all other governmental, regulatory and third party licenses, approvals, waivers and/or consents required under applicable law to consummate the transactions contemplated by the Plan, including without limitation the Industry Canada Approval (defined below), shall have been obtained and shall be final and in full force and effect without any condition or requirement that would reasonably be expected to have, individually or in the aggregate, a material impact on the current business operations of the Plan Sponsor. In addition, the FCC shall not have reconsidered the FCC Order on its own motion within 30 days (or, if released by a bureau or other subdivision of the FCC, within 40 days) of its release, and the FCC and the courts will have denied all petitions for reconsideration, applications for review and appeals (collectively, "*Appeals*") of the FCC Order (or of an FCC or court order affirming the FCC Order), or the periods for filing such Appeals have passed and no Appeal has been filed. Moreover, there shall exist no claim, action, suit, investigation, litigation or proceeding, pending or threatened in any court or before any arbitrator or governmental instrumentality, which would prohibit the transactions contemplated by the Plan.

- The prior approval of the Minister of Industry (the "*Industry Canada Approval*") approving the transfer of control of the Canadian Debtors to the Plan Sponsor or, at the option of the Plan Sponsor, the transfer or assignment of the licenses and authorizations held by the TSN Debtors to a party designated by the Plan Sponsor that is eligible to hold such licenses, to the extent required by applicable law, including the licenses and authorizations to consummate the transactions contemplated by the Plan, shall have been obtained and shall be final and in full force and effect without any condition or requirement that would reasonably be expected to have, individually or in the aggregate, a material impact on the current or future business operations of the Plan Sponsor. In addition, the courts will have denied all applications for judicial review or other court challenges to the Industry Canada Approval or appeals of any court order upholding the Industry Canada Approval or the periods for filing such appeals have passed and no appeal has been filed.

- The TSN Debtors shall have cash on hand as of the Effective Date of at least $5 million.

*(iii)*  **Waiver of Conditions**

The conditions to Confirmation of the Plan and to the occurrence of the Effective Date set forth in this Article X of the Plan may be waived at any time by the TSN Debtors, with the written consent of the Plan Sponsor; *provided, however,* that the TSN Debtors may not waive entry of the Confirmation Order.

*(iv)*  **Effect of Failure of Conditions**

If the Effective Date does not occur, the Plan shall be null and void in all respects and nothing contained in the Plan or the Disclosure Statement shall: (1) constitute a waiver or release of any claims by or Claims against the TSN Debtors; (2) prejudice in any manner the rights of the TSN Debtors, any holders of Claims or any other Entity; or (3) constitute an admission, acknowledgment, offer or undertaking by the TSN Debtors, any holders or any other Entity in any respect.

## J.  MODIFICATION, REVOCATION OR WITHDRAWAL OF THE PLAN

*(i)*  **Modification and Amendments**

Except as otherwise specifically provided in the Plan, the TSN Debtors reserve the right, subject to the reasonable consent of the Plan Sponsor, to modify the Plan as to material terms and seek Confirmation consistent with the Bankruptcy Code and, as appropriate, not re-solicit votes on such modified Plan. Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019 and those

restrictions on modifications set forth in the Plan, the TSN Debtors expressly reserve their rights, subject to the reasonable consent of the Plan Sponsor, to alter, amend or modify materially the Plan with respect to any or all Debtors, one or more times, after Confirmation, and, to the extent necessary, may initiate proceedings in the Bankruptcy Court to so alter, amend or modify the Plan or remedy any defect or omission, or reconcile any inconsistencies in the Plan, the Disclosure Statement or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of the Plan. Any such modification or supplement shall be considered a modification of the Plan and shall be made in accordance with this Article XI of the Plan.

In addition, prior to the Effective Date, the TSN Debtors (with the reasonable consent of the Plan Sponsor) may make appropriate technical adjustments and modifications to the Plan, without further order or approval of the Bankruptcy Court; provided, however, that such technical adjustments and modifications do not adversely affect in a material way the treatment of holders of Claims or Interests.

### (ii)     Effect of Confirmation on Modifications

Entry of a Confirmation Order shall mean that all modifications or amendments to the Plan occurring after the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or re-solicitation under Bankruptcy Rule 3019.

### (iii)    Revocation or Withdrawal of the Plan

The TSN Debtors (with the reasonable consent of the Plan Sponsor) reserve the right to revoke or withdraw the Plan before the Effective Date.   If the TSN Debtors revoke or withdraw the Plan, or if Confirmation or the Effective Date does not occur, then:  (1) the Plan shall be null and void in all respects; (2) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of any Claim or Interest or Class of Claims or Interests), assumption or rejection of Executory Contracts or Unexpired Leases effected by the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void; and (3) nothing contained in the Plan shall:  (a) constitute a waiver or release of any Claims or Interests or Claims by any TSN Debtor against any other Entity; (b) prejudice in any manner the rights of such Debtor or any other Entity; or (c) constitute an admission, acknowledgement, offer or undertaking of any sort by such Debtor or any other Entity.

## K.     RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court shall retain such jurisdiction over the Chapter 11 Cases and all matters, arising out of or related to, the Chapter 11 Cases and the Plan including jurisdiction to:

- allow, disallow, determine, liquidate, classify, estimate or establish the priority, Secured or Unsecured status or amount of any Claim or Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the Secured or Unsecured status, priority, amount or allowance of Claims;

- decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan;

- resolve any matters related to:  (a) the assumption, assumption and assignment or rejection of any Executory Contract or Unexpired Lease to which a TSN Debtor is party or with respect to which a TSN Debtor may be liable in any manner and to hear, determine and, if necessary, liquidate, any Claims arising therefrom, including Rejection Claims, Cure Claims pursuant to section 365 of the Bankruptcy Code or any other matter related to such Executory Contract or Unexpired Lease; (b) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed; (c) the Reorganized TSN Debtors amending, modifying or supplementing, after the Effective Date, pursuant to Article VI of the Plan, any Executory Contracts or Unexpired Leases to the list of Executory Contracts and Unexpired Leases to be assumed or rejected or otherwise; and (d) any dispute regarding whether a contract or lease is or was executory or expired.

- ensure that distributions to holders of Allowed Claims are accomplished pursuant to the provisions of the Plan;

- adjudicate, decide or resolve any motions, adversary proceedings, contested or litigated matters and any other matters, and grant or deny any applications involving a TSN Debtor that may be pending on the Effective Date;

- adjudicate, decide or resolve any and all matters related to any Cause of Action;

- adjudicate, decide or resolve any and all matters related to section 1141 of the Bankruptcy Code;

- enter and enforce any order for the sale of property pursuant to sections 363, 1123 or 1146(a) of the Bankruptcy Code;

- resolve any avoidance or recovery actions under sections 105, 502(d), 542 through 551 and 553 of the Bankruptcy Code;

- resolve any cases, claims, controversies, suits, disputes or causes of action that may arise in connection with the consummation, interpretation or enforcement of the Plan or any entity's obligations incurred in connection with the Plan;

- resolve any cases, controversies, suits, disputes or causes of action that may arise in connection with or under the DIP Loan Agreement;

- resolve any cases, controversies, suits, disputes or causes of action that may arise in connection with or under the Notes;

- issue injunctions, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any entity with consummation or enforcement of the Plan;

- resolve any cases, controversies, suits, disputes or causes of action with respect to the discharge, releases, injunctions, exculpations, indemnifications and other provisions contained in Article IX of the Plan and enter such orders as may be necessary or appropriate to implement such releases, injunctions and other provisions;

- enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked or vacated;

- determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release, indenture or other agreement or document created in connection with the Plan or the Disclosure Statement;

- adjudicate any and all disputes arising from or relating to distributions under the Plan;

- consider any modifications of the Plan, cure any defect or omission or reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

- determine requests for the payment of Claims and Interests entitled to priority pursuant to section 507 of the Bankruptcy Code, including requests by Professionals for payment of Accrued Professional Fees;

- hear and determine disputes arising in connection with the interpretation, implementation or enforcement of the Plan or the Confirmation Order, including disputes arising under agreements, documents or instruments executed in connection with the Plan;

- hear and determine matters concerning state, local and federal taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code;

- hear and determine all disputes involving the existence, nature or scope of the TSN Debtors' discharge, including any dispute relating to any liability arising out of the termination of employment or the termination of any employee or retiree benefit program, regardless of whether such termination occurred before or after the Effective Date;

- enforce all orders previously entered by the Bankruptcy Court;

- hear any other matter not inconsistent with the Bankruptcy Code; and

- enter an order concluding or closing the Chapter 11 Cases.

## L.   MISCELLANEOUS PROVISIONS

### (i)   *Immediate Binding Effect*

Subject to Article X.B of the Plan, and notwithstanding Bankruptcy Rules 3020(e), 6004(h) or 7062 or any other Bankruptcy Rule, upon the occurrence of the Effective Date, the terms of the Plan and the Plan Supplement shall be immediately effective and enforceable and deemed binding upon the TSN Debtors, the Reorganized TSN Debtors and any and all holders of Claims or Interests (irrespective of whether such Claims or Interests are deemed to have accepted the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, discharges and injunctions described in the Plan, each Entity acquiring property under the Plan, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the TSN Debtors.

### (ii)   *Dissolution of Creditors' Committee*

On the Effective Date, the Creditors' Committee shall dissolve and members thereof shall be released and discharged from all rights, duties, responsibilities and obligations from or related to the Chapter 11 Cases.  In addition, the retention and employment of the Creditors' Committee's attorneys, accountants and other agents shall terminate on the Effective Date.

### (iii)   *Severability of Plan Provisions*

If, before Confirmation of the Plan, any term or provision of the Plan is held by the Bankruptcy Court or any other court exercising jurisdiction to be invalid, void or unenforceable, the Bankruptcy Court or other court exercising jurisdiction shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired or invalidated by such holding, alteration or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is: (1) valid and enforceable pursuant to its terms; (2) integral to the Plan and may not be deleted or modified without the TSN Debtors' consent; and (3) nonseverable and mutually dependent.

### (iv)   *Votes Solicited in Good Faith*

Upon entry of the Confirmation Order, the TSN Debtors will be deemed to have solicited votes on the Plan in good faith and in compliance with the Bankruptcy Code and any applicable non-bankruptcy law, and pursuant to

section 1125(e) of the Bankruptcy Code, the TSN Debtors and their respective Affiliates, agents, representatives, members, principals, shareholders, officers, directors, employees, advisors and attorneys will be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale and purchase of Plan securities offered and sold under the Plan, and, therefore, will have no liability for the violation of any applicable law, rule or regulation governing the solicitation of votes on the Plan or the offer, issuance, sale or purchase of the New Common Stock or New Preferred Stock offered and sold under the Plan.

*(v)*      ***Closing of Chapter 11 Cases***

The Reorganized TSN Debtors shall, promptly after the full administration of the Chapter 11 Cases, file with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Bankruptcy Court to close the Chapter 11 Cases.

*(vi)*      ***Conflicts***

Except as set forth in the Plan, to the extent that any provision of the Disclosure Statement or any other order (other than the Confirmation Order) referenced in the Plan (or any exhibits, schedules, appendices, supplements or amendments to any of the foregoing), conflict with or are in any way inconsistent with any provision of the Plan, the Plan shall govern and control; *provided, however,* that if there is a conflict between the Plan and a Plan Supplement document, the Plan Supplement document shall govern and control; and *provided further, however,* that to the extent that any provision of the Plan conflicts with or is in any way inconsistent with any provision of the Confirmation Order, the Confirmation Order shall govern and control.

# IX.
## SOLICITATION AND VOTING PROCEDURES

This Disclosure Statement, accompanied by a ballot or ballots to be used for voting on the Plan, is being distributed to the holders of Claims in Classes 3, 5, 6 and 7. Only the holders of Claims in these Classes are entitled to vote to accept or reject the Plan and may do so by completing the ballot and returning it in the envelope provided. Additionally, a discussion of the procedures used to tabulate the votes cast for or against the Plan can be found in **Exhibit B**, attached hereto and are incorporated herein by reference and should be read in conjunction with this Disclosure Statement and in formulating a decision to vote to accept or reject the Plan.

The TSN Debtors, with the approval of the Bankruptcy Court, have engaged GCG as their Voting Agent to assist in the solicitation process. The Voting Agent will, among other things, answer questions, provide additional copies of all solicitation materials, and generally oversee the solicitation process for their assigned Claims. The Voting Agent will also process and tabulate ballots for each of their respective Classes that are entitled to vote to accept or reject the Plan and will file a voting report as soon as practicable before the Confirmation Hearing.

### A.     Holders of Claims Entitled to Vote on the Plan

Under the provisions of the Bankruptcy Code, not all holders of claims against and interests in a debtor are entitled to vote on a chapter 11 plan. As shown in the table below, the TSN Debtors are soliciting votes to accept the Plan only from holders of Claims and Interests in Classes 3, 5, 6 and 7 (collectively, the "***Voting Classes***"). The holders of Claims in the Voting Classes are Impaired under the Plan and are receiving property under the Plan. Therefore, holders of Claims in the Voting Classes have the right to vote to accept or reject the Plan.

The TSN Debtors are **not** soliciting votes from (a) holders of Unimpaired Claims in Classes 1, 2, and 4 because those parties are conclusively presumed to have accepted the Plan or (b) holders of Interests in Class 8 because those parties are conclusively presumed to have rejected the Plan. Additionally, the Voting and Tabulation Procedures that certain holders of Claims in the Voting Classes, such as those holders whose Claims have been disallowed or subject to a pending objection, are not entitled to vote to accept or reject the Plan. The following table provides a summary of the status and voting rights of each Class (and, therefore, of each holder within such Class) under the Plan:

**SUMMARY OF STATUS AND VOTING RIGHTS**

| Class | Status | Voting Rights |
|---|---|---|
| 1- Other Priority Claims | Unimpaired | No (deemed to accept) |
| 2- Other Secured Claims | Unimpaired | No (deemed to accept) |
| 3- Senior Secured Notes Claims | Impaired | Yes |
| 4- PMCA Claims | Unimpaired | No (deemed to accept) |
| 5- Senior Exchangeable Notes Claims | Impaired | Yes |
| 6- Other Unsecured Claims | Impaired | Yes |
| 7- Unsecured Convenience Claims | Impaired | Yes |
| 8- Equity Interests | Impaired | No (deemed to reject) |

### B.    Voting Record Date

**The Voting Record Date is 5:00 p.m. Prevailing Eastern Time on December 10, 2010**.  The Voting Record Date is the date on which it will be determined which holders of Claims and Interests in the Voting Classes are entitled to vote to accept or reject the Plan and whether Claims and Interests have been properly assigned or transferred under Bankruptcy Rule 3001(e) such that an assignee can vote as the holder of a Claim or Interest.

### C.    Voting on the Plan

**The Voting Deadline is 5:00 p.m. Prevailing Eastern Time on January [__], 2011**.  In order to be counted as votes to accept or reject the Plan, all Ballots, Note Ballots and Note Master Ballots must be properly executed, completed and delivered (either by using the return envelope provided, by first class mail, overnight courier or personal delivery) so that it is **actually received** on or before the Voting Deadline by either the Voting and Claims Agent at the following address:

| DELIVERY OF BALLOTS |
|---|
| Ballots, Note Ballots and Note Master Ballots must be **actually received** by the Voting and Claims Agent by the Voting Deadline of 5:00 p.m. (Prevailing Eastern Time) on January [__], 2011 at the following addresses: |
| ***Voting and Claims Agent:***<br>If by mail:<br><br>TerreStar Networks Inc.<br>c/o The Garden City Group, Inc.<br>P.O. Box 9649<br>Dublin, OH 43017-4949<br><br>If by hand or overnight courier:<br><br>TerreStar Networks Inc.<br>c/o The Garden City Group, Inc.<br>5151 Blazer Parkway, Suite A<br>Dublin, OH 43017<br>\* \* \* \* \* \* \*<br><br>If you received an envelope addressed to your nominee, you must return your ballot to your nominee prior to 5:00 p.m. on the date that is five (5) days prior to the Voting Deadline, to provide sufficient time for your nominee to compile and submit a Master Ballot.<br><br>If you have any questions on the procedure for voting on the Plan, please call the Voting and Claims Agent at the following telephone number:<br><br>1-866-682-1770 |

### D.    Ballots, Note Ballots or Master Ballots Not Counted

**No Ballot, Note Ballot or Master Ballot will be counted toward Confirmation if, among other things**: (a) it is illegible or contains insufficient information to permit the identification of the holder of the Claim or Interest; (b) it was transmitted by facsimile or other electronic means; (c) it was cast by an entity that is not entitled to vote on the Plan; (d) it was cast for a Claim listed in the Schedules as contingent, unliquidated or disputed for which the applicable bar date has passed and no proof of claim was timely filed; (e) it was cast for a Claim that is subject to an objection pending as of the Record Date (unless temporarily allowed in accordance with the Solicitation and Voting Procedures); (f) it was sent to the TSN Debtors, the TSN Debtors' agents/representatives (other than the Voting and Claims Agent), an indenture trustee or the Debtors' financial or legal advisors instead of to the Claims and Voting Agent; (g) it is unsigned; or (h) it is not marked to either accept or reject the Plan or it is

marked both to accept and reject the Plan.  **Please refer to the Voting and Tabulation Procedures set forth in Exhibit H hereto for additional requirements with respect to voting to accept or reject the Plan.**

**IF YOU HAVE ANY QUESTIONS ABOUT THE SOLICITATION OR VOTING PROCESS, PLEASE CONTACT THE VOTING AND CLAIMS AGENT.  ANY BALLOT, NOTE BALLOT OR MASTER BALLOT RECEIVED AFTER THE VOTING DEADLINE OR OTHERWISE NOT IN COMPLIANCE WITH THE VOTING AND TABULATION PROCEDURES WILL <u>NOT</u> BE COUNTED.**

## X.
## CONFIRMATION OF THE PLAN

### A.        The Confirmation Hearing

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a hearing to consider Confirmation.  Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to Confirmation.

The Bankruptcy Court has scheduled the Confirmation Hearing for **[DATE], 2011** at **10:00** a.m. (Prevailing Eastern Time) before the Honorable Judge Sean H. Lane, United States Bankruptcy Judge, in the Bankruptcy Court, located at Alexander Hamilton Custom House, One Bowling Green, New York, New York 10004.  The Confirmation Hearing may be adjourned from time to time without further notice except for an announcement of the adjourned date made at the Confirmation Hearing or any adjournment thereof.

### B.        Deadline to Object to Confirmation of the Plan

Objections to Confirmation must be filed and served at or before **5:00 p.m.** (Prevailing Eastern Time) on **January [__], 2011** in accordance with the notice of the Confirmation Hearing that accompanies this Disclosure Statement.  This means that written objections to Confirmation, if any, that conform to the applicable provisions of the Disclosure Statement Order, the Bankruptcy Code, the Bankruptcy Rules and the Local Bankruptcy Rules, must be filed, together with a proof of service, with the Bankruptcy Court and served so as to be **actually received** on or before the Plan Objection Deadline by the following parties:

- Counsel to the Debtors: Akin Gump Strauss Hauer & Feld LLP, Attn: Ira Dizengoff and Arik Preis, One Bryant Park, New York, New York, 10036;

- Counsel to the Plan Sponsor: Willkie Farr & Gallagher LLP, Attn: Matthew A. Feldman and Rachel Strickland, 787 Seventh Avenue, New York, New York 10019-6099

- U.S. Trustee: Office of the United States Trustee for the Southern District of New York, Attn: Susan Golden, Whitehall Street, 21st Floor, New York, New York 10004.

**Unless objections to Confirmation are timely served and Filed, they may not be considered by the Bankruptcy Court.**

### C.        Confirmation Hearing

The Confirmation Hearing will commence at 10:00 a.m. Prevailing Eastern Time on **[DATE]**, 2011.  The Confirmation Hearing will be held before the Honorable Sean H. Lane in the Bankruptcy Court, One Bowling Green, New York, New York 10004-1408.  At least 28 days before the Voting Deadline, the TSN Debtors will (a) serve the Confirmation Hearing Notice upon all known creditors of the TSN Debtors and (b) publish the Confirmation Hearing Notice in the national editions of *The Washington Post, USA Today* and *The Globe and Mail (national edition)*, which will contain, among other things, details regarding voting on and objecting to Confirmation, including the Voting Deadline and the Plan Objection Deadline, and the date, time and location of the Confirmation Hearing.  The Confirmation Hearing Notice will also be posted on the TSN Debtors' restructuring website www.TerreStarInfo.com.  **The Confirmation Hearing may be adjourned from time to time without further notice except for an announcement of the adjourned date made at the Confirmation Hearing or any adjournment thereof.**

### D.        Requirements for Confirmation of the Plan

Among the requirements for Confirmation are the following: (i) the Plan is accepted by all impaired Classes of Claims or, if the Plan is rejected by an impaired Class, that it "does not discriminate unfairly" and is "fair and equitable" as to such Class; (ii) the Plan is feasible; and (iii) the Plan is in the "best interests" of holders of Claims and Interests that are impaired under its provisions.

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies the requirements of section 1129 of the Bankruptcy Code. The TSN Debtors believe that the Plan satisfies or will satisfy all of the necessary requirements of chapter 11 of the Bankruptcy Code. Specifically, in addition to other applicable requirements, the TSN Debtors believe that the Plan satisfies or will satisfy the applicable Confirmation requirements of section 1129 of the Bankruptcy Code set forth below:

- The Plan complies with the applicable provisions of the Bankruptcy Code.

- The TSN Debtors, as the Plan proponents, have complied with the applicable provisions of the Bankruptcy Code.

- The Plan has been proposed in good faith and not by any means forbidden by law.

- Any payment made or promised under the Plan for services or for costs and expenses in, or in connection with, the chapter 11 cases, or in connection with the Plan and incident to the case, has been disclosed to the Bankruptcy Court, and any such payment: (i) made before Confirmation is reasonable or (ii) subject to the approval of the Bankruptcy Court is reasonable, if it is to be fixed after Confirmation.

- Either each holder of an impaired Claim or Interest in the TSN Debtors has accepted (or is deemed to have accepted) the Plan, or each non-accepting creditor will receive or retain under the Plan on account of such Claim or Interest, property of a value, as of the Effective Date of the Plan, that is not less than the amount that the holder would receive or retain if the TSN Debtors were liquidated on that date under chapter 7 of the Bankruptcy Code.

- Each Class of Claims or Interests that is entitled to vote on the Plan will have accepted the Plan, or the Plan can be confirmed without the approval of the Class pursuant to section 1129(b) of the Bankruptcy Code.

- Except to the extent that the holder of a particular Claim will agree to a different treatment of its Claim, the Plan provides that Administrative Claims and Priority Non-Tax Claims will be paid in full on the Effective Date, or as soon thereafter as is reasonably practicable.

- At least one Class of impaired Claims will have accepted the Plan, determined without including any acceptance of the Plan by any insider holding a Claim in that Class.

- Confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the TSN Debtors or any successors thereto under the Plan.

- All fees of the type described in 28 U.S.C. § 1930, including the fees of the U.S. Trustee, will be paid as of the Effective Date.

**E.      Best Interests of Creditors/Liquidation Analysis**

Often called the "best interests" test, section 1129(a)(7) of the Bankruptcy Code requires that a bankruptcy court find, as a condition to confirmation, that a chapter 11 plan provides, with respect to each class, that each holder of a claim or an interest in such class either (i) has accepted the plan or (ii) will receive or retain under the plan property of a value, as of the effective date of the plan, that is not less than the amount that such holder would receive or retain if the debtors liquidated under chapter 7 of the Bankruptcy Code. To make these findings, a bankruptcy court must: (i) estimate the cash liquidation proceeds that a chapter 7 trustee would generate if each of the debtor's chapter 11 cases were converted to a chapter 7 case and the assets of such debtor's estate were liquidated; (ii) determine the liquidation distribution that each non-accepting holder of a claim or an interest would receive from such liquidation proceeds under the priority scheme dictated in chapter 7; and (iii) compare the holder's liquidation distribution to the distribution under the plan that the holder would receive if the plan were confirmed and consummated.

To satisfy the requirements of section 1129(a)(7) of the Bankruptcy Code, the TSN Debtors, together with their retained advisors, prepared the liquidation analysis attached hereto as **Exhibit D** to this Disclosure Statement (the "*Liquidation Analysis*").  Based on the Liquidation Analysis, the Debtors believe that holders of Claims against the TSN Debtors will receive equal or greater value as of the Effective Date under the Plan than such holders would receive in a chapter 7 liquidation and that the Plan will therefore meet the "best interests" test provided in section 1129(a)(7) of the Bankruptcy Code.

### F.       Feasibility/Financial Projections

Section 1129(a)(11) of the Bankruptcy Code requires that confirmation of the plan of reorganization is not likely to be followed by the liquidation or the need for further financial reorganization of the debtor, or any successor to the debtor (unless such liquidation or reorganization is proposed in the plan of reorganization).

To determine whether the Plan meets this feasibility requirement, the TSN Debtors have analyzed their ability to meet their respective obligations under the Plan.  As part of this analysis, the TSN Debtors have prepared the projections, attached to this Disclosure Statement as **Exhibit E**.  Based upon the projections, the TSN Debtors believe that they will be a viable entity following the chapter 11 cases and that the Plan will meet the feasibility requirements of the Bankruptcy Code.

THE PROJECTIONS ATTACHED AS <u>EXHIBIT E</u>, INCLUDING THE UNDERLYING ASSUMPTIONS, SHOULD BE CAREFULLY REVIEWED IN EVALUATING THE PLAN.  THE PROJECTIONS WERE PREPARED IN NOVEMBER 2010.  WHILE MANAGEMENT BELIEVES THE ASSUMPTIONS UNDERLYING THE PROJECTIONS, WHEN CONSIDERED ON AN OVERALL BASIS, WERE REASONABLE WHEN PREPARED IN LIGHT OF CURRENT CIRCUMSTANCES AND EXPECTATIONS, NO ASSURANCE CAN BE GIVEN THAT THE PROJECTIONS WILL BE REALIZED.  THE TSN DEBTORS MAKE NO REPRESENTATION OR WARRANTY AS TO THE ACCURACY OF THE PROJECTIONS.

### G.       Acceptance by Impaired Classes

The Bankruptcy Code requires that, except as described in the following section, each impaired class of claims or interests must accept a plan in order for it to be confirmed.  A class that is not "impaired" under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to the class is not required.  A class is "impaired" unless the plan:  (i) leaves unaltered the legal, equitable and contractual rights to which the claim or the interest entitles the holder of the claim or interest; or (ii) cures any default, reinstates the original terms of such obligation, compensates the holder for certain damages or losses, as applicable, and does not otherwise alter the legal, equitable or contractual rights to which such claim or interest entitles the holder of such claim or interest.

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds in dollar amount and more than one-half in number of allowed claims in that class, counting only those claims that actually voted to accept or to reject the plan.  Thus, a class of claims will have voted to accept the plan only if two-thirds in amount and a majority in number actually voting cast their ballots in favor of acceptance.  For a class of impaired interests to accept a plan, section 1126(d) of the Bankruptcy Code requires acceptance by interest holders that hold at least two-thirds in amount of the allowed interests of such class, counting only those interests that actually voted to accept or reject the plan.  Thus, a class of interests will have voted to accept the plan only if two-thirds in amount actually voting cast their ballots in favor of acceptance.

### H.       Confirmation Without Acceptance by All Impaired Classes/Fair and Equitable Test

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a plan even if all impaired classes have not accepted the plan, *provided* that the plan has been accepted by at least one impaired class.  Pursuant to section 1129(b) of the Bankruptcy Code, notwithstanding an impaired class rejection or deemed rejection of the plan, the plan will be confirmed, at the plan proponent's request, in a procedure commonly known as "cramdown," so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.

*(i)*     *No Unfair Discrimination*

Often referred to as the "vertical test," this test applies to classes of claims or interests that are of equal priority and are receiving different treatment under a proposed plan. The test does not require that the treatment be the same or equivalent, but that such treatment be "fair." In general, bankruptcy courts consider whether a plan discriminates unfairly in its treatment of classes of claims of equal rank (*e.g.*, classes of the same legal character). Bankruptcy courts will take into account a number of factors in determining whether a plan discriminates unfairly. A proposed plan could treat two classes of unsecured creditors differently without unfairly discriminating against either class.

*(ii)*     *Fair and Equitable Test*

Often referred to as the "horizontal test," this test applies to classes of different priority and status (*e.g.*, secured versus unsecured) and includes the general requirement that no class of claims receive more than 100% of the amount of the allowed claims in such class. As to the dissenting class, this test sets different standards depending upon the type of claims or interests in such class:

### a.     Secured Claims

The condition that a plan be "fair and equitable" to a non-accepting class of secured claims includes the requirements that: (i) the holders of such secured claims retain the liens securing such claims to the extent of the allowed amount of the claims, whether the property subject to the liens is retained by the debtor or transferred to another entity under the Plan; and (ii) each holder of a secured claim in the class receives deferred cash payments totaling at least the allowed amount of such claim with a value, as of the effective date of the plan, at least equivalent to the value of the secured claimant's interest in the debtor's property subject to the liens.

### b.     Unsecured Claims

The condition that a plan be "fair and equitable" to a non-accepting class of unsecured claims includes the requirement that either: (i) the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or (ii) the holder of any claim or any interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or junior interest any property, subject to certain exceptions.

### c.     Interests

The condition that a plan be "fair and equitable" to a non-accepting class of interests includes the requirements that either: (i) the plan provides that each holder of an interest in that class receives or retains under the plan on account of that Interest property of a value, as of the effective date of the plan, equal to the greater of: (A) the allowed amount of any fixed liquidation preference to which such holder is entitled; (B) any fixed redemption price to which such holder is entitled; or (C) the value of such interest; or (ii) if the class does not receive the amount as required under (i) hereof, no class of interests junior to the non-accepting class may receive a distribution under the plan.

If any impaired Class rejects the Plan, the TSN Debtors reserve the right to seek Confirmation of the Plan utilizing the "cramdown" provision of section 1129(b) of the Bankruptcy Code. Specifically, to the extent that any Impaired Class rejects the Plan or is deemed to have rejected the Plan, the TSN Debtors will request Confirmation of the Plan, as it may be modified from time to time, under section 1129(b) of the Bankruptcy Code. The TSN Debtors reserve the right to alter, amend, modify, revoke or withdraw the Plan prior to Confirmation, including to amend or modify the Plan to satisfy the requirements of section 1129(b) of the Bankruptcy Code.

The TSN Debtors submit that if the TSN Debtors "cramdown" the Plan pursuant to section 1129(b) of the Bankruptcy Code, the Plan is structured such that it does not "discriminate unfairly" and satisfies the "fair and equitable" requirement. The TSN Debtors believe that the Plan and the treatment of all Classes of Claims and Interests under the Plan satisfy the foregoing requirements for nonconsensual Confirmation of the Plan.

**I.    Valuation of the TSN Debtors**

In conjunction with formulating the Plan, the TSN Debtors determined that it was necessary to estimate the post-Confirmation going-concern of the Reorganized Debtors (the "***Valuation Analysis***").  The Valuation Analysis is set forth on the exhibit attached hereto as **Exhibit F**.

THE VALUATION INFORMATION SET FORTH ON EXHIBIT F REPRESENTS A HYPOTHETICAL VALUATION OF THE REORGANIZED DEBTORS, WHICH ASSUMES THAT SUCH REORGANIZED DEBTORS CONTINUE AS AN OPERATING BUSINESS.  THE ESTIMATED VALUE SET FORTH ON EXHIBIT F DOES NOT PURPORT TO CONSTITUTE AN APPRAISAL OR NECESSARILY REFLECT THE ACTUAL MARKET VALUE THAT MIGHT BE REALIZED THROUGH A SALE OR LIQUIDATION OF THE REORGANIZED DEBTORS, THEIR SECURITIES OR THEIR ASSETS, WHICH VALUE MAY BE SIGNIFICANTLY HIGHER OR LOWER THAN THE ESTIMATE SET FORTH IN THIS SECTION.  ACCORDINGLY, SUCH ESTIMATED VALUE IS NOT NECESSARILY INDICATIVE OF THE PRICES AT WHICH THE NEW COMMON STOCK OR OTHER SECURITIES OF REORGANIZED TSN MAY TRADE AFTER GIVING EFFECT TO THE REORGANIZATION AND TRANSACTIONS SET FORTH IN THE PLAN, WHICH PRICES MAY BE SIGNIFICANTLY HIGHER OR LOWER THAN INDICATED BY THIS VALUATION.

**J.    Effect of Confirmation and Consummation of the Plan**

Following Confirmation, subject to Article X of the Plan, the Plan will be consummated on the Effective Date.  Among other things, on the Effective Date, certain release, injunction, exculpation and discharge provisions set forth in Article IX of the Plan will become effective.  As such, it is important to read the provisions contained in Article IX of the Plan very carefully so that you understand how Confirmation and Consummation of the Plan – which effectuates such provisions – will affect you and any Claim you may hold against the TSN Debtors and other claim holders so that you cast your vote accordingly.  Further discussion of the releases contemplated in the Plan is provided in section VIII of this Disclosure Statement.

# XI.
# RISK FACTORS

*Holders of Claims and Interests should read and consider carefully the risk factors set forth below, as well as the other information set forth in this Disclosure Statement and the documents delivered together herewith, referred to or incorporated by reference herein, before voting to accept or reject the Plan. Although these risk factors are many, these factors should not be regarded as constituting the only risks present in connection with the TSN Debtors' business or the Plan and its implementation.*

## A.  Risks Related to Confirmation of the Plan

### (i)  The TSN Debtors may not be able to obtain Confirmation of the Plan.

To emerge successfully from chapter 11 as a viable business, the TSN Debtors, like any debtor, must obtain approval of a plan of reorganization, and thereafter confirm and successfully implement the Plan. This process requires the TSN Debtors to (a) meet certain statutory requirements concerning the adequacy of disclosure with respect to any proposed plan; (b) solicit and obtain creditor acceptances of the proposed plan; and (c) fulfill other statutory conditions with respect to plan confirmation.

With regard to any proposed plan of reorganization, the TSN Debtors may not receive the requisite acceptances to confirm the Plan. If the requisite acceptances of the Plan are received, the TSN Debtors intend to seek Confirmation by the Bankruptcy Court. If the requisite acceptances are not received, the TSN Debtors may nevertheless seek Confirmation notwithstanding the dissent of certain Classes of Claims. The Bankruptcy Court may confirm the Plan pursuant to the "cramdown" provisions of the Bankruptcy Code, which allows the Bankruptcy Court to confirm a plan that has been rejected by an "impaired" class of claims if it determines that the plan satisfies section 1129(b) of the Bankruptcy Code. To confirm a plan over the objection of a dissenting class, a bankruptcy court also must find that at least one impaired class has accepted the plan, with such acceptance being determined without including the acceptance of any "insider" in such class.

Even if the requisite acceptances of the Plan are received, the Bankruptcy Court might not confirm the Plan as proposed. A dissenting holder of a Claim against or Interest in the TSN Debtors could challenge the balloting procedures and results as not being in compliance with the Bankruptcy Code. Further, even if the Bankruptcy Court determined that the balloting procedures and results were appropriate, the Bankruptcy Court could still decline to confirm the Plan if it found that any of the statutory requirements for confirmation had not been met. Specifically, section 1129 of the Bankruptcy Code sets forth the requirements for confirmation and requires, among other things, a finding by the Bankruptcy Court that (a) a debtor's plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes; (b) confirmation of the debtor's plan is not likely to be followed by a liquidation or a need for further financial reorganization; and (c) the value of distributions to non-accepting holders of claims within a particular class under the debtor's plan will not be less than the value of distributions such holders would receive if the debtor were liquidated under chapter 7 of the Bankruptcy Code. A bankruptcy court may determine that a proposed plan does not satisfy one or more of these requirements, in which case the proposed plan would not be confirmed by a bankruptcy court.

If the Plan is not confirmed by the Bankruptcy Court, it is unclear whether and when the TSN Debtors would be able to reorganize their businesses and what, if any, distributions holders of Claims or Interests ultimately would receive on account of their Claims or Interests. There also can be no assurance that the TSN Debtors will be able to successfully develop, prosecute, confirm and consummate an alternative plan of reorganization that is acceptable to the Bankruptcy Court and the TSN Debtors' creditors and other parties in interest. Additionally, it is possible that third parties may seek and obtain approval to terminate or shorten the exclusive period under section 1121 of the Bankruptcy Code during which only the Debtors may propose and solicit votes on a plan of reorganization. Finally, the TSN Debtors' emergence from bankruptcy is not assured. Although the TSN Debtors expect to emerge from bankruptcy, there can be no assurance that the TSN Debtors will successfully reorganize or of when this reorganization will occur.

*(ii)* ***Parties in Interest may object to the TSN Debtors' Classification of Claims and Equity Interests.***

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an interest in a particular class only if the claim or interest is substantially similar to the other claims or interests in that class. The TSN Debtors believe that the classification of holders of claims against and holders of interests in the TSN Debtors under the Plan complies with the requirements set forth in the Bankruptcy Code because the classes established under the Plan each encompass claims or interests that are substantially similar to similarly classified claims or interests. Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

*(iii)* ***The conditions precedent to the Effective Date of the Plan may not occur.***

As more fully set forth in the Plan, which is attached hereto as **Exhibit A**, the Effective Date is subject to a number of conditions precedent. If these conditions precedent are not met or waived pursuant to the provisions of the Plan, the Effective Date will not occur.

*(iv)* ***Historical financial information of the TSN Debtors may not be comparable to the financial information of the Reorganized Debtors.***

As a result of the consummation of the Plan and the transactions contemplated thereby, the financial condition and results of operations of the Reorganized Debtors from and after the Effective Date may not be comparable to the financial condition or results of operations reflected in the TSN Debtors' historical financial statements.

*(v)* ***The TSN Debtors may object to the amount or classification of a Claim.***

Except as otherwise provided in the Plan, the TSN Debtors reserve the right to object (prior to or after the occurrence of the Effective Date) to the amount or classification of any Claim under the Plan. The estimates set forth in this Disclosure Statement cannot be relied on by any holder of a Claim where such Claim is subject to an objection. Any holder of a Claim that is subject to an objection thus may not receive its expected share of the estimated distributions described in this Disclosure Statement.

*(vi)* ***Holders of Claims that are not Permitted to Participate in the Rights Offering as of the Subscription Record Date will not receive their Pro Rata share of the Rights allocated to their respective Classes.***

Pursuant to the Plan, distributions to the holders of Claims in Classes 3, 5, and 6 include Rights to purchase New Preferred Stock, but only with respect to holders of Claims that are Allowed as of the Subscription Record Date (i.e., the date that the order approving the Disclosure Statement is entered by the Bankruptcy Court). Therefore, to the extent that a holder's Claim is not permitted to participate in the Rights Offering as of the Subscription Record Date, such holder will not receive any of the Rights allocated to such holder's Class under the Plan, even if such holder's Claim becomes Allowed at a later date. The Rights Offering Procedures set forth the TSN Debtors' procedures for determining the amount of each holder's claim that is permitted to participate in the Rights Offering.

*(vii)* ***There may be litigation regarding the collateral securing the Senior Secured Notes, which could delay confirmation of the Plan and erode the value of the TSN Debtors' Estates.***

There is a litigable issue as to whether the TSN Debtors' obligations under the Senior Secured PIK Notes are secured by the TSN's rights in TerreStar-2. Certain holders of unsecured claims against the TSN Debtors have asserted that such obligations are not secured by the TSN's rights in TerreStar-2, an assertion that is disputed by certain holders of Senior Secured PIK Notes. As set forth herein, the TSN Debtors do not believe the outcome of this dispute would have any material impact on creditor recoveries under the Plan. However, litigation arising from this dispute could delay Confirmation and/or erode the value of the TSN Debtors' Estates by increasing the expenses of administration of the Debtors' Estates.

*(viii)*     ***There may be litigation regarding the ability of the TSN Debtors to reinstate the PMCA.***

Section 1124 of the Bankruptcy Code provides that a claim can be reinstated if a plan cures certain prepetition and postpetition defaults, including compensation for actual pecuniary loss, and reinstates the maturity and interest of the debt without otherwise altering the claimant's legal, equitable, or contractual rights.  The Plan provides for the reinstatement of the PMCA.  The TSN Debtors believe that the Plan meets the requirements necessary to reinstate the PMCA, including without limitation, the ability of the TSN Debtors to cure any defaults required to be cured under the PMCA.  Nevertheless, parties in interest may seek to litigate this issue and there can be no assurance that the Bankruptcy Court will agree with the TSN Debtors that the Plan satisfies the requirements of section 1124 with respect to the PMCA.

**B.        Risks That May Affect the Value of the Securities to Be Issued Under the Plan**

*(i)*      ***A Liquid Trading Market For The New Common Stock Or New Preferred Stock May Not Develop.***

There can be no assurances that a liquid trading market for the New Common Stock or New Preferred Stock will develop.  The liquidity of any market for the New Common Stock or New Preferred Stock will depend, among other things, upon the number of respective holders of New Common Stock and New Preferred Stock, the Reorganized Debtors' financial performance and the market for similar securities, none of which can be determined or predicted.  Therefore, the TSN Debtors cannot provide assurances that an active trading market will develop, or if a market develops, what the liquidity or pricing characteristics of that market will be.  If an active trading market does not develop, holders of New Common Stock and New Preferred Stock may have difficulty selling their shares.

*(ii)*      ***The resale of the New Common Stock or New Preferred Stock may be restricted by law.***

As described in Article XI, titled "Application of Securities Laws," the TSN Debtors intend to rely on the exemption from registration, pursuant to the exemptions contained in section 1145 of the Bankruptcy Code, the Securities Act of 1933, and/or equivalent exemptions in state securities laws, as applicable.  However, if a holder of New Common Stock or New Preferred Stock is deemed to be an "underwriter" with respect to such securities (with certain exceptions for "ordinary trading transactions" by certain persons) or an "affiliate" of the issuer of such securities, resales of such securities by such holder would not be exempt from the registration requirements under the Securities Act and applicable state securities laws under section 4(1) of the Securities Act.  Accordingly, such sales could be effected only pursuant to an effective registration statement or in reliance on another applicable exemption from these registration requirements, which may not be available to such holder.

Any distribution of securities in Canada pursuant to the Plan is being made under a prospectus exemption for a distribution in connection with a reorganization or arrangement under a statutory procedure.  TSN is not a reporting issuer in any province or territory of Canada.  Accordingly, any resale of such securities must be made in accordance with an exemption from the prospectus requirements of the securities laws of the applicable Canadian jurisdictions.  Recipients of the securities are advised to seek legal advice prior to any resale of the securities.

*(iii)*     ***The Valuation of New Common Stock and New Preferred Stock is Not Intended to Represent the Trading Value of the Securities to be Issued.***

The valuation of the Reorganized Debtors, set forth on <u>Exhibit F</u> hereto, is based on the assumption that the holders of Claims will receive substantially all of the issued New Common Stock or New Preferred on behalf of their Claims and is not intended to represent the trading values of New Common Stock or New Preferred Stock in public or private markets.

*(iv)* ***The Reorganized Debtors May Not Achieve Projected Financial Results Or Meet Post-Reorganization Debt Obligations And Finance All Operating Expenses, Working Capital Needs, and Capital Expenditures.***

The projected financial results of the Reorganized Debtors are based on numerous assumptions, including the timing, confirmation and consummation of the Plan in accordance with its terms, the anticipated future performance of the Reorganized Debtors, general business and economic conditions and other matters, many of which are beyond the control of the Reorganized Debtors and which may not materialize.

Accordingly, the Reorganized Debtors may not be able to achieve the revenue or cash flow relied upon to make the projections or to otherwise meet their projected financial results. To the extent the Reorganized Debtors do not meet their projected financial results or achieve projected revenues and cash flows, the Reorganized Debtors may lack sufficient liquidity to continue operating as planned after the Effective Date, may be unable to service their debt obligations as they come due or may not be able to meet their operational needs. Any one of these failures may preclude the Reorganized Debtors from, among other things: (a) enhancing the current customer offerings; (b) taking advantage of future opportunities; or (c) responding to competitive pressures. Further, a failure of the Reorganized Debtors to meet their projected financial results or achieve their projected revenues and cash flows could lead to cash flow and working capital constraints, which constraints may require the Reorganized Debtors to seek additional working capital. The Reorganized Debtors may not be able to obtain such working capital when it is required. Further, even if the Reorganized Debtors were able to obtain additional working capital, it may only be available on unreasonable terms. If any such required capital is obtained in the form of equity, the interests of the holders of the then-outstanding New Common Stock (and options or other rights to acquire New Common Stock), New Preferred Stock or Rights to purchase Rights Offering Preferred Stock could be diluted. While the TSN Debtors' Financial Projections represent management's view based on current known facts and assumptions about the future operations of the Reorganized Debtors, there is no guarantee that the Financial Projections will be realized.

*(v)* ***The Reorganized Debtors May Be Controlled By A Small Number Of Holders.***

Consummation of the Plan may result in a small number of holders owning a significant percentage of the outstanding shares of New Common Stock and New Preferred Stock. These holders may, among other things, exercise a controlling influence over the business and affairs of the Reorganized Debtors and have the power to elect directors and approve significant mergers, acquisitions, divestures, and other material corporate transactions, including the sale of the Reorganized Debtors, or delaying, preventing or deterring such transactions. The interests of such holders may differ from the interests of the other holders of New Common Stock and New Preferred Stock. The TSN Debtors can make no assurances regarding the future actions of the holders of New Common Stock and New Preferred Stock and the impact such actions may have on the value of the New Common Stock and New Preferred Stock.

**C.      Risks Related to the TSN Debtors' Businesses**

*(i)* ***Risks And Uncertainties Associated With The Chapter 11 Cases.***

Although the TSN Debtors believe that the Chapter 11 Cases, commenced in order to implement an agreed-upon restructuring, will be of short duration and will not be materially disruptive to their businesses, the TSN Debtors cannot be certain that this will be the case. Although the Plan is designed to minimize the length of the bankruptcy proceeding, it is impossible to predict with certainty the amount of time that the TSN Debtors may spend in bankruptcy or to assure parties-in-interest that the Plan will be confirmed.

Even if the Plan is confirmed on a timely basis, for the duration of the Chapter 11 Cases, the TSN Debtors' operations and the TSN Debtors' ability to execute their business strategy will be subject to the risks and uncertainties associated with bankruptcy. These risks include:

• the TSN Debtors' ability to obtain approval of the Bankruptcy Court with respect to motions filed in the Chapter 11 Cases from time to time;

• the TSN Debtors' ability to obtain and maintain normal trade terms with suppliers and service providers and maintain contracts that are critical to their operations;

• the TSN Debtors' ability to attract, motivate and retain key employees;

• the TSN Debtors' ability to attract and retain customers; and

• the TSN Debtors' ability to obtain creditor and Bankruptcy Court approval for, and then to consummate, a Plan to emerge from bankruptcy.

The TSN Debtors will also be subject to risks and uncertainties with respect to the actions and decisions of the creditors and other third parties who have interests in the Chapter 11 Cases that may be inconsistent with the TSN Debtors' restructuring and business goals.

These risks and uncertainties could affect the TSN Debtors' business and operations in various ways. For example, negative events or publicity associated with the Chapter 11 Cases could adversely affect the TSN Debtors' sales and relationships with their customers, as well as with their suppliers and employers, which in turn could adversely affect the TSN Debtors' operations and financial condition. In addition, pursuant to the Bankruptcy Code, the TSN Debtors need approval of the Bankruptcy Court for transactions outside the ordinary course of business, which may limit their ability to respond timely to certain events or take advantage of certain opportunities. Because of the risks and uncertainties associated with the Chapter 11 Cases, the TSN Debtors cannot predict or quantify the ultimate impact that events occurring during the reorganization process will have on their business, financial condition and results of operations.

As a result of the Chapter 11 Cases, the realization of assets and the satisfaction of liabilities are subject to uncertainty. While operating as debtors in possession, and subject to approval of the Bankruptcy Court, or otherwise as permitted in the normal course of business or Bankruptcy Court order, the TSN Debtors may sell or otherwise dispose of assets and liquidate or settle liabilities for amounts other than those reflected in the condensed consolidated financial statements included in TSC's Form 10-Q for the quarterly period ended June 30, 2010. Further, the Plan could materially change the amounts and classifications of assets and liabilities reported in the historical consolidated financial statements. The historical consolidated financial statements do not include any adjustments to the reported amounts of assets or liabilities that might be necessary as a result of Confirmation of a Plan.

*(ii)* ***Each Of The TSN Debtors Is A Development Stage Company With No Operating Revenues.***

Each of the TSN Debtors is a development stage company and only recently, with the announcement of and entry into the AT&T Agreement, has TSN generated minimal revenues from operations. The TSN Debtors' ability to transition into operating companies will depend on, among other things: successful development and execution of business plans; market acceptance of the services they intend to offer; and attracting, training and motivating highly skilled satellite and network operations personnel, a sales force and customer service personnel. The TSN Debtors may not be able to successfully complete the transition into operating companies or generate sufficient cash from operations to cover their expenses. Further, if the TSN Debtors do not become profitable, they will have difficulty obtaining funds to continue their operations.

*(iii)* ***The TSN Debtors Are Not Cash Flow Positive, And May Need Additional Liquidity To Fund Their Operations And Fully Fund All Of Their Necessary Capital Expenditures.***

The TSN Debtors do not generate sufficient cash from operations to cover their operating expenses, and it is unclear when, or if, they will be able to do so. Even if the TSN Debtors begin to generate cash in excess of operating expenses, they may require additional funds to meet capital expenditures and other non-operating cash expenses.

*(iv)*     ***The Reorganized Debtors will have indebtedness upon emergence.***

The Reorganized Debtors will have substantially less indebtedness than the TSN Debtors.  On the Effective Date, after giving effect to the transactions contemplated by the Plan, the Reorganized Debtors will, on a consolidated basis, have approximately $92 million in secured indebtedness under the Purchase Money Credit Agreement, as reinstated.

The Reorganized Debtors' indebtedness could have important consequences because:

•  a portion of the Reorganized Debtors' cash flow from operations will be dedicated to debt service and unavailable to support operations, working capital, capital expenditures, expansion, acquisitions or general corporate or other purposes;

•  the Reorganized Debtors' ability to obtain additional financing in the future may be limited;

•  the Reorganized Debtors' flexibility in planning for, or reacting to, changes in their business may be limited; and

•  it may make the Reorganized Debtors more vulnerable in the event of a downturn in their business or the economy in general.

The Reorganized Debtors' ability to make payments on and to refinance their debt, will depend on their ability to generate cash in the future.  This, to a certain extent, is subject to general economic, business, financial, competitive, legislative, regulatory and other factors that are beyond the control of the Reorganized Debtors.

There can be no assurance that the Reorganized Debtors will be able to generate sufficient cash flow from operations or that sufficient future borrowings will be available to pay off the Reorganized Debtors' debt obligations.  The Reorganized Debtors may need to refinance all or a portion of their debt on or before maturity; however, there can be no assurance that the Reorganized Debtors will be able to refinance any of their debt on commercially reasonable terms or at all.

*(v)*      ***The TSN Debtors May Require Funding After Emergence.***

The TSN Debtors may require funds for sales, general and administrative expenses, working capital, interest on borrowings, financing costs, potential capital expenditures and operating expenses until sometime after the commencement of commercial operations.  Such capital expenditures could exceed current estimates, in which case, the TSN Debtors may need to modify certain portions of their business plan.  If the TSN Debtors require more funding than they currently anticipate, or cannot meet their financing needs, their ability to operate their business, financial condition and results of operation could be adversely affected.

*(vi)*     ***The Success of Certain Portions of the TSN Debtors' Business Plan Will Depend On Market Acceptance Of New And Unproven Technology, Which May Never Occur.***

Other than satellite radio, the Debtors are not aware of any integrated satellite and terrestrial wireless network in commercial operation. As a result, the TSN Debtors' proposed market is new and untested and the TSN Debtors cannot predict with certainty the potential demand for the services the TSN Debtors plan to offer or the extent to which they will meet that demand.  There may not be sufficient demand in general for the services the TSN Debtors plan to offer, or in particular geographic markets, for particular types of services or during particular time periods, to enable the TSN Debtors to generate positive cash flow, and the TSN Debtors' cost structure may not permit the TSN Debtors to meet their obligations.

The TSN Debtors cannot successfully implement certain portions of their business plan if they cannot gain market acceptance for certain planned products and services.  A lack of demand could adversely affect the TSN Debtors' ability to sell their services, enter into strategic relationships or develop and successfully market new services.  In addition, demand patterns shift over time, and user preferences may not favor the services the TSN Debtors plan to offer.  Any material miscalculation with respect to the TSN Debtors' service offerings or operating

strategy will adversely affect the TSN Debtors' ability to operate their business, financial condition and results of operations.

(vii)    ***The TSN Debtors May Be Unable to Achieve Their Business and Financial Objectives Because The Communications Industry Is Highly Competitive.***

The global communications industry is highly competitive and characterized by rapid change.  The TSN Debtors will encounter competition in many forms, including:

- satellite services from other operators;

- conventional and emerging terrestrial wireless services;

- traditional wireline voice and high-speed data offerings;

- terrestrial land-mobile and fixed services; and

- next-generation integrated services that may be offered in the future by other networks operating in the S-band or the L-band.

Participants in the communications industry include major domestic and international companies, many of which have financial, technical, marketing, sales, distribution and other resources substantially greater than that of the TSN Debtors and which provide a wider range of services than the Reorganized Debtors will provide.  There currently are several other satellite companies that provide or are planning to provide services similar to the TSN Debtors.  In addition to facing competition from the TSN Debtors' satellite-based competitors, the TSN Debtors are subject to competition from terrestrial voice and data service providers in several markets and with respect to certain services, particularly from those that are expanding into rural and remote areas and providing the same general types of services and products that the TSN Debtors intend to provide.  Land-based telecommunications service capabilities have been expanded into underserved areas more quickly than the TSN Debtors anticipated, which could result in less demand for the TSN Debtors' services than anticipated when formulating the TSN Debtors' current business plan.  These ground-based communications companies may have certain advantages over the TSN Debtors because of the general perception among consumers that wireless voice communication products and services are cheaper and more convenient than satellite-based ones.  Furthermore, the TSN Debtors may also face competition from new competitors or emerging technologies with which the TSN Debtors may be unable to compete effectively.

With many companies targeting many of the same clients, if any of the TSN Debtors' competitors succeeds in offering services to clients before the TSN Debtors do, or develops a network that is, or that is perceived to be, superior to the TSN Debtors' network, then the TSN Debtors may not be able to execute their business plan, which would materially adversely affect their business, financial condition and results of operations.

The TSN Debtors' system may not function as intended, and they will not know whether it will function as intended until they have deployed a substantial portion of their network.  Hardware or software errors in space or on the ground may limit or delay the TSN Debtors' service, and therefore reduce anticipated revenues and the viability of the TSN Debtors' services.  There could also be delays in the planned development, integration and operation of the components of the TSN Debtors' network.  The strength of the signal from the TSN Debtors' satellite could cause ground-based interference or other unintended effects.  If the technological integration of the TSN Debtors' network is not completed in a timely and effective manner, the TSN Debtors' business will be harmed.

(viii)    ***Satellites Have A Limited Useful Life and Premature Failure Of The TSN Debtors' Satellite Could Damage Their Business.***

During and after their launch, all satellites are subject to equipment failures, malfunctions (which are commonly referred to as anomalies) and other problems.  A number of factors could decrease the expected useful lives or the utility of the TSN Debtors' satellites, including:

- defects in construction;

- radiation induced failure of satellite parts;

- faster than expected degradation of solar panels;

- malfunction of component parts;

- loss of fuel on board;

- higher than anticipated use of fuel to maintain the satellite's orbital location;

- higher than anticipated use of fuel during orbit raising following launch;

- random failure of satellite components not protected by back-up units;

- inability to control the positioning of the satellite;

- electromagnetic storms, solar and other astronomical events, including solar radiation and flares; and

- collisions with other objects in space, including meteors and decommissioned spacecrafts in uncontrolled orbits that pass through the geostationary belt at various points.

The TSN Debtors may experience failures, anomalies and other problems, whether of the types described above or arising from the failure of other systems or components, despite extensive precautionary measures taken to determine and eliminate the cause of anomalies in the TSN Debtors' satellites and provide redundancy for many critical components in their satellites. The interruption of the TSN Debtors' business caused by the loss or premature degradation of a satellite would continue until the TSN Debtors either extended service to end users on another satellite or built and launched additional satellites. If any of the TSN Debtors' satellites were to malfunction or to fail prematurely, it could affect the quality of service, substantially delay the commencement or interrupt the continuation of service, harm the TSN Debtors' reputation, cause the TSN Debtors' insurance costs to increase and adversely affect certain portions of the TSN Debtors' business and financial condition.

***(ix)*** ***Damage To, Or Caused By, The TSN Debtors' Satellites May Not Be Fully Covered By Insurance.***

The TSN Debtors have purchased launch and in-orbit insurance policies for their satellite. If the TSN Debtors' satellite is damaged in orbit, the TSN Debtors' insurance may not fully cover their losses and these failures may also cause insurers to include additional exclusions in the TSN Debtors' insurance policies when they come up for renewal. The TSN Debtors may not be able to obtain additional financing to construct, launch and insure a replacement satellite or such financing may not be available on terms favorable to the TSN Debtors. Also, any insurance the TSN Debtors obtain will likely contain certain customary exclusions and material change conditions that would limit their coverage. These exclusions typically relate to losses resulting from acts of war, insurrection or military action and government confiscation, as well as lasers, directed energy beams, nuclear and anti-satellite devices and radioactive contamination. Any uninsured losses could have a material adverse effect on the TSN Debtors.

The TSN Debtors do not expect to buy insurance to cover, and would not have protection against, business interruption, loss of business or similar losses. Furthermore, the TSN Debtors expect to maintain third-party liability insurance. Such insurance may not be adequate or available to cover all third-party damages that may be caused by the TSN Debtors' satellites, and the TSN Debtors may not be able to obtain or renew their third-party liability insurance on reasonable terms and conditions, or at all.

*(x)*     ***The TSN Debtors Depend On A Limited Number Of Suppliers And Service Providers To Design, Construct And Maintain the TSN Debtors' Network.***

The TSN Debtors rely on contracts with third parties to design and build their satellites, as well as the terrestrial components of their network.  The TSN Debtors also intend to enter into relationships with third-party contractors in the future for equipment and maintenance and other services relating to their network.  There are only a few companies capable of supplying the products and services necessary to implement and maintain their network.  As a result, if any third-party contractor relationship with the TSN Debtors is terminated, the TSN Debtors may not be able to find a replacement in a timely manner or on satisfactory terms.  In addition, if any of these third-party contractors are unable to perform on the terms of the contract due to financial reasons, other reasons specifically related to the business of these suppliers or other matters outside the TSN Debtors' control, the TSN Debtors' business would be significantly impacted.  This could lead to delays in the implementation of the TSN Debtors' network and interruptions in providing service to the TSN Debtors' customers, which would adversely affect the TSN Debtors' financial condition.

*(xi)*     ***The TSN Debtors May Rely On Third Parties To Identify, Develop And Market Products.***

The TSN Debtors have entered into an agreement with a third party to market their products.  The TSN Debtors intend to enter into additional such agreements with other third parties.  The TSN Debtors may be unable to identify, or to enter into agreements with, suitable third parties to perform these activities.  If the TSN Debtors do not form satisfactory relationships with third parties, or if any such third parties do not successfully carry out their contractual duties or meet expected deadlines, the TSN Debtors may not be able to successfully identify, develop and sell products, which could adversely affect the TSN Debtors' financial condition and results of operations.

*(xii)*     ***The TSN Debtors May Not Be Able To Identify, Develop And Market Innovative Products And May Not Be Able To Compete Effectively.***

The TSN Debtors' ability to implement their business plan depends in part on their ability to gauge the direction of commercial and technological progress in key markets and to fund and successfully develop and market products in their targeted markets. The TSN Debtors' competitors may have access to technologies not available to the TSN Debtors, which may enable them to provide communications services of greater interest to end users, or at a more competitive price. The TSN Debtors may not be able to develop new products or technology, either alone or with third parties, or license any additional necessary intellectual property rights from third parties on a commercially competitive basis.  The satellite and wireless industries are both characterized by rapid technological change, frequent new product innovations, changes in customer requirements and expectations and evolving industry standards.  If the TSN Debtors are unable to keep pace with these changes, the TSN Debtors' business may be unsuccessful.  Products using new technologies, or emerging industry standards, could make the TSN Debtors' technologies obsolete.  If the TSN Debtors fail to keep pace with the evolving technological innovations in their markets on a competitive basis, the TSN Debtors' financial condition and results of operation could be adversely affected. In particular, if existing wireless providers improve their coverage of terrestrial-based systems to make them more ubiquitous, demand for products and services utilizing the TSN Debtors' network could be adversely affected or fail to materialize.

*(xiii)*     ***The Current Weakening of U.S. and Canadian Economic Conditions As Well As Any Future Downturns Or Changes In Consumer Spending Could Adversely Affect The TSN Debtors' Financial Condition.***

The United States and Canada have experienced an economic downturn and spending by consumers has dropped.  If this downturn and decrease in spending continues the TSN Debtors' business may be adversely affected.  Demand for the services the TSN Debtors plan to offer may not grow or be accepted generally or in particular geographic markets, for particular types of services, or during particular time periods.  A lack of demand could adversely affect the TSN Debtors' ability to sell their services, enter into strategic relationships or develop and successfully market new services.

*(xiv)*    *Certain portions of the TSN Debtors' Business Require Use of Licenses Of Critical Intellectual Property From ATC Technologies, LLC, A Wholly-Owned Subsidiary Of LightSquared.*

The TSN Debtors license the majority of the technology they plan to use to operate their network from ATC Technologies, LLC ("**ATC Technologies**") a wholly-owned subsidiary of LightSquared. LightSquared has rights to approximately 30 MHz of spectrum in the L-band, is positioned to achieve device transparency and plans to offer services that compete with the services that the Reorganized Debtors plan to offer.

LightSquared has assigned to ATC Technologies a significant intellectual property portfolio, including a significant number of patents. Pursuant to the agreement by and between ATC Technologies and the TSN Debtors, ATC Technologies granted the TSN Debtors a perpetual, world-wide, non-exclusive, royalty-free, fully paid up, nontransferable (except for certain rights to sublicense), non-assignable, limited purpose right and license to certain existing patents owned by ATC Technologies for the sole purpose of developing, operating, implementing, providing and maintaining S-band MSS services with an ATC component. The TSN Debtors granted to ATC Technologies a perpetual, world-wide, non-exclusive, royalty-free, fully paid up, nontransferable (except for certain rights to sublicense), non-assignable, limited purpose right and license to certain existing patents owned or licensed by the TSN Debtors and certain technologies licensed by the TSN Debtors for the sole purpose of developing, operating, implementing, providing and maintaining L-band services or L-band services with an ATC component. ATC Technologies has also contractually committed to license to the TSN Debtors, pursuant to the same terms as set forth above, certain additional patents that may be developed, acquired or otherwise owned by ATC Technologies or its affiliates (including LightSquared and MSVI), and the TSN Debtors have contractually committed to license to ATC Technologies, pursuant to the same terms as set forth above, certain additional patents and technologies that may be developed, licensed, acquired or otherwise owned by the TSN Debtors until October 1, 2016.

The license agreement between the TSN Debtors and ATC Technologies may be terminated: (1) by mutual written consent of both parties; (2) by either party in the event that the other party fails to perform or otherwise breaches any material obligations under the license agreement and fails to cure such breach within 90 days of receiving notice thereof; or (3) in the event that the other party files a petition for bankruptcy or insolvency or upon certain other insolvency events.

Upon the filings of the Debtors' petition for bankruptcy the license agreement between the TSN Debtors and ATC Technologies may be terminated upon the terms and conditions set forth therein. However, notwithstanding any such potential termination of the license agreement with ATC Technologies, the TSN Debtors will retain their perpetual license to all ATC Technologies intellectual property licensed to the TSN Debtors on a license-by-license basis, until the date of the expiration of the applicable patent under which the license was granted. If ATC Technologies terminates or breaches its agreements with the TSN Debtors or if the TSN Debtors and ATC Technologies have a significant dispute regarding the licensed intellectual property, such termination, breach or significant dispute could have a material adverse effect on the TSN Debtors' business.

The intellectual property the TSN Debtors license from ATC Technologies includes issued patents and technology included in patent applications. The patents for which the TSN Debtors or ATC Technologies have applied may not be issued or, if they are issued, such patents may be insufficient to protect fully the technology the TSN Debtors own or license. Moreover, if such patents prove to be inadequate to protect fully the technology the TSN Debtors own or license, the TSN Debtors ability to implement their business plan and, consequently, their financial condition, may be adversely affected. In addition, any patents that may be issued to the TSN Debtors and any patents licensed to the TSN Debtors from ATC Technologies may be challenged, invalidated or circumvented.

The TSN Debtors also rely upon unpatented proprietary technology and other trade secrets. The TSN Debtors failure to protect such proprietary technology and trade secrets or the lack of enforceability or breach by third parties of agreements into which the TSN Debtors have entered could also adversely affect the TSN Debtors ability to implement their business plan and financial condition.

*(xv)*     ***The TSN Debtors May Incur Costs, And May Not Be Successful, In Defending Their Rights To Intellectual Property Upon Which the TSN Debtors Depend.***

In developing and implementing the TSN Debtors' network, the TSN Debtors will need to develop or obtain rights to additional technology that is not currently owned by or licensed to them. The TSN Debtors may be unsuccessful in developing additional technologies required to develop and implement their network, and may not be able to protect intellectual property associated with technologies the TSN Debtors develop from infringement by third parties. In addition, if the TSN Debtors are able to develop or license such technologies, there can be no assurance that any patents issued or licensed to the TSN Debtors will not be challenged, invalidated or circumvented. Litigation to defend and enforce these intellectual property rights could result in substantial costs and diversion of resources and could have a material adverse effect on the TSN Debtors' financial condition and results of operations, regardless of the final outcome of such litigation. Despite the TSN Debtors' efforts to safeguard and maintain their proprietary rights, the TSN Debtors may not be successful in doing so, and their competitors may independently develop or patent technologies equivalent or superior to their technologies. It is possible that third parties may infringe upon the TSN Debtors' intellectual property now and in the future.

The TSN Debtors may be unable to determine when third parties are using the TSN Debtors' intellectual property rights without the TSN Debtors' authorization. The undetected or unremedied use of the TSN Debtors' intellectual property rights or the legitimate development or acquisition of intellectual property similar to the TSN Debtors by third parties could reduce or eliminate any competitive advantage the TSN Debtors have as a result of their intellectual property, adversely affecting their financial condition and results of operations. If the TSN Debtors must take legal action to protect, defend or enforce their intellectual property rights, any suits or proceedings could result in significant costs and diversion of the TSN Debtors' resources and the TSN Debtors' management's attention. Furthermore, the TSN Debtors may not prevail in any such suits or proceedings. A failure to protect, defend or enforce the TSN Debtors' intellectual property rights could have an adverse effect on the TSN Debtors' business, financial condition and results of operations.

*(xvi)*    ***Third Parties May Claim That The TSN Debtors' Products Or Services Infringe Their Intellectual Property Rights.***

Other parties may have patents or pending patent applications relating to integrated wireless technology that may later mature into patents. Such parties may bring suit against the TSN Debtors for patent infringement or other violations of intellectual property rights. The development and operation of the TSN Debtors' system may also infringe or otherwise violate as-yet unidentified intellectual property rights of others. If the TSN Debtors' products or services are found to infringe or otherwise violate the intellectual property rights of others, the TSN Debtors' may need to obtain licenses from those parties or substantially re-engineer their products or processes in order to avoid infringement. The TSN Debtors may not be able to obtain the necessary licenses on commercially reasonable terms, if at all, or be able to re-engineer their products successfully. Moreover, if the TSN Debtors are found by a court of law to infringe or otherwise violate the intellectual property rights of others, the TSN Debtors could be required to pay substantial damages or be enjoined from making, using or selling the infringing products or technology. The TSN Debtors also could be enjoined from making, using or selling the allegedly infringing products or technology, pending the final outcome of the suit. The TSN Debtors' financial condition could be adversely affected if the TSN Debtors are required to pay damages or are enjoined from using critical technology.

*(xvii)*   ***Wireless Devices May, Or May Be Perceived To, Pose Health and Safety Risks And, As A Result, The TSN Debtors May Be Subject To New Regulations, Demand For The TSN Debtors' Services May Decrease And The TSN Debtors Could Face Liability Or Reputational Harm Based On Alleged Health Risks.***

There has been adverse publicity concerning alleged health risks associated with radio frequency transmissions from portable hand-held telephones that have transmitting antennae, similar to devices that may incorporate the TSN Debtors' universal chipset architecture. Lawsuits have been filed against participants in the wireless industry alleging various adverse health consequences, including cancer, as a result of wireless phone usage. If courts or governmental agencies find that there is valid scientific evidence that the use of portable hand-held devices poses a health risk, or if consumers' health concerns over radio frequency emissions increase for any reason, use of wireless handsets may decline. Further, government authorities might increase regulation of wireless

handsets as a result of these health concerns. The actual or perceived risk of radio frequency emissions could have an adverse effect on the TSN Debtors' business, financial condition and results of operations.

*(xviii)*   ***The TSN Debtors May Be Negatively Affected By Industry Consolidation.***

Consolidation in the communications industry could adversely affect the TSN Debtors by increasing the scale or scope of the TSN Debtors' competitors, or creating a competitor that is capable of providing services similar to those the TSN Debtors intend to offer, thereby making it more difficult for the TSN Debtors to compete. Industry consolidation also may impede the TSN Debtors' ability to identify acquisition, joint venture or other strategic opportunities.

*(xix)*   ***Certain Tax Implications of the TSN Debtors' Bankruptcy and Reorganization May Increase the Tax Liability of the Reorganized Debtors.***

Holders of Claims should carefully review Article XIII herein, titled "Certain U.S. Federal Income Tax Consequences of the Plan," to determine how the tax implications of the Plan and the TSN Debtors' chapter 11 cases may adversely affect the Reorganized Debtors.  Certain tax implications of the TSN Debtors' bankruptcy and reorganization may increase the tax liability of the Reorganized Debtors.

### D.      Risks Relating to Government Regulations

*(i)*   ***The TSN Debtors' Business Is Subject To A High Degree Of Government Regulation.***

The communications industry is highly regulated by governmental entities and regulatory authorities, including the FCC and Industry Canada.  The TSN Debtors' business is completely dependent upon obtaining and maintaining regulatory authorizations to operate the TSN Debtors' existing MSS network and planned integrated satellite and terrestrial network.  The needed authorizations include FCC and Industry Canada authorizations relating to (i) the TSN Debtors' satellite, TerreStar-1, and their ground spare currently under construction, TerreStar-2; (ii) the orbital slot in which TerreStar-1 resides and any additional orbital slot required for TerreStar-2, if any; (iii) the Ground Stations and CES; (iv) the integrated MSS/ATC handsets that will be used by customers to communicate over the TSN Debtors' planned integrated satellite and terrestrial network, including both spectrum authorizations and equipment certifications with respect to such handsets; (v) equipment authorizations with respect to planned terrestrial transmission facilities associated with the ATC component of the TSN Debtors' integrated satellite and terrestrial network; (vi) equipment authorizations related to the GENUS handset; and (vii) certain Section 214 authorizations issued by the FCC with respect to international communications originating or terminating in the United States, as well as other FCC and Industry Canada regulatory authorizations.  Failure to obtain or maintain necessary governmental authorizations would impair the TSN Debtors' ability to continue to offer MSS services using their existing MSS network and/or implement their planned network and would have a material adverse effect on their financial condition.

*(ii)*   ***The TSN Debtors Could Lose Their FCC Authorization and Industry Canada Approval In Principal And Be Subject To Fines Or Other Penalties.***

The TSN Debtors must comply with complex and changing FCC and Industry Canada rules and regulations to maintain their authorizations to use their assigned spectrum and orbital slot.  The TSN Debtors are required to maintain satellite coverage of all 50 states, the District of Columbia, Puerto Rico, the U.S. Virgin Islands and all regions of Canada that are within the coverage contour of the TerreStar-1 Satellite and to provide an integrated MSS service offering in all locations where the TSN Debtors' ATC is made available. Non-compliance with these or other conditions, including other FCC or Industry Canada gating or ongoing service criteria, could result in fines, additional conditions, revocation of the authorizations, or other adverse FCC or Industry Canada actions. The FCC issued in July 2010 a notice of proposed rulemaking and notice of inquiry in which the FCC sought public comment regarding certain proposed changes to the rules governing the use of 2 GHz MSS spectrum, including for purposes of operating an ATC network.  It is not possible to predict what, if any, revisions to the rules applicable to 2 GHz MSS providers will be adopted by the FCC in this pending proceeding or when any such rule changes would be adopted.  Such rule changes, if any, could impair the TSN Debtors' ability to execute their business plan and could

materially impact the value of the TSN Debtors' FCC authorizations. The loss of the TSN Debtors' spectrum authorizations would prevent them from implementing their business plan.

*(iii)*      ***FCC and Industry Canada Decisions Affecting The Amount of 2 GHz MSS S-band Spectrum Assigned To Us Are Subject To Reconsideration And Review.***

In December 2005, the FCC provided TMI Communications, Inc. ("***TMI Communications***") with a reservation of 10 MHz of uplink MSS spectrum and 10 MHz of downlink MSS spectrum in the 2 GHz MSS S-band. TMI Communications subsequently assigned that authorization to the TSN Debtors and on May 10, 2007 the FCC modified the reservation to reflect that change. Two parties have challenged the FCC's December 2005 ruling, and one party has also challenged a separate decision by the FCC to cancel its own 2 GHz MSS S-band authorization. If these challenges succeed, the amount of 2 GHz MSS S-band spectrum that is available to the TSN Debtors may be reduced to a level that is insufficient for the TSN Debtors to implement their business plan. Furthermore, in Canada, the TSN Debtors' spectrum could be reduced from 20 MHz to 14 MHz if Industry Canada determines that it is necessary to reapportion spectrum in order to license other MSS operators in Canada. Any reduction in the spectrum the TSN Debtors are authorized to use could impair their business plan and materially adversely affect their financial condition.

*(iv)*      ***The TSN Debtors' Service May Cause Or Be Subject To Interference.***

The TSN Debtors will be required to provide ATC service without causing harmful interference. In addition, the TSN Debtors must accept some interference from certain other spectrum users. For example, the FCC may adopt rules for an adjacent band that do not adequately protect the TSN Debtors against interference. In September 2004, the FCC issued an order allowing PCS operation in the 1995-2000 MHz and in June 2008 sought comment on proposed rules. In September 2007 and June 2008, the FCC sought comment on proposed rules for the 2155-2180 MHz bands. Both bands are adjacent to the 2 GHz MSS S-band. If the rules that the FCC adopts for the 1995-2000 MHz and 2155-2180 MHz bands do not adequately protect the TSN Debtors against adjacent band interference, the TSN Debtors' reputation and ability to compete effectively could be adversely affected. The FCC has stated that it anticipates issuing an order with respect to this matter in the fourth quarter of 2010. Requirements that the TSN Debtors limit the interference they cause, or requiring the TSN Debtors to accept certain levels of interference, may hinder satellite and/or planned ATC operations within the TSN Debtors' system and may, in certain cases, subject the TSN Debtors' users to a degradation in service quality, which may adversely affect the TSN Debtors' reputation and financial condition.

*(v)*      ***Technical Challenges Or Regulatory Requirements May Limit The Attractiveness Of Our Spectrum For Providing Mobile Services.***

The TSN Debtors believe their 2 GHz MSS S-band spectrum with ATC capability must be at least functionally equivalent to the PCS/cellular spectrum in order to be attractive to parties with which they may enter into strategic relationships. The FCC and Industry Canada require the TSN Debtors and their non-Debtor affiliates to satisfy certain gating criteria as a precondition to the provision of ATC service using their S-band spectrum, including a requirement that the TSN Debtors and their non-Debtor affiliates provide commercial satellite service throughout the United States and Canada and an "integrated service" requirement. Under the "safe harbor" method for satisfying this latter requirement, that all handsets with ATC functionality must also contain the ability to communicate with the TSN Debtors satellite network. The former requirement may limit the availability of some of the TSN Debtors' spectrum for terrestrial service and the latter requirement may impact whether handsets used to communicate with the TSN Debtor's planned integrated mobile satellite and terrestrial network are perceived by customers to be functionally equivalent to PCS/cellular handsets. In addition, the TSN Debtors may not commence the commercial provision of ATC services more than one year prior to completion of their ground spare satellite, which the TSN Debtors currently intend to be TerreStar-2. The TSN Debtors informed the FCC that they do not expect that TerreStar-2 will be completed until the fourth quarter of 2011. Any delays in such anticipated completion date could delay the date on which the TSN Debtors may begin deploying ATC services. Risks related to the satisfaction of these ATC gating criteria by the TSN Debtors may impact the interest of third parties in entering into strategic relationships with the TSN Debtors related to the TSN Debtors' deployment of a planned integrated mobile satellite and terrestrial network. If the TSN Debtors are not able to develop technology that allows the entities with which the TSN Debtors enter into strategic relationships to use the TSN Debtors' spectrum in a

manner comparable to PCS/cellular operators, the TSN Debtors' may not be successful in entering into strategic arrangements with these parties.

*(vi)*     ***The TSN Debtors May Face Unforeseen Regulations With Which They Find It Difficult, Costly Or Impossible To Comply.***

The provision of communications services is highly regulated. As a provider of communications services in the United States and Canada, the TSN Debtors will be subject to the laws and regulations of both the United States and Canada. Violations of laws or regulations of these countries may result in various sanctions including fines, loss of authorizations and the denial of applications for new authorizations or for the renewal of existing authorizations.

From time to time, governmental entities may impose new or modified conditions on the TSN Debtors authorizations, which could adversely affect their ability to generate revenues and implement their business plan. For example, from time to time, the U.S. federal government has considered imposing substantial new fees on the use of frequencies, such as the ones the TSN Debtors plan to use to provide their service. In the U.S. and Canada, the FCC and Industry Canada, respectively, already collect fees from space and terrestrial spectrum licensees. The TSN Debtors are currently required to pay certain fees, and it is possible that the TSN Debtors may be subject to increased fees in the future.

*(vii)*    ***Export Control and Embargo Laws May Preclude The TSN Debtors From Obtaining Necessary Satellites, Parts Or Data Or Providing Certain Services In The Future.***

The TSN Debtors must comply with U.S. export control laws in connection with any information, products, or materials that they provide to non-U.S. persons relating to satellites, associated equipment and data and with the provision of related services. These requirements may make it necessary for the TSN Debtors to obtain export or re-export authorizations from the U.S. government in connection with any dealings they have with 4491165 Canada Inc., 0887729 B.C. Ltd., TerreStar Canada, TerreStar Canada Holdings, non-U.S. satellite manufacturing firms, launch services providers, insurers, customers and employees. The TSN Debtors may not be able to obtain and maintain the necessary authorizations, which could adversely affect the TSN Debtors' ability to:

- effect the transfer agreements;

- procure new U.S.-manufactured satellites;

-  control any existing satellites;

- acquire launch services;

- obtain insurance and pursue our rights under insurance policies; or

- conduct our satellite-related operations.

In addition, if the TSN Debtors do not properly manage their internal compliance processes and, as a result, violate U.S. export laws, the terms of an export authorization or embargo laws, the violation could make it more difficult, or even impossible, to maintain or obtain licenses and could result in civil or criminal penalties.

*(viii)*   ***FCC And Industry Canada Regulations And Approval Processes Could Delay Or Impede A Transfer Of Control Of The TSN Debtors.***

Any investment that could result in a transfer of control of the TSN Debtors or a transfer of the TSN Debtors' licenses to another party is subject to prior FCC and Industry Canada approval and in some cases could involve a lengthy review period prior to its consummation. In addition, new and/or substantially increased foreign ownership in TSN Debtors may require the prior approval of the FCC. The TSN Debtors anticipate that they will need regulatory approvals before the emergence of the TSN Debtors from bankruptcy reorganization. The TSN

Debtors may not be able to obtain any such FCC or Industry Canada approvals on a timely basis, if at all, and the FCC or Industry Canada may impose new or additional license conditions as part of any review of such a request. As a result, these approval requirements could impede or prevent a transfer of control of the TSN Debtors as part of their intended reorganization.

E.      **Risks Relating to Forward Looking Statements**

*(i)      Financial Information Is Based On The TSN Debtors' Books And Records And, Unless Otherwise Stated, No Audit Was Performed.*

The financial information contained in this Disclosure Statement has not been audited. In preparing this Disclosure Statement, the TSN Debtors relied on financial data derived from their books and records that was available at the time of such preparation. Although the TSN Debtors have used their reasonable business judgment to ensure the accuracy of the financial information provided in this Disclosure Statement, and while the TSN Debtors believe that such financial information fairly reflects, in all material respects, the financial results of the TSN Debtors, the TSN Debtors are unable to warrant or represent that the financial information contained herein and attached hereto is without inaccuracies.

This Disclosure Statement contains various projections concerning the financial results of the Reorganized Debtors' operations, including the Financial Projections that are, by their nature, forward looking, and which projections are necessarily based on certain assumptions or estimates ultimately prove to be incorrect, the actual future financial results of the Reorganized Debtors may turn out to be different from the Financial Projections. The Financial Projections do not reflect emergence adjustments, including the impact of "fresh start" accounting.

Specifically, the projected financial results contained in this Disclosure Statement reflect numerous assumptions concerning the anticipated future performance of the Reorganized Debtors, some of which may not materialize, including, without limitation, assumptions concerning: (a) the magnitude of the potential adverse impacts of the filing of the Chapter 11 Cases on the TSN Debtors' business, financial condition, or results of operations, including the TSN Debtors' ability to maintain customer and vendor relationships that are critical to their business and the actions and decisions of their creditors and other third parties with interests in the Chapter 11 Cases; (b) the TSN Debtors' ability to obtain approval of Bankruptcy Court with respect to motions in the Chapter 11 Cases prosecuted from time to time and to develop, prosecute, confirm, and consummate one or more plans of reorganization with respect to the Chapter 11 Cases and to consummate all of the transactions contemplated by one or more such plans or upon which consummation of such plans may be conditioned; (c) the timing of Confirmation and Consummation of one or more plans of reorganization in accordance with its terms; (d) the anticipated future performance of the Reorganized Debtors; (e) general economic conditions in the markets in which the TSN Debtors operate, including changes in interest rates or currency exchange rates; (f) the financial condition of the TSN Debtors' customers or suppliers; and (g) other risks described herein and from time to time in TSC's SEC filings.

Due to inherent uncertainties associated with projecting financial results generally, the projections contained in this Disclosure Statement will not be considered assurances or guarantees of the amount of funds or the amount of Claims that may be Allowed in the various Classes. While the TSN Debtors believe that the Financial Projections contained in this Disclosure Statement are reasonable, there can be no assurance that they will be realized.

F.      **Risks Relating to Recoveries Under the Plan**

*(i)      The Recovery to holders of Allowed Claims Cannot Be Stated With Absolute Certainty.*

This Disclosure Statement contains various projections concerning the financial results of the Reorganized Debtors' operations, including the financial projections, that are, by their nature, forward looking, and which projections are necessarily based on certain assumptions and estimates regarding the anticipated future performance of the Reorganized Debtors, including, without limitation, their ability to maintain or increase revenue and gross margins, control future operating expenses or make necessary capital, as well as assumptions concerning general business and economic conditions and overall industry performance and trends, which the TSN Debtors are unable

to control. Should any or all of these assumptions or estimates ultimately prove to be incorrect or not materialize, the actual future experiences of the Reorganized Debtors may turn out to be different from the financial projections.

Due to the inherent uncertainties associated with projecting financial results generally, the projections contained in this Disclosure Statement will <u>not</u> be considered assurances or guarantees of the amount of funds or the amount of Claims that may be Allowed in the various Classes. While the TSN Debtors believe that the financial projections contained in this Disclosure Statement are reasonable, there can be no assurance that they will be realized. Also, because the liquidation analysis, distribution projections and other information contained herein and attached hereto are estimates only, the timing and amount of actual distributions to holders of Allowed Claims may be affected by many factors that cannot be predicted.

The Claims estimates set forth herein are based on various assumptions. The actual amounts of Allowed Claims may differ significantly from those estimates should one or more underlying assumption prove to be incorrect. Such differences may adversely affect the percentage recovery to holders of such Allowed Claims under the Plan. Moreover, the estimated recoveries set forth herein are necessarily based on numerous assumptions, the realization of many of which are beyond the TSN Debtors' control, including, without limitation, (a) the successful reorganization of the TSN Debtors, (b) an assumed date for the occurrence of the Effective Date, (c) the TSN Debtors' ability to achieve the operating and financial results included in the financial projections, (d) the TSN Debtors' ability to maintain adequate liquidity to fund operations and (e) the assumption that capital and equity markets remain consistent with current conditions. The actual amounts of Allowed Claims may differ significantly from those estimates should one or more underlying assumption prove to be incorrect, which could affect the percentage recovery to holders of such Allowed Claims under the Plan, in some instances adversely. Also, the estimated recoveries to holders of Allowed Claims are not intended to represent the private sale values of the Reorganized Debtors' securities.

The distributions available to holders of Allowed Claims under the Plan can be affected by a variety of contingencies, including, without limitation, whether the Bankruptcy Court orders the subordination of any Allowed Claims to other Allowed Claims, whether the TSN Debtors object to the amount or classification of any Claim, or whether, subject to the terms and conditions of the Plan, the TSN Debtors are required to modify certain terms or conditions of the Plan in order to Confirm the Plan. The occurrence of contingencies that could affect distributions available to holders of Allowed Claims under the Plan, however, will not affect the validity of the vote taken by the Impaired Classes to accept or reject the Plan or require any sort of revote by the Impaired Classes.

## G. Disclosure Statement Disclaimer

### (i) *No Representations Made Outside this Disclosure Statement Are Authorized.*

The information contained in this Disclosure Statement is for purposes of soliciting acceptances of the Plan and may not be relied upon for any other purposes. Except as otherwise provided herein or in the Plan, no representations relating to the TSN Debtors, the chapter 11 cases or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code. Any representations or inducements made to secure your acceptance or rejection of the Plan that are other than as contained in, or included with, this Disclosure Statement, should not be relied upon by you in arriving at your decision. You should promptly report unauthorized representations or inducements to the counsel to the Debtors, the counsel to the Creditors' Committee and the U.S. Trustee.

### (ii) *The TSN Debtors Relied on Certain Exemptions from Registration Under the Securities Act.*

This Disclosure Statement has not been filed with the SEC or any state regulatory authority. Neither the SEC nor any state regulatory authority has passed upon the accuracy or adequacy of this Disclosure Statement, or the exhibits or the statements contained herein, and any representation to the contrary is unlawful. This Disclosure Statement has been prepared pursuant to section 1125 of the Bankruptcy Code and Rule 3016(b) of the Federal Rules of Bankruptcy Procedure and is not necessarily in accordance with the requirements of federal or state securities laws or other similar laws.

To the maximum extent permitted by section 1145 of the Bankruptcy Code, the Securities Act and other applicable non-bankruptcy law, the issuance of the New Common Stock and the New Preferred Stock will be

exempt from registration under the Securities Act by virtue of section 1145 of the Bankruptcy Code or a "no sale" under the Securities Act as described herein.

*(iii)* ***The Information Herein Was Provided by the TSN Debtors and Relied Upon by Their Advisors.***

Counsel to and other advisors retained by the TSN Debtors in connection with the preparation of this Disclosure Statement. Although counsel to and other advisors retained by the TSN Debtors have performed certain limited due diligence in connection with the preparation of this Disclosure Statement, they have not verified independently the information contained herein.

The statements contained in this Disclosure Statement are made by the TSN Debtors as of the date hereof, unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has not been a change in the information set forth herein since that date. While the TSN Debtors have used their reasonable business judgment to ensure the accuracy of all of the information provided in this Disclosure Statement and in the Plan, the TSN Debtors nonetheless cannot, and do not, confirm the current accuracy of all statements appearing in this Disclosure Statement. Further, although the TSN Debtors may subsequently update the information in this Disclosure Statement, the TSN Debtors have no affirmative duty to do so unless ordered to do so by the Bankruptcy Court.

The financial information contained in this Disclosure Statement has not been audited. In preparing this Disclosure Statement, the TSN Debtors relied on financial data derived from their books and records that was available at the time of such preparation. Although the TSN Debtors have used their reasonable business judgment to ensure the accuracy of the financial information provided in this Disclosure Statement, and while the TSN Debtors believe that such financial information fairly reflects the financial condition of the TSN Debtors, the TSN Debtors are unable to warrant or represent that the financial information contained herein and attached hereto is without inaccuracies.

*(iv)* ***No Legal or Tax Advice Is Provided to You by this Disclosure Statement.***

This Disclosure Statement is not legal advice to you. The contents of this Disclosure Statement should not be construed as legal, business or tax advice. Each holder of a Claim or an Interest should consult his or her own legal counsel and accountant with regard to any legal, tax and other matters concerning his or her Claim or Equity Interest. This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Plan or object to Confirmation of the Plan.

*(v)* ***No Admissions Are Made by This Disclosure Statement.***

The information and statements contained in this Disclosure Statement will neither constitute an admission of any fact or liability by any Entity (including, without limitation, the Debtors) nor be deemed evidence of the tax or other legal effects of the Plan on the TSN Debtors, the Reorganized Debtors, holders of Allowed Claims or Equity Interest or any other parties in interest. The vote by a holder of an Allowed Claim for or against the Plan does not constitute a waiver or release of any Claims or rights of the TSN Debtors or the Reorganized Debtors (or any party in interest, as the case may be) to object to that holder's Allowed Claim, or recover any preferential, fraudulent or other voidable transfer or assets, regardless of whether any Claims or Causes of Action of the Debtors or their respective Estates are specifically or generally identified herein.

In addition, no reliance should be placed on the fact that a particular litigation claim or projected objection to a particular Claim or Interest is, or is not, identified in this Disclosure Statement. The TSN Debtors or the Reorganized Debtors may seek to investigate, file and prosecute Claims and Interests and may object to Claims after the Confirmation or Effective Date of the Plan irrespective of whether this Disclosure Statement identifies such Claims or Objections to Claims.

*(vi)*     ***Forward Looking Statements In This Disclosure Statement.***

The Debtors make statements in this Disclosure Statement that are considered forward-looking statements under the federal securities laws.  The Debtors consider all statements regarding anticipated or future matters, including the following, to be forward-looking statements:

- any future effects as a result of the pendency of the chapter 11 cases;

- the Debtors' expected future financial position, liquidity, results of operations, profitability and cash flows;

- financing plans;

- competitive position;

- business strategy;

- budgets;

- projected cost reductions;

- projected and estimated environmental liabilities;

- other projected and estimated liability costs;

- results of litigation;

- disruption of operations;

- regulatory changes;

- plans and objectives of management for future operations;

- contractual obligations;

- off-balance sheet arrangements;

- growth opportunities for existing services;

- projected price increases;

- projected general market conditions; and

- benefits from new technologies.

Statements concerning these and other matters are not guarantees of the TSN Debtors' future performance.  Such statements represent the TSN Debtors' estimates and assumptions only as of the date such statements were made.  There are risks, uncertainties and other important factors that could cause the TSN Debtors' actual performance or achievements to be materially different from those they may project and the TSN Debtors undertake no obligation to update any such statement.  These risks, uncertainties and factors include:

- the TSN Debtors' ability to develop, confirm and consummate the Plan;

- the TSN Debtors' ability to reduce their overall financial leverage;

- the potential adverse impact of the chapter 11 cases on the TSN Debtors' operations, management and employees, and the risks associated with operating the businesses during the chapter 11 cases;

- customer/partner response to the chapter 11 cases;

- inability to have claims discharged/settled during the chapter 11 cases;

- general economic, business and market conditions, including the recent volatility and disruption in the capital and credit markets and the significant downturn in the overall economy;

- interest rate fluctuations;

- exposure to litigation;

- dependence upon key personnel;

- ability to implement cost reduction and market share initiatives in a timely manner;

- efficacy of new technologies and facilities;

- the financial condition of the TSN Debtors' customers;

- adverse tax changes;

- limited access to capital resources;

- changes in laws and regulations;

- natural disasters; and

- inability to implement the TSN Debtors' business plan.

# XII.
## APPLICATION OF SECURITIES LAWS

### A.      Issuance and Resale of Securities Under the Plan

Section 1145 of the Bankruptcy Code generally exempts the issuance of a security from registration under the Securities Act (and any equivalent state securities or "blue sky" laws) if the following conditions are satisfied: (i) the security is issued by a debtor (or its successor) under a chapter 11 plan, (ii) the recipient of the security holds a claim against, an interest in, or a claim for an administrative expense against, the debtor and (iii) the security is issued entirely in exchange for such claim or interest, or is issued "principally" in exchange for such claim or interest and "partly" for cash or property.

Section 1145 is not available to any entity that is defined as an underwriter as defined in section 1145(b) of the Bankruptcy Code   Section 1145(b) of the Bankruptcy Code defines "underwriter" as an entity who: (A) purchases a claim against, interest in, or claim for an administrative expense in the case concerning, the debtor, if such purchase is with a view to the distribution of any security received or to be received in exchange for such a claim or interest; (B) offers to sell securities offered or sold under a plan for the holder of such securities; (C) offers to buy securities offered or sold under a plan from the holder of such securities, if such offer to buy is (i) with a view to the distribution of such securities, and (ii) under an agreement made in connection with the plan, with the consummation of the plan, or with the offer or sale of securities under the plan; or (D) is an issuer, as used in section 2(a)(11) of the Securities Act, with respect to such securities.   Issuer for these purposes is defined as any person who, directly or indirectly, controls, is controlled by, or is under direct or indirect common control with, the issuer. "Control" (as such term is defined in Rule 405 of Regulation C under the Securities Act) means the possession, direct or indirect, of the power to direct or cause the direction of the policies of a person, whether through the ownership of voting securities, by contract or otherwise.

Securities exempt from registration under section 1145 of the Bankruptcy Code may be resold without registration under the Securities Act or other federal securities laws pursuant to the exemption provided in section 4(1) of the Securities Act, which provides that the registration provisions of the Securities Act do not apply to transactions by persons other than issuers, underwriters or dealers.   In addition, such securities generally may be resold without registration under the state securities laws pursuant to various exemptions provided by the respective laws of several states.   **However, recipients of securities issued under the Plan are advised to consult their own counsel as to the availability of any such exemption from registration in any given instance and as to any applicable requirements or conditions to such availability.**

Securities distributed under the Plan to affiliates of the Company, meaning persons in a "control" relationship with the Company as defined above, would not be eligible for the exemption provided in section 4(1) of the Securities Act.   However, affiliates who receive securities under the Plan that would otherwise qualify for the exemption of section 1145 might still be able to sell those securities without registration pursuant to Rule 144 of the Securities Act.   Rule 144 allows a holder of securities that is an affiliate of an issuer to sell, without registration, the number of such securities that does not exceed, together with all sales of securities of the same class sold for the account of such holder within the preceding three (3) months, the greater of one percent (1%) of the number of outstanding securities in question or the average weekly trading volume in the securities in question during the four (4) calendar weeks preceding the date on which notice of such sale was filed pursuant to Rule 144, subject to the satisfaction of certain other requirements of Rule 144 regarding the manner of sale, notice requirements and the availability of specified current public information regarding the issuer.

Any distribution of securities in Canada pursuant to the Plan is being made under a prospectus exemption for a distribution in connection with a reorganization or arrangement under a statutory procedure.   TSN is not a reporting issuer in any province or territory of Canada.   Accordingly, any resale of such securities must be made in accordance with an exemption from the prospectus requirements of the securities laws of the applicable Canadian jurisdictions.

There can be no assurance that an active market for any of the securities to be distributed under the Plan will develop and no assurance can be given as to the prices at which they might be traded.

**BECAUSE OF THE COMPLEX, SUBJECTIVE NATURE OF THE QUESTION OF WHETHER A PARTICULAR HOLDER MAY BE AN UNDERWRITER, AFFILIATE OR DEALER, THE TSN DEBTORS MAKE NO REPRESENTATION CONCERNING THE ABILITY OF ANY PERSON TO DISPOSE OF THE SECURITIES TO BE DISTRIBUTED UNDER THE PLAN.**

**MOREOVER, SUCH SECURITIES, OR THE DOCUMENTS THAT ESTABLISH THE TERMS AND PROVISIONS THEREOF, MAY CONTAIN TERMS AND LEGENDS THAT RESTRICT OR INDICATE THE EXISTENCE OF RESTRICTIONS ON THE TRANSFERABILITY OF SUCH SECURITIES.**

**THE TSN DEBTORS RECOMMEND THAT RECIPIENTS OF SECURITIES UNDER THE PLAN CONSULT WITH LEGAL COUNSEL CONCERNING THE LIMITATIONS ON THEIR ABILITY TO DISPOSE OF SUCH SECURITIES.**

### B. New Common Stock and New Preferred Stock

The Plan provides that (subject to certain conditions as set forth therein and as previously set forth in Article VIII of this Disclosure Statement):

(a) each holder of an Allowed Senior Secured Notes Claim shall receive, on the Initial Distribution Date, its Pro Rata share of: (i) 97% of the New Common Stock; and (ii) if such holder's Allowed Senior Secured Notes Claim became an Allowed Claim in accordance with the Rights Offering Procedures on or before the Subscription Record Date, Rights to purchase 97% of the Rights Offering Preferred Stock;

(b) each holder of an Allowed Senior Exchangeable Notes Claim shall receive, on the Initial Distribution Date, its Pro Rata share of: (i) at least 1% but no more than 3% of the New Common Stock, and (ii) with respect to holders of Allowed Senior Exchangeable Notes Claims that become Allowed Claims in accordance with the Rights Offering Procedures on or before the Subscription Record Date only, Rights to purchase at least 1% but no more than 3% of the Rights Offering Preferred Stock; and

(c) each holder of an Allowed Other Unsecured Claim shall receive its Pro Rata share of: (i) 3% of the New Common Stock minus any amount of New Common Stock distributed to the holders of Allowed Senior Exchangeable Notes Claims pursuant to the Class 5 Distribution, and (ii) with respect to holders of Other Unsecured Claims that become Allowed Claims in accordance with the Rights Offering Procedures on or before the Subscription Record Date only, Rights to purchase 3% of the Rights Offering Preferred Stock minus any Rights to purchase Rights Offering Preferred Stock distributed pursuant to the holders of Allowed Senior Exchangeable Notes Claims pursuant to the Class 5 Distribution.

The TSN Debtors believe that the issuance of the New Common Stock, the Rights and, upon exercise of the Rights, the Rights Offering Preferred Stock, are exempt from the registration requirements of the Securities Act and equivalent state securities or "blue sky" laws pursuant to the exemptions contained, as applicable, in section 1145 of the Bankruptcy Code, the Securities Act of 1933, and/or equivalent exemptions in state securities laws.

### C. Rights Offering: Rights Offering Preferred Stock

The Rights Offering is described in Article V.D. of the Plan. Pursuant to the Rights Offering, the TSN Debtors will issue, if applicable, Rights to purchase the Rights Offering Preferred Stock to each holder of an Allowed Senior Secured Notes Claim, Allowed Senior Exchangeable Notes Claim and Allowed Other Unsecured Claim whose Claim became an Allowed Claim on or before the Subscription Record Date. The Backstop Party, in accordance with and subject to the terms of the Commitment Letter, has agreed to purchase up to $100 million of the Rights Offering Preferred Stock.

# XIII.
## CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

The following is a summary of certain U.S. federal income tax consequences of the Plan to the TSN Debtors and certain holders of Claims. This summary is based on the Internal Revenue Code of 1986, as amended (the "***Tax Code***"), Treasury Regulations thereunder, and administrative and judicial interpretations and practice, all as in effect on the date of this Disclosure Statement and all of which are subject to change, with possible retroactive effect. Due to the lack of definitive judicial and administrative authority in a number of areas, substantial uncertainty may exist with respect to some of the tax consequences described below. No opinion of counsel has been obtained, and the TSN Debtors do not intend to seek a ruling from the Internal Revenue Service (the "***IRS***") as to any of the tax consequences of the Plan discussed below. Events occurring after the date of the Disclosure Statement, including changes in law and changes in administrative positions, could affect the U.S. federal income tax consequences of the Restructuring. No representations are being made regarding the particular tax consequences of the confirmation and consummation of an Offer or the Plan to the Company or any Holder. There can be no assurance that the IRS will not challenge one or more of the tax consequences of the Plan described below.

This summary does not apply to holders of Claims that are otherwise subject to special treatment under U.S. federal income tax law (including, for example, banks, governmental authorities or agencies, financial institutions, insurance companies, pass-through entities, tax-exempt organizations, brokers and dealers in securities, mutual funds, small business investment companies, employees, persons who receive their Claims or Interests pursuant to the exercise of an employee stock option or otherwise as compensation, persons holding Claims or Interests that are a hedge against, or that are hedged against, currency risk or that are part of a straddle, constructive sale, or conversion transaction and regulated investment companies). The following discussion assumes that holders of Allowed Claims hold such Claims as "capital assets" within the meaning of section 1221 of the Tax Code. Moreover, this summary does not purport to cover all aspects of U.S. federal income taxation that may apply to the TSN Debtors and holders of Allowed Claims based upon their particular circumstances. Additionally, this summary does not discuss any tax consequences that may arise under any laws other than U.S. federal income tax law, including under state, local, or foreign tax law.

For purposes of this summary, a "U.S. Holder" means a holder of Claims that, in any case, is, for U.S. federal income tax purposes: (i) an individual that is a citizen or resident of the United States; (ii) a corporation, or other entity treated as a corporation for U.S. federal income tax purposes, created or organized in or under the laws of the United States, any state thereof or the District of Columbia; (iii) an estate, the income of which is subject to U.S. federal income tax regardless of its source; or (iv) a trust (x) if a court within the United States is able to exercise primary supervision over its administration and one or more United States persons have the authority to control all of the substantial decisions of such trust or (y) that has a valid election in effect under applicable Treasury Regulations to be treated as a U.S. person. A "Non-U.S. Holder" means a holder of Claims that is not a U.S. Holder and is, for U.S. federal income tax purposes, an individual, corporation (or other entity treated as a corporation for U.S. federal income tax purposes), estate or trust.

If an entity taxable as a partnership for U.S. federal income tax purposes holds Claims, the U.S. federal income tax treatment of a partner (or other owner) of the entity generally will depend on the status of the partner (or other owner) and the activities of the entity. Such partner (or other owner) should consult its tax advisor as to the tax consequences of the entity's ownership or disposition of Claims, New Common Stock, and Rights Offering Preferred Stock, if any.

The U.S. federal income tax consequences of the Plan are complex. The following summary is for information purposes only and is not a substitute for careful tax planning and advice based on the particular circumstances of each holder of a Claim or Interest. Each holder of a Claim or Interest is urged to consult his, her, or its own tax advisors as to the U.S. federal income tax consequences, as well as other tax consequences, including under any applicable state, local, and foreign law, of the restructuring described in the Plan.

**IRS CIRCULAR 230 DISCLOSURE: TO ENSURE COMPLIANCE WITH REQUIREMENTS IMPOSED BY THE IRS, ANY TAX ADVICE CONTAINED IN THIS DISCLOSURE STATEMENT (INCLUDING ATTACHMENTS) IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY ANY TAXPAYER FOR THE PURPOSE OF AVOIDING TAX-RELATED PENALTIES UNDER**

THE IRC. THE TAX ADVICE CONTAINED IN THIS DISCLOSURE STATEMENT (INCLUDING ATTACHMENTS) WAS WRITTEN TO SUPPORT THE PROMOTION OR MARKETING OF THE TRANSACTIONS DESCRIBED IN THIS DISCLOSURE STATEMENT. EACH TAXPAYER SHOULD SEEK ADVICE BASED ON THE TAXPAYER'S PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

A.     **Certain U.S. Federal Income Tax Consequences to the Reorganized Debtors**

*(i)*     Cancellation of Debt and Reduction of Tax Attributes

As a result of the Plan, the TSN Debtors' aggregate outstanding indebtedness will be substantially reduced. In general, absent an exception, a debtor will recognize cancellation of debt ("***COD***") income upon discharge of its outstanding indebtedness for an amount less than its adjusted issue price. The amount of COD income, in general, is the excess of (a) the adjusted issue price of the indebtedness discharged, over (b) the sum of the issue price of any new indebtedness of the taxpayer issued, the amount of cash paid and the fair market value of any other consideration, including stock of the TSN Debtors, given in exchange for such indebtedness at the time of the exchange.

A debtor is not, however, required to include any amount of COD income in gross income if such debtor is under the jurisdiction of a court in a chapter 11 bankruptcy proceeding and the discharge of debt occurs pursuant to that proceeding. Instead, as a price for the exclusion of COD income under the foregoing rule, Section 108 of the Tax Code requires the debtor to reduce (as of the first day of the taxable year following the year of the debt discharge) its tax attributes by the amount of COD income which it excluded from gross income. As a general rule, tax attributes will be reduced in the following order: (i) net operating losses ("***NOLs***"), (ii) most tax credits, (iii) capital loss carryovers, (iv) tax basis in assets (but not below the amount of liabilities to which the debtor remains subject), and (v) foreign tax credits. A debtor with COD income may elect first to reduce the basis of its depreciable assets under IRC Section 108(b)(5).

The amount of COD income (and, accordingly, the amount of tax attributes required to be reduced) cannot be known with certainty until after the Effective Date. Thus, although it is expected that a reduction of tax attributes will be required, the exact amount of such reduction cannot be predicted with certainty.

Any required reduction in tax attributes of a member of a consolidated group applies first to any tax attributes attributable to the debtor realizing the COD income at issue. To the extent the debtor reduces its tax basis in the stock of another member of the consolidated group (which basis may not be reduced below zero) such other member is required to reduce its tax attributes by an equivalent amount. It is not anticipated that the TSN Debtors will utilize tax attributes of parties other than the TSN Debtors due to the realization of COD income.

With respect to transactions giving rise to COD income occurring in 2009 and 2010, a debtor may elect to defer the recognition of the COD income, and thus the requirement to pay tax currently, until 2014. If the debtor defers such COD income until 2014, the COD income is then included in income ratably over the 5 taxable year period beginning in 2014. In certain cases, debtors may make the deferral election on a protective basis.

*(ii)*     ***Impact of Senior Secured Notes Treatment as Applicable High Yield Discount Obligations ("AHYDO")***

The Senior Secured Notes are subject to the provisions of the Tax Code dealing with applicable high yield discount obligations. In general, an AHYDO is any debt instrument with "significant original issue discount," a maturity date that is more than five years from the issue date and a yield to maturity that is at least five percentage points higher than the applicable federal rate on the issue date. When the Senior Secured Notes were issued with a yield of 15% in February 2007, the applicable federal rate was 4.61%. As such, any interest deductions with respect to any original issue discount ("***OID***") related to the Senior Secured Notes have been deferred until paid in cash or in other property (other than stock or debt issued by the TSN Debtors or by a person deemed to be related to the TSN Debtors under section 453(f)(1) of the Tax Code), and have been disallowed to the extent the yield to maturity on the Senior Secured Notes exceeds six percentage points over the applicable federal rate. Pursuant to the Plan, the deduction for the amount of interest on the Senior Secured Notes that has been previously deferred will be permanently disallowed because holders of Senior Secured Notes Claims will receive New Common Stock of the

Reorganized Debtors in exchange for these Claims. As a result, this interest will not be a part of the consolidated outstanding indebtedness in the calculation of COD income of the TSN Debtors because of the disallowance.

*(iii)*    ***Limitation of Net Operating Loss Carry Forwards and Other Tax Attributes***

The TSN Debtors collectively will have NOL carryovers at the time of the exchange of approximately $69 million, a portion of which is subject to limitations, as discussed below, from prior ownership changes. The precise amount of NOL carryovers and other tax attributes that will be available to the TSN Debtors collectively and individually after emergence is based on a number of factors and is impossible to calculate at this time. Some of the factors that will impact the amount of available NOLs include: the amount of tax losses incurred by the TSN Debtors in 2010; the value of the New Common Stock and the Rights Offering Preferred Stock; the amount of COD Income, if any, realized by the TSN Debtors under the Plan; and the extent to which different Debtors are affiliated or combined pursuant to the Plan. The NOLs are expected to be utilized to offset COD income, as discussed above in "Cancellation of Debt and Reduction of Tax Attributes." Under the Plan, the TSN Debtors will be a separate consolidated group after the Effective Date.

Under sections 382 and 383 of the Tax Code, if a corporation undergoes an "ownership change," the amount of its pre-change losses that may be utilized to offset future taxable income generally is subject to an annual limitation. At this time, the TSN Debtors anticipate that the issuance of the New Common Stock and New Preferred Stock, under the Plan are likely to result in an "ownership change" of the TSN Debtors for these purposes, and that the TSN Debtors' use of their pre-change losses is likely to be subject to limitation unless an exception to the general rules of sections 382 and 383 of the Tax Code applies.

a.    General Section 382 Annual Limitation

In general, the amount of the annual limitation to which a corporation that undergoes an "ownership change" would be subject is equal to the product of (i) the fair market value of the stock of the corporation immediately before the "ownership change" (with certain adjustments) multiplied by (ii) the "long-term tax-exempt rate" (which is the highest of the adjusted Federal long-term rates in effect for any month in the 3-calendar-month period ending with the calendar month in which the "ownership change" occurs; 3.67% for December 2010). Any unused limitation may be carried forward, thereby increasing the annual limitation in the subsequent taxable year.

b.    Special Bankruptcy Exceptions

An exception to the foregoing annual limitation rules generally applies when so-called "qualified creditors" of a debtor company in chapter 11 receive, in respect of their claims, at least 50% of the vote and value of the stock of the reorganized debtor (or a controlling corporation if also in chapter 11) pursuant to a confirmed chapter 11 plan (the "***382(l)(5) Exception***"). Under the 382(l)(5) Exception, a debtor's pre-change losses are not limited on an annual basis but, instead, are required to be reduced by the amount of any interest deductions claimed during the three taxable years preceding the effective date of the plan of reorganization, and during the part of the taxable year prior to and including the effective date of the plan of reorganization, in respect of all debt converted into stock in the reorganization. If the 382(l)(5) Exception applies and the TSN Debtors undergo another "ownership change" within two (2) years after consummation of the Plan, then the TSN Debtors' annual limitation to use their pre-change losses against their future income would be reduced to zero.

Where the 382(l)(5) Exception is not applicable (either because the debtor does not qualify for it or the debtor elects not to utilize the 382(l)(5) Exception), a second special rule will generally apply (the "***382(l)(6) Exception***"). Under the 382(l)(6) Exception, the limitation will be calculated by reference to the lesser of the value of the debtor corporation's new stock (with certain adjustments) immediately after the ownership change or the value of such debtor corporation's assets (determined without regard to liabilities) immediately before the ownership change. This differs from the ordinary rule that requires the fair market value of a debtor corporation that undergoes an "ownership change" to be determined before the events giving rise to the change. The 382(l)(6) Exception also differs from the 382(l)(5) Exception in that under the 382(l)(6) Exception the debtor corporation is not required to reduce its NOLs by the amount of interest deductions claimed during the current year and three preceding years with respect to the debt converted to equity, and the debtor may undergo a change of ownership within two (2) years without reducing the annual limitation on its NOLs to zero.

The issuance under the Plan of New Common Stock and the Rights Offering Preferred Stock, along with the cancellation of existing stock of the TSN Debtors, will cause an ownership change with respect to the TSN Debtors. Upon an ownership change, if any NOLs remain after any reduction to offset COD income, the TSN Debtors' pre-change losses would be subject to the Section 382 limitation (as described above). The TSN Debtors anticipate that any limitation arising under the Plan will be calculated according to the 382(l)(6) Exception. The TSN Debtors are uncertain, at this time, whether they would qualify for the 382(l)(5) Exception, and whether the consequences of that rule would be favorable relative to those under the 382(l)(6) Exception.

*(iv)*    ***Special Considerations in the Application of COD Rules and Reduction of Tax Attributes to Debtors***

As described above, the TSN Debtors will have NOLs at the time of the exchange. These tax attributes may be available for reduction as part of the COD income exclusion under section 108. A critical issue is the entity that incurred the particular NOLs or capital losses. The entity that realizes but does not recognize COD income is required to reduce its tax attributes. However, NOLs or other tax attributes, including capital losses in a sister company generally cannot be utilized to the extent the company with COD income has tax attributes that can be reduced – whether NOLs, capital losses, tax credits, or basis in its assets or a subsidiary. It is not anticipated that the TSN Debtors will utilize tax attributes of parties other than the TSN Debtors due to the realization of COD income.

*(v)*    ***Alternative Minimum Tax***

In general, an alternative minimum tax ("***AMT***") is imposed on a corporation's alternative minimum taxable income at a 20% rate to the extent that such tax exceeds the corporation's regular federal income tax. For purposes of computing taxable income for AMT purposes, certain tax deductions and other beneficial allowances are modified or eliminated. In particular, even though a corporation otherwise might be able to offset all of its taxable income for regular tax purposes by available NOL carry-forwards, only 90% of a corporation's taxable income from AMT purposes may be offset by available NOL carry-forwards (as computed for AMT purposes).

In addition, if a corporation undergoes an ownership change, within the meaning of section 382 of the Tax Code and is in a net unrealized built-in loss position (as determined for AMT purposes) on the date of the ownership change, the corporation's aggregate tax basis in its assets would be adjusted for certain AMT purposes to reflect the fair market value of such assets as of the change date.

### B.    Certain U.S. Federal Income Tax Consequences to the U.S. Holders under the Plan

The U.S. federal income tax consequences of the Plan to U.S. Holders and the character, amount and timing of income, gain or loss recognized as a consequence of the Plan and the distributions provided for or by the Plan generally will depend upon, among other things, (i) the manner in which a holder acquired a Claim; (ii) the length of time a Claim has been held; (iii) whether the Claim was acquired at a discount; (iv) whether the holder has taken a bad debt deduction in the current or prior years; (v) whether the holder has previously included accrued but unpaid interest with respect to a Claim; (vi) the holder's method of tax accounting; (vii) whether the holder will realize foreign currency exchange gain or loss with respect to a Claim; and (viii) whether a Claim is an installment obligation for federal income tax purposes. Therefore, holders of Claims are urged to consult their tax advisors for information that may be relevant to their particular situation and circumstances and the particular tax consequences to such holders as a result thereof.

*(i)*    ***Consequences to U.S. Holders of Allowed Senior Secured Notes Claims (Class 3)***

Each U.S. Holder of an Allowed Senior Secured Notes Claim shall receive, on the Initial Distribution Date, its pro rata share of 97% of: (i) the New Common Stock and (ii) Rights to purchase the Rights Offering Preferred Stock. U.S. Holders receiving Rights to purchase the Rights Offering Preferred Stock should see the "Rights Offering" discussion below.

The U.S. federal income tax consequences of the Plan to such U.S. Holders of Claims will depend, in part, on whether the Claims surrendered constitute "securities" for U.S. federal income tax purposes.

Whether a debt instrument constitutes a "security" is determined based on all the facts and circumstances, but most authorities have held that the length of the term of a debt instrument at initial issuance is an important factor in determining whether such instrument is a security for federal income tax purposes. These authorities have indicated that a term of less than five years is evidence that the instrument is not a security, whereas a term of ten (10) years or more is evidence that it is a security. There are numerous other factors that could be taken into account in determining whether a debt instrument is a security, including the security for payment, the creditworthiness of the obligor, the subordination or lack thereof with respect to other creditors, the right to vote or otherwise participate in the management of the obligor, convertibility of the instrument into an equity interest of the obligor, whether payments of interest are fixed, variable or contingent and whether such payments are made on a current basis or accrued. The Senior Secured Notes Claims may or may not constitute securities as the Senior Secured Notes have a term of approximately six (6) years.

If a U.S. Holder's Claims are treated as "securities" for federal income tax purposes, then the receipt of New Common Stock and the Rights in exchange for Allowed Senior Secured Notes Claims should constitute a "recapitalization" under section 368(a)(1)(E) of the Tax Code. As a result, except as discussed below with respect to accrued interest and in regards to "market discount", a U.S. Holder of such an Allowed Claim should not recognize gain or loss on the exchange of its Claim for New Common Stock and Rights. The U.S. Holder's basis in the New Common Stock and the Rights will be the same as the basis of the surrendered Claims immediately before the exchange, allocated between the New Common Stock and the Rights based on the relative fair market value of each. The U.S. Holder's holding period in the New Common Stock and the Rights will be the same as the holding period of the surrendered Claims immediately before the exchange.

If the Senior Secured Notes Claims are not treated as "securities" for federal income tax purposes, a U.S. Holder should be treated as exchanging its Claims for New Common Stock and Rights in a fully taxable exchange. In that case, the Holder should recognize gain or loss equal to the difference between (1) the fair market value as of the Effective Date of the New Common Stock and of the Rights Offering that is not allocable to accrued interest (not previously included in income) and (2) the U.S. Holder's tax basis in the Claims surrendered by the U.S. Holder (other than any tax basis attributable to accrued interest not previously included in income). See "Impact of Treatment of Senior Secured Notes as Applicable High Yield Discount Obligations" for a discussion on the AHYDO rules impact on a U.S. Holder's basis in its Allowed Senior Secured Notes Claims. Such gain or loss should be capital in nature if the Claims were held as capital assets by the U.S. Holder (subject to the "market discount" rules described below) and should be long-term capital gain or loss if the Claims were held for more than one year by the U.S. Holder. If the Holder is a non-corporate taxpayer, any such long-term capital gain will be taxed at preferential rates. The deductibility of capital losses is subject to limitations, see discussion below. To the extent that a portion of the New Common Stock received in the exchange is allocable to accrued interest, the Holder may recognize ordinary income. See the discussion of "Accrued Interest but Unpaid Interest" below.

In a taxable exchange, a U.S. Holder's tax basis in the New Common Stock and the Rights should equal the fair market value as of the Effective Date. A U.S. Holder's holding period for the New Common Stock should begin on the day following the Effective Date. For consequences of exercising the Rights, see "Rights Offering" discussion below.

*(ii)* *Consequences to Holders of Allowed Senior Exchangeable Notes Claims (Class 5) and Allowed Other Unsecured Claims (Class 6)*

Each U.S. Holder of a Senior Exchangeable Notes Claim shall receive, on the Initial Distribution Date, its pro rata share of the Class 5 Distribution. Each U.S. Holder of a Other Unsecured Claim shall receive its pro rata share the Class 6 Distribution. U.S. Holders receiving Rights to purchase the Rights Offering Preferred Stock should see the "Rights Offering" discussion below.

The U.S. federal income tax consequences of the Plan to such U.S. Holders of Claims will depend, in part, on whether the Claims surrendered constitute "securities" for U.S. federal income tax purposes, see discussion above. The Senior Exchangeable Notes Claims may or may not constitute securities as the Senior Secured Notes have a term of approximately six (6) years. The debt instruments underlying the Other Unsecured Claims may or may not constitute securities.

If a U.S. Holder's Claims are treated as "securities" for federal income tax purposes, then the receipt of New Common Stock and the Rights in exchange for Allowed Claims should constitute a "recapitalization" under section 368(a)(1)(E) of the Tax Code. As a result, except as discussed below with respect to accrued interest and in regards to "market discount", a U.S. Holder of such an Allowed Claim should not recognize gain or loss on the exchange of its Claim for New Common Stock and Rights. The Holder's basis and holding period in the New Common Stock and the Rights will be the same as the basis and holding period in the surrendered Claims immediately before the exchange.

If the Claims are not treated as "securities" for federal income tax purposes, a U.S. Holder should be treated as exchanging its Claims for New Common Stock and Rights in a fully taxable exchange. In that case, the Holder should recognize gain or loss equal to the difference between (1) the fair market value as of the Effective Date of the New Common Stock and the Rights that is not allocable to accrued interest (not previously included in income) and (2) the U.S. Holder's tax basis in the Claims surrendered by the U.S. Holder (other than any tax basis attributable to accrued interest not previously included in income). Such gain or loss should be capital in nature if the Claims were held as capital assets by the U.S. Holder (subject to the "market discount" rules described below) and should be long-term capital gain or loss if the Claims were held for more than one year by the U.S. Holder. If the Holder is a non-corporate taxpayer, any such long-term capital gain will be taxed at preferential rates. The deductibility of capital losses is subject to limitations, see discussion below. To the extent that a portion of the New Common Stock received in the exchange is allocable to accrued interest, the Holder may recognize ordinary income. See the discussion of accrued interest below.

In a taxable exchange, a U.S. Holder's tax basis in the New Common Stock and Rights should equal the fair market value as of the Effective Date. A U.S. Holder's holding period for the New Common Stock should begin on the day following the Effective Date. If the Rights have any value as of the Effective Date, their basis should equal such amount. For consequences of exercising the Rights, see "Rights Offering" discussion below.

*(iii)* *Consequences to U.S. Holders of Allowed Unsecured Convenience Claims*

Each U.S. Holder of an Allowed Unsecured Convenience Claim shall receive Cash in an amount equal to the lesser of (i) 10% of such holders' Unsecured Convenience Claim, and (ii) such holder's Pro Rata Share of $500.000..

U.S. Holders should recognize capital gain or loss (which capital gain or loss would be long-term capital gain or loss to the extent that the U.S. Holder has held the debt instrument underlying its Claim for more than one year) in an amount equal to the amount of Cash received over the U.S. Holder's adjusted basis its Allowed Unsecured Convenience Claims. To the extent that a portion of the Cash received represents accrued but unpaid interest that the Holder has not already taken into income, the Holder should recognize ordinary interest income. See "Accrued but Unpaid Interest" below.

*(iv)* *Rights Offering*

A recipient of Rights to purchase Rights Offering Preferred Stock generally should not recognize taxable gain or loss upon the exercise of its Rights. If a U.S. Holder allows the Rights received under the Plan to expire, it should recognize capital loss equal to its basis (if any) in such expiring Rights. The tax basis in the New Preferred Stock received upon participation in the Rights Offering should equal the amount paid for such New Preferred Stock, including the basis, allocable to the Rights. The holding period in such New Preferred Stock received should commence the day following its acquisition.

*(v)* *Ownership and Disposition of New Common Stock and New Preferred Stock*

Consequences of Dividends on New Common Stock and New Preferred Stock. Distributions made with respect to New Common Stock received under the Plan or New Common Stock received upon the exercise of the Rights generally will be treated as dividends to a U.S. Holder to the extent of current and accumulated earnings and profits of the Reorganized Debtors as determined under U.S. federal income tax principles, at the end of the tax year of the distribution. To the extent the distributions exceed the current and accumulated earnings and profits of the Reorganized Debtors, the excess will be treated first as a tax-free return of capital to the extent of the U.S. Holder's adjusted tax basis in the New Common Stock or New Preferred Stock and thereafter as capital gain. Corporate U.S.

Holders generally will be entitled to claim the dividends received deduction with respect to dividends paid on New Common Stock or New Preferred Stock, subject to applicable restrictions, including satisfaction of applicable holding period requirements.

        <u>Sale or Other Disposition of New Common Stock or New Preferred Stock</u>.  Upon the sale or other disposition of New Common Stock received under the Plan or New Preferred Stock received upon the exercise of the Rights, a U.S. Holder generally will recognize capital gain or loss equal to the difference between (i) the amount of cash and the fair market value of any property received upon the sale or other disposition and (ii) the U.S. Holder's adjusted tax basis in the New Common Stock or New Preferred Stock.  Such capital gain or loss will be long-term if the U.S. Holder's holding period in respect of such New Common Stock or New Preferred Stock is more than one year.  The deductibility of capital losses is subject to limitations, see discussion below.

### *(vi)* *Accrued but Unpaid Interest*

        A portion of the consideration received by participating U.S. Holders may be attributable to accrued but unpaid interest with respect to their Claims.  Such amount should be taxable to the U.S. Holders as ordinary interest income to the extent that the accrued interest has not been previously included in the U.S. Holder's gross income for U.S. federal income tax purposes. Conversely, a U.S. Holder generally recognizes a deductible loss to the extent that any accrued interest was previously included in income and is not paid in full.  If the Plan is consummated, the TSN Debtors will allocate for U.S. federal income tax purposes all distributions in respect of any Claim first to the principal amount of such Claim, and thereafter to accrued but unpaid interest, pursuant to the Plan. Certain legislative history indicates that an allocation of consideration between principal and interest provided for in a bankruptcy plan of reorganization is binding for U.S. federal income tax purposes.  However, no assurance can be given that the IRS will not challenge such allocation.  If a distribution with respect to a Claim is allocated entirely to the principal amount of such Claim, a U.S. Holder may be entitled to claim a loss to the extent of any accrued but unpaid interest on the Claim that was previously included in the U.S. Holder's gross income.  U.S. Holders of Claims should consult their tax advisors regarding the proper allocation of the consideration received by them under the Plan, as well as the character of any loss claimed with respect to accrued but unpaid interest previously included in gross income.

### *(vii)* *Market Discount*

        Under the "market discount" provisions of sections 1276 through 1278 of the Tax Code, some or all of any gain realized by a U.S. Holder exchanging the debt instruments constituting its Allowed Claim may be treated as ordinary income (instead of capital gain), to the extent of the amount of "market discount" on the debt constituting the surrendered Allowed Claim.

        In general, a debt instrument is considered to have been acquired with "market discount" if its holder's adjusted tax basis in the debt instrument is less than (i) its stated principal amount or (ii) in the case of a debt instrument issued with OID, its adjusted issue price, in each case, by at least a *de minimis* amount.  The *de minimis* amount is equal to 0.25% of the sum of all payments which, at the time of purchase, remain to be made on the debt instrument, excluding qualified stated interest, multiplied by the number of remaining whole years to maturity.  Generally, qualified stated interest is a stated amount of interest that is unconditionally payable in cash or other property (other than debt instruments of the issuer) at least annually at a single fixed rate.

        Any gain recognized by a U.S. Holder on the taxable disposition (determined as described above) of debts that it acquired with market discount should be treated as ordinary income to the extent of the market discount that accrued thereon while such debts were considered to be held by the U.S. Holder (unless the U.S. Holder elected to include market discount in income as it accrued).  To the extent that the surrendered debts that had been acquired with market discount are exchanged in a tax-free or other reorganization transaction for other property (as may occur here), any market discount that accrued on such debts but was not recognized by the U.S. Holder may be required to be carried over to the property received therefor and any gain recognized on the subsequent sale, exchange, redemption or other disposition of such property may be treated as ordinary income to the extent of the accrued but unrecognized market discount with respect to the exchanged debt instrument.

*(viii)*     ***Limitations on Use Capital Losses***

U.S. Holders of Claims who recognize capital losses as a result of the distributions under the Plan will be subject to limits on their use of capital losses. For noncorporate holders, capital losses may be used to offset any capital gains (without regard to holding periods) plus ordinary income to the extent of the lesser of (1) $3,000 ($1,500 for married individuals filing separate returns) or (2) the excess of the capital losses over the capital gains. Holders, other than corporations, may carry over unused capital losses and apply them to capital gains and a portion of their ordinary income for an unlimited number of years. For corporate holders, losses from the sale or exchange of capital assets may only be used to offset capital gains. Holders who have more capital losses than can be used in a tax year may be allowed to carry over the excess capital losses for use in succeeding tax years. Corporate holders may only carry over unused capital losses for the five years following the capital loss year, but are allowed to carry back unused capital losses to the three years preceding the capital loss year.

*(ix)*     ***Information Reporting and Backup Withholding***

In general, U.S. Holders (other than corporations and other exempt holders) will be subject to information reporting requirements with respect to interest, dividends and other taxable distributions paid in respect of, and the proceeds from a sale, redemption or other disposition of, the New Common Stock or New Preferred Stock, if applicable. In addition, such U.S. Holders may be subject to backup withholding on such payments if such U.S. Holder (i) fails to provide an accurate taxpayer identification number to the payor; (ii) has been notified by the IRS of a failure to report all interest or dividends required to be shown on its U.S. federal income tax returns; or (iii) in certain circumstances, fails to comply with applicable certification requirements.

Any amounts withheld under the backup withholding rules will be allowed as a refund or a credit against a U.S. Holder's U.S. federal income tax liability, provided that the required information is furnished to the IRS on a timely basis. A U.S. Holder should consult its tax advisors regarding the application of information reporting and backup withholding rules in their particular situations, the availability of an exemption therefrom, and the procedure for obtaining such an exemption, if applicable.

**C.     General U.S. Federal Income Tax Consequences to Non-U.S. Holders**

The rules governing U.S. federal income taxation of a Non-U.S. Holder are complex. Each Non-U.S. Holder should consult with its own tax advisor to determine the effect of U.S. federal, state, local and foreign income tax laws, as well as treaties, with regard to its participation in the transactions contemplated by the Plan, and its ownership of Claims, New Common Stock, and New Preferred Stock.

*(i)*     ***Tax Consequences to Non-U.S. Holders of Plan***

a.     Tax Consequences of Non-U.S. Holders Under the Plan

A Non-U.S. Holder generally will not be subject to U.S. federal income tax with respect to any New Common Stock, Rights, and Cash received in the Plan, unless (i) such Non-U.S. Holder is engaged in a trade or business in the United States to which income, gain or loss from the exchange is "effectively connected" for U.S. federal income tax purposes, or (ii) such Non-U.S. Holder is an individual and is present in the United States for 183 days or more during the taxable year of the exchange and certain other requirements are met.

b.     Non-U.S. Holders of New Common Stock or New Preferred Stock

If a Non-U.S. Holder receives New Common Stock or New Preferred Stock under the Plan, distributions of cash and property that Reorganized Debtors make in respect of New Common Stock or New Preferred Stock will constitute dividends for U.S. federal income tax purposes to the extent of its current or accumulated earnings and profits (as determined under U.S. federal income tax principles). Distributions of cash and property that constitute dividends for U.S. federal income tax purposes generally will be subject to U.S. federal withholding at a 30% rate unless a reduced rate is prescribed by an applicable income tax treaty. If the amount of a distribution exceeds Reorganized Debtors' current and accumulated earnings and profits, such excess first will be treated as a return of capital to the extent of a Non-U.S. Holder's tax basis in the New Common Stock or New Preferred Stock and

thereafter will be treated as gain from the disposition of such New Common Stock or New Preferred Stock, subject to tax as described below in "Sale, Exchange or Disposition of New Common Stock or New Preferred Stock."

In order to obtain a reduced rate of U.S. withholding tax under an applicable income tax treaty, a Non-U.S. Holder will be required to provide a properly executed IRS Form W-8BEN certifying its entitlement to benefits under the treaty. If a Non-U.S. Holder is eligible for a reduced rate of U.S. withholding tax under a treaty, the Non-U.S. Holder may obtain a refund or credit of any excess amounts withheld by filing an appropriate claim for a refund with the IRS. Each Non-U.S. Holder should consult its own tax advisor regarding its possible entitlement to benefits under a treaty.

The U.S. federal withholding tax described above will not apply to dividends paid to a Non-U.S. Holder if such dividends represent U.S. trade or business income for the Non-U.S. Holder and the Non-U.S. Holder provides a properly executed IRS Form W-8ECI certifying that the dividends are effectively connected with the Non-U.S. Holder's conduct of a trade or business within the U.S. because the dividends are otherwise subject to tax in the U.S. as part of their trade or business income.

c.      Effectively Connected Income and Loss

If a Non-U.S. Holder is engaged in a trade or business in the U.S. and if dividends received in respect of New Common Stock or New Preferred Stock, or gain or loss realized on the disposition of New Common Stock or New Preferred Stock are "effectively connected" with the conduct of such U.S. trade or business, any such dividends, gain or loss realized by the Non-U.S. Holder will be subject to full net-basis U.S. federal income tax in the same manner as if the Non-U.S. Holder were a U.S. Holder, unless an applicable income tax treaty provides otherwise. In addition, if the Non-U.S. Holder is a foreign corporation, the Non-U.S. Holder may also be subject to a "branch profits tax" on earnings and profits effectively connected with such U.S. trade or business (subject to certain adjustments) at a rate of 30%, unless the branch profits tax is reduced or eliminated by an applicable income tax treaty. Even though any such effectively connected income would be subject to income tax, and might also be subject to branch profits tax, it would not be subject to withholding tax if the Non-U.S. Holder satisfied the applicable certification requirements described above. Non-U.S. Holders should discuss the applicability of the "effectively connected" rules with their tax advisors.

d.      Sale, Exchange or Disposition of New Common Stock and New Preferred Stock

Subject to the discussion below concerning backup withholding, if a Non-U.S. Holder owns New Common Stock or New Preferred Stock, the Non-U.S. Holder generally will not be subject to U.S. federal income tax with respect to any gain or loss realized on the sale, exchange or other taxable disposition of such New Common Stock or New Preferred Stock, unless:

1.      the Non-U.S. Holder is an individual who is present in the U.S. for 183 days or more in the taxable year of disposition, and certain other conditions are met; or

2.      such gain is effectively connected with the Non-U.S. Holder's conduct of a trade or business in the U.S.

*(ii)     **Information Reporting and Backup Withholding for Non-U.S. Holders***

Unless certain exceptions apply, the Debtors must report annually to the IRS and to each Non-U.S. Holder any interest paid during the taxable year, as well as the amount of any dividends paid to the Non-U.S. Holder (whether such dividend income is subject to U.S. withholding tax or is exempt from such tax pursuant to an income tax treaty). Copies of these information returns may also be made available under the provisions of a specific treaty or other agreement to the tax authorities of the country in which a Non-U.S. Holder resides.

Under current U.S. federal income tax law, backup withholding tax will not apply to payments of dividends by the Debtors or its paying agent if the Non-U.S. Holder provides a properly executed IRS Form W-8BEN (or successor form), or otherwise establishes its eligibility for an exemption, provided that the Debtors or their paying agent, as the case may be, does not have actual knowledge or reason to know that the payee Non-U.S. Holder is a U.S. person.

Withholding and backup withholding are not additional taxes. Any amounts withheld from a payment to a Non-U.S. Holder under the withholding or backup withholding rules will be allowed as a credit against such Holder's U.S. federal income tax liability and may entitle the holder to a refund, provided that the holder furnishes the required information to the IRS. A Non-U.S. Holder should consult its tax advisor regarding the application of information reporting, withholding and backup withholding in such holder's particular situation, the availability of an exemption from backup withholding and the procedure for obtaining such an exemption, if available.

Under legislation recently enacted into law, certain payments made after December 31, 2012 to certain foreign entities (including foreign accounts or foreign intermediaries) would be subject to a 30% withholding tax unless various U.S. information reporting and due diligence requirements have been satisfied. Payments subject to such requirements include dividends on (as applicable) and the gross proceeds from the sale or other disposition of New Common Stock and New Preferred Stock. These requirements are different from, and in addition to, the withholding tax requirements described above. Non-U.S. Holders should consult their tax advisors concerning the application of this legislation to their particular circumstances.

D.      **Importance of Obtaining Professional Tax Assistance**

**THE FOREGOING DISCUSSION IS INTENDED ONLY AS A SUMMARY OF CERTAIN INCOME TAX CONSEQUENCES OF THE PLAN AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL. THE ABOVE DISCUSSION IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT TAX ADVICE. THE TAX CONSEQUENCES ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING ON A HOLDER'S PARTICULAR CIRCUMSTANCES. ACCORDINGLY, HOLDERS OF CLAIMS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS ABOUT THE UNITED STATES FEDERAL, STATE, AND LOCAL, AND APPLICABLE FOREIGN INCOME AND OTHER TAX CONSEQUENCES OF THE PLAN.**

# XIV.
## RECOMMENDATION

TerreStar Networks Inc. and its Debtor affiliates submit that the Plan is preferable to the alternatives described in this Disclosure Statement because it provides for a larger distribution to the TSN Debtors' creditors than would otherwise result in liquidation under chapter 7 of the Bankruptcy Code. In addition, any alternative other than Confirmation could result in extensive delays and increased administrative expenses, resulting in smaller distributions to holders of Allowed Claims (and, potentially, Interests, in the TSN Debtors) than those proposed under the Plan. The Debtors thus believe that approval of the Plan is in the best interests of all stakeholders in the TSN Debtors' chapter 11 cases, and accordingly, the Debtors recommend that holders of Claims and Interests entitled to vote on the Plan vote to accept the Plan.

Dated: December 2, 2010

Respectfully submitted,

TerreStar Networks Inc.
(for itself and on behalf of each of the TSN Debtors)

By: _s/Jeffrey Epstein_____
    Name: Jeffrey Epstein
    Title: Chief Executive Officer

Prepared by:

Ira S. Dizengoff
Arik Preis
AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036

(212) 872-1000 (Telephone)
(212) 872-1002 (Facsimile)

1333 New Hampshire Avenue, NW
Washington, DC 20036
(202) 887-4000 (Telephone)
(202) 887-4288 (Facsimile)
Joanna F. Newdeck

Ashleigh L. Blaylock

*Counsel to the Debtors and Debtors in Possession*

<u>**Exhibit A**</u>

**Plan**

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
(212) 872-1000 (Telephone)
(212) 872-1002 (Facsimile)
Ira S. Dizengoff
Arik Preis

1333 New Hampshire Avenue, NW
Washington, DC 20036
(202) 887-4000 (Telephone)
(202) 887-4288 (Facsimile)
Joanna F. Newdeck
Ashleigh L. Blaylock

*Counsel to the Debtors and Debtors in Possession*

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| TERRESTAR NETWORKS INC., *et al.*,[1] | ) | Case No. 10-15446 (SHL) |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |

## FIRST AMENDED JOINT CHAPTER 11 PLAN OF TERRESTAR NETWORKS INC., TERRESTAR NATIONAL SERVICES, INC., 0887729 B.C. LTD., TERRESTAR LICENSE INC., TERRESTAR NETWORKS HOLDINGS (CANADA) INC., AND TERRESTAR NETWORKS (CANADA) INC.

THIS CHAPTER 11 PLAN IS BEING SUBMITTED FOR
APPROVAL BY THE BANKRUPTCY COURT. THIS CHAPTER 11
PLAN HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT.
ACCORDINGLY, THIS IS NOT A SOLICITATION OF ACCEPTANCE
OR REJECTION OF THE CHAPTER 11 PLAN. ACCEPTANCES OR
REJECTIONS MAY NOT BE SOLICITED UNTIL A DISCLOSURE
STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT.

Dated: December 2, 2010

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal taxpayer-identification number, are: TerreStar New York Inc. (6394); TerreStar Networks Inc. (3931); Motient Communications Inc. (3833); Motient Holdings Inc. (6634); Motient License Inc. (2431); Motient Services Inc. (5106); Motient Ventures Holding Inc. (6191); MVH Holdings Inc. (9756); TerreStar License Inc. (6537); TerreStar National Services Inc. (6319); TerreStar Networks Holdings (Canada) Inc. (1337); TerreStar Networks (Canada) Inc. (8766) and 0887729 B.C. Ltd. (1345).

**TABLE OF CONTENTS**

ARTICLE I. ...................................................................................................................................1

    A.    Defined Terms ...........................................................................................1
    B.    Rules of Interpretation ............................................................................13
    C.    Computation of Time ...............................................................................13
    D.    Governing Law .........................................................................................13
    E.    Reference to Monetary Figures ...............................................................13
    F.    Settlement of Certain Inter-Creditor Issues ............................................13

ARTICLE II. ADMINISTRATIVE CLAIMS, DIP CLAIMS, U.S. TRUSTEE FEES AND
PRIORITY TAX CLAIMS...........................................................................................................14

    A.    Administrative Claims .............................................................................14
    B.    DIP Claims ...............................................................................................15
    C.    U.S. Trustee Fees .....................................................................................15
    D.    Priority Tax Claims ..................................................................................15

ARTICLE III. CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS.............15

    A.    General Rules of Classification ...............................................................15
    B.    Summary of Classification ......................................................................16
    C.    Treatment of Claims and Interests ..........................................................16

ARTICLE IV. ...............................................................................................................................18

ACCEPTANCE REQUIREMENTS...............................................................................................18

    A.    Acceptance or Rejection of the Plan ........................................................18
    B.    Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code ..........19

ARTICLE V. MEANS FOR IMPLEMENTATION OF THE PLAN ..............................................19

    A.    Limited Consolidation for Voting, Confirmation and Distribution Purposes ........................19
    B.    Intercompany Claims ...............................................................................19
    C.    Sources of Consideration for Plan Distributions .....................................19
    D.    Issuance of New Securities and Debt Instruments ...................................20
    E.    The Rights Offering .................................................................................20
    F.    Cancellation of Securities and Agreements..............................................20
    G.    Exemptions for Issuance of New Equity ..................................................21
    H.    Corporate Existence..................................................................................21
    I.    New Certificate of Incorporation and New By-Laws ...............................21
    J.    Reorganized TSN Debtors' Boards of Directors .....................................21
    K.    Officers of Reorganized TSN Debtors .....................................................22
    L.    Employee Benefits ...................................................................................22
    M.    Vesting of Assets in the Reorganized TSN Debtors.................................22
    N.    Restructuring Transactions.......................................................................22
    O.    Intercompany Interests .............................................................................23
    P.    Corporate Action......................................................................................23
    Q.    Effectuating Documents; Further Transactions .......................................23
    R.    General Settlement of Claims and Interests .............................................23
    S.    Section 1146 Exemption from Certain Taxes and Fees ...........................24
    T.    D&O Liability Insurance Policies and Indemnification Provisions............24
    U.    Preservation of Rights and Causes of Action...........................................24
    V.    Payment of Fees and Expenses of Senior Secured Notes Indenture Trustee/Agent
           and Purchase Money Agent......................................................................25

ARTICLE VI. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES.....25

| | | |
|---|---|---|
| A. | Assumption and Rejection of Executory Contracts and Unexpired Leases | 25 |
| B. | Cure of Defaults for Executory Contracts and Unexpired Leases Assumed | 26 |
| C. | Claims Based on Rejection of Executory Contracts or Unexpired Leases | 26 |
| D. | Insurance Policies | 26 |
| E. | Modifications, Amendments, Supplements, Restatements or Other Agreements. | 27 |
| F. | Reservation of Rights | 27 |
| G. | Contracts and Leases Entered Into After the Petition Date. | 27 |

**ARTICLE VII. PROVISIONS GOVERNING DISTRIBUTIONS** ... 27

| | | |
|---|---|---|
| A. | Record Date for Distributions | 27 |
| B. | Timing and Calculation of Amounts to Be Distributed | 27 |
| C. | Fractional Distributions | 28 |
| D. | Disbursing Agent | 28 |
| E. | Rights and Powers of Disbursing Agent | 28 |
| F. | Distributions to Holders of Disputed Claims | 28 |
| G. | Delivery of Distributions and Undeliverable or Unclaimed Distributions | 28 |
| H. | Hart-Scott-Rodino Compliance | 29 |
| I. | Withholding and Reporting Requirements | 29 |
| J. | Setoffs | 29 |
| K. | Claims Paid or Payable by Third Parties | 30 |
| L. | Postpetition Interest | 30 |
| M. | Section 506(c) Reservation | 30 |
| N. | Single Satisfaction of Claims | 30 |

**ARTICLE VIII.** ... 31

**PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED AND DISPUTED CLAIMS** ... 31

| | | |
|---|---|---|
| A. | Prosecution of Objections to Claims | 31 |
| B. | Allowance of Claims | 31 |
| C. | Disputed Claims Reserve | 31 |
| D. | Distributions After Allowance | 31 |
| E. | Distribution of Excess Amounts in the Disputed Claims Reserve | 31 |
| F. | Property Held in the Reserve for Disputed Claims | 31 |
| G. | Estimation of Claims | 32 |
| H. | Deadline to File Objections to Claims | 32 |

**ARTICLE IX. SETTLEMENT, RELEASE, INJUNCTION AND RELATED PROVISIONS** ... 32

| | | |
|---|---|---|
| A. | Compromise and Settlement of Claims, Interests and Controversies | 32 |
| B. | Releases by the TSN Debtors | 32 |
| C. | Releases by Holders of Claims and Interests | 33 |
| D. | Exculpation | 33 |
| E. | Discharge of Claims and Termination of Interests | 33 |
| F. | Injunction | 34 |
| G. | Term of Injunctions or Stays | 35 |
| H. | Injunction Against Interference With Plan | 35 |
| I. | Injunction Related to Releases and Exculpation | 35 |
| J. | Protection Against Discriminatory Treatment | 35 |
| K. | No Consent to Change of Control Required | 35 |
| L. | Release of Liens | 36 |

**ARTICLE X. CONDITIONS PRECEDENT TO CONFIRMATION OF THE PLAN AND THE EFFECTIVE DATE** ... 36

| | | |
|---|---|---|
| A. | Conditions Precedent to Confirmation | 36 |
| B. | Conditions Precedent to the Effective Date | 36 |
| C. | Waiver of Conditions | 37 |
| D. | Effect of Failure of Conditions | 37 |

**ARTICLE XI. MODIFICATION, REVOCATION OR WITHDRAWAL OF THE PLAN** ...............................38
    **A.**      **Modification and Amendments**.................................................................38
    **B.**      **Effect of Confirmation on Modifications** ...............................................38
    **C.**      **Revocation or Withdrawal of the Plan** ...................................................38

**ARTICLE XII. RETENTION OF JURISDICTION**.................................................................38

**ARTICLE XIII. MISCELLANEOUS PROVISIONS**...............................................................40
    **A.**      **Immediate Binding Effect**........................................................................40
    **B.**      **Additional Documents** ..............................................................................40
    **C.**      **Dissolution of Creditors' Committee**.......................................................40
    **D.**      **Successors and Assigns** .............................................................................41
    **E.**      **Service of Documents** ...............................................................................41
    **F.**      **Entire Agreement** .....................................................................................41
    **G.**      **Severability of Plan Provisions** ...............................................................41
    **H.**      **Exhibits** .....................................................................................................41
    **I.**      **Votes Solicited in Good Faith**...................................................................42
    **J.**      **Closing of Chapter 11 Cases** ....................................................................42
    **K.**      **Conflicts** ....................................................................................................42

# INTRODUCTION

TerreStar Networks, Inc., TerreStar National Services, Inc., 0887729 B.C. Ltd., TerreStar License Inc., TerreStar Networks Holdings (Canada) Inc., and TerreStar Networks (Canada) Inc. respectfully propose the following joint chapter 11 plan of reorganization. Capitalized terms used in the Plan and not otherwise defined shall have the meanings ascribed to such terms in Article I.A hereof.

# ARTICLE I.

## DEFINED TERMS, RULES OF INTERPRETATION,
## COMPUTATION OF TIME AND GOVERNING LAW

A.    *Defined Terms*

Unless the context otherwise requires, the following terms shall have the following meanings when used in capitalized form:

1.    *"Accrued Professional Compensation"* means, at any given moment, all accrued, contingent and/or unpaid fees (including success fees) for legal, financial advisory, accounting and other services and obligations for reimbursement of expenses rendered or incurred before the Effective Date that are awardable and allowable under sections 328, 330(a) or 331 of the Bankruptcy Code by any retained Professional in the Chapter 11 Cases, or that are awardable and allowable under section 503 of the Bankruptcy Code, that the Bankruptcy Court has not denied by a Final Order, all to the extent that any such fees and expenses have not been previously paid. To the extent that the Bankruptcy Court or any higher court denies or reduces by a Final Order any amount of a Professional's fees or expenses, then those reduced or denied amounts shall no longer constitute Accrued Professional Compensation. For the avoidance of doubt, Accrued Professional Compensation shall not include any accrued, contingent and/or unpaid fees for services and obligations for reimbursement of expenses rendered or incurred before the Effective Date by (i) any Entity retained pursuant to the Ordinary Course Professional Order and authorized to be compensated thereunder without filing a fee application, or (ii) the Senior Secured Notes Indenture Trustee/Agent and the Purchase Money Agent, who are authorized to be compensated under the Final DIP Order without filing a fee application.

2.    *"Additional Shares"* means shares of New Preferred Stock, other than the Rights Offering Preferred Stock.

3.    *"Administrative Claim"* means any right to payment constituting a cost or expense of administration of the Chapter 11 Cases of the TSN Debtors of the kind specified in section 503(b) of the Bankruptcy Code and entitled to priority pursuant to sections 507(a)(2) or 507(b) of the Bankruptcy Code, including, but not limited to: (a) the actual and necessary costs and expenses incurred after the Petition Date and through the Effective Date of preserving the Estates and operating the businesses of the TSN Debtors; (b) compensation for legal, financial advisory, accounting and other services and reimbursement of expenses Allowed pursuant to sections 328, 330(a), 331 or 363 of the Bankruptcy Code or otherwise for the period commencing on the Petition Date and through the Effective Date; and (c) all fees and charges assessed against the Estates pursuant to chapter 123 of title 28 of the United States Code, 28 U.S.C. §§ 1–4001.

4.    *"Administrative Claims Bar Date"* means the bar date for Administrative Claims as such term is defined in Article II.A.3 hereof.

5.    *"Affiliate"* has the meaning set forth in section 101(2) of the Bankruptcy Code.

6.    *"Allowed Claim" or "Allowed [___] Claim"* (with respect to a specific type of Claim, if specified) means: (a) any Claim (or a portion thereof) as to which no action to dispute, deny, equitably subordinate or otherwise limit recovery with respect thereto, or alter priority thereof, has been filed within the applicable period of time fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules or applicable law; or (b) any Claim or portion thereof that is allowed (i) in any contract, instrument, indenture or other agreement entered into in connection with

the Plan, (ii) pursuant to the terms of the Plan, (iii) by Final Order of the Bankruptcy Court, or (iv) with respect to an Administrative Expense Claim only (x) that was incurred by a TSN Debtor in the ordinary course of business during the Chapter 11 Cases of the TSN Debtors to the extent due and owing without defense, offset, recoupment or counterclaim of any kind, and (y) that is not otherwise disputed.

7.  *"Backstop Amount"* means the Backstop Party's commitment to purchase up to $100 million of the Rights Offering Preferred Stock, or such other greater amount as may be agreed upon by the Backstop Party and the TSN Debtors.

8.  *"Backstop Approval Order"* means that order entered by the Bankruptcy Court on [_____], 2010, authorizing and approving (a) the TSN Debtors' entry into the EPCA and (b) the Backstop Commitment Fee, Transaction Expenses, and Indemnification Obligations.

9.  *"Backstop Commitment Fee"* means a commitment fee equal to 3% of the Backstop Amount, which shall be paid in Additional Shares.

10.  *"Backstop Indemnification Obligations"* means the indemnification obligations described in Section 10 of the EPCA.

11.  *"Backstop Party"* means, collectively, EchoStar and, if applicable, any Related Purchasers (as defined in the EPCA).

12.  *"Bankruptcy Code"* means title 11 of the United States Code, as amended from time to time.

13.  *"Bankruptcy Court"* means the United States Bankruptcy Court for the Southern District of New York having jurisdiction over the Chapter 11 Cases or any other court having jurisdiction over the Chapter 11 Cases, including, to the extent of the withdrawal of any reference under 28 U.S.C. § 157, the United States District Court for the Southern District of New York.

14.  *"Bankruptcy Rules"* means the Federal Rules of Bankruptcy Procedure, as applicable to the Chapter 11 Cases, promulgated under section 2075 of title 28 of the United States Code, 28 U.S.C. §§ 1–4001, as well as the general and local rules of the Bankruptcy Court and the Order Pursuant to Sections 105(a) and (d) of the Bankruptcy Code and Bankruptcy Rules 1015(c), 2002(m) annd 9007 Implementing Certain Notice and Case Management Procedures (Docket No. 60), as it may be amended from time to time.

15.  *"Canadian Court"* means the Ontario Superior Court of Justice (Commercial List).

16.  *"Canadian Debtors"* means, collectively, TerreStar Networks (Canada) Inc., TerreStar Networks Holdings (Canada) Inc. and 0887729 B.C. Ltd.

17.  *"Canadian Proceedings"* means the recognition proceeding (Court File No.: CV-10-8944-00CL) commenced on October 20, 2010 before the Canadian Court by TSN, as foreign representative on behalf of the Debtors, pursuant to Part IV of the CCAA, to, among other things, recognize the jointly administered Chapter 11 Cases as a "foreign main proceeding".

18.  *"Cash"* means the legal tender of the United States of America or the equivalent thereof.

19.  *"Causes of Action"* means any action, claim, cause of action, controversy, demand, right, action, Lien, indemnity, guaranty, suit, obligation, liability, damage, judgment, account, defense, offset, power, privilege, license and franchise of any kind or character whatsoever of the TSN Debtors, known, unknown, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively, whether arising before, on, or after the Petition Date, in contract or in tort, in law or in equity or pursuant to any other theory of law.  Causes of Action also include: (a) any right of setoff, counterclaim or recoupment and any claim on contracts or for breaches of duties imposed by law or in equity; (b) the right to object to Claims or Interests; (c) any claim pursuant to section 362 or chapter 5 of the

Bankruptcy Code; (d) any claim or defense including fraud, mistake, duress and usury and any other defenses set forth in section 558 of the Bankruptcy Code; (e) any state law fraudulent transfer claim; and (f) any claim set forth on the Schedule of Retained Causes of Action.

20.     *"CCAA"* means the Companies' Creditors Arrangement Act (Canada), R.S. C. 1985, c. C-36, as amended.

21.     *"Chapter 11 Cases"* means (a) when used with reference to a particular Debtor, the chapter 11 case pending for that Debtor under chapter 11 of the Bankruptcy Code in the Bankruptcy Court and (b) when used with reference to all Debtors, the procedurally consolidated chapter 11 cases pending for the Debtors in the Bankruptcy Court under Case No. 10-15446 (SHL).

22.     *"Claim"* means any claim against a TSN Debtor as defined in section 101(5) of the Bankruptcy Code.

*23.*     *"Class"* means a category of holders of Claims or Interests as set forth in Article III.

24.     *"Class 3 Distribution"* means (i) 97% of the New Common Stock, and (ii) with respect to holders of Class 3 Claims that become Allowed Claims in accordance with the Rights Offering Procedures on or before the Subscription Record Date only, Rights to purchase 97% of the Rights Offering Preferred Stock.

25.     *"Class 5 Distribution"* means (i) at least 1% but no more than 3% of the New Common Stock, and (ii) with respect to holders of Class 5 Claims that become Allowed Claims in accordance with the Rights Offering Procedures on or before the Subscription Record Date only, Rights to purchase at least 1% but no more than 3% of the Rights Offering Preferred Stock.  The exact percentage will be determined after resolution of the Other Unsecured Claims pool; *however*, for the avoidance of doubt, (1) the TSN Debtors have assumed that the aggregate amount of Allowed Other Unsecured Claims at the TSN Debtors will be approximately $365 million; (2) any decrease in the aggregate amount of Allowed Other Unsecured Claims at the TSN Debtors will result in fewer shares of New Common Stock being issued by Reorganized TSN; and (3) Holders of the Senior Exchangeable Notes Claims will not be harmed by any increase in Allowed Other Unsecured Claims.

26.     *"Class 6 Distribution"* means (i) 3% of the New Common Stock <u>minus</u> any amount of New Common Stock distributed pursuant to the Class 5 Distribution, and (ii) with respect to holders of Class 6 Claims that become Allowed Claims in accordance with the Rights Offering Procedures on or before the Subscription Record Date only, Rights to purchase 3% of the Rights Offering Preferred Stock <u>minus</u> any Rights to purchase Rights Offering Preferred Stock distributed pursuant to the Class 5 Distribution.  The exact percentage will be determined based upon the final resolution of Allowed Other Unsecured Claims.  For the avoidance of doubt, (1) the TSN Debtors have assumed that the aggregate amount of Allowed Other Unsecured Claims at the TSN Debtors will be approximately $365 million; (2) to the extent Allowed Other Unsecured Claims are ultimately determined to be greater than $365 million, holders of Allowed Other Unsecured Claims will not receive any additional New Common Stock; (3) to the extent Allowed Other Unsecured Claims are ultimately determined to be less than $365 million, Reorganized TSN will issue fewer shares of New Common Stock.

27.     *"Collateral"* means any property or interest in property of the TSN Debtors subject to a Lien to secure the payment or performance of a Claim.

28.     *"Confirmation"* means the entry of the Confirmation Order on the docket of the Chapter 11 Cases.

29.     *"Confirmation Date"* means the date upon which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases of the TSN Debtors within the meaning of Bankruptcy Rules 5003 and 9021.

30.     *"Confirmation Hearing"* means the hearing held by the Bankruptcy Court concerning Confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code, as such hearing may be continued from time to time.

31.     *"Confirmation Order"* means the order entered by the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

32.     *"Convenience Class"* means the Class of Unsecured Convenience Claims.

33.     *"Convenience Class Election"* means an election by a holder of an Allowed Class 6 Claim in an amount in excess of $25,000 to be treated as a Holder of an Unsecured Convenience Claim in Class 7 by electing to reduce its Class 6 Claim to the amount of $25,000 in full and final satisfaction, release, and discharge of such Allowed Class 6 Claim.  Except as may be agreed to by the TSN Debtors, any Convenience Class Election must be made on the Ballot and no Holder of a Class 6 Claim can make a Convenience Class Election after the Voting Deadline.  Upon any Convenience Class Election, the Class 6 Claim of the applicable holder shall be automatically reduced to $25,000 and shall no longer be entitled to any other distribution on account of its Other Unsecured Credit Claim as contemplated by this Plan.

34.     *"Creditors' Committee"* means the statutory committee of unsecured creditors of the TSN Debtors appointed in the Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code by the U.S. Trustee, as such committee membership may be reconstituted from time to time.

35.     *"Cure Claim"* means a Claim based upon a monetary default, if any, by any TSN Debtor on an Executory Contract or Unexpired Lease at the time such contract or lease is assumed by such Debtor pursuant to sections 365 or 1123 of the Bankruptcy Code.

36.     *"D&O Liability Insurance Policies"* means all insurance policies of any of the TSN Debtors for directors', managers' and officers' liability, as set forth on the schedule of Insurance Policies to be included in the Plan Supplement.

37.     *"Debtor"* means one of the TSN Debtors, in its individual capacity as a debtor and debtor in possession in these Chapter 11 Cases.

38.     *"Debtors"* means, collectively, the TSN Debtors and the Non-TSN Debtors.

39.     *"DIP Agent"* means The Bank of New York Mellon, or its duly appointed successor, in its capacity as administrative agent and collateral agent under the DIP Loan Agreement.

40.     *"DIP Claims"* means any Claim derived from or based upon the DIP Loan Agreement, including without limitation Claims for principal, interest, fees, or expenses (including without limitation all reasonable, actual and documented fees, expenses and disbursements of (i) EchoStar and its counsel and financial advisors, which consists of Willkie Farr & Gallagher LLP, Sullivan & Cromwell LLP, Goodmans LLP, Steptoe & Johnson LLP, and Lazard Ltd. and (ii) the DIP Agent and its counsel, Emmet, Marvin & Martin, LLP).

41.     *"DIP Lenders"* means EchoStar and the other lenders that may become party to the DIP Loan Agreement from time to time, each in their capacity as such.

42.     *"DIP Loan Agreement"* means that certain Debtor-In-Possession Credit, Security & Guaranty Agreement, dated as of October 19, 2010, by and among TSN, as borrower, each of the other Debtors, as guarantors, the DIP Agent and the DIP Lenders, as may be amended, modified, ratified, extended, renewed, or restated, as well as any other documents entered into in connection therewith.

43.     *"Disbursing Agent"* means the Reorganized TSN Debtors or the Entity or Entities chosen by the Reorganized TSN Debtors to make or facilitate distributions pursuant to the Plan.

44.     *"Disclosure Statement"* means the disclosure statement that relates to this Plan, as such disclosure statement may be amended, modified, or supplemented (including all exhibits and schedules annexed thereto or referred to therein).

45.	"*Disallowed*" means a finding of the Bankruptcy Court in a Final Order, or provision in the Plan providing that a Disputed Claim or Interest shall not be Allowed.

46.	"*Discount Purchase Price*" means $22.71, the price at which the New Preferred Stock will be issued, as set forth in the EPCA.

47.	"*Disputed Claim*" or "*Disputed [___] Claim*" (with respect to a specific type of Claim, if specified) means a Claim that is not an Allowed Claim or Disallowed Claim as of the relevant date.

48.	"*Disputed Claims Reserve*" means the reserve to be created by the TSN Debtors to hold a contribution of New Common Stock, which reserve shall be held for the benefit of holders of Disputed Claims as of the Effective Date that subsequently become Allowed Claims, for distribution according to the procedures set forth in Article VIII.

49.	"*Distribution Date*" means any of the Initial Distribution Date or the Periodic Distribution Dates.

50.	"*Distribution Record Date*" means the date that the Confirmation Order is entered by the Bankruptcy Court.

51.	"*EchoStar*" means EchoStar Corporation and, where applicable, its Affiliates.

52.	"*Effective Date*" means the first business day after which all provisions, terms and conditions specified in Article X.B have been satisfied or waived pursuant to Article X.C.

53.	"*Entity*" has the meaning set forth in section 101(15) of the Bankruptcy Code.

54.	"*EPCA*" means that certain Equity Purchase and Commitment Agreement, dated as of November __, 2010, by and among Echostar Corporation and TSN (as the same may be amended, modified or supplemented from time to time).

55.	"*Equity Interests*" mean the Interests in TSN.  For the avoidance of doubt, Equity Interests include the TSN Preferred Shares.

56.	"*Estate*" means, as to each Debtor, the estate created for the Debtor in its Chapter 11 Case pursuant to section 541 of the Bankruptcy Code.

57.	"*Exculpated Claim*" means any claim related to any act or omission in connection with, relating to or arising out of the TSN Debtors' restructuring efforts, the TSN Debtors' Chapter 11 Cases, formulation, preparation, dissemination, negotiation or filing of the Disclosure Statement, Plan, DIP Loan Agreement or any contract, instrument, release or other agreement or document created or entered into in connection with the Disclosure Statement or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of consummation of the Plan, the administration and implementation of the Plan, including the issuance of Plan securities, or the distribution of property under the Plan or any other related agreement; *provided, however,* that Exculpated Claims shall not include any act or omission that is determined in a Final Order to have constituted gross negligence, willful misconduct or fraud.  For the avoidance of doubt, no Cause of Action, obligation or liability expressly set forth in or preserved by the Plan or the Schedule of Retained Causes of Action constitutes an Exculpated Claim.

58.	"*Exculpated Party*" means each of:  (a) the TSN Debtors, the Reorganized TSN Debtors and their Affiliates, (b) the Creditors' Committee and the current and former members thereof, in their capacity as such; (c) EchoStar in connection with the Chapter 11 Cases, including but not limited to the DIP Loan Agreement, the EPCA, the Plan, the Disclosure Statement, and related documents, agreements, and releases, and (d) the Indenture Trustees and (e) with respect to each of the foregoing Entities in clauses (a) through (d), such Entities' subsidiaries, affiliates, members, officers, directors, agents, financial advisors, accountants, investment bankers, consultants, attorneys, employees, partners, and representatives, in each case solely in their capacity as such.

59.     *"Executory Contracts and Unexpired Leases"* means contracts and leases to which one or more of the TSN Debtors are party that are subject to assumption or rejection under section 365 of the Bankruptcy Code.

60.     "*Final DIP Order*" means the *Final Order Under Sections 105, 361, 362, 363(c), 364(c)(1), 364 (c)(2), 364(c)(3), 364(d)(1) and 364(e) and 507 of the Bankruptcy Code and Bankruptcy Rules 2002, 4001 and 9014: (i) Authorizing Debtors to Obtain Postpetition Financing; (ii) Authorizing Debtors to Use Cash Collateral; and (iii) Granting Adequate Protection to Prepetition Secured Parties* (Docket No. 181).

61.     *"Final Order"* means, as applicable, an order or judgment of the Bankruptcy Court or other court of competent jurisdiction with respect to the relevant subject matter, which has not been reversed, stayed, modified or amended, and as to which the time to appeal or seek certiorari has expired and no appeal or petition for certiorari has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been or may be filed has been resolved by the highest court to which the order or judgment could be appealed or from which certiorari could be sought or the new trial, reargument or rehearing shall have been denied, resulted in no modification of such order or has otherwise been dismissed with prejudice.

62.     *"Harbinger"* means collectively, investment funds affiliated with Harbinger Capital Partners and Harbinger Capital Management.

63.     *"Holdback Amount"* means, with respect to Accrued Professional Compensation, amounts held back pursuant to an order or orders of the Bankruptcy Court in the Chapter 11 Cases, including the Interim Compensation Order.

64.     *"Holdback Amount Reserve"* means, with respect to Accrued Professional Compensation, a reserve established by the Reorganized TSN Debtors on the Effective Date for the benefit of the Professionals, and to be held in trust for the Professionals, for the payment of the Holdback Amount.

65.     *"Impaired"* has the meaning set forth in section 1124 of the Bankruptcy Code.

66.     *"Impaired Class"* means a Class of Claims or Interests that are Impaired. For the avoidance of doubt, Impaired Classes are Classes 3, 5, 6, 7, and 8 for each Debtor.

67.     *"Indemnification Provisions"* means each of the indemnification provisions, agreements or obligations in place as of the Petition Date, whether in the bylaws, certificates of incorporation or other formation documents in the case of a limited liability company, board resolutions or employment contracts, for the TSN Debtors and the current directors, officers, members (including *ex officio* members), employees, attorneys, other professionals and agents of the TSN Debtors.

68.     *"Indenture Trustees"* means, collectively, the Senior Secured Notes Indenture Trustee/Agent and the Senior Exchangeable Notes Indenture Trustee.

69.     *"Indentures"* means, collectively, the Senior Secured Notes Indenture and the Senior Exchangeable Notes Indenture.

70.     *"Initial Distribution Date"* means the date occurring on or as soon as reasonably practicable after the Effective Date when distributions under the Plan shall commence.

71.     *"Insurance Policies"* means, collectively, all of the TSN Debtors' insurance policies listed on the schedule of Insurance Policies to be included in the Plan Supplement.

72.     *"Intercompany Claim"* means any Claim held by a TSN Debtor against another TSN Debtor. The TSN Debtors shall include a schedule listing all Intercompany Claims in the Plan Supplement.

73.     *"Intercompany Interests"* mean the Interests in a TSN Debtor held by another TSN Debtor.

74. "*Interest*" means any equity security in a TSN Debtor as defined in section 101(16) of the Bankruptcy Code, including all issued, unissued, authorized or outstanding shares of capital stock of the TSN Debtors together with any warrants, options or contractual rights to purchase or acquire such equity securities at any time and all rights arising with respect thereto. For the avoidance of doubt, with respect to TSN, the Interests include the TSN Preferred Shares.

75. "*Interim Compensation Order*" means the *Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses for Professionals* (Docket No. 174).

76. "*Lien*" has the meaning set forth in section 101(37) of the Bankruptcy Code.

77. "*Material Contracts or Leases*" means any agreement, lease, user agreement or other type of contract of one or more of the TSN Debtors (a) where consideration has been or will be paid or received by the TSN Debtors or any of its Affiliates in excess of $100,000 in any twelve month period or in excess of $1,000,000 over the remaining term, (b) with an Affiliate, or (c) that relates to the sale, lease or use of spectrum, capacity or satellites (other than as contemplated by the Agreed Budget, as defined in the DIP Loan Agreement).

78. "*New Board*" means, with respect to each Reorganized TSN Debtor, the initial board of directors of such Entity appointed as of the Effective Date, the members of which shall be determined in accordance with Article V.J.

79. "*New By-Laws*" means, with respect to each Reorganized TSN Debtor, the new by-laws of such Entity, the form of which shall be included in the Plan Supplement and shall be reasonably satisfactory to the Plan Sponsor.

80. "*New Certificate of Incorporation*" means, with respect to each Reorganized TSN Debtor, the form of the initial certificate of incorporation (or other applicable formation document) of each such Entity, the form of which shall be included in the Plan Supplement and shall be reasonably satisfactory to the Plan Sponsor.

81. "*New Common Stock*" means a certain number of shares of common stock of Reorganized TSN authorized pursuant to the Plan, of which up to 23,263,176 shares shall be initially issued and outstanding as of the Effective Date, which shares shall be subject to dilution by the conversion of the New Preferred Stock into common stock of Reorganized TSN.

82. "*New Corporate Governance Documents*" means the New Certificates of Incorporation, the New Shareholders Agreement and the New By-Laws, substantially final forms of each of which shall be filed with the Bankruptcy Court in the Plan Supplement.

83. "*New Employment Agreements*" means employment agreements that the TSN Debtors shall enter into with certain individuals in the TSN Debtors' senior management, the form of which shall be included in the Plan Supplement and shall be reasonably satisfactory to the Plan Sponsor.

84. "*New Equity*" means the New Common Stock and the New Preferred Stock.

85. "*New Preferred Stock*" means newly issued Series A Preferred Convertible Stock to be issued on the Effective Date in connection with the Rights Offering, the Backstop Commitment Fee and, if purchased, the Overallotment, the terms and conditions of which shall be set forth in the New Preferred Stock Certificate of Designation.

86. "*New Preferred Stock Certificate of Designation*" means the certificate of designation dated as of the Effective Date governing the terms and conditions of the New Preferred Stock, the form of which shall be included in the Plan Supplement and shall be reasonably satisfactory to the Plan Sponsor.

87. "*New Shareholders Agreement*" means that certain agreement to be executed on or before the Effective Date providing for, among other things, the rights and obligations of the holders of the New Common

Stock, the form of which will be filed as part of the Plan supplement and shall be reasonably acceptable to the Plan Sponsor.

88.     *"Non-Backstopped Shares"* means shares of New Preferred Stock issuable in connection with the Rights Offering that are not subject to the Backstop Party's backstop obligations described herein and in the EPCA, if any.

89.     *"Non-Debtor Affiliate"* means any Affiliate of the TSN Debtors that is not a TSN Debtor.

*90.*     *"Non-TSN Debtors"* means TerreStar New York Inc.; Motient Communications Inc.; Motient Holdings Inc.; Motient License Inc.; Motient Services Inc.; Motient Ventures Holding Inc.; and MVH Holdings Inc.

91.     *"Notes"* means, collectively, the Senior Secured Notes and the Senior Exchangeable Notes.

92.     *"Notes Claims"* means, collectively, the Senior Secured Notes Claims and the Senior Exchangeable Notes Claims.

93.     *"Notice and Claims Agent"* means Garden City Group, Inc., located at P.O. Box 9576, Dublin, Ohio 43017-4876, (866) 405-2137, retained as the TSN Debtors' notice, claims and solicitation agent.

*94.*     *"Ordinary Course Professional Order"* means the *Order Authorizing the Debtors' Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business* (Docket No. 173).

95.     *"Other Debtors"* means all of the Debtors other than TSN.

96.     *"Other Priority Claim"* means any Claim accorded priority in right of payment under section 507(a) of the Bankruptcy Code, other than:  (a) an Administrative Claim; (b) a DIP Claim; or (c) a Priority Tax Claim.

97.     *"Other Secured Claims"* means a Secured Claim against the TSN Debtors, other than the PMCA Claims and the Senior Secured Notes Claims.

98.     *"Other Unsecured Claims"* means any Allowed unsecured claim against any TSN Debtor, other than a Senior Exchangeable Notes Claim and an Unsecured Convenience Claim, including without limitation, a trade claim, an unsecured claim held by a Non-Debtor Affiliate of the TSN Debtors against the TSN Debtors, or a claim arising out of the rejection of executory contracts or unexpired leases by any TSN Debtor.

99.     *"Overallotment"* means up to $25 million of Additional Shares purchased by the Backstop Party, at its option, in its sole discretion, purchased at the Discount Purchase Price pursuant to the EPCA.

100.     *"Periodic Distribution Date"* means, unless otherwise ordered by the Bankruptcy Court, the first Business Day that is 120 days after the Initial Distribution Date, and for the first year thereafter, the first Business Day that is 120 days after the immediately preceding Periodic Distribution Date.  After one year following the Distribution Date, the Periodic Distribution Date will occur on the first Business Day that is 180 days after the immediately preceding Periodic Distribution Date.  Notwithstanding the foregoing, if the Disbursing Agent determines, in his sole discretion, that there are not sufficient distributions to be made on a date that would otherwise be a Periodic Distribution Date, then the Periodic Distribution Date shall be the on last business day of the subsequent calendar quarter.

101.     *"Person"* has the meaning set forth in section 101(41) of the Bankruptcy Code.

102.     *"Petition Date"* means October 19, 2010.

103.     *"Plan"* means this *Joint Chapter 11 Plan of TerreStar Networks, Inc., TerreStar National Services, Inc., 0887729 B.C. Ltd., TerreStar License Inc., TerreStar Networks Holdings (Canada) Inc., and*

*TerreStar Networks (Canada) Inc.* and all exhibits hereto, including the Plan Supplement, which is incorporated herein by reference.

104. *"Plan Securities"* means, collectively, the New Common Stock and the New Preferred Stock.

105. *"Plan Sponsor"* means Echostar, in its capacity as plan sponsor.

106. *"Plan Supplement"* means the compilation of documents and forms of documents, schedules and exhibits to the Plan to be filed by the TSN Debtors by the Plan Supplement Filing Date compromised of, without limitation, the following: (a) the New Corporate Governance Documents, (b) the identity of the known members of the New Boards and the nature and compensation for any director who is an "insider" under the Bankruptcy Code; (c) the Rejected Executory Contract and Unexpired Lease List; (d) the Registration Rights Agreement; (e) the Schedule of Retained Causes of Action; (f) the New Preferred Stock Certificate of Designation; (g) the New Employment Agreements; (h) a schedule of the Insurance Policies; (i) a schedule of Intercompany Claims; and all exhibits, attachments, supplements, annexes, schedules, and ancillary documents related to each of the foregoing.

107. *"Plan Supplement Filing Date"* means the date on which the Plan Supplement shall be filed with the Bankruptcy Court, which date shall be at least ten days prior to the Voting Deadline or such later date as may be approved by the Bankruptcy Court without further notice; provided, however, that the identity of the initial members of the New Boards and the nature and compensation for any director who is an "insider" under the Bankruptcy Code known at the time shall not be required to be disclosed and filed with the Bankruptcy Court until 10 days prior to the Confirmation Hearing or such later date as may be approved by the Bankruptcy Court without further notice.

108. *"Plan Support Agreement"* means that certain agreement, dated as of October 19, 2010, by and between the Debtors, certain Non-Debtor Affiliates, and EchoStar, as amended, supplemented or modified from time to time.

109. *"PMCA Claims"* means the Allowed Claims derived from or based upon the Purchase Money Credit Agreement, in an aggregate amount of approximately $91.5 million.

110. *"Priority Tax Claim"* means any Claim of a governmental unit, as defined in section 101(27) of the Bankruptcy Code, of the kind specified in section 507(a)(8) of the Bankruptcy Code.

111. *"Pro Rata"* means, as applicable: (a) the proportion that an Allowed Claim or Interest in a particular Class bears to the aggregate amount of Allowed Claims or Interests in that Class; (b) the proportion that all Allowed Claims or Interests in a particular Class bear to the aggregate amount of Allowed Claims or Interests in such Class and other Classes entitled to share in the same recovery under the Plan; or (c) with respect to a participant in the Rights Offering who, in accordance with the Rights Offering Procedures, elects to exercise their right to purchase Non-Backstopped Shares or any Rights Offering Preferred Stock not purchased by other participants thereof or by the Backstop Party (in its capacity as holder of the Senior Secured Notes Claims), the proportion that (i) the amount of shares of Rights Offering Preferred Stock requested to be purchased by such participant (prior to issuance of the Backstopped Shares) bears to (ii) the aggregate amount of shares of Rights Offering Preferred Stock requested to be purchased by all other Rights Offering participants (excluding the Backstop Party) who elect to purchase Non-Backstopped Shares (prior to issuance of the Non-Backstopped Shares) or any Rights Offering Preferred Stock not purchased by other participants thereof or by the Backstop Party (in its capacity as holder of the Senior Secured Notes Claims).

112. *"Professional"* means an Entity: (a) retained pursuant to a Final Order in accordance with sections 327, 363 or 1103 of the Bankruptcy Code and to be compensated for services rendered before or on the Effective Date, pursuant to sections 327, 328, 329, 330, 363 and 331 of the Bankruptcy Code or (b) awarded compensation and reimbursement by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code.

113. *"Proof of Claim"* means a proof of Claim filed against any of the TSN Debtors in the Chapter 11 Cases.

114. "*Purchase Money Agent*" means the U.S. Bank National Association as Collateral Agent under the PMCA.

115. "*Purchase Money Credit Agreement*" means the Purchase Money Credit Agreement, dated as of February 5, 2008, among TSN, as borrower, each of the guarantors named therein, the lenders party thereto and the Purchase Money Agent.

116. "*Purchase Money Lenders*" means those lenders party to the Purchase Money Credit Agreement from time to time.

117. "*Registration Rights Agreement*" means the Registration Rights Agreement, dated as of the Effective Date, among the holders of the Senior Notes Claims and Reorganized TSN, the form of which will be included in the Plan Supplement and shall be reasonably satisfactory to the Plan Sponsor.

118. "*Rejected Executory Contract and Unexpired Lease List*" means the list (as may be amended) of Executory Contracts and Unexpired Leases that will be rejected by the TSN Debtors pursuant to the provisions of Article VI determined by the TSN Debtors; provided, however, that the disposition of any Material Contracts or Lease shall be determined by the TSN Debtors, with the reasonable consent of the Plan Sponsor.

119. "*Rejection Claim*" means a Claim arising from the rejection of an Executory Contract or Unexpired Lease pursuant to section 365 of the Bankruptcy Code.

120. "*Releasing Parties*" means all Entities who have held, hold or may hold Claims or Interests that have been released pursuant to Article IX.B or Article IX.C, discharged pursuant to Article IX.E or are subject to exculpation pursuant to Article IX.D.

121. "*Released Party*" means each of (in each case solely in their respective capacities): (a) the current and former directors and officers of the TSN Debtors who were directors or officers of the TSN Debtors as of or after the Petition Date; (b) the Indenture Trustees; (c) the Purchase Money Agent; (d) the DIP Lenders; (e) the Backstop Party; (f) the Plan Sponsor; (g) the Purchase Money Lenders; (h) the holders of the Notes, to the extent such parties vote to accept the Plan; (i) the DIP Agent; (j) the Creditors' Committee and the current and former members thereof; (k) Deloitte & Touche Inc., in its capacity as information officer in the Canadian Proceedings; and (l) with respect to each of the foregoing Entities in clauses (a) through (k), such Entities' subsidiaries, affiliates, members, officers, directors, agents, financial advisors, accountants, investment bankers, consultants, attorneys, employees, partners, and representatives, in each case, only in their capacity as such.

122. "*Reorganized*" means, with respect to the TSN Debtors, any TSN Debtor or any successor thereto, by merger, consolidation or otherwise, on or after the Effective Date.

123. "*Restructuring Transactions*" means a dissolution or winding up of the corporate existence of a debtor or the consolidation, merger, restructuring, conversion, dissolution, transfer, liquidation, contribution of assets, or other transaction pursuant to which a Reorganized TSN Debtor merges with or transfers substantially all of its assets and liabilities to a Reorganized TSN Debtor or newly formed Entity, prior to, on or after the Effective Date, as provided for in Article V.N of the Plan.

124. "*Rights*" means the non-certified subscription rights to purchase the Rights Offering Preferred Stock issued in connection with the Rights Offering on the terms and subject to the conditions set forth in the Plan, the Rights Offering Procedures, and the EPCA.

125. "*Rights Offering*" means the offering of the Rights by TSN to the Holders of the Senior Secured Notes Claims, Senior Exchangeable Notes Claims and Other Unsecured Claims to purchase the Rights Offering Preferred Stock, in accordance with the Rights Offering Procedures, the Plan and the EPCA.

126.    *"Rights Offering Preferred Stock"* means $125 million in face amount of New Preferred Stock to be issued on the Effective Date in connection with the Rights Offering, $100 million of which will be backstopped by the Backstop Party.

127.    *"Rights Offering Procedures"* means the procedures governing the Rights Offering, as agreed upon by the Backstop Party and the TSN Debtors and approved by the Bankruptcy Court, and described in the Disclosure Statement, the EPCA and offering documents relating to the Rights Offering.

128.    *"Schedule of Retained Causes of Action"* means the schedule, to be included as part of the Plan Supplement, listing the Causes of Action to be retained by the Reorganized TSN Debtors after the Effective Date.

129.    *"Schedules"* means, collectively, the schedules of assets and liabilities, schedules of Executory Contracts and Unexpired Leases and statements of financial affairs filed by the TSN Debtors pursuant to section 521 of the Bankruptcy Code and in substantial accordance with the Official Bankruptcy Forms, as may be amended from time to time before entry of a final decree.

130.    *"SEC"* means the Securities and Exchange Commission.

131.    *"Secured"* means, when referring to a Claim:  (a) secured by a Lien on property in which the Estate of the TSN Debtor against which the Claim is asserted has an interest, which Lien is valid, perfected and enforceable pursuant to applicable law or by reason of a Bankruptcy Court order, to the extent of the value of the creditor's interest in the Estate's interest in such property as determined pursuant to section 506(a) of the Bankruptcy Code; (b) subject to setoff pursuant to section 553 of the Bankruptcy Code, to the extent of the value of the property subject to setoff; or (c) otherwise Allowed by Final Order of the Court (which may be the Confirmation Order) as a Secured Claim.

132.    *"Securities Act"* means the U.S. Securities Action of 1933, as amended.

133.    *"Senior Exchangeable Notes"* means the 6.5% senior exchangeable payment-in-kind notes, issued by TSN pursuant to the Senior Exchangeable Notes Indenture.

134.    *"Senior Exchangeable Notes Claims"* means the Allowed Claims arising under the Senior Exchangeable Notes, in an aggregate amount of approximately $178.7 million.

135.    *"Senior Exchangeable Notes Indenture"* means the Indenture, dated as of February 7, 2008 between TSN, as issuer, each of the guarantors named therein and the Senior Exchangeable Notes Indenture Trustee, as well as any guarantees and other documents entered into in connection therewith.

136.    *"Senior Exchangeable Notes Indenture Trustee"* means Deutsche Bank National Trust Company and/or its predecessors and duly appointed successors, in its capacity as indenture trustee under the Senior Exchangeable Notes Indenture.

137.    *"Senior Secured Notes"* means the 15% senior secured payment-in-kind notes, issued by TSN pursuant to the Senior Secured Notes Indenture.

138.    *"Senior Secured Notes Claims"* means the Allowed Claims arising under the Senior Secured Notes, in an aggregate amount of approximately $1,016.7 million.

139.    *"Senior Secured Notes Indenture"* means the Indenture, dated as of February 14, 2007 between TSN, as issuer, the guarantors from time to time party thereto and the Senior Secured Notes Indenture Trustee, as well as any guarantees and other documents entered into in connection therewith, and as amended by those certain First and Second Supplemental Indentures, each dated as of February 7, 2008.

140.    *"Senior Secured Notes Indenture Trustee/Agent"* means U.S. Bank National Association and/or its duly appointed successor, in its capacity as indenture trustee and collateral agent under the Senior Secured Notes Indenture.

141.    *"Senior Secured Notes Security Agreements*" means, collectively:  (i) the Security Agreement, dated as of February 14, 2007, among TSN and the domestic guarantors to the Senior Secured Notes Indenture, as grantors, and U.S. Bank National Association, as trustee and collateral agent for the holders of the Senior Secured Notes;  and (ii) the Security Agreement, dated as of February 14, 2007, among TSN and the Canadian guarantors to the Senior Secured Notes Indenture, as grantors, and U.S. Bank National Association, as trustee and collateral agent for the holders of the Senior Secured Notes.

142.    *"Subscription Expiration Date"* means 5:00 p.m. (prevailing Eastern Time) on [____], 2011.

143.    *"Subscription Record Date"* means the record date established by TSN and approved by the Bankruptcy Court in connection with the Rights Offering, as provided in the EPCA.

144.    *"Transaction Expenses"* has the meaning ascribed to it in the EPCA.

145.    *"TSC"* means TerreStar Corporation.

146.    *"TSN*" means TerreStar Networks Inc.

147.    *"TSN Debtors*" means TerreStar Networks, Inc., TerreStar National Services, Inc., 0887729 B.C. Ltd., TerreStar License Inc., TerreStar Networks Holdings (Canada) Inc., and TerreStar Networks (Canada) Inc.

148.    *"TSN Preferred Shares*" means collectively, the TSN Series A Preferred Shares and the TSN Series B Preferred Shares.

149.    *"TSN Series A Preferred Shares*" means the one share of non-voting Series A preferred stock of TSN, which was issued to EchoStar.

150.    *"TSN Series B Preferred Shares*" means the one share of non-voting Series B preferred stock of TSN, which was issued to Harbinger.

151.    *"Unimpaired"* means any Claim or Interest that is not designated as Impaired.

152.    *"Unsecured Convenience Claims*" means any prepetition unsecured claim against any of the TSN Debtors that, but for being defined as a Unsecured Convenience Claim, would be an Other Unsecured Claim, and either (a) is Allowed in an amount of $25,000 or less or (b) is Allowed in an amount greater than $25,000, but is subject to an irrevocable election by the holder thereof to reduce the Allowed amount of the Other Unsecured Claim to $25,000 for the purpose of rendering such Claim an Unsecured Convenience Claim.

153.    *"Unsubscribed Shares"* means those shares of New Preferred Stock issued in connection with the Rights Offering that are not subscribed for pursuant to the Rights Offering as of the Subscription Expiration Date.

154.    *"U.S. Trustee"* means the United States Trustee for the Southern District of New York.

155.    *"U.S. Trustee Fees"* means fees arising under 28 U.S.C. § 1930(a)(6) or accrued interest thereon arising under 31 U.S.C. § 3717.

156.    *"Voting Deadline*" means 5:00 p.m. (prevailing Eastern Time) on [____], 2011.

B.      *Rules of Interpretation*

For purposes of this Plan: (a) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine or neuter gender shall include the masculine, feminine and the neuter gender; (b) any reference herein to a contract, lease, instrument, release, indenture or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; (c) any reference herein to an existing document or exhibit having been filed or to be filed shall mean that document or exhibit, as it may thereafter be amended, modified or supplemented; (d) unless otherwise specified, all references herein to "Articles" are references to Articles hereof or hereto; (e) unless otherwise stated, the words "herein," "hereof" and ''hereto'' refer to the Plan in its entirety rather than to a particular portion of the Plan; (f) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation hereof; (g) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; and (h) any immaterial effectuating provisions may be interpreted by the Reorganized TSN Debtors in a manner that is consistent with the overall purpose and intent of the Plan all without further Bankruptcy Court order.

C.      *Computation of Time*

The provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein.

D.      *Governing Law*

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of New York, without giving effect to the principles of conflict of laws, shall govern the rights, obligations, construction and implementation of the Plan, any agreements, documents, instruments or contracts executed or entered into in connection with the Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreement shall control); *provided, however,* that corporate governance matters relating to the TSN Debtors or the Reorganized TSN Debtors, as applicable, not incorporated in New York shall be governed by the laws of the jurisdiction of incorporation of the applicable TSN Debtor or Reorganized TSN Debtor, as applicable.

E.      *Reference to Monetary Figures*

All references in the Plan to monetary figures shall refer to currency of the United States of America, unless otherwise expressly provided.

F.      *Settlement of Certain Inter-Creditor Issues*

As discussed in detail in the Disclosure Statement and as otherwise provided herein, pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good faith compromise of all Claims, Interests and controversies relating to the contractual, legal and subordination rights that a holder of a Claim may have with respect to any Allowed Claim or Interest, or any distribution to be made on account of such Allowed Claim or Interest.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the TSN Debtors, their Estates and holders of Claims and Interests and is fair, equitable and reasonable.

## ARTICLE II.

## ADMINISTRATIVE CLAIMS, DIP CLAIMS, U.S. TRUSTEE FEES AND PRIORITY TAX CLAIMS

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, DIP Claims, U.S. Trustee Fees and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Article III and shall have the following treatment:

*A.      Administrative Claims*

1.      Administrative Claims

Except with respect to Administrative Claims that are Claims for Accrued Professional Compensation and except to the extent that a holder of an Allowed Administrative Claim agrees to less favorable treatment, each holder of an Allowed Administrative Claim shall, in complete satisfaction of such Allowed Administrative Claim, be paid Cash in the full amount of such Allowed Administrative Claim on the later of: (a) the Initial Distribution Date; (b) the first date such Administrative Claim is Allowed or as soon as reasonably practicable thereafter; and (c) the date such Allowed Administrative Claim becomes due and payable by its terms, or as soon thereafter as is reasonably practicable.

2.      Professional Compensation

(a)      Claims for Accrued Professional Compensation

Professionals or other Entities asserting a Claim for Accrued Professional Compensation for services rendered before the Effective Date must file and serve on the TSN Debtors and such other Entities who are designated by the Bankruptcy Rules, the Confirmation Order, the Interim Compensation Order or order of the Bankruptcy Court an application for final allowance of such Claim for Accrued Professional Compensation no later than 30 days after the Effective Date.  Objections to any Claim for Accrued Professional Compensation must be filed and served on the Reorganized TSN Debtors, the Creditors' Committee, the Office of the U.S. Trustee and the requesting party no later than the earlier of (a) 45 days after such application is filed or (b) 75 days after the Effective Date.

(b)      Treatment of Claims for Accrued Professional Compensation

A Claim for Accrued Professional Compensation in respect of which a final fee application has been properly filed and served pursuant to Article II(A)(2)(a) shall be payable to the extent approved by order of the Bankruptcy Court.  Subject to the Holdback Amount, on the Effective Date, or as soon thereafter as reasonably practicable, to the extent not otherwise paid, all Allowed Claims for Accrued Professional Compensation (including estimated Accrued Professional Compensation through the Effective Date) shall be paid in full in Cash.  To receive payment on the Effective Date for unbilled fees and expenses incurred through the Effective Date, each Professional shall reasonably estimate fees and expenses due for unbilled fees and expenses for periods that will not have been billed as of the Effective Date and shall deliver such estimates to the TSN Debtors, the Plan Sponsor and the U.S. Trustee prior to the Effective Date.  If the estimated payment received by such Professional exceeds the actual allowed Accrued Professional Compensation for the estimated period, such excess amount shall be deducted from the Holdback Amount for such Professional and if the Holdback Amount is insufficient, such Professional shall disgorge the difference.  If the estimated payment received by the Professional is lower than the Accrued Professional Compensation of such Professional, the difference shall be promptly paid to the Professional.

On the Effective Date, the Reorganized TSN Debtors shall fund the Holdback Amount Reserve for payment of the Holdback Amount.  Upon final allowance by the Bankruptcy Court of the Accrued Professional Compensation, or entry of an earlier order of the Bankruptcy Court granting the release of the Holdback Amount, such amount, less any excess paid in connection with estimated fees and expenses through the Effective Date, shall be paid promptly and directly to the Professionals.

(c) Post- Effective Date Fees and Expenses

Upon the Effective Date, any requirement that Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Reorganized TSN Debtors may employ and pay any Professional for services rendered or expenses incurred after the Effective Date in the ordinary course of business without any further notice to any party or action (including, without limitation, without the need to file a fee application), order or approval of the Bankruptcy Court.

### 3. Administrative Claim Bar Date

Except as otherwise provided in this Article II.A, requests for payment of Administrative Claims must be filed and served on the Reorganized TSN Debtors pursuant to the procedures specified in the Confirmation Order and the notice of entry of the Confirmation Order no later than 45 days after the Effective Date. Holders of Administrative Claims that are required to, but do not, file and serve a request for payment of such Administrative Claims by such date shall be forever barred, estopped and enjoined from asserting such Administrative Claims against the TSN Debtors or Reorganized TSN Debtors or their property and such Administrative Claims shall be deemed discharged as of the Effective Date. Objections to such requests, if any, must be filed and served on the Reorganized TSN Debtors and the requesting party no later than 90 days after the Effective Date. Notwithstanding the foregoing, no request for payment of an Administrative Claim need be filed with respect to an Administrative Claim previously Allowed by Final Order, including all Administrative Claims expressly Allowed under this Plan.

### B. DIP Claims

On the Effective Date, unless otherwise agreed to by the DIP Lenders, the DIP Claims shall be paid in full in Cash as provided under the DIP Loan Agreement. Upon payment and satisfaction in full of all Allowed DIP Claims, all liens and security interests granted to secure such obligations shall be terminated and immediately released and the DIP Lenders shall execute and deliver to the Reorganized TSN Debtors such instruments of release, satisfaction and/or assignments (in recordable form) as may be reasonably requested by the Reorganized TSN Debtors.

### C. U.S. Trustee Fees

On the Effective Date, the TSN Debtors shall pay all U.S. Trustee Fees that are due and owing on the Effective Date.

### D. Priority Tax Claims

Each holder of an Allowed Priority Tax Claim due and payable on or before the Effective Date shall receive, on the Distribution Date, at the option of the TSN Debtors (which option shall be reasonably satisfactory to the Plan Sponsor), one of the following treatments, in complete satisfaction of such Allowed Priority Tax Claim: (1) Cash in an amount equal to the amount of such Allowed Priority Tax Claim; (2) Cash in an aggregate amount of such Allowed Priority Tax Claim payable in installment payments over a period of time not to exceed five years after the Petition Date, pursuant to section 1129(a)(9)(C) of the Bankruptcy Code; or (3) such other treatment as may be agreed upon by such holder and the TSN Debtors or otherwise determined upon an order of the Bankruptcy Court.

## ARTICLE III.

## CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

### A. General Rules of Classification

(i) Pursuant to section 1122 of the Bankruptcy Code, set forth below is a designation of Classes of Claims against and Interests in the TSN Debtors. A Claim or Interest is placed in a particular Class only to the

extent that the Claim or Interest falls within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest falls within the description of such other Classes. A Claim or Interest is also placed in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim or Interest is an Allowed Claim in that Class and such Claim or Interest has not been paid, released, or otherwise settled prior to the Effective Date.

(ii) The TSN Debtors shall be treated as if they were consolidated solely for Plan voting, confirmation and distribution purposes as described in Article VII; provided, however, that if any Class of Impaired Claims votes to reject the Plan, the TSN Debtors' ability to confirm the Plan with respect to such rejecting Class pursuant to the cramdown standards of section 1129(b) of the Bankruptcy Code will be determined by reference to the treatment to which the holders of Claims in such Class would be entitled were (i) their Claims limited to the specific TSN Debtor(s) that are liable for such Claims, and (ii) the TSN Debtors not treated as consolidated for distribution and confirmation purposes. This limited consolidation treatment is designed to consensually pool the assets and liabilities of the TSN Debtors solely to implement the settlements and compromises reached by the primary constituencies in the TSN Debtors' Chapter 11 Cases.

B.    *Summary of Classification*

The following chart represents the general classification of Claims and Interests against the TSN Debtors pursuant to the Plan:

| Class | Claim | Status | Voting Rights |
|:---:|---|:---:|:---:|
| 1 | Other Priority Claims | Unimpaired | No (deemed to accept) |
| 2 | Other Secured Claims | Unimpaired | No (deemed to accept) |
| 3 | Senior Secured Notes Claims | Impaired | Yes |
| 4 | PMCA Claims | Unimpaired | No (deemed to accept) |
| 5 | Senior Exchangeable Notes Claims | Impaired | Yes |
| 6 | Other Unsecured Claims | Impaired | Yes |
| 7 | Unsecured Convenience Claims | Impaired | Yes |
| 8 | Equity Interests | Impaired | No (deemed to reject) |

C.    *Treatment of Claims and Interests*

1.    Class 1 – Other Priority Claims

(a)    *Classification:*  Class 1 consists of Other Priority Claims.

(b)    *Treatment:*  Except to the extent that a holder of an Allowed Other Priority Claim (i) has been paid by the TSN Debtors, in whole or in part, prior to the Effective Date or (ii) agrees to a less favorable treatment, each holder of an Allowed Other Priority Claim shall receive, on the Initial Distribution Date and in full satisfaction, settlement, release, and discharge of, and in exchange for such Other Priority Claim, Cash in the full amount of such Allowed Other Priority Claim.

(c)    *Voting:*  Class 1 is Unimpaired, and the holders of Other Priority Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, holders of Other Priority Claims are not entitled to vote to accept or reject the Plan.

2.    Class 2 – Other Secured Claims

(a) *Classification:* Class 2 consists of Other Secured Claims. Although all Other Secured Claims have been placed in one Class for the purposes of nomenclature, each Other Secured Claim, to the extent secured by a Lien on any property or interest in property of the TSN Debtors different than that securing any other Other Secured Claims, shall be treated as being in a separate sub-Class for the purpose of receiving distributions under the Plan.

(b) *Treatment:* On the Initial Distribution Date, except to the extent that a holder of an Allowed Other Secured Claim agrees to a less favorable treatment, at the option of the TSN Debtors or the Reorganized TSN Debtors (which option shall be reasonably satisfactory to the Plan Sponsor), (i) each Allowed Other Secured Claim shall be reinstated and Unimpaired in accordance with section 1124(2) of the Bankruptcy Code, or (ii) each holder of an Allowed Other Secured Claim shall receive, in full satisfaction, settlement, release, and discharge of, and in exchange for, such Other Secured Claim, either (w) Cash in the full amount of such Allowed Other Secured Claim, including any postpetition interest accrued pursuant to section 506(b) of the Bankruptcy Code, (x) the proceeds of the sale or disposition of the collateral securing such Allowed Other Secured Claim to the extent of the value of the holder's secured interest in such collateral, (y) the collateral securing such Allowed Other Secured Claim and any interest on such Allowed Other Secured Claim required to be paid pursuant to section 506(b) of the Bankruptcy Code, or (z) such other distribution as necessary to satisfy the requirements of section 1129 of the Bankruptcy Code.

(c) *Voting:* Class 2 is Unimpaired, and the holders of Other Secured Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, holders of Other Secured Claims are not entitled to vote to accept or reject the Plan.

3. Class 3 – Senior Secured Notes Claims

(a) *Classification:* Class 3 consists of the Senior Secured Notes Claims.

(b) *Treatment:* Each holder of an Allowed Senior Secured Notes Claim shall receive its Pro Rata share of the Class 3 Distribution.

(c) *Voting:* Holders of Senior Secured Notes Claims are Impaired. Therefore, each holder of a Senior Secured Notes Claim is entitled to vote to accept or reject the Plan.

4. Class 4 – PMCA Claims

(a) *Classification:* Class 4 consists of the PMCA Claims.

(b) *Treatment:* The PMCA Claims will be reinstated pursuant to section 1124 of the Bankruptcy Code.

(c) *Voting:* Class 4 is Unimpaired, and the holders of PMCA Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, holders of PMCA Claims are not entitled to vote to accept or reject the Plan.

5. Class 5 – Senior Exchangeable Notes Claims

(a) *Classification:* Class 5 consists of the Senior Exchangeable Notes Claims.

(b) *Treatment:* Each holder of a Senior Exchangeable Notes Claim shall receive, on the Initial Distribution Date, its Pro Rata share of the Class 5 Distribution.

(c)    *Voting:*  Holders of Senior Exchangeable Notes Claims are Impaired. Therefore, each holder of a Senior Exchangeable Notes Claim is entitled to vote to accept or reject the Plan.

6.   Class 6 – Other Unsecured Claims

(a)    *Classification:*  Class 6 consists of the Other Unsecured Claims.

(b)    *Treatment:*  Unless such holder has made a Convenience Class Election, each holder of an Allowed Other Unsecured Claim shall receive its Pro Rata share of the Class 6 Distribution.

(c)    *Voting:*  Holders of Other Unsecured Claims are Impaired. Therefore, each holder of an Other Unsecured Claim is entitled to vote to accept or reject the Plan.

7.   Class 7 – Unsecured Convenience Claims

(a)    *Classification:*  Class 7 consists of Unsecured Convenience Claims.

(b)    *Treatment:*  Each holder of an Allowed Unsecured Convenience Claim shall receive Cash in an amount equal to the lesser of: (i) 10% of such holders' Unsecured Convenience Claim; and (ii) such holder's Pro Rata share of $500,000.

(c)    *Voting:*  Class 7 is Impaired by the Plan. Therefore, each holder of an Unsecured Convenience Claim is entitled to vote to accept or reject the Plan.

8.   Class 8 – Equity Interests in TSN

(a)    *Classification:*  Class 8 consists of all Equity Interests.

(b)    *Treatment:*  On the Effective Date, all Equity Interests shall be deemed cancelled and shall be of no further force and effect, whether surrendered for cancellation or otherwise, and there shall be no distribution to the holders of Equity Interests.

(c)    *Voting:*  Class 8 is Impaired, and the holders of Equity Interests are conclusively presumed to have rejected the Plan. Therefore, holders of Equity Interests are not entitled to vote to accept or reject the Plan.

## ARTICLE IV.

## ACCEPTANCE REQUIREMENTS

A.    *Acceptance or Rejection of the Plan*

1.   Voting Class

Classes 3, 5, 6 and 7 are Impaired under the Plan and are receiving property under the Plan. Therefore, such Classes are entitled to vote to accept or reject the Plan.

2.   Presumed Acceptance of the Plan

Classes 1, 2, and 4 are Unimpaired under the Plan and are, therefore, conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.

B.        *Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code*

Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation by acceptance of the Plan by an Impaired Class of Claims.  The TSN Debtors shall seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Interests.  The TSN Debtors reserve the right to modify the Plan in accordance with Article XI hereof to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification.

## ARTICLE V.

## MEANS FOR IMPLEMENTATION OF THE PLAN

A.        *Limited Consolidation for Voting, Confirmation and Distribution Purposes*

1.    This Plan provides for substantive consolidation of the TSN Debtors' Estates, but solely for purposes of voting, confirmation, and making distributions to the holders of Allowed Claims under this Plan. On the Effective Date, and solely for purposes of voting, confirmation, and making distributions to the holders of Allowed Claims under this Plan: (a) all guarantees of any TSN Debtor of the payment, performance or collection of another TSN Debtor with respect to Claims against such TSN Debtor shall be eliminated and cancelled; (b) any single obligation of multiple Debtors shall be treated as a single obligation in the consolidated Chapter 11 Cases; and (c) all guarantees by a TSN Debtor with respect to Claims against one or more of the other TSN Debtors shall be treated as a single obligation in the consolidated Chapter 11 Cases. On the Effective Date, and in accordance with the terms of this Plan and the consolidation of the assets and liabilities of the TSN Debtors, all Claims based upon guarantees of collection, payment, or performance made by a TSN Debtor as to the obligation of another TSN Debtor shall be released and of no further force and effect. Except as set forth in this Article V.A.1, such substantive consolidation shall not affect (a) the legal and corporate structure of the Reorganized TSN Debtors, or (b) any obligations under any leases or contracts assumed in this Plan or otherwise after the Petition Date.

2.    Such election to treat the Estates as if they were consolidated solely for the purpose of implementing the Plan shall not affect: (1) the legal and corporate structures of the TSN Debtors, subject to the right of the TSN Debtors to effect the Restructuring Transactions contemplated pursuant to the Plan; (2) any obligations under any contracts or leases that were entered into during the Chapter 11 Cases or Executory Contracts and unexpired leases that have been or will be assumed pursuant to the Plan; (3) Intercompany Interests; (4) distributions from any insurance policies or proceeds of such policies; (5) the revesting of assets in the separate Reorganized TSN Debtors pursuant to Article V.N of the Plan.  In addition, such election to treat the Estates as consolidated for the purpose of implementing the Plan will not constitute a waiver of the mutuality requirement for setoff under section 553 of the Bankruptcy Code, except to the extent otherwise expressly waived by the TSN Debtors.

B.        *Intercompany Claims*

Each Allowed Intercompany Claim shall be reinstated on the Effective Date, except as otherwise determined to by the TSN Debtors with the reasonable consent of the Plan Sponsor.  After the Effective Date, the Reorganized TSN Debtors shall have the right to resolve or compromise Disputed Intercompany Claims without approval of the Bankruptcy Court.

C.        *Sources of Consideration for Plan Distributions*

1.    <u>Cash Consideration</u>

All Cash consideration necessary for the TSN Debtors or the Reorganized TSN Debtors, as applicable, to make payments or distributions pursuant hereto shall be obtained from the Rights Offering (and the Backstop Party's purchase of the Overallotment, if applicable) or other Cash on hand, including Cash derived from business operations.

D.    *Issuance of New Securities and Debt Instruments*

    1.    <u>Issuance of New Common Stock</u>

On the Effective Date, TSN shall issue the New Common Stock to the Holders of Claims entitled thereto.

    2.    <u>Issuance of New Preferred Stock</u>

On the Effective Date, the Reorganized TSN Debtor shall issue the New Preferred Stock, on such terms and conditions as set forth in the New Preferred Stock Certificate of Designation.

    3.    <u>New Shareholders Agreement</u>

The holders of the New Common Stock and New Preferred Stock shall be parties to the New Shareholders Agreement.  As of the Effective Date, and as a condition to receiving any distribution of New Common Stock or New Preferred Stock, holders of Claims or Interests that receive the New Common Stock or New Preferred Stock shall be deemed bound by the New Shareholders Agreement.

E.    *The Rights Offering*

    1.    <u>General Description</u>

Pursuant to the Rights Offering, TSN will offer and sell the Rights Offering Preferred Stock.  The Rights Offering Preferred Stock shall be subject to the New Preferred Stock Certificate of Designation.

    2.    <u>Rights Offering Procedures</u>

Each holder of Rights will be entitled to exercise such Rights in order to subscribe for and acquire their Pro Rata share of the Rights Offering Preferred Stock, calculated prior to giving effect to dilution resulting from the Backstop Commitment Fee and, if exercised, the Overallotment.  The Rights Offering will be consummated pursuant to the Rights Offering Procedures.

    3.    <u>The Backstop Commitment and Overallotment</u>

Pursuant to the terms of the EPCA, in order to facilitate the Rights Offering and implementation of the Plan, the Backstop Party has agreed to purchase, and TSN has agreed to sell and issue to the Backstop Party, at the Discount Purchase Price: (a) [___] shares of Rights Offering Preferred Stock, and (b) any Unsubscribed Shares, up to the Backstop Amount in accordance with and subject to the terms and conditions of the EPCA.  To the extent that there are Non-Backstopped Shares, participants in the Rights Offering may, subject to a right of first refusal of the Backstop Party with respect to the Non-Backstopped Shares, elect to purchase the Non-Backstopped Shares on a Pro Rata basis.  In addition, the Backstop Party shall have the option to purchase the Overallotment at the Discount Purchase Price pursuant to the EPCA.  On the Effective Date, in accordance with the Backstop Approval Order, (i) the TSN Debtors will pay to the Backstop Party the Transaction Expenses and (ii) the Backstop Party will receive the Backstop Commitment Fee and be entitled to the Backstop Indemnification Obligations.

F.    *Cancellation of Securities and Agreements*

On the Effective Date, except as otherwise specifically provided for in the Plan:  (1) the obligations of the TSN Debtors under the Senior Secured Notes Security Agreement and the Indentures, and any other certificate, share, note, bond, indenture, purchase right, option, warrant or other instrument or document directly or indirectly evidencing or creating any indebtedness or obligation of or ownership interest in the TSN Debtors giving rise to any Claim or Interest (except such certificates, notes or other instruments or documents evidencing indebtedness or obligations of the TSN Debtors that are specifically reinstated pursuant to the Plan), shall be cancelled as to the TSN Debtors, and the Reorganized TSN Debtors shall not have any continuing obligations thereunder and (2) the obligations of the TSN Debtors pursuant, relating or pertaining to any agreements, indentures, certificates of

designation, bylaws or certificate or articles of incorporation or similar documents governing the shares, certificates, notes, bonds, purchase rights, options, warrants or other instruments or documents evidencing or creating any indebtedness or obligation of the TSN Debtors (except such agreements, certificates, notes or other instruments evidencing indebtedness or obligations of the TSN Debtors that are specifically reinstated or assumed pursuant to the Plan) shall be released and discharged; *provided*, *however*, notwithstanding Confirmation or the occurrence of the Effective Date, any such indenture or agreement that governs the rights of the holder of a Claim shall continue in effect solely for purposes of (a) allowing holders of Senior Secured Notes Claims and Senior Exchangeable Notes Claims (as applicable) to receive distributions under the Plan as provided herein, (b) allowing the Indenture Trustees, if applicable, to make distributions under the Plan as provided herein, and in accordance with any payment priorities established under the Indentures and to deduct therefrom such compensation, reasonable fees and expenses due thereunder or incurred in making such distributions and to create a reserve, in an amount no greater than $[___], for future fees and expenses the Indenture Trustees may incur after the Effective Date and (c) allowing the Indenture Trustees to seek compensation and/or reimbursement of reasonable fees and expenses in accordance with the terms of the Indentures and this Plan; *provided further*, *however*, that the preceding proviso shall not affect the discharge of Claims or Interests pursuant to the Bankruptcy Code, the Confirmation Order or the Plan, or result in any expense or liability to the Reorganized TSN Debtors, except to the extent set forth in or provided for under this Plan. On and after the Effective Date, all duties and responsibilities of the Indenture Trustees under the Indentures, as applicable, shall be discharged except to the extent required in order to effectuate the Plan.

G.      *Exemptions for Issuance of New Equity*

The issuance of the New Common Stock, the New Preferred Stock, including the Rights Offering Preferred Stock and the Additional Shares (and the issuance of any common stock of Reorganized TSN upon conversion of the New Preferred Stock) shall be authorized and exempt from registration under the securities laws pursuant to, as applicable, section 1145 of the Bankruptcy Code, section 4(2) of the Securities Act of 1933, as amended, and/or other applicable laws, as of the Effective Date without further act or action by any person, unless required by provision of the relevant corporate documents or applicable law, regulation, order or rule; and all documents evidencing the same shall be executed and delivered as provided for in the Plan or the Plan Supplement.

H.      *Corporate Existence*

Subject to any Restructuring Transaction and except as otherwise provided herein, in the New Corporate Governance Documents or elsewhere in the Plan Supplement, each Debtor, as Reorganized, shall continue to exist after the Effective Date as a separate corporate entity, limited liability company, partnership or other form, as the case may be, with all the powers of a corporation, limited liability company, partnership or other form, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed. The Corporate Governance Documents shall be substantially in the form filed with the Plan Supplement.

I.      *New Certificate of Incorporation and New By-Laws*

On or as soon as reasonably practicable after the Effective Date, each of the Reorganized TSN Debtors will file their respective New Certificates of Incorporation with the applicable Secretaries of State and/or other applicable authorities in their respective states of incorporation in accordance with the corporate laws of the respective states of incorporation. After the Effective Date, each of the Reorganized TSN Debtors may amend and restate their respective New Certificates of Incorporation and New By-Laws and other constituent documents as permitted by the laws of their respective states of incorporation and their respective New Certificates of Incorporation and New By-Laws.

J.      *Reorganized TSN Debtors' Boards of Directors*

To the extent known, the identity of the members of the New Boards of each of the Reorganized TSN Debtors will be identified in the Plan Supplement.

K.      *Officers of Reorganized TSN Debtors*

To the extent known, officers of each of the other Reorganized TSN Debtors shall be identified in the Plan Supplement. Such officers shall serve in accordance with applicable non-bankruptcy law and, to the extent applicable, the New Employment Agreements.

L.      *Employee Benefits*

Except as otherwise provided herein, on and after the Effective Date, the Reorganized TSN Debtors may: (1) honor, in the ordinary course of business, any contracts, agreements, policies, programs and plans for, among other things, compensation (other than equity based compensation related to Interests), health care benefits, disability benefits, deferred compensation benefits, travel benefits, savings, severance benefits, retirement benefits, welfare benefits, workers' compensation insurance and accidental death and dismemberment insurance for the directors, officers and employees of any of the TSN Debtors who served in such capacity at any time and (2) honor, in the ordinary course of business, Claims of employees employed as of the Effective Date for accrued vacation time arising before the Petition Date; *provided, however,* that the TSN Debtors' or Reorganized TSN Debtors' performance under any employment agreement will not entitle any person to any benefit or alleged entitlement under any policy, program or plan that has expired or been terminated before the Effective Date, or restore, reinstate or revive any such benefit or alleged entitlement under any such policy, program or plan. Nothing herein shall limit, diminish or otherwise alter the Reorganized TSN Debtors' defenses, claims, Causes of Action or other rights with respect to any such contracts, agreements, policies, programs and plans.

M.      *Vesting of Assets in the Reorganized TSN Debtors*

Except as otherwise provided in the Plan or any agreement, instrument or other document incorporated therein, on the Effective Date any and all property in each Estate and all Causes of Action (except those released pursuant to the Releases by the TSN Debtors) shall vest in each respective Reorganized TSN Debtor, free and clear of all Liens, Claims, charges or other encumbrances. On and after the Effective Date, except as otherwise provided in the Plan, each Reorganized TSN Debtor may operate its business and may use, acquire or dispose of property and compromise or settle any Claims, Interests or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

N.      *Restructuring Transactions*

On the Effective Date or as soon as reasonably practicable thereafter, the Reorganized TSN Debtors may enter into the Restructuring Transactions and may take all actions as may be necessary or appropriate to effect a restructuring of their respective businesses or the overall organizational structure of the Reorganized TSN Debtors. The Restructuring Transactions may include one or more mergers, consolidations, restructurings, conversions, dissolutions, transfers or liquidations as may be reasonably determined by (i) the TSN Debtors, with the reasonable consent of the Plan Sponsor or (ii) the Reorganized TSN Debtors to be necessary or appropriate. The actions to effect the Restructuring Transactions may include: (1) the execution and delivery of appropriate agreements or other documents of merger, consolidation, restructuring, conversion, disposition, transfer, dissolution or liquidation containing terms that are consistent with the terms of the Plan and that satisfy the applicable requirements of applicable law and any other terms to which the applicable Entities may agree; (2) the execution and delivery of appropriate instruments of transfer, assignment, assumption or delegation of any asset, property, right, liability, debt or obligation on terms consistent with the terms of the Plan and having other terms for which the applicable parties agree; (3) the filing of appropriate certificates or articles of incorporation or amendments thereof, reincorporation, merger, consolidation, conversion or dissolution pursuant to applicable state law; and (4) all other actions that the applicable Entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law in connection with the Restructuring Transactions. In the event a Restructuring Transaction is a merger transaction, upon the consummation of such Restructuring Transaction, each party to such merger shall cease to exist as a separate corporate entity and thereafter the surviving Reorganized TSN Debtor shall assume and perform the obligations of each Reorganized TSN Debtor under the Plan. In the event a Reorganized TSN Debtor is liquidated, the Reorganized TSN Debtors (or the Reorganized TSN Debtor which owned the stock in such liquidating Debtor prior to such liquidation) shall assume and perform such obligations. Implementation of the Restructuring Transactions shall not affect the distributions under the Plan.

O.	*Intercompany Interests*

Subject to any Restructuring Transaction, in order to implement the Plan, at the option of the Reorganized TSN Debtors (with the reasonable consent of the Plan Sponsor), Intercompany Interests shall either (i) be retained, in which case the Debtor holding such Intercompany Interest shall continue to hold such Interest and the legal, equitable and contractual rights to which the holders of such Intercompany Interests are entitled shall remain unaltered or (ii) be cancelled and new Intercompany Interests in the applicable Other Debtor shall be issued pursuant to the Plan to the Reorganized TSN Debtor that holds such Intercompany Interests.

P.	*Corporate Action*

Upon the Effective Date, all actions contemplated by the Plan shall be deemed authorized and approved in all respects, including (1) entry into the New Employment Agreements; (2) selection of the directors and officers of the Reorganized TSN Debtors; (3) the distribution of the New Common Stock as provided herein; and (4) all other actions contemplated by the Plan (whether to occur before, on or after the Effective Date). All matters provided for in the Plan involving the corporate structure of the TSN Debtors or the Reorganized TSN Debtors, and any corporate action required by the TSN Debtors or the Reorganized TSN Debtors in connection with the Plan shall be deemed to have occurred and shall be in effect, without any requirement of further action by the directors or officers of the TSN Debtors or the Reorganized TSN Debtors.

On or (as applicable) before the Effective Date, the appropriate officers of the TSN Debtors or the Reorganized TSN Debtors, as applicable, shall be authorized and directed to issue, execute and deliver the agreements, documents, securities, certificates of incorporation, operating agreements and instruments contemplated by the Plan (or necessary or desirable to effect the transactions contemplated by the Plan) in the name of and on behalf of the Reorganized TSN Debtors, including any and all agreements, documents, securities and instruments relating to the foregoing. The authorizations and approvals contemplated by this Article V.O shall be effective notwithstanding any requirements under non-bankruptcy law.

Q.	*Effectuating Documents; Further Transactions*

On and after the Effective Date, the Reorganized TSN Debtors and the managers, officers and members of the boards of directors thereof are authorized to issue, execute, deliver, file or record such contracts, securities, instruments, releases and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement and further evidence the terms and conditions of the Plan and the securities issued pursuant to the Plan in the name of and on behalf of the Reorganized TSN Debtors, without the need for any approvals, authorization or consents except for those expressly required pursuant to the Plan.

R.	*General Settlement of Claims and Interests*

As discussed in detail in the Disclosure Statement and as otherwise provided herein, as one element of, and in consideration for, an overall negotiated settlement of disputed Claims and issues embodied in the Plan, pursuant to Bankruptcy Rule 9019 and section 1123 of the Bankruptcy Code and in consideration for the classification, distributions, releases and other benefits provided under the Plan, the provisions of the Plan constitute a good faith compromise and settlement of all Claims, Interests and controversies resolved pursuant to the Plan, including, without limitation, the settlement of issues arising from or related to (a) the litigable issue concerning whether the holders of the Senior Secured Notes have a security interest in TSN's rights in the TerreStar-2 satellite, and (b) the structural seniority which the holders of the Senior Exchangeable Notes have as a result of the guarantees granted to them by certain of the TSN Debtors, each as more fully described in the introduction to Article VIII of the Disclosure Statement. Pursuant to Rule 408 of the Federal Rules of Evidence, this Plan, the Disclosure Statement, the Plan Support Agreement (and any exhibits or supplements relating to the foregoing) and all negotiations relating thereto shall not be admissible into evidence in any proceeding unless and until this Plan in consummated, and then only in accordance with this Plan. In the event this Plan is not consummated, provisions of this Plan, the Disclosure Statement, the Plan Support Agreement (and any exhibits or supplements relating to the foregoing) and all negotiations relating thereto shall not be binding or probative.

Subject to Article VII, all distributions made to Holders of Allowed Claims and Interests in any Class are intended to be and shall be final and indefeasible.

S.  *Section 1146 Exemption from Certain Taxes and Fees*

Pursuant to section 1146(a) of the Bankruptcy Code, any transfers of property in contemplation of, in connection with, or pursuant to the Plan shall not be subject to any stamp tax or other similar tax or governmental assessment in the United States or Canada, and the Confirmation Order shall direct and be deemed to direct the appropriate state or local governmental officials or agents to forgo the collection of any such tax or governmental assessment and to accept for filing and recordation instruments or other documents pursuant to such transfers of property without the payment of any such tax or governmental assessment. Such exemption specifically applies, without limitation, to (1) the creation of any mortgage, deed of trust, lien or other security interest; (2) the making or assignment of any lease or sublease; (3) any restructuring transaction authorized by Article V.O hereof; or (4) the making or delivery of any deed or other instrument of transfer under, in furtherance of or in connection with the Plan, including: (a) any merger agreements; (b) agreements of consolidation, restructuring, disposition, liquidation or dissolution; (c) deeds; or (d) assignments executed in connection with any transaction occurring under the Plan.

T.  *D&O Liability Insurance Policies and Indemnification Provisions*

Notwithstanding anything herein to the contrary, as of the Effective Date, the D&O Liability Insurance Policies shall be deemed to be, and shall be treated as though they are, executory contracts and the TSN Debtors shall assume (and assign to the Reorganized TSN Debtors if necessary to continue the D&O Liability Insurance Policies in full force) all of the D&O Liability Insurance Policies pursuant to section 365(a) of the Bankruptcy Code. Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the TSN Debtors' foregoing assumption of each of the D&O Liability Insurance Policies. On or before the Effective Date, the Reorganized TSN Debtors shall obtain tail coverage under a directors' and officers' liability insurance policy for the current and former directors, officers and managers of the TSN Debtors for a period of five years, and placed with such insurers, the terms of which shall be set forth in the Plan Supplement.

As of the Effective Date, the directors, officers, members, attorneys, employees and other agents of the TSN Debtors who served the TSN Debtors prior to (but not on or after) the Effective Date shall be entitled to the full benefit of any applicable Indemnification Provisions; provided, that any claims by such directors, officers, members, attorneys, employees or other agents relating to or arising out of the Indemnification Provisions shall be deemed to be, and treated as though they are, Other Unsecured Claims against the TSN Debtors. For the avoidance of doubt, the Reorganized TSN Debtors shall have no liability to such directors, officers, members, attorneys, employees or other agents in respect of the Indemnification Provisions.

In addition, on the Effective Date, the New Corporate Governance Documents of the Reorganized TSN Debtors shall contain provisions which (i) eliminate the personal liability of the TSN Debtors' and the Reorganized TSN Debtors' then-present and future directors and officers for post-emergence monetary damages resulting from breaches of their fiduciary duties to the fullest extent permitted by applicable law in the jurisdiction in which the subject Reorganized TSN Debtor is organized; and (ii) require such Reorganized TSN Debtor, subject to appropriate procedures, to indemnify the TSN Debtors' and the Reorganized TSN Debtors' directors, officers, and other key employees (as such key employees are identified by the New Board) serving on or after the Effective Date for all claims and actions to the fullest extent permitted by applicable law in the jurisdiction in which the subject Reorganized TSN Debtor is incorporated or organized.

U.  *Preservation of Rights and Causes of Action*

In accordance with section 1123(b) of the Bankruptcy Code, and except where such Causes of Action have been expressly released (including, for the avoidance of doubt, pursuant to the Releases by the TSN Debtors provided by Article IX.B hereof), the Reorganized TSN Debtors shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action, including Causes of Action under chapter 5 of the Bankruptcy Code, whether arising before or after the Petition Date, and the Reorganized TSN Debtors' rights to commence, prosecute or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date. No Entity may rely on the absence of a specific reference in the Plan, the Disclosure Statement, or

the Schedule of Retained Causes of Action, to any Cause of Action against them as any indication that the TSN Debtors or Reorganized TSN Debtors, as applicable, will not pursue any and all available Causes of Action against them. No preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise) or laches, shall apply to such retained Causes of Action upon, after or as a consequence of the Confirmation or consummation of the Plan.

V.    *Payment of Fees and Expenses of Senior Secured Notes Indenture Trustee/Agent and Purchase Money Agent*

In accordance with the Final DIP Order, the fees and expenses of the Senior Secured Notes Indenture Trustee/Agent and the Purchase Money Agent shall be finally allowed. On the Effective Date (and thereafter with respect to fees and expenses relating to post-Effective Date service under the Plan) or as soon as reasonably practicable thereafter, the TSN Debtors or Reorganized Debtors shall pay in Cash all reasonable and documented unpaid fees and expenses of the Senior Secured Notes Indenture Trustee/Agent and the Purchase Money Agent and their advisors, including counsel. The TSN Debtors or Reorganized Debtors may dispute any portion of such fees and expenses in which case (a) the TSN Debtors or Reorganized Debtors shall pay the portion of such fees and expenses that is not specifically disputed and (b) in the absence of a consensual resolution, the affected Indenture Trustee/Agent or the Reorganized Debtors shall submit the dispute to the Bankruptcy Court for adjudication. For the avoidance of doubt, nothing herein affects an Indenture Trustee's right to exercise its charging lien against distributions to holders of the Notes.

## ARTICLE VI.

## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

A.    *Assumption and Rejection of Executory Contracts and Unexpired Leases*

Except as otherwise provided herein, or in any contract, instrument, release, indenture or other agreement or document entered into in connection with the Plan, each of the TSN Debtors' Executory Contracts and Unexpired Leases shall be deemed assumed as of the Effective Date, unless such Executory Contract or Unexpired Lease: (1) was assumed or rejected previously by the TSN Debtors; (2) expired or terminated pursuant to its own terms before the Effective Date; (3) is the subject of a motion to assume filed on or before the Effective Date; or (4) is identified on the Rejected Executory Contract and Unexpired Lease List.

Entry of the Confirmation Order shall constitute a Bankruptcy Court order approving the assumptions or rejections of such Executory Contracts or Unexpired Leases as set forth in the Plan, all pursuant to sections 365(a) and 1123 of the Bankruptcy Code. The Confirmation Order shall constitute an order of the Bankruptcy Court, approving (i) the assumption and assignment, or rejection, as the case may be, of Executory Contracts and Unexpired Leases, as described above, pursuant to sections 365(a) and 1123(b)(2) of the Bankruptcy Code, (ii) that the Reorganized TSN Debtors had properly provided for the cure of any defaults that might have existed, (iii) that each assumption and assignment was in the best interest of the Reorganized TSN Debtors, their estates, and all parties in interest in the Chapter 11 Cases, and (iv) the requirements for assumption and assignment of any Executory Contract or Unexpired Lease to be assumed had been satisfied. Unless otherwise indicated, all assumptions or rejections of Executory Contracts and Unexpired Leases pursuant to the Plan are effective as of the Effective Date. Each Executory Contract or Unexpired Lease assumed pursuant to the Plan or by Bankruptcy Court order but not assigned to a third party before the Effective Date shall revest in and be fully enforceable by the applicable contracting Reorganized TSN Debtor in accordance with its terms, except as such terms may have been modified by such order. Notwithstanding anything to the contrary in the Plan, the TSN Debtors (with the reasonable consent of the Plan Sponsor) or the Reorganized TSN Debtors, as applicable, reserve the right to alter, amend, modify or supplement the list of Executory Contracts and Unexpired Leases identified in the Plan Supplement at any time before the Effective Date; provided, that to the extent that, as of the Effective Date, there is any pending dispute between one or more of the TSN Debtors and a counterparty to an Executory Contract or Unexpired Lease regarding such counterparty's Cure Claim, the TSN Debtors and Reorganized TSN Debtors shall reserve the right to add the applicable Executory Contract or Unexpired Lease to the Rejected Executory Contract and Unexpired Lease List following the resolution of such dispute, in which event such Executory Contract or Unexpired Lease shall be deemed rejected and such counterparty shall have any and all rights with respect thereto. After the Effective Date,

the Reorganized TSN Debtors shall have the right to terminate, amend or modify any intercompany contracts, leases or other agreements without approval of the Bankruptcy Court.

B.    *Cure of Defaults for Executory Contracts and Unexpired Leases Assumed*

Any monetary defaults under each Executory Contract and Unexpired Lease to be assumed pursuant to the Plan shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the default amount in Cash on the Effective Date, subject to the limitations described below, or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree.  In the event of a dispute regarding (1) the amount of any payments to cure such a default, (2) the ability of the Reorganized TSN Debtors or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed or (3) any other matter pertaining to assumption, the payment of Cure Claims required by section 365(b)(1) of the Bankruptcy Code shall be made no later than ten (10) business days following the entry of a Final Order or orders resolving the dispute and approving the assumption.  At least ten days before the Confirmation Hearing, the TSN Debtors shall distribute, or cause to be distributed, notices of proposed assumption and proposed amounts of Cure Claims to the applicable third parties, which notices shall include procedures for objecting to proposed assumptions of Executory Contracts and Unexpired Leases and any amounts of Cure Claims to be paid in connection therewith and resolution of disputes by the Bankruptcy Court.  Any objection by a counterparty to an Executory Contract or Unexpired Lease to a proposed assumption or related Cure Claim amount must be filed, served and actually received by the TSN Debtors at least three days before the Confirmation Hearing.  Any counterparty to an Executory Contract or Unexpired Lease that fails to object timely to the proposed assumption or Cure Claim amount will be deemed to have assented to such assumption or cure amount.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time before the effective date of the assumption.

C.    *Claims Based on Rejection of Executory Contracts or Unexpired Leases*

All proofs of Claim with respect to Claims arising from the rejection of Executory Contracts and Unexpired Leases, if any, must be filed with the Bankruptcy Court within 30 days after the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection.  Any Claims arising from the rejection of Executory Contracts and Unexpired Leases not filed with the Bankruptcy Court within such time will be automatically disallowed, forever barred from assertion and shall not be enforceable against the TSN Debtors or the Reorganized TSN Debtors, the Estates or their property without the need for any objection by the Reorganized TSN Debtors or further notice to, or action, order or approval of the Bankruptcy Court.  All Allowed Claims arising from the rejection of the TSN Debtors' Executory Contracts and Unexpired Leases shall be classified as Class 6 Other Unsecured Claims against the applicable Debtor and shall be treated in accordance with Article III of the Plan.  The deadline to object to Claims arising from the rejection of Executory Contracts and Unexpired Leases, if any, shall be the later of (a) 180 days following the date on which such Claim was filed and (b) such other period of limitation as may be specifically fixed by an order of the Bankruptcy Court for objecting to such Claims.

D.    *Insurance Policies*

Notwithstanding anything herein to the contrary, as of the Effective Date, the TSN Debtors (with the reasonable consent of the Plan Sponsor) shall assume (and assign to the Reorganized TSN Debtors if necessary to continue the Insurance Policies in full force) all of the Insurance Policies pursuant to section 365(a) of the Bankruptcy Code.  Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the TSN Debtors' foregoing assumption of each of the Insurance Policies.

E.       *Modifications, Amendments, Supplements, Restatements or Other Agreements.*

Unless otherwise provided, each Executory Contract or Unexpired Lease that is assumed shall include all modifications, amendments, supplements, restatements or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and all Executory Contracts and Unexpired Leases related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under the Plan.

Modifications, amendments, supplements and restatements to Executory Contracts and Unexpired Leases that have been executed by the TSN Debtors during the Chapter 11 Cases shall not be deemed (unless otherwise agreed by the contract counterparty) to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority or amount of any Claims that may arise in connection therewith.

F.       *Reservation of Rights.*

Neither the exclusion nor inclusion of any Executory Contract or Unexpired Lease on the Rejected Executory Contract and Unexpired Lease List, nor anything contained in the Plan, shall constitute an admission by the TSN Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that any Reorganized TSN Debtor has any liability thereunder.  If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the TSN Debtors or Reorganized TSN Debtors, as applicable, shall have 45 days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.

G.       *Contracts and Leases Entered Into After the Petition Date.*

Contracts and leases entered into after the Petition Date by any TSN Debtor, including any Executory Contracts and Unexpired Leases assumed by such Debtor, will be performed by the Debtor or Reorganized TSN Debtor liable thereunder in the ordinary course of its business.  Accordingly, such contracts and leases (including any assumed Executory Contracts and Unexpired Leases) will survive and remain unaffected by entry of the Confirmation Order, unless the parties thereto agree to any modifications, amendments, supplements or restatements.

# ARTICLE VII.

# PROVISIONS GOVERNING DISTRIBUTIONS

A.       *Record Date for Distributions*

As of the entry of the Confirmation Order, the various transfer registers for each of the Classes of Claims or Interests as maintained by the TSN Debtors or their respective agents shall be deemed closed, and there shall be no further changes made to reflect any new record holders of any Claims or Interests.  The TSN Debtors shall have no obligation to recognize any transfer of Claims or Interests occurring on or after the Distribution Record Date.

B.       *Timing and Calculation of Amounts to Be Distributed*

Except as otherwise provided in the Plan, on the applicable Distribution Date, each holder of an Allowed Claim or Interest against the TSN Debtors shall receive the full amount of the distributions that the Plan provides for Allowed Claims or Interests in the applicable Class and in the manner provided herein.  In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.  If and to the extent that there are Disputed Claims, distributions on account of any such Disputed Claims shall be made pursuant to the provisions set forth in Article VIII hereof.  Except as otherwise provided herein, holders of Claims shall not be entitled to interest, dividends or

accruals on the distributions provided for herein, regardless of whether such distributions are delivered on or at any time after the Effective Date.

C.      *Fractional Distributions*

No fractions of New Common Stock, New Preferred Stock or Rights shall be distributed. Cash shall not be distributed under the Plan in denominations of less than one cent ($0.01). For purposes of distribution, fractions of New Common Stock, New Preferred Stock or Rights shall be rounded down to the nearest whole number. The Disbursing Agent shall have no obligation to make any distribution of Cash that is less than $10.00.

D.      *Disbursing Agent*

Except as otherwise provided herein, all distributions under the Plan shall be made by the Reorganized TSN Debtors as Disbursing Agent or such other Entity designated by the Reorganized TSN Debtors as a Disbursing Agent on the Effective Date. If the Disbursing Agent is not one of the Reorganized TSN Debtors, such entity shall obtain a bond or surety for the performance of its duties, and all costs and expenses of procuring any such bond or surety shall be borne by the TSN Debtors or Reorganized TSN Debtors; *provided*, *however*, that the Indenture Trustees shall not be required to obtain such a bond or surety..

E.      *Rights and Powers of Disbursing Agent*

    1.    Powers of the Disbursing Agent

The Disbursing Agent shall be empowered to: (a) affect all actions and execute all agreements, instruments and other documents necessary to perform its duties under the Plan; (b) make all distributions contemplated hereby; (c) employ professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions hereof.

    2.    Expenses Incurred On or After the Effective Date

Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable fees and expenses incurred by the Disbursing Agent in carrying out its obligations under this Article VII of the Plan on or after the Effective Date (including taxes) and any reasonable compensation and expense reimbursement claims (including reasonable attorney fees and expenses) made by the Disbursing Agent related thereto shall be paid in Cash by the Reorganized TSN Debtors in their reasonable discretion.

F.      *Distributions to Holders of Disputed Claims*

Notwithstanding any provision otherwise in the Plan and except as may be agreed to by the TSN Debtors (with the reasonable consent of the Plan Sponsor) or the Reorganized TSN Debtors, in each case in their sole discretion, and the holder of a Disputed Claim, no partial payments and no partial distributions shall be made with respect to any Disputed Claim until all Disputed Claims held by the holder of such Disputed Claim or Interest have become Allowed Claims or have otherwise been resolved by settlement or Final Order.

G.      *Delivery of Distributions and Undeliverable or Unclaimed Distributions*

    1.    Delivery of Distributions in General

Except as otherwise provided in the Plan and subject to Bankruptcy Rule 9010, distributions to holders of Allowed Claims shall be made to holders of record as of the Distribution Record Date by the Disbursing Agent: (a) to the signatory set forth on any of the Proofs of Claim filed by such holder or other representative identified therein (or at the last known addresses of such holder if no Proof of Claim is filed or if the TSN Debtors have been notified in writing of a change of address); (b) at the addresses set forth in any written notices of address changes delivered to the Disbursing Agent after the date of any related Proof of Claim; (c) at the addresses reflected in the Schedules if

no Proof of Claim has been filed and the Disbursing Agent has not received a written notice of a change of address; or (d) on any counsel that has appeared in the Chapter 11 Cases on the holder's behalf. Distributions under the Plan on account of Allowed Claims shall not be subject to levy, garnishment, attachment or like legal process, so that each holder of an Allowed Claim shall have and receive the benefit of the distributions in the manner set forth in the Plan. None of the TSN Debtors, the Reorganized TSN Debtors and the applicable Disbursing Agent shall incur any liability whatsoever on account of any distributions under the Plan except for gross negligence, willful misconduct or fraud.

Except as otherwise provided in the Plan, all distributions to holders of Notes Claims shall be governed by the Notes and the Indentures, and shall be deemed completed when made to the respective Indenture Trustees, who shall in turn make distributions in accordance with the Notes and Indentures.

2.    Undeliverable Distributions and Unclaimed Property

In the event that any distribution to any holder is returned as undeliverable, no distribution to such holder shall be made unless and until the Disbursing Agent has determined the then current address of such holder, at which time such distribution shall be made as soon as practicable after such distribution has become deliverable or has been claimed to such holder without interest; *provided, however,* that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code and forfeited at the expiration of six months from the applicable Distribution Date. After such date, all "unclaimed property" or interests in property shall revert to the Reorganized TSN Debtors (notwithstanding any applicable federal or state escheat, abandoned or unclaimed property laws to the contrary), and the Claim of any holder to such property or Interest in property shall be discharged and forever barred.

H.    *Hart-Scott-Rodino Compliance*

Any shares of New Common Stock or New Preferred Stock to be distributed under the Plan to any entity required to file a Premerger Notification and Report Form under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, or to meet any similar requirements under applicable non-U.S. law, shall not be distributed until the notification and waiting periods applicable under such law to such entity shall have expired or been terminated.

I.    *Withholding and Reporting Requirements*

In connection with the Plan and all instruments issued in connection therewith, the Disbursing Agent shall comply with all applicable withholding and reporting requirements imposed by any federal, state or local taxing authority, and all distributions under the Plan shall be subject to any such withholding or reporting requirements.

J.    *Setoffs*

The TSN Debtors and the Reorganized TSN Debtors may withhold (but not set off except as set forth below) from the distributions called for under the Plan on account of any Allowed Claim an amount equal to any claims, equity interests, rights and Causes of Action of any nature that the TSN Debtors or the Reorganized TSN Debtors may hold against the holder of any such Allowed Claim. In the event that any such claims, equity interests, rights and Causes of Action of any nature that the TSN Debtors or the Reorganized TSN Debtors may hold against the holder of any such Allowed Claim are adjudicated by Final Order or otherwise resolved, the TSN Debtors may, pursuant to section 553 of the Bankruptcy Code or applicable non-bankruptcy law, set off against any Allowed Claim and the distributions to be made pursuant hereto on account of such Allowed Claim (before any distribution is made on account of such Allowed Claim) the amount of any adjudicated or resolved claims, equity interests, rights and Causes of Action of any nature that the TSN Debtors or the Reorganized TSN Debtors may hold against the holder of any such Allowed Claim, but only to the extent of such adjudicated or resolved amount. Neither the failure to effect such a setoff nor the allowance of any Claim under the Plan shall constitute a waiver or release by the TSN Debtors or the Reorganized TSN Debtors of any such claims, equity interests, rights and Causes of Action that the TSN Debtors or the Reorganized TSN Debtors may possess against any such holder, except as specifically provided herein.

K.       *Claims Paid or Payable by Third Parties*

1.       Claims or Interests Paid by Third Parties

The TSN Debtors or the Reorganized TSN Debtors, as applicable, shall reduce in part or in full a Claim or Interest to the extent that the holder of such Claim or Interest receives payment in part or in full on account of such Claim or Interest from a party that is not a TSN Debtor or Reorganized TSN Debtor.  To the extent a holder of a Claim or Interest receives a distribution on account of such Claim or Interest and receives payment from a party that is not a TSN Debtor or a Reorganized TSN Debtor on account of such Claim or Interest, such holder shall, within two weeks of receipt thereof, repay or return the distribution to the applicable Reorganized TSN Debtor, to the extent the holder's total recovery on account of such Claim or Interest from the third party and under the Plan exceeds the amount of such Claim or Interest as of the date of any such distribution under the Plan.

2.       Claims Payable by Third Parties

No distributions under the Plan shall be made on account of Allowed insured Claims until the holder of such Allowed insured Claim has exhausted all remedies with respect to the TSN Debtors' Insurance Policies.  To the extent that one or more of the TSN Debtors' insurers agrees to satisfy in full a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, such Claim may be expunged without a Claims objection having to be filed and without any further notice to or action, order or approval of the Bankruptcy Court.

3.       Applicability of Insurance Policies

Except as otherwise provided in the Plan, distributions to holders of Allowed Claims shall be in accordance with the provisions of any applicable Insurance Policy.  Nothing contained in the Plan shall constitute or be deemed a waiver of any cause of action that the TSN Debtors or any Entity may hold against any other Entity, including insurers under any policies of insurance, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

L.       *Postpetition Interest*

Unless expressly provided herein, the Confirmation Order, the Final DIP Order, or any contract, instrument, release, settlement or other agreement entered into in connection with the Plan, or required by the Bankruptcy Code (including without limitation sections 506(b) and 1129(b) of the Bankruptcy Code), postpetition interest shall not accrue on or after the Petition Date on account of any Claim.

M.       *Section 506(c) Reservation*

The TSN Debtors and the Reorganized TSN Debtors reserve all rights under section 506(c) of the Bankruptcy Code with respect to any and all Secured Claims, except to the extent waived pursuant to the Final DIP Order.

N.       *Single Satisfaction of Claims*

Holders of Allowed Claims may assert such Claims against each Debtor obligated with respect to such Claim, and such Claims shall be entitled to share in the recovery provided for the applicable Class of Claims against each obligated Debtor based upon the full Allowed amount of the Claim.  Notwithstanding the foregoing, in no case shall the aggregate value of all property received or retained under the Plan on account of Allowed Claims exceed 100% of the underlying Allowed Claim.

**ARTICLE VIII.**

**PROCEDURES FOR RESOLVING CONTINGENT,
UNLIQUIDATED AND DISPUTED CLAIMS**

A.      *Prosecution of Objections to Claims*

The TSN Debtors (with the reasonable consent of the Plan Sponsor) or the Reorganized TSN Debtors, as applicable, shall have the exclusive authority to file, settle, compromise, withdraw or litigate to judgment any objections to Claims as permitted under the Plan.  From and after the Effective Date, the Reorganized TSN Debtors may settle or compromise any Disputed Claim without approval of the Bankruptcy Court.  The TSN Debtors reserve all rights to resolve any Disputed Claim outside the Bankruptcy Court under applicable governing law.

B.      *Allowance of Claims*

Except as expressly provided herein or in any order entered in the Chapter 11 Cases before the Effective Date (including the Confirmation Order), the Reorganized TSN Debtors after the Effective Date will have and retain any and all rights and defenses held by the TSN Debtors with respect to any Claim as of the Petition Date.  All claims of any Entity against any TSN Debtor shall be disallowed unless and until such Entity pays, in full, the amount it owes each such Debtor.

C.      *Disputed Claims Reserve*

On the Effective Date (or as soon thereafter as is reasonably practicable), the Reorganized TSN Debtors shall deposit in the Disputed Claims Reserve New Common Stock having an aggregate value equal to the aggregate value of the consideration that would have been distributed to the holders of all Disputed Claims as if such Disputed Claims had been Allowed Claims on the Effective Date, with the amount of such Allowed Claims to be determined, solely for the purposes of establishing reserves, to be the lesser of (a) the asserted amount of the Disputed Claims filed with the Bankruptcy Court, or (if no proof of such Claim was filed) scheduled by the TSN Debtors, (b) the amount, if any, estimated by the Bankruptcy Court pursuant to section 502(c) of the Bankruptcy Code pursuant to Article VIII.G or (c) the amount otherwise agreed to by the TSN Debtors and the holder of such Disputed Claims for reserve purposes.  In any vote by holders of New Common Stock, the New Common Stock held in the Disputed Claims Reserve shall be deemed to have been voted in the same proportions as the New Common Stock that was actually voted.

D.      *Distributions After Allowance*

On the Distribution Date following the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim becomes a Final Order, the Disbursing Agent shall provide to the holder of such Claim the distribution (if any) to which such holder is entitled under the Plan as of the Effective Date, without any interest to be paid on account of such Claim.

E.      *Distribution of Excess Amounts in the Disputed Claims Reserve*

Any Cash held in the Disputed Claims Reserve after all Disputed Claims have been Allowed or Disallowed shall be transferred by the Disbursing Agent or Reorganized TSN Debtors (as applicable), in a supplemental distribution to the holders of Allowed Claims in accordance with this Plan on a Pro Rata basis.  Any New Common Stock held in the Disputed Claims Reserve after all Disputed Claims have been Allowed or Disallowed shall be cancelled.

F.      *Property Held in the Reserve for Disputed Claims*

Each holder of a Disputed Claim that ultimately becomes an Allowed Claim will have recourse only to the undistributed New Common Stock and/or Cash (if applicable) held in the Disputed Claims Reserve for satisfaction

of the distributions to which holders of Allowed Claims are entitled under the Plan, and not to any Reorganized TSN Debtor, their property or any assets previously distributed on account of any Allowed Claim.

G.      *Estimation of Claims*

The TSN Debtors (before the Effective Date) or Reorganized TSN Debtors (on or after the Effective Date) may, at any time, and from time to time, request that the Bankruptcy Court estimate any Disputed Claim pursuant to section 502(c) of the Bankruptcy Code regardless of whether an objection was previously filed with the Bankruptcy Court with respect to such Claim, or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including during the pendency of any appeal relating to any such objection.  In the event that the Bankruptcy Court estimates any Disputed Claim, that estimated amount will constitute either the Allowed amount of such Claim or a maximum limitation on such Claim against any party or Entity, as determined by the Bankruptcy Court.  If the estimated amount constitutes a maximum limitation on such Claim, the TSN Debtors (before the Effective Date) or the Reorganized TSN Debtors (after the Effective Date), may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim.  All of the objection, estimation, settlement and resolution procedures set forth in the Plan are cumulative and not necessarily exclusive of one another.  Claims may be estimated and subsequently compromised, objected to, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court.

H.      *Deadline to File Objections to Claims*

Any objections to Claims shall be filed on or before the date that is the later of (a) one hundred and eighty (180) days after the Effective Date and (b) the last day of such other period of limitation as may be specifically fixed by an order of the Bankruptcy Court for objecting to certain Claims.

# ARTICLE IX.

## SETTLEMENT, RELEASE, INJUNCTION AND RELATED PROVISIONS

A.      *Compromise and Settlement of Claims, Interests and Controversies*

As discussed in detail in the Disclosure Statement and as otherwise provided herein, pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good faith compromise of all Claims, Interests and controversies relating to the contractual, legal and subordination rights that a holder of a Claim may have with respect to any Allowed Claim or Interest, or any distribution to be made on account of such Allowed Claim or Interest.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the TSN Debtors, their Estates and holders of Claims and Interests and is fair, equitable and reasonable.  In accordance with the provisions of the Plan, pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019(a), without any further notice to or action, order or approval of the Bankruptcy Court, after the Effective Date, the Reorganized TSN Debtors may compromise and settle Claims against them and Causes of Action against other Entities.

B.      **Releases by the TSN Debtors**

**Pursuant to section 1123(b) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan or the Plan Supplement, for good and valuable consideration, including the contributions of the Released Parties to facilitate the expeditious reorganization of the TSN Debtors and the implementation of the restructuring contemplated by the Plan and the other contracts, instruments, releases, agreements or documents executed and delivered in connection with the Plan, the Released Parties are deemed released and discharged by the TSN Debtors, the Reorganized TSN Debtors and the Estates from any and all claims, obligations, rights, suits, damages, Causes of Action, remedies and liabilities whatsoever, including any derivative claims, asserted or assertable on behalf of the TSN Debtors, whether known or unknown, foreseen or unforeseen, liquidated or unliquidated, fixed or contingent, matured or unmatured, existing or hereinafter**

arising, in law, equity or otherwise, that the TSN Debtors, the Reorganized TSN Debtors, the Estates or their Affiliates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other Entity, based in whole or in part on any act, omission, transaction, event or other occurrence taking place on or prior to the Effective Date in any way relating to the TSN Debtors, the Released Parties, the Reorganization Cases, this Plan or the Disclosure Statement, the EPCA, or related agreements, instruments or other documents, other than Claims or liabilities arising out of or relating to any act or omission of a Released Party that constitutes gross negligence, fraud or willful misconduct, as determined by a Final Order.

C.    *Releases by Holders of Claims and Interests*

As of the Effective Date, to the fullest extent permissible under applicable law, as such law may be extended or interpreted subsequent to the Effective Date, for good and valuable consideration, including the contributions of the Released Parties to facilitate the expeditious reorganization of the TSN Debtors and the implementation of the restructuring contemplated by the Plan and the other contracts, instruments, releases, agreements or documents executed and delivered in connection with the Plan, each holder of a Claim or an Interest shall be deemed to have conclusively, absolutely, unconditionally, irrevocably and forever, released and discharged the Debtors, the Reorganized Debtors and the Released Parties from any and all Claims, Interests, obligations, rights, suits, damages, causes of action, remedies and liabilities whatsoever, including any derivative Claims, asserted on behalf of a Debtor, whether known or unknown, foreseen or unforeseen, liquidated or unliquidated, fixed or contingent, matured or unmatured, existing or hereafter arising, in law, equity or otherwise, that such Entity would have been legally entitled to assert (whether individually or collectively), based in whole or in part on any act, omission, transaction, event or other occurrence taking place on or prior to the Effective Date in any way relating to the Debtors, the Released Parties, the Reorganization Cases, this Plan or the Disclosure Statement, or related agreements, instruments or other documents, other than Claims or liabilities arising out of or relating to any act or omission of a Released Party that constitutes gross negligence, fraud or willful misconduct, as determined by a Final Order; **provided**, that nothing herein shall be deemed a waiver or release of a Releasing Party's right to receive a distribution pursuant to the terms of this Plan.

D.    *Exculpation*

Except as otherwise specifically provided in the Plan or Plan Supplement, no Exculpated Party shall have or incur, and each Exculpated Party is hereby released and exculpated from, any Exculpated Claim, obligation, cause of action or liability for any Exculpated Claim, except for gross negligence or willful misconduct, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.  The TSN Debtors and the Reorganized TSN Debtors (and each of their respective Affiliates, agents, directors, officers, employees, advisors and attorneys) have, and upon Confirmation of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code with regard to the solicitation and distribution of the Plan securities pursuant to the Plan, and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

E.    *Discharge of Claims and Termination of Interests*

Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan, the distributions, rights and treatment that are provided in the Plan shall be in full and final satisfaction, settlement, release and discharge, effective as of the Effective Date, of all Claims, Interests and causes of action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against and Interests in, the TSN Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities and causes of action that arose before the Effective Date, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h) or

502(i) of the Bankruptcy Code, in each case whether or not: (1) a Proof of Claim or Interest based upon such Claim, debt, right or Interest is filed or deemed filed pursuant to section 501 of the Bankruptcy Code; (2) a Claim or Interest based upon such Claim, debt, right or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (3) the holder of such a Claim or Interest has accepted the Plan. Except as otherwise provided herein, any default by the TSN Debtors or their Affiliates with respect to any Claim or Interest that existed before or on account of the filing of the Chapter 11 Cases shall be deemed cured on the Effective Date. The Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the Effective Date occurring, except as otherwise expressly provided in the Plan.

F.    *Injunction*

FROM AND AFTER THE EFFECTIVE DATE, ALL ENTITIES ARE PERMANENTLY ENJOINED FROM COMMENCING OR CONTINUING IN ANY MANNER, ANY CAUSE OF ACTION RELEASED OR TO BE RELEASED PURSUANT TO THE PLAN OR THE CONFIRMATION ORDER.

FROM AND AFTER THE EFFECTIVE DATE, TO THE EXTENT OF THE RELEASES AND EXCULPATION GRANTED IN ARTICLE IX HEREOF, THE RELEASING PARTIES SHALL BE PERMANENTLY ENJOINED FROM COMMENCING OR CONTINUING IN ANY MANNER AGAINST THE RELEASED PARTIES AND THE EXCULPATED PARTIES AND THEIR ASSETS AND PROPERTIES, AS THE CASE MAY BE, ANY SUIT, ACTION OR OTHER PROCEEDING, ON ACCOUNT OF OR RESPECTING ANY CLAIM, DEMAND, LIABILITY, OBLIGATION, DEBT, RIGHT, CAUSE OF ACTION, INTEREST OR REMEDY RELEASED OR TO BE RELEASED PURSUANT TO ARTICLE IX HEREOF.

EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THE PLAN, THE PLAN SUPPLEMENT OR RELATED DOCUMENTS, OR FOR OBLIGATIONS ISSUED PURSUANT TO THE PLAN, ALL ENTITIES WHO HAVE HELD, HOLD OR MAY HOLD CLAIMS OR INTERESTS THAT HAVE BEEN RELEASED PURSUANT TO ARTICLE IX.B OR ARTICLE IX.C, DISCHARGED PURSUANT TO ARTICLE IX.E, OR ARE SUBJECT TO EXCULPATION PURSUANT TO ARTICLE IX.D, ARE PERMANENTLY ENJOINED, FROM AND AFTER THE EFFECTIVE DATE, FROM TAKING ANY OF THE FOLLOWING ACTIONS: (1) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (2) ENFORCING, ATTACHING, COLLECTING OR RECOVERING BY ANY MANNER OR MEANS ANY JUDGMENT, AWARD, DECREE OR ORDER AGAINST SUCH ENTITIES ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (3) CREATING, PERFECTING OR ENFORCING ANY ENCUMBRANCE OF ANY KIND AGAINST SUCH ENTITIES OR THE PROPERTY OR ESTATE OF SUCH ENTITIES ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (4) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS RELEASED, SETTLED OR DISCHARGED PURSUANT TO THE PLAN; AND (5) ACTING OR PROCEEDING IN ANY MANNER, IN ANY PLACE WHATSOEVER, THAT DOES NOT CONFORM WITH THE PROVISIONS OF THIS PLAN TO THE FULL EXTENT PERMITTED BY APPLICABLE LAW.

THE RIGHTS AFFORDED IN THE PLAN AND THE TREATMENT OF ALL CLAIMS AND INTERESTS HEREIN SHALL BE IN EXCHANGE FOR AND IN COMPLETE SATISFACTION OF ALL CLAIMS AND INTERESTS OF ANY NATURE WHATSOEVER, INCLUDING ANY INTEREST ACCRUED ON CLAIMS FROM AND AFTER THE PETITION DATE, AGAINST THE TSN DEBTORS OR ANY OF THEIR ASSETS, PROPERTY OR ESTATES. ON THE EFFECTIVE DATE, ALL SUCH CLAIMS AGAINST THE TSN DEBTORS SHALL BE FULLY RELEASED AND DISCHARGED, AND THE EQUITY INTERESTS SHALL BE CANCELLED.

EXCEPT AS OTHERWISE EXPRESSLY PROVIDED FOR HEREIN OR IN OBLIGATIONS ISSUED PURSUANT HERETO FROM AND AFTER THE EFFECTIVE DATE, ALL CLAIMS AGAINST THE TSN DEBTORS SHALL BE FULLY RELEASED AND DISCHARGED, AND ALL EQUITY INTERESTS SHALL BE CANCELLED, AND THE TSN DEBTORS' LIABILITY WITH RESPECT THERETO SHALL BE

EXTINGUISHED COMPLETELY, INCLUDING ANY LIABILITY OF THE KIND SPECIFIED UNDER SECTION 502(G) OF THE BANKRUPTCY CODE.

ALL ENTITIES SHALL BE PRECLUDED FROM ASSERTING AGAINST THE TSN DEBTORS, THE TSN DEBTORS' ESTATES, THE REORGANIZED TSN DEBTORS, EACH OF THEIR RESPECTIVE SUCCESSORS AND ASSIGNS, AND EACH OF THEIR ASSETS AND PROPERTIES, ANY OTHER CLAIMS OR INTERESTS BASED UPON ANY DOCUMENTS, INSTRUMENTS OR ANY ACT OR OMISSION, TRANSACTION OR OTHER ACTIVITY OF ANY KIND OR NATURE THAT OCCURRED BEFORE THE EFFECTIVE DATE.

G.      *Term of Injunctions or Stays*

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court or any order of the Canadian Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date.  All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

H.      *Injunction Against Interference With Plan*

To the fullest extent permitted by applicable law, upon the entry of the Confirmation Order, all of the Releasing Parties shall be enjoined from taking any actions to interfere with the implementation or consummation of this Plan.

I.      *Injunction Related to Releases and Exculpation*

The Confirmation Order shall permanently enjoin the commencement or prosecution by any person or entity, whether directly, derivatively or otherwise, of any Claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action or liabilities released pursuant to this Plan, including but not limited to the claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action or liabilities released in Articles IX.C and IX.D of this Plan.

J.      *Protection Against Discriminatory Treatment*

Consistent with section 525 of the Bankruptcy Code and the Supremacy Clause of the U.S. Constitution, all Entities, including Governmental Units, shall not discriminate against the Reorganized TSN Debtors or deny, revoke, suspend or refuse to renew a license, permit, charter, franchise or other similar grant to, condition such a grant to, discriminate with respect to such a grant against, the Reorganized TSN Debtors or another Entity with whom such Reorganized TSN Debtors have been associated, solely because one of the TSN Debtors has been a debtor under chapter 11, has been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases but before the Debtor is granted or denied a discharge) or has not paid a debt that is dischargeable in the Chapter 11 Cases.

K.      *No Consent to Change of Control Required*

To the fullest extent permitted by applicable law, except as otherwise expressly provided by order of the Bankruptcy Court, none of (a) the facts or circumstances giving rise to the commencement of, or occurring in connection with, the Chapter 11 Cases, (b) the issuance of the New Common Stock or New Preferred Stock pursuant to the Plan, or (c) consummation of any other transaction pursuant to the Plan (including, without limitation, the Restructuring Transactions) shall constitute a "change in ownership" or "change of control" (or a change in working control) of, or in connection with, any TSN Debtor requiring the consent of any person other than the TSN Debtors or the Bankruptcy Court.

L.      *Release of Liens*

Except as otherwise provided herein or in any contract, instrument, release or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, all mortgages, deeds of trust, Liens, pledges or other security interests against any property of the Estates shall be fully released and discharged, and all of the right, title and interest of any holder of such mortgages, deeds of trust, Liens, pledges or other security interests shall revert to the Reorganized TSN Debtor and its successors and assigns. For the avoidance of doubt, all mortgages, deeds of trust, Liens, pledges or other security interests against any property of the Estates shall be fully released and discharged on the Effective Date without any further action of any party, including, but not limited to, further order of the Bankruptcy Court, the Canadian Court or filing updated schedules or statements typically filed pursuant to the Uniform Commercial Code, the Personal Property Security Act (Ontario) or in accordance with any other real or personal property registry system in any of the applicable provinces in Canada; *provided*, that nothing in the Plan shall be deemed to release the Liens securing the PMCA Claims, which PMCA Claims and Liens are being reinstated hereby, or the Indenture Trustees' charging liens for unpaid fees, costs, expenses and indemnification under the Indentures or other agreements.

# ARTICLE X.

# CONDITIONS PRECEDENT TO CONFIRMATION OF THE PLAN AND THE EFFECTIVE DATE

A.      *Conditions Precedent to Confirmation*

It shall be a condition to Confirmation hereof that the following provisions, terms and conditions shall have been satisfied or waived pursuant to the provisions of Article X.C.

1.      The Bankruptcy Court shall have entered a Final Order, in form and substance acceptable to the TSN Debtors, approving the Disclosure Statement with respect to the Plan as containing adequate information within the meaning of section 1125 of the Bankruptcy Code.

B.      *Conditions Precedent to the Effective Date*

It shall be a condition to the Effective Date that the following provisions, terms and conditions shall have been satisfied or waived pursuant to the provisions of Article X.C.

1.      The Confirmation Order, in a form reasonably satisfactory to the TSN Debtors and Plan Sponsor, shall be a Final Order.

2.      The Canadian Court shall have entered an order, in form and substance reasonably acceptable to the TSN Debtors and the Plan Sponsor, recognizing the Bankruptcy Court's entry of the Confirmation Order, and such order shall have become a Final Order.

3.      The Bankruptcy Court shall have entered one or more orders (which may include the Confirmation Order), in form and substance reasonably acceptable to the TSN Debtors and the Plan Sponsor, authorizing the assumption and rejection of Executory Contracts and Unexpired Leases by the TSN Debtors as contemplated herein, which shall have become Final Orders.

4.      The Canadian Court shall have entered orders, in form and substance reasonably acceptable to the TSN Debtors and the Plan Sponsor, recognizing the Bankruptcy Court's entry of the orders described in Article X.B.3 above, and such orders shall have become Final Order.

5.      The Rights Offering shall have been consummated pursuant to the terms of this Plan, the Rights Offering Procedures, and the EPCA.

6. All of the schedules, documents, supplements and exhibits to the Plan shall have been filed in form and substance reasonably acceptable to the TSN Debtors and the Plan Sponsor.

7. All actions, documents, certificates, and agreements necessary to implement this Plan, including, without limitation, the New By-Laws, the New Certificate of Incorporation, and the Registration Rights Agreement, shall have been effected or executed and delivered to the required parties and, to the extent required, filed with the applicable governmental units in accordance with applicable laws.

8. A decision released by the FCC or a bureau or subdivision thereof (an "*FCC Order*") approving the transfer of control to the Plan Sponsor over the licenses and authorizations held by Debtors, and all other governmental, regulatory and third party licenses, approvals, waivers and/or consents required under applicable law to consummate the transactions contemplated by the Plan, including without limitation the Industry Canada Approval (defined below), shall have been obtained and shall be final and in full force and effect without any condition or requirement that would reasonably be expected to have, individually or in the aggregate, a material impact on the current business operations of the Plan Sponsor. In addition, the FCC shall not have reconsidered the FCC Order on its own motion within 30 days (or, if released by a bureau or other subdivision of the FCC, within 40 days) of its release, and the FCC and the courts will have denied all petitions for reconsideration, applications for review and appeals (collectively, "*Appeals*") of the FCC Order (or of an FCC or court order affirming the FCC Order), or the periods for filing such Appeals have passed and no Appeal has been filed. Moreover, there shall exist no claim, action, suit, investigation, litigation or proceeding, pending or threatened in any court or before any arbitrator or governmental instrumentality, which would prohibit the transactions contemplated by the Plan.

9. The prior approval of the Minister of Industry (the "*Industry Canada Approval*") approving the transfer of control of the Canadian Debtors to the Plan Sponsor or, at the option of the Plan Sponsor, the transfer or assignment of the licenses and authorizations held by the TSN Debtors to a party designated by the Plan Sponsor that is eligible to hold such licenses, to the extent required by applicable law, including the licenses and authorizations to consummate the transactions contemplated by the Plan, shall have been obtained and shall be final and in full force and effect without any condition or requirement that would reasonably be expected to have, individually or in the aggregate, a material impact on the current or future business operations of the Plan Sponsor. In addition, the courts will have denied all applications for judicial review or other court challenges to the Industry Canada Approval or appeals of any court order upholding the Industry Canada Approval or the periods for filing such appeals have passed and no appeal has been filed.

10. The TSN Debtors shall have cash on hand as of the Effective Date of at least $5 million.

C.     *Waiver of Conditions*

The conditions to Confirmation of the Plan and to the occurrence of the Effective Date set forth in this Article X may be waived at any time by the TSN Debtors, with the written consent of the Plan Sponsor; *provided, however,* that the TSN Debtors may not waive entry of the Confirmation Order.

D.     *Effect of Failure of Conditions*

If the Effective Date does not occur, the Plan shall be null and void in all respects and nothing contained in the Plan or the Disclosure Statement shall: (1) constitute a waiver or release of any claims by or Claims against the TSN Debtors; (2) prejudice in any manner the rights of the TSN Debtors, any holders of Claims or any other Entity; or (3) constitute an admission, acknowledgment, offer or undertaking by the TSN Debtors, any holders or any other Entity in any respect.

# ARTICLE XI.

## MODIFICATION, REVOCATION OR WITHDRAWAL OF THE PLAN

### A.  *Modification and Amendments*

Except as otherwise specifically provided herein, the TSN Debtors reserve the right, subject to the reasonable consent of the Plan Sponsor, to modify the Plan as to material terms and seek Confirmation consistent with the Bankruptcy Code and, as appropriate, not re-solicit votes on such modified Plan.  Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019 and those restrictions on modifications set forth in the Plan, the TSN Debtors expressly reserve their rights, subject to the reasonable consent of the Plan Sponsor, to alter, amend or modify materially the Plan with respect to any or all Debtors, one or more times, after Confirmation, and, to the extent necessary, may initiate proceedings in the Bankruptcy Court to so alter, amend or modify the Plan or remedy any defect or omission, or reconcile any inconsistencies in the Plan, the Disclosure Statement or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of the Plan.  Any such modification or supplement shall be considered a modification of the Plan and shall be made in accordance with this Article XI.

In addition, prior to the Effective Date, the TSN Debtors (with the reasonable consent of the Plan Sponsor) may make appropriate technical adjustments and modifications to the Plan, without further order or approval of the Bankruptcy Court; provided, however, that such technical adjustments and modifications do not adversely affect in a material way the treatment of holders of Claims or Interests.

### B.  *Effect of Confirmation on Modifications*

Entry of a Confirmation Order shall mean that all modifications or amendments to the Plan occurring after the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or re-solicitation under Bankruptcy Rule 3019.

### C.  *Revocation or Withdrawal of the Plan*

The TSN Debtors (with the reasonable consent of the Plan Sponsor) reserve the right to revoke or withdraw the Plan before the Effective Date.   If the TSN Debtors revoke or withdraw the Plan, or if Confirmation or the Effective Date does not occur, then:  (1) the Plan shall be null and void in all respects; (2) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of any Claim or Interest or Class of Claims or Interests), assumption or rejection of Executory Contracts or Unexpired Leases effected by the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void; and (3) nothing contained in the Plan shall:  (a) constitute a waiver or release of any Claims or Interests or Claims by any TSN Debtor against any other Entity; (b) prejudice in any manner the rights of such Debtor or any other Entity; or (c) constitute an admission, acknowledgement, offer or undertaking of any sort by such Debtor or any other Entity.

# ARTICLE XII.

## RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court shall retain such jurisdiction over the Chapter 11 Cases and all matters, arising out of or related to, the Chapter 11 Cases and the Plan including jurisdiction to:

1.  allow, disallow, determine, liquidate, classify, estimate or establish the priority, Secured or Unsecured status or amount of any Claim or Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the Secured or Unsecured status, priority, amount or allowance of Claims;

2. decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan;

3. resolve any matters related to: (a) the assumption, assumption and assignment or rejection of any Executory Contract or Unexpired Lease to which a TSN Debtor is party or with respect to which a TSN Debtor may be liable in any manner and to hear, determine and, if necessary, liquidate, any Claims arising therefrom, including Rejection Claims, Cure Claims pursuant to section 365 of the Bankruptcy Code or any other matter related to such Executory Contract or Unexpired Lease; (b) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed; (c) the Reorganized TSN Debtors amending, modifying or supplementing, after the Effective Date, pursuant to Article VI, any Executory Contracts or Unexpired Leases to the list of Executory Contracts and Unexpired Leases to be assumed or rejected or otherwise; and (d) any dispute regarding whether a contract or lease is or was executory or expired.

4. ensure that distributions to holders of Allowed Claims are accomplished pursuant to the provisions of the Plan;

5. adjudicate, decide or resolve any motions, adversary proceedings, contested or litigated matters and any other matters, and grant or deny any applications involving a TSN Debtor that may be pending on the Effective Date;

6. adjudicate, decide or resolve any and all matters related to any Cause of Action;

7. adjudicate, decide or resolve any and all matters related to section 1141 of the Bankruptcy Code;

8. enter and enforce any order for the sale of property pursuant to sections 363, 1123 or 1146(a) of the Bankruptcy Code;

9. resolve any avoidance or recovery actions under sections 105, 502(d), 542 through 551 and 553 of the Bankruptcy Code;

10. resolve any cases, claims, controversies, suits, disputes or causes of action that may arise in connection with the consummation, interpretation or enforcement of the Plan or any entity's obligations incurred in connection with the Plan;

11. resolve any cases, controversies, suits, disputes or causes of action that may arise in connection with or under the DIP Loan Agreement;

12. resolve any cases, controversies, suits, disputes or causes of action that may arise in connection with or under the Notes;

13. issue injunctions, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any entity with consummation or enforcement of the Plan;

14. resolve any cases, controversies, suits, disputes or causes of action with respect to the discharge, releases, injunctions, exculpations, indemnifications and other provisions contained in Article IX and enter such orders as may be necessary or appropriate to implement such releases, injunctions and other provisions;

15. enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked or vacated;

16. determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release, indenture or other agreement or document created in connection with the Plan or the Disclosure Statement;

17.        adjudicate any and all disputes arising from or relating to distributions under the Plan;

18.        consider any modifications of the Plan, cure any defect or omission or reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

19.        determine requests for the payment of Claims and Interests entitled to priority pursuant to section 507 of the Bankruptcy Code, including requests by Professionals for payment of Accrued Professional Fees;

20.        hear and determine disputes arising in connection with the interpretation, implementation or enforcement of the Plan or the Confirmation Order, including disputes arising under agreements, documents or instruments executed in connection with the Plan;

21.        hear and determine matters concerning state, local and federal taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code;

22.        hear and determine all disputes involving the existence, nature or scope of the TSN Debtors' discharge, including any dispute relating to any liability arising out of the termination of employment or the termination of any employee or retiree benefit program, regardless of whether such termination occurred before or after the Effective Date;

23.        enforce all orders previously entered by the Bankruptcy Court;

24.        hear any other matter not inconsistent with the Bankruptcy Code; and

25.        enter an order concluding or closing the Chapter 11 Cases.

## ARTICLE XIII.

## MISCELLANEOUS PROVISIONS

A.      *Immediate Binding Effect*

Subject to Article X.B, and notwithstanding Bankruptcy Rules 3020(e), 6004(h) or 7062 or any other Bankruptcy Rule, upon the occurrence of the Effective Date, the terms of the Plan and the Plan Supplement shall be immediately effective and enforceable and deemed binding upon the TSN Debtors, the Reorganized TSN Debtors and any and all holders of Claims or Interests (irrespective of whether such Claims or Interests are deemed to have accepted the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, discharges and injunctions described in the Plan, each Entity acquiring property under the Plan, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the TSN Debtors.

B.      *Additional Documents*

On or before the Effective Date, the TSN Debtors may file with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan. The TSN Debtors or Reorganized TSN Debtors, as applicable, and all holders of Claims receiving distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

C.      *Dissolution of Creditors' Committee*

On the Effective Date, the Creditors' Committee shall dissolve and members thereof shall be released and discharged from all rights, duties, responsibilities and obligations from or related to the Chapter 11 Cases. In addition, the retention and employment of the Creditors' Committee's attorneys, accountants and other agents shall terminate on the Effective Date.

D.       *Successors and Assigns*

The rights, benefits and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or assign, affiliate, officer, director, manager, agent, representative, attorney, beneficiaries or guardian, if any, of each Entity.

E.       *Service of Documents*

After the Effective Date, any pleading, notice or other document required by the Plan to be served on or delivered to the TSN Debtors or the Reorganized TSN Debtors shall be served on:

TerreStar Networks, Inc.
12010 Sunset Hills Road, 6th Flr.
Reston, Virginia 20190
Attn:  Doug Brandon, General Counsel

with copies to:

Akin Gump Strauss Hauer & Feld LLP
One Bryant Park
New York, New York 10036
Attn: Ira Dizengoff
      Arik Preis

After the Effective Date, the TSN Debtors may, in their sole discretion, notify Entities that, in order to continue receiving documents pursuant to Bankruptcy Rule 2002, such Entities must file a renewed request to receive documents pursuant to Bankruptcy Rule 2002.  After the Effective Date, the TSN Debtors are authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities who have filed such renewed requests.

F.       *Entire Agreement*

Except as otherwise indicated, the Plan and the Plan Supplement supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings and representations on such subjects, all of which have become merged and integrated into the Plan.

G.       *Severability of Plan Provisions*

If, before Confirmation of the Plan, any term or provision of the Plan is held by the Bankruptcy Court or any other court exercising jurisdiction to be invalid, void or unenforceable, the Bankruptcy Court or other court exercising jurisdiction shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired or invalidated by such holding, alteration or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is: (1) valid and enforceable pursuant to its terms; (2) integral to the Plan and may not be deleted or modified without the TSN Debtors' consent; and (3) nonseverable and mutually dependent.

H.       *Exhibits*

All exhibits and documents included in the Plan Supplement are incorporated into and are a part of the Plan as if set forth in full in the Plan.  After the exhibits and documents are filed, copies of such exhibits and documents shall be available upon request to the TSN Debtors' counsel, by contacting Ashleigh L. Blaylock, Akin Gump

Strauss Hauer & Feld LLP, 1333 New Hampshire Avenue, N.W., Washington, D.C. 20036, Telephone: (202) 887-4064, email: blaylocka@akingump.com, at the Bankruptcy Court's web site at *www.ecf.nysb.uscourts.gov* or at the website of the Notice and Claims Agent, at http://www.terrestarinfo.com. To the extent any exhibit or document is inconsistent with the terms of the Plan, unless otherwise ordered by the Bankruptcy Court, the non-exhibit or non-document portion of the Plan shall control.

I.      *Votes Solicited in Good Faith*

Upon entry of the Confirmation Order, the TSN Debtors will be deemed to have solicited votes on the Plan in good faith and in compliance with the Bankruptcy Code and any applicable non-bankruptcy law, and pursuant to section 1125(e) of the Bankruptcy Code, the TSN Debtors and their respective Affiliates, agents, representatives, members, principals, shareholders, officers, directors, employees, advisors and attorneys will be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale and purchase of Plan securities offered and sold under the Plan, and, therefore, will have no liability for the violation of any applicable law, rule or regulation governing the solicitation of votes on the Plan or the offer, issuance, sale or purchase of the New Common Stock or New Preferred Stock offered and sold under the Plan.

J.      *Closing of Chapter 11 Cases*

The Reorganized TSN Debtors shall, promptly after the full administration of the Chapter 11 Cases, file with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Bankruptcy Court to close the Chapter 11 Cases.

K.      *Conflicts*

Except as set forth in the Plan, to the extent that any provision of the Disclosure Statement or any other order (other than the Confirmation Order) referenced in the Plan (or any exhibits, schedules, appendices, supplements or amendments to any of the foregoing), conflict with or are in any way inconsistent with any provision of the Plan, the Plan shall govern and control; *provided, however,* that if there is a conflict between this Plan and a Plan Supplement document, the Plan Supplement document shall govern and control; and *provided further, however*, that to the extent that any provision of the Plan conflicts with or is in any way inconsistent with any provision of the Confirmation Order, the Confirmation Order shall govern and control.

Dated:  December 2, 2010

<div style="margin-left:40%">

Respectfully submitted,

TerreStar Networks Inc. (for itself and on behalf of each of the TSN Debtors)

By: */s/  Jeffrey Epstein*
    Name:  Jeffrey Epstein
    Title:  Chief Executive Officer

</div>

<u>**Exhibit B**</u>

**Disclosure Statement Order and Canadian Disclosure Statement Order**

**Exhibit C**

**Organizational Chart Of The Debtors And Their Non-Debtor Affiliates**

# Organizational Chart of TerreStar Corporation



# Exhibit D

## Liquidation Analysis

<center>**LIQUIDATION ANALYSIS**</center>

## I. Introduction

Section 1129(a)(7) of the Bankruptcy Code[(1)] requires that each holder of an impaired Allowed Claim or interest either (i) accepts the Plan or (ii) receives or retains under the Plan property of a value, as of the Effective Date, that is not less than the value such holder would receive or retain if the Debtors[(2)] were liquidated under Chapter 7 of the Bankruptcy Code on the Effective Date of the Plan. To demonstrate that the Plan satisfies this standard, the Debtors, in consultation with their legal and financial advisors, have prepared the Liquidation Analysis under a hypothetical liquidation under Chapter 7 (a "Liquidation") that a) estimates the realizable value of the Liquidating Debtors, and b) estimates the distribution to creditors resulting from the Liquidation.

The Liquidation Analysis is based on a number of estimates and assumptions that are inherently subject to significant economic, competitive and operational uncertainties and contingencies that are beyond the control of the trustee under Chapter 7. Further, the actual amounts of claims against the Liquidating Debtors' estates could vary materially from the estimates set forth in the Liquidation Analysis, depending on, among other things, the claims asserted during the liquidation proceedings under Chapter 7. Accordingly, while the information contained in the Liquidation Analysis is necessarily presented with numerical specificity, the Debtors cannot assure you that the values assumed would be realized or the claims levels assumed would not change if the Liquidating Debtors were in fact liquidated, nor can assurance be made that the Bankruptcy Court would accept this analysis or concur with these assumptions in making its determination under section 1129(a) of the Bankruptcy Code.

The following provides a general summary of the assumptions used in the Liquidation Analysis. In addition, the Notes to the Liquidation Analysis discuss more specific assumptions, and the Liquidation Analysis should be read in conjunction with the Notes.

## II. General Assumptions

The Liquidation Analysis assumes the conversion of the Debtors' Chapter 11 Cases to chapter 7 liquidation cases on March 31, 2011 (the "Conversion Date"). On the Conversion Date, it is assumed that the Bankruptcy Court would appoint one chapter 7 trustee (the "Trustee") to oversee the liquidation of the Estates. The liquidation is assumed to take six months to complete (the "Liquidation Period").

The Liquidation Analysis includes expenses expected to be incurred during the Liquidation Period, including those related to trustee fees, receiver fees, legal fees and other professional fees and operating / wind-down expenses as applicable to

---

[(1)] Capitalized terms used and not defined herein shall have the meanings ascribed to them in the Disclosure Statement or the Plan, as applicable.
[(2)] All references to the "Debtors" shall mean the "TSN Debtors".

each of the Liquidating Debtors.

## III.    Methodology

A forced sale analysis of the business as a going concern was used to estimate the approximate liquidation range of value for the TSN Debtors' assets.  To facilitate this transaction, Secured creditors are assumed to credit-bid their claims estimated at an amount that would be just greater than a third-party would be willing to pay (subject to a maximum credit-bid of their claim amount of $1.1bn [1] at the Conversion Date for the TSN Debtors' assets).  The TSN Debtors believe that the assets have the highest potential recovery value under this scenario, as the risk that the FCC would reclaim the S-band license is lowered if the TSN Debtors can continue as a going concern.  To be clear, in any other liquidation scenario (including, without limitation, any scenario in which the FCC reclaimed the license and the TSN Debtors and their creditors were unable to capture the value thereof), liquidation recovery values would be significantly reduced.

Under the approach outlined in the paragraph above, the valuation ultimately decided by the Bankruptcy Court for the assets of DBSD North America ("DBSD") was determined to be the best proxy for the valuation of the TSN Debtors' assets in a forced sale of the business as a going concern.  *In re DBSD N. Am., Inc.* et al., Case No. 09-13061 (REG) (Bankr. S.D.N.Y. July 13, 2009).  This valuation was then adjusted by adding any liquidation proceeds of TerreStar-2, a ground spare satellite. This adjustment was necessary as DBSD did not own or have access to a ground spare.

The DBSD valuation was determined to be the best proxy for the liquidation value of the TSN Debtors because the assets of the TSN Debtors and DBSD (with the exception of TerreStar-2) are very similar, and the valuation reflects the "failed auction" of DBSD's assets and limited universe of prospective buyers.  The TSN Debtors' ownership of TerreStar-2 is assumed to provide incremental value relative to the DBSD valuation.

The Liquidation Analysis assumes that the estimated value of the TerreStar-2 Satellite would be less than the amounts owing under the Purchase Money Credit Agreement and the Debtors' DIP Financing Facility (net of costs associated with liquidation).  Thus, any disputes that have been raised over unsecured creditors' entitlement to excess value of TerreStar-2 (after repayment of the Purchase Money Credit Agreement) are not material.

Subject to the qualifications and assumptions stated herein, this Liquidation Analysis estimates gross distributable value less liquidation costs of approximately $607 million to $823 million ("Net Liquidation Proceeds").  The Liquidation Analysis estimates that the Liquidation Proceeds will not be sufficient to pay pre-petition secured claims, chapter 11 administrative and priority claims and DIP Financing claims in full, and therefore there will be no net value available to unsecured creditors in a Liquidation.

_____
[1] Estimated as $1.017bn of 15.0% Secured Note Claims and $92 million of PMCA claims.

# Liquidation Analysis Summary

| Debtors' Assets | Note | Projected Book Value as of 3/31/2011 | Estimated Liquidation Value Low | Estimated Liquidation Value High |
|---|---|---|---|---|
| Cash and Cash Equivalents | | $ 2 | | |
| Inventories, net | | 5 | | |
| Due from TerreStar Global | | 0 | | |
| Deferred Issuance Costs | | 5 | | |
| Other Current Assets | | 10 | | |
| Restricted Cash | | 0 | | |
| Property & Equipment, Net | | 747 | | |
| TerreStar-2 | A | 275 | | |
| Intangible Assets | | 1 | | |
| **Gross Estimated Liquidation Proceeds Available for Distribution** | | **$ 1,045** | **$ 635** [1] | **$ 858** [1] |
| | | | | |
| Costs Associated with Liquidation: | B | | | |
| Payroll and Overhead Costs | | | $ (7) | $ (7) |
| Chapter 7 Trustee Fees | | | (19) | (26) |
| Chapter 7 Professional Fees | | | (2) | (2) |
| **Net Estimated Liquidation Proceeds Available for Distribution** | | | **$ 607** | **$ 823** |

| Distribution Summary | Note | Estimated Allowable Claims | Low | High |
|---|---|---|---|---|
| **Chapter 11 Claims** | | | | |
| **Carve Out for Professional Fees** | | | | |
| Carve Out for Professional Fees | C | $ 1 | $ 1 | $ 1 |
| Hypothetical Recovery to Holders of Claims Satisfied by the Carve Out | | | 100% | 100% |
| Proceeds Available After Distributions on Account of the Carve Out | | | $ 606 | $ 822 |
| | | | | |
| **DIP Claims** [2] | D | | | |
| DIP Facility | | $ 75 | $ 39 | $ 61 |
| Hypothetical Recovery to Holders of DIP Claims | | | 52% | 81% |
| Proceeds Available After Distributions on Account of DIP Claims | | | $ 566 | $ 761 |
| | | | | |
| **Pre-Petition Claims** | | | | |
| **Secured Claims** | E | | | |
| PMCA Credit Facility | | $ 92 | $ 92 | $ 92 |
| Hypothetical Recovery to Holders of PMCA Claims | | | 100% | 100% |
| Proceeds Available After Distributions on Account of PMCA Claims | | | $ 475 | $ 669 |
| | | | | |
| 15.0% Secured Notes | | $ 1,017 | $ 475 | $ 669 |
| Hypothetical Recovery to Holders of Secured Claims | | | 47% | 66% |
| Proceeds Available After Distributions on Account of 15.0% Secured Notes | | | $ - | $ - |
| | | | | |
| **Unsecured Claims** | F | | | |
| Admin. Claims, Priority Tax Claims, and Other Priority Claims | | N/A | $ - | $ - |
| Hypothetical Recovery to Holders of Admin. Claims, Priority Tax Claims, and Other Priority Claims | | | 0% | 0% |
| Proceeds Available After Distributions on Account of Admin. Claims, Priority Tax Claims, and Other Priority Claims | | | $ - | $ - |
| | | | | |
| General Unsecured Claims | G | N/A | $ - | $ - |
| Hypothetical Recovery to Holders of General Unsecured Claims | | | 0% | 0% |
| Proceeds Available After Distributions on Account of General Unsecured Claims | | | $ - | $ - |

[1] In the low case, includes $135 million of TerreStar-2 value and $500 million of value attributable to all other assets. In the high case, includes $158 million of TerreStar-2 value and $700 million of value attributable to all other assets.

[2] DIP Facility not assumed to receive 100% recovery due to its junior lien position relative to the PMCA with respect to TerreStar-2.

**Footnotes to Liquidation Analysis**

**Note A – TerreStar-2**

The book value of the work in progress on the TerreStar-2 satellite is added to the DBSD valuation range of $492 million to $692 million as the DBSD North America valuation did not include the liquidation proceeds of a second satellite. On August 17, 2010, Duff & Phelps, LLC ("D&P") was engaged to perform an appraisal of the TerreStar-2 satellite. D&P determined the appraisal value of TerreStar-2 to range from $185 million to $210 million. The liquidation value of TerreStar-2 is estimated to be $135 million to $158 million, based on a 25% discount to the D&P appraisal value range.

For purposes of the Liquidation Analysis, it was assumed that the proceeds of the TerreStar-2 liquidation would be applied first to the PMCA claims, then to the DIP Financing claims (the DIP Financing Facility has a lien that is junior to any liens held by the holders of the PMCA Credit Facility and the 15.0% Secured Notes).

**Note B - Costs Associated with Liquidation**

Chapter 7 trustee fees include those fees associated with the appointment of a Chapter 7 trustee in accordance with section 326 of the Bankruptcy Code. Trustee fees are estimated based on the requirements of the Bankruptcy Code and historical experience in other similar cases and are calculated at 3% of the Debtors' total liquidation value.

Other necessary liquidation / wind-down costs for the disposition of assets are estimated to include occupancy expenses such as rent, utilities, property taxes and building insurance and operating expenses such as telephone, supply, security and maintenance expenses. In addition, wind-down costs include severance and on-site management expenses required to close facilities, disassemble equipment and to prepare assets for sale. Such costs are approximated at $7 million over the six month period.

Fees for professionals (legal, investment banking, appraisal, brokerage, and accounting) to assist the Liquidating Debtors and the trustee under Chapter 7 with the liquidating process are assumed to start at approximately $500,000 per month gradually declining to $250,000 per month during the six month period.

**Note C – Carve Out for Professional Fees**

The amount of the Carve Out for accrued and unpaid professional fees and disbursements at March 31, 2011 is estimated to be approximately $1.0 million.

**Note D – DIP Claims**

        For purposes of the Liquidation Analysis, the estimated amount outstanding under the DIP Financing Facility as of March 31, 2011 is approximately $75 million including accrued interest. DIP Financing Facility claims are assumed to be paid off, to the extent remaining proceeds are available, with cash from the proceeds of the liquidation of TerreStar-2, on which the DIP Financing Facility has a lien that is junior to any liens held by the holders of the PMCA Credit Facility and the 15% Senior Secured Notes.

**Note E –Secured Claims**

        For purposes of the Liquidation Analysis, we have assumed that Secured Claims will consist primarily of the claims associated with the Purchase Money Credit Agreement and the 15.0% Secured Notes, with accreted balances of approximately $92 million and $1,017 million, respectively as of the assumed liquidation date of March 31, 2011.

**Note F – Administrative Claims, Priority Tax Claims, Other Priority Claims, Chapter 11 Post-petition Accounts Payable, and Accrued Liabilities**

        Administrative Claims, Priority Tax Claims, Other Priority Claims, Chapter 11 Post-Petition Accounts Payable, and Accrued Liabilities include unpaid post-petition operating expenses of the Debtors' Estates as projected at March 31, 2011. Administrative Claims are assumed to be paid on a pro rata basis from the net proceeds, if any, remaining after the payment of and distributions on account of liquidation costs, the Carve Out and Secured Claims.  Priority Tax Claims are assumed to be paid on a pro rata basis from the net proceeds available, if any, after the payment of and distributions on account of liquidation costs, the Carve Out, Secured Claims and Administrative Claims. Other Priority Claims, Chapter 11 Post-Petition Accounts Payable, and Accrued Liabilities would be paid in the priority as set forth in the Bankruptcy Code. In light of the fact that no net liquidation proceeds are available to be distributed to holders of these claims, no estimate is given.

**Note G – General Unsecured Claims**

For purposes of the Liquidation Analysis, the Debtors' management has assumed that unsecured claims will consist of estimated General Unsecured Claims and Convenience Class Claims as defined in the Plan. It should be noted that the Liquidation Analysis does not attempt to estimate potential additional General Unsecured Claims that would likely arise as a result of the rejection of remaining executory contracts and unexpired leases or the failure of the Debtors to perform under existing contracts with their suppliers. Such additional claims would likely result from a cessation of operations as contemplated in a chapter 7 liquidation and would likely be substantial in amount. Additionally, potential litigation claims have not been included. General Unsecured Claims are assumed to be paid on a pro rata basis from the net liquidation proceeds available, if any, after distributions on account of all other Claims. In light of the fact that no net liquidation proceeds are available

to be distributed to holders of General Unsecured Claims, no estimate is given.

<u>**Exhibit E**</u>

**Financial Projections**

### A. Purpose and Objectives

The TSN Debtors[1] prepared the Reorganized TerreStar Networks Pro Forma Balance Sheet, Projected Balance Sheet, Projected Income Statement, and Projected Cash Flow Statement (collectively, the "Financial Projections") for the years 2011 through 2015 (the "Projection Period"). The Financial Projections are based on a number of assumptions made by management with respect to the future performance of the TSN Debtors' operations. The Financial Projections and related assumptions in this Exhibit E are "forward-looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. Although management has prepared the Financial Projections in good faith and believes the assumptions to be reasonable, it is important to note that the TSN Debtors can provide no assurance that such Financial Projections and assumptions will be realized. As described in detail in the Disclosure Statement, a variety of risk factors could affect the TSN Debtors' actual financial results and must be considered. You are encouraged to read these risk factors in their entirety. See Article XI of the Disclosure Statement. The Financial Projections should be reviewed in conjunction with a review of these assumptions, including the accompanying qualifications and footnotes. Should actual results or conditions differ from such assumptions, the actual results and financial condition of the TSN Debtors may differ materially from those presented in the Financial Projections. The TSN Debtors did not prepare the Financial Projections with a view toward compliance with published guidelines of the Securities and Exchange Commission or guidelines established by the FASB, particularly for reorganization accounting. The TSN Debtors' independent accountants have neither examined nor compiled the Financial Projections and accordingly do not express an opinion or any other form of assurance with respect to the Financial Projections, assume no responsibility for the Financial Projections and disclaim any association with the Financial Projections. In addition, for comparative presentation purposes, the operations and cash flow for 2011 combine the predecessor company (January 1, 2011 through the Effective Date) and successor company (assumed Effective Date through December 31, 2011) to allow for a full year presentation.

All dollar amounts in the Financial Projections are US dollars unless otherwise indicated and any reference to "GAAP" refers to the generally accepted accounting principles in the United States of America.

### B. General Assumptions

#### 1. Methodology

The Financial Projections have been prepared by management and are based on the TSN Debtors' detailed operating forecast for 2011-2015. The Financial Projections reflect the strategic initiatives of the TSN Debtors including the launch of the Roam-in business with AT&T as the exclusive provider.

---

[1] Capitalized terms used and not defined herein shall have the meanings ascribed to them in the Disclosure Statement or the Plan, as applicable.

### 2. Plan Consummation

The operating assumptions assume that the Plan will be confirmed and consummated by March 31, 2011.

### 3. Roam-in Business

In September 2009, the TSN Debtors entered into a Mobile Satellite Services and Support Agreement with AT&T Mobility under which AT&T will offer certain of TerreStar's satellite communications services initially to its government and enterprise customers. In November 2010, the roam-in product was launched to consumers. The Financial Projections assume AT&T is the sole seller of Roam-in services.

### 4. Restructured Contracts

The Financial Projections assume the TSN Debtors continue to receive the benefit of several of their existing contract vendor relationships. Currently, not all of these required vendors have entered into settlements with the TSN Debtors regarding pre-petition amounts owed. For purposes of the Plan, the TSN Debtors have assumed restructuring these contracts with notes and cash payments, along with contract modifications, where applicable. The Financial Projections do not include these potential settlements. To the extent new notes are used for settlement purposes such notes shall require consent of the Plan Sponsor. Recoveries stated herein do not include the impact of additional cash or notes used for settlements with these contract vendors.

### 5. S-Band Spectrum

The TSN Debtors have the right to use two 10 MHz blocks of contiguous and unshared MSS S-band spectrum covering a population of over 330 million throughout the United States and Canada. On January 13, 2010, the TSN Debtors were granted authority by the FCC to operate dual-mode mobile terminals that can be used to communicate either via TerreStar's geosynchronous-orbit MSS satellite or ancillary terrestrial component ("ATC") base stations. The Financial Projections assume no revenues associated with S-Band Spectrum, other than revenues derived from the Roam-in Business.

### 6. Handset Inventory

The Financial Projections assume that the TSN Debtors will procure approximately 10,000 Genus handsets in 2010 from Elektrobit, which are projected to be sold by June 2011. Thereafter, the handsets will be directly sold to consumers by third parties. The TSN Debtors have no formal agreement with a third party to sell handsets, but are in discussions with one or more parties with regard thereto.

**7. Rights Offering**

The projections assume the TSN Debtors receive total proceeds from the rights offering of $125 million and an additional $25 million from the exercise by the Plan Sponsor of the Overallotment (i.e. $150 million in total equity proceeds raised). To the extent the TSN Debtors do not receive such proceeds, the TSN debtors may be required to obtain additional capital prior to 2012.

**C. Projected March 31, 2011 Balance Sheet and Reorganized TerreStar Networks Pro Forma Balance Sheet**

The Projected March 31, 2011 Balance Sheet was developed using the TSN Debtors' actual September 30, 2010 audited balance sheet adjusted to reflect management's projected operating results for the quarter ended December 31, 2010 through March 31, 2011. On the Effective Date, actual results may differ due to a variety of risk factors as discussed in Article XI of the Disclosure Statement. Adjustments were made to the Reorganized TerreStar Networks Pro Forma Balance Sheet to give effect to assumed consummation of the Plan. The estimated pro forma adjustments regarding the reorganized equity value of the TSN Debtors, their assets, or their liabilities will be based upon the fair value of the assets and liabilities as of the Effective Date.

As described more fully below, the Reorganized TerreStar Networks' Balance Sheet reflects Reorganized TerreStar Networks pro forma capital structure resulting from the consummation of the Plan. Specifically, and consistent with the assumptions set forth above, the Reorganized TerreStar Networks Balance Sheet assumes (a) that the TSN Debtors will have pro forma funded indebtedness of $91.5 million consisting of amounts under the existing Purchase Money Credit Agreement and (b) a $125 million Rights Offering pursuant to the terms as described more fully in Article VIII of the Disclosure Statement, as well as the exercise of the Plan Sponsor's $25 million Overallotment. The Overallotment is only exercisable at the option and sole discretion of the Plan Sponsor. The TSN Debtors' pro forma capital structure may change depending upon market conditions with respect to the TSN Debtors' capital raise efforts, operating performance and other sources of cash that might be available to the TSN Debtors.

Condensed Consolidated Balance Sheet
*Unaudited, $ in millions*

| | March 31, 2011 | | |
| | | Pro Forma | |
| | **Projected** | **Adjustments** | **Pro Forma** |
|---|---|---|---|
| **ASSETS** | | | |
| Cash and Cash Equivalents | $2.2 | $74.4 [(1)] | $76.7 |
| Other Current Assets | 10.1 | (2.0) [(2)] | 8.1 |
| Total Current Assets | 12.3 | 72.4 | 84.7 |
| | | | |
| Property, Plant, & Equipment, net | 1,021.9 | 0.0 [(3)] | 1,021.9 |
| Reorg. Value in Excess of Book Value of Assets | 0.8 | 48.9 [(4)] | 49.7 |
| Deferred Issuance Costs | 4.8 | (4.8) [(5)] | 0.0 |
| Handset Inventory | 5.0 | 0.0 | 5.0 |
| Deferred Tax Assets | 0.0 | 0.0 | 0.0 |
| **Total Assets** | $1,044.9 | $116.5 | $1,161.3 |
| | | | |
| **LIABILITIES** | | | |
| DIP | $63.6 | ($63.6) [(6)] | $0.0 |
| Post-Petition Accounts Payable | 0.0 | 0.0 | 0.0 |
| Deferred Rent and Other Liabilities | 21.6 | 0.0 | 21.6 |
| Accrued Professional Fees | 12.0 | (12.0) [(7)] | 0.0 |
| Purchase Money Credit Agreement | 91.5 | 0.0 | 91.5 |
| Total Liabilities Not Subject-to-Compromise | 188.7 | (75.6) | 113.1 |
| | | | |
| Total Liabilities Subject-to-Compromise | 1,602.5 | (1,602.5) [(8)] | 0.0 |
| Total Liabilities | 1,791.2 | (1,678.1) | 113.1 |
| | | | |
| **SHAREHOLDERS' EQUITY** | | | |
| Retained Earnings | (746.4) | 1,794.6 [(9)] | 1,048.2 |
| | | | |
| **Total Liabilities & Shareholder's Equity** | $1,044.9 | $116.5 | $1,161.3 |

**Notes to the Pro Forma Condensed Consolidated Balance Sheet**

*(1)  Cash and Cash Equivalents*
The adjustment of $74.4 million reflects proceeds of the $125.0 million of Rights Offering and the exercise of the $25.0 million Overallotment at the Plan Sponsor's sole discretion, less $63.6 million of DIP financing repayment and $12.0 million of accrued professional fees paid at emergence.

*(2)  Other Current Assets*
The adjustment of $2.0 million is due to the write-down of deferred issuance costs at emergence.

*(3)  Property, Plant, & Equipment, net*
All Property, Plant, & Equipment values will be subject to appraisals pursuant to fresh start accounting and are therefore subject to change.

*(4)  Reorg. Value in Excess of Book Value of Assets*
The adjustment of $48.9 million is due to the surplus of the fair market value of assets over tangible book value implied by the equity value of the Reorganized TSN Debtors of $1,048.2 million. This adjustment is subject to change upon application of fresh start accounting and related appraisals.

*(5)  Deferred Issuance Costs*
The adjustment of $4.8 million is due to the write-down of deferred issuance costs at emergence.

*(6)  DIP*
The projected DIP financing balance of $63.3 million will be repaid in cash at emergence.

*(7)  Accrued Professional Fees*
Accrued professional fees of $12.0 million will be paid in cash at emergence.  These professional fees are funded by drawing on the DIP financing facility.

*(8)  Liabilities Subject-to-Compromise*
Upon emergence, the TSN Debtors' Liabilities Subject-to-Compromise will be written down in full.

*(9)  Shareholders' Equity*
Adjustments to shareholders' equity were based on the estimated equity value of the Reorganized TSN Debtors of $1,048.2 million in accordance with "fresh start" accounting provisions of SOP 90-7.

## D.  Reorganized TerreStar Networks Projected Income Statement

Condensed Consolidated Projected Statement of Operations
*Unaudited, $ in millions*

| | Projected Financials for the Year Ended December 31, | | | | |
|---|---|---|---|---|---|
| | 2Q-4Q 2011 | 2012 | 2013 | 2014 | 2015 |
| *Revenue* | | | | | |
| Roam-In | $9.7 | $41.6 | $63.2 | $74.9 | $79.3 |
| Total Revenue | 9.7 | 41.6 | 63.2 | 74.9 | 79.3 |
| | | | | | |
| *Operating Expenses* | | | | | |
| Corporate Overhead | (8.6) | (11.3) | (11.9) | (12.3) | (12.5) |
| Satellite Operations | (16.5) | (21.1) | (20.9) | (21.3) | (21.7) |
| Roam-in and Genus Maintenance | (18.8) | (17.8) | (17.5) | (17.6) | (16.5) |
| Canada | (1.4) | (2.0) | (2.1) | (2.1) | (2.1) |
| Total Operating Expenses | (45.3) | (52.1) | (52.4) | (53.3) | (52.8) |
| | | | | | |
| Depreciation & Amortization | (26.7) | (35.6) | (35.7) | (35.9) | (36.0) |
| Operating Income (Loss) | (62.3) | (46.1) | (24.8) | (14.2) | (9.5) |
| | | | | | |
| Non-Cash Interest Expense | (10.1) | (1.5) | 0.0 | 0.0 | 0.0 |
| Cash Interest Expense | 0.0 | (12.8) | (14.4) | (14.4) | (14.4) |
| Reorganization Expenses | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Income Before Taxes | (72.4) | (60.4) | (39.3) | (28.7) | (24.0) |
| | | | | | |
| Income Tax Provision (Benefit) | 25.3 | 21.1 | 13.7 | 10.0 | 8.4 |
| | | | | | |
| **Net Income (Loss)** | **($47.0)** | **($39.2)** | **($25.5)** | **($18.6)** | **($15.6)** |

## 1.  Revenue

The TSN Debtors are expected to generate revenue from monthly recurring charges ("MRC") and the sale of voice minutes and data to roam-in subscribers. Subscribers are billed monthly and pay a fixed MRC plus per-minute usage fees for voice and per-megabyte usage fees for data. The TSN Debtors capture a portion of each of these fees. When building the projections, the TSN Debtors used assumptions about usage to develop an average revenue per user ("ARPU"). The major assumptions underlying roam-in revenue projections are described below:

> i.  Subscriber growth: subscribers are projected to grow from approximately 40,714 in 2011 to 155,753 in 2015 as the TSN Debtors capture a greater proportion of the addressable market for the roam-in plan.

ii. ARPU: ARPU declines from $50.00 per month in 2011 to $42.68 in 2015 as per minute charges decline due to forecasted increased competition in the market.

## 2. Operating Expenses

The TSN Debtors' expenses predominantly relate to maintaining the satellite infrastructure and costs associated with launching the Roam-In business including maintenance of the Genus handset hardware and software. These costs are described more fully below:

i. *Corporate Overhead*.  Includes executive compensation, corporate utilities, audit fees, board costs, counsel, software licenses and upgrades and other IT costs.  These costs represent approximately 20% of total costs in 2011 and 24% of total costs by 2015.

ii. *Satellite Operations*.  Represents all costs necessary to operate TerreStar-1, store TerreStar-2 and operate the ground network. These costs represent approximately 35% of total costs in 2011 and 41% of total costs by 2015.

iii. *Roam-In and Genus Maintenance*.  Includes costs associated with the roam-in product including contractual commitments for operating and billing systems, costs associated with the core network, E911 and other regulatory costs and costs associated with ongoing hardware and software development of the Genus phone.  These costs represent approximately 42% of total costs in 2011 and 31% of total costs by 2015.

iv. *Canada*. Includes costs associated with employees and maintenance of the satellite gateway in Allen Park, Ontario.

## 3. Depreciation & Amortization

Depreciation & Amortization expense projections are based on the TSN Debtors' assumption that the average useful life of all Property, Plant, & Equipment remains consistent with pre-reorganization practices. All Depreciation & Amortization expense projections are subject to change upon application of fresh start accounting and related appraisals.

## 4. Interest Expense

Interest expense projections are based on the TSN Debtors' estimated post-emergence capital structure assumed to be effective on March 31, 2011. The post-emergence debt is comprised of the PMCA which is assumed to accrue interest in-kind at a rate of 14.0% until February 2012, at which point interest will be paid in cash.

**5. Reorganization Items.**

The 2011 Reorganization Items consist of actual and estimated post petition fees for legal and professional advisors. These amounts exclude any gains or losses associated with the extinguishment of debt and revaluation of assets and liabilities under fresh-start reporting.

**6. Income Taxes.**

The Financial Projections assume the Reorganized TSN Debtors will not pay any taxes based on negative earnings before tax generated during the projection period.

### E. Reorganized TerreStar Networks Balance Sheets

The Reorganized TerreStar Networks Balance Sheets below set forth the projected financial position of the TSN Debtors, after giving effect to the projected March 31, 2011 Balance Sheet, the proposed reorganization and related pro forma adjustments described in Section C. The Reorganized TerreStar Networks Balance Sheets were developed based upon the projected results of operations and cash flows over the Projection Period.

Condensed Consolidated Projected Balance Sheet
*Unaudited, $ in millions*

| | Projected Financials for the Year Ended December 31, | | | | | |
|---|---|---|---|---|---|---|
| | 1Q 2011 (PF) | 2011 | 2012 | 2013 | 2014 | 2015 |
| **ASSETS** | | | | | | |
| Cash and Cash Equivalents | $76.7 | $43.7 | $14.3 | $4.0 | $4.1 | $8.6 |
| Other Current Assets | 8.1 | 8.1 | 8.1 | 8.1 | 8.1 | 8.1 |
| Total Current Assets | $84.7 | $51.8 | $22.3 | $12.0 | $12.1 | $16.6 |
| | | | | | | |
| Property, Plant, & Equipment, net | 1,021.9 | 999.5 | 968.5 | 937.8 | 907.3 | 876.8 |
| Reorg. Value in Excess of Book Value of Asse | 49.7 | 49.7 | 49.7 | 49.7 | 49.7 | 49.7 |
| Handset Inventory | 5.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Deferred Tax Assets | 0.0 | 25.3 | 46.5 | 60.2 | 70.2 | 78.6 |
| **Total Assets** | **$1,161.3** | **$1,126.3** | **$1,087.0** | **$1,059.8** | **$1,039.4** | **$1,021.8** |
| | | | | | | |
| **LIABILITIES** | | | | | | |
| Accounts Payable | $0.0 | $3.1 | $3.1 | $3.0 | $3.1 | $3.0 |
| Deferred Rent and Other Liabilities | 21.6 | 20.5 | 18.9 | 17.3 | 15.4 | 13.5 |
| Purchase Money Credit Agreement | 91.5 | 101.6 | 103.1 | 103.1 | 103.1 | 103.1 |
| Total Liabilities | 113.1 | 125.2 | 125.1 | 123.4 | 121.6 | 119.6 |
| | | | | | | |
| **SHAREHOLDER'S EQUITY** | | | | | | |
| Retained Profits (Deficit) | 1,048.2 | 1,001.2 | 961.9 | 936.4 | 917.8 | 902.2 |
| Total Equity | 1,048.2 | 1,001.2 | 961.9 | 936.4 | 917.8 | 902.2 |
| | | | | | | |
| **Total Liabilities & Shareholder's Equity** | **$1,161.3** | **$1,126.3** | **$1,087.0** | **$1,059.8** | **$1,039.4** | **$1,021.8** |

### F. Reorganized TerreStar Networks Statement of Cash Flow

The Reorganized TerreStar Networks Statement of Cash Flow sets forth the TSN Debtors' forecasted change in cash, after giving effect to the proposed reorganization.

Condensed Consolidated Projected Statement of Cash Flows
*Unaudited, $ in millions*

| | Projected Financials for the Year Ended December 31, | | | | |
|---|---|---|---|---|---|
| | **2Q-4Q 2011** | **2012** | **2013** | **2014** | **2015** |
| **Operating Activities:** | | | | | |
| Net Income (Loss) | ($47.0) | ($39.2) | ($25.5) | ($18.6) | ($15.6) |
| Depreciation & Amortization | 26.7 | 35.6 | 35.7 | 35.9 | 36.0 |
| Change in Accounts Payable | 3.1 | (0.0) | (0.0) | 0.0 | (0.1) |
| Non-Cash Interest Expenses | 10.1 | 1.5 | 0.0 | 0.0 | 0.0 |
| Handset Sales / (Purchases) | 5.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Non-Cash Taxes | (25.3) | (21.1) | (13.7) | (10.0) | (8.4) |
| Net Cash Used in Operating Activities | (27.6) | (23.3) | (3.6) | 7.3 | 11.9 |
| **Investing Activities:** | | | | | |
| TerreStar-1 Orbital Performance Incentives | (1.1) | (1.6) | (1.7) | (1.8) | (1.9) |
| Capital Expenditures | (4.3) | (4.6) | (5.1) | (5.4) | (5.5) |
| Net Cash Used in Investing Activities | (5.4) | (6.2) | (6.7) | (7.2) | (7.4) |
| **Financing Activities:** | | | | | |
| Purchase Money Credit Agreement | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Net Cash Used in Financing Activities | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| **Net Change in Cash & Cash Equivalents** | **($32.9)** | **($29.5)** | **($10.3)** | **$0.1** | **$4.5** |
| Beginning Cash and Cash Equivalents | $76.7 | $43.7 | $14.3 | $4.0 | $4.1 |
| Change in Cash and Cash Equivalents | (32.9) | (29.5) | (10.3) | 0.1 | 4.5 |
| Ending Cash and Cash Equivalents | $43.7 | $14.3 | $4.0 | $4.1 | $8.6 |

### 1. Working Capital

Working capital does not represent a material use or source of cash during the projection period. No Genus handsets are projected to be purchased after 2010.

### 2. Capital Expenditures

Capital expenditures are expected to range from approximately $5.0 million to $7.5 million for the years 2011 through 2015. The majority of these expenses are related to TerreStar-1's orbital performance incentive and maintenance of the core network.

**Valuation Analysis**

## VALUATION ANALYSIS

**A.      VALUATION OF THE REORGANIZED TSN DEBTORS**

In conjunction with formulating the Plan, the TSN Debtors determined that it was necessary to estimate the post-Confirmation going-concern value of the Reorganized Debtors. Accordingly, the TSN Debtors, with the assistance of Blackstone, its financial advisors, has prepared the foregoing valuation.

For purposes of the Plan, the reorganization value (the "Reorganization Value") is estimated to range from approximately $1.07 billion to $1.37 billion. The Reorganization Value reflects the going concern value of the Reorganized TSN Debtors after giving effect to the implementation of the Plan. The distributable value (the "Distributable Value") of the Reorganized TSN Debtors is estimated to range from approximately $905 million to $1.20 billion, with an approximate midpoint value of $1.05 billion. The Distributable Value reflects the Reorganization Value less the estimated $91.5 million of PMCA obligations and $75.3 million of DIP Financing obligations.  For purposes of the Plan, based on 30,000,000 shares of Common Stock of the Reorganized TSN Debtors (inclusive of the New Common Stock underlying the New Preferred Stock), subject to dilution from options and any equity grants in connection with the management incentive plan, the New Common Stock will have a plan value of $34.94.

In preparing an estimate of Reorganization Value, Blackstone conducted *inter alia*, the following due diligence:

(1)  Review of the TSN Debtors' operations, assets, strategy and vendor relationships, including the AT&T Roam-in business;

(2)  Analysis of the TSN Debtors' industry and key competitors, and trends in the environment in which the TSN Debtors operate;

(3)  Analysis of the performance and market position of the TSN Debtors relative to their key competitors and similar companies; and

(4)  Discussions regarding regulatory issues related to the TSN Debtors' assets.

Although Blackstone conducted a review and analysis of the TSN Debtors' business, operating assets and liabilities, and the Reorganized TSN Debtors' business plan, Blackstone assumed and relied on the accuracy and completeness of all financial and other information furnished to it by the TSN Debtors, as well as publicly available information.

**B.     VALUATION METHODOLOGIES**

In performing its analysis, Blackstone separately valued the TSN Debtors' S-Band spectrum holding and Roam-In Plan. The valuation of the TSN Debtors' S-Band spectrum holding incorporated (i) historical spectrum auctions analysis, (ii) precedent transactions analysis, and (iii) discounted cash flow ("DCF") analysis. The valuation of the Roam-In Plan incorporated a DCF analysis of the expected cash flows of the plan.

The TSN Debtors' 20 MHz of S-Band spectrum is among the TSN Debtors' most critical assets. MSS / ATC next-generation mobile service companies are firms that develop integrated mobile satellite and terrestrial services networks. The valuation of companies that utilize MSS / ATC next-generation mobile service spectrum is often expressed as a multiple of megahertz-population ("MHz-POP"). MHz-POP takes a company's spectrum measured in MHz and multiplies it by the number of people living in the region covered by the spectrum. Total Enterprise Value ("TEV") / MHz-POP is the primary valuation methodology for mobile satellite service providers whose business is not yet considered mature, and such valuation has been used by research analysts that cover MSS / ATC next-generation mobile service companies. These companies generally do not have positive cash flow and require extensive capital investments prior to obtaining positive earnings before interest, tax, depreciation, and amortization ("EBITDA").

Assuming a United States population of approximately 309 million people and a Canada population of approximately 34 million people, the TSN Debtors currently have approximately 6.2 billion MHz-POP in the US and approximately 0.7 billion MHz-POP in Canada. The FCC and Industry Canada have also granted the TSN Debtors the right to use this spectrum terrestrially for ATC services as a result of meeting certain gating criteria, which are intended to ensure that ATC remains ancillary to the provision of mobile satellite service.

**THE FOLLOWING SUMMARY DOES NOT PURPORT TO BE A COMPLETE DESCRIPTION OF THE ANALYSES AND FACTORS UNDERTAKEN TO SUPPORT BLACKSTONE'S CONCLUSIONS.**

**THE PREPARATION OF A VALUATION IS A COMPLEX PROCESS INVOLVING VARIOUS DETERMINATIONS AS TO THE MOST APPROPRIATE ANALYSES AND FACTORS TO CONSIDER, AS WELL AS THE APPLICATION OF THOSE ANALYSES AND FACTORS UNDER THE PARTICULAR CIRCUMSTANCES. AS A RESULT, THE PROCESS INVOLVED IN PREPARING A VALUATION IS NOT READILY SUMMARIZED.**

**1.     S-Band Spectrum (MSS / ATC)**

For purposes of valuing the TSN Debtors' S-Band spectrum, Blackstone has considered the value of a fully-enabled MSS / ATC spectrum license, compliant with all FCC gating criteria and covering a population of approximately 309 million people in the United States and approximately 34 million people in Canada.

*Historical Spectrum Auctions Analysis*

Blackstone reviewed data for FCC spectrum auctions from 1995 to 2008. In determining the most relevant auctions, the following factors were considered: (i) frequency range in close proximity to the TSN Debtors' S-Band spectrum, (ii) comparable-sized blocks of capacity, (iii) similar geographic coverage, and (iv) date of auctions held. Using these criteria, Blackstone determined the most relevant auction to be FCC Auction 66 (AWS-1). Auction 66 closed on September 18, 2006 and awarded 1,087 Advanced Wireless Services licenses of 5 MHz and 10 MHz paired blocks of capacity in the 1710-1755 MHz and 2110-2155 MHz frequency bands across the United States. These licenses covered geographic areas from small cellular market areas to large regional economic area groupings.

Blackstone derived an interim, gross valuation using the auction price / MHz-POP multiple based on the relevant terrestrial spectrum auction. However, because of differences in the characteristics of the spectrum, regulatory requirements, and the financial / competitive positions of the bidders involved in the auction, Blackstone made several adjustments to the gross valuation implied by the auction price / MHz-POP in order to calculate the TSN Debtors' implied S-Band spectrum valuation.

*Precedent Transactions Analysis*

Blackstone reviewed data for precedent M&A spectrum transactions from 2007 to present. In determining the most relevant transactions, the following factors were considered: (i) frequency range in close proximity to the TSN Debtors' S-Band spectrum, (ii) comparable-sized blocks of capacity, (iii) similar geographic coverage, and (iv) date of transaction. Blackstone then derived an interim, gross valuation using the transaction prices / MHz-POP multiples based on the relevant precedent transactions. However, due to differences in the characteristics of the spectrum, regulatory requirements, and the financial / competitive positions of the buyers involved in these transactions, Blackstone made several adjustments to the gross valuations in order to calculate the TSN Debtors' implied S-Band spectrum valuation.

In addition, Blackstone considered the bankruptcy reorganization precedent of DBSD North America, Inc. ("DBSD") (formerly ICO North America, Inc.). Blackstone made certain adjustments to reflect the differences between DBSD and TerreStar, including the TSN Debtors' compliance with FCC gating criteria (e.g., construction and maintenance of its spare satellite, TerreStar-2) and other investments in its network and technology infrastructure.

*Discounted Cash Flow Analysis*

To provide another reference for valuation of the S-Band spectrum, Blackstone performed a DCF analysis of the potential cash flows generated by ATC / terrestrial use of the spectrum, including the build-out of nationwide terrestrial network infrastructure.

A DCF analysis relates the value of an asset or business to the present value of expected future cash flows to be generated by that asset or business. A DCF analysis is a "forward looking" valuation methodology approach that discounts the expected future cash flows by a theoretical or observed discount rate determined by calculating the average cost of debt and equity for publicly traded companies that are similar to the TSN Debtors. This approach has two components: (i) the present value of the projected un-levered after-tax free cash flows for a determined period, and (ii) the present value of the terminal value of cash flows, which represents the TSN Debtors' value beyond the time horizon of the projected period. Similar to estimated cash flows, the estimated discount rate and expected capital structure of the Reorganized TSN Debtors are analyzed to derive a potential value. In performing the calculation, Blackstone made assumptions for the weighted average cost of capital, which is used to value future cash flows based upon the level of risk of the cash flows and the EBITDA terminal multiple, which is used to determine the future value of the enterprise after the end of the projected period.

This analysis determines the value of the S-Band spectrum, including capital expenditures (which could range in the billions of dollars) required for the build-out of terrestrial network infrastructure. In projecting the future cash flows from this business, Blackstone utilized industry sources and assumptions it believes to be reasonable. The resulting valuation range implied by the DCF analysis was incorporated into Blackstone's S-Band spectrum valuation. However, as a result of the TSN Debtors' lack of capital to fund such a build-out, Blackstone did not put significant weight on this analysis.

**S-Band Spectrum Valuation Summary (US and Canada)**

In conclusion, the valuation of the TSN Debtors' spectrum holdings incorporated (i) historical spectrum auctions analysis, (ii) precedent transactions analysis, and (iii) DCF analysis. Considering all of these valuation methodologies, Blackstone determined that the total value attributable to the TSN Debtors' S-Band spectrum ranges from $1.02 billion to $1.28 billion, or $0.16 to $0.20 / MHz-POP. The total value attributable to the TSN Debtors includes (i) $1.00 billion to $1.25 billion, or 100% of the value for the US S-Band spectrum (covering approximately 309 million POPs), and (ii) $22 million to $28 million, or 20% of the value for the Canada S-Band spectrum (covering approximately 34 million POPs). The TSN Debtors' spectrum holdings are fully enabled for MSS / ATC services and are compliant with FCC and Industry Canada regulatory requirements.

## 2. Roam-In Plan

In connection with estimating the post-Confirmation going-concern value of the Reorganized TSN Debtors, Blackstone reviewed and analyzed the TSN Debtors' business model. The TSN Debtors' business model is premised on acting as a wholesaler of satellite services and air time, as well as of the GENUS smartphone. The GENUS is marketed through the TSN Debtors' terrestrial provider partner, AT&T, as AT&T's Satellite Augmented Mobility Service ("SAM"). The GENUS smartphone is the first commercially-available dual-mode device that communicates over AT&T's traditional terrestrial wireless network, and enables subscribers to "roam-in" to TerreStar's satellite-based network in remote areas where AT&T's network is unavailable. SAM was launched for government and enterprise customers on September 21, 2010, with a roll-out for retail consumers expected later in 4Q 2010. Pursuant to the rate plan under the AT&T MSS agreement, AT&T pays TerreStar a (i) recurring monthly charge for each subscribing customer, (ii) fixed amount per minute for satellite voice calls (plus termination charges), and (iii) fixed amount for each megabyte of satellite data used and satellite text message sent or received.

### *DCF Analysis*

To value the Roam-In Plan, Blackstone performed a DCF analysis of the expected cash flows generated through the AT&T Satellite Augmented Mobility Service. The Roam-In Plan assumes that the Reorganized TSN Debtors are able to grow their customer base to approximately 156,000 by 2015 with revenue of approximately $79 million in that year. The Roam-In Plan only assumes cash flows generated through the sale of GENUS handsets and related services, and does not assume that the TSN Debtors utilize next-generation chipsets to introduce alternative dual-mode wireless satellite / terrestrial devices. Based on the recent launch of commercial services under the Roam-In Plan, Blackstone believes these projections are appropriately valued using a discounted cash flow analysis.

### Roam-In Plan Valuation

As a result, Blackstone determined the value of the Roam-In Plan to be approximately $50 million to $90 million.

**C.      SATELLITE VALUATION CONSIDERATIONS**

In compliance with current regulatory requirements for its MSS / ATC license, the TSN Debtors maintain two satellites – TerreStar-1 in orbit (launched on July 1, 2009) and TerreStar-2 as a ground spare. The valuation of the TSN Debtors' spectrum holdings outlined in Section B (1) is inclusive of the value of both TerreStar-1 and TerreStar-2 satellites, reflecting a fully enabled S-band spectrum for MSS / ATC services.

On August 17, 2010, the Company engaged Duff & Phelps, LLC ("D&P") to perform an appraisal of the TerreStar-2 satellite. D&P determined the appraisal value of TerreStar-2 to range from $185 million to $210 million. Blackstone has not performed an independent appraisal of TerreStar-2.

**Exhibit G**

**Solicitation, Voting and Tabulation Procedures**

**<u>Exhibit H</u>**

**Rights Offering Procedures**