AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
(212) 872-1000 (Telephone)
(212) 872-1002 (Facsimile)
Ira S. Dizengoff
Arik Preis
Ashleigh L. Blaylock

*Counsel to the Debtors and Debtors in Possession*

# UNITED STATES BANKRUPTCY COURT
# SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | Chapter 11 |
| TERRESTAR NETWORKS INC., *et al.*,[1] | Case No. 10-15446 (SHL) |
| Debtors. | Jointly Administered |

## DEBTORS' MOTION FOR ENTRY OF AN ORDER (I) AUTHORIZING THE DEBTORS TO ENTER INTO A STALKING HORSE AGREEMENT AND (II) APPROVING CERTAIN BID PROTECTIONS IN CONNECTION THEREWITH

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal taxpayer identification number, are: TerreStar Networks Inc. (3931); TerreStar License Inc. (6537); TerreStar National Services Inc. (6319); TerreStar Networks Holdings (Canada) Inc. (1337); TerreStar Networks (Canada) Inc. (8766) and 0887729 B.C. Ltd. (1345).

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT..................................................................................................1

JURISDICTION ...................................................................................................................5

BACKGROUND ...................................................................................................................6
    A.    The Sale Motion..............................................................................................6
    B.    The Stalking Horse Negotiations and the Stalking Horse Agreement....................7
    C.    The Stalking Horse Agreement ...........................................................................8
    D.    Certain "Extraordinary" Provisions in the Purchase Agreement that
        Require Separate Disclosure .................................................................................21
    E.    Revised Bidding Procedures and Revised Timeline for Bid Deadline,
        Auction and Sale Hearing .....................................................................................22

RELIEF REQUESTED..........................................................................................................23

SUPPORTING AUTHORITY .................................................................................................24
    A.    Entry Into The Stalking Horse Agreement Will Maximize Value For All
        Creditors and is in the Best Interest of the Debtors' Estates..................................24
    B.    The Sale of Assets to the Stalking Horse Bidder Should be Free and Clear
        of Liens, Claims, Encumbrances and Interests ......................................................26
    C.    Court Approval of the Assumption and Assignment of Designated
        Contracts In Connection with the Stalking Horse Agreement is Warranted.........27
    D.    The Stalking Horse Bidder is Entitled to Protections as a Good Faith
        Purchaser.............................................................................................................29
    E.    The Bid Protections are Warranted and in the Best Interests of the Debtors
        and Their Economic Stakeholders ........................................................................31
    F.    Request for Relief Pursuant to Bankruptcy Rules 6004(h) and 6006(d) ...............36

NOTICE...........................................................................................................................37

# TABLE OF AUTHORITIES

**Page(s)**

C<small>ASES</small>

*Allstate Ins. Co. v. Hughes*,
   174 B.R. 884 (S.D.N.Y. 1994).................................................................29

*Comm. of Equity Sec. Holders v. Lionel Corp.(In re Lionel Corp.*),
   722 F.2d 1063 (2d Cir. 1983)..................................................................24

*Cottle v. Storer Commc'ns, Inc.*,
   849 F.2d 570 (11th Cir. 1988) .................................................................32

*CRTF Corp. v. Federated Dep't. Stores, Inc.*,
   683 F. Supp. 422 (S.D.N.Y. 1988)...........................................................32

*In re 995 Fifth Ave. Assocs.*,
   96 B.R. 24 (Bankr. S.D.N.Y. 1989) ..........................................................32

*In re Adelphia Bus. Solutions, Inc.*,
   No. 02-11389 (REG) (Bankr. S.D.N.Y. Dec. 16, 2002) [Docket No. 760].......................34, 35

*In re Adelphia Bus. Solutions, Inc.*,
   No. 02-11389 (REG) (Bankr. S.D.N.Y. Jan. 23, 2003) [Docket No. 833]..............................32

*In re Angelika Films 57th, Inc.*,
   No. 97 Civ. 2239 (MBM), 1997 WL 283412, at *7 (S.D.N.Y. 1997).....................................30

*In re Bally Total Fitness of Greater N.Y., Inc.*,
   No. 07-12395 (BRL) (Bankr. S.D.N.Y. Aug. 21, 2007) [Docket No. 269]..............................35

*In re BearingPoint, Inc.*,
   No. 09-10691 (REG) (Bankr. S.D.N.Y. Apr. 7, 2009) [Docket No. 369] ..............................34

*In re Betty Owens Sch., Inc.*,
   No. 96 Civ. 3576 (PKL), 1997 WL 188127 (S.D.N.Y. Apr. 17, 1997)..................................24

*In re Chrysler LLC*,
   405 B.R. 84 (Bankr. S.D.N.Y. 2009),
   *aff'd*, 2009 U.S. App. LEXIS 17441 (2d Cir. Aug. 5, 2009)..................................................26

*In re Decora Indus., Inc.*,
   No. 00-4459 (JJF), 2002 WL 32332749 (D. Del. May 20, 2002) ...........................................24

*In re Del. and Hudson Ry. Co.*,
   124 B.R. 169 (D. Del. 1991).....................................................................24

*In re Extended Stay, Inc.*,
   No. 09-13764 (JMP) (Bankr. S.D.N.Y. Apr. 23, 2010) [Docket No. 975]............................34

*In re Footstar, Inc.*,
   No. 04-22350 (ASH) (Bankr. S.D.N.Y. Apr. 6, 2004) [Docket No. 316] ..............................35

*In re Fortunoff Fine Jewelry and Silverware*,
   No. 08-10353 (JMP) (Bankr. S.D.N.Y. Feb. 22, 2008) [Docket No. 190] ............................35

*In re G+G Retail, Inc.*,
   No. 06-10152 (RDD) (Bankr. S.D.N.Y. Jan. 30, 2006) [Docket No. 58] .............................35

*In re General Motors Corp.*,
   407 B.R. 463 (Bankr. S.D.N.Y. 2009).................................................................................26

*In re Lehman Bros. Holdings Inc., et al.*,
   No. 08-13555 (JMP) (Bankr. S.D.N.Y. Oct. 22, 2008) [Docket No. 1175] .........................35

*In re Leiner Health Prods., Inc.*,
   No. 08-10446 (Bankr. D. Del. May 30, 2008) [Docket No. 299]...........................................31

*In re Loral Space & Commc'ns Ltd.*,
   No. 03-41710 (RDD) (Bankr. S.D.N.Y. Aug. 19, 2003) ........................................................31

*In re Magellan Health Servs., Inc.*,
   No. 03-40515 (PCB) (Bankr. S.D.N.Y. Apr. 7, 2003)............................................................31

*In re Magnesium Corp. of Am.*,
   No. 01-14312 (Bankr. S.D.N.Y. June 4, 2002) ....................................................................26

*In re Metaldyne Corp.*,
   409 B.R. 661 (Bankr. S.D.N.Y. 2009) ..................................................................................31

*In re Neff Corp.*,
   No. 10-12610 (SCC) (Bankr. S.D.N.Y. July 13, 2010) [Docket No. 267] ............................33

*In re Rhythms Netconnections Inc.*,
   No. 01-14283 (Bankr. S.D.N.Y. Aug. 8, 2001) ....................................................................31

*In re Stadium Mgmt. Corp.*,
   895 F.2d 845, 847 (1st Cir. 1990) ......................................................................................29

*In re Stein & Day, Inc.*,
   113 B.R. 157 (Bankr. S.D.N.Y. 1990)..................................................................................30

*In re Steve & Barry's Manhattan LLC, et al.*,
   No. 08-12579 (ALG) (Bankr. S.D.N.Y. Aug. 5, 2008) [Docket No. 369] ............................35

*In re Twinlab Corp., et al.,*
No. 03-15564 (CB) (Bankr. S.D.N.Y. Sept. 26, 2003) [Docket No. 81]................................35

*Kabro Assocs. of W. Islip, LLC v. Colony Hill Assocs. (In re Colony Hill Assocs.),*
111 F.3d 269 (2d Cir. 1997)........................................................................................30

*Kysor Indus. Corp. v. Margaux, Inc.,*
674 A.2d 889 (Del. Super. Ct. 1996) ..........................................................................32

*MacArthur Company v. Johns-Manville Corp. (In re Johns-Manville Corp.),*
837 F.2d 89 (2d Cir. 1988)..........................................................................................26

*Matador Capital Mgmt. Corp. v. BRC Holdings, Inc.,*
729 A.2d 280 (Del. Ch. Ct. 1998)................................................................................32

*McMichael v. U.S. Filter Corp.,*
2001 U.S. Dist. LEXIS 3918 (C.D. Cal. 2001)..............................................................32

*Nostas Assocs. v. Costich (In re Klein Sleep Prods., Inc.),*
78 F.3d 18 (2d Cir. 1996) ...........................................................................................27

*Official Comm. of Subordinated Bondholders v. Integrated Res., Inc.*
*(In re Integrated Res., Inc.),* 147 B.R. 650 (S.D.N.Y. 1992),
*appeal dismissed,* 3 F.3d 49 (2d Cir. 1993) ............................................................32, 35

*Official Comm. of Unsecured Creditors v. LTV Corp. (In re Chateaugay Corp.),*
973 F.2d 141 (2d Cir. 1992)........................................................................................24

*Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.),*
4 F.3d 1095 (2d Cir. 1993)..........................................................................................27

*Reloeb Co. v. LTV Corp (In re Chateaugay Corp.),*
No. 92 Civ. 7054 (PKL), 1993 WL 159969 (S.D.N.Y. May 10, 1993)................................29

*Samjens Partners I v. Burlington Indus., Inc.,*
663 F. Supp. 614 (S.D.N.Y. 1987)...............................................................................32

**STATUTES**

11 U.S.C.

§ 105.................................................................................................................5, 23
§ 363..............................................................................................................*passim*
§ 363(b)..................................................................................................................23
§ 363(b)(1).............................................................................................................24
§ 363 (f)...........................................................................................................23, 25
§ 363(f)(1)-(5).......................................................................................................25
§ 363 (m).....................................................................................................23, 29, 30
§364.......................................................................................................................5, 23
§ 365...............................................................................................................11, 23
§ 365(a)..................................................................................................................27
§ 365(b)..................................................................................................................11
§ 365(b)(1)(C).......................................................................................................28
§ 365(f)............................................................................................................11, 29
§ 365(f)(1).............................................................................................................29
§ 365(f)(3).............................................................................................................29
§ 365(k)..................................................................................................................27
§ 503........................................................................................................................5
§ 507........................................................................................................................5
§ 1106(a)(3)...........................................................................................................16
§ 1106(a)(4)...........................................................................................................16
§ 1106(b)................................................................................................................17
§ 1107(a)..................................................................................................................6
§ 1108......................................................................................................................6

28 U.S.C.

§ 157(b)(2)...............................................................................................................5
§ 1334......................................................................................................................5
§ 1408......................................................................................................................5
§ 1409......................................................................................................................5

**RULES**

Fed. R. Bankr. P.

