AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
(212) 872-1000 (Telephone)
(212) 872-1002 (Facsimile)
Ira S. Dizengoff
Arik Preis
Ashleigh L. Blaylock

*Counsel to the Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| TERRESTAR NETWORKS INC., *et al.,*[1] | ) | Case No. 10-15446 (SHL) |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |

**NOTICE OF HEARING ON DEBTORS' MOTION FOR ENTRY OF AN ORDER
AUTHORIZING THE DEBTORS TO ENTER INTO THE EIGHTH AMENDMENT TO
THEIR DEBTOR-IN-POSSESSION LOAN AGREEMENT TO (A) INCREASE THE
AMOUNT OF THE COMMITMENT THEREUNDER UNTIL THE FUNDING DATE OF
THE PROPOSED SALE TRANSACTION AND (B) EXTEND THE MATURITY DATE**

    **PLEASE TAKE NOTICE** that on June 14, 2011, the above-captioned debtors and debtors in possession (collectively, the "***Debtors***") filed the *Debtors' Motion for Entry of an Order Authorizing the Debtors to Enter into an Eighth Amendment to their Debtor-in-Possession Loan Agreement to (a) Increase the Amount of the Commitment Thereunder Until the Funding Date of the Proposed Sale Transaction and (b) Extend the Maturity Date* (the "***Motion***").

    **PLEASE TAKE FURTHER NOTICE** that a hearing (the "***Hearing***") to consider the Motion, if necessary (as further described in the Motion), shall be held before the

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal taxpayer identification number, are: TerreStar Networks Inc. (3931); TerreStar License Inc. (6537); TerreStar National Services Inc. (6319); TerreStar Networks Holdings (Canada) Inc. (1337); TerreStar Networks (Canada) Inc. (8766) and 0887729 B.C. Ltd. (1345).

Honorable Sean H. Lane of the United States Bankruptcy Court for the Southern District of New York (the "*Bankruptcy Court*"), Alexander Hamilton Custom House, One Bowling Green, New York, New York 10004 on <u>July 7, 2011 at 1:00 p.m. (prevailing Eastern Time).</u>

      **PLEASE TAKE FURTHER NOTICE** that any responses to the Motion must be in writing, shall conform to the Federal Rules of Bankruptcy Procedure and the Local Rules of the Bankruptcy Court, and the Bankruptcy Court's Order Pursuant to Sections 105(a) and (d) of the Bankruptcy Code and Bankruptcy Rules 1015(c), 2002(m) and 9007 Implementing Certain Notice and Case Management Procedures [Docket No. 60] (the "*Case Management Order*"), shall be filed with the Bankruptcy Court either (a) electronically in accordance with General Order M-399 (which can be found at http://www.nysb.uscourts.gov) by registered users of the Bankruptcy Court's filing system, or (b) on a 3.5 inch disk, preferably in Portable Document Format (PDF), WordPerfect, or any other Windows-based word processing format (with a hard copy delivered directly to Chambers), in accordance with General Order M-182 (which can be found at http://www.nysb.uscourts.gov), and shall be served in accordance with General Order M-399 on: (a) counsel to the Debtors, Akin Gump Strauss Hauer & Feld LLP, One Bryant Park, New York, New York 10036, Attn: Ira S. Dizengoff, Esq. and Arik Preis, Esq.; (b) the Office of the United States Trustee for the Southern District of New York, 33 Whitehall Street, 21st Floor, New York, New York 10004, Attn: Susan Golden, Trial Attorney; (c) Otterbourg, Steindler, Houston & Rosen, P.C., as counsel to the statutory committee of unsecured creditors appointed in these chapter 11 cases; (d) Bank of New York Mellon as agent for the Debtors' postpetition debtor-in-possession financing; (e) Emmet, Marvin & Martin, LLP as counsel to the agent for the Debtors' postpetition debtor-in-possession financing; (f) U.S. Bank National Association as Collateral Agent for the Debtors' purchase money credit facility; (g) Weil, Gotshal & Manges

LLP as counsel to Harbinger Capital Partners Master Fund I, Ltd. and Harbinger Capital Partners Special Situations Fund, L.P.; (h) Willkie Farr & Gallagher LLP as counsel to EchoStar Corporation in its capacity as Lender under the Debtors' purchase money credit facility and Initial Lender under the Debtors' postpetition debtor-in-possession financing; (i) U.S. Bank National Association as Indenture Trustee for the Debtors' 15% Senior Secured Notes and Kelley Drye & Warren LLP as counsel to the Indenture Trustee; (j) Deutsche Bank National Trust Company as Indenture Trustee for the Debtors' 6.5% Senior Exchangeable Notes and Foley & Lardner LLP as counsel to the Indenture Trustee; (k) Quinn Emanuel Urquhart & Sullivan, LLP as counsel to certain holders of the Debtors' 6.5% Senior Exchangeable Notes; (l) the Internal Revenue Service; (m) the Securities and Exchange Commission; (n) the United States Attorney for the Southern District of New York; (o) the Federal Communications Commission; (p) Industry Canada; (q) Kirkland & Ellis LLP, as counsel to certain holders of the Debtors' 15% Senior Secured Notes; (r) K&L Gates, as counsel to Sprint Nextel Corporation and (s) parties in interest who have filed a notice of appearance in these cases pursuant to Bankruptcy Rule 2002, in each case so as to be received no later than **July 5, 2011 at 12:00 p.m. (prevailing Eastern time) (**the "***Response Deadline***").

  **PLEASE TAKE FURTHER NOTICE** that if no responses with respect to the Motion are timely filed and served in accordance with the Case Management Order, the Debtors may, on or after the Response Deadline, submit to the Bankruptcy Court an order substantially in the

form of the proposed order annexed to the Motion, which order may be entered with no further

notice or opportunity to be heard offered to any party.

New York, New York                          /s/ Ira S. Dizengoff
Dated:  June 14, 2011                         AKIN GUMP STRAUSS HAUER & FELD LLP
                                             One Bryant Park
                                             New York, New York 10036
                                             (212) 872-1000 (Telephone)
                                             (212) 872-1002 (Facsimile)
                                             Ira S. Dizengoff
                                             Arik Preis
                                             Ashleigh L. Blaylock

                                             *Counsel to the Debtors and Debtors in Possession*

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
(212) 872-1000 (Telephone)
(212) 872-1002 (Facsimile)
Ira S. Dizengoff
Arik Preis
Ashleigh L. Blaylock

*Counsel to the Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| TERRESTAR NETWORKS INC., *et al.,*[1] | ) Case No. 10-15446 (SHL) |
| | ) |
| Debtors. | ) Jointly Administered |
| | ) |

**DEBTORS' MOTION FOR ENTRY OF AN ORDER AUTHORIZING THE
DEBTORS TO ENTER INTO THE EIGHTH AMENDMENT TO THEIR
DEBTOR-IN-POSSESSION LOAN AGREEMENT TO (A) INCREASE THE AMOUNT
OF THE COMMITMENT THEREUNDER UNTIL THE FUNDING DATE OF THE
PROPOSED SALE TRANSACTION AND (B) EXTEND THE MATURITY DATE**

---

[1]  The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal taxpayer-identification number, are: TerreStar Networks Inc. (3931), TerreStar License Inc. (6537), TerreStar National Services Inc. (6319), TerreStar Networks Holdings (Canada) Inc. (1337), TerreStar Networks (Canada) Inc. (8766); and 0887729 B.C. Ltd. (1345).

# TABLE OF CONTENTS

**Page**

Preliminary Statement ........................................................................................................................1

Jurisdiction .........................................................................................................................................2

Background .........................................................................................................................................2

Basis For Relief .................................................................................................................................3

A.      The Debtors' Entry into the DIP Financing Agreement ..........................................................3

B.      The Debtors' Sale Process ......................................................................................................4

C.      The Timing of the Sale ............................................................................................................5

D.      The DIP Amendment ...............................................................................................................6

Relief Requested ...............................................................................................................................7

Supporting Authority ........................................................................................................................7

A.      The Debtors' Entry into the Eighth Amendment Satisfies the Requirements of
        Sections 363 and 364 of the Bankruptcy Code. ....................................................................7

        i.      Entry into the Eighth Amendment is in the Best Interests of the Debtors'
                Creditors and Estates, is Necessary to Preserve the Estates' Assets and is
                an Exercise of the Debtors' Sound and Reasonable Business Judgment. ................9

        ii.     The Terms of the Eighth Amendment are Fair, Reasonable and
                Appropriate Under the Circumstances ...................................................................11

B.      The Eighth Amendment Should Be Accorded the Benefits of Section 364(e) .....................12

Motion Practice ...............................................................................................................................13

Notice ..............................................................................................................................................13

# TABLE OF AUTHORITIES

Page(s)

C<small>ASES</small>

*In re Ames Dep't Stores, Inc.*,
115 B.R. 34 (Bankr. S.D.N.Y. 1990) ........................................................9

*In re Aqua Assocs.*,
123 B.R. 192 (Bankr. E.D. Pa. 1991) ......................................................8

*In re Barbara K. Enters, Inc.*,
No. 08-11474 (MG) 2008 WL 2439649 (Bankr. S.D.N.Y. June 16, 2008) ........................8, 9

*In re Dura Auto. Sys. Inc.*,
No. 06-11202, 2007 Bankr. LEXIS 2764 (Bankr. D. Del. Aug. 15, 2007) ..............................9

*In re Exide Techs.*, Inc.,
340 B.R. 222 (Bankr. D. Del. 2006)) ........................................................9

*In re Farmland Indus., Inc.*,
294 B.R. 855 (Bankr. W.D. Mo. 2003) ........................................................9

*In re Integrated Resources, Inc.*,
147 B.R. 650 (S.D.N.Y. 1992) ........................................................9, 10

*In re Ionosphere Clubs, Inc.*,
100 B.R. 670 (Bankr. S.D.N.Y. 1989) ........................................................9

*In re Lionel Corp.*,
722 F.2d 1063 (2d Cir. 1983) ........................................................9

*In re Lyondell Chem. Co.*,
No. 09-10023 (Bankr. S.D.N.Y. Feb. 27, 2009) ........................................................13

*In re YL West 87th Holdings I LLC*,
423 B.R. 421 (Bankr. S.D.N.Y. 2010) ........................................................8

*Lubrizol Enters., Inc. v. Richmond Metal Finishers, Inc.*,
756 F.2d 1043 (4th Cir. 1985), *cert. denied*, 475 U.S. 1057 (1986) ........................................10

*Pearl-Phil GMT (Far East) Ltd. v. Caldor Corp.*,
266 B.R. 575 (S.D.N.Y. 2001) ........................................................8

*Smith v. Van Gorkom*,
488 A.2d 858 (Del. 1985) ........................................................9

*Unsecured Creditors' Comm. v. First Nat'l Bank & Trust Co.*
   (*In re Ellingsen MacLean Oil Co.*),
   834 F.2d 599 (6th Cir. 1987) ...............................................................................13

**STATUTES**

11 U.S.C.
   § 363.................................................................................................................2
   § 363(b)(1) ........................................................................................................9
   § 364.............................................................................................................2, 7
   § 364(c) .............................................................................................................8
   § 364(e) .......................................................................................................12, 13
   § 1107(a) ...........................................................................................................3
   § 1108...............................................................................................................3

28 U.S.C.
   § 157.................................................................................................................2
   § 157(b)(2) ........................................................................................................2
   § 1334...............................................................................................................2
   § 1408...............................................................................................................2
   § 1409...............................................................................................................2

U.C.C. § 1-201(19) ...............................................................................................13

**RULES**

Fed. R. Bankr. P.
   2002.................................................................................................................14

**Local Rules of the Banrkuptcy Court for the Southern District of New York**

Rule 9013 .......................................................................................................... 13

The above-captioned debtors and debtors in possession (collectively, the "**Debtors**") seek entry of an order, substantially in the form attached hereto as <u>Exhibit A</u>, authorizing the Debtors to enter into an eighth amendment (as described in more detail below, the "**Eighth Amendment**") to the DIP Financing Agreement (defined below). In support of this motion, the Debtors respectfully state as follows:

<u>**Preliminary Statement**</u>[2]

1.  Concurrently herewith, the Debtors have filed a motion (the "**Stalking Horse Motion**") to enter into a Stalking Horse Purchase Agreement with the Purchaser, pursuant to which the Purchaser would provide the Debtors $1.375 billion in cash and the assumption of certain liabilities (the "**Stalking Horse Bid**" or the "**Purchase Price**"), in exchange for substantially all of the Debtors' Assets. By this motion, the Debtors seek authority, <u>which may ultimately not be required depending upon the outcome of the Auction</u>, to enter into the Eighth Amendment (a copy of which, in substantially final form, is attached hereto as <u>Exhibit B)</u> to their DIP Financing Agreement. As discussed further herein, the Eighth Amendment will extend the DIP Maturity Date to September 30, 2011 and increase the amount of the Commitment under the DIP Financing Agreement to $90 million to provide the Debtors with sufficient financing to maintain daily and chapter 11 operations for the period between entry of the Sale Order and the Funding Date associated with the sale of all or substantially all of the Debtors' Assets to Gamma Acquisition L.L.C. (the "**Purchaser**" or the "**Stalking Horse Bidder**") and, solely for the purposes of Section 6.19 of the Purchase Agreement, DISH Network Corporation.

2.  In the Sale Motion, the Debtors indicated that they would require incremental debtor-in-possession financing to be provided in the event their auction and sale process

---

[2]     Capitalized terms used but not defined in the Preliminary Statement shall have the meanings ascribed below.

extended beyond the current maturity of their DIP Financing Agreement. Unless amended, the DIP Financing Agreement matures on July 19, 2011 (the "**DIP Maturity Date**"). EchoStar has agreed that if the Stalking Horse Bidder is the Successful Bidder at the Auction,[3] EchoStar will enter into the Eighth Amendment to bridge the Debtors' liquidity needs from the date of entry of the Sale Order to the Funding Date. To effectuate this result, the Debtors seek the relief requested herein and to have this motion heard at the Sale Hearing should the Stalking Horse Bidder be the Successful Bidder at the Auction.[4] As set forth in greater detail herein, the Debtors respectfully submit that entering into the Eighth Amendment is an exercise of the Debtors' sound business judgment and should be approved.

## Jurisdiction

3.     The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

4.     Venue in this Court is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

5.     The bases for the relief requested herein are sections 363 and 364 of title 11 of the United States Code (the "**Bankruptcy Code**").

## Background

6.     On October 19, 2010 (the "**Petition Date**"), each of the Debtors filed a petition with this Court under chapter 11 of the Bankruptcy Code.[5] The Debtors are operating their

---

[3]     *See* Section 6.18 of the Purchase Agreement.

[4]     For the avoidance of doubt, the Debtors will only seek approval of this motion to the extent the Purchaser is the winner at the Auction; if the Purchaser is not the winner at the Auction, the Debtors may withdraw this motion and seek approval to enter into a replacement debtor in possession financing facility with another party, as needed.

[5]     Also on October 19, 2010, TerreStar New York Inc., Motient Communications Inc., Motient Holdings Inc., Motient License Inc., Motient Services Inc., Motient Ventures Holding Inc., and MVH Holdings Inc. (collectively, the "**Non-TSN Debtors**") each filed a petition for relief under chapter 11 of the Bankruptcy Code. On October 20, 2010, the Court entered an order providing for joint administration, for procedural purposes, of the Debtors' cases (the "**Joint Administration Order**"), which at that time included the Non-TSN Debtors.

businesses and managing their property as debtors in possession pursuant to Bankruptcy Code sections 1107(a) and 1108.[6] No request for the appointment of a trustee or examiner has been made in these chapter 11 cases.

## Basis For Relief

### A.  The Debtors' Entry into the DIP Financing Agreement

7.  On the Petition Date, the Debtors filed a motion (the "***DIP Motion***")[7] seeking authorization to enter into an aggregate $75 million senior secured debtor-in-possession financing facility by and among TerreStar Networks Inc., ("***TSN***"), as borrower, The Bank of New York Mellon, as Administrative and Collateral Agent (the "***DIP Agent***"), each of the Debtors other than the Borrower (the "***Guarantors***")[8] and EchoStar, as Initial Lender (together with the DIP Agent, the "***DIP Financing Lenders***") (as amended from time to time, the "***DIP Financing Agreement***").  The DIP Financing Agreement is secured by a first lien on all of the Debtors' Assets, subject to, inter alia, the liens of holders of the Debtors' 15% Senior Secured Notes and the lenders under the Debtors' purchase money credit agreement. On November 18, 2010, the Court approved the DIP Financing Agreement on a final basis [Docket No. 181] (the "***Final DIP Order***").

---

   On February 16, 2011, TerreStar Corporation and TerreStar Holdings Inc. each filed a petition for relief in this Court under chapter 11 of the Bankruptcy Code (the "***February Debtors***").  On February 23, 2011, the Court entered an order amending the Joint Administration Order to remove the Non-TSN Debtors from administration under the TerreStar Networks Inc. case number.  Contemporaneously therewith, the Court entered an order providing for the joint administration of the cases of the February Debtors and the Non-TSN Debtors.

[6]   A detailed description of the Debtors' business and the reasons for filing these chapter 11 cases is set forth in the Declaration of Jeffrey W. Epstein, Chief Executive Officer of TerreStar Networks Inc., in Support of First Day Pleadings (the "***First Day Declaration***"), which was filed contemporaneously with the Debtors' voluntary petitions for relief under chapter 11 of the Bankruptcy Code.

[7]   Because the Debtors are amending a limited number of provisions in the DIP Financing Agreement,, such as Sections 1.01 and 2.01 with regard to the definition and amount of the "Commitment", and Section 1.01, the definition of "Stated Maturity Date", the Debtors incorporate by reference herein the relief requested in the DIP Motion.

[8]   Ultimately, the non-Debtor entities were removed as Guarantors upon the repayment of the minimal funds loaned to such entities *See* First Amendment to the DIP Financing Agreement [Docket No. 153].

8.      As noted above, the DIP Financing Agreement matures on July 19, 2011.  Further, there is an Event of Default under the DIP Financing Agreement upon entry of an order approving a Sale Transaction to a party who is not a Designated Party, as that term is defined in the DIP Financing Agreement.  The Debtors estimate that by the date of the hearing on this motion (should the relief requested herein be necessary), the amount of principal and interest outstanding under the DIP Financing Agreement will be approximately $74.6 million.

**B.      The Debtors' Sale Process**

9.      On April 15, 2011, the Debtors filed a motion with the Court seeking approval of bid and auction procedures for a sale of substantially all of the Debtors' assets (the "***Sale Motion***") [Docket No. 533].[9]  Pursuant to the Sale Motion, the Debtors sought approval of, *inter alia*, the Debtors' proposed bid procedures (the "***Bid Procedures***"), and the setting of a hearing (the "***Sale Hearing***") for approval of any successful bidder (any such bidder, the "***Successful Bidder***") at the Auction.  On May 4, 2011, the Court held a hearing to consider the Sale Motion and entered the order approving the Bid Procedures (the "***Bid Procedures Order***") [Docket No. 577].  On June 7, 2011, the Debtors filed the Notice of Revised Sale Process Dates [Docket No. 613], which Notice extended the dates associated with the sale process as set forth in the Bid Procedures Order by one week, including the bid deadline (the "***Bid Deadline***"), which was extended until June 15, 2011.

10.      As further described in the Stalking Horse Motion, on June 14, 2011, the Debtors and the Purchaser executed a purchase agreement providing for a Sale Transaction to the

---

[9]      Additional information regarding the Debtors' chapter 11 cases from the Petition Date through and including the date of filing of the Sale Motion can be found in the Sale Motion, which is incorporated by reference herein.  *See Debtors' Motion Pursuant to 11 U.S.C. § 105, 363, 365, 503, and 507 and Fed. R. Bankr. P. 2002, 4001, 6004, 6006, 9008 and 9014, for Entry of (I) an Order Approving (A) Bid Procedures, (B) Notice of Sale, Auction, and Sale Hearing, (C) Assumption Procedures and Related Notices, and (II) an Order Approving the Sale of Substantially all of the Debtors' Assets* [Docket No. 533].

Purchaser (the "***Purchase Agreement***").  As such, and concurrently herewith, the Debtors filed the Stalking Horse Motion to approve entry into the Purchase Agreement, as well as a Second Notice of Revised Sale Process Dates, which further revises, among other things, the Bid Deadline to June 27, 2011, the date of the Auction to June 30, 2011 and date of the Sale Hearing to July 7, 2011.

### C.    The Timing of the Sale[10]

11.    The transaction structure reflected in the Purchase Agreement contemplates the Purchaser funding the vast majority of the Purchase Price on the Funding Date, which will likely occur substantially in advance of FCC or Industry Canada approval.[11]  However, because a number of the conditions precedent to the occurrence of the Funding Date (including, among other things, the passage of the appeal period for the Sale Order and a recognition order by the Canadian court approving the Sale, as well as Investment Canada approval of the Sale) are unlikely to be satisfied prior to the DIP Maturity Date in mid-July, the Debtors require an interim source of capital to fund operations and meet their obligations in these chapter 11 cases during the period between the DIP Maturity Date and the Funding Date.  If approved, the DIP Amendment will provide the Debtors with such essential financing.  Specifically, pursuant to the Eighth Amendment (which will become effective if the Stalking Horse Bidder is the Successful Bidder at the Auction), the DIP Maturity Date will be extended to September 30, 2011 and amount of the Commitment under the DIP Financing Agreement will increase to $90 million to bridge the Debtors' liquidity needs from the DIP Maturity Date to the Funding Date.  To

---

[10]    Capitalized terms used, but not defined in this section shall have the meaning ascribed to them in the Purchase Agreement.

[11]    As set forth in the Purchase Agreement, $30 million of the $1.375 billion Purchase Price will not be paid on the Funding Date, but will be payable (less the amount of the Employee Obligations (as defined in the Purchase Agreement) on the Closing Date.

effectuate this result, the Debtors seek the relief requested herein and to have this motion heard at the Sale Hearing should the Stalking Horse Bidder be the Successful Bidder at the Auction.

**D.    The DIP Amendment**

12.    Pursuant to the terms of the Final DIP Order, the Debtors are authorized to amend the DIP Financing Agreement without further order of the Court provided that the amendments are immaterial and, among other things, do not increase the commitments under the DIP Financing Agreement.[12]  Because the Eighth Amendment contemplates certain changes that are material, the Debtors are seeking Court approval of the Eighth Amendment.

13.    The Eighth Amendment would effectuate, among other things, the following changes to the DIP Financing Agreement:[13]

- Increase of Loan Commitment

    - The definition of Commitment in Section 1.01 is amended by adding the following after the last sentence thereof: "The aggregate amount of the Commitments on the Amendment Effective Date is $90 million."

- Extend DIP Maturity Date

    - The definition of Stated Maturity Date in Section 1.01 is amended in its entirety to read as follows: "Stated Maturity Date" shall mean September 30, 2011."

The Eighth Amendment will also include some mechanical changes to the DIP Financing Agreement to effectuate the material changes noted above.

14.    In negotiating the Eighth Amendment and preparing this motion, the Debtors have consulted with the statutory committee of unsecured creditors (the "***Creditors' Committee***"), which supports this Amendment.

---

[12]    *See* Final DIP Order at ¶ 6(c)(ii).

[13]    The summary of the terms of the Eighth Amendment contained herein is qualified in its entirety by reference to the Eighth Amendment, and to the extent of any conflict between this motion and the Eighth Amendment, Eighth Amendment shall govern.

## Relief Requested

15.     By this motion, the Debtors request entry of an order, pursuant to sections 363(b) and 364 of the Bankruptcy Code, <u>which may ultimately not be required depending upon the outcome of the Auction</u>, authorizing the Debtors to enter into the Eighth Amendment, which will enable the Debtors to borrow an additional $15 million under the DIP Financing Agreement to maintain operations for the period between the current DIP Maturity Date and the Funding Date and to extend the DIP Maturity Date to September 30, 2011 to the extent that the Purchaser prevails as the Successful Bidder at the Auction.

## Supporting Authority

**A.      The Debtors' Entry into the Eighth Amendment Satisfies the Requirements of Sections 363 and 364 of the Bankruptcy Code.**

16.     Section 364 of the Bankruptcy Code governs a Debtors' ability to secure postpetition financing.  11 U.S.C. § 364.  Pursuant to section 364(c) of the Bankruptcy Code, a court may authorize a debtor to incur debt that is (a) entitled to a superpriority administrative expense status; (b) secured by a lien on otherwise unencumbered property; or (c) secured by a junior lien on encumbered property if the debtor cannot obtain postpetition credit on an unsecured basis, on an administrative expense priority or secured solely by junior liens on the debtor's assets.  *See* 11 U.S.C. § 364(c);[14]  *In re Barbara K. Enters, Inc.*, No. 08-11474 (MG) 2008 WL 2439649, at *8 (Bankr. S.D.N.Y. June 16, 2008) (In order for a debtor to obtain postpetition secured credit under section 364, the debtor must prove that it was unable to

---

[14]     Specifically, section 364(c) of the Bankruptcy Code provides, in pertinent part, that:

If the trustee [or debtor in possession] is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt – (1) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of this title; (2) secured by a junior lien on property of the estate that is not otherwise subject to a lien; or (3) secured by a junior lien on property of the estate that is subject to a lien.

11 U.S.C. § 364(c).

reasonably obtain secure credit elsewhere…); *Pearl-Phil GMT (Far East) Ltd. v. Caldor Corp.*, 266 B.R. 575, 584 (S.D.N.Y. 2001) (superpriority administrative expenses authorized where debtor could not obtain credit as an administrative expense).

17.     Courts in this jurisdiction and others have fashioned guidelines in applying these statutory requirements.   Generally, courts advocate using a "holistic approach" to evaluate superpriority postpetition financing agreements, which focuses on the transaction as a whole.  As one court has noted:

> Obtaining credit should be permitted not only because it is not available elsewhere, which could suggest the unsoundness of the basis for use of the funds generated by credit, but also because the credit acquired is of significant benefit to the debtor's estate and . . . the terms of the proposed loan are within the bounds of reason, irrespective of the inability of the debtor to obtain comparable credit elsewhere.

*In re Aqua Assocs.*, 123 B.R. 192, 196 (Bankr. E.D. Pa. 1991); *see also In re YL West 87th Holdings I LLC*, 423 B.R. 421, 442 (Bankr. S.D.N.Y. 2010).

18.     In evaluating a debtors' proposed postpetition financing, courts consider whether the postpetition financing (a) is necessary to preserve the assets of the debtor's estate and is necessary, essential and appropriate for continued operation of the debtor's business, (b) is in the best interests of the debtor's creditors and estate, (c) is an exercise of a debtor's sound and reasonable business judgment, (d) was negotiated in good faith and at arms' length between the debtor and the lender (and/or its agent) and (e) contains terms that are fair, reasonable and adequate given the circumstances of the debtor and the proposed postpetition lender. *In re Farmland Indus., Inc.*, 294 B.R. 855, 862-70 (Bankr. W.D. Mo. 2003); *see also In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 37-39 (Bankr. S.D.N.Y. 1990).

19.     Additionally, section 363(b)(1) of the Bankruptcy Code provides that a debtor, "after notice and a hearing, may use, sell or lease, other than in the ordinary course of business,

property of the estate." 11 U.S.C. § 363(b)(1). Approval of a debtor's actions under section 363(b)(1) of the Bankruptcy Code requires the debtor to show that its decision was based on its business judgment. *See In re Lionel Corp.*, 722 F.2d 1063, 1070 (2d Cir. 1983) (requiring "some articulated business justification" to approve the use, sale or lease of property outside the ordinary course of business); *In re Ionosphere Clubs, Inc.*, 100 B.R. 670, 675 (Bankr. S.D.N.Y. 1989) (noting that the standard for determining a section 363(b) motion is "good business reason").

20. To determine whether the business judgment test is met, "the court 'is required to examine whether a reasonable business person would make a similar decision under similar circumstances.'" *In re Dura Auto. Sys. Inc.*, No. 06-11202, 2007 Bankr. LEXIS 2764, at *272 (Bankr. D. Del. Aug. 15, 2007) (quoting *In re Exide Techs.*, Inc., 340 B.R. 222, 239 (Bankr. D. Del. 2006)). Once a debtor articulates a valid business justification, it is presumed that "in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company." *In re Integrated Resources, Inc.*, 147 B.R. 650, 656 (S.D.N.Y. 1992) (*quoting Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985)). The business judgment rule therefore shields a debtor's management from judicial second-guessing, and mandates that a court approve a debtor's business decision unless that decision is a product of bad faith or gross abuse of discretion. *See id.*; *see also Lubrizol Enters., Inc. v. Richmond Metal Finishers, Inc.*, 756 F.2d 1043, 1047 (4th Cir. 1985), *cert. denied*, 475 U.S. 1057 (1986).

**i.** **Entry into the Eighth Amendment is in the Best Interests of the Debtors' Creditors and Estates, is Necessary to Preserve the Estates' Assets and is an Exercise of the Debtors' Sound and Reasonable Business Judgment.**

21. The Debtors' decision to enter into the proposed Eighth Amendment is an exercise of their sound business judgment that warrants approval by the Court. Regardless of the

outcome of the Auction, the Debtors will require funding to bridge them from entry of the Sale Order until the Funding Date. As discussed, even if the Stalking Horse Bidder is the Successful Bidder at the Auction, and the Debtors receive the vast majority of the Purchase Price on the Funding Date, the Funding Date is entirely dependent upon various conditions precedent that may not be completed until mid-August 2011 at the earliest. Accordingly, it is a likelihood that the DIP Maturity Date will pass and the funds from the current DIP Financing Agreement will be exhausted before the Funding Date.

22.     The Debtors have previously established the need for DIP financing pursuant to section 364 of the Bankruptcy Code in their DIP Motion, which is incorporated by reference herein. Moreover, this Court already made the findings with respect to the factors described above in the Final DIP Order.[15] The Debtors' proposed entry into the Eighth Amendment is consistent with the Court's previous findings in the Final DIP Order because the Debtors will garner significant benefits pursuant to the terms of Eighth Amendment.

23.     Most significantly, the Eighth Amendment is absolutely necessary to preserve the estates' Assets because it will provide the Debtors with the funds necessary to maintain operations in chapter 11 between the time of entry of the Sale Order and the Funding Date, and will ensure that the Debtors have the necessary funds to consummate the Sale Transaction. As discussed more fully in the First Day Declaration, the Debtors have cash needs but generate very little in the way of revenue. As of the date hereof, however, the Debtors are operating on minimal cash, almost all of which is provided by the DIP Financing Agreement. Given the Debtors' significantly constrained liquidity, impending DIP Maturity Date and the lag time before the Funding Date, entry into the Eighth Amendment will provide the Debtors sufficient

---

[15]     *See* Final DIP Order at ¶ 5.

liquidity to fund operations and to administer the chapter 11 cases (and their foreign recognition proceedings) while the Debtors satisfy the conditions precedent to the Funding Date.

24.     The Debtors recognize the potential harm to their estates should the Debtors fail to obtain bridge financing.  Absent access to the funding provided for in the Eighth Amendment, the ultimate consummation of the Sale Transaction with the Purchaser will be threatened and the Debtors will be compelled to forego the benefits that would inure to their estates and their constituents from the Sale Transaction.  Without the additional funds sought in this motion and provided through the Eighth Amendment, the Debtors will have no capital to support operations or fees and expenses related to these chapter 11 cases (and their foreign recognition proceedings) and would likely be compelled to liquidate, thereby threatening recoveries to their creditors.

25.     Accordingly, the Debtors, with the support of the Creditors' Committee, submit that entry into the Eighth Amendment is within their sound business judgment.  The Debtors have determined that amending the DIP Financing Agreement to increase the Commitment amount by $15 million will enable the Debtors to maintain operations in chapter 11 and make necessary capital expenditures prior to the Funding Date.  As a result, the Debtors believe that entry into the Eighth Amendment is consistent with their fiduciary duties and will maximize value for their estates.

## ii.     The Terms of the Eighth Amendment are Fair, Reasonable and Appropriate Under the Circumstances

26.     The Debtors believe that the terms of the Eighth Amendment are fair and reasonable in light of the Debtors' ongoing financial needs, the impending DIP Maturity Date and the current status of these chapter 11 cases.  Specifically, the Debtors believe that the increase in the Commitments is reasonable in light of the fact that the Debtors will neither incur any amendment fees for such increase nor will there be any change in the interest rate or other

economic terms.  Further, the increased interest borne by the Debtors as a result of the increase of the Commitment in the amount of $15 million (plus applicable interest), is negligible compared to the value received as a result of the Debtors' ability to consummate the Sale Transaction with the Purchaser.

27.      Because only a limited number of provisions (as described above) are being amended, the relief sought in the DIP Motion (which has already been approved by the Final DIP Order) with respect to the remainder of the DIP Financing Agreement, is consistent with and supplements the relief sought herein.

**B.      The Eighth Amendment Should Be Accorded the Benefits of Section 364(e)**

28.       Section 364(e) of the Bankruptcy Code provides that the "reversal or appeal of an authorization . . . to obtain credit or incur debt, or of a grant . . . of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal." 11 U.S.C. § 364(e).

29.      Courts generally hold that "good faith" in the context of postpetition financing means, consistent with the Uniform Commercial Code, honesty in fact in the conduct or transaction concerned. *See Unsecured Creditors' Comm. v. First Nat'l Bank & Trust Co. (In re Ellingsen MacLean Oil Co.)*, 834 F.2d 599, 605 (6th Cir. 1987) (citing U.C.C. § 1-201(19)). Additionally, good faith is measured with respect to the good faith of the lender as contrasted to that of the borrower. Transcript of Record at 736:24-25, *In re Lyondell Chem. Co.*, No. 09-10023 (Bankr. S.D.N.Y. February 27, 2009). Moreover, a lender's desire to ensure that it is repaid, to

make money on interest and fees and to protect prepetition positions are understandable and acceptable motivations for a postpetition lender in negotiating a deal. *Id*. at 737:10-14.

30.     As explained in detail herein, the terms of the Eighth Amendment to the DIP Financing Agreement were negotiated in good faith and at arm's length between the Debtors, the DIP Agent and the DIP Financing Lenders, and all of the DIP obligations will be extended by the DIP Financing Lenders in good faith (as such term is used in section 364(e) of the Bankruptcy Code).  No consideration is being provided to any party to, or guarantor of, obligations arising under the DIP Financing Agreement, other than as disclosed in the Eighth Amendment.

## Motion Practice

31.     This motion includes citations to the applicable rules and statutory authorities upon which the relief requested herein is predicated, and a discussion of their application to this motion.  Accordingly, the Debtors submit that this motion satisfies Rule 9013-1(a) of the Local Rules of Bankruptcy Procedure for the Southern District of New York.

## Notice

32.     The Debtors have provided notice of this motion to: (a) the Office of the United States Trustee for the Southern District of New York; (b) Otterbourg, Steindler, Houston & Rosen, P.C., as counsel to the statutory committee of unsecured creditors appointed in these chapter 11 cases; (c) Bank of New York Mellon as agent for the Debtors' postpetition debtor-in-possession financing; (d) Emmet, Marvin & Martin, LLP as counsel to the agent for the Debtors' postpetition debtor-in-possession financing; (e) U.S. Bank National Association as Collateral Agent for the Debtors' purchase money credit facility; (f) Weil, Gotshal & Manges LLP as counsel to Harbinger Capital Partners Master Fund I, Ltd. and Harbinger Capital Partners Special Situations Fund, L.P.; (g) Willkie Farr & Gallagher LLP as counsel to EchoStar Corporation in its capacity as Lender under the Debtors' purchase money credit facility and Initial Lender under

the Debtors' postpetition debtor-in-possession financing; (h) U.S. Bank National Association as Indenture Trustee for the Debtors' 15% Senior Secured Notes and Kelley Drye & Warren LLP as counsel to the Indenture Trustee; (i) Deutsche Bank National Trust Company as Indenture Trustee for the Debtors' 6.5% Senior Exchangeable Notes and Foley & Lardner LLP as counsel to the Indenture Trustee; (j) Quinn Emanuel Urquhart & Sullivan, LLP as counsel to certain holders of the Debtors' 6.5% Senior Exchangeable Notes; (k) the Internal Revenue Service; (l) the Securities and Exchange Commission; (m) the United States Attorney for the Southern District of New York; (n) the Federal Communications Commission; (o) Kirkland & Ellis LLP, as counsel to certain holders of the Debtors' 15% Senior Secured Notes; (p) K&L Gates LLP, as counsel to Sprint Nextel Corporation; (q) Industry Canada; and (r) parties in interest who have filed a notice of appearance in these cases pursuant to Bankruptcy Rule 2002.  In light of the nature of the relief requested, the Debtors respectfully submit that no further notice is necessary.

**WHEREFORE**, for the reasons set forth herein, the Debtors respectfully request that the Court (a) enter an order, substantially in the form annexed hereto as <u>Exhibit A</u>, authorizing the Debtors to enter into the Eighth Amendment and (b) grant such other and further relief as may be appropriate.