2002..............................................................................................................5, 23, 37
4001.........................................................................................................................5
4001(c)...................................................................................................................23
6003........................................................................................................................23
6004....................................................................................................................5, 23
6004(h).............................................................................................................21, 36
6006...................................................................................................................5, 23
6006(d)..................................................................................................................36
9006........................................................................................................................23
9008....................................................................................................................5, 23
9014....................................................................................................................5, 23

General Orders of the Bankruptcy Court for the Southern District of New York

General Order 331..........................................................................................................5, 20, 23
General Order 383..............................................................................................................5, 23

Local Rules of the Banrkuptcy Court for the Southern District of New York

6004-1 ................................................................................................................................5, 23
6006-1 ................................................................................................................................5, 23
9006-1 ................................................................................................................................5, 23

The above-captioned debtors and debtors in possession (collectively, the "***Debtors***") submit this motion seeking entry of an order substantially in the form attached hereto as Exhibit 1 (i) authorizing the Debtors to enter into that certain Purchase Agreement, attached to the proposed order as Exhibit A (the "***Purchase Agreement***"[2] or the "***Stalking Horse Agreement***")[3] by and among TerreStar Networks Inc., TerreStar License Inc., TerreStar National Services Inc., TerreStar Networks Holdings (Canada) Inc., TerreStar Networks (Canada) Inc. and 0887729 B.C. Ltd. and Gamma Acquisition L.L.C. (the "***Purchaser***" or the "***Stalking Horse Bidder***"), and (solely with respect to section 6.19 of the Purchase Agreement) DISH Network Corporation and (ii) approving the amended bid procedures, including the $27.5 million break-up fee (the "***Break-Up Fee***")[4] and the reimbursement of up to $3 million (the "***Expense Reimbursement Cap***") of the actual, reasonable and documented costs and expenses of the Stalking Horse Bidder incurred in connection with its bid (the "***Expense Reimbursement***" and, together with the Break-Up Fee and the other components of the Purchaser Protections, the "***Bid Protections***").  In support of this motion, the Debtors respectfully state as follows:

## PRELIMINARY STATEMENT

1.      After nearly a year of vigorous marketing, the Debtors' efforts to locate a qualified bidder offering to provide substantial value for the Debtors' assets have succeeded.  For numerous months, and even more intensely since entry of the *Order Pursuant to 11 U.S.C. §§ 105, 363, 364, 365, 503 and 507 and Fed. R. Bankr. P. 2002, 4001, 6004, 6006 9008 and 9014, Approving (a) Bid Procedures, (b) Notice of Sale, Auction, and Sale Hearing, and (c) Assumption Procedures and Related Notices* [Docket No. 577] (the "***Bid Procedures Order***"), the Debtors

---

[2]     Capitalized terms used but not defined herein shall have the meaning(s) ascribed to them in the Purchase Agreement.

[3]     A blackline of the Stalking Horse Agreement against the draft purchase agreement annexed to the Sale Motion (as defined herein) is attached to the proposed order as Exhibit B.

[4]     $27.5 million is equal to 2% of the Purchase Price (as defined herein).

have had discussions with several potential purchasers, including the Stalking Horse Bidder, regarding a potential bid. Shortly before the initial bid deadline, the Stalking Horse Bidder submitted an offer whereby the Stalking Horse Bidder would pay the Debtors $1.375 billion in cash and the assumption of liabilities (the "***Stalking Horse Bid***" or the "***Purchase Price***") in exchange for substantially all of the Debtors' assets. This motion seeks approval of this bid as the stalking horse or baseline bid for the Debtors' auction.

2. The Stalking Horse Bid represents a significant achievement for the Debtors in these chapter 11 cases, and the Debtors are pleased to report the following virtues, *inter alia*, of the Stalking Horse Bid:

a. The Purchase Price — $1.375 billion[56] — is more than $150 million greater than the valuation that the Debtors included in their disclosure statement filed in December.

b. The Purchase Price will be paid in all cash, as opposed to requiring creditors to take any other type of consideration.

c. The Purchase Price is greater than the amount of the Debtors' secured debt (projected as of September 30, 2011) by more than $90 million.

d. The Purchaser has agreed to assume the risk that it will receive FCC and Industry Canada approval of the "transfer of control" of the Debtors' communications licenses. Specifically, the Purchaser has agreed to pay more than 97% of the purchase price shortly after entry of a sale order approving the transaction, subject only to receipt of competition and antitrust regulatory approvals and other customary conditions set forth in the Purchase Agreement.[7]

---

[5] The following summary is qualified entirely by the terms of the Purchase Agreement and Bid Procedures. To the extent there are any inconsistencies between the terms described herein and the terms and conditions of the Purchase Agreement or Bid Procedures, the terms of the Purchase Agreement or Bid Procedures (as applicable) shall control.

[6] $30 million of the Purchase Price will not be paid on the Funding Date. Instead, it will be payable (less the amount of the Employee Obligations (as defined in the Purchase Agreement)) on the Closing Date.

[7] To the extent that the Purchaser is unable to receive FCC and Industry Canada approval, it will be entitled to require that the Debtors engage in a process to re-market and sell the assets, and the Purchaser will bear the entire risk associated with that process. This third-party sale process will be entirely funded by the Purchaser and will not affect the Purchase Price (upwards or downwards). In all events, if the Closing has not yet occurred, the Debtors will be permitted to pursue an "Alternative Sale" on January 1, 2013.

e.  Receipt of the proceeds of the bid shortly after entry of the sale order will allow the Debtors to file a motion with the Bankruptcy Court seeking to retire all or a portion of their more than $1.1 billion in secured debt (subject to Bankruptcy Court approval), thereby stopping the estate-burdening interest accrual of roughly $46 to $47 million per quarter (consisting of approximately (i) $40 million per quarter on the Debtors' 15% Senior Secured Notes,[8] (ii) $3.4 to $3.5 million per quarter on the Debtors' PMCA Credit Facility, and (iii) $3 million[9] per quarter on the Debtors' current debtor-in-possession financing (the "***DIP Facility***") or any replacement DIP facility).  The cutoff of the accrual of interest on the Debtors' secured debt will inure entirely to the benefit of the Debtors' unsecured creditors.

f.  In conjunction with the bid, the Debtors' DIP financing lender, EchoStar Corporation ("***EchoStar***" or the "***DIP Financing Lender***"), has agreed to extend the maturity and increase the amount of the Debtors' current DIP Facility until the Funding Date, thereby preventing any unnecessary event of default thereunder and ensuring that the Debtors can continue their business operations and chapter 11 cases without any interruption.

g.  The Stalking Horse Bidder has agreed to extend the bidding deadline until June 27th, with a new auction date of June 30th.  This will allow the Debtors to continue their marketing and auction process in the hopes of maximizing the consideration received for their assets.

h.  The Stalking Horse Bidder has agreed to only require minimal changes to the Bid Procedures approved by this Court on May 4, 2011.  Specifically, in order to qualify as an Initial Incremental Qualified Bid, a competing bidder's initial bid must: (i) be in an amount that exceeds the Stalking Horse Bid by $55.5 million, which is the sum of (A) the $27.5 million (2%) Break-Up Fee, (B) the $3 million Transaction Expense Reimbursement Cap; and (C) a $25 million initial incremental overbid, and (ii) consist of consideration in the form of cash or equity securities freely tradable on a nationally recognized securities exchange, provided that the Debtors, in consultation with the Creditors' Committee, reserve

---

[8]  Although the Debtors recognize that there is pending litigation, *Sprint Nextel Corp. and Official Comm. of Unsecured Creditors of TerreStar Networks Inc. v. U.S. Bank Nat'l Assoc. and TerreStar Networks Inc.*, No. 10-05461 (the "**Sprint Lien Litigation**"), regarding the validity of the liens securing the Senior Secured Notes, the briefing related to that litigation was completed almost sixty (60) days ago and argument was heard by the Court almost fifty-five (55) days ago.  As such, although the Debtors are admittedly not parties to the litigation, the Debtors expect to request that the Court render its decision regarding such litigation in the near term.

[9]  The Debtors' DIP Facility grows both on account of accrued interest and monthly principal draws.  The monthly principal draws will end mid-July, however, as a result of the DIP Facility's maturity (as explained further herein).  For that reason, the Debtors have omitted the approximately $8 million per month expense of the monthly principal draw in the summary contained herein.  To the extent the Debtors were forced to take a bid that would replace the DIP Facility (instead of upfront cash), the increased expense would thus be even greater.

the right to accept a bid that includes consideration in the form of an agreement to forgive secured debt as an Initial Incremental Qualified Bid, so long as such bid satisfies all of the requirements of an Initial Incremental Qualified Bid other than the requirement that the bid be payable in cash or equity securities freely tradable on a nationally recognized securities exchange. The Debtors believe that these requirements will not chill bidding, and that the proposed bid protections for the Stalking Horse Bidder are reasonable and appropriate for these cases and standard for auctions of this size and type.

3.　　　In light of the above, the Debtors, in a prudent exercise of their business judgment, decided it was preferable to have an auction with the Stalking Horse Bidder instead of a "naked" auction, as they did not want to risk an outcome whereby a naked auction yielded less value. As such, and in accordance with the Bid Procedures Order, the Debtors now seek approval of the relief requested in this motion. Importantly, while the Debtors acknowledge that this motion is being filed on the cusp of the Bid Deadline,[10] as noted above, the Debtors have filed a notice with the Bankruptcy Court concurrently herewith setting the new the Bid Deadline as June 27, 2011, at 5:00 p.m. New York Time.[11] This will effectively give prospective bidders at least two weeks to review the Stalking Horse Bid and prepare a higher or otherwise better bid for the Debtors' assets.

4.　　　The Stalking Horse Agreement is the product of good faith, arm's-length negotiations. The Debtors have been in discussions with the Purchaser on the terms of a Stalking Horse Bid for several months. As such, the parties were able to negotiate and finalize the terms of the Purchase Agreement (once an offer was made) very rapidly, which will help to ensure only a minimal delay in the Debtors auction process.

---

[10]　The Bid Deadline was extended to June 15, 2011 pursuant to the Debtors' *Notice of Revised Sale Process Dates* [Docket No. 613] (the "***Sale Process Dates Notice***"). For purposes of this motion, the sale process dates referred to herein shall be those set by the Bid Procedures Order as extended by the Sale Process Dates Notice.

[11]　The Debtors have also moved the Auction (as defined herein) to three (3) business days after the modified Bid Deadline, and the Sale Hearing to six (6) days after the Auction. These extensions are substantially consistent with the time frames currently contained in the Bid Procedures Order.

5. In addition to the numerous reasons listed above, and because it enables the Debtors to lock in a sizeable floor for their auction process, the Debtors believe, in an exercise of their business judgment and fiduciary duties, that the Stalking Horse Agreement represents their best opportunity to maximize value for their creditors. Moreover, as discussed in detail below, the Bidder Protections (including the Break-Up Fee and the Expense Reimbursement) (i) are fair and reasonable in scope and amount given the value of the Stalking Horse Bid, (ii) are typical of similar protections routinely approved by courts in this district, (iii) will not serve to hinder bidding, and (iv) were carefully negotiated in good faith and at arm's length. The statutory committee of unsecured creditors appointed in these chapter 11 cases (the "***Creditors' Committee***") has reviewed the Stalking Horse Agreement and supports the relief requested in this motion. Accordingly, by this motion, the Debtors request that the Court (1) authorize entry into and performance under the Stalking Horse Agreement and (2) approve the Bid Protections, without which the Stalking Horse Bidder will not proceed with the Stalking Horse Agreement.