New York, New York  
Dated: June 14, 2011

*/s/ Ira S. Dizengoff*  
AKIN GUMP STRAUSS HAUER & FELD LLP  
One Bryant Park  
New York, New York 10036  
(212) 872-1000 (Telephone)  
(212) 872-1002 (Facsimile)  
Ira S. Dizengoff  
Arik Preis  
Ashleigh L. Blaylock  

*Counsel to the Debtors and Debtors in Possession*

**EXHIBIT A**

**PROPOSED ORDER**

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
(212) 872-1000 (Telephone)
(212) 872-1002 (Facsimile)
Ira S. Dizengoff
Arik Preis
Ashleigh L. Blaylock

*Counsel to the Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| | ) |
| | ) |
| TERRESTAR NETWORKS INC., *et al.*,[1] | ) Case No. 10-15446 (SHL) |
| | ) |
| Debtors. | ) Jointly Administered |
| | ) |

**ORDER AUTHORIZING THE DEBTORS TO ENTER INTO THE EIGHTH
AMENDMENT TO THEIR DEBTOR-IN-POSSESSION LOAN AGREEMENT
TO (A) INCREASE THE AMOUNT OF THE COMMITMENT THEREUNDER
UNTIL THE FUNDING DATE OF THE PROPOSED SALE TRANSACTION
AND (B) EXTEND THE MATURITY DATE**

Upon the motion (the "***Motion***") of TerreStar Networks Inc., and its affiliates in the

above-captioned chapter 11 cases (collectively, the "***Debtors***") for entry of an order pursuant to

sections 363 and 364 of title 11 of the United States Code (the "***Bankruptcy Code***") authorizing

the Debtors to enter into the Eighth Amendment to the DIP Financing Agreement; and it

appearing that the relief requested in the Motion is fair and equitable, and it appearing that the

relief requested is in the best interests of the Debtors' estates, their creditors and other parties in

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal taxpayer-identification number, are: TerreStar Networks Inc. (3931), TerreStar License Inc. (6537), TerreStar National Services Inc. (6319), TerreStar Networks Holdings (Canada) Inc. (1337), TerreStar Networks (Canada) Inc. (8766); and 0887729 B.C. Ltd. (1345).

interest; and the Court having jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334; and consideration of the Motion and the relief requested therein being a core proceeding pursuant to 28 U.S.C. § 157(b); and venue being proper before this court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of the Motion having been provided, and it appearing that no other or further notice need be provided; and any objections to the Motion having been withdrawn or overruled on the merits; and after due deliberation and sufficient cause appearing therefor, it is hereby ORDERED that:

1.　　The Motion is granted to the extent set forth herein.

2.　　The Debtors are authorized to enter into the Eighth Amendment, to make, execute, and deliver all instruments and documents and to perform all acts in connection therewith that may be reasonably required or necessary for the Debtors' performance of their obligations under the Eighth Amendment.

3.　　Upon execution and delivery of the Eighth Amendment—which delivery shall occur upon the entry of the Sale Order—the Eighth Amendment shall constitute a valid and binding obligation of each of the parties thereto, enforceable against each party thereto in accordance with the terms thereof.　No obligation or payment under the Eighth Amendment or this Order shall be stayed, restrained, voidable, avoidable or recoverable under the Bankruptcy Code or under any applicable law, or subject to any defense, reduction, setoff, recoupment or counterclaim.

4.　　The Eighth Amendment has been negotiated in good faith and at arms' length between the Debtors, the DIP Agent and the DIP Financing Lenders, and all of the Debtors' obligations under the Eighth Amendment will be incurred in good faith as that term is used in section 364(e) of the Bankruptcy Code.

5.     The Debtors are authorized to take all actions necessary to effectuate the relief granted pursuant to this order in accordance with the Motion.

6.     The Court shall retain jurisdiction with respect to any matters, claims, rights or disputes arising from or related to the implementation of this Order.

New York, New York
Dated:_____, 2011

_____
Honorable Sean H. Lane
United States Bankruptcy Judge

**EXHIBIT B**

**THE EIGHTH AMENDMENT**

## EIGHTH AMENDMENT TO DEBTOR-IN-POSSESSION CREDIT, SECURITY & GUARANTY AGREEMENT

This Eighth Amendment, dated as of June __, 2011 (this "Amendment"), to the Debtor-in-Possession Credit, Security & Guaranty Agreement, dated as of October 21, 2010, by and among**:**

(i) TerreStar Networks Inc., a Delaware corporation (the "Borrower");

(ii) Motient Holdings Inc., a Delaware corporation, Motient Communications Inc., a Delaware corporation, Motient License Inc., a Delaware corporation, Motient Services Inc., a Delaware corporation, TerreStar New York Inc., a New York corporation, MVH Holdings Inc., a Delaware corporation, Motient Ventures Holding Inc., a Delaware corporation, TerreStar National Services, Inc., a Delaware corporation, and TerreStar License Inc., a Delaware corporation;

(iii) TerreStar Networks Holdings (Canada) Inc., an Ontario corporation, TerreStar Networks (Canada) Inc., an Ontario corporation, and 0887729 B.C. LTD., a British Columbia corporation;

(iv) the Lenders from time to time party thereto (the "Lenders"); and

(v) The Bank of New York Mellon, as administrative agent and collateral agent (in such capacities, the "Administrative Agent") (as amended by the First Amendment to Debtor-in-Possession Credit, Security & Guaranty Agreement, dated as of November 12, 2010, the Second Amendment to Debtor-in-Possession Credit, Security & Guaranty Agreement, dated as of December 14, 2010, the Third Amendment and Waiver to Debtor-in-Possession Credit, Security & Guaranty Agreement, dated as of January 5, 2011, the Fourth Amendment and Waiver to Debtor-in-Possession Credit, Security & Guaranty Agreement, dated as of February 3, 2011, the Fifth Amendment and Waiver to Debtor-in-Possession Credit, Security & Guaranty Agreement, dated as of February 15, 2011, the Waiver to Debtor-in-Possession Credit, Security & Security Agreement, dated as of April 1, 2011, the Sixth Amendment and Waiver to Debtor-in-Possession Credit, Security & Guaranty Agreement, dated as of May 3, 2011, and the Seventh Amendment and Waiver to Debtor-in-Possession Credit, Security & Guaranty Agreement, dated as of June 3, 2011, the "Credit Agreement");

is entered into by and among the Loan Parties and the Lenders.

WHEREAS, Loan Parties and the Lenders are parties to the Credit Agreement;

WHEREAS, the Lender party hereto constitutes the only Lender party to the Credit Agreement;

WHEREAS, the Loan Parties have requested that the Lenders consent to modification of the Credit Agreement as set forth herein;

WHEREAS, pursuant to Section 9.08(b) of the Credit Agreement, except as set forth therein, the Credit Agreement may be amended pursuant to an agreement in writing entered into by the Borrower and the Required Lender; and

WHEREAS, in connection with such request, the Loan Parties and the Lender have agreed to amend the Credit Agreement in certain respects, subject to the terms and conditions contained herein.

NOW, THEREFORE, the Lender and the Loan Parties hereby agree as follows:

1.     Definitions.  Any capitalized term used herein and not defined herein shall have the meaning assigned to it in the Credit Agreement.

2.     Amendments to Credit Agreement.  Effective as of the Amendment Effective Date (as defined below), the Credit Agreement is hereby amended as follows:

(a)     The definition of Agreed Budget in Section 1.01 is amended in its entirety to read as follows:

"Agreed Budget" shall mean Exhibit A to the Third Agreed Budget Letter Agreement, dated June__, 2011, by and between the Borrower and the Lender party thereto, subject to modification pursuant to Section 5.11(a)."

(b)     The definition of Stated Maturity Date in Section 1.01 is amended in its entirety to read as follows:

"Stated Maturity Date" shall mean September 30, 2011."

(c)     The definition of Commitment in Section 1.01 is amended by adding the following after the last sentence thereof:

"The aggregate amount of the Commitments on the Eighth Amendment Effective Date is $90,000,000."

(d)     Section 1.01 is amended by inserting the following definitions in proper alphabetical order:

""Eighth Amendment Effective Date" shall mean the "Amendment Effective Date" as defined in the Eighth Amendment to Debtor-in-Possession Credit, Security & Guaranty Agreement, dated as of June [__], 2011, among the Loan Parties and the Lender."

""Purchaser" shall have the meaning assigned to such term in the Purchaser Agreement."

""Purchase Agreement" shall mean the Purchase Agreement, dated as of June 14, 2011, by and among TerreStar Networks, Inc., TerreStar License Inc., TerrStar National Services Inc., TerreStar Networks Holdings (Canada) Inc.,

TerreStar Networks (Canada) Inc., 0887729 B.C. Ltd., and Gamma Acquisition L.L.C. and (solely with respect to Section 6.19 thereof) Dish Network Corporation."

(e)     Section 7.01(cc) is amended by deleting the word "or" from after the semicolon therein.

(f)     Section 7.01(dd) is amended by replacing the period therein with "; or".

(g)     Section 7.01 is amended by adding the following after the last section thereof:

"(ee) the termination of the Purchase Agreement pursuant to Section 8.1 of the Purchase Agreement (other than pursuant to Section 8.1(d) of the Purchase Agreement)."

3.     Consents and Other Agreements.

(a)     The Required Lender hereby consents to modification of the DIP Order, in the form attached hereto as Exhibit A, and the Final Recognition Order, in a form acceptable to the Required Lender.

(b)     For the avoidance of doubt, the parties hereto agree that no additional Upfront Fee will be payable with respect to the incremental Commitments effected by this Amendment.

4.     Representations and Warranties.  The Loan Parties hereby represent and warrant to the Lender, after giving effect to the amendments set forth herein, as follows:

(a)     The representations and warranties contained herein, in the Credit Agreement and in each certificate or other writing delivered to the Lender or the Administrative Agent pursuant hereto on or prior to the date hereof are true and correct in all material respects on and as of the date hereof as though made on such date (except to the extent that such representations and warranties relate solely to an earlier date, in which case, such representations and warranties are true and correct in all material respects on and as of such earlier date).

(b)     No Default or Event of Default has occurred and is continuing as of the date of this Amendment.

5.     Conditions to Effectiveness.  This Amendment shall become effective as of the first date (the "Amendment Effective Date") on which the Lender shall have received duly executed counterparts hereof that, when taken together, bear the authorized signatures of the Loan Parties.

6.     Miscellaneous.

(a)     Continued Effectiveness of the Credit Agreement.  This

Amendment shall be effective only in this specific instance for the specific purposes set forth herein. Except as otherwise expressly provided herein, the Credit Agreement is, and shall continue to be, in full force and effect and is hereby ratified and confirmed in all respects and each Loan Party hereby reaffirms all obligations of such Loan Party under the Credit Agreement. Except as expressly provided herein, the execution, delivery and effectiveness of this Amendment shall not operate as an amendment or waiver of any right, power or remedy of the Lenders under the Credit Agreement, nor constitute an amendment or waiver of any provision of the Credit Agreement or any other Loan Document, nor constitute a waiver of, or consent to, any Default or Event of Default now existing or hereafter arising under the Credit Agreement or any other Loan Document, and the Lenders expressly reserve all of their rights and remedies under the Credit Agreement and the other Loan Documents, under applicable law or otherwise.

(b)     <u>Counterparts</u>. This Amendment may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which shall be deemed to be an original, but all of which taken together shall constitute one and the same agreement. Delivery of an executed counterpart of this Amendment by telefacsimile or other electronic method of transmission shall be equally as effective as delivery of an original executed counterpart of this Amendment.

(c)     <u>Headings</u>. Section headings herein are included for convenience of reference only and shall not constitute a part of this Amendment for any other purpose.

(d)     <u>Costs and Expenses</u>. The Borrower agrees to pay on demand all fees, costs and expenses in connection with the preparation, execution and delivery of this Amendment

(e)     <u>Reference to Credit Agreement</u>. On and after the Amendment Effective Date, each reference in the Credit Agreement to "this Agreement", "hereunder", "hereof", "herein" or words of like import referring to the Credit Agreement, and each reference in the other Loan Documents to the "Credit Agreement", "thereunder", "thereof" or words of like import referring to the Credit Agreement shall mean and be a reference to the Credit Agreement as amended by this Amendment.

(f)     <u>Amendment as Loan Document</u>. The Loan Parties acknowledge and agree that this Amendment constitutes a "Loan Document" under the Credit Agreement. Accordingly, it shall be an Event of Default under the Credit Agreement (i) if any representation or warranty made by the Loan Parties under or in connection with this Amendment shall have been untrue, false or misleading in any material respect when made or (ii) subject to the applicable grace periods set forth in the Credit Agreement, if any Loan Party fails to comply with any covenant or agreement set forth herein.

(g)     <u>Governing Law</u>. **THIS AGREEMENT SHALL BE CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK AND GOVERNED BY THE LAWS OF THE STATE OF NEW YORK AND, AS APPLICABLE, THE BANKRUPTCY CODE.**

(h)     <u>Waiver of Jury Trial</u>. **EACH PARTY HERETO HEREBY**

**WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT OR ANY OF THE OTHER LOAN DOCUMENTS. EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING AMENDMENT AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS, AS APPLICABLE, BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 6(h).**

[Remainder of page intentionally left blank.]

IN WITNESS WHEREOF, the parties hereto have caused this Amendment to be duly executed by their respective authorized officers as of the day and year first above written.

TERRESTAR NETWORKS INC.,
debtor and debtor-in-possession, as the Borrower


By:_____
Name:
Title:

TERRESTAR NATIONAL SERVICES, INC.
TERRESTAR LICENSE INC.,
each a debtor and debtor-in-possession, as
Guarantors


By:_____
Name:
Title:




0887729 B.C. LTD.,
each a debtor and debtor-in-possession, as Canadian
Guarantors


By:_____
Name:
Title:

TERRESTAR NETWORKS HOLDINGS (CANADA) INC.
TERRESTAR NETWORKS (CANADA) INC.
each a debtor and debtor-in-possession, as Canadian Guarantors


By:_____
Name:
Title:

ECHOSTAR CORPORATION,
as Lender

By:_____
Name:
Title:

Exhibit A

Revised DIP Order

# EXHIBIT C

*In re Lyondell Chemical Co.*

1          UNITED STATES BANKRUPTCY COURT
             SOUTHERN DISTRICT OF NEW YORK

2
                              .  Chapter 11
3                             .
    IN RE:                    .  Case No. 09-10023 (REG)
4                             .
    LYONDELL CHEMICAL COMPANY, .  New York, New York
5                             .  Friday, February 27, 2009
                    Debtors.  .  8:35 a.m.
6   . . . . . . . . . . . . . . .  Volume 3.  Pages 561-762

7          TRANSCRIPT OF FINAL HEARING ON MOTION
                 FOR POST-PETITION FINANCING
8        BEFORE THE HONORABLE ROBERT E. GERBER
           CHIEF UNITED STATES BANKRUPTCY JUDGE
9
    APPEARANCES:  (On the record)
10
    For the Debtors:          George A. Davis,, Esq.
11                            Andrew Troop, Esq.
                              CADWALADER, WICKERSHAM & TAFT, LLP
12                            One World Financial Center
                              New York, New York  10281
13
                              Mark C. Ellenberg, Esq.
14                            Peter Friedman, Esq.
                              CADWALADER, WICKERSHAM & TAFT, LLP
15                            1201 F Street N.W.
                              Washington, DC  20004
16

17
    (Appearances Continued)
18

19

20  Audio Operator:           Electronically Recorded
                              by Karen and Brent, ECROs
21
    Transcription Company:    Rand Reporting & Transcription, LLC
22                            80 Broad Street, Fifth Floor
                              New York, New York 10004
23                            (212) 504-2919
                              www.randreporting.com
24

25  Proceedings recorded by electronic sound recording,
    transcript produced by transcription service.

```
 1   APPEARANCES:  (Continued)

 2   For the Creditors'
       Committee:              Steven D. Pohl, Esq.
 3                             Edward Weisfelner, Esq.
                               William M. Dolan, Esq.
 4                             BROWN RUDNICK
                               One Financial Center
 5                             Boston, Massachusetts  02111

 6   For ABN AMRO:             Corinne Ball, Esq.
                               JONES DAY
 7                             222 East 41st Street
                               New York, NY  10017
 8
                               Margot Schonholtz, Esq.
 9                             KAYE SCHOLER, LLP
                               425 Park Avenue
10                             New York, New York  10022-3598

11   For Citibank:             Marshall S. Huebner, Esq.
                               Darren Klein, Esq.
12                             Elliot Moskowitz, Esq.
                               DAVIS, POLK & WARDWELL
13                             450 Lexington Avenue
                               New York, New York  10017
14
     For Access Industries:    Jay Goffman, Esq.
15                             SKADDEN, ARPS, SLATE, MEAGHER
                                & FLOM, LLP
16                             Four Times Square
                               New York, New York  10036-6522
17
     For Bank of New York:     Kevin J. O'Brien, Esq.
18                             Glenn Siegel, Esq.
                               DECHERT LLP
19                             1095 Avenue of the Americas
                               New York, NY  10036
20
     For the US Trustee:       Paul Schwartzberg, Esq.
21                             UNITED STATES DEPARTMENT OF JUSTICE
                               OFFICE OF THE U.S. TRUSTEE
22                             33 Whitehall Street, 21st Floor
                               New York, New York  10004
23

24

25
     (Appearances continued)
```

```
 1    APPEARANCES:   (Continued)

 2    For UBS Securities, LLC,
      and UBS AG:              Linda Martin, Esq.
 3                             SIMPSON, THACHER & BARTLETT, LLP
                               425 Lexington Avenue
 4                             New York, New York  10017-3954

 5    For Wilmington Trust:    Arlene R. Alves, Esq.
                               SEWARD & KISSEL, LLP
 6                             One Battery Park Plaza
                               New York, NY  10004
 7
      For Law Debenture of
 8    New York:               Lewis S. Rosenbloom, Esq.
                               DEWEY & LE BOEUF, LLP
 9                             Two Prudential Plaza
                               180 North Stetson Avenue
10                             Suite 3700
                               Chicago, IL  60601
11
      For GM Channelview
12    Cogeneration, LLC        Curtis Miller, Esq.
                               MORRIS, NICHOLS, ARSHT & TUNNEL,
13                              LLP
                               1201 North Market St., 18th Floor
14                             P.O. Box 1347
                               Wilmington, DE  19899
15
      For Elgin, Joliet and
16    Eastern Railway:         Kurt T. Gwynne, Esq.
                               REED SMITH, LLP
17                             1201 Market Street, Suite 1500
                               Wilmington, DE  19801
18
      Appearing via telephone:

19
      For Texas Sampling &
20    Shrieve Chemical:         Joseph P. Hebert, Esq.
                                LISKOW & LEWIS
21                              822 Harding Street
                                P.O. Box 52008
22                              Lafayette, LA  70505

23    (Appearances continued)

24

25
```

APPEARANCES: (Continued)

Appearing via telephone:

For Sheldon Independent
School District:                    Owen Sonik, Esq.
                                    PERDUE, BRANDON, FIELDER, COLLINS
                                     & MOTT, LLP
                                    2600 Citadel Plaza, Suite 500
                                    Houston, TX  77008

INDEX

|                 |        | Page     |
|-----------------|--------|----------|
| ARGUMENT        |        | 566      |
| COURT DECISION  |        | 723,732  |

1    (Proceedings commence at 8:35 a.m.)

2         THE COURT:  Good morning.

3         All right.  Mr. Huebner, you can continue.

4         MR. HUEBNER:  Good morning, Your Honor.  I actually

5    don't intend to be -- I'm hoping under half an hour, and a lot

6    of it will actually be addressing the objections we have not

7    yet gotten to.  I wanted to just hit a couple of quick points

8    on the topics we already covered, if I may.

9         On the maturity --

10        THE COURT:  Sure.  Go ahead.

11        MR. HUEBNER:  On the maturity date, Your Honor, I told

12   you yesterday evening that there was a chemical case in this

13   courthouse in the recent weeks, and I neglected to mention its

14   name, which I should, that had a one-year maturity; that is the

15   Tronox case, which was cited in the papers, I believe, of

16   Simpson Thacher, T-r-o-n-o-x.  It's also Exhibit O to our

17   brief.  We did double-check it last night and, again, confirm

18   that it is a very recent comp of a one-year maturity entered in

19   this very building for a chemical company.

20        Second, Your Honor, I referred yesterday to record

21   evidence.  In fact, I think I strongly asserted the only record

22   evidence that a one-year maturity is, in fact, currently a

23   market term, and that is currently what the market is offering

24   to debtors generally and not just to this one.  I referred at

25   some length to the fact that Mr. Jaffe's testimony on this

1   point, which is uncontroverted and, in fact, the only record

2   evidence in this trial on what is market right now for DIPs,

3   knocked it out of the park.

4          I do want to remind the Court that this is not Mr.

5   Jaffe's first DIP or second or third or tenth.  He has been

6   doing this for eleven years at Citibank in the asset-based

7   group and, in fact, is the expert witness at this trial on what

8   is market for DIPs.  And as I said yesterday -- I will not

9   belabor the point -- I think it was for very, very good reason

10  the committee decided not to call him to the stand and instead

11  pay the price of allowing all of his declaration and

12  designation testimony to be uncontroverted and

13  incontrovertible.

14         THE COURT:  Okay.  And you designated the portions of

15  his deposition that they did rely on under your Rule 32 rights?

16         MR. HUEBNER:  We did, Your Honor.  They are all in the

17  record.  I think they all speak directly to the issues at the

18  heart of this.

19         What we actually did last night, Your Honor, which may

20  not be wanted or useful, we actually made you a packet of the

21  record evidence on the maturity dates, and if I had a long, you

22  know, dramatic closing, I might have read lots of excerpts from

23  it.  The Court may say, I don't want that, I can go read the

24  documents myself, or it might be useful to have a packet of the

25  actual record evidence --

1       THE COURT:  If you've provided it to your opponents or

2    if you're about to do so now, I'll take it.

3       MR. HUEBNER:  Thank you, Your Honor.  We certainly

4    will do that.

5       To be clear, this does not include any of the

6    transcript testimony during the proceedings.  We don't have the

7    transcript yet.  This is the evidence that is in the record

8    from designation and declarations, and since we have the

9    packet, I see no reason to what I might have otherwise done,

10   which is simply read it, refer to it, you know, be dramatic

11   about it.  We all know it's in there.  It was designated by

12   them.  That's the evidence and I was just going to move on.

13      THE COURT:  Okay.  Continue, please.

14      MR. HUEBNER:  Your Honor, the next point which I want

15   to hit, and this is my last point on maturity date, is that the

16   only record evidence about where the DIP is trading is Mr.

17   Dugan's testimony that it is trading below par, meaning the

18   market doesn't think that the lenders got some great deal here.

19   The market won't even buy this DIP right now at a hundred

20   cents.  Mr. Weisfelner argued, which was his right, that he

21   thinks that at one point it was trading above par.  He can't

22   testify.  I can't testify.  I should note that e-mails I got

23   last night said that it is now trading at 97.25, a further

24   decline from Mr. Dugan's sworn testimony of 99.5.

25      So just to equal out our argument, it's now arguably

1    moving south but, again, the only record evidence is it is

2    below par now and, therefore, not thought to be, obviously, all

3    that attractive.

4         Okay.  Moving on.  On the spirit of cooperation point,

5    Your Honor, I did reference yesterday that the committee had

6    never asked me to have anyone meet directly with the lenders.

7    I do want to note because I spent a lot of time with Mr.

8    Weisfelner's partner, Mr. Levine, taking scores and scores of

9    comments to the DIP order and I spent a lot of time thinking

10   about how the interim compares to the final.  I just want to be

11   clear that the black line that you see is about the heaviest I

12   have ever done in my career between an interim and a final.  I

13   say it only that Your Honor should understand that there's been

14   a very strong spirit of cooperation.  Wherever we could take

15   their comments, large and small, we believe we did.  Obviously,

16   the things that were remaining were, in fact, unbridgeable.

17        THE COURT:  Pause, please.  When did the provision,

18   which seemingly was some kind of black line but I couldn't tell

19   when and how, that changed filing a complaint by the committee

20   to filing a motion for STN authority to file such a complaint?

21        MR. HUEBNER:  Sure, Your Honor.  That's a -- it's a

22   great example of how we work something out.

23        You know, we were talking about how long the deadline

24   would be and they said we'd like standing, and we said, and the

25   debtors said, it's not appropriate at this point to give up

1   standing.  So we offered.  We said, look, you shouldn't have to

2   get standing before the deadline, all you need to do is file

3   the first legitimate piece of paper.  And so in lieu of a

4   lender challenge, which obviously they would not yet have

5   authority to do, in order to just be totally fair to them

6   because it was a very reasonable point, we agreed that all they

7   had to do was have an <u>STN</u> motion on file and those motions --

8   the <u>STN</u> requirement is that you show a prima facie case.

9           THE COURT:  So I won't have a gun to my head to decide

10  an <u>STN</u> motion.

11          MR. HUEBNER:  No, you will not.  That's a great

12  example of the kind of, I think, very thoughtful dialogue that

13  we had, taking whatever we could that was reasonable to narrow

14  the issues.  You will definitely not have a gun to your head.

15  Then, you know, they have to file a motion saying under the

16  Second Circuit law we want standing, here's why, and we're

17  going to make it --

18          THE COURT:  And then all of the defendants of the --

19  to the prospective litigation will tell me all the reasons why

20  they don't think it's in the best interests of the estate.

21          MR. HUEBNER:  Assuming that they have that view at the

22  time, that's right, and there will be no gun to your head.

23          THE COURT:  Have you ever seen a case where they

24  haven't had that view?  You saw it in <u>Adelphia</u>, didn't you?

25          MR. HUEBNER:  I was just the DIP agent, Your Honor.  I

1   definitely have seen that case, and Mr. Weisfelner has as well.

2   There are absolutely examples where parties in interest agree

3   that the committee is the appropriate pursuer of causes of

4   action.  Not every case is that case, but Mr. Weisfelner

5   actually cited precedence where standing was given at the very

6   beginning.  It, obviously, wasn't contested in those cases.

7            So, yes.  I don't think it's foregone.

8            But, in any event, your concern which is, am I being

9   jammed here?  Absolutely not.

10           THE COURT:  Oh, it's not just me.  It's ultimately the

11  estate.

12           MR. HUEBNER:  Correct.

13           THE COURT:  Because, otherwise, that would require the

14  creditors' committee to get its investigatory work done like in

15  about eight seconds.

16           MR. HUEBNER:  Yeah.  I quite agree, Your Honor, which

17  is -- again, which is why we lengthened the period and changed

18  it to that.  They just need to file an STN motion with an

19  appropriate -- with a complaint and the deadline to satisfy.

20           Now, in the real world I would venture to say, since

21  we've all been down this road before, that's probably not

22  what's going to happen because in the real world when the

23  committee calls someone and says, okay, it's Day 134 and

24  tomorrow's the deadline, would you like me to file a two-

25  hundred-and-sixty count really nasty complaint, or would you

1   like to give me an extension so that we can have some more time

2   to try to work this out.  The answer in, I think, every case I

3   have ever been in is that the parties agree to something

4   reasonable.  I don't -- I've never -- I don't think I've ever

5   been involved in a case where someone said, file your

6   complaint, because if there's a hope of working things out, you

7   extend and you do.

8        So I don't -- I can't -- I'm not going to profess

9   where this will be a problem in the future, but I can say that

10  the mechanic was changed very substantially in a way that

11  greatly lightens their burden and puts no time deadline on the

12  Court at all.

13       Speaking of burden on the Court, Your Honor, we

14  actually fought very late last night about Your Honor's

15  comments in terms of the Court being jammed on the milestones

16  and, actually, we quickly drafted, circulated it to all the

17  lenders and gave them a scream-or-die deadline, which has now

18  past, revised language that I hope addresses or, at a minimum,

19  ameliorates substantially the judge's concern.

20       What we changed, as Your Honor remembers, there was

21  flat language, including what I had not seen before, I thought

22  it was a little bit unclear, about the confirmation hearing

23  having been held.  I didn't know, as you didn't know, does that

24  mean ended, began.  I don't know what it meant.  So we rewrote

25  it as follows, which I hope will be something the Court finds

1    pleasing.  This is Section 618(c) and (d), which have both been

2    changed as follows:  "C:  By October" -- oh, I think we forgot

3    to tell the debtor.  We loosened the milestones.

4              "C:  By October 15th, 2009, obtain approval by the

5              Bankruptcy Court of such disclosure statement related

6              to such reorganization plan provided that if the

7              debtors have commenced a hearing prior to October

8              15th, 2009, with a reasonable belief that such

9              approval could be obtained at such hearing by such

10             date, and due to the Bankruptcy Court's availability

11             such hearing has not concluded by October 15th, 2009,

12             then such deadline shall be deemed extended by up to

13             ten days to accommodate the Bankruptcy Court's

14             availability."

15             THE COURT:  Ten days?

16             MR. HUEBNER:  Again, Your Honor, they should be filing

17   early enough to be done by October 15th.  The goal is not to

18   take away the deadline.  You know, if they're responsible

19   they'll work with chambers, they'll get the time they need and

20   the hearing will start whatever number of days before that is

21   necessary.  But if we're moving along and the Court is not

22   available for continuations like the one that the Court has

23   made itself available now, there is another ten days, and then,

24   frankly, on top of the ten days is the fact that, as we

25   discussed yesterday, the Courts have an amazing ability to

1    request extensions from the parties.

2             And, again, this is within the debtors' control.  As

3    long as --

4             THE COURT:  Pause, please.  Now that was on the

5    disclosure statement?

6             MR. HUEBNER:  It's there for the plan as well, Your

7    Honor.  In D:

8             "By December 1, 2009, obtain confirmation by the

9             Bankruptcy Court of such reorganization plan, provided

10            that if the debtors have commenced a hearing prior to

11            December 1, 2009, with a reasonable belief that such

12            confirmation could be obtained at such hearing by such

13            date, and due to the Court's unavailability the

14            hearing has not concluded by December 1, then such

15            deadline shall be deemed extended by up to ten days to

16            accommodate the Bankruptcy Court's availability."

17            So, again, their goal and obligation is to be done by

18   those dates and they need to start in time with a belief that

19   they can be done.  That's what a deadline is.  But if the

20   situation like the one we faced between Wednesday and today

21   comes up, that we just need more hearing, there is a pre-agreed

22   ten-day extension and then, obviously, we can face then what

23   happens.  But the only other way to do it is just to say,

24   there's just sort of -- there's no real deadline, and that's

25   not really fair either.  So at a minimum we now know what --

1    when they're supposed to be done by and what they're supposed

2    to have done, and there's at a minimum a ten-day additional

3    period to get that done as necessary.

4            Your Honor, I owe you a second apology because I was

5    stunned to hear --

6            THE COURT:  Pause, please, Mr. Huebner.  Have you

7    circulated the proposed revised language of 618(c) and (d) to

8    the other parties?

9            MR. HUEBNER:  Your Honor, that's a fair question.  We

10   have not because, again, we sent it to the lenders in the

11   middle of the night saying, you have until 8 a.m. and if you

12   don't reply, we will deem you to have consented.  It is a pro-

13   debtor, pro-committee change.  We have copies with us.  And

14   you're right; once the 8 a.m. hour passed a few minutes ago, we

15   probably should have blasted it out.  But we do have copies

16   available and we can hand them out to people.

17           THE COURT:  Including me.

18           MR. HUEBNER:  Yes, Your Honor.  For you, I -- you can

19   have my copy.

20           I don't want to pretend this is a seismic change.

21   It's not.  It's not a seismic change, but it is one that was

22   intended to address the concern, A, that I think (d) was just

23   badly drafted since we couldn't tell whether events commenced

24   or ended, and then the issue of some additional leeway being

25   put in to accommodate possible scheduling issues.

1        THE COURT:  Mr. Huebner, the way I read this, this

2   gives me ten days to issue a confirmation decision on a

3   potentially contested confirmation hearing.

4        MR. HUEBNER:  Your Honor, that's not -- it's not

5   unusual for all sorts of documents to have deadlines that the

6   plan shall have been confirmed by date X.  That's in almost

7   every bankruptcy case.  There is some document, whether it's a

8   purchaser that says the sale order shall have been entered by

9   date X, or a purchaser who says the bidding procedures order

10  shall have been entered by date X, or the union that says, my

11  claim shall have been found unallowable by date X.  This is

12  just the end date.  The debtors need to start whatever number

13  of days in advance of that is necessary to give you the time to

14  issue your decision.  So if they need to start the hearing, you

15  know, six days, eight days, four days earlier, there's nothing

16  remotely path-breaking or unusual about this.

17       In every bankruptcy case, debtors sign documents all

18  the time that require a court order by a certain date:  The

19  assumption of a contract, the approval of an M&A transaction,

20  the approval of 363 non-ordered course transaction.  This is

21  just the work-a-day aspects of being in Chapter 11.

22       So other than saying that there are no milestones

23  which, I think, is, you know, not -- well, (A), It's not

24  something I think the lenders would agree to, but (B), it's

25  just not something that I think is found in many or most deals.

1        I mean, anytime a DIP has a maturity date, that means

2   it has to be repaid by that date.  They all have maturity

3   dates.  That means that the plan shall have gone effective by

4   such date and it not only requires that a confirmation order be

5   entered by a certain date, but that all conditions precedent to

6   a plan to allow it to go effective, to allow the refinancing

7   under the exit facility also be done.  I mean, that's what

8   deadlines are.

9        THE COURT:  Go on, if that's all you have to say about

10  that.

11       MR. HUEBNER:  Your Honor, the second apology that I

12  think I owe you was your reference to the Applied Theory case,

13  which I just can't believe that we didn't cite.  You obviously

14  have ruled on the very topic that we talked about in a manner

15  favorable to the lenders and nobody cited it to you.  I don't

16  think I need to read you the ruling.  I'm sure that you're well

17  aware of it.

18       THE COURT:  I generally remember what I say.

19       MR. HUEBNER:  Yeah.  So I don't need to say more other

20  than to give you the companion comfort.  You asked me yesterday

21  whether I was confident that this was a fair DIP order on this

22  point, that it provided the pre-petition lenders with adequate

23  protection only for diminution and didn't, for example, say

24  things like, you won't get interest, and also that the lender

25  challenge and the unwind rights both with respect to the pre-

1  petition loans and the roll-up, would give you the authority to

2  unwind, reverse, you know, anything that turned out to be

3  inappropriate in light of any challenges that any party might

4  bring, and I just want to reaffirm my answer.

5        I was comfortable at the podium when you asked that

6  impromptu at the interim hearing.  I was comfortable at the

7  podium, again, when you asked it impromptu yesterday, but I

8  know it's not impromptu when the Court has concerns.  We went

9  back through the order.  We checked all the provisions and

10 we're very comfortable that the rights of the parties and the

11 Court are preserved, including with respect to the diminution

12 issues that we discussed yesterday in terms of avoidance

13 actions, which is if they lose a lien, either because it was a

14 fraudulent transfer or because it was unperfected as to an

15 entity, they can't get it back some wrong way and it is taken

16 away from them and there are provisions in the order that make

17 it very clear that that's what happens.

18       Your Honor, in terms of -- that's, I think, all I'm

19 going to say about the creditors' committee.  I obviously spent

20 some time yesterday on their objections.  I think it would be

21 fair and interesting to no one if I revisited any of that

22 ground.

23       In terms of Bank of New York, Your Honor, I think I'm

24 going to leave that largely to Mr. Ellenberg.  I obviously

25 said, I think, a fair piece on that as well, except --

1          THE COURT:  Which portion are you going to leave to

2    Mr. Ellenberg?

3          MR. HUEBNER:  The Bank of New York objection about

4    their adequate protection, except to note really only one point

5    on it, which is as follows:

6          You know, the creditors' committee believes that as a

7    matter of law and fairness, Bank of New York's adequate

8    protection lien should only come from the entities on which

9    they currently have a claim, which would be radically more

10   limited than the package that the debtors have offered and the

11   lenders have agreed to.

12         Bank of New York's view is that they get, obviously,

13   tons and tons of stuff and I won't repeat any of that.

14         The middle view or, in my view, the radically more

15   favorable to Bank of New York than the midpoint view is

16   obviously what was done.

17         I want to note that in terms of the marshaling issue,

18   which I really do feel is not a real issue, number one, the

19   intercompany post-petition liens are not only super priority

20   and secured, they are senior to adequate protection claims and

21   that's very important because it means that money comes back to

22   the debtors who lent it before any adequate protection is given

23   or paid, which is a big level or unfairness point that,

24   frankly, I think is the right point.

25         THE COURT:  Your point being that reduces the

1  diminution of value of --

2          MR. HUEBNER:  Of their entity.

3          THE COURT:  -- Mr. Siegel's debtor's concerns because

4  they haven't been tapped as much because they can recover it

5  from their sister companies before their total asset pooled to

6  meet their claims is computed.

7          MR. HUEBNER:  That's correct, Your Honor, although to

8  be clear, I actually think they may be a net taker and not a

9  net giver, but that's what I'm going to leave to Mr. Ellenberg.

10 I'm not --

11         THE COURT:  Well, if --

12         MR. HUEBNER:  -- the debtor.

13         THE COURT:  -- if there's a net taker, then you're

14 saying there's no harm, no foul.

15         MR. HUEBNER:  That's exactly the point; that there is

16 an evening mechanism before adequate protection is paid so that

17 it ensures fairness.  So if their entity is a net giver, they

18 get it back.  If they're a net taker, they don't get to

19 unfairly take it from others.