## <u>JURISDICTION</u>

6. This Court has subject matter jurisdiction to consider and determine this matter pursuant to 28 U.S.C. § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

7. The bases for the relief requested herein are sections 105, 363, 364, 503 and 507 of the United States Code (the "***Bankruptcy Code***"), Rules 2002, 4001, 6004, 6006, 9008, and 9014 of the Federal Rules of Bankruptcy Procedure (the "***Bankruptcy Rules***"), Rules 6004-1, 6006-1 and 9006-1 of the Local rules for the Southern District of New York (the "***Local Rules***"), and S.D.N.Y. General Orders 331 and 383 (respectively, "***General Order 331***" and "***General Order 383***").

## BACKGROUND

8.       On October 19, 2010 (the "***Petition Date***"), each of the Debtors filed a petition with this Court under chapter 11 of the Bankruptcy Code.[12]  The Debtors are operating their businesses and managing their property as debtors in possession pursuant to Bankruptcy Code sections 1107(a) and 1108.[13]  No request for the appointment of a trustee or examiner has been made in these chapter 11 cases.

### A.       The Sale Motion

9.       As this Court and all parties in interest in these cases are aware, in an effort to provide stakeholders with the highest possible recoveries, on April 15, 2011 the Debtors filed a motion with the Court seeking approval of bid and auction procedures for a sale of substantially all of the Debtors' assets [Docket No. 533] (the "***Sale Motion***").[14]  Pursuant to the Sale Motion, the Debtors sought approval of procedures that, among other things, requested that the Bankruptcy Court (a) approve the Debtors' proposed bid procedures (the "***Bid Procedures***") and (b) set a date for (i) an auction (the "***Auction***") for the sale of substantially all of the assets (the "***Assets***") of the Debtors' estates and (ii) a hearing (the "***Sale Hearing***") for approval of any

---

[12]    Also on October 19, 2010, TerreStar New York Inc., Motient Communications Inc., Motient Holdings Inc., Motient License Inc., Motient Services Inc., Motient Ventures Holding Inc., and MVH Holdings Inc. (collectively, the "***Non-TSN Debtors***") each filed a petition for relief under chapter 11 of the Bankruptcy Code. On October 20, 2010, the Court entered an order providing for joint administration, for procedural purposes, of the Debtors' cases (the "***Joint Administration Order***"), which at that time included the Non-TSN Debtors.

On February 16, 2011, TerreStar Corporation and TerreStar Holdings Inc. each filed a petition for relief in this Court under chapter 11 of the Bankruptcy Code (the "***February Debtors***").  On February 23, 2011, the Court entered an order amending the Joint Administration Order to remove the Non-TSN Debtors from administration under the TerreStar Networks Inc. case number.  Contemporaneously therewith, the Court entered an order providing for the joint administration of the cases of the February Debtors and the Non-TSN Debtors.

[13]    A detailed description of the Debtors' business and the reasons for filing these chapter 11 cases is set forth in the Declaration of Jeffrey W. Epstein, Chief Executive Officer of TerreStar Networks Inc., in Support of First Day Pleadings (the "***First Day Declaration***"), which was filed contemporaneously with the Debtors' voluntary petitions for relief under chapter 11 of the Bankruptcy Code.

[14]    Capitalized terms used but not defined herein shall have the meaning ascribed to them in the Sale Motion.

successful bidder (any such bidder, the "***Successful Bidder***") at the Auction, all as more fully set forth in the Sale Motion.

10.     On May 4, 2011, the Bankruptcy Court entered the revised Bid Procedures Order, which provided, among other things, that the Debtors, with the reasonable consent of the Creditors' Committee, may seek approval of entry into a stalking horse agreement at any time before 5:00 P.M. (New York Time) on the Bid Deadline, *provided, however*, that the Debtors seek Court approval of any stalking horse agreement on no less than five (5) business days' notice.[15]   As noted above, on June 7, 2011, the Debtors filed the Sale Process Dates Notice extending each of the deadlines initially set in the Bid Procedures Order by one week. Accordingly, the current Bid Deadline is 5:00 p.m. New York Time on June 15, 2011.

### B.      The Stalking Horse Negotiations and the Stalking Horse Agreement

11.     For the last few months, the Debtors have been in discussions with their constituents and with third parties that have expressed interest in participating in the Auction. From these discussions, the interested party that emerged with the highest or otherwise best bid to be a stalking horse bidder was the Stalking Horse Bidder.  After entry of the Bid Procedures Order, and before the initial bid deadline, the Stalking Horse Bidder began discussions with the Debtors in earnest regarding the contours of their proposed sale transaction and, shortly before the initial bid deadline, provided documentation regarding the Stalking Horse Bid to the Debtors. The Debtors and their professionals have since been in negotiations with the Stalking Horse Bidder and its advisors regarding the terms of the Stalking Horse Bid.

12.     Accordingly, on June 14, 2011, the Debtors and the Stalking Horse Bidder executed the Purchase Agreement (subject to this Court's approval), which provides for the sale

---

[15]     Bid Procedures Order at 5.

of the Acquired Assets to the Stalking Horse Bidder. The Debtors believe that the Purchase Agreement, coupled with the Auction process already approved by this Court and the Amended Bid Procedures (as defined below), will allow the Debtors to further test the purchase price against the market and maximize value through the auction process.

C.   **The Stalking Horse Agreement**[16]

13.   The salient terms of the Purchase Agreement are summarized as follows:

(a)   Purchase Price: The Purchase Price shall be $1.375 billion and shall consist of: (i) $50 million, which shall be deposited into the Escrow Account to provide funding for working capital and administrative expenses incurred, accrued, payable or paid by Sellers during the period from the Funding Date through December 31, 2011, in accordance with the Operating Budget; (ii) $1.295 billion, which shall be payable on or before the Funding Date; (iii) $30 million, less the amount of the Employee Obligations, which shall be payable as set forth in Section 2.5(b)(v);[17] and (iv) the Purchaser's assumption of the Employee Obligations on the Closing Date. The Purchase Price is payable as set forth in Section 2.5(b).

(b)   Purchaser: Gamma Acquisition LLC, a Colorado LLC.

(c)   Purchased Assets: Purchaser and/or one or more of its Affiliates or Subsidiaries, as applicable, shall purchase, acquire, assume and accept from Sellers, free and clear of all Seller Liabilities, Liens, Claims and Interests (except for Liens created by Purchaser and any Assumed Permitted Liens and Assumed Liabilities), all of Sellers' right, title and interest in and to all of their Assets, other than the Retained Assets;

(d)   Retained Assets: Notwithstanding anything in the Purchase Agreement to the contrary, the Acquired Assets shall not include the Assets which are to be retained by Sellers and not sold or assigned to Purchaser, which shall be limited to the following:

---

[16]   The following summary is qualified entirely by the terms of the Purchase Agreement. To the extent there are any inconsistencies between the description of the Purchase Agreement contained herein and the terms and conditions of the Purchase Agreement, the terms of the Purchase Agreement shall control. Capitalized terms used but not defined herein shall have the meaning ascribed to such terms in the Purchase Agreement. Unless otherwise set forth herein, section numbers shall refer to sections of the Purchase Agreement.

[17]   All section and article references contained in this paragraph 13 are references to sections or articles of the Purchase Agreement.

(i)       Cash and Cash Equivalents on hand of the Sellers as of the Closing Date other than as specifically provided for in Sections 2.1(q) and 2.1(r) and net of Third Party Deposits;

(ii)     all rights of Sellers in and to all Contracts other than the Designated Contracts;

(iii)    all losses, loss carryforwards and rights to receive refunds, and credits with respect to any and all Taxes of Sellers (and/or of any of their Affiliates) that constitute Non-Assumed Liabilities;

(iv)    all Tax Returns of Sellers;

(v)     all personnel files for employees who are not Transferred Employees and personnel files of Transferred Employees that may not be Transferred under Applicable Laws;

(vi)    books and records that Sellers are required by Applicable Law to retain to the extent they relate exclusively to the Retained Assets or the Non-Assumed Liabilities;

(vii)   customer relationships, goodwill and other intangible assets relating to, symbolized by or associated exclusively with the Retained Assets;

(viii)  all Employee Benefit Plans and Canadian Plans, including rights and any assets under any Employee Benefit Plan or Canadian Plan of Sellers which are not being assumed by Purchaser;

(ix)    any directors and officers liability insurance policies of Sellers and any claims thereunder;

(x)     the Avoidance Actions and all other Actions, including those related to the Retained Assets set forth in clauses (a) through (i) of Section 2.2, other than as specifically provided for in Section 2.1(v); and

(xi)    all right and claims of Sellers arising under this Agreement and the Ancillary Agreements.

(e)     <u>Assumption of Liabilities</u>: The Purchaser shall (or shall cause its designated Subsidiaries or Affiliates to) assume and become solely and exclusively liable for the following liabilities of the Sellers: (i) all liabilities and obligations of Sellers under the Designated Contracts that arise exclusively after the Closing Date; (ii) any other liabilities and obligations that are specifically designated by Purchaser in writing on or prior to the Closing Date; (iii) all liabilities relating to, or arising in respect of the Acquired Assets accruing, arising out of or relating to events,

occurrences, acts or omissions occurring or existing after the Closing Date, or the operation of the Business or the Acquired Assets after the Closing Date; (iv) all accrued liabilities with respect to the Employees and the Transferred Employees; including all accrued salary, vacation, and other compensation, and workers' compensation obligations (except for liabilities related to the Employee Benefit Plans and the Canadian Plans and such other non-assumed liabilities as are set forth in Section 2.4); (v) all liabilities arising out of or resulting from a change of control, layoffs or termination of the Employees and the Transferred Employees by any Seller prior to or on the Closing Date that arises from the consummation of the Transactions, including WARN Obligations; provided, that Purchaser shall not assume the Employee Obligations to the extent they exceed $30 million in the aggregate; and (vi) all liabilities and obligations of the Purchaser under Section 6.7.

(f)     <u>Non-Assumed Liabilities</u>:   Notwithstanding anything in the Purchase Agreement to the contrary, Purchaser shall not assume, and shall be deemed not to have assumed, any Seller Liabilities or any obligations or liabilities of any of their Subsidiaries or Affiliates or the Business, other than the Assumed Liabilities specified in Section 2.3(a).  For purposes of clarity, each of (i) any liabilities or obligations with respect to any Employee Benefit Plan, Canadian Plan, Canadian Union Plan, the Key Employee Incentive Plan, the Canada Pension Plan, the Quebec Pension Plan or other such plans created by an Applicable Law or administered by a Governmental Entity, (ii) any Cure Amounts, (iii) any liabilities or obligations of Sellers with respect to Taxes with respect to Sellers, the Business, or the Acquired Assets (except as provided in Section 6.10), (iv) other claims (including Taxes) against or relating to any of the Acquired Assets, Assumed Liabilities and/or the Business arising prior to the Closing Date, and (v) Employee Obligations in excess of $30 million in the aggregate, shall be Non-Assumed Liabilities.

(g)     <u>Representations and Warranties</u>: The Purchase Agreement includes customary representations, warranties, and covenants for transactions of this type and size in chapter 11.