20         But the second point is even more important, which is

21 it doesn't matter at all and that's why it's a fake issue

22 because the ultimate marshaling right is a Federal Court order

23 that says, you can look to every single entity in the corporate

24 family and take value wherever it's found, senior to every

25 single unsecured creditor in this case, senior to every

1  administrative creditor but for the DIP under 507, which has a

2  statutory requirement that adequate protection claims be paid

3  on an administrative priority basis.

4          So, again, I won't repeat yesterday's argument but

5  just to say the line that, you know, that sort of struck me,

6  whether it was sort of funny or not, that they have gone from

7  having a teenie weenie four-percent pro rata lien, pro rata

8  unequal and rateable with the -- credit facility against only

9  one entity that could fair very poorly indeed who knows it's

10 having an adequate protection right to refill every dollar of

11 diminution and loss from the entire corporate family, including

12 ABL collateral, which they never had before, and even their own

13 expert, I think, uses $16.8 billion or some number like that,

14 and I think that's Paragraph 9, maybe, of his declaration, you

15 know, saying even with these -- you know, knocking down the

16 assumptions, there's only, you know, at most 8 billion of DIP

17 and so there's billions and billions that turn to pay the

18 adequate protection claims that they now have a right to, which

19 right now they don't have a right to.

20         Also, Mr. Bigman testified under oath, because I asked

21 him because it was important to me, do these entities need the

22 DIP loan; yes.  Is it in their best interest, just the entities

23 Mr. Siegel is talking about, is it in their best interest; yes.

24 So the only evidence, the only testimony we have -- and I know

25 Mr. Ellenberg will address numbers -- is that these entities

1   have to have this DIP and that they're benefitting from this

2   DIP.

3            In terms of Millennium, Your Honor, I'm very glad we

4   had overnight to deal with this one because we found some stuff

5   in the indenture that I think you're going to find kind of

6   interesting.

7            Number one, let's talk about the law.  The law is that

8   a negative pledge, right, is not respected and not enforceable

9   in bankruptcy.

10           THE COURT:  That being Allegheny.

11           MR. HUEBNER:  Well, it turns out it's not only

12  Allegheny, Your Honor.  It's also the Southern District from

13  this district in the form of Judge Duffy's opinion, which we

14  found very early this morning in McLean Industries.  The cite

15  is 162 B.R. 410.  There was no mention --

16           THE COURT:  And that's Kevin Duffy in --

17           MR. HUEBNER:  It is, Your Honor.

18           THE COURT:  -- McLean?

19           MR. HUEBNER:  Yeah.  All we did was Shepardize

20  Allegheny.  I don't want people to think we went and did some

21  magic research project.  We just hit Shepardization and we got

22  four cases and the other three --

23           THE COURT:  Okay.  I would have hoped --

24           MR. HUEBNER:  -- weren't relevant.

25           THE COURT:  -- your associates Shepardized Allegheny

1  before last night.

2          MR. HUEBNER:  It was not in our brief, Your Honor.  It

3  wasn't our issue.  It was in the debtors' brief, but we're

4  careful, so we Shepardized it.  So --

5          THE COURT:  Where was the Allegheny response?

6          MR. HUEBNER:  In the debtors' response, Your Honor.

7  Remember, we're just the lenders.

8          THE COURT:  Yeah.  I understand that.  Okay.  Go on.

9          MR. HUEBNER:  So this case, which was reversed on

10  wholly unrelated grounds so I don't think that's analytically

11  relevant, says as follows:

12          "MARAD argues that the assignment was simply an

13          enforcement of security interests... In fact, MARAD

14          had only a restrictive covenant requiring its consent

15          prior to USL's bareboat chartering of the vessels.  A

16          restrictive covenant is not a perfected security

17          interest or a property interest that is valid against

18          a debtor-in-possession or a trustee under the

19          Bankruptcy Code.  See Allegaert v Chemical Bank, 657

20          F.2d 495 (2d Cir.1980); Allegheny, 93 B.R. 907 (Bankr.

21          W.D. Penn. 1988)."

22          So I think the law -- I mean, you know, let's not get

23  too dramatic.  There are only a couple of cases but the cases

24  say the same thing and they're clearly right, which is that a

25  restrictive covenant is just totally unenforceable in Chapter

1   11.  It would obviously be a crazy outcome, as a matter of

2   policy, if you could prime someone that had an actual perfected

3   lien.  But if someone had nothing but a, you know, a whispery

4   promise not to put more debt on, that that somehow was stronger

5   than an actual lien.

6            But then there are the facts, Your Honor, which sort

7   of matter, too.

8            Mr. Rosenbloom, who, by the way, I thought did a

9   really excellent job, did lead you to believe that there was a

10  provision in the existing debt documents that incorporated the

11  restrictive covenant on secured debt.  That is not true.  In

12  fact, what Section 11.13 of the senior facility and the

13  analogous provision of the other facility tell you are that

14  there's --

15           THE COURT:  Pause.  This is of the pre-petition senior

16  facility?

17           MR. HUEBNER:  It is, Your Honor.  Let me just read it

18  for the avoidance of doubt.

19           "Any amount that may be guaranteed by Millennium

20           Chemicals, Inc., or any of its subsidiaries shall not

21           exceed the amount permitted to be incurred as defined

22           in the Millennium Indenture as 'funded debt'" --

23           that's a defined term.  We'll talk about that in a

24           minute, very important -- "as defined in the

25           Millennium Indenture as more fully set forth in

1        Section 10.09 of the Millennium Indenture provided,

2        however, that upon the refinancing in full of the

3        Millennium notes, this Section 1113 shall cease to

4        operate and have any force" -- I would have said no

5        force -- "and have any force and effect as of the date

6        of such refinancing."

7        So does it actually incorporate the restrictive

8   covenant?  No.  That's a totally different section of the

9   Millennium indenture that relates to the inability to put on

10  secured debt.

11       What it actually tries to incorporate --

12       THE COURT:  You want to slow down, please, Mr.

13  Huebner?

14       MR. HUEBNER:  I apologize, Your Honor.

15       There are two arguably relevant sections of the

16  indenture.  There is the restriction on other secured debt,

17  which is what he talked to you about at some length yesterday,

18  and then there's a cap on the amount of debt.

19       THE COURT:  Now you're talking about the latter?

20       MR. HUEBNER:  Well, that's what the documents are

21  talking about and we'll be more precise yet in a moment.

22       So to be clear, nowhere in the senior facility is

23  there any agreement, acknowledgment or incorporation of the

24  fact that the Millennium indenture says we get equal and

25  rateable treatment.  It's just not there.  Period.  So this

1  whole argument that we have protection against secured debt

2  that the lenders agree to is not true.

3       Then the question is -- and it's not actually relevant

4  but I'll answer it -- did we agree that there would be a debt

5  cap, and the answer is, no, and here's why:

6       Remember when I read it I said it talks about funded

7  debt and that it's very important to read definitions.  What's

8  the definition in the Millennium indenture of "funded debt"?

9  I'll read that one, too.

10      "Funded debt means debt that by its terms matures more

11      than one year from the date of original issuance or

12      creation; or, (2) matures within one year but is

13      renewable or extendable at the option of the obligor

14      to a date more than one year from such date."

15      So to be clear, it certainly wasn't our intention,

16  just an odd coincidence, that because the DIP loan is more than

17  -- is less than one year in length and does not have an

18  extender feature, even if -- and we'll deal with the "even if"

19  in a moment -- even if somehow the DIP lenders, because they

20  were senior facility lenders, are somehow bound for the rest of

21  their natural lives by this pre-petition indenture, it doesn't

22  matter because funded debt is debt that's more than one year

23  and the DIP is not.  So it's not covered.  It's not

24  incorporated.  But it is --

25      THE COURT:  Is this a provision that I have to take

1   into account if I make your guys promise to provide a one-year

2   facility calendrically correct?

3           MR. HUEBNER:  It's not, Your Honor, because -- and

4   that's the last point.  In other words, first there's the law

5   that it's totally unenforceable; then there's the facts, that

6   the documents actually don't do what he says they do; then

7   there's the reality, which is what he's basically saying is,

8   and I'll just use Citibank as an example, because Citibank is a

9   senior facility lender and because in the senior facility

10  there's a provision that says and clearly means -- it clearly

11  means this -- that the senior facility will not be enlarged in

12  a way that violates the debt cap.  What he's really saying is

13  unthinkably radical; that Citibank can't be in the DIP because

14  it promised for itself as an institution never to allow this

15  bad thing to happen.  That's nonsense.  Citibank agreed under,

16  if anything, under the senior facility that this facility would

17  not be expanded.

18          I mean, think about what he's saying.  He's saying

19  that if it's all new money lenders, we can do a DIP of any

20  size.  But if he catches one person who was in the senior

21  facility, he can get them thrown out of the DIP because they

22  promised that they would never buy into any facility.  That's

23  not what it means.  When documents agree to something, you're

24  agreeing in your capacity as a lender under that document.

25  You're not binding your institution for the rest of time.

1          There's a reason here, too, he has no case law because

2     it's an unthinkable proposition; that when you sign a document

3     agreeing to something, with respect to that document, you're

4     binding your institution for the rest of the known universe.

5     It just -- it doesn't -- so the answer is you don't need to

6     resolve it for all those reasons.

7          And let me give you a fourth one.  There's another

8     misstatement of law in his papers, which is a little bit

9     surprising because we know this -- we all know this provision

10    very well.

11         He says that 365(c)(2) says -- means -- says that a

12    debtor -- he says -- let me be more precise.

13         "Under 365(c)(2), a debtor cannot assume, assign or

14    reject the Millennium indenture because..."

15         Well, the only problem is 365(c)(2) is missing the

16    third word: "reject."  And that's exactly the point.  We all

17    know what it says.  We've been dealing with it for decades.

18    365(c)(2) prevents the assumption or assignment of a financial

19    accommodation contract.  It certainly doesn't prevent its

20    rejection.  In fact, basically, financial contracts are deemed

21    accelerated and are rejected.

22         So to say -- and this is why Allegheny and McLean are,

23    of course, right -- lenders can't enforce covenants in

24    accelerated debt documents once a filing happens.  365(c)(2) is

25    there to stop the lending of new money or the issuance of new

1  securities, but it doesn't say you can't reject it.  In fact,

2  the indenture basically is rejected and now it has a claim

3  equal to the face amount of the notes as of the filing date of

4  the case.  So if he wants to have a breach claim, it's great,

5  but it's a mathematical totality --

6        THE COURT:  Well, is another way of saying it, is it

7  tantamount to getting specific performance of an agreement that

8  is going forward after the --

9        MR. HUEBNER:  That's a great way to say it.  He wants

10 specific performance of an unassumable pre-petition financing

11 contract.  Well, so would every lender.  I want all my

12 covenants respected, I want my minimum cash flow tests, I'm --

13 for performance, I want all my -- I mean, no.  You have a

14 claim, file it, we'll see you in the claims process.  To do

15 anything else would be a radical departure from law, which is

16 why, of course, he has no cases, 0.0, and we have the only

17 cases, which are McLean, which is a District Court case from

18 this jurisdiction, and Allegheny.  And they couldn't be more --

19 they're so obviously correct it's just not even worth spending

20 more time on.

21        Of course you can't enforce a provision in a pre-

22 petition contract of this nature.  You can't even assume the

23 contract if you wanted to.  If you wanted to assume it and you

24 wanted to accept its burdens with its benefits, you can't do

25 it.  Here the debtors certainly have not, and I'm sure Mr.

1 Ellenberg would be very happy to rise and make an oral motion

2 to reject the Millennium indenture to make this clear beyond

3 any further debate.

4 　　　　Your Honor, that's, I think, all I'm going to say on

5 Millennium.

6 　　　　Your Honor, the last issue is the sales tax that I'm

7 going to hit for right now because I do want to cede the podium

8 and because I know we're dealing with ABN AMRO later, and so

9 while I think that there are certain provisions of the term

10 sheet that you're going to find very, very, very interesting

11 and will help you very quickly resolve ABN AMRO, we're not

12 going to do that yet.  Instead, we're going to talk about the

13 tax objection.

14 　　　　Your Honor, as you know -- Mr. Sonik, are you on the

15 phone?

16 　　　　MR. SONIK:  Yes, I am.

17 　　　　MR. HUEBNER:  Fabulous.  Thank you.

18 　　　　Mr. Sonik very courteously reached out to us, Your

19 Honor, as you suggested and told us that he would not be

20 relying on any new cases.  We looked at his paper and

21 Shepardized that and are just going to cite one Supreme Court

22 case, which we sent him the cite and the actual copy of so he

23 wouldn't have to try to find it in the middle of the night as

24 soon as we found it.  It's <u>Butner v. United States</u>.  It's very

25 famous.

1          THE COURT:  Butner?

2          MR. HUEBNER:  Butner.  I'm sorry, Your Honor.

3          THE COURT:  I know Butner.

4          MR. HUEBNER:  And will say nothing surprising.  But,

5   you know, the interesting thing -- and I want to affirmatively

6   give credit where credit is due.  Darren Klein, second-year

7   associate Davis Polk, brought to my attention a provision in

8   the Bankruptcy Code that just went in that I have never seen

9   before.  It is totally dispositive and puts this right to bed.

10  Let's go to the videotape.

11         Section 503(b) talks about what is a priority claim.

12  503(b)(1):

13              "Any tax incurred by the estate" -- and now we're

14              going to begin the bracket --

15         THE COURT:  Wait.  503(b) talking about priority

16  claims?

17         MR. HUEBNER:  Yeah.

18         THE COURT:  I thought 503(b) talks about

19  administrative expense.

20         MR. HUEBNER:  It does.  Well, that's a priority.  I

21  mean --

22         THE COURT:  Oh, okay.

23         MR. HUEBNER:  -- it's sort of an administrative

24  priority.  So:

25              "Any tax" --

1        THE COURT:  In which subsection?

2        MR. HUEBNER:  -- "incurred by the estate" -- and now

3   you put a little bracket around the word "whether" because this

4   is what's brand new:

5              "[whether] secured or unsecured, including property

6              taxes for which liability is in rem, in personam, or

7              both."

8        Right?  So first you have 503(b)(1) that says secured

9   property taxes are admin priority claims under this section of

10  the Code even if secured.  And then, of course, you go back to

11  364, and what does 364 say?  364(c)(1) says that the Court is

12  authorized to grant administrative priority status that is

13  senior to, quote, "any and all administrative expenses of the

14  kind specified in Section 503(b) or 507(b) of this Title."

15       So before we even talk about the lien, which we'll do

16  in a minute, Congress was not only very clear, but spoke very

17  recently:

18             "364 DIP priorities are senior to the status that we

19             hereby confirm and give to secured property tax claims

20             under 503(b)."

21       It's just clear on its face and it's the law of the

22  land.

23       But now let's pretend for a minute that this new

24  section is not in the Code and that we're dealing with the more

25  generic question of the fact that 364(d) on its face clearly

1   says that, where necessary and appropriate, the Court is

2   authorized to grant a lien that is senior to all other liens.

3   So we just have a classic supremacy clause problem.  So we're

4   just back to law school.

5         The federal statute says the DIP lien is senior to all

6   other liens and they have a state tax statute that gives them

7   state priority for their tax liens.  Well, we know who wins,

8   (a) because we all went to law school, and (b) because there's

9   actually a Supreme Court case that is directly on point, and

10  that case, which I embarrassingly mispronounced, is <u>Butner</u>.

11        In the Footnote 9 of <u>Butner</u>, the Court says the

12  following:

13        "The Federal Constitution, Article I, Section 8, gives

14         Congress the power to establish uniform laws on the

15         subject of bankruptcy throughout the United States.

16         In view of this grant of authority to the Congress, it

17         has been settled from an early date that state laws to

18         the extent that they conflict with the laws of

19         Congress enacted under its constitutional authority on

20         the subject of bankruptcies are suspended.  While this

21         is true, state laws are thus suspended only to the

22         extent of actual conflict with the system provided by

23         the Bankruptcy Act of Congress."

24        Now there was clearly a conflict before 2005 because

25  364(d) said, we win, and state law said they win.  But in case

1   anybody was concerned that the Congress -- that the conflict

2   wasn't sharp enough or crystalized enough, 503(b) just smacks

3   you in the face with it because it says for the first time

4   secured property tax claims are deemed 503(b)(1) claims, and

5   then 364 says DIPs beat secured property tax claims.

6          So as you know, again, here, too, we were flexible.

7   We're not priming anybody that preexisted us to the extent that

8   there are property taxes that were properly perfected --

9          THE COURT:  Well, okay.  Pause.  I haven't checked the

10  legislative history.  I think this was one of the BAPCPA

11  amendments?

12         MR. HUEBNER:  It was, Your Honor.

13         THE COURT:  Presumably by reason of the lobbying of

14  the state tax authorities to get what they perceived to be more

15  protection, and this is just one of those cases where Congress,

16  if we're going to follow the plain meaning Congress attaches --

17  or the Supreme Courts told us we have to follow, we follow it

18  whichever way it cuts?

19         MR. HUEBNER:  Your Honor, I don't know why it was put

20  in.  We could only do so much overnight with no prior notice.

21  But whether or not they wanted it to get certain benefits --

22         THE COURT:  Your point is it's there now and the --

23         MR. HUEBNER:  -- it's there now.

24         THE COURT:  -- language is unequivocal.

25         MR. HUEBNER:  And it came with certain consequences,

1   including 364(c), without any question coming on top of it.  I

2   guess maybe it will end up in the category of be careful what

3   you wish for.

4            THE COURT:  I think that may well be the case.  All

5   right.  Mr. Huebner, I wonder if it's desirable to pause now

6   for you to give Mr. Sonik to be heard on this issue here when

7   you finish the points relating to him.

8            MR. HUEBNER:  Your Honor, I think that I am finished

9   with the points relating to him.

10           THE COURT:  All right.  Mr. Sonik, do you want to

11  respond?

12           MR. SONIK:  Yes, Your Honor, very briefly.

13           I have not had a chance to try to digest the 503(b)

14  argument that he was raising, but we simply urge the Court not

15  to find or construe 364(d) as the operative provision that we

16  were looking at to subordinate the post-petition interests of

17  the State of Texas that would otherwise be superior to the DIP

18  facility under a state law.

19           THE COURT:  Okay.  Pause, please.  If I heard Mr.

20  Huebner right, he's relying not just on 364(d) but also

21  364(c)(1).

22           MR. SONIK:  354?

23           THE COURT:  364, which is, of course, the financing

24  provision, (c) which talks about obtaining credit with priority

25  over certain things, and (1) which lists admin expenses in that

1  category.

2          MR. SONIK:  So 364(c), subparagraph --

3          THE COURT:  One.  Did I hear you right, Mr. Huebner?

4          MR. HUEBNER:  Yes, Your Honor.  I believe that's

5  correct.

6          MR. SONIK:  And the argument is that 503 --

7          THE COURT:  (b) lists exactly your kind of tax lien.

8      (Pause in proceedings.)

9          THE COURT:  Mr. Sonik, I know you have to go through

10 this but we've had a -- several moments of silence.

11         MR. SONIK:  Yes.  I'm trying to digest it as quickly

12 as I can, Your Honor.

13         THE COURT:  Mr. Huebner, do you object if you go on to

14 your other points and I let Mr. Sonik speak to this when you're

15 done with your other points?

16         MR. HUEBNER:  Your Honor, I only have one problem with

17 that.  I am done with my other points.

18         THE COURT:  Oh, all right.  Are you planning on

19 leaving the courtroom at this point or staying around for a few

20 minutes?

21         MR. HUEBNER:  No, Your Honor.  I will be here at least

22 until 11:30 at which point something is -- that is not moveable

23 will come up.  But I'll certainly be here for a little longer.

24         THE COURT:  All right.  Mr. Sonik, I'm going to give

25 you a few more minutes to do this, but I'm going to ask Mr.

1  Huebner to sit down now and we're going to move on.

2         MR. SONIK:  Thank you, Your Honor.

3         THE COURT:  Okay.

4         MR. SIEGEL:  Your Honor, may I have a moment?

5         THE COURT:  It depends on what it's for, Mr. Siegel.

6         MR. SIEGEL:  Okay.  It's actually very straight

7  forward and short.  I had not thought when I gave my oral

8  argument that I might ask the Court to speak again.  I do not

9  know what Mr. Ellenberg will say, but I want to alert the Court

10 to the fact that after Mr. Huebner's presentation, that I may,

11 in fact, ask the Court to speak again and let you know that.

12        THE COURT:  I'll decide that when the request needs to

13 be made and I need to rule on it.

14        MR. HUEBNER:  Yeah.  And to be clear, Your Honor, the

15 -- then, I mean, I guess if we're going to go to an endless

16 series of closings and re-closings, we'll ask for the same

17 reservation, which I would hope would not be granted.

18        THE COURT:  Okay.  Who's next?

19        Ms. Martin, are you planning to be heard or are we

20 going straight to Mr. Ellenberg or what?

21        MS. MARTIN:  Your Honor, I would like to be heard, but

22 I don't feel the need to repeat all of the very persuasive

23 arguments that Mr. Huebner has made on points that really

24 overlap what the ABL -- and even address the term facility as

25 well.

1      So I do have some very brief points I would make on

2 maturity and the BNY point.  I wonder, though, if it doesn't

3 make more sense for me to wait until after ABN speaks.  I can

4 make those very brief clean-up points and lay arguments with

5 respect to ABN.

6      THE COURT:  All right.  Mr. Ellenberg, I'll hear from

7 you next unless you want to yield to Mr. Goffman.

8      MR. ELLENBERG:  I would yield to Mr. Goffman, Your

9 Honor, and I'll bat clean-up.

10      THE COURT:  Okay.

11      MR. GOFFMAN:  Thank you, Your Honor.

12      Again, Jay Goffman from Skadden Arps on behalf of

13 Access.  For the record, Access is the owner of this business

14 with billions of dollars invested in this company.

15      Your Honor, for the past two days we've all sat in

16 this courtroom and we've heard Mr. Weisfelner and his partner

17 make all types of false and unsubstantiated attacks against my

18 client.

19      Now, I knew that eventually we were going to get to

20 that in this case.  He had campaigned when he sought to be

21 retained by the creditors' committee on the premise that he

22 would attack Access at some point.  But what I couldn't figure

23 out was why today?  Why make these types of false and

24 irrelevant attacks in the context of a DIP financing hearing?

25      But Mr. Weisfelner, in his very eloquent closing

1  argument, made all that clear.  He said a few things.  He said

2  he wants to extend maturity of the DIP financing, he wants

3  fewer milestones, fewer covenants, less control over

4  management.  We support those goals.  As the owner of this

5  business, we would prefer to have the best DIP financing this

6  company could possibly get.  Longer maturity is great.  Fewer

7  milestones is great.  What we don't support, however, are the

8  tactics that he used to try to get there.

9         As Mr. Weisfelner pointed out to the Court, in the

10 Norma case (phonetic), the standard for determining whether or

11 not to approve a DIP financing is the business judgment of the

12 debtor.  He pointed out to the Court that you could get to a

13 strict scrutiny standard, however, if it was deemed that the

14 actions of the management were somehow tainted by being

15 affiliated with the acts of a supposed bad guy insider.

16        So that was the strategy.  He wanted to spend two days

17 trying to tie the management of this company to Access and

18 trying to paint the management as the shield for Access and

19 trying to paint Access as a bad guy.  And that's what we heard

20 over and over and over again.

21        Unfortunately, the facts and the evidence prove quite

22 the contrary.  They try to discredit Mr. Bigman, the company's

23 CFO.  They tried to say he was somehow working for Access.

24 Well, the evidence shows he's not.  The evidence shows he's

25 always been working for -- that he's been working for the

1  company.  The evidence shows that he's satisfied his fiduciary

2  duties; that he's argued long and hard for the company in

3  trying to get the best facility this company can get.  He's

4  argued for all the key points that were necessary and he took

5  no act -- he took no action on behalf of Access and he wasn't

6  affiliated with Access at all in the process.

7       Nor was there a shred of evidence that Access has done

8  anything improper.  We heard again and again that, somehow,

9  Access was tied up in the DIP facility from Mr. Weisfelner.

10  Well, the evidence shows exactly the opposite.  The evidence

11  showed Access is not participating in the DIP facility, has

12  agreed not to participate in the DIP facility, and will not buy

13  into the DIP facility.  The evidence has shown that Access

14  wasn't the party that picked the maturity date here.  The DIP

15  lenders got together and decided on the maturity date.  If we

16  could get a longer maturity date, we'd be all in favor of it.

17  It wasn't our call.

18       The evidence shows that we have -- Access has no

19  involvement whatsoever in the extension of the maturity date

20  under the DIP, and has no involvement whatsoever in the

21  milestones or the covenants.

22       In his closing argument he stood here and said he was

23  confused about the role Access plays in the DIP.  Well, he's a

24  smart guy.  He wasn't confused.  He just didn't like the facts.

25       What he failed to note to the Court, however, Your

1  Honor, were the things that Access has already done to make

2  sure that we could avoid these types of sideshows.  The

3  supervisory board of this company created a restructuring

4  committee.  That restructuring committee has five members,

5  three of whom are independent directors.  The chairperson of

6  the restructuring committee is an independent director, Mr.

7  Flaugh (phonetic).  It was the restructuring committee and Mr.

8  Flaugh that led all the negotiations on the DIP financing, not

9  Access.

10         He also forgot to note that, again, to avoid these

11 types of sideshows, Access has already agreed that whatever

12 debt we buy in this case, we're not going to vote that debt

13 under a plan.  We're going to let the other parties in this

14 case figure -- vote on a plan so -- because we want to avoid

15 these types of sideshows.

16         He also said that we were in court here because we

17 were somehow afraid of actions that they might bring against

18 us.  That's nonsense, Judge.  We're in this court because we're

19 the owner of this company.  We've invested billions and

20 billions of dollars in this business and we'd like to see this

21 company come out of Chapter 11 in an organized manner.  We want

22 every creditor in this case to be paid, secured and unsecured.

23 It's only then that we can start realizing on the equity that

24 we have invested in this business, and true -- and there is

25 lots of equity.  As Mr. Weisfelner himself pointed out, less

1  than ten months ago this company was valued at over $30

2  billion.  That's over $10 billion of equity that was here less

3  than ten months ago.  The only reason we're in court now is the

4  catastrophic worldwide events that have occurred to all these

5  types of companies.

6          Now, going just to the -- to his goals, again, a

7  longer the maturity, here, here.  We would love that; fewer

8  covenants, the fewer the better; fewer milestones, yes; less

9  control by lenders over management, terrific.  If he can get it

10 -- if Your Honor wanted to insist upon it, we would have no

11 objection.  But the standard is the business judgment of the

12 debtor.  We accede to the debtors' business judgment that they

13 need the money and they need the money now, and they spent a

14 lot of time negotiating for this DIP financing and they need it

15 approved today.

16         So we would urge that Your Honor approve the DIP

17 financing with whatever additions Your Honor thought was

18 appropriate today so that this company can proceed; so that the

19 businesses worldwide don't have to worry about the stories

20 about whether or not there's going to be appropriate financing;

21 and so that we can eventually get on to the real task of

22 reorganizing these businesses and trying to get value to the

23 parties.

24         THE COURT:  All right.

25         MR. GOFFMAN:  Thank you.

1          THE COURT:  Thank you.  Mr. Ellenberg.

2          MR. ELLENBERG:  If the Court please, Mark Ellenberg,

3    Cadwalader, Wickersham & Taft, on behalf of the debtors.

4          Your Honor, the fact that we're standing here today

5    requesting approval of this debtor-in-possession financing

6    facility is really nothing short of a miracle.  We have seen a

7    lot of focus in -- during this hearing on small parts of the

8    package that make up this DIP financing facility, and we need

9    to focus on those small pieces, and I will focus on them later

10   on, but we also need to step back and assess those pieces in

11   the context of the overall facility that's being presented to

12   the Court, what it is, and what it means.

13         Because what we did here, Your Honor, was throw some

14   banks -- investment banks and hedge funds into a conference

15   room a week before Christmas and tell them that we needed $5

16   billion in new money, including term loans and continuing

17   access to asset-backed liquidity, and we told them that it all

18   had to be done by New Year's, and that no one was leaving until

19   we were finished, and to come out of that situation with this

20   facility is simply nothing short of amazing.

21         And I will just read for a moment from Mr. Jaffe's

22   testimony.  It's Page -- it's Paragraph 13 of his declaration.

23   He's actually quoting himself from his deposition and he says:

24             "I'll say again, they needed to raise over $3 billion

25             between Christmas and New Year's.  This was a

1        Herculean effort and, you know, we were -- I'll tell

2        you, I was concerned that the company wasn't going to

3        get it and we were going to have to liquidate our

4        collateral.  So I think the fact that it got done is

5        tremendous."

6        And it's just indisputable, Your Honor, and it's easy

7   to take for granted that we're here and we have access to $8

8   billion.  But it wasn't looking so easy the day before

9   Christmas and, in fact, it wasn't looking so easy on January

10  3rd, when we were still sitting at midnight in a conference

11  room counting pennies and wondering whether we were going to

12  get there.  This is an amazing accomplishment.

13       And moreover, Your Honor, the choice the debtor had

14  was take this DIP or liquidate -- or get this DIP and liquidate

15  because without this DIP financing there would be no

16  reorganization.  There would be no reorganization in the U.S.

17  There would be no value in Europe.  We would have liquidations

18  all over the place.

19       To be sure, this DIP has its warts.  Some are small;

20  some are big.  But warts and all, the question that this debtor

21  had to answer and had to exercise its business judgment on was,

22  is this DIP better than a liquidation.  The answer is clearly

23  yes.  In fact, when committee counsel rose to speak yesterday,

24  one of the first things he said was, yes, this DIP is better

25  than a liquidation, we do want this DIP approved.  And he also

1   said -- the very first thing he said was that there really is

2   no alternative to this DIP.

3        And that, Your Honor, is simply the case.  This is

4   what we got.  We did the best we could.  Nobody will stand up

5   here and say it's perfect.  The debtor won't say it's perfect.

6   The lenders won't say it's perfect.  But we did it and it's a

7   huge accomplishment and it gives the debtor a chance to live

8   and to breath and to reorganize, and really at the end of the

9   day, that was all we could ask.  We did the best we could.  We

10  all did the best we could.

11       Now, there are some other very important features

12  about this facility, Your Honor, that have been lost a bit in

13  the focus on some small points.  One of them is that this

14  facility permits us to fund not only the United States but

15  Europe where one-third of the total enterprise value resides,

16  and that we're doing this outside the purview of Chapter 11.

17       I think, Your Honor, that's unprecedented.  We've

18  already talked about how this is the largest DIP in history.  I

19  think this aspect of the DIP is unprecedented as well.  It was

20  very tricky.  It was very controversial.  It assumed a lot of

21  time during that very short negotiation period.  It was not a

22  forgone conclusion that these lenders were going to fund into

23  Europe to companies that were outside the direct purview of

24  this Court.  It was not an easy thing to accomplish and yet we

25  did it.

1        Another very important feature, Your Honor, that we

2   heard nothing about during this hearing, but we heard a lot

3   about during the interim hearing was that the lenders in this

4   facility have also agreed to forbearances and those

5   forbearances go to the exercise of remedies under the senior

6   secured and bridged facilities.  And the reason we needed those

7   forbearances, Your Honor, was because many of the obligors and

8   guarantors under those facilities are European entities who are

9   not in Chapter 11.

10       Fortunately, under the senior-secured indenture, if

11  fifty-one percent of the holders of that debt agree to forbear,

12  they bind everyone.  And so, in addition to counting pennies

13  and -- we were counting pennies even to get to $8 billion.  In

14  addition to counting pennies we were counting percentages.  So

15  we needed to achieve not only the money we needed, we needed

16  enough holders of the senior-secured to get us this

17  forbearance.

18       By the way, Your Honor, all of this explains why the

19  Bank of New York was not invited to this party.  Nothing

20  intentional about excluding them other than that it would have

21  been pointless to invite them.  The Bank of New York is an

22  indenture trustee.  They were not going to lend money into this

23  facility.  They represent a bunch of noteholders.  Whether or

24  not the noteholders would have been willing to participate, who

25  knows, but how could you find out?  You can't just send out a

1   message to all the noteholders, Lyondell's about to file

2   bankruptcy, they need a DIP loan, do you want to sign up.

3          First of all, there are securities laws issues with

4   that, and second of all, there's the obvious issue that you

5   just can't broadcast a message like that, and, also, you know,

6   it's too many small pieces scattered all over the place.  We

7   had two weeks -- we had less than two weeks to get this done.

8   It was pointless to exert energy on that kind of effort.

9          Another large point, Your Honor, that's been somewhat

10  lost in the shuffle is that the key to getting this loan at the

11  end of the day was the roll-up.  We had no term loan without

12  the roll-up.  It was clear there was a stand-off.  The parties

13  willing to participate in the term loan needed the roll-up to

14  make it effective.

15         Again, remember, Your Honor, the credit markets are

16  frozen.  There is no independent DIP lending source out there.

17  This is a defensive DIP being made by lenders who already had a

18  stake in this company through pre-petition secured financings.

19  Their price to get into this DIP was to be able to roll up some

20  of that debt.

21         The problem the debtors had and many of the lenders,

22  particularly the bridge lenders who were going to put the ABL

23  together also had was that if you layered the roll-up onto the

24  new money, you were going to have a facility that likely would

25  not be financeable at the end of the case.

1          And so the compromise --

2          THE COURT:  That's why you have the reinstatement

3   feature?

4          MR. ELLENBERG:  Yes, Your Honor.

5          And so the compromise -- and it was critical and,

6   again, I believe it's unprecedented -- is that they would get

7   to roll-up but we could restructure them at the end of the

8   case.

9          Now, there's some bells and whistles around that, but

10  the big point is that we don't have to refinance the roll-up at

11  the end of the case if we're not capable of refinancing the

12  roll-up at the end of the case.  Another way to think about it

13  is that they are moving up in priority but are otherwise being

14  treated as pre-petition debt.  It was a huge breakthrough and

15  it's what made this facility possible.

16         Now, counsel for the committee talked about how

17  there's competition to get into this facility that's so

18  attractive.  Well, Your Honor, that competition only occurred

19  after the roll-up was agreed to and the senior secured lender

20  community was made aware that that feature was available to

21  them.  And the people who bought into the syndication that we

22  heard testimony and argument about, they have bought into that

23  syndication to get the benefit of the roll-up and for no other

24  reason.

25         And again, Your Honor, the record is even with all of

1  that, this DIP is trading today below par.

2          One more big picture point, Your Honor.  I want to

3  echo Mr. Goffman's remarks.  We need this loan and we need it

4  now.  We've managed to limp through this far on the interim

5  authority.  There are huge expectations among our lenders --

6  our vendors and creditors about our securing this financing and

7  we need it to survive and we need it soon.

8          Let me turn, then, more specifically, Your Honor, to

9  the committee's objections.

10          After all the "sturm and dang," we're down to four

11  issues:  Short maturity date; milestones; untested covenant

12  package; management review.  Let's talk about each of them

13  separately.  But, first, let's talk about them as a group and

14  go back to the big picture.

15          Again, Your Honor, the committee has conceded that the

16  DIP is essential.  The committee has conceded that the DIP is

17  market.  He said, quote, "There is no alternative.  This is an

18  unprecedented facility in size and scope.  In effect, the

19  lenders set their own market."

20          Now, he tried to limit that comment to the cost

21  feature, which he had objected to previously but abandoned in

22  his closing argument, but, Your Honor, this facility is a

23  package.  Okay.  This was negotiated as an integrated whole.

24  The term sheet and, ultimately, the resulting credit agreement

25  represent a multitude of trade-offs, a multitude of

1   compromises.  Nothing was free.  Anytime anyone got something

2   it was because they were giving up something.  And so this is

3   presented to us as a package and that was the way we had to

4   assess it.

5           Now, Your Honor, the colloquy with Mr. Huebner

6   yesterday certainly made clear -- and we fully agree -- that

7   Your Honor can refuse to approve this facility, and Your Honor

8   can state clearly why you refuse to approve it and that if

9   certain features were removed, you would approve it, and

10  clearly Your Honor can do that.  But as Your Honor also

11  observed, you cannot force the lenders to accept the revisions

12  that you suggest.

13          Now, counsel for the committee called this a massive

14  game of chicken.  Your Honor, I think it is more like a massive

15  game of Russian roulette and, unfortunately, the gun is pointed

16  at the head of the company.

17          THE COURT:  Or is it both?

18          MR. ELLENBERG:  That is -- that's --

19          THE COURT:  This is a problem that we bankruptcy

20  judges, every time we have an aggressive DIP --

21          MR. ELLENBERG:  I understand, Your Honor, and it's the

22  problem the debtor has every time it's trying to negotiate a

23  DIP.  But let me say this.  If there's only a ten-percent

24  chance that the lenders will say no, if there's only a one-

25  percent chance that the lenders will say no, is the reward

1  worth the risk?  That's -- in the debtors' business judgment,

2  it wasn't, and I think that's the question the Court needs to

3  answer for itself and I know the Court will do that quite ably.

4         So let's focus down a bit on what the risks are, what

5  the specific criticisms are.  Let's start with the maturity

6  date, Your Honor.

7         Would we have preferred a longer facility?  Of course.

8  Did we ask for a longer facility?  Absolutely.  The record is

9  clear, Your Honor, it's clear from every single witness who

10 testified, including Mr. Dugan, that all the lenders had a one-

11 year horizon.  They were surprised by the need.  They were

12 surprised by the extent of the need.  They felt that they

13 didn't have good visibility into the company.  They felt that

14 they didn't have good visibility into the economic situation.