(h)     <u>Covenants</u>: The Purchase Agreement includes customary covenants for transactions of this type and size in chapter 11, and also includes the following:

(i)     *Efforts and Actions to Cause Closing to Occur*.  The parties shall take all actions necessary to make all filings required for FCC, Industry Canada, Investment Canada or any other required governmental entity approval or consent. *See* APA § 6.3(c),(e).

(ii)     *Submission for Court Approval*.   Sellers shall take all actions reasonably required to assume and assign the Designated Contracts to

Purchaser, including taking all actions reasonably required to obtain a Bankruptcy Court order containing a finding that the proposed assumption and assignment of the Designated Contracts to Purchaser satisfies all applicable requirements of section 365 of the Bankruptcy Code. *See* APA § 6.6(b).

(iii) *Submission for Court Approval*. Sellers shall use reasonable best efforts to obtain, on or prior to the Funding Date, entry of a Final Order of the Bankruptcy Court providing that the Bankruptcy Court shall retain jurisdiction to hear and determine a motion to assign the Designated Contracts to a Third Party purchaser in an Alternative Sale, pursuant to section 365 of the Bankruptcy Code, including, without limitation, to determine whether the Sellers have provided "adequate assurance" to counterparties to the Designated Contracts within the meaning of, and as required by, sections 365(b) and 365(f) of the Bankruptcy Code. *See* APA § 6.6(c).

(iv) *Use of Proceeds of Funding Date Payment*. Sellers shall: (i) no later than two (2) Business Days after the Debtors determine, in consultation with the Creditors Committee that the Purchaser is the winning bidder at the auction, file with the Bankruptcy Court a motion, in form and substance reasonably acceptable to Purchaser, seeking authority to use the proceeds of the Funding Date Payment to repay in full, on the Funding Date or as soon as reasonably practicable thereafter, all of Sellers' outstanding secured indebtedness, including, without limitation, Sellers' outstanding obligations under (A) the DIP Credit Agreement, (B) the Senior Secured Notes and (C) the Purchase Money Credit Agreement; and (ii) use their reasonable best efforts to obtain, no later than twenty-six Business Days after filing such motion, entry of a Final Order of the Bankruptcy Court granting such authority. *See* APA § 6.17.

(v) *Entry into New DIP Agreement*. If, within three (3) Business Days after the date of this Agreement (such third Business Day, the "***DIP Agreement Amendment Date***"), the DIP Credit Agreement has not been amended to provide that upon entry of the Sale Order, additional debtor-in-possession financing shall be made available to Sellers from the date of entry of the Sale Order (or the current maturity date of the DIP Credit Agreement, if earlier) to the Funding Date (the "***Amended DIP Credit Agreement***"), Parent shall enter into an agreement to provide such debtor-in-possession financing to Sellers as soon as practicable, but in no event more than five (5) Business Days following the DIP Agreement Amendment Date. Purchaser acknowledges that entry into the Amended DIP Credit Agreement is an integral part of the transactions contemplated by the Purchase Agreement and that any breach by Purchaser of section 6.18 shall be incapable of being cured. *See* APA § 6.18.

(i)     <u>Purchaser Conditions to Funding Date</u>:

    (i)     *Government Action*. There shall be no injunction, restraining order or decree of any Governmental Entity (other than the FCC or Industry Canada) in connection with the Bankruptcy Cases as further set forth in the Purchase Agreement;

    (ii)     *Regulatory Action*. There shall be no injunction, restraining order or decree by the FCC or Industry Canada in effect prohibiting the consummation of the Funding or the performance of any material aspect of the Transactions, taken as a whole or having any of the effects listed in Section 7.1(a)(i)(1) through (5).

    (iii)     *Consents, Approvals and Permits*. Other than the Specified Regulatory Approvals, all consents and approvals of any Person (other than a Governmental Entity) set forth in Section 7.1(a)(iii) of the Disclosure Letter, shall have been obtained, except (x) to the extent that the requirement for a particular consent or approval is rendered inapplicable by the Sale Order or other order of the Bankruptcy Court or the Canadian Court, if applicable, or (y) in the case of any Nonassignable Designated Contract. Other than the Specified Regulatory Approvals, all consents and approvals of any Governmental Entity, whether United States federal, state, local or non-United States, required in connection with the consummation of the Funding and the other Transactions, shall have been obtained except where the failure to obtain would not constitute a Material Adverse Effect. A copy of each such consent or approval referred to in Section 7.1(a)(iii) shall have been provided to Purchaser at or prior to the Funding. All Permits (other than any Permit that constitutes a Specified Regulatory Approval that has not yet been obtained) necessary for the operation of the Business included in the Acquired Assets either have been Transferred to Purchaser or have been obtained by Purchaser except where the failure to obtain would not constitute a Material Adverse Effect. All such consents, approvals and Permits referred to in Section 7.1(a)(iii) shall be in effect at the Funding and shall not have been amended, modified, revoked or rescinded.

    (iv)     *Antitrust Approvals*. Other than the Specified Regulatory Approvals (excluding for this purpose any Competition Act Approval and any Investment Canada Approval, which, if required, must have been obtained), all terminations or expirations of waiting periods imposed by any Governmental Entity necessary for the consummation of the transactions contemplated by this Agreement, including under any applicable antitrust regulations in any non-United States jurisdiction, shall have occurred and all other notifications, consents, authorizations and approvals required

to be made or obtained from any non-United States competition or antitrust authority (including any required Competition Act Approval and any required Investment Canada Approval) shall have been made or obtained for the transactions contemplated by this Agreement.

(v)     *Material Adverse Effect.*  Since the date of this Agreement, there shall not have occurred and be continuing any Material Adverse Effect or any facts, events or circumstances that would reasonably be expected to have such a Material Adverse Effect.

(vi)    *Sellers' Representations and Warranties.*  Each of the representations and warranties set forth in Article IV disregarding all materiality and Material Adverse Effect qualifications contained therein, shall be true and correct (i) as of the date hereof and as of the Funding Date (as though made on the Funding Date) or (ii) if made as of a date specified therein, as of such date, except (with respect to all representations and warranties set forth in Article IV other than Sections 4.1, 4.4, 4.22, 4.24(b) and 4.24(c)) for any failure to be true and correct that, individually and together with other such failures, has not had and would not reasonably be expected to have a Material Adverse Effect.

(vii)   *Sellers' Performance of Covenants.*  Sellers shall not have failed to perform in any material respect any material obligation or to comply in any material respect with any material agreement or material covenant of Sellers to be performed or complied with by them under this Agreement.

(viii)  *Certificate of Sellers' Officers.*  Purchaser shall have received from Sellers a certificate, dated the Funding Date, duly executed by the Chief Executive Officer, and the Chief Financial Officers of each individual Seller, reasonably satisfactory in form to Purchaser, to the effect of paragraph (v) through (vii) above.

(ix)    *Sale Order.*  The Bankruptcy Court shall have entered the Sale Order, the Sale Order shall have become a Final Order and the Sale Order shall not have been reversed, stayed, modified or amended.

(x)     *Sale Recognition Order.*  The Canadian Court shall have entered the Sale Recognition Order in form and substance reasonably satisfactory to Purchaser, the Sale Recognition Order shall be a Final Order and the Sale Recognition Order shall not have been reversed, stayed, modified or amended in any manner materially adverse to Purchaser without Purchaser's consent.

(xi) *Ancillary Agreements*. Sellers have duly executed and delivered to Purchaser each of the Ancillary Agreements and such Ancillary Agreements shall have been approved by order of the Bankruptcy Court (which may be included in the Sale Order) and, to the extent deemed reasonably necessary by Purchaser, the Canadian Court shall have entered an order recognizing any such order.

(j) <u>Purchaser Conditions to Closing Date</u>: All of the conditions to Funding shall be conditions to the Closing (treating references in Section 7.1(a) to the "Funding" as references to the Closing, as applicable, and "Funding Date" as references to the Closing Date, as applicable), in addition to the following conditions:

(i) *Other Consents*. All Third Party consents necessary for the Transfer of the Acquired Assets not previously delivered shall have been obtained.

(ii) *FCC Consent*. The FCC Consent shall have been issued.

(iii) *Industry Canada Consent*. The Industry Canada Consent shall have been issued and shall not have been amended, modified, revoked or rescinded.

(iv) *Bill of Sale; Conveyance Documents*. Sellers shall have duly executed and delivered to Purchaser the Bill of Sale, each of the Intellectual Property Instruments and each other Conveyance Document.

(v) *Tax Certifications*. Purchaser shall have received a certification of non-foreign status for each Seller (other than the Canadian Sellers) in the form and manner which complies with the requirements of Section 1445 of the Code and the Treasury regulations promulgated thereunder.

(vi) *Shareholders Agreement*. Purchaser shall have become party to the Shareholders Agreement, or another agreement among the shareholders of Solutions in substantially the form of the Shareholders Agreement.

(k) <u>Termination Events</u>: The Purchase Agreement may be terminated or abandoned at any time prior to the Funding Date as follows:

(i) By the mutual written consent of Purchaser and Sellers;

(ii) By either Purchaser or Sellers (and if by Sellers, in consultation with the Creditors' Committee) upon written notice given to the other, if the Bankruptcy Court, Canadian Court or any other Governmental Entity shall have issued an order, decree or ruling or

14

taken any other action (which order, decree, ruling or other action the parties hereto shall use their reasonable best efforts to prevent the entry of and remove), which permanently restrains, enjoins or otherwise prohibits the consummation of the Transactions and such order, decree, ruling or other action shall have become final and non-appealable;

(iii) By either Purchaser or Sellers upon written notice given to the other, if the Funding Date shall not have taken place on or before December 31, 2011 (the "Termination Date"). The Termination Date may be extended by Purchaser up to but not beyond (i) March 31, 2012 (in which case, for the avoidance of doubt, Purchaser will provide additional funding to Sellers (via the Escrow Account) in order to operate the Business and, to the extent necessary for payment of Sellers' expenses in connection with the Bankruptcy Cases, which amount shall be released to Purchaser if it is not used by the Sellers for such purposes, or (ii) if Purchaser, in its sole discretion, determines to provide additional funding to Sellers (via the Escrow Account) in order to operate the Business and, to the extent necessary for payment of Sellers' expenses in connection with the Bankruptcy Cases, which amount shall be released to Purchaser if it is not used by the Sellers for such purposes, June 30, 2012, the latest of any of which dates shall thereafter be deemed to be the Termination Date; provided, further that the failure of the Funding to occur on or before such date is not the result of a material breach of any covenant, agreement, representation or warranty hereunder by the party seeking such termination; and

(iv) By Sellers (in consultation with the Creditors' Committee) upon written notice given to Purchaser or Parent, as applicable, if Purchaser or Parent, as applicable, shall have breached or failed to perform in any material respect any of its representations, warranties, covenants or other agreements contained in this Agreement, which breach or failure to perform (i) would result in a failure of a condition set forth in Section 7.2 and (ii) cannot be cured within ten (10) Business Days after Sellers notify Purchaser or Parent, as applicable, of such breach.