15 They were not going to hand over $3 billion in new money and

16 $1.5 billion in continued liquidity for more than a year.  It

17 was not going to happen.

18        The debtors did push back.  We pushed back hard.  Mr.

19 Bigman testified to that.  Mr. Celentano's (phonetic)

20 declaration testifies to that.  Mr. Jaffe testified to that.

21 As to Mr. Dugan, I can only say a couple of things.  Number

22 one, he wasn't there at the very beginning of the term sheet

23 process, which is when most of these discussions occurred, and,

24 number two, perhaps his memory is a bit clouded by the blur

25 that those final ten days of the year were.

1     But, Your Honor, I think there is persuasive evidence

2   in the record as to what happened and, frankly, Your Honor, I

3   was there and, as an officer of the court, I can tell you we

4   pushed back hard on this issue, the lenders, when it

5   transferred.

6     As to the calendrical issue, Your Honor, everyone

7   talked about a year.  Our goal and the stated deadline was to

8   actually to file this case before the end of the year, and so

9   everyone was thinking in terms of calendar year 2008.

10     The reason the December 15th date was moved was, as

11   Mr. Dugan said and I think Mr. Jaffe also said in his

12   deposition, everyone had just spent Christmas to New Year's in

13   Cadwalader's conference rooms.  They didn't want to have to do

14   it again at the end of this year.  So the maturity date was

15   moved to December 15th instead of December 31st, but everyone

16   was thinking in terms of one year and the assumption was that

17   the filing was going to occur before the end of the year, and

18   it only slipped into January because the term sheet just hadn't

19   been completed yet.  But everyone was thinking in terms of one

20   year and they had already gone to committee and gotten it

21   approved with that date in it.

22     Now, you can say, well, go back to the committee, slip

23   it a week.  I can't emphasize, Your Honor, how fragile this

24   agreement was.  Again, it's easy to take it for granted now.

25   This was a terribly fragile situation.  Any time one issue got

1  reopened, no matter how small, and this one was more than

2  small, a hundred other issues reopened, and lenders were coming

3  in.  They were dropping out.  There was constant jockeying,

4  constant moving, and constant negotiating, and every time we

5  sent out a final version of the term sheet it came back with

6  even more comments than we had the last time.

7        And so this was an extremely fragile situation.  Our

8  goal was to take what we had and get into court because, again,

9  at the end of the day we were getting the largest DIP in

10 history and whatever its problems, it was going to permit this

11 company to stay alive and have a chance to reorganize.

12        Your Honor, the committee cited <u>Smurfit</u> and <u>Aleris</u>'s

13 comps.  As Mr. Huebner remarked, they are odd comps in that

14 they came after this DIP rather than before it.  As Mr. Huebner

15 also noted, Smurfit is an ABL facility, not a term facility.  I

16 believe also, Your Honor, that size -- committee counsel said

17 they were comparable in size to our DIP.  In fact, Smurfit, I

18 believe, is $350 million and Aleris, I believe, is $500 million

19 in new money.

20        In addition, Your Honor, there is a question about --

21        THE COURT:  Pause, please, Mr. Ellenberg.

22        MR. ELLENBERG:  Yes.

23        THE COURT:  Where are those two loans procedurally?

24 Are they at the interim DIP approval level or at the final DIP

25 approval level, or what?

1          MR. ELLENBERG:  I believe interim, Your Honor.

2          MR. HUEBNER:  I can take that up.

3          MR. ELLENBERG:  Yeah.

4          MR. HUEBNER:  Your Honor, <u>Aleris</u> is between interim

5   and final and <u>Smurfit</u> was, I think, recently finally approved.

6          THE COURT:  All right.  Thank you.

7          MR. ELLENBERG:  Your Honor, on the issue as to whether

8   we can get this all done in a year, clearly it's aggressive.

9   This is a big case.  There's a lot to do.  But at the end of

10  the day, Your Honor, the problem this company confronts and the

11  problem that ultimately drove it into bankruptcy is that they

12  have an interest burden of $1.3 billion a year.  That figure

13  comes from the Daneen (phonetic) declaration.  It is a crushing

14  burden of $1.3 billion of interest a year that this bankruptcy

15  case is about.  That particular problem is not that hard to fix

16  in Chapter 11 and that is the main problem we need to fix.

17          I'd also like to talk, Your Honor, about the ability

18  to extend this facility and to refinance it.  Committee counsel

19  somewhat denigrated that provision, said, what's the big deal,

20  of course you get to repay your loan, that they were giving you

21  the sleeves off their vest.  Not really, Your Honor.

22          First of all, Mr. Huebner noted that DIPs often have

23  lock-out provisions and prepayment restrictions associated with

24  them, but there's a much more fundamental issue than that and

25  committee counsel expressed uncertainty about it but it's an

1  issue as to which we need to be certain.

2         We can refinance this, only the new money portion.  We

3  get to roll the roll-up.  It's a key point.  The refinancing is

4  about the new money only.  Just like we can restructure the

5  roll-up when we do a plan, we can keep the roll-up rolling if

6  we refinance during the case.

7         Now, you'll say, okay, what's so hard about that?

8  Well, it is hard, Your Honor, because the roll-up loans are

9  governed by the credit agreement.  The same covenants apply to

10 the roll-up loans.  The same governance provisions apply to the

11 roll-up loans.  And so what -- how do you deal with a situation

12 where you've repaid the new money, replaced it with a new

13 facility, with a new credit agreement, but you still have the

14 roll-up loans continuing under this other agreement with

15 covenants and things that --

16         THE COURT:  Clarify that.

17         MR. ELLENBERG:  -- may not make sense anymore?

18         THE COURT:  The roll -- when you said the roll-ups are

19 subject to the credit agreement, you mean the pre-petition

20 credit agreements?

21         MR. ELLENBERG:  No.  No.  No, Your Honor.  The DIP

22 credit agreement.

23         THE COURT:  Well, that's what I thought but then I'm

24 confused.  So the roll-up loans provide a repayment on account

25 of pre-petition debt but are also capable of being refinanced

1   at the end of the case --

2           MR. ELLENBERG:  Correct.

3           THE COURT:  -- and thereby being treated, in many

4   respects, like pre-petition debt?

5           MR. ELLENBERG:  Correct.

6           THE COURT:  But what would be the underlying

7   documentation that would dictate their terms?  Would it be pre-

8   petition senior secured documentation, or would it be DIP

9   financing documentation of the type that I'm asked to approve

10  today?

11          MR. ELLENBERG:  Well, it's a combination, Your Honor.

12  As to things like events of default and maturity date, the

13  existing credit agreement -- the DIP facility credit agreement,

14  the one you're being asked to approve, those provisions as to

15  maturity date and covenants also apply to the roll-over.  And

16  that mechanical problem is part of what had to be negotiated

17  through in terms of making it possible for us to refinance the

18  new money but keep the roll-ups in place.

19          THE COURT:  Now, after exit from the existing 11,

20  assuming everybody in the room is successful in accomplishing

21  that, what would be the underlying economic terms of the

22  refinanced roll-up debt or is that yet to be determined?

23          MR. ELLENBERG:  Whatever the plan says, Your Honor.

24          THE COURT:  Okay.

25          MR. ELLENBERG:  There are certain limitations on what

1    we can do in the agreements, but within those constraints it's

2    whatever the plan says.

3              THE COURT:  Okay.

4              MR. ELLENBERG:  Now let's turn, Your Honor, to the

5    milestones.  I don't like the milestones.  They're annoying

6    and, I think, somewhat petty.  But this is what happens when

7    you throw a bunch of bankers and hedge funds into a room and

8    tell them we need $5 billion between Christmas and New Year's.

9              It's part of the package, Your Honor.  We negotiated

10   them as well as we could.  We can live with them.  We have to

11   live with them.  I wish they weren't there but I don't think

12   they're fatal, Your Honor.  I don't think they're remotely

13   fatal, again, in the context of this entire package.

14             The covenant package, Your Honor.  The record is clear

15   that this was vetted thoroughly by the company.  It was

16   negotiated by the company.  And I would also suggest, Your

17   Honor, that the committee's view on value necessarily implies

18   that the covenants will be met, particularly the EBITDA

19   covenant.

20             You'll remember the cross-examination of Mr. Bartell

21   by committee counsel and the conversation about how EBITDA

22   drives valuations and how a higher EBITDA leads to a higher

23   valuation.  Well, committee counsel has stated forcefully that

24   they think the Duff & Phelps current valuation of the company

25   on which these covenants were based is way too low, that

1   there's much more value there.  Well, that necessarily implies

2   a higher --

3              THE COURT:  Well, that --

4              MR. ELLENBERG:  -- higher EBITDA.

5              THE COURT:  Yeah.  But that's also a function of the

6   multiplier, isn't it?  I mean, isn't the main driver of

7   enterprise value EBITDA or its cousins?

8              MR. ELLENBERG:  Yes.  That's right, Your Honor.  And

9   so when they say there's a higher value, they are implicitly

10  projecting much better EBITDA than the company's current

11  projections.  That's the whole point.  And so the company is

12  comfortable that they have plenty of headroom under these

13  covenants.

14             And in all events, Your Honor, the suggestion in the

15  committee's papers that these are bad faith trick waters is

16  just in no way supported by the record.  These are usual

17  covenants that were presented in good faith for understandable

18  lending reasons and were negotiated hard by the company to get

19  to a reasonable point.

20             The management review provision, Your Honor.  I

21  understand the Court's concern that there may be some *in*

22  *terrorem* effect associated with that provision, and so let's

23  talk about that.

24             The genesis of the provision, Your Honor, is quite

25  different and really quite understandable.  As the record makes

1    clear, the lenders were very shaken when they were told in the

2    middle of December what the situation of this company was.  Any

3    reasonable lender, particularly one who is about to be asked to

4    fork over another 3.25 billion of new money plus continuing ABL

5    liquidity of 1.5 billion is going to say, who am I giving this

6    money to, is it the same management who just burned through the

7    $20 billion we loaned them a year ago, who just surprised me

8    and told me they're virtually out of money with no notice?

9    It's a lot to ask.

10        And so their response was, we want to take a look at

11   what's going on here, we want to take a look at who's running

12   this company, who's calling the shots, and what procedures do

13   they have so that we're comfortable that we're giving our money

14   to a competent entity.  It's completely innocent and completely

15   understandable.

16        Now, could that, whatever its intentions, have

17   unintended consequences *in terrorem* effect?  Well, maybe, Your

18   Honor.  But I think this management has shown in very concrete

19   ways that it's willing to do the right thing when it has to do

20   the right thing.

21        And one example of that, Your Honor, is the first day

22   here.  Your Honor will recall that the original DIP package had

23   access as a funder under the DIP and the -- among other things,

24   Access was going to purchase senior secured debt to participate

25   in the roll-up.  A group of other senior secured holders

1   objected to that and gave the debtors an alternative package

2   which would exclude Access and they did one other thing:  They

3   made the package better.  They reduced the pricing.  They

4   eliminated some fees.

5           When the company was presented with an improved

6   financing package, they took it.  Mr. Bigman made the call.  He

7   consulted with his advisors.  Mr. Daneen was also there.

8   Management was there.  They consulted their advisors.  They

9   were informed about what their responsibilities were and they

10  did the right thing, and so they took a DIP package that

11  excluded Access.  Was Access happy about that?  No, they

12  weren't.  You recall Mr. Goffman that night.  He wasn't happy

13  at all.  His client wasn't happy, okay.  But the company

14  management did the right thing.

15          Another example, Your Honor, Mr. Bigman was on the

16  witness stand and I think it's the single most dramatic moment

17  in this hearing.  Maybe that's not such a hard bar, but I think

18  the most --

19      (Laughter.)

20      MR. ELLENBERG:  I think the most dramatic moment in

21  the hearing was when Mr. Bigman was on the stand and he was

22  asked, do you think that the management of this company should

23  be changed.  Wow.  What a hard question to ask the CFO of this

24  company sitting in that chair in open court under oath in front

25  of Your Honor.  And what did Mr. Bigman do?  He sat there.  He

1    thought very hard and he said, you know, maybe it should be

2    changed.  How difficult was that for him to do?  It had to be

3    extraordinarily difficult.  How easy would it have been for him

4    to say, you know, we may not be perfect but we're the best

5    management for this company, I think we're doing a great job?

6    That would have been the easy answer.  That would have been the

7    political answer.  It's not the answer he gave, Your Honor.

8         I think this management has shown that it has backbone

9    and that it understands what its fiduciary duties are in this

10   case and that it's going to fulfill them.

11        Finally, with respect to the committee, Your Honor,

12   the committee made a plea for cooperation, for them to be in

13   the loop, to understand what's going on in the company, to

14   assist the company in its reorganization effort and, of course,

15   Your Honor, we pledge cooperation.  I think, Your Honor, in

16   fact, we've stood on our heads to cooperate with the committee

17   up to this point, to get them into this process.  Committee

18   counsel, I'm sure, has a different view of that.  I don't think

19   the "who struck John" is a productive conversation at this

20   point but we will, going forward, give the committee all the

21   cooperation it wants and needs.

22        Let's turn now to the Bank of New York.  The Bank of

23   New York, Your Honor, has two basic problems with their

24   position.  One of them is the facts; the second one is the

25   loan.  Let's start with the facts.

1        There's an inherent contradiction in how counsel for

2   Bank of New York describes the situation.  At first he says

3   he's the same as the senior secureds.  It's the first thing out

4   of his mouth.  But then he spends most of his time talking

5   about how he's different.  In fact, the very last thing he said

6   to you leaving the podium was, we want the same treatment as

7   the senior secureds and we want to be compensated for the loss

8   of our separate entity liens.  It's an inherent contradiction,

9   Your Honor.

10       And the fact is they are not the same.  They are

11  different and they are different in ways that make them

12  materially less well off than the senior secureds.  And what

13  they are getting, Your Honor, is something that makes them

14  materially better off than they are as a pre-petition state of

15  facts, and, as Mr. Huebner suggested, it may be, on a relative

16  basis, the best package that anyone in this case is getting.

17       So, again, Your Honor, their liens were limited.

18  Okay.  The ARCO notes have liens on the assets of Lyondell

19  Chemical Company.  Period.  End of story.  Nothing else.  The

20  Equistar bondholders have liens on the assets of Equistar.

21  Period.  End of story.

22       I think what we need to do now, Your Honor, is take a

23  look at our equity cushion analysis.  Your Honor, that is

24  Exhibit J to the Hawkins' declaration that was filed.  I have

25  extra copies here if Your Honor would like.

1          THE COURT:  Let me just check mine for a minute.

2      (Pause in proceedings.)

3          THE COURT:  I have mine handy, Mr. Ellenberg.  Thank

4  you.

5          MR. ELLENBERG:  Okay.

6          THE COURT:  I don't need it.

7          MR. ELLENBERG:  So, Your Honor, again, to set the

8  stage, as the record shows, this company had pre-petition debt

9  consisting of 12.19 billion as of the petition date of senior

10  secured financing.  The ARCO notes were 3.35 million as of the

11  petition date.  The Equistar notes are 150 million as of the

12  petition, so that the ARCO and --

13          UNKNOWN:  You mean 360 -- you meant 325 million,

14  right?

15          MR. ELLENBERG:  Yes.  So that the -- it's 325 million

16  for ARCO, so that the ARCO and Equistar together are 475

17  million.  When you add that to the senior-secured, Your Honor,

18  you get 12.665 billion.  Now that doesn't include, Your Honor,

19  the bridge.  The bridge is an additional 8.3 billion secured

20  but junior to the senior and to the ARCO and Equistar notes.

21          And, again, Your Honor, the ARCO and Equistar notes

22  actually started out as unsecured debt.  They got their liens

23  when the LBO debt was put on the company and their equal and

24  ratable clause entitled them to secured status.  So they

25  actually started out in life as unsecured creditors.

1    So the first page, Your Honor, of the -- of Exhibit J

2    goes through and gives the detail on the 12.665 billion in

3    debt.

4    Your Honor, the next page talks about the new

5    facility.  We have the 3.25 term loan.  We have the 1.5 billion

6    working capital facility.  There is an accordion feature.

7    We'll leave that out for the moment.  And then we have the

8    roll-up which, of course, gets deduced from the senior secured

9    amount.  So we have total priming debt of $8 billion.

10    We turn to the next page, Your Honor.  We add the 8

11    billion of priming debt to the balance of the senior secured

12    facility.  Now, that had been 12.19 billion, but it's now 8.940

13    because of the roll-up, and then we add ARCO and Equistar, and

14    so we have total debt -- above the bridge -- secured debt of

15    $17,415,000,000.

16    The next page, Your Honor, talks about the Duff &

17    Phelps business enterprise value midpoint, which is $19.2

18    billion.  We subtract from that the 17.415 billion representing

19    the total secured post-petition debt, excluding the bridge, and

20    that gets us an equity cushion above the bridge of $1.785

21    billion.

22    On the final page of the exhibit, Your Honor, we add

23    together the unrolled up senior facility and the ARCO/Equistar

24    notes, which gives us 9.415 billion of primed debt.  When we

25    use the --

1          THE COURT:  Pause, please.

2          MR. ELLENBERG:  Yes.

3          THE COURT:  On the last page after where it says notes

4    under senior facility agreement, that's the ARCO and Equistar?

5          MR. ELLENBERG:  Yes.  Yes, Your Honor.

6          THE COURT:  Go on, please.

7          MR. ELLENBERG:  Okay.  So the total debt being primed

8    is 9.415 billion.  When you divide that into the equity cushion

9    of 1.785 billion, we have an equity cushion of nineteen

10   percent.

11         Now the case law, Your Honor, suggests that anything

12   over ten is acceptable.  We have virtually double the minimum

13   equity cushion.  As a matter of law, under Section 364, that

14   entitles us to prime the ARCO and Equistar debt.

15         Now I must point out, Your Honor, that the reason it

16   is proper to view their equity cushion on a business enterprise

17   basis is because the adequate protection liens they're getting

18   gives them a lien on the entire business enterprise.  They

19   didn't have that when they started.  Okay.  It's what they're

20   getting under this facility and, as Mr. Huebner pointed out

21   yesterday, there's more.  They also get a lien on the ABL

22   assets.  That's not even reflected in that equity cushion

23   analysis.  So the equity cushion is nineteen percent plus their

24   adequate protection liens on the ABL assets.

25         Now, what does Bank of New York say about this?  Well,

1    first, Your Honor, they talk about marshaling.  They say you're

2    taking away my right to marshal the assets.  Well, Your Honor,

3    that cannot possibly be an issue anymore.  Marshaling is only

4    an issue where you have a lien on one asset and *pari passu*

5    lenders have a lien on your asset plus many others.  We've now

6    given them the exact same collateral package as the senior

7    secureds, exactly the same, and so the marshaling issue is

8    gone.  It's eviscerated.  It makes no sense to even be talking

9    about it anymore.

10           And even then, Your Honor, the marshaling analysis

11   itself actually relies on the same equity cushion, okay,

12   because the only benefit you get from marshaling is to be able

13   to spread that *pari passu* debt over other assets.  Well, if

14   there's no value in those other assets, then the marshaling

15   doesn't do you any good, and so their argument is ultimately

16   circular.  If -- either the equity cushion is there or it

17   isn't; that's the only way marshaling makes a difference to

18   them.

19           Now, they don't actually attack Duff & Phelps at all,

20   Your Honor.  In fact, they embrace Duff & Phelps.  So let's

21   look at what their expert, Mr. NaJane, actually says, and in

22   particular, let's look at Paragraph 20 and then Paragraph 21 of

23   his declaration.

24       (Pause in proceedings.)

25           THE COURT:  Go ahead.

1    MR. ELLENBERG:  So in Paragraph 20, and this is under

2  the heading of, "Conclusions," Paragraph 20, Mr. NaJane says:

3         "Assuming the validity of the Duff & Phelps analysis -

4         - assuming the validity of the Duff & Phelps analysis

5         and without considering the proposed replacement

6         liens, Broadpoint has concluded the following with

7         respect to the ARCO notes."

8         So, again, Your Honor, these are the notes secured by

9  Lyondell Chemical Company.  And the first conclusion is:

10        "Prior to the petition date, assuming the availability

11        of the marshaling doctrine, the ARCO notes were

12        oversecured by approximately 1.943 billion or 597.9

13        percent."

14        Well, let's unpack that sentence.  What does that

15 really mean?  It means he's accepting the same equity cushion

16 that I just demonstrated to Your Honor of nineteen percent.

17 Through the marshaling doctrine he's spreading the other senior

18 secured debt equitably to all the other assets and he comes out

19 with this equity cushion.  So he's embracing the Duff & Phelps

20 analysis of value to get to Bank of New York's fundamental

21 position that they are sitting oversecured at the Lyondell

22 Chemical Company.

23        And, again, it depends entirely on the existence of

24 value as found by Duff & Phelps at the entities other than

25 Lyondell Chemical because if there was no value at those other

1  entities, they're not oversecured.  In fact, Your Honor, the

2  Duff & Phelps report separately values Lyondell Chemical

3  Company and Equistar.  It values Lyondell Chemical Company at

4  11 billion.  So without marshaling they are undersecured at

5  Lyondell Chemical Company because they're *pari passu* with 12.1

6  billion of senior secured.  So that exceeds the 11 billion,

7  okay.  So it's only the existence of an enterprise equity

8  cushion that permits them to say that they are oversecured.

9        THE COURT:  All right.  Pause, please.  So when he

10  says in Paragraph 20(a) they were oversecured by 1.943 billion,

11  you're saying he's just in error in that because by reason of

12  the other pre-petition senior-secured debt being *pari passu*

13  with it on that collateral base, actually, it was undersecured?

14        MR. ELLENBERG:  Well, Your Honor, you have to go back

15  to his qualification which is assuming the availability of the

16  marshaling doctrine.  So --

17        THE COURT:  I see.

18        MR. ELLENBERG:  -- what that means is that he's

19  spreading that 12 billion over the other entities.

20        THE COURT:  He's laying it off on the other entities.

21        MR. ELLENBERG:  Exactly.

22        Now, similarly, Your Honor, the Duff & Phelps report,

23  which is in evidence, values Equistar at 2.4 billion.  So he's

24  got an even bigger problem there because, again, he's *pari*

25  *passu* with $12 billion of senior-secured debt.

1        And that gets us to Paragraph 21, which says:

2        "Assuming the validity of Duff & Phelps' analysis and

3        without considering the proposed replacement liens

4        prior to the petition date, assuming the availability

5        of the marshaling doctrine, the Equistar notes were

6        oversecured by approximately 1.899 billion."

7        Well, it's the same hocus pocus, Your Honor.

8        So two points:

9        One, they're only oversecured if you agree that

10   there's value in the other enterprises; and

11        Second, they're embracing Duff & Phelps.  They're not

12   attacking Duff & Phelps.  They're embracing Duff & Phelps.

13        What they then say is, well, you know, Duff & Phelps

14   could be wrong because, you know, the markets are volatile and

15   who knows, it's -- you know, it's Duff & Phelps opinion.

16        Yes, of course, Your Honor, that's true.  That's true

17   every time you value a company.  That's why the cases require

18   that the equity cushion be more than ten percent, okay.  But

19   we've exceeded that, Your Honor.  They have a nineteen percent

20   cushion.  That's their cushion against volatility and that's

21   all the cases require.

22        And, in fact, Your Honor, their -- Mr. NaJane's

23   argument really proves too much because if he's right, that

24   volatility erodes the business enterprise value equity cushion,

25   then he isn't oversecured, he's undersecured and they've just

1    talked themselves out of interest.

2           So they can't have it both ways.  If they're embracing

3    Duff & Phelps, who really is uncontested, Your Honor, then

4    there's a nineteen-percent equity cushion, they're adequately

5    protected and that's all the law requires.

6           In addition, Your Honor, Bank of New York complains

7    that it doesn't matter if we're adequately protected by an

8    equity cushion.  We're entitled to interest subject to a cash

9    flow test because other people are getting that.  The senior

10   secureds are getting it.  We're *pari passu* with them.  If

11   they're getting it, we're entitled to get it.  Well, not

12   surprisingly, they don't cite a single case for that

13   proposition.

14          What 364 says is you can prime a lien if you're giving

15   them adequate protection.  We're giving them adequate

16   protection.  I've just proved it.  What other people are

17   getting doesn't matter.  Okay.  We had to give other people

18   what we gave them to get them to lend us 3.25 billion in new

19   money.  Okay.  There's no requirement in any case or in 364

20   that just because somebody else is getting something, they have

21   to get it as long as they're adequately protected.

22          And again, Your Honor, while he wants to be like the

23   senior secureds, he clearly isn't like them.  He's different

24   from them.  And so even if that principle had some legal basis,

25   which it doesn't, he has no factual predicate for it because

1  they aren't just like the senior secureds.

2          Then next gets us, Your Honor, to the roll-up.  Again,

3  they say other people are getting the roll-up, we should get

4  the roll-up.  Two problems with that.

5          First of all, Your Honor, the roll-up is not -- the

6  roll-up is not adequate protection.  It clearly was an

7  inducement to get people to give us new money.  It is not

8  adequate protection and the case law is clear.  We cited it in

9  our brief.  You don't have to offer a DIP to anyone who wants

10  to participate in it.  As long as you're getting the best terms

11  you can get, you don't have to open a DIP up to auction for

12  anyone who wants to participate in it to participate in it.  So

13  they have no legal right to demand entry into the DIP.

14          But even if the adequate -- even if the roll-up were

15  adequate protection, Your Honor, again, there's no legal

16  requirement that they have to get it.  They're already

17  adequately protected.  They're adequately protected by their

18  equity cushion.  Even if the roll-up was adequate protection,

19  there's no case that says they have to get it just because

20  somebody else is.

21          The final issue, Your Honor, is that we've, in effect,

22  substantively consolidated the debtors.  Well, nonsense.  Mr.

23  Huebner's dealt with that.  We're going to continue to track

24  assets.  We're going to continue to track liabilities.  We're

25  going to track the intercompanies, and Mr. Huebner addressed

1   the priority point.  I won't repeat it.

2          But there's a further issue here, Your Honor.  What

3   counsel for Bank of New York said they wanted was their own DIP

4   loan.  They said, just lend to us, let us borrow for ourselves,

5   in fact, we're not even sure we need a DIP loan.  And all of

6   that is just at odds with the record.

7          First of all, the record is clear -- Mr. Bigman

8   testified.  We put in an exhibit -- that ARCO -- that Lyondell

9   Chemical Company and Equistar are huge consumers of the DIP

10  loan.  You asked yesterday Mr. Huebner about whether the $1.4

11  billion number he gave you was net of intercompanies.  No, it

12  is not.  The net intercompany number, Your Honor, was 300

13  million; that over a thirteen-week projection Lyondell Chemical

14  was expected to consume net 300 million of the DIP as an

15  operating deficit.

16         The record is similar for ARCO -- for Equistar.  They

17  are both consumers, net consumers of these DIP loans.

18         In addition, Your Honor, Lyondell Chemical benefitted

19  enormously from the pay-down of the pre-petition asset-backed

20  facilities.  There was an inventory facility and some

21  receivable securitizations.  Those were paid down in part

22  through the term loan and in part through the new asset-backed

23  facility.  And Lyondell Chemical was a huge indirect

24  participant in those facilities and, thus, benefitted

25  tremendously in real dollars --

1       THE COURT:  Well, you're saying --

2       MR. ELLENBERG:   -- by those facilities being paid

3  down.

4       THE COURT:   -- the debt that was paid down was the old

5  pre-petition revolver?

6       MR. ELLENBERG:  Yes, Your Honor.  There was an

7  inventory revolver and then there were -- technically, they

8  were securitizations for the receivables.  But those were both

9  paid down.

10      THE COURT:  Okay.

11      MR. ELLENBERG:  And the final point on that, Your

12  Honor, not only are they consumers and thus need the DIP loan

13  directly, but they can't get their own DIP loan.  Bank of New

14  York counsel complained that his entities were propping up the

15  rest of Lyondell.  That's simply not the case and the record

16  doesn't reflect it.

17      What the record reflects, particularly Mr. Bigman's

18  testimony -- and by the way his testimony in this case, not in

19  the 105 injunction case which also would support it -- is that

20  these companies operate on an integrated basis. This is a

21  horizontally and vertically integrated enterprise.  These

22  entities are constantly buying and selling inputs and outputs

23  to each other.  That's part of the synergy of the business.

24      The lending community obviously views them as an

25  integrated whole.  That is why the senior secured financing

1   pre-petition and the bridge loan pre-petition are cross-

2   collateralized all over the place.  They're cross-

3   collateralized in the U.S.  They're cross-collateralized in

4   Europe.  Given all that cross-collateralization, who would come

5   in as a DIP lender and say, well, I'm just going to lend to

6   that company.  It was never a realistic goal and it certainly

7   wasn't a realistic goal in the time frame that we were

8   presented with.

9           So, Your Honor, I think for all those reasons, the

10  Bank of New York's objections should be overruled.

11          That gets us, Your Honor, to Law Debenture.  I won't

12  spend a lot of time on that.  I think the <u>Allegheny</u> case is

13  dispositive and they try to weasel out from under that case by

14  saying, well, we're different because the pre-petition credit

15  agreement makes certain promises and now the pre-petition

16  lenders are breaking that promise.

17          Mr. Huebner suggests that that promise isn't really

18  there.  But, again, even if it is, Your Honor, the DIP lenders

19  are not coming back in their capacity as the pre-petition

20  lenders.  They're coming back in a wholly different capacity.

21  And if, for example, this was a full third-party DIP, Law

22  Debenture couldn't be making this argument, and the fact that

23  you have the same entities coming in to give the DIP doesn't

24  change the fact that they're doing it in a completely different

25  capacity and shouldn't be bound by that agreement.

1    And ultimately, Your Honor, it really has to be an

2  unacceptable premise that unsecured indenture provisions pre-

3  petition have any impact on a DIP loan.  They simply don't and

4  I'd suggest that's why there aren't a lot of cases on it.

5    And I don't think it's a question of rejection, Your

6  Honor, at all.  I think it's a question of pre-petition debt

7  matures and accelerates on account of the bankruptcy, and we

8  can restructure it and all those pre-petition covenants and

9  whatever are gone.  They were gone the moment we filed the

10 petition.  So I don't think I need to make a motion to reject.

11   What that brings me back to, Your Honor, are the

12 Farmland factors, which is the standard by which this Court

13 needs to assess this facility and make its decision.

14   So, Your Honor, the exercise of sound and reasonable

15 business judgment, I don't see how there could be any doubt at

16 this point on that question, particularly with the committee's

17 statement that this was, indeed, the only game in town and it

18 is better to have this DIP than to have no DIP.

19   Was alternative financing available on another basis?

20 Again, Your Honor, I think we have to be past that.  The

21 committee has conceded that.

22   Are the terms fair, reasonable and adequate given the

23 circumstances?  Well, Your Honor, I think "given the

24 circumstances" is the operative part of that sentence that

25 needs to be focused on.  Yes, given the circumstances it's just

1   amazing that we're here at all.  So, unquestionably, the terms

2   are fair, reasonable and adequate.

3          Negotiated in good faith and at arms length.  It could

4   not have been more at arms length and I believe the record is

5   clear, Your Honor, that it could not have been more in good

6   faith.

7          And so, Your Honor, for all those reasons I would ask

8   that the objections being overruled and the DIP be approved.

9          Thank you.

10         THE COURT:  All right.  Thank you.

11         Ms. Martin, you would be next.  How long do you think

12  you're going to be?

13         MS. MARTIN:  Well, Your Honor, on these points I only

14  had probably about ten minutes.  I was going to respond to ABN

15  AMRO --

16         THE COURT:  Oh, I see.

17         MS. MARTIN:  -- and that's why I was going to try to

18  go after ABN AMRO.

19         THE COURT:  All right.  We're going to take a break in

20  a minute for about ten minutes.  But before we do, on the tax

21  claims, Mr. Sonik, do you have anything you want to add to your

22  argument?

23         MR. SONIK:  Yes, Your Honor.  I'd like to suggest that

24  Section 364(c) is not applicable to this situation because it

25  did not authorize lien -- the granting of liens on property of

1  the estate that are otherwise subject to liens, which clearly

2  the post-petition Texas tax liens would -- claims would be.

3         THE COURT:  You want to say that again, please.  I'm

4  not sure if I followed it.

5         MR. SONIK:  Yes, Your Honor.  Section 5 -- I'm sorry -

6  - 364(c)(2) permits the granting of liens on property of the

7  estate only when that property is not otherwise subject to

8  liens.

9         THE COURT:  Right.  But what about (c)(1)?

10        MR. SONIK:  I'm sorry.  Well, I think that fails -- it

11  fails to take into account the -- position of the tax lien,

12  Your Honor.  We agree that 364(c) permits the granting of

13  credit with administrative priority over the right of the Texas

14  taxing entity to request administrative payment under 503(b),

15  but does not permit the granting of a lien on property if it's

16  otherwise subject to the tax liens.

17        So we have this bifurcated character of the Texas tax

18  lenders, the in rem and the in personam character.  Here the in

19  rem character is being ignored by the DIP lenders.

20        THE COURT:  All right.  Well, I think I understand

21  your argument.  Okay.  Anything else you'd like to -- me to

22  focus on?

23        MR. SONIK:  No, Your Honor.  I think the Court

24  understands our position.

25        THE COURT:  All right.  Thank you.  All right.  We'll

1    take ten minutes and we'll resume at that point.

2        (Recess taken at 10:21 a.m.)

3        (Proceedings resume at 10:35 a.m.)

4            THE COURT:  Have seats everybody.  Who's next?

5            MR. HUEBNER:  I believe nobody, Your Honor.  Other

6    than the ABN issue, we are done.

7            THE COURT:  All right.  I'll hear the ABN issue.  Mr.

8    Weisfelner.

9            MR. WEISFELNER:  Your Honor, if I might.  I know we

10   spent a lot of time on what I'll refer to as parochial issues:

11   Bank of New York, Law Debenture, the taxing authorities.  And I

12   would pray that Your Honor, in terms of the perspective of the

13   statutory committee representing all unsecured creditors, while

14   he probably didn't mean to, we got an awful lot of testimony

15   from Mr. Huebner.  We got an awful lot of characterizations of

16   the evidence and we were treated with an entire compendium of

17   information that was prepared overnight.  I think Your Honor

18   has already discerned that what's critically important to this

19   committee is maturity and milestones above all else.

20           And, Your Honor, claiming the prerogative of the

21   representative of all unsecured creditors, and while I

22   appreciate that the ABN AMRO issue is important, as is everyone

23   else's issue, I'd like an opportunity to briefly respond to the

24   more than, I think, close to two-hour argument that Mr. Huebner

25   gave.

1        THE COURT:  All right.  After we take the ABN AMRO

2   argument, I am going to give you an opportunity -- a brief

3   opportunity, not anywhere near comparable to the time you took

4   the first time, to reply and I'm going to give your opponents

5   an opportunity after you say that to surreply.

6        MR. HUEBNER:  Your Honor --

7        MR. SIEGEL:  Your Honor --

8        MR. HUEBNER:  -- is that true for all objectors or

9   merely --

10        THE COURT:  No.  Just the --

11        MR. HUEBNER:  -- for Mr. Weisfelner?

12        THE COURT:  -- creditors' committee.

13        MR. WEISFELNER:  Thank you, Your Honor.

14        THE COURT:  We're not going to repeat the entire

15   process.

16        MR. SIEGEL:  Your Honor, I had indicated earlier that

17   I was going to make the same request.  With respect to Mr.

18   Weisfelner, a good part of Mr. Huebner's presentation yesterday

19   dealt with our issues and I think that there are certain

20   clarifications that would be made appropriately.

21        MR. ROSENBLOOM:  Your Honor, and I apologize.  I would

22   make the same request on behalf of Law Debenture.  I can assure

23   you it will be very short.  But there has been a

24   misrepresentation of these facts again.

25        THE COURT:  Folks, I'm going to give you each a few

1  minutes to reply.  But let me make something clear, folks,

2  because the steam is starting to come out of my head.

3         If you were arguing in the Second Circuit or the U.S.

4  Supreme Court, you would have gotten fifteen minutes, twenty

5  minutes, or if you were lucky, thirty.  I have set a new indoor

6  record for allowing oral argument on this matter and there are

7  very practical limits on the extent to which I can ask people -

8  - or allow people, forgive me, to orally supplement the

9  comments they put in their papers.

10        We're going to do it, but we're going to do it fast.

11 And, Mr. Siegel, for instance, I don't know how long I let you

12 talk when you aren't the creditors' committee and I'm just not

13 in a position to permit that going forward.

14        Ms. Schonholtz.

15        MS. SCHONHOLTZ:  Thank you, Your Honor.  Margot

16 Schonholtz of Kaye Scholer for ABN AMRO.

17        ABN is the largest pre-petition secured creditor in

18 this case.  It is owed approximately $3.4 billion according to

19 Mr. Bigman's first-day affidavit.  It is a third of the debt

20 that is being primed here per Mr. Ellenberg's demonstrative

21 this morning.

22        It is a long-term holder.  There is no CDS or total

23 return slot protection on its debt, and it has and will

24 continue to support this company.  Indeed, it stepped up at the

25 interim hearing to fill a void left in part by the Access

1  leaving the DIP.