(v) By Purchaser or Sellers upon written notice given to Purchaser, if:

(a) at the conclusion of the Sale Hearing Purchaser is not determined by the Bankruptcy Court to be the successful bidder; or

(b) the Bankruptcy Court enters any order approving an Alternative Transaction.

For the avoidance of doubt, Purchaser shall not be required to act as the Back-Up Bidder in any auction for the Acquired Assets, except to the extent Purchaser consents in writing to act as the Back-Up Bidder.

(vi)    By Purchaser upon written notice given to Sellers, if any Seller shall have breached or failed to perform in any material respect any of its representations, warranties, covenants or other agreements contained in this Agreement, which breach or failure to perform (i) would result in a failure of a condition set forth in Section 7.1 and (ii) cannot be cured within ten (10) Business Days after Purchaser notifies Sellers of such breach;

(vii)   By Purchaser upon written notice given to Sellers:

(a)    unless, on or prior to June 24, 2011, the Bankruptcy Court has entered the Purchaser Protections Order;

(b)    unless, on or prior to September 30, 2011, (i) the Bankruptcy Court has entered the Sale Order and (ii) the Canadian Court has subsequently entered the Sale Recognition Order no longer than 21 days after (i); provided that Purchaser shall have the right to designate any later date for this purpose in its sole discretion;

(c)    if any Seller seeks to have the Bankruptcy Court enter an order dismissing a Bankruptcy Case or converting it to a case under Chapter 7 of the Bankruptcy Code, or appointing a trustee in its Bankruptcy Cases or appointing a responsible officer or an examiner with enlarged powers relating to the operation of Sellers' businesses (beyond those set forth in Section 1106(a)(3) or (4) of the Bankruptcy Code) under Bankruptcy Code Section 1106(b), or such an order of dismissal, conversion or appointment is entered for any reason and is not be reversed or vacated within three days after the entry thereof; or

(d)    if the Sale Order or the Sale Recognition Order has been revoked, rescinded or modified in any material respect and the order revoking, rescinding or modifying such order(s) shall not be reversed or vacated within three days after the entry thereof; provided that Purchaser shall have the right to designate any later date for this purpose in its sole discretion.

(l)    <u>Alternative Sale Mechanism</u>:

(i)  *Sale Notice.*  At the earliest to occur of (A) the date six months after the application for the FCC Consent with respect to the Transactions has been submitted to the FCC, if all or any one of the Specified Regulatory Approvals shall not have been granted on or prior to such date, (B) the date that is ten (10) Business Days after Purchaser becomes has or have committed a material breach of this Agreement or any Ancillary Agreement, and such material breach shall not have been cured during the ten (10) Business Day period after Purchaser provides written notice thereof to the Sellers, (C) the date upon which the FCC or Industry Canada denies, dismisses or designates for an evidentiary hearing the applications for the FCC Consent or the Industry Canada Approval, or (D) after the Funding Date, upon Purchaser's election, Purchaser shall have the right to deliver a written notice ("***Purchaser Alternative Sale Notice***") to Sellers to implement the Alternative Sale Procedures and request that Sellers sell or otherwise dispose of some or all of the Acquired Assets to one or more Third Parties that are eligible to hold legal title to such Acquired Assets, with all proceeds from such sales accruing to the sole benefit and account of Purchaser in accordance with the procedures set out in Exhibit A, including the procedure for identifying bona fide potential Third Party purchasers (each such sale or disposal, the "***Alternative Sale***").  In the event that the Closing has not occurred, at any time after January 1, 2013, unless a Purchaser Alternative Sale Notice shall previously have been delivered, Sellers shall have the right to deliver a written notice ("***Seller Alternative Sale Notice***" and together with the Purchaser Alternative Sale Notice, the "***Alternative Sale Notice***") to Purchaser to implement the Alternative Sale Procedures to sell or otherwise dispose of the Acquired Assets.  Notwithstanding any other provision hereof, it is understood and agreed that all Specified Regulatory Approvals and any other required approvals from Governmental Entities must be obtained for any Alternative Sale and are conditions precedent to the closing of any Alternative Sale and Sellers will retain de facto and de jure ownership, direction and control (within the meaning of the Communications Laws) of the Acquired Assets, including, for the avoidance of doubt, of all FCC Licenses, FCC-licensed facilities, Industry Canada Licenses and Industry Canada-licensed facilities until the closing of any Alternative Sale.

(ii)  *Alternative Sale Procedures.*  From and after the date of an Alternative Sale Notice, Sellers shall comply with all commercially reasonable directions from Purchaser with respect to an Alternative Sale and otherwise cooperate with Purchaser in conducting each Alternative Sale in accordance with the Alternative Sale Procedures (including engaging the Investment

Bank and such other advisors in connection with each Alternative Sale as may be requested by Purchaser), and shall follow reasonable instructions from Purchaser in determining the terms and conditions of the Alternative Sale and the sale process. It is expressly understood and agreed that the Alternative Sale is for the sole benefit and account and at the sole risk of Purchaser, in no event shall Sellers market, initiate or enter into any Alternative Sale or any agreement therefor without the prior written consent of Purchaser and in no event shall Sellers be required to provide any indemnification to a Third Party purchaser in connection with an Alternative Sale nor shall Purchaser be entitled to any refund or reduction of the Purchase Price regardless of the price paid for the Acquired Assets by a Third Party in an Alternative Sale. Sellers further agree and confirm that they shall direct the Third Party purchasers in the Alternative Sale to pay all proceeds payable in the Alternative Sale directly to Purchaser. Purchaser shall pay for any and all of costs and expenses reasonably incurred by Sellers in accordance with Section 3.5(b) in conducting an Alternative Sale; provided, however, that the engagement of any Investment Bank or any other professional shall be governed by and paid for pursuant to the procedures set forth in Exhibit B to the Purchase Agreement.

(iii) *Effect of Alternative Sale*. Upon the closing and consummation of any Alternative Sale, (A) all amounts in the Escrow Account relating to the Working Capital Escrow Consideration (which, for the avoidance of doubt, shall only include the amount paid on the Funding Date with respect to the estimated working capital and administrative expense requirements of the Sellers through December 31, 2011), to the extent not previously released and delivered to Sellers, shall be released therefrom and delivered to Sellers in accordance with this Agreement and the Escrow Agreement, (B) all other amounts in the Escrow Account (which, for the avoidance of doubt, shall only include amounts paid with respect to the estimated working capital requirements of the Sellers from and after January 1, 2012) shall be released therefrom and delivered to the Purchaser, and (C) this Agreement and the Escrow Agreement shall immediately be terminated (except for provisions of Section 3.5(b) and such other provisions of this Agreement and the Escrow Agreement as are expressly stated to survive termination).

(m) <u>Parent Guaranty</u>: In connection with the Purchase Agreement, DISH Network Corporation (the "***Parent***") has certain obligations, including the following:

(i) Parent agrees to take all action necessary to cause Purchaser to perform all of its agreements, covenants and obligations under this

Agreement that arise prior to the Closing Date. Parent unconditionally guarantees to Sellers the full and complete performance by Purchaser of its obligations under the Purchase Agreement with respect to payment of the Purchase Price. This is a guarantee of payment and performance and not of collectability. Parent waives diligence, presentment, demand of performance, filing of any claim, any right to require any proceeding first against Purchaser, protest, notice and all demands whatsoever in connection with the performance of its obligations set forth in Section 6.19 of the Purchase Agreement.

(ii)     Parent expressly acknowledges and agrees to be bound by the following provisions of the Purchase Agreement: Section 5.11 (qualification to Hold Communications Licenses), Section 6.18 (Entry into New DIP Agreement), Section 6.19 (Parent Obligations), Section 9.3 (Notices), Section 9.4 (Counterparts), Section 9.6 (Severability), Section 9.7 (Governing Law), Section 9.8 (Exclusive Jurisdiction), Section 9.9 (Remedies), Section 9.10 (Specific Performance), Section 9.11 (Purchaser Acknowledgement), the first sentence of Section 9.12 (Successors and Assigns), Section 9.13 (Headings) and Section 9.17 (Interpretation).

(iii)    Parent shall be entitled to withhold from any amount payable pursuant to this Section 6.19, such amounts as Parent is required to deduct and withhold with respect to the making of such payment under any provision of applicable federal, state, local or foreign Tax law. To the extent that amounts are so withheld and paid over to the appropriate Tax Authority by Parent, such withheld amounts shall be treated for all purposes of the Purchase Agreement as having been paid to Sellers.

14.     As noted above, one of the key features of the Stalking Horse Bid is that the Purchaser is funding 97% of the Purchase Price before its receipt of FCC or Industry Canada approval for the transaction (without any recourse other than an Alternative Sale if such approvals are not granted).[18]  The importance of this transaction structure cannot be overstated. First, it provides certainty that the Debtors will receive 97% of the Purchase Price. Second, this structure will enable the Debtors to seek this Court's approval to use the proceeds of the sale to

---

[18]    As noted above, $30 million of the Purchase Price will not be paid on the Funding Date, but will be payable (less the amount of the Employee Obligations (as defined in the Purchase Agreement) on the Closing Date.

retire their outstanding secured indebtedness (as discussed further herein) shortly after the Funding Date, thereby stopping the accrual of interest on approximately one billion dollars' of secured debt – which accrual will be, on average, approximately $14 million per month over the course of the next year. The savings realized by minimizing the accrual of interest on the Debtors' secured indebtedness will serve to enhance unsecured creditor recoveries, thereby maximizing value for as many stakeholders as possible.[19]

15. Further, the Stalking Horse Bid provides additional liquidity to the estates. The current DIP matures on July 19, 2011 (the "***DIP Maturity Date***"). In light of this, the Debtors included a provision in the Bid Procedures Order that notified potential bidders that they would need to give the Debtors short term DIP financing to replace the Debtors' currently outstanding DIP Facility. To that end, EchoStar has agreed that if the Stalking Horse Bidder is the successful bidder at the Auction, EchoStar will amend the DIP Facility to extend the DIP Maturity Date to September 30, 2011 and to increase the amount of the DIP Facility by $15 million to $90 million to bridge the Debtors' liquidity needs from the entry of the Sale Order to the Funding Date. To effectuate this result, substantially contemporaneously herewith, the Debtors will file a motion requesting Bankruptcy Court approval to enter into an amendment to the DIP Facility and seek to have that motion heard at the Sale Hearing should the Stalking Horse Bidder be the Successful Bidder.

---

[19] As discussed earlier, although there is pending litigation regarding the validity of the liens securing the Senior Secured Notes, the Debtors expect to request that the Court render its decision regarding such litigation in the near term.