2         It understands the need for DIP financing.  It has no

3  issue in continuing as a large participant in the ABL DIP and

4  the European securitization.  It is okay with being primed as

5  contemplated by the DIP order and the DIP documents.

6         ABN's limited objection to the term DIP has been

7  mischaracterized or misunderstood as an entirely intercreditor

8  dispute among DIP term lenders.  That is simply, Your Honor,

9  not the case.

10        The focus of the objection is that very specific

11 aspects of the proposed financing order and in the proposed

12 amendment to a pre-petition credit agreement are not fair or

13 reasonable to the pre-petition secured lenders.  ABN is not

14 objecting to the roll-up.  It is only objecting to the effects

15 on non-roll-up pre-petition secured lenders if the rolled-up

16 loans are deemed to be a refinance or repayment of those

17 rolled-up loans under the new DIP facility.

18        The DIP agreement, not the DIP term sheet, provides

19 that roll-up loans will be reflected in new notes, will have

20 full voting rights under the DIP, will be receiving payments

21 through the DIP agent, and will be administered under the DIP

22 documents.  Mr. Ellenberg also explained this morning that the

23 DIP documents contain the events of default, covenants, and

24 maturity date with respect to these rolled-up loans now.

25        Some could argue that the DIP structure constitutes a

1  repayment or a refinancing of the rolled-up pre-petition loans.

2         After the interim hearing, the testimony is that the

3  DIP term agent hired Allen & Overy to consider the structure.

4  Thereafter, novel provisions were placed in the DIP order,

5  specifically 10(e), Paragraph 10(e), and an amendment to a pre-

6  petition credit agreement was drafted.  Thirty-nine debtors

7  need to deliver an amendment as a closing condition, and the

8  DIP and roll-up lenders and their assignees are deemed to have

9  consented to and be a part of that amendment.

10        And those requirements are reflected, Your Honor, in

11 Sections 402(e) and 10.22(c) of the current, I believe, version

12 of the DIP credit agreement.

13        THE COURT:  10.22(c) did you say?

14        MS. SCHONHOLTZ:  Yes, Your Honor.

15        The effect of these novel provisions is as follows:

16        If the roll-up loans are deemed to be repaid by virtue

17 of the DIP provisions and thus lose their claims against

18 foreign debtors and non-debtor loan parties, and thus their

19 assets, then the non-roll-up lenders, which still have good

20 claims, suffer involuntary claim dilution by having an amount

21 of roll-up loans added back to share in their claim recoveries.

22        Let's do the math, Your Honor, with respect to

23 hypothetical numbers.  And, again, the press is here.  This is

24 not any reflection on any valuation.  I'm just using numbers as

25 an example.

1     Assume the U.S. assets are worth about 5.5 billion and

2     the foreign assets are worth about 3.5 billion.  Of the $6.5

3     billion DIP facility, there's new money of 3.25 -- this is a

4     term facility, Your Honor -- and rolled-up loans of 3.25

5     billion, leaving 8.75 billion of first lien loans that are not

6     rolled-up.

7     If the 6.5 billion of DIP loans, which includes the

8     roll-up, are paid for the U.S. and there's only 5.5 billion in

9     value, that leaves a billion-dollar roll-up deficiency.

10     If, in fact, those roll-up loans, Your Honor, are

11     deemed to have been repaid by virtue of the DIP structure, they

12     would have no right to share in recoveries with respect to non-

13     debtors.  So the math would be as follows:

14     Assuming the collateral outside the United States is

15     $3.5 billion, the 8.25 billion of remaining unrolled first lien

16     good claims would share that for approximately a forty-two-cent

17     recovery.

18     However, by virtue of the provisions in 10(e) of the

19     financing order and in Article 13 of the amendment, which was

20     filed at two o'clock yesterday morning, the roll-up lenders can

21     add back their claims against the foreign debtors.  So the math

22     would work as follows:

23     Still 3.5 billion of value in Europe, but now assuming

24     my one-billion-dollar deficiency -- just a hypothetical -- on

25     the rolled-up loans, that 3.5 would be shared with 9.25 billion

1    for a thirty-eight-percent recovery.

2            ABN has a billion-four outstanding with respect to the

3    first lien debt.  So a differential of any magnitude, even that

4    one, is certainly meaningful.

5            The testimony from the DIP agent was that it was the

6    DIP agent's job to put into effect in the DIP documents what

7    was required by the term sheet.  But the term sheet never

8    mentioned an involuntary springing claim dilution as I've

9    described or any pre-petition credit agreement.  Even the

10   priming that was provided for in the term sheet related only to

11   liens on debtors' assets, and that can be found at the term

12   sheet and next to the interim order at Pages 10 to 11.  There

13   was no reference to priming liens on non-debtor assets and,

14   again, Your Honor, we are not objecting to priming on debtors'

15   assets -- being primed on debtors' assets.

16           The financing motion does not mention claims dilution

17   or reallocation of claims or the amendment.  It did not request

18   any such relief.  There is no legal or evidentiary basis that's

19   been offered to support authorizing this relief pursuant to

20   this motion under 364 and, in fact, 364 reflects and refers to

21   lien priorities and lien priming.

22           The debtors have not cited any authority that would

23   permit, or offered any evidence to support the need for this

24   extraordinary relief, particularly, Your Honor, and this is

25   very important, without any notice or opportunity to be heard

1   by the pre-petition secured lenders who might be affected by

2   it.

3          The amendment was not filed until 2 a.m. yesterday.

4   To our knowledge, and according to Mr. Dugan's testimony, it

5   was still in draft at the time it was filed and during the

6   hearing yesterday and has not been finalized.  The testimony

7   was that no drafts were shown to anyone other than the group of

8   fourteen, the instructing group as it's been called, of DIP

9   lenders, and ABN.  Although it did see a draft as of 2:12, it

10  has not seen one since.

11         The testimony was, also, that there are hundreds of

12  affected pre-petition secured lenders which did not see this

13  amendment before it was filed and we do not believe they even

14  now have any reason to know about it or to look for it.  It has

15  not been posted as one would expect and as they would expect on

16  the Interlinks website for the pre-petition credit.

17         Although no effective notice was given, no statutory

18  basis offered for this request or relief, and there's no

19  evidence in the record to support the need for the relief, the

20  amendment itself now actually provides, in Article 7, that this

21  Court is authorizing the amendment as a DIP document under

22  Paragraph 6 (c) of the DIP financing order.  It is unclear how

23  that could occur under these circumstances.

24         As Mr. Huebner urged in his argument with respect to

25  the Millennium indenture, pre-petition financing documents are

1  unassumable.  Mr. Ellenberg essentially said the same thing.

2  If that's the case, how can there be an amendment to an

3  unassumable contract to be signed by forty of the debtors

4  without notice of a hearing as a condition to its DIP

5  financing?

6       In the last paragraph of his declaration, Mr. Dugan

7  calls it "conjecture" that the rolled-up loans would be deemed

8  refinanced.  The extension of that proposition is that no one

9  should worry that the claims -- about the claims dilution

10  occurring, as I've described it.  If he's right, it's hard to

11  understand why Article 13, Paragraph E of the amendment which

12  effects this claims dilution is necessary.  It's also hard to

13  understand why the DIP documents contain quite unusual

14  exculpation and indemnity provisions in favor of the DIP term

15  agent, should the Court later determine that pursuing this

16  structure constitutes gross negligence or willful misconduct.

17       The debtors' response to ABN's objection is that the

18  Court should ignore ABN for two reasons:

19       First, it's just an intercreditor dispute; it has

20  nothing to do with the debtors or the financing motion.  The

21  fact that the debtors are asking the Court in mid-hearing to

22  approve an amendment as a DIP document undermines that

23  assertion.  The amendment and certain provisions of the DIP

24  order are designed to redistribute recoveries by order of this

25  Court, and it's unclear how the debtors can assert that that

1   objection presents no issue for the Court to decide.

2        The debtors and the DIP term agent also say that ABN

3   should be ignored because thirteen of the fourteen members of

4   the instructing group are okay with this situation.  Given the

5   size of their roll-up loans, of course they're okay with

6   diluting other lenders' claims to increase their recoveries if

7   the rolled-up loans are deemed repaid.  That position also

8   ignores ABN's rights as a member of the instructing group to

9   approve the DIP order and to approve the DIP credit agreement.

10       Your Honor, it's also the adult equivalent of the

11  teenaged statement "everyone else is doing it."  And the

12  response to that is often -- the best response to that is:

13  Just because everyone else is doing it doesn't make it right.

14       What's going on here with the pre-petition credit

15  agreement amendment and similar embedded provisions in the DIP

16  order isn't right.  It isn't fair or reasonable, and there is

17  no legal or evidentiary basis in this record for granting that

18  relief.  That's why ABN is simply urging Your Honor that the

19  back-door, involuntary claims dilution provisions embedded in

20  these documents be removed.

21       We respectfully submit that this Court, particularly

22  given the total absence of notice, delete the offending

23  provisions in Article 13 and in the DIP order before approving

24  the DIP financing, and we've taken the liberty of marking the

25  DIP order and the amendment to accomplish that end.  We would

1  be happy to hand it up to the Court for review, to share our

2  comments with other parties.  There are very few changes

3  required.  And in fact, we have on prior drafts made the same

4  request of the lenders, and our requests have gone unanswered.

5          THE COURT:  My answer to that is the same as before.

6  If you've already or you're about to give them a copy of what

7  you want to hand up, you can hand it up.  You can have one of

8  your folks do that.  But I want to make sure that I understand

9  exactly what I am asked to do that gores your ox.  As I

10 understood it, there are two separate things:

11         One is giving Citibank and exculpation --

12         MR. HUEBNER:  It's not --

13         MS. SCHONHOLTZ:  It's not --

14         MR. HUEBNER:  It's definitely not Citibank, Your

15 Honor; it's UBS.

16         THE COURT:  Oh, UBS.

17         MS. SCHONHOLTZ:  It is --

18         THE COURT:  All right.

19         MS. SCHONHOLTZ:  Our objections, Your Honor, simply go

20 to the term DIP facility, not to the ABL.

21         THE COURT:  Okay.  Term.  The exculpation from any

22 liability that there might ultimately be found to your guys,

23 vis-a-vis any intercreditor issues.

24         And the second being asking me to approve the document

25 that was circulated yesterday morning at 2?

1       MS. SCHONHOLTZ:  The letter is, by far, the most

2   important because it affects substantive rights of pre-petition

3   lenders without notice, and actually without any record here to

4   support it.  That is the most important.

5       I point to the exculpation and the indemnity more to

6   point that, although people say there's no risk of this claims

7   dilution, obviously somebody thought there was enough of a risk

8   of this situation occurring that he or she thought it was

9   appropriate to protect the DIP term agent against that

10  possibility.

11      THE COURT:  All right.  Do you think that's the case,

12  or have you ever seen a facility where people didn't ask --

13      MS. SCHONHOLTZ:  It's supposed --

14      THE COURT:  -- the Judge to give them exculpation --

15      MS. SCHONHOLTZ:  No, Your Honor --

16      THE COURT:  -- in every imaginable way?

17      MS. SCHONHOLTZ:  No, Your Honor, it's -- the termsheet

18  contained a totally standard exculpation and indemnity.  What

19  our objection to is -- about this one is it says that, if this

20  structure fails, they are indemnified, they are indemnified

21  against gross negligence and willful misconduct.  That is

22  unusual, it is not customary, and the termsheet did not have

23  indemnification if an agent acts with gross negligence and

24  willful misconduct.  That's standard, we know that, we have no

25  issue with that.  It is the specific provision that was put

1    into this one that says, if it does constitute gross negligence

2    and willful misconduct, you're still going to indemnify them.

3              THE COURT:  Uh-huh.  Pause for a second.

4              MR. ELLENBERG:  Your Honor, I haven't seen the

5    documents counsel wanted to hand up, so perhaps --

6              THE COURT:  Well, why don't you gather them up and

7    circulate them now while I'm looking at --

8              MS. SCHONHOLTZ:  The comments, Your Honor --

9              MR. HUEBNER:  I mean, to be clear, no one has.

10             MS. SCHONHOLTZ:  No, no, no, that's not accurate, Your

11   Honor.  These were comments that we made on the DIP order

12   several days ago.  We have them here again, and there are very

13   few provisions.  But the -- certainly, the lenders' counsel has

14   seen a markup of the draft DIP order that covers these points,

15   and with respect to the amendment, since we saw it at two

16   o'clock this morning -- yesterday morning.  Sorry, the days are

17   all blending together.  It just requires the excise of one

18   provision, and Mr. Talmadge has them.  May I approach, Your

19   Honor?

20             THE COURT:  Yes.

21        (Pause in proceedings.)

22             THE COURT:  Okay.

23             MR. HUEBNER:  Your Honor, I just want to be clear.

24   This was clearly prepared before.  We've all been here, and we

25   were here yesterday.  It would have been nice to see this very

1    beautiful book before five to 11 from the podium.

2         THE COURT:  And no doubt Ms. Schonholtz is going to

3    say that, on a matter of the importance of the document that

4    was circulated at 2 yesterday, she would have related her

5    analogous questions.  And the issue I'm going to deal with Ms.

6    Martin on when it's her turn is how it complies with the

7    requirements of Bankruptcy Rule 4001(a) that requires all of

8    the relevant documents associated with the financing to be

9    submitted as part of the motion.  Although, of course, it's

10   customary for updated things to be provided thereafter, so long

11   as it's consistent with due process.

12        I'm going to let Ms. Schonholtz finish and let you

13   folks reply, and then I'm going to make a determination as to

14   whether it can be resolved today or whether I need to have a

15   continued hearing on this issue on Sunday.

16        MS. SCHONHOLTZ:  Understood, Your Honor.

17        Just for the record, I think Mr. Huebner gives us too

18   much credit.  This was actually prepared late last night, after

19   the hearing was over.  And obviously, with respect to the DIP

20   order comments, they've seen them already.

21        If I may, Your Honor, just with respect to the

22   amendment, if I can turn your attention to Page 5 of what I

23   handed up, which is at the back of the binder.

24        (Pause in proceedings.)

25        MS. SCHONHOLTZ:  Paragraph (e) is what we would call

1  the offending paragraph that works --

2          UNIDENTIFIED:  I'm sorry, Counsel.  What are you

3  referring to, please?

4          MS. SCHONHOLTZ:  I'm referring to the amendment that

5  ...

6      (Counsel confer.)

7          MS. SCHONHOLTZ:  Okay.  I apologize.  If everybody has

8  the amendment, this will take one second.

9          MR. ELLENBERG:  Nobody has it.

10         MR. HUEBNER:  Nobody has it.

11         MS. SCHONHOLTZ:  Everybody has the -- nobody has the

12 amendment?

13         THE COURT:  Well, I think your point is, I have it in

14 a supplemental document that was stuck in the back of the

15 spiral.  And do your opponents just have the spiral or do they

16 have --

17         MR. HUEBNER:  That's correct, Your Honor.

18         MS. SCHONHOLTZ:  Right.  Okay.  Your Honor, just for

19 the record, the document that was filed, "Notice of Filing of

20 Draft Amendment No. 2," at two o'clock in the morning, our

21 proposal with respect to that is just to strike Paragraph (e)

22 on Page 5.

23         THE COURT:  Uh-huh.

24     (Counsel confer.)

25     (Pause in proceedings.)

1      MS. SCHONHOLTZ:  Should I continue, Your Honor?

2      THE COURT:  I'm going to have to read it a couple more

3 times to fully understand its import, but I'm going to let you

4 to continue.

5      MS. SCHONHOLTZ:  All right.  And I'd be happy to

6 answer any questions.

7      The binder that we just handed out -- and again, these

8 comments had been provided previously with respect to the order

9 -- it's on Page 34 of what Mr. Talmadge handed out, would be to

10 delete the same language in Paragraph (e), because it's

11 identical to what we just looked at in the amendment.

12      THE COURT:  All right.  So the red stuff on the foot

13 of Page 34 is roughly consistent with what's in that

14 Subparagraph (e) on the amendment?

15      MS. SCHONHOLTZ:  I believe it's almost exactly the

16 same, Your Honor, yes.

17      THE COURT:  All right.

18      MS. SCHONHOLTZ:  Now the rest of the changes, which

19 are minor, contained in -- and we can look at them

20 individually, but contained in Paragraph 13, on Page 36 of the

21 markup; it's the blue language; Page 42, again the blue

22 language; and Page 61, same language, is just designed to avoid

23 a back-door way of preventing pre-petition lenders who may have

24 a good claim against non-debtor assets from having to not

25 receive them or turn them over to DIP lenders -- or roll-up

1    lenders.  Sorry.  That just basically avoids the same thing

2    happening through the injunction provision and other

3    provisions.  And those would be the only changes we'd suggest,

4    Your Honor.

5             THE COURT:  And you're saying that the blue language

6    has to be deleted to avoid --

7             MS. SCHONHOLTZ:  That blue language -- sorry -- goes

8    in.

9             THE COURT:  Oh, has to go in --

10            MS. SCHONHOLTZ:  Yes.

11            THE COURT:  -- to protect you from dilution as a

12   consequence of non-debtors paying off their assets?

13            MS. SCHONHOLTZ:  Yes.  The blue language goes in;

14   otherwise, assuming that the pre-petition secured parties would

15   get more of a non-diluted recovery in Europe, arguably certain

16   provisions of this DIP order would require us, notwithstanding

17   that we don't have to share on any other basis, to give it --

18   to not get paid until people above us are paid, and that's just

19   to avoid that consequence.  So the red comes out; the blue goes

20   in.

21            MR. ELLENBERG:  Your Honor -- Counsel, I see blue

22   language on Page 24, is that included?

23       (Counsel confer.)

24            MS. SCHONHOLTZ:  Yeah, no, that's -- we don't need to

25   focus on that.  That's not related to this issue and -- oh, I'm

1   sorry, I do apologize.  Thank you.

2          Page 24 is designed so we don't have a recurrence,

3   essentially, that the senior credit facility, which we're still

4   not clear how it could be amended, could be amended without at

5   least notice to all parties-in-interest.  That's what we've

6   done in the blue language on Pages 23 and 24.  We don't want to

7   find ourselves in this position again, Your Honor.

8          And if there are no questions --

9          THE COURT:  Well, the finding yourself in that

10  position isn't so much your fellow pre-petition lenders

11  prejudicing your interest; it's asking me to bless your fellow

12  pre-petition lenders adversely affecting your interest, right?

13  You're not asking me to adjudicate your intercreditor issues,

14  except insofar as I'm asked to bless them -- the prejudice to

15  you by reason of judicial action in this court.

16         MS. SCHONHOLTZ:  If I understand your question, our

17  issue is we don't want this Court to bless the prejudice

18  against the pre-petition secured lenders by the provisions I

19  pointed out; that is the point.  We are not asking you to

20  adjudicate any intercreditor disputes.  We just don't want to

21  be prejudiced if, in fact, the pre-petition secured lenders

22  have rights with respect to non-debtor collateral.

23         THE COURT:  All right.

24         MR. WEISFELNER:  Your Honor, may I inquire?  A

25  question from the perspective of the estate.

1       Counsel made reference to exculpatory provisions that

2   are unusual, and on first glance, I was hoping she could point

3   those out to the Court and the parties.

4       MS. SCHONHOLTZ:  I would be happy to, if you give me

5   one second.

6     (Counsel confer.)

7       MR. HUEBNER:  Yeah, Your Honor, let me just -- this is

8   other lenders indemnifying their agent; it's not the estate.

9       MS. SCHONHOLTZ:  But it's also -- it's rolled-up

10  lenders and DIP lenders.

11      THE COURT:  All right.  Well, if that's so, it would

12  seemingly moot out Mr. Weisfelner's concerns, but I'm not sure

13  if it would moot out Ms. Schonholtz's concerns.

14      MR. HUEBNER:  I agree, Your Honor.  I just wanted to -

15  -

16      MR. WEISFELNER:  That's why I sat down.

17      THE COURT:  Okay.

18      MR. WEISFELNER:  Thank you.

19      MS. SCHONHOLTZ:  Would you still like me to answer it

20  or no, Your Honor?

21      THE COURT:  I'm not sure if Mr. Weisfelner cares.  He

22  said he sat down.  Maybe -- Mr. Weisfelner, do you continue to

23  care?

24      MR. WEISFELNER:  Your Honor, my concern was the

25  obvious one, and that is that, if there's indemnity flowing to

1    an agent for conduct that exceeds the scope of the conduct that

2    agents typically get indemnified for, I didn't want this estate

3    potentially liable to an agent for lawsuits that other lenders

4    may have, for the fact that there were amendments proposed

5    without notice that affected their economic interests.

6              THE COURT:  Of course, I understand.  But it sounds

7    like that issue is now moot.

8              MR. WEISFELNER:  Based on the representation I just

9    heard, yes.

10             MS. SCHONHOLTZ:  With respect to the indemnification.

11   With respect to the exculpatory provisions, which are 9.03 of

12   the DIP credit agreement, the agent is being -- is being

13   exculpated from the same consequences.  The indemnification is

14   by the lenders.

15             THE COURT:  All right.  Then I'll hear from Mr.

16   Huebner or Ms. -- are you going to carry the ball for the --

17   for UBS --

18             MS. SCHONHOLTZ:  Thank you, Your Honor.

19             MS. MARTIN:  (Not identified) Your Honor, he has time

20   constraints, so I was going to speak first.  But recognizing

21   that Mr. Huebner has to be out of here by 11:30, he's going to

22   speak briefly.

23             THE COURT:  All right.

24             MR. HUEBNER:  Your Honor, I'm going to be very brief

25   because this is really not our issue.  But I think that there

1   are three things or two things that are very important for me

2   to say at the outset.

3        Ms. Schonholtz was very direct with the Court, and her

4   pleading is even more direct, on Page 4:

5        "These features were not contemplated by the DIP

6        termsheet, are quite novel, and are inconsistent with

7        the roll-up DIP loans."

8        In other words, her complaint is that things were

9   done; and, in particular, she says the issuance of notes and

10  the roll-up being documented under a new credit agreement, in

11  part, that are inconsistent with the termsheet, and that's why

12  they're very upset.  All right.  I think that's a fair

13  characterization of the problem.  The problem is that -- you

14  know what?  I'm not going to ask.  That's my understanding of

15  the problem --

16      (Laughter.)

17       MR. HUEBNER:  -- which is that we did things that

18  aren't in the termsheet.  Well, there's just one problem with

19  that:  They are in the termsheet, totally, expressly, and

20  directly.

21       And let me be very clear.  Unfortunately, I don't know

22  where it is in the exhibit set ...

23      (Counsel confer.)

24       THE COURT:  Well, make sure she gets a copy of what

25  you're giving me.

1    MR. HUEBNER:  She has the term -- this is the

2  termsheet.

3    (Counsel confer.)

4    MR. HUEBNER:  So, Your Honor, let's first go to the

5  section called "DIP Facilities," on Page 3.  And the first

6  paragraph says:

7         "What are the 'DIP facilities.'  The DIP facilities

8         are the new money facility and the roll-up facility."

9         Right?  That's what they are.  It's both of them, not

10  just the new money.

11         And then we turn the page, and we look at the last

12  sentence of the section called "DIP Facilities."  And what does

13  it say?  It says:

14         "The facilities will be documented under separate

15         credit agreements."

16         So this stunned surprise that the roll-up DIP facility

17  is documented under a new credit agreement, which is grossly at

18  variance with the termsheet, there is a reason they're the only

19  lender that feels that, because it's wrong.

20         And now let's talk about promissory notes, because

21  that's even more direct.  Now we can turn to Page 29, which is

22  the annex of customary closing documents, and we can go to

23  Subsection (b):

24         "Execution and delivery by the debtors of this

25         termsheet and promissory notes evidencing the loans

1          made and to be made under the facilities."

2          And what are "the facilities"?  Well, we just covered

3    that.  The facilities are the facilities in the DIP Facilities

4    section, which include the roll-up.

5          You know, I only rise on this point, not because I

6    want to be adverse to Ms. Schonholtz or Ms. Ball, but because

7    there is a reason thirteen lenders say that we did exactly what

8    the termsheet contemplates.  And again, it's right there in

9    their pleading:  Their view is that something radical happened

10   because the roll-up loans are getting promissory notes and

11   they're getting documented in a credit agreement.

12   Unfortunately for Ms. Schonholtz, that's exactly what the

13   termsheet says.  That's number one.

14          The second point --

15          THE COURT:  Well, is that the issue, or is the issue

16   what the definitive documentation ultimately says?

17          MR. HUEBNER:  No.  The issue is that they are

18   documented under a new credit agreement, and it should -- their

19   concern is that, because this is being done as a new loan, it

20   could be deemed new, and not the payoff of the old loan.  And

21   there is a series of risk and rewards about which way people

22   think it's better to be done.  Thirteen people decided the

23   other way.  But more importantly, that's what the termsheet

24   said they were doing.  So the fact that they don't like it is

25   sort of interesting, but not relevant to this Court.

1    Now let's talk about the provisions that they're

2    talking about.  First of all, they say things like, "for the

3    avoidance of doubt, it is the parties' intention."  Nobody is

4    asking you to make a finding, nobody is asking you to issue a

5    ruling.  I mean, look at the language that they're talking

6    about.

7    This is in the amendment -- which, by the way, just to

8    be very clear, the 2 a.m. was not last night at 2 in the

9    morning; it was the night before at 2 in the morning, or

10   whatever it was.  So Ms. Schonholtz discussed these things with

11   the Court yesterday with full knowledge of that amendment then.

12   It was not something that they learned about in the last X

13   hours by any stretch.  And as you know, since they've been

14   sending markups -- which, again, I personally am -- I don't

15   think I've been involved in -- you know, this is not a new

16   issue to anyone.

17   So the question is:  Is the Court being asked to make

18   a finding on these issues that is unreasonable or

19   inappropriate?  And I'm going to leave this largely to Ms.

20   Martin.  But if you look at the things that are striking, there

21   are things like lenders indemnifying other lenders; whether

22   lenders are voting for an amendment that she doesn't like.

23   Well, that's fine.  She can vote.  And if she can get enough

24   people to carry the day, the amendment won't pass.  The

25   debtors' activity in this amendment is ministerial.  It's not a

1  material document from the estate's perspective because it's

2  merely the effectuation of the roll-up.

3          And now let's talk law, right?  The law --

4          THE COURT:  Pause, please, because you made a

5  potentially significant point.

6      (Laughter.)

7          MR. HUEBNER:  Well, it took three days, but I'm glad

8  that I could ...

9      (Laughter.)

10          MS. MARTIN:  (Not identified) You're stealing my

11  argument.

12          THE COURT:  You're saying that the content of the

13  amendment doesn't gore the ox of the estate or the unsecured

14  creditor community or anybody other than the parties to the

15  senior secured documentation as to which this is an amendment?

16          MR. HUEBNER:  I have two words, Your Honor:  Bing-O.

17      (Laughter.)

18          MR. HUEBNER:  That's exactly right.  The estate can

19  speak to the amendment for themselves.  We happen to need their

20  John Hancock on amendments because that's the way the credit

21  agreement is set.  This effectuates the roll-up in a manner

22  that I believe -- and I don't want to overspeak because it's

23  not my side of the house, and we're getting outside my scope,

24  and I'm getting, correctly, looks from Simpson Thacher like,

25  what are you doing up there.

1    (Laughter.)

2         MR. HUEBNER:  But --

3         MS. MARTIN:  We don't disagree with Mr. Huebner.  This

4    is just the argument we were going to be making, so ...

5    (Laughter.)

6         MR. HUEBNER:  Okay.  So I should really stop soon.

7    Let me just say one more bankruptcy law thing, and then Ms.

8    Martin can answer your questions, and it sounds like very much

9    to your satisfaction.  Let me just talk bankruptcy law, because

10   that is something that I think I'm hopefully occasionally

11   competent to speak on.

12        THE COURT:  All right.  But before you go on to your

13   next point, the question that I guess I'll ask Ms. Martin,

14   since you won't be here anymore --

15   (Laughter.)

16        THE COURT:  -- is:  If it doesn't affect the interest

17   of the estate and/or my unsecured creditor community, then why

18   do I care about it and why do I need it?  She can answer that,

19   if you prefer not to.

20        MS. MARTIN:  Well, Your Honor --

21        THE COURT:  When it's her turn.

22        MS. MARTIN:  Okay.

23   (Laughter.)

24        MR. HUEBNER:  Your Honor, let me just hit the law for

25   a minute.  Ms. Schonholtz suggested to the Court that because

1   the pre-petition financing agreement is a financing agreement,

2   it cannot be amended, and the lenders cannot enter into

3   agreements or changes, particularly as amongst themselves, in

4   connection with that agreement.  I'm sure she's thought about

5   this now for a couple of days, and you would have thought that

6   there might have been a case cite or a statutory cite, and of

7   course there are none, because I believe that there are none.

8          This is not unusual that agreements -- especially

9   because there are agreements between the lenders in the

10  document -- do remain for some purposes of living in a

11  document; for example, if there are changes to indemnity.

12  People sometimes move for stay relief, for example, to give

13  notices that do affect the debtor under preexisting documents,

14  like things that, you know, trigger potentially interest rate

15  changes and the like.  So I don't think it's right to say that

16  the large number of pre-petition lenders can no longer do

17  anything to a document that gives them rights and remedies,

18  vis-a-vis one another; that they are frozen in time merely

19  because under 365(c)(2) the debtor is no longer allowed as a

20  matter of law to accept new extensions of credit under that

21  document.

22         On the 4001 point, Your Honor, which is the last

23  bankruptcy technological point that I will address before

24  ceding the podium that I probably shouldn't have even risen to.

25  I said it yesterday, and it's a very dangerous thing, so I'm

1    not ending in the way that I would like.  It's a very dangerous

2    thing to have a discussion with the Judge about why less notice

3    is actually okay.  That's not a position one ever wants to be

4    in; and, in particular, I pride myself on being a huge advocate

5    of time and notice and inter-activity.

6         But as it happens, what 4001 actually says is that:

7         "A motion to attain credit in accordance with 9014

8         shall be accompanied by a copy of the credit agreement

9         and a proposed form of order."

10        Not having the rule in front of me yesterday, I took

11   the view, and I expressed my understanding of common practice,

12   having done this for a while, that the main documents that

13   impact the debtor are always to be filed, and should.

14        This pre-petition amendment is a great example of

15   something --

16        THE COURT:  You're saying it's not the credit

17   agreement, but it is an amendment to the pre-petition secured

18   debt documentation.

19        MR. HUEBNER:  Correct.  And that's why Mr. Weisfelner

20   correctly stood up, but then also correctly sat down.  Because

21   if the amendment --

22        (Laughter.)

23        MR. HUEBNER:  That was not a joke.

24        If the amendment had the effect of impacting the

25   estate, and there were things in there that said, the debtor

1   hereby agrees to indemnify UBS for bad-faith, willful

2   misconduct, that would be a very material document, and that

3   would be the kind of thing that I think that the Court and

4   parties absolutely should know, but have time to reflect.

5        But Ms. Martin will describe what that document

6   actually is, and then the Court will decide whether it's in the

7   category of the DIP credit agreement, or one of the many, many

8   --

9        THE COURT:  I understand that.  But then, Ms. Martin,

10  when it's your turn, the question I'm going to ask you is

11  whether, if it is not strictly encompassed within 4001(a), but

12  I'm nevertheless required to approve it in any way, whether

13  you've got to give appropriate notice of whatever you're asking

14  the Judge to approve.  I'm not going to prejudge the answer to

15  that question, but that's what I'm going to ask you when it's

16  your turn.

17       MR. HUEBNER:  Shall it be your turn now?

18       MS. MARTIN:  It is my turn.

19    (Pause in proceedings.)

20       MS. MARTIN:  Good morning, Your Honor.  I think my

21  danger in letting Mr. Huebner go first is that he's left me in

22  a position of largely repeating some very, what I believe are

23  effective and to-the-point arguments on this issue.

24       If you'd like me to deal first with this 4001 issue,

25  the amendment is something that the debtors will need to sign.

1  It is --

2       THE COURT:  Will need to sign?

3       MS. MARTIN:  The debtors need to sign the amendment

4  because they're a party to the pre-petition agreement.  That's

5  why we've taken the view, we would file it, but we don't view

6  it as being material to the debtors.  The only impact this

7  amendment has is on non-debtors.  There are non-debtors who are

8  signatories to the pre-petition agreement, and therefore are

9  signatories to the amendment.  And the impact of the amendment

10  is only on the non-debtors.

11       So, while the debtor has to sign, that is purely a

12  ministerial act.  And we've put this before Your Honor on the

13  basis that you probably would want to see this if the debtors

14  are signing it, perhaps sign off on it, but I don't know that

15  there's been any issue of a loss of due process.

16       THE COURT:  Well, okay.  Then let me ask you the

17  corollary of that or the follow-up question to that.  If the

18  only reason the debtors are asked -- are required to sign it is

19  because they're a party to it, but if they are not affected by

20  it in any material way, then is my more appropriate order to

21  permit them to sign it without passing upon the document in any

22  other way?

23       MS. MARTIN:  That's exactly right, Your Honor.  I

24  don't think there's anything in this order that asks you to

25  pass on the document.  And I don't have the cites in front of

1  me, but we looked this up -- I don't think that anything in

2  your entry of the DIP order would constitute res judicata or

3  collateral estoppel on this issue.

4          The significant point with the amendment is it's not

5  this Court who decides, with all due respect, Your Honor,

6  whether or not that amendment is going to take place; it's the

7  lenders who decide, the pre-petition lenders.  So while ABN

8  AMRO, as one of those pre-petition lenders, is unhappy with the

9  impact this amendment may have on them, enough of the other

10 lenders to that facility have indicated that they are willing

11 to sign on to this amendment.

12         THE COURT:  Do I correctly assume that the pre-

13 petition senior secured debt documentation has provisions in it

14 that dictate what kinds of affirmative votes are required in

15 order to achieve an amendment approval?

16         MS. MARTIN:  That's exactly right, Your Honor.

17         THE COURT:  Some kind of percentage of some sort of

18 another.

19         MS. MARTIN:  Yes.  As to this one, fifty-one percent

20 of lenders holding -- I'm sorry -- lenders holding fifty-one

21 percent of the outstanding debt.

22         THE COURT:  All right.  Continue.

23         MS. MARTIN:  So the suggestion that has been made is

24 that Your Honor entering the order that's been put before him

25 is you're making an amendment to that pre-petition agreement,

1 and that is not the impact. The amendment takes place only

2 when that fifty-one percent of lenders agree. So this is an

3 intercreditor issue. ABN may not be happy with that result,

4 but that's not something the Court is causing to happen; it's

5 not something that the debtor is causing to happen. It's

6 something that all the lenders to that facility have gotten

7 together and have agreed will be the final result.

8           We also think that -- I just want to quickly correct a

9 statement that was made about the factual record, which is that

10 the testimony is that these various provisions were put in and

11 the amendment was put in after certain advice came from ANO.

12 Mr. Dugan's testimony was actually pretty clear on that, that

13 he doesn't even recall the sequencing of it. So I think, while

14 it's perhaps a minor point, I just want to make sure that

15 that's clear on the record.

16           I don't know that I have much more. I do want to

17 speak to several issues, though. One is that, let's just step

18 back and recognize -- this really goes to the indemnity. UBS

19 stepped in as an unwilling agent. There record is undisputed

20 on that. This is an incredibly complex facility. It was one

21 that, until the wee hours of negotiating after many days,

22 people still weren't sure was even going to happen. I think it

23 was called a "herculean effort," "miraculous" by Mr. Ellenberg.

24           Mr. Dugan's first meeting that he attended was on

25 December 29th. Other UBS representatives attended earlier

1    meetings.  But it wasn't until the wee hours of the morning --

2    I'm sure you remember, Your Honor, during the first-day

3    hearings, which stretched into the 1 or 2 a.m. hour of the

4    following morning, that UBS agreed to step up and be the agent.

5    And that's because everyone else involved with this recognized

6    how much work was going to be involved, how complicated this

7    was going to be, and potentially how risky it would be to

8    structure something that would make every party happy.

9           So the idea that there was an indemnity that would

10   protect UBS in the tremendous job it has done, by the way, in

11   brokering a consensus among what we had thought was fourteen,

12   but now is at least thirteen of the fourteen lenders -- and

13   there are sufficient numbers of the other thirteen who would

14   step up to fill the gap that ABN AMRO is willing to fill.

15          I don't even understand the argument that the

16   indemnity is over-reaching an inappropriate.  And again --

17          THE COURT:  Time out, because this is the -- I

18   understood your first point.  Because if the debtor is merely

19   being authorized to sign something that's giving away ice in

20   winter, it doesn't affect the debtor, and that could be argued

21   to cause me to shrug my shoulders.  But you're asking me, by

22   the indemnity, to create substantive rights as between non-

23   parties to the estate.  And at least arguably that requires me

24   to stick my nose in an area where I may not have jurisdiction.

25          MS. MARTIN:  Your Honor --

1          THE COURT:  You know, because -- I don't know -- I'm

2   sure you've been getting no sleep and you've been busy on other

3   things.  But one of the things that I talked about in the

4   preliminary injunction hearing on the wholly unrelated issues

5   that took place earlier this week and which I issued the

6   decision on yesterday was that I had related-to jurisdiction

7   and other kinds of jurisdiction because it had -- that issue

8   had an effect on the estate.  Determining the matters of

9   dispute between the various members of the senior secured pre-

10  petition facility seems, at least at first glance, to have a

11  lesser effect upon the estate.