## D. Certain "Extraordinary" Provisions in the Purchase Agreement that Require Separate Disclosure

16. The Purchase Agreement contains the following provisions, which the Guidelines for the Conduct of Asset Sales, adopted by this Court's General Order M-331, require be separately disclosed:

    i.    Stalking Horse Bid Protections: The Purchase Agreement includes the following provisions:

        (i)   Break-Up Fee: As part of the Bid Procedures,[20] the Debtors are seeking approval of a Break-Up Fee in the aggregate amount of $27.5 million, which is 2% of the $1.375 billion Purchase Price under the Purchase Agreement. The Break-Up Fee will be payable in accordance with the terms of the Purchase Agreement and shall constitute an allowed administrative expense of each selling Debtor's estate;

        (ii)   Expense Reimbursement: The Stalking Horse Bidder will be entitled to reimbursement of all actual, reasonable and documented out-of-pocket costs and expenses incurred by Purchaser through the date of termination in connection with the transaction as contemplated by the Purchase Agreement, up to a maximum amount of $3 million;

        (iii)   Initial Incremental Qualified Bid: The Bid Procedures will be amended to require that (a) the initial bid by any party at the Auction for the sale of the Assets be payable in cash or equity securities freely tradable on a nationally recognized securities exchange and (b) the minimal overbid at any Auction for the sale of the Assets must exceed the Purchase Price by the sum of (i) $3 million, the maximum amount of the Expense Reimbursement, plus (ii) $27.5 million, the amount of the Break-Up Fee, plus (iii) $25 million.

    j.    Sale Free and Clear: As described in this motion and as provided in the Sale Order, the sale of the Assets will be free and clear of all liens, claims, encumbrances, and other interests except for those permitted encumbrances and Assumed Liabilities specified in the Purchase Agreement;

---

[20] The Debtors indicated that they would likely seek such bid protections for any Stalking Horse Bidder in the Bid Procedures Order.

k.     <u>Relief from Bankruptcy Rule 6004(h)</u>: As described below, the Sellers seek relief from the fourteen-day stay imposed by Bankruptcy Rule 6004(h).

**E.**     **<u>Revised Bidding Procedures and Revised Timeline for Bid Deadline, Auction and Sale Hearing</u>**[21]

17.     In connection with the Stalking Horse Bid, the Purchaser required certain modifications to the Bid Procedures approved by the Court on May 4, 2011 (such modified bid procedures, the "***Amended Bid Procedures***"), to which modifications the Debtors have agreed. The Amended Bid Procedures are attached to the proposed order as <u>Exhibit C</u> and a blackline of the same against the approved Bid Procedures is attached to the proposed order as <u>Exhibit D</u>. In addition to revising the sale process deadlines contained in the Bid Procedures Order (as set forth below), the only significant change contained in the Amended Bid Procedures is the inclusion of an Initial Incremental Qualified Bid, which (i) shall be required to be in an amount no less than the amount of the Purchase Price plus $55.5 million (the sum of $25 million, the Expense Reimbursement Cap and the Break-Up Fee) and (ii) <u>must</u> be comprised of cash and/or equity securities freely tradable on a nationally recognized securities exchange, provided that the Debtors, in consultation with the Creditors' Committee, reserve the right to accept a bid that includes consideration in the form of an agreement to forgive secured debt as an Initial Incremental Qualified Bid, so long as such bid satisfies all of the requirements of an Initial Incremental Qualified Bid other than the requirement that the bid be payable in cash or equity securities freely tradable on a nationally recognized securities exchange. The Debtors, in consultation with the Creditors' Committee, will state the value and methodology for valuations of any such bid on the record at the auction.

---

[21]     Capitalized terms used but not defined in this section shall have the meaning(s) ascribed to them in the Amended Bid Procedures.

18.     Because the Debtors are seeking approval of their entry into the Stalking Horse Agreement on June 21, 2011, in accordance with the Bid Procedures Order, the Debtors, with the agreement of the Stalking Horse Bidder and the Creditors' Committee, also set a new timeline for the Auction and the Sale Hearing.  As discussed above, the Bid Procedures Order requires that (a) the Debtors serve any motion seeking approval of a stalking horse agreement before the Bid Deadline[22] on five business days' notice, and (b) the Auction occur no earlier than three (3) business days after entry of an order granting any such motion.  Having filed this motion on June 14, 2011 and sought a corresponding hearing five business days thereafter, in compliance with the Bid Procedures Order, and in the prudent exercise of their fiduciary duties to ensure that all parties have an opportunity to respond to the Stalking Horse Bid, the Debtors have amended the date set for (x) the Bid Deadline from June 15, 2011 to June 27, 2011 (the "***New Proposed Bid Deadline***"), (y) the Auction from June 22, 2011 to June 30, 2011 and (z) the Sale Hearing from June 29, 2011 to July 7, 2011.

## **RELIEF REQUESTED**

19.     Pursuant to Bankruptcy Code sections 105, 363, 364 and 365, Bankruptcy Rules 2002, 4001(c), 6003, 6004, 6006, 9006, 9008 and 9014, Local Rules 6004-1, 6006-1 and 9006-1 and General Orders 331 and 383, ***first***, the Debtors respectfully request that the Court grant the Debtors the authority to (a) enter into the Purchase Agreement with the Stalking Horse Bidder and (b)  approve the Amended Bid Procedures and the Bid Protections, all as more fully set forth in the Purchase Agreement.

20.     ***Second,*** as more fully set forth in the Sale Motion, the Debtors request entry of an order (the "***Sale Order***") substantially in the form to be filed with the Court on or prior to the

---

[22]     The Bid Procedures Order set the Bid Deadline as Wednesday, June 8, 2011 at 5:00 p.m.  As noted above, the Sale Process Dates Notice extended that deadline to Wednesday, June 15, 2011 at 5:00 p.m.

Sale Hearing (a draft of which is attached hereto as <u>Exhibit 2</u>) that will, *inter alia*, approve (i) the sale of the Assets pursuant to Bankruptcy Code sections 105, 363(b), (f) and (m) and 365 and Bankruptcy Rules 6004, 6006, 9008 and 9014 in accordance with the terms of the Stalking Horse Agreement (subject to higher and better offers in accordance with the Bid Procedures), free and clear of all liens, claims, encumbrances, and other interests (other than certain expressly specified permitted encumbrances and assumed liabilities, all as more specifically set forth in the Purchase Agreement or other applicable purchase agreement) and (ii) the assumption and assignment of certain executory contracts and unexpired leases related to the Assets and the sale transaction, pursuant to Bankruptcy Code sections 363 and 365.

## SUPPORTING AUTHORITY

### A. <u>Entry Into The Stalking Horse Agreement Will Maximize Value For All Creditors and is in the Best Interest of the Debtors' Estates</u>

21.     Ample authority exists for entry into the Stalking Horse Agreement.  Bankruptcy Code section 363 provides, in relevant part, that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1).  Courts in the Second Circuit and others, in applying this section, have required that the sale of a debtor's assets be based upon the sound business judgment of the debtor. *See Official Comm. of Unsecured Creditors v. LTV Corp. (In re Chateaugay Corp.)*, 973 F.2d 141, 143 (2d Cir. 1992) (holding that a judge reviewing a section 363(b) application must find from the evidence presented a good business reason to grant such application); *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.*), 722 F.2d 1063, 1071 (2d Cir. 1983) (same).  Once a Court is satisfied that there is a sound business justification for the proposed sale, the Court must then determine whether (i) the debtor has provided the interested parties with adequate and reasonable notice, (ii) the sale price is fair and reasonable, and (iii) the purchaser is proceeding in

good faith. *In re Betty Owens Sch., Inc.*, No. 96 Civ. 3576 (PKL), 1997 WL 188127, at *4 (S.D.N.Y. Apr. 17, 1997); *accord In re Del. & Hudson Ry. Co.*, 124 B.R. 169, 176 (D. Del. 1991); *In re Decora Indus., Inc.*, No. 00-4459 (JJF), 2002 WL 32332749, at *2 (D. Del. May 20, 2002).

22.     The Debtors believe that the value offered by the Stalking Horse Bidder is fair and reasonable and represents the highest and best offer received by the Debtors.  The value that the Debtors would receive under the Purchase Agreement is more than $150 million greater than the valuation that the Debtors included in their disclosure statement just six months ago. Moreover, the terms of the transaction – including the agreement to fund prior to receiving FCC and Industry Canada approval – will ensure that the Debtors have the best opportunity to retire secured debt as soon as possible, thereby halting the recovery-diminishing interest accrual.

23.     To ensure that the Debtors receive the maximum value for the Assets, however, the Debtors and the Stalking Horse Bidder have agreed that the Purchase Agreement — and its floor of $1.375 billion — will serve as the "stalking horse" bid for the sale of the Assets, and that an Auction will take place subject to the Amended Bid Procedures.  Additionally, the Debtors believe that an Auction with a stalking horse bidder offering a fair price with reasonable bid protections is preferable to a "naked" auction without such a floor.  Moreover, the Debtors have not received a higher or otherwise better offer from *any* potential purchaser to serve as a stalking horse bid, and do not want to take the risk that running a "naked" auction might not yield a bid with value equal to that of the Stalking Horse Bid.  Accordingly, the Debtors believe that entry into the Purchase Agreement and continuation of the sale process in accordance with the Amended Bid Procedures is in the best interests of their estates and will ensure the maximization of value for all of the Debtors' creditors.

B. **The Sale of Assets to the Stalking Horse Bidder Should be Free and Clear of Liens, Claims, Encumbrances and Interests**

24.     Pursuant to Bankruptcy Code section 363(f), a debtor in possession may sell property of the estate

> free and clear of any interest in such property of an entity other than the estate if (1) applicable non-bankruptcy law permits sale of such property free and clear of such interest, (2) such entity consents, (3) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property, (4) such interest is in bona fide dispute, or (5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f)(1)-(5).

25.     The Debtors believe that, pursuant to the Purchase Agreement, one or more of the tests of section 363(f) are satisfied with respect to the Stalking Horse Bid.  In particular, the Debtors believe that they meet, among others, the test set forth in section 363(f)(5).  Any parties in interest that assert liens, claims, encumbrances or other interests in, to or against the Assets will be adequately protected by having their liens, if any, attach to the proceeds of the Auction, in the same order of priority, with the same validity, force and effect that such parties had prior to the Auction, subject to any claims and defenses that the Debtors and their estates may possess with respect thereto.  Accordingly, Bankruptcy Code section 363(f) authorizes the transfer and conveyance of the Assets free and clear of all liens, claims, encumbrances and all other interests.

26.     The Debtors also submit that it is appropriate to sell the Assets free and clear of successor liability relating to the Debtors' businesses.  Such a provision ensures that the Stalking Horse Bidder is protected from any claims or lawsuits premised on the theory that the Stalking Horse Bidder is a successor in interest to one or more of the Debtors.  Courts have consistently held that a buyer of a debtor's assets pursuant to a section 363 sale takes free from successor

liability relating to the debtor's business. *See, e.g.*, *MacArthur Co. v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 837 F.2d 89, 93-94 (2d Cir. 1988) (holding that channeling of claims to proceeds is consistent with intent of sale free and clear under Bankruptcy Code section 363(f)); *In re General Motors Corp.*, 407 B.R. 463, 505 (Bankr. S.D.N.Y. 2009) (finding that "the law in this Circuit is clear; the Court will permit [the debtor's] assets to pass to the purchaser free and clear of successor liability claims") (citing *In re Magnesium Corp. of Am.*, No. 01-14312 (Bankr. S.D.N.Y. June 4, 2002)); *In re Chrysler LLC*, 405 B.R. 84, 111 (Bankr. S.D.N.Y. 2009) ("[S]uccessor or transferee liability claims against [the purchaser] are encompassed by section 363(f) and are therefore extinguished by the Sale Transaction."), *aff'd*, 2009 U.S. App. LEXIS 17441 (2d Cir. Aug. 5, 2009). The purpose of an order purporting to authorize the transfer of assets free and clear of all liens, claims, encumbrances and all other interests would be frustrated if claimants could thereafter use the transfer as a basis to assert claims against a purchaser arising from a seller's pre-sale conduct. To that end, the Stalking Horse Bidder should not be liable under any theory of successor liability relating to the Debtors' businesses, but should hold the purchased Assets free and clear.