12         Your Honor, the lenders who are being asked to

13  indemnify UBS are the lenders participating in this DIP.  This

14  is not a reach-back to entities in the pre-petition secured

15  facility, asking all of those lenders to indemnify UBS for what

16  it has done in connection with this DIP.

17         THE COURT:  So if -- excuse me.  So if ABN AMRO

18  chooses not to participate in the DIP, they're not on the hook

19  for the indemnification?

20         MS. MARTIN:  That's right, Your Honor.

21         THE COURT:  Okay.  Continue.

22         MS. MARTIN:  So that's exactly my point.  This is

23  something that thirteen -- and this is in our brief, as well --

24  thirteen of the fourteen have agreed to sign on to.  It is a --

25  one of these material conditions, perhaps probably more

1   material to UBS than others.  But as Mr. Ellenberg said, this

2   is a tenuous agreement.  There are pieces that have been

3   balanced against each other; one person gives something, but

4   they take something else.  And to sit there and take out any

5   one provision could be disastrous for this facility.

6          And as far as UBS is concerned, you know, if we step

7   back, there were -- and this, again, was in our -- I'm sorry --

8   is in Mr. Dugan's declaration.  There were other structures

9   that were considered.  There were -- even before the termsheet

10  was entered, there was a structure that was considered that

11  was, I think, very comparable to what ABN would like to see

12  happen right now.

13         But many lenders -- and this is not just UBS's doing.

14  In fact, Mr. Dugan gave testimony yesterday that they have

15  taken the lead as the administrative agent.  That does not mean

16  that these are UBS's terms in this document.  This is heavily

17  negotiated between the lenders themselves.  It represents input

18  from all fourteen lenders.  It's compromises, not just with the

19  debtors, not just with the committee, but it's compromises

20  between and among the lenders to come up with something that

21  all fourteen thought worked.

22         And once the termsheet was agreed to, it's coming up

23  with compromises to draft a final credit agreement that all

24  thirteen -- and I actually would probably all fourteen -- agree

25  is consistent with the termsheet.  I don't even think ABN AMRO

1  and Mr. Huebner pointed you to provisions in the termsheet and

2  the specific areas that ABN AMRO is complaining about.

3       But what ABN AMRO is complaining about is not any

4  inconsistency with the termsheet; and indeed, this structure is

5  entirely consistent with the termsheet.  They're complaining

6  about provisions that are beyond that.  But as we've just

7  talked about, the particular concern they have, this amendment,

8  is something that's going to be agreed to by the lenders; the

9  sufficient lenders, the pre-petition facility.  If they weren't

10  willing to agree to it, it wouldn't be happening, but that's

11  why it's going to take place.

12       So from UBS's perspective, Your Honor, if this

13  indemnification provisions wasn't there; if thirteen hadn't

14  agreed to do it, if thirteen were putting UBS in the position

15  of saying, look, we've all come up with a structure now that we

16  think works and makes sense, but, UBS, you're the one that's

17  going to be on the hook if it doesn't work and doesn't make

18  sense, that just would not work for UBS; and it frankly

19  wouldn't be appropriate, particularly here, given the extensive

20  involvement of every lender.  So it's not --

21       THE COURT:  I understand that.  But let me repeat

22  something that I think you answered, but because it's so

23  important.

24       MS. MARTIN:  Sure.

25       THE COURT:  What you are asking me to approve does not

1   in any way, shape, or form subject ABN AMRO to the risk of

2   writing out a check to indemnify you.

3         MS. MARTIN:  That's right, Your Honor.

4      (Counsel confer.)

5         MS. MARTIN:  Oh, I'm sorry.  Hold on one second, Your

6   Honor.

7      (Counsel confer.)

8         MS. MARTIN:  Yeah.  I think I'm correct on that, Your

9   Honor, and if I take a quick break, I can consult on that.  I

10  think the concern of ABN AMRO is that, because they've already

11  lent under this facility, they're on the hook, Your Honor.

12  They've lent under the interim facility.  They're indicating

13  that they want to be taken out of the facility.  They're not --

14  I'm sorry -- they're not participating in the final facility

15  that's being entered.  So I don't think that this binds ABN

16  AMRO.

17        THE COURT:  All right.  Continue.

18        MS. MARTIN:  I don't know if Your Honor has further

19  questions on the ABN AMRO issue.  I think I've really made the

20  points that I wanted to make with respect to ABN AMRO.  So

21  unless you have further questions, I'm just going to briefly

22  address one or two points with respect to maturity and the BONY

23  issue.

24        THE COURT:  Sure.

25        MS. MARTIN:  You know, again, this is the risk of

1  perhaps speaking last, so I think even these brief points that

2  I wanted to make were covered --

3         THE COURT:  That's okay.

4         MS. MARTIN:  -- by Mr. Ellenberg today.

5         But with respect to maturity, I want to make sure

6  there's just no ambiguity about why this has not changed off

7  the original December 15th date or, you know, the eleven months

8  and change that we've got.

9         You know, Mr. Weisfelner yesterday tried to argue in

10  advance the position of the lenders about why it couldn't be

11  changed and any -- he conjectured that what you would hear that

12  it's an administrative impossibility at this time; that calling

13  together the creditors' committees at this point could never

14  take place in the time allowed, and I would expect there are

15  tremendous administrative difficulties there.  But like Mr.

16  Huebner, I like to focus on the evidence that's actually been

17  introduced.

18         And Mr. Dugan has described this issue as not one of

19  practical impossibility in going back to the creditors'

20  committees -- and I noticed his testimony on this point was

21  included in the packet that Mr. Huebner pulled together -- but

22  it's an issue about getting all of the lenders to agree to a

23  change -- to change a provision that is and always has been a

24  material term.

25         By the time Mr. Dugan focused on this issue -- and the

1   testimony is his first meeting was December 29 -- this was an

2   apparently agreed provision.  You know, most certainly,

3   sometime between that date and when we had the first-day

4   hearings on January 7th, everybody went to their credit

5   committees for approval of that term.  That's a material term;

6   it's a material term to UBS, it's a material term to other

7   lenders.  That is the term that was presented to everyone for

8   approval.

9          And for all of the reasons that Mr. Dugan laid out and

10  Mr. Jaffe laid out, that term is significant with this facility

11  and in these markets.  This is a risky facility.  This is one

12  that almost didn't come together.  We have a very complicated

13  and very large loan, and the lenders feel protected having a

14  shorter maturity date.  And that is something that, without

15  having, they would not have entered into this facility.  Not

16  only do they all go to their credit committees to get approval

17  based on that term, but when they stood up here in your court -

18  - and I think it was on January 7th, though maybe it bled into

19  the next day -- when they made their commitments here, that was

20  the term that was in the termsheet.

21         So the difficulty in going back to credit committees

22  is not one of just asking everybody to meet in the central

23  conference room and take a vote, can we change it; it's getting

24  them to agree that one of the foundational points that will

25  reduce the risk they're taking on with this agreement now be

1   changed, be taken out of the agreement.  The impossibility is

2   not one of practicalities; it's one of materiality.  And you

3   cannot, at this late date, affect a very tenuous, risky

4   agreement, by changing what is one of the most significant

5   provisions in that agreement.

6           You know, I also -- Mr. Huebner made another note I'll

7   make just very quickly about the evidence Mr. Weisfelner tried

8   to put in about this trading below par.  And I'm not going to -

9   - again, I'd be doing the same thing.  But I think if there had

10  been evidence put in and it was put in on the last couple of

11  weeks, we would see this is not a new phenomenon, this trading

12  below par.

13          You know, and then I think -- the other issue that,

14  you know, perhaps is a little bit confusing is -- and I've

15  addressed it, but just to make the point -- that the committee

16  has put a lot of emphasis on the testimony of Mr. Dugan as to

17  his understanding of how the December 15th date got into the

18  agreement.  You know, I think the testimony that he understood

19  this came from Access.  But they have completely ignored his

20  testimony, which I just talked about, about why it stayed in

21  the agreement.  It didn't stay in the agreement because it was

22  a relic that people just didn't choose to revisit; it stayed in

23  the agreement because of the significance of having a date that

24  was relatively short and would most ensure that these lenders

25  get repaid.

1          I think, real quickly, on Bank of New York, I'll make

2     a point that I think has been made by Mr. Huebner and Mr.

3     Ellenberg both, but it's important, so that's why I'll repeat

4     it.  The roll-up is not adequate protection for the senior

5     secured lenders.

6          You know, I think, Your Honor, the gallery here has

7     been largely quiet.  They've laughed at all the appropriate

8     jokes, but they've otherwise been quiet and attentive to these

9     proceedings.  I think we all heard the collective gasp of

10    incredulity from the gallery when Mr. Siegel suggested or

11    stated outright during his closing that the roll-up is a form

12    of adequate protection for the senior secured lenders.

13         THE COURT:  Pause, please, Ms. Martin.

14         If I'm going to be reluctant to rely even on counsel

15    putting forth facts to tell me things, when they haven't been

16    sworn, I -- I don't think it's helpful to talk about the

17    reaction of everybody in the gallery.  Make your next point,

18    please.

19         MS. MARTIN:  Well, the point I want to make is that

20    that's consistent with the evidence.  The roll-up has always

21    been compensation provided to the lenders for providing new

22    money to the company.  You know, we've heard there was no DIP

23    at all until the logjam was broken by this agreement that there

24    would be this dollar-for-dollar roll-up of new money and roll-

25    up loans.

1      Mr. Dugan testified yesterday that there would be no

2  DIP without the roll-up.  I think it was Mr. Bigman, and it may

3  have been one of the other company representatives who has

4  given the same testimony.  And Your Honor, I'll even agree with

5  ABN AMRO's objection on their description of this issue.  You

6  know, if you look at Paragraph 6 of their objection, they

7  state:

8           "The right to roll up senior facility pre-petition

9           secured loans was intended to be consideration for

10          pre-petition lenders which agreed to provide new money

11          DIP loans."

12     This is not adequate protection, and I think the point

13 just bears emphasizing.

14     And finally, again, I think Mr. Ellenberg dealt with

15 this this morning, but with respect to Bank of New York's

16 suggestion that there's no practical reason why they shouldn't

17 be allowed to participate in the roll-up -- and by the way, I

18 don't think we've heard anything about BNY's willingness to

19 participate in the new money part of the facility.

20     But Mr. Siegel's opinion that this would be doable

21 and, you know, maybe take a little work on the documents, but

22 not really be so impossible, really fails to reflect the

23 practical issues involved.  And I don't think I need to say it

24 more than the company has already said it:  It just can't

25 happen.  He pointed out there would be security law issues for

1   the company.

2        (Counsel confer.)

3        MS. MARTIN:  Yes.  Mr. Huebner noted yesterday, these

4   are public bondholders, and there's no credit agent who's going

5   to act for public bondholders.  So if this were to have

6   happened, it would have had to have been an entirely different

7   facility.  They just can't be worked into the current one.

8        Your Honor, I have no other points, unless you have

9   some further questions for me on these issues.

10       MS. SCHONHOLTZ:  May I briefly address the Court?

11       THE COURT:  Yes, Ms. Schonholtz.

12       MR. ELLENBERG:  Do I get a chance to speak, Your

13  Honor.

14       THE COURT:  Yes.  But what's the most sensible order

15  for me to take you folks, guys.

16       MR. ELLENBERG:  Well, I'm responding to her points, so

17  ...

18       MS. SCHONHOLTZ:  Whatever you prefer, Your Honor.

19       THE COURT:  You're going to respond to whatever Ms.

20  Schonholtz says?

21       MR. ELLENBERG:  I'm responding to what she's already

22  said, Your Honor.

23       THE COURT:  Well, why don't you --

24       MR. ELLENBERG:  Do you want me to go last?

25       THE COURT:  -- let Ms. Schonholtz speak, and then if

1  she says anything else you feel like you want to respond to,

2  you can deal with both.

3            MR. ELLENBERG:  Okay.

4      (Pause in proceedings.)

5            MS. SCHONHOLTZ:  Thank you, Your Honor.  Very briefly.

6            Ms. Martin says that this Court is not being asked to

7  approve the amendment and the corresponding provisions in the

8  DIP financing order.  But in fact, if you just look at the

9  amendment, Article 7 on Page 7 says in Section A:

10           "If this amendment is being executed in connection

11           with Section 6(c) of the orders," which would give it

12           authorization.

13           And B:

14           "This amendment is a DIP document, as such term is

15           defined in the orders."

16           So --

17           THE COURT:  Time out.  Where is that, Ms. Schonholtz?

18           MS. SCHONHOLTZ:  The amendment, Your Honor.

19           THE COURT:  Yeah, that's this, right?

20           MS. SCHONHOLTZ:  Yes.  Amendment No. 2, and Waiver to

21  Credit Agreement, Simpson Thacher, Draft 2/25/09.

22      (Pause in proceedings.)

23           THE COURT:  Yeah.  All right.  Now Page 7.  Section

24  which one?

25           MS. SCHONHOLTZ:  7.

1          THE COURT:  Oh, I see it.  All right.

2          MS. SCHONHOLTZ:  So I think, Your Honor, Ms. Martin

3    may be incorrect that you're not being authorized to approve

4    anything.

5          In addition, forty debtors have to sign this document

6    --

7          THE COURT:  Can I deal with that by -- if I otherwise

8    am satisfied that it doesn't raise a matter of material concern

9    from the estate's perspective, simply say so?

10         MS. SCHONHOLTZ:  You can, Your Honor, as long as it's

11   not given any effect for another reason, by order of this Court

12   today, for another reason --

13         THE COURT:  No, I'm talking mainly about saying what

14   I'm not ruling on, rather than adding things that I am ruling

15   on.

16         MS. SCHONHOLTZ:  Okay.  That would be maybe one way to

17   accommodate it, Your Honor.

18         Although I would point out that a similar provision

19   that we're objecting to is in the DIP financing order, so we

20   just have to be mindful it's in both places.  Forty debtors

21   have to sign this thing, Your Honor, and it is a closing

22   condition to the DIP financing.  So it's not as if it's a stray

23   document that has nothing to do with what you are being asked

24   to rule on today.

25         THE COURT:  You mean getting the requisite affirmative

1  vote of the pre-petition secured senior facility is a condition

2  to the debtors getting their money?

3        MS. SCHONHOLTZ:  Your Honor, yes, although I believe

4  they changed it last night to say that a certain amount of the

5  new money lenders and roll-up lenders.  But the delivery of

6  this amendment, with, I presume, the understanding that it has

7  some effect, is a closing condition to this DIP.

8        THE COURT:  You mean this estate is being held hostage

9  to you pre-petition lenders making your own private deal?

10       MS. SCHONHOLTZ:  We don't -- we are not trying to make

11  a private deal; we are just not wanting to be prejudiced by an

12  amendment that arguably requires a hundred percent vote that's

13  being asked to be blessed by something less indirectly through

14  this Court, without notice.  That is all.

15       Ms. Martin said that enough lenders have approved this

16  amendment to have okayed it.  Well, apparently, according to

17  the testimony yesterday, there are 600 or some number of

18  hundred pre-petition lenders.  So the fact that thirteen have

19  blessed it, that may pass it or not under a required lender

20  standard, but there is an argument it's a hundred percent issue

21  as to whether this can go into effect under the DIP -- under,

22  sorry, the pre-petition credit agreement.

23       Again, we are not asking you to do anything with this;

24  we want this issue to be set aside for another day on proper

25  notice in the appropriate forum.  It is the debtors and the

1   thirteen lenders who are putting this before you.

2         The debtors have not directly asked for this relief.

3   They haven't establish that anyone is entitled to have claims

4   dilution against another creditor, and there's no evidence in

5   the record at all that this is necessary.  And so, again, if

6   it's not going to happen, and if it's not that necessary, we

7   would ask that it be stricken from this order, and just that

8   provision of this amendment be stricken.

9         I also believe that Ms. Martin may have been

10  incorrect.  ABN -- in her first iteration, to be fair.  ABN is

11  on the hook, if you will, with the expanded indemnities.  It is

12  a DIP lender.  It has funded two-thirds of its committed amount

13  following the interim.  And whether we remain party to this

14  agreement, whether somebody actually shows up with more than

15  words to take us out remains to be seen, Your Honor; in part,

16  with respect to what happens here today.  So we're a DIP

17  lender, we're bound, we have a lot of money in this -- in this

18  estate already on a post-petition basis, as well as a pre-

19  petition basis.  Thank you, Your Honor.

20        THE COURT:  All right.  What do we have now?  Mr.

21  Weisfelner and -- oh, forgive me.  Mr. Ellenberg.

22        MR. ELLENBERG:  Thank you, Your Honor.

23        Let's talk about two things that ABN has not

24  mentioned, either in their papers or today:  They haven't

25  mentioned 364, they haven't mentioned <u>Farmland</u>.  I continue to

1    believe, Your Honor, this is an intercreditor dispute that has

2    nothing to do with the issues before this Court.

3         THE COURT:  Oh, I agree with you in the sense of my

4    approving or disapproving the DIP as a concept, Mr. Ellenberg.

5    But the problem, as I have been understanding it for the last

6    hour or so, is what kind of provisions I appropriately can or

7    should put into the orders that I enter, associated with

8    approval of the DIP, if I approve it.

9         MR. ELLENBERG:  Well, let's talk about that, Your

10   Honor.  Counsel just said that in the amendment, it says that

11   it is being approved pursuant to Section 6(c) of the order, and

12   that it will be a DIP document for purposes of the order.

13   Let's look at what Section 6(c) actually says, Your Honor.

14   It's on Page 22 of the binder.

15      (Pause in proceedings.)

16         THE COURT:  You're talking about the underlying --

17         MR. ELLENBERG:  I'm talking about the order, Your

18   Honor.

19         THE COURT:  Oh, the order.  Page 22 of the order?

20         MR. ELLENBERG:  Yes.  You'll see the (c) there, and

21   that's 6(c), which is the cross-reference from the agreement.

22   This is the only thing this Court is being asked to do with

23   respect to this document, and this is nothing but an

24   authorization-to-sign provision.

25         "In furtherance of the foregoing, and without further

1          approval of this Court, each debtor was, by the

2          interim order, and hereby is authorized and directed

3          to perform all tasks to make, execute, and deliver all

4          instruments and documents."

5          That's all this is, Your Honor.

6          And then (c)(1) says:

7          "The execution, delivery, and performance of the DIP

8          documents."

9          Okay.  So we are being authorized to sign this

10   amendment, period, end of story; that's all Your Honor is being

11   asked to do, authorize us to sign it.  You are not passing on

12   its contents, you are not approving any of the concepts, you

13   are saying nothing about any intercreditor issue that is

14   implicated by that document.

15          Now, Your Honor, let's look at the language that

16   counsel wanted to remove.  It's on Page 34.  As Mr. Huebner

17   says, the deletion starts, "For the avoidance of doubt."  This

18   is chicken soup.  All right?  It is not operative; it is merely

19   interpretive.

20          THE COURT:  Well, you can understand whether, if it's

21   chicken soup, I might be of a mind to go on a diet --

22      (Laughter.)

23          THE COURT:  -- and simply leave it out.  I mean, "for

24   the avoidance of doubt" suggests analytically --

25          MR. ELLENBERG:  Okay.

1       THE COURT:  -- that that's already the import of the

2   existing documents, which I assume is what you meant by

3   "chicken soup."

4       MR. ELLENBERG:  That's correct, Your Honor, and --

5       THE COURT:  And if I don't feel like taking a side in

6   that dispute -- and you can sense from the many questions I'm

7   asking, I am not inclined to take a side in the dispute,

8   subject to any further rights to be heard -- then the question

9   I've got to ask myself is:  Why should I say it, in what, in

10  essence, is an order coming out of my mouth?

11      MR. ELLENBERG:  Well, Your Honor, what comes before,

12  which is part of 6(c), has not been objected to.  All right?

13  And it says:

14          "Nothing contained herein shall affect the obligations

15          of non-debtor affiliates of the debtors with respect

16          to any guarantees provided by such non-debtor

17          affiliates under senior pre-petition loan documents or

18          with respect to the senior facility pre-petition

19          security interest."

20      Nobody objects to that language; it's perfectly

21  appropriate language.  All it's saying is, you're not affecting

22  anything having to do with the obligations of non-debtors.

23  Everyone agrees with that.

24      Again, the rest of this is interpretive.  Why the

25  lenders want this in here, Your Honor, it's not our request, we

1  didn't ask to have it put in there.  The lenders have asked to

2  put it in there.  For whatever reason, it makes them feel more

3  comfortable.  But the point is what she is asking to be removed

4  is something that starts "for the avoidance of doubt."

5        What is taking sides, and what is much more

6  problematic, is what counsel is asking to be inserted; the

7  comments -- the insertions do try to prejudge the intercreditor

8  dispute, and that's a problem, I would think.  I don't know

9  what business the Court would have making those insertions.

10       Let me be clear, Your Honor.  From the day we agreed

11  to this roll-up, we have made clear that the intercreditor

12  issues resulting from this roll-up -- and there are many, going

13  way beyond the one ABN has pointed out -- are not the business

14  of this Court.  There was an original request to have the Court

15  approve the roll-up, make findings about whether it's in

16  compliance with the indenture or not in compliance with the

17  indenture.  We refused all of that.  It is not properly within

18  the province of this Court because it has nothing to do with

19  the debtor; it is solely intercreditor.  We've worked very hard

20  to keep those issues out of this case and out of this order.

21  The additions that are requested here do exactly the opposite.

22       So again, Your Honor, I don't care if the language on

23  Page 34 is deleted or not, except that I need the lenders to

24  lend.  And if this is what they need to lend, then I need it.

25  But I must say, it starts with "for the avoidance of doubt."

1   Thank you, Your Honor.

2           MS. SCHONHOLTZ:  I'm going to take care of one of your

3   problems, if I may.  The intention was not to prejudge

4   intercreditor disputes with that language.  We'd be fine if the

5   order said "without prejudice to all rights with respect to

6   those issues later."  So we're not aiming to have you decide

7   any intercreditor dispute.

8           And Mr. Ellenberg did not point the Court to Section

9   7(b) of an amendment that says the amendment is a DIP document.

10  And if you look at Page 3 of the binder we gave you, Your

11  Honor, where DIP documents are defined, that's the important

12  one.

13          "Authorization for the Debtors.  Debtors are being

14          authorized to execute and deliver all final

15          documentation and to perform such other and further

16          acts."

17          So it is being blessed as a DIP document under 7(b).

18  Thank you, Your Honor.

19          THE COURT:  All right.  Let's get back to the rights I

20  gave Mr. Weisfelner and Mr. Siegel to speak further.

21          MR. WEISFELNER:  Your Honor, I'd like the ability to

22  speak last.  If we're going to go through all these different

23  parochial squabbles, I want to be able to represent the

24  interests of all of the general unsecured creditors in one

25  focused position.

1      THE COURT:  I guess I don't care.  Mr. Siegel, come on

2  up.

3      I did tell you, Mr. Weisfelner, that if you say

4  anything even as you put it last, I'm going to give your

5  opponents a chance for surrebuttal.

6      Go ahead, Mr. Siegel.

7      MR. SIEGEL:  Your Honor, I won't be long.

8      THE COURT:  Please don't make it long.

9      MR. SIEGEL:  Basically, I just want to take us back to

10  what exactly it is the Bank of New York is asking for and what

11  we think is going on.  This is actually a very straightforward

12  request.  There is $475 million of debt that was secured as a

13  result of the equal and ratable provisions in those bonds as

14  part of the 2007 transaction.  As a consequence of that, those

15  unsecured bonds became subject to $12.2 billion worth of debt

16  that was placed alongside of it.  Those bonds had a right to

17  seek marshaling on the day of the filing of the petition.

18      Based upon the debtors' numbers, if marshaling was

19  effectuated, those bonds would be paid in full, and there would

20  be a substantial excess available to make sure that they were

21  paid in full, even if there was a decline in value of the

22  Lyondell assets.  That's where we were on the day of the

23  filing.

24      What the statute says is we're entitled to be

25  adequately protected for how that position is changed.  So what

1     happens?  What happens is there is a DIP facility placed on the

2     -- as my partner puts it -- the Lyondell empire.  And what we

3     say in Mr. NaJane's affidavit is absent any adequate protection

4     at all, this is what has happened to our position.  Then we

5     say, how should the Court protect us for that position.

6           When Mr. Ellenberg says, we want to have it both ways,

7     unfortunately, we know we can't it both ways.  So what they are

8     identifying as us wanting to have both ways is us dealing with

9     the practical realities of the motion before this Court.

10     Whether we think there should have been a separate DIP done or

11     not is irrelevant.  There was not a separate DIP done.  We

12     can't unscramble that egg.  What we are asking you to do, Your

13     Honor, is to give us adequate protection for that change in

14     interest which includes that scrambled egg.  That's what's

15     going on here.

16           So what we say is the way they have done this is they

17     have taken this position that we have and they have taken us

18     and they have given us a claim to the community of assets of

19     the empire.  Well, the community of assets of the empire also

20     have very substantial borrowing needs.  The debtor has

21     attempted to explain what the borrowing needs of the entity

22     are.  Frankly, Your Honor, I am very confused by all the

23     debtors' explanations.  I think I heard Mr. Huebner yesterday

24     and Mr. Ellenberg yesterday saying that some of that DIP draw-

25     down was attributable to the refinancing of the asset-based

1   lending.  I think Your Honor pointed out that maybe some of it

2   was going out to foreign entities.  I don't think we have any

3   good evidence as to what the actual borrowing needs of LCC and

4   Equistar are.  Excuse me.  So we're uncertain about that.

5          But I do think that what we're seeing is we're not

6   seeing a lot of cash flow going out -- I'm sorry, cash flow

7   coming in when we look at that line of the equation on the five

8   weeks, at least.  The rest of that thirteen-week is

9   speculative.

10         So all we are saying to you, Your Honor, and adequate

11  protection, as I'm sure Your Honor knows, comes from the Fifth

12  Amendment of the Constitution for taking.  Something is being

13  taken; we need to get something back.  We're saying we need to

14  be treated fairly for that.

15         Only one other point, and then I'll sit down.  That

16  point is about the roll-up.  The roll-up is a very confusing

17  issue.  The reason it's such a confusing issue is it comes in

18  three stages.  There is the initial roll-up.  The initial roll-

19  up is a provision in the original lending by the original

20  lenders who said they wouldn't do the lending without the roll-

21  up.  That is not adequate protection.

22         Then there is the second stage, the stage when Access

23  was kicked out and the new lenders came in.  And those people

24  committed, and they asked for a roll-up.  That is also not

25  adequate protection.  But then what did they do?  Then they

1  said, in addition to that, we will give senior lenders who want

2  to the right to buy into the DIP and thereby get the roll-up.

3  That was what the adequate protection is.

4           Thank you, Your Honor.

5           THE COURT:  All right.  Mr. Rosenbloom?

6           MR. ROSENBLOOM:  I thank you, Your Honor.  Lewis

7  Rosenbloom, Dewey & LeBoeuf, on behalf of Law Debenture as

8  successor trustee.  I appreciate the Court's indulgence.  And I

9  will need the Court's admonishment to be brief.  That said, I'd

10 like to think, at least with respect to matters of brevity, my

11 record here is unassailable.

12          THE COURT:  Compared to your colleagues, without a

13 doubt.

14     (Laughter.)

15          MR. ROSENBLOOM:  That said, Your Honor, I wasn't quite

16 sure how to take Mr. Huebner's remarks.  Would seem to suggest

17 that I was a master of manipulation.  But when Mr. Ellenberg

18 stood up and described me as a weasel, I decided Mr. Huebner's

19 remarks would be taken as a compliment.  I wish he were here.

20     (Laughter.)

21          MR. ROSENBLOOM:  Let me try it one last time.

22          Yesterday, I said that there are two operative

23 provisions.  These estates have not been substantively

24 consolidated, and we are not seeking to enforce the indenture

25 against the debtors.  We are seeking to enforce it against the

1   lenders.

2          What the Millennium debtors have granted to the

3   lenders is described as a limited guarantee capped at fifteen

4   percent as set forth in the indenture of consolidated total net

5   worth, or net asset value.  So it is our position first that

6   adequate protection in whatever form with respect to the pre-

7   petition loans must be intended to protect that limited

8   guarantee which is the only right the pre-petition lenders have

9   under the pre-petition loan documents against the Millennium

10  debtors.

11         By way of example, if the amount of the guaranty,

12  which is fixed under the indenture, arose, the difference

13  between the original amount and its eroded value can be

14  provided in the form of adequate protection.  The pre-petition

15  lenders are obliged to live with the terms of the indenture

16  which were entered into prior to the execution and delivery of

17  the pre-petition notes, and by the express terms and condition

18  of those loan agreements was accepted and adopted as binding on

19  the pre-petition lenders.

20         Next, with respect to the roll-up loan, as Mr. Siegel

21  said, it's very complicated.  I'm not sure I completely

22  understand it.  It does have multiple components.  If it's not

23  adequate protection for the pre-petition loans, then our

24  argument that they're capped by the pre-petition interest, the

25  limited guaranty, that would fall.

1    It does have a maturity over one year, so maybe it's

2  funded debt as provided under the indenture, or, as it's been

3  described, it's really akin to a DIP facility in which case our

4  final point, and I think the creditors' committee has made the

5  point, Bank of New York has made the point; each separate

6  debtor unless and until substantive consolidation is mandated

7  by this Court, each separate debtor can only be subjected to

8  liability for the benefit derived by that separate debtor's

9  estate.  So whether it's the DIP loan or the roll-over loan,

10  the Millennium debtor estate should only be subjected to claims

11  equal to the value provided to those estates.  If the

12  Millennium debtors are net borrowers, then clearly the lenders,

13  the DIP lenders are entitled to whatever rights and interests

14  have been granted to them.  But if the Millennium debtors are

15  net contributors, as we believe they've been, not net

16  borrowers, then their estate should not be subjected to the

17  billions of dollars of debt both in the form of rollover and in

18  the form of new money DIP simply because they're affiliates.

19    Your Honor, we will leave to the Court's review and

20  good judgment the indenture and the various loan agreements

21  which are made expressly subject to that indenture to determine

22  which of these master manipulators is right.  I believe, Your

23  Honor, that any result other than I have suggested is not only

24  illegal, it borders on, as Mr. Siegel said, an unconstitutional

25  taking of our estate's property and, therefore, is harsh, is

1  oppressive, and is punitive.

2          Thank you, Your Honor.

3          THE COURT:  Thank you.

4          Mr. Weisfelner?

5          MR. WEISFELNER:  Thank you, Your Honor.  Again, for

6  the record, Edward Weisfelner of Brown Rudnick for the Official

7  Committee of Unsecured Creditors.

8          As I think Your Honor may have been able to discern

9  from our arguments, our issues are narrow and primarily revolve

10 around the maturity and the milestones.  And, Your Honor, I

11 don't know if Mr. Dugan is still in the courtroom, but if he

12 is, he can't be getting paid enough from his institution.

13     (Laughter.)

14         THE COURT:  Given the compensation in that community,

15 I suspect he nevertheless is.

16     (Laughter.)

17         MR. WEISFELNER:  I don't know if that's pre or post-

18 bonus.

19         My point is this:  You had his counsel, and perhaps

20 more importantly you had debtors' counsel, try and tell you

21 that you can't rely on Dugan's testimony because he missed the

22 first two days of the marathon meetings.  And I think what Mr.

23 Ellenberg said was that he thought that maybe the guy was,

24 quote, "cloudy."

25         Here's what Dugan said in response to the question of,

1  why is there a December 15, 2009 maturity date.  The answer:

2  Because that was in the initial request from Access.

3        Now, if you go on to take a look at the Jaffe

4  evidence, remember this is the guy that bam, bam, bam, hit it

5  out of the park on the issue of maturity.  Maybe I added one

6  "bam" too many.  Maybe it was just bam, bam, he hit it out of

7  the park.

8        Well, here's Jaffe, the guy that we were afraid to

9  call on the whole issue of maturity:

10       "Question --" and this is from Page 27 of his

11  deposition, which is in the record:

12       "Question:  I want to talk about --"

13       THE COURT:  Give me a second, please.

14       MR. WEISFELNER:  Certainly.

15       THE COURT:  Go ahead.

16       MR. WEISFELNER:  "Question --" and I'm starting on

17  Line 15 -- "I want to talk about where the 12/15 date came

18  from.  Who specifically, for example, proposed December 15th,

19  '09 as the maturity date?

20       "Answer:  I don't know."

21       On Page 30, starting on Line 18, the question is:

22       "And so what was the genesis of the one-year proposal?

23       "Answer:  The genesis was we thought it was a market

24  term.  We also had very little long-term visibility into the

25  company."

1          Your Honor, on Page 39 --

2          MS. MARTIN:  Your Honor, I'm not -- I really hesitate

3  to interrupt, but I just note that the committee did not do

4  designations from Mr. Dugan's deposition.

5          MR. WEISFELNER:  Of course we did.

6          MR. DOLAN:  Quite to the contrary, Your Honor.

7          MR. WEISFELNER:  You haven't seen this document

8  before?

9          THE COURT:  I --

10         MS. MARTIN:  Your Honor, I won't fight about it.  It

11 was attached an exhibit.  We fought about whether those were

12 depositions to attach as an exhibit, but I don't want to

13 interrupt his argument.  I'm sorry, Your Honor.

14         THE COURT:  I could swear that as part of my pretrial

15 review I did review committee designations, and I thought we

16 were going to take the entirety of this under Rule 32, anyway.

17         MR. WEISFELNER:  And, Your Honor, I apologize for

18 addressing counsel.  It just -- it was a little disconcerting

19 to be told that we didn't file a document that I was reading

20 from.

21         MR. FRIEDMAN:  Your Honor, it's Mr. Friedman.  The --

22 Mr. Weisfelner's firm did designate yesterday by agreement Mr.

23 Dugan's -- I'm sorry, Mr. Jaffe's deposition testimony.

24         THE COURT:  Wasn't there even a piece of paper I saw

25 that was called, "Designations"?

1        MR. FRIEDMAN:  Originally, Your Honor, our firm

2   designated deposition testimony, and then yesterday, by

3   agreement, the committee did as well.

4        THE COURT:  All right.  The substantive issue, then,

5   is behind us.  I am going to ask that we try to maintain the

6   decorum that I kind of like to have in this courtroom and that

7   we not turn on each other, and that comments be addressed

8   solely to me.

9        Go on, Mr. Weisfelner.

10       MR. WEISFELNER:  And, Your Honor, for that I apologize

11  to the Court and to Ms. Martin.

12       I'm on Page 36, and I won't be much longer in terms of

13  running through these quotes.  I just think they're critically

14  important for Your Honor to be able to discern from the record

15  and not from what I characterize as Mr. Huebner's testimony,

16  but from the record what Mr. Jaffe, who we were afraid to call

17  to the stand because he boom, boom, boom, hit it out of the

18  park.

19       Question, Page 36, Line 19:

20       "Did any of the lenders, to the best of your

21  knowledge, ever express to the debtors that a one-year maturity

22  date was necessary to ensure that they would be repaid?

23       "Answer:  I don't believe so, no."

24       Page 37, Line 8:

25       "Did the debtors ever broach to the lenders a

1  mechanism or framework by which the maturity date could be

2  extended?

3        "Answer:  I do not believe so."

4        Almost done.  Two more references.

5        You know, according to Mr. Huebner, Mr. Jaffe is an

6  expert in the area of DIP financing.  I don't know where he got

7  that from other than his own head.  It may be true, but it's

8  not part of the record.

9        In fact, on Page 39, when Mr. Jaffe was asked in

10  connection with his reference that he thought that the term was

11  "market," Line 20:

12        "And you say, quote, 'it was a market term.'  Can you

13  tell me in -- first of all, what did you mean by that?

14        "Answer:  I think that in today's credit environment,

15  you know, DIP tenures and maturities are shortened from where

16  they were four or five years ago, particularly after the

17  bankruptcy law changed, and we felt that that was a reasonable

18  market term.

19        "Question:  So have you seen any other one-year

20  maturity dates in the DIP?

21        "Answer:  I don't have any off the top of my head."

22        And then, finally, Your Honor, question beginning on

23  Page 42 from my partner to Mr. Jaffe:

24        "I don't want to put too fine a point on the one-year

25  maturity date.  I want to again follow up on that.  I

1  understand your testimony to be that in your experience you

2  don't recall seeing another facility with a one-year maturity

3  date.  Is that correct?

4         "Answer:  No.  I said I can't name one off the top of

5  my head."

6         Now --

7         THE COURT:  Hang on, Mr. Weisfelner.  The pagination

8  on my copy seems to be different than from what you're reading

9  from.  What was the page that your transcript showed?

10        MR. WEISFELNER:  On the last citation, Your Honor?

11        THE COURT:  Yes.

12        MR. WEISFELNER:  It began at Page 42, Line 21 --

13        THE COURT:  All right.  I --

14        MR. WEISFELNER:  -- and ran through Page 43, Line 4.

15        THE COURT:  All right.  I think I found it in a

16 different place on mine.

17        MR. MOSKOWITZ:  Your Honor, I can clarify that after.

18 It's -- you may be looking at the rough transcript as opposed -

19 -

20        THE COURT:  Yeah.

21        MR. MOSKOWITZ:  Okay.

22        THE COURT:  Are there any material differences between

23 the rough and final?  Because I don't have a final that I'm

24 aware of.