### C. Court Approval of the Assumption and Assignment of Designated Contracts In Connection with the Stalking Horse Agreement is Warranted

27. To facilitate and effect the sale of the Assets to the Stalking Horse Bidder, the Debtors seek authorization to assume and assign certain contracts (the "***Designated Contracts***")[23] to the Stalking Horse Bidder in accordance with the assumption procedures outlined in the Sale Motion, as modified to reflect the new dates of the Auction and the Sale Hearing. Bankruptcy Code Section 365(a) provides that a debtor in possession, "subject to the

---

[23] As provided in the Stalking Horse Agreement, the Designated Contracts (and proposed Cure Amounts) will be filed with the Bankruptcy Court prior to the hearing regarding approval of the Stalking Horse Agreement.

court's approval, may assume or reject any executory contract or unexpired lease of the debtor."

11 U.S.C. § 365(a). A debtor's decision to assume an executory contract or unexpired lease must be an exercise of its sound business judgment for the Court to approve the assumption under Bankruptcy Code section 365(a). *See Nostas Assocs. v. Costich (In re Klein Sleep Prods., Inc.)*, 78 F.3d 18, 25 (2d Cir. 1996); *Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.)*, 4 F.3d 1095, 1099 (2d Cir. 1993). In connection with the proposed sale, the Debtors will assume and assign only the Designated Contracts (i.e. those executory contracts and unexpired leases that the Stalking Horse Bidder has indicated it wants to assume).

28.     Further, Bankruptcy Code section 365(k) provides that assignment by the debtor to an entity of a contract or lease "relieves the trustee and the estate from any liability for any breach of such contract or lease occurring after such assignment." 11 U.S.C. § 365(k). Therefore, upon approval by this Court of the Stalking Horse Bid and subsequent consummation of the Closing Date, the Debtors will be relieved of their obligations under the Designated Contracts, thereby further decreasing the obligations of the estate and creating value for creditors.

29.     As further described in detail in the Sale Motion, the Debtors' assumption of the Designated Contracts will be contingent upon timely payment of Cure Amounts on the effective date of any plan. In addition, at the Sale Hearing, to the extent necessary, the Debtors will be prepared to proffer testimony or present evidence to demonstrate the ability of the Stalking Horse Bidder to perform under the Designated Contracts. The Sale Hearing, therefore, will provide the Court and other interested parties with the opportunity to evaluate the ability of the Stalking Horse Bidder to provide adequate assurance of future performance under the Designated Contracts, as required by Bankruptcy Code section 365(b)(1)(C). At the Sale Hearing, the

Debtors will also request that the Court agree that its order with regard to assumption and assignment of the Designated Contracts is without prejudice to the rights of any contract counterparty to object, at a later date, to any issues of adequate assurance of future performance to the extent that the Purchaser chooses to consummate an Alternative Sale process to a different purchaser.  Accordingly, it is requested that, at the conclusion of the Sale Hearing, the proposed assumption and assignment of the Designated Contracts be approved.

30.     To facilitate the assumption and assignment of the Designated Contracts, the Debtors further request that the Court find all anti-assignment provisions of the Designated Contracts to be unenforceable under Bankruptcy Code section 365(f).[24]

### D.     The Stalking Horse Bidder is Entitled to Protections as a Good Faith Purchaser

31.     Bankruptcy Code section 363(m) protects a good-faith purchaser's interest in property purchased from a debtor notwithstanding that the sale conducted under Bankruptcy Code section 363(b) is later reversed or modified on appeal.  Specifically, section 363(m) states that:

> The reversal or modification on appeal of an authorization under [section 363(b)] ... does not affect the validity of a sale ... to an entity that purchased ... such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale ... were stayed pending appeal.

11 U.S.C. § 363(m).

---

[24]     Section 365(f)(1) provides in part that, "notwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law, that prohibits, restricts, or conditions the assignment of such contract or lease, the trustee may assign such contract or lease..." 11 U.S.C. § 365(f)(1).  Section 365(f)(3) further provides that "[n]otwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law that terminates or modifies, or permits a party other than the debtor to terminate or modify, such contract or lease or a right or obligation under such contract or lease on account of an assignment of such contract or lease, such contract, lease, right, or obligation may not be terminated or modified under such provision because of the assumption or assignment of such contract or lease by the trustee." 11 U.S.C. § 365(f)(3).

32.     Section 363(m) "affords 'finality to judgments by protecting good faith purchasers, the innocent third parties who rely on the finality of bankruptcy judgments in making their offers and bids.'" *Reloeb Co. v. LTV Corp* (*In re Chateaugay Corp.),* No. 92 Civ. 7054 (PKL), 1993 WL 159969, at *3 (S.D.N.Y. May 10, 1993) (quoting *In re Stadium Mgmt. Corp.*, 895 F.2d 845, 847 (1st Cir. 1990); *see also Allstate Ins. Co. v. Hughes*, 174 B.R. 884, 888 (S.D.N.Y. 1994) ("Section 363(m) . . . provides that good faith transfers of property will not be affected by the reversal or modification on appeal of an unstayed order, whether or not the transferee knew of the pendency of the appeal"); *In re Stein & Day, Inc.*, 113 B.R. 157, 162 (Bankr. S.D.N.Y. 1990) ("pursuant to 11 U.S.C. § 363(m), good faith purchasers are protected from the reversal of a sale on appeal unless there is a stay pending appeal").

33.     The Second Circuit has indicated that a party would have to show fraud or collusion between the buyer and the debtor in possession or trustee or other bidders in order to demonstrate a lack of good faith. *See Kabro Assocs. of W. Islip, LLC v. Colony Hill Assocs. (In re Colony Hill Assocs.)*, 111 F.3d 269, 276 (2d Cir. 1997) ("[t]ypically, the misconduct that would destroy a [buyer]'s good faith status at a judicial sale involves fraud, collusion between the [buyer] and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders"); *see also In re Angelika Films 57th, Inc.*, Nos. 97 Civ. 2239 (MBM), 97 Civ. 2241 (MBM), 1997 WL 283412, at *7 (S.D.N.Y. 1997) (same; holding that purchaser's status as an insider was not per se bad faith).

34.     The selection of the Stalking Horse Bidder has been the product of arm's-length, good faith negotiations.  Indeed, the Debtors extracted numerous concessions from the Stalking Horse Bidder on the Purchase Agreement during the course of their negotiations.  Thus, even to the extent the Stalking Horse Bidder is not the ultimate winner at the Auction, by subjecting the

Assets to a market test through the Auction the Debtors submit that the consideration to be received in any Auction will be fair and reasonable. Based upon the record to be made at the Sale Hearing, the Debtors will request a finding that the Stalking Horse Bidder (subject to higher and better offers in accordance with the Amended Bid Procedures) is a good-faith purchaser entitled to the protections of Bankruptcy Code section 363(m).

     **E.**     **The Bid Protections are Warranted and in the Best Interests of the Debtors and Their Economic Stakeholders**

          *1.*     *The Break-Up Fee*

35. Approval of break-up fees and other forms of bid protections in connection with the sale of significant assets pursuant to Bankruptcy Code section 363 is appropriate both to protect a potential purchaser from competing purchasers that use a stalking horse offer as a baseline to submit a better offer without undertaking customary diligence, as well as to compensate a bidder for ensuring that a debtor will receive fair value at an auction. *In re Metaldyne Corp.*, 409 B.R. 661, 670 (Bankr. S.D.N.Y. 2009) (approving bid protections because, among other factors, "the stalking horse bid brings value to the estate by setting a floor on the price and providing a structure for potential competing bids . . . [and] would provide comfort to the Debtors' employees and customers that the company was entering the auction with a locked-in bid"); *see also In re Leiner Health Prods., Inc*., et al., 08-10446 (Bankr. D. Del. May 30, 2008) [Docket No. 299] (authorizing the debtors' entry into a stalking horse agreement on the bid deadline set in the order approving bid procedures); *In re Rhythms Netconnections Inc*., No. 01-14283 (Bankr. S.D.N.Y. Aug. 8, 2001) (in conjunction with the order approving the debtors' bid procedures, pre-approving the debtors' entry into a stalking horse agreement at any time prior to the auction).

36.     Bankruptcy courts have approved bidding incentives similar to the Break-Up Fee under the business judgment rule, which proscribes judicial second-guessing of the actions of a corporation's board of directors taken in good faith and in the exercise of honest judgment. *See, e.g.*, *In re Loral Space & Commc'ns Ltd.*, No. 03-41710 (RDD) (Bankr. S.D.N.Y. Aug. 19, 2003) (approving break-up fee and expense reimbursement) [Docket No. 154]; *In re Magellan Health Servs., Inc.*, No. 03-40515 (PCB) (Bankr. S.D.N.Y. Apr. 7, 2003) (approving termination fee, commitment fee and reimbursement of expenses) [Docket No. 147]; *In re Adelphia Bus. Solutions, Inc.*, No. 02-11389 (REG) (Bankr. S.D.N.Y. Jan. 23, 2003) (approving termination fee and reimbursement of expenses) [Docket No. 833]; *Official Comm. of Subordinated Bondholders v. Integrated Res., Inc.* (*In re Integrated Res., Inc.*), 147 B.R. 650, 656-62 (S.D.N.Y. 1992), *appeal dismissed*, 3 F.3d 49 (2d Cir. 1993) (approving break-up fee and expense reimbursement and noting that break-up fee arrangements that have been negotiated by a debtor are to be reviewed according to the deferential "business judgment" standard, under which such procedures and arrangements are "presumptively valid"); *In re 995 Fifth Ave. Assocs.*, 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989) (bidding incentives may be "legitimately necessary to convince a 'white knight' to enter the bidding by providing some form of compensation for the risks it is undertaking").

37.     Three factors courts routinely consider when assessing proposals for break-up fees in chapter 11 cases include:[25] (i) whether the relationship of the parties who negotiated the

---

[25]     Outside the bankruptcy context, courts routinely uphold the business judgment of independent boards that approve break-up fees that are designed to maximize value and do not chill the auction process. Such fees are presumptively appropriate under the business judgment rule and non-bankruptcy courts rarely rule on their propriety. *See, e.g.*, *Cottle v. Storer Commc'ns, Inc.*, 849 F.2d 570, 578 (11th Cir. 1988); *CRTF Corp. v. Federated Dep't. Stores, Inc.*, 683 F. Supp. 422, 440 (S.D.N.Y. 1988); *Samjens Partners I v. Burlington Indus., Inc.*, 663 F. Supp. 614, 623 (S.D.N.Y. 1987); *McMichael v. U.S. Filter Corp.*, 2001 U.S. Dist. LEXIS 3918, at *35 (C.D. Cal. 2001); *Matador Capital Mgmt. Corp. v. BRC Holdings, Inc.*, 729 A.2d 280, 291 (Del. Ch. Ct. 1998); *Kysor Indus. Corp. v. Margaux, Inc.*, 674 A.2d 889, 897 (Del. Super. Ct. 1996) (explaining that termination fees are not unusual in merger context).

break-up fee is tainted by self-dealing or manipulation; (ii) whether the fee hampers, rather than encourages, bidding; and (iii) whether the amount of the fee is unreasonable relative to the proposed purchase price. *See Integrated Resources*, 147 B.R. at 657. Here, an analysis of each of these three factors supports approval of the Break-Up Fee.