25        MR. WEISFELNER:  Your Honor, I can represent that

1   there are not.

2          MR. MOSKOWITZ:  I agree, Your Honor.  This is Elliot

3   Moskowitz from Davis Polk for Citibank.

4          THE COURT:  Okay.

5          MR. WEISFELNER:  Your Honor, again, I want to focus on

6   the maturity date.  And I must tell you that, you know, we

7   still, sitting here today, have difficulty balancing the two

8   different lines of testimony that we've generally heard.  And I

9   think they're both in the record.

10          From the company, we understand that maturity was a

11  critical issue and that there was continuous push-back on that

12  and every other term.  From the agents' testimony, we're told

13  that it was locked in early, regardless of whether it was an

14  Access term or not, but it was locked in early to the point

15  where because Dugan missed the first two meetings, he had no

16  basis to understand what the predicate was for December 15th.

17  But you know what?  By the time he got to the meetings, before

18  year-end, and certainly by the time he was selected as agent,

19  sometime during the evening of the interim facility, he was

20  there for every single meeting.  And what he told us was the

21  date was there, it was a material term, it was part of the term

22  sheet, and he can't recall the debtor ever pushing back on it.

23  And that troubles us.

24          And on the one hand, our debtor tells us, we pushed

25  hard on every material term, and on the other hand, the agents,

1  both Citibank and UBS, can't recall the push-back.  What they

2  do tell you they recall is that it was communicated to them

3  that the creditors' committee wanted them to consider, a la

4  Smurfit Stone and Aleris, provisions where they'd extend the

5  maturity for a cash payment.   That's what they recall.

6       And that provision was rejected, according to the

7  testimony, because it was too late.  It was a material term

8  already built into the documentation.  And, Your Honor, here's

9  what's wrong with that as a matter of policy.  And I took

10  special interest in Ms. Martin's argument in this regard, and

11  she was talking about the practicality of getting a material

12  provision changed.

13       If she's right, then you don't need a creditors'

14  committee.  Forget about them.  Run into court on an interim

15  financing, which is typically the first day of the case, get a

16  provision stuck in a term sheet or placed in a term sheet with

17  lots of pre-thought associated with it -- not the case we have

18  here -- one that's subsequently discussed on the merits in

19  terms of what it meant in terms of risk/reward -- not what we

20  had here -- and the mere fact that it's in a term sheet, is a

21  material term, comes before the Court on an interim means; we

22  don't care what a creditors' committee has to say about this

23  afterwards.  People who negotiate post-petition financing

24  understand or are construed to have understood to their

25  detriment that they could come up with as many material terms

1   as they want.  The Court can approve it on an interim financing

2   basis, but that the Court does that, as this Court did, without

3   prejudice to the rights of general unsecured creditors speaking

4   through an official creditors' committee that gets appointed

5   after the fact.  How dare they throughout all of their

6   testimony, the only record they've established, tell you that

7   the rationale for the maturity date -- and, Your Honor, I

8   challenge them, either the debtor or the lenders to find one

9   iota of proof in any of the trial testimony so far that there

10  was a considered reasoned judgment made about the maturity date

11  or the extension of the maturity date, as requested by the

12  committee.  I mean, what function did they think the committee

13  was ultimately going to play?

14          The testimony is it was too late by then.  Why was it

15  too late?  It was locked into the term sheet.  That was a

16  material term.

17          Your Honor, there's a reason, at least in my opinion,

18  that UBS became the agent on that fateful evening.  I think it

19  has a lot to do with the character of the participants, the

20  other members of the group of fourteen.  And if you take ABN

21  AMRO out, as I guess they're desperate to get out now because

22  of the way they think they've been, to use their language,

23  unfairly and unreasonably treated at the very end of this

24  process, they're being unfairly and unreasonably treated from

25  their perspective not by the debtor, certainly not by the

1  general unsecured creditors of the estate, but by part of this

2  group of funds that we spent so much time dealing with and

3  negotiating over, not in terms of what's in the best interests

4  of the debtor and its estate vis-a-vis the lenders, not with a

5  lot of attention to what's the maturity, what's the amount that

6  we're borrowing, what are the covenants.  The attention and

7  focus and the time delay has been on intercreditor issues, how

8  does the roll-up work, how does the loan get effectuated,

9  syndicated, sold out to other creditors that are interested in

10  the loan.

11          And, by the way, again, before I forget, it is a

12  matter of evidence, you heard testimony -- I can't remember

13  from what witness -- about this DIP facility trading below par.

14  And then you heard a lot of what I think was lawyers' testimony

15  from the podium about trading.  I want to remind Your Honor

16  that, likewise, as a matter of evidence, we have in the Maxwell

17  declaration, which again, Your Honor, was not contested in any

18  way, shape or form, that at Page 6, Paragraph 18, last sentence

19  notes:

20          "The highly attractive pricing and terms ceded on the

21  DIP facility relative to the current market is substantiated by

22  recent market bids over par for the DIP facility."

23          Bam, bam, bam, he knocked it out of the park, and they

24  never called him.

25          Your Honor, I also want to focus on the whole notion

1  that we've got to compare these terms to a marketplace, this

2  illusive concept of a market.  And you were told by Mr. Huebner

3  about the Tronox case.  And he picked it because it's a 2009

4  Southern District of New York case -- I think the judge is

5  Judge Gonzalez -- that approved a three-hundred-and-sixty-four-

6  day term DIP loan with no built-in extensions of maturity.  And

7  you were told that like LyondellBasell, Tronox is a chemical

8  company, and that like LyondellBasell, Tronox has European

9  operations.  Unlike LyondellBasell, the DIP facility in Tronox

10 is all of $125 million.  It's a dramatically smaller company.

11 Revenues of $1.7 billion compared to this debtor, revenues of

12 forty-two-and-a-half billion dollars.  Total indebtedness, 700

13 million compared to 24 billion.  Eighteen hundred employees

14 versus 18,000 employees.

15        My point is simply this:  For purposes that serve

16 them, the lenders and the debtors want to talk to you about how

17 the terms of this facility compares to a so-called market.

18 When it's inconvenient for them, they argue to you that there

19 is no market, we made this market.  The reality is they're

20 right, they did make this market.  The economic terms they

21 created in terms of what the cost of the DIP facility is.  But

22 to suggest that we shouldn't have a mechanism for extending the

23 maturity more than the eleven and a half months originally

24 proposed, and I think we're down to nine and a half months if

25 it gets approved today, by comparing it to any other DIP

1    facility is literally comparing apples to oranges.

2           Judge, there is only -- and I want to wrap this up and

3    come down to my final point.  You heard from Mr. Ellenberg the

4    argument that we're going to make it from a timing perspective,

5    don't worry about it, you know, we're going to do the plan, the

6    disclosure statement, the business plan development, it's all

7    going to happen in enough time to get us to a December 1st

8    confirmation hearing.  And with all due respect to Mr. Huebner,

9    frankly, the changes that were made last night are, from my

10   perspective, more onerous and burdensome, except to clarify

11   that all you got to do is start the hearing.  That's all you

12   have to do.

13          The debtors are now under an obligation to start the

14   hearing with a reasonable belief that they can get the relief

15   on that date.  I mean, it's a whole other layer of complication

16   before the debtors can get beyond December 1.

17          Here's my point.  You know, the debtors support their

18   proposition that they can get this case done anywhere within

19   the unreasonable time frames being suggested.  Why?  Because

20   you're to understand this is a balance sheet problem.  You got

21   it?  Mr. Ellenberg said, we've got a massive interest burden,

22   and that's the main problem to fix, that somehow fixing a

23   balance sheet because you have too much interest, that's a snap

24   and a walk in the park.

25          Well, Your Honor, let me suggest this.  The committee

1   has retained, subject to Your Honor's approval, Chemical

2   Markets Associates.  We assert that they are the premiere party

3   in terms of being able to assist companies, their creditors,

4   their shareholders with analyzing investments in the chemical

5   field.  So important are they, in fact, that our debtors are

6   subscribers to their services, as is, I would venture to guess,

7   a lot of our lender constituency and virtually all of our

8   competitors.

9        Likewise, we have retained through CMAI an industry

10  expert in the petro -- in the refining area to supplement those

11  services of CMAI that may not spill over into the refining

12  area.  What the committee's experts are undertaking now in

13  connection with the perceived valuation fight is a process that

14  they tell us will take them potentially months to complete.

15  And that is understanding on a fundamental facility-by-facility

16  basis what is the optimum operating profile of all of those

17  facilities because unless and until you can understand the

18  maximum operating output of those facilities, unless you can

19  understand the margins, and unless you can understand the

20  extent to which the modeling that this debtor does is or isn't

21  sophisticated enough to run these assets, you can't even begin

22  to figure out how to do a financial restructuring.

23       A financial restructuring is more than just saying,

24  well, I've got too much debt on my balance sheet, by the way,

25  debt that was put on less than a year ago by presumably very

1  sophisticated lenders.  This, Your Honor, make no mistake about

2  it, is ultimately a combination of an operational overhaul with

3  attendant financial implications.  I know the lenders, the

4  senior lenders would love to minimize the issue to a balance

5  sheet test because if that's all it is, then we might as well

6  go to a confirmation hearing tomorrow where they tell you that

7  we've got to lop off the substantial interest burden, convert

8  their debt into equity, adios everybody else, nice to see you.

9       And, Your Honor, that's at the heart of the maturity

10  issue and that's at the heart of the milestone issue.  It's

11  about having an opportunity for the unsecured creditors to

12  present their case, that for some $36 billion worth of value

13  that makes our equity owner Access in the money, that's got to

14  be proven.

15       Now, the difference between Access and the general

16  unsecured creditor constituency is Access has the opportunity

17  through its own buying power to effect a result through the

18  writing of a check.  We only have the opportunity to effect the

19  result through the indulgence of this Court and the preparation

20  of competent evidence.

21       To approve a DIP facility of this magnitude, given

22  what happened to this company as quickly as it happened, with

23  the milestones that are being implicated and with the interim

24  effect the management change issues have on our management is

25  the functional equivalent of taking the unsecured creditors'

1 processionals and requiring them to tie hands behind their back

2 for the balance of the case.  It ties Your Honor's hands, as

3 we've indicated before, in terms of considering exclusivity

4 extensions, in terms of thinking about the reasonableness of

5 notice on things like disclosure statements.

6          Your Honor, just about every other party that came to

7 this podium concerned about this DIP financing and its

8 implications will have another bite at the apple.  They will

9 all of them be able to argue their legal issues at or about a

10 confirmation hearing if we ever get to one.  They'll all be

11 able to argue about the implications for their clients based on

12 intercreditor or interestate payments and whether payments to

13 foreign creditors were adequately secured or not, or whether

14 there was dilution or diminution in value.  Boy, I hope for the

15 day that there is enough time and effort to go through those

16 issues.  We've got one shot, "we" being the general unsecured

17 creditor constituency, one shot.  And that's to tell these

18 lenders, again not your typical banks, not that there's

19 anything wrong with being a hedge fund.  Some of my friends run

20 hedge funds.  But tell these guys that they're not capturing

21 the value that could be available over the repayment of their

22 debt by in the largest single DIP ever considered by a

23 Bankruptcy Court anywhere they want an eleven-month maturity.

24 Why?  Because it's a fundamental term of the deal.  When was it

25 put in place?  Not too sure, it may have been come from Access.

1  What kind of push-back did you get from the debtor?  Not

2  anything we can generally remember.  Did you know that the

3  committee wanted you to extend it?  Yeah, they wanted to be

4  able to pay for an extension.  What did you do about that?

5  Didn't feel like budging.

6      I think the characterization I got from debtors'

7  counsel was on certain issues they were intransigent.  On

8  certain other issues they were being petty.  Well, I don't know

9  that they're entitled to be intransigent and petty in these

10 circumstances, given the benefits that they're asking Your

11 Honor for:  Roll-up, 506(c) waiver, payment of post-petition

12 interest on a cash-pay basis with a negative arbitrage to the

13 estate.  The benefits just keep on rolling.  They got to make a

14 concession, Judge.  And the concession they have to make is on

15 reasonable capability to extend the maturity because that will

16 bring them to the table.  That will afford the general

17 unsecured creditors the opportunity to deal with issues and

18 attempt to resolve them consensually.  If there's a deadline,

19 we're out of business.  And if there's an unreasonable

20 deadline, we've really done something untoward to the process.

21     And for all those reasons, Your Honor, and again,

22 because they can't tell you that something is inviolate because

23 it was conceived and agreed to before a creditors' committee

24 was even formed, that can't be the reason.  But that's what

25 you're being told.  It is what it is because it got approved

1    before the trappings of this Court ever got involved.  And in

2    this regard, Your Honor, the statutory committee does really

3    serve as a trapping of the Court in an effort to protect the

4    process.

5          At the end of the day, let's look at it.  Our -- is

6    the DIP likely to get repaid?  Yes.  That's the debtors'

7    evidence.  Likely to get paid with, as Mr. Huebner indicated,

8    billions and billions of dollars worth of cushion.  Are the

9    senior secured credit facility holders likely to get repaid in

10   this case, either through the roll-up or through the non-roll-

11   up?  The answer is yes.  They've got billions and billions of

12   dollars worth of cushion.

13         Given the billions and billions of dollars of cushion,

14   the fact that we're being charged twenty percent all in on this

15   facility, that a good portion of it is going to pay pre-

16   petition debt at a huge negative arbitrage, given the other

17   protective provisions that the lenders have sought, no one is

18   taking away from the debtor the fact that this was a, quote,

19   "Herculean effort," and it's a, quote, "miracle that we're

20   here."  Well, the miracle became a lot easier once the debtor

21   conceded the roll-up issue.

22         Enough is enough.  You can't turn over control of the

23   case to the lender group of fourteen, thirteen, or however many

24   funds we're talking about this early in the process, especially

25   when Your Honor knows from experience that you can't get to

1   confirmation by December 1st, no matter what the debtor tells

2   you, and that worse than the maturity date, you can't achieve

3   the milestones.  You know it sitting here today in your heart

4   of hearts; you know it in your head.  How can you approve an

5   order that contemplates, suggests that that's doable?  There is

6   both the need for propriety and the need for the appearance of

7   propriety.  It's a joke.  And Your Honor shouldn't lend your

8   imprimatur to a scheme that has the suggestion that one of the

9   largest companies ever to seek protection before this or any

10  other Bankruptcy Court is going to hit milestones in two or

11  three months.  It's comical.

12          And, Your Honor, for those reasons, we would

13  respectfully request that Your Honor condition approval of this

14  loan on, among other things, a change in the maturity date and

15  a change in the milestones.

16          Thank you, Judge.

17          THE COURT:  All right.  Have I heard everything now?

18  Mr. Ellenberg, is there any desire to surreply?

19          MR. ELLENBERG:  May we give a brief response, Your

20  Honor?

21          THE COURT:  Yes.

22          MR. ELLENBERG:  Your Honor, could we have a short

23  recess?  I would like to --

24          THE COURT:  Ten minutes.

25          MR. ELLENBERG:  -- perhaps just have a single

1  response.

2       Thank you.

3    (Recess taken at 12:37 p.m.)

4    (Proceedings resume at 12:44 p.m.)

5       THE COURT:  Have seats.

6       Mr. Ellenberg.

7       MR. ELLENBERG:  If the Court please, Mark Ellenberg on

8  behalf of the debtors, Your Honor.  I will be responding on

9  behalf of the debtors and the lenders with respect to the final

10 DIP closings that we just heard from the committee, Bank of New

11 York and Law Debenture.

12      Your Honor, with respect to the Bank of New York, we

13 agree that Bank of New York is entitled to adequate protection.

14 We are giving them adequate protection in the form of an equity

15 cushion.

16      What I think I heard Mr. Siegel saying is that he has

17 an equity cushion now, and because he's being primed, the

18 equity cushion is being -- getting smaller, and he needs to be

19 compensated for that.  And that, of course, is not the law.  By

20 definition, any time you prime a lender, a pre-petition lender

21 who has an equity cushion, the equity cushion is going to get

22 smaller, by definition.  The question is, how big is the

23 remaining cushion and does it meet the minimum standard that

24 the cases have required.

25      So, here, we have a nineteen-percent cushion.  It

1   doubles the standard in the cases, and that is his adequate

2   protection under the Bankruptcy Code and the United States

3   Constitution.

4          Again, Mr. Siegel said he was confused as to whether

5   there was evidence as to the borrowing needs of LCC and

6   Equistar.  Your Honor, there was specific, clear evidence on

7   that point as to both of those companies.  Mr. Bigman testified

8   about it, there were exhibits on it, I mentioned the numbers

9   already; there is no confusion about that.  It was clear and it

10  was specific to those entities.

11         With respect to Law Debenture, Your Honor, I think Mr.

12  Rosenbloom suggested that it is unfair to his clients to be

13  burdened by this DIP since they are not getting any benefit

14  from it.  Number one, Your Honor, Millennium would be dead

15  without this DIP.  If there is no DIP loan, there is no

16  Millennium, they are in liquidation, just like every other

17  company that is in Chapter 11 before you now.

18         Moreover, Your Honor, Millennium owns twenty-nine

19  percent of Equistar.  It's one of their primary assets.

20         Finally, Your Honor, Law Debenture suggested that

21  adequate protection must be provided because they're losing

22  their limited guarantee.  Well, Your Honor, they are unsecured

23  creditors.  They are not entitled to adequate protection.

24         Finally, Your Honor, with respect to the committee,

25  only a few things the committee said require a response.

1  First, Your Honor, we've heard way too much already about the

2  maturity date, but counsel was quite selective in his view of

3  the record.  For example, counsel said there was no evidence

4  from any witness that the debtors ever pushed back.  He was

5  shocked that we had said it when no witness would support it.

6  Well, as one example, I'm reading from Paragraph 5 of Mr.

7  Jaffe's declaration where he's actually quoting himself from

8  his deposition.  And he says:

9          "The debtors' financial company Evercore pushed back

10             on the one-year maturity date initially, but I think

11             the lenders all very quickly said, look, due to what I

12             said before, a lack of visibility, we think this is

13             the norm.  We pushed back on that, and said, it's

14             going to be one year.  And I think there were bigger

15             issues to handle at the time.  The company needed to

16             raise 3 billion."

17         So there was some push-back from -- my recollection is

18  from Evercore, but the lenders quickly said, we're not -- we

19  weren't going to do something longer than a year.  So there is

20  evidence of push-back, Your Honor.  And, again, this was a very

21  compressed negotiation period during which a lot of things had

22  to get accomplished.  But, clearly, there is evidence of push-

23  back.

24         Similarly, Your Honor, counsel questioned Mr.

25  Huebner's statement that Mr. Jaffe was an expert on DIPs.  He

1   didn't know where that came from.  It comes from the transcript

2   of Mr. Jaffe's deposition.  He describes his experience and his

3   expertise on the subject.

4           In addition, Your Honor, counsel quoted Mr. Jaffe as

5   saying that when he was asked whether he could provide any

6   examples about a one-year DIP, he said, I couldn't -- I can't

7   come up with one off the top of my head.  What counsel didn't

8   read was the next sentence, which says, "But I'll go home and

9   dig some up for you."  In fact, he did that.  There are over

10  nine of them.  They're cited in the briefs filed by Davis Polk.

11  The debtors have filed a different one.  So there were at least

12  nine examples of a one-year DIP that have been in the papers,

13  and they were provided by Mr. Jaffe and Davis Polk.

14          Mr. Dugan and Mr. Jaffe and other witnesses clearly

15  stated that there were economic reasons for the denial of the -

16  - of a term longer than one year.  And in particular, when Mr.

17  Dugan was being examined about why the committee's request,

18  recent request post-term sheet to the steering committee for

19  the ability to pay for additional expenses, when he was asked

20  why that was considered and why it was turned down, he said,

21  because of the same reasons we turned it down before:  We

22  didn't want to take the risk.  And counsel said, oh, so there

23  was no economic reason, it was just you didn't want to do it.

24  And he pushed back.  He said, no, I told you what the reasons

25  were, they were economic reasons --

1          THE COURT:  Okay.  Source of this again, please?

2          MR. ELLENBERG:  It was Mr. Dugan's cross-examination,

3     Your Honor.

4          THE COURT:  Mr. Dugan's cross here?

5          MR. ELLENBERG:  Yes.  And I'm sorry that there's no

6     transcript available.

7          THE COURT:  Right.

8          MR. ELLENBERG:  But he was clearly asked, you know,

9     why did the lenders even now when the committee asked turn down

10    the request for extensions, and he gave an answer that there

11    were economic reasons, and they're the same economic reasons

12    that were described in the testimony of Mr. Jaffe and that were

13    given to the debtors when we were trying to negotiate the term

14    sheet.

15         Now, finally, Your Honor, Mr. Weisfelner said that the

16    lenders are not entitled just to be intransigent and petty,

17    that at some point they need to make a concession.  Your Honor,

18    they're giving us $3.25 billion in new money, they're giving us

19    continued access to 1.5 billion in liquidity; I think that's a

20    pretty good concession.  It's what we need to keep this company

21    alive.

22         Once again, Your Honor, I can't over-emphasize, all of

23    these issues have to be viewed in perspective.  They have to be

24    viewed as part of the larger deal.  We concede it's not

25    perfect.  We would like things to be different.  This is the

1   deal we have.  We urge Your Honor to approve it.

2           Thank you.

3           THE COURT:  Thank you.

4           All right.  I think I have unresolved issues on cash

5   management.  Is that correct?  Where's the U.S. Trustee

6   objector?

7           MR. FRIEDMAN:  Your Honor, I think he may be in the

8   overflow room.  May I just have a moment to go get Mr. --

9           THE COURT:  Yeah.  Tell him I'm waiting here.

10          MS. MARTIN:  Your Honor, in the meantime, can I just

11  point you to a provision in the credit agreement that may

12  answer one of your questions on indemnity?

13          THE COURT:  If it's merely a cite.

14          MS. MARTIN:  It's a cite.  If you look at the

15  introductory paragraph of the credit agreement, which defines

16  "lenders," and then 9.08 of the credit agreement --

17          THE COURT:  9.08?

18          MS. MARTIN:  Right.  It says who's providing the

19  indemnity, which is the defined term of "lender."

20          THE COURT:  Lender under the term?

21          MS. MARTIN:  Lender under the debtor-in-possession

22  credit agreement, right, the term.

23          THE COURT:  Okay.

24          MS. MARTIN:  Not the pre-petition.

25          THE COURT:  As compared to any of the other post-

1  petition facilities?

2        MS. MARTIN:  Right.

3        THE COURT:  Okay.

4        MR. FRIEDMAN:  Thank you, Your Honor.  Peter Friedman

5  from Cadwalader on behalf of the debtors.  We filed our cash

6  management motion and investment guidelines motion on the first

7  day and received interim approval in connection with those.

8  Subsequently, we received a variety of objections from the

9  committee, which we resolved consensually, from Violia

10 Industries, which we resolved consensually, Bank of New York

11 which we resolved consensually, Law Debenture Trust Company

12 which we resolved consensually.  The U.S. Trustee has asserted

13 a few objections, I think particularly to the debtors' use --

14 or maintenance of some accounts under its existing cash

15 management system that are not on their approved -- authorized

16 list of depositories.

17        As we noted in our response papers, it's a small

18 number of accounts that remain.  Seven of them we already

19 intend to close.  A number of the other ones are lock-box

20 accounts which get swept every day into institutions which are

21 approved.  There are certain accounts which are in foreign

22 countries which we -- the debtors use to pay customs and other

23 import duties, trade services, utilities where they're required

24 by local regulations in foreign jurisdictions to use a local

25 bank, so we believe that's appropriate as well.

1          I think there are certain accounts that are under SEC

2    -- I'm not sure if "trusteeship" is the right word, but are in

3    connection with investments the debtor had in the money market

4    fund that broke the buck --

5          THE COURT:  Like reserve funds?

6          MR. FRIEDMAN:  Yes, Your Honor.

7          THE COURT:  Okay.

8          MR. FRIEDMAN:  And so, obviously, there's nothing the

9    debtors can really do about that.  And I believe in the end,

10   there's maybe one account at an institution which is

11   approximately $620,000.  It's an environmental remediation

12   account where disbursements are controlled by counsel.  We just

13   -- we believe it's appropriate to be able to continue that fund

14   -- that account as is at PNC Advisers.

15        With respect to the investment guidelines, I would

16   make two points.  One is that we do believe that with the

17   liquidity, hopefully provided in the DIP and given that -- I

18   think draws under the DIP are $250 million as well as the fact,

19   although the trustee has pointed out that to this point, the

20   debtors don't have excess cash, obviously there is a

21   seasonality of the debtors' business and it's projected that

22   cash will be greater in the year, so there may be excess cash.

23   Obviously, the DIP lenders are hoping there's excess cash so

24   that they'll have their interest paid.  So I believe the

25   investment guidelines are appropriate.  I believe the --

1   there's actually been no substantive objections to the existing

2   guidelines.  There are provisions in the DIP that provide for -

3   - with certainly the lenders' consent and I think if the DIP

4   credit agreement was approved, would permit the debtors to

5   invest in certain things beyond solely -- you know, solely

6   what's statute -- what, you know, what's required in the

7   statute, but that, you know -- but the Court is permitted to

8   authorize.

9        And so I want to keep it simple.  For those reasons,

10  we request entry of the final order with respect to the cash

11  management system and investment guidelines that we've

12  proposed.

13       THE COURT:  Okay.  Mr. Schwartzberg?

14       MR. SCHWARTZBERG:  Your Honor, Paul Schwartzberg for

15  the U.S. Trustee's Office.  I'll keep it quick.

16       With regard to the authorized depositories or non-

17  authorized depositories, we did receive a response just

18  recently, and it appears that there is only one account at PNC

19  Advisers that is in an unauthorized depository.  On top of

20  that, there's the concern that some of the accounts, although

21  we don't know how much is in any of them, are significantly

22  more than that which is the security that has been pledged to

23  the -- in the Southern District.  For instance, on the motion

24  itself, there's $100 million in a Citibank account.  My

25  understanding is Citibank has only pledged about $17 million to

1   the Southern District.  So that excess amount would be at risk.

2            And, similarly, with the investment guidelines that go

3   beyond 345, there's a concern there why can't those be put in

4   things that comply with 345.  To the extent that any benefit is

5   going to be achieved beyond what could be achieved under 345,

6   it hasn't been set forth to us or in any of the pleadings.

7            THE COURT:  All right.  Do you need or want to reply,

8   Mr. Friedman?

9            MR. FRIEDMAN:  Not unless you have any specific

10  questions, Your Honor.

11           THE COURT:  All right, folks.  Frankly, I can't find

12  my pre-argument notes vis-a-vis this matter, but I can rule

13  from memory, and based upon what I've just heard now.

14           The debtors' motion is granted in part and denied in

15  part, and the following are the bases for my exercise of my

16  discretion in this regard.

17           Anybody who's been paying attention to the newspapers

18  in the last year, and who has not been on another solar system,

19  knows the underlying basis for concerns articulated by the U.S.

20  Trustee and as are announced in 345.  Moreover, the fact that

21  the debtor has 37 million bucks tied up in the reserve fund, a

22  failed money market fund, underscores that the U.S. Trustee's

23  objections are hardly frivolous, are reasonable in origin, and

24  that they require much more attention by bankruptcy judges now

25  than they required two years ago, five years ago, or ten years

1  ago.

2          With that said, we have to apply some common sense.

3  Because of liquidity concerns, balances are relatively low now,

4  which eliminates the instantaneous need to respond to these

5  concerns, but we have to pay attention to matters for the last

6  year.  To the extent that bank accounts have to be maintained

7  in foreign jurisdictions, or particular banks to comply with

8  local law, the debtors have authority to comply with that.

9          To the extent that the debtors would be disrupting

10  their relationships with their accounts receivable payors, and

11  would be just raising the risk that if they changed the

12  instructions to the payors collecting receivables, which is

13  important to any business large and small, the benefits of

14  compliance with that would -- with 345 would be far outweighed

15  by the potential prejudice to the estate, and that's

16  particularly so since the accounts are swept on a daily basis.

17          I am waiving 345 compliance on the lock boxes, but I

18  am going to require the debtor to consult with the creditors'

19  committee and the U.S. Trustee before there is any material

20  change in its practice of sweeping its lock boxes on a daily

21  basis.

22          The debtors are to use their best efforts to get the

23  money out of the reserve fund as soon as the compliance

24  proceeding or the enforcement proceeding permits that, and for

25  them to get whatever they can out of the reserve fund when that

1   time comes, and perhaps as the most challenging aspect of this,

2   they are to use their best efforts within the next thirty days

3   to bring any other cash balances, even if they're at Citibank,

4   into alternative depositories that reduce their exposure down

5   to protected limits.  I don't care whether that's with fully

6   345 compliant institutions by collateralization arrangements or

7   by spreading the money among alternative institutions, but the

8   debtors will comply within thirty days of this date, unless by

9   request prior to that time, that period for compliance is

10  extended for cause.

11          I'm going to simply so order the record and invite the

12  debtors to paper that order at their convenience which, given

13  their other burdens, may be several days or more than that from

14  now.

15          MR. FRIEDMAN:  Thank you, Your Honor.

16          THE COURT:  All right.  Mr. Schwartzberg, your time to

17  appeal if you're not happy with that ruling, or for that matter

18  any other parties in interest, will run from the date of the

19  papered order, not from today.

20          MR. SCHWARTZBERG:  Thank you, Your Honor.  So now that

21  we understand, obviously, the Code provides Your Honor

22  discretion in that matter.

23          THE COURT:  Okay.

24          MR. FRIEDMAN:  Your Honor, may I just inquire as to

25  the investment guidelines you approved?

1        THE COURT:  Except insofar as I spoke, I have no

2   problems with anything that was proposed.

3        MR. FRIEDMAN:  Thank you.

4        THE COURT:  Everything else is approved as modified by

5   your deals with other stakeholders.

6        MR. FRIEDMAN:  Thank you, Your Honor.

7        THE COURT:  Okay.  Do we have anything else before I

8   can take a recess now?

9      (No verbal response.)

10       THE COURT:  All right.  Here's what we're going to do,

11  folks.  I'm going to try very hard to give you a ruling today.

12  Obviously, it wouldn't be as extensive today as it would be if

13  I took the time to write, but I think that would be contrary to

14  everyone's interests.

15       It's going to be no earlier than late afternoon, and

16  possibly into the evening.  You can plan your lives

17  accordingly.  I am going to ask my recording staff to have the

18  machine available for a dictated decision today, and I'm going

19  to ask my courtroom deputy either from the courthouse or from

20  home to be in a position to enter an order today if I approve

21  it with the recognition that I'm not in a position now to tell

22  you how extensive any order might be changed from the one

23  that's proposed to me, if in fact I approve it.

24       We're in recess.

25     (Recess taken at 1:05 p.m.)

1    (Proceedings resume at 7:03 p.m.)

2         THE COURT:  Have seats, everybody.  Have seats.

3         You've waited a long time.  Are you rising for a

4    particular purpose?

5         MR. KLEIN:  I'd like to make one quick clarification,

6    Your Honor, if I may.

7         THE COURT:  May I get your name, please?

8         MR. KLEIN:  Darren Klein from Davis, Polk & Wardwell

9    on behalf of Citibank.

10        THE COURT:  Yes, Mr. Klein.

11        MR. KLEIN:  Earlier today, when a lot of paper was

12   flying around and a lot of people were speaking on the fly, I

13   just want to make one quick clarification just so the record is

14   perfectly clear.  We were discussing in the context of ABN

15   AMRO's objection the pre-petition amendment that was recently

16   filed, and does it or does it not impact the borrower.  And it

17   does not.

18        But in that context, questions about indemnity

19   language were raised which Your Honor may recall.

20        THE COURT:  Uh-huh.

21        MR. KLEIN:  And my partner Mr. Huebner said that that

22   indemnity language is a lender indemnity, which is absolutely

23   true.  However, there is similar language in one of the

24   borrower indemnities.  So we just wanted to make this

25   clarification so that the record is full and complete.  And

1  that language relates to indemnifying the term DIP agent solely

2  with respect to the roll-up.

3          And if it's okay with Your Honor, I'd just like to

4  read that language into the record.

5          THE COURT:  Well, is this the language that's there

6  now, or a proposed change that you might make?

7          MR. KLEIN:  This language has been in the term DIP

8  credit agreement since the beginning.  It was in the version

9  filed a week ago.  This has nothing to do with the pre-petition

10  amendment and is solely about the term DIP credit agreement.

11          THE COURT:  Where are you reading from?

12          MR. KLEIN:  Section 10.05 on Page 134.

13          THE COURT:  This in classic corporate form starts in

14  single-spaced text at the top third of the page and runs

15  without a new paragraph for the remainder of that page and two-

16  thirds of the following page.

17          MR. KLEIN:  I would --

18          MR. WEISFELNER:  Your Honor, can I try and put this in

19  context because I think after four hours, we don't need to

20  shuffle things around and, for lack of a better term, hide the

21  salami, not that I'm accusing anybody of anything.  But Your

22  Honor will recall that I popped up --

23          THE COURT:  I remember well.

24          MR. WEISFELNER:  -- and based on certain

25  representations, I sat down.  Although I have a tendency to do

1   that a lot, this was one particular time I popped up and then

2   sat down.  I popped up because my ears perked up on the notion

3   that the borrowers here, our debtor-in-possession would be

4   indemnifying the agent in the context of two very extraordinary

5   circumstances:  One, a contention by ABN AMRO that there was

6   something untoward about the nature of the amendment, that it

7   prejudiced the interests of pre-petition lenders, and that

8   while the debtor shouldn't care, there could be hell to pay

9   among the lenders, or that the debtor may have to care to the

10  extent the debtor is indemnifying the agent.  We were told they

11  weren't.  That's why I sat down.

12          I stand up now because we're told, well, we didn't

13  really mean it, we are indemnifying the agent -- "we," being

14  the debtor -- not only are we indemnifying the agent, but the

15  way we've defined the language, we're indemnifying the agent

16  even if it's determined -- or, I'm sorry, we're defining the

17  agent for all of its activities, including but not limited to

18  the promulgation of this amendment, even to the extent that one

19  were to determine -- or they're asking Your Honor to define

20  that conduct as being something other than gross negligence or

21  willful misconduct.  You're, in effect, making that finding.

22          Your Honor, that's cutting a little too close to the

23  bone in terms of being scary from the proposition of the

24  estate.  This is not, you know, something out there that

25  appears to be hypothetical.  It's something out there that

1  appears to be potentially pretty real.

2        MR. KLEIN:  Your Honor, I don't mean to interrupt, but

3  I feel I was interrupted, and it might make sense just to --

4        THE COURT:  Well, Mr. Klein, if you can make the issue

5  go away, then I'll hear you now.  But I must tell you, Mr.

6  Klein, that the entire decision that I wrote or prepared for

7  dictating, including and perhaps especially my rulings vis-a-

8  vis Ms. Schonholtz's concerns, was premised on what I was told

9  before.  And if what I was told before is no longer the case,

10 then we're going to have to reevaluate the rulings which I am

11 about to deliver on that, and that if it turns out after full

12 argument -- and I'll give people more opportunity for argument

13 -- that Mr. Weisfelner's concerns in that regard continue to be

14 true --

15       MR. KLEIN:  I understand, Your Honor.

16       THE COURT:  -- that's going to impair my ability to

17 approve a provision of that character.

18       MR. KLEIN:  I understand, Your Honor.  I think maybe

19 if I read it, Your Honor might be comfortable with it.  But I

20 would just like to say that the discussion at the time was

21 about the lender indemnity, and Mr. Huebner, bless his heart,

22 he's done many things for this company, but he hasn't very

23 opened the term credit agreement and was not aware of this

24 provision.

25       THE COURT:  Well, you can certainly tell me where the

1    provision it.

2            MR. KLEIN:  It's Section 10.05, Your Honor.

3            THE COURT:  Yeah.  That's what I was talking about

4    that running over two pages.  I need more specificity than

5    that.

6            MR. KLEIN:  Sure.  It begins at the first line on 134

7    with the "Provided further."

8            THE COURT:  Uh-huh.

9            MR. KLEIN:  "Provided further that such indemnitee

10           shall not as to any indemnity be available to the

11           extent that such liabilities, obligations, losses,

12           damages, penalties, claims, demands, actions,

13           judgments, suits, costs, expenses or disbursements

14           resulted from the gross negligence or willful

15           misconduct of such indemnitee, or of any affiliate,

16           director, officer, partner, employee, counsel, agent,

17           trustee, advisor or attorney-in-fact of the indemnitee

18           as determined by a final judgment of a Court of

19           competent jurisdiction."

20           And now we get to the parenthetical:

21           "It being understood and agreed that the design,

22           development, negotiation, documentation, closing,

23           execution or implementation of the transfer or

24           designation of the roll-up loans in and of itself

25           shall not -- shall in no event be deemed to constitute

1          gross negligence or willful misconduct for purposes

2          hereof."

3          I would just make one further note, Your Honor, that

4    this is not indemnifying the lenders.  This provision relates

5    solely to the term DIP agent.

6          THE COURT:  UBS?

7          MR. KLEIN:  UBS.

8          THE COURT:  I'm not going to decide that now.

9          MR. KLEIN:  Thank you, Your Honor.

10          THE COURT:  We have a lot of people in the room who

11   have been waiting six and a half hours for a decision.  I'm

12   going to deliver it.