38. First, there is no self-dealing or manipulation between the Stalking Horse Bidder and the Debtors. Indeed, the Debtors have had ample time to explore every other opportunity in these chapter 11 cases and, even now that the Debtors have agreed to the terms of the Stalking Horse Bid, the Stalking Horse Bidder has agreed to only minimal changes to the Bid Procedures and has agreed to give the Debtors even more time to market their assets. Moreover, the Debtors negotiated at arm's-length with the Stalking Horse Bidder, as evidenced by the favorable terms of the Purchase Agreement.[26]

39. Second, it is the Debtors' business judgment that the Break-Up Fee will not hamper bidding. Moreover, without agreeing to the Break-Up Fee, the Debtors would be unable to secure a proposal as favorable as the Stalking Horse Bid, and would lack the security of the minimum bid that they now enjoy. Indeed, because it is by virtue of the Break-Up Fee (and Expense Reimbursement) that the Debtors can rely on a bidding floor, the Debtors believe the Break-Up Fee and the related Purchase Agreement will actually *encourage* constructive bidding. On account of this bidding floor, the Debtors expect the Purchase Agreement to encourage other interested parties to submit competitive bids at or before the Auction. Moreover, and importantly, the Debtors do not want to lose the highest and best committed bid received.

---

[26] Neither the Stalking Horse Bidder nor its parent, DISH Network Corporation, is an existing stakeholder in the Debtors' estates. The Stalking Horse Bidder is an affiliate of EchoStar, who is the Debtors' largest secured creditor and DIP Financing Lender.

Accordingly, the Debtors believe that agreeing to pay the Break-Up Fee has opened the door to a path that will encourage further bidding on their assets at greater, value-maximizing prices.

40.     Finally, at 2% of the purchase price, the amount of the Break-Up Fee is well within the range of reasonableness, particularly with respect to the proposed purchase price, and moreover is comparable to those approved in the context of asset sales in other large chapter 11 cases. *See e.g.*, *In re Neff Corp.*, No. 10-12610 (SCC) (Bankr. S.D.N.Y. July 13, 2010) [Docket No. 267] (approving break-up fee of approximately 2.5% of backstopped rights offering amount and expense reimbursement of up to $1 million); *In re Extended Stay, Inc.*, No. 09-13764 (JMP) (Bankr. S.D.N.Y. Apr. 23, 2010) [Docket No. 975] (approving liquidated damages of 10% of overall enterprise value to successful bidder and expense reimbursement of up to $10 million if plan is withdrawn or investment agreement terminated); *In re BearingPoint, Inc.*, No. 09-10691 (REG) (Bankr. S.D.N.Y. Apr. 7, 2009) [Docket No. 369] (approving a break-up fee of approximately 3% of the purchase price and expense reimbursement up to $1,500,000); *In re Adelphia Bus. Solutions, Inc.*, No. 02-11389 (REG) (Bankr. S.D.N.Y. Dec. 16, 2002) [Docket No. 760] (approving break-up fee of 2.5% of the purchase price and expense reimbursement). Moreover, in light of the fact that the Debtors foreshadowed two months ago that they may take a stalking horse with a 2% break-up fee, and no party objected to such provision in the Bid Procedures, the Debtors believe that this fee has already been implicitly approved by all parties.

41.     The Debtors and the Creditors' Committee submit that the Stalking Horse Bidder has provided a material benefit to the Debtors and their creditors by providing a bid that (a) sets a floor for bidding at the Debtors' Auction and (b) allows the Debtors to walk away from the offer, upon the payment of the Break-Up Fee and Expense Reimbursement, if the Debtors receive a higher or otherwise better offer that meets or exceeds the Initial Incremental Qualified Bid. This

bid structure provides significant value to the Debtors' estates by setting a meaningful baseline for the Auction, while allowing the Debtors flexibility to keep the door open for a higher and better offer.

42.     In order to provide potential bidders and parties in interest with ample notice, the Debtors are extending the Bid Deadline by nearly two weeks.  This will give interested parties time to re-calibrate their bids and as of yet uninvolved parties the chance to enter the sale process.  Accordingly, and because without such Bid Protections the Debtors would not have the Stalking Horse Bid, the Break-Up Fee is reasonable and appropriate and represents the best method for maximizing value for the benefit of the Debtors' estates.

2.     *The Expense Reimbursement*

43.     Likewise, the Stalking Horse Bidder should be entitled to the Expense Reimbursement, which, as noted above, are capped at $3 million.  Approval of an expense reimbursement as a superpriority claim in connection with a sale of assets pursuant to Bankruptcy Code section 363 is appropriate and has become a recognized bidder protection practice in chapter 11 cases.  Expense reimbursements, such as the one being sought here, enable a debtor to ensure a sale to a contractually committed buyer at a price the debtor believes is fair, while providing the debtor with the potential of obtaining an enhanced recovery through an

auction process.[27]

44.     As described above, the Expense Reimbursement (which would be a superpriority administrative expense) was a material inducement for, and condition of, the Stalking Horse Bidder's entry into the Purchase Agreement.  The Stalking Horse Bidder is unwilling to commit to hold open the offer to purchase the Assets under the terms of the Purchase Agreement unless the Stalking Horse Bidder is assured payment of the Expense Reimbursement.  As explained herein, the Stalking Horse Bidder has provided value to the Debtors' estate by, among other things, conducting the legal and financial diligence necessary to submit a $1.375 billion purchase offer that will serve as the baseline for all other bids, and negotiating the form of Purchase Agreement that all other bidders will use as a template in the sale process.  As such, the Stalking Horse Bidder is entitled to be compensated for its efforts, and the Expense Reimbursement should be authorized.

## F.     Request for Relief Pursuant to Bankruptcy Rules 6004(h) and 6006(d)

45.     Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property . . . is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6004(h).  Bankruptcy Rule 6006(d) further provides that an "order authorizing the trustee to assign an executory contract or unexpired lease under

---

[27]     *See, e.g., In re Lehman Bros. Holdings Inc., et al.,* No. 08-13555 (JMP) (Bankr. S.D.N.Y. Oct. 22, 2008) [Docket No. 1175] (approving break-up fee and expense reimbursement); *In re Steve & Barry's Manhattan LLC, et al.,* No. 08-12579 (ALG) (Bankr. S.D.N.Y. Aug. 5, 2008) [Docket No. 369] (approving break-up fee and expense reimbursement); *In re Fortunoff Fine Jewelry and Silverware, LLC,* No. 08-10353 (JMP) (Bankr. S.D.N.Y. Feb. 22, 2008) [Docket No. 190] (approving break-up fee); *In re Bally Total Fitness of Greater N.Y. Inc.,* No. 07-12395 (BRL) (Bankr. S.D.N.Y. Aug. 21, 2007) [Docket No. 269] (approving break-up fee and expense reimbursement); *In re G+G Retail, Inc.,* No. 06-10152 (RDD) (Bankr. S.D.N.Y. Jan. 30, 2006) [Docket No. 58]; *In re Footstar, Inc.,* No. 04-22350 (ASH) (Bankr. S.D.N.Y. Apr. 5, 2004) [Docket No. 316] (authorizing the debtors to enter into purchase agreements with break-up fees); *Integrated Res.,* 147 B.R. 650 (approving break-up fee and expense reimbursement); *In re Twinlab Corp., et al.,* No. 03-15564 (CB) (Bankr. S.D.N.Y. Sept. 26, 2003) [Docket No. 81] (approving break-up fee and expense reimbursement); *In re Adelphia Bus. Solutions, Inc.,* No. 02-11389 (REG) (Bankr. S.D.N.Y. Dec. 16, 2002) [Docket No. 760] (approving break-up fee and expense reimbursement).

§ 365(f) is stayed until the expiration of 14 days after the entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6006(d).

46. The Debtors believe that approval of the Stalking Horse Agreement should be granted as soon as practicable in order to preserve and maximize value for the Debtors' estates. Accordingly, the Debtors request that the proposed order, attached hereto as <u>Exhibit 1</u>, (a) authorizing the Debtors' entry into the Stalking Horse Agreement and (b) approving the Amended Bid Procedures and the Bid Protections be effective immediately upon entry of such order and that the fourteen-day stay under Bankruptcy Rules 6004(h) and 6006(d) be waived.

## **NOTICE**

47. The Debtors have provided notice of this motion to: (a) the Office of the United States Trustee for the Southern District of New York; (b) Otterbourg, Steindler, Houston & Rosen, P.C., as counsel to the statutory committee of unsecured creditors appointed in these chapter 11 cases; (c) Bank of New York Mellon as agent for the Debtors' postpetition debtor-in-possession financing; (d) Emmet, Marvin & Martin, LLP as counsel to the agent for the Debtors' postpetition debtor-in-possession financing; (e) U.S. Bank National Association as Collateral Agent for the Debtors' purchase money credit facility; (f) Kirkland & Ellis LLP, as counsel to the Ad Hoc Group of 15% Noteholders; (g) Weil, Gotshal & Manges LLP as counsel to Harbinger Capital Partners Master Fund I, Ltd. and Harbinger Capital Partners Special Situations Fund, L.P.; (h) Willkie Farr & Gallagher LLP as counsel to EchoStar Corporation in its capacity as Lender under the Debtors' purchase money credit facility and Initial Lender under the Debtors' postpetition debtor-in-possession financing and as counsel to the Stalking Horse Bidder; (i) U.S. Bank National Association as Indenture Trustee for the Debtors' 15% Senior Secured Notes and Kelley Drye & Warren LLP as counsel to the Indenture Trustee; (j) Deutsche Bank National

Trust Company as Indenture Trustee for the Debtors' 6.5% Senior Exchangeable Notes and Foley & Lardner LLP as counsel to the Indenture Trustee; (k) Quinn Emanuel Urquhart & Sullivan, LLP as counsel to certain holders of the Debtors' 6.5% Senior Exchangeable Notes; (l) the Internal Revenue Service; (m) the Securities and Exchange Commission; (n) the United States Attorney for the Southern District of New York; (o) the Federal Communications Commission; (p) Industry Canada; (q) K&L Gates LLP, as counsel to Sprint Nextel Corporation; and (r) parties in interest who have filed a notice of appearance in these cases pursuant to Bankruptcy Rule 2002. In light of the nature of the relief requested, the Debtors respectfully submit that no further notice is necessary.

WHEREFORE the Debtors respectfully request that the Court grant the relief requested herein and such other and further relief as is just.

New York, New York
Dated:  June 14, 2011

_/s/ Ira S. Dizengoff_

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
(212) 872-1000 (Telephone)
(212) 872-1002 (Facsimile)
Ira S. Dizengoff
Arik Preis
Ashleigh L. Blaylock

_Counsel to the Debtors and Debtors in Possession_