13          In this contested matter in the jointly administered

14   Chapter 11 cases of Lyondell Chemical Company and its

15   affiliates, the debtors move for final approval of their

16   proposed DIP financing.  Subject to adjustment of a few dates

17   in the milestone provision of Section 6.18 of the term loan

18   agreement and anywhere else provisions of that substance

19   appear, and revisions to make clear my neutrality in the

20   intercreditor disputes which are the subject of the objections

21   by ABN AMRO, all of which are very minor in the scheme of

22   things but are absolutely essential from an institutional point

23   of view and which are matters that I will not waive, I'm

24   approving the proposed financing.

25          There follows a summary, which will probably take

1    about half an hour for me to dictate, of the bases for this

2    ruling:

3          The standards for approval of a facility of this

4    character were set forth by Judge Jerry Venters in his very

5    frequently cited decision in <u>Farmland Industries</u>, 294 BR 855,

6    Bankruptcy Western District of Missouri, 2003.  As Judge

7    Venters set forth the standards, they are:

8          One, that the proposed financing is an exercise of

9    sound and reasonable business judgment;

10         Two, that the financing is in the best interests of

11   the estate and its creditors;

12         Three, that the credit transaction is necessary to

13   preserve the assets of the estate and is necessary, essential

14   and appropriate for the continued operation of the debtors'

15   businesses;

16         Four, that the terms of the transaction are fair,

17   reasonable and adequate, given the circumstances of the

18   debtor/borrower and the proposed lender;

19         And, five, that the financing was negotiated in good

20   faith and at arm's length between the debtors, on the one hand,

21   and the agents and the lenders on the other hand.

22         Rearranging, and for purposes of discussion, in order

23   of increasing difficulty, I'm going to address them in turn.

24         The first that I should address, which is Number 3 in

25   Judge Venter's decision, is whether the financing is necessary;

1   that is, whether the credit transaction is necessary to

2   preserve the assets of the estate and is necessary, essential

3   and appropriate for the continued operation of the debtors'

4   business.  In that regard, there can be no doubt.  It's not

5   disputed by anyone.  The debtors absolutely need the requested

6   funding, and without it, they would quickly liquidate.  This

7   isn't a matter of judgment or opinion; it's a matter of reality

8   and is wholly undisputed.  This financing is of the highest

9   importance that one could possibly imagine with respect to this

10  estate.

11          The second requirement is that the financing is in the

12  best interests of the estate and its creditors.  And, certainly

13  from an overall perspective, that, once more, cannot be

14  doubted.

15          The third factor, as I'm ordering them now, which was

16  the first that those -- of those that Judge Venters

17  articulated, was that the proposed financing is an exercise of

18  sound and reasonable business judgment.  I've considered the

19  testimony with respect to the efforts by the debtors and their

20  professionals to get this deal put together and to negotiate

21  the best terms they could.  And I'm satisfied that this

22  requirement has likewise been satisfied.

23          I noted before at the DIP preliminary hearing, and my

24  view hasn't changed, that the terms that are now available for

25  DIP financings in the current economic environment aren't as

1   desirable as they were when I ruled on similar motions earlier

2   in my tenure on the bench.  But I can't find any fault with

3   respect to the efforts in trying to -- the efforts by the

4   estate in trying to do and get the best deal it could, and I

5   can't ignore the facts as to the present state of the financial

6   markets which, understandably, were a major element of the

7   evidence and argument in the hearing that took place before me

8   over the last three days.  See, for example, Jaffe declaration,

9   Paragraph 9, and the designated deposition testimony that was

10  quoted at that point in the declaration.

11          I found Mr. Dugan to be a very credible witness, even

12  after cross-examination, and though I didn't see Mr. Jaffe live

13  and had to rely on his testimony that I read, I see no basis

14  for not accepting his testimony as well.  They described the

15  state of the credit markets and the challenges the debtors

16  faced in trying to get the financing they did.

17          Talking about some relatively minor inconsistencies in

18  testimony as to who asked for what and when; what do we know

19  from that?  Among other things, different lender

20  representatives, businesspeople and counsel, dealt with

21  different borrower representatives, businesspeople and counsel.

22  I think it's true that there are some seeming inconsistences

23  between the recollections of the lender witnesses, Jaffe and

24  Dugan, and of Mr. Bigman as set forth to me in this hearing.

25  But I think that any inconsistencies in that regard are not

1  material by reason of Mr. Dugan having missed two important

2  meetings in the early days of the negotiations, and,

3  importantly, by my recognition of the role of the

4  professionals, like counsel and Evercore in the negotiations.

5  See, for example, Jaffe deposition, Page 32 to 33 describing

6  push-back from Evercore.

7         I agree with the creditors' committee that when

8  management is conflicted in making a business decision it can

9  no longer rely on the business judgment rule, and instead, its

10  transactions have to be evaluated on a total fairness strict

11  scrutiny type of standard.  But I find as a fact that there was

12  no material management self-interest affecting this financing

13  as analyzed, negotiated, or ultimately agreed to by the

14  debtors.

15         The fourth requirement that I need to focus on, Number

16  5 in Judge Venters' list in <u>Farmland</u> is that the financing

17  agreement was negotiated in good faith and at arm's length

18  between the debtors, on the one hand, and the agents and the

19  lenders on the other hand.  Good faith is important as one of

20  the <u>Farmland</u> factors, and also because a good faith finding is

21  important under Section 364(e) of the Code if an Appellate

22  Court is asked to reverse or modify a decision authorizing the

23  financing or the grant of the liens.

24         Good faith is measured with respect to the good faith

25  of the lender as contrasted to that of the borrower.  While

1   there were early questions articulated as possible good-faith

2   issues with respect to this financing, and I permitted

3   discovery to depose lender agent personnel to investigate any

4   questions in this regard, no evidence ultimately was presented

5   to me to have any basis for me to question anyone's good faith.

6   In particular, I listened very hard for indications that the

7   lenders had demanded terms that they knew in advance would

8   result in preordained default or that they were looking to do

9   this financing for any ulterior purpose, for example, for

10  reasons other than a good-faith desire to get paid back, to

11  make money on interest and fees, and to protect pre-petition

12  positions, all of which are understandable and acceptable

13  motivations for a DIP lender to do a deal.  There were no such

14  indications here.

15       It's hard to prove a negative except by the

16  conspicuous absence of facts to the contrary, and that's what

17  we have here.  Good faith is a matter as to which we judges

18  make a good-faith finding when, after a fair opportunity to

19  show that good faith isn't present, we don't see or hear

20  anything to lead us to believe that parties were proceeding in

21  any way other than in good faith.  That being the case here, I

22  find the good-faith requirement satisfied.

23       The last requirement, Number 4 in the _Farmland_ list,

24  is that the terms of the transaction are fair, reasonable and

25  adequate, given the circumstances of the debtor/borrower and

1   the proposed lender.  This factor is where the creditors'

2   committee has the greatest concerns, and where the issues most

3   worthy of discussion exist.  I'll discuss the various aspects

4   of the issues raised under this factor in turn.

5           Turning first to covenants, covenants, especially

6   financial covenants, are trip wires to give earlier warning of

7   more serious defaults, such as payment defaults, and permit

8   corrective measures or exercises of remedies.  As a general

9   matter, they're normally acceptable if they're not calculated

10  in advance to result in preordained default or have that

11  effect.  There was extensive lender testimony as to the reasons

12  for the financial covenants, for example Citibank witness Jaffe

13  at Paragraphs 10 through 12 of his declaration, and I find the

14  financial covenants to be reasonable.

15          The next category deals with the provisions relating

16  to changes in management, or as the issue was articulated in

17  one of the creditor committee briefs, mechanisms to rest

18  operating control.  Given the surprises that resulted from the

19  debtors announcing their financial performance so late in 2008

20  and the material drop in operating performance, all of the

21  debtors' creditors, including their lenders, would have

22  understandable needs and concerns to take a look at management.

23  That's not necessarily an indictment of incumbent management.

24  Changing or supplementing management is considered in many, if

25  not most, Chapter 11 cases.  But the lenders expanding on

1  creditors' usual desire to at least consider management changes

2  was not unreasonable.

3          My more serious concern, as I noted in oral argument,

4  was not reserving the right to change management, but the

5  effect of the reservation of that right on management conduct

6  during the Chapter 11 case, especially management's taking side

7  on intercreditor issues in connection with the formulation of a

8  plan.

9          Provisions of that character would, to be sure, tend

10  to discourage management from taking positions that would get

11  lenders angry, but, here, the role of the independent

12  directors, the role of the debtors' professionals, the debtors'

13  prior conduct to date, and the fact that changes of management

14  are a possibility in every Chapter 11 case collectively cause

15  me to believe that any incidental effects of the type where

16  management might feel pressured to side with the lenders on

17  plan formulation issues are not material here.

18          Next, a matter once of concern to the creditors'

19  committee was the expensive pricing for this facility;

20  likewise, the related economic turns which were hardly ideal,

21  such as a high rate of interest and the need to assume negative

22  arbitrage on rolled up money.  Ultimately, however, recognizing

23  the state of the financing markets at this point in time, and

24  the testimony I heard that describing the current market as a

25  difficult market in which to obtain debtor financing statement

1  -- debtor financing, would be a, quote, "massive

2  understatement," the committee did not appear to be pressing

3  this objection.

4         In any event, by reason of present market conditions,

5  as disappointing as the pricing terms are, I find the

6  provisions reasonable here and now.

7         Folks, I should say that every decision we bankruptcy

8  judges issue in this district, including dictated decisions

9  after trial, tends to develop a life of its own and to become

10  the precedent for the next case.  I assume, or at least hope

11  that economic conditions in this country, including freeze-ups

12  of the lending markets and the very limited present

13  availability of credit will ultimately improve.  What I'm of a

14  mind to recognize and respect now in the way of economic

15  reality will be trumped by the facts on the ground with respect

16  to economic conditions at the time of the next financing I'm

17  asked to approve.  And people should be wary of using this case

18  as a precedent in the next one that comes down the road,

19  especially if that's the case after the liquidity markets have

20  loosened up.

21         The next area where specific provisions are a matter

22  of creditors' committee concern is characterized as provisions

23  that are devices to stymie inquiry.  Those concerns relate to

24  the budget given to the creditors' committee to investigate

25  potential causes of action against lenders on behalf of the

1  estate in the time allowed to the creditors' committee to

2  commence litigation on behalf of the estate if its

3  investigation deems that to be warranted.

4          Provisions of the type that caused the creditors'

5  committee to have those concerns would have been disapproved by

6  me if they hadn't been changed between the time they were first

7  proposed and now, but as modified they're satisfactory.  One of

8  the troublesome provisions would have allowed sixty days for

9  the creditors' committee to investigate potential claims while

10 unduly limiting the right of the creditors' committee to ask

11 for an extension of time for cause.  A provision of that

12 character is required under Local Bankruptcy Rule 4001-2(f).

13         Now the provision still limits the grounds on which an

14 extension can be requested, but it expands the time to June 1,

15 ninety days from now, resulting in a total period of about 135

16 days from the time the creditors' committee's counsel was

17 appointed.  As modified, it's okay.

18         Another provision would have required commencing the

19 suit within the required time when doing so would have first

20 required securing STN authority eating up valuable time.  It

21 was modified to provide that the time requirement would be

22 satisfied if a motion for STN authority were filed within the

23 time limit, along with a proposed complaint.  As STN motions

24 can often take a long time to brief and argue, even when

25 there's a strong likelihood that STN authority would be given

1   and the grounds for opposing the _STN_ motion barely meet Rule

2   9011 standards, thus, that was an important change that had to

3   be made.  But now that it's been made, it's satisfactory to me.

4           Finally, the originally proposed twenty-five-thousand-

5   dollar budget for creditors' committee investigation was

6   ridiculous in a case of this size, but it was changed to

7   $250,000 in the revised final order, and the language was

8   changed to provide that it could also be used for prosecuting

9   any such claims when lenders don't always agree to fund

10  prosecution of the claims against them as contrasted to the

11  essential investigation of the existence of such claims.  As

12  revised, it's satisfactory.

13          The most serious issues with respect to the terms of

14  the facility were and are obvious.  They resulted from the

15  financing's one-year duration, or to be exact, duration of

16  about two weeks short of one year, and the milestones were set

17  up working backwards from that date.  The maturity date is now

18  December 15, and to state the obvious, we're now about six

19  weeks into the case and the clock has been ticking.

20          I understand the committee's anxieties in this regard

21  which are hardly imagined on their part.  They're real, and

22  they've been a matter of concern to me, as well.  But the

23  debtors, who don't like it either, agreed to the maturity date

24  and the milestones as a matter of necessity and as a matter of

25  what I've already determined was appropriate business judgment.

1    Now, looking at these provisions under a more of a

2    strict scrutiny style of reasonableness, I find the maturity

3    date, the duration of this facility to be sufficiently

4    reasonable for me not to risk the loss of the facility by

5    disapproving it.

6    There was much testimony relating to the maturity

7    facility and ultimately satisfactory reasons were provided for

8    requiring it.  Jaffe testified that we thought it was a market

9    term, that the lenders regarded it as justified by reason of

10   having little long-term visibility into the company because

11   numbers provided by the debtors were changing constantly, and

12   that one year was sort of a market norm reflecting a new norm,

13   new reduction from earlier cases in which DIP facilities

14   commonly were two years.

15   It also was clear that the debtors pushed back to try

16   to secure a longer term, though I see no evidence that they, as

17   contrasted to the creditors' committee, pushed to get a paid-

18   for option to extend, but the debtors and their professionals

19   were unsuccessful by reason of the lenders declining to agree.

20   The lenders have also submitted evidence of other

21   facilities of one-year duration.  I'm not in a position to make

22   a factual finding that one-year facilities are now the norm,

23   even in the present environment, or, especially, that they

24   would or should be the norm in better economic climates.  The

25   better way of putting the factual finding that I think I can

1  make is that they are now not atypical.  I can and do find that

2  a one-year facility is not now unreasonable.  As <u>Farmland</u>

3  states, we look at whether the terms are reasonable, given the

4  circumstances of the debtor/borrower and the proposed lender.

5      I recognize, folks, that when I say that the one-year

6  facility is not now unreasonable, that an equally satisfactory

7  way of putting it is that it is reasonable.

8      Milestones by themselves are inoffensive, but they can

9  be such, that is they can be offensive if they are unworkable

10 from the outset or are designed to put the debtor into default.

11 The evidence here appears to be undisputed that the milestones

12 were fixed by going backward from the maturity date.  Here, all

13 seem to agree that they leave little room for error.  But the

14 debtors' evidence and representations were that they can be

15 achieved.  And there was no evidence that the milestones were

16 put into place with the expectation or hope that they could not

17 be met.

18     I find the milestones reasonable as a conceptual

19 matter.  And subject to my institutional needs, which I'll

20 discuss momentarily, they are satisfactory as to their

21 specifics.

22     As I said, I have important institutional needs which

23 will result upon my insistence on revisions in the provisions

24 relating to milestones and a corresponding adjustment in the

25 maturity date to meet present obligations on my part as to

1  which I'm going to be out of town on some of the relevant

2  dates, and more importantly, demands on the Court in this case

3  and the increasing number of other major filings that this

4  Court has received in this very, very bad economic environment.

5       Major Chapter 11 cases are coming into this court on a

6  nearly daily basis providing material challenges to the judges

7  of this court in managing their case loads and giving people

8  hearings when parties want them.  I've already had two filings

9  with more than a billion dollars in debt this year.  In mega

10  cases, which used to be relatively unusual in this district,

11  are now very close to being the norm.  So are contested

12  confirmation hearings.  And in this economy, it's at least

13  foreseeable, if it's not also likely, that things are going to

14  get worse.

15       I will not allow debtors in a case on my watch to go

16  in default on the facilities they need to survive because my

17  calendar gets jammed or because of limits on my ability to push

18  myself harder.  I'll give you the language I'll insist on.  It

19  will basically obligate the debtor to commence the proceedings

20  required under the milestones by their deadlines, unless I have

21  to adjust that by the need to schedule my calendar, and it will

22  give me the flexibility to hold multi-day hearings and to

23  schedule them, and to allow me to give the matters on my watch

24  the quality decisions you all deserve.

25       You will remember, perhaps cynically, what I was told

1    about how long this financing hearing would take.  I will

2    confess that I didn't really believe it then, and eight and a

3    half years on the bench in this job have caused me to have a

4    more realistic understanding of what litigation takes than the

5    milestones even as redrafted in this case seem to reflect.

6         The practical effect of the provisions I'll insist on

7    could bring the facility closer to its originally discussed

8    one-year maturity, or even a few days passed that, depending on

9    what my calendar looks like at the end of this year, and, of

10   course, the extent, if any, to which there might be a several-

11   day confirmation hearing and/or the need on my part to issue an

12   extensive decision.

13        I don't know in practice whether the changes I'll

14   insist upon are going to change the schedule or not, and while

15   Jaffe said he didn't regard the difference between a December

16   15 and an actual one-year maturity as material, you know, maybe

17   there's some jerk in the lending group who thinks it does.  But

18   either way, you're going to have to live with it.

19        The changes I'm going to insist upon are as follows,

20   and I'll give one of your folks a copy of the markup to make

21   sure that you draft it properly:

22        In Subparagraph C where it says, "The hearing is not

23   concluded by October 15," it's going to be changed to 23rd.

24   And where it says that, "Such deadline shall be deemed extended

25   by up to ten days," it shall be changed to say, "extended

1   through October 30."

2          In Paragraph D, where it says, "With a reasonable

3   belief that such confirmation could be obtained at such hearing

4   by such date," the word "commencing" is going to be inserted

5   before "by such date."

6          In the second-to-last line where it says, "shall be

7   extended by up to ten days," it's going to be changed to

8   twenty-one days.  And at the end, it's going to say, "And the

9   maturity date shall be adjusted by a like amount."

10         Lenders, if you don't like it, you can give me a new

11  facility.

12         Other matters:  Liens on avoidance actions.  The

13  creditors' committee also objects to granting liens on

14  avoidance actions and to allowing super pri entitlements to

15  reach avoidance action proceeds.  Ultimately, I find what was

16  done here to be acceptable, but I need to explain why.

17         The lenders argued that they drafted their entitlement

18  in this area to only obtain a lien on the proceeds of avoidance

19  actions and not liens on the actions themselves.  Drafting to

20  recognize that distinction affects who gets to control those

21  actions, and that's no small thing.  But it isn't the only

22  issue.

23         The more important issue, of course, is who gets the

24  economic benefit of any avoidance actions that turn out to be

25  successful.  As I said in my 2008 decision in Applied Theory,

1   2008 Westlaw 1869770:

2           "There is no hard and fast prohibition against

3           granting liens on avoidance actions or granting super

4           pri claims that would have the same economic

5           substance, that is, allowing the super pri to siphon

6           off value that would otherwise be available for admin

7           claims or general unsecured claims.  Rather, what we

8           look to do is to see whether granting a lien on

9           avoidance actions is appropriate to secure the post-

10          petition lending or to provide a substitute lien or

11          alternative means to provide adequate protection."

12          As Mr. Huebner properly observed, proceeds of

13  avoidance actions are property of the estate.  So there's

14  nothing inherently wrong with allowing them to be used to

15  satisfy claims in order of priority.  But he also recognized

16  pre-petition security interest did not attach to avoidance

17  action proceeds.  So the real issue here is whether I should

18  allow adequate protection liens and super pri entitlements to

19  latch onto them now.  That's a fact-intensive inquiry, but here

20  I think that under the facts here it's appropriate to allow

21  them to be available for the purpose of securing post-petition

22  loans and providing adequate protection, and I'm going to

23  permit them now.

24          That's especially so since I note now, as I noted at

25  the interim DIP hearing, that all payments under the rubric of

1  adequate protection are, quote, "on account of," quote,

2  adequate protection entitlements, and they're only to

3  compensate pre-petition secured lenders for the diminution, if

4  any, of the value of their collateral.

5       To the extent we're talking about lenders whose only

6  claim to avoidance proceeds is by reason of adequate protection

7  entitlements, the lien on avoidance action proceeds is subject

8  to the same limitations, of course.

9       506(c) waivers:  I also agree with Mr. Huebner that,

10 for the most part, the purpose of 506(c) is to protect assets

11 not subject to liens from expenditures for the benefit of

12 preserving secured creditors' collateral.  I note that he said

13 that was the, quote, "primary," purpose, and I said, quote,

14 "for the most part," quote, because there may be circumstances

15 where a case is doing badly and is being liquidated in Chapter

16 11 or converts to Chapter 7 at a time when all of the value

17 goes to the secured creditors, and the debtor or Chapter 7

18 trustee is effectively running the case for the secureds.

19       In that event, we often require that the secureds pay

20 for the continuing maintenance of the case for their benefit.

21 And if the secureds don't want the judge to simply give them

22 relief from the stay so they can liquidate their collateral on

23 their own out of court, they have to pay for the expenses of

24 having the trustee maintain and liquidate their collateral for

25 them.  So, normally, we permit 506 waivers if, but only if,

1   they have appropriate carve-outs.  Here, we have that, and the

2   506 waivers are thus permissible.

3            Thus, I don't need to decide and do not decide whether

4   a creditors' committee has the standing to object to 506(c)

5   waivers in instances in which such waivers might not be

6   appropriate under the facts of those other cases.  I heard the

7   lenders' contention that only debtors can be heard on 506

8   waivers after Hen House.  While I have some material doubts as

9   to whether the lenders are right in that contention, since

10  there is a Section 1109 of the Code that gives parties in

11  interest the right to appear and be heard on any issue, I don't

12  need to decide that today.

13           That completes my discussion of the Farmland factors.

14  Subject to the adjustment of the milestones and the maturity

15  date to permit the management of my calendar and my ability to

16  hold multi-day hearings and decide disputed matters, the

17  creditors' committee's objections are overruled.

18           Turning now to the objections by the Bank of New York.

19  Bank of New York, as indenture trustee under the two indentures

20  for the ARCO and Equistar noteholders, also objects to the

21  financing.  For the reasons that follow, its objections, too,

22  will be overruled.

23           First, Bank of New York argues that there has been an

24  insufficient showing of benefit to Lyondell Chemical Company,

25  ARCO's successor, or Equistar.  I reject that as a finding of

1  fact, or to the extent applicable, as a mixed question of fact

2  and law.  Neither company could survive without the DIP

3  financing proposed here, and each would then have to liquidate.

4       Additionally, there will be many periods when Lyondell

5  Chemical Company and Equistar will be net takers, borrowers

6  under the DIP facility.  Though that will not always be the

7  case, and there may be periods when one or another of them is a

8  net lender to non-debtor affiliates, they will be protected by

9  the intercompany obligations that have the second highest

10 liens.

11      Also, as I found in my preliminary injunction decision

12 earlier this week, and find again on independently submitted

13 evidence here, the debtors function as an integrated group of

14 affiliated companies, and we can't measure the benefits to any

15 individual debtor solely by the amount of borrowed cash that's

16 in its till at any particular period of time.

17      Bank of New York also argues that it isn't getting the

18 same adequate protection that other pre-petition lenders are

19 getting, and that this is improper.  Well, the premise is

20 correct; the conclusion isn't.  Bank of New York is entitled to

21 adequate protection, but there's no requirement in the Code

22 that the adequate protection provided to each party otherwise

23 entitled to protection be identical.  Rather, each party

24 entitled to adequate protection is entitled to whatever it

25 takes to protect its interest; no less, no more.

1    Here, Bank of New York has received a lien on a much

2 greater collateral base, and while its obligors are liable for

3 a considerably larger body of indebtedness, that being the

4 price they pay for staying alive, the evidence shows an equity

5 cushion of about nineteen percent nevertheless, well in excess

6 of the ten percent that we customarily require as a

7 satisfactory equity cushion.

8    Then, Bank of New York argues concerns arising from

9 argued substantive consolidation.  While Bank of New York

10 contends that the DIP results in a de facto substantive

11 consolidation, I don't agree.  Intercompany obligations remain

12 and they are secured at a very high level, protecting the

13 ability to recover from other debtors.

14    Bank of New York also objects to provisions in the

15 documents under which it would have to waive its right to

16 marshaling.  Its marshaling right was a pre-petition right in

17 connection with debt that was primed and for which it now has

18 adequate protection.  And since it now has a lien on all of the

19 debtors' assets, including ABL collateral on which it never had

20 a lien before, there will be no occasion to apply marshaling

21 with respect to the post-petition period.

22    Bank of New York also objects to the inability to

23 participate, presumably not on its own behalf but, rather, the

24 inability to participate of its various public noteholders in

25 the roll-up loan.  I find as a fact that the roll-up loan was

1   not offered to provide adequate protection, but, rather, was an

2   element of the consideration offered to those willing to lend

3   new money that the debtors badly needed.  As Bank of New York

4   was already secured -- excuse me, adequately protected, it was

5   entitled to no more in the way of adequate protection under

6   this rubric.

7         For all of these reasons, Bank of New York's

8   objections are overruled.

9         Turning now to the objections of Law Debenture Trust

10  Company:  Law Debenture Trust, indenture trustee on behalf of

11  holders of unsecured notes issued by debtor Millennium America,

12  also objects to this facility.  It argues that its equal and

13  ratable clause requires it to be granted a lien to keep it *pari*

14  *passu* with newly issued secured debt and expressly or impliedly

15  that it's entitled to adequate protection as a result.

16        In In Re Allegheny International, 93 BR 907, Judge

17  Cosetti of the Western District of Pennsylvania dealt with this

18  exact issue.  There, too, indenture trustees had provisions in

19  their bond indentures that provided that if the bond issuer was

20  granted a security interest in their assets, the debentures

21  would be secured equally and ratably.

22        When the debtors proposed to grant those security

23  interests in the course of the Allegheny International Chapter

24  11 case as part of a 364 motion, they asked for adequate

25  protection for the security interests that would arise by

1    reason of those clauses in their indentures.

2            Judge Cosetti ruled that the equally and ratably

3    clauses were more than negative pledges and that they

4    constituted an equitable lien, but he noted that whatever lien

5    the indenture trustees had was unperfected and couldn't be

6    perfected because of the automatic stay.  He stated:

7            "Simply stated, the trustee or debtor-in-possession

8             has the power of a judicial lien creditor as of the

9             date the bankruptcy petition is filed, including the

10            right to avoid any liens that are unperfected as of

11            the filing date.  Since unperfected liens are

12            avoidable, then the interests of the indenture

13            trustees, in this case First Chicago and U.S. Trust,

14            must also be avoidable."

15           He went on to say:

16           "For the above reasons, First Chicago's argument that

17            it has an interest in property which is entitled to

18            adequate protection pursuant to 11 U.S.C. Section 363

19            must fail."

20           And I'm skipping:

21           "Since the alleged lien is voidable, First Chicago

22            lacks an interest in property entitled to adequate

23            protection."  93 BR at 909 to 910.

24           Judge Duffy held to the same effect in this district

25    in In Re McLean Industries, 162 BR 410 at Page 421, citing,

1   among other authority, <u>Allegheny</u>.  As Judge Duffy held, a

2   restrictive covenant is not a perfected security interest or a

3   property interest that's valid against a debtor-in-possession

4   or trustee under the Bankruptcy Code.

5        Nor is there a basis for Law Debenture's other

6   contention that Millennium America was bound by covenants in

7   its documentation effectively capable of being enforced by

8   specific performance that it could enforce against the debtors

9   or the lenders, even though those covenants might impose caps

10  on other debt.  Except in the rarest cases, and certainly not

11  in financial contracts, we don't enforce by specific

12  performance covenants in pre-petition documentation.  Upon the

13  debtors' default, the bonds accelerated and rights to specific

14  performance ceased.  And the underlying obligations were a

15  financial accommodation which were incapable of assumption and

16  which, without doubt, the debtors never assumed.

17       As the last of the written objections, ABN AMRO has

18  filed a limited objection to the approval of the term loan

19  facility.  It doesn't raise any objections to the ABL facility.

20  ABN AMRO argues that language in Paragraph 10(e) of a Draft

21  Amendment No. 2 to documentation relating to the pre-petition

22  senior secured loan to which debtor Lyondell Chemical is a

23  party, but which doesn't substantively affect Lyondell or any

24  of the other debtors for which Lyondell is agent, adversely

25  affects ABN by reason of potential dilution of ABN AMRO

1   recoveries from non-debtors.  Thus, it asks me to delete

2   language in the proposed approval order that might prejudice

3   ABN AMRO's rights in that regard and ask me to maintain

4   neutrality with respect to intercreditor issues.

5        The debtors argue that this is purely an intercreditor

6   issue and that I should not get involved in it for that reason.

7   They further argue that it's not a Section 364 issue and

8   doesn't go to approval of the facility.

9        I agree with the debtors in that regard.  I agree that

10  it is indeed an intercreditor issue, that it does not involve

11  Section 364 or approval of the facility, and that I should not

12  get involved in it.  And I also think that, for that reason, I

13  should remain neutral.  And because of that, I believe that I

14  should delete any language in my order that tips the scales in

15  any intercreditor dispute and that, upon request, I should

16  include appropriate language in some order, either this one or,

17  if it's more practical in another one, not necessarily

18  requiring changes to be made in underlying documentation that

19  makes it clear that by my authorizing any of the debtors to

20  execute the loan documentation I'm not deciding any issues that

21  might arise solely between other creditors.

22       Thus, the text in Section 10(e) on Pages 34 to 35 of

23  the document that I was provided should be deleted.  If you can

24  draft mutually satisfactory language for some order, either

25  this order or, if it's more practical, a supplemental one that

1  makes it clear what I'm not deciding and that explicitly states

2  and confirms my intent to stay neutral, I'll approve it.

3      Turning last to the objection of the taxing

4  authorities.  By an oral objection that I considered, even

5  though it failed to comply with my earlier orders, certain

6  taxing authorities who have liens on debtor property to secure

7  payment of taxes due to them object to the DIP facility priming

8  their tax liens.  Their concerns as to pre-petition liens were

9  consensually resolved, but they object insofar as the DIP would

10  prime any post-petition liens they might have if the debtors

11  failed to make necessary tax payments to them in the post-

12  petition period.

13      In essence, each of the lenders in the tax

14  authorities' claims the first priority to the proceeds of

15  assets that are the subject of their respective claims of lien.

16  I rule that the priority must go to the lenders and, thus, that

17  the tax authorities' oral objection must be overruled.

18      I do for two reasons:  The first, and more important

19  of them, is the supremacy clause of the United States

20  Constitution, and because a valid exercise of the federally

21  granted bankruptcy power must take priority over state law to

22  the extent inconsistent.  In Butner v. The United States, 440

23  U.S. 48, the Supreme Court stated:

24      "The federal Constitution, Article 1, Section 8, gives

25      Congress the power to establish uniform laws on the

1    subject of bankruptcy throughout the United States.

2    In view of this grant of authority to the Congress, it

3    has been settled from an early date that state laws,

4    to the extent that they conflict with the laws of

5    Congress enacted under its Constitutional authority on

6    the subject of bankruptcies, are suspended."

7    440 U.S. at 54, Note 9.

8    Second, perhaps as a flaw in the drafting of the

9    Bankruptcy Code, one of the many drafting flaws in the 2005

10   BAPCPA amendments, but nevertheless, by reason of the Code's

11   seemingly unambiguous language, the taxing authorities' liens

12   that are subject to the liens I can grant under Section

13   364(c)(1).

14   Section 364(c)(1) of the Code provides in relevant

15   part:

16   "If the trustee is unable to obtain unsecured credit

17   allowable under Section 503(b)(1) of this Title, as an

18   administrative expense, the Court, after notice and a

19   hearing, may authorize the obtaining of credit or the

20   incurring of debt with priority over any or all

21   administrative expenses of the kind specified in

22   Section 503(b) of this Title."

23   Then we have to go back to look at the priorities that

24   are set forth in Section 503(b).  It provides, in relevant

25   part:

1           "After notice and a hearing, there shall be allowed

2           administrative expenses, including any tax incurred by

3           the estate, whether secured or unsecured, including

4           property taxes for which liability is in rem, in

5           personam, or both."

6           Of course, the debtors showed long ago that they

7      couldn't get unsecured credit as an administrative expense.

8      And I don't think there's any real doubt that the taxing

9      authorities' taxes are covered under Section 503(b)(1)(b).

10     When Section 503(b)(1)(b) was added to the Code as part of the

11     2005 BAPCPA amendments, taxes of the character in question here

12     were picked up in Section 364(c)(1) by its incorporation of

13     Section 503(b)(1) as amended -- 503(b) as amended.  Forgive me.

14     And Congress provided that a Section 364(c)(1) lien could trump

15     liens of the type covered under Section 503(b)(1)(b).

16          Now, folks, I'm not sure if that was intentional.

17     It's my impression that the BAPCPA amendments added the

18     language in 503(b)(1)(b) at the behest of lobbyists for the

19     taxing authorities, and presumably the lobbyists were trying to

20     give taxing authorities a leg up rather than to hurt their

21     clients.

22          But we judges look to the Congressional intent, not

23     the lobbyists, and the Congressional intent is expressed by the

24     statutory language.  Where statutory language is unambiguous,

25     we follow it.

1    While Section 364(d) of the Code would at first glance

2    also seem to apply, as the lenders would additionally be

3    getting a priming lien as to which they then have to offer

4    adequate protection, the lenders may, if they wish, rely on

5    Section 364(c)(1), as Congress has by the more specific

6    language of Sections 503(b) and 364(c) indicated how, quote,

7    "property taxes for which liability is in rem," are to be

8    treated.

9    Thus, the lenders may assert priority under Butner and

10   Section 364(c)(1).

11   Finally, to the extent other objections were raised

12   and not resolved, and I haven't discussed them, they're

13   overruled.  All right.

14   Not by way of re-argument, are there any mechanical

15   issues that I need to deal with?  Mr. Davis, you rose a long

16   time ago.

17   MR. DAVIS:  No, Your Honor.  I did rise, but I rose

18   because I wanted to -- I know that this case has placed upon

19   Your Honor, your law clerks and your staff tremendous burdens,

20   in particular in connection with this DIP financing motion and

21   in connection with the preliminary injunction motion.  On

22   behalf of the debtors, and I think I'm probably speaking on

23   behalf of all parties in interest, we thank you for your time

24   and attention to these critical matters in this case.

25   THE COURT:  That's my job, Mr. Davis, but thank you.

1      MR. WEISFELNER:  Your Honor, I wanted to rise to

2  express the exact same sentiment and to congratulate our

3  adversaries on a case well presented and well argued.

4      THE COURT:  Very well.  Thank you.

5      All right.  Mr. Siegel?

6      MR. SIEGEL:  Just wanted to chime in and say the same

7  thing, Your Honor.  Thank you.

8      THE COURT:  Sure.

9      UNIDENTIFIED:  Your Honor, I'm going to feel left out

10  if I don't as well, but we do thank you very much for your time

11  on this matter.

12      THE COURT:  Okay.  Well, thanks.  You don't need to

13  repeat yourselves at this point.

14    (Laughter.)

15      THE COURT:  How do you folks want to deal with the

16  finalization and submission of the order?  Do you want it

17  entered tonight?  Ms. Blum is waiting for you, but out of

18  courtesy to her, if it's going to take more than maybe half an

19  hour or something like that, I would like to consider whether

20  we can either e-mail it to her for her to enter later tonight,

21  or for you to polish it over the weekend.  I'm going to be here

22  on other matters, coincidentally involving this case, tomorrow

23  and Sunday.  You can e-mail stuff to my chambers and/or to Ms.

24  Blum, and I think, but I'll have to confirm for you, that she

25  can enter it over the weekend and/or if you want me to so order

1  the record, I'll do whatever your reasonable needs and concerns

2  can best be accomplished by doing.

3        Mr. Davis?

4        MR. DAVIS:  Your Honor, if you would so order the

5  record?  And what I would like to do in light of all of the

6  time, attention that this Court and Ms. Blum have put to this

7  matter over the last number of days, I would suggest that we

8  allow parties an opportunity to take a look one last time at

9  the order and that we ask that anyone provide us comments by

10  tomorrow at 10:15 -- at about ten o'clock in the morning, and

11  we'll endeavor to get the order entered over the weekend.  I

12  think that will be satisfactory for our purposes.

13        THE COURT:  All right.  Fair enough.

14        I'll provide to you, Mr. Davis, or your designee the

15  wording that I changed on Section 6.18.

16        MR. DAVIS:  Thank you, Your Honor.

17        THE COURT:  Any further business?

18     (No verbal response.)

19        THE COURT:  Then we're adjourned.

20     (Proceedings concluded at 8:08 p.m.)

21                              *****

22

23

24

25

1    CERTIFICATION

2         We certify that the foregoing is a correct transcript

3    from the electronic sound recording of the proceedings in the

4    above-entitled matter.

5

6    Transcriptionists:  Cathryn Lynch, NJ Cert. No. 565, Sherri

7    Lynn Breach, AAERT Cert. No. 397, Coleen Rand, AAERT Cert. No.

8    341

9

10

11
_____    March 5, 2009
12   Coleen Rand, AAERT Cert. No. 341
     Certified Court Transcriptionist/Agency Director
13   For Rand Reporting & Transcription, LLC

14

15

16

17

18

19

20

21

22

23

24

25